IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES BOYLE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 1080 |
| | ) | |
| v. | ) | Judge Elaine Bucklo |
| | ) | |
| UNIVERSITY OF CHICAGO, *et al.*, | ) | Magistrate Judge Denlow |
| | ) | |
| Defendants. | ) | |

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Defendants, THE UNIVERSITY OF CHICAGO, LARRY TORRES, CLARENCE E.
MOORE, OSCAR GALARZA, MICHAEL KWIATKOWSKI and ARTHUR GILLESPIE, by
their attorney, Steven M. Puiszis of HINSHAW & CULBERTSON LLP, and pursuant to Local
Rule 56.1, submit the following as their Statement of Undisputed Facts[1] in support of their
Motion for Summary Judgment:

### I. Parties, Jurisdiction And Venue

1.      This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §1331
(Ex. A, ¶1), and venue is proper under 28 U.S.C. §1391 (Ex. A, ¶2).

2.      Charles Boyle, is a resident and citizen of the State of Illinois (Ex. A, ¶1).

3.      The University of Chicago is a private educational institution (Ex. A, ¶9).

---

[1] The following exhibits are attached hereto and are referenced in this Rule 56.1 Statement:

| | |
|---|---|
| Ex. A | University Defendants' Answer to Plaintiff's Complaint. |
| Ex. B | Deposition transcript of Charles Boyle. |
| Ex. C | Deposition transcript of Clarence Moore. |
| Ex. D | Deposition transcript of Arthur Gillespie. |
| Ex. E | Deposition transcript of Michael Kwiatowski. |
| Ex. F | Deposition transcript of Oscar Galarza. |
| Ex. G | Deposition transcript of Larry Torres. |
| Ex. H | Deposition transcript of Ashley Glover. |
| Ex. I | Deposition transcript of Kenneth Roberson. |
| Ex. J | Deposition transcript of Carl Martin. |
| Ex. K | Photos of Charles Boyle taken following the incident. |

4.    Defendants Larry Torres, Clarence E. Moore, Oscar Galarza, Michael Kwiatowski and Arthur Gillespie were employees of the University of Chicago on the date of this incident, October 18, 2008 (Ex. A, ¶¶4-8).

5.    Larry Torres is 40 years old and began his employment with the University in January, 2007 (Ex. G, p. 15), and Oscar Galarza began with the University in June or July of 2007 (Ex. F, p.8).   On the  date of the incident, Arthur Gillespie had been employed by the University for a little over seven months (Ex. D, p. 8). Michael Kwiatowski had been employed for approximately six and one-half years (Ex. E, p. 7).  It was Clarence Moore's first day with the University (Ex. C, p. 9), although he had worked for 24 years as a Chicago Police officer, his last assignment being in the Traffic Safety Unit (Ex. C, p. 11-12);  he is 56 years old (Ex. C, p. 8).

6.    Charles Boyle is 22 years old, he was an All Conference football player in high school and claims to have played football for a short period at the University of Illinois (Ex. B, pp. 8-9); he stands 5' 11¾" tall and weighed about 235 pounds on the date of the incident (Ex. B, p. 9); plaintiff estimates that at one time could bench press approximately 345 pounds (*Id.* at 10) and could leg press approximately 700 pounds (*Id.* at p. 11); Ashley Glover described Charles Boyle as a big strong guy, who is pretty well built, who has a lot of big muscles in his chest, shoulders and arms (Ex. H, p. 76).

7.    Plaintiff also uses the name Charles Cain (Ex. B, p. 2; Ex. H, p. 12); and he "raps" under the name of Charles Cain or Apollo Cain (Ex. H, p. 15).

## II. Background Information

8.    On October 18, 2008, Larry Torres and Clarence Moore were working together for the first time (Ex. G, p. 48); this was a "training" day for Clarence Moore (Ex. C, p. 15). Both of them were wearing uniforms indicating they were University police and the vehicle they drove indicated they were University of Chicago police (Ex. C, pp. 55-56; Ex. G, p.19-20,49). The

uniforms the University officers wore at that time resembled those worn by the Chicago police (Ex. G, p. 127).

9.    At approximately 2:30 a.m. that morning, Torres and Moore stopped for coffee at a Dunkin' Donuts located at 1435 East 53rd Street in Hyde Park (Ex. G, p. 24); as they were leaving the Dunkin' Donuts, they heard a loud car horn constantly blaring and then they saw the car drive past them (Ex. G, pp. 25-26). The car was a silver colored Chrysler (Ex. G, p. 33; Ex. C, p. 33).

