# EXHIBIT C

**Page 1:**

```
          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
CHARLES BOYLE,                 )
          Plaintiff,           )
     -vs-                      ) No. 09 C 1080
UNIVERSITY OF CHICAGO          )
POLICE OFFICER LARRY           )
TORRES, et al.,                )
          Defendants.          )
```

The deposition of CLARENCE MOORE, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before ATHANASIA MOURGELAS, a notary public within and for the County of Cook and State of Illinois, at 222 North LaSalle Street, Suite 300, Illinois, on the 10th day of November, 2009, at the hour of 2:22 o'clock p.m.

Reported by: Athanasia Mourgelas
License No. 084-004329

**Page 2:**

1 APPEARANCES:
2    ED FOX & ASSOCIATES, by
3    MR. JONATHAN R. KSIAZEK,
4    300 West Adams Street, Suite 330,
5    Chicago, Illinois 60606,
6    (312) 345-8877,
7        Representing the Plaintiff;
8
9    HINSHAW & CULBERTSON, by
10   MR. STEVE M. PUISZIS,
11   222 North LaSalle Street, Suite 300,
12   Chicago, Illinois 60601,
13   (312) 704-3000,
14       Representing the Defendant,
15       University of Chicago Police
16       Officers;
17
18   ASSISTANT CORPORATION COUNSEL, by
19   MS. HELEN C. GIBBONS,
20   30 North LaSalle Street, Room 900,
21   Chicago, Illinois 60602,
22   (312) 744-3982,
23       Representing the Defendant,
24       City of Chicago.

**Page 3:**

1                    I N D E X
2  WITNESS                      EXAMINATION
3  CLARENCE MOORE
4  By Mr. Ksiazek                   6
5  By Ms. Gibbons                  114
6  By Mr. Puiszis                  115
7  By Mr. Ksiazek (further)        130
8
9
10
11
12
13
14              E X H I B I T S
15 NUMBER                    MARKED FOR ID
16 PLAINTIFF'S Deposition Exhibit
17 No. 11                         102
18 No. 12                         106
19
20
21
22
23
24

**Page 4:**

1        (Whereupon, the deposition
2        commenced at 2:22 o'clock p.m.)
3        (Witness sworn.)
4    MR. KSIAZEK: Would you please state your
5 name for the record spelling your last name.
6    THE WITNESS: My name is Clarence, middle
7 initial E, last name is Moore, M-O-O-R-E.
8    MR. KSIAZEK: Mr. Moore, have you ever had
9 your deposition taken before?
10   THE WITNESS: Yes. But I don't recall how
11 long ago.
12   MR. KSIAZEK: Was it more than five years
13 ago?
14   THE WITNESS: Definitely.
15   MR. KSIAZEK: Okay. I'll just remind you of
16 a few of the ground rules for a deposition since
17 it's been a little while. Basically I'm going
18 to ask you some questions about the incident
19 that happened on October 18th, 2008. I'm going
20 to ask that you answer my questions to the best
21 of your knowledge and answer all my questions
22 truthfully. Okay?
23   THE WITNESS: Yes.
24   MR. KSIAZEK: And if you answer my

1 (Pages 1 to 4)

1  questions, I'll have to assume that you
2  understood my question. And if there's any
3  question that you don't understand for any
4  reason, just let me know, and I'll rephrase or
5  I'll try and re-ask it another way. Okay?
6      THE WITNESS: Okay.
7      MR. KSIAZEK: When I'm asking my questions,
8  I will -- there will be some points when I
9  might -- I'm sorry, you might answer uh-uh or
10  uh-huh or shake your head, so please try and
11  answer all questions verbally like you're doing
12  right now, that way the court reporter can pick
13  up all your answers. Okay?
14      THE WITNESS: No problem.
15      MR. KSIAZEK: And I will try not -- and I'll
16  do my best to not talk over you. I just ask
17  that you do the same for me when I'm asking a
18  question and I'll try not to talk over you when
19  you're giving your answer. If that does happen,
20  then -- we just need to have a clear transcript,
21  so I'll do my best and you can just re-state
22  your answer if that happens. Okay?
23      THE WITNESS: No problem.
24      MR. KSIAZEK: And also, if you need to take

5

1  this matter?
2      A. No.
3      Q. Is there anything preventing you from
4  testifying truthfully today?
5      A. No.
6      Q. What's your educational background?
7      A. One year of college.
8      Q. Where did you attend college?
9      A. Western Michigan University, Kalamazoo,
10  Michigan.
11      Q. When did you attend Western Michigan
12  University?
13      A. 1971 and 1972.
14      Q. And what degree were you seeking when
15  you attended Western Michigan University for one
16  year?
17      A. I think I majored in poli-sci and
18  business administration.
19      Q. Is there a reason why you only attended
20  for one year?
21      A. I couldn't afford it.
22      Q. How tall are you, sir?
23      A. 5', 9".
24      Q. And how much do you weigh?

7

1  a break at any point when I'm asking you a
2  question, feel free to say that you want to take
3  a break. Just before you take that break, make
4  sure that you have answered any pending
5  questions that are out there. Okay?
6      THE WITNESS: Okay.
7          CLARENCE MOORE,
8  having been first duly sworn, was examined and
9  testified as follows:
10          EXAMINATION
11  BY MR. KSIAZEK:
12      Q. What documents did you review in
13  preparation for your deposition today?
14      A. My court testimony and Answers to
15  Interrogatories.
16      Q. Are you referencing your testimony on
17  January 20th, 2009?
18      A. You know, I didn't check the date.
19      Q. But that was at the motion to suppress
20  hearing, is that what you're speaking of?
21      A. Yes.
22      Q. And your interrogatories you said?
23      A. Yes.
24      Q. Did you review any police reports in

6

1      A. 200.
2      Q. Did you weigh about 200 pounds in
3  October of 2008?
4      A. Yeah, 205.
5      Q. And how old are you?
6      A. 56 years old.
7      Q. What is your current position?
8      A. Currently I'm full-time employment with
9  the University of Chicago, Sergeant of Police.
10      Q. How long have you worked for the
11  University of Chicago as a police officer?
12      A. Full-time?
13      Q. Sure. Well, in total actually?
14      A. Well, there's a break in there -- in
15  total? I'm trying to figure it out.
16      Q. No problem.
17      A. Well, from August 9th to present. Then
18  from the date of this incident, then sometime in
19  there I was laid off. So there was a period --
20  August 9th to present is what?
21      Q. August 9th of 2009?
22      A. Yes. And part-time prior to that.
23  Probably two or three months. It's an estimate.
24      Q. So just to recap, August 9th to the

8

2 (Pages 5 to 8)

1  present, you've worked full-time for the
2  University of Chicago?
3    A.  Uh-huh.
4    Q.  That's a yes?
5    A.  Yes.
6    Q.  Have you been a sergeant from August
7  9th, 2009 to the present?
8    A.  Yes.
9    Q.  And then when was the date prior to
10  August 9th, 2009 when you last worked for the
11  University of Chicago?
12    A.  I started October 9th, the night of
13  this incident was my first day, and I believe it
14  was in May that that part-time ended, May of
15  2009. And I'm guessing.
16    Q.  Sure.  And when you were part-time at
17  the University of Chicago, what was your rank
18  from 2007 to May of 2009?
19    A.  Patrol officer.
20    Q.  You said you were working -- actually,
21  where were you working in between May of 2009
22  and August of 2009?
23    A.  I'm sorry?
24    Q.  Where were you working from May of 2009

9

1    A.  Yes.
2    Q.  Okay.  How long have you worked for the
3  Chicago police officer -- Chicago Police
4  Department?
5    A.  24 years.
6    Q.  Do you still work for the Chicago
7  Police Department?
8    A.  No.
9    Q.  So when was your last day at the
10  Chicago Police Department?
11    A.  August 8th, 2009.
12    Q.  So if I have my dates correct, you
13  started at the Chicago Police Department
14  approximately 1975?
15    A.  No.
16    Q.  When did you start?
17    A.  May 6th, 1985.
18    Q.  So May 6th, 1985, what was your rank
19  when you started at the Chicago Police
20  Department?
21    A.  I started as a patrol officer.
22    Q.  What was the highest rank that you
23  achieved at the Chicago Police Department?
24    A.  Patrol officer.

11

1  to August of 2009?
2    A.  I don't understand that question, where
3  was I working.
4    Q.  Yeah.  Did you have a job during that
5  time? You said you were -- you've been working
6  for the University from August 9th to the
7  present; right?
8    A.  Yes.
9    Q.  And you worked part-time for the
10  University of Chicago from October 18th, 2007 to
11  May of 2009; right?
12    A.  That's correct.
13    Q.  Okay.  So where were you working from
14  May of 2009 to August of 2009?
15    A.  I'm still trying to get a clarity of
16  what you mean by where was I working.
17    MR. PUISZIS:  Were you employed?
18    THE WITNESS:  Was I employed somewhere else?
19    MR. PUISZIS:  Yeah.
20    MR. KSIAZEK:  Yeah.
21    THE WITNESS:  Okay.  Thank you.  Yes, I was
22  a Chicago police officer.
23  BY MR. KSIAZEK:
24    Q.  A Chicago police officer?

10

1    Q.  Did you have a beat that you were
2  assigned to when you first started?
3    A.  Started when, sir?
4    Q.  At the Chicago Police station --
5  Chicago --
6    MR. PUISZIS:  24 years ago, you want to know
7  what the beat was?  Is it really relevant?
8  BY MR. KSIAZEK:
9    Q.  What was your beat when you left in
10  August of 2009?
11    A.  I didn't have a beat.
12    Q.  What was your assignment?
13    A.  I was in the Traffic Safety Unit.
14    Q.  How long were you a traffic safety
15  officer for?
16    A.  I wasn't a traffic safety officer but I
17  was in the unit from '98 until I left -- no --
18  yes, '98 until I left.  I was a driving
19  instructor, and I did traffic safety
20  presentations.
21    Q.  You said you were a patrol officer, did
22  you go on patrol while you were a traffic
23  safety --
24    MR. PUISZIS:  Objection, he's told you --

12

3 (Pages 9 to 12)

| | |
|---|---|
| 1   well, you can go ahead and answer the question | 1   as you said? |
| 2   again about what you did as a traffic safety | 2    A. That is correct. |
| 3   officer. | 3    Q. Did you attend any training before |
| 4   BY MR. KSIAZEK: | 4   going out on patrol on October 18th, 2008 at the |
| 5    Q. Did you patrol the streets? | 5   University of Chicago? |
| 6    A. As a traffic safety officer? | 6    A. Prior to? |
| 7    Q. Yes. | 7    Q. Yes. |
| 8    A. No. | 8    A. No. That was my training day. |
| 9    Q. Why did you start work part-time for | 9    Q. So you were essentially being trained |
| 10   the University of Chicago Police Department? | 10   when you went out on your patrol on October |
| 11    A. Extra income. | 11   18th, 2008? |
| 12    Q. And why did -- the first time that you | 12    A. I need you to clarify what you mean by |
| 13   began working for the University of Chicago, why | 13   beat training. |
| 14   did you leave in May of 2009? | 14    Q. Sure. You said that was my training on |
| 15    A. I was laid off. | 15   October 18th, 2008, what do you mean by that? |
| 16    Q. How many hours were you working when | 16    A. I said that was a training day. |
| 17   you were working part-time for the University of | 17    Q. Okay. That was a training day, what do |
| 18   Chicago? | 18   you mean by that? |
| 19    A. I have no idea. It was nothing | 19    A. What I mean by that? |
| 20   consistent. | 20    Q. Yes. |
| 21    Q. On average, can you say how many hours | 21    A. That was my first day out. |
| 22   a week did you work? | 22    Q. What was your understanding of what |
| 23    A. A week, no, I can't tell you. | 23   your training was going to be? |
| 24    Q. How about in a month? | 24    A. To learn that patrol, that area. |
|                              13 |                              15 |
| 1    A. As I said before, I don't -- I can't | 1    Q. Anything else? |
| 2   tell you. It is a question that you're asking | 2    A. No. |
| 3   me right now and I have no recollection to give | 3    Q. Did you have any training in regards to |
| 4   you an average of what I was working per month. | 4   the policies and procedures of the University of |
| 5   It was nothing consistent. | 5   Chicago Police Department prior to October 18th, |
| 6    Q. Did you have -- were you assigned to a | 6   2008? |
| 7   beat when you started at the University of | 7    A. No. |
| 8   Chicago as a police officer? | 8    Q. Did you have any training about the |
| 9    MR. PUISZIS: I object. You know, what he | 9   policies and procedures of the University of |
| 10   did on any day after this occurrence would be | 10   Chicago Police Department on October 18th, 2008? |
| 11   irrelevant, but go ahead and answer the | 11    A. I'm going to have to ask you to re-ask |
| 12   question. | 12   that question. |
| 13   BY MR. KSIAZEK: | 13    Q. Sure. Did anyone sit down with you and |
| 14    Q. That's what I said when you first | 14   say these are our policies and procedures that |
| 15   started at the University of Chicago, did you | 15   we follow on October 18th, 2008 at the |
| 16   have a beat that you were assigned to? | 16   University of Chicago? |
| 17    A. Yes. | 17    A. When you say anyone, can you be a |
| 18    Q. What was the beat that you were | 18   little more specific on that question? |
| 19   assigned to? | 19    Q. Did a fellow patrol officer sit down |
| 20    A. They varied. | 20   with you and go through the policies and |
| 21    Q. What beat were you assigned to on | 21   procedures at the University of Chicago Police |
| 22   October 18th, 2008? | 22   Department? |
| 23    A. 109, Beat 109. | 23    A. Are you asking me did anyone go through |
| 24    Q. And this was your first day on the job | 24   all the policies and procedures with the |
|                              14 |                              16 |

4 (Pages 13 to 16)

1   University of Chicago?
2     Q.  I'm asking you if anyone at the
3   University of Chicago Police Department sat down
4   with you and explained any of the policies or
5   procedures that they had at the University of
6   Chicago Police Department on October 18th, 2008?
7     A.  To some extent.
8     Q.  Who sat down with you and explained to
9   you the policies and procedures?
10     A.  Well, there's no sit down.  Officer
11   Torres was assigned with me that night.  And
12   during the course of that night, he gave me some
13   information about the beats and things like
14   that.
15     Q.  Okay.  So he gave you information about
16   the beat, what information did he give you?
17     A.  Talked about the University police
18   boundaries in terms of where they patrol.  We
19   talk about different codes.
20     Q.  Did you talk about any arrest
21   procedures?
22     A.  No, not that I recall.
23     Q.  Did you talk about any detaining
24   procedures?

17

1     Q.  Well, I'm talking about any policies
2   and procedures.  I'm talking about detaining.
3   I'm talking about what your duties are.
4     MR. PUISZIS:  The thing is he's been a
5   police officer for 20 years beforehand.  And if
6   you're talking about policies and procedures as
7   opposed to general orders, you're talking light
8   years differ so --
9   BY MR. KSIAZEK:
10     Q.  Okay.  Let's go this way.  Did you look
11   at any general orders before you went out on
12   patrol on October 18th, 2008?
13     A.  No.
14     MS. GIBBONS:  Objection, vague.
15   BY MR. KSIAZEK:
16     Q.  Did Officer Torres say anything to you
17   prior to going out on your patrol that day about
18   the training that you were going to undertake?
19     A.  I don't recall.
20     Q.  And what shift were you working on
21   October 18th, 2008?
22     A.  The first watch.
23     Q.  Does that start at midnight?
24     A.  I believe it was 11:00 to 7:00, 11:00

19

1     A.  No, not that I recall.
2     Q.  Was the only one that you talked to on
3   October -- was Officer Torres the only one you
4   talked to on October 18th, 2008 about the
5   policies and procedures of the University of
6   Chicago Police Department?
7     A.  No.
8     Q.  Who else did you talk to?
9     A.  I can't recall who all I talked to
10   during the course of that day.  I can't even
11   tell you who the watch commander was back then.
12   I can't tell how many people I talked to or what
13   we talked about.
14     Q.  Well, do you know if you talked about
15   the policies and procedures before you went out
16   on your patrol that day or was it after you came
17   back from your patrol?
18     A.  I have a -- I can't understand your
19   question.  You're asking me policies and
20   procedures and that could be really broad.  If
21   you could ask me something specific, I could say
22   yes or no to.  But policies and procedures, I
23   don't know what you're talking about
24   specifically.

18

1   p.m. to 7:00 a.m.
2     Q.  And you were in a patrol car that
3   night?
4     A.  Yes.
5     Q.  Were you driving a patrol car?
6     A.  Torres started driving.  Yes, I drove
7   the car later on that day.
8     Q.  When did -- you said Officer Torres
9   started driving?
10     A.  Yes.
11     Q.  When did you actually drive?
12     A.  I don't recall what time.
13     Q.  At some point you were at Dunkin'
14   Donuts that night; right?
15     A.  That is correct.
16     Q.  Were you driving before you arrived at
17   the Dunkin' Donuts?
18     A.  Yes.
19     MR. PUISZIS:  Let me just take a break.
20         (Whereupon, a short break was
21         taken.)
22     MR. KSIAZEK:  We're back on the record.
23   BY MR. KSIAZEK:
24     Q.  Let's actually go back a little bit.

20

5 (Pages 17 to 20)

1 Were you ever disciplined while you were an
2 officer at the Chicago Police Department?
3     A.  What do you mean by disciplined?
4     Q.  Did you ever have any complaints filed
5 against you?
6     MR. PUISZIS:  Objection, irrelevant.
7     MS. GIBBONS:  I'll join.
8     THE WITNESS:  You've got to be a little bit
9 more specific.
10 BY MR. KSIAZEK:
11     Q.  I'm asking you if you ever had any
12 civilian complaints filed against you when you
13 were working at the Chicago Police Department?
14     A.  Okay.  And what kind of specific
15 complaints?
16     Q.  I'm sorry, I'm asking about any
17 complaints?
18     MR. PUISZIS:  Objection, any complaint would
19 be irrelevant.
20     MS. GIBBONS:  I'll join.
21     THE WITNESS:  I need you to be more
22 specific.
23 BY MR. KSIAZEK:
24     Q.  Well, if you can recall any, then I'm
                                                    21

1 against you?
2     A.  He said I beat him in the head with a
3 retractable baton.
4     Q.  Were you sued as a result of this
5 incident?
6     A.  No.
7     Q.  Do you know what the outcome of this --
8 was an investigation undertaken?
9     A.  Yes.
10     Q.  Do you know what the result of this
11 investigation was?
12     A.  It was either unfounded or not
13 sustained, one of them.
14     Q.  Any other complaints filed against you
15 for excessive force?
16     A.  Not that I recall.
17     MR. PUISZIS:  By the way while we're at it
18 on this one, did the guy who filed the complaint
19 against you attempt to do anything to you?
20     THE WITNESS:  Yeah, he tried to stab me with
21 an ice pick.  He was arrested.
22     MR. PUISZIS:  And was this during the course
23 of any type of an investigation?
24     THE WITNESS:  Not car accident.  An
                                                    23

1 going to ask you to tell me about them.  If you
2 can't recall any, then you can say so.  Did you
3 have any -- do you remember any?
4     A.  I don't understand your question.
5 You're referring too generally to even respond
6 to.
7     Q.  Have you ever had any complaints filed
8 against you for use of excessive force while you
9 were at the Chicago Police Department?
10     A.  Yes.
11     Q.  When did you have complaints filed
12 against you for excessive force?
13     A.  Not complaints.
14     Q.  Okay.  What then?
15     A.  When?  Sometime in -- I don't remember
16 the exact date, late '90's.
17     Q.  What was the circumstances of this
18 complaint?
19     MR. PUISZIS:  Again, just a continuing
20 objection, irrelevant.
21 BY MR. KSIAZEK:
22     Q.  Who filed the complaint against you?
23     A.  I don't recall his name at this time.
24     Q.  Do you know why the complaint was filed
                                                    22

1 investigation.  And he was found guilty of
2 attempted aggravated battery.
3 BY MR. KSIAZEK:
4     Q.  Have you ever been sued in your
5 capacity as a Chicago Police Officer before?
6     A.  Not that I recall.
7     Q.  You've told us -- I'm not sure if I
8 asked this already.  Were there any other
9 excessive force complaints?
10     A.  Not that I recall.
11     Q.  Any complaints filed against you for
12 wrongful arrests?
13     A.  Not that I recall.
14     Q.  And were you working as a patrol
15 officer when this excessive force complaint was
16 filed against you in the late '90's?
17     A.  I was working as a tactic officer.
18     Q.  Have you ever been suspended from the
19 Chicago Police force?
20     A.  No.
21     Q.  Any other complaints that you can
22 recall being filed against you in your time at
23 the Chicago Police Department?
24     A.  Again, you have to explain what you
                                                    24

6 (Pages 21 to 24)

1   mean by complaints.
2       Q. Well, you gave me an example about an
3   excessive force complaint that was filed against
4   you; right?
5       A. You asked a specific question and I can
6   relate to that question, that's why I answered
7   it that way.
8       Q. Can you recall any other complaints
9   that were filed against you that were like the
10  excessive force one that might have been for
11  some other reason?
12      A. The way you're paraphrasing this
13  question I can say not the way you're
14  paraphrasing that question. That's all I can
15  say.
16      Q. Have you ever been written up while you
17  were working for the Chicago Police Department?
18      MR. PUISZIS: Objection. What do you mean
19  by written up?
20      THE WITNESS: I have to ask the same
21  question, what do you mean by written up? I've
22  gotten 56 or 57 commendations, that's a write
23  up. I mean, what are you asking me?
24      MR. PUISZIS: Do you want to tell us about

25

1   you ever been notified by the Office of
2   Professional Standards that any other complaints
3   have been filed against you?
4       A. I don't recall.
5       Q. Do you recall any other Office of
6   Professional Standards investigation that you've
7   had to respond to?
8       A. I do not recall at this time.
9       Q. When you said this was your first day
10  and this was your first day of training on
11  October 18th, 2008; right?
12      A. Yes.
13      Q. How many days were you -- how many days
14  ultimately were you trained at the University of
15  Chicago Police Department?
16      A. I think there were a total of six what
17  they call ride-alongs.
18      Q. Were these all with Officer Torres?
19      A. No.
20      Q. Who else did you have these ride-alongs
21  with?
22      A. I don't recall specifically who they
23  were at this time.
24      Q. Do you know why in August of 2009 you

27

1   your 56 commendations?
2       MR. KSIAZEK: We'll have a chance to go over
3   those but --
4   BY MR. KSIAZEK:
5       Q. Have you ever been investigated by IED
6   for any reason beyond -- besides the one that
7   you just told me about for excessive force?
8       A. Investigated by who?
9       Q. Internal Affairs.
10      A. Oh, no, not that I know of.
11      Q. But an investigation was undertaken in
12  this excessive force case that you've told us
13  about; right?
14      A. By whom?
15      Q. By IED. By Internal Affairs.
16      A. Not -- no. Internal Affairs, I mean,
17  not that I know of. I've never had any
18  investigation by Internal Affairs that I had to
19  address.
20      Q. Okay. Who investigated the excessive
21  force complaint against you?
22      A. Office of Professional Standards back
23  then.
24      Q. So have you ever had any other -- have

26

1   were hired back as a full-time sergeant by the
2   University of Chicago Police Department? I'm
3   asking just because you left as a patrol
4   officer; right?
5       A. I took an exam, I was interviewed and
6   obviously I did very well because they hired me.
7       Q. So we talked about the Dunkin' Donuts;
8   right? At some point on October 18th, 2009, you
9   were at Dunkin' Donuts; right?
10      A. That's correct.
11      Q. And what, if anything, happened when
12  you were at the Dunkin' Donuts?
13      A. At which point, in the store, out the
14  store? Help me out.
15      Q. Did you hear anything when you were
16  inside the Dunkin' Donuts?
17      A. Inside?
18      Q. Inside the Dunkin' Donuts.
19      A. I heard other people talking inside the
20  Dunkin' Donuts.
21      Q. Did you hear a horn inside the Dunkin'
22  Donuts?
23      A. No.
24      Q. At what point did you hear the horns?

