# EXHIBIT E

ORIGINAL

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,                )
            Plaintiff,        )
    -vs-                      ) No. 09 C 1080
UNIVERSITY OF CHICAGO         )
POLICE OFFICER LARRY          )
TORRES, et al.,               )
            Defendants.       )

The deposition of MICHAEL KWIATKOWSKI,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before ATHANASIA MOURGELAS, a notary
public within and for the County of Cook and
State of Illinois, at 222 North LaSalle Street,
Suite 300, Illinois, on the 10th day of
November, 2009, at the hour of 10:09 o'clock
a.m.

Reported by:  Athanasia Mourgelas
License No. 084-004329

**Page 3**

INDEX

| WITNESS | EXAMINATION |
|---|---|
| MICHAEL KWIATKOWSKI | |
| By Mr. Ksiazek | 6 |
| By Ms. Gibbons | 42 |
| By Mr. Puiszis | 44 |
| BY MR. Ksiazek (further) | 50 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| PLAINTIFF'S Deposition Exhibit | |
| No. 10 | 33 |

**Page 2**

1  APPEARANCES:
2      ED FOX & ASSOCIATES, by
3      MR. JONATHAN R. KSIAZEK,
4      300 West Adams Street, Suite 330,
5      Chicago, Illinois 60606,
6      (312) 345-8877,
7          Representing the Plaintiff;
8
9      HINSHAW & CULBERTSON, by
10     MR. STEVE M. PUISZIS,
11     222 North LaSalle Street, Suite 300,
12     Chicago, Illinois 60601,
13     (312) 704-3000,
14         Representing the Defendant,
15         University of Chicago Police
16         Officers;
17
18     ASSISTANT CORPORATION COUNSEL, by
19     MS. HELEN C. GIBBONS,
20     30 North LaSalle Street, Room 900,
21     Chicago, Illinois 60602,
22     (312) 744-3982,
23         Representing the Defendant,
24         City of Chicago.

**Page 4**

1          (Whereupon, the deposition
2           began at 10:09 o'clock a.m.)
3          (Witness sworn.)
4      MR. KSIAZEK:  Can you please state your name
5  spelling your last name for the record.
6      THE WITNESS:  Michael Kwiatkowski,
7  K-W-I-A-T-K-O-W-S-K-I.
8      MR. KSIAZEK:  Officer Kwiatkowski, is that
9  how you say it; right?
10     THE WITNESS:  Yes, sir.
11     MR. KSIAZEK:  Have you ever had your
12 deposition taken before?
13     THE WITNESS:  No.
14     MR. KSIAZEK:  So this is your first time
15 having your deposition taken of you?
16     THE WITNESS:  Yes.
17     MR. KSIAZEK:  I'm going to give you some
18 ground rules, basically explain what we're doing
19 here and what's going to happen.  First of all,
20 I'm just going to ask you some questions, and
21 ask that you answer them truthfully and to the
22 best of your knowledge.  Is that okay?
23     THE WITNESS:  Yes.
24     MR. KSIAZEK:  And when you're answering

1 (Pages 1 to 4)

1  those questions, I just ask that you answer them
2  verbally, so out loud with a yes or no or
3  whatever answer you're going to give and there
4  might be times when you say uh-uh or uh-huh or
5  you shake your head, and then we'll just remind
6  you to answer out loud. Is that okay?
7      THE WITNESS: Yes.
8      MR. KSIAZEK: Okay. And when I'm asking my
9  questions, I'll do my best to not try and talk
10  over when you're giving your answers and I just
11  ask that you do the same for me just so that we
12  can have a clear record for the court reporter.
13  Okay?
14      THE WITNESS: Yes.
15      MR. KSIAZEK: And you understand that you
16  are under oath today?
17      THE WITNESS: Yes.
18      MR. KSIAZEK: And is there anything
19  preventing you from testifying truthfully today?
20      THE WITNESS: No.
21
22
23
24
                                    5

1      A.  Approximately six and a half years.
2      Q.  So you started in approximately 2002,
3  middle of 2002?
4      A.  2003.
5      Q.  Do you know when you started in 2003?
6      A.  June of 2003.
7      Q.  Have you worked for any other police
8  departments prior to working for the University
9  of Chicago Police Department?
10      A.  No.
11      Q.  So your first job was with the
12  University of Chicago?
13      A.  Yes.
14      Q.  What was your rank when you first
15  started in 2003 with the University of Chicago
16  Police Department?
17      A.  Patrolman.
18      Q.  And were you a patrolman on October
19  18th, 2008 with the University of Chicago?
20      A.  Yes.
21      Q.  When did you become a sergeant?
22      A.  August of 2009.
23      Q.  Have you ever served in the military?
24      A.  No.
                                    7

1          MICHAEL KWIATKOWSKI,
2  having been first duly sworn, was examined and
3  testified as follows:
4          EXAMINATION
5  BY MR. KSIAZEK:
6      Q.  Okay. What is your educational
7  background?
8      A.  I achieved a bachelor's in criminal
9  justice from Michigan State University.
10      Q.  When did you obtain that bachelor's
11  degree?
12      A.  1999.
13      Q.  Upon graduating from Michigan State
14  University, what jobs did you hold?
15      A.  I was a supervisor for RPS Airborne
16  Express and a manager for USF Distribution.
17      Q.  UFS Distribution you said, sir?
18      A.  USF.
19      Q.  And what is your current position?
20      A.  I'm a sergeant.
21      Q.  Where do you work?
22      A.  The University of Chicago Police.
23      Q.  How long have you worked for University
24  of Chicago Police Department?
                                    6

1      Q.  How tall are you, sir?
2      A.  Approximately 6', 1".
3      Q.  And how much do you weigh?
4      A.  Between 275 and 280.
5      Q.  How much did you weigh in October of
6  2008?
7      A.  Approximately the same.
8      Q.  How old are you?
9      A.  32.
10      Q.  Were you assigned to a beat on October
11  18th of 2008?
12      A.  Yes.
13      Q.  What beat was that?
14      A.  152.
15      Q.  What are the boundaries of Beat 152 in
16  October of 2008?
17      A.  There's not really a set boundary.
18      Q.  Okay. So what is your assignment with
19  Beat 152?
20      A.  Surveillance. At that time it was
21  surveillance.
22      Q.  How long was your assignment on Beat
23  152 surveillance?
24      A.  From — can you explain the question,
                                    8

                                    2 (Pages 5 to 8)

1 are you asking --
2   Q. Sure. How long did you serve on Beat
3 152? You said on October 2002 you were working
4 Beat 152?
5   A. Yeah.
6   Q. How long were you working on Beat 152?
7   A. The hours?
8   Q. The months, years?
9   MR. PUISZIS: How many days had you been
10 working?
11   THE WITNESS: I would say approximately six
12 months.
13 BY MR. KSIAZEK:
14   Q. You had been working six months prior
15 to October of 2008?
16   A. Correct.
17   Q. And how many months did you work after
18 October of 2008?
19   A. All the way until July of '09.
20   Q. Now, when you say your assignment was
21 surveillance, what do you mean by that?
22   A. Do you mean the capacity?
23   Q. What were you surveying? What were you
24 investigating?

9

1   A. Patrol and maintaining safety and
2 security of the campus and faculty and staff
3 students of the University.
4   Q. And did you have a focus more on this
5 robbery pattern that you spoke of earlier or was
6 it just more general patrol?
7   A. Our focus was the robbery but we were
8 also doing general patrol and maintaining campus
9 safety and security.
10   Q. Were you working with a partner?
11   A. No.
12   Q. So --
13   MR. PUISZIS: Let him finish his question
14 before you answer.
15 BY MR. KSIAZEK:
16   Q. And did you have your own squad car?
17   A. I had my own vehicle.
18   Q. Was it a marked car or was it an
19 unmarked car?
20   A. Unmarked.
21   Q. And what beat are you currently
22 assigned to?
23   A. The beat number is 170.
24   Q. What does Beat 170, what is that

11

1   A. Within the University area of authority
2 at that time I believe I was working a robbery
3 pattern, so I was in areas where we would have
4 incidents of robberies.
5   Q. Okay. Was there a specific part of the
6 campus that you were investigating more than
7 others?
8   A. At that time I believe it was between
9 53rd to basically 63rd Street.
10   Q. Do you know what the boundaries were --
11 you said 53rd and 63rd Street, were there
12 another cross section boundaries where you were
13 investigating streets?
14   A. Our campus -- our area of authority we
15 go from Cottage Grove back east until Stony
16 Island or the lake depending on the area you're
17 in, Stony Island or Lake Shore depending on the
18 area.
19   Q. So you were investigating 53rd Street
20 to 63rd Street from Cottage Grove to Stony
21 Island approximately?
22   A. I was working in those areas.
23   Q. Okay. And what were your day-to-day
24 duties be in October of 2008?

10

1 assignment?
2   A. Training.
3   Q. So where do you -- do you currently
4 train all the new officers?
5   A. We schedule training.
6   Q. And what is your role in the training?
7   A. And I provide training on various
8 subjects.
9   Q. What subjects do you provide training
10 on?
11   A. We do our annual firearms
12 qualification.
13   Q. Anything else?
14   A. Mobile data terminals and use.
15   Q. Anything else besides firearms
16 qualifications and mobile data terminals and
17 use?
18   A. Report writing.
19   Q. Anything else besides these three
20 training class that you spoke of?
21   A. Currently, no.
22   Q. Okay. So just to recap, you train
23 officers in firearms qualifications, mobile data
24 terminals and use and how to write a report; is

12

3 (Pages 9 to 12)

1   that correct?
2     A.  The report writing, correct.
3     Q.  And do you work out of the Chicago
4   Police Department -- University of Chicago
5   Police Department headquarters?
6     A.  No.
7     Q.  When you're not on patrol?
8     A.  Correct.
9     Q.  And what is your shift currently?
10    A.  Days.
11    Q.  Okay.  So what are your hours during
12  the days?
13    A.  06:30 to 14:30 hours.
14    Q.  In October of 2008 when you were
15  working Beat 152, what were your hours then?
16    A.  21:00 to 05:00.
17    Q.  Did you have the occasion to be at 1435
18  53rd Street on October 13th, 2008?
19    A.  What was the address?
20    Q.  1435 East 53rd Street?
21    A.  I don't believe I was at that address.
22    Q.  Were you on -- let's put it this way,
23  did you get a dispatch telling you that there
24  was a 10-1 on 53rd Street on October 18th, 2008?

