# EXHIBIT F

**ORIGINAL**

---

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHEASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,           )
        Plaintiff,       )
  vs.                    ) No. 09 CH 1080
UNIVERSITY OF CHICAGO POLICE )
OFFICER LARRY TORRES, et al.,)
        Defendants.      )

The discovery deposition of OSCAR GALARZA, taken in the above-entitled cause, before Karen E. Dominick-Rigoni, a Registered Professional Reporter of Cook County, Illinois, on the 9th day of November, 2009, at the hour of 2:29 p.m. at 222 North LaSalle Street, Suite 300, Chicago, Illinois, pursuant to notice.

Reported by:  Karen E. Dominick-Rigoni, CSR, RPR
License No.:  084-004480

1

---

**INDEX**

| WITNESS | EXAMINATION |
|---------|-------------|
| OSCAR GALARZA | |
| By Mr. Ksiazek | 4, 56 |
| By Ms. Gibbons | 52 |
| By Mr. Puiszis | 53, 63 |

**EXHIBITS**

| NUMBER | MARKED FOR ID |
|--------|---------------|
| Galarza Deposition Exhibit | |
| No. 8 | 55 |
| No. 9 | 58 |

3

---

APPEARANCES:
  ED FOX & ASSOCIATES, By
  MR. JONATHAN R. KSIAZEK
  300 West Adams Street, Suite 330
  Chicago, Illinois 60606
  (312) 345-8877
        Representing the Plaintiff;

  HINSHAW & CULBERTSON, LLP, By
  MR. STEVEN M. PUISZIS
  222 North LaSalle Street, Suite 300
  Chicago, Illinois 60601
  (312) 704-3000

        - AND -

  CITY OF CHICAGO - DEPARTMENT OF LAW
  EMPLOYMENT AND POLICY LITIGATION
  DIVISION, By
  MS. HELEN GIBBONS
  30 North LaSalle Street, Room 900
  Chicago, Illinois 60602
  (312) 742-3541

        Representing the Defendants.

2

---

1        (Witness sworn.)
2        OSCAR GALARZA,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as follows:
5        EXAMINATION
6  BY MR. KSIAZEK:
7     Q.  Good morning — or good afternoon
8  actually.  Could you please state your name,
9  spelling the last name for the record.
10    A.  First name Oscar, O-s-c-a-r, last name
11  Galarza, G-a-l-a-r-z-a.
12    Q.  Mr. Galarza, my name is Jonathan
13  Ksiazek.  I'm an attorney for the plaintiff in
14  this matter.  I'm just going to be asking you
15  some questions regarding what happened on
16  October 18, 2008.  Before I begin, have you ever
17  had a deposition taken before?
18    A.  I have.
19    Q.  Okay.  When was the last time you had a
20  deposition taken?
21    A.  A few years ago.
22    Q.  What was the deposition taken in
23  regards with?
24    A.  In the City of Chicago while I was

4

---

1 (Pages 1 to 4)

**Page 5**

1  working for the City of Chicago.
2      Q.  Was that a lawsuit for the City of
3  Chicago?
4      A.  No, sir.
5      Q.  Do you know how many years ago it was?
6      A.  A few years ago.
7      Q.  Okay.  Well, I'm just going to remind
8  you a few of the ground rules since it has been
9  a few years since you have had your deposition
10  taken.  Like I said, I'm going to ask you a
11  series of questions, and I ask that you answer
12  the questions truthfully and to the best of your
13  ability; is that fair?
14      A.  Yes, sir.
15      Q.  Okay.  And when I'm asking these
16  questions, you're going to have to answer
17  verbally, so you're going to have to say yes or
18  no or whatever the answer is instead of saying
19  uh-uh or uh-huh, okay, just so the court
20  reporter can pick up whatever testimony you're
21  giving.
22      A.  Okay.
23      Q.  And I will do my best not to speak over
24  you and I just ask that you not speak over me

**Page 6**

1  when I'm asking a question or, like I said, I'll
2  do my best not to step over you when -- or talk
3  over you when you're giving your answer, but
4  that's just for the benefit of the court
5  reporter so we can have a clean transcript,
6  okay?
7      A.  Okay.
8      Q.  And you understand that you're under
9  oath today?
10      A.  Yes, sir.
11      Q.  And is there anything preventing you
12  from testifying truthfully today?
13      A.  No.
14      Q.  Can you tell me about your educational
15  history?
16      A.  I have an associate's in criminal
17  justice.  I have a bachelor's in law enforcement
18  management, and I'm currently working on my
19  master's in public safety administration.
20      Q.  Let's start with your associate's
21  degree.  Where did you get that from?
22      A.  City of Chicago, Wright College.
23      Q.  And when did you obtain that degree?
24      A.  Somewhere in maybe 1999, 2000, 2001,

**Page 7**

1  somewhere down there.
2      Q.  Okay.  Did you -- after obtaining your
3  associate's degree, did you immediately seek
4  your bachelor's degree?
5      A.  It probably took me a year or so, a
6  little longer maybe.  I don't remember.
7      Q.  What were you doing within that year
8  period after you obtained your associate's?
9      A.  Most likely I was working.
10      Q.  Where were you working?
11      A.  Oh, my God, I don't remember.
12      Q.  Okay.  And where did you obtain your
13  bachelor's degree from?
14      A.  Calumet College of St. Joseph in
15  Whiting, Indiana.
16      Q.  How long did you attend St. Joseph?
17      A.  How long does it take for a bachelor's,
18  maybe two years?  Two years, two years plus
19  maybe, yeah.
20      Q.  Do you know when you graduated from
21  St. Joseph's?
22      A.  If I'm not mistaken --
23      Q.  I'm sorry, Calumet college.
24      A.  -- could be two thousand -- I graduated

**Page 8**

1  maybe in 2006, somewhere down there.  Maybe a
2  little bit before, maybe after.
3      Q.  Okay.  And where are you currently
4  seeking your master's at?
5      A.  Same school, Calumet College of
6  St. Joseph.
7      Q.  How long of a program is that?
8      A.  It's a two-year program.
9      Q.  How far are you into that?
10      A.  Halfway.  I started in January, so I
11  will be graduating December of 2010.
12      Q.  How long have you worked for the
13  University of Chicago as a police officer?
14      A.  Since 2007, June or July of 2007.
15      Q.  Before working for the University of
16  Chicago as a police officer, had you ever worked
17  for any other police departments?
18      A.  Yes.
19      Q.  Which other ones?
20      A.  City of Chicago Aviation Police.
21      Q.  Is that it?
22      A.  Yes.
23      Q.  When did you work as -- for the City of
24  Chicago as aviation police?

2 (Pages 5 to 8)

1    A. I'm sorry?
2    Q. When? What years did you work?
3    A. I work for — from maybe 2006 to 2007.
4    Q. So about a year?
5    A. A little more than a year if I'm not
6  mistaken. I know it was more than a year, less
7  than two years.
8    Q. Did you leave the aviation police with
9  the City of Chicago to work for the University
10  of Chicago?
11    A. Yes, sir.
12    Q. And was the aviation police job with
13  the City of Chicago, was that your first job
14  after graduating from Calumet College?
15    A. No, sir.
16    Q. Where else did you work?
17    A. Chicago Fire Department, Internal
18  Affairs Division, IAD.
19    Q. How long did you work there for?
20    A. I worked there from — it has to be
21  from maybe 2005 to the time I started working
22  for aviation police, somewhere in there.
23    Q. When you worked for the City of Chicago
24  Aviation Police, did you ever have any

9

1  discipline?
2    A. No, sir.
3    Q. You ever get written up?
4    A. No, sir.
5    Q. Officer, how tall are you?
6    A. I'm sorry?
7    Q. How tall are you?
8    A. Five nine.
9    Q. And how much do you weigh?
10    A. Right now, about 215.
11    Q. How much did you weigh on —
12  MR. PUISZIS: No way.
13  BY MR. KSIAZEK:
14    Q. How much did you weigh in October
15  of 2008, if you recall?
16    A. No, I don't recall.
17    Q. Is it about the same?
18    A. I don't recall.
19  MS. GIBBONS: It's all the muscle.
20  MR. PUISZIS: Where do you pack it away?
21  MS. GIBBONS: It's pure muscle.
22  THE WITNESS: That's what my doctor told me a
23  couple weeks ago I was about 200, 210, 215,
24  something like that. I don't really remember.

10

1  BY MR. KSIAZEK:
2    Q. Have you ever served in the military?
3    A. No, sir.
4    Q. Okay. And are you currently a patrol
5  officer with the University of Chicago?
6    A. Yes, sir.
7    Q. And was that your rank in October
8  of 2008?
9    A. 2008?
10    Q. In October 2008.
11    A. Yes, sir.
12    Q. What are your duties as a patrol
13  officer?
14    A. Protect the students and property of
15  the University of Chicago, serve and protect.
16    Q. Do you have an assigned beat that you
17  work at the University of Chicago currently?
18    A. Currently I've been working 241, but
19  it's not something — I mean, I've been working
20  for the past maybe two months, but nobody has a
21  set beat. Any given time, you can work
22  something else.
23    Q. Do you recall what beat you were
24  working on October 18, 2008?

11

1    A. Yes.
2    Q. What beat was that?
3    A. 101.
4    Q. What are the boundaries of Beat 101?
5    A. Back then it was from Cottage Grove to
6  Shore Drive and from 39 to maybe 47 —
7  47th Street.
8    Q. Okay. And were you working with a
9  partner on October 18, 2008?
10    A. No, sir.
11    Q. So you were driving a patrol car by
12  yourself?
13    A. Yes, sir.
14    Q. Did your car have a computer in it —
15  inside of it in October of 2008?
16    A. No, sir.
17    Q. So how would you go about getting
18  information about a potential suspect without a
19  computer in your car?
20    A. Over the radio.
21    Q. How did you have the occasion to come
22  to 1435 East 53rd Street on the night of
23  October 18, 2008?
24    A. A call was placed over the air.

12

3 (Pages 9 to 12)

1  Q.  Do you recall — this is from dispatch?
2  A.  Yes, sir.
3  Q.  Do you recall what the dispatch call
4  said?
5  A.  For a 10-1.
6  Q.  Well, what's your understanding of what
7  a 10-1 means?
8  A.  10-1 is an officer who needs help right
9  away.
10  Q.  Did the dispatch indicate where the
11  10-1 was occurring?
12  A.  Yes.
13  Q.  Where was that?
14  A.  To the best of my knowledge, somewhere
15  on 53rd and Blackstone.
16  Q.  Okay.  Where were you located when you
17  got this dispatch call?
18  A.  I was in the area of 47th and
19  Lake Park.
20  Q.  How far away is that from 53rd and
21  Blackstone?
22  A.  Walking distance?  Driving distance?
23  Q.  Well, let's go with — let's go with
24  driving distance.

13

1  A.  A few minutes.
2  Q.  Would you say more than five?
3  A.  A few minutes.  It all depends,
4  traffic.  You tell me.  Depends on the day, the
5  time, hours.
6  Q.  Do you remember how long it actually
7  took you to arrive at 53rd and Blackstone from
8  47th and Lake Park that night?
9  A.  Yeah, a few minutes.
10  Q.  Do you recall what route you took to
11  arrive at 53rd and Blackstone?
12  A.  Yes.  I drove north -- I drove
13  southbound Lake Park and then westbound on 53rd.
14  Q.  Do you remember what time you got this
15  dispatch call?
16  A.  Approximately 2:35, 2:30 something,
17  somewhere around there.
18  Q.  And what did you do once you got that
19  call?
20  A.  I put on the air that -- I put on the
21  air that I just arrived.
22  Q.  So you got the call and you headed
23  towards 53rd and Blackstone?
24  A.  Yes.

14

1  Q.  And then you told dispatch that you
2  arrived on the scene?
3  A.  Yes.
4  Q.  Now, what did you first see as you
5  arrived on the scene?
6  A.  I observed Officer Torres and
7  Officer Moore wrestling with a male subject.
8  Q.  Okay.  Let's go back.  Where did you
9  park your car?
10  A.  In the middle of the street with the
11  lights on.
12  Q.  And where was Officer Moore and
13  Torres's car located?
14  A.  Their car was parked on 53rd facing
15  eastbound.
16  Q.  Was it in the street?
17  A.  Yes.
18  Q.  Was it in the eastbound lane of
19  traffic?
20  A.  That I don't recall well.  I don't
21  recall that.  I know the car was parked on
22  eastbound 53rd.
23  Q.  Did you see another car parked on the
24  street?

15

1  A.  Yeah, there were several cars parked on
2  the street.
3  Q.  What other cars do you remember being
4  parked on the street?
5  A.  Several civilian cars.
6  Q.  Can you describe these cars?
7  A.  No, sir.
8  Q.  Did you see a silver Chrysler parked on
9  the street?
10  A.  I don't remember, sir.
11  Q.  Did you see a car parked either
12  immediately next to or right nearby
13  Officer Moore and Torres's car?
14  A.  Like I said, next to -- next was
15  several cars parked.  I don't recall which
16  model, what color or anything like that.
17  Q.  Okay.  Well, where were Officer Moore
18  and Torres and Mr. Boyle, who you said was
19  wrestling with them, where were they located?
20  A.  They were -- they were in the street.
21  Q.  Was it close to the curb, in the middle
22  of the street?  Where was it?
23  A.  In the middle of the street on the
24  eastbound lane.

