# EXHIBIT G

ORIGINAL

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHEASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,        )
        Plaintiff,    )
    vs.               ) No. 09 CH 1080
UNIVERSITY OF CHICAGO POLICE )
OFFICER LARRY TORRES, et al.,)
        Defendants.   )

        The discovery deposition of LARRY TORRES,
taken in the above-entitled cause, before
Karen E. Dominick-Rigoni, a Registered
Professional Reporter of Cook County, Illinois,
on the 9th day of November, 2009, at the hour of
10:08 a.m. at 222 North LaSalle Street,
Suite 300, Chicago, Illinois, pursuant to
notice.

Reported by: Karen E. Dominick-Rigoni, CSR, RPR
License No.: 084-004480

**Page 2**

1  APPEARANCES:
2      ED FOX & ASSOCIATES, By
       MR. JONATHAN R. KSIAZEK
3      300 West Adams Street, Suite 330
       Chicago, Illinois 60606
4      (312) 345-8877
5          Representing the Plaintiff;
6
       HINSHAW & CULBERTSON, LLP, By
7      MR. STEVEN M. PUISZIS
       222 North LaSalle Street, Suite 300
8      Chicago, Illinois 60601
       (312) 704-3000
9
       - AND -
10
       CITY OF CHICAGO - DEPARTMENT OF LAW
11     EMPLOYMENT AND POLICY LITIGATION
       DIVISION, By
12     MS. HELEN GIBBONS
       30 North LaSalle Street, Room 900
13     Chicago, Illinois 60602
       (312) 742-3541
14
           Representing the Defendants.
15
16
17
18
19
20
21
22
23
24

**Page 3**

1                  I N D E X
2    WITNESS                    EXAMINATION
3    LARRY TORRES
4      By Mr. Ksiazek...............4, 139
5      By Ms. Gibbons................125
6      By Mr. Puiszis................129
7
8
9
10                E X H I B I T S
11   NUMBER                  MARKED FOR ID
12   Torres Deposition Exhibit
13     No. 1..........................90
14     No. 2..........................97
15     No. 3.........................111
16     No. 4.........................112
17     No. 5.........................114
18     No. 6.........................117
19     No. 7.........................122
20
21
22
23
24

**Page 4**

1        MR. KSIAZEK: Mr. Torres, would you please
2    state your name — full name for the record and
3    spell the last.
4        THE WITNESS: Larry Torres, T-o-r-r-e-s.
5            (Witness sworn.)
6            LARRY TORRES,
7    called as a witness herein, having been first
8    duly sworn, was examined and testified as follows:
9            EXAMINATION
10   BY MR. KSIAZEK:
11       Q. Now that you're sworn, have you ever
12   had your deposition taken before?
13       A. No.
14       Q. So this is the first time you've taken
15   a deposition?
16       A. Yes.
17       Q. Okay. I'll just explain some basic
18   ground rules. Since this is your first time,
19   basically I'm going to be asking you some
20   questions and I ask that you answer truthfully
21   and to the best of your knowledge; is that okay?
22       A. Yes.
23       Q. And I'm going to ask that you answer
24   all my questions verbally. So just like you

1    answered yes just now, I'd ask that you answer
2    with a yes or no or whatever answer you provide,
3    just make sure not to shake your head or don't
4    say any uh-huhs or uh-uhs just because the court
5    reporter can't pick that up, okay?
6    A.  Okay.
7    Q.  I will try my best not to talk over you
8    just because we don't want to cause confusion
9    for the court reporter, and then I just ask that
10   you try not to talk over me and just the
11   transcript reads out better that way, okay?
12   A.  Okay.
13   Q.  And, lastly, if you ever need to take a
14   break, then you can just ask for a break.  Just
15   make sure that if you do ask for a break, you
16   have answered my question before you do ask for
17   a break; is that fair?
18   A.  Okay.
19   Q.  Okay.  If I could ask, what documents
20   did you review in preparation for your
21   deposition today?
22   A.  I just overlooked my initial report.
23   Q.  The police report?
24   A.  Correct.

5

1    Q.  And you understand you're under oath
2    and you have an obligation to testify truthfully
3    today?
4    A.  Yes.
5    Q.  Is there any preventing you today from
6    testifying truthfully?
7    A.  No.
8    Q.  Just some background information.  What
9    is your educational background?
10   A.  I graduated high school and I had some
11   college.
12   Q.  When did you graduate high school?
13   A.  '88.
14   Q.  Where did you graduate from?
15   A.  Leo High School.
16   Q.  Is that -- where is that located?
17   A.  79th and Sangamon.
18   Q.  Okay.  And did you immediately go to
19   college after that?
20   A.  No.
21   Q.  Okay.  What did you do after graduating
22   from high school?
23   A.  I worked.
24   Q.  And where did you work after high

6

1    school?
2    A.  For a company called Clean Way
3    Sweeping.
4    Q.  What were you doing for Clean Way?
5    A.  Driving a truck.
6    Q.  How long did you work for Clean Way?
7    A.  Approximately three years.
8    Q.  What did you do -- or why did you leave
9    Clean Way?
10   A.  I got another job.
11   Q.  And where did you work after Clean Way?
12   A.  The City of Chicago.
13   Q.  Were you working as an officer?
14   A.  No.  As a garbage man.
15   Q.  How long did you work as a garbage man
16   for the city?
17   A.  About four years.
18   Q.  Okay.  And what did you -- why did you
19   leave the city as a garbage man?
20   A.  Because I wanted to become a police
21   officer.
22   MR. PUISZIS:  It was a smelly job, right?
23   THE WITNESS:  I couldn't take the smell.
24

7

1    BY MR. KSIAZEK:
2    Q.  Okay.  So you said you worked for three
3    years for Clean Way, for four years as a garbage
4    man, so that would be about 1995 when you left
5    the city as a garbage man?
6    A.  Well, no, because I was working for
7    Clean Way while I was still in school.
8    Q.  Okay.  So when did you leave the city
9    as a garbage man?
10   A.  I believe it was '92.
11   Q.  And is that when you went to become an
12   officer?
13   A.  Correct.
14   Q.  Okay.  Did you go to college in 1992?
15   A.  I was going to night classes.
16   Q.  You were going to night classes.
17       When did you go to night classes?
18   A.  I'm trying to think exactly what year
19   it was, because I just took several classes in
20   criminal justice.
21   Q.  Do you recall if it was when you were
22   working for Clean Way or for when you were
23   working as a garbage man?
24   A.  Garbage man.

8

2  (Pages 5 to 8)

1    Q. Where did you take these night classes?
2    A. Daley College.
3    Q. Do you recall how long -- for how many
4 years you took these classes?
5    A. Two years.
6    Q. Did you graduate with a degree?
7    A. No.
8    Q. Okay. So 1992, did you become an
9 officer with the city?
10    A. No.
11    Q. Okay. Where did you -- what did you do
12 after working as a garbage man?
13    A. I became a police officer with the
14 Cook County Forest Preserve Police.
15    Q. What were -- what was your job title as
16 a Cook County Forest Preserve? Were you a
17 patrol officer?
18    A. Yes.
19    Q. What were your duties as a patrol
20 officer with the forest preserve?
21    A. Patrol the forest preserves.
22    Q. Did you have a -- what was your
23 assignment during that time?
24    A. My assignment?

9

1    Q. And this was approximately 1995?
2    A. Approximately.
3    Q. How long did you work for Department of
4 Streets and Sanitation?
5    A. Until 2005.
6    Q. And what did you do in 2005?
7    A. I then resigned from the City of
8 Chicago.
9    Q. Why did you resign?
10    A. To become a police officer.
11    Q. And where were you employed in 2005 as
12 a police officer?
13    A. I was a -- I always did part-time in
14 between all this. I was a Crestwood Police
15 officer and I did the Merrionette Park
16 part-time.
17    Q. Okay. So you worked at Crestwood?
18    A. Crestwood.
19    Q. And Merrionette Park?
20    A. Merrionette Park. I was doing that
21 part-time.
22    Q. Do you recall what years you were
23 working at Crestwood part-time?
24    A. I would say -- Crestwood or?

11

1    Q. Yes. Did you work in a specific forest
2 preserve?
3    A. No. Anywhere in Cook County.
4    Q. Okay. How long did you work for the
5 Cook County Forest Preserve?
6    A. For, let's see, I believe it was
7 three years.
8    Q. And why did you leave the Cook County
9 Forest Preserve?
10    A. For another job.
11    Q. Were you ever disciplined as part of
12 your job at the Cook County Forest Preserve?
13    A. No.
14    Q. Did you ever get written up when you
15 worked for the Cook County Forest Preserve?
16    A. No.
17    Q. So what job did you -- what job did you
18 acquire after you worked for the Cook County
19 Forest Preserve?
20    A. I then had worked for the Department of
21 Streets and Sanitation for the City of Chicago
22 as a foreman.
23    Q. As a foreman you said?
24    A. Correct.

10

1    Q. Just Crestwood for now.
2    A. I believe it was -- it was so long ago.
3    Q. Go ahead.
4    A. Maybe '93, '95. I'm not sure.
5    Q. Do you mean 1993 to 1995 or '93 or '95?
6    A. '93 or '95. I'm not sure what year I
7 started over there.
8    Q. Okay. How long did you work there
9 part-time?
10    A. Two years.
11    Q. And why did you leave Crestwood?
12    A. To go to Merrionette Park. I just
13 jumped around.
14    Q. And were you ever disciplined as part
15 of your duties at Crestwood while you were a
16 part-time officer there?
17    A. No.
18    Q. Were you ever written up?
19    A. No.
20    Q. So how long did you work for
21 Merrionette Park as a part-time officer?
22    A. 2000 to 2007.
23    Q. How many hours did you work part-time
24 for Crestwood on, let's say, a weekly basis?

12

3 (Pages 9 to 12)

1    A. It was only approximately 12 hours a
2  week.
3    Q. Do you recall what shift you worked?
4    A. Nights.
5    Q. Would that be the first shift maybe?
6    A. Midnights.
7    Q. Midnight shift.
8        And how many hours a week did you work
9  for Merrionette Park part-time?
10   A. It was approximately two days a week,
11  too, so that was like -- the shifts are usually
12  six hours or 12 hours, too. When they're
13  part-time, they're not a full eight hours.
14   Q. And would you still work the night
15  shift for Merrionette Park?
16   A. Yes.
17   Q. Were you ever disciplined when you
18  worked for Merrionette Park?
19   A. No.
20   Q. And did you ever receive any write-ups
21  when you worked there?
22   A. No.
23   Q. What were you a patrol officer for --
24   A. Yes.

                                          13

1    Q. -- Crestwood?
2        And a patrol officer for
3  Merrionette Park?
4    A. Yes.
5    Q. Did you have a beat that you were
6  assigned to?
7    A. No.
8    Q. So how would you get your assignments?
9    A. Just dispatch.
10   Q. And is that the same with
11  Merrionette Park?
12   A. Yes.
13   Q. You didn't have an assigned beat?
14   A. No.
15   Q. So when did you start working for the
16  City of Chicago as a police officer?
17   A. I never was a police officer.
18   Q. Oh, I'm sorry.
19       Okay. Where did you -- when did you
20  obtain a full-time police officer job?
21   A. I was full-time with the forest
22  preserve and then I became with the
23  University of Chicago.
24   Q. When did you start with the

                                          14

1  University of Chicago?
2    A. January of '07.
3    Q. Is that why you left your part-time
4  position with Merrionette Park?
5    A. Yes.
6    Q. Okay. Have you ever served in the
7  military?
8    A. No.
9    Q. Okay. Officer, how tall are you?
10   A. Five eleven.
11   Q. And how much do you weigh?
12   A. Approximately 200.
13   Q. How old are you?
14   A. 40.
15   Q. So do you still work for the
16  University of Chicago Police Department?
17   A. Yes.
18   Q. And you've worked for the University of
19  Chicago since January of '07 through today's
20  date?
21   A. Correct.
22   Q. Have you had any other jobs in between
23  January '07 and today's date?
24   A. No.

                                          15

1    Q. So what is your position with the
2  University of Chicago?
3    A. My current position?
4    Q. Yes.
5    A. I'm a sergeant with patrol.
6    Q. And what does that -- what does being a
7  sergeant entail? What are your duties?
8    A. Just supervisor. I supervise
9  patrolmen.
10   Q. Do you go on patrol yourself?
11   A. Yes.
12   Q. On October 18, 2008, what was your
13  rank?
14   A. Patrolman.
15   Q. Okay. When did you become a sergeant?
16   A. August 9 of this year.
17   Q. Can you describe the training or did
18  you receive any training to become a police
19  officer at the University of Chicago?
20   A. With the University of Chicago?
21   Q. Yes.
22   A. Just basic house training they call it,
23  which is you just learn their certain areas,
24  beats.

                                          16

                          4 (Pages 13 to 16)

1    Q.  Do you remember how long this training
2  was?
3    A.  The university's training, I believe it
4  was six weeks.
5    Q.  Did you receive any other training
6  besides basic — or, actually, let's go back.
7        What do you mean by "basic house
8  training"?
9    A.  Well, I did my initial training with
10  the Chicago Police Academy when I became a
11  forest preserve police.  But when you go to
12  different departments, they have different
13  ordinances and reports and you just generally
14  learn their areas and reports.
15    Q.  Do you know when you received your
16  basic training, what year, when you went to the
17  forest preserve?
18    A.  I believe that was when I started at
19  the forest preserve.  It was either '93 or '95.
20  It was — you go to the Chicago Police Academy
21  for 16-week training.
22    Q.  Okay.  What shift do you currently
23  work?
24    A.  Midnights.

17

1    Q.  And were you working that same shift on
2  October 18, 2008?
3    A.  Yes.
4    Q.  Were you working with a partner on
5  October 18, 2008?
6    A.  Yes.
7    Q.  Who were you working with?
8    A.  Officer Moore.
9    Q.  Do you know how long Officer Moore had
10  been working for the University of Chicago
11  Police Department on October 18, 2008?
12    A.  He was just recently hired.
13    Q.  And do you know why you were assigned
14  to work with Officer Moore?
15    A.  They just — in the roll call room,
16  they just assign people to each other.  You
17  don't pick.
18    Q.  Had you worked with Officer Moore
19  previous to October 18, 2008?
20    A.  No.
21    Q.  So this is your first time working with
22  him?
23    A.  Correct.
24    Q.  Was it your understanding that you were

18

1  training Officer Moore on October 18, 2008?
2    A.  Yes.
3    Q.  Were you given special instructions in
4  regards to how to train Officer Moore on
5  October 18, 2008?
6    A.  No.
7    Q.  So what is your understanding of what
8  your duties were in regards to training
9  Officer Moore?
10    A.  Basically just show him the area
11  because he's a Chicago Police officer, so he has
12  all the training he needs.
13    Q.  So basically you were just driving —
14    A.  Showing him the area, our boundaries.
15    Q.  Okay.  Were you driving a patrol car
16  that day —
17    A.  Yes.
18    Q.  — on October 18?
19    MR. PUISZIS:  Let him finish his question
20  before you answer.
21  BY MR. KSIAZEK:
22    Q.  Can you just briefly describe what a
23  University of Chicago patrol car looks like.
24    A.  They're all white with lettering on the

19

1  side that says Police.  It's, like, a maroon
2  color and underneath it says University of
3  Chicago.
4    Q.  And do you know what beat you were
5  working on October 18, 2008?
6    A.  109.
7    Q.  What are the boundaries of Beat 109?
8    A.  That would be 61st to 64th, then it
9  would be Cottage Grove to Lake Shore Drive.
10    Q.  And who was driving the patrol car on
11  October 18, 2008?
12    A.  Officer Moore.
13    Q.  Why was he driving that day?
14    A.  He chose to.
15    Q.  As a University of Chicago Police
16  officer, what is your jurisdiction?
17    MR. PUISZIS:  Objection, I'm not sure I
18  understand the question.
19  BY MR. KSIAZEK:
20    Q.  Let me see if I can clarify.  What —
21  do you have a separate jurisdiction from the
22  Chicago Police Department?
23    MR. PUISZIS:  Again, I object, I'm not sure I
24  understand.

20

5 (Pages 17 to 20)

1    MS. GIBBONS: Join in the objection.
2    BY MR. KSIAZEK:
3    Q.  Does your boundaries – does University
4    of Chicago's boundaries overlap with the
5    Chicago Police's boundaries with their
6    jurisdiction?
7    MS. GIBBONS: Objection, vague.
8    BY MR. KSIAZEK:
9    Q.  If you know.
10   A.  Do they overlap?
11   Q.  Yes.
12   A.  What do you mean by "overlap"?
13   Q.  Well, let's say hypothetically you were
14   to pull someone over, does the University of
15   Chicago have sole jurisdiction over an area or
16   does it overlap with the Chicago Police
17   Department?  I guess I'm asking do you work in
18   conjunction with the University of Chicago --
19   or, I'm sorry, the Chicago Police Department or
20   do you have your own separate area?
21   MR. PUISZIS: You mean, do they -- certain
22   areas they patrol exclusively without any
23   City of Chicago?
24   MR. KSIAZEK: That would be a better

21

1    question, yes.
2    BY MR. KSIAZEK:
3    Q.  Are there any areas that you patrol
4    exclusively where the city does not?
5    A.  No.
6    Q.  What is the extent of the University of
7    Chicago's police powers?
8    A.  As to what?  What do you mean?
9    Q.  Can you arrest a suspect?
10   A.  We detain for the City of Chicago.
11   Q.  What do you mean by "detain"?
12   A.  Well, we don't actually make the full
13   arrest.  Chicago Police Department makes the
14   arrest.  They do the processing and everything.
15   We assist them in calls and we detain people for
16   the City of Chicago.
17   Q.  Do you write reports?
18   A.  We write our own reports.
19   Q.  Do you have the occasion to look at any
20   reports of stolen vehicles?  Can you see whether
21   or not a vehicle is stolen on your computer?
22   A.  On a computer?
23   Q.  Yes.  Well, actually, let me go back.
24   Do you have a computer in your car, your patrol

22

1    car?
2    A.  Yes.
3    Q.  And did you have a computer in your car
4    on October 18, 2008?
5    A.  No.
6    Q.  So on October 18, 2008, you didn't have
7    the opportunity to look whether or not a car was
8    stolen?
9    A.  Repeat that question.
10   Q.  Sure.  On October 18, 2008, you were
11   working without a computer, right?
12   A.  Correct.
13   Q.  So if you got information from a
14   suspect, could you look up any information about
15   that suspect on -- in any way?
16   A.  If I had a computer, I could.
17   Q.  How would you receive information from
18   a suspect without a computer?
19   A.  Through a radio.
20   Q.  So on October -- in October 2008, you'd
21   have to radio to dispatch to get information --
22   A.  Correct.
23   Q.  -- about a suspect?
24        And if you were to run a plate for

23

1    instance, you'd have to radio that to dispatch,
2    too?
3    A.  Yes.
4    Q.  Okay.  Did you have the occasion to be
5    at approximately 1435 East 53rd Street that
6    night on October 18, 2008?
7    A.  Was I there?  Yes.
8    Q.  Do you recall what time you were there?
9    A.  Approximately 2:30 in the morning.
10   Q.  What were you doing on 53rd Street at
11   about 2:30 in the morning?
12   A.  I was -- went for coffee at Dunkin'
13   Donuts.
14   Q.  Do you know if that Dunkin' Donuts is
15   open 24/7?
16   A.  Yes.
17   Q.  Was Officer Moore with you at that
18   time?
19   A.  Yes.
20   Q.  So both Officer Moore and yourself went
21   inside the Dunkin' Donuts for coffee?
22   A.  Correct.
23   Q.  And what happened after you got the
24   coffee from Dunkin' Donuts?

24

6  (Pages 21 to 24)

1  A. As we proceeded to exit the building,
2  we heard a car horn, and when we opened the
3  door, we walked out, we seen a car with the horn
4  driving past.
5  Q. So you heard the horn while you were
6  inside Dunkin' Donuts?
7  A. The doorway, we were coming out, just
8  about outside the door. Were in the door.
9  There's two doors.
10  Q. Okay. When you say there's two
11  doorways, was the first -- let's say, the main
12  entrance door, was that door open?
13  A. The street -- from the street side or
14  inside?
15  Q. From the street side.
16  A. No.
17  Q. Was the inside door, as you say, the
18  second door, not the street door, but the inside
19  door, was that door open?
20  A. No.
21  Q. So both doors were closed --
22  A. Closed, correct.
23  Q. -- when you heard the horn?
24  A. Correct.

25

1  Q. Can you describe the horn noise that
2  you heard when you were inside the Dunkin'
3  Donuts?
4  A. Just a consistent, like, horn. It
5  didn't -- it was consistent. It wasn't a
6  beeping. It was just a --
7  Q. Was it loud or --
8  A. Yes.
9  Q. -- was it soft?
10  A. Loud.
11  Q. Did -- after you heard this horn, did
12  you look up to see if there was a car that this
13  horn was coming from?
14  A. Yes. We seen a car drive by with the
15  horn blowing still.
16  Q. So when you first heard the horn, did
17  you see a car at that point?
18  A. No.
19  Q. When did you first see the car?
20  A. As we exited the building.
21  Q. Approximately how much time had passed
22  in between when you first heard the horn and
23  when you saw the car?
24  A. Seconds.

26

1  Q. And what did you do once you first
2  noticed this car?
3  A. I proceeded to walk into my patrol car.
4  Q. Did Officer Moore do the same thing?
5  A. Yes.
6  Q. Did you keep the car in your sight as
7  you were heading towards your patrol car?
8  A. Yes.
9  Q. What did you notice, if anything, about
10  the car as you were walking towards your own
11  car?
12  A. I noticed that the car pulled over
13  abruptly and hit the curb with the tires.
14  Q. All right. How far away was -- let's
15  go back.
16  In what direction of travel was the car
17  that the horn was going off? What direction of
18  travel was that car traveling?
19  A. Eastbound on 53rd.
20  Q. And as I understand it, 53rd Street is
21  an east/west street?
22  A. Correct.
23  Q. And your own car was parked in front --
24  A. Correct.

27

1  Q. -- of the Dunkin' Donuts?
2  A. Correct.
3  MR. PUISZIS: Let him finish his question
4  before you answer it, okay?
5  BY MR. KSIAZEK:
6  Q. And what car was -- or what direction
7  was your car facing when it was parked on the
8  street?
9  A. Eastbound.
10  Q. Okay. You said that the car pulled
11  over and abruptly hit the curb with its tires.
12  How far away when you exited the Dunkin' Donuts
13  was this car from you at that point?
14  A. When I exited the door?
15  Q. Right. When you first exited the
16  Dunkin' Donuts, how far away was the car with
17  the horn away from you?
18  A. It was right in front of us.
19  Approximately 20 feet then.
20  Q. So if you were to walk straight ahead
21  about 20 feet, you would have gotten straight to
22  the car? Was it right in front of you on the
23  street in your field of vision or was it to your
24  left or right?

28

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1    A.  When I opened the door, it was right in
2  front of me.
3    Q.  So straight ahead in your field of
4  vision?
5    A.  Correct.
6    Q.  And how long -- how much time had
7  passed between when you saw the car as you were
8  walking outside the Dunkin' Donuts and when it
9  pulled over and hit the curb as you stated?
10    A.  How long was it?
11    Q.  Yeah.  How much time had passed?
12    A.  A minute or so.
13    Q.  Approximately how far had the car
14  traveled from what you could tell?
15    A.  From where, the curb?
16    Q.  Right.  I'm sorry, when you first saw
17  it as you walked outside the Dunkin' Donuts to
18  when it can curbed, yes.
19    A.  How far from the point where I seen it
20  to the point where it curbed, how far was that
21  distance?
22    Q.  Correct.  Yes.
23    A.  Approximately 75 feet, 100 feet.
24    MR. PUISZIS:  So a minute or so it took to

                                                      29

1    the car curbed, the horn --
2    A.  The noise stopped, correct.
3    Q.  Now, you say that the car pulled over
4  and abruptly hit the curb with its tires.  Can
5  you describe how this occurred?
6    MR. PUISZIS:  Objection, asked and answered.
7  You can go ahead and answer it again.
8    THE WITNESS:  It pulled over at a quick
9  speed, hit the curb and stopped.
10  BY MR. KSIAZEK:
11    Q.  Did you actually see the tires hit the
12  curb itself?
13    A.  Yes.
14    Q.  How much force, I guess, would you say
15  the tires struck the curb with?
16    MR. PUISZIS:  Objection, characterization.  I
17  don't know that I understand the question, "how
18  much force".
19    MS. GIBBONS:  Join in the objection.
20  BY MR. KSIAZEK:
21    Q.  Was it -- did it hit it strongly?  Did
22  it sort of bump up against the curb?
23    MR. PUISZIS:  Objection, I don't understand
24  the question.  But if you understand the

                                                      31

1  travel that distance?
2    THE WITNESS:  As soon as I seen the car, it
3  curbed.
4  BY MR. KSIAZEK:
5    Q.  Was there a lot of traffic on that
6  night?
7    A.  I don't recall seeing cars out there.
8    Q.  So as far as you recall, this was the
9  only car --
10    A.  Correct.
11    Q.  -- that was out there?
12       Now, at any point, did the horn stop
13  going off in between when you first saw the car
14  outside the Dunkin' Donuts and when it pulled
15  over to the curb?
16    A.  When did it stop?
17    Q.  At any point, did it stop in between
18  when the car -- when you first saw the car and
19  when it pulled over the curb?
20    A.  It stopped when the car curbed.
21    Q.  Did it immediately stop once it curbed
22  or was it a few seconds after or --
23    A.  I don't recall.
24    Q.  But you just recall about the time when

                                                      30

1  question, you can go ahead and answer it.  I'm
2  not sure if anyone can talk about how strongly
3  something bumps a curb.
4    MS. GIBBONS:  I join.
5  BY MR. KSIAZEK:
6    Q.  If you know.
7    A.  No.
8    Q.  Did you see the car shake at any point
9  when it hit the curb?
10    A.  Yes.
11    Q.  Can you describe how the car shook when
12  it hit the curb?
13    A.  Side to side.
14    Q.  How -- approximately how many times did
15  it shake?
16    A.  It just shook.  I wasn't counting.
17    Q.  Did you have any conversation with
18  Officer Moore when you first heard the horn
19  sounding?  Did you say anything to him and did
20  he say anything to you?
21    A.  Officer Moore stated let's check the
22  car out.
23    Q.  Was this when you were still inside the
24  Dunkin' Donuts?

                                                      32

                                        8  (Pages 29 to 32)

1   A.  As we were walking to our vehicle.
2   Q.  So this was after the car had gone past
3 you?
4   A.  Yes.
5   Q.  Did you say anything in response to
6 Officer Moore when he said let's check out the
7 vehicle?
8   A.  No.
9   Q.  So what did you proceed to do after you
10 saw the car hit the curb?
11   A.  Well, at that time, I was inside
12 sitting down in the passenger side and I just —
13 I just kept staring at the car the whole time
14 when Officer Moore pulled up.
15   Q.  Okay.  Where — were you inside the car
16 when you saw the car with the horn actually hit
17 the curb?
18   A.  I was getting into the car.
19   Q.  So you were in the process of getting
20 into your car?
21   A.  Correct.  Looking at the car.
22   Q.  Now, can you describe the vehicle that
23 you saw that the horn was going off in?
24   A.  It was a silver Chrysler, four-door.

33

1   Q.  Did you say anything in response?
2   A.  I said okay.
3   Q.  And what did you understand him to mean
4 by that statement?
5   A.  To what?
6   MR. PUISZIS:  Objection, calls for a
7 characterization.
8 BY MR. KSIAZEK:
9   Q.  Well, what is your understanding of
10 that statement?
11   A.  Say it again.
12   Q.  What did you understand that statement
13 to mean, by he said let's make sure everything
14 was all right?
15   A.  To check the safety concerns of that
16 vehicle.
17   Q.  Did you — at that point when you got
18 into the car and the horn was going off, did you
19 think that the vehicle was stolen?
20   A.  Possible.
21   Q.  And why did you think that?
22   A.  Because the horn was going off.
23   Q.  What about the horn going off made you
24 think that the vehicle might be stolen?

35

1   Q.  Do you know what year it was?
2   A.  No.
3   Q.  Did you turn on your lights once you
4 got inside the vehicle?
5   A.  I don't recall.  I wasn't driving.
6   Q.  Okay.  Do you recall if Officer Moore
7 turned on the lights once you got in the
8 vehicle?
9   A.  No, I don't recall.
10   Q.  So are you unsure whether or not the
11 lights were on?
12   MR. PUISZIS:  He said he didn't know.  He
13 doesn't remember.  So, I mean, I don't know how
14 he can say anything more if he doesn't remember.
15 Objection, sorry.
16 BY MR. KSIAZEK:
17   Q.  Approximately how long did it take for
18 you -- yourself and Officer Moore to travel to
19 the -- where the vehicle had curbed itself?
20   A.  A couple minutes.
21   Q.  Did you have any conversations with
22 Officer Moore once you were inside the vehicle?
23   A.  He just said let's make sure
24 everything's all right with this car.

34

1   A.  Because most older cars, the alarm
2 system is a horn.
3   Q.  Did this car appear to you to be a
4 newer car or an older car?
5   A.  It looked older.
6   Q.  And did you have any other reason to
7 believe that this vehicle was stolen besides the
8 fact that the horn was going off?
9   A.  No.
10   Q.  Did you tell Officer Moore that you
11 believed that this vehicle might be stolen while
12 you were inside your car?
13   A.  No.
14   Q.  Did you tell dispatch that you thought
15 you might be in pursuit of a stolen car?
16   A.  No.
17   MR. PUISZIS:  Objection, the car was already
18 stopped.
19   MS. GIBBONS:  Join in that objection.
20 BY MR. KSIAZEK:
21   Q.  Did you call — did you tell officer —
22 did you tell dispatch that you were stopping to
23 investigate a possible stolen car?
24   A.  No.

