# EXHIBIT I

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE, Plaintiff,

-vs-

UNIVERSITY OF CHICAGO POLICE OFFICER LARRY TORRES, ET AL., Defendants.

No. 09 C 1080

The deposition of KENNETH ROBERSON called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Frances S. Lucente CSR, a notary public within and for the County of Cook and State of Illinois, at 222 North LaSalle Street, Chicago, Illinois, on the 1st day of December, 2009, at the hour of 2:00 p.m.

Reported by: Frances S. Lucente, CSR
License No.: 084-004005

1

APPEARANCES:

ED FOX & ASSOCIATES, by
JONATHAN R. KSIAZEK, ESQ.
300 WEST ADAMS STREET, SUITE 330
CHICAGO, ILLINOIS 60606
(312) 345-8877
Representing the Plaintiff,

HINSHAW & CULBERTSON, LLP, by
STEVE PUSZNIS, ESQ.
222 NORTH LASALLE STREET, SUITE 300
CHICAGO, ILLINOIS 60601
(312) 704-3000
Representing Defendant, University of Chicago

2

APPEARANCES CONTINUED:

ASSISTANT CORPORATION COUNSEL, by
HELEN GIBBONS, ESQ.
30 NORTH LASALLE STREET, SUITE 900
CHICAGO, ILLINOIS 60602
(312) 744-3989
Representing City of Chicago Police Officers.

3

INDEX

| WITNESS | EXAMINATION |
|---|---|
| Kenneth Roberson | |
| By Mr. Pusznis | 5 |
| By Ms. Gibbons | 82 |
| By Mr. Ksiazek | 85 |

NO EXHIBITS MARKED

4

(Witness sworn.)

KENNETH ROBERSON,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PUSZNIS:

Q. Would you please tell us your full name and spell your last name for the benefit of the court reporter.
A. Kenneth Roberson, R-o-b-e-r-s-o-n.
Q. Kenneth, we're going to be asking you some questions today about an incident involving Charles Boyle. If at any time you don't hear my question or don't understand it, please tell me. Okay?
A. Okay.
Q. If you go ahead and answer the question, everyone is going to assume that you heard the question and that you understood it. All right?
A. Okay.
Q. The court reporter is going to be taking down everything anyone says in the room today. She can't take down a nod of the head or a shrug of the shoulders. So while I'll know what your answer is, she won't be able to transcribe it into deposition

testimony. So please keep all of your answers out loud, verbal in nature. Okay?
A. Okay.
Q. Finally, you're probably going to know what my question is before I finish it. Please wait until my question is finished before you begin answering my question because the court reporter -- while she's very good -- has trouble taking down two people speaking at one time. All right?
A. Yes.
Q. We've got some background noise here so please -- you sound like you're a little soft-spoken. Please try to keep your voice up so the court reporter doesn't have any trouble hearing you.
A. Okay. I understand.
Q. How old are you?
A. 22.
Q. When was the last time you ever saw Steve Sinclair?
A. I haven't seen him in a while, but I've spoken to him.
Q. Where's he at?
A. I'm not sure where he is. Usually, when I

speak to him it's usually just over the phone, conversate (sic) or something like that.
Q. Where does he live?
A. His last known address that I knew was his mother's house.
Q. Which was where?
A. 78th and Langley.
Q. He's not in prison, is he?
A. No.
Q. Did you call him, or does he call you?
A. He usually calls me.
Q. What's his phone number?
A. I don't have his phone number off the top of my head. He usually calls private or restricted, or he'll call when he's with a mutual friend of ours.
Q. Is he living in Illinois?
A. Yes, because we go to the same barbershop.
Q. So you still see him?
A. I haven't seen him, but we have the same barber. The barber and I may have a conversation about him.
Q. Is he going to school?
A. Not to my knowledge.

Q. Is he working?
A. No.
Q. Is he in a hospital somewhere?
A. No.
Q. What's he doing with his life?
A. He DJs.
Q. He DJs?
A. Yes.
Q. You have no idea about his whereabouts?
A. The last I heard of his whereabouts, he was staying with his mother. They got into some type of altercation and he moved out, but I'm not sure where he lives.
Q. How long ago did he move out?
A. I'm not sure. At least three or four months.
Q. Do you know what the nature of the altercation was with his mom?
A. No.
Q. Where do you live?
A. In Calumet City.
Q. What's the address?
A. 34 Warren.
Q. 34 Warren?

A. Yes.
Q. How long have you lived at that address?
A. Well, my mother's lived there for about seven years. I recently moved in sometime last year.
Q. Where did you live before that?
A. With my aunt.
Q. Where does she live?
A. 75th and King Drive.
Q. 75th and King Drive?
A. Yes.
Q. Are you related to Charles Boyle at all?
A. No. We've just been friends since kindergarten.
Q. What about Steven Sinclair, do you know if Steven is related to Charles?
A. No, they're not related. We've all been friends since kindergarten.
Q. Because one of the police officers who have been deposed said that he spoke to someone who was Charles's cousin at the scene. Do you know who that might have been?
A. No.
Q. So you've basically known Charles your

9

entire life?
A. Yeah. I mean, if we're out somewhere and someone asks us since we've known each other so long we consider each other family.
Q. Can you tell me about your educational background.
A. I went to Kenwood Academy High School.
Q. Did you graduate?
A. Yes.
Q. When did you graduate?
A. 2005.
Q. What did you do after that?
A. I started going to Northern Illinois University.
Q. How long did you go to Northern Illinois?
A. I went there for a semester, and then I came home and I attended Harper College in Palatine, Illinois. I couldn't get any financial aid so I've been working since.
Q. How long did you go to Harper College?
A. A semester.
Q. So you finished a year in college about?
A. Yeah.
Q. Where are you currently working now?

10

A. I work for a temp agency called Salem, Inc.
Q. Salem, Inc.?
A. Yes. I work in a call center at Computer Share.
Q. What do you do there?
A. I started off as a customer service representative on the phone doing proxy solicitation for mutual funds. Now, I'm in the quality department screening calls to make sure the agents are making quality calls.
Q. When you say agents are making quality calls, on whose behalf, what company?
A. Computer Share.
Q. Computer Share?
A. Computer Share Fund Services.
Q. Fund Services?
A. Yes.
Q. Where are they located? Where is your office located?
A. Two North LaSalle.
Q. How long have you been employed for Computer Share Fund Services?
A. I originally started there in March of

11

'07, and since it's a temp job it goes up and down. I was laid off for a while, then I worked at Value City department store and came back to Computer Share in April of this year and I've been there ever since.
Q. You've been there since?
A. Yes.
Q. What did you do at Value City, were you a salesman?
A. Yeah, I worked the sales floor in the houseware department.
Q. Ever been a member of the union?
A. No.
Q. No military background?
A. No.
Q. Have you ever been convicted of a crime?
A. No.
Q. Have you ever been married?
A. No.
Q. Do you also work with Charles Boyle?
A. No.
Q. Are you a DJ?
A. Part time, yes.
Q. Do you use any particular name as a DJ?

12

A. Yes.
Q. What's that?
A. DJ K-Mac. That stands for DJ K-Mac.
Q. Have you done any work on any of Charles's music?
A. Yes.
Q. What do you do with regard to Charles's music?
A. I've composed a few beats for him. I've sat in on his recording sessions, somewhat engineered some of his projects. I've DJ'd parties that we've thrown together.
Q. Now when you say you've engineered several of his projects, is that what somebody might refer to as mixing his songs?
A. Yeah. I have recorded him, mixed, you know, gave positive feedback, negative feedback, just critiqued his music.
Q. How many songs has he recorded?
A. Honestly, I couldn't say. He records day and night.
Q. Where does he record?
A. He has a home studio.
Q. A home studio?

13

A. Yes.
Q. Does he sell his music?
A. Not to my knowledge because even their latest projects that I haven't been a part of he offered free downloads.
Q. Would you describe his music as rap?
A. Not really. He's more of a -- to me there's a difference between rap and hip hop. He's more of a hip hop artist.
Q. I'm like a 50-year-old out-of-touch white guy. What's the difference between rap and hip hop?
A. Rap is more of, you know, people who like grasp nothing from it. It's just them talking about nonsense. Hip hop is more dealing with people who have something to say and have a story to tell.
Q. You would describe his music more as hip hop than rap?
A. Yes.
Q. But does he sing or does he speak during the course of his songs or his music or shout?
A. It's more -- I don't know how I would say it, but it's like speaking but speaking to the

14

beat, not just like spoken words.
Q. Right. Besides being a DJ, do you have any involvement in the music industry?
A. Not really.
Q. How often would you and Charles DJ together at parties?
A. Well, it used to be I would DJ like two times a week or when we threw parties, when we didn't throw parties like every couple of months.
Q. Is Steven also a DJ?
A. Yes, at one point he was my DJ partner.
Q. Why isn't he your DJ partner any longer?
A. I mean, we still talk about doing certain things together and DJ-ing certain parties together. Right now I'm more focused on working. It's like since he has no job he has more time to dedicate to it.
Q. Now the three of you went to grammar school. When I say the three of you, Steven Sinclair, yourself and Charles Boyle went to school together -- grammar school and high school?
A. Yes.
Q. Has Charles always lived in the Chicago area?

15

A. As far as I can remember, yeah. There may have been one point in time where he might have mentioned living like in Memphis.
Q. How long did he live in Memphis for?
A. I'm not sure. We were pretty young. I know there was one point in time when he transferred from our grammar school.
Q. Have you always known him as Charles Boyle?
A. I've known him as Charles Cain.
Q. Does he do his hip hop songs under the name Apollo Cain?
A. Yes.
Q. Do you know why he uses Apollo?
A. I know it has something to do with Greek mythology because growing up as kids, Charles and Steven reminded us of Apollo.
Q. Did Charles play football at Kenwood?
A. Yes.
Q. How long was he on the veracity for?
A. I'm not sure, but I think he got promoted to veracity sophomore year.
Q. Did he play football in college?
A. No.

16

Q. When was the last time you saw Charles?
A. I'd say about two or three months ago.
Q. When was the last time you saw Ashley Glover?
A. I haven't seen Ashley Glover since -- it's been a while -- the last time we all went to court together.
Q. You went to court on Charles's behalf?
A. I went, but they didn't need me.
Q. Okay. But you were there?
A. Yes.
Q. You weren't subpoenaed?
A. No, they just called me and asked me would I come.
Q. You went because you and he are close friends?
A. Yeah, I guess, and they had asked me.
Q. Would it be fair to describe your relationship with Charles as a close friend?
A. A close friend. I consider him something like a brother.
Q. Do you know what he's doing right now in terms of working or going to school?
A. The last time I know he was going to Columbia College.

Q. Do you know if he's working?
A. From what I remember he was working for CTU on-line.
Q. I'm sorry?
A. CTU on-line, Colorado Technical University on-line.
Q. Do you recall the date of this incident that gives rise to this lawsuit?
A. I'm not sure the actual date. I know it was somewhere around October of last year.
Q. Do you remember what day of the week it was?
A. It had to be a Friday or Saturday night because we had gone out.
Q. Were you working back then?
A. Yes, I was working at Value City department store.
Q. Do you recall if you worked that day?
A. More than likely I didn't work because I went out. I'm leaning more towards it being a Friday, because I didn't work Wednesday or Fridays.
Q. But would you have worked on Saturday then?

A. Yes, but normally when I work on Saturday I close, so I wouldn't have been out with him.
Q. So you're thinking this was a Friday night that you went out?
A. Yeah.
Q. Now had you and Steven and Charles made plans to go out before you actually went out that night or that day?
A. Not really. Steven's idea to go out was spur of the moment. A lot of stuff with him is just spur of the moment.
Q. So how did you guys -- when I say you guys I'm talking about you, Steven and Charles -- make plans to go out?
A. I believe Steven was with Ashley, and we all met at Charles's house. I drove my car to Charles's house and parked my car on his block. I got in the car with them, and we just all decided to go out to a club.
Q. Was there any reason why you went out to this club?
A. I believe Steven had some promoters that wanted to meet with him about DJ-ing.
Q. What time did you meet up with Steven and

Charles and Ashley at Charles's apartment?
A. Say probably late in the 8:00 o'clock hour or early in the 9:00 o'clock hour.
Q. Did you actually go into Charles's apartment?
A. I believe so, but I can't be for sure.
Q. Did you hang out at Charles's apartment for any period of time?
A. Probably not.
Q. Who then drove to this club or bar or wherever you guys went to?
A. Steven drove Ashley's car.
Q. What kind of car was it?
A. A Chrysler Seebring.
Q. And where did you drive to?
A. I don't recall the name of the club, but it was on the north side.
Q. Do you recall where on the north side?
A. Not exactly because I wasn't really driving.
Q. Okay. Do you remember the club name or the bar name?
A. No.
Q. How old were you on that particular day in

2008?
A. 21.
Q. Was everybody in your group 21 or older?
A. I believe so because we all got in the club. I know Charles, Steven and I were.
Q. Does the name Club Olay sound correct?
A. I'm not sure.
Q. What happened when you arrived at this club or this bar?
A. Hanging out I saw a few people that I knew from previous clubs and DJ-ing parties and clubs. I talked to them. I remember having two drinks. I had one Corona and a Long Island Iced Tea.
Q. Who were the people that you knew from these DJ parties and other clubs?
A. A guy named Isiah and Pierre.
Q. Do you know their last names?
A. No.
Q. And did Charles have anything to drink?
A. I think he had some -- I don't know if he drunk the whole beer. I think he had a Corona.
Q. What about Steven, did he have anything to drink?
A. I'm not sure about Steven because he was

with Ashley most of the night and moving around talking to different people.
Q. How long were you at this establishment for?
A. A few hours.
Q. Did Steven meet these promoters?
A. I do believe I seen him talking to a few people. I'm not sure if he was actually talking business with them.
Q. Were you and he still DJ-ing together at the time?
A. Yeah.
Q. So when he was meeting with these promoters weren't you with him?
A. Not exactly, because some things we do together and certain things I don't get involved in. Normally, like if they want us to DJ as a team then I will be involved; but if it was just him and what we call a solo mission, then it was just for his benefit.
Q. Do you know if promoters wanted him for a solo mission or to work with you?
A. More than likely it was probably for a solo mission because I had no involvement in it.

Q. Now after you were at this bar or lounge for a couple of hours, what happened?
A. Pretty much I got back in Ashley's car and left.
Q. Had you ever been in Ashley's car before?
A. Maybe twice.
Q. When was the last time prior to this incident that you had been in Ashley's car?
A. Maybe a few weeks earlier.
Q. Anything unusual happen to that car when you were in it a few weeks earlier?
A. No.
Q. After you left the bar, where did the four of you go?
A. We were headed back to Charles's house, and we were on Lake Shore Drive. Steven and I needed to go to the bank. We both have Bank of America. We went to the Bank of America on 53rd Street in Hyde Park.
Q. Why did you need to go to the bank?
A. In the bar when I bought my drinks I had swiped my card, and I knew there wasn't that much money in my card. I wanted to make a deposit before the money was taken out and I was charged an

overdraft fee.
Q. If you had the cash on you, why didn't you just pay with the cash?
A. I don't know.
Q. Why did Steven want to go to the bank?
A. I think he wanted to make a deposit and withdrawal.
Q. Why not make a deposit and withdrawal before you guys went to the bar?
A. I have no idea. Before we went to the bar I had no need to even make a deposit until I swiped the card.
Q. Was this a debit card?
A. Yes.
Q. For your checking account?
A. Well, it wasn't for -- yeah.
Q. How much did you have in your account when you went to the bar that day?
A. I'm not sure.
Q. How much was the drink?
A. I'm not exactly sure, but usually Long Island Iced Teas can range from like $8 to $10.
Q. Would it be fair to say that you had less than $8 to $10 in your checking account when you

went to the bar that evening?
A. Yeah.
Q. How much in cash did you have?
A. Probably 200-something dollars.
Q. Of the 200, how much were you going to deposit?
A. I think I deposited like $30 that night.
Q. Where did you get the $200 from?
A. Working at Value City.
Q. A paycheck?
A. Yeah.
Q. Now did you guys have any plans to go anywhere other than to Charles's apartment as you were driving on Lake Shore Drive?
A. I hadn't had any other plans besides when we stopped at the bank because I was going to get my car.
Q. Had anyone indicated they wanted to get something to eat?
A. If I'm not mistaken, we may have had pizza that night. I believe we had already went to Sarpino's.
Q. So your recollection is that you guys had already been to Sarpino's?

25

A. Yeah.
Q. Where is the Sarpino's located that you went to?
A. It's on the north side because we were already up north.
Q. You guys didn't need to go to the ATM to get money to go to Sarpino's?
A. No, because at Sarpino's they have like five-five-five, like you order three or more medium pizzas and they're $5.
Q. So who paid at Sarpino's?
A. Since you had to order altogether, I think we all put in like whatever change we had.
Q. Now what route did you take from the bar to get to Sarpino's?
A. You come outside the bar, and I believe you make a left on the main street. I'm not sure of the street name. Sarpino's is right on the main street that goes east and west.
Q. Do you recall the name of the street that Sarpino's was on?
A. No.
Q. How long were you at Sarpino's for?
A. Not long because we got the pizzas and ate

26

in the car.
Q. After you went to Sarpino's and got these pizzas where did you go?
A. To the Bank of America.
Q. What route did you take from Sarpino's to get to the Bank of America?
A. We got on Lake Shore Drive.
Q. How far did you go on Lake Shore Drive before you got off of it?
A. To the 47th Street exit.
Q. To 47th Street?
A. Yes. You take Lake Park down to 53rd and 53rd over to Blackstone where the Bank of America is located.
Q. Which way were you driving on 53rd Street, eastbound or westbound? I'm not familiar with that part of town.
A. I believe we made a right onto Blackstone. We took Blackstone to 52nd, then made a left and went to -- what's the next street -- Dorchester. We then came down Dorchester to 53rd, and then we were going eastbound onto 53rd.
Q. So if you would divide 53rd in half, you would be on the south side of 53rd going eastbound?