10.    Torres and Moore observed the silver Chrysler travel eastbound a short distance past them and then saw it swerve into the parking lane and make contact with the curb (Ex. G, pp. 27-28; Ex. C, p.34-35); the silver Chrysler was the only car traveling on 53rd Street at that time of the morning and its horn stopped blaring at some point after the vehicle made contact with the curb and stopped (Ex. G, p. 30).

11.    On October 18, 2008, Ashley Glover and her mother owned the 2006 gray Chrysler Sebring (Ex. H, pp. 7-8); on the date of the incident, the grey Chrysler Sebring that Ashley Glover owned had an electrical shortage which would cause the vehicle's horn to blow for no reason (Ex. H, p. 29); the horn would randomly go off and would continuously blare anywhere from five seconds to a minute (Ex. H, p. 30); the length of time the horn sounded varied, the time of day varied and in most instances, when the car was turned off, the horn would stop (Ex. H, p. 31).

12.    Ashley Glover, her former boyfriend, Steven Sinclair (Ex. H, p. 8) and two friends, Kenneth Roberson, and the plaintiff, Charles Boyle, met at the plaintiff's apartment the night before and went to a bar on the north side of Chicago called the Ole Lounge (Ex. B, pp. 27-29) for several hours there that evening (Ex. I, p. 22).

13.     The four of them, Glover, Sinclair, Roberson and Boyle went to the Ole Lounge in Ashley Glover's grey Chrysler Sebring (Ex. H, pp. 22, 27, 40; Ex. B, p. 25; Ex. I, pp. 19, 22); the four of them (Glover, Sinclair, Roberson and the plaintiff) were returning from Ole Lounge when the incident occurred (Ex. H, pp. 19, 29). Steven Sinclair was driving the vehicle when the horn began to blare (Ex. B, p. 39).

14.     On October 18, 2008, Ashley Glover's 2006 grey Chrysler Sebring also had an alarm which would cause the horn to go off when the alarm was activated (Ex. H, p. 31); Glover acknowledged that if a person didn't know her vehicle had an electrical short and heard the horn go off, they might conclude that the car's alarm was going off (Ex. H, p. 32).

15.     A person who heard the horn of Ashley Glover's vehicle constantly blare when it went off, who did not know the vehicle had an electrical short, could conclude that the alarm was going off and that the vehicle had been stolen (Ex. H, p. 31).

16.     The vehicle's horn went off and began to blare right after they turned onto 53rd Street and continued to blare until after they stopped driving (Ex. H, p. 45; Ex. I, p. 29); Glover estimated the car had traveled approximately three blocks with the horn blaring (Ex. H, pp. 51-52).

17.     As Ashley Glover's vehicle was traveling down 53rd Street past a Dunkin' Donuts with the horn blaring, Steven Sinclair who was driving the car, made a remark "your stupid horn, and there's a cop right there" or something to that effect (Ex. H, p. 62).

18.     Kenneth Robertson who was a passenger in the front seat of Glover's grey Chrysler Sebring, recalled that Steven Sinclair, who was driving Ashley's car, would typically drive a car up onto the curb and then come down off the curb when parking the car, and Roberson recalled that when Sinclair did so on the morning of October 18, 2008, that the car gently shook when the vehicle hit he curb (Ex. I, p. 85; Ex. G, p. 32).

19.     Steven Sinclair who was driving Ashley Glover's car, did not stop the car in relation to a signal by any police officer to pull the vehicle over (Ex. B, p45; Ex. H, p. 63).

20.     After the vehicle hit the curb, Torres and Moore observed two people quickly exit the silver Chrysler and walk eastbound away from the car and out of their eyesight (Ex. G, pp. 38-40; Ex. C, p. 40, 124-25); they saw that there were still two people in or near the Chrysler (Ex. G, p. 41, Ex. C. p. 41); a female in the front passenger seat and Charles Boyle, who also got out of the car a couple of seconds after the first two individuals (Ex. G, pp. 45-46; Ex. C, p. 44-45).

### III. Torres And Moore Approach The Vehicle

21.     The plaintiff went to the front of the silver Chrysler and opened the hood (Ex. G, p. 46; Ex. H, p. 57; Ex. C, p.45); Torres and Moore then approached him and asked "whose car is this?" and also asked the plaintiff for identification (Ex. G, pp. 47-48; Ex. C, p.48, 51); Boyle turned around and faced Torres and Moore (Ex. G, p. 48).

22.     Ashley Glover recalled that the plaintiff never produced his identification for Moore and Torres, despite them asking to see it three times (Ex. H, pp. 64, 71, 73).

23.     Plaintiff assumed that Torres and Moore were police officers when he was asked to procure some identification after he turned around to look at him (Ex. B, p. 60).