28

7 (Pages 25 to 28)

1    A.  After leaving -- exiting Dunkin' Donuts
2  walking back toward my squad car.
3    Q.  So you were outside the doors of
4  Dunkin' Donuts when you heard the horn go off?
5    A.  That is correct.
6    Q.  How far were you away from the doors of
7  Dunkin' Donuts when you heard the horn sound
8  off?
9    A.  I don't recall.
10    Q.  Had you just stepped outside the doors
11  or was the door closed behind you?
12    MR. PUISZIS:  Objection, asked and answered.
13  He's already said he doesn't recall.
14    MR. KSIAZEK:  I'm trying to see if he does
15  recall.
16    MR. PUISZIS:  At some point it gets
17  badgering.  This is the third time you've asked
18  him where he was when he heard.  I didn't object
19  the second time.  You asked him a third and a
20  fourth time but I'm going to start objecting.
21  Because a deposition that should take an hour
22  will take three hours this way.
23    So you can answer the question a third
24  time.
                                            29

1    Q.  How did it sound?
2    A.  It was a continuous horn sound,
3  uninterrupted.
4    Q.  So after hearing this horn sound, what
5  did you do?  You're standing outside the Dunkin'
6  Donuts; right?
7    A.  Yes.
8    Q.  You hear the horn sound; right?
9    A.  Yes.
10    Q.  After hearing the horn sound, what did
11  you do?
12    MR. PUISZIS:  Objection, it's been asked and
13  answered.  He said he looked in the direction
14  that he thought it was coming from.  If you want
15  to have him answer it a second time, he can do
16  so.
17  BY MR. KSIAZEK:
18    Q.  After looking in the direction that the
19  horn was coming from, what did you do after
20  that?
21    A.  I didn't do anything.
22    Q.  Did you get in your car?
23    A.  No.
24    Q.  Did Officer Moore get in the car?
                                            31

1    THE WITNESS:  What's the question again?
2  BY MR. KSIAZEK:
3    Q.  How far away were you from the door,
4  you don't recall?
5    A.  Yes.
6    Q.  What did you do when you heard the horn
7  sound?
8    A.  I looked in the direction, which I
9  thought it was coming from.
10    Q.  Where was Officer Torres when you first
11  heard the horn?
12    A.  Standing somewhere near me.
13    Q.  Did you say anything to Officer Torres
14  when you heard the horn sounding?
15    A.  No.
16    Q.  Did Officer Torres say anything to you
17  when you heard the horn sounding?
18    A.  Can you repeat that question?
19    Q.  Sure.  Did Officer Torres say anything
20  to you when you first heard the horn sound?
21    A.  I don't recall.
22    Q.  If you can, can you describe how the
23  horn sounded?
24    A.  Yes.
                                            30

1    A.  I'm sorry?
2    Q.  Did -- excuse me, did Officer Torres
3  get inside of the car?
4    A.  When?
5    Q.  After you looked to see where the horn
6  was coming from; right?
7    A.  Sir, I said I looked in the direction
8  where the horn was coming from.
9    Q.  What did you see when you looked in the
10  direction where the horn was coming from?
11    A.  I saw nothing at first.
12    Q.  At some later point did you see a car?
13    A.  Yes.
14    Q.  When did you see that car?
15    A.  When it came in my sight.
16    Q.  How much time passed when you first
17  heard the horn and when it came into your sight?
18    A.  I have no idea.
19    Q.  Was the horn still going and continuous
20  this whole time?
21    A.  Yes, sir.
22    Q.  Okay.  And once the vehicle was in your
23  sight, could you describe the vehicle?
24    A.  I believe it was a gray car.  I think
                                            32

8 (Pages 29 to 32)

1  it was a Chrysler product.
2      Q.  Did the Chrysler pass right by you?
3      A.  It headed eastbound on the street.
4  Yes, it did pass by me.
5      Q.  And this was 53rd Street?
6      A.  Yes.
7      Q.  And 53rd Street is an east, westbound
8  street?
9      A.  That is correct.
10     Q.  So after you -- did the car pass by you
11  when you were standing in front of the Dunkin'
12  Donuts?
13     A.  Yes.
14     Q.  And after the car passed by you on the
15  Dunkin' Donuts, was the horn still going off?
16     A.  Yes.
17     Q.  Did you say anything to Officer Torres
18  or did he say anything to you after the car
19  passed by you and the horn was still going off?
20     A.  I don't recall at that point.
21     Q.  After the car passed by you, did you
22  then get inside of your patrol car?
23     A.  At some time, yes.
24     Q.  Did you keep looking at the gray

33

1  Chrysler as it continued eastbound on 53rd
2  Street?
3      A.  Yes.
4      Q.  What did you see the gray Chrysler do
5  as you kept watching it drive down 53rd Street?
6      A.  It -- the horn is steady, still
7  constant horn noise and it kind of drifted into
8  the curb east of us, hit the curb and stopped
9  abruptly with the horn still going off.
10     Q.  Were you standing outside of your car
11  when you observed this happen?
12     A.  Yes.
13     Q.  When you said that it drifted into the
14  curb, can you describe the motion of the car?
15     A.  The difference in someone parking a
16  vehicle versus them -- the vehicle hit the curb
17  like it wasn't being steered into the curb.
18     Q.  Did you see the tires actually move to
19  the point where it was moving over to the curb?
20     MR. PUISZIS:  Did you see the tires turn?
21     THE WITNESS:  I saw the vehicle moving.  I
22  couldn't see the -- you want to ask me that
23  question again, please.
24

34

1  BY MR. KSIAZEK:
2      Q.  Sure.  Well, how do you -- why do you
3  think that it was drifting like it wasn't being
4  steered?
5      A.  Because it actually ran into the curb
6  instead of like it was being parked and bumped
7  up against the curb and then bounced off a
8  little bit and stopped abruptly as if the driver
9  didn't have control of the vehicle.
10     Q.  Did you see the car shake?
11     A.  From bouncing off the curb?
12     Q.  Yes.
13     A.  Yes.
14     Q.  Now, at this point when you saw the car
15  hit the curb and come to a stop, right, you saw
16  the car come to a stop?
17     A.  Yes.
18     Q.  When you saw the car come to a stop,
19  did you have any reason to believe that this car
20  was a stolen vehicle?
21     A.  Did I have any reason to believe --
22  yes, it became a suspicious vehicle to me at
23  that point.
24     Q.  At what point, when it was parked at

35

1  the curb?
2      A.  The way it was -- the way it stopped,
3  the horn constantly going off and it seemed like
4  -- the driver was not in control.
5      Q.  So you said it was a suspicious
6  vehicle; right?  Did you have any reason to
7  believe it was a stolen vehicle?
8      A.  That thought came across my mind.
9      Q.  And why did that thought come across
10  your mind?
11     MR. PUISZIS:  Objection, asked and answered.
12  You can answer it a second time.
13     THE WITNESS:  Based on my experience as a
14  police officer.
15  BY MR. KSIAZEK:
16     Q.  At some point did the horn go off?  Did
17  the horn stop sounding?
18     A.  At what --
19     Q.  Was there a point where the horn
20  stopped sounding?
21     A.  I don't understand your question.
22     Q.  Okay.  After the car hit the curb, was
23  the horn still going off?
24     A.  Yes.

36

9 (Pages 33 to 36)

1    Q. And after you saw the car hit the curb,
2   did you get inside of your vehicle?
3    A. Yes.
4    Q. And when you were inside your vehicle,
5   was the horn still going off?
6    A. Yes.
7    Q. Did you drive towards where the
8   Chrysler had stopped against the curb?
9    A. Yes.
10   Q. And when you were driving towards when
11   — where the Chrysler had stopped against the
12   curb, was the horn still going off in the
13   Chrysler?
14   A. Yes.
15   Q. Now, you got to where the Chrysler was;
16   right? You drove your car down 53rd Street;
17   right?
18   A. I drove the car east, yes, on 53rd.
19   Q. And you drove towards where the
20   Chrysler had stopped against the curb; right?
21   A. Yes.
22   Q. At some point you stopped your car;
23   right?
24   A. Yes.

37

1    Q. And when you stopped your car, was the
2   horn still going off?
3    A. Yes.
4    Q. Okay. When you were inside of your
5   vehicle driving eastbound on 53rd Street towards
6   where the gray Chrysler was, did you have any
7   conversations with Officer Torres?
8    A. Yes.
9    Q. What did you say to Officer Torres and
10   what did he say to you?
11   A. What I said to him, what do you think,
12   what we got, a stolen car, do you think somebody
13   is in trouble.
14   Q. What did he say in response?
15   A. Let's check it out, something to that
16   effect.
17   Q. Approximately how long did it take you
18   to drive down 53rd Street eastbound to get to
19   where the gray Chrysler had stopped?
20   A. Not long.
21   Q. Do you know how many feet you had to
22   drive or how many blocks you had to drive?
23   A. No blocks. A matter of feet.
24   Q. Where did you stop the car in relation

38

1   to where the Chrysler was stopped, did you stop
2   in front or behind the Chrysler?
3    A. Behind it.
4    Q. Were you directly behind the Chrysler
5   or were you to its right or left?
6    A. To its — both cars facing the same
7   direction.
8    Q. Both cars facing east, right.
9    A. I would be to the left.
10   Q. And were you actually in the street of
11   like the eastbound lane of 53rd Street or were
12   you sort of in the parking spot there?
13   A. That was two questions —
14   Q. Okay. Were you actually parked in the
15   street in the eastbound lane of 53rd Street?
16   A. The vehicle was stopped in the street.
17   The squad car I was driving was stopped in the
18   street, in the angle behind the vehicle, behind
19   the Chrysler.
20   Q. As you were approaching the Chrysler
21   and driving down eastbound on 53rd Street, did
22   you see anyone leave the gray Chrysler, exit the
23   gray Chrysler?
24   A. Okay. You're asking me did I see

39

1   anybody exit the vehicle?
2    Q. As you were driving down 53rd Street,
3   yes.
4    A. No.
5    Q. Once you stopped your vehicle, did you
6   see anyone exit the gray Chrysler?
7    A. Yes.
8    Q. Who did you see exit the gray Chrysler,
9   if you know?
10   A. Two. One person exit — one male exit
11   from the left side and another male exit from
12   the passenger side.
13   Q. What did you see these two subjects do
14   once they exited the vehicle?
15   A. They exited the vehicle. They did not
16   look behind them, and they walked eastbound on
17   53rd Street.
18   Q. Was there a Bank of America just a
19   little bit down on 53rd Street that you saw?
20   A. Yes.
21   Q. Do you know how far down that Bank of
22   America was from where this Chrysler was parked?
23   A. I don't understand what you mean by how
24   far.

40

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

| | |
|---|---|
| 1    Q. How many feet was it away from where | 1    BY MR. KSIAZEK: |
| 2   the Chrysler was parked? | 2    Q. Okay. Well, when you saw the driver |
| 3    A. I have no idea how many feet it is. | 3   exit the vehicle, why didn't you get out of your |
| 4    Q. Okay. So you said these two subjects | 4   vehicle and go and try and talk to him? |
| 5   exited the vehicle and they walked eastbound | 5    A. Okay. You're asking me why. The way |
| 6   down 53rd Street? | 6   this is happening, I'm sitting and watching -- |
| 7    A. Yes. | 7   I'm observing. Okay. That's the only way I can |
| 8    Q. And this happened while you were still | 8   tell you. I'm watching to see what's going on |
| 9   inside your patrol car; right? | 9   here. |
| 10    A. Yes. | 10    Q. You said earlier that this was a |
| 11    Q. Once you stopped your patrol car and | 11   suspicious vehicle; right? |
| 12   saw the two subjects exit the vehicle, did you | 12    A. In my mind, yes. |
| 13   say anything to Officer Torres? | 13    Q. So the driver of the suspicious vehicle |
| 14    A. I probably did. I don't recall exactly | 14   just exited from the vehicle; right? |
| 15   what I said. | 15    A. Yes. |
| 16    Q. Did Officer Torres say anything to you? | 16    Q. And you sat and you observed this |
| 17    A. I don't recall. | 17   driver of the suspicious vehicle walk away from |
| 18    Q. Now, why didn't you exit your vehicle | 18   the vehicle at that point; right? |
| 19   and go after these two subjects? | 19    MR. PUISZIS: Objection. Now this is the |
| 20    A. I have to say this, I don't understand | 20   fifth time you've asked the question. Subject |
| 21   your question. | 21   to the objection, you could answer it a fifth |
| 22    Q. Okay. So your vehicle was stopped; | 22   time. |
| 23   right? | 23    BY MR. KSIAZEK: |
| 24    A. Yes. | 24    Q. Yes? |
|                                       41 |                                       43 |
| 1    Q. While your vehicle was stopped, you saw | 1    A. Yes to what? Say it again. |
| 2   a person, a male subject exit the driver door of | 2    Q. You saw the driver of a suspicious |
| 3   the vehicle; right? | 3   vehicle get out of the vehicle and walk away; |
| 4    A. Yes. | 4   right? |
| 5    Q. And you also saw another subject exit | 5    A. Yes, he's walking away. |
| 6   from the -- was it the rear passenger door? | 6    Q. Okay. And you didn't stop that driver |
| 7    A. I didn't say that. I said from the | 7   of the suspicious vehicle at that point? |
| 8   passenger side. | 8    A. I'm still in my car, sir. |
| 9    Q. So it was the passenger side front door | 9    Q. You didn't stop the passenger of this |
| 10   they exited from? | 10   suspicious -- |
| 11    A. I don't recall. | 11    A. I'm still in my car as they're walking. |
| 12    Q. Okay. Regardless, you saw another | 12    Q. Did you see anyone else exit from the |
| 13   person, a subject exit from the passenger side? | 13   vehicle while you were still sitting in your |
| 14    A. That is correct. | 14   car? |
| 15    Q. And this happened while you had -- | 15    A. Yes. |
| 16   right after you arrived in your patrol car next | 16    Q. Who did you see exit from the vehicle |
| 17   to the gray Chrysler; right? | 17   while you were still sitting in your car? |
| 18    MR. PUISZIS: Objection, asked and answered | 18    A. Mr. Boyle. |
| 19   now on the fourth time I think. You can go | 19    Q. Do you know from what door Mr. Boyle |
| 20   ahead and answer it again. | 20   exited when he exited the vehicle? |
| 21    THE WITNESS: Well, you said next to. I | 21    A. He got out on the left side of the car. |
| 22   never was next to the car. So I can't say right | 22    Q. And that would be the passenger rear |
| 23   to that because I was not right next to the car. | 23   seat of the car? |
| 24   I was behind it. | 24    A. No, the driver side of the car. |
|                                       42 |                                       44 |

Page 45

```
1     Q.  Right, you said the left side?
2     A.  Yes.
3     Q.  He got out from the back driver side
4  door; right?
5     A.  He got out of the left side of the car.
6  I'm behind the car.
7     Q.  What did you see Mr. Boyle do once he
8  got out of the car?
9     A.  Mr. Boyle got out of the car. He also
10 did not look back at us. He walked forward
11 about two or three steps in front of the car.
12 By this time, I'm out of my car. He walked two
13 or three steps in front of the car, then he
14 stopped, turned around, came back to the hood,
15 raised the hood and the horn was still going on,
16 continuously sounding.
17    Q.  When --
18    A.  Excuse me for a second. May I ask you
19 something?
20 MR. PUISZIS: Let's take a break.
21          (Whereupon, a short break was
22           taken.)
23 MR. KSIAZEK: We're back on the record.
24
```

Page 46

```
1  BY MR. KSIAZEK:
2     Q.  The last thing you told me was that
3  Mr. Boyle got out of the car, walked forward two
4  to three steps in front of the car, stopped,
5  came back around and raised the hood; is that
6  right?
7     A.  He walked -- let me say it again.
8     Q.  Sure.
9     A.  He walked two or three steps in front
10 of the car. He turned around. He came directly
11 back to the hood of the car and opened the hood
12 of the car.
13    Q.  And when you saw Mr. Boyle raise the
14 hood of the car, you were out of the car at that
15 point; right?
16    A.  Sometime in all this observation, I'm
17 out the car walking toward and watching him
18 outside of the car. And specifically what time
19 or how many seconds, I don't recall that.
20    Q.  Okay. And did you see anyone else
21 still in the car after the two subjects left,
22 exit the vehicle and Mr. Boyle exit the vehicle?
23    A.  Yes, there was still someone else in
24 that car.
```

Page 47

```
1     Q.  Was it a female in the car?
2     A.  I later found out it was a female.
3     Q.  How did you find that out?
4     A.  She looked like a female.
5     Q.  Did you talk to her?
6  MR. PUISZIS: Objection. At what point?
7  BY MR. KSIAZEK:
8     Q.  Did you talk to her after you got out
9  of your car, immediately after you got out of
10 your car?
11    A.  No.
12    Q.  But you did notice her after you got
13 out of your car?
14    A.  Oh, definitely.
15    Q.  Once you got out of your car and you
16 saw Mr. Boyle raise the hood, what did you do?
17    A.  I looked to see where the other two
18 guys were.
19    Q.  Did you see the other two subjects at
20 that point?
21    A.  No. They had disappeared in the
22 vestibule of where that bank was.
23    Q.  Did you see them actually go into the
24 vestibule?
```

Page 48

```
1     A.  No. When you say did I see them go
2  into the vestibule?
3     Q.  Yeah, did you see them go --
4     A.  I cannot see the doors from the bank.
5  From where we were, you can't see the doors.
6  All I can tell you is they were out of sight.
7  MR. PUISZIS: Don't guess and don't
8  speculate. If they're out of sight, they're out
9  of sight.
10 BY MR. KSIAZEK:
11    Q.  This is a lighted -- 53rd Street was
12 lighted at that point in night; right?
13    A.  2:30 in the morning, artificial
14 lighting.
15    Q.  So after you were looking to see where
16 the other two guys were, did Officer Torres say
17 anything to Mr. Boyle?
18    A.  We both asked -- I asked him whose car
19 it was.
20    Q.  So you asked Mr. Boyle whose car it
21 was?
22    A.  I asked. Torres asked.
23    Q.  Who asked first?
24    A.  I don't recall.
```

1    Q.  Okay.  When you asked Mr. Boyle whose
2  car it was, how did he respond?
3    A.  He didn't.
4    Q.  What was Mr. Boyle doing when you asked
5  him whose car it was?
6    A.  Standing there looking at me at that
7  point.
8    Q.  Now, before you asked Mr. Boyle whose
9  car it was, what was he doing?
10    A.  I don't recall specifically.  He's in
11  front of the car.  He had the hood up.  The horn
12  is going off.  I've got something going on.  I
13  don't know who this guy is.  And I asked whose
14  car was it.
15    Q.  He's actually leaned over inside of the
16  hood of the car?
17    A.  I didn't say that.  I told you I don't
18  recall.
19    Q.  Now, when Officer Torres asked him
20  whose car it was, did Mr. Boyle respond to that?
21    A.  No.  From my recollection when I asked
22  him, he never answered the question whose car it
23  was, when I asked him or Torres asked.  As far
24  as I recall, he never answered that question.
                                                49

1    Q.  When either yourself or Officer Torres
2  asked Mr. Boyle whose car it was, did he raise
3  his arm at any point and point to the car?
4    A.  No, not -- no.
5    Q.  Did you hear the female that was still
6  in the car at that point, did you hear her say
7  anything when you asked Mr. Boyle whose car it
8  was?
9    A.  No.
10    Q.  Did you hear her say anything when
11  Officer Torres asked whose car it was?
12    A.  No.
13    Q.  So what did you do after Mr. Boyle did
14  not respond to your question whose car is it?
15    A.  I asked him again.
16    Q.  And how did he respond the second time
17  you asked him whose car it was?
18    A.  Somewhere in this exchange he said the
19  horn is stuck.  I said, I know that, whose car
20  is it.  He didn't respond.  I asked him for some
21  ID.  He didn't respond.
22    Q.  Did you ask him for ID immediately
23  after you asked him whose car it was?
24    A.  Sir, what's your name again?
                                                50

1    Q.  My name is Mr. Ksiazek.
2    A.  Mr. Ksiazek.
3    Q.  Yes.
4    A.  I've got suspicious vehicle, horn going
5  off.  I've got a person standing in front of me
6  that's evasive.  I don't recall exactly how
7  questions were asked beyond that.  I don't know
8  if it was seconds.  I can't give you those kind
9  of answers.  I don't know.  I don't recall.
10    Q.  I'm just asking to the best of your
11  ability to tell me what happened that night.
12  Okay.
13    A.  If you would ask me specifically
14  something that I am capable of answering, I can
15  tell you exactly what happened.  So what's your
16  last question?
17    Q.  So after you asked him for ID and he
18  didn't respond, what happened after that?
19    A.  After I told you he said the horn was
20  blowing?
21    Q.  Sure.  Yeah, you said he told you that
22  the horn is stuck; right?
23    A.  Yes.
24    Q.  And --
                                                51

1    A.  I said I see that, and I asked him for
2  some ID.  He did not respond.  Somewhere in that
3  same time Torres is asking him for ID.  He did
4  not respond.  He never -- he did not give any
5  ID.  Somewhere in that -- those seconds he said
6  to Officer Torres, I don't have to show you
7  anything.  I said, let's step over to the car.
8  At that time he pushed off.  He pushed us both
9  off.
10    Q.  And when you said to Mr. Boyle to walk
11  over to the car --
12    A.  I didn't say walk over to the car.
13    Q.  What did you say?
14    A.  Step over to the car.
15    Q.  Step over to the car.  You told
16  Mr. Boyle to step over to the car, did you guide
17  him over to the car?
18    A.  He pushed off.
19    Q.  Did he push off immediately after you
20  told him to step over to the car?
21    A.  Somewhere in that exchange, that's when
22  he got -- he pushed.  I'm using my hands to
23  usher him in the direction indicating which way
24  I would like for him to move to step over the
                                                52

13 (Pages 49 to 52)

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1  car, he pushed off.
2    Q.  Did you ever touch him with your hands
3  when you were ushering him over?
4    A.  Let me ask you this, are you asking me
5  did I do a deliberate grab on him?
6    Q.  I'm asking you when you told him step
7  over to the car and you ushered him over to the
8  car, did you physically touch Mr. Boyle?
9    A.  I don't recall.  I recall him pushing
10 off.  I recall him creating contact, pushing me
11 off.
12   Q.  Did he push you?
13   A.  Yes.
14   Q.  How did he push you?
15   A.  He pushed me with his hands and his
16 arms.
17   Q.  It was with both arms?
18   A.  No.  He was using the other arm to push
19 Torres.
20   Q.  Okay.  So he pushed you with one arm
21 while he pushed Officer Torres with the other
22 arm?
23   A.  He pushed us both off.  I'm on one side
24 and Torres is on the other side.  He made

53

1  contact with both of us.
2    Q.  Do you know if you were on his left
3  side or his right side?
4    A.  I don't recall exactly.
5    Q.  After he pushed both of you off, what
6  happened?
7    A.  You're asking what did I do?
8    Q.  What did you do after he pushed you
9  off?
10   A.  I grabbed his arm.
11   Q.  Why did you grab his arm?
12   A.  The man just pushed the police.
13   Q.  Do you know what arm you grabbed of
14 his?
15   A.  Exactly, no.
16   Q.  What did Officer Torres do?
17   A.  He grabbed him, too.
18   Q.  Did he also grab Mr. Boyle's arms?
19   A.  Yes.
20   Q.  So as you -- after you grabbed one of
21 Mr. Boyle's arms and Officer Torres grabbed
22 Mr. Boyle's arms, what did you do at that point?
23   A.  We're now trying to control him.  I
24 believe Officer Torres was telling him to calm

54

1  down and now the wrestling match was on.  He's
2  resisting us totally.  He's swinging us around
3  now.  He's literally fighting with us.
4    Q.  Okay.  When both yourself and Officer
5  Torres grabbed Mr. Boyle's arms, did he say
6  anything to you?
7    A.  No.
8    Q.  Did he say anything to you when he
9  pushed both yourself and Officer Torres away?
10   A.  He blurted out something but I don't
11 recall what he said.  It wasn't nothing in
12 cooperation, that's for sure.
13   Q.  When you first asked Mr. Boyle whose
14 car it was, was that the first thing you said to
15 Mr. Boyle?
16   A.  Yes.
17   Q.  Did you identify yourself before you
18 said whose car is this?
19   A.  In terms of what?
20   Q.  Did you say I'm a police officer, whose
21 car is this?
22   A.  Sir, I'm in full uniform, I've got a
23 badge, a radio, it's obvious I'm the police in a
24 squad car that says University of Chicago

55

1  Police.  I felt that was enough of identifying
2  myself.  And, yes, at one point I did tell him.
3    Q.  When did you tell him that you were a
4  police officer?
5    A.  During his resisting.
6    Q.  You said Officer Torres told him to
7  calm down; is that right?
8    A.  I remember hearing him say that, relax
9  something to that point, trying to get the guy
10 to get some control of this guy.  So he gave a
11 verbal command of relax.
12   Q.  Okay.  And when you say it was a
13 wrestling match at that point, after Officer
14 Torres told him to calm down or relax, was it
15 like WWF Wrestling, what do you mean?
16   A.  I never watched it.
17   Q.  Well, what do you mean by it was a
18 wrestling match?
19   A.  Mr. Boyle was not cooperating.
20 Mr. Boyle was resisting.  Mr. Boyle tensed up.
21 He flexed.  He's strong.  He's pulling us.  He's
22 doing more pulling and turning than we are.  I'm
23 trying to hold onto him.
24   Q.  What part of his body were you trying

56

14 (Pages 53 to 56)

1    to hold onto, his arm?
2     A. Yeah, it hasn't changed. It's the same
3    answer, his arms. I'm trying to make sure he
4    doesn't get a chance to strike me, make sure
5    he's not given a chance to -- get ahold of him.
6    We're trying to restrain this guy.
7     Q. Have you ever seen like wrestling in
8    the Olympics, have you ever seen that?
9     A. No.
10    Q. Have you ever seen wrestling in
11    college?
12     A. I need to ask what -- have I ever seen
13    wrestling, sir?
14    Q. Yes.
15     A. Yes.
16    Q. Where have you seen wrestling?
17    MR. PUISZIS: Objection, irrelevant.
18    THE WITNESS: Where?
19    BY MR. KSIAZEK:
20    Q. Yes.
21     A. I used to try wrestling a little bit --
22    I've seen me try to wrestle. I think when I was
23    in elementary school I might have went off for
24    the wrestling team. Somewhere in the 1960's.

57

1     A. Because of the force that was being
2    used to resist us. The force that was being
3    used directed toward us. The tension I could
4    feel in his arms. He's flinging his arms. He's
5    literally trying to fling his arms like he's
6    trying to throw a punch.
7    Q. And were you actually preventing him
8    from throwing a punch when you were grabbing
9    onto his arms?
10     A. I definitely was trying to protect
11    myself and my partner.
12    Q. And at that point your partner was also
13    holding onto Mr. Boyle?
14     A. We were both in the same predicament.
15    Q. Did you ever see Mr. Boyle pick up your
16    partner, physically pick him up?
17     A. Yes.
18    Q. When did you see Mr. Boyle physically
19    pick up your partner?
20     A. As we were trying to get control of
21    this young man, he led us from this -- just led
22    us from the front of that Chrysler to the back
23    of that Chrysler. We ended up toward the -- let
24    me slow down so you can get all this.

59

1    But specifically WWF, whatever you said, no,
2    never watched it.
3    Q. Okay. So as you were trying to hold
4    on --
5    MR. PUISZIS: You're not missing much.
6    THE WITNESS: Yeah. I mean, I saw them
7    bunch off a rope and that's enough for me.
8    That's not wrestling as far as I'm concerned.
9    BY MR. KSIAZEK:
10    Q. When you were trying to hold onto
11    Mr. Boyle's arm as he was -- you said he was
12    struggling with you; right?
13    MR. PUISZIS: You can go ahead for a third
14    time.
15    THE WITNESS: Yes.
16    BY MR. KSIAZEK:
17    Q. What was Officer Torres doing when you
18    were holding onto Mr. Boyle's arm?
19     A. Mr. Boyle -- when I say we were holding
20    onto him and trying to restrain him, Mr. Boyle
21    was trying to throw I believe was -- if we let
22    go, if he would have broke loose, he would have
23    punched one of us.
24    Q. Why do you believe that?

58

1    Q. You can keep saying.
2     A. The struggle went from the front of the
3    car, the Chrysler, down the left side of the
4    Chrysler, in between my squad car and the
5    Chrysler, toward the curb. We're struggling
6    with this young man. We're trying to get
7    somewhere where we can get control of him. He
8    forced -- Torres's door was still open, the
9    passenger door of our squad car was open.
10    At that point somewhere in there he
11    lifted Torres up with me still holding him.
12    Torres fell back toward into the squad car. I'm
13    trying to pull -- your client lifted Torres and
14    me up.
15    Q. So he lifted Officer Torres up and
16    placed him in the squad car?
17     A. That's not what I said.
18    Q. What did you say?
19     A. Your question was there ever a time
20    that he ever lifted --
21    Q. Officer Torres?
22     A. Torres, which I interpreted as the
23    point where Boyle's body used his body to lift
24    Torres off the ground, and that's what I've just

60

15 (Pages 57 to 60)

1 described.
2    Q. Did Mr. Boyle ever lift you up off the
3 ground?
4    A. As he got -- I'm pulling on him trying
5 to get him off of Torres because Torres now is
6 pinned in between the car, so I'm pulling toward
7 him. When Boyle lifted him up, I used my body
8 leverage to flip all three of us to the ground.
9        Meanwhile into that, somewhere in that
10 struggle, Officer Torres was able to use one
11 hand to get to the radio that was attached to
12 his shoulder and call for help, 10-1.
13    Q. Did you have a radio on your uniform
14 that night?
15    A. No.
16    Q. Do you know if Officer Torres radioed
17 dispatch before you exited your vehicle to tell
18 them that you were investigating a suspicious
19 car, a suspicious vehicle?
20    A. Okay. You asked me did I know if
21 Officer Torres, I don't recall.
22    Q. And now you used your own body leverage
23 to flip yourself, Mr. Boyle and Officer Torres
24 onto the ground, is that your testimony?