                   13

1  miles or blocks it is?
2    A.  Approximately eight to nine blocks.
3    Q.  And what were you doing when you got
4  this dispatch?
5    A.  Patrol.
6    Q.  So you got this dispatch and you headed
7  towards 53rd Street?
8    A.  Yes.
9    Q.  Do you remember what route you took to
10  get to 53rd Street?
11    A.  I believe I went north on Blackstone.
12    Q.  And then you turned onto 53rd from
13  Blackstone?
14    A.  I would have turned westbound onto
15  53rd.
16    Q.  Okay.  As you turned westbound onto
17  53rd Street, what did you see?
18    A.  Could you be more specific with the
19  question?
20    Q.  I'm just asking you as you're turning
21  onto 53rd Street, what, if anything, did you see
22  on 53rd Street?
23    A.  I observed several University officers
24  that have responded to a call trying to place a

                   15

1    A.  Yes.
2    Q.  Do you recall what the dispatch said
3  exactly?
4    A.  No, I do not recall the exact details.
5    Q.  Where were you when you got this
6  dispatch?
7    A.  Approximately 60th and Drexel.
8    Q.  Do you know what time you got this
9  dispatch?  Do you know what time you got
10  dispatched?
11    A.  Approximately 02:30 to 02:40 hours.
12    Q.  And what did you do once you received
13  this dispatch?
14    A.  I started heading towards the location
15  of the dispatch.
16    Q.  How far did it take you to arrive at
17  53rd Street from 60th and Drexel?
18    A.  Could you repeat that question?
19    Q.  Sure.  How long did it take you to
20  arrive at 53rd Street from where you were at
21  60th and Drexel?
22    A.  Approximately one to two minutes.  I
23  don't recall exactly.
24    Q.  Do you know how far away, how many

                   14

1  subject into custody.
2    Q.  Okay.  And at some point did you park
3  your vehicle?
4    A.  Yes.
5    Q.  And where did you park your vehicle?
6    A.  Approximately I was -- my vehicle was
7  -- it was west of 53rd Street -- it was west of
8  Blackstone on 53rd Street.
9    Q.  Do you know how far you traveled down
10  53rd Street before you parked your vehicle?
11    A.  I don't recall exactly.  It could have
12  been approximately a quarter of a block.  I
13  don't recall exactly.
14    Q.  Okay.  After you parked your vehicle,
15  what did you do?
16    A.  I exited my vehicle.
17    Q.  And as you exited your vehicle, what
18  did you see at that point?
19    A.  Several officers trying to place the
20  subject into custody.
21    Q.  Can you describe how the officers --
22  first of all, how many officers were there?
23    A.  I would say approximately five at that
24  point.

                   16

4 (Pages 13 to 16)

1    Q.  Do you know if they were all University
2  of Chicago officers or were there some Chicago
3  Police Officers there?
4    A.  They were all University of Chicago.
5    Q.  Did you recognize any of the officers
6  that were attempting to put the subject into
7  custody?
8    A.  Yes.
9    Q.  Who did you recognize?
10    A.  Officer Galarza, Torres, Gillespie,
11  Officer Moore, and there -- that's all I could
12  recall.  There may have been a few more.  That's
13  all I can recall.
14    Q.  Okay.  So how were Officers Galarza,
15  Torres, Gillespie and Moore attempting to place
16  the subject into custody?
17    A.  They were attempting to place him into
18  handcuffs.
19    Q.  Where was Officer Galarza in relation
20  to the subject?
21    A.  When I arrived, I believe Officer
22  Galarza was by the subject's arms.
23    Q.  And did you later learn that the
24  subject at the scene that night was Charles
                                                    17

1  Boyle?
2    A.  Yes.
3    Q.  Where was Officer Torres in relation to
4  Mr. Boyle?
5    A.  I don't recall.
6    Q.  When you say Officer Galarza was by
7  Mr. Boyle's arms, was he on the left side or the
8  right side?
9    A.  When -- I don't recall exactly when I
10  arrived on the scene what side.  I believe he
11  was more -- yeah, I don't recall.
12    Q.  Where was Officer Gillespie to
13  Mr. Boyle?
14    A.  Officer Gillespie was by Mr. Boyle's
15  legs.
16    Q.  Was Mr. Boyle standing at this point?
17    A.  No.
18    Q.  Where was Mr. Boyle?
19    A.  Mr. Boyle was facedown on the ground.
20    Q.  Was he laying on the ground with his
21  belly on the ground or was his back on the
22  ground?
23    A.  His stomach was on the ground.
24    Q.  And did you notice anything that
                                                    18

1  Mr. Boyle was doing while he was on the ground?
2    A.  Yes.
3    Q.  What was he doing?
4    A.  He was kicking and struggling.  He was
5  kind of wiggling his arms trying to break his
6  arms free.
7    Q.  Okay.  Where was Officer Moore in
8  relation to Mr. Boyle when Mr. Boyle was on the
9  ground?
10    A.  I do not recall.
11    Q.  And you said that Mr. Boyle was kicking
12  and struggling, do you know which officer was
13  trying to actually put the handcuffs on
14  Mr. Boyle?
15    A.  I believe it was Officer Galarza, and I
16  went to assist.
17    Q.  When you said Mr. Boyle was kicking and
18  struggling, was he kicking violently?
19    MR. PUISZIS:  Objection to the
20  characterization.  I don't know what you mean by
21  violently.  When a person can look at a
22  situation and say it's violent, someone else
23  could say it was not so violent.  So subject to
24  the objection, you can answer the question.
                                                    19

1  BY MR. KSIAZEK:
2    Q.  Was he kicking violently?
3    A.  I personally would characterize it as
4  violently, yes.
5    Q.  And why is that?
6    A.  The amount of force being exerted.
7    Q.  Did you -- you actually saw Mr. Boyle's
8  legs go up in the air?
9    A.  I believe so.
10    Q.  Do you know how high his legs went up
11  in the air?
12    A.  No.
13    Q.  Was it -- were both legs going up in
14  the air?
15    A.  I don't recall.
16    Q.  You said you saw Mr. -- I'm sorry,
17  Officer Gillespie by Mr. Boyle's legs, did you
18  see Mr. Boyle actually kick Officer Gillespie?
19    A.  No.
20    Q.  Did you actually see Mr. Boyle kick in
21  Officer Gillespie's direction?
22    A.  Yes.
23    Q.  Do you know if Officer Gillespie was
24  wearing his glasses when you saw him that night?
                                                    20

5 (Pages 17 to 20)

1    A.  Yes.
2    Q.  And when you arrived on the scene and
3  as you say Mr. Boyle was kicking in Officer
4  Gillespie's direction, when you saw this, was
5  Officer Gillespie wearing his glasses at that
6  point?
7    A.  I don't recall.  I do know that after
8  the completion of the call, we were looking for
9  Officer Gillespie's glasses.
10    Q.  Do you know if he ever found his
11  glasses?
12    A.  I believe he did.  I believe they were
13  in several pieces.
14    Q.  Did you ever see the glasses yourself?
15    A.  No, I don't recall.
16    Q.  Do you know who found Officer
17  Gillespie's glasses?
18    A.  No.
19    Q.  Okay.  While -- you said you moved over
20  to Mr. Boyle to attempt to place -- assist in
21  placing him in handcuffs; right?
22    A.  Yes.
23    Q.  So what happened as you went over to
24  assist placing Mr. Boyle in handcuffs?

21

1  resisting.
2    Q.  How many times did you hear Officer
3  Galarza say that?
4    A.  I don't recall the exact amount of
5  times.
6    Q.  But it was more than once?
7    A.  Yes.
8    Q.  Did Mr. Boyle say anything in response?
9    A.  Not that I can recall.
10    Q.  When you first arrived on the scene and
11  exited your vehicle, did you see any witnesses
12  at the scene?
13    A.  I believe there were some people on the
14  street, but I don't know exactly who or how
15  many.
16    Q.  And do you know how many police cars
17  were on the scene when you arrived?
18    A.  I don't recall exactly.  I know I was
19  the fourth or fifth assist unit to arrive.  Like
20  I said, my primary focus was on officer safety,
21  so I wasn't really paying attention to how many
22  squad cars were --
23    Q.  Sure.  Did you see a silver Chrysler on
24  the scene that night?

23

1    A.  We stated to stop to -- to Mr. Boyle to
2  stop resisting arrest, and I helped maintain
3  control of Mr. Boyle's arms when the handcuffs
4  were placed on him.
5    Q.  So did you actually -- were you the
6  officer who actually put the handcuffs on
7  Mr. Boyle?
8    A.  No.
9    Q.  Do you know which officer actually
10  physically placed the handcuffs on Mr. Boyle?
11    A.  No, I do not recall.  My focus was
12  maintaining control of his arms so nobody -- for
13  officer safety and nobody would get hit or
14  struck.
15    Q.  By the way, when you first arrived on
16  the scene and you exited your vehicle, did you
17  hear any conversation between -- did you hear
18  Mr. Boyle say anything?
19    A.  No.
20    Q.  And did you hear -- right after you
21  exited your vehicle, did you hear any of the
22  four University of Chicago officers say
23  anything?
24    A.  Yes.  I heard Officer Galarza say stop

22

1    A.  Yes.
2    Q.  Where was that silver Chrysler located?
3    A.  That would -- it was on 53rd facing
4  westbound.
5    Q.  Where did -- where was Mr. Boyle laying
6  or -- or how far away from the silver Chrysler
7  was Mr. Boyle laying on the ground, if you can
8  recall?
9    A.  I don't recall.
10    Q.  Did you -- how far away was Mr. Boyle
11  laying from the closest University of Chicago
12  Police patrol car?
13    A.  I couldn't recall.  I don't recall.
14    Q.  Do you know if it was a few feet or was
15  it more than that?
16    A.  I couldn't say.  I couldn't give you an
17  exact distance or recall.
18    Q.  Did you hear anyone -- once you first
19  got out of your vehicle, did you hear any of the
20  witnesses that you said that were on the scene?
21    A.  No.
22    Q.  Did you hear -- you didn't hear
23  anything from them?
24    A.  No.