16

4 (Pages 13 to 16)

1  Q. Were they close to the median or was it
2  sort of right in the middle of the eastbound
3  lane?
4  MR. PUISZIS: Objection, the question assumes
5  there's a median there.
6  Subject to the objection, you can answer the
7  question.
8  BY MR. KSIAZEK:
9  Q. You can answer the question.
10  A. He was in the middle of the lane. I
11  mean, they were moving back and forth.
12  Q. Okay. So describe -- when you say
13  wrestling, describe what you saw.
14  A. I observed Officer Moore and
15  Officer Torres trying to apprehend the subject
16  and the subject was pushing away from them and
17  they were wrestling. They were just pushing
18  each other.
19  Q. Where was Officer Moore located in
20  relation to the subject?
21  A. That I don't recall, sir.
22  Q. Do you recall where Officer Torres was
23  located in relation to the subject?
24  A. No, sir.
17

1  Q. But you do know that Officer Moore and
2  Torres were attempting to arrest Mr. Boyle?
3  A. The subject, yes, sir.
4  Q. How do you know that?
5  A. Because when I show up at the scene --
6  would you repeat the question.
7  Q. Sure. How do you know that
8  Officer Moore and Officer Torres were trying to
9  arrest Mr. Boyle?
10  A. Because both officers were stating to
11  the subject that he's under arrest.
12  Q. Okay. When you arrived at the scene,
13  what did you do? What was the first thing that
14  you did?
15  A. When I arrived at the scene, I observed
16  the two officers and the subject in the middle
17  of the street, so what I did was park my car in
18  the middle of both lanes facing westbound with
19  the lights so neither one of them will get hit
20  by a car.
21  Q. And when did you hear Officer Moore and
22  Torres saying to Mr. Boyle that he was under
23  arrest?
24  A. When I got out of the car and on my way
18

1  to help them out to place the subject in
2  apprehension.
3  Q. Did you see any other University of
4  Chicago Police cars at the scene when you first
5  arrived?
6  MR. PUISZIS: You mean other than Moore and
7  Torres?
8  BY MR. KSIAZEK:
9  Q. I'm sorry, yes, other than Moore and
10  Torres?
11  A. At that point, no.
12  Q. So you were the second University of
13  Chicago patrol car to arrive at the scene?
14  A. Yes.
15  Q. And did you hear Mr. Boyle say anything
16  in response to Officer Moore and Torres's
17  statements that he was under arrest?
18  A. Oh, yes.
19  Q. What did he say?
20  A. He was just -- he was using vulgar
21  language. He was insulting everybody.
22  Q. What was he saying?
23  A. MF this, MF that, F this, F that, you
24  know, the usual.
19

1  Q. Well, I wasn't there, so...
2  A. Well, I'm telling you what he was
3  saying. I mean, you know, trust me, if I were
4  to know that we were going to get into a
5  lawsuit, I would have brought my own camera. I
6  would have recorded the whole thing for you.
7  Moreover, I mean, it's a shame that we don't
8  have a camera in the car, otherwise you will be
9  able to observe and hear everything on your own.
10  Q. Sure.
11  Okay. So you said he was saying
12  MF this, F that. How many times did he say
13  that?
14  A. I didn't have a chance to write this
15  down, so I don't recall that, sir.
16  Q. So Officer Moore and Torres just said
17  to Mr. Boyle you're under arrest, right?
18  A. Yes, sir.
19  Q. In response, Mr. Boyle said MF? What
20  did he say?
21  A. Like I said, he was insulting, MF this,
22  MF that and couple other things. Those are the
23  couple things I remember right now.
24  Q. Okay. How many -- did he say MF twice
20

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois    (312) 263-0052**

1    or did he say it more than that?
2        A.  Multiple times.
3        MR. PUISZIS:  Maybe we should find out how
4    many times he said it in his rap songs.
5    BY MR. KSIAZEK:
6        Q.  So after you heard Mr. Boyle say
7    MF this, MF that, what did you do?
8        A.  Then at some point -- at some point,
9    Officer Torres, Officer Moore and the subject
10   went on the ground and one of his arms broke
11   loose from being handcuffed and that's when I
12   gained control -- trying to gain control of that
13   hand to make the -- to place the subject in
14   handcuffs.
15       Q.  Okay.  How long was Mr. Boyle swearing
16   at the Officers Moore and Torres?
17       A.  Excuse me?
18       Q.  How long -- how much time had passed
19   when Officer Moore and Torres -- how much time
20   passed -- let me rephrase.
21           How much time -- how long did Mr. Boyle
22   swear at Officer Moore and Torres?
23       A.  During the whole altercation.
24       Q.  Okay.  Did Officer Moore and Torres say
                                                        21

1    they pushing Mr. Boyle?
2        A.  What do you mean "pushing"?
3        Q.  Were they striking him?
4        A.  No.
5        Q.  Did they push him?
6        A.  No.
7        Q.  What did they do to him?
8        A.  Trying to place the subject in
9    handcuffs.
10       Q.  Well, how did they try and put him in
11   handcuffs?
12       A.  By placing the two hands on the back
13   and placing the handcuffs on him.
14       Q.  And they were doing this in the middle
15   of the street?
16       A.  Yes.
17       Q.  So when you first arrived, you saw
18   Officer Moore and Torres trying to put Mr. Boyle
19   in handcuffs?
20       A.  Yes, sir.
21       Q.  Okay.  As you saw them try and put him
22   in handcuffs, what was Mr. Boyle doing?
23       A.  Pushing away from them.
24       Q.  How was he pushing away from them?
                                                        23

1    anything in response to Mr. Boyle swearing at
2    them?
3        A.  Stop resisting.
4        Q.  Was Mr. Boyle resisting at that point?
5        A.  Oh, yes, sir.
6        Q.  How was he resisting?
7        A.  By pushing away, using every mean he
8    can -- he could to get away from the location by
9    kicking.
10       Q.  Well, was he standing up at this point?
11       MR. PUISZIS:  At what point?  Objection.
12   BY MR. KSIAZEK:
13       Q.  Okay.  After he was swearing -- when he
14   was swearing to Officer Moore and Torres, was he
15   standing up?
16       A.  I don't recall.
17       Q.  Were Officer Moore and Torres standing
18   up?
19       A.  Listen, it was a pushing situation.  It
20   was back and forth, back and forth.  I mean, if
21   you give -- we'll have to be -- it was from the
22   floor to up and the ground, up and the ground,
23   on the floor.  This is how bad it was.
24       Q.  So were Officer Moore and Torres, were
                                                        22

1        A.  For instance, if I grab your arm, you
2    will resist by pushing your arm away from me.
3    That is the way.
4        Q.  Is that what Mr. Boyle was doing?
5        A.  Yes.
6        Q.  Okay.  What else was he doing to resist
7    being placed in handcuffs?
8        A.  Using any other means, for instance,
9    kicking, pushing his other arm.
10       Q.  When did he kick?
11       A.  When he was on the floor, he started
12   kicking.  That's one of the times I recall him
13   kicking.
14       Q.  Okay.  How did he get on the floor?
15       A.  How did he get on the floor?
16       Q.  Yes.
17       A.  Good question.  I don't know.
18       Q.  Was he on the floor before they tried
19   to put him in handcuffs?
20       A.  Maybe when he was resisting, he fell on
21   the floor.
22       Q.  You were there.  You need to tell me.
23       A.  Yeah, like I said, he was pushing,
24   kicking.  We were asking him to stop resisting
                                                        24

6 (Pages 21 to 24)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1   and then everybody went on the floor. And then
2   I recall one of the officers not leaving the
3   scene, but, I guess, if I'm not mistaken,
4   Officer Torres got tired so he step aside for a
5   second and then I gained control of his -- one
6   of his arms. But at that point, he started
7   kicking with his legs.
8           Officer -- if I'm not mistaken,
9   Officer Gillespie got kicked in the face and his
10  glasses broke. Somehow he got his other hand
11  loose while I was trying to gain control of his
12  other arm. He overpowered me and that's the way
13  I hurt -- I injured my right shoulder.
14      Q. Okay. So you gave me a lot of stuff
15  there.
16      A. Oh, yeah.
17      Q. Let's go through it. So according to
18  your testimony, they were trying to arrest
19  Mr. Boyle, right?
20      A. Yes.
21      Q. And at some point, they went onto the
22  floor, and Officer Moore, Torres and Mr. Boyle
23  went on the floor?
24      A. And myself, yes.

25

1   Q. Okay. When did you get involved in the
2   skirmish between Officer Moore, Torres and
3   Mr. Boyle?
4       A. When I arrived at the scene.
5       Q. So you arrived at the scene and went
6   immediately to help Officer Moore and Torres?
7       A. Correct.
8       Q. What did you do to help Officer Moore
9   and Torres?
10      A. How?
11      Q. What actions did you take, yes.
12      A. Trying to place the subject in
13  handcuffs. Help assisting the two officers
14  place him, the subject, in handcuffs.
15      Q. All right. Where did you approach
16  Mr. Boyle at to try and get him into handcuffs?
17      A. That I don't remember. I mean, it
18  happens -- you don't have time for all this
19  stuff. You just -- you need to place the
20  subject in handcuffs and that's what it is. I
21  mean, I don't remember if I was coming from the
22  right or the left. That I don't remember.
23      Q. Okay. Were you helping out putting him
24  in handcuffs, were you in front of Mr. Boyle?

26

1   Were you facing Mr. Boyle?
2       A. I don't remember that.
3       Q. You don't remember where you were?
4       A. No.
5       Q. And I think you stated already
6   previously you don't remember where
7   Officer Moore was?
8       A. Correct.
9       Q. And you don't remember where
10  Officer Torres was?
11      A. Correct.
12      Q. But you do know that at some point all
13  four of you went down to the ground, right?
14      A. Correct.
15      Q. And what happened when the four of you
16  went down onto the ground?
17      A. Then at that point, we were able to
18  gain control of his two arms and place the
19  subject in handcuffs.
20      Q. Do you recall how Mr. Boyle fell to the
21  ground, in what position he was?
22      A. No, sir.
23      Q. You don't know if he was facedown or
24  back?

27

1       A. No, I don't remember, sir.
2       Q. Okay. Were you on top of Mr. Boyle?
3       A. No.
4       Q. You were on the side?
5       A. Yes.
6       Q. Do you know where Officer Moore and
7   Officer Torres were once the four of you fell to
8   the ground?
9       A. Yeah, the four of us fell on the
10  ground. Nobody fall on top of anybody. I mean,
11  it was just all around him.
12      Q. Well, if there was three of you, how
13  did all four of you fall to the ground? If
14  there's three officers trying to wrestle, how
15  did all four of you fall to the ground?
16      A. I don't know.
17      Q. Were you in contact with Mr. Boyle?
18      A. I was in contact with Mr. Boyle, yes.
19      Q. What part of his body were you
20  contacting when he fell?
21      A. All the time was his arm.
22      Q. So you were holding onto his arm?
23      A. Yes.
24      Q. And you fell to the ground while you

28

7 (Pages 25 to 28)

1 were holding onto his arm?
2     A. Yes.
3     Q. Do you know who actually was able to
4 get Mr. Boyle into handcuffs?
5     A. No.
6     Q. Was it yourself?
7     A. I don't remember, sir.
8     Q. Did you -- was Mr. Boyle put in
9 handcuffs while he was on the ground?
10     A. Yes, sir.
11     Q. And when -- when you went down to the
12 ground, do you remember Mr. Boyle saying
13 anything to you or to any of the officers?
14     A. He's still running his mouth. He was
15 still talking about -- saying something. I
16 don't remember what he was saying.
17     Q. Was it swear words?
18     A. I don't recall.
19     Q. And were Officer Moore -- was
20 Officer Moore saying anything while you were
21 down on the ground?
22     A. I don't remember.
23     Q. Was Officer Torres saying anything
24 while you were on the ground?

29

1     A. I observed Michael -- what is his last
2 name?
3     Q. Kwiatkowski?
4     A. Kwiatkowski, yes. He was there.
5     Q. So Officers Gillespie and Kwiatkowski
6 were present while the four of you were down on
7 the ground?
8     A. Yes, at some point.
9     Q. How long were you down on the ground
10 for?
11     A. I don't recall.
12     Q. Where was Officer Gillespie when you
13 were on the ground?
14     A. He was --
15     MR. PUISZIS: Objection. At what point?
16 BY MR. KSIAZEK:
17     Q. Okay. When did -- while you were on
18 the --
19     MR. PUISZIS: He already said he doesn't know
20 when Gillespie arrived, so, I mean --
21     MR. KSIAZEK: I'm asking where he was
22 standing. Where was Officer Gillespie standing
23 when he was on the ground?
24     MR. PUISZIS: If you know, go ahead.

31

1     A. I don't remember.
2     Q. And did you say anything?
3     A. Yes, I did.
4     Q. What did you say?
5     A. Stop resisting.
6     Q. And why did you say that?
7     A. Because I have to communicate with the
8 subject.
9     Q. Okay. Did he say anything in response?
10     A. I don't remember.
11     Q. Now, you said that Officer Gillespie
12 had arrived at some point?
13     A. Yes, sir.
14     Q. Do you recall -- do you know when he
15 arrived?
16     A. No.
17     Q. Did you see him arrive?
18     A. No.
19     Q. Did you see any other officers
20 while you were on the ground besides
21 Officer Gillespie from the University of Chicago
22 or Chicago Police Officers?
23     A. Yes.
24     Q. Who did you see?