36

9 (Pages 33 to 36)

1    Q.  So did you have any information about
2  the vehicle when you -- yourself and
3  Officer Moore stopped except for the -- about
4  the Chrysler that you spoke of besides the fact
5  that the horn was going off, any other
6  information about the vehicle?
7    MR. PUISZIS:  At what point?
8    MR. KSIAZEK:  When they first stopped their
9  car next to the --
10    MR. PUISZIS:  Oh, when the officer stopped.
11    MR. KSIAZEK:  When the officer stopped --
12  right, I'm sorry.
13    THE WITNESS:  Repeat that.
14  BY MR. KSIAZEK:
15    Q.  Sure.  Did you have any information
16  about the Chrysler when yourself and Officer
17  Moore stopped your vehicle next to the Chrysler?
18    A.  No.
19    Q.  So the only thing you knew about the
20  Chrysler was that the horn was going off?
21    A.  Correct.
22    Q.  Okay.  Did you notice -- what did you
23  notice as you were driving towards the Chrysler,
24  if anything?

37

1    THE WITNESS:  I mean, quite a few.  There's a
2  bank.  There's a Boston Market.  There's quite a
3  few, but nothing open at that time.
4  BY MR. KSIAZEK:
5    Q.  Well, you said there was a bank, right?
6    A.  Correct.
7    Q.  And according to your knowledge, you
8  could possibly access the ATMs at 2 o'clock in
9  the morning?
10    A.  Yes, they're 24 hours.
11    Q.  And you said the Dunkin' Donuts was
12  open 24/7, right?
13    A.  Correct.
14    Q.  You said these two people walked away
15  from your eyesight?
16    A.  Correct.
17    Q.  Did they ever run or jog?
18    A.  No.
19    Q.  Was there anything suspicious about the
20  fact that they walked away from the car?
21    A.  Yes, with the horn going -- when the
22  car curbed so quick at 2:30 in the morning, you
23  know, two gentlemen exited the vehicle right
24  away, we thought there might be a problem.

39

1    A.  I noticed when it hit the curb, two
2  people got out quickly and walked away from my
3  eyesight.
4    Q.  And where were these two people --
5  where did these two people exit from in the car,
6  was it the driver's side or the passenger's
7  side?
8    A.  One was the driver, the other one was
9  the passenger rear.
10    Q.  And approximately -- you said they
11  walked out of your eyesight.  Approximately how
12  far from you did they walk?
13    A.  To the corner.
14    Q.  Do you know if there's any businesses
15  or stores on that corner where they walked
16  towards?
17    A.  There's a lot of businesses and stores.
18    Q.  What businesses and stores are on
19  53rd Street along this area that we're talking
20  about right now?
21    MR. PUISZIS:  You mean that are open at 2:30
22  in the morning?
23    MR. KSIAZEK:  I'm just talking about in
24  general.

38

1    Q.  And did you ever try to go after this
2  driver and passenger of the car?
3    A.  No.
4    Q.  Why not?
5    A.  Because we grabbed the other guy who
6  exited the vehicle out at the same -- later.
7  That's who we stopped, was Mr. Boyle.
8    Q.  Okay.  Where were you when you saw the
9  driver and passenger get out of the car?
10    A.  I was in the passenger seat of the
11  squad car.
12    Q.  Okay.  How far away were you from the
13  Chrysler?
14    A.  Ten feet.
15    Q.  So were you still approaching the
16  Chrysler or were you stopped?
17    A.  Approaching it.
18    Q.  So you were about ten feet from the
19  Chrysler and you had not stopped yet?
20    A.  Correct.
21    Q.  Was the street lighted at 2:30 in the
22  morning?
23    A.  Yes, there's streetlights.
24    Q.  Did you say anything to Officer Moore,

40

10  (Pages 37 to 40)

1 did Officer Moore say anything to you when you
2 observed these individuals -- the two
3 individuals exit the car from the driver and
4 passenger side?
5    A. No.
6    Q. Did you radio to dispatch for backup
7 once you saw these two individuals leave their
8 car?
9    A. No.
10   Q. Why not?
11   A. First we were trying to find out what
12 the problem was.
13   Q. So did you feel that the problem, the
14 horn going off, was more important than these
15 two individuals walking away from the car?
16   A. No. There was two other individuals
17 still there.
18   Q. So at some point, did you actually --
19 did Officer Moore actually stop the car --
20   A. Yes.
21   Q. -- next to the Chrysler?
22   A. Yes.
23   Q. Where in relation to the Chrysler did
24 Officer Moore park your patrol car?

41

1    A. I don't recall the exact spot.
2    Q. Was it behind the Chrysler?
3    A. I don't remember.
4    Q. Let me ask it this way: When you
5 left -- when you exited the vehicle, in what
6 direction did you have to travel to approach the
7 Chrysler?
8    A. When I stepped out, my door was right
9 there by the car, so we were just a matter of
10 feet away.
11   Q. So if I understand this correctly, when
12 you opened your door and you stepped out, was
13 the Chrysler to your right?
14   A. Yes.
15   Q. And approximately how many feet was in
16 between yourself -- or, I'm sorry, your patrol
17 car and the Chrysler?
18   A. Ten feet.
19   Q. Was that from your passenger side door
20 to the driver's side door of the Chrysler?
21   A. I don't recall if -- you're saying that
22 if my door was next to the driver's door?
23   Q. Right. So you said you don't recall
24 whether you parked alongside the Chrysler or if

42

1 you're parked behind, right?
2    A. Correct.
3    Q. Okay. But you did say that when you
4 opened your door, it was about ten feet from --
5 to walk to the Chrysler, right?
6    A. Correct.
7    Q. And so -- and you said you -- did you
8 say which direction you walked towards to get
9 towards the Chrysler?
10   A. Just walked right -- straight to the
11 Chrysler.
12   Q. Straight. So if 53rd Street is an
13 east/west street, do you know if you walked
14 north or south?
15   A. I don't remember. The whole time I was
16 watching the people in the car and the car. I
17 just jumped out of the car. I can't recall
18 exactly where our car was positioned.
19   Q. So if you were watching the people in
20 the car, does that mean that you were able to
21 look out your passenger side window and you
22 could see the people and the car when you looked
23 to your right outside your passenger side
24 window?

43

1    A. When I first seen the people, I was
2 looking at them through the --
3    Q. Through the front?
4    A. -- through the front windshield,
5 correct, because we were still in motion.
6    Q. Okay. Was there a point when you were
7 able to look to the right and see the people?
8    A. No, but --
9    Q. You were always looking -- I'm sorry, I
10 didn't mean to interrupt.
11   A. No. They were -- like I said, I was
12 watching them when they exited the vehicle. At
13 the time, we were still in motion and I was
14 watching them through the windshield.
15   Q. Were you always watching the people
16 through the windshield or did you ever look to
17 your right and see the people through the -- to
18 the right window there?
19   A. I don't recall. I don't.
20   Q. You said you were observing the people
21 in the car, though, right?
22   A. Yes.
23   Q. So what did you see -- once your
24 vehicle was stopped, what did you see the people

44

11 (Pages 41 to 44)

1 in the car do?
2    A.  What did I see the people in the car
3 do?  They exited the vehicle.  You're talking
4 about the driver and the --
5    Q.  Well, I'm actually speaking about -- so
6 you saw the driver and the passenger exit the
7 vehicle?
8    A.  Correct.
9    Q.  How many other people -- were there any
10 other people in the car?
11    A.  Yes.
12    Q.  How many other people were in the car?
13    A.  Two.
14    Q.  And can you describe these individuals
15 that were in the car?
16    A.  One was a female in the front seat,
17 passenger front.
18    Q.  Okay.
19    A.  And then Mr. Boyle had exited the
20 vehicle as we stopped and got out of the car.
21    Q.  So right as you stopped, right as you
22 stopped your vehicle, was that when Mr. Boyle
23 got out of his car?
24    A.  He was already getting out of his car.

45

1 Everybody was exiting the car.  Two people
2 exited, they walked, Boyle exited a couple
3 seconds later after those other two.
4    Q.  And when Boyle exited, you had not
5 stopped your car yet, though?
6    A.  No.
7    Q.  Where did Mr. Boyle go?
8    A.  To the front of the car and opened the
9 hood.
10    Q.  Were you stopped when you saw Mr. Boyle
11 go to the front of the car?
12    A.  Yes, we stopped.
13    Q.  Okay.  When you were stopped -- right
14 at the point where you were stopped, where was
15 Mr. Boyle?
16    A.  At the front of the car.
17    Q.  And so you were -- were you still in
18 the car when he opened up the hood?
19    A.  Yes.  I was exiting the vehicle at the
20 time he was opening up the hood.
21    Q.  Did Mr. Boyle walk or run when he
22 walked -- went to the hood of the car?
23    A.  Walked.
24    Q.  And when did you actually get out of

46

1 your car?  When you saw -- what did you do after
2 you got out of your car?
3    A.  I approached Mr. Boyle.
4    Q.  What did Officer Moore do at that
5 point?
6    A.  He exited the vehicle.  We both
7 approached Boyle.
8    Q.  As you approached Mr. Boyle, what was
9 he doing at that point?
10    A.  He was looking under the hood.
11    Q.  Was his back to you as you approached
12 him?
13    A.  Yes.
14    Q.  And was he bent over, like, inside the
15 hood there?
16    A.  Yes.
17    Q.  How far away were you from Mr. Boyle
18 when you -- at that point?
19    MR. PUISZIS:  At what point?  Objection.
20 BY MR. KSIAZEK:
21    Q.  Okay.  When -- did you have a
22 conversation with Mr. Boyle?
23    A.  I asked him a question.
24    Q.  Okay.  How far away from Mr. Boyle were

47

1 you when you asked him this question?
2    A.  Maybe a foot.
3    Q.  Were you directly behind him when
4 you -- about a foot behind him at that point?
5    A.  Yes, I was right behind him.
6    Q.  What did you ask Mr. Boyle?
7    A.  I said, whose car is this?
8    Q.  And what did he say?
9    A.  Why?
10    Q.  What did you say in response?
11    A.  I said, do you have any identification
12 on you?
13    Q.  And what was his response to your
14 question?
15    A.  He didn't respond.
16    Q.  Was -- when you were having this
17 conversation with Mr. Boyle, was he continuing
18 to be -- was he still underneath the hood?
19    A.  No.  He turned around and faced us.
20    Q.  And when did he turn around to face
21 you?
22    A.  When I asked him the question.
23    Q.  Why did you ask him whose car it was?
24    A.  Because I wanted to know whose car it

48

12 (Pages 45 to 48)

1    was.

2        Q.   And why did you ask him for ID?

3        A.   Why?

4        Q.   Yes.

5        A.   Because normally everyone we stop on

6    the street, we usually try to get a piece of

7    identification for the person so you know who

8    you're talking to.

9        Q.   Did you identify yourself as an

10   officer?

11       A.   Did I identify myself?

12       Q.   As an officer, yes.

13       A.   No.  I had a uniform on.

14       Q.   You didn't say I'm Officer Torres,

15   though?

16       A.   No.

17       Q.   You said he didn't respond after you

18   asked him for ID, right?

19       A.   Correct.

20       Q.   So what happened after you asked him

21   for identification?

22       A.   Officer Moore then asked him to step

23   over by our car.

24       Q.   Did Officer Moore at any point identify

49

1    himself as an officer?

2        A.   No.

3        Q.   And you said you noticed that there was

4    a female passenger inside the car?

5        A.   Correct.

6        Q.   Did you hear -- did you have a

7    conversation with her -- or, actually, did you

8    hear her say anything while you were having this

9    conversation with Mr. Boyle?

10       A.   No.

11       Q.   Do you recall if the windows on the car

12   were open or closed?

13       A.   Closed.

14       Q.   Were all the windows closed, all four?

15       A.   As far as I could see, yes.

16       Q.   And were there any cars parked ahead or

17   in front of where this Chrysler was parked?

18       A.   No.

19       Q.   So this Chrysler was the only car

20   parked on that side of the street as far as you

21   could tell?

22       A.   Yes.

23       Q.   Okay.  Now, once Officer Moore asked

24   Mr. Boyle to step over by the car, what happened

50

1    after that?

2        A.   Well, in the process of asking, he

3    said, sir, could you step over by the car and he

4    went to guide his arm towards our car and that's

5    when Mr. Boyle became aggressive and he pulled

6    away and pushed Officer Moore's arm away.

7        Q.   Did Mr. Boyle say anything in response

8    to Officer Moore's question to step over by the

9    car -- or direction to step over by the car?

10       A.   Did he say anything?

11       Q.   Yeah, did Mr. Boyle say anything in

12   response?

13       A.   No.

14       Q.   And you said that Officer Moore guided

15   Mr. Boyle's arm over to the car.  Can you

16   describe how he did this?

17       A.   Describe it?  He, with his hand, like,

18   pushing away towards the car to guide him

19   towards the car.

20       Q.   Did he grab his arm?

21       A.   No.

22       Q.   Did he touch officer -- I'm sorry, did

23   he touch Mr. Boyle?

24       A.   His arm.

51

1        Q.   Which part of his arm?

2        A.   It's, like, by his elbow.

3        Q.   So he sort of touched his elbow to sort

4    of guide him over to the car; is that what your

5    testimony is?

6        A.   Yes.

7        Q.   Did he push him over to the car?

8        A.   No.

9        Q.   Did he sort of -- how far -- let me go

10   back.

11            How far did Officer Moore guide

12   Mr. Boyle before he became aggressive?

13            MS. GIBBONS:  Objection, vague.

14            MR. PUISZIS:  You can go ahead and answer it.

15   I mean, did he take a step or something?

16            MR. KSIAZEK:  Sure.

17            MR. PUISZIS:  Did he take two or three steps

18   or take any steps?

19            THE WITNESS:  He didn't take no steps.  He

20   just --

21   BY MR. KSIAZEK:

22       Q.   So Officer Moore attempted to push --

23   to place his hand on Mr. Boyle's elbow?

24       A.   Yes.

52

13 (Pages 49 to 52)

1   Q.  And Mr. Boyle didn't move at all?
2   A.  No.  When Officer Moore guided him over
3   to the car, that's when he pushed away from
4   Officer Moore.
5   Q.  Well, how did Officer Moore get him
6   over to the car?
7   A.  We didn't.
8   Q.  Well, you just said that when --
9   A.  He was guiding him to the car to say
10  let's go this way to the car -- by our squad
11  car.
12  Q.  Okay.  So --
13  A.  Because he was in front of his car.
14  Q.  Sure.
15  A.  So we wanted to bring him over by our
16  car.
17  Q.  So did Mr. Boyle walk over to your car
18  by his own volition?
19  A.  No.  He never walked to our car.
20  Q.  So he never was by your car?
21  A.  No.
22  Q.  Okay.  So where -- where in relation to
23  your car and the Chrysler that was there did
24  Mr. Boyle start becoming aggressive?

53

1   A.  In front of his car.
2   Q.  Did he become aggressive immediately
3   after Officer Moore attempted to guide his arm
4   or had some time passed in between?
5   A.  What do you mean by "time passed"?
6   Q.  Was there a few seconds when
7   Officer Moore attempted to guide him by his
8   elbow and then he became aggressive or did he
9   immediately become aggressive as soon as
10  Officer Moore touched his elbow?
11  A.  Maybe a couple seconds, just like --
12  Q.  What do you mean by Mr. Boyle became
13  aggressive?
14  A.  He pushed Officer Moore's arm away.
15  Q.  And how did he -- how did he push his
16  arm away?
17  A.  In a swinging motion, pushed it away.
18  Q.  What happened after Mr. Boyle pushed
19  Officer Moore's arm away?
20  A.  I then grabbed Boyle's arm and told him
21  to relax.
22  Q.  Which arm did you grab of Mr. Boyle's?
23  A.  His right arm.
24  Q.  Was that the same arm that

54

1   Officer Moore was attempting to guide?
2   A.  No.
3   Q.  So Officer Moore's attempting to guide
4   his left arm?
5   A.  Correct.
6   Q.  And you grabbed his right arm?
7   A.  Correct.
8   Q.  And where were you located in
9   relation -- so were you on Mr. Boyle's right
10  side at that point?
11  A.  Directly behind him.
12  Q.  You were directly behind him.  And
13  where was Officer Moore located?
14  A.  In front of him.
15  Q.  So what happened after you grabbed his
16  arm and told him to relax?
17  A.  Then he became very aggressive and just
18  started basically wrestling with us.
19  Q.  Did Mr. Boyle say anything to you after
20  you told him to relax?
21  A.  No.
22  Q.  Okay.  Describe how Mr. Boyle started
23  to wrestle with you.
24  A.  As I grabbed his arm, he pulled away

55

1   from me, and then Officer Moore grabbed his
2   other arm and he kept pulling away from us and
3   then we repeatedly told him stop resisting, stop
4   resisting.  And then he -- as we were wrestling
5   with him, he grabbed me in a bear hug and he
6   grabbed me and he started running with me into
7   my squad car.
8   Q.  Okay.  Were you putting him under
9   arrest at this point?
10  A.  No.  We were just going to do a contact
11  card on him.  Any time we stop an individual,
12  you got to do a contact card.
13  Q.  So why didn't you tell him to stop
14  resisting?
15  A.  Because at the time, we were trying to
16  detain him so we could -- further questions.
17  Q.  Why were you trying to detain him for
18  further questions?
19  A.  Because he wasn't cooperating.
20  Q.  At that point, you just had asked him
21  for his ID, though, right?
22  A.  Correct, but then when we pushed away
23  from Officer Moore, he committed battery to an
24  officer.

56

14  (Pages 53 to 56)

1    Q.  But Officer Moore had touched him
2 first, right?
3    A.  Touched his arm, correct.
4    Q.  So by wrestling, is it my understanding
5 that you basically mean that he was trying to
6 pull away from both yourself and Officer Moore?
7    A.  He did both that, plus grabbed me in a
8 bear hug.
9    Q.  How did he grab you in a bear hug?  Can
10 you describe that?
11    A.  Wrapped his arms around me and lifted
12 me up?
13    Q.  Did his arms go all the way around you?
14    A.  Yes.
15    Q.  And did they interlock?
16    A.  I don't know if they interlocked.
17    Q.  So he was behind you when he bear
18 hugged you?
19    A.  He was behind me?
20    Q.  Where was he located to you when he
21 bear hugged you?
22    A.  After I grabbed his arm, he pulled
23 away, he then turned towards me.
24    Q.  So he was facing you when he --

57

1    A.  No.
2    Q.  Go ahead.
3    A.  I was directly behind him, and then
4 when he pushed Moore away, I grabbed his right
5 arm.  He then turned at me, so he turned his
6 body around at me.
7    Q.  So he was facing you when he turned
8 around towards you, right?
9    A.  When are you talking about?
10    Q.  Right before he bear hugged you.
11    A.  Correct.
12    Q.  He turned and faced you, right?
13    A.  Correct.
14    Q.  So he was facing you, you could see his
15 eyes, --
16    A.  Correct.
17    Q.  -- when he gave you a bear hug?
18    A.  Correct.
19    Q.  And so he wrapped his arms around
20 you -- around your back?
21    A.  Correct.
22    Q.  Did he say anything as he was bear
23 hugging you?
24    A.  No.

58

1    Q.  You said he slammed you into the car?
2    A.  Correct.
3    Q.  What car did he slam you into?
4    A.  My patrol car.
5    Q.  Well, how did you get -- how did he
6 slam you into your patrol car if you were --
7 when you approached him, you were right next to
8 his car -- not his car, the Chrysler?
9    A.  Everything happened so fast.  We were
10 twisting and turning.  All I know is at the time
11 he grabbed me and he started running -- pushing
12 me, lifted me and I was going backwards, so I
13 don't know how -- which way -- how we spun
14 around, but he wound up pushing me into my
15 patrol car.
16    Q.  Do you know what direction that -- you
17 said he pulled you up and lifted you?
18    A.  Correct.
19    Q.  So do you know what direction he
20 actually --
21    A.  No.  I was --
22    Q.  How hard did he slam you against the
23 patrol car?
24    A.  Hard enough to knock the wind out of

59

1 me.
2    Q.  So what happened after he picked you up
3 and slammed you on the patrol car?
4    A.  Officer Moore began trying to get him
5 off me and then I got on the radio and called
6 for assistance.
7    Q.  So you actually called for assistance
8 to dispatch?
9    A.  Correct.
10    Q.  Did -- while -- after Mr. Boyle picked
11 you up and slammed you against the patrol car --
12    MR. PUISZIS:  I don't think he said
13 "against", but subject to the objection.
14    MR. KSIAZEK:  Sure.
15 BY MR. KSIAZEK:
16    Q.  After, let's just say, Mr. Boyle bear
17 hugged you, did he say anything to you at that
18 point?
19    A.  No.
20    Q.  And did you say anything to him?
21    A.  No.
22    Q.  Did Officer Moore say anything?
23    A.  I don't recall.
24    Q.  Did you hear the woman who was located

60

15 (Pages 57 to 60)

**Page 61**

1  in the vehicle say anything at this point?
2      A. I don't know. Everything happened so
3  fast.
4      Q. So what happened after you radio to
5  dispatch for help?
6      A. He then turned around and started
7  wrestling with Officer Moore again, and I was
8  trying to grab his legs so we could get him down
9  on the ground. And then next thing I know, the
10  other squads pulled up.
11      Q. Okay. Let's go through that a little
12  bit closer. So you -- he was wrestling with
13  Officer Moore?
14      A. Correct.
15      Q. Can you describe how he was wrestling
16  with Officer Moore?
17      A. He had his back towards me, so they
18  were -- I could just see them two. They were
19  face to face. And then I proceeded to go after
20  Boyle again from behind because now he had his
21  back towards me because he was face to face with
22  Officer Moore.
23      Q. So were they actually touching each
24  other?

**Page 62**

1      A. They were being physical, correct.
2      Q. What do you mean by "being physical"?
3      A. Well, they were wrestling. I couldn't
4  see exactly what was going on because he had his
5  back to me.
6      Q. Who's -- was that Officer Moore's or
7  Boyle's back?
8      A. Boyle.
9      Q. What did you see Officer Moore doing?
10      A. Trying to detain him. They were both
11  wrestling back and forth.
12      Q. I guess I don't quite understand what
13  you mean by "wrestling". Were they sort of
14  grabbing each other? Were their hands touching?
15  What do you mean?
16      A. Making contact with each other.
17      Q. What parts of their bodies were making
18  contact with each other?
19      A. Their hands and arms.
20      Q. Where was Mr. Boyle's hands and arms
21  coming in contact with Officer Moore?
22      A. Exactly, I don't know. They were --
23  all I could see is Boyle's hands from the rear.
24  I couldn't tell you exactly where he was

**Page 63**

1  touching Moore.
2      Q. Okay. And where were Officer Moore's
3  hands and arms coming into contact with
4  Mr. Boyle?
5      A. On his hands and arms, too.
6      Q. So were they kind of sort of -- so were
7  both of their hands on their shoulders or where
8  were they -- do you know where they were
9  located?
10      A. No.
11      Q. But at some point, you tried to get his
12  legs, Mr. Boyle's legs?
13      A. Correct.
14      Q. When did you attempt to get Mr. Boyle's
15  legs together?
16      A. After he threw me against the car, then
17  he proceeded to go, you know, after Moore and
18  then that's when he had -- Boyle had his back to
19  me and I -- from behind, I radioed in for
20  assistance and then I went and I tried to grab
21  his legs so we could get him down on the ground.
22      Q. All right. You said you had the wind
23  knocked out of you.
24      A. Correct. This was a couple seconds,

**Page 64**

1  though, in between here.
2      Q. So how long did you have the wind
3  knocked out of you for?
4      A. Seconds.
5      Q. So for a couple seconds, you had the
6  wind knocked out of you, you got up, you radioed
7  for help?
8      A. Correct.
9      Q. And then you tried to get Mr. Boyle's
10  legs together?
11      A. Correct.
12      Q. What happened when you tried to get his
13  legs together?
14      A. And then the other assisting officers
15  came and then I just -- I kind of -- they took
16  over then, the assisting officers.
17      Q. So where -- what exactly was happening
18  when the assisting officers came? Had you tried
19  to get Mr. Boyle's legs together at that point
20  or no?
21      A. I tried, and then when the other units
22  came, I let him go because I was out of wind,
23  and, like I said, they took over from there.
24      Q. Okay. So they arrived after you tried

16 (Pages 61 to 64)

1  to get his legs together?
2      A.  Correct.
3      Q.  Was it immediately after or did some
4  time pass in between?
5      A.  As soon as I grabbed his legs, they
6  pulled up, they grabbed him, so I would say
7  immediately then I guess.
8      Q.  At any point was Mr. Boyle on the
9  ground during -- from when you first approached
10  him by the hood and when you tried to get his
11  legs together?
12     A.  No.
13     Q.  Okay.  What happened when the other
14  officers arrived after you had tried to get his
15  legs together?
16     A.  I basically -- I stayed right where I
17  was at.  I was out of wind.  And the other
18  officers, the assisting officers, took care of
19  the situation.  From thereon, I didn't -- I was
20  winded.  I just kind of leaned over and was
21  gasping.
22     Q.  What do you mean -- or what did you see
23  the other officers do once they arrived at the
24  scene?

65

1      A.  They tried to place him in custody and
2  he was still wrestling with them.
3      Q.  Do you recall who exactly -- or how
4  many squad cars arrived at the scene?
5      A.  Several.
6      Q.  Do you know any of the officers that
7  did arrive that night?
8      A.  Yes.
9      Q.  Who do you know that arrived that
10  night?
11     A.  Officer Galarza, Officer Gillespie,
12  Officer Mike Kwiatkowski.
13     Q.  Kwiatkowski?
14     A.  Kwiatkowski.  A bunch of us and other
15  units, but those are the main officers that
16  actually finally got him down and handcuffed
17  him.
18     Q.  Were those -- those three officers that
19  you stated, Galarza, Gillespie and Kwiatkowski,
20  were those -- did those three officers arrive,
21  as you stated, right after you tried to get his
22  legs together?  Were those officers all there?
23     A.  I don't know what order they arrived,
24  but all I know is they were all there.

66

1      Q.  Okay.  And then you did say that
2  Mr. Boyle was still wrestling with these other
3  officers once they arrived.  Can you describe
4  how he was wrestling with them?
5      A.  They were trying to get him down on the
6  ground and handcuff him and he was fighting with
7  them.
8      Q.  How were they trying to get him to get
9  down on the ground?
10     A.  I was at the time -- like I said, I was
11  leaning over, so I don't -- I can't recall
12  exactly what they were doing -- how they were
13  doing it because I was then leaning over because
14  I was -- I was gasping for air.  I was
15  short-winded.
16     Q.  Well, where were you leaning over?
17     A.  Just leaning over.
18     Q.  Against your car?
19     A.  No.
20     Q.  Just on the side of the road there?
21     A.  On the street.
22     Q.  How long were you leaning over for?
23     A.  Seconds.
24     Q.  So you did see them wrestle with

67

1  Mr. Boyle, right?
2      A.  Yes.
3      Q.  And you saw them attempt -- the other
4  officers attempt to place him under arrest?
5      A.  Correct.
6      Q.  And what did you see?
7      A.  They were just -- they were telling him
8  stop resisting, to put his hands behind his back
9  and he wouldn't do that.  They were trying to
10  grab his arms and place handcuffs on him.
11     Q.  Did he say anything in response to --
12  well, first of all, do you know who told him to
13  stop resisting?
14     A.  I heard several officers saying that.
15     Q.  Specifically do you know which ones
16  said that?
17     A.  No, I couldn't tell you.
18     Q.  And did Mr. Boyle say anything in
19  response when they told him to stop resisting?
20     A.  No.
21     Q.  Okay.  Was Mr. Boyle still standing
22  when -- or was he standing when they told him to
23  stop resisting?
24     A.  At that time, they had just gotten down

68

17  (Pages 65 to 68)

1  on the ground.
2     Q.  Okay.  How did they get him down on the
3  ground?
4     A.  I don't know.
5     Q.  And how was Mr. Boyle on the ground?
6  Was he laying down?  Was he face first?  What
7  position was his body in?
8     A.  When I seen him on the ground, he was
9  facedown on the ground.
10     Q.  Was he doing anything while he was
11  facedown on the ground?
12     A.  Yeah, he was stretching his arms and
13  legs out and swinging.
14     Q.  He was actually swinging while he was
15  down on the ground?
16     A.  Because they were trying to get his
17  hands behind his back and he wouldn't let them.
18     Q.  Okay.  Did you see how Mr. Boyle was
19  brought down to the ground?
20     A.  No.
21     Q.  Okay.  What happened after the other
22  officers were attempting to place him under
23  arrest?  Did they get him under arrest?  Did
24  they get him in cuffs?