27

A. Yes.
Q. Who was driving at the time?
A. Steven.
Q. Where were you positioned in the vehicle?
A. I was in the back seat.
Q. On which side?
A. I can't remember. I'm not sure. I would say I was behind Steven because Charles is a little bigger than I, and Steven drives with the seat back sometimes.
Q. Did anything unusual happen with the car as you guys were driving to Bank of America?
A. The horn just started mysteriously going off.
Q. I'm sorry?
A. The horn started mysteriously going off.
Q. Where was the car located approximately when the horn started going off?
A. When I heard it going off, Steven was getting ready to park a little bit in front of the Dunkin' Doughnuts that's on 53rd.
Q. Well, you heard it as soon as the horn went off; right?
A. Yeah.

28

Q. So you recall being on 53rd Street when the horn went off?
A. Yes.
Q. How long did the horn go off for?
A. The horn was still going off when we put the car in park. Steven and I got out to go to Bank of America. Charles got out to see could he possibly stop it.
Q. I mean from the time the car came to a stop when it was parked, how long had the car's horn been going off?
A. About 45 seconds to a minute.
Q. Where exactly did Steven park the car?
A. He parked it on 53rd Street.
Q. Is there any stop sign at the intersection of 53rd and Blackstone for eastbound traffic?
A. Yes, a stop sign, but he parked his car way before the stop sign.
Q. How much distance was there between the stop sign and the front of the car where Steven parked at?
A. At least like 15 feet.
Q. Was there any car between where Steven parked Ashley's car and the stop sign?

A. I'm not sure if it was when we were going into the bank, but I noticed when we came out the bank there was no car out there except for the police cars.
Q. So as far as you can recall there was no car parked between Ashley's car and the stop sign?
A. No. There may have been cars behind Steven.
Q. But none in front?
A. No.
Q. It would have been physically impossible for a police officer to throw Charles into the rear of a car that was parked there because there was no car parked there, right?
A. I wouldn't say impossible because when I came out the ATM he was shoved on the back of the police car.
Q. Well, I'm not talking about the police car now. I'm talking about another passenger car parked between the stop sign and Ashley's car. If there was no car there, it would have been impossible for the police to throw Charles's head into a car that wasn't there; agree?
A. I wouldn't say impossible because I can't

recall if there was a car there or not.
Q. Okay. Now the Bank of America ATM is not on the block where you guys parked the car. It's another block east, isn't it?
A. It's not a whole block east.
Q. There's a street there, Blackstone, and then there's the start of another block and the ATM is down in that next block; isn't it?
A. It's right down the corner.
Q. There are some businesses between 53rd and Blackstone and where the ATM is, isn't there?
A. There's a Dunkin' Doughnuts and then there's a building and then there's the Bank of America across the street.
Q. So the Bank of America -- your testimony is -- is right on the corner there at 53rd and Blackstone.
A. The Giordano's is right there at the corner. The Bank of America building is connected on with the Giordano's building.
Q. Is the Giordano's between --
A. The Giordano's is actually on Blackstone.
Q. Is it between Blackstone and the ATM -- the Bank of America where the ATM is located?

A. Could you rephrase the question.
Q. You've got 53rd Street that runs east and west, and then you've got Blackstone that runs north and south; right?
A. Yes.
Q. So on the southeast corner of 53rd and Blackstone there's a Giordano's, correct?
A. It's a little bit farther south of the corner.
Q. What's right on the corner of 53rd and Blackstone, or what was right on the corner of 53rd and Blackstone on this date in October of 2008?
A. I'm not sure, but I know the Bank of America building is connected with the Giordano's building.
Q. How far from where the sidewalk is on the east side of Blackstone do you have to walk to get to where the Bank of America building is located -- where the entrance of the Bank of America building is located?
A. It's a little walk.
Q. What's a little walk?
A. Maybe about a minute walk.
Q. About a minute walk?

A. Yeah, if that.
Q. In terms of distance, can you estimate it for me?
A. Not really.
Q. There's also parking on that block where the Bank of America ATM is located, right?
A. It's parking, but most of the time when you go to the Hyde Park area there's rarely anywhere to park.
Q. Well, let me ask you, this was 2:30 in the morning, wasn't it, or thereabouts, or was it closer to 3:00?
A. Maybe somewhere around there. I'm not sure, but no matter what time you go to Hyde Park there's rarely anywhere to park.
Q. So your testimony is there were no parking spots available in the block on 53rd Street east of Blackstone where the Bank of America is located?
A. I'm not saying that because I wasn't driving so therefore it wasn't my decision to determine where we parked.
Q. So when you got out of the car, Ashley's car, the horn was still going?
A. Yeah.

Q. Do you know how long the horn continued to blow after you got out of the car?
A. No, because once Charles said he was going to see what was going on with it, me and Steven continued to go to the bank.
Q. Now this was sometime between 2:30 and 3:00 in the morning, correct?
A. I'm not sure. It was so long ago.
Q. I'm sorry?
A. I'm not sure. It was so long ago.
Q. What were the lighting conditions like at 2:30 or 3:00 o'clock in the morning?
A. It's pretty dark with the exception of the street lights lighting the street up.
Q. Was the Bank of America ATM on the same side of the street as Ashley's car was parked?
A. Yeah, it was on the southbound side of the street, but you have to cross the crosswalk to get there.
Q. But you didn't have to cross to the other side of 53rd Street to get there?
A. Not to the north side, but you continued to cross east.
Q. Right. Do you recall hearing the horn

stop blaring as you were walking towards the ATM?
A. I can't recall because me and Steven were having a conversation walking to the bank.
Q. What were you and Steven talking about?
A. Probably our normal talk -- females.
Q. Now there was a University squad car parked in front of the Dunkin' Doughnuts, wasn't there?
A. Yeah, I recall seeing the University of Chicago Police over by Dunkin' Doughnuts.
Q. Did anyone say anything as Ashley's car passed the University of Chicago Officers with the horn blaring the way it was?
A. No, they didn't say anything to us because we walked out the car and walked to the bank.
Q. No, I said was anyone inside of your car -- when I say your car, I'm talking about Ashley's car -- did anyone inside of Ashley's car say anything to one another as the car passed the University of Chicago squad?
A. I don't believe so. I noticed they were there. No one usually says anything. You just notice your surroundings.
Q. Let me ask you, when you were at Kenwood

do you remember a black Chicago Police Officer coming to Kenwood talking to the students about how they should handle themselves when they were stopped by the police on the street?
A. No.
Q. You don't remember anything like that?
A. No.
Q. You never received any presentation from a police officer how to handle a street stop?
A. No.
Q. I'm not talking about you generally. I'm just talking about everybody at your high school.
A. I don't recall anything like that.
Q. Do you recall Ashley saying anything like, damn, the horn is going off just as we're passing the police or anything like that?
A. No. I try to tune Ashley out.
Q. Why is that?
A. She's very annoying.
Q. Why is she very annoying?
A. Because she just complains.
Q. Do you remember anyone saying or commenting on the fact that the horn was blaring as you were driving by the University of Chicago

squad?
A. No, but I mean the horn -- I don't recall anyone saying anything, but I'm pretty sure if someone said anything it probably wasn't because the police were there. It's just horns going off and alarms going off could be just completely annoying.
Q. I'm sorry?
A. Car alarms, horns, anything of that nature is just completely annoying.
Q. When a horn goes off and blares for a while, that can be an indication that an alarm on a car was activated; correct?
A. Yeah, you could say that because my car does that.
Q. So a police officer seeing a car driving down the street with the horn blowing, not knowing if there's a problem with the electrical system in the car could think that it's the alarm of the car going off; right?
MR. KSIAZEK: Objection, speculation. Go ahead.
THE WITNESS: I could see how you could infer that.

BY MR. PUSZNIS:
Q. So you could see how an officer hearing a horn going off as a car is driving down the street could infer that a car is possibly stolen; correct?
A. I could see that. If that was the case, if they saw us, why would they even let us get out the car and walk away?
Q. That wasn't my question. My question was if a police officer sees a car driving down the street with the horn going off, they could think that the car was stolen; correct?
A. Sure.
Q. And when a police officer pulls up to what potentially is a stolen car, who poses the most danger to a police officer -- the people that are at the car or the people who have walked away from the car?
MR. KSIAZEK: Objection, speculation.
THE WITNESS: That's a difficult question to answer. It depends how you look at the situation.
MR. PUSZNIS: Right.
BY MR. PUSZNIS:
Q. Do you think it would be appropriate for a police officer coming up to a car, not knowing if

it's stolen or not, to ask someone questions like who's car is this and can I see your identification, please?
A. Would I think that's inappropriate?
Q. Yeah.
A. I wouldn't say it's inappropriate.
Q. In fact, it's good police work; isn't it?
A. I mean, if I was the cop in that situation I would ask that question.
Q. You and Steven got out of the car, and you began walking to the ATM; correct?
A. Yes.
Q. Did you ever turn around and look back in the direction of the car before you got into the ATM?
A. I did.
Q. You did. Okay. Where were you about or where were you located when you turned around and looked at the car?
A. Crossing the street at Blackstone.
Q. I'm sorry?
A. Crossing the street at Blackstone.
Q. What did you see as you turned around and looked?

A. Charles was raising the hood up looking under it.
Q. Did you see where the University of Chicago Police Officers were at that point in time?
A. The car was still by the Dunkin' Doughnuts.
Q. So would it be fair to say that the University of Chicago Officers did not signal the car to come over to the curb?
A. No, we were already parked.
Q. Was anybody else on the street that night at that hour of the morning when you and Steven got out of the car to walk to the ATM?
A. Not that I remember.
Q. What did you do after you turned around and looked back at the car when Charles was lifting up the hood?
A. Nothing, continued to walk to the bank.
Q. Did you go into the bank?
A. Yeah, Steven and I both went into the bank and used the ATMs.
Q. Before you actually entered the bank, did you look back towards Ashley's car?
A. No.

Q. Now to get into the bank do you have to use your ATM card?
A. You have to use your ATM debit card or some form of credit card or something to get into the bank.
Q. Right. Where is the ATM machine when you're inside the bank?
A. As you go into the bank facing this way, the ATMs are on an angle angled towards her.
Q. So let's imagine the doors to this room, which are to my right and your left are the front doors to the ATM. Can we just assume that for a second. You and Steven are walking into the ATM now. Okay. Where are the actual money machines located inside of the Bank of America?
A. Like angled onto this wall.
Q. So it would be angled to your right as you're going in, correct?
A. Yeah.
Q. How many feet inside the door did you have to walk in order to get to those ATMs?
A. About five or six or seven steps.
Q. So would it be fair to say that it's anywhere from 5 to 10 feet inside the Bank of

America where the ATM is located?
A. Yeah.
Q. As you're standing in front of the ATM, what can you see?
A. Nothing.
Q. When you were inside the ATM did you hear anything?
A. I didn't hear anything. There were two ATMs in there; but the one I had started to use, it wouldn't accept the cash deposit so I had to wait for Steven to finish with his ATM and then start my deposit. He had walked away from the ATM and was over by the glass windows.
Q. Did you ever walk over by the glass windows while you were waiting for Steven to use the ATM?
A. No, because I recall messing with him while he was at the ATM just playing with him like I'm going to see your PIN number, just messing with him.
Q. How long did it take Steven to use the ATM about?
A. About four minutes.
Q. Four minutes? Okay. Then how long did it

take for you to use the ATM?
A. About two minutes because I just made a quick cash deposit. Steven was by the windows. He had seen the lights flashing and everything so he had kind of rushed me out of there.
Q. Well, would it be fair to say that you were inside the ATM for approximately six minutes then?
A. Approximately somewhere around there.
Q. Now while you were using the ATM did Steven say anything?
A. Yeah. He rushed me out of there, had mentioning a bunch of flashing lights that looked like the police were over there. He had rushed me out of there. I made my deposit, and we left the bank together.
Q. When you stepped outside of the ATM, how far were you from Ashley's car at that point?
A. Across Blackstone on the farther east side of the street.
Q. In terms of the distance between the front of Ashley's car and where you were standing as you stepped outside the doors of the ATM, what would that distance be approximately?

A. I'm not sure.
Q. Less than a block?
A. Yeah, it's way less than a block.
Q. The size of a football field?
A. I'm not sure if it's that long.
Q. Tell me what you saw when you first stepped out of the ATM and looked in the direction of Ashley's car.
A. I couldn't see Charles at all, but I did see Ashley on the passenger side of her car. She did look all distraught, so me and Steven hurried up and went over there to see what was going on.
Q. So from where you were standing outside the ATM, you could see Ashley seated inside the vehicle?
A. Yeah.
Q. And you could tell from that distance that she looked distraught?
A. Yes.
Q. How many squad cars did you see at that time, one or more than one?
A. It was more than one, and then the other cars were pulling up.
Q. So when you walked out of the ATM and you

looked and could see Ashley, you couldn't see Charles?

A. No, I couldn't see him at that point. As we got closer and walked over to see what was going on, Steven was in front of me asking what was going on. And then once we got around to see what was going on, Charles was on the ground. They were kicking and stomping him. Steven was like what are you all doing that for. One of the cops asked Steven did he want to be next.

Q. Well, my point is during the six minutes or so you were inside the ATM, you didn't see what happened between Charles and any police officers on the street; correct?

A. No.

Q. When you first stepped out of the ATM, you couldn't see Charles and what interaction, if any, he had with any police officers; correct?

A. No.

Q. Where were you the first time you saw Charles?

A. Back onto that side of 53rd, and I had stepped around the police car. I came around the police car. They had him on the ground, kicking

and stomping him. He's yelling I'm already handcuffed, why are you constantly kicking and stomping me.

Q. We'll get into that. It wasn't until you came around the police car that you could see Charles, right?

A. Right.

Q. Where was the police car in relation to Ashley's car?

A. Angled off into the middle of the street in front of Ashley's car to the left of it.

Q. Was it angled towards the curb or away from the curb?

A. The back end was towards the curb. The front end was away from the curb. If this is the side of the street, the car was angled that way.

Q. So the police pulled in front of the car?

A. No. Say a car is coming this way and you want to cut it off, they kind of swerved in and swerved out.

Q. Where was Charles positioned in relation to the front of Ashley's car and the rear of that squad car?

A. In the middle of the street in between

both cars.

Q. How many officers were on the scene at that point in time?

A. About four or five.

Q. Do you know if they were University of Chicago Officers?

A. University of Chicago Officers, and then the Chicago police came.

Q. We'll get into that. So you saw four to five University of Chicago Officers at that point in time when you walked around the squad car; right?

A. Yeah.

Q. You said Charles was on the ground?

A. Yeah.

Q. Was anybody holding him down?

A. I wouldn't say holding him down, but if you're getting kicked and stomped in the middle of the street it's kind of hard for you to get up and get away from that if you're handcuffed.

Q. When you saw Charles on the ground he was handcuffed?

A. Yeah.

Q. And was he handcuffed in front or behind?

A. His hands were behind his back.

Q. Was he laying on the ground, or was he on his knees? What actual position was he in?

A. He was laying on the ground, but at one point in time he was on his knees trying to get up.

Q. Now you said that there were four to five University of Chicago Officers, I think you described it as kicking and stomping him?

A. Yeah.

Q. When you first saw Charles he was on his knees?

A. I don't know if he was on his knees prior to when I first saw him, but when I came over he was on the ground.

Q. Was he on his knees when you first saw him, or was he laying face down on the ground when you first saw him?

A. To my recollection face down.

Q. There were four to five University of Chicago Officers standing around him?

A. Yeah.

Q. Can you describe any of them for me?

A. Not really.

Q. I mean, were any of them Asian?

A. I remember a black one. I do remember some type of Hispanic one.
Q. I'm sorry?
A. I remember a black one and a Hispanic one.
Q. Did you see any white officers?
A. Not really sure.
Q. Did you see any Asian officers?
A. Not to my knowledge.
Q. I'm sorry?
A. Not to my knowledge.
Q. How many black and Hispanic officers did you see from the University of Chicago when you first went around the squad car?
A. I'm not sure like the number as far as their ethnicity, because when I walked up their backs were to me and they were constantly kicking and stomping.
Q. So Charles is on the ground. These four to five University of Chicago Officers are facing him with their backs to you. You see them kicking and stomping him. Is that what you've described for us?
A. Yeah.
Q. How many times would you say these four to

five University of Chicago Officers kicked and stomped Charles?
A. I'm not sure of the number, but it was repeatedly because he was constantly saying I'm already down why are you kicking and stomping me.
Q. Did they stop for a period of time, or is this constant kicking?
A. It was constant at first, but it pretty much slowed down as people started to gather.
Q. Well, how many times did you see a University of Chicago Officer kick or stomp Charles as he was handcuffed on the ground?
A. It was repeatedly, so at least six or seven times.
Q. How long of a period of time did this kicking and stomping occur for?
A. I'd say about -- between 5 to 10 minutes.
Q. I'm sorry?
A. Between 5 to 10 minutes.
Q. Between 5 and 10 minutes?
A. Yeah. The Chicago Police eventually showed up. It was like when they showed up it kind of calmed down.
Q. Was this kicking and stomping constant

during the 5 to 10 minutes?
A. Yeah.
Q. Was any University of Chicago officer doing more of this kicking and stomping during the 5 to 10 minutes than any other officer?
A. It's mainly the Hispanic one.
Q. It was mainly the Hispanic one?
A. The Hispanic one and the African-American male. I can't really describe him, but I noticed he had like a funny mustache.
Q. The Hispanic officer and the African-American male officer with a funny mustache were doing most of the kicking?
A. Yeah.
Q. Did you see any University of Chicago Officer on the ground looking for his glasses that had been broken?
A. Yeah, because I do recall someone making a statement like you're lucky this wasn't 10 years ago because I would have killed you, you made me break my glasses.
Q. Do you know if Charles kicked that officer in the face and broke his glasses?
A. No, I am not sure if that happened, or if

it had happened if it was before I came out there.
Q. But you do remember a University of Chicago Officer looking for his glasses?
A. Yeah.
Q. Where were these University of Chicago Officers kicking and stomping Charles's body during this 5- to 10-minute period of time?
A. All over from head down.
Q. You said from the head down. Was he actually kicked in the head?
A. Yeah.
Q. Did you see the officers kicking Charles in the head?
A. Yeah.
Q. Did you see the officers kicking Charles in the face?
A. Face, side, ribs.
Q. Anywhere else?
A. It was pretty much all over.
Q. And when they kicked Charles did they hurt him?
A. I would say so. If anyone is getting kicked and stomped all over, I'm pretty sure they will be hurting.