24.     Plaintiff admitted he did not produce his identification because he wanted to know why Torres and Moore wanted to see his identification (Ex. B, pp. 60-62).

25.     Ashley Glover did not believe there was anything improper about the University officers asking plaintiff for identification not knowing if the car was stolen or not (Ex. H, p. 65) and she believed those were reasonable questions to ask after the vehicle's horn had gone off at 2:30 in the morning and not knowing if the car was stolen (Ex. H, p. 64).

26.    It was not Officer Moore or Torres' intent to have the plaintiff arrested when they approached him on the street at 2:30 a.m. (Ex. C, p.125; Ex. G, p.135).

27.    Torres and Moore were attempting to determine if the car was stolen or if someone in the car needed assistance (Ex. G, p. 41, 136).

28.    Torres did not believe they were doing anything improper or violating anyone's rights by approaching the vehicle to investigate what was going on with the vehicle (Ex. G, p. 135).

29.    If the car wasn't a stolen vehicle and no one was in need of assistance, Torres and Moore would have simply filled out a "contact card," on Mr. Boyle, and that would have ended their involvement with him and the vehicle (Ex. G, pp. 136, 56).

### IV. Reasonable Suspicion Existed

30.    During Clarence Moore's 24 years on the Chicago Police Department, he was involved in numerous stolen car arrests and recoveries and has driven a stolen vehicle after it was recovered which had its steering column "peeled" (Ex. C, pp. 119-20).

31.    Clarence Moore also worked in his father's gas station and has repaired stolen vehicles after they were recovered that had steering column peeled and the vehicle's ignition lock broken in order to hot wire and steal the car. (Ex. C, p. 119).

32.    Based on that experience, Moore explained that a horn constantly blowing was consistent with a vehicle's alarm system having been shorted out in an attempt to steal the vehicle by hot wiring the car (Ex. C, pp. 116, 117; see also Ex. G, p.133-34).

33.    Moore also explained that steering a stolen vehicle can be difficult because after a steering column was "peeled," the steering on the vehicle could lockup on the driver (Ex. C, pp. 116, 120).

34.    Based on his years of experience as a police officer and as a mechanic, Moore explained that because the vehicle's horn was constantly blaring, because he observed the vehicle suddenly hit the curb at 2:30 a.m. and then several people quickly exit the vehicle and walk away from the car, suggested to him that the grey Chrysler Sebring could have been stolen and that the steering could have possibly locked up on the driver (Ex. C, pp. 116, 120, 127-28; see also Ex. G. p. 134-36).

35.    Moore was also concerned with whether a person who was in the car was in distress and had been pushing the car's horn or that the occupants of the car were forcing someone to do something (Ex. C, p. 128; see also Ex. G, p. 135).

### V.  Plaintiff's Actions Supply Probable Cause

36.    When Moore and Torres approached the plaintiff, they had on uniforms indicating they were University of Chicago police officers (Ex. G, p. 49); after the plaintiff refused to produce any identification, Moore asked the plaintiff to step over to their vehicle (Ex. G, p. 49).

37.    As Moore went to guide plaintiff in the direction of the University vehicle, the plaintiff pushed Moore's arm away (Ex. G, p. 51-53); when that occurred Torres grabbed plaintiff's arm and told him to relax (Ex. G, p. 54).

38.    After Torres grabbed plaintiff's arm and told him to relax, plaintiff pulled his arm away from Torres (Ex. G, p. 55). Moore then grabbed plaintiff's other arm and plaintiff pulled his arm away from Moore (Ex. G, p. 56), Moore and Torres told plaintiff to stop resisting (*Id.*). They were trying to get some control of the plaintiff (Ex. C, p.55), but found they were essentially wrestling with him (Ex. G, p. 56). Officer Moore suffered a sprained wrist during the incident (Ex. C, p. 87).

39.    When plaintiff pushed Officer Moore's arm away he committed a battery on Moore (Ex. A, p. 57).

40.     At one point while Moore and Torres were wrestling with plaintiff, the plaintiff put Officer Torres in a bear hug, lifted him up and pushed him into the University car hard enough to knock the wind out Torres for several seconds (Ex. G, pp. 59-60, 63).

41.     Officer Torres got on the radio and called dispatch for assistance (Ex. G, p. 60).

42.     Shortly after Torres called for assistant other University officers began to arrive (Ex. G, p. 64).

43.     After plaintiff refused to produce any identification, Ashley Glover observed plaintiff make a "shoulder roll" to move the officer's hand away (Ex. H, pp. 79-80), which Ms. Glover later described as the plaintiff flailing his shoulder (Ex. H, pp. 87-88).