61

1 three of them went to the ground, were they in
2 the squad or out the squad.
3    MR. KSIAZEK: Well, I'm asking him --
4    MR. PUISZIS: Because he's already described
5 what happened outside the squad. And I object
6 to you trying to change his testimony by
7 changing some of the words of what he said. So
8 if you're going to use what he said as a
9 predicate to your next question, describe what
10 he said accurately. Object to the
11 mischaracterization.
12    MR. KSIAZEK: I'm trying to understand it
13 and I'm trying to clarify it if for the record
14 so --
15 BY MR. KSIAZEK:
16    Q. When you flipped Mr. Boyle onto the
17 ground, where was Mr. Boyle located?
18    A. Well, when we all hit the ground,
19 Mr. Boyle was still in between the two of us.
20    Q. And Officer Torres was in the vehicle
21 at that point or was he outside of the vehicle
22 at that point?
23    A. Sir, we can't be on the ground and in
24 the vehicle at the same time. So I'm not trying

63

1    MR. PUISZIS: Objection, asked and answer
2 again. But you can go ahead and tell him a
3 second time.
4    THE WITNESS: I didn't intentionally try to
5 flip myself to the ground. I wanted to get your
6 client on the ground and I inadvertently -- the
7 weight took me down, too. So all three of us
8 hit the ground, if that's what you want to know.
9 BY MR. KSIAZEK:
10    Q. So that's a yes; right?
11    A. Did all three of us hit the ground, is
12 that what you're asking me?
13    Q. Yes. Well, you flipped all three of
14 you to the ground; right?
15    A. I used my leverage to try to get your
16 client off balance to the ground and
17 subsequently all three of us landed to the
18 ground.
19    Q. Was officer -- Mr. Boyle -- when you
20 flipped or you used your leverage to flip
21 Mr. Boyle and Officer Torres onto the ground,
22 was Mr. Boyle inside of your squad car or was he
23 outside the squad car?
24    MR. PUISZIS: Are you asking him when all

62

1 to be -- you know, your question, I don't
2 understand the question. So if you're asking me
3 are we in -- we can't be in the vehicle and on
4 the ground at the same time.
5    Q. Well, when you flipped Mr. Boyle to the
6 ground; right?
7    MR. PUISZIS: Again, I object. This is the
8 fourth time you've asked and he described what
9 he did.
10 BY MR. KSIAZEK:
11    Q. I'm asking where was Mr. Boyle when you
12 flipped him to the ground?
13    MR. PUISZIS: And I object to the reference
14 to flipping him to the ground. He said he
15 lifted up and used -- Mr. Boyle was lifting them
16 up. He used his leverage and all three of them
17 fell to the ground. So I object to your
18 characterization of flipping him to the ground.
19 BY MR. KSIAZEK:
20    Q. When you used your leverage to take
21 Mr. Boyle down to the ground, where was
22 Mr. Boyle located?
23    MR. PUISZIS: Before he went to the ground
24 or after he went to the ground?

64

16 (Pages 61 to 64)

BY MR. KSIAZEK:

1 Q. Before he went to the ground?
2 A. Good question. Okay. He's still in
3 between the both of us.
4 Q. Where?
5 A. When you say where, sir?
6 Q. Were the three of you in between the
7 silver Chrysler and your patrol car?
8 A. You know what, I answered that a long
9 time ago.
10 MR. PUISZIS: But when you hit the ground.
11 MR. KSIAZEK: When you hit the ground.
12 MR. PUISZIS: When all three of you fell to
13 the ground, were you --
14 THE WITNESS: We were where I told him where
15 we were then. Boyle had just lifted Torres into
16 our squad car. The door was open, the passenger
17 door of the squad car was open. That's when you
18 asked me at any time did Boyle -- did I see
19 Boyle lift up Torres. You asked me that
20 question, and I told specifically when I saw
21 that, that was outside our car door where he
22 lifted him up into that car door and then get
23 him -- then when we went to get him off, that's

65

1 when he lifted -- Boyle used his weight and he
2 lifted Torres up.
3 I used my leverage to put -- try to put
4 him down on the ground. All three of us hit the
5 ground, on the ground outside the squad car.
6 We're way behind the Chrysler. Remember we
7 started from the front of the Chrysler, all the
8 way down the side, closer to the curb, then back
9 into by our squad car because we're trying to
10 get a place where we can try to use something to
11 get control. Okay. That's where we are.
12 BY MR. KSIAZEK:
13 Q. Okay. Did you have your handcuffs out
14 at this point when you were on the ground?
15 A. I could not get to my handcuffs because
16 your client was a handful. I could not get to
17 any handcuffs. I couldn't get to anything other
18 than trying to keep this guy from swinging and
19 hitting someone. I'm trying to maintain
20 control.
21 Q. Okay. When the three of you first fell
22 onto the ground, how did Mr. Boyle fall to the
23 ground, was it belly up or was his back on the
24 ground -- I'm sorry, was his belly up or was his

66

1 back up?
2 A. His belly was not up. He did not fall
3 on his back.
4 Q. So he fell on his belly?
5 A. I don't know -- he did not fall on his
6 belly either.
7 Q. Did he fall on his side?
8 A. He's not trying to fall at all. He's
9 going -- we're all going to the ground. The way
10 you're characterizing the fall is if he
11 completely has his own hit the ground on his
12 belly or on his back. That did not happen.
13 Q. Okay. Describe how yourself -- well,
14 you already described that so we won't go into
15 that.
16 A. Thank you.
17 Q. But once you're on the ground, where
18 are you located? Where are you located in
19 relation to Mr. Boyle?
20 A. Sir, I don't recall. At one point I'm
21 on the bottom of the pile, I'm on the side of
22 the pile. He's trying to get up. I'm
23 trying to get up over him. He's trying to get
24 me down. He gets Torres down. We're back and

67

1 forth here.
2 He's kicking. He's trying to punch.
3 At one point you fall loose. He throws an arm.
4 This is a person not being -- he's totally --
5 he's uncontrollable. He's very -- he's
6 resisting. He's fighting with us.
7 Q. When you first fell to the ground, do
8 you recall if you were on top of Mr. Boyle, if
9 you're underneath Mr. Boyle? Do you recall
10 where you were located?
11 A. Obviously I didn't answer you directly.
12 No, I don't recall. What I recall is what I
13 told you prior to.
14 Q. When you said he was kicking, did he
15 kick you?
16 A. He probably did.
17 Q. Do you know when he kicked you?
18 A. What do you mean by when? Are you
19 asking me the exact time?
20 Q. I'm not asking you the exact time. I'm
21 saying you fell to the ground; right? All three
22 of you were on the ground; right?
23 MR. PUISZIS: Objection, asked and answered
24 for like the seventh time now.

68

17 (Pages 65 to 68)

BY MR. KSIAZEK
1    Q.  After you fell on the ground, when did
2  he kick you?
3    A.  Sometime in that struggle.
4    Q.  Okay.  When did he punch you after the
5  three of you fell to the ground?
6    A.  I didn't say he punched me.
7    Q.  Well, you said he was punching, did he
8  punch you?  Did he punch you?
9    A.  Did his fist hit me in the face?
10   Q.  Yes.
11   A.  No.
12   Q.  Did his fist hit Officer Torres in the
13 face?
14   A.  I don't recall.
15   Q.  Do you recall him kicking Officer
16 Torres?
17   A.  I don't know for sure but I'm quite
18 sure Torres got kicked.
19   Q.  Well, is it you're quite sure or you
20 don't know?
21   A.  Well, the man is kicking at both of us
22 and we're trying to restrain him.  If you're
23 kicking and somebody is holding you, you're

69

1  going to possibly get contact.  You asked me did
2  he get kicked?
3    Q.  Right.
4    A.  I don't recall, but I'm quite sure he
5  did have contact with his feet because the man
6  was kicking on both of us and we're on top of
7  him, we're on the bottom of him, we're on the
8  side of him.
9    Q.  Were you saying anything to Mr. Boyle?
10   A.  Stop, sir.
11   Q.  Did he say anything in response once
12 you said to him stop, sir?
13   A.  He said a lot of things.  I don't
14 remember exactly what he said.  Most of it was
15 not pleasant, so there was some curse words.
16 There was a lot of stuff being said.  I wasn't
17 interested.  I'm trying to get control of a
18 person here.  And at this point he's very
19 dangerous to me.
20   Q.  Why is he dangerous to you?
21   A.  Because he's resisting the police, and
22 he's trying to fight with the police.
23   Q.  You said he said some curse words, can
24 you say those curse words?

70

1    A.  I just told you what I said, I didn't
2  recall what he said.
3    Q.  Now, at some point did other University
4  of Chicago officers arrive?
5    A.  Yes.
6    Q.  When did you first see other University
7  of Chicago officers arrive?
8    A.  When they were trying to help me
9  control your client, arrest your client at this
10 point because he's under arrest.
11   Q.  When you saw the other University of
12 Chicago officers arrive, did you have your
13 handcuffs out at that point?
14   A.  No.
15   Q.  Were you trying — so you weren't
16 trying to put Mr. Boyle into handcuffs when the
17 other University of Chicago officers arrived?
18   A.  When the other University police
19 officers at the time that you sound like you're
20 framing when they arrived, I'm still struggling
21 with your client.  We do not have control.  He's
22 still resisting.  The arrest process is real
23 simple.  If the officer says your under arrest,
24 you put your hands behind your back.  The only

71

1  thing that goes on you is handcuffs.  That never
2  happened in that process with your client.
3    Q.  Okay.  As a University of Chicago
4  police officer, you're not allowed to arrest
5  someone, though; right?
6    A.  That's not right.
7    Q.  You're allowed to arrest someone as a
8  University of Chicago police officer?
9    A.  Yes.
10   Q.  Do you know who the first University of
11 Chicago officer was to arrive at the scene
12 besides yourself and Officer Torres?
13   A.  No.
14   Q.  Do you know how many University of
15 Chicago officers arrived as back-up?
16   A.  At the time of the incident?
17   Q.  When was the first time — how many
18 University of Chicago officers did you first see
19 as back-up?
20   A.  I don't know how many I saw as back-up.
21   Q.  Okay.  Do you know how many University
22 of Chicago officers were helping you to arrest
23 Mr. Boyle?
24   A.  At the time this situation was going

72

18 (Pages 69 to 72)

1 on, I did not count the officers whether they
2 were University officers or whether they were
3 Chicago officers there. I did not count
4 officers. I cannot tell you.
5     Q. Did you recognize -- I know this was
6 your first day, but did you recognize any of the
7 University of Chicago officers who came to
8 assist you?
9     A. Recognize them how?
10     Q. Did you know their names?
11     A. At the time we were trying to control
12 -- you're asking me did I know -- I don't
13 understand your question at all.
14     Q. Okay.
15     A. I'm sorry.
16     Q. Sure. Did you know -- well, as of
17 today's date, do you know who came and assisted
18 you with arresting Mr. Boyle from the University
19 of Chicago Police Department?
20     A. Yes.
21     Q. Who came and assisted you?
22     A. Officer Galarza, Kwiatkowski and there
23 were some other officers there. Whoever is on
24 that report, that's who came.
                                                     73

1 arrested with two sets of cuffs on because we
2 wouldn't had put one set on him and everything
3 is quiet, then you have an opportunity to see
4 who's there.
5     Q. Okay. So after everything was quiet
6 and you saw who is there, was it then that you
7 realized that it was Galarza, Gillespie and
8 Kwiatkowski that helped you assisting to arrest
9 Mr. Boyle?
10     A. I learned -- yes. And when you asked
11 how Galarza had his shoulder injury, because he
12 got kicked. Gillespie's glasses got slapped off
13 and knocked off his face. Everybody is
14 assessing their injuries now.
15     Q. But did you see Officer Galarza
16 actually get kicked when Mr. Boyle was on the
17 ground?
18     A. Yes, I sure did.
19     Q. How did Mr. Boyle kick Officer Galarza?
20     A. When he was tossing around and we're
21 trying to get cuffs on him now because now help
22 is there now I got handcuffs, he spins around.
23 He's wrestling around and he raised his -- he
24 was -- his in the legs were big and kicked out.
                                                     75

1     Q. And how did you later learn that those
2 were the officers that came to assist you with
3 Mr. Boyle?
4     A. I don't understand your question at
5 all.
6     Q. When did you learn that Officers
7 Galarza, Gillespie and Kwiatkowski came and
8 assisted you with -- when did you learn that
9 those were the officers that were assisting you
10 to arrest Mr. Boyle?
11     A. What do you mean by learn?
12     Q. Well, you didn't know that those --
13 that Officer Galarza, Gillespie and Kwiatkowski
14 were the ones assisting on October 18th, 2008;
15 right?
16     A. No, I didn't -- see I don't -- look,
17 your questions are so vague. You're asking me
18 learn, no. I did not care what officers were
19 there to help. They were there to help. I did
20 not have time to count. I can't recollect
21 counting one, two, three, four. I didn't have
22 time to look at anybody's -- they were in
23 uniform, they were University of Chicago Police.
24     How we learned later after this guy was
                                                     74

1 He kicked Galarza on the shoulder.
2     Q. Okay. Did you see Mr. Boyle kick
3 Officer Gillespie?
4     A. Somewhere in there I could see him
5 getting kicked, and I saw his glasses fall off
6 his face. My glasses went off my face.
7     Q. You were wearing glasses that night?
8     A. Yes.
9     Q. And did you see where Officer
10 Gillespie's glasses landed?
11     A. No. Somewhere in the vicinity. I saw
12 him pick them up.
13     Q. Did he pick them up in one piece?
14     A. No, his glasses were mangled I believe.
15 I think he had to send home to get -- to have
16 another pair brought or something like that. I
17 don't recall. I knew there was some
18 conversation about that.
19     Q. But do you know if they were still in
20 one piece or if they were actually in more than
21 one piece?
22     · MR. PUISZIS: He's asked and answered the
23 question, Counsel.
24     THE WITNESS: I used the word mangled.
                                                     76

19 (Pages 73 to 76)

BY MR. KSIAZEK:

Q. Okay. How far did your glasses fly off your face?

A. Further than we can reach them for sure. I had to look for them.

Q. At some point was Mr. Boyle actually placed in handcuffs?

A. Two sets of handcuffs.

Q. Two sets of handcuffs?

A. He never stopped struggling. We could not convince him to cuff him at all. One cuff and we still could not get his hands behind his back to conventional cuff him.

Q. So was it a set of cuffs for his legs?

A. No.

Q. Where were the two cuffs?

A. I was able to get one cuff on him, one of my sets of cuffs and some other officer came out with another set of cuffs. We connected the end, the free end of my set of cuffs and the free end of the other officer's set of cuffs and we were able to get Mr. Boyle's hands in the proximity to where those two sets of cuffs and the other cuff could be used to cuff the other

77

free hand.

Q. So it was your cuffs and another officer's cuffs?

A. I have no idea who they were at this time.

Q. And you got him in cuffs while he's still on the ground; right?

A. Yes. He never cooperated at any point other than to the point where we're on the ground.

Q. What did you do once Boyle was in cuffs on the ground?

A. I asked him for some assistance. We got him up off the ground, and he was placed on the back of a squad car and leaned forward because he was still was resisting. So I had him bent over the trunk of a car, I don't remember if it was my squad car or somebody else's car.

He was bent over with his chest over the trunk of the car in a subdued manner so he could not raise back up. I'm telling this man to calm down. It's over. You're under arrest.

Q. After you told him that he was under arrest, was that at the point where he calmed

78

down or did he keep struggling?

A. Ask your question. Help me out here.

Q. Did he calm when you told him to calm down when he was under arrest?

A. You're asking me when I was speaking to him did he stop, no. He still needed someone there with him.

Q. Were you the only officer who was standing by him at that point?

A. I don't recall.

Q. How did he keep struggling when you told him to calm down, that he's under arrest?

A. He was trying to raise up off the car, trying to stand up.

Q. And what did you do once he tried to raise above the car and stand up?

A. Just place my hand on his back firmly, calm down, you're not going anywhere. That kind of language.

Q. At that point did he calm down?

A. Somewhere down the line he did calm down where to the point where he could be transported to a squad car and be taken into the 21st District and processed, yes.

79

Q. Well, that's a large period of time there so --

A. I don't know what's large to you or not. The question was just as large.

Q. Okay. So after you placed your hand on his back firmly, did you walk him over -- well, actually at that point did you notice any Chicago Police Officers at the scene?

A. Chicago Police Officers was there prior to that point --

Q. When did you first --

A. -- I believe. I have no idea of when they got there. I was not -- I'm only going to repeat what I said before, I don't know. I was in a struggle. I was in a fight. I'm trying to protect myself and trying to restrain a person who's not cooperating. Okay. I have no idea of what time, who was there first, UCP officers, Chicago Police Officers, who drove past, who did not stop, I don't.

Q. Did you personally walk -- you don't know, you testified you don't know. I'm sorry.

A. Thank you.

Q. At some point he was placed in a squad

80

20 (Pages 77 to 80)

1  car, though, in the CPD squad car, though;
2  right?
3      A.  Yes, I believe he was transported by
4  CPD.  I'm not sure.
5      Q.  Did you have any conversations -- well,
6  did you recognize the Chicago Police Officers
7  who were at the scene that day?
8      A.  By uniform, of course.
9      Q.  Did you recognize them by name?
10     A.  No.
11     Q.  Did you have any conversations with the
12 Chicago Police Officers who were at the scene
13 once Mr. Boyle was subdued?
14     A.  I don't recall.  And what I don't
15 recall is specifically talking whether or not I
16 said something, whether I said anything.  I
17 don't recall.  To answer your question
18 specifically, I don't recall.
19     Q.  You just recall Mr. Boyle being inside
20 the Chicago Police officer patrol car?
21     A.  You asked me that already.
22     Q.  I know.
23     A.  I don't --
24     Q.  I'm asking you if you remember that?

81

1      A.  Do I remember what?
2      Q.  Mr. Boyle actually being placed inside
3  the Chicago Police car?
4      A.  As I said earlier, I can't remember if
5  he was transferred by UCPD or CPD.  I think he
6  was -- I'm almost sure it was UCPD -- I mean,
7  Chicago Police.  What conversation I had with
8  the Chicago Police, I don't recall specifically.
9  I'm quite sure we did.  I don't know what it
10 was.  It had to be something about the situation
11 if I did.
12     Q.  Okay.  Did you have any conversations
13 with any of the witnesses who were at the scene
14 on October 18th, 2008?
15     A.  And who are you speaking of?
16     Q.  Did you have any conversations with
17 Ashley Glover at the scene?
18     A.  Yes.
19     Q.  When did you have this conversation?
20     A.  After Boyle was under -- in cuffs, she
21 now was standing outside the car.  Prior to the
22 struggle, she never got out the car.  I never
23 saw her out the car.  And I asked her what's
24 wrong with him, what's going on here, is he

82

1  drunk, is he mental.
2      Q.  What did she say when you asked her
3  that?
4      A.  She didn't answer me.  One of the other
5  guys, that one of the guys that disappeared and
6  is now back on the inside, he told her to shut
7  up, don't say nothing to nobody.  Which one said
8  that, I don't know.  I just knew it was one of
9  the two that was with her.
10     Q.  Is this the only conversation that you
11 had with Ashley Glover or one of the two guys
12 who had come back on the scene?
13     A.  I don't recall any other -- I'm trying
14 to find out who he was.  We still didn't know
15 who he was.  We probably asked him what was his
16 name.  We probably would have asked him a whole
17 lot of information.
18     Q.  At any point did you get his
19 identification?
20     A.  Yeah.  Somebody got it.  I don't
21 remember who.  To answer your question did I get
22 his identification, did I physically get it?
23     Q.  Sure, did you physically get it?
24     A.  Not on the scene.

83

1      Q.  But you said another officer did;
2  right?
3      A.  Somebody had to.  I don't know who.
4      Q.  Was it at that point that you learned
5  that this was Charles Boyle?
6      A.  At what point, sir?
7      Q.  When the officer got identification
8  from Mr. Boyle.
9      A.  I wasn't with him when he got the
10 identification.  I told you I didn't know.
11     Q.  Okay.  So after Mr. Boyle went away in
12 the squad car, did you say he went to the 21st
13 District?
14     A.  I'm sorry?
15     Q.  Did you say he went to the 21st
16 District?
17     A.  Yes.
18     Q.  And after he went to the 21st District,
19 were you still at the scene after Mr. Boyle had
20 been taken away from the scene?
21     A.  Help me understand this, are you asking
22 me when Boyle -- when he was transported away,
23 was I still standing at that scene?
24     Q.  That's what I'm asking you, yes.

84

21 (Pages 81 to 84)

1    A.  Yes.
2    Q.  How long did you remain at the scene
3  after Mr. Boyle had been taken away?
4    A.  I don't know how long I remained at the
5  scene. I can tell you what I did next. Officer
6  Torres and I went to the 21st District.
7    Q.  Okay. Did you have any conversations
8  with Mr. -- Officer Torres as yourself and him
9  traveled to the 21st District?
10    A.  I'm quite sure we did. What we talked
11  -- yes, we did.
12    Q.  Do you remember what you talked about
13  on the way there?
14    A.  Verbatim, no.
15    Q.  Do you remember the general subject of
16  the conversation?
17    A.  I'm quite sure it was about what we
18  just endured. I know we were both -- I know I
19  expressed that we did a good job in restraining
20  this guy. I expressed that the response was
21  good. Everybody acted accordingly. This young
22  man was very combative, and he did not get hurt.
23    Q.  This was your first day at the job and
24  you said all this?

85

1    A.  Yes. Thank you.
2    Q.  Do you know if Officer Torres said
3  anything in response to you when you expressed
4  these sentiments?
5    A.  He expressed the same thing in so many
6  words. We also talked about the fear that we
7  were just placed in.
8    Q.  What did you say the fear that you were
9  just placed in?
10    A.  He could have got a gun. He could have
11  grabbed my gun. I didn't know if he had a
12  weapon when we were going through all this.
13  We're working together. This is not the end of
14  our day so we're sitting here talking about this
15  scenario, going through it, talking about
16  officer safety because you're right, this is the
17  first day, this is the first time I met Officer
18  Torres.
19        I have no knowledge of his prior police
20  experience, so this was a good time for us to
21  talk. We talked then, and we talked later about
22  officer safety and what we could have done
23  differently, if we could have done anything
24  differently. And it came out that we did it

86

1  right in terms of our safety and this young
2  man's safety.
3    Q.  Did Officer Torres say anything to you
4  while you were on your way to the 21st District
5  about any injuries?
6    A.  I don't recall Officer Torres. I told
7  him about mine. My wrist was hurting. I
8  sprained my wrist in this. I knew Galarza was
9  going to the hospital. And Gillespie, I didn't
10  know the extent of his injury at that time.
11    Q.  How did you know Officer Galarza was
12  going to the hospital?
13    A.  Because I heard it on the scene. I
14  think he even said -- as I recall, he said I
15  have to go get my shoulder looked at and he went
16  to the emergency room.
17    Q.  How did you sprain your wrist?
18    A.  Wrestling with your client, sir, trying
19  to handcuff your client.
20    Q.  Was this when you were on the ground?
21  This was when you're wrestling on the ground;
22  right?
23    A.  Through the whole ordeal. The young
24  man was very strong. How old is he? 21 or

87

1  something like that? I'm 56. There's a little
2  difference in muscles.
3    Q.  Do you recall any time during this
4  altercation that Officer Torres had the wind
5  knocked out of him?
6    A.  I remember him being winded. I
7  remember at some point in this ordeal him
8  gasping.
9    Q.  Do you remember if he was hunched over
10  at any point during the altercation trying to
11  catch his breath?
12    A.  Okay. Because hunched over -- we were
13  hunched over a lot during this.
14    Q.  Do you remember if he was hunched over
15  trying to catch his breath?
16    A.  I remember that.
17    Q.  When was he hunched over?
18    A.  I can't -- whenever he could catch his
19  breath. It was several opportunities in there
20  that he was able to catch his breath. You had
21  to catch a breath with this guy.
22    Q.  So at some point you arrived at the
23  21st District; right?
24    A.  That's correct.

88

22 (Pages 85 to 88)

1    Q.  And once you arrived at the 21st
2  District, what did you personally do?
3    A.  Sat down.
4    Q.  Do you know where you sat down?
5    A.  In the holding room where the officers
6  were starting -- the Chicago Police Department
7  was starting their paperwork.
8    Q.  Was Mr. Boyle there with --
9    A.  Yes.
10   Q.  -- yourself?
11      Where was Officer Torres?
12   A.  He was in and out of the room.
13   Q.  Okay.  Did you talk to the Chicago
14  Police Department officers while they were
15  filling out the paperwork?
16   A.  Yes.
17   Q.  What did you tell the Chicago Police
18  Department officers as they were filling out
19  paperwork?
20   A.  Basically what happened.
21   Q.  What exactly did you tell them?
22   A.  The same thing I told you about the
23  vehicle, the horn sounding, constantly sounding,
24  observing the vehicle, abruptly stopping to the

                                                89

1  the police report.  That's how they wrote it.
2  They do their police report.  We do our police
3  report.  Officer Torres was in charge of our
4  police report.
5    Q.  Did you fill out any paperwork that
6  night on October 18th, 2008?
7    A.  I don't recall.  When you say any
8  paperwork, I might have did a contact card.  I
9  don't recall what paperwork I did do.
10   Q.  Did you file any police reports that
11  night?
12   A.  I don't recall what I filled out.
13   Q.  Did you fill out an injury report?
14   A.  Yes.
15   Q.  This has been marked previously as
16  Plaintiff's Exhibit 2.  I'm showing you what has
17  been Bates stamped 109 through 0114.  And I'm
18  specifically showing you Bates stamp numbers
19  00113 and 00114, and I'll let you take a look at
20  this document.
21   A.  Okay.
22   Q.  This is the injured personal report
23  that you've just referred to?
24   A.  Uh-huh.

                                                91

1  curb.  Two guys got out.  What we talked about
2  with Boyle.  Boyle started refusing the
3  information, pushed off on us and it took how
4  many officers, was there six, seven officers,
5  and one of those sets of cuffs on him is mine.
6    Q.  Did they say anything in response when
7  you told them what happened?
8    A.  Specifically what are you asking me --
9    Q.  Well, you were there.
10   A.  -- to say?
11      I mean, I could tell you that we talked
12  about our years of experience -- I mean, there
13  was a lot of conversation.  Please ask me
14  something specific so I can answer you.
15   Q.  I'm asking specifically after you told
16  the Chicago Police Department officers the story
17  that you just told me --
18   A.  Okay.
19   Q.  -- what specific statements did they
20  make to you?
21   A.  I don't recall.
22   Q.  Did they write down what you told them
23  on their police report, if you know?
24   A.  I don't recall.  I -- I'd have to read

                                                90

1    Q.  And you filled this out yourself?
2    A.  No.
3    Q.  Who filled this out for you?
4    A.  Reporting Officers R. Hill.
5    Q.  Do you know when Officer Hill filled
6  this out for you?
7    A.  Whatever date and time it says here.
8    Q.  Do you know when you spoke with Officer
9  Hill?
10   A.  Whatever date and time is on here.  I
11  can't read it.
12   Q.  Well, I can't read it either so --
13   A.  I can't -- you know, what do you want
14  me to do?
15   Q.  Do you know --
16   A.  Hold on a second here, it says here
17  date reported.  I see why you can't read it.
18  Yeah.  Okay.
19   Q.  So if you look at Page 2 of this
20  document -- I'm sorry, it's the last page of
21  Exhibit 2, which is Bates stamped 01114.  This
22  is a paragraph that was written in summary
23  regarding your injuries; correct?  You can read
24  that paragraph and then I'll ask you about it.