24

6 (Pages 21 to 24)

1    Q.  You didn't hear any conversations
2    between them?
3    A.  No.
4    Q.  Did you notice if anyone was located
5    inside of the silver Chrysler?
6    A.  No, I did not.
7    MR. PUISZIS:  You didn't notice or you
8    didn't know?
9    THE WITNESS:  I didn't know -- I don't
10   recall seeing anybody inside of it.
11   MR. PUISZIS:  Okay.
12   BY MR. KSIAZEK:
13   Q.  So after -- how long approximately did
14   it take from the point when you first arrived on
15   the scene and exited your vehicle to when
16   Mr. Boyle was in handcuffs?
17   A.  A few minutes.  Approximately a few
18   minutes.
19   Q.  Do you know -- well, did you see any of
20   the four officers that you named, Officer
21   Galarza, Moore, Torres and Gillespie, did you
22   see any of them strike Mr. Boyle?
23   A.  No.
24   Q.  Did you see Mr. Boyle strike any of

25

1    several officers there.  I know as I stated
2    earlier Gillespie was there, Galarza was there
3    and Moore and Torres was there.  I don't recall
4    anybody's specific location.  I was focused
5    maintaining control of the subject's arms.
6    Q.  Okay.  Did you -- at some point,
7    though, Mr. Boyle stood up from the ground?
8    A.  Yes.
9    Q.  And that was by one of the officers who
10   was there, either Moore or Torres or Galarza or
11   Gillespie?
12   A.  Yeah, I don't recall exactly who
13   assisted him up from the ground.
14   Q.  Did Mr. Boyle say anything when he was
15   -- once he stood up from the ground?
16   A.  Not that I can recall.
17   Q.  Did you hear any of the officers say
18   anything when Mr. Boyle stood up from the
19   ground?
20   A.  Not that I can recall.
21   Q.  So what happened if you can recall once
22   Mr. Boyle was stood up?
23   A.  I was not on the scene for -- after he
24   was placed into custody, I wasn't on the scene

27

1    them?
2    A.  No.
3    Q.  You just saw them attempting to put him
4    into handcuffs, the four officers?
5    A.  Correct.
6    Q.  What happened after Mr. Boyle was
7    placed into handcuffs?
8    A.  I don't recall.  Could you be more
9    specific with your question?
10   Q.  Well, you said he was on the ground,
11   did someone pull him up from the ground,
12   Mr. Boyle?
13   A.  Yes, I believe he was -- I don't know
14   if he was put into a squad car.  I'm not sure
15   exactly what happened afterwards.
16   Q.  You were -- when Mr. Boyle was actually
17   placed into handcuffs, were you standing over
18   him?
19   A.  I believe I was on his -- more toward
20   his right side.
21   Q.  And do you know what, if any,
22   University of Chicago officers were located
23   around you on Mr. Boyle's right side?
24   A.  I don't recall.  I knew there were

26

1    for much longer.  I know the Chicago Police
2    Department did arrive on the scene, and I
3    believe the -- he was -- I'm not sure exactly if
4    he was turned over to them or what happened
5    next.
6    Q.  When did you first see the Chicago
7    Police Officers at the scene?
8    A.  Shortly after the subject was in
9    custody.
10   Q.  Was that when Mr. Boyle was still on
11   the ground or was that when he stood up?
12   A.  I do not recall.  I don't recall
13   exactly.
14   Q.  But you do remember Mr. Boyle being
15   given over to the Chicago Police Department?
16   A.  I'm not sure exactly who transported
17   Mr. Boyle in.  I wasn't there for that part of
18   the call so I don't want to go further into that
19   because I don't --
20   Q.  What did you do once Mr. Boyle was
21   stood up and given over to either the Chicago
22   Police Department officers or some other
23   officers?
24   A.  I cleared the scene of the call and

28

7 (Pages 25 to 28)

1   went back on patrol.
2       Q.  Do you know when you actually cleared
3   the scene?
4       A.  No.
5       Q.  Was it before or was it after Mr. Boyle
6   was taken away from the scene?
7       A.  I believe it was before.
8       Q.  Did you have any conversations when
9   Mr. Boyle was taken into custody with Officer
10  Moore at that point?
11      A.  No, not that I can recall.
12      Q.  Did you have any conversations with
13  Officer Torres once Mr. Boyle was taken into
14  custody?
15      A.  Not that I can recall.
16      Q.  Did you have any conversations with
17  Officer Galarza?
18      A.  Not that I can recall.
19      Q.  And did you have any with Officer
20  Gillespie?
21      A.  No.  I -- I may have spoken to him
22  regarding his glasses because after the call we
23  were looking for his glasses but that was the
24  extent if there was any conversation.

29

1       Q.  Do you recall what you said to Officer
2   Gillespie or what he said to you?
3       A.  No.
4       Q.  Now, during this altercation when you
5   saw Mr. Boyle on the ground and were attempting
6   to assist placing him into handcuffs, at any
7   point did you strike Mr. Boyle?
8       A.  No.
9       Q.  Did Mr. Boyle strike you?
10      A.  No.
11      Q.  Did you have any conversations with any
12  Chicago Police Officers who were at the scene
13  that night?
14      A.  No.
15      Q.  Did you ever talk to any of the four
16  University of Chicago Police Officers that we
17  have spoken of, Torres, Moore, Gillespie or
18  Galarza about what happened that morning since
19  October 18th, 2008?
20      A.  Not specifically.  I may have asked
21  them if they were okay, but I don't recall any
22  specific.
23      Q.  Do you know when you asked them if they
24  were okay?

30

1       A.  No, I don't recall.
2       Q.  Do you know if that was the same day or
3   you just don't recall?
4       A.  I believe it was after the incident.
5   Probably the days following.  I couldn't give
6   you specifics.
7       Q.  What did they say to you when you asked
8   them if they were okay?
9       A.  I don't recall the specifics of the
10  conversation.
11      Q.  Have you had any other involvement with
12  this case outside of what you've spoken about
13  today?
14      A.  There was one court appearance.
15      Q.  Do you recall when you appeared in
16  court?
17      A.  I believe it was in January of '09.
18      Q.  And why were you in court in January of
19  2009?
20      A.  I was subpoenaed for this case.
21      Q.  Did you end up testifying?
22      A.  No, I did not.
23      Q.  Did you ever -- on October 18th, 2008,
24  did you ever tell dispatch that you were on the

31

1   scene?
2       A.  Yes, I believe I did.  I may have let
3   dispatch know that I was, with the radio, on the
4   scene.
5       Q.  Did you ever tell dispatch everybody
6   take a slow down?
7       A.  I don't recall.
8       Q.  Do you recall what you did tell
9   dispatch that night?
10      A.  No.
11      Q.  When did you learn that the suspect on
12  the scene was Charles Boyle?
13      A.  I don't recall exactly.
14      Q.  Did you fill out any paperwork in
15  conjunction with this case?
16      A.  No.
17      Q.  You didn't fill out a police report?
18      A.  No, I did not.
19      Q.  And you didn't fill out an injury
20  report?
21      A.  No.
22      Q.  Did you fill out a court report for
23  your appearance on January 20th, 2009?
24      A.  I do not believe I filed a court

32

8 (Pages 29 to 32)

1 report.
2    MR. KSIAZEK: I will mark this as Exhibit
3 No. 10.
4         (Whereupon, PLAINTIFF'S
5         Deposition Exhibit No. 10 was
6         marked for identification.)
7 BY MR. KSIAZEK:
8    Q. What I've handed you and what's been
9 marked as Plaintiff's Exhibit 10, these are your
10 Answers to Interrogatories that you prepared
11 with your counsel.
12       Do you recognize this document?
13    A. Yes.
14    Q. You've read through this document?
15    A. Yes.
16    Q. By the way, what documents did you read
17 through in preparation for your deposition
18 today?
19    A. This is the only document, the
20 interrogatory.
21    Q. Okay. And if you look on the last
22 page, which has been marked at the bottom as
23 Page 10, that's your signature on the last page?
24    A. Yes.

33

1    Q. If you look on Page 3, under answer --
2 there's an answer to question two, which is on
3 the previous page, which is Page 2, please
4 identify all persons including but not limited
5 to police officers who witnessed or have
6 knowledge of the incident alleged in the
7 plaintiff's complaint. And if you turn back to
8 Page 3, in the second paragraph, which is in the
9 middle of the page --
10    A. Uh-huh.
11    Q. -- in the last sentence says Officer
12 Gerald Johnson and Lieutenant White were on the
13 scene at some point?
14    A. Yes.
15    Q. Did you ever see Officer Johnson or
16 Lieutenant White on the scene that night?
17    A. Yes.
18    Q. When did you see them on the scene?
19    A. I don't recall the exact point.
20    Q. Were they at the scene when you
21 arrived, when you first arrived?
22    A. No.
23    Q. And do you know if you saw them after
24 Mr. Boyle was placed into custody?

34

1    A. Yes.
2    Q. If you look above in the first
3 paragraph, the second to last sentence in the
4 answer it says, Officer Moore injured his left
5 wrist and Officer Galarza injured his shoulder
6 in the process.
7         Do you know how Officer Moore injured
8 his left wrist?
9    A. No, I do not. I don't know the
10 specifics.
11    Q. Do you know how Officer Galarza injured
12 his shoulder?
13    A. No.
14    Q. And in the next sentence it states,
15 Officer Gillespie was kicked in the head by the
16 plaintiff breaking his glasses.
17         And you stated previously you didn't
18 see Officer Gillespie get kicked in the head?
19    A. He stated that he was -- that's why we
20 were looking for his glasses.
21    Q. Sure. But you never saw Officer
22 Gillespie get kicked in the head; right?
23    A. No, I didn't actually see that. No.
24    Q. Did you have any conversations with

35

1 Officer Moore or Officer Torres about them
2 hearing a horn on October 18th, 2008 in relation
3 to the Chrysler?
4    A. No. Not other than after the report,
5 after the incident.
6    Q. Okay. Did you read the police report
7 after the incident?
8    A. Yeah, I believe I did review it for --
9 I saw a copy of it before we went to court.
10    Q. Was that the only time that you read
11 the police report?
12    A. That I can recall.
13    Q. So was that the first time that you
14 learned about the suspicious vehicle on October
15 18th, 2008?
16    A. I don't recall exactly what the
17 original dispatch was.
18    Q. Well, you said the dispatch was a 10-1?
19    A. No. But what I'm saying if there was
20 radio traffic leading up to that point. I don't
21 recall. I was responding to the 10-1.
22    Q. Well, when you arrived at the scene on
23 October 18th, 2008, did you -- what did you know
24 about what was taking place?

36

9 (Pages 33 to 36)

1    A.  Other than the fact that the 10-1 went
2  out, that's what I was responding to.  That's
3  all I can recall at this point.  I was
4  responding to the 10-1.
5    Q.  Did you know anything about a
6  suspicious vehicle when you arrived on the
7  scene?
8    A.  I don't recall.
9    Q.  Did you know if there was a suspect
10 that was resisting arrest when you arrived on
11 the scene?
12   A.  No.  I was responding to the call, the
13 10-1.  So I was responding to the officer's
14 request for assistance and that --
15   Q.  So is your testimony that the dispatch
16 didn't say anything about a suspicious vehicle?
17   A.  I don't recall exactly what was said
18 over dispatch.
19   Q.  Okay.  If you look on Page 6, and this
20 answer asks -- I'm sorry, this question asks for
21 your understanding of the policies and customs
22 that govern writing of any log report when an
23 individual is arrested and when the custody is
24 transferred to the City of Chicago Police

37

1  Department.
2    As a University of Chicago officer, you
3  can't arrest anyone; right?
4    A.  Correct.
5    Q.  Okay.  So basically what University of
6  Chicago officers do is you will detain a
7  suspect; right?
8    A.  Correct.
9    Q.  Then you will wait for the Chicago
10 Police Officers to arrive?
11   A.  Yes.
12   Q.  And the Chicago police officer will
13 actually arrest?
14   A.  Yes, they do the arrest report.
15   Q.  And the University of Chicago officers
16 they also write their own reports; right?
17   A.  Yes, they do an in-house report.
18   Q.  And they also patrol, the University of
19 Chicago officers also patrol certain areas?
20   A.  Yes, in our designated areas of patrol.
21   Q.  So if you look on Page 7 of this
22 document, under question 9, it states I was
23 working an investigation in plain clothes on
24 behalf of the University.  That's the second