30

1     THE WITNESS: Officer -- at some point, I
2 observed Officer Gillespie holding the subject's
3 legs.
4 BY MR. KSIAZEK:
5     Q. And that's -- was that while the
6 subject was on the ground?
7     A. At some point, yes.
8     Q. Did you see Officer Kwiatkowski do
9 anything when he arrived at the scene?
10     A. Yes.
11     Q. What did he do?
12     A. He helped -- he tried to help place the
13 subject in handcuffs.
14     Q. This was before Mr. Boyle was in
15 handcuffs?
16     A. Yes.
17     Q. So Officer Gillespie and Kwiatkowski
18 arrived before Mr. Boyle was in handcuffs?
19     A. Yes.
20     Q. Okay. So what happened after Mr. Boyle
21 was placed in handcuffs?
22     A. Officer Gillespie started looking for
23 his glasses, which were in pieces, and he was
24 holding his face because he got kicked pretty

32

8 (Pages 29 to 32)

**Page 33**

1  bad during the time he was helping restrain the
2  subject.
3      Q.  Did you see Officer Gillespie get
4  kicked?
5      A.  Oh, yeah.
6      Q.  Can you describe what happened?
7      A.  He got struck.  I mean, the subject
8  struck him with his leg.  The glasses fall apart
9  and he -- I mean, you heard the (indicating)
10  actual the way he was struck with his feet.
11      Q.  Okay.  Was Mr. Boyle in handcuffs when
12  he kicked Officer Gillespie?
13      A.  No.
14      Q.  And was Officer Gillespie on the ground
15  or was he standing?
16      A.  He was on the ground.
17      Q.  How was he on the ground?  Was he on
18  his knees?  Was he laying down?
19      A.  Yes, he was on his knees trying to hold
20  his legs.
21      Q.  Which leg did Mr. Boyle --
22      A.  I don't know, sir.
23      Q.  Can you describe the glasses?
24      A.  No, sir.

**Page 34**

1      Q.  Do you know how many pieces it
2  shattered into?
3      A.  No.
4      Q.  But you heard it, right?
5      A.  Yeah.
6      Q.  So Mr. Boyle was placed into handcuffs
7  while he was still on the ground, right?
8      A.  Yes.
9      Q.  At some point, did someone pull him up
10  from the ground?
11      A.  Once he was handcuffed, we placed him
12  on his feet.
13      Q.  Who actually pulled him up from his
14  feet --
15      A.  I don't remember.
16      Q.  -- or from the ground?
17      A.  I don't remember.
18      Q.  Was it yourself?
19      A.  No, it wasn't me.
20      Q.  What were you doing once -- when
21  Mr. Boyle was being pulled up to his feet?
22      A.  Oh, I stepped on the side to catch my
23  breath.
24      Q.  Were you out of breath?

**Page 35**

1      A.  Yes.
2      Q.  Why were you out of breath?
3      A.  Why?
4      Q.  Yes.
5      A.  Because he was fighting.
6      Q.  How was he fighting?
7      MR. PUISZIS:  Objection.  You've asked and
8  answered this five times now.  You can answer it
9  a sixth time.  You can go ahead and answer it.
10      THE WITNESS:  If you could repeat the
11  question for me, please.
12      MR. PUISZIS:  He wanted to know how he was
13  fighting.
14      MR. KSIAZEK:  Sure.
15      MR. PUISZIS:  So, I mean, you can tell him
16  again how he kicked Gillespie in the face.  You
17  can talk about everything else that happened
18  that we've been talking about for the last
19  15 minutes.  So you can go ahead and answer the
20  question.
21      THE WITNESS:  Okay.  After he was pushing,
22  kicking, after he hurt my shoulder,
23  after I was able to pull his -- help him out,
24  handcuff him, yes.  Once he was restrained and

**Page 36**

1  on his feet, I stepped to the side so I can
2  catch my breath.  I was tired.  How's that?
3  BY MR. KSIAZEK:
4      Q.  Sure.  You said you hurt your shoulder?
5      A.  I didn't hurt -- he hurt my shoulder.
6      Q.  Well, your shoulder was hurt?
7      A.  Yes, sir.
8      Q.  And specifically do you remember how
9  your shoulder was hurt?
10      A.  It was painful, pain.
11      Q.  Well, I mean, what action did Mr. Boyle
12  take that hurt your shoulder?
13      A.  When he pushed my right arm.
14      Q.  And this is while you were on the
15  ground?
16      A.  At some point.
17      Q.  Was it on the ground or were you
18  standing up?
19      A.  You know what -- he was fighting all of
20  us from the time he was on the ground to the
21  time he was in handcuffs -- all the way until he
22  was in handcuffs.
23      Q.  So you're not sure when you injured
24  your shoulder?

9 (Pages 33 to 36)

1    A.   Yeah, when he pulled my -- when he
2  pulled my arm.
3    Q.   Okay.  I'm just trying to clarify when
4  actually that happened.
5    A.   When?  During the fight.
6    Q.   Was it before -- was it before he was
7  in handcuffs?
8    A.   Of course.
9    Q.   And was it before he went down to the
10  ground?
11    A.   That I don't recall.  It was -- that
12  was in between.
13    Q.   Okay.  So what happened after Mr. Boyle
14  stood up and you stepped to the side to catch
15  your breath?
16    A.   A couple city units arrived on the
17  scene and they took the subject with them.  I
18  don't know anything else.
19    Q.   Did the University of Chicago officers
20  physically walk Mr. Boyle over to the Chicago
21  Police Department?
22    A.   Yes.
23    Q.   How far did they walk him over there?
24    A.   A couple feet.

                                           37

1    Q.   Did you hear Mr. Boyle say anything
2  after he got up and was being walked over to the
3  Chicago Police officers?
4    A.   I don't recall.
5    Q.   Did any of the Chicago -- I'm sorry,
6  University of Chicago Police officers say
7  anything after he was stood up and walked over
8  to the Chicago Police officers?
9    A.   I don't recall.
10    Q.   Did you say anything to the City of
11  Chicago Police officers?
12    A.   No, sir.
13    Q.   So once Mr. Boyle was walked over to
14  the Chicago Police officers, their vehicle, what
15  did you do?
16    A.   Then I cleared out the scene.
17    Q.   What did that entail?
18    A.   Meaning that I put over the air that I
19  will -- that I told dispatch to clear me from
20  the scene and put me back in my zone, which
21  means I'm going back to whatever area I was
22  patrolling.
23    Q.   Well, did you go see a doctor about
24  your shoulder?

                                           38

1    A.   Half an hour later, my arm -- my
2  shoulder started bothering me.  That's when I
3  called my lieutenant.
4    Q.   Okay.  Let's go back actually.  When
5  you were still at the scene but after Mr. Boyle
6  was in the Chicago Police officer car, did you
7  talk to any witnesses at the scene?
8    A.   No.
9    Q.   Did you see anyone else gathered at the
10  scene besides the officers, either University of
11  Chicago or Chicago Police officers and
12  Mr. Boyle, besides those persons, did you see
13  anyone else at the scene?
14    A.   I don't recall, sir.
15    Q.   Did you see a young woman at the scene?
16    A.   No, sir.  I don't recall anything.
17    Q.   So after you told dispatch to clear
18  from the scene, you continued on your beat after
19  that?
20    A.   Yes.
21    Q.   And then 30 minutes later you said --
22  you told your lieutenant your shoulder was
23  bothering you?
24    A.   Approximately 30 minutes.

                                           39

1    Q.   How did you communicate that to your
2  lieutenant?
3    A.   I called the lieutenant.
4    Q.   Did you call him over the radio?
5    A.   No.  My cell phone.
6    Q.   What did you tell him?
7    A.   That my shoulder hurts.
8    Q.   And what did he say?
9    A.   To go to the emergency room.
10    Q.   Did you go to the emergency room?
11    A.   Yes, sir.
12    Q.   Where -- what emergency room did you go
13  to?
14    A.   University of Chicago ER.
15    Q.   And what did the doctors tell you?
16    A.   They took some X-rays and told me to
17  put some ice packs for a few days, and if the
18  pain consisted, you have to contact a shoulder
19  doctor, orthopaedic.
20    Q.   Did you ever follow up with a shoulder
21  doctor, an orthopaedic?
22    A.   No.  But my shoulder still bothers me,
23  so I'm thinking about going.
24    Q.   Your shoulder still bothers you today?

                                           40

                                  10 (Pages 37 to 40)

1    A. Yes.
2    Q. How does it bother you?
3    A. It hurts. When the weather is kind of
4  cold, it hurts a little bit.
5    Q. Okay. I'm going to show you what has
6  already been previously marked as Exhibit 1.
7  This is a copy of the dispatch tape. Have you
8  reviewed this document before your testimony
9  today?
10   A. I don't recall.
11   Q. You don't recall seeing this document?
12   A. Uh-uh.
13   Q. Okay. This is a transcript that's been
14  provided by your counsel about the -- of the
15  dispatch on October 18, 2008, okay. And at the
16  top it says start time, approximately 2:37
17  hours. Is that when you remember arriving at
18  35th Street on the 18th?
19   A. If this document says that, yes.
20   Q. Okay.
21   A. I was not looking at my clock — on my
22  time clock, but that's fine.
23   Q. Okay. Now, if you look in the middle
24  of the page under — where it says dispatch,

41

1  53rd and Blackstone, we've got a 10-1, 10-1,
2  53rd and Blackstone. Is that the dispatch call
3  that you heard which caused you to go to 53rd
4  and Blackstone Street?
5    A. Yes.
6    Q. And you said earlier you're Unit 101,
7  correct?
8    A. Yes, sir.
9    Q. So you stated in response, 101 en route
10  53rd and Blackstone, right?
11   A. Correct.
12   Q. Okay. If you look a little later down
13  the page where it says 101 again, it says 101,
14  23.
15   A. Yes.
16   Q. What does 23 indicate?
17   A. 23 means I have arrived at the location
18  previously given to me. On the scene, how's
19  that?
20   Q. Sure.
21     Okay. And then dispatch asked you,
22  101, what do you got over there? One, zero,
23  one, what do you have? 101, do you see 109?
24  Okay, units, we got the city coming. Can

42

1  somebody get there? Next unit on the scene,
2  tell me what you got. Do you remember hearing
3  that over dispatch?
4    A. I don't recall.
5    Q. You don't recall hearing that?
6    A. Well, I don't recall this.
7    Q. Okay. Now, where it says unknown, it
8  says, we got one guy on the ground, we got two
9  officers. Did you say that to dispatch?
10   A. (Indicating.)
11   Q. You have to answer yes or no.
12   A. Don't know. Maybe I did. Maybe I
13  didn't. I don't recall.
14   Q. Okay. Well, dispatch was asking you
15  what you got over there, right? They were
16  talking to you when it says, 101, what you got
17  over there, right?
18   A. Yes.
19   Q. So does it make sense that this would
20  be you saying we got one guy on the ground, we
21  got two officers?
22   MR. PUISZIS: Objection. He's already said
23  he doesn't remember. Dispatch also says, next
24  unit on the scene, tell me what you got.

43

1  BY MR. KSIAZEK:
2    Q. Well, you did testify you were the only
3  one -- the only additional unit on the scene
4  when you first got there, right?
5    A. Correct.
6    Q. Okay. If you can turn to page two of
7  this document. If you look at the top where it
8  says, 101, and you say to dispatch 101, right?
9    A. Uh-huh.
10   Q. You have to answer yes.
11   A. Yes.
12   Q. Okay. And then dispatch echoes back
13  101, correct?
14   A. Correct.
15   Q. And then 101 says, please run driver's
16  license for me, driver's license B, boy,
17  400-1448-7100. Did you say that to dispatch?
18   A. I don't recall by the paper. I don't
19  recall that.
20   Q. Okay. But at some point, did you
21  obtain Mr. Boyle's driver's license?
22   A. I don't recall. I mean, I don't
23  remember.
24   Q. You don't remember if you ever got

44

11 (Pages 41 to 44)

1     Mr. Boyle's driver's license?
2     A. I don't remember.
3     Q. I'm going to ask you to look at what
4  has been previously marked as Plaintiff's
5  Exhibit 2. If you would turn to the third page,
6  what is -- they have little numbers on the
7  bottom which is U, dash, C0111.
8     A. Okay.
9     Q. Do you see that?
10     Okay. This is a police report that you
11  filled out.
12     A. Excuse me?
13     Q. I said this is a police report -- I'm
14  sorry. Oh, I'm sorry, wrong. Disregard that.
15     Did you fill out any reports in
16  connection with this case?
17     A. No, sir.
18     Q. You didn't file out an injured person's
19  report?
20     A. I don't fill one out because I was
21  injured. Another officer does it for me -- did
22  it for me.
23     Q. Okay. So someone filled this out for
24  you?