69

1     A.  Yes.  Correct.
2     Q.  Did you see them place him in
3  handcuffs?
4     A.  No.
5     Q.  Why didn't you see them place him in
6  handcuffs?
7     A.  Because there were several officers
8  there, and I don't know who placed him in
9  handcuffs, but I was standing right there.  I
10  just couldn't tell you who exactly placed -- are
11  you asking me who put the handcuffs on?
12     Q.  I'm just asking you if you actually did
13  see them, whoever it was, place handcuffs on
14  him?
15     A.  I didn't see exactly, no.  I seen them
16  trying to put the handcuffs, but I didn't know
17  who put the handcuffs on.
18     Q.  So what did they do -- well, how many
19  officers were trying to get the handcuffs on
20  him?
21     A.  Three that I can recall, but there were
22  so many officers around, but I don't remember.
23  Three at the time.
24     Q.  Do you know what Officer Moore was

70

1  doing when they were trying to get the handcuffs
2  on him?
3     A.  No, I don't remember.  I don't know
4  what he was doing.
5     Q.  Did you see him in that area?
6     A.  I don't recall.
7     Q.  Once they did have him in the
8  handcuffs, what did you see the other officers
9  do?
10     A.  After they handcuffed him?
11     Q.  Right.
12     A.  They placed him in the squad car,
13  transported him to the 21st District.
14     Q.  Okay.  Did they have to pull him up or
15  did he stand up voluntarily?
16     A.  I don't recall.  I don't know.
17     Q.  And where on the street was Mr. Boyle
18  actually on the ground in relation to his car --
19  or not his car, excuse me, the Chrysler?
20     A.  I can't recall exactly where he was,
21  because he was just on the street.  Everything
22  happened so fast.
23     Q.  Do you know in relation to your squad
24  car where Mr. Boyle was?

71

1     A.  I can't recall.
2     Q.  Was it in between -- in the distance in
3  between your car and the Chrysler that was on
4  the street there?
5     A.  I don't recall.  There were so many
6  people.
7     Q.  Do you know if it was on the sidewalk?
8     A.  It was definitely on the street.
9     Q.  It was on the street.
10     Now, at some point, did Chicago Police
11  officers arrive?
12     A.  Correct.
13     Q.  And when did they arrive?
14     A.  I couldn't tell you exactly when, but
15  they arrived.
16     Q.  Do you recall having any conversations
17  with them?
18     A.  The Chicago Police?
19     Q.  Yes.
20     A.  At what time?
21     Q.  Well, you said you don't remember when
22  they arrived, but at some point they did arrive?
23     A.  Correct.
24     Q.  And they came to the scene of the

72

18 (Pages 69 to 72)

1 incident here, right?
2     A.  Correct.
3     Q.  Was this before or after Mr. Boyle was
4 placed in handcuffs?
5     A.  I don't recall.  I would imagine when
6 they were trying to place him in handcuffs.
7     Q.  So you think they arrived when he was
8 trying to be -- when he was being put in
9 handcuffs?
10    A.  Correct.
11    MR. PUISZIS:  When do you first recall seeing
12 officers from Chicago there?
13    THE WITNESS:  Well, there was officers from
14 what they call a 10-1.  There were officers from
15 all over.  They just came so quick.
16    MR. PUISZIS:  But when do you recall Chicago
17 officers as opposed to the University of Chicago
18 officers?
19    THE WITNESS:  When -- after I leaned up and I
20 was gasping for air, I was leaning over, when I
21 leaned up, I seen Chicago and ourselves.
22    MR. PUISZIS:  And this was before or after he
23 was put in cuffs?
24    THE WITNESS:  Before.

                                                    73

1 BY MR. KSIAZEK:
2     Q.  What were the Chicago Police officers
3 doing when you saw them?
4     A.  What were they doing?
5     Q.  Yeah.
6     A.  You know what, I don't recall because
7 everything -- like I said, I was bent down and I
8 put my head up and they were already on the
9 ground.
10    Q.  The Chicago Police officers were on the
11 ground?
12    A.  No.  No.  The Officers Galarza,
13 Kwiatkowski and Gillespie.
14    Q.  Okay.  Where were the Chicago Police
15 officers when you first saw them?
16    A.  They were standing around.
17    Q.  How far away from you were they?
18    A.  There were several of them.  How far?
19 I mean, a matter of feet away from me.
20    Q.  Okay.  After you had caught your breath
21 or, you know, were done leaning over, did you
22 have a conversation with the Chicago Police
23 officers at the scene?
24    A.  Did I?

                                                    74

1     Q.  Yes.
2     A.  No.
3     Q.  Did you -- I'm sorry, go ahead.
4     A.  I mean, when exactly are you talking
5 about?  Because what happened was once they
6 placed him in custody, you know, I did an
7 initial report.  I just told them I'd meet them
8 at the 21st District, the transporting car.
9     Q.  So that's all you said -- was that all
10 you said to the Chicago Police officers, I'll
11 meet you at the 21st District?
12    A.  Correct.
13    Q.  Did you tell them any details about
14 what happened?
15    A.  They asked what happened --
16 Officer Darling asked me what had happened, and
17 I told him that we were trying to get some
18 information from him and he resisted from us.
19    Q.  So officer -- did Officer Darling
20 approach you and ask you what happened?
21    A.  No.  He was -- they were standing by
22 their car.
23    Q.  Okay.  So how did this conversation
24 start?

                                                    75

1     A.  I walked over to them.  I'm trying to
2 get all my thoughts together.
3     Q.  Sure.  So after you caught your
4 breath -- was this before or after you caught
5 your breath?
6     A.  After.
7     Q.  Okay.  So after you caught your breath,
8 you walked over to Officer Darling?
9     A.  After they placed him in custody and
10 they put him -- and then I walked over there,
11 yeah.
12    Q.  So they placed him in custody.  Was he
13 in the squad car at that point?
14    A.  No.
15    Q.  So he was standing -- Mr. Boyle was
16 standing outside the squad car?
17    A.  Correct.
18    Q.  And while Mr. Boyle was standing
19 outside the squad car, you walked over to
20 Officer Darling?
21    A.  Correct.
22    Q.  And you told Officer Darling what
23 happened?
24    A.  Correct.

                                                    76

19 (Pages 73 to 76)

1    Q.   Okay.  Do you remember specifically
2  what you said to him besides what you had
3  already stated?
4    A.   No, not specifically.
5    Q.   Did he say anything in response to you?
6    A.   I don't recall.
7    Q.   And then at that point, did you tell
8  him that you would meet them at the
9  21st District?
10    A.   Excuse me?
11    Q.   When did you tell the Chicago Police
12  officers that you'd meet them at the
13  21st District?
14    A.   When they placed him inside the
15  vehicle.
16    Q.   Okay.  Did they place him inside the
17  vehicle while you were having this conversation
18  with Officer Darling?
19    A.   Correct.
20    Q.   And what did you do after they placed
21  Mr. Boyle inside the vehicle?
22    A.   What did I do?  I went to the
23  21st District.
24    Q.   Did you -- before you went to the

77

1  21st District, did you interview any of the
2  witnesses at the scene?
3    A.   Other officers from the University of
4  Chicago were asking people questions of what
5  happened and getting stuff.  Myself, I walked
6  back to the car.
7    Q.   Do you remember which officers were
8  getting information from the witnesses?
9    A.   The same officers that were involved in
10  detaining him.
11    Q.   So Galarza, Gillespie and Kwiatkowski?
12    A.   Correct.
13    Q.   What did Officer Moore do if you can
14  recall?
15    A.   I can't recall.
16    Q.   But did he travel with you to the
17  21st District?
18    A.   Yes.
19    Q.   Do you recall if he was asking any
20  questions of the witnesses at the scene?
21    A.   I don't recall.
22    Q.   You didn't -- during your whole
23  interaction with Mr. Boyle, did you ever ask him
24  for his registration of the vehicle?

78

1    A.   No.
2    Q.   And at any point during this
3  altercation, did Mr. Boyle strike you besides
4  what you testified about with the bear hug?
5    A.   Did he strike me?
6    Q.   Yes.
7    A.   No.
8    Q.   Did -- do you recall Mr. Boyle saying
9  anything when he was being placed in the squad
10  car?
11    A.   No.
12    Q.   Do you recall any other conversations
13  or anything that Mr. Boyle might have said
14  during this whole altercation that we haven't
15  talked about before?
16    A.   I don't recall him saying anything at
17  that time.
18    Q.   Do you recall any other conversations
19  that you had with Officer Moore during this
20  whole altercation that we haven't talked about
21  previously?
22    A.   What do you mean by --
23    Q.   From the point when yourself and
24  Officer Moore first heard the horn honking to

79

1  when Mr. Boyle was placed into the squad car, do
2  you recall any conversations between yourself
3  and Officer Moore that you haven't previously
4  testified about?
5    A.   No.
6    Q.   Do you recall -- did you have any
7  conversations with Officer Gillespie once he
8  arrived at the scene?
9    A.   No.  Basically after -- no, I didn't.
10    Q.   Did you have any conversations with
11  Officer Galarza once he arrived at the scene?
12    A.   No.
13    Q.   And did you say anything to any of the
14  other officers who arrived at the scene?
15    A.   After the scene, I went and sat in the
16  car, and then the other officers were getting
17  all the information and I decided to meet them
18  back at the station.
19    Q.   You told them to meet you back at the
20  station?
21    A.   I'll meet them back at the station
22  because I was doing the report.  At our station,
23  though, not at the --
24    Q.   Did they say anything to you in

80

20  (Pages 77 to 80)

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

**Page 81**

1 response?
2     A. Not that I could recall, no.
3     Q. Do you recall them telling you anything
4 that they might have learned after talking to
5 the witnesses at the scene?
6     A. I don't remember.
7     Q. Okay. So how long did this whole
8 altercation take place from when you first heard
9 the horn honking when you were inside the
10 Dunkin' Donuts to when you -- Mr. Boyle was
11 sitting in the car in handcuffs?
12     A. I don't know. It happened real quick.
13 Approximate time I couldn't tell you. It's
14 just -- I couldn't tell you exact time. I don't
15 know how long.
16     Q. Do you know if it was longer than
17 ten minutes?
18     A. I don't know.
19     Q. Was it longer than a half an hour?
20     MR. PUISZIS: He just said he didn't know, so
21 I object to badgering the witness.
22 BY MR. KSIAZEK:
23     Q. How long of a drive is it from where
24 you're located on 53rd Street to the

**Page 82**

1 21st District, if you know?
2     A. A few minutes.
3     Q. And so yourself and Officer Moore --
4     A. Correct.
5     Q. -- both traveled to the 21st District?
6     A. Correct.
7     Q. How long were you sitting in the car --
8 you said you went and sat in the car while the
9 other officers were talking to the witnesses.
10 How long were you sitting in the car before you
11 went to go to the 21st District?
12     A. I couldn't recall exact time. I don't
13 know how long.
14     Q. Do you recall what witnesses these
15 other officers were speaking to?
16     A. The other people that were in the
17 vehicle.
18     Q. Did you say anything to Officer Moore
19 or did Officer Moore say anything to you while
20 you were driving to the 21st District?
21     A. I don't recall. I might have. I don't
22 recall exactly what I said.
23     Q. Now, were you injured besides losing --
24 getting the wind knocked out of you, were you

**Page 83**

1 injured as a result of this altercation?
2     A. No.
3     Q. Do you know if Officer Moore was
4 injured?
5     A. Yes. He mentioned his wrist was
6 hurting.
7     Q. Did he say anything about how his wrist
8 was injured?
9     A. From the altercation.
10     Q. When did you have this conversation
11 about Officer Moore being injured?
12     A. He stated that to me in the car when we
13 were going to the 21st District.
14     Q. Do you recall exactly what he said?
15     A. No, I don't.
16     Q. Did you see Officer Moore's wrist?
17     A. Did I look at it?
18     Q. Did you look at it?
19     A. Yeah.
20     Q. What did you see?
21     A. It just looked like it was puffy, like
22 a little swollen.
23     Q. What happened once you arrived at the
24 21st District station?

**Page 84**

1     A. What exactly do you mean?
2     Q. What, if anything, happened? Did you
3 talk with Mr. Boyle once you got there?
4     A. No.
5     Q. What did you do once you walked into
6 the 21st station?
7     A. Basically Officer Moore took over
8 the -- was talking with the officers -- the
9 Chicago Police officers -- and getting all their
10 stuff ready for the report, file the report.
11     Q. Was what did you hear Officer Moore say
12 to the CPD officers when they were getting ready
13 to do their report?
14     A. He was just telling them exactly what
15 happened.
16     Q. Do you recall what specifically he said
17 and what the officer said -- the Chicago Police
18 officer said in response?
19     A. No.
20     Q. Do you have sort of a general idea of
21 what he said?
22     A. They were in one room, I was in the
23 other room doing the -- started the report, so I
24 couldn't exactly hear exactly what was going on.

21 (Pages 81 to 84)

1    Q.  In what room were officer -- was
2  Officer Moore and these Chicago Police officers
3  in?
4    A.  The booking room.
5    Q.  And what room were you in?
6    A.  There's an adjoining -- there's an
7  adjacent room right next to that.  I was right
8  next to it.
9    Q.  Was anyone else in the room where you
10  were located?
11    A.  No.
12    Q.  And was anyone else in the booking room
13  where the Chicago Police officers and
14  Officer Moore was located?
15    A.  They had the two officers, Chicago
16  Police officers that were doing the booking, you
17  had Officer Moore in there and then you had
18  Boyle in there.
19    Q.  Okay.  So you -- well, what did you do
20  once you were in that separate room?  You said
21  you started writing the report?
22    A.  Yeah, we have our own reports we have
23  to write.
24    Q.  Did you have that paperwork handy with
85

1  you or where did you get that paperwork from?
2    A.  I keep it with me in my vest.
3    Q.  Did you have any conversations with
4  Mr. Boyle when you were in the 21st District?
5    A.  No.
6    Q.  Did you -- did Mr. Boyle say anything
7  to you while --
8    A.  No.
9    Q.  Did you have any conversations besides
10  what we've talked about with the Chicago Police
11  officers once you were at the 21st District?
12    A.  Could you repeat that.
13    Q.  Sure.  Did you talk to any of the
14  Chicago Police officers that had arrested
15  Mr. Boyle while you were at the 21st District?
16    A.  No.  Officer Moore was handling all
17  that.
18    Q.  So you had no interaction at all with
19  the Chicago Police officers?
20    A.  Not at that time, no.  I was sitting in
21  the other room.
22    Q.  And how long did you spend at the
23  21st District?
24    A.  We were quite a -- exactly, I don't
86

1  know, but we were there a long time.
2    Q.  Why were you there a long time?
3    A.  Officer Moore was doing the report.
4  There are several different reports that we do,
5  and I was doing some of it and then Moore was
6  doing the other half of it.
7    Q.  Okay.  So when you're filling out a
8  report, what do you mean by "several different
9  reports"?
10    A.  Well, there's a contact card or arrest
11  card, just different things that we need for our
12  reports, and a general report.
13    Q.  Are there any other documents or
14  paperwork that you have to fill out in an
15  incident such as this besides the contact card,
16  arrest card and general report?
17    A.  No.  That's basically it.
18    Q.  So you testified that that's basically
19  the reason why you were there for a long time?
20    A.  Correct, because we have to wait --
21  because Chicago does everything and we get it
22  from Chicago.
23    Q.  Okay.  So why do you do that?
24    A.  That's the procedure.
87

1    Q.  So do you look at the Chicago Police
2  officers' report when you're filling out your
3  own report?
4    A.  No.
5    Q.  Why does the Chicago Police Department
6  write their report first, though?
7    MS. GIBBONS:  Objection, foundation.
8  BY MR. KSIAZEK:
9    Q.  You can answer the question.
10    A.  What's that?
11    Q.  Why does the Chicago Police officers
12  get to write their report or do their paperwork
13  first?
14    A.  It's not basically who does first.
15  It's just that we need certain things off of
16  their report.
17    Q.  What information do you need?
18    A.  We need just officer's name, the badge
19  number and RD number.  Some officers don't pull
20  an RD number up right away.  Sometimes they wait
21  a little bit.  They write up something before
22  they pull an RD up.  It's based on -- each
23  officer's got different ways of reporting --
24  writing.
88

22  (Pages 85 to 88)

1    Q.  So after you finished writing the
2  report, did you leave the 21st District after
3  that?
4    A.  Yes.
5    Q.  Were any other Chicago -- I'm sorry,
6  University of Chicago Police officers at the
7  station besides yourself and Officer Moore?
8    A.  No.
9    Q.  And how many University of Chicago
10  Police officers was Officer Moore talking to to
11  help fill out the report?
12    MR. PUISZIS:  You said University of Chicago.
13  BY MR. KSIAZEK:
14    Q.  I'm sorry, Chicago Police Department
15  officers.
16    A.  Repeat that.
17    Q.  How many Chicago Police Department
18  officers was Officer Moore talking to?
19    MR. PUISZIS:  Objection.  If you know.  He
20  said he was in a different room.
21    MR. KSIAZEK:  Right.
22  BY MR. KSIAZEK:
23    Q.  If you know.
24    A.  No, I don't.

89

1    MR. KSIAZEK:  Mark this Exhibit 1.
2      (Whereupon, Torres Deposition
3      Exhibit No. 1 was marked for
4      identification.)
5  BY MR. KSIAZEK:
6    Q.  Okay.  I'm showing you what has been
7  marked for identification purposes as Exhibit 1,
8  and this has been provided by your counsel.  Has
9  the Bates stamps 0047, 0048 and 0049 at the
10  bottom of the page.  Do you see those stamps,
11  Officer?
12    A.  Yes.
13    Q.  And so this is a dispatch tape from
14  October 18, 2008.  Have you seen this transcript
15  before?
16    A.  No.
17    Q.  Okay.  So on this document, it says a
18  starting time of 2:37 hours, right?  Do you see
19  that at the top?
20    A.  Yes.
21    Q.  Is that approximately when this
22  incident took place from the best of your
23  memory?
24    A.  Yes.

90

1    Q.  Okay.  Now, under the first two
2  sentences here, dispatch, go ahead unit.  You
3  stated earlier that you had called dispatch,
4  right?
5    A.  When?
6    Q.  When you were calling for backup.
7    A.  Correct.
8    Q.  So if this is dispatch saying go ahead
9  unit, do you recall dispatch telling you to go
10  ahead?
11    A.  I don't remember.
12    Q.  You don't remember dispatch telling you
13  to go ahead on October 18, 2009 -- or 2008,
14  excuse me.
15    A.  No.
16    Q.  So it says unit on the next line.  Did
17  you tell dispatch, 1424 55th Street, hurry up?
18  Did you make that statement?
19    A.  As far as I can recall, yes, if it's
20  there.  I don't recall.
21    Q.  That sounds like something you might
22  have said?
23    A.  Correct.
24    Q.  And do you recall dispatch saying back

91

1  to you, any unit on the scene with him?  109.
2  Do you recall that statement being made to you?
3    A.  Yes.
4    Q.  Okay.  And 109, that is -- that was
5  your unit number?
6    A.  Correct.
7    Q.  So under where it says 109, it says
8  send me a car over here.  Did you make that
9  statement to dispatch?
10    A.  Yes.
11    Q.  Now, you didn't say you wanted a car
12  sent over there, right?
13    A.  No.  Just whatever it says.
14    Q.  And you didn't say there's -- the
15  suspect is being aggressive, right?
16    A.  At that time, no.
17    Q.  So you didn't say anything about a
18  stolen vehicle at that time?
19    A.  No.
20    Q.  Okay.  Dispatch asked you for the
21  address.  He said, I need the address, 109,
22  what's your location, right?
23    A.  Correct.
24    Q.  And you told him 53rd and Blackstone,

92

23  (Pages  89  to  92)

1  right?
2      A.   Correct.
3      Q.   And that's where this incident took
4  place, right?
5      A.   Correct.
6      Q.   Okay.  So dispatch said in response,
7  53rd and Blackstone, we got a 10-1.  What does
8  10-1 mean?
9      A.   Officer needs assistance, help.  It's
10  the code for police.
11      Q.   Is it just general assistance?
12      A.   No.  A 10-1 is like, you know, an
13  officer needs help.
14      Q.   And did you tell him that you needed
15  help?  I mean, you said send me a car over here,
16  right?
17      A.   Yes.  I was -- as I was making these
18  radio things, I was still in the process with
19  this guy.  So whenever I was yelling -- trying
20  to grab my radio and yell, that's what I was
21  doing.  It wasn't -- I wasn't just sitting
22  there.  I was still wrestling with the guy while
23  I'm trying to call.
24      Q.   Okay.  So if you look down where it

93

1      A.   Yes.
2      Q.   You recall hearing that.
3          Okay.  And then on the second page on
4  what's Bates stamped 0048, you see where it
5  says, 101, please run driver's license for me,
6  driver's license B, boy, 400-1448-7100?  You see
7  where it says that?
8      A.   Yes.
9      Q.   Do you know how they got that driver's
10  license?
11      A.   No, I don't.
12      Q.   Okay.  Who -- do you know who's driving
13  Car 101?
14      A.   No, I don't.
15      Q.   But you had never gotten Mr. Boyle's
16  driver's license, right?
17      A.   No.
18      Q.   And when dispatch -- a few lines down
19  dispatch said, you should be talking to a
20  Charles Boyle, 6733 South Chappell, he's clear,
21  squad.  Did you hear that from dispatch?
22      A.   No.
23      Q.   You didn't hear that?
24      A.   I don't recall that.

95

1  says dispatch, 101, what you got over there?
2  One, zero, one, what do you have?  Do you see
3  that -- where dispatch said that, right?  It's
4  in the middle of the page.  And then the next
5  sentence says unknown, we got one guy on the
6  ground, we got two officers, right?
7      A.   Yes.
8      Q.   So if you know, do you know if that was
9  referring to yourself and Officer Moore with
10  Mr. Boyle on the ground?
11      A.   I have no idea.
12      Q.   Okay.  And then where dispatch says,
13  53 and Blackstone, okay, units, do we have
14  everything under control at 53 and Blackstone.
15  And there's an unknown, it says, everybody take
16  a slow down.  Did you say everyone take a slow
17  down?
18      A.   No.
19      Q.   Do you know who said everyone take a
20  slow down?
21      A.   No.
22      Q.   Do you recall hearing over dispatch,
23  though, okay, units, slow it down at 53 and
24  Blackstone, slow it down?

94

1      Q.   Okay.  Up -- prior to that point, even
2  if you didn't hear that, did you know that the
3  person that you approached was Mr. -- or when
4  did you learn Mr. Boyle's name?
5      A.   I recall at the station, 21st District.
6      Q.   So you didn't know his name before you
7  got to the 21st District?
8      A.   No.
9      Q.   And where it says 105, 105, dash, while
10  we're at it, can you run a plate that this guy
11  was in.  Dispatch asks, what was it.
12  105 states, Illinois, X-ray 398206, correct?
13      A.   Correct.
14      Q.   You never called dispatch and asked
15  them to run the plates, right?
16      A.   Correct.
17      Q.   And even when you thought it was a
18  stolen vehicle when you first heard the horn
19  honking, you never radioed dispatch and asked
20  them to run the license plate number?
21      A.   No, we didn't.
22      Q.   And when you first approached the
23  vehicle, you didn't call dispatch and ask them
24  to run the license place number?

96

24 (Pages 93 to 96)

1    A. At that time, no.
2    Q. Why didn't you do that?
3    A. Because we never assumed it was stolen,
4 stolen. We wasn't sure if it was stolen or if
5 somebody was — needed help.
6    Q. You never assumed that it was stolen,
7 though?
8    A. Exactly.
9    MR. KSIAZEK: We'll mark this as Plaintiff's
10 Exhibit 2.
11       (Whereupon, Torres Deposition
12       Exhibit No. 2 was marked for
13       identification.)
14 BY MR. KSIAZEK:
15    Q. Do you recognize what I've marked as
16 Plaintiff's Exhibit 2? This is what has been
17 Bates stamped 0109UC through 0114.
18    A. Okay. Yes.
19    Q. Do you recognize this document?
20    A. This top one?
21    Q. Yes.
22    A. Yes.
23    Q. And this is the police report that you
24 wrote, right, these first two pages, 0109 and

97

1 report that you wrote at the 21st District?
2    A. Probably threw it out. I scratch --
3 for scratch.
4    Q. But you wrote it on a document that
5 looks just like this?
6    A. No, I didn't write this — I keep a pad
7 with me and I write information.
8    Q. Okay. But you didn't have this
9 actual report format in front of you at the
10 21st District?
11    A. At the 21st, yes.
12    Q. Okay. So you had this format at the
13 21st District?
14    A. Yes.
15    Q. Did you write out a report like this at
16 the 21st District?
17    A. Yes.
18    Q. And your testimony is that you threw
19 that out?
20    A. The original one I wrote?
21    Q. The original one that you wrote, yeah.
22 Is it your testimony that you threw the original
23 report that you wrote at the 21st District away
24 in the garbage?

99

1 0110?
2    A. Yes.
3    Q. Okay. You didn't write the last four
4 pages, 0111 through 0114?
5    A. No.
6    Q. Okay. So on the top, on suspicious —
7 or, I'm sorry, under classification, you wrote
8 suspicious person, slash, auto. Why did you
9 write that?
10    A. That's what my supervisor gave me at
11 the time.
12    Q. When did your supervisor give that to
13 you?
14    A. When I was in the station.
15    Q. Which station?
16    A. Our station.
17    Q. So did you write this report at
18 your station or did you write it at the
19 21st District?
20    A. I wrote one at 21st, but I rewrote it
21 at our station, because these are handwritten
22 and sometimes you just jot down stuff and
23 then — before you hand it in, it's got to be —
24    Q. Do you — what did you do with the

98

1    A. Yes. Well, I don't know if I threw it
2 away at the 21st District. I kept it with me
3 and bring it to my station.
4    Q. Okay. So you're saying that you threw
5 it away when you got at your station?
6    A. After I —
7    Q. Okay. So what did you do with that
8 first report that you got?
9    A. The one I originally started with,
10 yeah, I threw that away because this was my —
11 the report that I was handing in to my
12 supervisor.
13    Q. You threw that one away at your
14 station?
15    A. Correct.
16    Q. At the University of Chicago Station?
17    A. Correct.
18    Q. Where is the University of Chicago
19 Station — Police Station related — located in
20 relation to the 21st District? How far away is
21 it?
22    A. I don't know exactly how far. It's on
23 5555 Ellis. That was our old station.
24    Q. And that was in 2008?

100

25 (Pages 97 to 100)

1    A.   Correct.
2    Q.   That was your old station.
3         Do you know when exactly you threw that
4  old report away?
5    A.   That day when I did this one.
6    Q.   So you wrote -- so you wrote this new
7  report, right?
8    A.   Correct.
9    Q.   And then after you wrote this new
10 report, you threw the old report away?
11   A.   Correct.
12   Q.   Is it your common practice to write
13 two different reports?
14   A.   Sometimes I do that.  It doesn't bother
15 me to rewrite a report.
16   Q.   And you said you had notes.  You had a
17 notepad with you?
18   A.   Yes.
19   Q.   Did you keep any of those notes that
20 you wrote down?
21   A.   No.
22   Q.   What did you do with those notes?
23   A.   Probably threw it away with the other
24 report.  Because I'm not really a good writer or

101

1  speller, so I have to write stuff down in order
2  to put a report because some supervisors are
3  very picky in how you write a report.
4    Q.   Sure.  But you would agree with me that
5  any information that you write down after --
6  after an incident, that's relevant information,
7  right?
8    A.   Not all of it, no.
9    Q.   Why wouldn't it be relevant
10 information?
11   A.   Because sometimes I have a scratch
12 piece of paper that I wrote other stuff down on
13 from prior incidents or stuff that has nothing
14 to do with this one.
15   Q.   Sure.  But if you had information
16 about, let's say, this specific incident that
17 you wrote down, you would agree that that
18 information would be relevant to this report,
19 right?
20   A.   At that time, yes.
21   Q.   And it'd be relevant to the
22 investigation as a whole, right?
23   A.   Yes, I guess.
24   Q.   So why did you throw it away then?

102

1    A.   I can't answer that.  I don't know.  I
2  frequently do that.  I rewrite stuff.
3    Q.   You frequently throw away notes and
4  information you have about cases?
5    A.   On my scratch pad, yes, and stuff I
6  rewrite, yes.  Because like I said, sometimes
7  you classify one thing and then a supervisor
8  says, no, reclassify it, so you can't scratch it
9  out, so you have to rewrite it.  And that's --
10 at the time, that's what my supervisor told me
11 to put down as a classification.
12   Q.   Who's your supervisor?
13   A.   At that time, it was Sergeant
14 McClinton.
15   Q.   Okay.  Do you know why he told you to
16 put that down?
17   A.   No.  But that's part of the problem we
18 have.  That's why I say about throwing it away,
19 it happens often.  You classify something and
20 it's -- the sergeant's got to have the final
21 approval.  So if he says that's not the
22 classification, you have to put down what the
23 sergeant says.
24   Q.   Do you recall anything about what your

103

1  notes that you threw away you said, do you
2  recall anything that you wrote down or anything
3  that those notes said?
4    A.   That was -- it was basically this
5  RD number, just stuff like this, and then I was
6  trying to remember what officers were on the
7  scene.  Just gathering a little information here
8  and there.
9    Q.   So when did you have this conversation
10 with your Sergeant McClinton?  Is that his name?
11   A.   Correct.
12   Q.   When did you have this conversation
13 about putting suspicious person, slash, auto on
14 this report?
15   A.   At what time?  I don't know.  It was
16 that night, though.
17   Q.   Was it on October 18?
18   A.   Correct.
19   Q.   What did you say to him and what did he
20 say to you?
21   A.   I don't recall everything.  It's been a
22 while.
23   Q.   Did you talk to him about the incident
24 on 53rd?