Q. This isn't like WWF where they're pretending that they're --
A. Right, when you're getting kicked and stomped with boots I'm sure it would hurt.
Q. And it would leave marks and bruises, right?
A. Yeah.
Q. Let me show you what has been previously marked as Glover Deposition Exhibit No. 2 and Charles Boyle Deposition Exhibit No. 1. Do you know when those photographs were taken?
A. No.
Q. Did you know if they were taken before or after Charles was kicked and beat and stomped for 5 to 10 minutes by the University of Chicago Officers?
A. I'm not sure. I wasn't there when the pictures were taken.
Q. Do you know if this is how Charles looked after he was beat and kicked and stomped by the University of Chicago Officers for 5 to 10 minutes?
A. I'm not sure, because once they got him up and put him in the car they took him to the police station. When Steven and I went to police station

53

to see what was going on, they wouldn't tell us anything or let us see him.
Q. But my question is do you know if these photos show how Charles appeared after the University of Chicago Officers allegedly kicked and beat and stomped him for 5 to 10 minutes?
A. I don't know because after this incident I spoke with Charles but I hadn't seen him.
Q. Well, did you see Charles after he was picked up off of the street?
A. Not clearly because he was surrounded by officers.
Q. I assume if Charles was kicked in the face and repeatedly stomped for 5 to 10 minutes he would have been cut or bruised or bleeding, correct?
MR. KSIAZEK: Objection, speculation.
MR. PUSZNIS: You can answer the question.
THE WITNESS: I'm trying to -- it's hard to say because you can be in fights and can get beat bad but don't necessarily end up bleeding or cut or anything, just be in pain and have bruises.
BY MR. PUSZNIS:
Q. If you're kicked and stomped, as you've described it, for 5 or 10 minutes with boots by

54

five police officers that's going to leave some marks; wouldn't it?
A. You're going to have bruises, but it's not certainty that you're going to bleed or anything.
Q. If you were kicked in the face for this 5 to 10 minutes, you would be bruised; wouldn't you?
A. Yeah.
Q. You might have a black eye?
A. If you say so.
Q. If you were kicked in the face your face might be cut?
MR. KSIAZEK: Objection, speculation.
THE WITNESS: I would say so.
BY MR. PUSZNIS:
Q. If you were kicked in the head you might suffer a concussion, right?
MR. KSIAZEK: Speculation.
THE WITNESS: Not all the time.
BY MR. PUSZNIS:
Q. So you saw these University of Chicago Officers kicking Charles while he was handcuffed and stomping Charles for 5 to 10 minutes on the ground. What happened next? What caused them to stop?

55

A. I would say all the commotion and attention they were getting because just random people came outside. Our barber had walked from his home to 53rd where the incident was going on.
Q. What's your barber's name?
A. Chris.
Q. What's his last name?
A. Golden.
Q. Where does he live?
A. The last time I visited his home he was in Hyde Park.
Q. Where in Hyde Park?
A. On 51st and Woodlawn.
Q. How far is that from the location of where this 5 to 10 minute beat-down occurred?
A. About three blocks away.
Q. Anyone call Chris?
A. I think Steven had spoke to him.
Q. Why did Steven call Chris?
A. Because at that time Chris was more than just a barber. He was someone like -- well, he's Steven's manager now. I guess it was someone that Steven called that he probably could trust.
Q. Anyone take any photographs?

56

A. Not to my knowledge because -- I don't know if anybody took any pictures, but I know Ashley Glover had her camera on her that night.
Q. I'm sorry?
A. I don't know if anyone took any pictures, but I know Ashley had her camera on her that night.
Q. Did you see Ashley take any photographs?
A. I didn't see her take any photographs.
Q. Now who else besides your barber walked over after Steven called him?
A. I know some female and maybe a few other people who probably had just -- you know when there's commotion and people just tend to gather to see what's going on.
Q. How long after you saw Charles being kicked and stomped by the University of Chicago Officers did Steven call his barber?
A. I'm not sure. I just noticed he was on the phone with someone, and then a few minutes later Chris showed up.
Q. At what point during this incident did Chris show up?
A. Chris had showed up after they had picked Charles up off the ground and his pants were

halfway down. They had put him up against the University of Chicago police car.
Q. When did Charles's pants come halfway down?
A. His pants were halfway down while he was on the ground being kicked and stomped.
Q. Were his boxers pulled down too?
A. I didn't see his boxers pulled down.
Q. I'm sorry?
A. I didn't see his boxers pulled down.
Q. Was he wearing briefs?
A. I'm not sure.
Q. How far down were his pants pulled?
A. Say like right in the mid -- not completely down but not up.
Q. So kind of like mid hip level?
A. A little bit lower than that.
Q. A little bit lower than that?
A. Yeah.
Q. I know from my kids that they usually wear their pants down low. How far down below where Charles normally wore his pants were these pants pulled?
A. We never really sagged our pants or

anything like that.
Q. The term is sagging?
A. Yeah.
Q. You never sagged your pants?
A. Not really, because we always talked about other people.
Q. Do you know how those pants got pulled down?
A. No.
Q. Now at some point during this 5 to 10 minutes of kicking and stomping Charles, Steven said something?
A. Steven said something as soon as he and I walked up from the bank. He was like what's going on here, and the cop was like do you want to be next. That's when we kind of backed away and just walked around.
Q. What officer said do you want to be next?
A. I don't recall his name or anything like that.
Q. Can you describe him?
A. Not really. It was so long ago.
Q. Do you remember if he was African-American, white, Hispanic, Asian?

A. No.
Q. So these University of Chicago Officers knew that you and Steven were there as well as Ashley, right, during this 5 to 10 minutes that --
A. Yeah, because Ashley was there the whole time.
Q. Right. Now did you or Steven say anything else to Charles or to the officers during this 5 to 10 minutes of beating and stomping as you've described it for us?
A. No, because we didn't really say anything because we didn't want anything to get more out of hand than it already was once Steven asked what was going on and they asked him did he want to be next. We basically were talking to Ashley. Ashley what's going on, but she was too shaken up to really talk about it.
Q. When did you start to see other people arrive at the scene after you started talking to Ashley?
A. About two minutes after we got there.
Q. How many other people started showing up?
A. It wasn't that many, about seven or eight people.

Q. Seven to eight people, did you get any of their names?
A. No.
Q. So this kicking and stomping was still going on while the seven to eight witnesses were there, correct?
A. It wasn't going on too much longer. Once the Chicago Police had showed up, shortly after that it was like it's all calmed down from there. As opposed to them trying to take one side or the other, they were really just trying to calm the situation down.
Q. So would it be fair to say that the University of Chicago Officers didn't care if there were witnesses there, and they kicked Charles and stomped Charles for 5 to 10 minutes out on the street?
MR. KSIAZEK: Objection, speculation.
THE WITNESS: Obviously, I would say they didn't care because they continued to do it anyway.
BY MR. PUSZNIS:
Q. Did you see the officers from the University of Chicago do anything other than kick

61

and stomp Charles during this 5 to 10 minutes?
A. I'm trying to think. Not so much, just doing anything else.
Q. Did you see them punch Charles or hit him with any type of an object?
A. I don't recall any objects. It may have been punches, kicks, that's all the same, blows.
Q. What was Charles saying during this 5 to 10 minutes he was being kicked and stomped?
A. He's constantly yelling I'm already down why do you keep hitting me, I can't do anything, I can't resist or anything like that so why do you keep hitting me.
Q. Did you hear him say anything else?
A. Nothing else other than why are you constantly hitting me, kicking me, punching me, stuff like that.
Q. When the City of Chicago Officers arrived, what happened?
A. Excuse me?
Q. When the City of Chicago Officers arrived, what happened?
A. They pretty much tried to calm the situation down. They eventually picked Charles up

62

off the ground, put him on the car and everything. Chris was there by that time. Chris was trying to explain to them how he was a good kid and trying to see what was going on. The Chicago Police was telling us where he would be taken to.
Q. Now did you see the City of Chicago Officers actually pick Charles up off of the ground?
A. I'm not sure which officer picked him up off of the ground, but they came over. Their main objective was not to try to cause any more commotion or anything. They were just trying to calm the situation down, so I'm not sure who picked him up off the ground.
Q. Did you see any City of Chicago Officer search Ashley's car?
A. No.
Q. Were you present for any conversation between Ashley and any University of Chicago Officer or City of Chicago Police Officer?
A. No.
Q. Did you have any conversation with any of the University of Chicago Officers at any time on the scene?

63

A. No.
Q. Did Steven have any conversation with any of the University of Chicago Officers at the scene other than what you've already described for us?
A. I believe one of them had posed a statement of what are you all doing here or who's car is this, and Steven told him it was my girlfriend's car. Yeah, they were talking to him because he was originally the one driving.
Q. Did you provide your name and address and any identifying information to the University of Chicago Officers?
A. I don't recall.
Q. Did Steven provide his name and address and identifying information to University of Chicago Officers?
A. I don't recall.
Q. Do you know about Ashley, whether she did?
A. Maybe she did because it was her car -- to prove it was her car.
Q. But you don't know one way or the other?
A. No.
Q. When you walked back over to where the squad car was and Ashley's car was, was the hood

64

still up?
A. I can't remember.
Q. When you turned around as you were walking towards the ATM -- I want to go back to when you were walking towards the ATM. You said you turned around. You looked, and you saw Charles under the car; right?
A. Yeah, looking under the hood, raising the hood up and looking under it.
Q. Did he put the bar up that holds the hood up to the car?
A. I don't know if the car had a bar.
Q. At some point did the horn stop?
A. Yeah, because when we came out of the ATM it wasn't going off anymore.
Q. Charles is a big guy, isn't he?
A. Somewhat, not so much anymore.
Q. He's strong, isn't he?
A. Yeah.
Q. Was he All City playing football?
A. I'm not sure.
Q. Now you saw Charles lift it up. You don't know whether it was a University of Chicago Officer or a City of Chicago Officer or who did that?

A. Lifted the hood up?
Q. No, lifted Charles up off of the ground?
A. No, I don't recall that.
Q. Eventually, Charles was taken over and placed in a City of Chicago squad car?
A. I'm not sure what squad car, but I know he ended up at a Chicago Police Department.
Q. What did you and Ashley and Steven do when Charles was taken from the scene to the City of Chicago Police Station?
A. Ashley dropped me and Steven off to my car, then Steven and I went over to the police station where Charles was.
Q. Did Ashley go too?
A. I don't believe she was with us. It was just Steven and I, because when we got there they wouldn't answer any questions we had or anything.
Q. Do you recall seeing Ashley at the 21st District station at any time after the incident?
A. I'm not sure. I know Steven and I rode together.
Q. Now how long did you stay at the 21st District station?
A. Not too long, maybe about 20 or 30

minutes.
Q. What did you do after the 20 to 30 minutes?
A. We went outside and talked, and we were outside talking to -- Charles's girlfriend at that time, her father.
Q. Do you remember his name?
A. No.
Q. Do you recall if he was a police officer?
A. Yes. He's a police officer in Bellwood or Maywood, somewhere out there.
Q. Now after this 20 to 30 minutes passed, what did you do?
A. Dropped Steven off at home and then I went home.
Q. Then you went home?
A. Yeah.
Q. Do you recall Charles saying anything to you or Ashley or Steven before he was transported from the scene at any point in time?
A. Not really. The only thing he said was once he was off the ground in the police car that if he needed any money for bail could I look out for him.

Q. Was that what he said to you?
A. Yeah, that's the only thing he shouted out to me.
Q. Did you say anything in response?
A. I got you.
Q. That's because you had money still on you?
A. I had money still on me and money at home.
Q. Did you ever learn that night what Charles was being arrested for?
A. Not that night.
Q. When you spoke to Mr. Robinson, what did you say to him -- or what did Steven say to him and what did he say in response?
A. He was just asking what happened from our perspective, and Steven and I was telling him we really don't know what started off the whole altercation or everything. We just know that when we came out they were attacking him once he was handcuffed and on the ground and everything, and they didn't stop. That's all we saw. We didn't know what had kicked it off or what had started it from the beginning.
Q. Did Mr. Robinson say anything else?

A. Not really. He was just mainly talking about how his daughter had woken him up out of his sleep to go see about Charles.
Q. Did you know at that point in time if Charles was going to get a D-Bond or an I-Bond?
A. No.
Q. Did you know when Charles was going to be released or when his bond was going to be set?
A. No.
Q. Did you see Charles at all at the 21st District station?
A. No.
Q. Did you see any of the University of Chicago Officers at the 21st District station?
A. No, I just seen the Chicago Police.
Q. Now you said you waited at the 21st District station for a period of time, about 20 to 30 minutes, and then you dropped Steven off at home and you went home; right?
A. Yeah, we were waiting because Charles's girlfriend was calling us and telling us that her father was on his way.
Q. So you waited for him to arrive. You had the conversation with him, and then you left?

A. Yeah.
Q. When did you next speak to Charles about this incident?
A. Later the next day, I believe, but he wasn't really talking about the incident because he didn't really want to talk about it. He was just letting me know that he was at home, and he was going to the doctor and stuff.
Q. So he called you from his home and told you he was going to the doctor?
A. Yeah.
Q. Do you recall what time that conversation occurred?
A. No.
Q. Do you know if anyone was with him at that time?
A. I know he said something about his cousin had came to get him.
Q. Is Ashley his cousin?
A. No.
Q. Who was his cousin?
A. He didn't say what cousin. He just said cousin.
Q. Do you know if Charles had decided he was

going to sue the University of Chicago by that point in time?
A. No.
Q. Did he say anything to you about filing a lawsuit at that time?
A. No, he really just kept the conversation short.
Q. Do you know if he had taken photographs of himself before or after he spoke to you that day?
A. No.
Q. When was the next time you saw Charles in person?
A. It was quite a while because during that time I was working a lot. I really didn't have time to really go anywhere.
Q. When someone describes themselves as coke c-o-k-e, what does that mean?
MR. KSIAZEK: Objection, relevance. Go ahead and answer.
THE WITNESS: As coke?
MR. PUSZNIS: Yeah.
THE WITNESS: I haven't heard that before.
BY MR. PUSZNIS:
Q. Well, you follow Charles on Twitter,

right?
A. No. Well, I'm on Twitter, but I rarely log into Twitter.
Q. At one point when you logged onto Twitter for Charles, there was a statement that says cane is coke. Do you know what he meant by that?
A. No.
Q. Is he referring to Coca-Cola?
A. I'm not sure.
Q. Or do you know if he was referring to something else when he was referring to himself as coke?
A. I'm not sure. I rarely pay attention to anything on Twitter.
Q. Are you one of his Facebook friends?
A. Yeah.
Q. He puts his music up on Facebook, right?
A. Yeah.
Q. Between the music that he puts up on his Facebook account and the music that you've mixed for him, you're familiar with some of his lyrics; aren't you?
A. Yeah.
Q. We've already established that Charles

puts out music under the name of Apollo Cane, right?
A. Yes.
Q. Are you familiar with the song called Diamonds?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: Not off the title. I'd probably have to hear it to know what you're talking about.
MR. PUSZNIS: Something about diamonds on my neck, diamonds on my neck, diamonds on my neck is the chorus?
A. Okay, I know what you're talking about.
Q. Are you familiar with those lyrics?
A. Not really. I know the song. I know the song, yeah.
Q. That's one of Charles's songs, right?
A. Yes.
Q. One of the lines in the song is smoking pounds of green, smoking pounds of green, smoking pounds of green, diamonds on my neck, diamonds on my neck, diamonds on my neck; right?
MR. KSIAZEK: Objection, relevance.
BY MR. PUSZNIS:
Q. When Charles talks about smoking pounds of

green, what is he referring to?
A. Smoking pounds of green, that actual line actually came from another artist, Notorious Big.
Q. I'm sorry?
A. That line came from Notorious Big.
Q. What's that referring to, smoking pounds of green?
A. Probably marijuana.
Q. So Charles sings hip hop songs about smoking marijuana?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: I wouldn't say it's about him smoking marijuana. You know how you have certain people that you admire, like everyone who rap sings or does hip hop, sometimes they will incorporate someone else's lyrics into their own song.
Q. I don't mean to use this offensively, but these are the words of his song. In the song Diamonds, does he say these niggers need to jump on my dick KKKK?
MR. KSIAZEK: Objection, relevance.
BY MR. PUSZNIS:
Q. Do you know if he uses that language in that song?

A. I mean, probably so.
Q. Does he refer to blacks as niggers in his songs?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: Yeah. That's anyone who has some type of art and they have a creative passion for something they express themselves.
BY MR. PUSZNIS:
Q. I understand. Are you familiar with the song called Da Best by Apollo Cane?
A. Yeah.
Q. There's a line in there, hey, hey P, KC KC Midas DJ, let's go. Is he referring to you in that line about let's go?
A. With the DJ that could refer to me, Steven, or some other DJs we know.
Q. Okay. In the song do you know what he refers to when it says it's AP? Does that mean Apollo Cane?
A. Yeah.
Q. So when he says it's AP, I kill the cracker like a muffin, do you know what he's referring to?
MR. KSIAZEK: Objection, relevance.