44.     After the plaintiff "flailed his shoulder," Ms. Glover observed the officer use both hands to try and push the plaintiff in the direction of the squad car and the plaintiff would not allow himself to move in that direction and, in fact, plaintiff moved farther away from the squad car (Ex. H, pp. 95-96).

## VI. Gillespie, Galarza And Kwiatkowski's Arrival In Response To Torres' Call For Assistance

45.     Torres made a 10-1 call, which means an officer in distress (Ex. D, p. 14).

46.     After hearing a 10-1 call, other officers from the University drove to the location (Ex. E, p. 37; Ex. F pp. 12-13).

47.     Moore and Torres where then involved in a struggle with the plaintiff (Ex. D, pp15-16).

48.     Upon Gillespie's arrival, it appeared to him that the three of them (Torres, Moore and the plaintiff) were thrashing about with Boyle attempting to push Torres and Moore away from him and Torres and Moore attempting to handcuff plaintiff (Ex. D, pp. 18-19).

49.     At that time, Gillespie did not know if they were struggling for a weapon (Ex. D, p. 20).

50.     Gillespie heard Torres and Moore tell Boyle stop resisting and were then trying to control the plaintiff.

51.     Gillespie ran over to the group and recalled they all fell to the ground (Ex. D, p. 22).

52.     After Gillespie regained his bearings, Gillespie found he had ended up by Mr. Boyle's legs and feet (Ex. D, p. 23) and once on the ground, Boyle continued to resist with both his arms and his legs (Ex. D, p. 26).

53.     While Gillespie was on his knees holding the plaintiff's legs, the plaintiff kicked Gillespie in the side of the face causing Gillespie's glasses to be thrown from his face, and mangling the frames of his glasses (Ex. D, p. 27; Ex. E, pp. 19-20; Ex. F, p. 25, 33).

54.     As a result of that kick, Gillespie was hurt. He suffered some slight bruising to his face, but he did not think it required any medical attention (Ex. D, p. 28).

55.     After being kicked in the face, Gillespie reengaged and continued to hold Boyle by the legs while the officers up top attempted to handcuff him (Ex. D, p. 28).

56.     Gillespie was disoriented from being kicked, and after Boyle was handcuffed, Gillespie, another University officer, started looking for Gillespie's glasses (Ex. D, p. 30; Ex. E, p. 21; Ex F, pp. 32-33); after Gillespie found his broken glasses, he spoke to the watch commander and returned to the station in order to call and get a spare pair of glasses (Ex. D, pp. 37, 40).

57.     When Gillespie arrived on the scene, after observing Boyle apparently resisting arrest, he believed probable cause existed to have Boyle arrested (Ex. D, pp. 52-53).

58.     Upon Oscar Galarza's arrival, he observed Torres and Moore appeared to be wrestling with a male person in the eastbound lane of 53rd Street (Ex. F, p. 15); Galarza

observed Officers Moore and Torres attempting to apprehend the subject who was pushing them away and they were wrestling (Ex. F, p. 17).

59.    Galarza went over to assist and attempted to gain control of one of Mr. Boyle's arms (Ex. F, pp. 21, 25, 28); plaintiff was pushing the officers' arms away when all of them fell to the ground (Ex. F, pp. 22-24).

60.    Galarza heard Officers Moore and Torres say stop resisting to Boyle (Ex. F, pp. 21-22); Galarza does not know what caused all of them to fall to the ground (Ex. F, p. 24).

61.    Galarza was attempting to assist the officers getting Boyle into handcuffs (Ex. F, p. 26); while they were on the ground, Torres got so tired he had to step aside for a second and then Galarza gained control of one of Boyle's arms (Ex. F, p. 25); while on the ground, Galarza told Mr. Boyle to stop resisting (Ex. F, p. 30); Boyle continued to struggle while he was on the ground until he was placed in handcuffs (Ex. F, p. 36); after Boyle was on the ground, he was eventually placed in handcuffs (Ex. F, p. 29).

62.    The plaintiff injured Officer Galarza's right shoulder during the incident (Ex. F, p. 25).

63.    Galarza's shoulder was injured when Boyle pulled his arm (Ex. F, p. 37).

64.    Galarza subsequently went to the University of Chicago emergency room where his shoulder was x-rayed, he was placed on pain medication, told to see an orthopedic doctor for follow-up and told to use ice packs (Ex. F, pp. 39-40, 61-62).

65.    When Kwiatowski arrived, he saw Galarza, Torres, Gillespie and Moore were attempting to place Boyle in handcuffs (Ex. E, pp. 16-17); Boyle was then facedown with his stomach on the ground and Kwiatowski observed that Boyle was kicking and struggling, he was wiggling his arms to try and break free (Ex. E, pp. 18-19).