                                                92

23 (Pages 89 to 92)

1  A. Yes.
2  Q. So is that a true and correct
3  statement?
4  A. It's a summary.
5  Q. It's a summary?
6  A. Yes.
7  Q. But is the summary correct?
8  A. Yes.
9  Q. And is that what you told Officer Hill
10 at some point on October 18th, 2008?
11 A. This is a summary.
12 Q. Is it a summary of what you told
13 Officer Hill?
14 A. The bottom line is my left wrist was
15 injured in the process of handcuffing and
16 placing offender in custody.
17 Q. Okay.
18 A. Okay. That is correct.
19 Q. So you never -- or you didn't fill out
20 an injury report yourself, Officer Hill filled
21 it out for you?
22 A. Yes. When you say fill out the report,
23 you said made a report.
24 Q. I might have said made the report.

93

1  A. If you had asked me did I handwrite the
2  report and sign off as if I wrote the report, I
3  would have told you.
4  Q. Do you know what Mr. Boyle was charged
5  with?
6  A. Obstruction and resisting. I didn't
7  review the police report when I came in here.
8  Q. Do you know how long you were at the
9  21st District for?
10 A. No.
11 Q. Did you have any conversations with
12 Mr. Boyle when you were at the 21st District?
13 A. With Mr. Boyle?
14 Q. Yes.
15 A. Yes.
16 Q. What did you say to him and what he did
17 say?
18 A. I asked him what was wrong with him.
19 Q. When did you ask him what was wrong
20 with him?
21 A. When we were at the 21st District.
22 Q. Was it before or after the paperwork
23 was being filled out?
24 A. Before or after or during, i'm not

94

1  sure.
2  Q. How did he respond when you asked him
3  what was wrong with him?
4  A. He didn't.
5  Q. Did you say anything else to him?
6  A. Yes, I said why were you doing all
7  this.
8  Q. And what did he say if anything in
9  response?
10 A. He didn't.
11 Q. Did you say anything else to Mr. Boyle?
12 A. I probably asked him that again and
13 what he said to me, he told me about he played
14 football at Kenwood and probably -- and I assume
15 he was talking about why he was able to toss us
16 around, but I think he said he went to school,
17 to college. I don't remember if he tried to say
18 he had a job or anything. I asked him again
19 whose car was that. He didn't tell me. I asked
20 him had he been drinking. I asked him was he on
21 medication, something to that effect.
22 Q. Did he give you answers to those
23 questions?
24 A. No.

95

1  Q. Did you have a conversation with
2  Officer Torres when you were at the 21st
3  District?
4  A. Yeah. Sure.
5  Q. What did you say to Officer Torres?
6  A. I don't recall the specifics.
7  Q. Do you remember generally what the
8  conversation was about?
9  A. We were probably talking about the
10 report. I was probably asking about the
11 paperwork we need to do, what we need to do, you
12 know.
13 Q. Have you ever filled out a Chicago
14 Police Report before in your time as a Chicago
15 police officer?
16 A. Yes.
17 Q. So you knew how to fill out a Chicago
18 Police Report; right?
19 A. Yes.
20 Q. Did you know how to fill out a
21 University of Chicago Police Report on October
22 18th, 2008?
23 A. I don't understand what you mean did I
24 know how to. If you give me a report, if I read

96

1   it, I could fill in the blanks. I mean, what
2   are you trying to ask me?
3       Q. Well, you had never filled out a
4   University of Chicago Police Report prior to
5   that date; right?
6       A. That is correct.
7       Q. Once the paperwork was all filled out,
8   what did you do?
9       A. From we -- are we still at the 21st
10  District?
11      Q. Yes, still at the 21st District. All
12  the paperwork is done, what do you do?
13      A. I left the station.
14      Q. You left immediately after the
15  paperwork was done?
16      A. Sir, what do you mean immediately?
17      Q. Well --
18      A. After the process was over, we left the
19  station.
20      Q. By process, do you mean paperwork?
21      A. Paperwork. We done everything we're
22  supposed to do in terms of this process so we
23  leave.
24      Q. Was there anything else that you and
                                                    97

1   Officer Torres had to do besides paperwork?
2       A. In terms of what?
3       Q. With Mr. Boyle.
4       A. No. Other than appear in occur.
5       Q. We'll talk about that in a second. Did
6   you have any conversations with Officer Torres
7   after you left the station about what happened
8   with Mr. Boyle?
9       A. Yes.
10      Q. When did you have this conversation?
11      A. Sometime after we left the station. In
12  the same nature that I told you before that we
13  talked about.
14      Q. The same nature, what are you --
15      A. In terms of what happened, how we did,
16  you know, how we acted properly. That's about
17  it in terms of this. Then we continued with the
18  rest of our tour.
19      Q. So you continued on patrol?
20      A. Yes.
21      Q. Did you say you might have filled out
22  one of the contact cards for --
23      A. If you want to show me all the
24  document, I can show you what's my handwriting
                                                    98

1   because I told you I didn't recall.
2       Q. All right. I'll show you what has been
3   previously marked as Plaintiff's Exhibit 3 and
4   4. These are the contact cards that have been
5   provided by your counsel.
6           Is any of the handwriting on either
7   Plaintiff's Exhibit 3 or Plaintiff's Exhibit 4
8   your handwriting?
9           MS. GIBBONS: Just to make the record clear,
10  it was a group exhibit.
11          MR. KSIAZEK: I'm sorry, you're right.
12          THE WITNESS: It looks like -- you know
13  what, these contact cards would have been signed
14  on the back. Where is the back?
15  BY MR. KSIAZEK:
16      Q. I don't have the back.
17      A. All right. This is close to my
18  handwriting. Ashley Glover, yeah.
19      Q. What other information is located on
20  the back of the contact card?
21      A. There would have been a place for them
22  to be signed. That's about it. Whether they
23  got signed on, I don't know. I don't think I
24  filled out any of this stuff. I mean, this one
                                                    99

1   here looks like it's two different handwriting
2   on this one so I really don't know. I can't
3   tell by this.
4       Q. Okay. Have you read the University of
5   Chicago Police Report in this case?
6       A. Not today.
7       Q. Not today, but did you read it at some
8   point?
9       A. Yeah, at some point.
10      Q. When did you read it?
11          MR. PUISZIS: Objection, irrelevant. You
12  can go ahead and answer the question.
13          THE WITNESS: When did I read it?
14  BY MR. KSIAZEK:
15      Q. Yes.
16      A. Specifically what date and what time, I
17  don't recall.
18      Q. Did you read it before you attended
19  court on January 20th, 2009?
20      A. I don't recall if I did or didn't.
21      Q. You said you did attend court in
22  conjunction with this case?
23      A. Every court appearance.
24      Q. So do you recall when the first court
                                                    100

25 (Pages 97 to 100)

1  appearance was?
2  A. The exact date, no.
3  Q. If I told you it was December 9th,
4  2008, would that sound about right?
5  A. I would assume you're telling me the
6  truth so —
7  Q. And you attended court a second time;
8  right?
9  A. Yes.
10  Q. And do you know if that was on January
11  20th, 2009?
12  A. I don't recall, but if you told me that
13  again, I would have to assume that you're being
14  honest and telling me the truth. And I would
15  say yes.
16  Q. You said earlier you did review your
17  testimony from the motion to suppress hearing on
18  January 20th, 2009?
19  A. I reviewed the testimony prior to
20  coming in here today.
21  Q. Did you ever fill out a complaint in
22  conjunction with this case?
23  A. When you say fill out —
24  Q. Did you ever write a complaint to be
                                                   101

1  filed in the Circuit Court of Cook County. You
2  should ask him if you want to get in this
3  minutia, ask him where he signed it.
4  BY MR. KSIAZEK:
5  Q. You signed this document; right?
6  A. The original document, yes.
7  Q. So where did you sign this document?
8  A. I signed the complaint at the police
9  station.
10  Q. And that was on October 18th, 2008;
11  right?
12  A. Yes.
13  Q. And the complaint reads resisting or
14  obstructing a peace officer and that he
15  knowingly resisted performance — is that
16  performance?
17  A. Yes.
18  Q. Of PO Moore of an authorized act within
19  his official capacity to be a peace officer
20  engaged in the execution of his duties and that
21  he resisted investigatory stop by failing to
22  produce ID and became combative by flailing his
23  arms.
24  Did I read that correctly; right?
                                                   103

1  filed in the Circuit Court against Mr. Boyle?
2  A. Are you asking me did I personally —
3  Q. Yes.
4  A. — write the complaint?
5  Q. Yes.
6  A. And write in there all the wording in
7  the complaint?
8  Q. I'm asking you that, yes.
9  A. No.
10  Q. Did you ever sign a complaint?
11  A. Yes, I believe I did.
12  MR. KSIAZEK: We'll mark this as Exhibit 11.
13       (Whereupon, PLAINTIFF'S
14        Deposition Exhibit No. 11 was
15        marked for identification.)
16  BY MR. KSIAZEK:
17  Q. This is a complaint that you signed in
18  Circuit Court of Cook County, Illinois; correct?
19  MR. PUISZIS: I object. I don't know that
20  he signed it in the Circuit Court of Cook
21  County.
22  MR. KSIAZEK: Well, the complaint is in the
23  Circuit Court of Cook County.
24  MR. PUISZIS: The complaint is ultimately
                                                   102

1  MR. PUISZIS: I object because I don't
2  believe the complaint that was signed in the
3  police station included by flailing his arms and
4  you know it, Counsel, if you read the
5  transcript.
6  THE WITNESS: And my answer concurs with
7  counsel.
8  BY MR. KSIAZEK:
9  Q. So you signed everything by flailing by
10  his arms?
11  MR. PUISZIS: And there's also Chicago, Cook
12  County, Illinois above.
13  BY MR. KSIAZEK:
14  Q. But you did not write that; right?
15  A. That is correct.
16  Q. So the Chicago Police Officers wrote
17  that; correct?
18  A. Which part of this?
19  Q. That paragraph that I just read where
20  it states committed the offense of? And, in
21  fact, the Chicago Police Officers wrote this
22  whole document except for your signature; right?
23  MS. GIBBONS: Objection, foundation.
24
                                                   104

26 (Pages 101 to 104)

BY MR. KSIAZEK:

1  Q. Is that a yes?
2  A. Say that again.
3  Q. The Chicago Police Officers wrote
4  everything on this complaint except for your
5  signature; right?
6     MS. GIBBONS: Same objection.
7     MR. PUISZIS: Well, there's language in here
8  that was added to my understanding in court, and
9  I don't believe that was -- the police officers
10 who added that. I think it was the prosecutor
11 who did. So I'd object to the question.
12    MS. GIBBONS: I join.
13 BY MR. KSIAZEK:
14    Q. But you can answer the question. So
15 the Chicago Police Officers wrote everything on
16 this document excluding what we have talked
17 about and your signature; right?
18    A. That's correct.
19    Q. Does the statement here that says --
20 that paragraph that I read to you starting with
21 committing the offense of, is that a true and
22 correct statement of what happened that night on
23 October 18?

105

1  A. Resisting obstructing, yes. Being
2  combative, yes. Failing to produce ID, yes.
3  Resisting an investigation stop, yes.
4     MR. KSIAZEK: I will make this Plaintiff's
5  Exhibit 12.
6        (Whereupon, PLAINTIFF'S
7         Deposition Exhibit No. 12 was
8         marked for identification.)
9  BY MR. KSIAZEK:
10    Q. You did actually testify in court on
11 January 20th, 2009; correct?
12    A. Again, if that's the day you're telling
13 me, I have to assure that you're being correct
14 and truthful, yes.
15    Q. Sure. And you were under oath; right?
16    A. Yes.
17    Q. What I've handed you and what's been
18 marked for identification purposes as
19 Plaintiff's Exhibit 12. These are your Answers
20 to Plaintiff's Interrogatories.
21       Do you recognize this document?
22    A. Yes.
23    Q. Okay. If you turn to the last page, on
24 Page 10, that's your signature on the last page;

106

1  correct?
2  A. Yes.
3  Q. If you turn to Page 3, in the middle of
4  the page, the second paragraph and the second
5  sentence of the second paragraph says, Officer
6  Gerald Johnson and Lieutenant White from the
7  University of Chicago Police Department were on
8  the scene at some point?
9  A. Yes.
10 Q. Did you see Officer Johnson and
11 Lieutenant White on the scene on October 18th,
12 2008?
13 A. Yes.
14 Q. When did you see them on the scene?
15 A. Sometime during that ordeal.
16 Q. Do you know if it was before or after
17 Mr. Boyle was in handcuffs?
18 A. I don't know.
19    I need a restroom break.
20       (Whereupon, a short break was
21        taken.)
22 MR. KSIAZEK: We're back on the record.
23 THE WITNESS: Yes, sir.

107

1  BY MR. KSIAZEK:
2  Q. If I could direct your attention in
3  Plaintiff's Exhibit 12 to Page 8, and we're
4  looking at question number 11.
5  A. Yes, sir.
6  Q. And your answer to question 11 you
7  state, subject to those -- and this is the last
8  two sentences in your answer to question 11.
9  Subject to those objections and without waiving
10 the same, I am not aware of any complaints ever
11 having been filed against me with the University
12 of Chicago other than this one.
13    Have you had any complaints filed
14 against you since you sent these documents on --
15 or since you signed this document on July 21st,
16 2009?
17 A. Say that again, please.
18 Q. Have you had any complaints filed
19 against you while in your capacity as University
20 of Chicago police officer since you provided
21 these answers to your counsel?
22 A. No. You're talking about outside of
23 this case; right?
24 Q. Right.

108

27 (Pages 105 to 108)

1    A. Excluding this case.
2    Q. Is there any other information
3  regarding the incident on October 18th, 2008
4  that we haven't talked about today that you're
5  aware of?
6    MR. PUISZIS: I object to the vagueness of
7  the question.
8  BY MR. KSIAZEK:
9    Q. Is there anything else you want to
10  state today about what happened on October 18th,
11  2008 that we haven't talked about previously?
12    MR. PUISZIS: Objection to the vagueness of
13  the question. Anything else he wants to state?
14  If you have a specific question, then ask him a
15  specific question.
16    Do you have anything else you want to
17  state?
18    THE WITNESS: Well, I'm waiting on to get
19  some -- all I'm going to do is ask you again
20  specifically what you want me to answer so I can
21  answer it.
22  BY MR. KSIAZEK:
23    Q. Have you talked to Officer Torres since
24  October 18th, 2008 about what happened on that
                                                                109

1  date?
2    A. No.
3    Q. You haven't?
4    A. No. The court date, that kind of
5  thing, court notifications, when is your, you
6  know, dates.
7    Q. Did you talk to him when yourself and
8  Officer Torres appeared in court?
9    Did you talk to Officer Torres about
10  this case about what happened on October 18th,
11  2008 when yourself and Officer Torres appeared
12  in court?
13    A. At what point?
14    Q. Did you talk to him on December 9th,
15  2008, Officer Torres?
16    A. December 9th?
17    Q. Yes. When you first appeared in court
18  in regards to the criminal case against
19  Mr. Boyle, did you talk to Officer Torres at
20  that point?
21    MR. PUISZIS: About this case or about --
22    MR. KSIAZEK: About this, that's what I'm
23  asking.
24    MR. PUISZIS: -- or things in general?
                                                                110

1    THE WITNESS: And I'm not trying to agitate
2  you or anything but I need to know exactly what
3  you're talking about. Are you talking about
4  after when we testified and go out in the hall
5  and don't talk about this or are you trying to
6  get to that or are you saying before we went to
7  court, you know, hey, we're going to court.
8  What are you saying? Ask me something --
9  BY MR. KSIAZEK:
10    Q. Did you talk before you went to court?
11  Did you talk with Officer Torres before you went
12  to court on December 9th, 2008?
13    A. Yes.
14    Q. What did you say to Officer Torres on
15  December 9th, 2008?
16    A. I can't believe this is still going on.
17  This guy was wrong, and now he's trying to sue.
18    Q. Well, that was actually his criminal
19  case.
20    A. Excuse me? You asked me about December
21  9th.
22    Q. Right.
23    A. Okay. That's the kind of conversation
24  I had with him.
                                                                111

1    Q. Did he say anything in response?
2    A. Pretty much he agreed.
3    Q. Where did you have that conversation?
4    A. Where?
5    Q. Where.
6    A. I don't recall. I don't know if that's
7  the day he drove us to court or if it was
8  another day.
9    Q. Did you have a conversation with
10  Officer Torres once you were inside the
11  courthouse about this case?
12    A. No.
13    Q. Did you have a conversation on January
14  20th, 2009 with Officer Torres about this case,
15  either before court, during court, after court?
16    A. Before court, we did have a
17  conversation because I do recall talking to him
18  about finally his witnesses -- that was the last
19  court case, right, the January that you asked me
20  about; is that correct?
21    Q. I think so, yes.
22    A. I mean, you gave me the dates so I
23  don't recall. So, yeah, we talked -- I remember
24  talking to him about, oh, the guys, those three
                                                                112

28 (Pages 109 to 112)

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1  people finally showed up. So we had that kind
2  of conversation.
3      Q. Do you know exactly what you said to
4  him and what he said to you?
5      A. Not verbatim, no. I know he responded
6  to me, yeah, now they're coming, why weren't
7  they here before, that kind of comment.
8      Q. And have you spoken to Officer Torres
9  about this case since January 20th, 2009?
10     MR. PUISZIS: When you say about this case,
11  what do you mean? About the fact they've been
12  sued, about the fact that there's depositions
13  pending, about the substance of what happened?
14  Because unless it's about the substance of what
15  happened, it's irrelevant and immaterial.
16  BY MR. KSIAZEK:
17     Q. You can answer the question.
18     A. We did talk about the deposition
19  because it was changed and he called me and
20  asked me what date it was. I looked at the
21  schedule that they printed out and I gave him
22  the date he was supposed to go.
23     MR. KSIAZEK: Nothing further at this time.
24
                                              113

1                    EXAMINATION
2  BY MS. GIBBONS:
3      Q. Officer Moore, I just have a few
4  questions for you. Taking you back to the date
5  of the incident, I know there was a lot going on
6  but I'm just trying to best understand when you
7  first saw the Chicago Police Department on the
8  scene.
9          As I recall, you testified that it
10  wasn't until Mr. Boyle was up and you had him
11  handcuffed and against a squad car; is that
12  correct?
13     A. I think so. I don't recall exactly
14  when they were there. I do remember seeing a
15  squad car. I don't recall exactly what time
16  they got there or anything like that.
17     Q. Do you recall approximately how many
18  Chicago police officers were on the scene?
19     A. I don't remember. I know -- I remember
20  one car. I don't remember -- I'm quite sure
21  afterwards there might have been some cars that
22  drove passed but I don't remember.
23     Q. Do you recall seeing a Chicago Police
24  sergeant or a supervisor in a white shirt on the
                                              114

1  scene?
2      A. I don't recall. Our supervisors were
3  wearing white shirts, too, so I don't recall.
4      MS. GIBBONS: I have nothing further.
5                    EXAMINATION
6  BY MR. PUISZIS:
7      Q. Officer Moore, on October 18th of 2008,
8  how old were you, sir?
9      A. 55.
10     Q. And do you normally go looking to
11  wrestle with 21-year old former football players
12  in your capacity either as a Chicago police
13  officer or a University of Chicago police
14  officer?
15     A. No, sir.
16     MR. KSIAZEK: That's leading. Objection.
17  BY MR. PUISZIS:
18     Q. You had mentioned earlier about you
19  thought that -- you were questioned about why
20  the vehicle was suspicious and you said
21  something about your experience as a police
22  officer, do you remember that?
23     A. Yes.
24     Q. Can you tell us or share with us what
                                              115

1  your experience was as a police officer that led
2  you to believe that was a suspicious vehicle or
3  why you thought it might be stolen?
4      A. Well, in my experience if the horn is
5  stuck in the horn position constantly blowing,
6  it could mean somebody shorted out the alarm
7  system or tried to hot wire the car. The other
8  thing was the way this car abruptly hit the
9  curb, it was like the steering could have locked
10  up on the driver.
11     Q. Now, what's the significance of the
12  steering locking up on the driver as it relates
13  to possibly being a stolen vehicle?
14     A. The column could have been peeled and
15  they used a prying object to engage into start.
16     Q. And when you said that the --
17     A. Steering column.
18     Q. -- steering column, you talked about
19  hot wiring, what could happen when you hot wire
20  a car that would cause the alarm to go off or
21  would cause the horn to go off?
22     A. Well, if the alarm is connected to the
23  horn, if the alarm mechanism, the noise
24  mechanism is the horn, then if that's interfered
                                              116

29 (Pages 113 to 116)

1    with, it would make the horn go into a stop --
2    constant horn instead of an alarming horn with
3    intermittent sounds.
4       Q.  Well, you were a Chicago police officer
5    for 24 years before this incident?
6       A.  Yes.
7       Q.  Can you tell us what areas of the City
8    you worked?
9       A.  I worked in the 3rd District at 7040
10   South Cottage Grove. I came on the job in May
11   of '85. I did my time in the academy. And as
12   of February of '86, I was on a tactical unit. I
13   worked all the way up until the tactical unit in
14   the 3rd District until 1998.
15      Q.  Now, does the part of the University of
16   Chicago jurisdiction or boundaries include the
17   3rd Police District?
18      A.  That is correct.
19      Q.  So you've had experience with
20   University of Chicago officers during the time
21   you were a Chicago police officer working in the
22   3rd District; correct?
23      A.  Correct.
24      Q.  And you were aware of the fact that

117

1    that the University of Chicago officers are
2    involved in; correct?
3       A.  That is correct.
4       Q.  Now, besides being a police officer, do
5    you have any other experience in any other
6    capacity that led you to have experience with
7    vehicles that may have been stolen or hot wired
8    or had their ignition lock broken?
9       A.  My dad owned a gas station from 1962
10   until 1976. 1975 I was part owner of a gas
11   station, so I grew up around his cars.
12      Q.  And did you ever have occasion to
13   repair vehicles after the engine column was
14   peeled, after vehicles were hot wired or after
15   the ignition lock was broken?
16      A.  Yes.
17      Q.  Okay. And have you firsthand
18   experience with observing cars having problems
19   with steering after the ignition lock was
20   broken and the steering column peeled as you've
21   described for us a little while ago?
22      MR. KSIAZEK:  Objection, leading.
23      THE WITNESS:  Yes, professionally as a
24   police officer and personally back in the

119

1    typically Chicago police officers fill out
2    complaint forms; correct?
3       A.  Yes.
4       Q.  University of Chicago officers usually
5    don't fill out complaint forms; correct?
6       A.  That is correct.
7      MR. KSIAZEK:  Leading. Objection.
8    BY MR. PUISZIS:
9      Q.  Who decides what charges to be placed,
10   the University of Chicago officers or someone
11   else?
12      A.  Someone else. Ultimately it's someone
13   else.
14      Q.  Does the Process of Felony Review get
15   involved at all?
16      A.  At the Chicago police level, yes.
17      Q.  And just so the record is clear, what
18   is Felony Review, and what does that entail?
19      A.  That entails from my experience as a
20   Chicago police officer, the State's Attorney
21   hearing the facts in the case and make a
22   decision of whether or not they're going to
23   prove felony charges or not.
24      Q.  Okay. And again, that's not something

118

1    day. As a police officer, I have been involved
2    in numerous stolen car arrests, recoveries and
3    actually I've had vehicles, attempted to drive
4    vehicles that the columns have been peeled and
5    actually know how that steering can lock up on
6    you.
7    BY MR. PUISZIS:
8      Q.  So when you observed the vehicle veer
9    or I forget exactly the term you used, and
10   bounce into the curb, based on your years of
11   experience as a Chicago police officer and as
12   working in a garage mechanic repairing stolen
13   vehicles, what did you reasonably believe based
14   on that years of experience and your
15   observations that day?
16      A.  I believe the driver of that car was
17   not in control of that steering and that
18   steering could possibly have been locked.
19      Q.  And is that a factor that led you to
20   believe could indicate that this may have been a
21   stolen vehicle?
22      A.  Yes.
23      Q.  And you didn't know if it was stolen or
24   not but you certainly had suspicions at that

120

30 (Pages 117 to 120)

1  time, would that be fair to say?
2     A.  Yes, that suspicion and others.
3     Q.  Is it lawful to resist any arrest --
4     A.  No.
5     Q.  -- Officer Moore?
6     A.  No.
7     Q.  The University of Chicago officers are
8  permitted to detain people on the street;
9  correct?
10    A.  Yes.
11 MR. KSIAZEK: Objection, leading.
12 BY MR. PUISZIS:
13    Q.  And are University of Chicago officers
14 permitted to place people into handcuffs for
15 their safety while they're being detained?
16    A.  Yes.
17    Q.  And typically if a University of
18 Chicago officer observes conduct that he or she
19 reasonably believes may constitute a crime, are
20 they permitted to detain someone and call the
21 Chicago Police?
22    A.  Yes.
23    Q.  Now, you described during the course of
24 the struggle, the point in time when you and

                121

1  ground near approximately the passenger door,
2  that area, we struggled with this young man to
3  the back of the vehicle and closer to the main
4  lane of the street.
5     Q.  When you say the back of the vehicle,
6  are you talking about the Chrysler or the back
7  of your squad?
8     A.  The back of the squad.
9     Q.  And so at some point then you were in
10 the middle or close to the middle of the street?
11    A.  Yes.
12    Q.  Okay. Let's back up a second. The
13 Chrysler was against the curb; correct?
14    A.  Yes.
15    Q.  Your squad was positioned behind it and
16 on an angle?
17    A.  Yes.
18    Q.  And was the back of your car extending
19 into the middle lane of traffic?
20    A.  Yeah, kind of --
21 MR. KSIAZEK: Objection, leading.
22 THE WITNESS: -- sort of. Yes, kind of,
23 sort of. It was not crossed into the opposite
24 lane of traffic.