38

1  sentence in answer to question 9.
2    What plain clothes were you wearing on
3  that night?
4    A.  I don't recall exactly what I was
5  wearing.
6    Q.  But you weren't wearing your uniform?
7    A.  Correct.
8    Q.  Did you have any identification on you
9  like a badge or a --
10   A.  Yes, I had -- I wore a badge holder.
11   Q.  And were you wearing that around your
12 neck?
13   A.  Yes.
14   Q.  Have you ever been disciplined during
15 your employment at the University of Chicago
16 Police Department?
17   A.  No.
18   Q.  Have you ever been written up while
19 working for the University of Chicago Police
20 Department?
21   MR. PUISZIS:  Objection.  What do you mean
22 by written up?
23 BY MR. KSIAZEK:
24   Q.  I mean, have you ever been -- I'm not

39

1  sure if there's anything -- if there's a
2  difference between write up or discipline, but
3  have you ever been written up for any reason?
4    A.  I have not been disciplined.
5    Q.  Okay.  Have you ever been -- have you
6  ever had any investigations or any complaints
7  against you?
8    A.  I was subject of an investigation.
9    Q.  What was -- when did this investigation
10 take place?
11   MR. PUISZIS:  Let me object because it's
12 irrelevant, but you can go ahead and answer the
13 question.
14   THE WITNESS:  I believe it was in July of
15 2008.
16 BY MR. KSIAZEK:
17   Q.  And what happened to cause this
18 investigation to take place?
19   A.  The University officers responded to a
20 call along with Chicago Police, and in the
21 Chicago Police report it stated that OC spray
22 was used by a University of Chicago police
23 officer.
24   So the responding University of Chicago

40

10 (Pages 37 to 40)

1 Police Officers had an investigation opened on
2 them by the Department to verify that this was
3 not the case. We do not carry OC spray. It's
4 not issued to us, and we're not authorized to
5 use it. So it was unfounded.
6    Q. Just what is OC spray?
7    A. Oleoresin Capsicum. It's similar to a
8 pepper spray. We are not authorized to carry or
9 deploy it.
10    Q. And you were working -- in July of
11 2008, you were working on this surveillance
12 unit?
13    A. Yes.
14    Q. That was Unit 152; right?
15    A. Yes.
16    Q. Have you ever been sued in your
17 capacity as University of Chicago police officer
18 before?
19    A. No.
20    Q. Outside of this lawsuit, obviously
21 outside of this lawsuit.
22    Did you have a computer in your vehicle
23 on October 18th, 2008?
24    A. No.
41

1    Q. So when you would get some information
2 -- or when you would request information about a
3 potential suspect, you would have to relay
4 information to dispatch; right?
5    A. Yes.
6    Q. And dispatch would tell you, for
7 instance, if you had a license plate number,
8 they would tell you who the owner of the car
9 was?
10    A. Yes.
11    Q. Is there anything else that you wish to
12 state or can think of in relation to this
13 incident on October 18th, 2008?
14    A. No.
15    Q. Are there any other conversations that
16 you had on October 18th, 2008 that we haven't
17 spoken about today with anyone?
18    A. Not that I can recall.
19    MR. KSIAZEK: I don't have any further
20 questions.
21    MS. GIBBONS: I just have a few questions.
22       EXAMINATION
23 BY MS. GIBBONS:
24    Q. Hi, Officer, I'm Helen Gibbons. I'm
42

1 one of the attorneys representing the City of
2 Chicago Police Officers.
3    I just want to step back to the
4 incident to understand who you saw there and
5 when you noticed CP on the scene.
6    So you said that you noticed the
7 Chicago Police Officers after the subject was in
8 custody?
9    A. Yes, after the cuffs had been placed on
10 him.
11    Q. Okay. But you didn't recall if
12 Mr. Boyle was still on the ground or if he was
13 standing up?
14    A. Correct.
15    Q. Do you recall about how many Chicago
16 Police Officers were on the scene?
17    A. I don't recall exactly. I know it was
18 -- there was at least one patrol unit, and I
19 believe a sergeant responded. I don't have the
20 specific beats or names.
21    Q. Okay. That was going to be my next
22 question. You don't know any of the CP officers
23 or the sergeant?
24    A. I don't recall.
43

1    Q. Do you recall -- or do you know or have
2 you come to know any of their names?
3    A. I believe it was -- yeah, I can't -- I
4 can't recall.
5    Q. Now, after Mr. Boyle was in custody,
6 did he -- when the handcuffs were on him, did he
7 continue to struggle and fight against the
8 University of Chicago Police Officers?
9    A. Yes. After the handcuffs were placed
10 on him, I believe he was still struggling.
11    Q. Do you recall for about how long?
12    A. No, I do not.
13    Q. And do you recall if the Chicago Police
14 Officers were on the scene when Mr. Boyle was
15 still struggling?
16    A. I don't recall.
17    Q. And do you recall who walked Mr. Boyle
18 -- you know what, I'm sorry you already
19 testified to that.
20    MS. GIBBONS: Those are all the questions I
21 have.
22       EXAMINATION
23 BY MR. PUISZIS:
24    Q. The investigation that you talked
44

11 (Pages 41 to 44)

1  about, that was -- was there a citizen who filed
2  a complaint against you?
3    A.  No, it was not a citizen complaint.  It
4  was internal generated by our former deputy
5  chief.
6    Q.  And that was to simply investigate
7  whether you or any other University of Chicago
8  officer who responded to this particular
9  incident had or used pepper spray?
10    A.  Yes.
11    Q.  And what was the result of that
12  investigation?
13    A.  It was unfounded.
14    Q.  So neither you nor any other University
15  of Chicago officer carried pepper spray or used
16  pepper spray in connection with that incident;
17  correct?
18    A.  Correct.
19    Q.  Now, you mentioned University of
20  Chicago is not permitted to use OC or pepper
21  spray?
22    A.  Right.
23    Q.  Does the University of Chicago allow
24  its officers to carry the big long cal

45

1  its station in October of 2008 have a lockup
2  facility?
3    A.  No.
4    Q.  Did it have any capacity to inventory
5  property or anything like that?
6    A.  No.
7    Q.  Are you allowed now or then to make
8  traffic offenses or arrests for traffic
9  offenses?
10    A.  No.
11    Q.  Now or then are you allowed to take
12  someone into custody back to the University of
13  Chicago station?
14    A.  No.
15    Q.  If you see someone commit a crime, what
16  are you permitted to do?
17    A.  To place them into custody and detain
18  them for -- notify Chicago Police Department and
19  turn them over to the City of Chicago Police.
20    Q.  And then who prepares the police
21  reports and go to court, and who fills out the
22  criminal complaints?
23    A.  The Chicago Police Department.
24    Q.  Does the University of Chicago officers

47

1  flashlights?
2    A.  No.
3    Q.  Did you see anyone from the University
4  of Chicago carrying any big cal flashlights that
5  night?
6    A.  No.
7    Q.  Are you permitted to carry any type of
8  flashlight?
9    A.  Yes, the --
10    Q.  Can you describe the type of flashlight
11  you're allowed to carry?
12    A.  Yes, the small -- they refer to it as
13  the stinger style flashlights, the poli -- the
14  plastic.
15    Q.  How big are they?
16    A.  They're approximately eight -- I
17  believe about eight inches in length.
18    Q.  So maybe the size of two fists?
19    A.  Yes, approximately.
20    Q.  Not the 16 or 20 inch flashlights that
21  you might see that you can purchase in a
22  commercial establishment?
23    A.  Correct.
24    Q.  Now, does the University of Chicago at

46

1  have any authority to do that?
2    A.  No.
3    Q.  Would it be fair to say that you have
4  not been provided full police powers as a
5  University of Chicago officer?
6    MR. KSIAZEK:  Objection, calls for a legal
7  conclusion.  You can answer.
8    MR. PUISZIS:  Go ahead.
9    THE WITNESS:  Correct.  Yes.
10  BY MR. PUISZIS:
11    Q.  The areas that you patrol, are they
12  also patrolled by the City of Chicago police?
13    A.  Yes.
14    Q.  Are there any areas that you patrol
15  that the City of Chicago does not patrol?
16    A.  No.
17    Q.  Have you been delegated an exclusive
18  public function to patrol any areas of the
19  University of Chicago campus or any part of the
20  City of Chicago that the Chicago Police are not
21  authorized to patrol?
22    A.  No.
23    Q.  Have you been delegated any exclusive
24  public authority to do anything that the City of

48

12  (Pages  45 to  48)

1 Chicago police officers are not permitted to do?
2   A. No.
3   Q. And there are certain things you cannot
4 do; is that correct?
5   A. Correct.
6   Q. Do you recall if the vehicle -- the
7 silver Chrysler that you were talking about
8 earlier if it was facing eastbound or westbound
9 or do you recall one way or the other?
10   A. I believe there were -- there were two
11 silver Chryslers, the subject's vehicle and I
12 believe that night I may have been driving a
13 silver vehicle also. So the subject Boyle's
14 vehicle was facing eastbound and my vehicle was
15 facing westbound.
16   Q. Was Mr. Boyle allowing himself to be
17 handcuffed?
18   A. No.
19   Q. Is it lawful to resist any arrest
20 whatsoever?
21   A. No.
22   Q. And is it proper to put someone in
23 handcuffs to protect an officer's safety?
24   A. Yes.