45

1     A. Yes, sir.
2     MR. PUISZIS: Well, wait, can he see what it
3  is before he answers a question.
4     MR. KSIAZEK: I'm sorry, he gave it back to
5  the --
6     MR. PUISZIS: Which page are you looking at?
7     MR. KSIAZEK: We're looking at -- still
8  looking at 0111. This is the injured person's
9  report.
10     MR. PUISZIS: Okay.
11  BY MR. KSIAZEK:
12     Q. So someone filled this document out for
13  you?
14     A. Yes.
15     Q. And when -- where you see at the bottom
16  where it says Lisa -- I'm not sure if I can make
17  that out -- Raduke. Do you know whose that is?
18     A. Yes.
19     Q. Who filled this out for you?
20     A. Officer Lisa Redmond.
21     Q. Redmond, okay. So Officer Redmond
22  filled this out for you?
23     A. Yes, sir.
24     Q. Okay. Did you talk to her and provide

46

1  her with information here?
2     A. Yes, sir.
3     Q. Information in this report.
4     When did you talk to her?
5     A. When I went to the hospital.
6     Q. So was she -- was she with you at the
7  hospital?
8     A. We have a police officer at the
9  hospital 24/7.
10     Q. And that, on October 18, 2008, that
11  would be -- Lisa Redmond would be the police
12  officer at the hospital that night?
13     A. Yes, sir.
14     Q. So this isn't your handwriting?
15     A. No, sir. You don't see my signature
16  anywhere here.
17     Q. Right. Do you know what time you spoke
18  to Officer Redmond on October 18?
19     A. Whatever time, it was documented in the
20  report.
21     Q. Well, this report at the top indicates
22  2:38, right?
23     A. Uh-huh.
24     MR. PUISZIS: Under time of occurrence.

47

1     MR. KSIAZEK: Under time of occurrence,
2  right, that's what I'm getting at.
3  BY MR. KSIAZEK:
4     Q. Under time of occurrence it says 2:38,
5  right?
6     A. Uh-huh.
7     Q. You have to say yes.
8     A. What time are we talking about?
9     Q. We're looking at the very top under
10  time of occurrence next to date.
11     A. 2:38, yes, sir.
12     Q. Okay. But it doesn't say when this
13  report was filled out, though, right, on this
14  document?
15     A. Whatever it says there, you know. I
16  didn't write this report, so I can't answer
17  that, sir. I don't know.
18     Q. Okay. If you turn to the next page
19  which is Bates stamped 0112, did you provide
20  Officer Redmond with the information which is
21  located in the paragraph under narrative?
22     A. Yes, sir.
23     Q. Okay. So this paragraph states, in
24  reference to -- is that PDI?

48

12 (Pages 45 to 48)

1    A.  Yes, sir.
2    Q.  Number U2020, 18th of October, '08,
3  2:38 hours.  Officer Galarza, Unit 101,
4  responded to a 10-1 call to assist with 109.
5  Officer Torres, Officer Galarza reported
6  while -- is that reported?
7    A.  Yes.
8    Q.  -- while trying to handcuff the
9  offender, he injured his right shoulder.  Is
10  that true and accurate?
11    MR. PUISZIS:  Did you read it accurately?
12  BY MR. KSIAZEK:
13    Q.  What did I not read?
14    A.  If you rewind the tape, you will hear.
15    Q.  What did I miss?
16    A.  A couple words in there.
17    Q.  Oh, I'm sorry, refer to PDI, U2020?
18    A.  No, sir, but that's fine.  For the most
19  part, it's accurate, yes.
20    Q.  Well --
21    A.  You want to read it again?
22    Q.  I'll read it again just so we can get
23  it true and accurate here.
24    A.  10-4.

49

1    Q.  Okay.  In summary, in reference to
2  PDI Number U2020, 18th of October 08,
3  2:38 hours, Officer Galarza, Unit 101, responded
4  to a 10-1 call to assist with --
5    A.  Unit.
6    Q.  Unit, okay.  I missed that word, sorry.
7      -- Unit 109.  Officer Torres,
8  Officer Galarza reported while trying to
9  handcuff the offender, he injured his right
10  shoulder.  Refer to PDI Number U2020.  That's
11  correct, right?
12    A.  Yes.
13    Q.  Okay.  Did you have any conversations
14  with Officer Moore or Officer Torres on
15  October 18 regarding this incident?
16    A.  No.
17    Q.  Have you ever had any conversations
18  with Officer Moore or Torres since October 18
19  regarding this incident?
20    A.  No.
21    Q.  Did you ever see any of the University
22  of Chicago officers strike Mr. Boyle?
23    A.  No, sir.
24    Q.  Did you ever discuss with any of

50

1  University of Chicago officers why Mr. Boyle was
2  being arrested that night?
3    A.  No, sir.
4    Q.  Why not?
5    A.  Because I read the report later on.
6    Q.  But you never asked why he was being
7  arrested while you were at the scene on the
8  18th?
9    MR. PUISZIS:  In response to a 10-1 officer
10  needs assistance?
11    MR. KSIAZEK:  I'm asking the question.
12    THE WITNESS:  No, sir.
13  BY MR. KSIAZEK:
14    Q.  When did you read the Chicago Police
15  report?
16    A.  Not the Chicago Police report, our
17  report.
18    Q.  Okay.  When did you read your report?
19    A.  Later on.
20    Q.  Do you know how much later?
21    A.  A few days later.
22    MR. KSIAZEK:  I don't have any more questions
23  at this time.
24

51

1          EXAMINATION
2  BY MS. GIBBONS:
3    Q.  I just have a few.
4    A.  Yes, ma'am.
5    Q.  Not to go completely back, but I just
6  need to understand when exactly you first
7  noticed the City of Chicago Police officers?
8  What do you recall?
9    A.  After the subject was in handcuffs.
10    Q.  Okay.  So when you kind of stepped off
11  to the side?
12    A.  Once we handcuffed the subject and the
13  subject was on his feet, I stepped aside and
14  then I saw city units on the scene.
15    Q.  Now, when the city units were on the
16  scene, were they just arriving to the scene
17  or --
18    A.  Arriving at the scene.
19    Q.  Okay.  Do you recall how many units
20  arrived?
21    A.  Definitely more than one, ma'am.
22    Q.  Do you recall -- did you know any of
23  those officers?
24    A.  No.  No.  Nobody by name.  I don't

52

13 (Pages 49 to 52)

**Page 53**

1  remember.
2     Q.  Do you recall if there was a City of
3  Chicago sergeant that arrived on the scene?
4     A.  I remember seeing a white shirt from
5  the city.
6     Q.  And did you talk to any of those
7  officers?
8     A.  No, ma'am.
9     MS. GIBBONS:  That's all I have.
10          EXAMINATION
11  BY MR. PUISZIS:
12     Q.  Did you ever see any of the University
13  of Chicago officers pull Mr. Boyle's pants and
14  underwear down on the street?
15     A.  No, sir.
16     Q.  When you get a 10-1 call, that means an
17  officer needs assistance I think you said?
18     A.  Yes, it does.  Yes, sir.
19     Q.  Are you timing how long it takes you
20  normally when you respond to a 10-1 call how
21  quickly you get to the scene?
22     A.  Definitely not.
23     Q.  And when you arrive on the scene in
24  response to a 10-1 call, are you measuring

**Page 54**

1  things before you get out of your squad car?
2     A.  No.
3     Q.  Are you timing things before you get
4  out of your squad car?
5     A.  No, sir.
6     Q.  You see two officers wrestling with
7  someone, are you bothering to count off the
8  number of feet from your squad car to where the
9  two officers are wrestling?
10     A.  No, sir.
11     Q.  Are you taking out a tape measure and
12  measuring how far from another car the two
13  officers and the subject are wrestling?
14     A.  No, sir.
15     Q.  What's your purpose when you get out of
16  the squad car and go to where the two officers
17  and the subject are wrestling?
18     A.  To help the other officers, they're
19  under stress.
20     Q.  And are you making a mental note
21  because there's going to be a lawsuit about
22  who's holding whom where?
23     A.  No, sir.  That's the least of my
24  concerns.

**Page 55**

1     Q.  Typically when officers place someone
2  in handcuffs and they're resisting arrest, do
3  they try to put the subject on the ground?
4     A.  No, sir.
5     Q.  And did -- was Charles Boyle taken back
6  to the University of Chicago after this incident
7  or was he taken to Chicago Police Department?
8     A.  He was taken to the Chicago Police.
9     Q.  Why wasn't he taken back to the
10  University of Chicago?
11     A.  Because we don't process anyone.  All
12  the processing is done at any of the police
13  stations in the city.
14     Q.  Do you have a lockup at the
15  University of Chicago?
16     A.  No, sir, we do not.  We don't.
17     MR. PUISZIS:  Thank you.  I don't have
18  anything else.
19     MR. KSIAZEK:  I'm just going to show you
20  these things real quick.  This is Exhibit 8 I
21  believe.
22         (Whereupon, Galarza Deposition
23         Exhibit No. 8 was marked for
24         identification.)

**Page 56**

1        FURTHER EXAMINATION
2  BY MR. KSIAZEK:
3     Q.  Do you recognize this document?
4     A.  I recognize -- this specific?  I have
5  seen these forms, but never seen this before.
6     Q.  You've never seen this actual document
7  itself?
8     A.  No, sir.
9     Q.  You didn't fill this document out?
10     A.  No, sir.
11     Q.  It says this form was completed by
12  Robert Callahan?
13     A.  Sergeant Callahan.
14     Q.  Okay.  And on October 18, 2008 --
15     A.  Yes, sir.
16     Q.  -- on the bottom.
17     Did you yourself speak with
18  Sergeant Callahan?
19     A.  Yes, he's the sergeant from the
20  hospital.
21     Q.  Okay.  What did you say to Sergeant
22  Callahan?
23     A.  What you see here is what I told him.
24     Q.  When did you have this conversation?

14 (Pages 53 to 56)

1      A.  When I arrived at the ER, the hospital.
2      Q.  So was Sergeant Callahan present with
3  the other officer?
4      A.  What officer?
5      MR. PUISZIS:  Redmond?
6  BY MR. KSIAZEK:
7      Q.  Redmond, yeah, I'm sorry.
8          So was Sergeant Callahan present with
9  Officer Redmond when you arrived at the
10  hospital?
11     A.  Yes, sir.
12     Q.  Were you there when he filled out this
13  form for you?
14     A.  I was in the hospital when he filled it
15  out.
16     Q.  I'm sorry, did you actually see him
17  fill out this form?
18     A.  No.
19     Q.  Okay.  Did he ask you about how the
20  accident occurred?
21     A.  Yes, sir.
22     Q.  And what did you tell him?
23     A.  Exactly what you see in the report.
24     Q.  So you told him that you were -- the

57

1  answers to the plaintiff's interrogatories.
2  Have you seen this document before?
3      A.  Yes.
4      Q.  And on the last page, this is your
5  signature?
6      A.  Yes, sir.
7      Q.  Okay.  If you look on page three of
8  this document, it's the second paragraph down,
9  where it says, "Other officers from the
10  University of Chicago also responded and would
11  have seen the plaintiff either on the ground or
12  in handcuffs or being escorted to a City of
13  Chicago squad car for transportation.  Officer
14  Gerald Johnson and a Lieutenant White from the
15  University of Chicago Police Department were on
16  the scene at some point."  Do you recall seeing
17  Officer Johnson and Lieutenant White at the
18  scene?
19     A.  Yes.
20     Q.  Where did you -- or when did you see
21  them at the scene?
22     A.  Once he was handcuffed and city units
23  were at the scene.
24     Q.  So did Officer Johnson arrive after

59

1  offender was resisting a lawful arrest?
2      A.  Yes, sir.
3      Q.  And you told him that you were
4  attempting to effect a lawful arrest?
5      A.  Yes, sir.
6      Q.  And you told him that handcuffs were
7  being used when you were attempting to effect
8  this lawful arrest?
9      A.  Yes, sir.
10     Q.  And it states that the offender
11  resisted violently.  Did you tell
12  Officer Callahan -- or Sergeant Callahan that?
13     A.  Yes, sir.
14     Q.  And you -- where it says list all
15  injuries, you complained of pain and soreness in
16  your back and right shoulder?
17     A.  Yes, sir.
18     MR. KSIAZEK:  This is Exhibit 9.
19         (Whereupon, Galarza Deposition
20          Exhibit No. 9 was marked for
21          identification.)
22  BY MR. KSIAZEK:
23     Q.  Okay.  What I've handed you that's
24  marked for identification as Exhibit 9 are your

58

1  Mr. Boyle was handcuffed?
2      A.  I don't know what time he arrived.
3      Q.  But the first time you saw them was
4  after he was in handcuffs?
5      A.  Yes.
6      Q.  So on page five is the first full
7  paragraph which begins, "Officers Moore and
8  Torres had just stepped out of a Dunkin'
9  Donuts".  If you look at the fourth sentence, it
10  says, "The University of Chicago officers Moore
11  and Torres initially attempted to handcuff the
12  plaintiff who refused to allow himself to be
13  handcuffed and the other officers including
14  Aguilar, Kwiatkowski and Gillespie assisted in
15  attempting to get the plaintiff onto the ground
16  and handcuffed."
17     MR. PUISZIS:  Aguilar is a typo.  It's my
18  mistake.
19     MR. KSIAZEK:  Okay.
20     MR. PUISZIS:  It should be Galarza.
21  BY MR. KSIAZEK:
22     Q.  So that's yourself, not Aguilar?
23     MR. PUISZIS:  There is no Officer Aguilar
24  with the city -- University of Chicago, right?