104

26 (Pages 101 to 104)

1   A. Oh, yes.
2   Q. What did you tell him?
3   A. I told him exactly what happened.
4   Q. Do you recall exactly what you said to
5   him?
6   A. No.
7   Q. But he told you to put suspicious
8   person, slash, auto on the top?
9   A. Correct.
10  Q. And then you say on box, I believe it's
11  seven, time of occurrence, that says 2:38. So
12  is that about the time dispatch said 2:37, so
13  that's about when this incident occurred?
14  A. Approximately.
15  Q. Okay. And under circumstances in this
16  Box 26 I believe, in the middle of the page, do
17  you see vehicle of offender, it says '06
18  Chrysler? Do you see that?
19  A. Yes.
20  Q. That's -- that was the correct vehicle
21  that was -- that Mr. Boyle exited from?
22  A. Yes.
23  Q. And under 27, do you see weapons?
24  A. Yes.

105

1   Q. Do you know what that circle indicates?
2   Is it used or no, not used or what is that?
3   A. What circle? Right here?
4   Q. The circle -- it seems to be around the
5   word used.
6   A. It's a D, slash, NA, does not apply.
7   Q. Okay. That works.
8      If you could switch to page two which
9   is Bates stamped at the bottom U/C0110. I would
10  ask that if you read the paragraph that you
11  wrote here, and then I'll ask you a few
12  questions about it.
13  A. Sure.
14  Q. Okay. And you wrote this paragraph on
15  page two of this document, correct?
16  A. Yes.
17  Q. So according to your knowledge, is this
18  paragraph true and correct to the best of your
19  recollection?
20  A. Yes.
21  Q. Okay. It states the vehicle -- and it
22  says one, two, three, four lines down, "the
23  vehicle then curbed quickly and two male
24  subjects exited the vehicle." Did you say --

106

1   you don't say anything in this police report
2   about the vehicle hitting the curb, right?
3   A. No, I didn't state it in here, no.
4   Q. And why didn't you put that in the
5   report?
6   A. I don't know. I didn't.
7   Q. And then if you look about the middle
8   of the page, it states ROs, which stands for
9   responding officers, right?
10  A. Or reporting officer.
11  Q. Or reporting officers, excuse me.
12     Reporting officers approached Boyle and
13  asked who vehicle was it. Boyle answered why.
14  ROs then asked for an ID, and at this time
15  became evasive. Do you know what you meant by
16  when you said evasive?
17  A. Evasive, he wasn't -- you know, when
18  we're asking him something, he wasn't being --
19  what's the word I'm looking for? I'm brain dead
20  right now. Just, you know, he wasn't following
21  our directions. You know, he wasn't -- he was
22  just --
23  Q. That's fine.
24     And he says he refused to produce an

107

1   ID.
2   A. Yes.
3   Q. And so that's right? He refused to
4   give you an ID, right?
5   A. Correct.
6   Q. Okay. Did you -- then it said Boyle
7   became very combative and Torres called for
8   assistance, right?
9   A. Correct.
10  Q. Now, you didn't put in here that he
11  became combative with yourself, right?
12  A. No.
13  Q. Okay. And I'll just ask again, what
14  did you mean by -- when you wrote combative?
15  A. He was resisting. He was fighting with
16  us.
17  Q. But you didn't put in -- well, I'm
18  sorry. You did put in here that he began
19  fighting, right?
20  A. Correct.
21  Q. Officer then began fighting.
22     Well, you put in here, began fighting
23  with Officer Moore, Torres, Galarza and
24  Kwiatkowski. So you put in here that he was

108

27 (Pages 105 to 108)

1  fighting with four officers, right?
2     A.  Correct.
3     Q.  And before that, however, you don't
4  state in the report that he was fighting with
5  just yourself and Officer Moore, right?
6     A.  What are you talking about?
7     Q.  Well, I'm saying in this paragraph,
8  describing what happened at the scene.
9     MR. PUISZIS:  You mean other than where he
10 says he became very combative?
11    MR. KSIAZEK:  Right.  I'm saying before --
12 before that, he didn't put that he was fighting.
13    MR. PUISZIS:  I mean, the police report is
14 supposed to be a summary, okay.  You want to
15 make a big deal out of this, go ahead.
16    You can -- I don't know if there's a question
17 pending.  Why don't you let him ask you a
18 question.  I'm sorry.
19    THE WITNESS:  Our reports are just for our
20 department.  That doesn't go any further than
21 our department.  That's why everything goes
22 based on the Chicago Police Department.  Ours
23 are just basically summaries.
24
                                              109

1  BY MR. KSIAZEK:
2     Q.  Okay.  And then at the bottom you say,
3  Officer Gillespie's glasses were broken?
4     A.  Correct.  My sergeant told me to put
5  that at the bottom of the report.
6     Q.  But you had no knowledge about
7  Officer Gillespie's glasses being broken besides
8  what your sergeant told you?
9     A.  Correct.
10    Q.  Okay.  You said you did not fill out
11 the contact cards at the scene?
12    A.  At the scene?
13    Q.  Yes, at the scene of the incident on
14 53rd Street there.
15    A.  What do you mean?
16    Q.  You did not fill any contact cards out?
17    A.  Did I fill out the contact cards on the
18 scene?
19    Q.  Yes.
20    A.  Not that I recall.
21    Q.  Did you fill out any contact cards in
22 general?
23    A.  Yes.
24    Q.  Okay.  And did you fill out the arrest
                                              110

1  card?
2     A.  Yes.
3     MR. KSIAZEK:  We'll mark this for
4  identification purposes as Plaintiff's
5  Exhibit 3.
6           (Whereupon, Torres Deposition
7            Exhibit No. 3 was marked for
8            identification.)
9  BY MR. KSIAZEK:
10    Q.  So you filled out what has been marked
11 as Plaintiff's Exhibit 3?
12    A.  Yes.
13    Q.  Okay.  Where it says where employed,
14 St. Patrick's Church, how did you learn that
15 information?
16    A.  I got it from the officers at the
17 21st District.
18    Q.  Okay.  So did you talk to the
19 Chicago Police officers?
20    A.  I didn't.  Moore did.
21    Q.  Okay.  So Officer Moore talked to the
22 Chicago Police officers and got this knowledge?
23    A.  Correct.
24    Q.  And then Officer Moore told you that?
                                              111

1     A.  Correct.
2     Q.  Did you learn any of the information on
3  this arrest card firsthand or was it all from
4  Officer Moore?
5     A.  Officer Moore.
6           (Whereupon, Torres Deposition
7            Exhibit No. 4 was marked for
8            identification.)
9  BY MR. KSIAZEK:
10    Q.  So these are contact -- what has been
11 marked as Plaintiff's Exhibit 4 are contact
12 cards for Steven Sinclair, Kenneth Roberson, and
13 those are on -- what's been marked as 0064,
14 Bates stamped, and then Ashley Glover is on
15 Bates stamped 0065.  And, Officer, did you fill
16 out these contact card reports?
17    A.  Yes, I did.
18    Q.  Okay.  And how did you learn these
19 individuals' names?
20    A.  Other officers that were on the scene
21 that gave me their contact cards which was -- I
22 couldn't read it, so I rewrote it on these
23 cards.  This was later.
24    Q.  When did you fill these out?
                                              112

                            28  (Pages 109 to 112)

1    A.  When I went back to my station, and
2  towards the end of the night when these other
3  officers gave me their -- they did contact cards
4  on the scene that they gave me and they weren't
5  legible and I rewrote them.
6    Q.  Okay.  Is it your understanding that
7  these were the passengers in the Chrysler that
8  was at the scene that night?
9    A.  Correct.  That's what they stated.
10    Q.  Did they state anything else?
11    A.  Not that I could recall.
12    Q.  All right.  Did you ever have the
13  occasion to attend court for -- in connection
14  with this case?  Did you attend any hearings
15  that Mr. Boyle was present at?
16    A.  Yes, I went to court.  There were
17  several different court dates.
18    Q.  Do you recall what the dates were?
19    A.  No, I don't.
20    Q.  Are there any documents that would
21  refresh your recollection as to when you arrived
22  at court?
23    A.  I just got subpoenas, so whenever.
24    MR. KSIAZEK:  All right.  I'll show you what

113

1  we'll mark as Exhibit 5 here.
2    (Whereupon, Torres Deposition
3    Exhibit No. 5 was marked for
4    identification.)
5  BY MR. KSIAZEK:
6    Q.  And this is -- I believe this is a
7  report that you filled out.
8    A.  Court report.
9    Q.  Court report.
10    Okay.  And it says -- on the bottom, it
11  says Officer Torres.  That's your handwriting
12  and name, correct?
13    A.  Correct.
14    Q.  Okay.  So according to the first page
15  of this document, which is Bates stamped 0052,
16  you appeared on December 12, 2008.  And then
17  according to the first paragraph up here, the
18  case was continued to January 20, 2009?
19    A.  Correct.
20    Q.  And you wrote that paragraph up top?
21    A.  Yes.
22    Q.  Okay.  And you wrote the second
23  paragraph here?
24    A.  Yes.

114

1    Q.  Where it says "in summary".
2    A.  Yes.  It's just a little --
3    Q.  If you would turn to the second page.
4  This is a document indicating that -- it says
5  Arrest Clearing and Closing, slash, Offense
6  Clear Up, slash, Court Info, correct?
7    A.  Correct.
8    Q.  And the date on this is January 20,
9  2009?
10    A.  Correct.
11    Q.  Okay.  Then if you turn to the third
12  page, what has been marked Bates stamped 0061,
13  that's your name at the bottom, correct?
14    A.  Yes.
15    Q.  You're Torres, and your star number is
16  1028?
17    A.  Correct.
18    Q.  Okay.  So you -- this paragraph, "in
19  summary" -- what begins "in summary", the first
20  paragraph,--
21    A.  Yes.
22    Q.  -- you wrote that paragraph, correct?
23    A.  Yes.
24    Q.  And then on the second paragraph it

115

1  states, "On January 20, 2009, ROs returned to
2  Branch 46 in front of Judge Donnelly who
3  dismissed all charges against Charles Boyle due
4  to CPD complaints written wrong."  Do you know
5  what you meant by that?
6    A.  Well, like I said, the judge based it
7  on what the judge had told us that Chicago
8  actually didn't do the arrest -- I mean, they
9  weren't there.  They were just basically doing
10  the paper.  And we as the arresting agency, our
11  reports didn't conflict he said, because there's
12  a Chicago report and then there's our reports.
13    Q.  So the judge actually said that the
14  reports conflict?
15    MR. PUISZIS:  Objection, there's a transcript
16  of what the judge said.  What he's -- now you're
17  asking him to repeat hearsay.  The transcript
18  will speak for itself.
19    If you remember what the judge said, you can
20  go ahead and answer the question.
21  BY MR. KSIAZEK:
22    Q.  Do you remember what the judge said?
23    A.  Not exactly, no.
24    MR. KSIAZEK:  This will be Exhibit 6.

116

29 (Pages 113 to 116)

1    (Whereupon, Torres Deposition
2    Exhibit No. 6 was marked for
3    identification.)
4  BY MR. KSIAZEK:
5    Q.  Do you recognize this document?
6    A.  I mean, I've never seen it before, but
7  this is --
8    Q.  You've never -- I'm sorry, go ahead.
9    A.  -- general order.
10    Q.  Okay.  Have you seen this document
11  before, this general order?
12    A.  This specific one, no.
13    Q.  Okay.  Have you seen a general order in
14  regards to questioning and frisk without arrest
15  from the Chicago -- University of Chicago Police
16  Department?
17    A.  No.
18    Q.  So you've never seen this document
19  before?
20    A.  This specific one, no.
21    Q.  Okay.  Have you seen something similar
22  to this document?
23    A.  They have general orders.  Just, you
24  know, they have a general order book, but they

117

1  into the record, because asking it in -- asking
2  it in specific portions of it is improper
3  because these are procedures and all of the
4  particular parts of the procedure may or may not
5  be applicable.
6    MR. KSIAZEK:  All right.  Well, I'll read the
7  whole thing in the record then.
8  BY MR. KSIAZEK:
9    Q.  So that was paragraph one.
10    Paragraph two, "May be made with less
11  than probable cause to arrest but the facts
12  involving the stop must constitute 'reasonable
13  suspicion.'"
14    "The officer will identify himself and
15  state the purpose for the 'Stop.'"
16    Persons -- on paragraph four:  "Persons
17  will be detained for a reasonable period of time
18  only."
19    Paragraph five:  "Detention and
20  questioning will be conducted in the vicinity of
21  where the person was stopped."
22    Have I read that correctly?
23    A.  Yes.
24    Q.  Okay.  So did you have a reasonable

119

1  don't -- you know, we don't look at every single
2  general order.  I mean, we don't have the --
3  it's not like they pass out general orders with
4  our department.  They just have a book there.
5    Q.  All right.  Well, under -- this is
6  titled Questioning and Frisk Without Arrest, and
7  I believe this was issued February 1, 1990
8  according to this document, and this was
9  produced by your counsel.  So under Guidelines
10  for a Stop, it states:  "Will be made only when
11  the officer has a reasonable belief that a crime
12  is being committed, is about to be committed or
13  has been committed by the person stopped."
14    Did you believe when you stopped on
15  October 18, 2008, that a crime was being
16  committed, about to be committed or --
17    MR. PUISZIS:  Well, I object to this as an
18  incomplete hypothetical because you see
19  paragraph two says, "May be made with less than
20  probable cause to arrest", yada, yada, yada.
21    MR. KSIAZEK:  And I was going to get there,
22  too.
23    MR. PUISZIS:  Well, then ask him -- ask the
24  question the fair way and read the whole thing

118

1  belief that a crime was about to be committed or
2  did you have reasonable suspicion to believe
3  that a crime was about to be committed or
4  committed on October 18, 2008?
5    MR. PUISZIS:  Are you saying that every time
6  an officer walks up to somebody on the street,
7  the only time they can question or talk to the
8  person is when these five guidelines are
9  applicable?  Was this man ever taken into
10  detention before the wrestling began?
11    MR. KSIAZEK:  Well, he was stopped.
12    MR. PUISZIS:  Did the officer stop him?
13    MR. KSIAZEK:  They asked him for
14  identification.
15    MR. PUISZIS:  So that's -- that -- an officer
16  has to have probable cause to believe a crime is
17  committed before he can ask someone for
18  identification?
19    MR. KSIAZEK:  I'm just reading the document.
20    MR. PUISZIS:  Well, you know, the thing is,
21  you know, procedures -- departmental procedures
22  are not the groundwork for a 1983 claim.
23  There's plenty of cases out there that say you
24  can violate departmental procedures as long as

120

1  you're in compliance with the law. That's fine.
2  So I object to the whole line of questioning as
3  being irrelevant and immaterial, but go ahead
4  and ask him any questions you want. This is all
5  irrelevant to whether or not, you know, there
6  was even Fourth Amendment implicated at any
7  point before the wrestling started occurring.
8    MS. GIBBONS: I'll join.
9    MR. PUISZIS: So, I'm sorry, I didn't mean
10  to –
11    MR. KSIAZEK: That's fine.
12  BY MR. KSIAZEK:
13    Q.  Do you have a reasonable belief that a
14  crime was committed or about to be committed?
15    A.  Yes.
16    Q.  What crime?
17    A.  Well, we had a suspicion with the
18  vehicle with the horn going off.
19    Q.  Okay. Did you identify yourself and
20  state the purpose for why you were asking
21  questions of Mr. Boyle?
22    A.  Did I what?
23    Q.  Did you identify yourself to Mr. Boyle?
24    A.  No.

121

1    Q.  And did you tell Mr. Boyle why you were
2  stopping him?
3    MR. PUISZIS: Objection, they never stopped
4  him.
5    Subject to the objection, you can answer the
6  question.
7  BY MR. KSIAZEK:
8    Q.  You can answer the question.
9    A.  We questioned him.
10    MR. KSIAZEK: This will be the last thing, I
11  promise. Mark this as Exhibit 7.
12        (Whereupon, Torres Deposition
13         Exhibit No. 7 was marked for
14         identification.)
15  BY MR. KSIAZEK:
16    Q.  I've handed you what's been marked as
17  Plaintiff's Exhibit 7 and these are your
18  interrogatories, correct, your answers to your
19  interrogatories?
20    A.  Yes.
21    Q.  Okay. And on the last page, page nine,
22  that's your signature right on the bottom of the
23  page there?
24    A.  Yes.

122

1    Q.  Okay. And you say on – okay, you say
2  on page five under the answer to question five,
3  on very bottom of the page it says, may have
4  knowledge of a conversation with the plaintiff
5  when he refused to tell him about the incident
6  or said he had another way he was going to deal
7  with this or words to that effect.
8    Do you know anything about those
9  statements that were made on the very -- it's
10  the last three lines?
11    A.  Oh, no.
12    MR. PUISZIS: He knows nothing about the
13  complaint your client filed against them under a
14  different name.
15  BY MR. KSIAZEK:
16    Q.  Okay. Under question nine, your
17  answer – the question is "Please describe your
18  assignment with the University of Chicago Police
19  Department on October 18, 2008. Your response
20  should include the actual time you began and
21  ended your duties." Your answer is, on
22  October 18, I was working for the University of
23  Chicago on the midnight shift. I was working
24  assignment 109. Clarence Moore was riding with

123

1  me to learn the University's practices and
2  procedures. When you say practices and
3  procedures, is that what you meant by –
4    A.  The boundaries and our reports.
5    Q.  And under answer number ten you say
6  you've never previously been sued in your
7  capacity as a University of Chicago Police
8  officer. Is that still correct?
9    A.  Yes.
10    Q.  Okay. Besides this lawsuit obviously.
11    MS. GIBBONS: Just really quickly, on
12  page five, are those notes from you, the written
13  notes on the interrogatories? Just curious, are
14  they yours?
15    MR. KSIAZEK: No, they're not.
16    MS. GIBBONS: You produced this copy, okay.
17    MR. KSIAZEK: No, they're not.
18  BY MR. KSIAZEK:
19    Q.  Actually, I should ask. On page five,
20  did you circle Aguilar and put a question mark
21  on that?
22    A.  Yeah, that was the wrong name.
23    Q.  Are those your initials, LT?
24    A.  Yes.

124

31  (Pages 121 to 124)

1    Q.  And also on page five under Salvatore
2  or Salvatore (different pronunciation), you put
3  question marks next to it?
4    A.  Yeah, I didn't know who that was when I
5  was reading it.
6    Q.  Is there any other information relating
7  to the incident on October 18, 2008 that we
8  haven't talked about here today?
9    A.  No.
10   MR. KSIAZEK: I don't believe I have any
11  other questions.
12   MS. GIBBONS: I just have a few if you don't
13  mind, Steve.
14   MR. PUISZIS: Okay.
15   EXAMINATION
16  BY MS. GIBBONS:
17   Q.  Officer Torres, I'm Helen Gibbons. I
18  represent the City of Chicago and the City of
19  Chicago Police officers in this matter. I just
20  wanted to quickly go back to the actual incident
21  when Mr. Boyle was taken into custody. You
22  don't recall exactly when the Chicago Police
23  Department officers arrived on the scene, do
24  you?
                                             125

1    A.  Not exactly, no. Like I said,
2  everything happened so fast, that when I was —
3  when I called for 10-1, they came. It was just
4  like a relief for me. I just kind of — the
5  next thing you know, there's just cars from all
6  over.
7    Q.  Do you recall — I'm sorry, were you
8  done?
9    A.  I mean, I just don't remember
10  exactly — there was a lot of Chicago Police
11  there, but what — exactly what time and how
12  they got there, when they got there, I don't
13  know exactly, because as I said, they just
14  flooded — you know, when they call a 10-1, it's
15  just like they come from everywhere.
16   Q.  Do your recall approximately how many
17  City of Chicago Police officers were on the
18  scene?
19   A.  No, I couldn't say exactly. I don't
20  know exactly.
21   Q.  Were there more than two?
22   A.  Oh, yes.
23   Q.  Was there a supervisor or a sergeant in
24  a white shirt?
                                             126

1    A.  Yes, from the Chicago Police.
2    Q.  And just can you recall when the other
3  University of Chicago Police officers were
4  working to get Mr. Boyle into custody, do you
5  recall seeing the City of Chicago Police
6  officers there at that point in time?
7    A.  No.
8    Q.  Okay. And what's the University of
9  Chicago Police uniform look like?
10   A.  Just like Chicago's. Well, we changed
11  it now, but back then it was just like
12  Chicago's.
13   Q.  Can you just tell me a little bit —
14   A.  Like a blue shirt with either black
15  vest or blue vest. The only difference was our
16  patch and our stars, but other than that, it
17  looked just like Chicago.
18   Q.  And do you recall which city
19  university — I'm sorry, City of Chicago Police
20  officers by name you dealt with? Do you recall
21  any of the Chicago Police officers' names?
22   A.  That night?
23   Q.  Uh-huh.
24   A.  I just remember Darling and — because
                                             127

1  what it is, I was out of — might be 109. I
2  know a lot of guys — that's in the
3  3rd District, so I kind of know them all by name
4  and face. But because I was up there getting
5  coffee, that's the 21st District, and I never
6  used to deal with the 21st District. I
7  basically deal with — because our thing goes
8  into the 21st, to the 2nd and to the
9  3rd District, so we deal with three different
10  districts. So I'm familiar with all the guys in
11  the 3rd District where I was working. That's my
12  beat actually.
13   Q.  So no guys from the 3rd District were
14  there?
15   A.  No. Actually, there was a 3rd District
16  car there, but I don't know who it was, because
17  I remember them saying — the guys in the
18  station, they're saying that guys came from all
19  over.
20   Q.  But you don't recall specifically who
21  it was?
22   A.  No.
23   Q.  You just heard about it?
24   A.  Yeah. I said everything happened so
                                             128

32  (Pages 125 to 128)

1 fast. All this happened in a matter of — it
2 seemed like, you know, minutes.
3     Q.  Do you recall who placed Mr. Boyle into
4 the squad car?
5     A.  No.  I believe it was one of our guys
6 that actually put him in the car.  I'm not
7 certain with that.  But usually if it's one of
8 our people, we put them in the car, but it
9 doesn't always happen that way.  Depending on
10 whoever's driving the car, the officer from
11 Chicago, they might want to pat them down and
12 throw them in the car themselves.  It's kind of
13 hard when you're working with two different
14 departments.
15     Q.  But did you see Mr. Boyle get placed
16 into a squad car?
17     A.  No, I didn't see him actually getting
18 put into the car, no.
19     MS. GIBBONS: That's all. I have nothing
20 further at this point.
21         EXAMINATION
22 BY MR. PUISZIS:
23     Q.  Your police report, is it meant to be a
24 summary?

129

1     A.  Yes.
2     Q.  It's not meant to be a transcript?
3     A.  No.
4     Q.  And if you had known you were going to
5 be sued by Charles Boyle, would you have
6 included additional information --
7     A.  Oh, definitely.
8     Q.  — in your report?
9     A.  Definitely.
10     Q.  Is there anything in your report that
11 was marked as an exhibit that -- you said you
12 had started a report and then rewrote it --
13     A.  Yeah.
14     Q.  -- at the University of Chicago.
15     A.  Correct.
16     Q.  Anything in that original report that
17 you began at the University of Chicago that is
18 not contained in this report that was marked as
19 Exhibit --
20     MR. KSIAZEK:  Two.
21 BY MR. PUISZIS:
22     Q.  - 2 for identification purposes?
23     A.  No.
24     Q.  And the principal change dealt with the

130

1 classification?
2     A.  Correct.
3     Q.  Now, are you allowed to make narcotics
4 arrests?
5     A.  No.
6     Q.  Do you participate in the narcotics
7 investigations?
8     A.  No.
9     Q.  Are you allowed to write traffic
10 tickets?
11     A.  No.
12     Q.  So you don't have full police powers as
13 such, do you?
14     A.  No.
15     Q.  And the jurisdiction where you work —
16 I'm sorry, not the jurisdiction, but the areas
17 that you work as a University Chicago -- on
18 behalf of the University of Chicago, there's
19 also Chicago Police officers that work that —
20 those areas as well, correct?
21     A.  Correct.
22     Q.  So what you do for the University of
23 Chicago in terms of the safety of its students
24 is not exclusive to the University of Chicago by

131

1 any stretch of the imagination, is it?
2     A.  No.
3     Q.  And what's your understanding of your
4 responsibility as an officer for the University
5 of Chicago?
6     A.  Is to protect the students and the
7 property of the University of Chicago.
8     Q.  Now, at 2:35 or 2:38 in the morning
9 when this incident happened, were there any
10 other vehicles on the street?
11     A.  No, not that I recall.
12     Q.  The uniform you wear, does it have your
13 nametag on it?
14     A.  Yes.
15     Q.  Okay.  And would someone looking at you
16 recognize that you're some type of law
17 enforcement officer?
18     A.  Yes.
19     Q.  Now, you heard the horn go off.  You
20 saw the car abruptly pull to the curb, right?
21     A.  Correct.
22     Q.  The following block, there's the
23 Bank of America with an ATM?
24     A.  Yes.

132

1    Q.   Are parking spots up there?
2    A.   Yes.
3    Q.   If people wanted to go to an ATM, could
4    they have parked there?
5    A.   Yes.
6    Q.   You saw two men after the car hit the
7    curb get out of the car right away?
8    A.   Correct.
9    Q.   Okay. And they walked and you lost
10   sight of them, right?
11   A.   Correct.
12   MR. KSIAZEK:  Objection, leading.
13   BY MR. PUISZIS:
14   Q.   In terms of a potential hazard to you
15   as an officer, who represents the greatest
16   hazard to you, the people in the car or the
17   people who had walked some distance away from
18   the car that were now out of your sight?
19   A.   The people in the car.
20   Q.   When an ignition lock is broken -- or
21   one of the ways to steal a car is to break an
22   ignition lock and peel the column, steering
23   column, right?
24   A.   Right.

                                          133

1    MR. KSIAZEK:  Objection, leading.
2    BY MR. PUISZIS:
3    Q.   When that happens, would there be
4    trouble steering a car from time to time?
5    A.   Yes.
6    Q.   You didn't know whether that car was
7    stolen or not, right?
8    A.   Correct.
9    Q.   But one of the things you understood or
10   you were trained was that when a vehicle is
11   stolen, if it has an alarm system, it can
12   activate the horn of the car, correct?
13   A.   Correct.
14   MR. KSIAZEK:  Objection, leading.
15   BY MR. PUISZIS:
16   Q.   And is that something you learned in
17   the police academy?
18   A.   Yes.
19   Q.   And so the -- would it be fair to say
20   that the horn going off and the manner in which
21   the car went to the curb was at least consistent
22   with the possibility of there being a stolen
23   vehicle?
24   A.   Yes.

                                          134

1    MR. KSIAZEK:  Objection, leading.
2    BY MR. PUISZIS:
3    Q.   Sometimes when people honk the horn or
4    blow their horn, it's also a sign that they may
5    need assistance?
6    A.   Yes.
7    Q.   So did you feel you were doing anything
8    improper or violating anyone's rights by driving
9    over to see what was going on with that car
10   given the fashion in which it stopped?
11   A.   No.
12   Q.   Now, you saw two men get out of the car
13   and walk quickly away from it, correct?
14   A.   Correct.
15   Q.   You saw Mr. Boyle get out of the car,
16   correct?
17   A.   Correct.
18   Q.   Was it your intent at that point to put
19   Mr. Boyle under arrest?
20   A.   No.
21   Q.   What was your purpose in approaching
22   Mr. Boyle?
23   A.   To see what the problem was with the
24   car, to find out if it was stolen or if there

                                          135

1    was -- somebody needed assistance. And
2    basically if everything would have worked out
3    right, we would have just did a -- filled out a
4    contact card and that would have been it.
5    Q.   When you asked for his -- when you
6    asked him whose vehicle was this, what did he
7    say?
8    A.   Why?
9    Q.   Did he tell you who owned the car?
10   A.   No.
11   Q.   When you asked him for identification,
12   did he provide you with any identification?
13   A.   No.
14   Q.   Typically if someone is not violating
15   the law -- or let me withdraw it and ask it this
16   way:  Has it been your experience, Officer, that
17   when someone is not violating the law, they will
18   provide information to a police officer upon
19   request?
20   A.   Yes.
21   MR. KSIAZEK:  Objection, speculation.
22   THE WITNESS:  Yes.
23   BY MR. PUISZIS:
24   Q.   Now, when Mr. Boyle picked you up, you

                                          136

                              34 (Pages 133 to 136)

1 were off your feet?
2    A.  Correct.
3    Q.  And he was moving you back towards your
4 squad car?
5    A.  Yes.
6    Q.  Kind of like how a linebacker tackles a
7 running back, locks him up and runs him back?
8    A.  Yes.
9    MR. KSIAZEK:  Objection, foundation.
10 BY MR. PUISZIS:
11    Q.  And do you remember what he -- you
12 know, did he put you somewhere?  Did he throw
13 you on top of the car?  Did he throw you in your
14 squad car?  What happened to you?
15    A.  I fell into the passenger side.
16    Q.  You actually fell into the passenger
17 side seat of your car?
18    A.  Car.
19    Q.  And then did Officer Moore jump on his
20 back to try and pull him off of you?
21    A.  Yes.
22    MR. KSIAZEK:  Objection, leading.
23 BY MR. PUISZIS:
24    Q.  Did you have any idea what his intent

137

1 obtained the contact cards from?
2    A.  Do I know who wrote them?
3    Q.  Yeah.
4    A.  No, I don't.
5    Q.  Do you recall at what point during the
6 course of this whole incident that Mr. Boyle
7 actually was taken down to the ground?
8    A.  Do I recall at what point?
9    Q.  Yeah.
10    A.  At what time?  No, not exactly because
11 I didn't actually take him down.
12    MR. PUISZIS:  Thank you.  I don't have any
13 other questions.
14         FURTHER EXAMINATION
15 BY MR. KSIAZEK:
16    Q.  The parking spots that you said about
17 the bank, the ATM, was it on the street or was
18 it an actual lot?
19    A.  It's a street.
20    Q.  So the parking spot was actually on the
21 street?
22    A.  For that ATM, if you're going to that
23 ATM, it's on the street.
24    MR. KSIAZEK:  I don't have anything further.