THE WITNESS: No.
BY MR. PUSZNIS:
Q. When he says I'm high all the time so I'm having grind, do you know what he's referring to?
A. No.
MR. KSIAZEK: Objection, relevance.
BY MR. PUSZNIS:
Q. Do you know if he's talking about being high all the time he's talking about being on marijuana or some type of drugs?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: No. Because in our world you can be high off of something and it doesn't have to be drugs. You know, if you have a female and you're in love with her, you're high off of love, anything like that. It's all how you perceive it.
BY MR. PUSZNIS:
Q. Are you familiar with a song called Bidnezz, B-i-d-n-e-z-z, by Apollo Cane?
A. No.
Q. Ever hear him say words I'm crushing anybody dat, d-a-t, standing in my way. AP is on the scene, man, that's all I gotta say?
MR. KSIAZEK: Objection, relevance.

BY MR. PUSZNIS:
Q. Ever hear that song?
A. I can't recall. Some music I have. Some music I don't have.
MR. KSIAZEK: Are you going to go through every song?
MR. PUSZNIS: No, just a few.
BY MR. PUSZNIS:
Q. You're familiar with the song, Yo, aren't you?
A. Yo.
Q. Yes?
A. That's not Charles's song. It's someone else's song.
Q. Who's song is it?
A. It's a KC song.
Q. It's the other guy that he sings with or does hip hop with, right?
A. Yeah.
Q. What about lyrics to D Boyz?
A. Who?
Q. D Boyz, B-o-y-z?
A. D Boyz.

Q. Uh-huh.
A. Meaning, B Boyz.
Q. D Boyz, yeah?
A. B Boyz -- they have a song called B Boyz, not D Boyz.
Q. Are you familiar with that?
A. Yeah.
Q. Does he refer to himself as a knockout artist trying to get rich?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: Yeah, but a knockout artist is an artist who comes up on the scene and just blows everyone away by their talent.
BY MR. PUSZNIS:
Q. Have you heard of a song called Cronym, C-r-o-n-y-m, I think it's spelled?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: I've heard of something called Acronym.
BY MR. PUSZNIS:
Q. On that song, doesn't he say you got a right to kill brothers like the KKK?
MR. KSIAZEK: Objection, relevance to this whole line of questions.

THE WITNESS: Yes.
BY MR. PUSZNIS:
Q. He does?
A. But I think he's talking more as far as being a hip hop artist/battler, you have a right to demolish your opponent lyrically.
Q. Are you familiar with a song called Party Animal?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: Yeah.
BY MR. PUSZNIS:
Q. Why did you laugh about that one?
A. It's one of the songs I listen to a lot.
Q. Of Charles's?
A. Yeah.
Q. In one of the lines in there he's looking for a chick to ride him like a Harley?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: Yeah.
BY MR. PUSZNIS:
Q. What about Led's Do It, is that one of Charles's songs?
A. Led's Do It.
MR. KSIAZEK: Objection, relevance.

THE WITNESS: I'm not sure if that's his song or KC's song.
BY MR. PUSZNIS:
Q. Do you know if there's lyrics or lines in there about let me get off le cochran with a case?
MR. KSIAZEK: Objection, relevance.
THE WITNESS: Yes.
BY MR. PUSZNIS:
Q. Was he referring to Johnny Cochran?
A. Probably. It also depends on how you use get off.
Q. Was he referring to his criminal case?
A. I'm not sure. That song might have been recorded before all this happened.
Q. Has he ever done any songs about being arrested by the police?
A. Not to my knowledge. If he has, it's probably just from growing up in our surroundings.
Q. I'm not sure I understand. What do you mean?
A. As far as our surroundings?
Q. Yes.
A. Growing up in our neighborhood it's always, you know, the young black male is being

harassed or everything by the police. So if he's raping about being arrested by the police, you can't help but to rap or tell a story about the things you see on a daily basis.

Q. Have you spoken to Charles about your deposition?

A. Not too much about it. I just called him when Mr. Ksiazek first called me and left me a voicemail. I just called to see who Mr. Ksiazek was. We didn't discuss too much about what was going on.

Q. Have you seen any of the University of Chicago Officers involved in this incident since?

A. Just the time we went to court.

Q. Did Charles ever have any run-ins with the University of Chicago Officers before this?

A. No.

Q. Had he ever been arrested by University of Chicago Officers or by City of Chicago Officers before this?

A. Not to my knowledge.

Q. To your knowledge had he ever been harassed by the police on any prior occasion?

A. No.

Q. I'm sorry?

A. Not to my knowledge.

MR. PUSZNIS: I don't have anything else right now. Thanks, Kenneth.

EXAMINATION

BY MS. GIBBONS:

Q. My name is Helen Gibbons. I'm one of the attorneys for the City of Chicago and the City of Chicago Police Officers. I just want to step back to the incident itself and get a clearer picture of when you first saw the Chicago Police Officers on the scene. Can you tell me when you first noticed the Chicago Police Officers as opposed to the University of Chicago Police Officers?

A. Well, the University of Chicago Police Officers were there the whole time. The Chicago Police Officers had really came to try to diffuse the situation.

Q. Do you recall about how many Chicago Police Officers were on the scene?

A. It wasn't that many. I'd say two or three maybe four, if I'm not mistaken.

Q. Do you remember how many Chicago squad cars there were?

A. One or two.

Q. Do you recall seeing a Chicago Police Officer with a white shirt on?

A. I can't recall.

Q. Do you recall the Chicago Police Officers that you did see, what did they look like, what race, were they male, female, any of that information?

A. I can't really recall because it's so long ago and I don't want to be wrong.

Q. When they first came and they were there to diffuse the situation, was Charles still on the ground or was he standing?

A. Like I said, he was still on the ground. That's why I'm not sure who picked him up.

Q. Was he still being beaten at that point in time?

A. I would say it was towards them giving their final blows.

Q. When it was towards them giving their final blows, you mean them as the University of Chicago Police Officers?

A. Yeah, because I can't recall the Chicago Police Officers really trying to get involved in

the situation.

Q. But you said that they were there to diffuse the situation?

A. Like trying to see what was going on for themselves and trying to calm it down.

Q. Now you had mentioned that after all of this happened that you didn't really see Charles for a while, but did you talk to him?

A. Yeah, I called to check on him, make sure did he need anything.

Q. How did he seem to you?

A. I guess he was as well as could be expected, so we didn't go into any details of what was wrong with him or anything. We just had a normal conversation. I asked if he needed anything. We talked about music mostly. That's about it. Mostly when I talked to Charles, it was about music, or he wants to know how my daughter is doing or something of that nature.

Q. Did he take any time off from performing or DJ-ing or writing music that you know of because of this incident?

A. I don't know if he took any time off from performing or anything, but I'm pretty sure he kept

writing.

MS. GIBBONS: I have nothing further.

EXAMINATION

BY MR. KSIAZEK:

Q. I want to go back to when you said that Steven parked the car before the ATM.

A. Yeah.

Q. Can you describe how Steven parked the car on 53rd Street?

A. Steven has this thing that if you don't touch the curb you're not parking right, so he likes to drive up on the curb and come down and park. That way you knows he's close enough to the curb.

Q. Did you see the car actually touch the curb?

A. Gently.

Q. Just kind of bump up against it?

A. Yeah.

Q. Did the car actually shake when it hit the curb, or was it just gently?

A. Just gently.

Q. Do you know how fast the car was going when it gently went up against the curb?

A. It couldn't have been going no more than five miles because he was pulling into the parking spot.

Q. You said something about them throwing Charles on top of a car. Do you recall saying that?

A. Yeah, it was pretty much them picking him up off the ground, pushing him on the side of the University of Chicago police car and patting him down to see if he had anything on him.

Q. How do you know that the University of Chicago Officers picked him up off the floor?

A. I said I couldn't recall who picked him up and put him on the car.

Q. When did that happen?

A. This was after the Chicago Police were on the scene.

Q. That was after they were kicking and striking him?

A. Yeah.

MR. KSIAZEK: I don't think I have anything further.

MR. PUSZNIS: I don't have anything else. Kenneth, your dep is now done. The court reporter,

when the transcript is ordered, will type it up. You have a right to take a look at the transcript to read it over to make sure that all the questions were taken down correctly and that the answers were also transcribed correctly. You can't change your testimony, but if there's a typo or something in there that's misspelled or something you've got a right to take a look at it if you want to. We always offer people the opportunity to read the transcript over if they want to. The court reporter will contact you. You probably have to come to her office to take a look at it, but that's your option. That's your right if you want to do it. The question is do you want to take a look at the transcript, or do you trust the court reporter to get down everything accurately that was asked and your answers.

THE WITNESS: I'll look at it.

MR. PUSZNIS: Signature will be reserved.

(FURTHER DEPONENT SAITH NOT.)

(Whereupon, the deposition concluded at 4:05)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE, )
Plaintiff, )
-vs- ) No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE )
OFFICER LARRY TORRES, ET AL., )
Defendants. )

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Frances S. Lucente, Certified Shorthand Reporter, on December 1, 2009, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

____________________________
KENNETH ROBERSON

SUBSCRIBED AND SWORN TO before me this ______ day of ________________ 2010.

__________________________
Notary Public

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Frances S. Lucente, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on the 1st day of December, 2009, personally appeared before me, at 222 North LaSalle Street, Chicago, Illinois, KENNETH ROBERSON, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein CHARLES BOYLE is the Plaintiff, and UNIVERSITY OF CHICAGO POLICE OFFICER LARRY TORRES, ET AL, are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

89

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 8th day of January, 2010.

Frances S. Lucente

NOTARY PUBLIC, COOK COUNTY, ILLINOIS

90

McCorkle Court Reporters, Inc.
200 N. LaSalle Street Suite 300
Chicago, Illinois 60601-1014

CERTIFIED MAIL
January 8, 2010

Mr. Kenneth Roberson
c/o Jonathan R. Ksiazek
300 West Adams Street, Suite 330
Chicago, Illinois 60606

IN RE: CHARLES BOYLE V. UNIVERSITY OF CHICAGO
DATE OF DEPOSITION: DECEMBER 1, 2009

Dear Mr. Roberson:

Your deposition in the above-entitled cause is now ready for reading and signing as required by law.

Please call the Signature Department upon receipt of this letter to schedule an appointment to come to the above address to read and sign your deposition. You have 28 days from the date of this correspondence in which to appear for reading and signing.

If you fail to appear or notify us so that we may make arrangements for another appointment, your deposition will be completed and forwarded to the attorneys and will be "... used as fully as though signed."

______ Procedure outlined in Rule 207 (a) of the Illinois Supreme Court Rules

______ Procedure outlined in Rule 30 (e) of the Rules of Civil Procedure for the U.S. District Courts

Sincerely,

Margaret Setina, Signature Department

Court Reporter: Frances S. Lucente, CSR

cc: Helen Gibbons, Esq. Steve Pusznis, Esq.

91

A
able
5:24
above-entitled
88:13 91:10
Academy
10:7
accept
42:10
account
24:15,17,24
72:20
accurately
87:16 88:15
Acronym
78:19
activated
37:13
actual
18:10 41:14
48:3 74:2
Adams
2:4 91:6
address
7:4 8:22 9:2
64:10,14
91:12
admire
74:14
affixed
90:12
aforesaid
89:18,24
African-Ame...
51:8,12 59:24
agency
11:1
agents
11:11,12
ago
8:14 17:2 34:8
34:10 51:20
59:22 83:10
agree
30:23
ahead
5:16 37:22
71:18
aid
10:19
AL
1:8 88:8 89:13
alarm
37:12,19
alarms
37:6,9
allegedly
54:5
altercation
8:12,16 68:18
altogether
26:12
America
23:18,18 27:4
27:6,13
28:12 29:7
31:2,14,15
31:19,24
32:14,18,19
33:6,18
34:15 41:15
42:1
angle
41:9
angled
41:9,16,17
46:10,12,16
Animal
79:8
annoying
36:19,20 37:7
37:10
answer
5:16,23 38:20
54:17 66:17
71:19
answering
6:7
answers
6:1 87:4,17
88:16
anybody
40:11 47:16
57:2 76:22
anymore
65:15,17
anyway
61:21
AP
75:18,21 76:22
apartment
20:1,5,7 25:13
Apollo
16:12,14,17
73:1 75:10
75:19 76:19
appear
88:17 91:13,15
APPEARANCES
2:1 3:1
appeared
54:4 89:8
appointment
91:12,15
appropriate
38:23
approximately
28:17 43:7,9
43:24
April
12:4
area
15:24 33:8
arrangements
91:15
arrested
68:10 80:16
81:2,18
arrive
60:19 69:23
arrived
21:8 62:18,21
art
75:6
artist
14:9 74:3 78:9
78:11,12
artist/battler
79:5
Ashley
17:3,5 19:15
20:1 22:1
36:14,17
44:10,14
45:1 57:3,6
57:7 60:4,5
60:15,15,20
63:19 64:18
66:8,11,14
66:18 67:19
70:19
Ashley's
20:12 23:3,5,8
29:24 30:6
30:20 33:22
34:16 35:11
35:18,18
40:23 43:18
43:22 44:8
46:9,11,22
63:16 64:24
Asian
48:24 49:7
59:24
asked
17:13,17 45:9
60:13,14
84:15 87:16
88:16
asking
5:11 45:5
68:15
asks
10:3
ASSISTANT
3:3
ASSOCIATES
2:2
assume
5:17 41:12
54:13
ate
26:24
ATM
26:6 30:16
31:2,7,11,23
31:24 33:6
34:15 35:1
39:11,15
40:13 41:2,3
41:6,12,13
42:1,3,6,11
42:12,16,18
42:21 43:1,7
43:10,17,23
44:7,14,24
45:12,16
65:4,5,14
85:6
ATMs
40:21 41:9,21
42:9
attacking
68:19
attended
10:17
attention
56:2 72:13
attorneys
82:8 90:6
91:16
aunt
9:7
available
33:17
B
B
78:2,4,4
back
12:3 18:16
23:3,15 28:5
28:9 30:16
39:13 40:16
40:23 45:22
46:14 48:1
64:23 65:4
82:9 85:5
backed
59:16
background
6:11 10:6
12:14
backs
49:16,20
bad
54:19
ball
67:23
bank
23:17,17,18,20
24:5 25:16
27:4,6,13
28:12 29:7
30:2,3 31:2
31:13,15,19
31:24 32:13
32:18,19
33:6,18 34:5
34:15 35:3
35:15 40:18
40:19,20,22
41:1,5,7,8
41:15,24
43:16 59:14
bar
20:10,22 21:9
23:1,13,21
24:9,10,18
25:1 26:14
26:16 65:10
65:12
barber
7:21,21 56:3
56:21 57:9
57:17
barbershop
7:18
barber's
56:5
basically
9:24 60:15
basis
81:4
beat
15:1 53:14,20
54:6,19
beaten
83:16
beating
60:9
beats
13:9
beat-down
58:15
beer
21:21
began
39:11
beginning
68:23
behalf
11:13 17:8
believe
19:15,22 20:6
21:4 22:7
25:21 26:16
27:18 35:21
64:5 66:15
70:4
Bellwood
67:10
benefit
5:8 22:20
Best
75:10
Bidnezz
76:19
big
65:16 74:3,5
bigger
28:9
bit
28:20 32:8
58:17,18
black
36:1 49:1,4,11
55:8 80:24
blacks
75:2
Blackstone
27:13,18,19
29:16 31:6
31:11,17,22
31:23 32:3,7
32:11,12,17
33:18 39:20
39:22 43:19
blares
37:11
blaring
35:1,13 36:23
bleed
55:4
bleeding
54:15,20
block
19:17 31:3,4,5
31:7,8 33:5
33:17 44:2,3
blocks
56:16
blow
34:2
blowing
37:17
blows
62:7 78:12
83:19,21
body
52:6
bond
69:8
boots
53:4 54:24
bought
23:21
boxers
58:7,8,10
Boyle
1:4 5:13 9:12
12:20 15:20
16:9 53:10
88:4 89:12
91:7
Boyz
77:21,23,24
78:2,3,4,4,5
break
51:21
briefs
58:11
broke
51:23
broken
51:17
brother
17:21
brothers
78:22
bruised
54:15 55:6
bruises
53:5 54:21
55:3
building
31:13,19,20
32:14,15,18
32:19
bump
85:18
bunch
43:13
business
22:9
businesses
31:10
B-i-d-n-e-z-z
76:19
B-o-y-z
77:23
C
C
1:6 88:6 89:3
Cain
16:10,12
call
7:10,10,15
11:4 22:19
58:17,19
57:17 91:11
called
1:10 5:3 11:1
17:13 56:23
57:10 70:9
73:4 75:10
76:18 78:4
78:15,18
79:7 81:7,8
81:9 84:9
calling
69:21
calls
7:11,14 11:10
11:11,13
calm
61:11 62:23
63:13 84:5
calmed
50:23 61:9
Calumet
8:21
camera
57:3,6
cane
72:5 73:1
75:10,19
76:19
car
19:16,17,18
20:12,13
23:3,5,8,10
25:17 27:1
28:11,17
29:6,9,13,17
29:20,23,24
30:3,6,6,13
30:14,17,18
30:19,20,21
30:23 31:1,3
33:22,23
34:2,16 35:6
35:11,15,17
35:17,18,18
35:19 37:9
37:13,14,16
37:19,19
38:3,4,7,9
38:11,14,16
38:17,24
39:2,10,14
39:19 40:5,9
40:13,16,23
43:18,22
44:8,10
45:23,24
46:5,8,9,11
46:16,17,18
46:22,23
47:11 49:13
53:23 58:2
63:1,16 64:7
64:8,19,20
64:24,24
65:7,11,12
66:5,6,12
67:22 85:6,8
85:15,20,23
86:5,9,14
card
23:22,23 24:12
24:13 41:2,3
41:4
care
61:14,20