66. Kwiatkowski observed Boyle kicking violently and saw Boyle's legs go up in the air and saw Boyle kick in Gillespie's direction (Ex. E, pp. 19-20).

67. Kwiatowski helped maintain control of Mr. Boyle's arms until the handcuffs were placed on him (Ex. E, p. 22); once Boyle stood up from the ground, Kwiatowski then left the scene and went back to his regular duties (Ex. E, pp. 27-28).

68. It is proper to place a person in handcuffs when necessary to protect an officer's safety (Ex. E, p. 49).

69. It is not lawful or permissible to resist an officer's arrest (Ex. F, p. 63).

### VII. Other Stops Of Glover's Vehicle And Requests For Her Identification

70. On one other occasion when Ashley Glover was driving her car on the I-57 expressway, the vehicle's horn started to blare and she pulled over with a state trooper who was investigating whether there was a problem (Ex. H, pp. 52-53); on that occasion the state trooper asked Ms. Glover for identification, which she produced, and there was no problem. The officer advised her to get off the expressway and drive on the street for safety reasons (Ex. H, pp. 53-54).

### VIII. Color Of Law

71. The duties and responsibilities of the University of Chicago defendants are to patrol and maintain the safety and security of the University campus, as well as its faculty, staff and students (Ex. E, pp. 10, 11; Ex. F, p. 11).

72. University of Chicago officers will detain a suspect and wait for City of Chicago police officers to arrive, University officers do not make arrests (Ex. E, p. 38; Ex. F, p. 55; Ex. J, p. 27); City of Chicago police officers actually make the arrest, process the arrest and prepare arrest reports (Ex. E, p. 38; Ex. J, p. 27); University officers do not fill out criminal complaint forms (Ex. C, p. 118); someone other than the University officer decides what charges are placed

against a person who was arrested by City of Chicago police (Ex. A, p. 118); typically, an Assistant State's Attorney during the felony review process determines whether or not felony charges will be placed against an arrestee and University officers are not involved in felony charging decisions (Ex. A, pp. 118, 119); in this instance, City of Chicago police officer Carl Martin completed the complaint against the plaintiff without ever speaking to Officers Moore or Torres (Ex. J, pp. 22, 44).

73.    University of Chicago officers are not allowed to make stops for traffic offenses (Ex. E, p. 47), or write traffic tickets (Ex. G, p. 131), or participate in narcotics investigations (*Id.*)

74.    The University of Chicago does not have a lockup and their officers are not allowed to take individuals into custody at the University of Chicago's security facility, they detain individuals and notify the Chicago Police Department and then turn them over to Chicago police (Ex. E, p. 47).

75.    University of Chicago police officers are not permitted to carry OC or pepper spray, nor are they permitted to carry "billyclubs" or the big Kel brand flashlights that are approximately 16 to 20 inches long (Ex. D, p. 52; Ex. E, pp. 45-46).

76.    The areas that the University of Chicago officers patrol are also patrolled by the Chicago Police, and there are no areas of the University that the University's officers patrol that the City of Chicago police do not patrol (Ex. E, p. 48; Ex. G, p. 131-32).

77.    The University of Chicago police officers have not been delegated an exclusive public function to patrol any areas of the University of Chicago's campus or the City of Chicago that the Chicago police are not authorized to patrol (Ex. E, p. 48; Ex. G, p.131-32).

78.    The University of Chicago officers have not been delegated the exclusive authority to do anything which the City of Chicago police officers are not permitted to perform,

and there are certain activities that the University officers are not permitted to perform that the City of Chicago police perform (Ex. E, pp. 48-49).

79.    University of Chicago officers have not been provided full police powers (Ex. E, p. 48; Ex. G, p. 131).

### IX.  Post Incident Photos Of Plaintiff

80.    The photos of Charles Boyle attached hereto as Ex. K, were taken either at the Chicago Police Station or shortly after his release and those photos truly and accurately depict plaintiff's condition following the incident which is the subject matter of this lawsuit (Ex. B, pp. 81, 83, 84, 105-06; Ex. H, pp 145, 147, 148).

Respectfully submitted,

Dated:  March 31, 2010

By: /Steven M. Puiszis_____    _____
One of the Attorneys for Defendants,
The University of Chicago, Larry Torres,
Clarence E. Moore, Oscar Galarza,
Michael Kwiatowski and Arthur Gillespie

Steven M. Puiszis
HINSHAW & CULBERTSON LLP
222 North LaSalle Street
Suite 300
Chicago, Illinois  60601-1081
(312) 704-3000