                123

1  Officer Torres and the plaintiff Mr. Boyle fell
2  to the ground; correct?
3     A.  Yes.
4     Q.  And this was at a point in time shortly
5  after Officer Torres had been pushed into the
6  open doorway area of your squad; correct?
7     A.  That's correct.
8     Q.  Okay. Now, after the three of you fell
9  to the ground, did the struggle end then?
10    A.  No.
11    Q.  What happened?
12    A.  We did the best we could to hold on to
13 this young man and to obstruct his attempt to
14 break loose and strike out. Subsequently, okay.
15 But once help came, that was the only time we
16 were able to control him enough to handcuff him.
17 And as I stated before, he was still so
18 uncontrollable. He could not be handcuffed
19 conventionally with one pair of cuffs.
20    Q.  But did you remain in the area of the
21 passenger side of your squad or did the
22 struggle, move from that location to another
23 location?
24    A.  No. We were -- once we were on the

                122

1  BY MR. PUISZIS:
2     Q.  Right. But typically when you see a
3  squad -- typically when you see police pull
4  behind someone, they position their vehicle part
5  way into the next lane of traffic to protect
6  them as they approach the driver side door;
7  correct?
8     A.  That's correct.
9     Q.  And that's something that officers are
10 trained to do; correct?
11    A.  Correct.
12 MR. KSIAZEK: Objection, foundation.
13 BY MR. PUISZIS:
14    Q.  So that you aren't hit by another
15 vehicle as you walk towards the driver side of
16 the door; correct?
17    A.  That's correct.
18    Q.  Now, as you said you were observing
19 what was happening and you saw two men get out
20 of the car and walk away from the vehicle;
21 correct?
22    A.  That's correct.
23    Q.  There were still two people either
24 inside the vehicle or at some point one inside

                124

31 (Pages 121 to 124)

1 and one outside the vehicle; correct?
2    A. Yes.
3    Q. And you were trying to determine if
4 what was happening if that was a stolen car;
5 correct?
6    MR. KSIAZEK: Objection, leading.
7 BY MR. PUISZIS:
8    Q. As you approached the vehicle?
9    A. Correct.
10    Q. Now, was it your intent to place
11 Charles Boyle under arrest as you walked towards
12 him and he was then asked whose car this was?
13    A. No, that was not my intent.
14    Q. Now, of the four people who were in the
15 car, who was the greatest threat to your and
16 Officer Torres's safety, the person in the car,
17 the person in the front of the car or the two
18 guys who walked away and was out of your sight?
19    MR. KSIAZEK: Objection to the
20 characterization as a threat.
21    THE WITNESS: The person in front of the
22 car, Mr. Boyle.
23 BY MR. PUISZIS:
24    Q. Have you been trained in, you know,

125

1 terms of how to safely handle police stops?
2    A. Yes.
3    Q. Have you been trained on assessing
4 threat levels as a police officer?
5    A. Yes.
6    Q. And have you had on-the-job experience
7 in your 24 years as a Chicago police officer in
8 this regard?
9    A. Yes.
10    Q. At some point do you remember Mr. Boyle
11 actually being on all fours being on the ground
12 and trying to get up --
13    A. Yes.
14    Q. -- during the course of struggle?
15    Do you remember during the course of
16 these events that that occurred?
17    A. Not exactly, but other than it was in
18 the street, we were still in the street. And it
19 was after we had all went to the ground and he
20 was still trying to get up.
21    Q. How would you describe Mr. Boyle, was
22 he a weakling or was he a strong young man?
23    A. Very strong young man.
24    Q. About how far did you have to drive the

126

1 squad from where it was parked to where you
2 positioned it behind the silver Chrysler before
3 this incident occurred?
4    A. The exact footage, I can't tell you.
5 I'd say 20, 30 feet, two car lengths, a car
6 length and a half. I'm not sure.
7    Q. Was there anything unusual about the
8 fact that the two people got out of the car
9 almost immediately after the vehicle had
10 occurred?
11    A. Yes.
12    Q. What was unusual about that?
13    A. One, they didn't look back.
14    Q. What was the significance of them not
15 looking back in your mind as a police officer
16 with over 24 years of experience?
17    A. The significance was that they know
18 they passed the police, the horn is constantly
19 going on, the horn sounding and they hit the
20 curb abruptly. And they get out of the car,
21 they didn't look back. And they were like
22 determined to just walk away.
23    But in assessing all this, that -- as
24 far as when they were walking further east, in

127

1 assessing them walking away, then Boyle gets out
2 of the car, they disappear in the vicinity of
3 that bank. They're no longer visible. Now
4 Boyle was there.
5    So our focus had to be turned on Boyle,
6 and the horn is still going off and there's
7 somebody else in the vehicle. So a stolen car,
8 do we have a person in distress that was pushing
9 the horn, we don't know what we had in terms of
10 that. So everything was still up in the air
11 there.
12    Leaning more towards a stolen car, bank
13 vicinity, another person in the car. In my
14 experience, it could have been anything, stolen
15 car, somebody at the ATM machine, forcing
16 somebody to make a payment, we don't know.
17    Q. And what time of the day or evening was
18 this?
19    A. This is approximately 2:30 in the
20 morning which is even more concerning.
21    Q. Why is that?
22    A. At 2:30 in the morning, just being 55
23 years old, who's goes to the ATM or what purpose
24 are you going to a bank at 2:30 in the morning.

128

32 (Pages 125 to 128)

1 Even the liquor store is now closed. So very,
2 very unusual.
3    Q. And were there parking spots do you
4 know in front of that Bank of America on 53rd
5 Street?
6    A. The parking on that whole south side
7 was very scarce. There was plenty -- I mean,
8 there was no parking pretty much.
9    Q. I'm sorry, there was --
10    A. At that time of night on 53rd and
11 especially at night there was not that many cars
12 parked there. There was plenty of parking
13 spaces out there.
14    Q. So if somebody wanted to go to the ATM,
15 they could have parked at or near in front of
16 the Bank of America?
17    A. Yes. And even in this case, this guy
18 headed up -- the way -- he had no cars to avoid.
19 It was like he's just crashed into the curb
20 almost because he had nothing there interfering
21 or going into the curb. He didn't have to park.
22 He could have just drove up and parked in front
23 of the place or wherever he wanted to go.
24    MR. PUISZIS: Thank you. I don't have
129

1    MR. KSIAZEK: I think that's all I have.
2    MS. GIBBONS: I have nothing further.
3    MR. PUISZIS: Neither do I. Signature is
4 reserved.
5        (Whereupon, the deposition
6        concluded at 5:15 o'clock
7        p.m.)
8    (FURTHER DEPONENT SAITH NAUGHT.)
131

1 anything else.
2    FURTHER EXAMINATION
3 BY MR. KSIAZEK:
4    Q. When you were parked behind this
5 Chrysler and you saw the driver get out of the
6 vehicle, your partner Officer Torres didn't call
7 for back-up; right?
8    A. No.
9    Q. Okay. And when you saw Mr. Boyle get
10 out of the car, you didn't call for back-up;
11 right?
12    A. We were out the car. No, we did not
13 call for back-up at that point.
14    Q. Even though all these things were going
15 on, the driver and the passenger were walking
16 down the street out of your point of view and
17 Mr. Boyle was in front of the car?
18    A. There was no physical contact with
19 these guys at this point, there was no weapon
20 being displayed at us. You know, we're -- I did
21 not call for back-up at this point.
22    We called for back-up but we couldn't
23 control your client. And if he had complied, we
24 would not have to call for back-up.
130

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
3        EASTERN DIVISION
4 CHARLES BOYLE,        )
5        Plaintiff,   )
6    -vs-            ) No. 09 C 1080
7 UNIVERSITY OF CHICAGO    )
8 POLICE OFFICER LARRY      )
9 TORRES, et al.,        )
10        Defendants.   )
11    I, CLARENCE MOORE, being first duly
12 sworn, on oath say that I am the deponent in the
13 aforesaid deposition taken on the 10th day of
14 November, 2009; that I have read the foregoing
15 transcript of my deposition, consisting of pages
16 6 through 130 inclusive, and affix my signature
17 to same.
18    _____
        CLARENCE MOORE
19
20 Subscribed and sworn to
21 before me this _____ day
22 of _____, 2010.
23 _____
24    Notary Public
132

33 (Pages 129 to 132)

1  STATE OF ILLINOIS   )
2                      ) SS:
3  COUNTY OF C O O K   )
4      I, ATHANASIA MOURGELAS, a notary public
5  within and for the County of Cook County and
6  State of Illinois, do hereby certify that
7  heretofore, to-wit, on the 10th day of November,
8  2009, personally appeared before me, at 222
9  North LaSalle Street, Suite 300, Chicago,
10 Illinois, CLARENCE MOORE, in a cause now pending
11 and undetermined in the Circuit Court of Cook
12 County, Illinois, wherein CHARLES BOYLE, is the
13 Plaintiff, and UNIVERSITY OF CHICAGO POLICE
14 OFFICER, et al., are the Defendants.
15     I further certify that the said CLARENCE
16 MOORE was first duly sworn to testify the truth,
17 the whole truth and nothing but the truth in the
18 cause aforesaid; that the testimony then given
19 by said witness was reported stenographically by
20 me in the presence of the said witness, and
21 afterwards reduced to typewriting by
22 Computer-Aided Transcription, and the foregoing
23 is a true and correct transcript of the
24 testimony so given by said witness as aforesaid.

133

---

1  McCorkle Court Reporters, Inc.
   200 N. LaSalle Street Suite 300
2  Chicago, Illinois 60601-1014
3
4  January 6th, 2010
   Mr. Steve M. Puiszis
5  Hinshaw & Culbertson
   222 North LaSalle Street
6
   IN RE: Boyle v. University of Chicago, et al.
7  COURT NUMBER: 09 C 1080
   DATE TAKEN: November 10, 2009
8  DEPONENT: Clarence Moore
9  Dear Mr. Puiszis:
10 Enclosed is the deposition transcript for the
   aforementioned deponent in the above-entitled
11 cause. Also enclosed are additional signature
   pages, if applicable, and errata sheets.
12
   Per your agreement to secure signature, please
13 submit the transcript to the deponent for review
   and signature. All changes or corrections must
14 be made on the errata sheets, not on the
   transcript itself. All errata sheets should be
15 signed and all signature pages need to be signed
   and notarized.
16
   After the deponent has completed the above,
17 please return all signature pages and errata
   sheets to me at the above address, and I will
18 handle distribution to the respective parties.
19 If you have any questions, please call me at the
   phone number below.
20
21 Sincerely,
   Margaret Setina      Athanasia Mourgelas
22 Signature Department    Court Reporter
           (312) 263-0052
23 cc: Mr. Ksiazek, Ms. Gibbons.
24

135

---

1      I further certify that the signature to
2  the foregoing deposition was reserved by counsel
3  for the respective parties.
4      I further certify that the taking of this
5  deposition was pursuant to notice and that there
6  were present at the deposition the attorneys
7  hereinbefore mentioned.
8      I further certify that I am not counsel
9  for nor in any way related to the parties to
10 this suit, nor am I in any way interested in the
11 outcome thereof.
12     IN TESTIMONY WHEREOF: I have hereunto
13 set my hand and affixed my notarial seal this
14 6th day of January, 2010.
15
16
17
18
19     _____
20     NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21     LIC. NO. 84-4329
22
23
24

134

---

34 (Pages 133 to 135)

| A | | | | | |
|---|---|---|---|---|---|
| ability | angle | 23:21 75:1 | 74:9,14 75:8 | badgering | 17:18 117:16 |
| 51:11 | 39:18 123:16 | arresting | ASSOCIATES | 29:17 | Boyle |
| able | answer | 73:18 | 2:2 | balance | 1:4 44:18,19 |
| 61:10 77:17,22 | 4:20,21,24 5:9 | arrests | assume | 62:16 | 45:7,9 46:3 |
| 88:20 95:15 | 5:11,19,22 | 24:12 120:2 | 5:1 95:14 | bank | 46:13,22 |
| 122:16 | 13:1 14:11 | arrive | 101:5,13 | 40:18,21 47:22 | 47:16 48:17 |
| above-entitled | 29:23 31:15 | 71:4,7,12 | assure | 48:4 128:3 | 48:20 49:1,4 |
| 135:10 | 36:12 42:20 | 72:11 | 106:13 | 128:12,24 | 49:8,20 50:2 |
| abruptly | 43:21 57:3 | arrived | Athanasia | 129:4,16 | 50:7,13 |
| 34:9 35:8 | 62:1 68:11 | 20:16 42:18 | 1:15,22 133:4 | based | 52:10,16 |
| 89:24 116:8 | 81:17 83:4 | 71:17,20 | 135:21 | 36:13 120:10 | 53:8 55:13 |
| 127:20 | 83:21 90:14 | 72:15 88:22 | ATM | 120:13 | 55:15 56:19 |
| academy | 100:12 104:6 | 89:1 | 128:15,23 | Basically | 56:20,20 |
| 117:11 | 105:15 108:6 | artificial | 128:14 | 4:17 89:20 | 58:19,20 |
| accident | 108:8 109:20 | 48:13 | attached | Bates | 59:13,15,18 |
| 23:24 | 109:21 | Ashley | 61:11 | 91:17,18 92:21 | 61:2,7,23 |
| accurately | 113:17 | 82:17 83:11 | attempt | baton | 62:19,21,22 |
| 63:10 | answered | 99:18 | 23:19 122:13 | 23:3 | 63:16,17,19 |
| achieved | 6:4 25:6 29:12 | asked | attempted | battery | 64:5,11,15 |
| 11:23 | 31:13 36:11 | 24:8 25:5 | 24:2 120:3 | 24:2 | 64:21,22 |
| act | 42:18 49:22 | 29:12,17,19 | attend | beat | 65:16,19,20 |
| 103:18 | 49:24 65:9 | 31:12 38:11 | 7:8,11 15:3 | 12:1,7,9,11 | 66:1,22 |
| acted | 68:23 76:22 | 42:18 43:20 | 100:21 | 14:7,16,18 | 67:19,22 |
| 85:21 98:16 | answering | 48:18,18,20 | attended | 14:21,23 | 68:8,9 70:9 |
| Adams | 51:14 | 48:22,22,23 | 7:15,19 100:18 | 15:13 17:16 | 71:16 72:23 |
| 2:4 | answers | 49:1,4,8,13 | 101:7 | 23:2 | 73:18 74:3 |
| added | 5:13 6:14 51:9 | 49:19,21,23 | attention | beats | 74:10 75:9 |
| 105:9,11 | 95:22 106:19 | 49:23 50:2,7 | 108:2 | 17:13 | 75:16,19 |
| additional | 108:21 | 50:11,15,17 | Attorney | began | 76:2 77:6 |
| 135:11 | anybody | 50:20,22 | 118:20 | 13:13 | 78:11 81:13 |
| address | 40:1 | 51:7,17 52:1 | attorneys | believe | 81:19 82:2 |
| 26:19 135:17 | anybody's | 55:13 61:20 | 134:6 | 9:13 19:24 | 82:20 84:5,8 |
| administration | 74:22 | 62:1 64:8 | August | 32:24 35:19 | 84:11,19,22 |
| 7:18 | appear | 65:19,20 | 8:17,20,21,24 | 35:21 36:7 | 85:3 89:8 |
| Affairs | 98:4 | 68:23 70:1 | 9:6,10,22 | 54:24 58:21 | 90:2,2 94:4 |
| 26:9,15,16,18 | appearance | 75:10 76:22 | 10:1,6,14 | 58:24 76:14 | 94:12,13 |
| affix | 100:23 101:1 | 78:13 81:21 | 11:11 12:10 | 80:12 81:3 | 95:11 98:3,8 |
| 132:16 | APPEARANCES | 82:23 83:2 | 27:24 | 102:11 104:2 | 102:1 107:17 |
| affixed | 2:1 | 83:15,16 | authorized | 105:10 | 110:19 |
| 134:13 | appeared | 94:1,18 95:2 | 103:18 | 111:16 118:2 | 114:10 122:1 |
| afford | 110:8,11,17 | 95:12,18,19 | average | 120:13,16,20 | 125:11,22 |
| 7:21 | 133:8 | 95:20 111:20 | 13:21 14:4 | believes | 128:10,21 |
| aforementioned | applicable | 112:19 | avoid | 121:19 | 128:1,4,5 |
| 135:10 | 135:11 | 113:20 | 129:18 | belly | 130:9,17 |
| aforesaid | approach | 125:12 | aware | 66:23,24 67:2 | 132:4 133:12 |
| 132:13 133:18 | 124:6 | asking | 108:10 109:5 | 67:4,6,12 | 135:6 |
| 133:24 | approached | 5:7,17 6:1 | 117:24 | bent | Boyle's |
| aggravated | 125:8 | 14:2 16:23 | a.m | 78:17,19 | 54:18,21,22 |
| 24:2 | approaching | 17:2 18:19 | 20:1 | best | 55:5 58:11 |
| agitate | 39:20 | 21:11,16 | | 4:20 5:16,21 | 58:18 60:23 |
| 111:1 | approximately | 25:23 28:3 | | 51:10 114:6 | 77:22 |
| ago | 11:14 38:17 | 39:24 43:5 | _____B_____ | 122:12 | break |
| 4:11,13 12:6 | 114:17 123:1 | 51:10 52:3 | B | beyond | 6:1,3,3 8:14 |
| 65:10 119:21 | 128:19 | 53:4,6 54:7 | 3:14 | 26:6 51:7 | 20:19,20 |
| agreed | area | 62:12,24 | back | big | 45:20,21 |
| 112:2 | 15:24 122:8,20 | 63:3 64:2,11 | 18:11,17 20:22 | 75:24 | 107:19,20 |
| agreement | 123:2 | 68:19,20 | 20:24 26:22 | bit | 122:14 |
| 135:12 | areas | 73:12 74:17 | 28:1 29:2 | 20:24 21:8 | breath |
| ahead | 117:7 | 79:5 81:24 | 45:3,10,14 | 35:8 40:19 | 88:11,15,19,20 |
| 13:1 14:11 | arm | 84:21,24 | 45:23 46:5 | 57:21 | 88:21 |
| 42:20 58:13 | 50:3 53:18,20 | 90:8,15 | 46:11 59:22 | blanks | broad |
| 62:2 100:12 | 53:22 54:10 | 98:10 102:2 | 60:12 68:8 | 97:1 | 18:20 |
| ahold | 54:11,13 | 102:8 110:23 | 68:23 87:1,3 | blocks | broke |
| 57:5 | 57:1 58:11 | assessing | 67:12,24 | 38:22,23 | 58:22 |
| air | 58:18 68:3 | 75:14 126:3 | 71:24 77:13 | blowing | broken |
| 128:10 | arms | 127:23 128:1 | 78:15,21 | 51:20 116:5 | 119:8,15,20 |
| al | 53:16,17 54:18 | assigned | 79:17 80:6 | blurted | brought |
| 1:9 132:9 | 54:21,22 | 12:2 14:6,16 | 83:6,12 | 55:10 | 76:16 |
| 133:14 135:6 | 55:5 57:3 | 14:19,21 | 99:14,14,16 | body | bumped |
| alarm | 59:4,4,5,9 | 17:11 | 99:20 107:22 | 58:24 60:23,23 | 35:6 |
| 116:6,20,22,23 | 103:23 104:3 | assignment | 114:4 119:24 | 61:7,22 | bunch |
| alarming | 104:10 | 12:12 | 123:3,5,6,8 | bottom | 58:7 |
| 117:2 | arrest | assist | 123:12,18 | 67:21 70:7 | business |
| allowed | 17:20 71:9,10 | 73:8 74:2 | 127:13,15,21 | 93:14 | 7:18 |
| 72:4,7 | 71:22,23 | assistance | background | bounce | |
| altercation | 72:4,7,22 | 78:13 | 7:8 | 120:10 | _____C_____ |
| 88:4,10 | 74:10 75:8 | ASSISTANT | back-up | bounced | C |
| America | 78:22,24 | 2:18 | 72:15,19,20 | 35:7 | 1:6 2:19 132:6 |
| 40:18,22 129:4 | 79:4,12 | assisted | 130:7,10,13 | bouncing | 133:3 135:7 |
| 129:16 | 121:3 125:11 | 73:17,21 74:8 | 130:21,22,24 | 35:11 | call |
| | arrested | assisting | badge | boundaries | 27:17 61:12 |
| | | | 55:23 | | |

121:20 130:6
130:10,13,21
130:24
135:19
called
1:11 113:19
130:22
calm
54:24 56:7,14
78:22 79:3,3
79:12,18,20
79:21
calmed
78:24
capable
51:14
capacity
24:5 103:19
108:19
115:12 119:6
car
20:2,5,7 23:24
29:2 31:22
31:24 32:3
32:12,14,24
33:10,14,18
33:21,22
34:10,14
35:10,14,16
35:18,19
36:22 37:1
37:16,18,22
38:1,12,24
39:17 41:9
41:11 42:16
42:22,23
44:8,11,14
44:17,21,23
44:24 45:5,6
45:8,9,11,12
45:13 46:3,4
46:10,11,12
46:14,14,17
46:18,21,24
47:1,9,10,13
47:15 48:18
48:20 49:2,5
49:9,11,14
49:16,20,22
50:2,3,6,7
50:11,14,17
50:19,23
52:7,11,12
52:14,15,16
52:17,20
53:1,7,8
55:14,18,21
55:24 60:3,4
60:9,12,16
61:6,19
62:22,23
65:8,17,18
65:22,23
66:5,9 78:15
78:17,18,18
78:20 79:13
79:16,23
81:1,1,20
82:3,21,22
82:23 84:12
95:19 114:11
114:15,20
116:7,8,20
120:2,16
123:18
124:20 125:4
125:12,15,16
125:17,22
127:5,5,8,20
128:2,7,12
128:13,15

130:10,12,17
card
91:8 99:20
cards
98:22 99:4,13
care
74:18
cars
39:6,8 114:21
119:11,18
129:11,18
case
26:12 100:5,22
101:22
108:23 109:1
110:10,18,21
111:19
112:11,14,19
113:9,10
118:21
129:17
catch
88:11,15,18,20
88:21
cause
116:20,21
133:10,18
135:11
cc
135:23
certainly
120:24
certify
133:6,15 134:1
134:4,8
chance
28:2 57:4,5
change
63:6
changed
57:2 113:19
changes
135:13
changing
83:7
characteriz...
64:18 125:20
characterizing
67:10
charge
91:3
charged
94:4
charges
118:9,23
Charles
1:4 84:5
125:11 132:4
133:12
check
6:18 38:15
chest
78:19
Chicago
1:7 2:5,12,15
2:21,24 8:9
61:11 9:2,11
9:17 10:10
10:22,24
11:3,3,6,10
11:13,19,23
12:4,5 13:10
13:13,18
14:8,15 15:5
16:5,10,16
16:21 17:1,3
17:6 18:6
21:2,13 22:9
24:5,19,23
25:17 27:15
28:2 55:24

71:4,7,12,17
72:3,8,11,15
72:18,22
73:3,7,19
74:23 80:8,9
80:19 81:6
81:12,20
82:3,7,8
89:6,13,17
90:16 96:13
96:14,17,21
97:4 100:5
104:11,16,21
105:4,16
107:7 108:12
108:20 114:7
114:18,23
115:12,13
117:4,16,20
117:21 118:1
118:4,10,16
118:20 119:1
120:11 121:2
121:13,18,21
126:7 132:7
133:9,13
135:2,6
Chrysler
33:1,2 34:1,4
37:8,11,13
37:15,20
38:6,19 39:1
39:2,4,19,20
39:22,23
40:6,8,22
41:2 42:17
59:22,23
60:3,4,5
65:8 66:6,7
123:6,13
127:2 130:5
Circuit
102:1,18,20,23
103:1 133:11
circumstances
22:17
City
2:24 117:7
Civil
1:12
civilian
21:12
criminal
21:12
Clarence
1:11 3:3 4:6
8:7 132:11
132:18
133:10,15
135:8
clarify
115:2
clarity
10:15 63:13
clear
5:20 99:9
118:17
client
60:13 62:6,16
66:16 71:9,9
71:21 72:2
87:18,19
130:23
close
99:17 123:10
closed
29:11 129:1
closer
66:8 123:3
codes
17:19
college
7:7,8 57:11

95:17
column
116:14,17,18
119:13,20
columns
120:4
combative
85:22 103:22
106:2
come
35:15,16,18
36:9 83:12
coming
30:9 31:14,19
32:6,8,10
101:20 113:6
command
58:11
commander
18:11
commenced
4:2
commendations
25:22 26:1
comment
113:7
committed
104:20
committing
105:22
complaint
21:18 22:18,22
22:24 23:18
24:15 25:3
26:21 101:21
101:24 102:4
102:7,10,17
102:22,24
103:8,13
104:2 105:5
118:2,5
complaints
21:4,12,15,17
22:7,11,13
23:14 24:9
24:11,21
25:1,8 27:2
108:10,13,18
completed
135:16
completely
67:11
complied
130:23
Computer-Aided
133:22
concerned
58:8
concerning
128:20
concluded
131:6
concurs
104:6
conduct
12:18
conjunction
100:22 101:22
connected
77:19 116:22
consistent
13:20 14:5
consisting
132:15
constant
34:7 117:2
constantly
36:3 89:23
116:5 127:18
constitute
121:19

contact
53:10 54:1
70:1,5 91:8
98:22 99:4
99:13,20
130:18
continued
34:1 98:17,19
continuing
22:19
continuous
31:2 32:19
continuously
45:16
control
35:9 36:4
54:23 56:10
59:20 60:7
68:11,20
70:17 71:9
71:21 73:11
120:17
122:16
130:23
conventional
77:13
conventionally
122:19
conversation
76:18 82:7,19
83:10 85:16
90:13 96:1,8
98:10 111:23
112:3,9,13
112:17 113:2
conversations
38:7 81:5,11
82:12,16
85:7 94:11
98:6
convince
77:11
Cook
1:16 102:18,20
102:23 103:1
104:11 133:5
133:11
134:20
cooperated
78:8
cooperating
56:10 80:17
cooperation
55:12
CORPORATION
2:18
correct
10:12 11:12
15:2 20:15
28:10 20:5
33:9 42:14
88:24 92:23
93:2,7,18
97:6 102:18
104:15,17
105:19,23
106:11,13
107:1 112:20
114:12
117:18,22,23
118:2,5,6
119:2,3
121:9 122:2
122:6,7
123:13 124:7
124:8,10,11
124:16,17,21
124:22 125:1
125:5,9
133:23
corrections

135:13
correctly
103:24
Cottage
117:10
counsel
2:18 78:23
99:5 104:4,7
108:21 134:2
134:8
count
73:1,3 74:20
counting
74:21
County
1:16 102:18,21
102:23 103:1
104:12 133:3
133:5,5,12
134:20
course
17:12 18:10
33:22 81:8
121:23
126:14,15
court
1:1 5:12 6:14
100:19,21,23
100:24 101:7
102:1,18,20
105:9 106:10
110:4,5,8,12
110:17 111:7
111:7,10,12
112:7,15,15
112:15,16,19
132:1 133:11
135:1,7,22
courthouse
112:11
Courts
1:13
CPD
81:1,4 82:5
crashed
129:19
creating
53:10
crime
121:19
criminal
110:18 111:18
crossed
123:23
cuff
77:11,11,13,17
77:24,24
cuffs
75:1,21 77:14
77:16,18,19
77:20,21,23
78:2,3,6,11
82:20 90:5
122:19
Culbertson
2:9 135:5
curb
34:8,8,14,16
34:17,19
35:5,7,11,15
36:1,22 37:1
37:8,12,20
60:5 66:8
90:1 116:9
120:10
123:13
127:20
129:19,21
current
8:7

Currently
6:8
curse
70:15,23,24
custody
93:16

**D**

D
3:1
dad
119:9
dangerous
70:19,20
date
6:18 8:18 9:9
22:16 73:17
92:7,10,17
97:5 100:16
101:2 110:1
110:4 113:20
113:22 114:4
135:7
dates
11:12 110:6
112:22
day
1:18 9:13 11:9
14:10,24
15:8,16,17
15:21 18:10
18:16 19:17
20:7 27:9,10
73:6 81:7
85:23 86:14
86:17 106:12
112:7,8
120:1,15
128:17
132:13,21
133:7 134:14
days
27:13,13
Dear
135:9
December
101:3 110:14
110:16
111:12,15,20
decides
118:9
decision
118:22
Defendant
2:14,23
Defendants
1:10 132:10
133:14
definitely
4:14 47:14
59:10
degree
7:14
deliberate
53:5
Department
11:4,7,10,13
11:20,23
13:10 16:5
16:10,22
17:3,6 18:6
21:2,13 22:9
24:23 25:17
27:15 28:2
73:19 89:6
89:14,18
90:16 107:7
114:7 135:22
deponent
131:8 132:12
135:8,10,13