49

1   MR. PUISZIS: I don't have anything else.
2       FURTHER EXAMINATION
3 BY MR. KSIAZEK:
4   Q. Okay. Just where was your vehicle
5 parked in relation to you said the subject's
6 vehicle, the silver Chrysler?
7   A. I don't recall the exact orientation
8 where they were. I know my vehicle was facing
9 westbound.
10   Q. Do you know how far apart from the
11 silver Chrysler your vehicle was parked?
12   A. No, I do not recall.
13   MR. KSIAZEK: Nothing further.
14   MR. PUISZIS: No further questions.
15   MS. GIBBONS: I have nothing further.
16   MR. KSIAZEK: We'll reserve.
17       (Whereupon, the deposition
18       concluded at 11:16 o'clock
19       a.m.)
20
21   (FURTHER DEPONENT SAITH NAUGHT.)
22
23
24

50

1       IN THE UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF ILLINOIS
3           EASTERN DIVISION
4 CHARLES BOYLE,          )
5       Plaintiff,   )
6   -vs-              ) No. 09 C 1080
7 UNIVERSITY OF CHICAGO    )
8 POLICE OFFICER LARRY     )
9 TORRES, et al.,          )
10       Defendants.   )
11   I, MICHAEL KWIATKOWSKI, being first duly
12 sworn, on oath say that I am the deponent in the
13 aforesaid deposition taken on the 10th day of
14 November, 2009; that I have read the foregoing
15 transcript of my deposition, consisting of pages
16 6 through 50 inclusive, and affix my signature
17 to same.
18   _____
            MICHAEL KWIATKOWSKI
19
20 Subscribed and sworn to
21 before me this _____ day
22 of _____, 2010.
23   _____
24   Notary Public

51

1 STATE OF ILLINOIS   )
2               ) SS:
3 COUNTY OF C O O K   )
4   I, ATHANASIA MOURGELAS, a notary public
5 within and for the County of Cook County and
6 State of Illinois, do hereby certify that
7 heretofore, to-wit, on the 10th day of November
8 2009, personally appeared before me, at 222
9 North LaSalle Street, Suite 300, Chicago,
10 Illinois, MICHAEL KWIATKOWSKI, in a cause now
11 pending and undetermined in the Circuit Court of
12 Cook County, Illinois, wherein CHARLES BOYLE, is
13 the Plaintiff, and UNIVERSITY OF CHICAGO POLICE
14 OFFICER, et al., are the Defendants.
15   I further certify that the said MICHAEL
16 KWIATKOWSKI was first duly sworn to testify the
17 truth, the whole truth and nothing but the truth
18 in the cause aforesaid; that the testimony then
19 given by said witness was reported
20 stenographically by me in the presence of the
21 said witness, and afterwards reduced to
22 typewriting by Computer-Aided Transcription, and
23 the foregoing is a true and correct transcript
24 of the testimony so given by said witness as

52

13 (Pages 49 to 52)

1  aforesaid.
2      I further certify that the signature to
3  the foregoing deposition was reserved by counsel
4  for the respective parties.
5      I further certify that the taking of this
6  deposition was pursuant to notice and that there
7  were present at the deposition the attorneys
8  hereinbefore mentioned.
9      I further certify that I am not counsel
10  for nor in any way related to the parties to
11  this suit, nor am I in any way interested in the
12  outcome thereof.
13      IN TESTIMONY WHEREOF:  I have hereunto
14  set my hand and affixed my notarial seal this
15  6th  day of January, 2010.
16
17
18
19
20
21  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
22  LIC. NO. 84-4329
23
24
                                    53

1      McCorkle Court Reporters, Inc.
       200 N. LaSalle Street Suite 300
2      Chicago, Illinois 60601-1014
3
4  January 6th, 2010
   Mr. Steve M. Pulszis
5  Hinshaw & Culbertson
   222 North LaSalle Street
6
   IN RE: Boyle v. University of Chicago, et al.
7  COURT NUMBER: 09 C 1080
   DATE TAKEN: November 10, 2009
8  DEPONENT: Michael Kwiatkowski
9  Dear Mr. Pulszis:
10  Enclosed is the deposition transcript for the
   aforementioned deponent in the above-entitled
11  cause. Also enclosed are additional signature
   pages, if applicable, and errata sheets.
12
   Per your agreement to secure signature, please
13  submit the transcript to the deponent for review
   and signature. All changes or corrections must
14  be made on the errata sheets, not on the
   transcript itself. All errata sheets should be
15  signed and all signature pages need to be signed
   and notarized.
16
   After the deponent has completed the above,
17  please return all signature pages and errata
   sheets to me at the above address, and I will
18  handle distribution to the respective parties.
19  If you have any questions, please call me at the
   phone number below.
20
21  Sincerely,
   Margaret Setina    Athanasia Mourgelas
22  Signature Department   Court Reporter
            (312) 263-0052
23  cc: Mr. Ksiazek, Ms. Gibbons.
24
                                    54

                      14 (Pages 53 to 54)

Case: 1:09-cv-01080 Document #: 46-6 Filed: 03/31/10 Page 16 of 31 PageID #:450

1
2

**A**

above-entitled
54:10
achieved
6:8
Adams
2:4
additional
54:11
address
13:19,21 54:17
affix
51:16
affixed
53:14
aforementioned
54:10
aforesaid
51:13 52:18
53:1
agreement
54:12
ahead
40:12 48:8
air
20:8,11,14
Airborne
6:15
al
1:9 51:9 52:14
54:6
alleged
34:6
allow
45:23
allowed
46:11 47:7,11
allowing
49:16
altercation
30:4
amount
20:6 23:4
annual
12:11
answer
4:21 5:1,3,6
11:14 19:24
34:1,2 35:4
37:20 39:1
40:12 48:7
answering
4:24
answers
5:10 33:10
anybody
25:10
anybody's
27:4
apart
50:10
appearance
31:14 32:23
APPEARANCES
2:1
appeared
31:15 52:8
applicable
54:11
approximately
7:1,2 8:2,7
9:11 10:21
14:7,11,22
15:2 16:8,12
16:23 25:13
25:17 46:16
46:19
area
10:1,14,16,18
areas
10:3,22 38:19

38:20 48:11
48:14,18
arms
17:22 18:7
19:5,6 22:3
22:12 27:5
arrest
22:2 37:10
36:3,13,14
49:19
arrested
37:23
arrests
47:8
arrive
14:18,20 23:19
28:2 38:10
arrived
17:21 18:10
21:2 22:15
23:10,17
25:14 34:21
34:21 36:22
37:8,10
asked
30:20,23 31:7
asking
5:8 9:1 15:20
asks
37:20,20
assigned
8:10 11:22
assignment
8:18,22 9:20
12:1
assist
19:16 21:20,24
23:19 30:6
assistance
37:14
ASSISTANT
2:18
assisted
27:13
ASSOCIATES
2:2
Athanasia
1:15,23 52:4
54:21
attempt
21:20
attempting
17:8,15,17
26:3 30:5
attention
23:21
attorneys
43:1 53:7
August
7:22
authority
10:1,14 48:1
48:24
authorized
41:4,8 48:21
a.m
1:20 4:2 50:19

**B**

B
3:12
bachelor's
6:8,10
back
10:15 18:21
29:1 34:7
43:3 47:12
background
6:7
badge
39:9,10

basically
4:18 10:9 38:5
beat
8:10,13,15,19
8:22 9:2,4,6
11:21,23,24
13:15
beats
43:20
began
4:2
behalf
38:24
believe
10:2,8 13:21
15:11 17:21
18:10 19:15
20:9 21:12
21:12 23:13
26:13,19
28:3 29:7
31:4,17 32:2
32:24 36:8
40:14 43:19
44:3,10
46:17 49:10
49:12
belly
18:21
best
4:22 5:9
big
45:24 46:4,15
Blackstone
15:11,13 18:8
block
16:12
blocks
15:1,2
bottom
33:22
boundaries
8:15 10:10,12
boundary
8:17
Boyle
1:4 18:1,4,13
18:16,18,19
19:1,8,8,11
19:14,17
20:18,20
21:3,20,24
22:1,7,10,18
23:8 24:5,7
24:10 25:16
25:22,24
26:6,12,16
27:7,14,18
27:22 28:10
28:14,17,20
29:5,9,13
30:5,7,9
32:12 34:24
43:12 44:5
44:14,17
49:16 51:4
52:12 54:6
Boyle's
18:7,14 20:7
20:17 22:3
26:23 49:13
break
19:5
breaking
35:16

**C**

C
1:6 2:19 51:6
52:3 54:7
cal

45:24 46:4
call
15:24 21:8
28:18,24
29:2 37:12
40:20 54:19
called
1:12
calls
48:6
campus
10:6,14 11:2,8
48:19
capacity
9:22 41:17
47:4
Capsicum
41:7
car
11:16,18,19
24:12 26:14
42:8
carried
45:15
carry
41:3,8 45:24
46:7,11
carrying
46:4
cars
23:16,22
case
31:12,20 32:15
41:3
cause
40:17 52:10,18
54:11
cc
54:23
certain
38:19 49:3
certify
52:6,15 53:2,5
53:9
changes
54:13
characteriz...
19:20
characterize
20:3
Charles
1:4 17:24
32:12 51:4
52:12
Chicago
1:7 2:5,12,15
2:21,24 6:22
6:24 7:9,12
7:15,19 13:3
13:4 17:2,2
17:4 22:22
24:11 26:22
28:1,6,15,21
30:12,16
37:24 38:2,8
38:9,12,15
38:19 39:15
39:19 40:20
40:21,22,24
41:17 43:2,7
43:15 44:8
44:13 45:7
45:15,20,23
46:4,24
47:13,18,19
47:23,24
48:5,12,15
48:19,20,20
49:1 51:7
52:9,13 54:2
54:6

chief
45:5
Chrysler
23:23 24:2,6
25:5 36:3
49:7 50:6,11
Chryslers
49:11
Circuit
52:11
citizen
45:1,3
City
2:24 37:24
43:1 47:19
48:12,15,20
48:24
Civil
1:13
class
12:20
clear
5:12
cleared
28:24 29:2
closest
24:11
clothes
38:23 39:2
come
44:2
commercial
46:22
commit
47:15
complaint
34:7 45:2,3
complaints
40:6 47:22
completed
54:16
completion
21:8
computer
41:22
Computer-Aided
52:22
concluded
50:18
conclusion
48:7
conjunction
32:15
connection
45:16
consisting
51:15
continue
44:7
control
22:3,12 27:5
conversation
22:17 29:24
31:10
conversations
25:1 29:8,12
29:16 30:11
35:24 42:15
Cook
1:16 52:5,12
53:21
copy
38:9
CORPORATION
2:18
correct
9:16 13:1,2,8
26:5 38:4,8
39:7 43:14
45:17,18
46:23 48:9

49:4,5 52:23
corrections
54:13
Cottage
10:15,20
counsel
2:18 33:11
53:3,9
County
1:16 52:3,5,5
52:12 53:21
court
1:1 5:12 31:14
31:16,18
32:22,24
36:9 47:21
51:1 52:11
54:1,7,22
Courts
1:14
CP
43:5,22
crime
47:15
criminal
6:8 47:22
cross
10:12
cuffs
43:9
Culbertson
2:9 54:5
current
6:19
currently
11:21 12:3,21
13:9
custody
16:1,20 17:7
17:18 27:24
28:9 29:9,14
34:24 37:23
43:8 44:5
47:12,17
customs
37:21

**D**

D
3:1
data
12:14,16,23
DATE
54:7
day
1:18 31:2
51:13,21
52:7 53:15
days
9:9 13:10,12
31:5
day-to-day
10:23
Dear
54:9
Defendant
2:14,23
Defendants
1:10 51:10
52:14
degree
6:11
delegated
48:17,23
Department
6:24 7:9,16
13:4,5 28:2
28:15,22
38:1 39:16
39:20 41:2
47:18,23

54:22
departments
7:8
depending
10:16,17
deploy
41:9
deponent
50:21 51:12
54:8,10,13
54:16
deposition
1:11 3:14 4:1
4:12,15 33:5
33:17 50:17
51:13,15
53:3,6,7
54:10
depositions
1:14
deputy
45:4
describe
16:21 46:10
designated
38:20
details
14:4
detain
38:6 47:17
difference
40:2
direction
20:21 21:4
discipline
40:2
disciplined
39:14 40:4
dispatch
13:23 14:2,8,9
14:13,15
15:4,6 31:24
32:3,5,9
36:17,18
37:15,18
42:4,8
dispatched
14:10
distance
24:17
distribution
8:16,17 54:18
District
1:1,2,13 51:1
51:2
DIVISION
1:3 51:3
document
33:12,14,19
38:22
documents
33:16
doing
4:18 11:8 15:3
19:1,3
Drexel
14:7,17,21
driving
49:12
duty
6:2 51:11
52:16
duties
10:24