60

15 (Pages 57 to 60)

McCorkle Court Reporters, Inc.
Chicago, Illinois     (312) 263-0052

1    THE WITNESS: Right.
2  BY MR. KSIAZEK:
3    Q. If you turn to the next page, page six,
4  question six asks -- it says, "State whether you
5  sustained any physical injury during your
6  interaction with the plaintiff on or about
7  October 18, 2008." And it asks you to describe
8  your injury.
9    So you say that you were given pain
10 medication in the second or third sentence
11 there. What kind of pain medication were you
12 given?
13    A. Prescription.
14    Q. Was it Tylenol or --
15    A. I guess it was Vicodin or something
16 like that.
17    Q. How long were you on Vicodin for?
18    A. A couple days.
19    Q. Are you still on Vicodin?
20    A. Sorry, what did you ask me?
21    Q. Are you still on Vicodin right now?
22    A. I told you that I was on Vicodin for a
23 couple days after the accident.
24    Q. Okay. And you state, "I used ice packs

                                                    61

1  with the University of Chicago." Have you had
2  any complaints made against you that -- just in
3  general?
4    MR. PUISZIS: You mean like this one?
5  BY MR. KSIAZEK:
6    Q. Well, besides this one.
7    A. No.
8    Q. So this is the only complaint that
9  you've had against you?
10    A. Yes. Been a good boy.
11    MR. KSIAZEK: Nothing further.
12    FURTHER EXAMINATION
13 BY MR. PUISZIS:
14    Q. Is it lawful to resist an arrest of an
15 officer at any time to your knowledge?
16    A. I'm sorry, what was that?
17    Q. Is it lawful or is it permissible to
18 resist an officer's arrest at any time?
19    A. No, sir.
20    MR. PUISZIS: Nothing further.
21    MS. GIBBONS: I have nothing further.
22    MR. PUISZIS: Let's reserve.
23    FURTHER DEPONENT SAITH NAUGHT
24    (Witness excused at 3:44 p.m.)

                                                    63

1  on my shoulder for sometime following the
2  incident." How long did you use ice packs on
3  your shoulder for?
4    A. At least a week. A little more than a
5  week.
6    Q. Do you know -- the next sentence says,
7  "I understand Officer Moore injured his wrist
8  and Officer Gillespie was also kicked in the
9  head and his glasses were broken in the
10 incident." I believe we talked about
11 Officer Gillespie being kicked in the head. Do
12 you know how Officer Moore injured his wrist?
13    A. No idea, sir. Don't know.
14    Q. Have you ever been sued before in your
15 capacity as an officer?
16    A. No, sir.
17    Q. If you look on page eight where it
18 says, identify all complaints, including but not
19 limited to, complaints of false arrests,
20 excessive use of force, unlawful search and/or
21 seizure, et cetera. In your answer on the last
22 sentence you said, "Subject to those objections
23 and without waiving same, there have been no
24 complaints that have been sustained against me

                                                    62

1
2    IN THE UNITED STATES DISTRICT COURT FOR THE
3        NORTHEASTERN DISTRICT OF ILLINOIS
4              EASTERN DIVISION
5
6  CHARLES BOYLE,            )
       Plaintiff,        )
7  vs.              ) No. 09 CH 1080
   UNIVERSITY OF CHICAGO POLICE )
8  OFFICER LARRY TORRES, et al.,)
       Defendants.         )
9
10   This is to certify that I have read the
11 transcript of my deposition taken in the
12 above-entitled cause by KAREN E.
13 DOMINICK-RIGONI, Registered Professional
14 Reporter, on November 9, 2009, and that the
15 foregoing transcript accurately states the
16 questions asked and the answers given by me as
17 they now appear.
18   _____
19      OSCAR GALARZA
20 SUBSCRIBED AND SWORN TO
21 Before me this _____, day
22 of _____, 2010.
23   _____
24 Notary Public

                                                    64

16 (Pages 61 to 64)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, KAREN E. DOMINICK-RIGONI, a
Registered Professional Reporter within and for
the County of Cook County and State of Illinois,
do hereby certify that heretofore, to-wit, on
the 9th day of November, 2009, personally
appeared before me, at 222 North LaSalle Street,
Suite 300, Chicago, Illinois, OSCAR GALARZA, in
a cause now pending and undetermined in the
Circuit Court of Cook County, Illinois, wherein
CHARLES BOYLE is the Plaintiff, and UNIVERSITY
OF CHICAGO POLICE OFFICER LARRY TORRES, ET AL.
are the Defendants.

I further certify that the said
witness was first duly sworn to testify the
truth, the whole truth and nothing but the truth
in the cause aforesaid; that the testimony then
given by said witness was reported
stenographically by me in the presence of the
said witness, and afterwards reduced to
typewriting by Computer-Aided Transcription, and
the foregoing is a true and correct transcript

65

of the testimony so given by said witness as
aforesaid.

I further certify that the signature
to the foregoing deposition was not waived by
counsel for the respective parties.

I further certify that the taking of
this deposition was pursuant to notice, and that
there were present at the deposition the
attorneys hereinbefore mentioned.

I further certify that I am not
counsel for nor in any way related to the
parties to this suit, nor am I in any way
interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have
hereunto set my hand and affixed my signature
this 12th day of January, 2010.

_Karen E. Dominick-Rigoni_
KAREN E. DOMINICK-RIGONI, CSR, RPR
COOK COUNTY, ILLINOIS

66

McCORKLE COURT REPORTERS, INC.
200 North LaSalle Street, Suite 300
Chicago, Illinois 60601-2956
(312) 263-0052

January 12, 2010

HINSHAW & CULBERTSON, LLP
ATTN: MR. STEVEN M. PUISZIS
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
IN RE: BOYLE vs. UNIVERSITY OF CHICAGO
COURT NUMBER: 09 CH 1080
DATE TAKEN: 11/09/09
DEPONENT: OSCAR GALARZA

Dear Mr. Puiszis:

Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled
cause. Also enclosed are additional signature
pages, if applicable, and errata sheets.
Per your agreement to secure signature, please
submit the transcript to the deponent for review
and signature. All changes or corrections must
be made on the errata sheets, not on the
transcript itself. All errata sheets should be
signed and all signature pages need to be signed
and notarized.
After the deponent has completed the above,
please return all signature pages and errata
sheets to me at the above address, and I will
handle distribution to the respective parties.

If you have any questions, please call me at the
above phone number.
Sincerely,
Margaret Setina    Court Reporter:
Signature Department  Karen E. Dominick-Rigoni
                      CSR, RPR
cc: All parties.

67

17 (Pages 65 to 67)

1

**A**

ability
5:13
able
20:9 27:17
29:3 35:23
above-entitled
1:14 84:12
67:11
accident
57:20 61:23
accurate
49:10,19,23
accurately
49:11 64:15
action
36:11
actions
26:11
actual
33:10 56:6
Adams
2:3
additional
44:3 67:11
address
67:18
administration
8:19
Affairs
9:18
affixed
66:15
aforementioned
67:11
aforesaid
65:19 66:2
afternoon
4:7
ago
4:21 5:5,6
10:23
agreement
67:13
Aguilar
60:14,17,22,23
ahead
31:24 35:9,19
air
12:24 14:20,21
38:18
al
1:10 64:8
65:14
allow
80:12
altercation
21:23
and/or
62:20
answer
5:11,16,18 6:3
17:6,9 35:8
35:9,19
43:11 44:10
48:16 62:21
answered
35:8
answers
46:3 59:1
64:16
anybody
28:10
apart
33:8
appear
64:17
APPEARANCES
2:1
appeared
65:9

applicable
67:12
apprehend
17:15
apprehension
19:2
approach
28:15
approximately
14:16 39:24
41:16
area
13:18 38:21
arm
24:1,2,9 25:12
28:21,22
29:1 38:13
37:2 39:1
arms
21:10 25:6
27:18
arrest
18:2,9,11,23
19:17 20:17
25:18 55:2
58:1,4,8
63:14,18
arrested
51:2,7
arrests
62:19
arrive
14:7,11 19:13
30:17 53:23
59:24
arrived
14:21 15:2,5
18:12,15
19:5 23:17
26:4,5 30:12
30:15 31:20
32:9,18
37:16 42:17
52:20 53:3
57:1,9 60:2
arriving
41:17 52:16,18
aside
25:4 52:13
asked
35:7 42:21
51:6 64:16
asking
4:14 5:15 8:1
24:24 31:21
43:14 51:11
asks
61:4,7
assigned
11:16
assist
49:4 50:4
assistance
51:10 53:17
assisted
60:14
assisting
26:13
ASSOCIATES
2:2
associate's
6:16,20 7:3,8
assumes
17:4
attempted
60:11
attempting
18:2 58:4,7
60:15
attend
7:16

**B**

ATTN
67:5
attorney
4:13
attorneys
66:9
aviation
8:20,24 9:8,12
9:22,24

**B**

B
3:10 44:16
bachelor's
6:17 7:4,13,17
back
12:5 15:8
17:11 22:20
22:20 23:12
27:24 38:20
38:21 39:4
44:12 46:4
52:5 55:5,9
58:16
bad
22:23 33:1
Bates
48:19
beat
11:16,21,23
12:2,4 39:18
begins
60:7
believe
55:21 62:10
benefit
6:4
best
5:12,23 6:2
13:14
bit
8:2 41:4
Blackstone
13:15,21 14:7
14:11,23
42:1,2,4,10
body
28:19
bother
41:2
bothering
39:2,23 54:7
bothers
40:22,24
bottom
45:7 46:15
58:16
boundaries
12:4
boy
44:16 63:10
Boyle
1:6 16:18 18:2
18:9,22
19:15 20:17
20:19 21:6
21:15,21
23:18,22
24:4 25:19
25:22 26:3
26:16,24
27:1,20 28:2
28:17,18
29:4,8,12
32:14,18,20
33:11,21
34:6,21
36:11 37:13
37:20 38:1
38:13 39:5

39:12 50:22
51:1 55:6
60:1 64:6
65:13 67:7
Boyle's
44:21 45:1
53:13
breath
34:23,24 35:2
36:2 37:15
broke
21:10 25:10
broken
62:9
brought
20:5

**C**

C
65:3
call
12:24 13:3,17
14:15,19,22
40:4 42:2
49:4 50:4
53:16,20,24
58:12
Callahan
56:12,13,18,22
57:2,8 58:12
58:12
called
4:3 39:3 40:3
Calumet
7:14,23 8:5
9:14
camera
20:5,8
capacity
62:15
car
12:11,14,19
15:9,13,14
15:21,23
16:11,13
18:17,20,24
19:13 20:8
39:6 54:1,4
54:8,12,16
59:13
cars
16:1,3,5,6,15
19:4
case
45:16
catch
34:22 36:2
37:14
cause
1:15 64:12
65:11,19
67:11
caused
42:3
cc
67:24
cell
40:5
certify
64:10 65:7,16
66:3,6,10
cetera
62:21
CH
1:8 64:7 67:7
chance
20:14
changes
67:14
Charles
1:6 55:5 64:6

65:13
Chicago
1:9,19 2:3,8
2:10,13 4:24
5:1,3 6:22
8:13,16,20
8:24 9:9,10
9:13,17,23
11:5,15,17
19:4,13
30:21,22
37:19,20
38:3,5,6,8
38:11,14
40:14 50:22
51:1,14,16
52:7 53:3,13
55:6,7,8,10
55:15 59:10
59:13,15
60:10,24
63:1 64:7
65:10,14
67:2,6,7
Chrysler
16:8
Circuit
65:12
city
2:10 4:24 5:1
5:2 6:22
8:20,23 9:9
9:13,23
37:16 38:10
42:24 52:7
52:14,15
53:2,5 55:13
59:12,22
60:24
civilian
16:5
clarify
37:3
clean
6:5
clear
38:19 39:17
cleared
38:16
clock
41:21,22
close
16:21 17:1
cold
41:4
college
6:22 7:14,23
8:5 9:14
color
16:16
come
12:21
coming
26:21 42:24
communicate
30:7 40:1
complained
58:15
complaint
63:8
complaints
62:18,19,24
63:2
completed
56:11 67:17
completely
52:5
computer
12:14,19
Computer-Aided

65:23
concerns
54:24
connection
45:16
consisted
40:18
contact
28:17,18 40:18
contacting
28:20
continued
39:18
control
21:12,12 25:5
25:11 27:18
conversation
58:24
conversations
50:13,17
Cook
1:16 65:6,12
66:23
copy
41:7
correct
26:7 27:8,11
27:14 42:7
42:11 44:5
44:13,14
50:11 65:24
corrections
67:14
Cottage
12:5
counsel
41:14 66:5,11
count
54:7
County
1:16 65:3,6,6
65:12 66:23
couple
10:23 20:22,23
37:16,24
49:16 61:18
81:23
course
37:8
court
1:2 5:19 6:4
64:2 65:12
67:1,7,22
criminal
6:16
CSR
1:23 66:22
67:23
CULBERTSON
2:6 67:4
curb
16:21
currently
6:18 8:3 11:4
11:17,18
CO111
45:7