139

1 was when he threw you into -- onto the seat on
2 the passenger side of your vehicle?
3    A.  No.
4    Q.  Was he still face to face with you?
5    A.  Yes.
6    Q.  Had you struck him or hit him or done
7 anything to cause that type of activity or
8 response from him?
9    A.  No.
10    Q.  Now, once Officer Moore grabbed -- or
11 jumped on his back, is that when you radioed --
12    A.  Yes.
13    Q.  -- requesting assistance?
14    MR. KSIAZEK:  Objection, leading.
15 BY MR. PUISZIS:
16    Q.  Do you know how many officers from the
17 University of Chicago responded to that request
18 for assistance?
19    A.  I believe all of them.
20    Q.  Was it more than just the officers
21 named in this lawsuit?
22    A.  Yes.
23    Q.  Do you know who actually would have
24 spoken to the witnesses at the scene who you

138

1    MR. PUISZIS:  We'll reserve signature.
2         FURTHER DEPONENT SAITH NAUGHT
3    (Witness was excused at 12:46 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

140

35 (Pages 137 to 140)

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHEASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,            )
        Plaintiff,        )
    vs.                   ) No. 09 CH 1080
UNIVERSITY OF CHICAGO POLICE )
OFFICER LARRY TORRES, et al.,)
        Defendants.       )

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by KAREN E. DOMINICK-RIGONI, Registered Professional Reporter, on November 9, 2009, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

_____
        LARRY TORRES
SUBSCRIBED AND SWORN TO
Before me this _____ day
of _____, 2010.

_____
Notary Public

141

---

of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was not waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my signature this 12th day of January, 2010.

_____
KAREN E. DOMINICK-RIGONI, CSR, RPR
COOK COUNTY, ILLINOIS

143

---

STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K     )

I, KAREN E. DOMINICK-RIGONI, a Registered Professional Reporter within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on the 9th day of November, 2009, personally appeared before me, at 222 North LaSalle Street, Suite 300, Chicago, Illinois, LARRY TORRES, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein CHARLES BOYLE is the Plaintiff, and UNIVERSITY OF CHICAGO POLICE OFFICER LARRY TORRES, ET AL. are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript

142

---

McCORKLE COURT REPORTERS, INC.
200 North LaSalle Street, Suite 300
Chicago, Illinois 60601-2956
(312) 263-0052

January 12, 2010

HINSHAW & CULBERTSON, LLP
ATTN: MR. STEVEN M. PUISZIS
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
IN RE: BOYLE vs. UNIVERSITY OF CHICAGO
COURT NUMBER: 09 CH 1080
DATE TAKEN: 11/09/09
DEPONENT: LARRY TORRES

Dear Mr. Puiszis:

Enclosed is the deposition transcript for the aforementioned deponent in the above-entitled cause. Also enclosed are additional signature pages, if applicable, and errata sheets.
Per your agreement to secure signature, please submit the transcript to the deponent for review and signature. All changes or corrections must be made on the errata sheets, not on the transcript itself. All errata sheets should be signed and all signature pages need to be signed and notarized.
After the deponent has completed the above, please return all signature pages and errata sheets to me at the above address, and I will handle distribution to the respective parties.

If you have any questions, please call me at the above phone number.
Sincerely,
Margaret Selina        Court Reporter:
Signature Department Karen E. Dominick-Rigoni
                       CSR, RPR
cc: All parties.

144

36 (Pages 141 to 144)

**A**

able
43:20 44:7
above-entitled
1:14 141:12
144:11
abruptly
27:13 28:11
31:4 132:20
academy
17:10,20
134:17
access
39:8
accurately
141:15
acquire
10:18
activate
134:12
activity
138:7
actual
99:9 123:20
125:20
139:18
Adams
2:3
additional
130:6 144:11
address
92:21,21
144:18
adjacent
85:7
adjoining
85:6
affixed
143:15
aforementioned
144:11
aforesaid
142:19 143:2
agency
116:10
aggressive
51:5 52:12
53:24 54:2,8
54:9,13
55:17 92:15
ago
12:2
agree
102:4,17
agreement
144:13
Aguilar
124:20
ahead
12:3 28:20
29:3 31:7
32:1 50:16
52:14 58:2
75:3 91:2,8
91:10,13
109:15
116:20 117:8
121:3
air
67:14 73:20
al
1:10 141:8
142:14
alarm
36:1 134:11
allowed
131:3,9
alongside
42:24
altercation
79:3,14,20

81:8 83:1,9
Amendment
121:6
America
132:23
answer
4:20,23 5:1,2
19:20 28:4
31:7 32:1
52:14 88:9
103:1 116:20
122:5,8
123:2,17,21
124:5
answered
5:1,16 31:6
107:13
answers
122:18 141:16
anyone's
135:8
appear
36:3 141:17
APPEARANCES
2:1
appeared
114:16 142:9
applicable
119:5 120:9
144:12
apply
106:6
approach
42:6 75:20
approached
47:3,7,8,11
59:7 65:9
96:3,22
107:12
approaching
40:15,17
135:21
approval
103:21
Approximate
81:13
approximately
7:7 11:1,2
13:1,10
15:12 24:5,9
26:21 28:19
29:13,23
32:14 34:17
38:10,11
42:15 90:21
105:14
126:16
area
19:10,14 21:15
21:20 38:19
71:5
areas
16:23 17:14
21:22 22:3
131:16,20
arm
51:4,6,15,20
51:24 52:1
54:3,14,16
54:19,20,22
54:23,24
55:4,6,16,24
56:2 57:3,22
58:5
arms
57:11,13 58:19
139:17,22,23
63:3,5 68:10
69:12
arrest
22:9,13,14

56:9 68:4
69:23,23
87:10,16
110:24 112:3
115:5 116:8
117:14 118:6
118:20
119:11
135:19
arrested
86:14
arresting
116:10
arrests
131:4
arrive
66:7,20 72:11
72:13,22
arrived
64:24 65:14,23
68:4,9,23
67:3 72:15
72:22 73:7
80:8,11,14
83:23 113:21
125:23
Ashley
112:14
asked
31:6 47:23
48:1,22
49:18,20,22
50:23 56:20
75:15,16
92:20 96:14
96:19 107:13
107:14
120:13 136:5
136:6,11
141:16
asking
4:19 21:17
51:2 70:11
70:12 78:4
78:19 107:18
116:17 119:1
119:1 121:20
asks
96:11
assign
18:16
assigned
14:6,13 18:13
assignment
9:23,24 123:18
123:24
assignments
14:8
assist
22:15
assistance
60:6,7 63:20
93:9,11
108:8 135:5
136:1 138:13
138:18
assisting
64:14,16,18
65:18
ASSOCIATES
2:2
assumed
97:3,6
ATM
132:23 133:3
139:17,22,23
ATMs
39:8
attempt
63:14 68:3,4
attempted

52:22 54:3,7
attempting
55:1,3 69:22
attend
113:13,14
ATTN
144:5
attorneys
143:9
August
16:16
auto
98:8 104:13
105:8
a.m
1:18

**B**

B
3:10 95:6
back
17:6 22:23
27:15 47:11
52:10 58:20
61:17,21
62:5,7,11
63:18 68:8
69:17 78:6
80:18,19,21
91:24 113:1
125:20
127:11 137:3
137:7,7,20
138:11
background
6:8,9
backup
41:6 91:6
backwards
59:12
badge
88:18
badgering
81:21
bank
39:2,5 132:23
139:17
based
88:22 109:22
116:6
basic
4:17 16:22
17:6,7,16
basically
4:19 19:10,13
55:18 57:5
65:16 80:9
84:7 87:17
87:18 88:14
104:4 109:23
116:9 128:7
136:2
basis
12:24
Bates
90:9 95:4
97:17 106:9
112:14,15
114:15
115:12
battery
56:23
bear
56:5 57:8,9,17
57:21 58:10
58:17,22
60:16 79:4
beat
14:5,13 20:4,7
128:12
beats

16:24
becoming
53:24
beeping
26:6
began
60:4 108:18,21
108:22
120:10
123:20
130:17
begins
115:19
behalf
131:18
belief
118:11 120:1
121:13
believe
8:10 10:6 12:2
17:3,18 36:7
105:10,16
114:6 118:7
118:14 120:2
120:16
125:10 129:5
138:19
believed
36:11
bent
47:14 74:7
best
4:21 5:7 90:22
106:18
better
5:11 21:24
big
109:15
bit
61:12 88:21
127:13
black
127:14
Blackstone
92:24 93:7
94:13,14,24
block
132:22
blow
116:2
blowing
26:15
blue
127:14,15
bodies
62:17
body
58:6 69:7
book
117:24 118:4
booking
85:4,12,16
Boston
39:2
bother
101:14
bottom
90:10 106:9
110:2,5
114:10
115:13
122:22 123:3
boundaries
19:14 20:7
21:3,4,5
124:4
box
105:10,16
boy
95:6
Boyle

1:6 40:7 45:19
45:22 46:2,4
46:7,10,15
46:21 47:3,7
47:8,17,22
47:24 48:6
48:17 50:9
50:24 51:5,7
51:11,23
52:12 53:1
53:17,24
54:12,18
55:19,22
60:10,16
61:20 62:8
63:4,18 65:8
67:2 68:1,18
68:21 69:5
69:18 71:17
71:24 73:3
76:15,18
77:21 78:23
79:3,8,13
80:1 81:10
84:3 85:18
86:4,6,15
94:10 95:20
105:21
107:12,13
108:6 113:15
116:3 121:21
121:23 122:1
125:21 127:4
129:3,15
130:5 135:15
135:19,22
136:24 139:6
141:6 142:13
144:7
Boyle's
51:15 52:23
54:20,22
55:9 62:7,20
62:23 63:12
63:14 64:9
64:19 95:15
96:4
brain
107:19
Branch
116:2
break
5:14,14,15,17
133:21
breath
74:20 76:4,5,7
briefly
19:22
bring
53:15 100:3
broken
110:3,7 133:20
brought
69:19
building
25:1 26:20
bump
31:22
bumps
32:3
bunch
66:14
businesses
38:14,17,18

**C**

C
142:3
call
16:22 18:15
36:21 73:14

93:23 96:23
126:14
144:19
**called**
4:7 7:2 60:5,7
91:3 96:14
108:7 126:3
**calling**
91:6
**calls**
22:15 35:6
**capacity**
124:7
**car**
19:15,23 20:10
22:24 23:1,3
23:7 25:2,3
26:12,14,17
26:19,23
27:2,3,6,7
27:10,11,12
27:16,18,23
28:6,7,10,13
28:16,22
29:7,13 30:2
30:9,13,18
30:18,20
31:1,3 32:8
32:11,22
33:2,10,13
33:15,16,18
33:20,21
34:24 35:18
36:3,4,4,12
36:15,17,23
37:9 38:5
39:20,22
40:2,9,11
41:3,8,15,19
41:24 42:9
42:17 43:16
43:16,17,18
43:20,22
44:21 45:1,2
45:10,12,15
45:20,23,24
46:1,5,8,11
46:16,18,22
47:1,2 48:7
48:23,24
49:23 50:4
50:11,19,24
51:3,4,9,9
51:15,18,19
52:4,7 53:3
53:6,9,10,11
53:13,16,17
53:19,20,23
54:1 56:7
59:1,3,4,6,8
59:8,15,23
60:3,11
63:16 67:18
71:12,18,19
71:24 72:3
75:8,22
76:13,16,19
78:6 79:10
80:1,16
81:11 82:7,8
82:10 83:12
92:8,11
93:15 95:13
128:16 129:4
129:6,8,10
129:12,16,18
132:20 133:6
133:7,16,18
133:19,21
134:4,6,12
134:21 135:9

135:12,15,24
136:9 137:4
137:13,14,17
137:18
**card**
56:11,12 87:10
87:11,15,16
111:1 112:3
112:16 136:4
**cards**
110:11,16,17
110:21
112:12,21,23
113:3 139:1
**care**
65:18
**cars**
30:7 36:1
50:16 66:4
126:5
**case**
113:14 114:18
**cases**
103:4 120:23
**caught**
74:20 76:3,4,7
**cause**
1:14 5:8
118:20
119:11
120:16 138:7
141:12
142:11,19
144:11
**cc**
144:24
**certain**
16:23 21:21
88:15 129:7
**certify**
141:10 142:7
142:16 143:3
143:6,10
**CH**
1:8 141:7
144:7
**change**
130:24
**changed**
127:10
**changes**
144:14
**Chappell**
95:20
**characteriz...**
31:16 35:7
**charges**
116:3
**Charles**
1:6 95:20
118:3 130:5
141:6 142:13
**check**
32:21 33:6
35:15
**Chicago**
1:9,19 2:3,8
2:10,13 7:12
10:21 11:8
14:16,23
15:1,16,19
16:2,19,20
17:10,20
18:10 19:11
19:23 20:3
20:15,22
21:5,15,16
21:18,19,23
22:10,13,16
72:10,18
73:12,18,17

73:21 74:2
74:10,14,22
75:10 77:11
78:4 84:9,17
85:2,13,15
86:10,14,19
87:21,22
88:1,5,11
89:5,6,9,12
89:14,17
100:16,18
109:22
111:19,22
116:7,12
117:15,15
123:18,23
124:7 125:18
125:19,22
126:10,17
127:1,3,5,9
127:17,19,21
129:11
130:14,17
131:17,18,19
131:23,24
132:5,7
138:17 141:7
142:10,14
144:2,6,7
**Chicago's**
21:4 22:7
127:10,12
**chose**
20:14
**Chrysler**
33:24 37:4,16
37:17,20,23
40:13,16,19
41:21,23
42:2,7,13,17
42:20,24
43:5,9,11
50:17,19
53:23 59:8
71:19 72:3
105:18 113:7
**Church**
111:14
**circle**
108:1,3,4
124:20
**Circuit**
142:12
**circumstances**
105:15
**city**
2:10 7:12,16
7:19 8:5,8
9:9 10:21
11:7 14:16
21:23 22:4
22:10,16
125:18,18
126:17 127:5
127:18,19
**claim**
120:22
**Clarence**
123:24
**clarify**
20:20
**classes**
8:15,16,17,19
9:1,4
**classification**
98:7 103:11,22
131:1
**classify**
103:7,19
**Clean**
7:2,4,6,9,11

8:3,7,22
**clear**
95:20 115:6
**Clearing**
115:5
**client**
123:13
**closed**
25:21,22 50:12
50:13,14
**closer**
61:12
**Closing**
115:5
**code**
93:10
**coffee**
24:12,21,24
**college**
6:11,19 8:14
9:2
**color**
20:2
**column**
133:22,23
**combative**
108:7,11,14
109:10
**come**
126:15
**coming**
25:7 26:13
62:21 63:3
**committed**
58:23 118:12
118:12,13,16
118:16 120:1
120:3,4,17
121:14,14
**common**
101:12
**company**
7:2
**complaint**
123:13
**complaints**
116:4
**completed**
144:17
**compliance**
121:1
**computer**
22:21,22,24
23:3,11,16
23:18
**Computer-Aided**
142:23
**concerns**
35:15
**conducted**
119:20
**conflict**
116:11,14
**confusion**
5:8
**conjunction**
21:18
**connection**
113:13
**consistent**
26:4,5 134:21
**constitute**
119:12
**contact**
56:10,12 62:16
62:18,21
63:3 87:10
87:15 110:11
110:16,17,21
112:10,11,16

112:21 113:3
136:4 139:1
**contained**
130:18
**continued**
114:18
**continuing**
48:17
**control**
94:14
**conversation**
32:17 47:22
48:17 50:7,9
74:22 75:23
77:17 83:10
104:9,12
123:4
**conversations**
34:21 72:16
79:12,18
80:2,7,10
86:3,9
**Cook**
1:16 9:14,16
10:3,5,8,12
10:15,18
142:3,6,6,12
143:22
**cooperating**
56:19
**copy**
124:16
**corner**
38:13,15
**correct**
5:24 8:13
10:24 15:21
18:23 23:12
23:22 24:22
25:22,24
27:22,24
28:2 29:5,22
30:10 31:2
33:21 37:21
39:6,13,16
40:20 43:2,8
44:5 45:8
49:19 50:5
55:5,7 56:22
57:3 58:11
58:13,16,18
58:21 59:2
59:18 60:9
61:14 62:1
63:13,24
64:8,11 65:2
68:5 70:1
72:12,23
73:2,10
75:12 76:17
76:21,24
77:19 78:12
82:4,6 87:20
91:7,23 92:6
92:23 93:2,5
96:12,13,16
100:15,17
101:1,8,11
104:11,18
105:9,20
106:15,18
108:5,9,20
109:2 110:4
110:9 111:23
112:1 113:9
114:12,13,19
115:6,7,10
115:13,17,22
122:18 124:8
130:15 131:2
131:20,21

132:21 133:8
133:11 134:8
134:12,13
135:13,14,16
135:17 137:2
142:24
**corrections**
144:14
**correctly**
42:11 119:22
**Cottage**
20:9
**counsel**
90:8 118:9
143:5,11
**counting**
32:16
**County**
1:16 9:14,16
10:3,5,8,12
10:15,18
142:3,6,6,12
143:22
**couple**
34:20 46:2
54:11 63:24
64:5
**course**
139:6
**court**
1:2 5:4,9
113:13,16,17
113:22 114:8
114:9 115:6
141:2 142:12
144:1,7,22
**CPD**
84:12 116:4
**Crestwood**
11:14,17,18,23
11:24 12:1
12:11,15,24
14:1
**crime**
118:11,15
120:1,3,16
121:14,16
**criminal**
8:20
**CSR**
1:23 143:21
144:23
**cuffs**
69:24 73:23
**CULBERTSON**
2:6 144:4
**curb**
27:13 28:11
29:15
30:15,19
31:4,9,12,15
31:22 32:3,9
32:12 33:10
33:17 38:1
107:2 132:20
133:7 134:21
**curbed**
29:18,20 30:3
30:20,21
31:1 34:19
39:22 106:23
**curious**
124:13
**current**
16:3
**currently**
17:22
**custody**
66:1 75:6 76:9
76:12 125:21
127:4

**D**

D
3:1 106:6
Daley
9:2
Darling
75:16,19 76:8
76:20,22
77:19 127:24
dash
96:9
date
15:20,23 115:8
144:8
dates
113:17,18
day
1:17 19:16
20:13 101:5
141:21 142:8
143:16
days
13:10
dead
107:19
deal
109:15 123:6
128:6,7,9
dealt
127:20 130:24
Dear
144:9
December
114:16
decided
80:17
Defendants
1:11 2:14
141:8 142:15
definitely
72:8 130:7,9
degree
9:8
department
2:10 10:20
11:3 15:16
18:11 20:22
21:17,19
22:13 88:5
89:14,17
109:20,21,22
117:16 118:4
123:19
125:23
144:22
departmental
120:21,24
departments
17:12 129:14
Depending
129:9
deponent
140:2 144:8,11
144:13,17
deposition
1:13 3:12 4:12
4:15 5:21
90:2 97:11
111:6 112:6
114:2 117:1
122:12
141:11 143:4
143:7,8
144:10
describe
16:17 19:22
26:1 31:5
32:11 33:22
45:14 51:16
51:17 55:22
57:10 61:15

67:3 123:17
describing
109:8
details
75:13
detain
22:10,11,15
56:16,17
62:10
detained
119:17
detaining
78:10
detention
119:19 120:10
difference
127:15
different
17:12,12 87:4
87:8,11
88:23 89:20
101:13
113:17
123:14 125:2
128:9 129:13
direction
27:16,17 28:6
42:6 43:8
51:9 59:16
59:19
directions
107:21
directly
48:3 55:11,12
58:3
disciplined
10:11 12:14
13:17
discovery
1:13
dismissed
116:3
dispatch
14:9 23:21
24:1 38:14
38:22 41:6
60:8 61:5
90:13 91:2,3
91:8,9,12,17
91:24 92:9
92:20 93:6
94:1,3,12,22
95:18,19,21
96:11,14,19
96:23 105:12
distance
29:21 30:1
72:2 133:17
distribution
144:18
District
1:2,3 71:13
75:8,11 77:9
77:13,23
78:1,17 82:1
82:5,11,20
83:13,24
86:4,11,15
88:23 89:2
96:5,7 98:19
99:1,10,13
99:16,23
100:2,20
111:17 128:3
128:5,6,9,11
128:13,15
141:2,3
districts
128:10
DIVISION
1:4 2:11 141:4

document
90:17 97:19
99:4 106:15
114:15 115:4
117:5,10,18
117:22 118:8
120:19
documents
5:19 87:13
113:20
doing
7:4 11:20
24:10 47:9
62:9 67:12
67:13 69:10
71:1,4 74:3
74:4 80:22
84:23 85:16
87:3,5,6
93:21 116:9
135:7
Dominick-Ri...
1:15,23 141:13
142:4 143:21
144:22
Donnelly
116:2
Donuts
24:13,14,21,24
25:6 26:3
28:1,12,16
29:8,17
30:14 32:24
39:11 81:10
door
26:3,8,8,12,12
25:17,18,18
25:19,19
28:14 29:1
42:8,12,19
42:20,22,22
43:4
doors
25:9,21
doorway
25:7
doorways
25:11
drive
20:9 26:14
81:23
driver
38:8 40:2,9
41:3 45:4,6
driver's
38:6 42:20,22
95:5,6,9,16
driving
7:5 19:13,15
20:10,13
25:4 34:5
37:23 82:20
96:12 129:10
135:8
due
116:3
duly
4:8 142:17
Dunkin
24:12,14,21,24
25:6 26:2
28:1,12,16
29:8,17
30:14 32:24
39:11 81:10
duties
9:19 12:15
16:7 19:8
123:21

**E**

E
1:15,23 3:1,10
141:12 142:4
143:21
144:22
earlier
91:3
East
24:5
Eastbound
27:19 28:9
EASTERN
1:4 141:4
east/west
27:21 43:13
ED
2:2
educational
6:9
effect
123:7
eight
13:13
either
17:19 127:14
elbow
52:2,3,23 54:8
54:10
eleven
15:10
Ellis
100:23
employed
11:11 111:13
EMPLOYMENT
2:11
enclosed
144:10,11
ended
123:21
enforcement
132:17
entail
16:7
entrance
25:12
errata
144:12,14,15
144:17
et
1:10 141:8
142:14
evasive
107:15,16,17
everybody
46:1 94:15
everything's
34:24
exact
42:1 81:14
82:12
exactly
8:18 43:18
62:4,22,24
64:17 66:3
67:12 70:10
70:15 71:20
72:14 75:4
82:22 83:14
84:1,14,24
84:24 86:24
97:8 100:22
101:3 105:3
105:4 116:23
125:22 126:1
126:10,11,13
126:19,20
139:10
EXAMINATION
3:2 4:9 125:15
129:21

139:14
examined
4:8
exclusive
131:24
exclusively
21:22 22:4
excuse
71:19 77:10
91:14 107:11
excused
140:3
exhibit
3:12 90:1,3,7
97:10,12,16
111:5,7,11
112:7,11
114:1,3
116:24 117:2
122:11,13,17
130:11,19
exit
25:1 38:5 41:3
45:6
exited
26:20 28:12,14
28:15 39:23
40:6 42:5
44:12 45:3
45:19 46:2,2
46:4 47:6
105:21
106:24
exiting
46:1,19
experience
136:16
explain
4:17
extent
22:6
eyes
58:15
eyesight
38:3,11 39:15

**F**

face
48:20 61:19,19
61:21,21
69:6 128:4
138:4,4
faced
48:19 58:12
facedown
69:9,11
facing
28:7 57:24
58:7,14
fact
36:8 37:4
39:20
facts
119:11
fair
5:17 118:24
134:19
familiar
128:10
far
27:14 28:12,16
29:13,19,20
30:8 38:12
40:12 47:17
47:24 50:15
50:20 52:9
52:11 74:17
74:18 91:19
100:20,22
fashion
135:10

fast
59:9 61:3
71:22 126:2
129:1
February
118:7
feel
41:13 135:7
feet
28:19,21 29:23
29:23 40:14
40:18 42:10
42:15,18
43:4 74:19
137:1
fell
137:15,16
female
45:16 50:4
field
28:23 29:3
fighting
67:6 108:15,19
108:21,22
109:1,4,12
file
84:10
filed
123:13
fill
87:14 89:11
110:10,16,17
110:21,24
112:15,24
filled
111:10 114:7
136:3
filling
87:7 88:2
final
103:20
finally
66:16
find
41:11 135:24
fine
107:23 121:1
121:11
finish
19:19 28:3
finished
89:1
first
4:7,14,18 13:5
18:21 25:11
26:16,19,22
27:1 28:15
29:16 30:13
30:18 32:18
37:8 41:11
44:1 57:2
65:9 68:12
69:6 73:11
74:15 79:24
81:8 88:6,13
88:14 91:1
96:18,22
97:24 100:8
114:14,17
115:19
142:17
firsthand
112:3
five
15:10 119:19
120:8 123:2
123:2 124:12
124:19 125:1
flooded
126:14
following

107:20
132:22
follows
4:8
foot
48:2,4
force
31:14,18
foregoing
141:15 142:24
143:4
foreman
10:22,23
forest
9:14,16,20,21
10:1,5,9,12
10:15,19
14:21 17:11
17:17,19
format
99:9,12
forth
62:11
foundation
88:7 137:9
four
7:17 8:3 50:14
98:3 106:22
109:1 119:16
Fourth
121:6
four-door
33:24
FOX
2:2
frequently
103:2,3
frisk
117:14 118:6
front
27:23 28:18,22
29:2 44:3,4
45:16,17
46:8,11,16
50:17 53:13
54:1 55:14
99:9 116:2
full
4:2 13:13
22:12 131:12
full-time
14:20,21
further
56:16,18
109:20
129:20
139:14,24
140:2 142:16
143:3,6,10

**G**

Galarza
66:11,19 74:12
78:11 80:11
108:23
garbage
7:14,15,19 8:3
8:5,9,23,24
9:12 99:24
gasping
65:21 67:14
73:20
gathering
104:7
general
38:24 84:20
87:12,16
93:11 110:22
117:9,11,13
117:23,24
118:2,3

generally
17:13
gentlemen
39:23
getting
33:18,19 45:24
78:5,8 80:16
82:24 84:18
84:12 128:4
129:17
Gibbons
2:12 3:5 21:1
21:7 31:19
32:4 36:19
52:13 88:7
121:8 124:11
124:16
125:12,16,17
129:19
Gillespie
66:11,19 74:13
78:11 80:7
Gillespie's
110:3,7
give
98:12 108:4
given
19:3 135:10
141:16
142:20 143:1
glasses
110:3,7
Glover
112:14
go
6:18 8:14,17
12:3,12
16:10 17:6
17:11,20
22:23 27:15
31:7 32:1
40:1 46:7,11
52:9,14
53:10 57:13
58:2 61:11
61:19 63:17
64:22 75:3
82:11 91:2,8
91:9,13
109:15,20
116:20 117:8
121:3 125:20
132:19 133:3
goes
109:21 128:7
going
4:19,23 8:15
8:16 27:17
30:13 33:23
35:18,22,23
36:8 37:5,20
39:21 41:14
58:10 59:12
84:24 118:21
121:18 123:6
130:4 134:20
135:9 139:22
good
101:24
gotten
28:21 68:24
95:15
grab
51:20 54:22
57:9 61:8
63:20 68:10
93:20
grabbed
40:5 54:20
55:6,15,24

56:1,5,6
57:7,22 58:4
59:11 65:5,6
138:10
grabbing
62:14
graduate
8:12,14 9:6
graduated
6:10
graduating
6:21
greatest
133:15
ground
4:18 61:9
63:21 65:9
67:6,9 69:1
69:3,5,8,9
69:11,15,19
71:18 74:9
74:11 94:6
94:10 130:7
groundwork
120:22
Grove
20:9
guess
21:17 31:14
62:12 65:7
102:23
guide
51:4,18 52:4
52:11 54:3,7
55:1,3
guided
51:14 53:2
guidelines
118:9 120:8
guiding
53:9
guy
40:5 93:19,22
94:5 96:10
guys
128:2,10,13,17
128:18 129:5

**H**

H
3:10
half
81:19 87:6
hand
51:17 52:23
98:23 143:15
handcuff
67:6
handcuffed
68:16 71:10
handcuffs
68:10 70:3,6,9
70:11,13,16
70:17,19
71:1,8 73:4
73:6,9 81:11
handed
122:16
handing
100:11
handle
144:18
handling
86:16
hands
62:14,19,20,23
63:3,5,7
68:8 69:17
handwriting
114:11
handwritten

98:21
handy
85:24
happen
129:9
happened
24:23 49:20
50:24 54:18
55:15 59:9
60:2 61:2,4
64:12 65:13
69:21 71:22
75:5,14,15
75:16,20
76:23 78:5
81:12 83:23
84:2,15
105:3 109:8
126:2 128:24
129:1 132:9
137:14
happening
64:17
happens
103:19 134:3
hard
59:22,24
129:13
hazard
133:14,16
head
5:3 74:8
heading
27:7
hear
50:6,8 60:24
84:11,24
95:21,23
96:2
heard
25:2,5,23 26:2
26:11,16,22
32:18 68:14
79:24 81:8
96:18 128:23
132:19
hearing
94:22 95:2
hearings
113:14
hearsay
116:17
Helen
2:12 125:17
help
61:5 64:7
89:11 93:9
93:13,15
97:5
hereinbefore
143:9
heretofore
142:7
hereunto
143:15
high
6:10,12,15,22
8:24
HINSHAW
2:8 144:4
hired
18:12
hit
27:13 28:11
29:9 31:4,9
31:11,21
32:9,12
33:10,16
38:1 133:6
138:6
hitting