cars
30:4,7 44:20
44:23 47:1
82:24
car's
29:10
case
38:5 80:5,12
cash
24:2,3 25:3
42:10 43:3
cause
63:11 88:13
89:10,17
91:10
caused
55:23
cc
91:24
center
11:4
certain
15:13,14 22:16
74:13
certainty
55:4
Certified
88:14 91:3
certify
88:11 89:6,15
90:1,4,8
change
26:13 87:5
charged
23:24
Charles
1:4 5:12 9:12
9:16,24
12:20 15:5
15:20,23
16:8,10,16
16:18 17:1
17:19 19:6
19:13 20:1
21:5,19 28:8
29:7 30:12
34:3 40:1,16
44:9 45:2,7
45:13,17,21
46:6,21
47:14,21
48:10 49:18
50:2,11
51:22 52:12
52:15,20
53:10,14,19
54:4,8,9,13
55:21,22
57:15,24
58:22 59:11
60:8 61:15
61:16 62:1,4
62:8,24 63:7
65:6,16,22
66:2,4,9,13
67:18 68:9
69:3,5,7,10
70:2,24
71:11,24
72:5,24
73:24 74:9
81:5,15
83:12 84:7
84:17 86:5
88:4 89:11
91:7
Charles's
9:21 13:4,7
17:8 19:16
19:17 20:1,4
20:7 23:15
25:13 30:22
52:6 58:3
67:5 69:20
73:16 77:14
79:14,22
check
84:9
checking
24:15,24
Chicago
1:7,16 2:5,12
2:15 3:6,8
15:23 35:10
35:12,20
36:1,24 40:4
40:8 47:6,7
47:8,10 48:7
48:20 49:12
49:19 50:1
50:11,21
51:3,15 52:3
52:5 53:15
53:21 54:5
55:20 57:16
58:2 60:2
61:8,14,24
62:18,21
63:4,6,15,19
63:20,23
64:3,12,16
65:23,24
66:5,7,10
69:14,15
71:1 81:13
81:16,19,19
82:8,9,11,13
82:14,15,16
82:19,23
83:2,5,22,23
86:9,12,16
88:7 89:9,12
91:2,6,7
chick
79:17
chorus
73:11
Chris
56:6,17,19,20
57:20,22,23
63:2,2
Chrysler
20:14
Circuit
89:10
City
3:8 8:21 12:3
12:8 18:17
25:9 62:18
62:21 63:6
63:15,20
65:20,24
66:5,9 81:19
82:8,8
Civil
1:12 91:20
clearer
82:10
clearly
54:11
close
17:15,19,20
19:2 85:13
closer
33:12 45:4
club
19:19,21 20:10
20:16,21
21:5,6,9
clubs
21:11,11,15
Coca-Cola
72:8
cochran
80:5,9
coke
71:16,20 72:6
72:12
college
10:17,20,22
16:23 18:1
Colorado
18:6
Columbia
18:1
come
17:14 26:16
40:9 58:3
85:12 87:12
91:12
comes
78:12
coming
38:2 38:24
46:18
commenting
36:23
commotion
56:1 57:13
63:12
company
11:13
complains
36:21
completed
91:16
completely
37:6,10 58:15
composed
13:9
Computer
11:4,14,15,16
11:23 12:4
Computer-Aided
89:21
concluded
87:22
concussion
55:16
conditions
34:11
connected
31:19 32:14
consider
10:4 17:20
constant
50:7,8,24
constantly
48:2 49:16
50:4 62:10
62:16
contact
87:11
continued
3:1 34:1,5,22
40:18 61:20
conversate
7:2
conversation
7:21 35:3
63:18,22
64:2 69:24
70:12 71:6
84:15
convicted
12:16
Cook
1:15 89:5,11
90:19
cop
39:8 59:15
cops
45:9
corner
31:9,16,19
32:6,9,10,11
Corona
21:13,21
CORPORATION
3:3
correct
21:6 32:7 34:7
37:13 38:4
38:11 39:11
41:18 45:14
45:18 54:15
61:6 89:23
correctly
87:4,5
correspondence
91:13
counsel
3:3 90:2,8
County
1:15 89:3,5,5
89:11 90:19
couple
15:9 23:2
course
14:22
court
1:1 5:9,20 6:7
6:14 17:6,8
81:14 86:24
87:10,15
88:1 89:11
91:1,18,22
Courts
1:13 91:20
cousin
9:21 70:17,19
70:21,22,23
cracker
75:22
creative
75:6
credit
41:4
crime
12:16
criminal
80:12
critiqued
13:18
Cronym
78:15
cross
34:18,20,23
Crossing
39:20,22
crosswalk
34:18
crushing
76:21
CSR
1:14,23 91:23
CTU
18:4,6
CULBERTSON
2:9
curb
40:9 46:12,13
46:14,15
85:11,12,14
85:16,21,24
currently
10:24
customer
11:7
cut
46:19 54:15,20
55:11
c-o-k-e
71:17
C-r-o-n-y-m
78:16
c/o
91:5

D

D
4:1 77:21,23
77:24 78:3,5
Da
75:10
daily
81:4
damn
36:15
danger
38:15
dark
34:13
dat
76:22
date
18:8,10 32:12
91:8,13
daughter
69:2 84:18
day
1:17 13:20
18:12,19
19:8 20:24
24:18 70:4
71:9 88:21
89:7 90:12
days
91:13
dealing
14:15
Dear
91:9
debit
24:13 41:3
December
1:17 88:14
89:7 91:8
decided
19:18 70:24
decision
33:20
dedicate
15:17
Defendant
2:14
Defendants
1:9 88:9 89:14
demolish
79:6
dep
86:24
department
11:10 12:3,11
18:18 66:7
91:11,23
depends
38:20 80:10
DEPONENT
87:20
deposed
9:20
deposit
23:23 24:6,8
24:11 25:6
42:10,12
43:3,15
deposited
25:7
deposition
1:10 5:24 53:9
53:10 81:6
87:21 88:12
90:2,5,6
91:8,10,13
91:16
depositions
1:13
describe
14:6,18 17:18
48:22 51:9
59:21 85:8
described
48:8 49:21
54:24 60:10
64:4
describes
71:16
details
84:13
determine
33:21
diamonds
73:5,9,10,10
73:20,20,21
74:19
dick
74:20
difference
14:8,11
different
22:2
difficult
38:19
diffuse
82:17 83:12
84:3
direction
39:14 44:7
discuss
81:10
distance
29:19 33:2
43:21,24
44:17
distraught
44:11,18
District
1:1,2,12 66:19
66:23 69:11
69:14,17
88:1,2 91:20
divide
27:23
DIVISION
1:3 88:3
DJ
12:22,24 13:3
13:3 15:2,5
15:7,10,11
15:12 21:15
22:17 75:13
75:15
DJs
8:6,7 75:16
DJ'd
13:11
DJ-ing
15:14 19:23
21:11 22:10
84:21
doctor
70:8,10
doing
8:5 11:8 15:13
17:22 45:9
51:4,13 62:3
64:6 84:19
dollars
25:4
door
41:20
doors
41:10,12 43:23
Dorchester
27:20,21

Doughnuts 28:21 31:12 35:7,10 40:6
downloads 14:5
drink 21:19,23 24:20
drinks 21:12 23:21
drive 9:9,10 20:15 23:16 25:14 27:7,8 85:12
drives 28:9
driving 20:20 25:14 27:15 28:2 28:12 33:20 36:24 37:16 38:3,9 64:9
dropped 66:11 67:14 69:18
drove 19:16 20:10,12
drugs 76:10,14
drunk 21:21
duly 5:3 89:16
Dunkin 28:21 31:12 35:7,10 40:5
d-a-t 76:22
D-Bond 69:5

E

e 4:1 91:19
earlier 23:9,11
early 20:3
east 26:19 31:4,5 32:2,17 33:17 34:23 43:19
eastbound 27:16,22,24 29:16
EASTERN 1:3 88:3
eat 25:19
ED 2:2
educational 10:5
eight 60:23 61:1,5
electrical 37:18
else's 74:16 77:15
employed 11:22
ended 66:7
engineered 13:11,13
entered 40:22
entire 10:1
entrance 32:19
Esq 2:3,10 3:4 91:24,24
established 72:24
establishment 22:3
estimate 33:2
ET 1:8 88:8 89:13
ethnicity 49:15
evening 25:1
eventually 50:21 62:24 66:4
everybody 21:3 36:12
exactly 20:19 22:15 24:21 29:13
examination 1:11 4:2 5:5 82:5 85:3
examined 5:4
exception 34:13
Excuse 62:20
Exhibit 53:9,10
EXHIBITS 4:10
exit 27:10
expected 84:13
explain 63:3
express 75:7
eye 55:8

F

face 48:16,18 51:23 52:16,17 54:13 55:5 55:10,10
Facebook 72:15,17,20
facing 41:8 49:19
fact 36:23 39:7
fail 91:15
fair 17:18 24:23 40:7 41:23 43:6 61:13
familiar 27:16 72:21 73:4,13 75:9 76:18 77:10 78:6 79:7
family 10:4
far 16:1 27:8 30:5 32:16 43:18 49:14 56:14 58:13,21 79:4 80:21
farther 32:8 43:19
fast 85:23
father 67:6 69:22
fee 24:1
feedback 13:17,17
feet 29:22 41:20,24
female 57:11 76:14 83:7
females 35:5
field 44:4
fights 54:19
filing 71:4
final 83:19,21
Finally 6:4
financial 10:18
finish 6:5 42:11
finished 6:6 10:22
first 5:3 44:6 45:16 45:20 48:10 48:13,15,17 49:13 50:8 81:8 82:11 82:12 83:11 89:16
five 41:22 47:4,10 48:6,19 49:19 50:1 55:1 86:2
five-five-five 26:9
flashing 43:4,13
floor 12:10 86:12
focused 15:15
follow 71:24
follows 5:4
football 16:18,23 44:4 65:20
foregoing 88:15 89:22 90:2
form 41:4
forwarded 91:16
four 8:15 23:13 42:23,24 47:4,9 48:6 48:19 49:18 49:24 82:22
FOX 2:2
Frances 1:14,23 88:13 89:4 91:23
free 14:5
Friday 18:14,22 19:3
Fridays 18:22
friend 7:16 17:19,20
friends 9:13,18 17:16 72:15
front 28:20 29:20 30:9 35:7 41:11 42:3 43:21 45:5 46:11,15,17 46:22 47:24
full 5:7
fully 91:16
Fund 11:16,17,23
funds 11:9
funny 51:10,12
further 85:2 86:22 87:20 89:15 90:1,4,8

G

gather 50:9 57:13
generally 36:11
gently 85:17,21,22,24
getting 28:20 47:18 52:22 53:3 56:2
Gibbons 3:4 4:5 82:6,7 85:2 91:24
Giordano's 31:18,20,21,22 32:7,14
girlfriend 67:5 69:21
girlfriend's 64:8
given 88:16 89:18,23
gives 18:9
giving 83:18,20
glass 42:13,14
glasses 51:16,21,23 52:3
Glover 17:4,5 53:9 57:3
go 5:16 7:18 10:15,20 19:7,9,14,19 20:4 23:14 23:17,20 24:5 25:12 26:6,7 27:3 27:8 29:4,6 33:8,14 34:5 37:21 40:19 41:8 65:4 66:14 69:3 71:15,18 75:13,14 77:6 84:13 85:5
goes 12:1 26:19 37:11
going 5:11,17,20 6:4 7:23 10:13 17:23,24 25:5,16 27:22,24 28:13,16,18 28:19 29:5 29:11 30:1 33:23 34:3,4 36:15 37:5,6 37:20 38:3 38:10 41:18 42:19 44:12 45:4,5,7 54:1 55:1,3 55:4 56:4 57:14 59:14 60:14,16 61:5,7 63:4 65:15 69:5,7 69:8 70:8,10 71:1 77:6 81:11 84:4 85:23 86:1
Golden 56:8
good 6:8 39:7 63:3
gotta 76:23
graduate 10:8,10
grammar 15:18,21 16:7
grasp 14:14
Greek 16:15
green 73:19,19,20 74:1,2,7
grind 76:4
ground 45:7,24 47:14 47:21 48:2,4 48:14,16 49:18 50:12 51:16 55:23 57:24 58:6 63:1,8,10,14 66:2 67:22 68:20 83:13 83:14 86:8
group 21:3
growing 16:16 80:18,23
guess 17:17 56:22 84:12
guy 14:11 21:16 65:16 77:18
guys 19:12,12 20:11 24:9 25:12 25:23 26:6 28:12 31:3

H

half 27:23
halfway 58:1,3,5
hand 60:13 90:12
handcuffed 46:2 47:20,22 47:24 50:12 55:21 68:20
handle 36:3,9
hands 48:1
hang 20:7
Hanging 21:10
happen 23:10 28:11 86:15
happened 21:8 23:2 45:13 51:24 52:1 55:23 62:19,22 68:15 80:14 84:7
harassed 81:1,23
hard 47:19 54:18
Harley 79:17
Harper 10:17,20
head 5:22 7:14 30:22 52:8,9 52:10,13 55:15
headed 23:15
hear 5:13 42:6,8 62:14 73:8 76:21 77:3
heard 5:17 8:10 28:19,22 71:22 78:15 78:18
hearing 6:14 34:24 38:2
Helen 3:4 82:7 91:24
help 81:3
hereinbefore 90:7
heretofore 89:6
hereunto 90:11
hey 75:12,12
he'll 7:15
high 10:7 15:21 36:12 76:3,9 76:13,15
HINSHAW 2:9
hip 14:8,9,11,15 14:18 16:11 58:16 74:9 74:15 77:19 79:5
Hispanic 49:2,4,11 51:6 51:7,8,11 59:24
hit 62:4 85:20
hitting

62:11,13,16
holding
47:16,17
holds
65:10
home
10:17 13:23,24
56:4,10
67:14,15,16
68:8 69:18
69:19 70:7,9
Honestly
13:20
hood
40:1,17 64:24
65:8,9,10
66:1
hop
14:8,9,12,15
14:19 16:11
74:9,15
77:19 79:5
horn
28:13,16,18,22
29:2,4,5,11
33:23 34:1
34:24 35:13
36:15,23
37:2,11,17
38:3,10
65:13
horns
37:5,9
hospital
8:3
hour
1:18 20:2,3
40:12
hours
22:5 23:2
house
7:5 19:16,17
23:15
houseware
12:11
hurried
44:11
hurt
52:20 53:4
hurting
52:24
Hyde
23:19 33:8,14
56:11,12

I

Iced
21:13 24:22
idea
8:9 19:9 24:10
identification
39:3
identifying
64:11,15
Illinois
1:2,16,17 2:5
2:12 3:6
7:17 10:13
10:15,18
88:2 89:1,6
89:9,11
90:19 91:2,6
91:18
imagine
41:10
impossible
30:11,15,22,24
inappropriate
39:4,6
incident
5:12 18:8 23:8
54:7 56:4
57:21 66:19
70:3,5 81:13
82:10 84:22
incorporate
74:15
indicated
25:18
indication
37:12
industry
15:3
infer
37:23 38:4
information
64:11,15 83:8
inside
35:16,18 41:7
41:15,20,24
42:6 43:7
44:14 45:12
interaction
45:17
interested
90:10
intersection
29:15
involved
22:16,18 81:13
83:24
involvement
15:3 22:24
involving
5:12
Isiah
21:16
Island
21:13 24:22
I-Bond
69:5

J

January
90:13 91:4
job
12:1 15:16
Johnny
80:9
Jonathan
2:3 91:5
jump
74:19

K

K
89:3
KC
75:12,12 77:17
KC's
80:2
keep
6:1,13 62:11
62:13
Kenneth
1:10 4:3 5:2
5:10,11 82:4
86:24 88:19
89:9 91:5
Kenwood
10:7 16:18
35:24 36:2
kept
71:6 84:24
kick
50:11 61:24
kicked
47:18 50:1
51:22 52:10
52:20,23
53:3,14,20
54:5,13,23
55:5,10,15
57:16 58:6
61:15 62:9
68:22
kicking
45:8,24 46:2
48:8 49:16
49:20 50:5,7
50:16,24
51:4,13 52:6
52:12,15
55:21 59:11
61:4 62:16
86:18
kicks
62:7
kid
63:3
kids
16:16 58:20
kill
75:21 78:22
killed
51:20
kind
20:13 43:5
46:19 47:19
50:22 58:16
59:16 85:18
kindergarten
9:14,18
King
9:9,10
KKK
78:22
KKKK
74:20
knees
48:3,5,11,12
48:15
knew
7:4 21:10,14
23:22 60:3
knockout
78:8,11
know
5:23 6:4 8:17
9:15,21
13:17 14:13
14:23 16:6
16:14,15
17:22,24
18:2,10 21:5
21:17,20
22:21 24:4
32:13 34:1
47:5 48:12
51:22 53:11
53:13,19
54:3,7 57:2
57:2,5,6,11
57:12 58:20
59:7 64:18
64:21 65:12
65:23 66:6
66:20 68:17
68:18,22
69:4,7 70:7
70:15,17,24
71:8 72:6,10
73:8,12,14
73:14 74:13
74:23 75:16
75:17,22
76:4,8,14
80:4,24
84:18,21,23
85:23 86:11
knowing
37:17 38:24
knowledge
7:24 14:3 49:8
49:10 57:1
80:17 81:21
81:22 82:2
known
7:4 9:24 10:3
16:8,10
knows
85:13
Ksiazek
2:3 4:6 37:21
38:18 54:16
55:12,17
61:18 71:18
73:6,22
74:11,21
75:4,24 76:6
76:11,24
77:6 78:10
78:17,23
79:9,18,24
80:6 81:8,9
85:4 86:21
91:5
K-Mac
13:3,3