135:16
deposition
1:11 3:16 4:1
4:9,16 6:13
29:21 102:14
106:7 113:18
131:5 132:13
132:15 134:2
134:5,6
135:10
depositions
1:14 113:12
describe
30:22 32:23
34:14 63:9
67:13 126:21
described
61:1 63:4 64:8
67:14 119:21
121:23
detain
121:8,20
detained
121:15
detaining
17:23 19:2
determine
125:3
determined
127:22
differ
19:8
difference
34:15 88:2
different
17:19 100:1
differently
86:23,24
direct
108:2
directed
59:3
direction
30:8 31:13,18
32:7,10 39:7
52:23
directly
39:4 46:10
68:11
disappear
128:2
disappeared
47:21 83:5
disciplined
21:1,3
dispatch
61:17
displayed
130:20
distress
128:8
distribution
135:18
District
1:1,2,13 79:24
84:13,16,18
85:6,9 87:4
88:23 89:2
94:9,12,21
96:3 97:10
97:11 117:9
117:14,17,22
132:1,2
DIVISION
1:3 132:3
document
91:20 92:20
98:24 103:5
103:6,7
104:22
105:17

106:21
108:15
documents
6:12 108:14
doing
5:11 49:4,9
56:22 58:17
95:6
Donuts
20:14,17 28:7
28:9,12,16
28:18,20,22
29:1,4,7
31:8 33:12
33:15
door
29:11 30:3
42:2,6,9
44:19 45:4
60:8,9 65:17
65:18,22,23
123:1 124:6
124:16
doors
29:3,6,10 48:4
48:5
doorway
122:6
drifted
34:7,13
drifting
35:3
drinking
95:20
drive
20:11 34:5
37:7 38:18
38:22,22
120:3 128:24
driver
35:8 36:4 42:2
43:2,13,17
44:2,6,24
45:3 116:10
116:12
120:16 124:6
124:15 130:5
130:15
driving
12:18 20:5,6,9
20:16 37:10
38:5 39:17
39:21 40:2
drove
20:6 37:16,18
37:19 80:19
112:7 114:22
129:22
drunk
83:1
duly
6:8 132:11
133:16
Dunkin
20:13,17 28:7
28:9,12,16
28:18,20,21
29:1,4,7
31:5 33:11
33:15
duties
19:3 103:20

**E**

E
3:1,14 4:7
earlier
43:10 82:4
101:16
115:18
east

33:7 34:8
37:18 39:8
127:24
eastbound
33:3 34:1 38:5
38:18 39:11
39:15,21
40:16 41:5
EASTERN
1:3 132:3
ED
2:2
educational
7:6
affect
38:16 95:21
either
23:12 50:1
67:6 92:12
99:6 112:15
115:12
124:23
elementary
57:23
else's
78:18
emergency
87:16
employed
10:17,18
employment
8:8
enclosed
135:10,11
ended
9:14 59:23
endured
85:18
engage
116:15
engaged
103:20
engine
119:13
entail
118:18
entails
118:19
errata
135:11,14,14
135:17
especially
129:11
essentially
15:9
estimate
8:23
et
1:9 132:9
133:14 135:6
evasive
51:6
evening
128:17
events
126:16
Everybody
75:13 85:21
exact
22:16 68:19,20
101:2 127:4
exactly
41:14 51:6,15
54:4,15
70:14 89:21
111:2 113:3
114:13,15
120:9 126:17
exam
28:5
examination

1:12 3:2 6:10
114:1 115:5
130:2
examined
6:8
example
25:2
excessive
22:8,12 23:15
24:9,15 25:3
25:10 26:7
26:12,20
exchange
50:18 52:21
excluding
105:17 109:1
excuse
32:2 45:18
111:20
execution
103:20
exhibit
3:16 91:16
92:21 99:3,7
99:7,10
102:12,14
106:5,7,19
108:3
exit
39:22 40:1,6,8
40:10,10,11
41:12,18
42:2,5,13
43:3 44:12
44:16 46:22
46:22
exited
40:14,15 41:5
42:10 43:14
44:20,20
61:17
exiting
29:1
experience
36:13 86:20
90:12 115:21
116:1,4
117:19
118:19 119:5
119:6,18
120:11,14
126:6 127:16
128:14
explain
24:24
explained
17:4,8
expressed
65:19,20 86:3
86:5
extending
123:18
extent
17:7 87:10
Extra
13:11

**F**

face
76:6,14 75:13
76:6,6 77:3
facing
39:6,8
fact
104:21 113:11
113:12
117:24 127:8
factor
120:19
facts
118:21

failing
103:21 106:2
fair
121:1
fall
66:22 67:2,5,7
67:8,10 68:3
76:5
far
29:6 30:3
40:21,24
49:23 58:8
77:2 126:24
127:24
fear
86:6,8
February
117:12
feel
6:2 59:4
feet
38:21,23 41:1
41:3 70:5
127:5
fell
60:12 64:17
65:13 66:21
67:4 68:7,21
68:22 122:1
122:8
fellow
16:19
felony
118:14,18,23
felt
47:2
female
47:1,2,4 50:5
fifth
43:20,21
fight
70:22 80:15
fighting
55:3 68:6
figure
8:15
file
91:10
filed
21:4,12 22:7
22:11,22,24
23:14,18
24:11,16,22
25:3,9 27:3
102:1 103:1
108:11,13,18
fill
91:5,13 93:19
93:22 96:17
96:20 97:1
101:21,23
118:1,5
filled
91:12 92:1,3,5
93:20 94:23
96:13 97:3,7
98:21 99:24
filling
89:15,18
finally
112:18 113:1
find
47:3 83:14
firmly
79:17 80:6
first
6:8 9:13 12:2
13:12 14:14
14:24 15:21
19:22 27:9
27:10 30:10

30:20 32:11
32:16 48:23
55:13,14
66:21 68:7
71:8 72:10
72:17,18
73:6 80:11
80:18 85:23
86:17,17
100:24
110:17 114:7
132:11
133:16
firsthand
119:17
fist
69:10,13
five
4:12
flailing
103:22 104:3,9
flexed
56:21
fling
59:5
flinging
59:4
flip
61:8,23 62:5
62:20
flipped
62:13,20 63:16
64:5,12
flipping
64:14,18
fly
77:2
focus
128:5
follow
16:15
follows
6:9
footage
127:4
football
95:14 115:11
force
22:8,12 23:15
24:9,15,19
25:3,10 26:7
26:12,21
59:1,2
forced
60:8
forcing
128:15
foregoing
132:14 133:22
134:2
forget
120:9
former
115:11
forms
118:2,5
forth
68:1
forward
45:10 46:3
78:15
found
24:1 47:2
foundation
104:23 124:12
four
74:21 125:14
fours
126:11
fourth
29:20 42:19

64:8
FOX
2:2
framing
71:20
free
6:2 77:20,21
78:1
front
33:11 39:2
42:9 45:11
45:13 46:4,9
49:11 51:5
59:22 60:2
66:7 125:17
125:21 129:4
129:15,22
130:17
full
55:22
full-time
8:8,12 9:1
28:1
further
3:7 77:4
113:23 115:4
127:24 130:2
131:2,8
133:15 134:1
134:4,8

G

Galarza
73:22 74:7,13
75:7,11,15
75:19 76:1
87:8,11
garage
120:12
gas
119:9,10
gasping
88:8
general
19:7,11 85:15
110:24
generally
22:5 96:7
Gerald
107:8
getting
76:5
Gibbons
2:19 3:5 19:14
21:7,20 99:9
104:23 105:7
105:13 114:2
115:4 131:2
135:23
Gillespie
74:7,13 75:7
76:3 87:9
Gillespie's
75:12 76:10
give
14:3 17:16
51:8 52:4
95:22 98:24
given
57:5 133:18,24
giving
5:19
glasses
75:12 76:5,6,7
76:10,14
77:2
Glover
82:17 83:11
99:18
go
12:22 13:1

14:11 16:20
16:23 19:10
20:24 26:2
29:4 36:16
41:19 42:19
43:4 47:23
48:1,3 58:13
58:22 62:2
67:14 87:15
100:12 111:4
113:22
115:10
116:20,21
117:1 129:14
129:23
goes
72:1 128:23
going
4:17,19 15:4
15:23 16:11
19:17,18
22:1 29:20
32:19 33:15
33:19 34:9
36:3,23 37:5
37:12 38:2
43:8 45:15
49:12,12
51:4 63:8
67:9,9 70:11
72:24 79:18
80:13 82:24
86:12,15
87:9,12
109:19 111:7
111:16 114:5
118:22
127:19 128:6
128:24
129:21
130:14
good
65:3 85:19,21
86:20
gotten
25:22
grab
53:5 54:11,18
grabbed
54:10,13,17,20
54:21 55:5
86:11
grabbing
59:8
gray
32:24 33:24
34:4 38:6,19
39:22,23
40:8,8 42:17
greatest
125:15
grew
119:11
ground
4:16 60:24
61:3,8,24
62:5,6,8,11
62:14,16,18
62:21 63:1
63:17,18,23
64:4,6,12,14
64:17,18,21
64:23,24
65:2,11,12
65:14 66:4,5
66:5,14,22
66:23,24
67:9,11,17
68:7,21,22
69:2,6,75:17
78:7,10,12

78:14 87:20
87:21 122:2
122:9 123:1
128:11,19
group
99:10
Grove
117:10
guess
48:7
guessing
9:15
guide
52:16
guilty
24:1
gun
86:10,11·
guy
23:18 49:13
56:9,10 57:6
66:18 74:24
85:20 88:21
111:17
129:17
guys
47:18 48:16
83:5,5,11
90:1 112:24
125:18
130:19

H

H
3:14
half
127:6
hall
111:4
hand
61:11 78:1
79:17 80:5
134:13
handcuff
87:19 122:16
handcuffed
114:11 122:18
handcuffing
93:15
handcuffs
66:13,15,17
71:13,16
72:1 75:22
77:7,8,9
107:17
121:14
handed
106:17
handful
66:16
handle
126:1 135:18
hands
52:22 53:2,15
71:24 77:12
77:22
handwrite
94:1
handwriting
98:24 99:6,8
99:18 100:1
happen
5:19 34:11
67:12 116:19
happened
4:19 28:11
41:8 42:15
51:11,15,18
54:8 63:5
72:2 89:20
90:7 98:7,15

105:23
109:10,24
110:10
113:13,15
122:11
happening
43:6 124:19
125:4
happens
5:22
head
5:10 23:2
headed
33:3 129:18
hear
28:15,21,24
31:8 50:5,6
50:10
heard
28:19 29:4,7
29:18 30:6
30:11,14,17
30:20 32:17
87:13
hearing
6:20 31:4,10
58:8 101:17
118:21
HELEN
2:19
help
28:14 61:12
71:8 74:19
74:19 75:21
79:2 84:21
122:15
helped
75:8·
helping
72:22
hereinbefore
134:7
heretofore
133:7
hereunto
134:12
hey
111:7
highest
11:22
Hill
92:4,5,9 93:9
93:13,20
Hinshaw
2:9 135:5
hired
28:1,6
hit
34:8,16 35:15
36:22 37:1
62:8,11
63:18 65:11
65:12 66:4
67:11 69:10
69:13 116:8
124:14
127:19
hitting
66:19
hold
56:23 57:1
53:3,10
92:16 122:12
holding
58:18,19 59:13
60:11 69:24
89:5
home
76:15
honest
101:14

hood
45:14,15 46:5
46:11,11,14
47:16 49:11
49:16
horn
28:21 29:4,7
30:8,11,14
30:17,20,23
31:2,4,8,10
31:19 32:5,8
32:10,17,19
33:15,19
34:6,7,9
36:3,16,17
36:19,23
37:5,12 38:2
45:15 49:11
50:19 51:4
51:19,22
89:23 116:4
116:5,21,23
116:24 117:1
117:2,2
127:18,19
128:6,9
horns
28:24
hospital
87:9,12
hot
116:7,19,19
119:7,14
hour
1:19 29:21
hours
13:16,21 29:22
hunched
88:9,12,13,14
88:17
hurt
85:22
hurting
87:7

I

ice
23:21
ID
3:15 50:21,22
51:17 52:2,3
52:5 103:22
106:2
idea
13:19 32:16
41:3 78:4
80:12,17
identification
83:19,22 84:7
84:10 102:15
106:8,18
identify
55:17
identifying
56:1
IED
26:5,15
ignition
119:8,15,19
Illinois
1:2,17,18 2:5
2:12,21
102:18
104:12 132:2
133:1,6,10
133:12
134:20 135:2
immaterial
113:15
immediately
47:9 50:22

| | | | | |
|---|---|---|---|---|
| 52:19 97:14 | 14:11 21:6,19 | 72:14,20,21 | landed | 61:7 64:15 | 40:10,11 42:2 |
| 97:16 127:9 | 22:20 57:17 | 73:5,10,12 | 62:17 76:10 | 65:16,23 | man |
| inadvertently | 100:11 | 73:16,17 | lane | 66:1,2 | 54:12 59:21 |
| 62:6 | 113:15 | 74:12 76:19 | 39:11,15 123:4 | lifting | 60:6 69:22 |
| incident | | 80:3,14,22 | 123:19,24 | 64:15 | 70:5 78:21 |
| 4:18 8:18 9:13 | **J** | 80:22 81:22 | 124:5 | light | 85:22 87:24 |
| 23:5 72:16 | January | 82:9 83:8,14 | language | 19:7 | 122:13 123:2 |
| 109:3 114:5 | 6:17 100:19 | 84:3,10 85:4 | 79:19 105:8 | lighted | 126:22,23 |
| 117:5 127:3 | 101:10,18 | 85:18,18 | large | 48:11,12 | mangled |
| include | 106:11 | 86:2,11 | 80:1,3,4 | lighting | 76:14,24 |
| 117:16 | 112:13,19 | 87:10,11 | LARRY | 48:14 | manner |
| included | 113:9 134:14 | 89:4 90:23 | 1:8 132:8 | line | 78:20 |
| 104:3 | 135:4 | 92:5,8,13,15 | LaSalle | 79:21 93:14 | man's |
| inclusive | job | 94:4,8 96:12 | 1:17 2:11,20 | liquor | 87:2 |
| 132:16 | 10:4 14:24 | 96:20,24 | 133:9 135:1 | 129:1 | Margaret |
| income | 85:19,23 | 98:16 99:12 | 135:5 | literally | 135:21 |
| 13:11 | 85:18 117:10 | 99:23 100:2 | late | 55:3 59:5 | mark |
| indicate | Johnson | 101:10 | 22:16 24:16 | little | 102:12 |
| 120:20 | 107:6,10 | 102:19 104:4 | lawful | 4:17 16:18 | marked |
| indicating | join | 107:16,18 | 121:3 | 20:24 21:8 | 3:15 91:15 |
| 52:23 | 21:7,20 105:13 | 110:6 111:2 | leading | 35:8 40:19 | 99:3 102:15 |
| information | JONATHAN | 111:7 112:6 | 115:16 118:7 | 57:21 88:1 | 108:8,18 |
| 17:13,15,16 | 2:3 | 113:3,5 | 119:22 | 119:21 | match |
| 83:17 90:3 | July | 114:5,19 | 121:11 | located | 55:1 56:13,18 |
| 99:19 109:2 | 108:15 | 120:5,23 | 123:21 125:6 | 63:17 64:22 | matter |
| initial | jurisdiction | 125:24 | leaned | 67:18,18 | 7:1 38:23 |
| 4:7 | 117:16 | 127:17 128:9 | 49:15 78:15 | 68:10 99:19 | McCorkle |
| injured | | 128:16 129:4 | Leaning | location | 135:1 |
| 91:22 93:15 | **K** | 130:20 | 15:24 | 122:22,23 | mean |
| injuries | K | knowingly | learn | look | 10:16 15:12,15 |
| 75:14 87:5 | 133:3 | 103:15 | 15:24 74:1,6,8 | 119:8,15,19 | 15:18,19 |
| 92:23 | Kalamazoo | knowledge | 74:11,18 | 120:5 | 21:3 25:1,18 |
| injury | 7:9 | 4:21 86:19 | learned | looked | 25:21,23 |
| 75:11 87:10 | keep | Ksiazek | 74:24 75:10 | 116:9 120:18 | 26:16 40:23 |
| 91:13 93:20 | 33:24 60:1 | 2:3 3:4,7 4:4 | 84:4 | locking | 56:15,17 |
| inside | 66:18 79:1 | 4:8,12,15,24 | leave | 116:12 | 58:6 68:18 |
| 28:16,17,18,19 | 79:11 | 5:7,15,24 | 13:14 39:22 | long | 74:11 82:6 |
| 28:21 32:3 | Kenwood | 6:11 10:20 | 97:23 | 4:11 8:10 11:2 | 90:11,12 |
| 33:22 37:2,4 | 95:14 | 10:23 12:8 | leaving | 12:14 38:17 | 96:23 97:1 |
| 38:4 41:9 | kept | 13:4 14:13 | 29:1 | 38:20 65:9 | 97:16,20 |
| 49:15 62:22 | 34:5 | 19:9,15 | led | 85:2,4 94:8 | 99:24 112:22 |
| 81:19 82:2 | kick | 20:22,23 | 59:21,21 116:1 | longer | 113:11 116:6 |
| 83:6 112:10 | 68:15 69:3 | 21:10,23 | 119:6 120:19 | 128:3 | 127:2 |
| 124:24,24 | 75:19 76:2 | 28:2,4 29:3 | left | look's | mechanic |
| instructor | kicked | 28:2,4 29:14 | 12:9,17,18 | 19:10 40:16 | 120:12 |
| 12:19 | 68:17 69:19 | 30:2 31:17 | 28:3 39:5,9 | 45:10 74:16 | mechanism |
| intent | 70:2 75:12 | 35:1 36:15 | 40:11 44:21 | 74:22 77:5 | 116:23,24 |
| 125:10,13 | 75:16,24 | 43:1,23 | 45:1,5 46:21 | 91:19 92:19 | medication |
| intentionally | 76:1,5 | 45:23 46:1 | 54:2 60:3 | 127:13,21 | 95:21 |
| 82:4 | kicking | 47:7 48:10 | 93:14 97:13 | looked | men |
| interested | 68:2,14 69:16 | 51:1,2 57:19 | 97:14,18 | 30:8 31:13 | 124:19 |
| 70:17 134:10 | 69:22,24 | 58:9,16 62:9 | 98:7,11 | 32:5,7,9 | mental |
| interfered | 70:6 | 63:3,12,15 | legs | 47:4,17 | 83:1 |
| 116:24 | kind | 64:10,19 | 75:24 77:14 | 87:15 113:20 | mentioned |
| interfering | 21:14 34:7 | 65:1,12 | length | looking | 115:18 134:7 |
| 129:20 | 51:8 79:18 | 66:12 69:1 | 127:6 | 31:18 33:24 | met |
| intermittent | 110:4 111:23 | 77:1 99:11 | lengths | 48:15 49:6 | 86:17 |
| 117:3 | 113:1,7 | 99:15 100:14 | 127:5 | 108:4 115:10 | Michigan |
| Internal | 123:20,22 | 102:12,18,22 | let's | 127:15 | 7:9,10,11,15 |
| 28:9,15,16,18 | knew | 103:4 104:8 | 19:10 20:24 | looks | middle |
| interpreted | 76:17 83:8 | 104:13 105:1 | 38:15 45:20 | 99:12 100:1 | 4:6 107:3 |
| 60:22 | 87:8 96:17 | 105:14 106:4 | 52:7 123:12 | loose | 123:10,10,19 |
| interrogato... | knocked | 106:9 107:22 | level | 58:22 68:3 | midnight |
| 6:15,22 106:20 | 75:13 88:5 | 108:1 109:8 | 118:16 | 122:14 | 19:23 |
| interviewed | know | 109:22 | levels | lot | mind |
| 26:5 | 5:4 6:18 12:6 | 110:22 111:9 | 126:4 | 70:13,16 83:17 | 36:8,10 43:12 |
| investigated | 14:9 18:14 | 113:16,23 | leverage | 88:13 90:13 | 127:15 |
| 26:5,8,20 | 18:23 22:24 | 115:16 118:7 | 61:8,22 62:15 | 114:5 | mine |
| investigating | 23:7,10 | 119:22 | 62:20 64:16 | | 87:7 90:5 |
| 61:18 | 26:10,17 | 121:11 | 64:20 66:3 | **M** | minutia |
| investigation | 27:24 38:21 | 123:21 | LIC | M | 103:3 |
| 23:8,11,23 | 40:9,21 | 124:12 125:6 | 134:21 | 2:10 135:4 | mischaracte... |
| 24:1 26:11 | 44:19 49:13 | 125:19 130:3 | License | machine | 63:11 |
| 26:18 27:6 | 50:19 51:7,9 | 131:1 135:23 | 1:23 | 128:15 | missing |
| 106:3 | 54:2,13 | Kwiatkowski | Lieutenant | main | 58:5 |
| investigatory | 61:16,20 | 73:22 74:7,13 | 107:8,11 | 123:3 | month |
| 103:21 | 62:8 64:1 | 75:8 | lift | maintain | 13:24 14:4 |
| involved | 65:8 67:5 | | 60:23 61:2 | 66:19 | months |
| 118:15 119:2 | 68:17 69:18 | **L** | 65:20 | majored | 8:23 |
| 120:1 | 69:21 72:10 | laid | lifted | 7:17 | Moore |
| irrelevant | | 8:19 13:15 | 60:11,13,15,20 | male | 1:11 3:3 4:7,8 |

6:7 31:24
103:18 114:3
115:7 121:5
132:11,18
133:10,16
135:8
morning
48:13 128:20
128:22,24
motion
6:19 34:14
101:17
Mourgelas
1:15,22 133:4
135:21
move
34:18 52:24
122:22
moving
34:19,21
muscles
88:2
M-O-O-R-E
4:7

_____ N _____

N
3:1 135:1
name
4:5,5,8,7
22:23 50:24
51:1 81:9
83:16
names
73:10
nature
98:12,14
NAUGHT
131:8
near
30:12 123:1
129:15
need
5:20,24 15:12
21:21 57:12
96:11,11
107:19 111:2
135:15
needed
79:6
Neither
131:3
never
26:17 42:22
49:22,24
52:4 56:16
58:2 72:1
77:10 78:8
82:22,22
93:19 97:3
night
9:12 17:11,12
20:3,14
48:12 51:11
61:14 76:7
91:6,11
105:23
129:10,11
noise
34:7 116:23
normally
115:10
North
1:17 2:11,20
133:9 135:5
NORTHERN
1:2 132:2
notarial
134:13
notarized
135:15

notary
1:15 132:24
133:4 134:20
notice
47:12 80:7
134:5
notifications
110:5
notified
27:1
November
1:18 132:14
number
3:15 108:4
135:7,19
numbers
91:18
numerous
120:2

_____ O _____

O
133:3,3
oath
106:15 132:12
object
14:9 29:18
63:5,10 64:7
84:13,17
102:19 104:1
105:12 109:6
116:15
objecting
29:20
objection
12:24 19:14
21:6,18
22:20 25:18
29:12 31:12
38:11 42:18
43:19,21
47:6 57:17
62:1 68:23
100:11
104:23 105:7
109:12
115:16 118:7
119:22
121:11
123:21
124:12 125:6
125:19
objections
108:9
observation
46:16
observations
120:15
observed
34:11 43:16
120:8
observes
121:18
observing
43:7 89:24
119:18
124:18
obstruct
122:13
obstructing
103:14 106:1
Obstruction
94:6
obvious
55:23
obviously
28:6 68:11
occasion
119:12
occur

98:4
occurred
126:16 127:3
127:10
occurrence
14:10
October
4:19 8:3 9:12
10:10 14:22
15:4,10,15
16:5,10,15
17:6 18:3,4
19:12,21
27:11 28:8
74:14 82:14
91:6 93:10
96:21 103:10
105:24
107:11 109:3
109:10,24
110:10 115:7
offender
93:16
offense
104:20 105:22
Office
26:22 27:1,5
officer
1:8 8:11 9:19
10:22,24
11:3,21,24
12:15,16,21
13:3,6 14:8
16:19 17:10
18:3 19:5,16
20:6 21:2
24:5,16,17
27:18 28:4
30:10,13,16
30:19 31:24
32:2 33:17
36:14 38:7,9
41:13,16
48:16 49:19
50:1,11 52:6
53:21 54:16
54:21,24
55:4,9,20
58:4,6,13
58:17 60:15
60:21 61:10
61:16,21,23
62:19,21
63:20 69:13
69:16 71:23
72:4,8,11,12
73:22 74:13
75:15,19
76:3,9 77:18
79:8 81:20
84:1,7 85:5
85:8 86:2,16
86:17,22
87:3,6,11
88:4 89:11
91:3 92:5,8
93:9,13,20
96:2,5,15
98:1,6
103:14,19
107:5,10
108:20
109:23 110:8
110:9,11,15
110:19
111:11,14
112:10,14
113:8 114:3
115:7,13,14
115:22 116:1
117:4,21

118:20 119:4
119:24 120:1
120:11 121:5
121:18 122:1
122:5 125:16
126:4,7
127:15 130:6
132:8 133:14
officers
2:16 71:4,7,12
71:17,19
72:15,18,22
73:1,2,3,4,7
73:23 74:2,6
74:9,18 80:8
80:9,18,19
81:6,12 89:5
89:14,18
90:4,4,16
92:4 104:18
104:21 105:4
105:10,16
114:18
117:20 118:1
118:4,10
119:1 121:7
121:13 124:9
officer's
77:21 78:3
official
103:19
oh
26:10 47:14
112:24
okay
4:15,22 5:5,6
5:13,22 6:5
6:6 10:13,21
11:2 15:17
17:15 19:10
21:14 22:14
26:20 32:22
36:22 38:4
39:14,24
41:4,22
42:12 43:2,5
43:7 44:6
46:20 49:1
51:12 53:20
55:4 56:12
58:3 61:20
65:3 66:11
86:13,21
87:13 69:5
72:3,21
73:14 75:5
76:2 77:2
80:5,17
82:12 84:11
85:7 88:12
89:13 90:18
91:21 92:18
93:17,18
100:4 106:23
111:23
118:24
119:17 122:8
122:14
123:12 130:9
old
8:5,6 87:24
115:8,11
128:23
Olympics
57:8
once
32:22 40:5,14
41:11 45:7
47:15 67:17
70:11 78:11
79:15 81:13

89:1 97:7
112:10
122:15,24
ones
74:14
on-the-job
126:6
open
60:8,9 65:17
65:18 122:6
opened
46:11
opportunities
88:19
opportunity
75:3
opposed
19:7
opposite
123:23
ordeal
87:23 88:7
107:15
orders
19:7,11
original
103:6
outcome
23:7 134:11
outside
29:3,10 31:5
34:10 46:18
62:23 63:5
63:21 65:22
66:5 82:21
108:22 125:1
owned
119:9
owner
119:10
o'clock
1:19 4:2 131:6

_____ P _____

page
92:19,20
106:23,24,24
107:3,4
108:3
pages
132:15 135:11
135:15,17
pair
76:16 122:19
paperwork
89:7,15,19
91:5,8,9
94:22 96:11
97:7,12,15
97:20,21
98:1
paragraph
92:22,24
104:19
105:21 107:4
107:5
paraphrasing
25:12,14
park
129:21
parked
35:6,24 39:14
40:22 41:2
127:1 129:12
129:15,22
130:4
parking
34:15 39:12
129:3,6,8,12
part
56:24 104:18