**E**

E
3:1,12
earlier
11:5 27:2 49:8
east

10:15 13:20
eastbound
49:8,14
EASTERN
1:3 51:3
ED
2:2
educational
6:6
eight
15:2 46:16,17
either
27:10 28:21
employment
39:15
enclosed
54:10,11
errata
54:11,14,14,17
establishment
46:22
et
1:9 51:9 52:14
54:6
everybody
32:5
exact
14:4 23:4
24:17 34:19
50:7
exactly
14:3,23 16:11
16:13 18:9
23:14,18
26:15 27:12
28:3,13,16
32:13 36:16
37:17 39:4
43:17
examination
1:12 3:2 6:4
42:22 44:22
50:2
examined
6:2
exclusive
48:17,23
exerted
20:6
Exhibit
3:14 33:2,5,9
exited
16:16,17 22:16
22:21 23:11
25:15
explain
4:12 8:24
Express
6:16
extent
29:24

**F**

facedown
18:19
facility
47:2
facing
24:3 48:8,14
49:15 50:8
fact
37:1
faculty
11:2
fair
48:3
far
14:16,24 16:9
24:6,10
50:10
feet

24:14
fifth
23:19
fight
44:7
filed
32:24 45:1
fill
32:14,17,19,22
fills
47:21
finish
11:13
firearms
12:11,15,23
first
4:14,19 6:2
7:11,14
16:22 22:15
23:10 24:18
25:14 28:6
34:21 35:2
36:13 51:11
52:16
fists
46:18
five
16:23
flashlight
46:8,10
flashlights
46:1,4,13,20
focus
11:4,7 22:11
23:20
focused
27:4
following
31:5
follows
6:3
force
20:6
foregoing
51:14 52:23
53:3
former
45:4
found
21:10,16
four
22:22 25:20
26:4 30:15
fourth
23:19
FOX
2:2
free
19:6
full
48:4
function
48:18
further
3:7 28:18
42:19 50:2
50:13,14,15
50:21 52:15
53:2,5,9

**G**

Galarza
17:10,14,19,22
18:6 19:15
22:24 23:3
25:21 27:2
27:10 29:17
30:18 35:5
35:11
general
11:6,8

generated
45:4
Gerald
34:12
Gibbons
2:19 3:5 42:21
42:23,24
44:20 50:15
54:23
Gillespie
17:10,15 18:12
18:14 20:17
20:18,23
21:5 25:21
27:2,11
29:20 30:2
30:17 35:15
35:18,22
Gillespie's
20:21 21:4,9
21:17
give
4:17 5:3 24:16
31:5
given
28:15,21 52:19
52:24
giving
5:10
glasses
20:24 21:5,9
21:11,14,17
29:22,23
35:16,20
go
10:15 20:8
28:18 40:12
47:21 48:8
going
4:17,19,20 5:3
20:13 43:21
govern
37:22
graduating
6:13
ground
4:18 18:19,20
18:21,22,23
19:1,9 24:7
26:10,11
27:7,13,15
27:19 28:11
30:5 43:12
Grove
10:15,20

**H**

H
3:12
half
7:1
hand
53:14
handcuffed
49:17
handcuffs
17:18 19:13
21:21,24
22:3,6,10
25:16 26:4,7
26:17 30:6
44:6,9 49:23
handed
33:8
handle
54:16
happen
4:19
happened
21:23 26:6,15
27:21 28:4

30:18 40:17
head
5:5 35:15,18
35:22
headed
15:6
heading
14:14
headquarters
13:5
hear
22:17,17,20,21
23:2 24:18
24:19,22,22
25:1 27:17
heard
22:24
hearing
36:2
Helen
2:19 42:24
helped
22:2
hereinbefore
53:8
heretofore
52:7
hereunto
53:13
HI
42:24
high
20:10
Hinshaw
2:9 54:5
hit
22:13
hold
6:14
holder
39:10
horn
36:2
hour
1:19
hours
9:7 13:11,13
13:15 14:11

**I**

ID
3:13
identification
33:6 39:8
identify
34:4
Illinois
1:2,17,18 2:5
2:12,21 51:2
52:1,6,10,12
53:21 54:2
inch
46:20
inches
46:17
incident
31:4 34:6 36:5
36:7 42:13
43:4 45:9,16
incidents
10:4
including
34:4
inclusive
51:16
individual
37:23
information
42:1,2,4
injured
35:4,5,7,11

injury
32:19
inside
25:5,10
instance
42:7
interested
53:11
internal
45:4
Interrogato...
33:10
interrogatory
33:20
inventory
47:4
investigate
45:6
investigating
9:24 10:6,13
10:19
investigation
38:23 40:8,9
40:18 41:1
44:24 45:12
investigations
40:6
involvement
31:11
in-house
38:17
irrelevant
40:12
Island
10:16,17,21
issued
41:4

**J**

January
31:17,18 32:23
53:15 54:4
job
7:11
jobs
6:14
Johnson
34:12,15
JONATHAN
2:3
July
9:19 40:14
41:10
June
7:6
justice
6:9

**K**

K
52:3
kick
20:18,20
kicked
35:15,18,22
kicking
19:4,11,17,18
20:2 21:3
kind
19:5
knew
26:24
know
7:5 10:10 14:8
14:9,24 16:9
17:1 19:12
19:20 20:10
20:23 21:7
21:10,16
22:9 23:14

| | | | | | |
|---|---|---|---|---|---|
| 23:16,18 | 37:22 | named | offenses | **P** | plaintiff |
| 24:14 25:8,9 | long | 25:20 | 47:8,9 | page | 1:5 2:7 35:16 |
| 25:19 26:13 | 6:23 8:22 9:2 | names | officer | 33:22,23,23 | 51:5 52:13 |
| 26:21 27:1 | 9:6 14:19 | 43:20 44:2 | 1:8 4:8 17:10 | 34:1,3,3,8,9 | plaintiff's |
| 28:1 29:2 | 25:13 44:11 | NAUGHT | 17:11,19,21 | 37:19 38:21 | 3:14 33:4,9 |
| 30:23 31:2 | 45:24 | 50:21 | 18:3,6,12,14 | pages | 34:7 |
| 32:3 34:23 | longer | neck | 19:7,12,15 | 51:15 54:11,15 | plastic |
| 35:7,9,11 | 28:1 | 39:12 | 20:17,18,21 | 54:17 | 46:14 |
| 36:23 37:5,9 | look | need | 20:23 21:3,5 | paperwork | plate |
| 43:17,22 | 19:21 33:21 | 54:15 | 21:9,16 22:6 | 32:14 | 42:7 |
| 44:1,2,18 | 34:1 35:2 | neither | 22:9,13,24 | paragraph | please |
| 50:8,10 | 37:19 38:21 | 45:14 | 23:2,20 | 34:8 35:3 | 4:4 34:3 54:12 |
| knowledge | looking | never | 25:20 29:9 | park | 54:17,19 |
| 4:22 34:6 | 21:8 29:23 | 35:21 | 29:13,17,19 | 16:2,5 | point |
| Ksiazek | 35:20 | new | 30:1 34:11 | parked | 16:2,18,24 |
| 2:3 3:4,7 4:4 | loud | 12:4 | 34:15 35:4,5 | 16:10,14 50:5 | 18:16 21:6 |
| 4:8,11,14,17 | 5:2,8 | night | 35:7,11,15 | 50:11 | 25:14 27:6 |
| 4:24 5:8,15 | | 17:24 20:24 | 35:18,21 | part | 29:10 30:7 |
| 5:18 6:5 | **M** | 23:24 30:13 | 36:1,1 38:2 | 10:5 28:17 | 34:13,19 |
| 9:13 11:15 | M | 32:9 34:16 | 38:12 40:23 | 48:19 | 36:20 37:3 |
| 20:1 25:12 | 2:10 54:4 | 39:3 46:5 | 41:17 42:24 | particular | poll |
| 33:2,7 39:23 | maintain | 49:12 | 45:8,15 48:5 | 45:8 | 46:13 |
| 40:16 42:19 | 22:2 | nine | 51:8 52:14 | parties | police |
| 48:6 50:3,13 | maintaining | 15:2 | officers | 53:4,10 54:18 | 1:8 2:15 6:22 |
| 50:16 54:23 | 11:1,8 22:12 | north | 2:16 12:4,23 | partner | 6:24 7:7,9 |
| Kwiatkowski | 27:5 | 1:17 2:11,20 | 15:23 16:19 | 11:10 | 7:16 13:4,5 |
| 1:11 3:3 4:6,8 | manager | 15:11 52:9 | 16:21,22 | patrol | 17:3 23:16 |
| 6:1 51:11,18 | 8:16 | 54:5 | 17:2,3,5,14 | 11:1,6,8 13:7 | 24:12 28:1,7 |
| 52:10,16 | Margaret | NORTHERN | 22:22 25:20 | 15:5 24:12 | 28:15,22 |
| 54:8 | 54:21 | 1:2 51:2 | 26:4,22 27:1 | 29:1 38:18 | 30:12,16 |
| K-W-I-A-T-K... | mark | notarial | 27:9,17 28:7 | 38:19,20 | 32:17 34:5 |
| 4:7 | 33:2 | 53:14 | 28:22,23 | 43:18 48:11 | 36:6,11 |
| | marked | notarized | 30:12,16 | 48:14,15,18 | 37:24 38:10 |
| **L** | 3:13 11:18 | 54:15 | 34:5 38:6,10 | 48:21 | 38:12 39:16 |
| lake | 33:6,9,22 | notary | 38:15,19 | patrolled | 39:19 40:20 |
| 10:16,17 | McCorkle | 1:15 51:24 | 40:19 41:1 | 48:12 | 40:21,22 |
| LARRY | 54:1 | 52:4 53:21 | 43:2,7,16,22 | patrolman | 41:1,17 43:2 |
| 1:8 51:8 | mean | notice | 44:8,14 | 7:17,18 | 43:7,16 44:8 |
| LaSalle | 9:21,22 19:20 | 18:24 25:4,7 | 44:24 47:24 | pattern | 44:13 47:18 |
| 1:17 2:11,20 | 39:21,24 | 53:6 | 49:1 | 10:3 11:5 | 47:19,20,23 |
| 52:9 54:1,5 | mentioned | noticed | officer's | paying | 48:4,12,20 |
| lawful | 45:18 53:8 | 43:5,6 | 37:13 49:23 | 23:21 | 49:1 51:8 |
| 49:19 | Michael | notify | okay | pending | 52:13 |
| lawsuit | 1:11 3:3 4:6 | 47:18 | 4:22 5:6,8,13 | 52:11 | policies |
| 41:20,21 | 6:1 51:11,18 | November | 6:6 8:18 | people | 37:21 |
| laying | 52:10,15 | 1:19 51:14 | 10:5,23 | 23:13 | position |
| 18:20 24:5,7 | 54:8 | 52:7 54:7 | 12:22 13:11 | pepper | 8:19 |
| 24:11 | Michigan | number | 15:16 16:2 | 41:8 45:9,15 | potential |
| leading | 6:9,13 | 3:13 11:23 | 16:14 17:14 | 45:16,20 | 42:3 |
| 36:20 | middle | 42:7 54:7,19 | 19:7 21:19 | permitted | powers |
| learn | 7:3 34:9 | | 25:11 27:6 | 45:20 46:7 | 48:4 |
| 17:23 32:11 | miles | **O** | 30:21,24 | 47:16 49:1 | preparation |
| learned | 15:1 | O | 31:8 33:21 | person | 33:17 |
| 36:14 | military | 52:3,3 | 36:6 37:19 | 19:21 | prepared |
| left | 7:23 | oath | 38:5 40:5 | personally | 33:10 |
| 18:7 35:4,8 | minutes | 5:16 51:12 | 43:11,21 | 20:3 52:8 | prepares |
| legal | 14:22 25:17,18 | object | 50:4 | persons | 47:20 |
| 48:6 | mobile | 40:11 | old | 34:4 | presence |
| legs | 12:14,16,23 | objection | 8:8 | pertaining | 52:20 |
| 18:15 20:8,10 | months | 19:19,24 39:21 | Oleoresin | 1:14 | present |
| 20:13,17 | 9:8,12,14,17 | 48:6 | 41:7 | phone | 53:7 |
| length | Moore | observed | once | 54:19 | preventing |
| 46:17 | 17:11,15 19:7 | 15:23 | 14:12 23:6 | physically | 5:19 |
| let's | 25:21 27:3 | obtain | 24:18 27:15 | 22:10 | previous |
| 13:22 | 27:10 29:10 | 6:10 | 27:21 28:20 | pieces | 34:3 |
| LIC | 30:17 35:4,7 | obviously | 29:13 | 21:13 | previously |
| 53:22 | 36:1 | 41:20 | opened | place | 35:17 |
| license | morning | OC | 41:1 | 15:24 16:19 | primary |
| 1:24 42:7 | 30:18 | 40:21 41:3,6 | orientation | 17:15,17 | 23:20 |
| Lieutenant | Mourgelas | 45:20 | 50:7 | 21:20 36:24 | prior |
| 34:12,16 | 1:15,23 52:4 | occasion | original | 40:10,18 | 7:8 9:14 |
| limited | 54:21 | 13:17 | 38:17 | 47:17 | Probably |
| 34:4 | moved | October | outcome | placed | 31:5 |
| located | 21:19 | 7:18 8:5,10,16 | 53:12 | 22:4,10 26:7 | Procedure |
| 24:2 25:4 | | 9:3,15,18 | outside | 26:17 27:24 | 1:13 |
| 26:22 | **N** | 10:24 13:14 | 31:12 41:20,21 | 34:24 43:9 | process |
| location | N | 13:18,24 | owner | 44:9 | 35:6 |
| 14:14 27:4 | 3:1 54:1 | 30:19 31:23 | 42:8 | placing | proper |
| lockup | name | 36:2,14,23 | o'clock | 21:21,24 30:6 | 49:22 |
| 47:1 | 4:4,5 | 41:23 42:13 | 1:19 4:2 50:18 | plain | property |
| log | | 42:16 47:1 | | 38:23 39:2 | 47:5 |