**D**

D
3:1
dash
45:7
date
48:10 67:8
day
1:17 14:4
64:21 65:8
66:16
days
40:17 51:21

```
61:18,23              driver's              58:18,20,24        forth                54:21 55:19       head
Dear                  44:15,16,21                              17:11 22:20,20       good              62:9,11
67:9                  45:1              ————————————           four                 4:7,7 24:17       headed
December              driving                    F             27:13,15 28:7        63:10             14:22
8:11                  12:11 13:22,24    F                      28:9,13,15           grab              hear
Defendants            drove             19:23,23 20:12         31:6                 24:1              18:21 19:15
1:11 2:14 64:8        14:12,12          face                   fourth               graduated           20:9 38:1
65:15                 duly              25:9 32:24             60:9                  7:20,24             49:14
Definitely            4:4 65:17         35:16                  FOX                  graduating        heard
52:21 53:22           Dunkin            facedown               2:2                  8:11 9:14         21:6 33:9 34:4
degree                60:8              27:23                  front                ground              42:3
6:21,23 7:3,4         duties            facing                 26:24                5:8 21:10         hearing
7:13                  11:12             15:14 18:18           full                  22:22,22          43:2,5
Department                              27:1                  60:6                  27:13,16,21       HELEN
2:10 9:17         ————————————          fair                  further              28:8,10,13        2:12
37:21 55:7               E              5:13                   58:1 63:11,12        28:15,24          help
59:15 67:22       E                     fell                   63:20,21,23          29:9,12,21        13:8 19:1 26:6
departments       1:15,23 3:1,10        28:10,13,15           65:16 66:3,6         29:24 30:20       26:8,13
8:17                  64:12 65:4        33:8                  66:10                 31:7,9,13,23      32:12 35:23
depends               66:22 67:22       false              ————————————            32:6 33:14        54:18
14:3,4            earlier               62:19                       G               33:16,17          helped
deponent          42:6                  far                   gain                 34:7,10,16        32:12
63:23 67:8,11     East                  8:9 13:20             21:12 25:11          36:15,17,20       helping
67:13,17          12:22                 37:23 54:12           27:18                37:10 43:8        26:23 33:1
deposition        eastbound             feet                  21:12 25:5           43:20 55:3        hereinbefore
1:13 3:12 4:17        15:15,18,22        33:10 34:12,14       Galarza              59:11 60:15       66:9
4:20,22 5:9       16:24 17:2            34:21 36:1            1:14 3:3,12           Grove             heretofore
55:22 58:19       EASTERN               37:24 52:13           4:2,11,12            12:5              65:7
64:11 68:4,7      1:4 64:4              54:8                   49:3,5 50:3          guess             hereunto
66:8 67:10        echoes                fell                   50:8 55:22          25:3 61:15        66:15
describe          44:12                 24:20 27:20           58:19 60:20          guy               HINSHAW
16:6 17:12,13     ED                    28:7,9,20,24          64:19 65:10          43:8,20           2:6 67:4
33:6,23 61:7      2:2                   fight                  67:8                 G-a-l-a-r-z-a     history
discipline        educational          37:5                  gathered             4:11              6:15
10:1              6:14                  fighting               39:9                                  hit
discovery         effect                35:5,6,13,22         general          ————————————          18:19
1:13              58:4,7                36:19                 63:3                       H            hold
discuss           eight                 file                  Gerald              H                 33:19
50:24             62:17                 45:18                  59:14               3:10              holding
dispatch          either                fill                  getting             Half              28:22 29:1
13:1,3,10,17      46:11 39:10           45:15,20 56:9         12:17 48:2           39:1              32:2,24
14:15 15:1        59:11                 57:17                 Gibbons              Halfway           54:22
38:19 39:17       emergency             filled                2:12 3:5 10:19      8:10              hospital
41:7,15,24        40:9,10,12            45:11,23 46:12        10:21 52:2           hand              47:5,7,9,12
42:2,21 43:3      EMPLOYMENT            46:19,22              53:9 63:21           21:13 25:10       56:20 57:1
43:9,14,23        2:11                  48:13 57:12           Gillespie            66:15             57:10,14
44:8,12,17        en                    57:14                 25:9 30:11,21        handcuff          hour
Disregard         42:9                  find                   31:5,12,20          35:24 49:8        1:18 39:1
45:14             enclosed              21:3                   31:22 32:2           50:8 60:11        hours
distance          67:10,11              fine                   32:17,22            handcuffed        14:5 41:17
13:22,22,24       enforcement           41:22 49:18           33:3,12,14           21:11 34:11       49:3 50:3
distribution      6:17                  Fire                   35:16 60:14         52:12 59:22       how's
67:18             entail                9:17                  62:8,11              60:1,13,16        36:2 42:18
DISTRICT          38:17                 first                 give                 handcuffs         hurt
1:2,3 64:2,3      ER                    4:3,10 9:13           22:21                21:14 23:9,11     25:13 35:22
Division          40:14 57:1           15:4 18:13            given                23:13,19,22       36:4,5,5,6,9
1:4 2:11 9:18     errata                19:4 19:17           11:21 42:18           24:7,19           38:12
64:4              67:12,14,15,17        44:4 52:6            61:9,12               26:13,14,18       hurts
doctor            escorted              60:3,6 65:17         64:16 65:20           26:20,24          40:7 41:3,4
10:22 38:23       59:12                 five                  66:1                 27:19 29:4,9
40:19,21          et                    10:8 14:2 35:8       giving               32:13,15,18    ————————————
doctors           1:10 62:21            60:6                  5:21 6:3             32:21 33:11          I
40:15             64:8 65:14            floor                 glasses              34:6 36:21        IAD
document          everybody            22:12,23 24:11        25:10 32:23          36:22 37:4,7      9:18
41:8,11,19        19:21 25:1           24:14,15,18           33:8,23 62:9         52:9 55:2         ice
44:7 46:12        exactly               24:21 25:1           go                   58:6 59:12        40:17 61:24
48:14 56:3,6      52:6 67:23            25:22,23             12:17 13:23,23        60:4              62:2
56:9 59:2,8       EXAMINATION          follow                15:8 25:17           handed            ID
documented        3:2 4:5 52:1         40:20                 31:24 35:9           58:23             3:11
47:19             53:10 56:1           following              35:19 38:23         handle            idea
doing             63:12                62:1                  39:4 40:9,10         67:18             62:13
7:7 23:14,22      examined             follows                40:12 42:3          hands             identification
24:4,8 34:20      4:4                  4:4                   52:5 54:16           23:12             55:24 58:21,24
Dominick-Ri...    excessive            force                 God                  handwriting       identify
1:15,23 64:13     62:20                62:20                 7:11                 47:14             62:18
65:4 66:22        Excuse               foregoing             going                happened          Illinois
67:22             21:17 45:12          64:15 65:24           4:14 5:7,10,16       4:15 27:15        1:3,17,19 2:3
Donuts            excused              66:4                  5:17 20:4            32:20 33:8        2:8,13 64:3
60:9              63:24                form                  38:21 40:23          35:17 37:4        65:1,6,10,12
Drive             Exhibit              56:11 57:13,17        41:5 45:3            37:13             66:23 67:2,6
12:6              3:12 41:6 45:5       forms                                      happens           immediately
                  55:20,23            56:5                                       26:18             7:3 16:12 26:6
```

incident
50:15,19 55:6
62:2,10
including
60:13 62:18
Indiana
7:15
indicate
13:10 42:16
indicates
47:21
indicating
33:9 43:10
information
12:18 47:1,3
48:20
initially
60:11
injured
25:13 36:23
45:18,21
46:8 49:9
50:9 62:7,12
injuries
58:15
injury
61:5,8
inside
12:15
instance
24:1,8
insulting
19:21 20:21
interaction
61:8
interested
66:13
Internal
9:17
interrogato...
59:1
involved
26:1

**J**

January
8:10 66:16
67:3
job
9:12,13
Johnson
59:14,17,24
Jonathan
2:2 4:12
Joseph
7:14,16 8:6
Joseph's
7:21
July
8:14
June
8:14
justice
6:17

**K**

K
65:3
Karen
1:15,23 84:12
65:4 66:22
67:22
kick
24:10
kicked
25:9 32:24
33:4,12
35:16 62:8
62:11
kicking

22:9 24:9,12
24:13,24
25:7 35:22
kind
41:3 52:10
61:11
knees
33:18,19
know
5:5 7:20 9:6
15:21 18:1,4
18:7 19:24
20:3,4 24:17
27:12,23
28:6,16 29:3
30:14 31:19
31:24 33:22
34:1 35:12
36:19 37:18
43:12 46:17
47:17 48:15
48:17 51:20
52:22 60:2
62:6,12,13
knowledge
13:14 63:15
Ksiazek
2:2 3:4 4:6,13
10:13 11:1
17:8 19:8
21:5 22:12
31:16,21
32:4 35:14
36:3 44:1
46:4,7,11
48:1,3 49:12
51:11,13,22
55:19 56:2
57:6 58:18
58:22 60:19
60:21 61:2
63:5,11
Kwiatkowski
31:3,4,5 32:8
32:17 60:14

**L**

Lake
13:19 14:8,13
lane
15:18 16:24
17:3,10
lanes
18:15
language
19:21
LARRY
1:10 64:8
65:14
LaSalle
1:18 2:7,12
65:9 67:1,5
law
2:10 6:17
lawful
58:1,4,8 63:14
63:17
lawsuit
5:2 20:5 54:21
laying
33:18
leave
9:8
leaving
25:2
left
26:22
leg
33:8,21
legs
25:7 32:3

33:20
let's
6:20 13:23,23
15:8 25:17
39:4 63:22
license
1:24 44:16,16
44:21 45:1
lieutenant
39:3,22 40:2,3
59:14,17
lights
15:11 18:19
limited
62:19
Lisa
46:16,20 47:11
list
58:14
Listen
22:19
LITIGATION
2:11
little
7:8 8:2 9:5
41:4 42:12
45:6 62:4
LLP
2:6 67:4
located
13:16 15:13
18:19 17:19
17:23 48:21
location
22:8 42:17
lockup
55:14
long
7:16,17 8:7,12
9:19 14:6
21:15,18,21
31:9 53:19
61:17 62:2
longer
7:6
look
41:23 42:12
44:7 45:3
59:7 60:9
62:17
looking
32:22 41:21
46:6,7,8
48:9
loose
21:11 25:11
lot
25:14

**M**

M
2:7 67:5
making
54:20
male
15:7
management
6:18
Margaret
67:22
marked
3:11 41:6 45:4
55:23 58:20
58:24
master's
6:19 8:4
matter
4:14
ma'am
52:4,21 53:8
McCORKLE

87:1
mean
11:19 17:11
19:6 20:3,7
22:7,20 23:2
26:17,21
28:10 31:20
33:7,9 35:15
36:11 44:22
63:4
Meaning
38:18
means
13:7 24:8
38:21 42:17
53:16
measure
54:11
measuring
53:24 54:12
median
17:1,5
medication
61:10,11
mental
54:20
mentioned
66:9
MF
19:23,23 20:12
20:19,21,22
20:24 21:7,7
Michael
31:1
middle
15:10 16:21,23
17:2,10
18:16,18
23:14 41:23
military
11:2
minutes
14:1,3,9 35:19
39:21,24
missed
50:8
mistake
60:18
mistaken
7:22 9:6 25:3
25:8
model
16:16
months
11:20
Moore
15:7,12 16:13
16:17 17:14
17:19 18:1,8
18:21 19:6,9
19:16 20:16
21:9,16,19
21:22,24
22:14,17,24
23:18 25:22
26:2,6,8
27:7 28:6
29:19,20
50:14,18
60:7,10 62:7
62:12
morning
4:7
mouth
29:14
moving
17:11
Multiple
21:2
muscle
10:19,21

**N**

N
3:1
name
4:8,9,10,10,12
31:2 52:24
narrative
48:21
NAUGHT
63:23
nearby
18:12
need
24:22 26:19
52:6 67:15
needs
13:8 51:10
53:17
neither
18:19
never
51:6 56:5,6
night
12:22 14:8
47:12 51:2
nine
10:8
normally
53:20
north
1:18 2:7,12
14:12 65:9
67:1,5
NORTHEASTERN
1:3 64:3
notarized
67:16
Notary
64:24
note
54:20
notice
1:20 66:7
noticed
52:7
November
1:17 64:14
65:8
number
3:11 49:2 50:2
50:10 54:8
67:7,20
numbers
45:6

**O**

O
65:3,3
oath
6:9
objection
17:4,6 22:11
31:15 35:7
43:22
objections
62:22
observe
20:9
observed
15:6 17:14
18:15 31:1
32:2
obtain
6:23 7:12
44:21
obtained
7:8
obtaining
7:2
occasion