107:2
honk
135:3
honking
79:24 81:9
96:19
hood
46:9,18,20,22
47:10,15
48:18 65:10
horn
25:2,3,5,23
26:1,4,11,13
26:15,16,22
27:17 28:17
30:12 31:1
32:18 33:16
33:23 35:18
35:22,23
36:2,8 37:5
37:20 39:21
41:14 79:24
81:9 96:18
121:18
132:19
134:12,20
135:3,4
hour
1:17 81:19
hours
12:23 13:1,8
13:12,12,13
39:10 90:18
house
16:22 17:7
hug
56:5 57:8,9
58:17 79:4
hugged
57:18,21 58:10
60:17
hugging
58:23
hurry
91:17
hurting
83:6
hypothetical
118:18
hypothetically
21:13

**I**

ID
3:11 49:2,18
56:21 107:14
108:1,4
idea
84:20 94:11
137:24
identification
48:11 49:7,21
90:4,7 97:13
111:4,8
112:8 114:4
117:3 120:14
120:18
122:14
130:22
136:11,12
identify
49:9,11,24
119:14
121:19,23
ignition
133:20,22
Illinois
1:3,16,19 2:3
2:8,13 96:12
141:3 142:1
142:6,10,12

143:22 144:2
144:6
imagination
132:1
imagine
73:5
immaterial
121:3
immediately
6:18 30:21
54:2,9 65:3
65:7
implicated
121:6
important
41:14
improper
119:2 135:8
incident
73:1 87:15
90:22 93:3
102:6,16
104:23
105:13
110:13 123:5
125:7,20
132:9 139:6
incidents
102:13
include
123:20
included
130:6
incomplete
118:18
indicates
106:1
indicating
115:4
individual
58:11
individuals
41:2,3,7,15,18
45:14 112:19
Info
115:6
information
6:8 23:13,14
23:17,21
37:1,6,15
75:18 78:8
80:17 88:17
99:7 102:5,6
102:10,15,18
103:4 104:7
111:15 112:2
125:6 130:6
136:18
initial
5:22 17:9 75:7
initials
124:23
injured
82:23 83:1,4,8
83:11
inside
24:21 25:6,14
25:17,18
26:2 32:23
33:11,15
34:4,22
36:12 47:14
50:4 77:14
77:16,21
81:9
instance
24:1
instructions
19:3
intent
135:18 137:24

78:23 86:18
interested
143:13
interlock
57:15
interlocked
57:16
interrogato...
122:18,19
124:13
interrupt
44:10
interview
78:1
investigate
38:23
investigation
102:22
investigations
131:7
involved
78:9
involving
119:12
irrelevant
121:3,5
issued
118:7
it'd
102:21

**J**

January
15:2,19,23
114:18 115:8
116:1 143:16
144:3
job
7:10,22 9:15
10:10,12,17
10:17 14:20
jobs
15:22
jog
39:17
join
21:1 31:19
32:4 36:19
121:8
JONATHAN
2:2
jot
98:22
judge
116:2,6,7,13
116:16,19,22
jump
137:19
jumped
12:13 43:17
138:11
jurisdiction
20:16,21 21:6
21:15 131:15
131:16
justice
8:20

**K**

K
142:3
Karen
1:15,23 141:12
142:4 143:21
144:22
keep
27:6 86:2 99:6
101:19
Kenneth
112:12

kept
33:13 56:2
100:2
kind
63:6 84:15
65:20 126:4
128:3 129:12
137:6
knew
37:19
knock
59:24
knocked
63:23 64:3,6
82:24
know
17:15 18:9,13
20:4 21:9
24:14 31:17
32:6 34:1,12
34:13 38:14
39:23 43:13
48:24 49:7
57:16 59:10
59:13,16,19
61:2,9 62:22
63:8,17 66:6
66:9,23,24
68:12,15
69:4 70:8,16
70:24 71:3
71:16,23
72:7 74:6,21
75:6 81:12
81:15,16,18
81:20 82:1
82:13 83:3
87:1 89:19
89:23 93:12
94:8,8,19
95:9,12 96:2
96:6 100:1
100:22 101:3
103:1,15
104:15 106:1
107:6,15,17
107:20,21
109:16 116:4
117:24 118:1
120:20,21
121:5 123:8
125:4 126:5
126:13,14,20
128:2,3,16
129:2 134:6
137:12
138:16,23
139:2
knowledge
4:21 39:7
106:17 110:6
111:22 123:4
known
130:4
knows
123:12
Ksiazek
2:2 3:4 4:1,10
8:1 19:21
20:19 21:2,8
21:24 22:2
28:5 30:4
31:10,20
32:5 34:16
35:8 36:20
37:8,11,14
38:23 39:4
47:20 52:16
52:21 60:14
60:15 74:1
81:22 88:8

89:13,21,22
90:1,5 97:9
97:14 109:11
110:1 111:3
111:9 112:9
113:24 114:5
116:21,24
117:4 118:21
119:6,8
120:11,13,19
121:11,12
122:7,10,15
123:15
124:15,17,18
125:10
130:20
133:12 134:1
134:14 135:1
136:21 137:9
137:22
138:14
139:15,24
Kwiatkowski
66:12,13,14,19
74:13 78:11
108:24

**L**

Lake
20:9
Larry
1:10,13 3:3
4:4,6 141:8
141:19
142:10,14
144:8
LaSalle
1:18 2:7,12
142:9 144:1
144:5
lastly
5:13
law
2:10 121:1
132:16
136:15,17
lawsuit
124:10 138:21
laying
69:6
leading
133:12 134:1
134:14 135:1
137:22
138:14
leaned
65:20 73:19,21
leaning
67:11,13,16,17
67:22 73:20
74:21
learn
16:23 17:14
96:4 111:14
112:2,18
124:1
learned
81:4 134:16
leave
7:8,19 8:8
10:8 12:11
41:7 89:2
left
8:4 15:3 28:24
42:5 55:4
legible
113:5
legs
81:8 63:12,12
63:15,21
64:10,13,19

65:1,5,11,15
66:22 69:13
Leo
6:15
lettering
19:24
let's
10:8 12:24
17:6 21:13
25:11 27:14
32:21 33:6
34:23 35:13
53:10 60:16
61:11 102:16
license
1:24 95:5,8,10
95:16 96:20
96:24
lifted
57:11 59:12,17
lighted
40:21
lights
34:3,7,11
line
91:16 121:2
linebacker
137:6
lines
95:18 106:22
123:10
LITIGATION
2:11
little
81:11 83:22
88:21 104:7
115:12 127:13
LLP
2:6 144:4
located
6:16 55:8,13
57:20 60:24
63:9 81:24
85:10,14
100:19
location
92:22
lock
133:20,22
locks
137:7
long
7:6,15 9:3
10:4 11:3
12:2,8,20
17:1 18:9
29:6,10
34:17 64:2
67:22 81:7
81:15,23
82:7,10,13
86:22 87:1,2
87:19 120:24
longer
81:16,19
look
22:19 23:7,14
24:23 43:21
44:7,16
83:17,18
88:1 93:24
107:7 118:1
127:9
looked
36:5 43:22
83:21 127:17
looking
33:21 44:2,9
47:10 107:19
132:15
looks

19:23 99:5
losing
82:23
lost
133:9
lot
30:5 38:17
126:10 128:2
139:18
loud
26:7,10
LT
124:23

**M**

M
2:7 144:5
main
25:11 66:15
making
82:16,17 93:17
male
106:23
man
7:14,15,19 8:4
8:5,9,23,24
9:12 120:9
manner
134:20
Margaret
144:22
mark
90:1 97:9
111:3 114:1
122:11
124:20
marked
3:11 90:3,7
97:12,15
111:7,10
112:7,11,13
114:3 115:12
117:2 122:13
122:16
130:11,18
Market
39:2
marks
125:3
maroon
20:1
matter
42:9 74:19
125:19 129:1
McClinton
103:14 104:10
McCORKLE
144:1
mean
12:5 17:7
21:12,21
22:8,11
34:13 35:3
35:13 38:21
39:1 43:20
44:10 52:15
54:5,12 57:5
62:2,13,15
65:22 74:19
75:4 79:22
84:1 87:8
93:8,15
108:14 109:9
109:13
110:15 116:8
117:6 118:2
121:9 126:9
meant
107:15 116:5
124:3 129:23
130:2

meet
75:7,11 77:8
77:12 80:17
80:19,21
memory
90:23
men
133:6 135:12
mentioned
83:5 143:9
Merrionette
11:15,19,20
12:12,21
13:9,15,18
14:3,11 15:4
middle
94:4 105:16
107:7
midnight
13:7 123:23
Midnights
13:6 17:24
Mike
66:12
military
15:7
mind
125:13
minute
29:12,24
minutes
34:20 81:17
82:2 129:2
Moore
18:8,9,14,18
19:1,4,9
20:12 24:17
24:20 27:4
32:18,21
33:6,14 34:6
34:18,22
36:10 37:3
37:17 40:24
41:1,19,24
47:4 49:22
49:24 50:23
51:14 52:11
52:22 53:2,4
53:5 54:3,7
54:10 55:1
55:13 56:1
56:23 57:1,6
58:4 60:4,22
61:7,13,16
61:22 62:9
62:21 63:1
63:17 70:24
78:13 79:19
79:24 80:3
82:3,18,19
83:3,11 84:7
84:11 85:2
85:14,17
86:16 87:3,5
89:7,10,18
94:9 108:23
109:5 111:20
111:21,24
112:4,5
123:24
137:19
138:10
Moore's
51:6,8 54:14
54:19 55:3
62:6 63:2
83:16
morning
24:9,11 38:22
39:9,22
40:22 132:8

motion
44:5,13 54:17
move
53:1
moving
137:3

**N**

N
3:1
name
4:2,2 88:18
96:4,6
104:10
114:12
115:13
123:14
124:22
127:20 128:3
named
138:21
names
112:19 127:21
nametag
132:13
narcotics
131:3,6
NAUGHT
140:2
need
5:13 87:11
88:15,17,18
92:21 135:5
144:15
needed
93:14 97:5
136:1
needs
19:12 93:9,13
never
14:17 53:19,20
95:15 96:14
96:19 97:3,6
117:6,8,18
122:3 124:6
128:5
new
101:6,9
newer
36:4
night
8:15,16,17 9:1
13:14 24:6
30:6 66:7,10
104:16 113:2
113:8 127:22
Nights
13:4
nine
122:21 123:16
noise
26:1 31:2
normally
49:5
north
1:18 2:7,12
43:14 142:9
144:1,5
NORTHEASTERN
1:3 141:3
notarized
144:16
Notary
141:24
notepad
101:17
notes
101:16,19,22
103:3 104:1
104:3 124:12
124:13

notice
1:20 27:9
37:22,23
143:7
noticed
27:2,12 38:1
50:3
November
1:17 141:14
142:8
number
3:11 88:19,19
88:20 92:5
96:20,24
104:5 115:15
124:5 144:7
144:20

**O**

0
142:3,3
oath
6:1
object
20:23 81:21
118:17 121:2
objection
20:17 21:1,7
31:6,16,19
31:23 34:15
35:8 38:17
36:19 47:19
52:13 60:13
88:7 89:19
116:15 122:3
122:5 133:12
134:1,14
135:1 136:21
137:9,22
138:14
obligation
6:2
observed
41:2
observing
44:20
obtain
14:20
obtained
139:1
obviously
124:10
occasion
22:19 24:4
113:13
occurred
31:5 105:13
occurrence
105:11
occurring
121:7
October
16:12 18:2,5
18:11,19
19:1,5,18
20:5,11 23:4
23:6,10,20
23:20 24:6
90:1,14 91:13
104:17
118:15 120:4
123:19,22
125:7
offender
105:17
Offense
115:5
officer
1:10 7:13,21
8:12 9:9,13
9:17,20

11:10,12,15
12:16,21
13:23 14:2
14:16,17,20
15:9 16:19
18:8,9,14,18
19:1,4,9,11
20:12,16
24:17,20
27:4 32:18
32:21 33:6
33:14 34:6
34:18,22
36:10,21
37:3,10,11
37:16 40:24
41:1,19,24
47:4 49:10
49:12,14,22
49:24 50:1
50:23 51:6,8
51:14,22
52:11,22
53:2,4,5
54:3,7,10,14
54:19 55:1,3
55:13 56:1
56:23,24
57:1,6 60:4
60:22 61:7
61:13,16,22
62:6,9,21
63:2 66:11
66:11,12
70:24 75:16
75:19,19
76:8,20,22
77:18 78:13
79:19,24
80:3,7,11
82:3,18,19
83:3,11,16
84:7,11,17
84:18 85:1,2
85:14,17
86:16 87:3
89:7,10,18
90:11 93:9
93:13 94:9
107:10
108:21,23
109:5 110:3
110:7 111:21
111:24 112:4
112:5,15
114:11
118:11
119:14 120:6
120:12,15
124:8 125:17
129:10 132:4
132:17
133:15
136:16,18
137:19
138:10 141:8
142:14
officers
64:14,16,18
65:14,18,18
65:23 66:6
66:15,18,20
66:22 67:3
68:4,14
69:22 70:7
70:19,22
71:8 72:11
73:12,13,14
73:17,18
74:2,10,12
74:15,23

75:10 77:12
78:3,7,9
80:14,16
82:9,15 84:8
84:9,12 85:2
85:13,15,16
86:11,14,19
88:2,11,19
89:6,10,15
89:18 94:6
104:6 107:9
107:11,12
109:1 111:16
111:19,22
112:20 113:3
125:19,23
126:17 127:3
127:6,20,21
131:19
138:16,20
officer's
88:18,23
Oh
14:18 37:10
105:1 123:11
126:22 130:7
okay
4:17,21 5:5,6
5:11,12,18
5:19 6:18,21
7:18 8:2,8
8:14 9:8,11
10:4 11:17
12:8 14:19
15:6,9 16:15
17:22 19:15
24:4 25:10
28:4,10
33:15 34:6
35:2 37:22
40:8,12 43:3
44:6 45:18
46:13 47:21
47:24 50:23
53:12,22
55:22 56:8
61:11 63:2
64:24 65:13
67:1 68:21
69:2,18,21
71:14 74:14
74:20 75:23
76:7 77:1,16
81:7 85:19
87:7,23 90:6
90:17 91:1
92:4,20 93:6
93:24 94:12
94:13,23
95:3,12 96:1
97:18 98:3,6
99:8,12
100:4,7
103:15
105:15 106:7
106:14,21
108:6,13
109:14 110:2
110:10,24
111:13,18,21
112:18 113:6
114:10,14,22
115:11,18
117:10,13,21
119:24
121:19
122:21 123:1
123:1,16
124:10,16
125:14 127:8
132:15 133:9

old
15:13 100:23
101:2,4,10
older
36:1,4,5
once
27:1 30:21
34:3,7,22
41:7 44:23
50:23 65:23
67:3 71:7
75:5 80:7,11
83:23 84:3,5
85:20 86:11
138:10
ones
68:15
open
24:15 25:12,19
38:21 39:3
39:12 50:12
opened
25:2 29:1
42:12 43:4
46:8,18
opening
46:20
opportunity
23:7
opposed
73:17
order
66:23 102:1
117:9,11,13
117:24 118:2
orders
117:23 118:3
24:4,10
ordinances
17:13
original
99:20,21,22
130:16
originally
100:9
outcome
143:13
outside
25:3 29:8,17
30:14 43:23
76:16,19
overlap
21:4,10,12,16
overlooked
5:22
owned
136:9
o'clock
39:8

**P**

pad
99:6 103:5
page
90:10 94:4
95:3 105:16
106:8,15
107:8 114:14
115:3,12
122:21,21,23
123:2,3
124:12,19
125:1
pages
97:24 98:4
144:12,15,17
paper
102:12 118:10
paperwork
85:24 86:1
87:14 88:12
paragraph

106:10,14,18
109:7 114:17
114:20,23
115:18,20,22
115:24
118:19 119:9
119:10,16,19
park
11:15,19,20
12:12,21
13:9,15,18
14:3,11 15:4
41:24
parked
27:23 28:7
42:24 43:1
50:16,17,20
133:4
parking
133:1 139:16
139:20
part
10:11 12:14
52:1 103:17
participate
131:6
particular
119:4
parties
143:5,12
144:18,24
partner
18:4
parts
62:17 119:4
part-time
11:13,16,21,23
12:9,16,21
12:23 13:9
13:13 15:3
pass
65:4 118:3
passed
28:21 29:7,11
54:4,5
passenger
33:12 38:9
40:2,9,10
41:4 42:19
43:21,23
45:6,17 50:4
137:15,16
138:2
passengers
113:7
passenger's
38:6
pat
129:11
patch
127:16
Patrick's
111:14
patrol
9:17,19,21
13:23 14:2
16:5,10
19:15,23
20:10 21:22
22:3,24 27:3
27:7 41:24
42:16 59:4,6
59:15,23
60:3,11
Patrolman
16:14
patrolmen
16:9
peel
133:22
pending

109:17
142:11
people
18:16 22:15
38:2,4,5
39:14 43:16
43:19,22
44:1,7,15,17
44:20,24
45:2,9,10,12
46:1 72:6
78:4 82:16
129:8 133:3
133:16,17,19
135:3
period
119:17
person
49:7 96:3 98:8
104:13 105:8
118:13
119:21 120:8
personally
142:8
Persons
119:16,16
phone
144:20
physical
62:1,2
pick
5:5 18:17
picked
60:2,10 136:24
picky
102:3
piece
49:6 102:12
place
52:23 66:1
68:4,10
69:22 70:2,5
70:13 73:8
77:16 81:8
90:22 93:4
96:24
placed
70:8,10 71:12
73:4 75:6
76:9,12
77:14,20
79:9 80:1
129:3,15
plaintiff
1:7 2:5 123:4
141:6 142:13
Plaintiff's
97:9,16 111:4
111:11
112:11
122:17
plate
23:24 98:10,20
plates
96:15
please
4:1 95:5
123:17
144:13,17,19
plenty
120:23
plus
57:7
point
26:17 28:13
29:19,20
30:12,17
32:8 35:17
37:7 41:18
44:6 46:14
47:5,9,18,19

48:4 49:24
55:10 56:9
56:20 80:18
61:1 63:11
64:19 65:8
72:10,22
76:13 77:7
79:2,23 98:1
121:7 127:6
129:20
135:18 139:5
139:8
police
1:9 5:23 7:20
9:13,14
11:10,12,14
14:16,17,20
15:16 16:18
17:10,11,20
18:11 19:11
20:1,15,22
21:16,19
22:7,13
72:10,18
74:2,10,14
74:22 75:10
77:11 84:9
84:17 85:2
85:13,16
86:10,14,19
88:1,5,11
89:6,10,14
89:17 93:10
97:23 100:19
107:1 109:13
109:22
111:19,22
117:15
123:18 124:7
125:19,22
126:10,17
127:1,3,5,9
127:19,21
129:23
131:12,19
134:17
136:18 141:7
Police's
21:5
POLICE
2:11
portions
119:2
position
15:4 16:1,3
69:7
positioned
43:18
possibility
134:22
possible
35:20 38:23
possibly
39:8
potential
133:14
powers
22:7 131:12
practice
101:12
practices
124:1,2
preparation
5:20
presence
142:21
present
113:15 143:8
preserve
9:14,16,20

10:2,5,9,12
10:15,19
14:22 17:11
17:17,19
preserves
9:21
preventing
6:5
previous
18:19
previously
79:21 80:3
124:6
principal
130:24
prior
98:1 102:13
probable
118:20 119:11
120:16
Probably
99:2 101:23
problem
39:24 41:12,13
141:7
135:23
procedure
87:24 119:4
procedures
119:3 120:21
120:21,24
124:2,3
proceed
33:9
proceeded
26:1 27:3
61:19 63:17
process
33:19 51:2
93:18
processing
22:14
produce
107:24
produced
118:9 124:16
Professional
1:16 141:13
142:5
promise
122:11
pronunciation
125:2
property
132:7
protect
132:6
provide
5:2 136:12,18
provided
90:8
Public
141:24
puffy
83:21
Puiszis
2:7 3:6 7:22
19:19 20:17
20:23 21:21
28:3 29:24
31:6,16,23
34:12 36:6
36:17 37:7
37:10 38:21
47:19 52:14
52:17 60:12
73:11,16,22
81:20 89:12
89:19 109:9
109:13
116:15

118:17,23
120:5,12,15
120:20 121:9
122:3 123:12
125:14
129:22
130:21
133:13 134:2
134:15 135:2
136:23
137:10,23
138:15
139:12 140:1
144:5,9
pull
21:14 57:6
71:14 88:19
88:22 132:20
137:20
pulled
27:12 28:10
29:9 30:14
30:19 31:3,8
33:14 51:5
55:24 57:22
59:17 61:10
65:8
pulling
56:2
purpose
119:15 121:20
135:21
purposes
90:7 111:4
130:22
pursuant
1:19 143:7
pursuit
36:15
push
52:7,22 54:15
pushed
51:6 53:3
54:14,17,18
56:22 58:4
pushing
51:18 59:11,14
put
68:8 70:11,16
70:17 73:8
73:23 74:8
76:10 102:2
103:11,16,22
105:7 107:4
108:10,17,18
108:22,24
109:12 110:4
124:20 125:2
129:6,8,18
135:18
137:12
putting
56:8 104:13
p.m
140:3

_____
Q
_____

question
5:16 19:19
20:18 22:1
23:9 28:3
31:17,24
32:1 47:23
48:1,14,22
51:8 88:9
109:16,18
116:20
118:24 120:7
122:6,8
123:2,16,17
124:20 125:3

questioned
122:9
questioning
117:14 118:6
119:20 121:2
questions
4:20,24 56:16
56:18 78:4
78:20 106:12
121:4,21
125:11
139:13
141:16
144:19
quick
31:8 39:22
73:15 81:12
quickly
38:2 106:23
124:11
125:20
135:13
quite
39:1,2 62:12
86:24

_____
R
_____

R
2:2
radio
23:19,21 24:1
41:6 60:5
61:4 93:18
93:20
radioed
63:19 64:6
96:19 138:11
rank
16:13
RD
88:19,20,22
104:5
read
106:10 112:22
118:24 119:6
119:22
141:10
reading
120:19 125:5
reads
5:11
ready
84:10,12
real
81:12
really
101:24 124:11
rear
38:9 82:23
reason
36:8 87:19
reasonable
118:11 119:12
119:17,24
120:2 121:13
recall
8:21 9:3 11:22
13:3 24:8
30:7,8,23,24
34:5,6,9
42:1,21,23
43:17 44:19
50:11 60:23
66:3 67:11
70:21 71:6
71:16,20
72:1,5,16
73:5,11,16
74:6 77:8
78:14,15,19
78:21 79:8

79:12,16,18
80:2,6 81:2
81:3 82:12
82:14,21,22
83:14 84:16
91:9,19,20
91:24 92:2
94:22 95:2
95:24 96:5
103:24 104:2
104:21 105:4
110:20
113:11,18
125:22 126:7
126:16 127:2
127:5,18,20
128:20 129:3
132:11 139:5
139:8
receive
13:20 16:18
17:5 23:17
received
17:15
reclassify
103:8
recognize
97:15,19 117:5
132:16
recollection
106:19 113:21
record
4:2 119:1,7
reduced
142:22
referring
94:9
refresh
113:21
refused
107:24 108:3
123:5
regards
19:4,8 117:14
Registered
1:15 141:13
142:5
registration
78:24
related
100:19 143:11
relating
125:6
relation
41:23 53:22
55:9 71:18
71:23 100:20
relax
54:21 55:16,20
relevant
102:6,9,18,21
relief
126:4
remember
17:1 34:13,14
42:3 43:15
70:22 71:3
72:21 77:1
78:7 81:6
91:11,12
104:6 116:19
116:22 126:9
127:24
128:17
137:11
repeat
23:9 37:13
86:12 89:16
116:17
repeatedly
56:3

```
5:22,23 75:7
80:22 84:10
84:10,13,23
85:21 87:3,8
87:12,16
88:2,3,6,12
88:16 89:2
89:11 97:23
98:17 99:1,9
99:15,23
100:8,11
101:4,7,10
101:10,15,24
102:2,3,18
104:14 107:1
107:5 109:4
109:13 110:5
114:7,8,9
116:12
129:23 130:8
130:10,12,16
130:18
reported
1:23 142:20
reporter
1:16 5:5,9
141:14 142:5
144:22
REPORTERS
144:1
reporting
88:23 107:10
107:11,12
reports
17:13,14 22:17
22:18,20
85:22 87:4,9
87:12 101:13
109:19
112:16
116:11,12,14
124:4
represent
125:18
Representing
2:5,14
represents
133:15
request
136:19 138:17
requesting
138:13
reserve
140:1
resign
11:9
resigned
11:7
resisted
75:18
resisting
56:3,4,14 68:8
68:13,19,23
108:15
respective
143:5 144:18
respond
48:15 49:17
responded
138:17
responding
107:9
response
33:5 35:1
48:10,13
51:7,12
68:11,19
77:5 81:1
84:18 93:6
123:19 138:8
responsibility
```

```
132:4
result
83:1
return
144:17
returned
116:1
review
5:20 144:13
rewrite
101:15 103:2,6
103:9
rewrote
98:20 112:22
113:5 130:12
riding
123:24
right
7:22 23:11
27:14 28:15
28:18,22,24
29:1,16
34:24 35:14
37:12 38:20
39:5,12,23
42:8,13,23
43:1,5,10,23
44:7,17,18
44:21 45:21
45:21 46:13
48:5 49:18
54:23 55:6,9
56:21 57:2
58:4,8,10,12
59:7 63:22
65:16 66:21
68:1 70:9
71:11 73:1
85:7,7 88:20
89:21 90:18
91:4 92:12
92:15,22
93:1,4,16
94:3,6 95:16
96:15 97:24
101:7 102:7
102:19,22
106:3 107:2
107:9,20
108:3,4,8,11
108:19 109:1
109:5,11
113:12,24
118:5 119:6
122:22
132:20 133:7
133:10,23,24
134:7 136:3
rights
135:8
road
67:20
Roberson
112:12
roll
18:15
room
2:12 18:15
84:22,23
85:1,4,5,7,9
85:12,20
86:21 89:20
ROs
107:8,14 116:1
RPR
1:23 143:21
144:23
rules
4:18
run
23:24 39:17
```

```
46:21 95:5
96:10,15,20
96:24
running
58:6 59:11
137:7
runs
137:7

─── S ───

S
3:10
safety
35:15 131:23
SAITH
140:2
Salvatore
125:1,2
Sangamon
6:17
Sanitation
10:21 11:4
sat
80:15 82:8
saw
26:23 29:7,16
30:13,18
33:10,16,23
40:8 41:7
45:6 46:10
47:1 68:3
74:3,15
132:20 133:6
135:12,15
saying
42:21 68:14
79:8,16 91:8
91:24 100:4
109:7,11
120:5 128:17
128:18
says
20:1,2 90:17
91:16 92:7,7
92:13 94:1,5
94:12,15
95:5,7 96:9
103:8,21,23
105:11,17
106:22
107:24
109:10
111:13
114:10,11
115:1,4
118:19 123:3
scene
65:24 66:4
72:24 74:23
78:2,20 80:8
80:11,14,15
81:5 92:1
104:7 109:8
110:11,12,13
110:18
112:20 113:4
113:8 125:23
126:18
138:24
school
6:10,12,15,22
7:1 8:7
scratch
99:2,3 102:11
103:5,8
seat
40:10 45:16
137:17 138:1
second
25:18 95:3
114:22 115:3
```

```
115:24
seconds
26:24 30:22
46:3 54:6,11
63:24 64:4,5
67:23
secure
144:13
see
10:6 20:20
22:20 26:12
26:17,19
31:11 32:8
43:22 44:7
44:17,23,24
45:2 50:15
58:14 61:18
62:4,9,23
65:22 67:24
68:8 69:18
70:2,5,13,15
71:5,8 83:16
83:20 90:10
90:18 94:2
95:4,6
105:17,18,23
118:18
119:15,17
135:9,23
seeing
30:7 73:11
127:5
seen
25:3 26:14
29:19 30:2
44:1 69:8
70:15 73:21
90:14 117:6
117:10,13,18
117:21
send
92:8 93:15
sent
92:12
sentence
94:5
sentences
91:2
separate
20:21 21:20
85:20
sergeant
16:5,7,15
103:13,23
104:10 110:4
110:8 126:23
sergeant's
103:20
served
15:6
set
143:15
Setina
144:22
seven
105:11
shake
5:3 32:8,15
sheets
144:12,14,15
144:18
shift
13:3,5,7,15
17:22 18:1
123:23
shifts
13:11
shirt
126:24 127:14
shook
32:11,16
```

```
Shore
20:9
short-winded
67:15
shoulders
63:7
show
19:10 113:24
showing
19:14 90:6
side
20:1 25:13,15
32:13,13
33:12 38:6,7
41:4 42:19
42:20 43:21
43:23 50:20
55:10 67:20
137:15,17
138:2
sidewalk
72:7
sight
27:6 133:10,18
sign
135:4
signature
122:22 140:1
143:3,15
144:11,13,14
144:16,17,22
signed
144:15,15
silver
33:24
similar
117:21
Sincerely
144:21
Sinclair
112:12
single
118:1
sir
51:3
sitting
33:12 81:11
82:7,10
86:20 93:21
situation
65:19
six
13:12 17:4
slam
59:3,6,22
slammed
59:1 60:3,11
slash
98:8 104:13
105:8 106:8
115:5,6
slow
94:16,16,20,23
94:24
smell
7:23
smelly
7:22
soft
26:9
sole
21:15
somebody
97:5 120:6
136:1
soon
30:2 54:9 65:5
sorry
14:18 21:19
29:16 34:15
37:12 42:16
```

```
44:9 51:22
75:3 89:5,14
98:7 108:18
109:18 117:8
121:9 126:7
127:19
131:16
sort
31:22 52:3,3,9
62:13 63:6
84:20
sounding
32:19
sounds
91:21
south
43:14 95:20
speak
118:18
speaking
46:5 82:15
special
19:3
specific
10:1 102:16
117:12,20
119:2
specifically
68:15 77:1,4
84:16 126:20
speculation
136:21
speed
31:9
spell
4:3
speller
102:1
spend
86:22
spoke
37:4
spoken
138:24
spot
42:1 139:20
spots
133:1 139:16
spun
59:13
squad
40:11 53:10
56:7 66:4
71:12,23
78:13,16,19
79:9 80:1
95:21 129:4
129:16 137:4
137:14
squads
61:10
SS
142:2
St
111:14
stamped
95:4 97:17
106:9 112:14
112:15
114:15
115:12
stamps
90:9,10
stand
71:15
standing
68:21,22 70:9
74:16 75:21
76:15,16,18
stands
107:8
```

star
115:15
staring
33:13
stars
127:16
start
14:15,24 53:24
75:24
started
12:7 17:18
55:18,22
56:6 59:11
61:6 84:23
85:21 100:9
121:7 130:12
starting
90:18
state
4:2 107:3
109:4 113:10
119:15
121:20 142:1
142:6
stated
29:9 32:21
66:19,21
77:3 83:12
91:3 113:9
statement
35:4,10,12
91:18 92:2,9
statements
123:9
states
1:2 98:12
106:21 107:8
116:1 118:10
141:2,15
station
80:18,20,21,22
83:24 84:6
89:7 96:5
98:14,15,16
98:18,21
100:3,5,14
100:16,19,19
100:23 101:2
113:1 128:18
stayed
65:16
steal
133:21
steering
133:22 134:4
stenographi...
142:21
step
49:22 50:24
51:3,8,9
52:15
stepped
42:8,12
steps
52:17,18,19
Steve
125:13
Steven
2:7 112:12
144:5
stolen
22:20,21 23:8
35:19,24
36:7,11,15
36:23 92:18
96:18 97:3,4
97:4,6 134:7
134:11,22
135:24
stop
30:12,18,17,21