L

laid
12:2
Lake
23:16 25:14
27:7,8,12
Langley
7:7
language
74:23
LARRY
1:8 88:8 89:13
LaSalle
1:16 2:11 3:5
11:21 89:8
91:1
late
20:2
latest
14:4
laugh
79:12
law
91:10
lawsuit
18:9 71:5
laying
48:2,4,16
le
80:5
leaning
18:21
learn
68:9
leave
53:5 55:1
Led's
79:21,23
left
23:4,13 26:17
27:19 41:11
43:15 46:11
69:24 81:8
letter
91:12
letting
70:7
let's
41:10 75:13,14
level
58:16
License
1:24
life
8:5 10:1
lift
65:22
lifted
66:1,2
lifting
40:16
lighting
34:11,14
lights
34:14 43:4,13
likes
85:12
line
74:2,5 75:12
75:14 78:24
lines
73:18 79:16
80:4
listen
79:13
little
6:12 28:8,20
32:8,21,22
58:17,18
live
7:3 8:20 9:6,8
16:4 56:9
lived
9:2,3 15:23
lives
8:13
living
7:17 16:3
LLP
2:9
located
11:19,20 26:2
27:14 28:17
31:24 32:18
32:20 33:6
33:18 39:18
41:15 42:1
location
56:14
log
72:3
logged
72:4
long
8:14 9:2 10:4
10:15,20
11:22 16:4
16:20 21:13
22:3 24:21
26:23,24
29:4,10 34:1
34:8,10
42:21,24
44:5 50:15
57:15 59:22
66:22,24
83:9
longer
15:12 61:7
look
38:20 39:13
40:23 44:11
67:23 83:6
87:2,8,12,14
87:18
looked
39:19,24 40:16
43:13 44:7
44:18 45:1
53:19 65:6
looking
40:1 51:16
52:3 65:8,9
79:16
lot
19:10 71:14
79:13
loud
6:2
lounge
23:1
love
76:15,15
low
58:21
lower
58:17,18
Lucente
1:14,23 88:13
89:4 91:23
lucky
51:19
lyrically
79:6
lyrics
72:21 73:13
74:16 77:21
80:4

M

machine
41:6
machines
41:14
MAIL
91:3
main
26:17,18 63:10
making
11:11,12 51:18
male
51:9,12 80:24
83:7
man
76:23
manager
56:22
March
11:24
Margaret
91:22
marijuana
74:8,10,13
76:10
marked
4:10 53:9
marks
53:5 55:2
married
12:18
matter
33:14
Maywood
67:11
McCorkle
91:1
mean
10:2 15:13
29:9 37:2
39:8 48:24
71:17 74:17
75:1,18
80:20 83:21
Meaning
78:2
meant
72:6
medium
26:9
meet
19:23,24 22:6
meeting
22:13
member
12:12

Memphis 16:3,4
mentioned 16:3 84:8 90:7
mentioning 43:13
messing 42:17,19
met 19:16
mid 58:14,16
Midas 75:13
middle 46:10,24 47:18
miles 86:2
military 12:14
minute 29:12 32:23,24 56:15
minutes 42:23,24 43:2 43:7 45:11 50:17,19,20 51:1,5 53:15 53:21 54:6 54:14,24 55:6,22 57:19 59:11 60:4,9,21 61:16 62:1,9 67:1,3,12 69:18
mission 22:19,22,24
misspelled 87:7
mistaken 25:20 82:22
mixed 13:16 72:20
mixing 13:15
mom 8:18
moment 19:10,11
money 23:23,24 26:7 41:14 67:23 68:6,7,7
months 8:16 15:9 17:2
morning 33:11 34:7,12 40:12
mother 8:11
mother's 7:5 9:3
move 8:14
moved 8:12 9:4
moving 22:1
muffin 75:22
music 13:5,8,18 14:2 14:6,18,22 15:3 72:17 72:19,20 73:1 77:4,5 84:16,18,21
mustache 51:10,12
mutual 7:15 11:9
mysteriously 28:13,16
mythology 16:16

N

N 4:1 91:1
name 5:7,8 12:24 16:12 20:16 20:21,22 21:6 26:18 26:20 56:5,7 59:19 64:10 64:14 67:7 73:1 82:7
named 21:16
names 21:17 61:2
nature 6:2 8:17 37:9 84:19
necessarily 54:20
neck 73:10,10,10,20 73:21,21
need 17:9 23:20 24:11 26:6 74:19 84:10
needed 23:17 67:23 84:15
negative 13:17
neighborhood 80:23
never 36:8 58:24 59:4
niggers 74:19 75:2
night 13:21 18:14 19:3,8 22:1 25:7,21 40:11 57:3,6 68:9,11
nod 5:22
noise 6:11
nonsense 14:15
normal 35:5 84:15
normally 19:1 22:17 58:22
north 1:16 2:11 3:5 11:21 20:17 20:18 26:4,5 32:4 34:22 89:8
Northern 1:2 10:13,15 88:2
notarial 90:12
notary 1:14 88:24 89:4 90:19
notice 1:11 35:23 90:5
noticed 30:2 35:21 51:9 57:18 82:12
notify 91:15
Notorious 74:3,5
number 7:12,13 42:19 49:14 50:3

O

O 89:3,3
object 62:5
Objection 37:21 38:18 54:16 55:12 61:18 71:18 73:6,22 74:11,21 75:4,24 76:6 76:11,24 78:10,17,23 79:9,18,24 80:6
objective 63:11
objects 62:6
Obviously 61:19
occasion 81:23
occur 50:16
occurred 56:15 70:13
October 18:11 32:12
offensively 74:17
offer 87:9
offered 14:5
office 11:20 87:12
officer 1:8 30:12 36:1 36:9 37:16 38:2,9,13,15 38:24 50:11 51:3,5,11,12 51:16,22 52:3 59:18 63:9,15,20 63:20 65:23 65:24 67:9 67:10 83:3 88:8 89:13
officers 3:9 9:19 35:12 40:4,8 45:13 45:18 47:2,6 47:7,10 48:7 48:20 49:5,7 49:11,19 50:1 52:6,12 52:15 53:16 53:21 54:5 54:12 55:1 55:21 57:17 60:2,8 61:14 61:23 62:18 62:21 63:7 63:23 64:3 64:12,16 69:14 81:13 81:16,19,19 82:9,11,13 82:14,16,17 82:20 83:5 83:22,24 86:12
Okay 5:14,15,19 6:2 6:3,16 17:10 20:21 31:2 39:17 41:14 42:24 73:12 75:17
Olay 21:6
old 6:17 20:24
older 21:3
once 34:3 45:6 53:22 60:13 61:7 67:22 68:19
on-line 18:4,6,7
opponent 79:6
opportunity 87:9
opposed 61:10 82:13
option 87:13
order 26:9,12 41:21
ordered 87:1
originally 11:24 64:9
outcome 90:10
outlined 91:18,19
outside 26:16 43:17,23 44:13 56:3 67:4,5
out-of-touch 14:10
overdraft 24:1
o'clock 20:2,3 34:12

P

P 75:12
paid 26:11
pain 54:21
Palatine 10:18
pants 57:24 58:3,5 58:13,21,22 58:22,24 59:4,7
park 23:19 27:12 28:20 29:6 29:13 33:8,9 33:14,15 56:11,12 85:13
parked 19:17 29:10,14 29:17,21,24 30:6,13,14 30:20 31:3 33:21 34:16 35:7 40:10 85:6,8
parking 33:5,7,16 85:11 86:2
part 12:23 14:4 27:17
particular 12:24 20:24
parties 13:11 15:6,8,9 15:14 21:11 21:15 90:3,9
partner 15:11,12
Party 79:7
passed 35:12,19 67:12
passenger 30:19 44:10
passing 36:15
passion 75:6
patting 86:9
pay 24:3 72:13
paycheck 25:10
pending 89:10
people 6:9 14:13,16 21:10,14 22:2,8 38:15 38:16 50:9 56:3 57:12 57:13 59:6 60:18,22,24 61:1 74:14 87:9
perceive 76:16
performing 84:20,24
period 20:8 50:6,15 52:7 69:17
person 71:12
personally 89:8
perspective 68:16
pertaining 1:13
phone 7:1,12,13 11:8 57:19
photographs 53:11 56:24 57:7,8 71:8
photos 54:4
physically 30:11
pick 63:7
picked 54:10 57:23 62:24 63:9 63:13 83:15 86:12,13
picking 86:7
picture 82:10
pictures 53:18 57:2,5
Pierre 21:16
PIN 42:19
pizza 25:20
pizzas 26:10,24 27:3
placed 66:5
Plaintiff 1:5 2:7 88:5 89:12
plans 19:7,14 25:12 25:15
play 16:18,23
playing 42:18 65:20
please 5:7,14 6:1,5 6:12,13 39:3 91:11
point 15:11 16:2,6 40:4 43:18 45:3,11 47:3 47:10 48:5 57:21 59:10 65:13 67:20 69:4 71:2 72:4 83:16
police 1:7 3:9 9:19 30:4,12,17 30:18,22 35:10 36:1,4 36:9,16 37:5 37:16 38:9 38:13,15,24 39:7 40:4 43:14 45:13 45:18,23,24 46:5,8,17 47:8 50:21 53:23,24 55:1 58:2 61:8 63:4,20 66:7,10,12 67:9,10,22 69:15 80:16 81:1,2,23 82:9,11,13 82:14,15,17 82:20 83:2,5 83:22,24 86:9,16 88:7 89:13
posed 64:5
poses 38:14
position 48:3
positioned 28:4 46:21
positive 13:17
possibly 29:8 38:4
potentially 38:14
pounds 73:19,19,20,24 74:2,6
presence 89:20
present 63:18 90:6

presentation 36:8
pretending 53:2
pretty 16:5 23:3 34:13 37:3 50:8 52:19 52:23 62:23 84:24 86:7
previous 21:11
previously 53:8
prior 23:7 48:12 81:23
prison 7:8
private 7:14
probably 6:4 20:2,9 22:23 25:4 35:5 37:4 56:23 57:12 73:7 74:8 75:1 80:10 80:18 87:11
problem 37:18
Procedure 1:12 91:18,19 91:20
projects 13:11,14 14:4
promoted 16:21
promoters 19:22 22:6,14 22:21
prove 64:20
provide 64:10,14
proxy 11:8
public 1:15 88:24 89:4 90:19
pulled 46:17 58:7,8 58:10,13,23 59:7
pulling 44:23 86:2
pulls 38:13
punch 62:4
punches 62:7
punching 62:16
pursuant 1:11 90:5
pushing 86:8
Pusznis 2:10 4:4 5:6 38:1,21,22 54:17,22 55:14,19 61:22 71:21 71:23 73:9 73:23 74:22 75:8 76:2,7 76:17 77:2,8 77:9 78:14 78:20 79:2 79:11,20 80:3,8 82:3 86:23 87:19 91:24
put 26:13 29:5 53:23 58:1 63:1 65:10 86:14
puts 72:17,19 73:1
p.m 1:18

Q

quality 11:10,11,12
question 5:13,16,18 6:5 6:6,7 32:1 38:8,8,19 39:9 54:3,17 87:14
questions 5:12 39:1 66:17 78:24 87:3 88:16
quick 43:3
quite 71:13

R

R 2:3 91:5
race 83:7
raising 40:1 65:8
random 56:2
range 24:22
rap 14:6,8,11,13 14:19 74:14 81:3
raping 81:2
rarely 33:8,15 72:2 72:13
read 87:3,9 88:11 91:12
reading 91:10,13
ready 28:20 91:10
really 14:7 15:4 19:9 20:19 33:4 48:23 49:6 51:9 58:24 59:5,22 60:11,17 61:11 67:21 68:17 69:1 70:5,6 71:6 71:14,15 73:14 82:17 83:9,24 84:7
rear 30:12 46:22
reason 19:20
recall 18:8,19 20:16 20:18 26:20 29:1 30:5 31:1 34:24 35:2,9 36:13 36:14 37:2 42:17 51:18 59:19 62:6 64:13,17 66:3,18 67:9 67:18 70:12 77:4 82:19 83:2,4,5,9 83:23 86:5 86:13
receipt 91:11
received 36:8
recollection 25:23 48:18
record 13:22
recorded 13:16,19 80:14
recording 13:10
records 13:20
reduced 89:21
refer 13:14 75:2,15 78:8
referring 72:8,10,11 74:1,6 75:13 75:23 76:4 80:9,12
refers 75:18
regard 13:7
related 9:12,16,17 90:9
relation 46:8,21
relationship 17:19
released 69:8
relevance 71:18 73:6,22 74:11,21 75:4,24 76:6 76:11,24 78:10,17,23 79:9,18,24 80:6
remember 16:1 18:3,12 20:21 21:12 28:7 36:1,6 36:22 40:14 49:1,1,4 52:2 59:23 65:2 67:7 82:23
reminded 16:17
repeatedly 50:4,13 54:14
rephrase 32:1
reported 1:23 89:19
reporter 5:9,20 6:7,14 86:24 87:11 87:15 88:14 91:22
Reporters 91:1
representative 11:8
Representing 2:7,14 3:8
required 91:10
reserved 87:19 90:2
resist 62:12
respective 90:3
response 68:4,14
restricted 7:15
ribs 52:17
rich 78:9
ride 79:17
right 5:18 6:9 15:2 15:15 17:22 26:18 27:18 28:23 30:14 31:9,16,18 32:4,10,11 33:6 34:24 37:20 38:21 41:6,11,17 46:6,7 47:12 53:3,6 55:16 58:14 60:4,7 65:7 69:19 72:1,17 73:2 73:16,21 77:19 78:22 79:5 82:3 85:11 87:2,8 87:13
rise 18:9
Roberson 1:10 4:3 5:2 5:10 88:19 89:9 91:5,9
Robinson 68:12,24
rode 66:20
room 5:21 41:10
route 26:14 27:5
Rule 91:18,19
Rules 1:11 91:18,20
runs 32:2,3
run-ins 81:15
rushed 43:5,12,14
R-o-b-e-r-s... 5:10

S

S 1:14,23 88:13 89:4 91:23
sagged 58:24 59:4
sagging 59:2
SAITH 87:20
Salem 11:1,3
sales 12:10
salesman 12:9
Sarpino's 25:22,24 26:2 26:7,8,11,15 26:18,21,23 27:2,5
sat 13:10
Saturday 18:14,23 19:1
saw 6:19 17:1,3 21:10 38:6 44:6 45:20 47:9,21 48:10,13,15 48:17 55:20 57:15 65:6 65:22 68:21 71:11 82:11
saying 33:19 36:14,22 37:3 50:4 62:8 67:18 86:5
says 5:21 35:22 72:5 75:18 75:21 76:3
scene 9:21 47:2 60:19 63:24 64:3 66:9 67:20 76:23 78:12 82:12 82:20 86:17
schedule 91:12
school 7:23 10:7 15:19,20,21 15:21 16:7 17:23 36:12
screening 11:10
seal 90:12
search 63:16
seat 28:5,9
seated 44:14
second 41:13
seconds 29:12
see 7:19 29:7 34:4 37:23 38:2,5 39:2,23 40:3 42:4,19 44:9 44:10,12,14 44:20 45:1,1 45:3,4,6,12 45:17 46:5 49:5,7,12,20 50:10 51:15 52:12,15 54:1,2,9 57:7,8,14 58:8,10 60:18 61:23 62:4 63:4,6 63:15 69:3 69:10,13 81:4,9 83:6 84:4,7 85:15 86:10
Seebring 20:14
seeing 35:9 37:16 66:18 83:2
seen 6:21 7:20 17:5 22:7 43:4 54:8 69:15 81:12
sees 38:9
sell 14:2
semester 10:16,21
service 11:7
Services 11:16,17,23
sessions 13:10
set 69:8 90:11
Setina 91:22
seven 9:4 41:22 50:14 60:23 61:1,5
shake 85:20
shaken 60:16
Share 11:5,14,15,16 11:23 12:4
shirt 83:3
Shore 23:16 25:14 27:7,8
short 71:7
Shorthand 88:14
shortly 61:8
shoulders 5:23
shout 14:22
shouted 68:2
shoved 30:16
show 53:8 54:4 57:22
showed 50:22,22 57:20 57:23 61:8
showing 60:22
shrug 5:22
sic 7:2
side 20:17,18 26:4 27:24 28:6 32:17 34:16 34:17,21,22 43:19 44:10 45:22 46:16 52:17 61:10 86:8
sidewalk 32:16
sign 29:15,17,18,20