117:15
119:10 124:4
parties
134:3,9 135:18
partner
59:11,12,16,19
130:6
part-time
8:22 9:14,16
10:9 13:9,17
pass
33:2,4,10
passed
32:16 33:14,19
33:21 114:22
127:18
passenger
40:12 42:6,8,9
42:13 44:9
44:22 60:9
85:17 122:21
123:1 130:15
patrol
9:19 11:21,24
12:21,22
13:5 15:4,10
15:24 16:19
17:18 18:16
18:17 19:12
19:17 20:2,5
24:14 28:3
33:22 41:9
41:11 42:16
65:8 81:20
98:19
payment
128:16
peace
103:14,19
peeled
116:14 119:14
119:20 120:4
pending
6:4 113:13
133:10
people
18:12 28:19
113:1 121:8
121:14
124:23
125:14 127:8
performance
103:15,16
period
8:19 80:1
permitted
121:8,14,20
person
40:10 42:2,13
51:5 68:4
70:18 80:16
125:16,17,21
128:8,13
personal
91:22
personally
80:21 89:2
102:2 119:24
133:8
pertaining
1:14
phone
135:19
physical
130:18
physically
53:8 59:16,18
83:22,23
pick
5:12 23:21
59:15,16,19

76:12,13
piece
76:13,20,21
pile
67:21,22
pinned
61:6
place
66:10 79:17
99:21 121:14
125:10
129:23
placed
60:16 77:7
78:14 80:5
80:24 82:2
86:7,9 118:9
placing
93:16
plaintiff
1:5 2:7 122:1
132:5 133:13
Plaintiff's
3:16 91:16
99:3,7,7
102:13 108:4
106:6,19,20
108:3
played
95:13
players
115:11
pleasant
70:15
please
4:4 5:10 34:23
90:13 108:17
135:12,17,19
plenty
129:7,12
PO
103:18
point
6:1 20:13 28:8
28:13,24
29:16 32:12
33:20 34:19
35:14,23,24
36:16,19
37:22 43:18
44:7 46:15
47:6,20
48:12 49:7
50:3,3,6
54:22 56:2,9
56:13 59:12
60:10,23
83:21,22
66:14 67:20
68:3 70:18
71:3,10,13
77:6 78:8,9
78:24 79:9
79:20,22
80:7,10,24
83:18 84:4,6
88:7,10,22
93:10 100:8
100:9 107:8
110:13,20
121:24 122:4
123:9 124:24
126:10
130:13,16,19
130:21
points
5:8
police
1:8 2:15 6:24
8:9,11 10:22
10:24 11:3,3

11:7,10,13
11:19,23
12:4 13:10
14:8 16:5,10
16:21 17:3,6
17:17 18:6
19:5 21:2,13
22:9 24:5,19
24:23 25:17
27:15 28:2
36:14 54:12
55:20,23
56:1,4 70:21
70:22 71:18
72:4,6 73:19
74:23 80:8,9
80:19 81:6
81:12,20
82:3,7,8
86:19 89:6
89:14,17
90:16,23
91:1,2,2,4
91:10 94:7
96:14,15,18
96:21 97:4
100:5 103:8
104:3,16,21
105:4,10,16
107:7 108:20
114:7,18,23
115:12,13,23
116:1 117:4
117:17,21
118:1,16,20
119:4,24
120:1,11
121:21 124:3
126:1,4,7
127:15,18
132:8 133:13
policies
18:4,9,14,20
16:24 17:4,9
18:5,15,19
18:22 19:1,6
poli-sci
7:17
position
8:7 116:5
124:4
positioned
123:15 127:2
possibly
70:1 116:13
120:18
pounds
8:2
predicament
59:14
predicate
63:9
preparation
6:13
presence
133:20
present
8:17,20 9:1,7
10:7 134:6
presentations
12:20
pretty
112:2 129:8
preventing
7:3 59:7
previously
91:15 99:3
109:11
printed
113:21
prior

8:22 9:9 15:6
16:5 19:17
68:13 80:9
82:21 86:19
97:4 101:19
probably
8:23 41:14
68:16 83:15
83:16 95:12
95:14 96:9
96:10
problem
5:14,23 8:16
problems
119:18
Procedure
1:13
procedures
16:4,9,14,21
16:24 17:5,9
17:21,24
18:5,15,20
18:22 19:2,6
process
71:22 72:2
93:15 97:18
97:20,22
118:14
processed
79:24
produce
103:22 106:2
product
33:1
Professional
26:22 27:2,8
professionally
119:23
properly
98:16
prosecutor
105:11
protect
59:10 80:16
124:5
prove
118:23
provided
99:5 108:20
proximity
77:23
prying
116:15
public
1:15 132:24
133:4 134:20
Puiszis
2:10 3:6 10:17
10:19 12:6
12:24 14:9
19:4 20:19
21:6,18
22:19 23:17
23:22 25:18
25:24 29:12
29:16 31:12
34:20 36:11
42:18 43:19
45:20 47:6
48:7 57:17
58:5,13 62:1
82:24 63:4
64:7,13,23
65:11,13
68:23 76:22
100:11
102:19,24
104:1,11
105:8 109:6
109:12
110:21,24

113:10 115:6
115:17 118:6
120:7 121:12
124:1,13
125:7,23
129:24 131:3
135:4,9
pull
60:13 124:3
pulling
56:21,22 61:4
61:6
punch
59:6,8 68:2
69:5,9,9
punched
58:23 69:7
punching
69:8
purpose
128:23
purposes
106:18
pursuant
1:12 134:5
push
52:19 53:12,14
53:18
pushed
52:8,8,18,22
53:1,15,20
53:21,23
54:5,8,12
55:9 90:3
122:5
pushing
53:9,10 128:8
put
86:3,3 71:16
71:24 75:2
p.m
1:19 4:2 20:1
131:7

_____
Q
_____
question
5:2,3,18 6:2
10:2 13:1
14:2,12
16:12,18
18:19 22:4
25:5,6,13,14
25:21 29:23
30:1,18
34:23 36:21
41:21 43:20
49:22,24
50:14 51:16
60:19 63:9
64:1,2 65:3
65:21 73:13
74:4 76:23
79:2 80:4
81:17 83:21
100:12
105:12,15
108:4,6,8
109:7,13,14
108:15
113:17
questioned
115:19
questions
4:18,20,21 5:1
5:7,11 6:5
39:13 51:7
74:17 95:23
144:4 135:19
quiet
75:3,5
quite

69:18,20 70:4
82:9 85:10
85:17 114:20

_____
R
_____
R
2:3 92:4
radio
55:23 61:11,13
radioed
61:16
raise
46:13 47:16
50:2 78:21
79:13,16
raised
45:15 46:5
75:23
ran
35:5
rank
9:17 11:18,22
reach
77:4
read
90:24 92:11,12
92:17,23
96:24 100:4
100:7,10,13
100:18
103:24 104:4
104:19
105:21
132:14
reads
103:13
real
71:22
realized
75:7
really
12:7 18:20
100:2
rear
42:6 44:22
reason
5:4 7:19 25:11
28:6 35:19
35:21 36:6
reasonably
120:13 121:19
recall
4:10 17:22
18:1,9 19:19
20:12 21:24
22:2,23
23:16 24:6
24:10,13,22
25:8 27:4,5
27:8,22 29:9
29:13,15
30:4,21
33:20 41:14
41:17 42:11
46:19 48:24
49:10,18,24
51:6,9 53:9
53:9,10 54:4
55:11 61:21
67:20 68:8,9
68:12,12
69:15,16
70:4 71:2
76:17 79:10
81:14,15,17
81:18,19
82:8 83:13
87:6,14 88:3
90:21,24
91:7,9,12
96:6 99:1

100:17,20,24
101:12 112:6
112:17,23
114:9,13,15
114:17,23
115:2,3
recap
8:24
recognize
73:5,6,9 81:6
81:9 106:21
recollect
74:20
recollection
14:3 49:21
record
4:5 20:22
45:23 63:13
99:9 107:22
118:17
recoveries
120:2
reduced
133:21
reference
64:13
referencing
6:16
referred
91:23
referring
22:5
refusing
90:2
regard
126:8
regarding
92:23 109:3
Regardless
42:12
regards
16:3 110:18
relate
25:6
related
134:9
relates
116:12
relation
38:24 67:19
relax
50:8,11,14
relevant
12:7
remain
85:2 122:20
remains.
85:4
remember
22:3,15 56:8
66:6 70:14
78:17 81:24
82:1,4 83:21
85:12,15
88:6,7,9,14
88:16 95:17
96:7 112:23
114:14,19,19
114:20,22
115:22
126:10,15
remind
4:15
repair
119:13
repairing
120:12
repeat
30:18 80:14
rephrase
5:4

| | | | | |
|---|---|---|---|---|
| report | 25:4 28:13 | 129:7 | 75:1 77:8,9,18 | 32:21 44:8 | spoke |
| 73:24 90:23 | 27:11 28:4,8 | scenario | 77:23 90:5 | 50:24 55:22 | 92:8 |
| 91:1,2,3,4 | 28:9 31:6,8 | 86:15 | seven | 57:13 63:23 | spoken |
| 91:13,22 | 32:6 33:2 | scene | 90:4 | 65:6 67:20 | 113:8 |
| 93:20,22,23 | 35:15 36:6 | 72:11 80:8 | seventh | 70:10,12 | spot |
| 93:24 94:2,2 | 37:16,17,20 | 81:7,12 | 88:24 | 84:6 87:18 | 39:12 |
| 94:7 96:10 | 37:23 39:6,8 | 82:13,17 | shake | 97:16 107:23 | spots |
| 96:14,18,21 | 41:9,23 42:3 | 83:12,24 | 5:10 35:10 | 108:5 115:8 | 129:3 |
| 96:24 97:4 | 42:16,17,22 | 84:19,20,23 | share | 115:15 | sprain |
| 100:5 | 42:23 43:11 | 85:2,5 87:13 | 115:24 | sit | 87:17 |
| reported | 43:14,18 | 107:8,11,14 | sheets | 16:13,19 17:10 | sprained |
| 1:22 92:17 | 44:4 45:1,4 | 114:8,18 | 135:11,14,14 | sitting | 87:8 |
| 133:19 | 46:6,15 | 115:1 | 135:17 | 43:6 44:13,17 | squad |
| reporter | 48:12 51:22 | schedule | shift | 86:14 | 29:2 39:17 |
| 5:12 135:22 | 54:3 58:7 | 113:21 | 19:20 | situation | 55:24 60:4,9 |
| Reporters | 58:12 62:10 | school | shirt | 72:24 82:10 | 60:12,16 |
| 135:1 | 62:14 64:6 | 57:23 95:16 | 114:24 | six | 62:22,23 |
| Reporting | 68:21,22 | seal | shirts | 27:16 90:4 | 63:2,2,5 |
| 92:4 | 70:3 72:5,6 | 134:13 | 115:3 | slapped | 65:17,18 |
| reports | 74:15 78:7 | seat | short | 75:12 | 66:5,9 78:15 |
| 6:24 91:10 | 81:2 84:2 | 44:23 | 20:20 45:21 | slow | 78:18 79:23 |
| Representing | 86:16 87:1 | second | 107:20 | 59:24 | 80:24 81:1 |
| 2:7,14,23 | 87:22 88:23 | 29:19 31:15 | shorted | somebody | 84:12 114:11 |
| reserved | 98:18 97:5 | 36:12 45:18 | 116:6 | 38:12 69:24 | 114:15 122:6 |
| 131:4 134:2 | 99:2,11,17 | 50:16 62:3 | shortly | 78:18 83:20 | 122:21 123:7 |
| resist | 101:4,8 | 92:16 98:5 | 122:4 | 84:3 116:6 | 123:8,15 |
| 59:2 121:3 | 103:5,11,24 | 101:7 107:4 | shoulder | 128:7,15,16 | 124:3 127:1 |
| resisted | 104:14,22 | 107:4,5 | 61:12 75:11 | 129:14 | SS |
| 103:15,21 | 105:6,18 | 123:12 | 76:1 87:15 | sorry | 133:2 |
| resisting | 106:15 | seconds | show | 5:9 9:23 21:16 | stab |
| 55:2 56:5,20 | 108:23,24 | 46:19 51:8 | 52:6 98:23,24 | 32:1 66:24 | 23:20 |
| 68:6 70:21 | 111:22 | 52:5 | 99:2 | 73:15 80:22 | stamp |
| 71:22 78:16 | 112:19 124:2 | secure | showed | 84:14 92:20 | 91:18 |
| 94:6 103:13 | 130:7,11 | 135:12 | 113:1 | 99:11 129:9 | stamped |
| 108:1,3 | room | see | showing | sort | 91:17 92:21 |
| respective | 2:20 87:16 | 29:14 32:5,9 | 91:16,18 | 39:12 123:22 | stand |
| 134:3 135:18 | 89:5,12 | 32:12,14 | shut | 123:23 | 79:14,16 |
| respond | rope | 34:4,18,20 | 83:6 | sound | Standards |
| 22:5 27:7 49:2 | 58:7 | 34:22 35:10 | side | 29:7 30:7,20 | 26:22 27:2,6 |
| 49:20 50:14 | rules | 39:22,24 | 40:11,12 42:8 | 31:1,2,4,8 | standing |
| 50:16,20,21 | 1:12 4:16 | 40:6,8,13 | 42:9,13 | 31:10 71:19 | 30:12 31:5 |
| 51:18 52:2,4 | | 43:8 44:12 | 44:21,24 | 101:4 | 33:11 34:10 |
| 95:2 | | 44:18 45:7 | 45:1,3,5 | sounded | 49:6 51:5 |
| responded | **S** | 46:20 47:17 | 53:23,24 | 30:23 | 79:9 82:21 |
| 113:5 | S | 47:19,23 | 54:3,3 60:3 | sounding | 84:23 |
| response | 3:14 | 48:1,3,4,5 | 66:8 67:7,21 | 30:14,17 36:17 | start |
| 38:14 70:11 | safely | 48:15 52:1 | 70:8 122:21 | 38:20 45:16 | 11:16 13:9 |
| 85:20 86:3 | 126:1 | 59:15,18 | 124:6,15 | 89:23,23 | 19:23 29:20 |
| 90:6 95:9 | safety | 65:19 71:8 | 129:6 | 127:19 | 118:15 |
| 112:1 | 12:13,14,16,19 | 72:18 74:16 | sight | sounds | started |
| rest | 12:23 13:2,6 | 75:3,15 76:2 | 32:15,17,23 | 117:3 | 9:12 11:13,19 |
| 98:18 | 86:16,22 | 76:4,9 92:17 | 48:6,8,9 | south | 11:21 12:2,3 |
| restrain | 87:1,2 | 107:10,14 | 125:18 | 117:10 129:6 | 14:7,15 20:6 |
| 57:6 58:20 | 121:15 | 124:2,3 | sign | spaces | 20:9 66:7 |
| 69:23 80:16 | 125:16 | seeing | 94:2 102:10 | 129:13 | 90:2 |
| restraining | SAITH | 114:14,23 | 103:7 | speaking | starting |
| 85:19 | 131:8 | seeking | signature | 6:20 79:5 | 89:6,7 105:21 |
| restroom | sat | 7:14 | 104:22 105:6 | 82:15 | state |
| 107:19 | 17:3,8 43:16 | seen | 105:18 | specific | 1:16 4:4 108:7 |
| result | 89:3,4 | 57:7,8,10,12 | 106:24 131:3 | 16:18 18:21 | 109:10,13,17 |
| 23:4,10 | saw | 57:16,22 | 132:16 134:1 | 21:9,14,22 | 133:1,6 |
| retractable | 32:11 34:21 | send | 135:11,12,13 | 25:5 90:14 | stated |
| 23:3 | 35:14,15,18 | 76:15 | 135:15,17,22 | 90:19 109:14 | 122:17 |
| return | 37:1 40:18 | sent | signed | 109:15 | statement |
| 135:17 | 41:12 42:1,5 | 108:14 | 99:13,22,23 | specifically | 93:3 105:20,23 |
| review | 42:12 43:2 | sentence | 102:17,20 | 18:24 27:22 | statements |
| 6:12,24 94:7 | 42:2 46:13 | 107:5 | 103:3,5,8 | 46:18 49:10 | 90:19 |
| 101:16 | 47:16 58:6 | sentences | 104:2,9 | 51:13 58:1 | states |
| 118:14,18 | 85:21 71:11 | 108:8 | 108:15 | 85:21 81:15 | 1:1,13 104:20 |
| 135:13 | 72:20 75:8 | sentiments | 135:15,15 | 81:18 82:8 | 132:1 |
| reviewed | 76:5,11 | 86:4 | significance | 90:8,15 | State's |
| 101:19 | 82:23 114:7 | sergeant | 116:11 127:14 | 91:18 100:16 | 118:20 |
| re-ask | 124:19 130:5 | 8:9 9:6 28:1 | 127:17 | 109:20 | station |
| 5:5 16:11 | 130:9 | 114:24 | silver | specifics | 12:4 97:13,19 |
| re-state | saying | set | 65:8 127:2 | 96:6 | 98:7,11 |
| 5:21 | 60:1 68:21 | 75:2 77:14,19 | simple | speculate | 103:9 104:3 |
| ride-alongs | 70:9 111:6,8 | 77:20,21 | 71:23 | 48:8 | 119:9,11 |
| 27:17,20 | says | 134:13 | Sincerely | spelling | steady |
| right | 55:24 71:23 | Setina | 135:21 | 4:5 | 34:6 |
| 5:12 10:7,11 | 92:7,16 | 135:21 | sir | spins | steered |
| 14:3 20:14 | 106:20 107:5 | sets | 7:22 12:3 32:7 | 75:22 | 34:17 35:4 |
| | scarce | | | | |

| | | | | |
|---|---|---|---|---|
| steering 116:9,12,17,18 119:19,20 120:5,17,18 | struggling 58:12 60:5 71:20 77:10 79:1,11 | 4:3 6:8 132:12 132:20 133:16 | 120:9 terms 17:18 55:19 | 45:12 46:18 50:16 52:3,8 58:14 60:19 62:3 63:24 |
| stenographi... 133:19 | stuck 50:19 51:22 | system 116:7 | 87:1 97:22 98:2,16,17 | 64:4,8 65:10 65:19 68:19 |
| step 52:7,14,15,16 52:20,24 53:6 | 116:5 stuff 70:16 99:24 | _____ T _____ | 126:1 128:9 testified 6:9 80:22 | 68:20,24 71:19 72:16 72:17,24 |
| stepped 29:10 | subdued 78:20 81:13 | T 3:14 | 111:4 114:9 testify | 73:11 74:20 74:22 78:5 80:1,18 |
| steps 45:11,13 46:4 46:9 | subject 42:2,5,13 43:20 85:15 | tactic 24:17 tactical | 106:10 133:16 testifying 7:4 | 86:17,20 87:10 88:3 92:7,10 |
| Steve 2:10 135:4 | 108:7,9 subjects | 117:12,13 take | testimony 6:14,16 61:24 | 96:14 100:16 101:7 113:23 |
| stolen 35:20 36:7 38:12 116:3 | 40:13 41:4,12 41:19 46:21 47:19 | 5:24 6:2,3 20:19 29:21 29:22 38:17 | 63:6 101:17 101:19 133:18,24 | 114:15 117:11,20 121:1,24 |
| 116:13 119:7 120:2,12,21 120:23 125:4 | submit 135:13 Subscribed | 45:20 64:20 91:19 taken | 134:12 Thank 10:21 87:16 | 122:4,15 128:17 129:10 |
| 128:7,12,14 stop | 132:20 subsequently | 1:14 4:9 20:21 45:22 79:23 | 80:23 86:1 129:24 | tires 34:18,20 today |
| 35:15,16,18 36:17 38:24 39:1 44:6,9 | 62:17 122:14 substance 113:19,14 | 84:20 85:3 107:21 132:13 135:7 | thereof 134:11 thing | 6:13 7:4 100:6 100:7 101:20 |
| 70:10,12 79:6 80:20 103:21 106:3 | sue 111:17 sued | talk 5:16,18 17:19 17:20,23 | 19:4 46:2 54:14 72:1 86:5 89:22 | 109:4,10 today's 73:17 |
| 117:1 stopped 34:8 35:8 36:2 | 23:4 24:4 113:12 suit | 18:8 43:4 47:5,8 86:21 89:13 98:5 | 110:5 116:8 things 17:13 70:13 | told 12:24 24:7 26:7,12 46:2 |
| 36:20 37:8 37:11,20,22 | 134:10 Suite | 110:7,9,14 110:19 111:5 | 110:24 130:14 think | 49:17 51:19 51:21 52:15 |
| 38:1,19 39:1 39:16,17 40:5 41:11 | 1:17 2:4,11 133:9 135:1 | 111:10,11 113:18 talked | 7:17 27:16 32:24 35:3 38:11,12 | 52:20 53:6 56:8,14 65:15,21 |
| 41:22 42:1 45:14 46:4 77:10 | summary 92:22 93:4,5,7 93:11,12 | 17:17 18:2,4,9 18:12,13,14 28:7 85:10 | 42:19 57:22 76:15 82:5 87:14 95:16 | 68:13 71:1 78:23 79:3 79:12 83:6 |
| stopping 89:24 stops | supervisor 114:24 supervisors | 85:12 86:6 86:21,21 90:1,11 | 99:23 105:11 112:21 | 84:10 87:6 89:22 90:7 90:15,17,22 |
| 126:1 store 28:13,14 129:1 | 115:2 supposed 97:22 113:22 | 98:13 105:17 109:4,11,23 112:23 | 114:13 131:1 third 29:17,19,23 | 93:9,12 94:3 95:13 98:12 99:1 101:3 |
| story 90:16 street | suppress 6:19 101:17 sure | 116:18 talking 18:23 19:1,2,3 | 58:13 thought 30:9 31:14 | 101:12 top 68:8 70:8 |
| 1:17 2:4,11,20 33:3,5,7,8 34:2,5 37:16 | 6:4 8:13 9:16 15:14 18:13 24:7 30:19 | 19:6,7 28:19 81:15 86:14 86:15 95:15 | 38:8,9 115:19 116:3 threat | Torres 1:9 17:11 18:3 19:16 20:6,8 |
| 38:5,18 39:10,11,15 | 35:2 46:8 51:21 55:12 | 96:9 108:22 111:3,3 | 125:15,20 126:4 | 27:18 30:10 30:13,16,19 |
| 39:15,16,18 39:21 40:2 40:17,19 | 57:3,4 69:18 69:19,20 70:4 73:16 | 112:17,24 123:6 tall | three 8:23 29:22 45:11,13 | 32:2 33:17 38:7,9 44:13 41:16 48:16 |
| 41:6 48:11 121:8 123:4 | 81:4 82:6,9 83:23 85:10 | 7:22 team 57:24 | 46:4,9 61:8 62:7,11,13 62:17 63:1 | 48:22 49:19 49:23 50:1 50:11 52:3,6 |
| 123:10 126:18,18 129:5 130:16 | 85:17 95:1 96:4 106:15 114:20 127:6 | tell 13:23 14:2 18:11,12 | 64:16 65:7 65:13 66:4 66:21 68:21 | 53:19,21,24 54:16,21,24 55:5,9 56:6 |
| 133:9 135:1 135:5 | suspended 24:18 | 22:1 25:24 43:8 48:6 | 69:6 74:21 112:24 122:8 | 56:14 58:17 60:11,12,13 60:15,21,22 |
| streets 13:5 strike | suspicion 121:2 suspicions | 51:11,15 56:2,3 61:17 62:2 73:4 | throw 58:21 59:6 throwing | 60:24 61:5,5 61:10,16,21 61:23 62:21 |
| 57:4 122:14 strong | 120:24 suspicious | 85:5 89:17 89:21 90:11 | 59:8 throws | 63:20 65:16 65:20 66:2 |
| 56:21 87:24 126:22,23 | 35:22 36:5 43:11,13,17 44:2,7,10 | 95:19 100:3 115:24 117:7 | 68:3 time 10:5 13:12 | 67:24 69:13 69:17,19 72:12 85:6,8 |
| struggle 60:2 61:10 69:4 80:15 | 51:4 61:18 61:19 115:20 | 127:4 telling 54:24 78:21 | 20:12 22:23 24:22 27:8 | 86:2,18 87:3 87:6 88:4 89:11 91:3 |
| 82:22 121:24 122:9,22 126:14 | 118:2 sustained 23:13 | 101:5,14 108:12 | 27:23 29:17 29:19,20,24 | 98:2,5 98:1 98:6 109:23 |
| struggled 123:2 | swinging 55:2 66:18 sworn | tensed 56:20 tension 59:3 ters | 31:15 32:16 32:20 33:23 32:12 42:19 43:20,22 | 110:8,9,11 110:15,19 111:11,14 112:10,14 113:8 122:1 122:5 130:6 132:9 Torres's 60:8 125:16 toss 95:15 tossing 75:20 total 8:13,15 27:16 totally 55:2 68:4 touch 53:2,8 tour 98:18 to-wit 133:7 traffic 12:13,14,16,19 12:22 13:2,6 124:5 trained 15:9 27:14 124:10 125:24 126:3 training 15:3,8,13,14 15:16,17,23 16:3,8 19:18 27:10 transcript 5:20 104:5 132:15 133:23 135:10,13,14 Transcription 133:22 transferred 82:5 transported 79:23 81:3 84:22 traveled 85:9 tried 23:20 79:15 95:17 116:7 trouble 38:13 true 93:2 105:22 133:23 trunk 78:17,20 truth 101:6,14 133:16,17,17 truthful 106:14 truthfully 4:22 7:4 try 5:5,10,15,18 43:4 57:21 57:22 62:4 62:15 66:3 66:10 trying 8:15 10:15 29:14 54:23 56:9,23,24 57:3,6 58:3 58:10,20,21 59:5,6,10,20 |

60:6,13 81:4
63:6,12,13
63:24 66:9
66:18,19
67:8,22,23
67:23 68:2
69:23 70:17
70:22 71:8
71:15,16
73:11 75:21
79:13,14
80:15,16
83:13 87:18
88:10,15
97:2 111:1,5
111:17 114:6
125:3 126:12
126:20
**turn**
34:20 106:23
107:3
**turned**
45:14 46:10
128:5
**turning**
56:22
**two**
8:23 39:13
40:10,13
41:4,12,19
45:11,12
46:3,9,21
47:17,19
48:16 63:19
74:21 75:1
77:8,9,16,23
83:9,11 90:1
100:1 108:8
124:19,23
125:17 127:5
127:8
**type**
23:23
**typewriting**
133:21
**typically**
116:1 121:17
124:2,3

___
**U**
**UCP**
80:18
**UCPD**
82:5,6
**uh-huh**
5:10 9:3 91:24
**uh-uh**
5:9
**ultimately**
27:14 102:24
118:12
**uncontrollable**
88:5 122:18
**underneath**
88:9
**understand**
5:3 10:2 16:18
22:4 36:21
40:23 41:20
63:12 64:2
73:13 74:4
84:21 96:23
114:6
**understanding**
15:22 105:9
**understood**
5:2
**undertake**
19:18
**undertaken**
23:8 26:11