| | | | | | |
|---|---|---|---|---|---|
| protect 49:23 | 30:1,21 31:1 31:3,9,15 | return 54:17 | seeing 25:10 | 45:9,15,16 45:21 | 49:11 50:5 submit |
| provide 12:7,9 | 32:7,8,13 34:19 36:12 | review 36:8 54:13 | sentence 34:11 35:3,14 | squad 11:16 23:22 | 54:13 subpoenaed |
| provided 48:4 | 36:16,21 37:3,8,17 | right 4:9 18:8 21:21 | 39:1 sergeant | 26:14 SS | 31:20 Subscribed |
| public 1:16 48:18,24 | 39:4 42:18 43:11,15,17 | 22:20 26:20 26:23 35:22 | 6:20 7:21 43:19,23 | 52:2 staff | 51:20 sued |
| 51:24 52:4 53:21 | 43:24 44:1,4 44:11,13,16 | 38:3,7,16 41:14 42:4 | serve 9:2 | 11:2 standing | 41:16 suit |
| Puiszis 2:10 3:6 9:9 | 44:17 49:6,9 50:7,12 | 45:22 robberies | served 7:23 | 18:16 26:17 43:13 | 53:11 Suite |
| 11:13 19:19 25:7,11 | recap 12:22 | 10:4 robbery | set 8:17 53:14 | started 7:2,5,15 14:14 | 1:18 2:4,11 52:9 54:1 |
| 39:21 40:11 44:23 48:8 | received 14:12 | 10:2 11:5,7 role | Setina 54:21 | state 1:17 4:4 6:9 | supervisor 8:15 |
| 48:10 50:1 50:14 54:4,9 | recognize 17:5,9 33:12 | 12:6 Room | shake 5:5 | 6:13 42:12 52:1,6 | sure 9:2 14:19 |
| pull 26:11 | record 4:5 5:12 | 2:20 route | sheets 54:11,14,14,17 | stated 22:1 27:1 | 23:23 26:14 28:3,16 |
| purchase 46:21 | reduced 52:21 | 15:9 RPS | shift 13:9 | 35:17,19 40:21 | 35:21 40:1 surveillance |
| pursuant 1:12 53:6 | refer 46:12 | 6:15 rules | Shore 10:17 | states 1:1,13 35:14 | 8:20,21,23 9:21 41:11 |
| put 13:22 17:6 | regarding 29:22 | 1:12 4:18 | Shortly 28:8 | 38:22 51:1 station | surveying 9:23 |
| 19:13 22:6 26:3,14 | related 53:10 | S | shoulder 35:5,12 | 47:1,13 stenographi... | suspect 32:11 37:9 |
| 49:22 | relation 17:19 18:3 | S 3:12 | side 18:7,8,10 | 52:20 step | 38:7 42:3 suspicious |
| Q | 19:8 36:2 42:12 50:5 | safety 11:1,9 22:13 | 26:20,23 signature | 43:3 Steve | 36:14 37:6,16 49:24 |
| qualification 12:12 | relay 42:3 | 23:20 49:23 SAITH | 33:23 51:16 53:2 54:11 | 2:10 54:4 stinger | sworn 4:3 6:2 51:12 |
| qualifications 12:16,23 | remember 15:9 28:14 | 50:21 saw | 54:12,13,15 54:17,22 | 46:13 stomach | 51:20 52:16 |
| quarter 16:12 | remind 5:5 | 20:7,16,24 21:4 26:3 | signed 54:15,15 | 18:23 Stony | T |
| question 8:24 11:13 | repeat 14:18 | 30:5 34:23 35:21 36:9 | silver 23:23 24:2,6 | 10:15,17,20 stood | T 3:12 |
| 14:18 15:19 19:24 26:9 | report 12:18,24 13:2 | 43:4 saying | 25:5 49:7,11 49:13 50:6 | 27:7,15,18,22 28:11,21 | take 14:16,19 25:14 |
| 34:2 37:20 38:22 39:1 | 32:17,20,22 33:1 36:4,6 | 36:19 says | 50:11 similar | stop 22:1,2,24 | 32:6 40:10 40:18 47:11 |
| 40:13 43:22 questions | 36:11 37:22 38:14,17 | 34:11 35:4 scene | 41:7 simply | street 1:17 2:4,11,20 | taken 1:15 4:12,15 |
| 4:20 5:1,9 42:20,21 | 40:21 reported | 17:24 18:10 21:2 22:16 | 45:6 Sincerely | 10:9,11,19 10:20 13:18 | 29:6,9,13 51:13 54:7 |
| 44:20 50:14 54:19 | 1:23 52:19 reporter | 23:10,12,17 23:24 24:20 | 54:21 sir | 13:20,24 14:17,20 | talk 5:9 30:15 |
| R | 5:12 54:22 Reporters | 25:15 27:23 27:24 28:2,7 | 4:10 6:17 8:1 situation | 15:7,10,17 15:21,22 | talked 44:24 |
| R 2:3 | 54:1 reports | 28:24 29:3,6 30:12 32:1,4 | 19:22 six | 16:7,8,10 23:14 52:9 | talking 49:7 |
| radio 32:3 36:20 | 38:16 47:21 representing | 32:12 34:13 34:16,18,20 | 7:1 9:11,14 size | 54:1,5 streets | tall 8:1 |
| rank 7:14 | 2:7,14,23 43:1 request | 36:22 37:7 37:11 43:5 | 46:18 slow | 10:13 strike | tell 31:24 32:5,8 |
| read 33:14,16 36:6 | 37:14 42:2 reserve | 43:18 44:14 schedule | 32:6 small | 25:22,24 30:7 30:9 | 42:6,8 telling |
| 36:10 51:14 really | 50:16 reserved | 12:5 seal | 46:12 sorry | struck 22:14 | 13:23 terminals |
| 8:17 23:21 reason | 53:3 resist | 53:14 second | 20:16 37:20 44:18 | struggle 44:7 | 12:14,16,24 testified |
| 40:3 recall | 49:19 resisting | 34:8 35:3 38:24 | specific 10:5 15:18 | struggling 19:4,12,18 | 6:3 44:19 testify |
| 14:2,4,23 16:11,13 | 22:2 23:1 37:10 | section 10:12 | 26:9 27:4 30:22 43:20 | 44:10,15 students | 52:16 testifying |
| 17:12,13 18:5,9,11 | respective 53:4 54:18 | secure 54:12 | specifically 30:20 | 11:3 style | 5:19 31:21 testimony |
| 19:10 20:15 21:7,15 | responded 15:24 40:19 | security 11:2,9 | specifics 31:6,9 35:10 | 46:13 subject | 37:15 52:18,24 53:13 |
| 22:11 23:4,9 23:18 24:8,9 | 43:19 45:8 responding | see 15:17,21 16:18 | spelling 4:5 | 16:1,20 17:6 17:16,20,24 | thereof 53:12 |
| 24:13,13,17 25:10 26:8 | 36:21 37:2,4 37:12,13 | 20:18,20 21:14 23:11 | spoke 11:5 12:20 | 19:23 28:8 40:8 43:7 | things 49:3 |
| 26:24 27:3 27:12,16,20 | 40:24 response | 23:23 25:19 25:22,24 | spoken 29:21 30:17 | 49:13 subjects | think 42:12 |
| 27:21 28:12 28:12 29:11 | 23:8 result | 26:8 34:15 34:18 35:18 | 31:12 42:17 spray | 12:8,9 subject's | three 12:19 time |
| 29:15,18 | 45:11 | 35:23 46:3 46:21 47:15 | 40:21 41:3,6,8 | 17:22 27:5 | 4:14 8:20 10:2 10:8 14:8,9 |