12:21
occurred
57:20
occurrence
47:24 48:1,4
48:10
occurring
13:11
October
4:16 10:14
11:7,10,24
12:9,15,23
41:15 47:10
47:18 49:2
50:2,15,18
56:14 61:7
offender
49:9 50:9 58:1
58:10
officer
1:10 8:13,16
10:5 11:5,13
13:8 15:6,7
15:12 16:13
16:17 17:14
17:15,19,22
18:1,8,8,21
19:16 20:16
21:9,9,19,22
21:24 22:14
22:17,24
23:18 25:4,8
25:9,22 26:2
26:6,8 27:7
27:10 28:6,7
29:19,20,23
30:11,21
31:11,22
32:1,2,8,17
32:22 33:3
33:12,14
39:6 45:21
46:20,21
47:8,12,18
48:20 49:3,5
49:5 50:3,7
50:8,14,14
50:18 51:9
53:17 57:3,4
57:9 58:12
59:13,17,24
60:23 62:7,8
62:11,12,15
63:15 64:8
65:14
officers
18:10,16 21:18
25:2 26:13
28:14 29:13
30:19,22
31:5 37:19
38:3,6,8,11
38:14 39:10
39:11 43:9
43:21 50:22
51:1 52:7,23
53:7,13 54:6
54:9,13,16
54:18 55:1
59:9 60:7,10
60:13
officer's
63:16
Oh
7:11 19:18
22:5 25:16
33:5 34:22
45:14 48:17
okay
4:19 5:7,15,19
5:22 6:6,7

```
7:2,12 8:3
11:4 12:8
13:16 15:8
16:17 17:12
18:12 20:11
20:24 21:15
21:24 22:13
23:21 24:6
24:14 25:14
26:1,23 28:2
30:9 31:17
32:20 33:11
36:21 37:3
37:13 38:4
41:5,13,15
41:20,23
42:12,21,24
43:7,14 44:6
44:12,20
45:8,10,23
46:10,21,24
48:12,18,23
50:1,6,13
51:18 52:10
52:19 56:14
56:21 57:19
58:23 59:7
60:19 61:24
once
14:18 28:7
34:11,20
35:24 38:13
52:12 59:22
ones
8:19
orthopaedic
40:19,21
Oscar
1:14 3:3 4:2
4:10 64:19
65:10 67:8
outcome
66:13
overpowered
25:12
O-s-c-a-r
4:10
```

```
        P
pack
10:20
packs
40:17 61:24
62:2
page
41:24 42:13
44:8 45:5
46:6 48:18
59:4,7 60:6
61:3,3 62:17
pages
67:12,15,17
pain
36:10 40:18
58:15 61:9
61:11
painful
36:10
pants
53:13
paper
44:18
paragraph
48:21,23 59:8
60:7
park
13:19 14:8,13
15:9 18:17
parked
15:14,21,23
16:1,4,8,11
```

```
16:15
part
28:19 49:19
parties
66:5,12 67:18
67:24
partner
12:9
passed
21:18,20
patrol
11:4,12 12:11
19:13
patrolling
38:22
PDI
48:24 49:17
50:2,10
pending
65:11
period
7:8
permissible
63:17
personally
65:8
persons
39:12
person's
45:18 46:8
phone
40:5 67:20
physical
61:5
physically
37:20
pick
5:20
pieces
32:23 34:1
place
19:1 21:13
23:8 28:12
26:14,19
27:18 32:12
55:1
placed
12:24 24:7
32:21 34:8
34:11
placing
23:12,13
plaintiff
1:7 2:5 4:13
59:11 60:12
60:15 61:6
64:6 65:13
plaintiff's
45:4 59:1
please
4:8 35:11
44:15 67:13
67:17,19
plus
7:18
point
19:11 21:8,8
22:4,10,11
25:6,21
27:12,17
30:12 31:8
31:15 32:1,7
34:9 36:16
44:20 59:16
police
1:9 8:13,16,17
8:20,24 9:8
9:12,22,24
19:4 30:22
37:21 38:3,6
38:8,11,14
```

```
39:6,11
45:10,13
47:8,11
51:14,16
52:7 55:7,8
55:12 59:15
64:7 65:14
POLICY
2:11
position
27:21
potential
12:18
Prescription
61:13
presence
65:21
present
31:6 57:2,8
66:8
pretty
32:24
preventing
6:11
previously
27:6 41:6
42:18 45:4
probably
7:5
process
55:11
processing
55:12
Professional
1:16 64:13
65:5
program
8:7,8
property
11:14
protect
11:14,15
provide
46:24 48:19
provided
41:14
public
6:19 64:24
Puiszis
2:7 3:6 10:12
10:20 17:4
19:8 21:3
22:11 31:15
31:19,24
35:7,12,15
43:22 46:2,6
46:10 47:24
49:11 51:9
53:11 55:17
57:5 60:17
60:20,23
63:4,13,20
63:22 67:5,9
pull
34:9 35:23
53:13
pulled
34:13,21 37:1
37:2
pure
10:21
purpose
54:15
pursuant
1:19 66:7
push
23:5
pushed
36:13
pushing
17:16,17 22:7
```

```
22:19 23:1,2
23:23,24
24:2,9,23
35:21
put
14:20,20 23:10
23:18,21
24:19 29:8
38:18,20
40:17 55:3
putting
26:23
p.m
1:18 63:24

        Q
question
6:1 17:4,7,9
18:6 24:17
35:11,20
46:3 51:11
61:4
questions
4:15 5:11,12
5:16 51:22
64:16 67:19
quick
55:20
quickly
53:21

        R
R
2:2
radio
12:20 40:4
Raduke
46:17
rank
11:7
rap
21:4
read
49:11,13,21,22
51:5,14,18
64:10
real
55:20
really
10:24
recall
10:15,16,18
11:23 13:1,3
14:10 15:20
15:21 16:15
17:21,22
20:15 22:16
24:12 26:2
27:20 29:18
30:14 31:11
37:11 38:4,9
39:14,16
41:10,11
43:4,5,8,13
44:18,19,22
52:8,19,22
53:2 59:16
recognize
56:3,4
record
4:9
recorded
20:6
Redmond
46:20,21,21
47:11,18
48:20 57:5,7
57:9
reduced
85:22
```

```
refer
49:17 50:10
reference
48:24 50:1
refused
60:12
regarding
4:15 50:15,19
regards
4:23
Registered
1:16 64:13
65:5
related
66:11
relation
17:20,23
remember
7:6,11 10:24
14:6,14 16:3
16:10 20:23
26:17,21,22
27:2,3,6,9
28:1 29:7,12
29:16,22
30:1,10
34:15,17
36:8 41:17
43:2,23
44:23,24
45:2 53:1,4
remind
5:7
repeat
18:6 35:10
rephrase
21:20
report
45:10,13,19
46:9 47:3,20
47:21 48:13
48:16 51:5
51:15,16,17
51:18 57:23
reported
1:23 49:5,6
50:8 65:20
reporter
1:16 5:20 6:5
64:14 65:5
67:22
REPORTERS
67:1
reports
45:16
Representing
2:5,14
reserve
63:22
resist
24:2,6 63:14
63:18
resisted
58:11
resisting
22:3,4,6 24:20
24:24 30:5
55:2 58:1
respective
66:5 67:18
respond
53:20
responded
49:4 50:3
59:10
response
19:16 20:19
22:1 30:9
42:9 51:9
53:24
restrain
```

```
33:1
restrained
35:24
return
67:17
review
67:13
reviewed
41:8
rewind
49:14
right
10:10 13:8
16:12 17:2
20:17,23
25:13,19
26:15,22
27:13 34:4,7
38:13 42:10
43:15,17
44:4,8 47:17
47:22 48:2,5
48:13 49:9
50:9,11
58:16 60:24
61:1,21
Robert
56:12
room
2:12 40:9,10
40:12
route
14:10 42:9
RPR
1:23 66:22
67:23
rules
5:8
run
44:15
running
29:14

        S
S
3:10
safety
6:19
SAITH
63:23
saw
17:13 23:17,21
52:14 60:3
saying
5:18 18:22
19:22 20:3
20:11 29:12
29:15,16,20
29:23 43:20
says
41:16,19,24
42:13,13
43:7,8,16,23
44:8,15
46:16 48:4
48:15 56:11
58:14 59:9
60:10 61:4
62:6,18
scene
15:2,5 18:5,12
18:15 19:4
19:13 25:3
26:4,5 32:9
37:17 38:16
38:20 39:5,7
39:10,13,15
39:18 42:18
43:1,24 44:3
51:7 52:14
52:16,16,18
```

53:3,21,23
59:16,18,21
59:23
school
8:5
search
62:20
second
19:12 25:5
59:8 61:10
secure
67:13
see
15:4,23 16:8
16:11 19:3
30:17,19,24
32:8 33:3
38:23 39:9
39:12,15
42:23 45:9
46:2,15
47:15 50:21
53:12 54:6
56:23 57:16
57:23 59:20
seeing
41:11 53:4
59:16
seek
7:3
seeking
8:4
seen
56:5,5,6 58:2
59:11
seizure
62:21
sense
43:19
sentence
60:9 61:10
62:6,22
sergeant
53:3 56:13,18
56:19,21
57:2,8 58:12
series
5:11
serve
11:15
served
11:2
set
11:21 66:15
Setina
67:22
shame
20:7
shattered
34:2
sheets
67:12,14,15,18
shirt
53:4
Shore
12:6
shoulder
25:13 35:22
38:4,5,6,9
36:12,24
38:24 39:2
39:22 40:7
40:18,20,22
40:24 49:9
50:10 58:16
62:1,3
show
18:5 41:5
55:19
side
28:4 34:22

36:1 37:14
52:11
signature
47:15 59:5
66:3,15
67:11,13,14
67:15,17,22
signed
67:15,15
silver
16:8
Sincerely
67:21
sir
5:4,14 6:10
9:11,15 10:2
10:4 11:3,6
11:11 12:10
12:13,18
13:2 16:7,10
17:21,24
18:3 20:15
20:18 22:5
23:20 27:22
28:1 29:7,10
30:13 33:22
33:24 36:7
38:12 39:14
39:16 40:11
42:8 45:17
46:1,23 47:2
47:13,15
48:11,17,22
49:1,18
50:23 51:3
51:12 53:15
53:18 54:5
54:10,14,23
55:4,16 58:8
56:10,15
57:11,21
58:2,5,9,13
58:17 59:6
62:13,16
63:19
situation
22:19
six
61:3,4
sixth
35:9
skirmish
26:2
somebody
43:1
songs
21:4
soreness
58:15
sorry
7:23 9:1 10:6
19:9 38:5
45:14,14
46:4 49:17
50:8 57:7,16
61:20 63:16
sort
17:2
southbound
14:13
speak
5:23,24 56:17
specific
56:4
specifically
36:8
spelling
4:9
spoke
47:17
squad

54:1,4,8,16
59:13
SS
65:2
St
7:14,16,21 8:6
stamped
48:19
standing
22:10,15,17
31:22,22
33:15 38:18
start
8:20 41:16
started
8:10 9:21
24:11 25:6
32:22 39:2
state
4:8 61:4,24
65:1,6
stated
27:5 42:9
statements
19:17
states
1:2 48:23
58:10 64:2
64:15
stating
18:10
stations
55:13
stenographi...
65:21
step
6:2 25:4
stepped
34:22 36:1
37:14 52:10
52:13 60:8
STEVEN
2:7 67:5
stood
37:14 38:7
stop
22:3 24:24
30:5
street
1:19 2:3,7,12
12:7,22
15:10,16,24
16:2,4,9,20
16:22,23
18:17 23:15
41:18 42:4
53:14 65:9
67:1,5
stress
54:19
strike
50:22
striking
23:3
struck
33:7,8,10
students
11:14
stuff
25:14 26:19
subject
15:7 17:6,15
17:16,20,23
18:3,11,16
19:1 21:9,13
23:8 26:12
26:14,20
27:19 30:8
32:6,13 33:2
33:7 37:17
52:9,12,13

54:13,17
55:3 62:22
subject's
32:2
submit
67:13
SUBSCRIBED
64:20
sued
62:14
suit
66:12
Suite
1:19 2:3,7
65:10 67:1,5
summary
50:1
sure
18:7 20:10
35:14 36:4
36:23 42:20
46:16
suspect
12:18
sustained
61:5 62:24
swear
21:22 29:17
swearing
21:15 22:1,13
22:14
sworn
4:1,4 64:20
65:17

_____
T
_____
T
3:10
take
7:17 26:11
36:12
taken
1:14 4:17,20
4:22 5:10
55:5,7,8,9
64:11 67:8
takes
53:19
talk
6:2 35:17 39:7
46:24 47:4
53:6
talked
62:10
talking
29:15 35:18
43:16 48:8
tell
10:5,7
tape
41:7 49:14
54:11
tell
6:14 14:4
24:22 35:15
40:6,15 43:2
43:24 57:22
58:11
telling
20:2
testified
4:4
testify
44:2 65:17
testifying
6:12
testimony
5:20 25:18
41:8 65:19
66:1,14
Thank

55:17
thereof
66:13
thing
18:13 20:6
things
20:22,23 54:1
54:3 55:20
think
27:5 53:17
thinking
40:23
third
45:5 61:10
thousand
7:24
three
28:12,14 59:7
time
4:19 9:21
11:21 14:5
14:14 21:18
21:19,21
22:18 28:21
33:1 35:9
36:20,21
41:16,22
47:17,19,24
48:1,4,8,10
51:23 60:2,3
63:15,18
times
20:12 21:2,4
24:12 35:8
timing
53:19 54:3
tired
25:4 36:2
today
6:9,12 40:24
41:9
told
10:22 15:1
38:19 39:17
39:22 40:16
56:23 57:24
58:3,6 61:22
top
28:2,10 41:16
44:7 47:21
48:9
Torres
1:10 15:6
16:18 17:15
17:22 18:2,8
18:22 19:7
19:10 20:16
21:9,16,19
21:22,24
22:14,17,24
23:18 25:4
25:22 26:2,6
26:9 27:10
28:7 29:23
49:5 50:7,14
50:18 60:8
60:11 64:8
65:14
Torres's
15:13 16:13
19:16
to-wit
65:7
traffic
14:4 15:19
transcript
6:5 41:13
64:11,15
65:24 67:10
67:13,15
Transcription