41:19 49:5
56:3,3,11,13
68:8,13,19
68:23 118:10
119:12,15
120:12
stopped
30:20 31:2,9
38:18 37:3,8
37:10,11,17
40:7,18,19
44:24 45:20
45:21,22
46:5,10,12
46:13,14
118:13,14
119:21
120:11 122:3
135:10
stopping
36:22 122:2
stores
38:15,17,18
straight
28:20,21 29:3
43:10,12
street
1:18 2:3,7,12
24:5,10
25:13,13,15
25:18 27:20
27:21 28:8
28:23 38:19
40:21 43:12
43:13 49:6
50:20 67:21
71:17,21
72:4,8,9
81:24 91:17
110:14 120:6
132:10
139:17,19,21
139:23 142:9
144:1,5
streetlights
40:23
Streets
10:21 11:4
stretch
132:1
stretching
69:12
strike
79:3,5
strongly
31:21 32:2
struck
31:15 138:6
students
131:23 132:6
stuff
78:5 84:10
98:22 102:1
102:12,13
103:2,5
104:5
subject
60:13 122:5
subjects
106:24
submit
144:13
subpoenas
113:23
SUBSCRIBED
141:20
sued
124:6 130:5
suit
143:12
Suite

1:19 2:3,7
142:10 144:1
144:5
summaries
109:23
summary
109:14 115:1
115:19,19
129:24
supervise
16:8
supervisor
16:8 98:10,12
100:12 103:7
103:10,12
126:23
supervisors
102:2
supposed
109:14
sure
5:3,15 12:4,6
20:17,23
23:10 32:2
34:23 35:13
37:15 52:16
53:14 60:14
76:3 86:13
97:4 102:4
102:15
106:13
suspect
22:9 23:14,15
23:18,23
92:15
suspicion
119:13 120:2
121:17
suspicious
39:19 98:6,8
104:13 105:7
Sweeping
7:3
swinging
54:17 69:13,14
switch
108:8
swollen
83:22
sworn
4:5,8,11
141:20
142:17
system
36:2 134:11

T

T
3:10
tackles
137:6
take
5:13 7:23 9:1
34:17 52:15
52:17,18,19
81:8 94:15
94:16,19
139:11
taken
1:14 4:12,14
120:9 125:21
139:7 141:11
144:8
talk
5:7,10 32:2
84:3 86:13
104:23
111:18 120:7
talked
79:15,20 86:10
111:21 125:8

talking
38:19,23 45:3
49:8 58:9
75:4 81:4
82:9 84:8
89:10,18
95:19 109:6
tall
15:9
tape
90:13
tell
29:14 36:10,14
36:21,22
50:21 56:13
62:24 68:17
70:10 72:14
75:13 77:7
77:11 81:13
81:14 91:17
93:14 105:2
122:1 123:5
127:13 136:9
telling
68:7 81:3
84:14 91:9
91:12
ten
40:14,18 42:18
43:4 81:17
124:5
terms
131:23 133:14
testified
4:8 79:4 80:4
87:18
testify
6:2 142:17
testifying
6:6
testimony
52:5 99:18,22
142:19 143:1
143:14
Thank
139:12
thereof
143:13
thereon
65:19
thing
27:4 37:19
61:9 103:7
118:24 119:7
120:20
122:10 126:5
128:7
things
87:11 88:15
93:18 134:9
think
8:18 35:19,21
35:24 60:12
73:7
third
115:11
thought
36:14 39:24
96:17
thoughts
76:2
three
7:7 8:2 10:7
52:17 66:18
86:20 70:21
70:23 106:22
123:10 128:9
threw
63:16 99:2,18
99:22 100:1
100:4,10,13

101:3,10,23
104:1 138:1
throw
102:24 103:3
129:12
137:12,13
throwing
103:18
tickets
131:10
time
4:14,18 9:23
18:21 24:8
24:18 26:21
29:6,11
30:24 33:11
33:13 39:3
43:15 44:13
46:20 54:4,5
56:11,15
59:10 65:4
87:10 68:24
70:23 72:20
79:17 81:13
81:14 82:12
86:20 87:1,2
87:19 90:18
92:16,18
97:1 98:11
102:20
103:10,13
104:15
105:11,12
107:14
119:17 120:5
120:7 123:20
126:11 127:6
134:4,4
139:10
times
32:14
tires
27:13 28:11
31:4,11,15
title
9:15
titled
118:6
today
5:21 6:3,5
125:8
today's
15:19,23
told
54:20 55:16,20
56:3 68:12
68:19,22
75:7,17
76:22 80:19
92:24 103:10
103:15 105:3
105:7 110:4
110:8 111:24
116:7
top
90:19 97:20
98:6 105:8
114:20
137:13
Torres
1:10,13 3:3,12
4:1,4,6
49:14 90:2
97:11 108:7
108:23 111:6
112:6 114:2
114:11
115:15 117:1
122:12
125:17 141:8
141:19

142:10,14
144:8
touch
51:22,23
touched
52:3 54:10
57:1,3
touching
61:23 62:14
63:1
to-wit
142:7
traffic
30:5 131:9
train
19:4
trained
134:10
training
16:17,18,22
17:1,3,5,8,9
17:16,21
19:1,8,12
transcript
5:11 90:14
116:15,17
130:2 141:11
141:15
142:24
144:10,13,15
Transcription
142:23
transported
71:13
transporting
75:8
travel
27:16,18 30:1
34:18 42:6
78:16
traveled
29:14 82:5
traveling
27:18
tried
63:11,20 64:9
64:12,18,21
84:24 65:10
65:14 66:1
66:21
trouble
134:4
truck
7:5
true
106:18 142:24
truth
142:18,18,18
truthfully
4:20 6:2,6
try
5:7,10 40:1
49:6 137:20
trying
8:18 41:11
56:15,17
57:5 60:4
61:8 62:10
67:5,8 68:9
69:16 70:16
70:19 71:1
73:6,8 75:17
78:1 93:19
93:23 104:6
turn
34:3 48:20
115:3,11
turned
34:7 48:19
57:23 58:5,5
58:7,12 61:8

turning 59:10
twisting 59:10
two 9:5 12:10
13:10 25:9
25:10 38:1,4
38:5 39:14
39:23 41:2,7
41:15,16
45:13 46:1,3
52:17 61:18
85:15 91:1
94:6 97:24
101:13 106:8
106:15,22,23
118:19
119:10
126:21
129:13
130:20 133:6
135:12
type 132:16 138:7
typewriting 142:23
Typically 136:14
T-o-r-r-e-s 4:4

U
Uh-huh 127:23
uh-huhs 5:4
uh-uhs 5:4
underneath 20:2 48:18
understand 6:1 20:18,24
27:20 31:17
31:23,24
35:3,12
42:11 62:12
understanding 18:24 19:7
35:9 57:4
113:6 132:3
understood 134:9
undetermined 142:11
uniform 49:13 127:9
132:12
unit 91:2,9,16 92:1
92:5
UNITED 1:2 141:2
units 64:21 86:15
94:13,23
university 1:9 14:23 15:1
15:16,18
16:2,19,20
18:10 19:23
20:2,15 21:3
21:14,18
22:6 73:17
78:3 89:6,9
89:12 100:16
100:18
117:15
123:18,22
124:7 127:3
127:8,19

130:14,17
131:17,18,22
131:24 132:4
132:7 138:17
141:7 142:13
144:7
university's 17:3 124:1
unknown 94:5,15
unsure 34:10
usually 13:11 49:6
129:7
U/C0110 106:9

V
vague 21:7 52:13
vehicle 22:21 33:1,7
33:22 34:4,8
34:19,22
35:16,19,24
36:7,11 37:2
37:6,17
39:23 40:6
42:5 44:12
44:24 45:3,7
45:20,22
48:19 47:6
61:1 77:15
77:17,21
78:24 82:17
92:18 96:18
96:23 105:17
105:20
106:21,23,24
107:2,13
121:18
134:10,23
136:6 138:2
vehicles 22:20 132:10
verbally 4:24
vest 86:2 127:15,15
vicinity 119:20
violate 120:24
violating 135:8 136:14
136:17
vision 28:23 29:4
volition 53:18
voluntarily 71:15
vs 1:8 141:7
144:7

W
wait 87:20 88:20
waived 143:4
walk 27:3 28:20
38:12 43:5
46:21 53:17
135:13
walked 25:3 29:17
38:2,11,15

39:14,20
43:8,10,13
46:2,22,23
53:19 76:1,8
76:10,19
78:5 84:5
133:9,17
walking 27:10 29:8
33:1 41:15
walks 120:6
want 5:8 109:14
121:4 129:11
wanted 7:20 48:24
53:15 92:11
125:20 133:3
wasn't 26:5 32:16
34:5 56:19
93:21,21
97:4 107:17
107:18,20,21
watching 43:16,19 44:12
44:14,15
way 5:11 7:2,4,6,9
7:11 8:3,7
8:22 23:15
42:4 53:10
57:13 59:13
118:24 123:6
129:9 136:16
143:11,12
ways 88:23 133:21
weapons 105:23
wear 132:12
week 13:2,8,10
weekly 12:24
weeks 17:4
weigh 15:11
went 8:11 17:16
24:12,20
46:22 51:4
63:20 77:22
77:24 80:15
82:8,11
113:1,18
134:21
weren't 113:4 116:9
West 2:3
we'll 97:9 111:3
114:1 140:1
we're 38:19 96:10
107:18
we've 86:10
WHEREOF 143:14
white 19:24 126:24
whoever's 129:10
wind 59:24 63:22
64:2,6,22

65:17 82:24
winded 65:20
window 43:21,24 44:18
windows 50:11,14
windshield 44:4,14,16
withdraw 136:15
witness 3:2 4:4,5,7
7:23 30:2
31:8 37:13
39:1 52:19
73:13,19,24
81:21 109:19
136:22 140:3
142:17,20,22
143:1
witnesses 78:2,8,20 81:5
82:9,14
138:24
woman 60:24
word 108:5 107:19
words 123:7
work 6:24 7:6,11,15
10:1,4 11:3
12:8,20,23
13:8,14
15:15 17:23
18:14 21:17
131:15,17,19
worked 6:23 8:2 10:15
10:18,20
11:17 13:3
13:18,21
15:18 18:18
136:2
working 7:13 8:6,22,23
9:12 11:23
14:15 18:1,4
18:7,10,21
20:5 23:11
123:22,23
127:4 128:11
129:13
works 106:7
wouldn't 68:9 69:17
102:9
wound 59:14
wrapped 57:11 58:19
wrestle 55:23 67:24
wrestling 55:18 58:4
57:4 61:7,12
61:15 62:3
62:11,13
66:2 67:2,4
93:22 120:10
121:7
wrist 83:5,7,16
write 22:17,18 85:23
88:6,12,21
98:3,9,17,18
99:6,7,15

101:12 102:1
102:3,5
131:9
writer 101:24
write-ups 13:20
writing 85:21 88:24
written 10:14 12:18
116:4 124:12
wrong 116:4 124:22
wrote 97:24 98:7,20
99:1,4,20,21
99:23 101:6
101:6,9,20
102:12,17
104:2 106:11
106:14
108:14
114:20,22
115:22 139:2

X
X 3:1,10
X-ray 96:12

Y
yada 118:20,20,20
yeah 28:11 51:11
69:12 74:5
76:11 83:19
85:22 99:21
100:10
124:22 125:4
128:24
130:13 139:3
139:9
year 8:18 12:6
16:16 17:16
34:1
years 7:7,17 8:3,3
9:4,5 10:7
11:22 12:10
yell 83:20
yelling 93:19

Z
zero 94:2

0
0047 90:9
0048 90:9 95:4
0049 90:9
0052 114:15
0061 115:12
0064 112:13
0065 112:15
0109

97:24
0109UC 97:17
0110 98:1
0111 98:4
0114 97:17 98:4
06 105:17
07 15:2,19,23
084-004480 1:24
09 1:8 141:7
144:7

1
1 3:13 90:1,3,7
118:7
10-1 73:14 93:7,8
93:12 126:3
126:14
10:06 1:18
100 29:23
101 94:1 95:5,13
1028 115:16
105 96:9,9,12
1080 1:8 141:7
144:7
109 20:6,7 92:1,4
92:7,21
123:24 128:1
11/09/09 144:8
111 3:15
112 3:16
114 3:17
117 3:18
12 13:1,12 114:16
144:3
12th 143:16
12:46 140:3
122 3:19
125 3:5
129 3:6
139 3:4
1424 91:17
1435 24:5
16-week 17:21
18 16:12 18:2,5
18:11,19
19:1,5,18
20:5,11 23:4
23:6,10 24:6

| | | |
|---|---|---|
| 90:14 91:13<br>104:17<br>118:15 120:4<br>123:19,22<br>125:7<br>**1983**<br>120:22<br>**1990**<br>118:7<br>**1992**<br>8:14 9:8<br>**1993**<br>12:5<br>**1995**<br>8:4 11:1 12:5 | 24<br>39:10<br>24/7<br>24:15 39:12<br>26<br>105:16<br>263-0052<br>144:2<br>27<br>105:23 | **7**<br>7<br>3:19 122:11,13<br>122:17<br>704-3000<br>2:8<br>742-3541<br>2:13<br>75<br>29:23<br>79th<br>6:17 |
| **2**<br>2<br>3:14 39:8<br>97:10,12,16<br>130:22<br>**2nd**<br>128:8<br>**2:30**<br>24:9,11 38:21<br>39:22 40:21<br>**2:35**<br>132:8<br>**2:37**<br>90:18 105:12<br>**2:38**<br>105:11 132:8<br>**20**<br>28:19,21<br>114:18 115:8<br>116:1<br>**200**<br>15:12 144:1<br>**2000**<br>12:22<br>**2005**<br>11:5,6,11<br>**2007**<br>12:22 | **3**<br>3<br>3:15 111:5,7<br>111:11<br>**3rd**<br>128:3,9,11,13<br>128:15<br>**30**<br>2:12<br>**300**<br>1:19 2:3,7<br>142:10 144:1<br>144:5<br>**312**<br>2:4,8,13 144:2<br>**330**<br>2:3<br>**345-8877**<br>2:4<br>**398206**<br>96:12 | **8**<br>88<br>6:13<br>**9**<br>9<br>16:16 141:14<br>**9th**<br>1:17 142:8<br>**90**<br>3:13<br>**900**<br>2:12<br>**92**<br>8:10<br>**93**<br>12:4,5,6 17:19<br>**95**<br>12:4,5,6 17:19<br>**97**<br>3:14 |
| **2008**<br>16:12 18:2,5<br>18:11,19<br>19:1,5 20:5<br>20:11 23:4,6<br>23:10,20<br>24:6 90:14<br>91:13 100:24<br>114:16<br>118:15 120:4<br>123:19 125:7<br>**2009**<br>1:17 91:13<br>114:18 115:9<br>116:1 141:14<br>142:8<br>**2010**<br>141:22 143:16<br>144:3<br>**21st**<br>71:14 75:8,11<br>77:9,13,23<br>78:1,17 82:1<br>82:5,11,20<br>83:13,24<br>84:6 86:4,11<br>86:15,23<br>89:2 96:5,7<br>98:19,20<br>99:1,10,11<br>99:13,16,23<br>100:2,20<br>111:17 128:5<br>128:6,8<br>**222**<br>1:18 2:7 142:9<br>144:5 | **4**<br>4<br>3:4,16 112:7<br>112:11<br>**40**<br>15:14<br>**400-1448-7100**<br>95:6<br>**46**<br>116:2<br><br>**5**<br>5<br>3:17 114:1,3<br>**53**<br>94:13,14,23<br>**53rd**<br>24:5,10 27:19<br>27:20 38:19<br>43:12 81:24<br>92:24 93:7<br>104:24<br>110:14<br>**55th**<br>91:17<br>**5555**<br>100:23<br><br>**6**<br>6<br>3:18 116:24<br>117:2<br>**60601**<br>2:8 144:6<br>**60601-2956**<br>144:2<br>**60602**<br>2:13<br>**60606**<br>2:3<br>**61st**<br>20:8<br>**64th**<br>20:8<br>**6733**<br>95:20 | |

**EXHIBITS**

The University of Chicago Police – Dispatch Tape – 18 October 2008

Starting time:          0237 hours

| | |
|---|---|
| Dispatch | Go head unit |
| Unit | 1424 55th Street, hurry up |
| Dispatch | Any unit on the scene with him? 109 |
| 109 | Send me a car over here |
| Dispatch | I need the address, 109 what's your location? |
| 109 | 53rd and Blackstone |
| Dispatch | 53rd and Blackstone, we got a 10-1, 10-1 53rd and Blackstone |
| 101 | 101 enroute 53rd and Blackstone right? |
| Dispatch | 53 and Blackstone, 5-3 and Blackstone, we got a 10-1 |
| 130 | Take my two (2) cars right now |
| Dispatch | 105 and 106 you headed? |
| 105 | 5 going |
| 101 | 101, 23 (twenty-three) |
| Dispatch | 101 what you got over there? One, zero, one what do you have? 101 do you see 109? Okay units we got the city coming can somebody get there? Next unit on the scene tell me what you got. |
| Unknown | We got one guy on the ground we got two (2) officers. |
| Dispatch | 53 and Blackstone I need every officer we got to get to 5-3 and Blackstone. |
| 100 | 100 is in enroute. |
| Dispatch | 53 and Blackstone, okay units do we have everything under control at 53 and Blackstone? |
| Unknown | Everybody take a slow down |
| 100 | Slow it down |
| Dispatch | Okay units slow it down at 53 and Blackstone, slow it down. Slow it down at 53 and Blackstone. 53 and Blackstone units slow it down. |

U-2020
Page 1 of 3


TORRES
EXHIBIT NO. 1
11-03-05 KOR

| | |
|---|---|
| 105 | Squad give it a disregard we have enough units on the scene |
| Dispatch | Okay 105 is giving disregard, enough units on the scene 53 and Blackstone. |
| 106 | 6 – 10-4 |
| 101 | 101 |
| Dispatch | 101 |
| 101 | Please run driver's license for me, driver's license, B-boy 40014487100. |
| Dispatch | 10-4 |
| Dispatch | Okay 106, that driver's license, 103 |
| 100 | There is a (indistinct) what you need dispatch? |
| Dispatch | Someone there ran a drivers license, I want to give them the information. |
| 106 | Oh go ahead squad, squad go ahead with the drivers license info |
| Dispatch | You should be talking to a Charles Boyle, 6733 S. Chappell he's clear squad. |
| Unknown | Any priors or any contact cards or anything |
| Dispatch | We're checking through the computer |
| 105 | 105 – while you're at it can you run a plate that this guy was in? |
| Dispatch | What was it? |
| 105 | Illinois, X-ray 398206 |
| Dispatch | 10-4 |
| 100 | 100 to 103 |
| 103 | 3 go |
| 100 | You got an extra pair of glasses, or do you need to go home and get some or anything? |
| 103 | I'm going to have get some Lt. cause I can't see anything. |
| 100 | Okay park your car and I'll give you a ride home to get some if you got an extra pair. |

U-2020
Page 2 of 3

U/C
0048

| | |
|---|---|
| 109 | One zero nine |
| Dispatch | 109 – |
| 109 | Alright I got an IL DL when ready? |
| Dispatch | Go with it |
| 109 | Disregard, disregard |
| Unknown | 17 paw on that escort |
| Dispatch | 10-4, the drivers license or the plate, X-ray 3908206 coming back clear valid on an 06 Chrysler, 4 door. Margo and Ashley Glover, 13033 Seeley in Blue Island. |
| 105 | 105 – 10-4 if you can hold that information |
| Dispatch | Printing it as we speak |

| 1 TYPE OF INCIDENT | 2 CLASSIFICATION CODE | 3 CLASSIFICATION |
|---|---|---|
| □ SERVICE □ PREASE □ ATTEMPT □ OFFENSE | 47 | SUSPICIOUS PERSON / AUTO |

**SCENE**

| 5 ADDRESS OF OCCURRENCE | 6 DATE OCC (DAY-MO-YR) | 7 TIME OF OCCURRENCE |
|---|---|---|
| 1435 E 53 ST | 18 OCT 08 | 0235 |
| 8 APT OR ROOM NUMBER OTHER INFO N/A | 9 SU OF C PROPERTY | □ RESIDENCE □ ON STREET □ IN ALLEY | 8 DATE REPORTED 18 OCT 08 | TIME REPORTED 0735 |
| □ KNOW U OF C PROPERTY | □ NON RESIDENCE □ OUTSIDE AREA OF AUTHORITY |

| GIVE NAME OF BLDG. OR TYPE OF LOCATION WHERE INCIDENT OCCURRED | BUILDING CODE | REPORTED VIA □ U OF C RADIO □ CPD RADIO |
|---|---|---|
| STREET | N/A | □ ON VIEW □ OTHER |

ALL INFORMATION, DESCRIPTIONS AND STATEMENTS IN THIS REPORT ARE APPROXIMATIONS OR SUMMARIZATIONS UNLESS INDICATED OTHERWISE

**COMPL/VICTIM**

| 13 ⊠ COMPLAINANT □ VICTIM | ADDRESS | APT OR ROOM NO | 14 HOME PHONE | 15 TIME AVAILABLE |
|---|---|---|---|---|
| L TORRES | 5555 S ELLIS | N/A | 762-8181 | ANY |
| 16 □ FAC DEPT & POSITION □ ALUMNI EMPLOYER Police Officer UofC | 17 □ RELATIVE OF □ FAC □ STAFF □ STU COMPLETE INFO IN LINE # 76 | SEX M | RACE W | AGE 39 | 18 BUSINESS PHONE 762-8181 | TIME AVAILABLE ANY |
| □ STU □ STAFF | □ PAT □ NON-UNIV |

| 19 □ ILLNESS □ INJURY | □ TREATED | □ RELEASED □ ADMITTED | IF ADMITTED | ROOM NO | PHYSICIAN | HOSPITAL |
|---|---|---|---|---|---|---|

**OFFENDER/SUSPECT/VICTIM/WITNESS**

| 20 NAME OF ⊠ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX M | RACE B | AGE 27 | HT 59 | WT 247 | EYES BRN | HAIR BLK | BUILD large | COMPLEXION DRK | U OF C AFFILIATED □ YES □ FAC □ NO □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| O Boyle CHARLES | ADDRESS 6733 S CHAPPEL | PHONE 763-2575 | | | | | | | | DEPT □ UCPD ARREST |

| 21 NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ FAC □ NO □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | ADDRESS | N | | | | | PHONE A | | | N/ | DEPT □ UCPD ARREST |

| 22 NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ FAC □ NO □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | ADDRESS | N | | | | | PHONE A | | | N/ | DEPT □ UCPD ARREST |

| 23 NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ FAC □ NO □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | ADDRESS | N | | | | | PHONE A | | | N/ | DEPT □ UCPD ARREST |

| 24 NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ FAC □ NO □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | ADDRESS | N | | | | | PHONE A | | | N/ | DEPT □ UCPD ARREST |

| 25 HOW MANY OFFENDERS? | SUSPECTS? | WITNESSES? | ARRESTED? | VEHICLE? | CONTACT CARDS MADE? | ARREST CARDS MADE? |
|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 1 | | |

**CIRCUMSTANCES**

| 26 VEHICLE OF ⊠ OFFENDER □ SUSPECT | YEAR 06 | MAKE CHRYSLER | MODEL PASS | BODY STYLE 4 DR | COLOR SILVER | STATE LICENSE NO X398206 | STATE IL | YEAR 08 | OTHER IDENTIFYING MARKS N/A |
|---|---|---|---|---|---|---|---|---|---|

| 27 WEAPONS □ HAND GUN □ RIFLE □ SHOT GUN | CAL-GA | COLOR □ BLUE STEEL □ NP/CHROME □ OTHER | □ KNIFE OR CUTTING INSTRUMENT TYPE | □ OTHER WEAPON (SPECIFY TYPE) A |
|---|---|---|---|---|

| 28 POSSIBLE POINT OF ENTRY | 29 POSSIBLE POINT OF EXIT | 30 POSSIBLE TOOLS USED A | 31 HOW WERE TOOLS USED A |
|---|---|---|---|

| 32 BURG ALARM ON PREMISES □ YES □ NO ⊠ DNA | 33 ALARM CIRCUMVENTED □ YES □ NO ⊠ DNA | 34 TOOL MARKS PRESERVED □ YES □ NO ⊠ DNA | 35 WERE OCCUPANTS AT HOME □ YES □ NO ⊠ DNA |
|---|---|---|---|

**PROPERTY**

| 36 DESCRIBE PROPERTY □ TAKEN □ DAMAGED □ LOST □ MISSING □ RECOVERED □ FOUND | LIST TOTAL DOLLAR VALUE OF TAKEN LOST OR MISSING PROPERTY ONLY | 1 MONEY $ | 2 CITY RADIO STEREO etc. $ | 3 COMPUTER EQUIP. $ | 4 OFFICE EQUIP. $ | 5 □ CLOTHING $ | 6 □ JEWELRY $ |
|---|---|---|---|---|---|---|---|
| USE BY LINE NO 38 NARR | $ 0 | 7 BICYCLE $ | 8 MEDICAL EQUIP $ | 9 PHOTO EQUIP $ | 10 HOUSEHOLD ITEMS $ | 11 BOOKS $ | 12 OTHER $ |

| 37 VEHICLE OR TRAILER (SPECIFY TYPE) | YEAR | MAKE | MODEL | BODY STYLE | COLOR | STATE LICENSE | STATE | YEAR | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|---|---|

| OWNER OF PROPERTY □ U OF C □ STUDENT □ PATIENT □ RELATIVE □ FACULTY □ STAFF □ ALUMNI □ OTHER | CPD INVENTORY # N | UCPD INVENTORY # A |
|---|---|---|

**PERSONNEL**

| 39 REPORTING OFFICER'S NAME (PRINT) Torres | OFFICER'S ASSIGNMENT 109 | OFFICER'S SIGNATURE Torres | 40 CPD BEAT ASSIGNED NO 2132 | NOTIFIED BY COMPL. OR VICTIM □ NEW RESTATE OR OPERATIONS □ CPD REFUSED REPORT □ COMPL. REFUSED CPD |
|---|---|---|---|---|
| 41 ASSIST UNITS (PRINT NAMES AND ASSIGNMENTS) 106, 101, 100, 2120, 2131 | | | 42 CPD OFFICER (PRINT NAME) STAR NO RD NO DARLING 19135 HP63406 | |
| 43 APPROVING SUPERVISOR'S NAME (PRINT) | APPROVAL SIGNATURE | | 44 CPD UNITS ASSIGNED BEAT N/A | |

**NOTIFICATIONS**

| 45 □ DIRECTOR | TIME | 5 □ CENTRAL ADMIN - TIME | 7 □ DEAN OF STUDENTS - TIME | 3 □ SECC - TIME | 4 □ OTHER - TIME |
|---|---|---|---|---|---|
| □ ASSOC DIR □ ASS'T DIR | | | | | |

| 46 PERSON MAKING NOTIFICATION Kip C. | 47 COPY SENT BY | 48 COPY SENT TO (DAILY TIME) □ REAL ESTATE OPERATIONS □ DEAN OF STUDENTS □ OTHER (SPECIFY) HARRIS, REPARLE, CHIEF | 18 OCT 0600 |
|---|---|---|---|

| 49 MUG BOOK □ YES □ WILL CONTACT □ REFUSED ⊠ DNA | | 50 SEE LETTER □ RISK MGMT (CLAIMS) SIGNED □ NOTIFIED □ REFUSED ⊠ DNA |
|---|---|---|

THE UNIVERSITY OF CHICAGO POLICE DEPARTMENT 1     U/C0109

| OPERATOR 1 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO | STATE | OTHER IDENTIFYING MARKS |
|------------|-------|------|------|------------|------------|-------|-------------------------|
| VEHICLE 1 | | | | | | | |

| OPERATOR 2 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO | STATE | OTHER IDENTIFYING MARKS |
|------------|-------|------|------|------------|------------|-------|-------------------------|
| VEHICLE 2 | | | | | | | |

IDENTIFY STREETS
BY NAME OR NUMBER

DRAW ARROW
INDICATING
NORTH

1. Follow dotted lines to draw outline of roadway at place of accident.
2. Number each vehicle and show direction of travel by arrow.