29:24 30:6 30:20 91:12
signal 40:8
signature 87:19 90:1 91:11,23
signed 91:17
signing 91:10,14
Sincerely 91:21
Sinclair 6:20 9:15 15:20
sing 14:21
sings 74:9,14 77:18
situation 38:20 39:8 61:12 62:24 63:13 82:18 83:12 84:1,3
six 41:22 43:7 45:11 50:13
size 44:4
sleep 69:3
slowed 50:9
smoking 73:18,19,19,24 74:2,6,10,13
soft-spoken 6:13
solicitation 11:9
solo 22:19,22,24
somebody 13:14
somewhat 13:10 65:17
song 73:4,14,15,18 74:16,18,18 74:24 75:10 75:17 76:18 77:3,7,10,14 77:15,16,17 78:4,15,21 79:7 80:1,2 80:13
songs 13:15,19 14:22 16:11 73:16 74:9 75:3 79:13,22 80:15
soon 28:22 59:13
sophomore 16:22
sorry 18:5 28:15 34:9 37:8 39:21 49:3,9 50:18 57:4 58:9 74:4 82:1
sound 6:12 21:6
south 27:24 32:4,8
southbound 34:17
southeast 32:6
speak 7:1 14:21 70:2
speaking 6:9 14:24,24
speculation 37:21 38:18 54:16 55:12 55:17 61:18
spell 5:8
spelled 78:16
spoke 9:20 54:8 56:18 68:12 71:9
spoken 6:22 15:1 81:5
spot 86:3
spots 33:17
spur 19:10,11
squad 35:6,20 37:1 44:20 46:23 47:11 49:13 64:24 66:5,6 82:23
SS 89:2
standing 42:3 43:22 44:13 48:20 76:22 83:13
stands 13:3
start 31:7 42:11 60:18
started 10:13 11:7,24 28:13,16,18 42:9 50:9 60:19,22 68:17,22
State 1:15 89:1,5
statement 51:19 64:6 72:5
states 1:1,12 88:1,15
station 53:24,24 66:10 66:13,19,23 69:11,14,17
stay 66:22
staying 8:11
stenographi... 89:19
step 82:9
stepped 43:17,23 44:7 45:16,23
steps 41:22
Steve 2:10 6:19 91:24
Steven 9:15,16 15:10 15:19 16:17 19:6,13,15 19:22,24 20:12 21:5 21:22,24 22:6 23:16 24:5 28:3,8 28:9,19 29:6 29:13,20,23 30:8 34:4 35:2,4 39:10 40:12,20 41:13 42:11 42:15,21 43:3,11 44:11 45:5,8 45:10 53:24 56:18,19,23 57:10,17 59:11,13 60:3,7,13 64:2,7,14 66:8,11,12 66:16,20 67:14,19 68:13,16 69:18 75:16 85:6,8,10
Steven's 19:9 56:22
stolen 38:4,11,14 39:1
stomp 50:11 62:1
stomped 47:18 50:2 52:23 53:4 53:14,20 54:6,14,23 57:16 58:6 61:16 62:9
stomping 45:8 46:1,3 48:8 49:17 49:21 50:5 50:16,24 51:4 52:6 55:22 59:11 60:9 61:4
stop 29:8,10,15,17 29:18,20,24 30:6,20 35:1 36:9 50:6 55:24 65:13 68:21
stopped 25:16 36:4
store 12:3 18:18
story 14:16 81:3
street 1:16 2:4,11 3:5 23:19 26:17,18,19 26:20 27:10 27:11,15,20 29:1,14 31:6 31:14 32:2 33:17 34:14 34:14,16,18 34:21 36:4,9 37:17 38:3 38:10 39:20 39:22 40:11 43:20 45:14 46:10,16,24 47:19 54:10 61:17 85:9 89:9 91:1,6
striking 86:19
strong 65:18
students 36:2
studio 13:23,24
stuff 19:10 62:17 70:8
subpoenaed 17:12
SUBSCRIBED 88:20
sue 71:1
suffer 55:16
suit 90:9
Suite 2:4,11 3:5 91:1,6
Supreme 91:18
sure 6:24 8:13,15 11:10 16:5 16:21 18:10 20:6 21:7,24 22:8 24:19 24:21 26:17 28:7 30:1 32:13 33:14 34:8,10 37:3 38:12 44:1,5 49:6,14 50:3 51:24 52:23 53:4,17,22 57:18 58:12 63:9,13 65:21 66:6 66:20 72:9 72:13 80:1 80:13,19 83:15 84:9 84:24 87:3
surrounded 54:11
surroundings 35:23 80:18,21
swerved 46:19,20
swiped 23:22 24:11
sworn 5:1,4 88:20 89:16
system 37:18

T

take 5:22 26:14 27:5,12 42:21 43:1 56:24 57:7,8 61:10 84:20 87:2,8,12,14
taken 1:14 23:24 53:11,13,18 63:5 66:4,9 71:8 87:4 88:12
talent 78:13
talk 15:13 35:5 60:17 70:6 84:8
talked 21:12 59:5 67:4 84:16 84:17
talking 14:14 19:13 22:2,7,8 30:18,19 35:4,17 36:2 36:11,12 60:15,19 64:8 67:5 69:1 70:5 73:8,12 76:8 76:9 79:4
talks 73:24
Tea 21:13
team 22:17
Teas 24:22
Technical 18:6
tell 5:7,14 10:5 14:17 44:6 44:17 54:1 81:3 82:12
telling 63:5 68:16 69:21
temp 11:1 12:1
tend 57:13
term 59:2
terms 17:23 33:2 43:21
testified 5:4
testify 89:16
testimony 6:1 31:15 33:16 87:6 89:18,23 90:11
Thanks 82:4
thereabouts 33:11
thereof 90:10
thing 67:21 68:2 85:10
things 15:14 22:15,16 81:4
think 16:21 21:20,21 24:6 25:7 26:12 37:19 38:10,23 39:4 48:7 56:18 62:2 78:16 79:4 86:21
thinking 19:3
three 8:15 15:18,19 17:2 26:9 56:16 82:21
threw 15:8
throw 15:9 30:12,22
throwing 86:4
thrown 13:12
time 5:13 6:9,19 12:23 15:16 16:2,6 17:1 17:3,6,24 19:24 20:8 22:11 23:7 28:2 29:9 33:7,14 40:4 44:21 45:20 47:3,11 48:5 50:6,15 52:7 55:18 56:10 58:20 60:6 63:2,23 66:19 67:6 67:20 69:4 69:17 70:12 70:16 71:2,5 71:11,14,15 76:3,9 81:14 82:16 83:17 84:20,23
times 15:8 49:24 50:10,14
title 73:7
today 5:12,21
told 64:7 70:9
top 7:13 86:5
TORRES 1:8 88:8 89:13
touch 85:11,15
town 27:17
to-wit 89:7
traffic 29:16
transcribe 5:24
transcribed 87:5
transcript 87:1,2,10,15 88:12,15 89:23
Transcription 89:22
transferred 16:7
transported 67:19
tried 62:23
trouble 6:8,14
true 89:22
trust 56:23 87:15
truth 89:16,17,17
try 6:13 36:17 63:11 82:17
trying 48:5 54:18 61:10,11 62:2 63:2,3 63:12 78:9 83:24 84:4,5
tune

36:17
turn
39:13
turned
39:18,23 40:15 65:3,5
twice
23:6
Twitter
71:24 72:2,3,4 72:14
two
6:9 11:21 15:7 17:2 21:12 42:8 43:2 60:21 82:21 83:1
type
8:12 49:2 62:5 75:8 76:10 87:1
typewriting
89:21
typo
87:6

U

Uh-huh
78:1
understand
5:14 6:16 75:9 80:19
understood
5:18
undetermined
89:10
union
12:12
United
1:1,12 88:1
University
1:7 2:14 10:14 18:6 35:6,9 35:12,20 36:24 40:3,8 47:5,7,10 48:7,19 49:12,19 50:1,11 51:3 51:15 52:2,5 53:15,21 54:5 55:20 57:16 58:2 60:2 61:14 61:24 63:19 63:23 64:3 64:11,15 65:23 69:13 71:1 81:12 81:16,18 82:14,15 83:21 86:9 86:11 88:7 89:12 91:7
unusual
23:10 28:11
use
12:24 41:2,3 42:9,15,21 43:1 74:17 80:10
uses
16:14 74:23
usually
6:24 7:1,11,14 24:21 35:22 58:20
U.S
91:20

V

V
91:7
Value
12:3,8 18:17 25:9
vehicle
28:4 44:15
veracity
16:20,22
verbal
6:2
visited
56:10
voice
6:13
voicemail
81:9
vs
1:6 88:6

W

wait
6:6 42:10
waited
69:16,23
waiting
42:15 69:20
walk
32:17,21,22,23 32:24 38:7 40:13,18 41:21 42:14
walked
35:15,15 38:16 42:12 44:24 45:4 47:11 49:15 56:3 57:9 59:14 59:17 64:23
walking
35:1,3 39:11 41:13 65:3,5
wall
41:16
want
22:17 24:5 45:10 46:19 59:15,18 60:12,14 65:4 70:6 82:9 83:10 85:5 87:8,10 87:13,14
wanted
19:23 22:21 23:23 24:6 25:18
wants
84:18
Warren
8:23,24
wasn't
20:19 23:22 24:16 30:23 33:11,19,20 35:7 37:4 38:8 46:4 51:19 53:17 60:23 61:7 65:15 70:5 82:21
way
27:15 29:18 35:13 41:8 44:3 46:16 46:18 64:21 69:22 76:22 85:13 90:9 90:10
wear
58:20
wearing
58:11
Wednesday
18:22
week
15:8 18:12
weeks
23:9,11
went
10:7,16 15:18 15:20 17:6,8 17:9,15 18:21 19:4,7 19:20 20:11 23:18 24:9 24:10,18 25:1,21 26:3 27:2,20 28:23 29:2 40:20 44:12 49:13 53:24 66:12 67:4 67:14,16 69:19 81:14 85:24
weren't
17:12 22:14
west
2:4 26:19 32:3 91:6
westbound
27:16
We'll
46:4 47:9
we're
5:11 10:2 36:15
we've
6:11 9:13,17 10:3 13:12 72:24
whereabouts
8:9,10
WHEREOF
90:11
white
14:10 49:5 59:24 83:3
windows
42:13,15 43:3
withdrawal
24:7,8
witness
4:2 5:1,3 37:23 38:19 54:18 55:13 55:18 61:19 71:20,22 73:7 74:12 75:5 76:1,12 78:11,18 79:1,10,19 80:1,7 87:18 89:15,19,20 89:24
witnesses
61:5,15
woken
69:2
Woodlawn
56:13
words
15:1 74:18 76:21
wore
58:22
work
11:1,4 12:20 13:4 18:20 18:22 19:1 22:22 39:7
worked
12:2,10 18:19 18:23
working
8:1 10:19,24 15:15 17:23 18:2,3,16,17 25:9 71:14
world
76:12
wouldn't
19:2 30:15,24 39:6 42:10 47:17 54:1 55:2,6 66:17 74:12
writing
84:21 85:1
wrong
83:10 84:14
WWF
53:1

X

X
4:1

Y

yeah
10:2,23 12:10 13:16 16:1 17:17 19:5 22:12 24:16 25:2,11 26:1 28:24 33:1 33:24 34:17 35:9 37:14 39:5 40:20 41:19 42:2 43:12 44:3 44:16 47:13 47:15,23 48:9,21 49:23 50:21 51:2,14,18 52:4,11,14 53:7 55:7 58:19 59:3 60:5 64:8 65:8,14,19 67:17 68:2 69:20 70:1 70:11 71:21 72:16,18,23 73:15 75:5 75:11,20 77:20 78:3,7 78:11 79:10 79:15,19 83:23 84:9 85:7,19 86:7 86:20
year
9:5 10:22 12:4 16:22 18:11
years
9:4 51:19
yelling
46:1 62:10
Yo
77:10,12
young
16:5 80:24

$

$10
24:22,24
$200
25:8
$30
25:7
$5
26:10
$8
24:22,24

0

07
12:1
084-004005
1:24
09
1:6 88:6

1

1
53:10 88:14 91:8
1st
1:17 89:7
10
41:24 50:17,19 50:20 51:1,5 51:19 53:15 53:21 54:6 54:14,24 55:6,22 56:15 59:10 60:4,9 61:16 62:1,9
10-minute
52:7
1080
1:6 88:6
15
29:22

2

2
53:9
2:00
1:18
2:30
33:10 34:6,12
20
66:24 67:2,12 69:17
200
25:5 91:1
200-something
25:4
2005
10:11
2008
21:1 32:12
2009
1:17 88:14 89:7 91:8
2010
88:22 90:13 91:4
207
91:18
21
21:2,3
21st
66:18,22 69:11 69:14,16
22
6:18
222
1:16 2:11 89:8
28
91:13

3

3:00
33:12 34:7,12
30
3:5 66:24 67:2 67:12 69:18 91:19
300
2:4,11 91:1,6
312
2:6,13 3:7
330
2:4 91:6
34
8:23,24
345-8877
2:6

4

4:05
87:22
45
29:12
47th
27:10,11

5

5
4:4 41:24 50:17,19,20 51:1,5 52:7 53:14,21 54:6,14,24 55:5,22 56:15 59:10 60:4,8 61:16 62:1,8
50-year-old
14:10
51st
56:13
52nd
27:19
53rd
23:18 27:12,13 27:15,21,22 27:23,24 28:21 29:1 29:14,16 31:10,16 32:2,6,10,11 33:17 34:21 45:22 56:4 85:9

6

60601
2:12
60601-1014
91:2
60602
3:6
60606
2:5 91:6

7

704-3000
2:13
744-3989
3:7
75th
9:9,10
78th
7:7

8

8
91:4
8th
90:12
8:00

20:2
82
4:5
85
4:6

9

9:00
20:3
900
3:5

EXHIBITS

CHICAGO POLICE DEPARTMENT

# ARREST REPORT

3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11.420C(REV. 6/30)

**FINAL APPROVAL**

CB #: 17392877
IR #: 1958082
YD #:
RD #: HP634061
EVENT #: 0829202513

## ARREST REPORTING

**OFFENDER**

Name: BOYLE, Charles D
Res: 6733 S Chappel Ave
Chicago, IL 60649
773-363-2575
Beat: 331
Empl: Church Maintenance
DOB: 07 May 1987
AGE: 21 years
POB: Illinois
SSN: 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
DLN: B40014487100 -US
ARMED WITH Unarmed

Male
Black
5' 09"
197 lbs
Brown Eyes
Black Hair
Short Hair Style
Dark Complexion

Marks: Tattoo Cloud on Upper Right Arm
Tattoo Praying Hands on Upper Left Arm

**INCIDENT**

Arrest Date: 18 October 2008 02:56
TRR Completed? No
Location: 1435 E 53rd St
Chicago, IL 60615
304 - Street
Beat: 2132
Holding Facility: District 002 Male Lockup
Resisted Arrest? Yes

Total No Arrested: 1
Co-Arrests
Assoc Cases
DCFS Ward ? No
Dependent Children? No

**CHARGES**

Victim

1 Offense As Cited 720 ILCS 5.0/31-1-A
RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP
Class A - Type M

2 Offense As Cited 720 ILCS 5.0/31-1-A
RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP
Class A - Type M

**RECOVERED NARCOTICS**

NO NARCOTICS RECOVERED

IR #1958082

**WARRANT**

NO WARRANT IDENTIFIED

CB #:17392877

EXHIBIT
1
12/16/9

Boyle, 09 C 1080
FCRL 0011

Chicago Police Department - ARREST Report

CB #: 17392877

BOYLE, Charles

**ARREST REPORTING**

**NON-OFFENDER(S)**

**ARRESTEE VEHICLE**

NO ARRESTEE VEHICLE INFORMATION ENTERED

**PROPERTIES**

**Confiscated Properties :**

All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR BOYLE, Charles, NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

**INCIDENT NARRATIVE**

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)

IN SUMMARY : A/O'S RESPONDED TO ASSIST UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL SPOKE WITH U OF C POLICE OFFICER MOORE, CLARENCE #1012, AND U OF C OFFICER TORRES, LARRY #1028, WHO RELATED TO A/O'S THAT THE ABOVE LISTED OFFENDER BOYLE, CHARLES D., REFUSED TO PRODUCE ID UPON AN INVESTIGATORY STREET STOP, AND DURING A PROTECTIVE PATDOWN OFFENDER BECAME COMBATIVE BY FLAILING HIS ARMS AND PULLING AWAY. OFFENDER TAKEN INTO CUSTODY ON SIGNED COMPLAINTS, READ RIGHTS PER MIRANDA AND TRANSPORTED TO 021 DISTRICT FOR FURTHER PROCESSING. OFC TORRES ADVISED OF COURT INFO.