**undetermined**
133:11
**unfounded**
23:12
**uniform**
55:22 61:13
74:23 81:8
**uninterrupted**
31:3
**unit**
12:13,17
117:12,13
**United**
1:1,13 132:1
**University**
1:7 2:15 7:9
7:12,15 8:9
8:11 9:2,11
9:17 10:6,10
13:10,13,17
14:7,15 15:5
18:4,9,16,21
17:1,3,5,17
18:5 27:14
28:2 55:24
71:3,6,11,17
71:18 72:3,8
72:21 73:2,7
73:18 74:23
96:21 97:4
100:4 107:7
108:11,19
115:13
117:15,20
118:4,10
119:1 121:7
121:13,17
132:7 133:13
135:8
**unusual**
127:7,12 129:2
**use**
22:8 61:10
63:8 66:10
**usher**
52:23
**ushered**
53:7
**ushering**
53:3
**usually**
118:4

___
**V**
**v**
135:6
**vague**
19:14 74:17
**vagueness**
109:6,12
**varied**
14:20
**veer**
120:8
**vehicle**
32:22,23 34:16
34:16,21
35:9,20,22
38:6,7 37:2
37:4 38:5
39:16,18
40:1,5,14,15
41:5,12,18
41:22 42:1,3
43:3,4,11,13
43:14,17,18
44:3,3,7,13
44:16,20
46:22,22
51:4 61:17

61:19 63:20
63:21,24
64:3 69:23
89:24 115:20
116:2,13
120:8,21
123:3,5
124:4,15,20
124:24 125:1
125:8 127:9
128:7 130:6
**vehicles**
119:7,13,14
120:3,4,13
**verbal**
56:11
**verbally**
5:11
**verbatim**
85:14 113:5
**versus**
34:16
**vestibule**
47:22,24 48:2
**vicinity**
76:11 128:2,13
**view**
130:16
**visible**
128:3
**vs**
1:6 132:6

___
**W**
**waiting**
109:18
**waiving**
108:9
**walk**
43:17 44:3
52:10,12
80:6,21
124:15,20
127:22
**walked**
40:16 41:5
45:10,12
46:3,7,9
125:11,18
**walking**
29:2 44:5,11
46:17 127:24
128:1 130:15
**want**
6:2 12:6 25:24
31:14 34:22
82:8 92:13
98:23 103:2
109:9,16,20
**wanted**
62:5 129:14,23
**wants**
109:13
**wasn't**
12:16 34:17
35:3 55:11
70:16 84:9
114:10
**watch**
18:11 19:22
**watched**
56:16 58:2
**watching**
34:5 43:6,8
46:17
**way**
5:5,12 19:10
23:17 25:7
25:12,13
29:22 36:2,2
43:5,7 52:23

66:6,8 67:9
85:13 87:4
116:8 117:13
124:5 129:18
134:9,10
**weakling**
126:22
**weapon**
86:12 130:19
**wearing**
76:7 115:3
**week**
13:22,23
**weigh**
7:24 8:2
**weight**
62:7 66:1
**went**
15:10 18:15
19:11 57:23
60:2 63:1
64:23,24
65:2,24 76:6
84:11,12,15
84:18 85:6
87:15 95:16
111:6,10,11
126:19
**weren't**
71:15 113:8
**West**
2:4
**westbound**
33:7
**Western**
7:9,11,15
**We'll**
28:2 98:5
102:12
**we're**
20:22 23:17
45:23 54:23
57:6 60:5,6
66:6,9 67:9
67:24 69:23
70:6,7,7
75:20 78:9
86:13,14
97:21 107:22
108:3 111:7
130:20
**WHEREOF**
134:12
**white**
107:6,11
114:24 115:3
**wind**
88:4
**winded**
88:6
**wire**
116:7,19
**wired**
119:7,14
**wiring**
116:19
**witness**
3:2 4:3,6,10
4:14,23 5:6
5:14,23 6:6
10:18,21
21:8,21
23:20,24
25:20 30:1
34:21 36:13
42:21 57:18
58:6,15 62:4
65:15 76:24
99:12 100:13
104:6 107:23
109:18 111:1

119:23
123:22
125:21
133:19,20,24
**witnesses**
82:13 112:18
**word**
76:24
**wording**
102:6
**words**
63:7 70:15,23
70:24 86:6
**work**
11:6 13:9,22
**worked**
8:10 9:1,10
10:9 11:2
117:8,9,13
**working**
9:20,21,24
10:3,5,13,16
13:13,16,17
14:4 19:20
21:13 24:14
24:17 25:17
86:13 117:21
120:12
**wouldn't**
75:2
**wrestle**
57:22 115:11
**wrestling**
55:1 56:13,15
56:18 57:7
57:10,13,16
57:21,24
58:6 75:23
87:18,21
**wrist**
87:7,8,17
93:14
**write**
25:22 90:22
101:24 102:4
102:6 104:14
**written**
25:16,19,21
92:22
**wrong**
82:24 94:18,19
95:3 111:17
**wrongful**
24:12
**wrote**
91:1 94:2
104:16,21
105:4,16
**WWF**
56:15 58:1

___
**X**
**X**
3:1,14

___
**Y**
**yeah**
8:4 10:4,19,20
23:20 48:3
51:21 57:2
58:6 83:20
92:18 98:4
89:18 100:9
112:23 113:6
123:20
**year**
7:7,16,20
**years**
4:12 8:6 11:5
12:6 19:5,8

90:12 117:5
120:10,14
126:7 127:16
128:23
**young**
59:21 60:6
85:21 87:1
87:23 122:13
123:2 126:22
126:23

___
**0**
**00113**
91:19
**00114**
91:19
**01114**
92:21
**0114**
91:17
**084-004329**
1:23
**09**
1:8 132:8
135:7

___
**1**
**10**
106:24 135:7
**10th**
1:18 132:13
133:7
**10-1**
61:12
**102**
3:17
**106**
3:18
**1080**
1:6 132:6
135:7
**109**
14:23,23 91:17
**11**
3:17 102:12,14
108:4,6,8
**11:00**
19:24,24
**114**
3:5
**115**
3:6
**12**
3:18 106:5,7
106:19 108:3
**130**
3:7 132:16
**18**
105:24
**18th**
4:19 10:10
14:22 15:4
15:11,15
16:5,10,15
17:6 18:4
19:12,21
27:11 28:8
74:14 82:14
91:6 93:10
96:22 103:10
107:11 109:3
109:10,24
110:10 115:7
**1980's**
57:24
**1962**
119:9
**1971**
7:13
**1972**

7:13
1975
11:14 119:10
1976
119:10
1985
11:17,18
1998
117:14

---
2
---
2
91:16 92:19,21
2:22
1:19 4:2
2:30
48:13 128:19
128:22,24
20
19:5 127:5
20th
6:17 100:19
101:11,18
106:11
112:14 113:9
200
8:1,2 135:1
2007
9:18 10:10
2008
4:19 8:3 14:22
15:4,11,15
16:6,10,15
17:6 18:4
19:12,21
27:11 74:14
82:14 91:6
93:10 96:22
101:4 103:10
107:12 109:3
109:11,24
110:11,15
111:12,15
115:7
2009
1:19 6:17 8:21
9:7,10,15,18
9:21,22,24
10:1,11,14
10:14 11:11
12:10 13:14
27:24 28:8
100:19
101:11,18
106:11
108:16
112:14 113:9
132:14 133:8
135:7
2010
132:22 134:14
135:4
205
8:4
21
87:24
21st
79:24 84:12,15
84:18 85:6,9
87:4 88:23
89:1 94:8,12
94:21 96:2
97:8,11
108:15
21-year
115:11
222
1:17 2:11
133:8 135:5
24
11:5 12:6

---

117:5 126:7
127:16
263-0052
135:22

---
3
---
3
99:3,7 107:3
3rd
117:9,14,17,22
30
2:20 127:5
300
1:18 2:4,11
133:9 135:1
312
2:6,13,22
135:22
330
2:4
345-8877
2:6

---
4
---
4
99:4,7

---
5
---
5
7:23
5:15
131:6
53rd
33:5,7 34:1,5
37:16,18
38:5,18
39:11,15,21
40:2,17,19
41:6 48:11
129:4,10
55
115:9 128:22
56
8:6 25:22 26:1
88:1
57
25:22

---
6
---
6
3:4 132:16
6th
11:17,18
134:14 135:4
60601
2:12
60601-1014
135:2
60602
2:21
60606
2:5

---
7
---
7:00
18:24 20:1
704-3000
2:13
7040
117:9
744-3982
2:22

---
8
---
8
108:3
8th
11:11
84-4329

---

134:21
85
117:11
86
117:12

---
9
---
9
7:23
9th
8:17,20,21,24
9:7,10,12
10:6 101:3
110:14,16
111:12,15,21
90's
22:16 24:16
900
2:20
98
12:17,18

**EXHIBITS**

EXHIBIT
Plaintiff's
11
09MHFHD

(Agency #)

655, CCMC-0222 & CCMC-0225)          CCCR N654-100M-10/10/06

THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Illinois,
                                    Plaintiff          }      No. _____

v.

____, CHARLES D.
                                    Defendant          }

MOORE, CLARENCE, E. _____, complainant, now appears before
                    (Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES       of 6733 SOUTH CHAPPEL       has, on or about
      (Defendant)             (Address)

18 OCT 08 , at the location of 1435 EAST 53RD ST, Chicago, Cook Cty, IL.
   (Date)                              (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that he KNOWINGLY RESISTED THE PERFORMANCE OF PO Moore OF AN AUTHORIZED
ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE
EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP
BY FAILING TO PRODUCE ID AND BECAME COMBATIVE BY Flailing his arms

in violation of 720      Illinois Compiled Statutes      5          31-1
                (Chapter)                              (Act)      (Sub Section)

AOIC Code

X P.O. Clarence E. Moore
              (Complainant's Signature)

5555 S. ELLIS
(Complainant's Address)

773-702-81-81
(Complainant's Telephone)

STATE OF ILLINOIS }
COOK COUNTY      } ss:

X P.O. Clarence E. Moore
(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the
same is true.

X P.O. Clarence E. Moore
              (Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER , 2008

C. Mertad                                    # 17246
(Judge's/Clerk's/Law Enforcement Officer's Signature)      (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,      Judge _____      Judge's No.
     or

WARRANT ISSUED,      Bail set at: _____
     or

BAIL SET AT: _____      Judge _____ 000015      Judge's N

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ORIGINAL - COURT FILE

EXHIBIT B

34-2   4 DEC / 0900   CPD / Cook
(Court Branch #      (Court Date/Time)      (Arresting Agency #)
or District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 (   )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                                          Plaintiff

        v.                                              No. _____

BOYLE, CHARLES D
                                          Defendant

MOORE, CLARENCE E
        (Complainant's Name Printed or Typed)        , complainant, now appears before

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES    of 6733 SOUTH CHAPPEL    has, on or about
        (Defendant)                    (Address)

18 OCT 08 , at the location of 1435 EAST 53RD ST   Chicago, Cook County,
    (Date)                        (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER

in that KNOWINGLY RESISTED THE PERFORMANCE OF PO Moore OF AN AUTHORIZ
ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE
EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP
z / FAILING TO PRODUCE ID AND BECAME COMBATIVE BY Flailing his arms

in violation of 720   Illinois Compiled Statutes   5   / 31-1
        (Chapter)                        (Act)            (Sub Section)

AOIC Code

                                          X P.O. Clarence E. Moore
                                              (Complainant's Signature)
                                          5555 S. ELLIS
                                              (Complainant's Address)
                                          773-702-8181
                                              (Complainant's Telephone)
STATE OF ILLINOIS }                        X P.O. Clarence E. Moore
COOK COUNTY      } ss:                         (Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the
same is true.

                                          X P.O. Clarence E. Moore
                                              (Complainant's Signature)

Subscribed and sworn to before me on this   18   day of   OCTOBER   , 2008

C. Martin                                    # 17246
(Judge's/Clerk's/Law Enforcement Officer's Signature)        (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,   Judge _____
    or
                                                              Judge's No.
WARRANT ISSUED,   Bail set at: _____
    or
BAIL SET AT: _____   Judge _____        000016

                                                              Judge's No.

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
ORIGINAL - COURT FILE

34-2    4 DEC / 0900    CPD / COOK
(Court Branch # or District #)    (Court Date/Time)    (Arresting Agency #)

M____meanor Complaint    (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)    CCCR N654-100M-10/10/06 (         ,

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

Plaintiff

v.                                                        No. _____

BOYLE, CHARLES D.

Defendant

MOORE, CLARENCE E. _____, complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES    of 6733 SOUTH CHAPPEL    has, on or about
(Defendant)                (Address)

18 OCT 08, at the location of 1435 EAST 53RD ST Chicago, Cook County,
(Date)                            (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER

in charge KNOWINGLY RESISTED THE PERFORMANCE OF PO Moore OF AN AUTHORIZ
ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE
EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP
by ~~PANICKEY RANNING~~ on a suspicious call by and becoming COMBATIVE and flailing his arms

in violation of 720    Illinois Compiled Statutes    5    31-1
(Chapter)                                      (Act)    (Sub Section)

AOIC Code

[ ][ ][ ][ ][ ][ ]

X P.O. Clarence E. Moore
(Complainant's Signature)

5555 S. Ellis
(Complainant's Address)

773-762-8181
(Complainant's Telephone)

X P.O. Clarence E. Moore
(Complainant's Name Printed or Typed)

STATE OF ILLINOIS } ss:
COOK COUNTY

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X P.O. Clarence E. Moore
(Complainant's Signature)

Subscribed and sworn to before me on this ___18___ day of ___OCTOBER___, 2008

C. Martin                                    # 17246
(Judge's/Clerk's/Law Enforcement Officer's Signature)    (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,    Judge _____
      or                                                                Judge's No.

WARRANT ISSUED,    Bail set at: _____
      or

BAIL SET AT: _____    Judge _____    000017
                                                                Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
ORIGINAL - COURT FILE

34-2    4 DEC / 0900    CPD / Cook
(Court Branch #    (Court Date/Time)    (Arresting Agency #)
or District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)    CCCR N654-100M-10/10/06 (          )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                Plaintiff

    v.    }    No. _____

BOYLE, CHARLES D.

            Defendant

MOORE, CLARENCE E. _____, complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES    of 6733 SOUTH CHAPEL    has, on or about
   (Defendant)    (Address)

18 OCT 08 , at the location of 1435 EAST 53RD ST Chicago, Cook County
(Date)    (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER

in that (S)HE KNOWINGLY RESISTED THE PERFORMANCE OF PO MOORE OF AN AUTHORIZED
ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE
EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP
~~a consensual contact by~~ Fleeing his arrest
~~possible stolen~~

in violation of 720 Illinois Compiled Statutes 5 / 31-1
  (Chapter)    (Act)    (Sub Section)

**AOIC Code**

| | | | | | | |
|-|-|-|-|-|-|-|

X P.O. Clarence E. Moore
(Complainant's Signature)

5555 S. Ellis
(Complainant's Address)

773-702-81-81
(Complainant's Telephone)

X P.O. Clarence E. Moore
(Complainant's Name Printed or Typed)

STATE OF ILLINOIS } ss:
COOK COUNTY }

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the
same is true.

X P.O. Clarence E. Moore
(Complainant's Signature)

Subscribed and sworn to before me on this __18__ day of __OCTOBER__ , 2008

C. Martin    # 17246
(Judge's/Clerk's/Law Enforcement Officer's Signature)    (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,   Judge _____
   or                                    Judge's No.

WARRANT ISSUED,   Bail set at: _____
   or

BAIL SET AT: _____ Judge _____
                                           Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
ORIGINAL - COURT FILE

000018

34-2    4 DEC / 0900    CPD / Cook
(Court Branch #        (Court Date/Time)        (Arresting Agency #)
District #)

Misdemeanor Complaint    (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)    CCCR N654-100M-10/10/06 (        )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                                        Plaintiff            } No.

            v.

BOYLE, CHARLE D.
                                        Defendant

TORRES, LARRY #1028 U OF C POLICE        , complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE; CHARLES D        of 6733 SOUTH CHAPPEL        has, on or about
        (Defendant)                        (Address)

18 OCT 08    , at the location of 1435 EAST 53RD STREET, Chicago Cook County
    (Date)                        (Place of Offense)                        IL

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that he KNOWINGLY RESISTED THE PERFORMANCE OF PO TORRES OF AN
AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER
ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN
INVESTIGATORY STOP BY FAILING TO PRODUCE IA AND BECAME COMBATIVE BY
FLAILING HIS ARMS

in violation of 720    Illinois Compiled Statutes    5    /31-1
            (Chapter)                        (Act)        (Sub Section)

**AOIC Code**

X _____ Torres
    (Complainant's Signature)

5555 S ELLIS
    (Complainant's Address)

773-802-8181
    (Complainant's Telephone)

STATE OF ILLINOIS    }
COOK COUNTY        } ss:

X _____ Torres L TORRES
    (Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X _____ Torres
    (Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER , 2008

C. Martin                                #12246
(Judge's/Clerk's/Law Enforcement Officer's Signature)            (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,    Judge _____        Judge's No. _____
    or

WARRANT ISSUED,    Bail set at: _____

    or

BAIL SET AT: _____    Judge _____        Judge's No. _____

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    000019

34-2   4 DEC/0900   CPD/Cook
(Court Branch #    (Court Date/Time)    (Arresting Agency #)
or District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0322 & CCMC-0325)        CCCR N654-100M-10/10/06 (        )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,
                                        Plaintiff
              v.                                   No. _____

BOYLE, CHARLE D.
                                        Defendant

TORRES, LARRY #1028 U OF C POLICE
                    (Complainant's Name Printed or Typed)        , complainant, now appears before

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES D    of 6733 SOUTH CHAPPEL        has, on or about
      (Defendant)              (Address)

18 OCT 08        , at the location of 1435 EAST 53RD STREET, Chicago Cook County
    (Date)                    (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that HE KNOWINGLY RESISTED THE PERFORMANCE OF P.O. TORRES OF AN
AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER
ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN
INVESTIGATORY STOP BY FAILING TO PRODUCE I.D. AND BECAME COMBATIVE BY
PULLING AWAY.

in violation of 720        Illinois Compiled Statutes    5        /31-1
                (Chapter)                            (Act)        (Sub Section)

AOIC Code
[ ][ ][ ][ ][ ][ ]

X _____
              (Complainant's Signature)
5555 S ELLIS
              (Complainant's Address)
773-702-8181
              (Complainant's Telephone)

STATE OF ILLINOIS  } ss:
COOK COUNTY

X _____ L TORRES
              (Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the
same is true.

X _____
              (Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER        , 20__

C. Maxin
(Judge's/Clerk's/Law Enforcement Officer's Signature)

#17246
(Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,    Judge _____
   or                                                        Judge's No.
W._RRANT ISSUED,   Bail set at: _____
   or
BAIL SET AT: _____    Judge _____
                                                        Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        000020
                        ORIGINAL - COURT FILE

*34-2*    *4 DEC / 0900*    *CPD / Cook*
(Court Branch # or District #)    (Court Date/Time)    (Arresting Agency #)

Misdemeanor Complaint (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)      CCCR N654-100M-10/10/06 (      )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                        **Plaintiff**

     v.                               No. _____

*BOYLE, CHARLE D.*

                        **Defendant**

*TORRES, LARRY #1028 U OF C POLICE* , complainant, now appears before
                    (Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: *BOYLE, CHARLES D* of *6733 SOUTH CHAPPEL* , has, on or about
       (Defendant)              (Address)

*18 OCT 08* , at the location of *1435 EAST 53RD STREET Chicago Cook Ill* ,
     (Date)                        (Place of Offense)

committed the offense(s) of *RESISTING OR OBSTRUCTING A PEACE OFFICER*

in that s/he *KNOWINGLY RESISTED THE PERFORMANCE OF PO TORRES OF AN AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP _____ AND BECAMING COMBATIVE AND pulling his arm*

in violation of *720*    Illinois Compiled Statutes    *5*      */31-1*
       (Chapter)                               (Act)                (Sub Section)

**AOIC Code**

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|

X _(signature)_
(Complainant's Signature)

*5555 S ELLIS*
(Complainant's Address)

*773 - 702 - 8181*
(Complainant's Telephone)

**STATE OF ILLINOIS**
**COOK COUNTY**   ss:

X _(signature)_ *Larry L TORRES*
(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X _(signature)_
(Complainant's Signature)

Subscribed and sworn to before me on this *18* day of *OCTOBER* , *2008*

*C. Mait* _(signature)_           *#17246*
(Judge's/Clerk's/Law Enforcement Officer's Signature)          (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

**SUMMONS ISSUED,**   Judge _____
      or                                          Judge's No.

**WARRANT ISSUED,**   Bail set at: _____
      or

**BAILSET AT:** _____    Judge _____
                                                Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
ORIGINAL - COURT FILE

000021

34-2   4 DEC/0900   CPD/Code
(Court Branch # or District #)   (Court Date/Time)   (Arresting Agency #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 (        )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                **Plaintiff**

    v.   }   No. _____

BOYCE, CHARLES D.
              **Defendant**

TORRES, LARRY #1028 U OF C POLICE , complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYCE, CHARLES D of 6733 SOUTH CHAPPEL has, on or about
(Defendant)   (Address)

18 OCT 08 , at the location of 1435 EAST 53RD STREET, Chicago Cook County;
(Date)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER

in that s/he KNOWINGLY RESISTED THE PERFORMANCE OF PO TORRES OF AN
AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER
ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN
INVESTIGATORY STOP ~~OF A BATTERY AND A AND BECAME COMBATIVE~~
~~in his grip possible stolen~~

In violation of 720 Illinois Compiled Statutes 5 / 31-1
    (Chapter)   (Act)   (Sub Section)

    **AOIC Code**

| | | | | |
|--|--|--|--|--|

X _J Torres_
       (Complainant's Signature)

5555 S ELLIS
(Complainant's Address)

773-802-8181
(Complainant's Telephone)

**STATE OF ILLINOIS** }
**COOK COUNTY** } ss:

X _J Torres_ L TORRES
       (Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X _J Torres_
       (Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER , 2008

_C. Martin_ #77246
(Judge's/Clerk's/Law Enforcement Officer's Signature)   (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

**SUMMONS ISSUED,**   Judge _____
    **or**                        Judge's No.

**WARRANT ISSUED,**   Bail set at: _____
    **or**

**BAIL SET AT:** _____   Judge _____
                     Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
ORIGINAL - COURT FILE   000022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHARLES BOYLE,                          )
                Plaintiff,          )
                           )
v.                                      )
                           )   No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE            )
OFFICER LARRY TORRES, et al.,           )
                           )
               Defendants.          )

*EXHIBIT Plaintiff's 12*

## DEFENDANT MOORE'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

NOW COMES the Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER CLARENCE E. MOORE, Star #1012 ("Moore"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information and belief, and are made without prejudice to the objections set forth herein. Defendant specifically reserves the right to amend and/or supplement his responses at any time to introduce information

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1.     Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:**     Clarence E. Moore.  My attorney, Steven Puiszis, consulted with me in preparing these answers.

2.     Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

**ANSWER:**    Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well as a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and the handcuffing him. Officer Moore injured his left wrist and Officer Galarza injured his shoulder in the process. Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin of the City of Chicago. Other offices from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

3.    Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

**ANSWER:**    Objection, defendant objects to this Interrogatory on the grounds that it seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify anyone believed "to have knowledge supporting the defendant" and also asks for a summary of "what knowledge" this defendant "believes each person may possess." That information is more proper the subject of a deposition and to require the provision of such a summary is overbroad, harassing and unduly burdensome. Subject to those objections and without waiving same, see those individuals listed in Interrogatory No. 2 and defendants who were identified in the University of Chicago defendants' Rule 26 Disclosures. The University of Chicago officers would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4.    Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

    a.    Why he/she was at that location;

    b.    Whether he/she had any physical contact with Plaintiff;

    c.    Whether he/she participated in the arrest of Plaintiff;

    d.    Whether he/she participated in the search of Plaintiff;

    e.    Whether he/she had any participation in the bringing of criminal charges against Plaintiff.

**ANSWER:**    Objection. Defendant objects to this Interrogatory as being vague and ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against the defendant include assertions relating to his arrest and to the purported use of force against him as well as a state law claim of malicious prosecution. Subparagraph (e) is vague and ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

6459574v1897854 4236

criminal charges." Subject to those objections and without waiving same, see my answer to Interrogatory No. 2.

Officer Torres and I and  had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past them with its horn continuously blowing and then observe the vehicle swerve to the curb and bump it.  They initially investigated what was happening.  The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance.  The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar, Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officer Torres and I would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and the Complaints were signed by both me and Officer Torres.

5.    If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

**ANSWER:**  I do not personally know of any such investigation.  However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6. State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:** I injured my left wrist. I believe it was sprained and I treated it with ice and range of motion exercises. I understand that Officer Gillespie was kicked in the head during the incident and his glasses were broken. I also understand that Officer Galarza injured his shoulder, but I do not know what treatment he received.

7. Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:** Objection. This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc. Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it. Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact. I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we turn any such person over to the Chicago Police who will then transport that person to a local

6

police station and process that person, including taking booking photos, filling out arrest reports, filing criminal complaints and seeking approval by the State's Attorney working felony review of felony charges. While University of Chicago employees write out our own reports, we do not prepare criminal complaints and do not process an arrestee during the booking process.

8.    Please state how long and in what capacity you have been employed by the University of Chicago Police Department. Your response should include a brief description of your change in assignments and/or rank if any, and when those changes occurred. Your response should also include whether you were concurrently employed by the City of Chicago as a police officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:**    The date of the incident involving Charles Boyle, was my second day on the job for the University.

9.    Please describe your assignment with the University of Chicago Police Department on October 18, 2008. Your response should include the actual time you began and ended your duties.

**ANSWER:**    On October 18, 2008, I was working on the midnight shift for the University of Chicago on assignment 109. I was riding along with Officer Larry Torres to learn the University's procedures.

10.    State the case number, caption, and jurisdiction of all civil cases in which you were named a defendant during the course of your employment with the University of Chicago Police Department and/or the City of Chicago Police Department.

**ANSWER:**    Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in a capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are substantially similar in nature. Subject to those objections and without waiving same, I do not

recall ever having been sued as a Chicago Police Officer and I have never been previously sued in my capacity as a University of Chicago Police officer.

11.     Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

**ANSWER:**     Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in some capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are substantially similar in nature. Subject to those objections and without waiving same, I am not aware of any complaints ever having been filed against me with the University of Chicago other than this one. I have not had any complaints filed against me as a Chicago police officer during the past five years.

12.     Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

**ANSWER:**     Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13.     State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

8

**ANSWER:** I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14. State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:** Defendant objects to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving said objection, this defendant states this is unknown to me at this time.

15. State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

**ANSWER:** Yes. I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46.

16. State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:** I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46 and appeared at that hearing in my capacity as a police officer for the University of Chicago.

17. State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:** Objection. This Interrogatory calls for attorney work product. Defendant further objects to this Interrogatory as overbroad, and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion. Defendant further objects that it is unduly burdensome and harassing. Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of

9

Chicago Defendants' Response to Plaintiff's Production Request and these Answers to
Interrogatories.

By: _____

Officer Clarence E. Moore

SUBSCRIBED AND SWORN TO
before me this 21st day of
July, 2009.

_____
Notary Public

OFFICIAL SEAL
JODY A DONNE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/24/12

OFFICIAL SEAL
JODY A DONNE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 09/24/12

OFFICIAL SEAL
JODY A DONNE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 09/24/12

6459574v1897854 4236