36:10,13
times
5:4 23:2,5
today
5:16,19 31:13
33:18 42:17
Torres
1:9 17:10,15
18:3 25:21
27:3,10
29:13 30:17
36:1 51:9
to-wit
52:7
traffic
36:20 47:8,8
train
12:4,22
training
12:2,5,6,7,9
12:20
transcript
51:15 52:23
54:10,13,14
Transcription
52:22
transferred
37:24
transported
28:16
traveled
18:9
true
52:23
truth
52:17,17,17
truthfully
4:21 5:19
try
5:9
trying
15:24 16:19
19:5,13
turn
34:7 47:18
turned
15:12,14,16
28:4
turning
15:20
two
14:22 34:2
46:18 49:10
type
46:7,10
typewriting
52:22

___ U ___

UFS
6:17
uh-huh
5:4 34:10
uh-uh
5:4
understand
5:15 43:4
understanding
37:21
undetermined
52:11
unfounded
41:5 45:13
uniform
39:6
unit
23:19 41:12,14
43:18
United
1:1,13 51:1
University

1:7 2:15 6:9
6:14,22,23
7:8,12,15,19
10:1 11:3
13:4 15:23
17:1,4 22:22
24:11 26:22
30:16 38:2,5
38:15,18,24
39:15,19
40:19,22,24
41:17 44:8
45:7,14,19
45:23 46:3
46:24 47:12
47:24 48:5
48:19 51:7
52:13 54:8
unmarked
11:19,20
use
12:14,17,24
41:5 45:20
USF
6:16,18

___ V ___

v
54:6
various
12:7
vehicle
11:17 16:3,5,8
16:10,14,16
16:17 22:16
22:21 23:11
24:19 25:15
36:14 37:6
37:16 41:22
49:6,11,13
49:14,14
50:4,6,8,11
verbally
5:2
verify
41:2
violent
19:22,23
violently
19:18,21 20:2
20:4
vs
1:6 51:6

___ W ___

wait
38:9
walked
44:17
want
28:18 43:3
wasn't
23:21 27:24
28:17
way
9:19 13:22
22:15 33:16
49:9 53:10
53:11
wearing
20:24 21:5
39:2,5,6,11
weigh
8:3,5
went
15:11 19:16
20:10 21:23
29:1 36:9
37:1
weren't

39:6
west
2:4 16:7,7
westbound
15:14,16 24:4
49:8,15 50:9
we'll
5:5 50:16
we're
4:18 41:4
whatsoever
49:20
WHEREOF
53:13
White
34:12,16
wiggling
19:5
wish
42:11
witness
3:2 4:3,8,10
4:13,16,23
5:7,14,17,20
9:11 25:9
40:14 48:9
52:19,21,24
witnessed
34:5
witnesses
23:11 24:20
wore
39:10
work
6:21 9:17 13:3
worked
6:23 7:7
working
7:8 9:3,6,10
9:14 10:2,22
11:10 13:15
38:23 39:19
41:10,11
wrist
35:5,8
write
12:24 38:16
40:2
writing
12:18 13:2
37:22
written
39:18,22 40:3

___ X ___

X
3:1,12

___ Y ___

yeah
9:5 18:11
27:12 36:8
44:3
years
7:1 9:8

___ 0 ___

02:30
14:11
02:40
14:11
05:00
13:16
06:30
13:13
D84-004329
1:24
09
1:6 9:19 31:17
51:6 54:7

___ 1 ___

1
8:2
10
3:15 33:3,5,9
33:23 54:7
10th
1:18 51:13
52:7
10-1
13:24 36:18,21
37:1,4,13
10:09
1:19 4:2
1080
1:6 51:6 54:7
11:16
50:18
13th
13:18
14:30
13:13
1435
13:17,20
152
8:14,15,19,23
9:3,4,6
13:15 41:14
16
46:20
170
11:23,24
18th
7:19 8:11
13:24 30:19
31:23 36:2
36:15,23
41:23 42:13
42:16
1999
6:12

___ 2 ___

2
34:3
20
46:20
20th
32:23
200
54:1
2002
7:2,3 9:3
2003
7:4,5,6,15
2008
7:19 8:6,11,16
9:15,18
10:24 13:14
13:18,24
30:19 31:23
38:2,15,23
40:15 41:11
41:23 42:13
42:16 47:1
2009
1:19 7:22
31:19 32:23
51:14 52:8
54:7
2010
51:22 53:15
54:4
21:00
13:16
222
1:17 2:11 52:8
54:5
263-0052
54:22

275
8:4
280
8:4

___ 3 ___

3
34:1,8
2:20
300
1:18 2:4,11
52:9 54:1
312-
2:6,13,22
54:22
32
8:9
33
3:15
330
2:4
345-8877
2:6

___ 4 ___

42
3:5
44
3:6

___ 5 ___

50
3:7 51:16
53rd
10:9,11,19
13:18,20,24
14:17,20
15:7,10,12
15:15,17,21
15:22 16:7,8
16:10 24:3

___ 6 ___

6
3:4 8:2 37:19
51:16
6th
53:15 54:4
60th
14:7,17,21
60601
14:7,17,21
60601-1014
54:2
60602
2:21
60606
2:5
63rd
10:9,11,20

___ 7 ___

7
38:21
704-3000
2:13
744-3982
2:22

___ 8 ___

84-4329
53:22

___ 9 ___

9
38:22 39:1
900

2:20

**EXHIBITS**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES BOYLE, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 09 C 1080 |
| UNIVERSITY OF CHICAGO POLICE | ) | |
| OFFICER LARRY TORRES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

EXHIBIT
Plaintiff's
10
1100911010

## DEFENDANT KWIATKOWSKI'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER KWIATKOWSKI ("Kwiatkowski"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information and belief, and are made without prejudice to the objections set forth herein. Defendant specifically reserves the right to amend and/or supplement his responses at any time to introduce information

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1.     Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:**   Michael Kwiatkowski. My attorney, Steven Puiszis, consulted with me in preparing these answers.

2.     Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

**ANSWER:** Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well as a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and then handcuffing him. Officer Moore injured his left wrist and Officer Galarza injured his shoulder in the process. Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin. Other offices from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

3. Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

**ANSWER:** Objection, defendant objects to this Interrogatory on the grounds that it seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify anyone believed "to have knowledge supporting the defendant" and also asks for a summary of "what knowledge" this defendant "believes each person may possess." That information is more proper the subject of a deposition and to require the provision of such a summary is overbroad, harassing and unduly burdensome. Subject to those objections and without waiving same, see those individuals listed in Interrogatory No. 2 and defendants who were identified in the University of Chicago defendants' Rule 26 Disclosures. The University of Chicago officers would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4. Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

    a.    Why he/she was at that location;

    b.    Whether he/she had any physical contact with Plaintiff;

    c.    Whether he/she participated in the arrest of Plaintiff;

    d.    Whether he/she participated in the search of Plaintiff;

    e.    Whether he/she had any participation in the bringing of criminal charges against Plaintiff.

**ANSWER:** Objection. Defendant objects to this Interrogatory as being vague and ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against the defendant include assertions relating to his arrest and to the purported use of force against him as well as a state law claim of malicious prosecution. Subparagraph (e) is vague and ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

criminal charges." Subject to those objects and without waiving same, see my answer to Interrogatory No. 2.

Officers Moore and Torres had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past them with its horn continuously blowing and then observed the vehicle abruptly swerve to the curb and bump it. They initially investigated what was happening. The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance. The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar, Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officers Moore and Torres would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and any Complaints would have been signed by either Officer Moore or Officer Torres.

5.      If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

**ANSWER:**   I do not personally know of any such investigation.   However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6.      State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:**     No I was not injured. I understand that Officer Gillespie was kicked in the head during the incident and his glasses were broken. I also understand that Officer Galarza injured his shoulder and Officer Moore his wrist, but I do not know what treatment they received.

7.      Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:**     Objection. This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc. Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it. Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact. I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we turn any such person over to the Chicago Police who will then transport that person to a local

6

police station and process that person, including taking booking photos, filling out arrest reports, filing criminal complaints and seeking approval by the State's Attorney working felony review of felony charges. While University of Chicago employees write out our own reports, we do not prepare criminal complaints and do not process an arrestee during the booking process.

8.     Please state how long and in what capacity you have been employed by the University of Chicago Police Department. Your response should include a brief description of your change in assignments and/or rank if any, and when those changes occurred. Your response should also include whether you were concurrently employed by the City of Chicago as a police officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:**   On the date of the incident involving Charles Boyle, I had been employed by the University of Chicago for approximately five years and four months. During this timeframe there has been no change in rank and at no time while employed with the University of Chicago have I been employed concurrently with the City of Chicago as a police officer.

9.     Please describe your assignment with the University of Chicago Police Department on October 18, 2008. Your response should include the actual time you began and ended your duties.

**ANSWER:**   On October 18, 2008, I was working as an officer for the University of Chicago during its midnight shift. I was working an investigation in plain clothes on behalf of the University.

10.     State the case number, caption, and jurisdiction of all civil cases in which you were named a defendant during the course of your employment with the University of Chicago Police Department and/or the City of Chicago Police Department.

**ANSWER:**   Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in a capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are

7

substantially similar in nature. Subject to those objections and without waiving same, I have never worked for the Chicago Police Department and I have never been previously sued in my capacity as a University of Chicago Police officer.

11. Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

**ANSWER:** Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in a capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are substantially similar in nature. Subject to those objections and without waiving same, there have been no sustained complaints against me during my career as a University of Chicago police office.

12. Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

**ANSWER:** Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13. State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

8

**ANSWER:** I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14.    State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:** Defendant objects to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving same objection, this defendant states this is unknown to me at this time.

15.    State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

**ANSWER:** No.

16.    State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:** Defendant objects to Interrogatory No. 16 in that he was never subpoenaed to Court and, therefore, his duties as an Officer for the University of Chicago on January 20, 2009 and/or December 6, 2008 are irrelevant and immaterial. Defendant also objects to this Interrogatory as overbroad and harassing and seeks information not reasonably calculated to lead to the discovery of admissible evidence.

17.    State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:** Objection. This Interrogatory calls for attorney work product. Defendant further objects to this Interrogatory as overbroad, and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion. Defendant further objects that it is unduly burdensome and harassing. Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of

9

Chicago Defendants' Response to Plaintiff's Production Request and these Answers to Interrogatories.

By: _____
Officer Michael Kwiatkowski

SUBSCRIBED AND SWORN TO
before me this 21st day of July, 2009.

_____
Notary Public

```
OFFICIAL SEAL
JODY A DONNE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/24/12
```

10

6459576v1897854 4236