65:23
transportation
59:13
tried
24:18 32:12
true
49:10,23 65:24
trust
20:3
truth
65:16,18,18
truthfully
5:12 6:12
try
23:10,21 26:16
55:3
trying
17:15 18:8
21:12 23:8
23:18 25:11
25:18 26:12
33:19 33:19
37:3 49:8
50:8
turn
44:6 45:5
48:18 61:3
twice
20:24
two
7:18,18,18,24
9:7 11:20
18:16 23:12
26:13 27:18
43:8,21 44:6
54:6,9,12,16
two-year
8:8
Tylenol
61:14
typewriting
65:23
Typically
55:1
typo
60:17

_____
U
_____
U
45:7
uh-huh
5:19 44:9
47:23 48:6
uh-uh
5:19 41:12
understand
6:8 52:6 62:7
understanding
13:6
underwear
53:14
undetermined
65:11
unit
42:6 43:1,24
44:3 49:3
50:3,5,6,7
UNITED
1:2 64:2
units
37:16 42:24
52:14,15,19
59:22
University
1:9 8:13,15
9:9 11:5,15
11:17 19:3
19:12 30:21
37:19 38:6
39:10 40:14
50:21 51:1

```
53:12 55:6           we've              38:20          2006              6
55:10,15             35:18 42:1                        8:1 9:3
59:10,15             WHEREOF            ___0___         2007            60601
60:10,24             66:14                              8:14,14 9:3     2:8 67:6
63:1 64:7            white              0111            2008            60601-2956
65:13 67:7           53:4 59:14,17      46:8            4:16 10:15      67:2
unknown              Whiting            0112             11:8,9,10,24   60602
43:7                 7:15               48:19            12:9,15,23     2:13
unlawful             witness            08               41:15 47:10   60606
62:20                3:2 4:1,3          49:2 50:2        58:14 61:7     2:3
use                   10:22 32:1        084-004480      2009           63
62:2,20              35:10,21           1:24            1:17 64:14      3:6
usual                51:12 61:1         09               65:8
19:24                63:24 65:17        1:8 64:7 67:7   2010            ___7___
U2020                65:20,22                           8:11 64:22     704-3000
49:2,17 50:2         66:1               ___1___         66:16 67:3     2:8
50:10                witnesses          1               210            742-3541
                     39:7               41:6            10:23          2:13
___V___              woman              10-1            215
vehicle              39:15              13:5,7,8,11     10:10,23        ___8___
38:14                word               42:1,1 49:4     222
verbally             50:6               50:4 51:9       1:18 2:7 65:9  8
5:17                 words              53:16,20,24     67:5           3:13 55:20,23
Vicodin              29:17 49:16        10-4
61:15,17,19,21       work               49:24           23             ___9___
61:22                8:23 9:2,3,9       101             42:14,16,17    9
violently            9:16,19            12:3,4 42:6,9   24/7           3:14 58:18,20
58:11                11:17,21           42:13,13,22     47:9           58:24 64:14
vs                   worked             42:23 43:16     241            9th
1:8 64:7 67:7        8:12,16 9:20       44:8,8,13,15    11:18          1:17 65:8
vulgar               9:23               49:3 50:3       263-0052       900
19:20                working            1080            67:2           2:12
                     5:1 6:18 7:9       1:8 64:7 67:7
___W___              7:10 8:15          109             ___3___
wait                 9:21 11:18         42:23 49:4      3:44
46:2                 11:19,24           50:7            63:24
waived               12:8               11/09/09        30
66:4                 wrestle            67:8            2:12 39:21,24
waiving              28:14              12              300
62:23                wrestling          67:3           1:19 2:3,7
walk                 15:7 16:19         12th            65:10 67:1,5
37:20,23             17:13,17           66:16           312
walked               54:6,9,13,17       1435            2:4,8,13 67:2
38:2,7,13            Wright             12:22           330
Walking              6:22               15             2:3
13:22                wrist              35:19           345-8877
want                 62:7,12           18             2:4
49:21                write              4:16 11:24      35th
wanted               20:14 48:16        12:9,23         41:18
35:12                written            41:15 47:10     39
wasn't               10:3               47:18 50:15     12:6
20:1 34:19           wrong              50:18 56:14
55:9                 45:14              61:7            ___4___
way                                     18th            4
10:12 18:24          ___X___            41:18 49:2      3:4
24:3 25:12           X                  50:2 51:8       400-1448-7100
33:10 36:21          3:1,10             1999            44:17
66:11,12             X-rays             6:24            47
weather              40:16                              12:6
41:3                                    ___2___         47th
week                 ___Y___            2              12:7 13:18
62:4,5               yeah               45:5            14:8
weeks                7:19 14:9 18:1     2:29
10:23                24:23 25:16        1:18            ___5___
weigh                28:9 33:5          2:30
10:9,11,14           34:5 37:1          14:16           52
went                 57:7               2:35            3:5
21:10 25:1,21        year               14:16           53
25:23 26:5           7:5,7 9:4,5,6      2:37            3:6
27:13,16             years              41:16           53rd
29:11 37:9           4:21 5:5,6,9       2:38            12:22 13:15,20
47:5                 7:18,18,18         47:22 48:4,11   14:7,11,13
West                 9:2,7              49:3 50:3       14:23 15:14
2:3                  young              200             15:22 42:1,2
westbound            39:15              10:23 67:1      42:3,10
14:13 18:18                             2000            55
we'll                ___Z___            6:24            3:13
22:21                                   2001            56
We're                zero               6:24            3:4
46:7 48:9            42:22              2005            58
                     zone               9:21            3:14
```

**EXHIBITS**



THE UNIVERSITY OF
# CHICAGO
HUMAN RESOURCES MANAGEMENT

Effective 10/2007
Page 1 of 1
Questions about this form? Contact UHRM Benefits:
E-mail: Benefits@uchicago.edu

## Supervisor's First Report – Workers' Compensation Claim of Injury/Illness

**PLEASE PRINT**

Department: _POLICE_     Date Notified of Injury/Illness: _18 OCT 08_

Employee Name _GALARZA, OSCAR A._   Job Title: _POLICE OFFICER_ Union: _PBA_

Date Hired to Present Position: _____   Last Day Worked: _18 OCT 08_

Date of Injury/Illness/Accident: _18 OCT 08_   Time: _2:38_ (am)/pm  M-F Accident: Y (N)

Specific Location of Accident: (address, building name, area in building or grounds):
_1435 E. 53RD ST. (ON STREET)_

How did the accident/injury/illness occur: _OFFENDER WAS RESISTING A LAWFUL ARREST._

What was the employee doing specifically at the time: _ATTEMPTING TO EFFECT A LAWFUL ARREST._

Were the activities within the scope, responsibilities, duties and course of employment: (Y)/ N

List any equipment or tools being used at the time: _HANDCUFFS._

Identify contributing factors, if any at the time: _OFFENDER RESISTED VIOLENTLY._

List all injuries, where on the employee's body or nature of illness: _COMPLAINT OF PAIN/SORENESS IN BACK AND RIGHT SHOULDER._

List witnesses and co-workers present, include contact information:
_OFC. L. TORRES (773) 418-9982_
_OFC. G. MOORE (773) 426-7404_

U/C0108

First person notified of injury/illness/accident: _LT. S. WHITE_

UC Safety/Environmental Office notified: Y /(N)   By: _____ Date: _____

Employee sent for medical attention: (Y)/ N   ER or UCOM Clinic: _E.R._

Form completed by: _ROBERT Y. CALLAHAN_   Title: _SERGEANT_

Signature: _Robert Y. Callahan_   Date: _18 OCT 08_

GALARZA
EXHIBIT NO. _8_
11.09.09 KDR

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHARLES BOYLE,              )
             Plaintiff,     )
               )
v.                      )
               )    No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE   )
OFFICER LARRY TORRES, et al.,    )
               )
            Defendants.   )

## DEFENDANT GALARZA'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

NOW COMES the Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER GALARZA ("Galarza"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information -- ‧ ‧ ‾ and are made without prejudice to the objections set forth herein. Defendant s‍ reserves the right to amend and/or supplement his responses at any time to introduce in‍

6459575v‍

GALARZA
EXHIBIT NO. 9
11-09-09   KDR

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1.     Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:** Oscar Galarza. My attorney, Steven Puiszis, consulted with me in preparing these answers.

2.     Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

6459575v1897854 4236

**ANSWER:** Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well as a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and then handcuffing him. I injured my shoulder in the process, Officer Moore injured his wrist and Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin. Other offices from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

3.    Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

ANSWER:    Objection, defendant objects to this Interrogatory on the grounds that it

seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify

anyone believed "to have knowledge supporting the defendant" and also asks for a summary of

"what knowledge" this defendant "believes each person may possess." That information is more

proper the subject of a deposition and to require the provision of such a summary is overbroad,

harassing and unduly burdensome. Subject to those objections and without waiving same, see

those individuals listed in Interrogatory No. 2 and defendants who were identified in the

University of Chicago defendants' Rule 26 Disclosures. The University of Chicago officers

would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4.    Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

   a.    Why he/she was at that location;

   b.    Whether he/she had any physical contact with Plaintiff;

   c.    Whether he/she participated in the arrest of Plaintiff;

   d.    Whether he/she participated in the search of Plaintiff;

   e.    Whether he/she had any participation in the bringing of criminal charges against Plaintiff.

ANSWER:    Objection. Defendant objects to this Interrogatory as being vague and

ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against

the defendant include assertions relating to his arrest and to the purported use of force against

him as well as a state law claim of malicious prosecution. Subparagraph (e) is vague and

ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

criminal charges." Subject to those objections and without waiving same, see my answer to Interrogatory No. 2.

Officers Moore and Torres had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past them with its horn continuously blowing and then observed the vehicle abruptly swerve to the curb and bump it. They initially investigated what was happening. The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance. The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar, Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officers Moore and Torres would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and any Complaints would have been signed by either Officer Moore or Officer Torres.

5. If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

**ANSWER:** I do not personally know of any such investigation. However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

5

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6.      State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:**   Yes, I injured my shoulder in this occurrence. I went to the University Hospital where x-rays were taken. I was given pain medication and was told to stay off of work for several days. I used ice packs on my shoulder for sometime following the incident. I understand that Officer Moore injured his wrist and Officer Gillespie was also kicked in the head and his glasses were broken in the incident. I do not know if they received any treatment.

7.      Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:**   Objection. This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc. Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it. Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact. I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we

6

turn any such person over to the Chicago Police who will then transport that person to a local police station and process that person, including taking booking photos, filling out arrest reports, filing criminal complaints and seeking approval by the State's Attorney working felony review of felony charges. While University of Chicago employees write out our own reports, we do not prepare criminal complaints and do not process an arrestee during the booking process.

8. Please state how long and in what capacity you have been employed by the University of Chicago Police Department. Your response should include a brief description of your change in assignments and/or rank if any, and when those changes occurred. Your response should also include whether you were concurrently employed by the City of Chicago as a police officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:** On the date of the incident involving Charles Boyle, I had been employed by the University of Chicago for approximately 15 months.

9. Please describe your assignment with the University of Chicago Police Department on October 18, 2008. Your response should include the actual time you began and ended your duties.

**ANSWER:** On October 18, 2008, I was working for the University of Chicago Police Department as a patrol officer on the midnight shift. My assignment was 101.

10. State the case number, caption, and jurisdiction of all civil cases in which you were named a defendant during the course of your employment with the University of Chicago Police Department and/or the City of Chicago Police Department.

**ANSWER:** Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in a capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are substantially similar in nature. Subject to those objections and without waiving same, I have

7

never worked for the Chicago Police Department and I have never been previously sued in my capacity as a University of Chicago Police officer.

11.   Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

   **ANSWER:**   Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in some capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other complaints that are substantially similar in nature. Subject to those objections and without waiving same, there have been no complaints that have been sustained against me with the University of Chicago.

12.   Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

   **ANSWER:**   Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13.   State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

8

**ANSWER:**  I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14.  State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:**  Defendant objects to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving said objection, this defendant states this is unknown to me at this time.

15.  State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

~~**ANSWER:**  No.~~

16.  State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:**  Defendant objects to this Interrogatory in that he was never subpoenaed to Court and, therefore, his duties as an Officer for the University of Chicago on January 20, 2009 and/or December 6, 2008 are irrelevant and immaterial. Defendant further objects to this Interrogatory as overbroad and harassing and seeks information not reasonably calculated to lead to the discovery of admissible evidence.

17.  State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:**  Objection. This Interrogatory calls for attorney work product. Defendant further objects to this Interrogatory as overbroad and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion. Defendant further objects that it is unduly burdensome and harassing. Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of

6459575v1897854 4236

Chicago Defendants' Response to Plaintiff's Production Request and these Answers to Interrogatories.

By: _____

Officer Oscar Galarza

SUBSCRIBED AND SWORN TO
before me this 2D day of
July, 2009.

_____
Notary Public

> OFFICIAL SEAL
> MAXWELL A FISHER
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES:11/27/09

10

6459575v1897854 4236