Use solid line to show path before accident.

dotted line after accident.

4. Show pedestrian by:
5. Show utility poles by:
6. Show motorcycle by:

D – N – A

(Circle)

| Direction of Travel | N | S | E | W |
|---|---|---|---|---|
| Vehicle 1 | 1 | 2 | 3 | 4 |
| Vehicle 2 | 1 | 2 | 3 | 4 |

**51. NARRATIVE**

Description of Offender M/B 5'9 247 lbs Blk hair Blu eyes Grey Jacket Blue Jeans White + Blk gym shoes

In Summary on 18 Oct 08 at Approx 2:38 hrs while on Patrol R/O's Moore #1612 and Torres #1028 noticed a silver Chrysler driving east bound on 53st with horn sounding while driving. The vehicle then curbed quickly and two male subjects existed vehicle and began walking east bound on 53rd St. The third subject now known as O'Boyle, Charles 4/27/87 (Offender) exited vehicle and opened hood of vehicle. R/O's approached O'Boyle and asked who vehicle was it. O'Boyle answered why? R/O's then asked for an I.D. and at this time became evasive and refused to produce an ID. O'Boyle then became very combative and P.O. Torres called for assistance. Offender then began fighting with Officer's Moore, Torres, Galarza + Kwiatkowski, during the altercation arrest Officers Galarza + Moore got injured. OFC. Moore injured left wrist. Offender was transported to 21st Dist. by beat 2132 for Processing. Offender was charged with interference to Police Officer (Resisting)
Court date 04 Dec 08 Branch 34-2 Time 0900 hrs

OFC. Gillespe glasses were broken.

This is a Chicago Police / University of Chicago incident report form, largely handwritten and difficult to read.

**1 TYPE OF INCIDENT:** ☑ SERVICE ☐ OFFENSE ☐ ATTEMPTED OFFENSE

**2 CLASSIFICATION CODE:** 61

**3 CLASSIFICATION:** INJURED PERSON

**ADDRESS OF OCCURRENCE:** 5503 55 ST. CHICAGO IL 1600

**8 DATE OCC (DAY-MO-YR):** 18 OCT 08

**9 TIME OF OCCURRENCE:** 0258

**8 APT OR ROOM NUMBER:** N/A

☑ U OF C PROPERTY   ☐ RESIDENCE   ☐ ON STREET   ☐ IN ALLEY

**10 DATE REPORTED:** 18 OCT 08   **TIME REPORTED:** 0258

GIVE NAME OF BLDG OR TYPE OF LOCATION WHERE INCIDENT OCCURRED: STREET   BUILDING CODE: N/A

REPORTED VIA: ☐ U/C RADIO ☐ CPD RADIO ☐ REVIEW ☐ OTHER

ALL INFORMATION DESCRIPTIONS AND STATEMENTS IN THIS REPORT ARE APPROXIMATIONS OR SUMMARIZATIONS UNLESS INDICATED OTHERWISE

**16 COMPLAINANT / VICTIM:** OSCAR R. GALARZA   **ADDRESS:** 5555 S. ELLIS CHICAGO IL   **HOME PHONE:** 702-8181   **TIME AVAILABLE:** July

FAC, DEPT & POSITION: Police   EMPLOYER: UQC   SEX M   RACE H   AGE 34   **BUSINESS PHONE:** 702-8181   **TIME AVAILABLE:** Any

**19** ☐ WITNESS ☐ RELATED ☑ RELEASED ☐ INJURY ☐ ADMITTED   ROOM: 14   **PHYSICIAN:** Dr. Foster K   **HOSPITAL:**

**20 NAME OF** ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☑ WITNESS ☐ OTHER: LARRY TORRES   **ADDRESS:** 5555 S. Ellis   **PHONE:** 702-8181   SEX M RACE H AGE 41 HT 509 WT 150 EYES Bro HAIR Blk COMPLEXION LIGHT

**21 NAME OF** ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER: N/A

**22 NAME OF** ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER: N/A

**23 NAME OF** ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER: N/A

N/A

**24** N/A

**25 VEHICLE OF** ☐ OFFENDER ☐ VICTIM ☐ SUSPECT: N/A

**27 WEAPONS:** N/A

**28** N/A

**36 DESCRIBE PROPERTY:** N/A

**40 REPORTING OFFICER'S NAME:** DOCUMENT LIST   BADGE 131

**42 APPROVING SUPERVISOR:** D. CALHOUN S.T.

**UI/C0111**

U/C 0111

| OPERATOR 1 VEHICLE 1 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATS | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|
| RATOR 2 VEHICLE 2 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATE | OTHER IDENTIFYING MARKS |

IDENTIFY STREETS
BY NAME OR NUMBER

DRAW ARROW
INDICATING
NORTH

- Follow dotted lines to draw outline of roadway at place of accident.
- Number each vehicle and show direction of travel by arrow.

Use solid line to show path before accident.

Dotted line after accident.

Show pedestrian by:
Show utility poles by:
Show motorcycle by:

|  | (Circle) |  |  |  |
|---|---|---|---|---|
| Direction of Travel | N | S | E | W |
| Vehicle 1 | 1 | 2 | 3 | 4 |
| Vehicle 2 | 1 | 2 | 3 | 4 |

51. NARRATIVE: In Summary

In Refuhe to PAI # U2020 18 OCT 08 0238 Hs.
O/C - GALAEZA unit 101 responded to a 10-1 Call to Assist
Unit 109 Off-Force, O/C Galaeza reported while trying
to hand cuff the offender he Enjured His Right shulder
REFER TO PI # U2020

| 1. TYPE OF INCIDENT | 2. CLASSIFICATION CODE | 3. CLASSIFICATION | | | | | 6. DATE OCC (DAY-MO-YR) | 7. TIME OF OCCURRENCE |
|---|---|---|---|---|---|---|---|---|
| ☐ SERVICE ☐ OFFENSE ☐ ATTEMPTED OFFENSE | 61 | Injured Person | | | | | 18 OCT 08 | 0238 |

**SCENE**

| 4. ADDRESS OF OCCURRENCE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1435 E 53rd St | | | | | | | | |

| 8. APT. OR ROOM NUMBER | 9. CHURCH OF PROPERTY | ☐ RESIDENCE | ☐ ON STREET | ☐ IN ALLEY | 10. DATE REPORTED | 11. TIME REPORTED |
|---|---|---|---|---|---|---|
| D-n-A | ☐ NON-U OF C PROPERTY | ☐ NON-RESIDENCE | ☐ OUTSIDE AREA OF AUTHORITY | | 18 OCT 08 | 0238 |

GIVE NAME OF BLDG OR TYPE OF LOCATION WHERE INCIDENT OCCURRED: Street   BUILDING CODE: D-n-A   REPORTED VIA: ☐ U OF C RADIO ☐ CPD RADIO ☐ IN VIEW ☐ OTHER

ALL INFORMATION DESCRIPTIONS AND STATEMENTS IN THIS REPORT ARE APPROXIMATIONS OR SUMMARIZATIONS UNLESS INDICATED OTHERWISE

**COMPL/VICTIM**

| 12. ☐ COMPLAINANT ☑ VICTIM | ADDRESS | APT OR ROOM NO | 14. HOME PHONE | 15. TIME AVAILABLE |
|---|---|---|---|---|
| Moose Clarence | 5555 S Ellis Chgo IL | | 702-5181 | Any |

| 16. ☐ U OF C | DEPT & POSITION | ☐ ALARM | EMPLOYER | 17. RELATIVE OF | SEX | RACE | 16. BUSINESS PHONE | 18. TIME AVAILABLE |
|---|---|---|---|---|---|---|---|---|
| ☐ STU ☑ STAFF | Police | ☐ PAT ☐ NON-UNIV | U of Chgo | ☐ FAC ☐ STU | M | 55 | 702-5181 | Any |

| 19. ☐ ILLNESS ☑ INJURY | ☐ TREATED | ☐ RELEASED | ☐ ADMITTED | ☐ SUBMITTED | ROOM NO | PHYSICIAN | HOSPITAL |
|---|---|---|---|---|---|---|---|

**OR./W/SUSPECT/VICTIM/WITNESS**

| 20. NAME OF ☐ OFFENDER ☐ SUSPECT ☑ VICTIM ☑ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|
| Torres Lazo | M | A | 41 | 59 | 150 | Brn | Blk | Med | Lt | ☐ YES ☐ FAC ☐ NO ☐ STU ☐ STAFF |
| ADDRESS 5555 S Ellis | | | | | | PHONE | | | | DEPT: Police ☐ U OF C ARREST |

| 21. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ☐ YES ☐ FAC ☐ NO ☐ STU ☐ STAFF |
| ADDRESS | | | | | PHONE | | | | DEPT: ☐ U OF C ARREST |

| 22. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ☐ YES ☐ FAC ☐ NO ☐ STU ☐ STAFF |

| 23. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|

| 24. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|

| 25. HOW MANY OFFENDERS | HEIGHT | WEIGHT | BUILD | HAIR | OTHER IDENTIFYING MARKS | ARREST CARD MARK? |
|---|---|---|---|---|---|---|

**CIRCUMSTANCES**

| 26. VEHICLE OF ☐ OFFENDER ☐ SUSPECT | YEAR | MAKE | MODEL | BODY STYLE | COLOR | STATE LICENSE NO | STATE | YEAR | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|---|---|

| 27. WEAPON | CALIBER | CHOKE | | |
|---|---|---|---|---|
| ☐ NONE ☐ USED ☐ NOT DISPLAYED | ☐ HAND GUN ☐ RIFLE ☐ SHOT GUN | ☐ PUMP ☐ BOLT ☐ SEMI ☐ SINGLE | ☐ FULL AUTO ☐ AUTOMATIC ☐ OTHER | ☐ OTHER WEAPON (SPECIFY TYPE) |

| 28. POSSIBLE POINT OF ENTRY | 29. MEANS OF ENTRY | 30. POINT ITEMS USED | 31. OTHER MEANS ITEMS USED |
|---|---|---|---|

| 32. BURG ALARM ON PREMISE | 33. ALARM OFF/UNLOCKED | 34. DOOR/GATE UNLOCKED | 35. WERE WINDOWS/DOORS AT HOME? |
|---|---|---|---|
| ☐ YES ☐ NO ☒ ON/A | ☐ YES ☐ NO ☒ ON/A | ☐ YES ☐ NO ☒ ON/A | ☐ YES ☐ NO ☒ ON/A |

**PROPERTY**

| 36. DESCRIBE PROPERTY | LIST TOTAL DOLLAR VALUE | 1. CURRENCY | 2. T.V. RADIO STEREO | 3. JEWELRY/FURS | 4. OFFICE EQUIP | 5. CLOTHING | 6. JEWELRY |
|---|---|---|---|---|---|---|---|
| ☐ TAKEN ☐ DAMAGED ☐ LOST ☐ MISSING ☐ RECOVERED ☐ FOUND ☒ N/A | $ | 7. VEHICLE | 8. FIREARM | 9. PHOTO EQUIP | 10. HOUSEHOLD ITEMS | 11. BOOKS | 12. OTHER |
| LIST BY UNIT NO IN HARD | $ | | | | | | |

| 37. VEHICLE OR TRAILER (LIST BY TYPE) | YEAR | MAKE | MODEL | BODY STYLE | COLOR | STATE | YEAR | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|---|
| N/A | | | | | | | | |

| 38. OWNER OF PROPERTY | |
|---|---|
| ☐ U OF C ☐ STUDENT ☐ FACULTY ☐ RELATIVE ☐ FACULTY ☐ STAFF ☐ NON-U OF C ☐ OTHER | |

**PERSONNEL**

| 39. REPORTING OFFICER'S NAME (PRINT) | | STAR NO | 40. APPROVING OFFICER 48 | | | ☐ NOTIFIED BY COMPL OR VICTIM ☐ CPD NOTIFIED IN PERSON ☐ COMPL IN PERSON CPD |
|---|---|---|---|---|---|---|
| Hill | 205 | | Medical | | | |

| 41. ASSIST UNITS (PRINT NAMES AND STAR NUMBERS) | | | | | 42. | |
|---|---|---|---|---|---|---|

| 43. APPROVING SUPERVISOR'S NAME (PRINT) | SUPERVISOR STAR NO | 44. | CHIEF | |
|---|---|---|---|---|
| Sgt Chism | 107 | | | |

| 45. ☐ INSPECTOR ☐ ASST DIR DIR ☐ ASST DIR | 46. PERSON MAKING NOTIFICATION | | | |
|---|---|---|---|---|

U/C0113

| OPERATOR 1 VEHICLE 1 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATE | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|
| OPERATOR 2 VEHICLE 2 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATE | OTHER IDENTIFYING MARKS |

Follow dotted lines to draw outline of roadway at place of accident.
Number each vehicle and show direction of travel by arrow.

IDENTIFY STREETS BY NAME OR NUMBER

DRAW ARROW INDICATING NORTH

Use solid line to show path fore accident.

itted line after accident.

Show pedestrian by:
Show utility poles by:
Show motorcycle by:

(Circle)

| Direction of Travel | N | S | E | W |
|---|---|---|---|---|
| Vehicle 1 | 1 | 2 | 3 | 4 |
| Vehicle 2 | 1 | 2 | 3 | 4 |

51. NARRATIVE: In Summary

- Above listed Location, Date and times Officer Moore #1012 unit 101 responded to a 10-1 call to assist unit 105 Officer Torres. Officer Moore injured his left wrist while in process of Handcuffing and placing offender in custody Reference PDJ 47020

TORRES

EXHIBIT NO. 2

11·09·09  KDTR

02/24/2009 15:04 FAX 773 702-1028    UofC Police    @007

✓

### THE UNIVERSITY OF CHICAGO
### POLICE DEPARTMENT
### RECORD OF ARREST

**Last Name** O Boyle    **First** CHARLES    **MI** O

**Alias** N/A

**Address** 6733 S. CHAPPEL    **Phone** 363- 773 2575

**Male** ☒ **Female** ☐    **Age** 21    **Weight** 155    **Height** 5'09"    **Marks, Scars, etc.** LFT ARM TATTC RT ARM

**Wht.** ☐ **Race Blk.** ☒ **Oth.** ☐    **Compl.** Lt. ☐ Med. ☐ Drk. ☒    **Sl.** ☐ **Bld.** Med. ☐ Hvy. ☐    **Eyes** Brn. ☒ Bl. ☐ Grey ☐ Green ☐

**Color Hair** Blk. ☒ Brn. ☐ Red ☐    Blonde ☐ White ☐ Grey ☐    **Where Employed** ST. PATRICK'S CHURCH

**Date of Birth** 04/07/1987    **Social Security Number** 335 78 4561

**Place of Arrest** 1435 E 53rd ST    **Date & Time of Arrest** 18 OCT 08 02:38
Initiated ☒ Assigned ☐

**Charges and Type of Arrest** INTERFERENCE with Public officer (Resisting)
☐ Misd. Warrant ☐ Felony Warrant ☐ Felony ☒ Misdemeanor ☐ Traffic

**Arresting Officers** 2    **Chgo. Police Dept.** DARLING # 19135 2.1 Dist.    **U of C P.D.** C MOORE 1012 C TORRES 1028

**Complainant's Name** C MOORE # 1012    L TORRES # 1028

**Address** 5555 S. ELLIS    **Phone** 773 762-8181    **IR #**

**Court Br.** 34-2    **Date & Time** 9:00 am 04 DEC 08    **Final Disposition**

**Docket #**

U/C
0051

TORRES
EXHIBIT NO. 3
11-09-08 KDR

| Last Name SINCLAIR | First STEVEN | MI D | Campus Area |
|---|---|---|---|
| Address 7834 S Langley | | | Phone |

Location of Contact: 1435 E 53ST

Date & Time of Contact: 18 OCT 08

| Race B | Sex M | Age 21 | Hght. 5'7 | Wght. 165 | Hair BLK | Eyes BRN | Compl. DRK | Scars N/U |
|---|---|---|---|---|---|---|---|---|

Clothing Worn: BLK Hoody + BLK Jeans

D.O.B. N/A

Desc. of Vehicle Involved: Silver Chrysler

Driver's Lic. No. S524-7848-7048

Incident Report #

**THE UNIVERSITY OF CHICAGO**
**POLICE DEPARTMENT**
Field Contact Card

UCS

---

| Last Name ROBERSON | First Kenneth | MI D | Campus Area |
|---|---|---|---|
| Address 7533 S. King DR | | | Phone |

Location of Contact: 1412 E 53ST

Date & Time of Contact: 18 OCT 08

| Race B | Sex M | Age | Hght. 5'10 | Wght. 165 | Hair BLK | Eyes BRN | Compl. DRK | Scars N/U |
|---|---|---|---|---|---|---|---|---|

Clothing Worn: BLK Hoody + DRK Jeans

D.O.B. 12/15/86

Desc. of Vehicle Involved:

Driver's Lic. No.

Incident Report #

**THE UNIVERSITY OF CHICAGO**
**POLICE DEPARTMENT**
Field Contact Card

UCS

U/C
0064



TORRES
EXHIBIT NO. 1
11-09-09 KOR

| Last Name | First | MI | Campus Area |
|---|---|---|---|
| GLOVER | ASHLEY | | Phone 773 757-7019 |

| Address | | Date & Time of Contact |
|---|---|---|
| 13033 S. Seeley Blue Island | | 18 OCT 05 |

| Location of Contact | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1435 E 53 ST | | | | | | | |

| Race | Sex | Age | Hght. | Wght. | Hair | Eyes | Compl. | Scars |
|---|---|---|---|---|---|---|---|---|
| | | 21 | 507 | 112 | BLK | BRN | MED | N/U |

D.O.B.

| Clothing Worn | Driver's Lic. No. |
|---|---|
| BLK JACKET DRK PANTS | N/A |

Desc. of Vehicle Involved
Silver Chrysler

Incident Report #

THE UNIVERSITY OF CHICAGO
POLICE DEPARTMENT
Field Contact Card

UCS

U/C
0065

NARRATIVE:

IN SUMMARY ON 12 DEC. 08 AT APPROX. 0700AM P/O'S TOLLES + MOORE APPEARED IN COURT BRANCH 46 ROOM 304 AT 09:00AM FOR DEFENDANT BOYLE. CHARLES FOR PCI # 0 2020 SUSPICIOUS PERSON / AUTO CPD RD # HP 634061 INTERFERENCE WITH A POLICE OFFICER THE CASE WAS CONTINUED TO 30 JAN 09 BRANCH 46 RM 304 AT 13:30PM

IN SUMMARY ON 18 OCT 08 AT APPROX 2:38HRS WHILE ON PATROL P/O'S MOORE #1N2 +TORRES #1028 NOTICED A SILVER CHRYSLER DRIVING EAST BOUND ON 53ST. THE VEHICLE CURBED AND P/O'S INVESTAGATED THE SITUATION AT WHICH TIME OFFENDER BOYLE BECAME VERY EVASIVE AND THEN COMBATIVE. P/O'S CALLED FOR ASSISTANCE AND WAS PLACE INTO CUSTODY AND PROCESSED AT THE 21ST DIST POLICE STATION.

TORRES
EXHIBIT NO. 5
11-09-09 KMR

U/C
0052

PAGE 1 OF 1

SUPERVISOR: _____

OFFICER: TORRES 1028

## The University of Chicago Police Department
### ARREST CLEARING AND CLOSING / OFFENSE CLEAR UP / COURT INFO

| ORIGINAL INCIDENT DATE: | SUPPLEMENTAL DATE/TIME: | TYPE OF INCIDENT: | PDI # |
|---|---|---|---|
| 18 OCT 08 | 20 JAN 09 | Suspicious Auto | 18020 |

☒ COURT REPORT: BRANCH: 46 (555 W Harrison) JUDGE: Donnelly

COMPLAINANT(S): Torres # 1028  Meide # 1412

DEFENDANT: Charles Beile   DOCKET # 08-277751   CHARGE: Resisting

DEFENDANT: _____ DOCKET # _____ CHARGE: _____

DEFENDANT: _____ DOCKET # _____ CHARGE: _____

DEFENDANT: _____ DOCKET # _____ CHARGE: _____

OFFICER'S IN COURT: Torres # 1028

STATE'S ATTORNEY: _____ DEFENSE ATTORNEY(S): _____

PERSON(S) TRANSPORTED: N/A

---

☐ OFFENSE CLEARANCE: ☐ Administrative Clearance  ☐ Cleared by Arrest  ☐ Cleared Exceptional  ☐ Cleared Unfounded

### COMPLETE THE REVERSE SIDE SUMMARIZING THE INVESTIGATION
### INDICATE ADMISSIONS, WEAPONS AND VEHICLES USED, M.O. AND PROPERTY RECOVERED

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____   U/C  0060

NOTIFICATIONS: _____

TRANSMITTALS: _____

**NARRATIVE:**

In summary on 18 oct 08 at approx 2:30 p.m R/o's Moore #1612 + Torres #1028 noticed a silver Chrysler driving East bound on 53 St. Two male subjects Exited vehicle and began walking East bound on 53 St. The third subject Charles Boyle Exited vehicle and opened Hood of vehicle. R/o's Then Asked Boyle for ID Refused And Then became combative + Ho Torres Called for Assistance.

On 30 Jan 09 R/o's Returned To Branch #6 In Front on Judge Donnelly who dismissed All Charges Against Charles Boyle due To CPD Complaints written wrong.

U/C
0061

PAGE / OF /

SUPERVISOR: _____  NAME     850 RANK     OFFICER: Torres NAME     1028 STAR #

| SPECIAL ORDER | 1 February 1990 | 1 February 1990 | 01-90 |

| SUBJECT | DIST. | AMENDS |
| Questioning and Frisk Without Arrest | AC, CU, SU, PU | None |

| RELATED DIRECTIVES | RESCINDS |
| None | None |

## I. PURPOSE

To provide guidelines that ensure judicial compliance, safeguarding citizen rights, and proper police conduct during temporary questioning and search without arrest.

## II. POLICY

It is the policy of this Department to regulate the circumstances and manner in which officers may temporarily question without arrest.

## III. PROCEDURE

### A. Definition

1. "Stop and Frisk" refers to stopping and detaining persons on public premises or on the street for the purposes of briefly questioning and obtaining personal identification.

   a. The "Stop" includes a temporary detention of a person for investigation. It occurs when an officer uses authority to compel a person to halt or remain in a certain place.

   b. A "frisk", which is distinguished from a search, is the running of hands rapidly over another person; it is done after a person is "stopped" solely for the purpose of discovering weapons if an officer has reason to believe the person is armed and dangerous.

### B. Guidelines for a "Stop"

1. Will be made only when the officer has a reasonable belief that a crime is being committed, is about to be committed or has been committed by the person(s) stopped.

2. May be made with less than probable cause to arrest but the facts involving the stop must constitute "reasonable suspicion."

3. The officer will identify himself and state the purpose for the "Stop."

4. Persons will be detained for a reasonable period of time only.

5. Detention and questioning will be conducted in the vicinity of where the person was stopped.

Torres

EXHIBIT NO. 6

11-09-09 KOR

U/C0100

6.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHARLES BOYLE,                          )
                         Plaintiff,     )
                                        )
v.                                      )
                                        )        No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE            )
OFFICER LARRY TORRES, et al.,           )
                                        )
                         Defendants.    )

### DEFENDANT TORRES'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

NOW COMES the Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER LARRY TORRES, Star #1028 ("Torres"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information and belief and are made without prejudice to the objections set forth herein. Defendant reserves the right to amend and/or supplement his responses at any time to introduce i

*TORRES*
**EXHIBIT NO. 7**
*11-09-09 KDR*

6459565v18

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to·or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1. Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:** Larry Torres. My attorney, Steven Puiszis, consulted with me in preparing these answers.

2. Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

**ANSWER:**    Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and then handcuffing him. Officer Moore injured his left wrist and Officer Galarza injured his shoulder in the process. Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin. Other offices from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

6459565v1897854 4236

3.      Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

**ANSWER:**   Objection, defendant objects to this Interrogatory on the grounds that it seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify anyone believed "to have knowledge supporting the defendant" and also asks for a summary of "what knowledge" this defendant "believes each person may possess." That information is more proper the subject of a deposition and to require the provision of such a summary is overbroad, harassing and unduly burdensome.  Subject to those objections and without waiving same, see those individuals listed in Interrogatory No. 2 and defendants who were identified in the University of Chicago defendants' Rule 26 Disclosures.  The University of Chicago officers would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4.      Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

    a.      Why he/she was at that location;

    b.      Whether he/she had any physical contact with Plaintiff;

    c.      Whether he/she participated in the arrest of Plaintiff;

    d.      Whether he/she participated in the search of Plaintiff;

    e.      Whether he/she had any participation in the bringing of criminal charges against Plaintiff.

**ANSWER:**   Objection.  Defendant objects to this Interrogatory as being vague and ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against the defendant include assertions relating to his arrest and to the purported use of force against him as well as a state law claim of malicious prosecution.  Subparagraph (e) is vague and ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

6459565v1897854 4236

criminal charges." Subject to those objections and without waiving same, see my answer to Interrogatory No. 2.

Officer Moore and me had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past us with its horn continuously blowing and then observed the vehicle abruptly swerve to the curb and bump it. They initially investigated what was happening. The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance. The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officers Moore and I would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and any Complaints were signed by both Officer Moore and me.

5.    If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

**ANSWER:**   I do not personally know of any such investigation. However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

5

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6.      State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:**   No I was not injured. I understand that Officer Gillespie was kicked in the head during the incident and his glasses were broken.  I also understand that Officer Galarza injured his shoulder and Officer Moore injured his wrist, but I do not know what treatment they received.

7.      Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:**   Objection.  This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc.  Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it.  Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact.  I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we turn any such person over to the Chicago Police who will then transport that person to a local

6

police station and process that person, including taking booking photos, filling out arrest reports,

filing criminal complaints and seeking approval by the State's Attorney working felony review

of felony charges. While University of Chicago employees write out our own reports, we do not

prepare criminal complaints and do not process an arrestee during the booking process.

8.    Please state how long and in what capacity you have been employed by the University of Chicago Police Department. Your response should include a brief description of your change in assignments and/or rank if any, and when those changes occurred. Your response should also include whether you were concurrently employed by the City of Chicago as a police officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:**    On the date of the incident involving Charles Boyle, I had been employed

by the University of Chicago since January 2, 2007. I have worked as a patrol officer during that

timeframe. At no time while I was employed by the University of Chicago Police Department

was I concurrently employed by the City of Chicago as a police officer.

9.    Please describe your assignment with the University of Chicago Police Department on October 18, 2008. Your response should include the actual time you began and ended your duties.

**ANSWER:**    On October 18, 2008, I was working for the University of Chicago on the

midnight shift. I was working assignment 109. Clarence Moore was riding with me to learn the

University's practices and procedures.

10.    State the case number, caption, and jurisdiction of all civil cases in which you were named a defendant during the course of your employment with the University of Chicago Police Department and/or the City of Chicago Police Department.

**ANSWER:**    I have never worked for the Chicago Police Department and I have never

been previously sued in my capacity as a University of Chicago Police officer.

11.    Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

7

**ANSWER:** Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in some capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other complaints that are substantially similar in nature. Subject to those objections and without waiving same, there have been no complaints that have been sustained against me with the University of Chicago.

12.    Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

**ANSWER:** Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13.    State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

**ANSWER:** I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14.    State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:** Defendant objections to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving said objection, defendant states this is unknown to me at this time.

8

15.     State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

**ANSWER:**     Yes.  I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46.

16.     State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:**     I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46 and appeared at that hearing on behalf of the University of Chicago.

17.     State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:**     Objection.  This Interrogatory calls for attorney work product.  Defendant further objects to this Interrogatory as overbroad and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion.  Defendant further objects that it is unduly burdensome and harassing.  Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of Chicago Defendants' Response to Plaintiff's Production Request and these Answers to Interrogatories.

By: _____
Officer Larry Torres

SUBSCRIBED AND SWORN TO
before me this 20TH day of July, 2009.

_____
Notary Public

OFFICIAL SEAL
ELLEN L. JENNINGS-MORGAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/30/12

9

6459565v1897854 4236