**COURT INFO**

Desired Court Date: 04 December 2008
Branch: 34-2 155 W 51ST ST - Room
Court Sgt Handle? Yes
Initial Court Date: 04 December 2008
Branch: 34-2 155 W 51ST ST - Room
Docket #:

**BOND INFO**

Bond Date: 18 October 2008 11:8
Type: Recognizance
Receipt #: I8770331
Amount: $1,000.00

Boyle, 09 C 1080
FCRL 0012

Chicago Police Department - ARREST Report

CB #: 17392877

BOYLE, Charles

## ARREST REPORTING

REPORTING PERSONNEL

**ATTESTING OFFICER:**

**I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.**

| | | | | |
|---|---|---|---|---|
| **Attesting Officer:** | #19135 | DARLING, V (PC0R101) | 18 OCT 2008 04:39 | |

**ARRESTING OFFICER(S):**

| | | | **Beat** |
|---|---|---|---|
| **1st Arresting Officer:** | #19135 | DARLING, V (PC0R101) | 2132 |
| **2nd Arresting Officer:** | #17246 | MARTIN, C E (PC0S916) | 2132 |

**APPROVING SUPERVISOR:**

| | | | |
|---|---|---|---|
| **Approval of Probable Cause :** | #339 | STOPPA, K A (PC0F280) | 18 OCT 2008 04:40 |

Print Generated By: NITSCHE, Lawrence ( IL16CPDAAI ) Page 3 of 5 20 MAR 2009 12:10

powered by: CLEAR Technology

Boyle, 09 C 1080
FCRL 0013

Chicago Police Department - ARREST Report

CB #: 17392877

BOYLE, Charles

## ARREST PROCESSING REPORT

**LOCKUP KEEPER PROCESSING**

**Holding Facility:** District 002 Male Lockup
**Received in Lockup:** 18 October 2008 07:21
**Prints Taken:** 18 October 2008 07:58
**Palmprints Taken:** Yes
**Photograph Taken:** 18 October 2008 07:57
**Released from Lockup:** 18 October 2008 11:15

**Time Last Fed:** 18 October 2008 07:22
**Time Called:**
**Phone#:**
**Cell #:** 2/3
**Transport Details :** 2PO 2132 18-OCT-2008 03:00

**VISUAL CHECK OF ARRESTEE**

| Question | Answer |
|---|---|
| Is there obvious pain or injury? | No |
| Is there obvious signs of infection? | No |
| Under the influence of alcohol/drugs? | No |
| Signs of alcohol/drug withdrawal? | No |
| Appears to be despondent? | No |
| Appears to be irrational? | No |
| Carrying medication? | No |

**ARRESTEE QUESTIONNARIE**

| Question | Answer |
|---|---|
| Presently taking medication? | No |
| (If female)are you pregnant? | No |
| First time ever been arrested? | No |
| Attempted suicide/serious harm? | No |
| Serious medical or mental problems? | No |
| Are you receiving treatment? | No |

**RETURN TO HOLDING FACILITY COMMENTS:**

**QUESTIONNAIRE REMARKS:**

**LOCKUP KEEPER COMMENTS:**

**EMERGENCY CONTACT**

**Name :** SINCLAIR, Steven

**Res:** 1735 E 79th St, #2FL
Chicago, IL 60649
773-574-4135

**Beat:** 0414

**INTERVIEW LOG**

NO INTERVIEWS LOGGED

**VISITOR LOG**

NO VISITORS LOGGED

Boyle, 09 C 1080
FCRL 0014

Chicago Police Department - ARREST Report

CB #: 17392877

BOYLE, Charles

## ARREST PROCESSING REPORT

**MOVEMENT LOG**

MOVEMENT LOG INFORMATION NOT AVAILABLE

**WC COMMENTS**

Watch Commander Comments:

**REL w/o CHARGING**

DOES NOT APPLY TO THIS ARREST

**PROCESSING PERSONNEL**

ARRESTEE PROCESSING PERSONNEL:

| | | | Beat |
|---|---|---|---|
| Searched By: | #4299 | DRIVER, F T (PC0E416) | |
| Lockup Keeper: | #9865 | LAMAR, W L (PC0L482) | |
| Assisting Arresting Officer: | #1012 | MOORE, C | |
| Assisting Arresting Officer: | #1028 | TORRES, L | |
| Fingerprinted By: | #9865 | LAMAR, W L (PC0L482) | |

APPROVAL PERSONNEL:

| | | | | Beat |
|---|---|---|---|---|
| Final Approval of Charges : | #55 | FLUDER, J A(PC02957) | 18 OCT 2008 11:04 | |

Boyle, 09 C 1080
FCRL 0015

CHICAGO POLICE DEPARTMENT

# ORIGINAL CASE INCIDENT REPORT

3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11.388(6/03)-C)

RD #: HP634061
EVENT #: 0829202513
Case ID: 6562348 CASR229

This Document is not an official copy. It is a computerized version of data entered from an original case report. A copy of the original case report can be obtained from the Records Division

## INCIDENT

**ASSIGNED TO ADMINISTRATIVE PERSONNEL**

**IUCR:** 3710 - Interfere With Public Officer - Resist/Obstruct/Disarm Officer

**Occurrence Location:** 1435 E 53rd St
Chicago IL 60615
304 - Street

**Beat:** 2132

**Unit Assigned:** 2132
**RO Arrival Date:** 18 October 2008 02:43
**# Offenders:** 1

**Occurrence Date:** 18 October 2008 02:37

## NON OFFENDER

**VICTIM**

**Name:** MOORE, Clarence
**Res:** 5555 S Ellis Ave
Chicago IL 60637
**Beat:** 2133
**Beat:** 5100

**Demographics**
Male
Black
**Age:** 55 Years

**Other Communications and Availability**
**Business Phone:** 773-702-8181

**VICTIM**

**Name:** TORRES, Larry
**Res:** 5555 S Ellis Ave
Chicago IL 60637
**Beat:** 2133
**Beat:** 5100

**Demographics**
Male
White
**Age:** 40 Years

**Other Communications and Availability**
**Business Phone:** 773-702-8181

## SUSPECTS

**Suspect # 1** — In Custody

**Name:** BOYLE, Charles D
**Res:** 6733 S Chappel Ave
Chicago IL 60649
**Beat:** 0331

**Demographics**
Male
Black
5'09,
197 lbs
Brown Eyes
Black Hair
Dark Complexion
**Age:** 21 years

**Other Communications and Availability**

## RELATIONSHIP

**RELATIONSHIP**

(Victim) MOORE, Clarence is a No Relationship of (Offender) BOYLE, Charles,D

RD #: HP634061

CLEAR Technology

EXHIBIT 2 12/1/09

Boyle, 09 C 1080
FCRL 0008

Chicago Police Department - Incident Report

RD #: HP634061

PERSONNEL

| | Star No | Emp No | Name | User | Date | Unit | Beat |
|---|---|---|---|---|---|---|---|
| Reporting Officer | 19135 | #33994 | DARLING, Vincent | (PC0R101) | 19 Oct 2008 09:03 | 021 | 2132 |
| Reporting Officer | 17246 | #49591 | MARTIN, Carl, E | (PC0S916) | 19 Oct 2008 09:03 | 021 | 2132 |

CLEAR Technology

1

CLEAR Data Warehouse
Arrest Narrative For Arrest ID 15290500
Report Date= 3/20/2009

The narrative contained herein has been transcribed from the original arrest report and is therefore not official!

| NARRATIVE |
| --- |
| IN SUMMARY : A/O'S RESPONDED TO ASSIST UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL SPOKE WITH U OF C POLICE OFFICER MOORE, CLARENCE #1012, AND U OF C OFFICER TORRES, LARRY #1028, WHO RELATED TO A/O'S THAT THE ABOVE LISTED OFFENDER BOYLE, CHARLES D., REFUSED TO PRODUCE ID UPON AN INVESTIGATORY STREET STOP, AND DURING A PROTECTIVE PATDOWN OFFENDER BECAME COMBATIVE BY FLAILING HIS ARMS AND PULLING AWAY. OFFENDER TAKEN INTO CUSTODY ON SIGNED COMPLAINTS, READ RIGHTS PER MIRANDA AND TRANSPORTED TO 021 DISTRICT FOR FURTHER PROCESSING. OFC TORRES ADVISED OF COURT INFO. |

tabbies
EXHIBIT
3
12/1/09 [illegible]

[F]ERAL OFFENSE [C]REPORT [CHIC]AGO POLICE

1. OFFENSE/INCIDENT – PRIMARY CLASSIFICATION: INTERFERENCE WITH PUBLIC OFFICER
IUCR OFF. CODE: 3710
2. SECONDARY CLASSIFICATION: RESIST
3. R.D. NO.: HP - 634061

4. ADDRESS OF OCCURRENCE: NO. 1435 DIR E STREET 53rd ST APT. NO.
5. FIRE RELATED: ☐ 1 YES ☒ 2 NO
6. DATE OF OCCURRENCE – TIME: DAY 18 MO. OCT YR. 08 0237
7. BEAT OF OCCUR.: 2132
8. BEAT/UNIT ASSIGN: 2132

9. TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE): STREET
10. LOCATION CODE: 304
11. DATE R.O. ARRIVED – TIME: 18 OCT 08 0243
12. ASSIGNED BY: ☐ 2 ON VIEW ☐ 3 SUPERVISOR ☒ [illegible]

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 21. NAME (LAST–FIRST–M.I.) | IDENTITY VERIFIED | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. TIME AVAIL. | 27. OCCUPATION | 28. INJURED YES–NO | 29. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|---|
| MOORE, CLARENCE (U of C. P.D) | ☐ | 5555 S. ELLIS | M 1 55 | DNA | (773) 702-8181 | ANY | POLICE OFC | X | 24 |
| TORRES, LARRY (U of C. P.D) | ☐ | 5555 S. ELLIS | M 2 40 | DNA | 702-8181 | ANY | POLICE OFC | X | 24 |

PARENT, GUARDIAN, IF JUVENILE

☐ 1 DISCOVERED ☐ 2 WITNESSED ☐ 3 REPORTED OFFENSE 32. 33. 34. 35.

RACE CODES: 1-BLACK 2-WHITE 3-BLACK-HISPANIC 4-WHITE-HISPANIC 5-AMER. IND./ALASK. NAT. 6-ASIAN/PACIFIC ISLANDER

OFFENDER/VICTIM RELATIONSHIP CODES
• USE CORRESPONDING CODE FOR ALL "STEP" RELATIONSHIPS • DO NOT LEAVE RELATIONSHIP CODE BLANK
01 - WIFE, 02 - HUSBAND, 03 - FORMER WIFE, 04 - FORMER HUSBAND, 05 - MOTHER, 06 - FATHER, 07 - SON, 08 - DAUGHTER, 09 - BROTHER, 10 - SISTER, 11 - AUNT, 12 - UNCLE, 13 - MOTHER-IN-LAW, 14 - FATHER-IN-LAW, 15 - SON-IN-LAW, 16 - DAUGHTER-IN-LAW, 17 - BROTHER-IN-LAW, 18 - SISTER-IN-LAW, 19 - OTHER RELATIVE, 20 - GIRLFRIEND (INCLUDES "FORMER"), 21 - BOYFRIEND (INCLUDES "FORMER"), 22 - FRIEND/ACQUAINTANCE, 23 - OTHER - SPECIFY, 24 - STRANGER, 25 - CARETAKER

| 41. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42. HOME ADDRESS | 43. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC. | 44. C.B./I.R. NO. | 45. OFFENDER REL. CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| DOYLE, CHARLES D. D. | 6733 S. CHAPPEL | M 1 21 | 5'09" | 197 | BR | BLK | DARK | TATOO CLOUD & ANGEL HANDS [illegible] | 17392877 | 24 |

51. OBJECT/WEAPON ☒ 1 USED ☐ 2 DISPLAYED ☐ 3 UNK
☐ 01 HAND GUN ☐ 02 SHOTGUN ☐ 03 RIFLE ☐ 04 KNIFE ☐ 05 VEHICLE ☐ 06 BLUNT INSTRUMENT ☐ 07 THROWN OBJECT ☐ 08 EXPLOSIVE ☐ 09 LIQUID/GAS ☐ 10 BOTTLE/GLASS ☐ 11 RAZOR ☐ 12 PRY TOOL ☒ 13 HAND, FEET ☐ 14 OTHER ☐ 15 DNA

52. FIREARM FEATURES: ☐ 01 CHROME/NICKEL ☐ 02 BLUE STEEL ☐ 03 SHORT BARREL ☐ 04 LONG BARREL ☐ 05 SAWED OFF ☐ 06 OTHER ☐ 07 UNKNOWN ☒ 08 DNA

53. POINT/ENTRY: ☐ 01 FRONT DOOR ☐ 02 REAR DOOR ☐ 03 WINDOW ☐ 04 ROOF ☐ 05 FLOOR ☐ 06 SIDE DOOR ☐ 07 OTHER ☐ 08 UNKNOWN ☒ 09 DNA

54. POINT/EXIT: ☐ 01 FRONT DOOR ☐ 02 REAR DOOR ☐ 03 WINDOW ☐ 04 ROOF ☐ 05 FLOOR ☐ 06 SIDE DOOR ☐ 07 OTHER ☐ 08 UNKNOWN ☒ 09 DNA

55. BURGLAR ALARM: ☒ DNA; ON PREMISE ☐ 1 YES ☐ 2 NO; ALARM CIRCUMVENTED ☐ 1 YES ☐ 2 NO

56. SAFE BURGLARY METHOD: ☐ 01 PUNCH ☐ 02 TORCH ☐ 03 EXPLOSIVE ☐ 04 DRILL ☐ 05 REMOVED ☐ 06 PEEL ☐ 07 OPEN ☐ 08 UNKNOWN ☒ 09 DNA

57. IF RESIDENCE, WHERE WERE OCCUPANTS: ☐ 01 WORK ☐ 02 VISITING ☐ 03 VACATION ☐ 04 WEDDING ☐ 05 FUNERAL/WAKE ☐ 06 OTHER ☐ 07 UNKNOWN ☒ 08 DNA

58. UNUSUAL CHARACTERISTICS OF OFFENSE: SEE NARRATIVE

59. GANG RELATED AFFILIATION: ☐ VICTIM ☐ OFFENDER — DNA DENIED

71. DESCRIBE PROPERTY IN NARRATIVE — T = TAKEN; R = RECOVERED
1 MONEY; 2 JEWELRY; 3 FURS; 4 CLOTHING; 7 OFFICE EQUIPMT.; 8 TV, RADIO, STEREO; 9 HOUSEHOLD GOODS; 0 CONSUM. GOODS; FIREARMS; & Narc./Dang. Drugs; 5 OTHER; 6 NONE

72. VEHICLE/TRAILER ☐ STOLEN ☐ THEFT FROM ☐ OFFENDER'S | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE | EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO. POUND

NARRATIVE (Do not duplicate or repeat information – for explanation or additional information only)

EVENT #02513 IN SUMMARY: A/O'S RESPONDED TO AN ASSIST THE UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL U of C POLICE OFC MOORE #1012, AND U of C POLICE OFC TORRES #1026 HAD ABOVE OFFENDER IN CUSTODY IN THAT HE BECAME COMBATIVE ON AN INVESTIGATORY STREET STOP, BY FLAILING HIS ARMS AND PULLING AWAY DURING A PROTECTIVE PATDOWN, VICTIMS REQUESTED ASSISTANCE. OFFENDER READ RIGHTS AND

81. SOBRIETY OF VICTIM: ☒ 1 SOBER ☐ 2 HBD
82. FLASH MESSAGE SENT: ☐ 1 YES ☒ 2 NO
91. EXTRA COPIES REQUIRED: ☒ NORMAL
☒ CONT'D. OTHER SIDE ☐ R.O.
92. OFFICER NOTIFYING FOLLOW-UP INVESTIG. UNIT: BY REPORT — UNIT NOTIFIED, PERSON ☐ NOTIFIED ☐ ARRIVED, DATE (DAY-MO-YR) – TIME
93. FIRST OFFICER AT SCENE: UNIVERSITY OF CHICAGO
94. OFFICER NOTIFYING ☐ 1ST D/S ☐ E.T. ☐ M.E. — PERSON ☐ NOTIFIED ☐ ARRIVED, DATE (DAY-MO-YR) – TIME
95. REPORTING OFFICER'S NAME (PRINT): V. DARLING — STAR NO. 19135 — OFFICER'S SIGNATURE: [signature]
96. REPORTING OFFICER'S (PRINT): C. MARTIN — STAR NO. 17246 — OFFICER'S SIGNATURE: [signature]
DATE INVEST. COMPLETED – TIME: 18 OCT 08 0455
97. SUPERVISOR APPROVING (PRINT NAME) — STAR NO.
APPROVAL SIGNATURE — DATE APPROVED — TIME

[1]380 (Rev. 8/95)

R.D. NO. HP - 634061

TRANSPORTED TO 021 DIST FOR FURTHER PROCESSING.
BT# 2120, 2131 ON SCENE. A/O'S HAVE NO
KNOWLEDGE OF EVENTS

COURT INFO: 34-2
04DEC08
0900HRS

000013

I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE. | SUPERVISOR'S SIGNATURE | DATE (DAY-MO-YR.)

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

I-UCR OFFENSE CODE – ☐1 CORRECT ☐2 REVISED | REV. CODE | I-UCR METHOD CODE | METHOD ASSIGNED ☐1 FIELD ☐2 ADMIN. ☐3 SUMMARY | UNIT NO. | OFFICER ASSIGNED STAR NO. | DATE ASSIGNED | SUPV. STAR NO. | INVESTIGATIVE FILE ☐1 YES ☐2 NO | REASSIGNED ☐1 YES ☐2 NO

OFFICER REASSIGNED – STAR NO. | DATE | STATUS ☐0 PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED ☐3 CLEARED CLOSED ☐4 CLEARED OPEN ☐6 EXC. CLRD. CLOSED ☐8 EXC. CLEARED OPEN ☐7 CLOSED–NON-CRIMINAL

IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST) ☐1 ARREST & PROSECUTION ☐2 DIRECTED TO FAMILY COURT ☐3 COMPL. REFUSED TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPTIONAL ☐ADU ☐JUV

VICTIM IDENTIFIERS ☐1 CORRECT ☐2 REVISED | VICTIM NO. | REVISED NAME | REVISED ADDRESS | REVISED PHONE NO. ☐HOME ☐BUSINESS

VALUE OF PROPERTY TAKEN/RECOVERED ☐1 DNA ☐2 VERIFIED ☐3 CORRECTED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT.

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMT. | 8 TV, RADIO, STEREO | 9 HOUSEHOLD GOODS | 10 CONSUM. GOODS | 11 FIREARMS | 14 NARC/DANG. DRUGS | 15 OTHER | 16 NONE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T ☐R |

SERIAL NOS. OR IDENTIFICATION NOS. ☐1 DNA ☐2 VERIFIED ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

PREPARED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) | APPROVED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR.)

McCorkle Court Reporters, Inc.
200 N. LaSalle Street Suite 300
Chicago, Illinois 60601-1014

CERTIFIED MAIL

January 8, 2010

Mr. Kenneth Roberson
c/o Jonathan R. Ksiazek
300 West Adams Street, Suite 330
Chicago, Illinois 60606

IN RE: CHARLES BOYLE V. UNIVERSITY OF CHICAGO
DATE OF DEPOSITION: DECEMBER 1, 2009

Dear Mr. Roberson:

Your deposition in the above-entitled cause is now ready for reading and signing as required by law.

Please call the Signature Department upon receipt of this letter to schedule an appointment to come to the above address to read and sign your deposition. You have 28 days from the date of this correspondence in which to appear for reading and signing.

If you fail to appear or notify us so that we may make arrangements for another appointment, your deposition will be completed and forwarded to the attorneys and will be "... used as fully as though signed."

______ Procedure outlined in Rule 207 (a) of the Illinois Supreme Court Rules

______ Procedure outlined in Rule 30 (e) of the Rules of Civil Procedure for the U.S. District Courts

Sincerely,

Margaret Setina
Signature Department

Court Reporter:
Frances S. Lucente, CSR

cc: Helen Gibbons, Esq.
Steve Pusznis, Esq.