**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES BOYLE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 09 C 1080 |
| | ) | |
| v. | ) | JUDGE BUCKLO |
| | ) | |
| UNIVERSITY OF CHICAGO, *et al.* | ) | MAGISTRATE JUDGE DENLOW |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE UNIVERSITY OF
CHICAGO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, CHARLES BOYLE ("Boyle" or "Plaintiff"), by and through his attorneys, ED FOX & ASSOCIATES, and for his response in opposition to the University of Chicago ("University") Defendants' Motion for Summary Judgment states as follows:

### I. INTRODUCTION

At about 2:30 a.m. in the morning on October 18, 2008, the Plaintiff was on 53rd Street looking under the hood of his friend's parked car when University officers Clarence Moore ("Moore") and Larry Torres ("Torres") approached him and asked "whose car is this?". After the Plaintiff identified his friend as the owner of the vehicle, Moore and Torres threw the Plaintiff onto their squad car, placed the Plaintiff in handcuffs and hit the Plaintiff with a flashlight to get him down on the ground. When the Plaintiff was on the ground, Moore and Torres repeatedly punched and kicked the Plaintiff for several minutes. University officers Oscar Galarza ("Galarza"), Arthur Gillespie and Michael Kwiatkowski ("Kwiatkowski") arrived on the scene shortly thereafter. Galarza, Kwiatkowski and Gillespie immediately ran towards the Plaintiff and all five of the University officers continued to kick and strike the Plaintiff numerous times.

Boyle was taken into the custody of the Chicago Police Department ("CPD") and charged with resisting a peace officer based on the sworn complaints of Moore and Torres. The charges against the Plaintiff were dismissed on January 20, 2009 as *nolle pros*. Subsequently, Plaintiff filed his complaint against the Defendants alleging 1) unreasonable seizure, 2) excessive force, and related state law claims of 3) malicious prosecution and 4) battery.

## II.   SUMMARY OF FACTS

**A.   Plaintiff, Ashley Glover and Kenneth Roberson's Version of Events**

### 1.   Events of October 18, 2008

On the night prior to October 18, 2008, Charles Boyle and three of his friends, Kenneth Roberson ("Roberson"), Steven Sinclair ("Sinclair") and Ashley Glover ("Glover"), went to the Ole Lounge, located on the north side of Chicago for several hours. (D. ¶12)[1]. In the early morning of October 18, 2008, Boyle, Roberson, Sinclair and Glover left the Ole Lounge and headed to 53rd Street to use a Bank of America ATM. (P. ¶1). Sinclair drove the car, which Glover owned, while Glover sat in the front passenger seat and Roberson and Boyle saw in the back. (P. ¶1; D. ¶¶11, 13). About 1-2 blocks from the ATM, the horn in Glover's car went off. (P. ¶2). The horn was a constant sound. (D. ¶¶9,11,16). The horn stopped at some point around the time when Sinclair parked the car on 53rd Street. (P. ¶2). The horn was blaring for a period of time in-between 20 seconds to one minute. (Id.). Sinclair parked in a parking spot located on 53rd Street, and did not hit the curb. (P. ¶3).

After Sinclair parked, Sinclair and Roberson got out of the car and walked about half a block to go to the ATM. (P. ¶3). Boyle got out of the car to look under the hood to see why the horn had been going off. (Id.). Glover remained seated in the front seat of her car. (Id.). Less

---

[1] (D. ¶) refers to a paragraph from the University Defendants' Rule 56.1 Statement of Undisputed Facts, while (P. ¶) refers to a paragraph from the Plaintiff's Local Rule 56.1(b)(3)(c) Statement of Additional Material Facts

than one minute later, Officers Moore and Torres drove up and parked in front of Glover's car. (P. ¶6). Moore and Torres approached Boyle and one of the officers told Boyle to "put [his] fucking hands up". (Id.). Boyle put his hands up in response to this command. (Id.). At that point, Boyle had his back to Moore and Torres and was facing the engine of the car. (Id.). Officers Moore and Torres were standing approximately one and a half to two feet away from Boyle. (Id.). Officer Moore[2] asked Boyle "whose car is this"? (P. ¶7).

In response Boyle pointed to Glover, who was sitting in the car, and said "it's hers". (P. ¶7). Glover put her hand out of the passenger window and said to the officers "it's my car." (Id.). Boyle then turned to look back at the engine of the car. (Id.).

After Boyle pointed to Glover and turned back to look at the engine of the car, an officer said to Boyle "show me some damn ID." (P. ¶8). Boyle asked this officer why. (Id.). Boyle then turned around to face the officer who asked him for ID. (Id.). The officer then told Boyle to "show me some fucking ID". (Id.). Boyle stated to the officer that he didn't have a problem with authority, but simply was asking why. (Id.). Boyle heard Moore state "I see we're going to have to deal with you." (Id.).

Officer Moore grabbed Boyle, turned him around, and slammed him onto the squad car parked directly in front of Glover's car. (P. ¶9). Moore then grabbed Boyle by the collar and asked again for Boyle's ID. (Id.). Boyle again asked "why" and Moore stated "because I said so." (Id.). As Moore slammed Boyle into the car, Torres punched Boyle in the back and hit him in the stomach with a flashlight. (Id.). Torres then started to pull Boyle's pants down. (Id.). Boyle heard Moore say "we're going to get your ass." (Id.). Boyle went down to the ground as

---

[2] Boyle testified in his deposition that he was approached by an African-American officer, identified as Officer Moore, who asked him the above question. (P. ¶7). Officer Moore does not dispute that he had a conversation with Boyle when Boyle was under the hood. (P. ¶32; D. ¶21). The other officer at the scene was a Hispanic officer, Officer Torres, who admits to arriving at the scene with Moore. (Id.).

3

Moore and Torres kicked and hit Boyle. (P. ¶10). Boyle said to the officers "I'm not doing anything, please stop hitting me" while the officers continued to strike Boyle. (Id.).

When Boyle was on the ground, Glover saw the Moore and Torres's legs moving and kicking Boyle. (P. ¶10). Glover heard Boyle state "I'm not resisting. Please stop kicking me." (Id.). From inside her car, Glover saw Moore and Torres kick Boyle for several minutes. (Id.). After two to three minutes, 3-4 more squad cars arrived at the scene. (P. ¶11). University officers Galarza, Gillespie and Kwiatkowski ran out of their squad cars and immediately proceeded to run over to and kick Boyle. (Id.). University officers kicked and punched Boyle all over his body, including his neck and chest area, more than 20 times. (Id.). In total, University officers kicked and punched Boyle for approximately 5-10 minutes. (Id.). Glover did not see Boyle wrestling with any officers, nor did she see Boyle pick up any of the officers. (P. ¶12).

Roberson was in the ATM located less than one block down from the car when he saw flashing lights outside the ATM window. (P. ¶13). He walked to Glover's car where he saw four to five University officers kicking and stomping Boyle. (Id.). Roberson asked the officers what they were doing, and one of the officers asked Roberson if he wanted to be next. (Id.). Roberson heard Boyle state, "I'm already in handcuffs, why are you kicking and stomping me?" when Boyle was on the ground in handcuffs. (Id.). The kicking was constant at first, and slowed as more officers arrived at the scene. (P. ¶14). Officer Torres and Officer Moore[3] did most of the kicking. (Id.). Roberson saw Boyle's head kicked downwards to the ground. (Id.). Roberson heard an officer state to Boyle, "you're lucky this wasn't ten years ago because I would have killed you, you made me break my glasses." (Id.). Roberson saw Boyle's pants half-way down when he was getting kicked. (Id.).

---

[3] Roberson testified in his deposition that he saw an African-American officer and Hispanic officer doing most of the kicking. (P. ¶14). Boyle identified Moore as the African-American officer, while Torres is the Hispanic officer. (P. ¶32).

4

Eventually, Boyle was lifted off the ground by his handcuffs and turned to face CPD officers. (P. ¶15). After lifting Boyle up, University officers immediately handed him off to CPD officers Vincent Darling ("Darling") and Carl Martin ("Martin"). (Id.). Boyle was then placed in the back of a CPD squad car. (Id.).

### 2. Criminal Charges against Boyle

Darling and Martin took Boyle down to the 21st district police station for processing. (P. ¶16). Moore and Torres followed them to the 21st district station. (Id.). At the station, Moore told Darling that he had made a stop on Boyle because the hood on his car was up. (P. ¶17). Moore also told Darling that he and Boyle got into a verbal altercation, and that Moore took Boyle down to the ground. (Id.). Moore and Torres signed criminal complaints against Boyle. (P. ¶18). Boyle was not charged with battery, despite the fact that Moore told Darling that Boyle hit him a couple times. (Id.). On January 20, 2009, a State of Illinois judge dismissed the charge of resisting or obstructing a peace officer against Boyle as *nolle pros*. (P. ¶20).

## B. Defendants' Version of Events

### 1. Officers Torres and Moore

On October 18, 2009, Moore and Torres were working in a patrol car together. (D. ¶8). At approximately 2:30 a.m., Moore and Torres went to a Dunkin Donuts located on 53rd Street. (D. ¶9). After leaving the Dunkin Donuts, they heard a car horn going off without interruption. (Id.). Moore and Torres saw a silver Chrysler drive by them going eastbound on 53rd street. (D. ¶¶9,10). Moore stated to Torres, "let's check the car out." (Id.).

Moore and Torres got in their patrol car and traveled down 53rd street to investigate the car. (P. ¶5). Torres does not remember where Moore parked the vehicle in relation to the Glover's car, while Moore alleges that he pulled up behind the car. (Id.). Moore and Torres

5

saw two people get out of the car and walk out of their eyesight. (D. ¶20). Torres alleges that thought that these two people leaving the car were suspicious but did not follow them. (P. ¶5). Boyle was already out of the car when the officers parked. (Id.). The officers approached Boyle, who was under the hood of the car. (D. ¶21). Moore considered Boyle, who was looking under the hood, the biggest threat out of the four individuals who were originally inside the car. (P. ¶5). Moore admits to touching Boyle to guide him towards the patrol car. (P. ¶9).

At this point in the events, Moore and Torres present blatantly conflicting testimony. A few of the discrepancies are listed below:

- Both Moore and Torres claim that Torres ended up against their patrol car. (P. ¶22). After Torres was allegedly against the patrol car, Torres claims he saw Boyle turn around and start wrestling with Moore. (P. ¶23). Moore testified he went after Boyle from behind immediately after Torres fell into the squad car. (Id.). *These testimonies are irreconcilable. If Torres is to be believed, it would have been impossible for Moore to go after Boyle from behind as Boyle had already turned around to face Moore.*

- Torres testified that he was against the patrol car when Boyle was wrestling with Moore. (P. ¶24). Torres then went after Boyle from behind and tried to grab Boyle's legs. (Id.). Moore states that when Torres was against the patrol car, Moore used his body leverage to flip Boyle, Torres and Moore all down to the ground. (P. ¶25). Once on the ground, Moore claims that Boyle started wrestling with Moore and Torres. (Id.). *Torres states nothing about Moore flipping the three of them onto the ground.*

- Torres alleges that after Boyle pushed him into the patrol car, he called for assistance via dispatch. (P. ¶26). Moore testified that when Moore, Torres and Boyle were all on the ground, Torres was able to use one hand to get on the radio and call for help. (Id.). *Once again, Moore contradicts Torres by stating that Torres was on the ground when Torres alleges that he was not.*

- Torres claims he had the wind knocked out of him for a couple of seconds and let go of Boyle's legs because he was tired. (P. ¶27). Torres was winded and leaning over, so he did not see how Moore and assisting University officers tried to get Boyle down to the ground or placed handcuffs on Boyle. (Id.). Moore's testimony once again contradicts Torres's statements. Moore stated that when the Moore, Torres and Boyle hit the ground, Boyle was in-between Moore and Torres. (P. ¶28). Moore is also "quite sure" that Torres got kicked while on the ground. (Id.). Moore further testified that at various times Moore and Torres were on top of Boyle, Boyle was at various

6

times on top of them, and at various times they were on the side of Boyle. (Id.). *Torres does not remember being on the ground, being kicked on the ground, or even how Boyle got down on the ground.*

### 2. Officers Galarza, Gillespie and Kwiatkowski

Officers Galarza, Gillespie and Kwiatkowski's testimonies are similar to Moore and Torres's in that they are full of contradictions and impossibilities. Specifically:

- Galarza testified that when he arrived upon the scene, he saw Moore and Torres wrestling with Boyle in the middle of street. (D. ¶58). Galarza did not see any other officers besides Moore and Torres present. (Id.). Galarza further alleges that he saw Boyle trying to push away Moore and Torres while they tried to put him in handcuffs. (D. ¶58). Galarza alleges that he, Moore and Torres all went down to the floor. (D. ¶¶59,60). *This contradicts the testimony given by Moore and Torres, as Moore alleges Boyle, Torres and himself went down to the ground and Torres stated he was winded when other officers got Boyle to the ground.*

- When Gillespie arrived he only saw Moore and Torres struggling with Boyle and did not see any other officers (including Galarza). (D. ¶48; P. ¶29). Gillespie alleges he saw Boyle thrashing while Moore and Torres attempted to handcuff Boyle. (D. ¶48). At that point, Gillespie ran over to provide assistance and made contact with Boyle, Moore and Torres. (D. ¶51; P. ¶29). As a result, the three University officers and Boyle fell down to the ground. (D. ¶51). *Gillespie's testimony contradicts the testimony of the previous officers in two ways. First, he claims to be the third University officer at the scene (when Galarza also claims to be the third officer) and second, he claims that he caused Moore, Torres, Boyle and himself to fall to the ground when previous testimony states otherwise.*

- Gillespie alleges that as he held onto Boyle's leg, Boyle kicked him in the face and knocked his glasses off. (D. ¶53). Yet when Kwiatkowski arrived on the scene he saw Gillespie's glasses on his face and did not see Boyle come into contact with Gillespie. (P. ¶30). At some point later however, Kwiatkowski did see Gillespie's glasses on the ground in several pieces. (Id.). Kwiatkowski did not see Boyle strike any officer, and did not see any officers strike Boyle. (Id.).

- When Kwiatkowski arrived at the scene, he saw several officers trying to put Boyle into custody. (D. ¶65). He recognized Moore, Torres, Galarza and Gillespie at the scene. (Id.). Amongst these officers, Kwiatkowski saw Galarza by Boyle's arms and Gillespie by Boyle's legs while Boyle was face down on the ground. (P. ¶31). Kwiatkowski believes that Galarza was trying to place Boyle in handcuffs. (Id.). *However, none of the University officers remember placing Boyle in handcuffs.* (Id.).

### III. SUMMARY JUDGMENT STANDARD

In deciding whether there is a genuine issue for trial, the court must construe the facts in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-moving party. *Dumas v. Infinity Broad Corp.*, 416 F.3d 671, 676 (7th Cir. 2005). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary judgment is a stringent standard that should be granted with caution. *See Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

### IV. ARGUMENT[4]

**A. The University officers seized the Plaintiff, violating his 4th Amendment rights**

**1. Torres and Moore did not have reasonable suspicion to approach**

The Fourth Amendment of the Constitution of the United States protects individuals against unreasonable searches and seizures. *See* U.S. Const. amend. IV. A police officer may conduct a brief, investigatory stop of a suspect if the officer has reasonable suspicion based on articulable facts that a crime is about to be or has been committed. *Terry v. Ohio,* 392 U.S. 1, 21 (1953); *United States v. Hampton*, 585 F.3d 1033, 1038 (7th Cir. 2009). Reasonable suspicion requires the ability "'to point to specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Novak*, 870 F.2d 1345, 1350 (7th Cir. 1989) (quoting *Terry*, 392 U.S. at 21). "The officer [making a *Terry* stop]…must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Alabama v. White*, 496 U.S. 325, 330 (1990) (quoting *Terry*, 392 U.S. at

---

[4] Defendants failed to present arguments against Plaintiff's excessive force claim, and have waived arguments against this claim pursuant to *Steen v. Meyers,* 486 F.3d 1017, 1020 (7th Cir. 2007) (absence of discussion in brief amounts to abandonment of argument).

27). "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, `taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

In the present case, Defendants cannot articulate facts which would amount to reasonable suspicion that a crime had been or was about to be committed. While Moore and Torres allege that they were investigating a stolen vehicle, many factors go directly against their claim:

- Moore and Torres both state that the sole reason why they thought Glover's car was stolen was because they heard the horn going off. (P. ¶4). Yet, according to the Plaintiff's version of the facts, the horn stopped before the time when the car was parked and *prior* to when Moore and Torres arrived at Glover's car. (P. ¶2). In fact Judge Donnelly, the state court judge in Boyle's criminal case, stated in open court that, "I don't think that the officer had, judging from the totality of the circumstances, reason to believe that something criminal was afoot here." (P. ¶20).

- Despite the fact that Moore and Torres contradict each other in regards to how the car was parked[5], whether or not the car hit the curb in no way relates to whether or not a crime was being committed as Torres admits that the only reason he thought the car was stolen was because the horn was going off. (P. ¶5).

- Moore and Torres both saw the car park on 53rd street without any direction from a law enforcement agent, mitigating any suspicious activity that the officers might have believed was going on. (D. ¶19).

- Moore and Torres did not testify that Boyle had any tools that could be used to steal a car, nor that any stolen cars matched the description of Glover's car. (P. ¶33). Boyle was not acting evasively or suspiciously prior to when Moore and Torres approached him – he merely walked out of the car, and looked under the hood. (P. ¶¶5-6).

- Moore and Torres both saw the driver and a passenger[6] get out of a "suspicious vehicle", yet chose to let these individuals walk out of their sight. (D. ¶20). These individuals did not run or act evasively when they were walking away. Moore and Torres incredulously claim that they felt Boyle was a greater threat then the two individuals walking away from the vehicle. (P. ¶5).

---

[5] Torres alleges that he saw the car pull over abruptly, while Moore claims he saw the car drift into the curb. (P. ¶4).
[6] These people were later identified as Roberson and Sinclair, who walked half a block down to an ATM. (P. ¶3).

9

- Notably, Moore and Torres *did not* include the fact that they thought the vehicle was stolen in their police report showing that their justification for the stop was made up after the fact. (P. ¶19).

Simply put, observing a person looking under the hood of a car is not justification for a *Terry* stop. Many cases have held that under facts similar in substance to the instant case, reasonable suspicion to detain was not present. *See e.g., Gentry v. Sevier,* 597 F.3d 838, 845 (7th Cir. 2010) (Officers who stopped a man, in camouflage clothes, pushing a wheelbarrow in area of report of a "suspicious person" at 2:30 a.m. did not have articulable facts for a *Terry* stop.); *U.S. v. Packer*, 15 F.3d 654, 658-659 (7th Cir. 1994) (Four men sitting in a parked car with fogged windows in the wee hours of the morning is not suspicious.); *Reid v. Georgia*, 448 U.S. 438 (1980). (Strong drug profile information does not add up to reasonable suspicion.); *Moya v. United States,* 761 F.2d 322, 325 (7th Cir. 1984) ("We must be especially cautious when the evidence that is alleged to establish probable cause is entirely consistent with innocent behavior."); *Brown v. Texas,* 443 U.S. 47, 52 (1979) (noting that the "fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"); *U.S. v. Jerez*, 108 F.3d 684, 693-694 (7th Cir. 1997) (No reasonable suspicion where there is "a car, bearing out-of-state license plates, that contained four men who refused to make eye contact with [the sheriff] and that made a sharp right-hand turn.")

Thus, Plaintiff has shown that no reasonable suspicion existed based upon the Defendants' own version of the facts. However assuming, *arguendo,* that Defendants have shown reasonable suspicion, no reasonable suspicion exists under the Plaintiff's version of the facts above, which must be taken as true. Plaintiff did not more than look under the hood of a car to check on a horn.

**2. The University officers did not have a right to demand Boyle's ID, which Boyle did not refuse to produce**

As has been said by many courts, the law is abundantly clear that while an officer may wish to question a citizen, the citizen has the right to walk away:

> law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

*Florida v. Royer*, 460 U.S. 491, 497-8 (1983) (citations omitted); *See also, Terry,* 392 U.S. at 31, 32-33 (Harlan, J., concurring); *id.,* at 34 (White, J., concurring).

Here, Moore and Torres claim to have been investigating a suspicious vehicle and asked Boyle who the owner of the car was. (D. ¶21). Boyle pointed to Ashley Glover, who was sitting in the car, and said "it's hers." (P. ¶7). Ashley Glover pointed her hand out the window and said "it's my car." (Id.). Even assuming that the initial stop was valid (which it was not), Boyle's answer should have ended this interaction with Moore and Torres. However, even after this initial seizure, Moore continued to detain Boyle without any reasonable suspicion and asked him for an ID. *Boyle never refused to produce an ID to Moore, but merely asked Moore why*. (P. ¶8). Moreover, this issue is a red herring. Under the Fourth Amendment and State law, absent reasonable suspicion officers do not have the right to demand identification. (*See Terry,* 392 U.S. at 21; *Hiibel v. Nevada*, 542 U.S. 177, 187 (2004); 725 ILCS 5/107-1). Therefore, Moore

11

and Torres' illegal seizure of Boyle was outside of the scope of the Defendants' alleged purpose for the initial stop, which itself was illegal.

### 3. The University officers did not have probable cause to arrest Boyle

"A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Village of Hoffman Estates,* 511 F.3d 673, 679 (7th Cir. 2007). The Defendants make no effort to link the law to the facts in connection with the Illinois identity statute, 725 ILCS 5/107-14, because on its face, the failure to give an ID is not a crime. "It has been held that refusing to identify oneself or falsely identifying oneself in connection with a criminal matter does not constitute resistance or obstruction." *People v. Synnott*, 811 N.E. 2d 236, 239, 349 Ill. App. 3d 223, 239 (2d Dist. 2004). The relevant portion of the state statute reads as follows:

> Temporary Questioning without Arrest. A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102-15 of this Code, and may demand the name and address of the person and an explanation of his actions.

725 ILCS 5/107-14.

Beyond the facts above showing that Boyle at no time resisted arrest, the Defendants did not have probable cause to arrest Boyle for three further reasons. First, as argued above, as Moore and Torres had no reasonable suspicion that Boyle was committing a crime they had no reason to demand Boyle's name and address. Second, under 725 ILCS 5/107-14 an individual is not required to produce an ID. Rather, an individual only has to produce his name and address if there is reasonable suspicion that he is committing a crime. Lastly, Boyle never refused to produce his identification but merely asked Moore "why". In response, Boyle was beaten and

12

unable to produce any ID because of the Defendants' actions. Thus, none of the Plaintiff's actions gave the Defendant officers probable cause to place the Plaintiff under arrest.

### 4. Officers Galarza, Gillespie, and Kwiatkowski seized the Plaintiff

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) citing *Davis v. Mississippi,* 394 U.S. 721 (1969); *Terry, supra* at 16-19. "'[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person,' and the Fourth Amendment requires that the seizure be 'reasonable.'" *Brignoni-Ponce*, 422 U.S. at 878 (quoting *Terry*, 392 U.S. at 16).

Based upon the Plaintiff's version of the facts in this case, Officers Galarza, Gillespie and Kwiatkowski seized the Plaintiff. Glover and Roberson testified that when Moore and Torres were kicking Boyle more University officers came upon the scene, ran out of their cars and started to kick Boyle themselves. (P. ¶¶11,13). Officers Galarza, Gillespie and Kwiatkowski admitted getting out of their cars and running towards Boyle. (D. ¶¶51,58,65). Thus, these three University officers saw Boyle being kicked and had no reason to believe that Boyle was resisting arrest. Officers Galarza, Gillespie and Kwiatkowski participated in the seizure of the Plaintiff when they kicked Boyle without provocation, and participated in his arrest by putting Boyle in handcuffs. Therefore, based on all of the above, summary judgment against the Defendants on Plaintiff's claim of illegal seizure should be denied.

### B. The University officers were acting under the color of law

Section 1983 provides for a federal remedy for deprivations of an individual's constitutional rights made by a person acting under the color of state law. *See* 42 U.S.C. §1983. While the United States Supreme Court has explicitly left open the question of whether "private

13

police forces" may be considered state actors (*See Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 163 (1978)), numerous courts have held that privately employed officers with police powers can be deemed state actors for the purposes of §1983. *See Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 184 F.3d 623 (7th Cir. 1999) (holding that no legal difference exists between privately employed special officers with full police powers and police officers under §1983); *Henderson v. Fisher*, 631 F.2d 1115, 1118 (3rd Cir. 1980) ("the delegation of police powers, a government function, to the campus police buttresses the conclusion that the campus police act under color of state authority"); *Scott v. Northwestern University School of Law*, 1999 WL 134059 (N.D. Ill. March 8, 1999) (holding that a private university police force can act under the color of state law for purposes of §1983).

A private institution is deemed to have acted as a state actor in two specific types of instances. In the first instance, a private party is deemed a state actor if a state effectively directs or controls the actions of the private party such that the state can be ultimately responsible for the private party's decision. *See Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996) (citing *Flagg Bros*, 436 U.S. at 166). The second instance is based on the general situation where a private entity can be deemed a state actor when "a state delegates a 'public function' to a private entity." *See id.* (citing *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982)). The University officers are to be deemed state actors under the second method because the State of Illinois has delegated police powers to the University of Chicago.

**1. The University Officers have been delegated to an exclusive public function**

"A private entity may be deemed a state actor…if it performs functions that are 'traditionally the exclusive prerogative of the State.'" *Wade*, 83 F.3d at 905 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974)). In this case, the State of Illinois has

granted private universities police powers traditionally reserved to the state under the Private College Campus Police Act, 110 ILCS 1020/1. This act gives private university police officers, including University of Chicago officers, "the powers of municipal peace officers and county sheriffs, including the power to make arrests … for violations of state statutes, municipal or county ordinances, " with the limitation that those "powers may be exercised only on college or university property, for the protection of students, employees, visitors and their property, and the property of the college or university" and that "[c]ampus police shall have no authority to serve civil process." 110 ILCS 1020/1. Under 110 ILCS 1020/1, University of Chicago police officers perform functions that traditionally only belong exclusively to the State of Illinois.

*Scott v. Northwestern University School of Law,* a case from this Court, is directly analogous and on point to the instant case. In *Scott,* members of the Northwestern University police department approached an individual in the school law library, requested his ID based on the fact that he met he description of a man suspected of theft, and detained him. *Scott*, 1999 WL 134059 at *1. Despite the fact that the plaintiff in *Scott* did not have stolen possessions on his person, he was nonetheless charged with criminal trespass and imprisoned at the Chicago Police Department for over seventeen hours. *Id.*

The Defendants in *Scott* challenged whether Northwestern University's police force could be deemed state actors under §1983. *Scott*, 1999 WL 134059 at *3. Judge Kocoras ruled that Northwestern University's police force can act under the color of state law for purposes of §1983 because by accepting the State of Illinois' authorization, "Northwestern and its police must also accept the grave responsibility to protect an individual's constitutional rights, the same responsibility that §1983 enforces against municipal and other forces." *Scott*, 1999 WL 134059 at *6. Judge Kocoras further held that "[t]o permit the state to delegate its police powers to

15

Northwestern University and then shield the Northwestern police force from liability …. would pervert the language and intent of §1983." *Id.* The same principles apply to the University of Chicago here.

*Wade v. Byles*, a case that the Defendants cite in their motion, is distinguishable from the instant case. In *Wade,* the Chicago Housing Authority employed security guards, contracted through a private security company, to provide security for CHA building lobbies. *Wade*, 83 F.3d at 904. The private security guards in *Wade* did not have any police powers, and were *separate and distinct* from the CHA police force itself. *Id.* at 903. The latter, in contrast to the private security guards, were vested with the powers of city and state police under an Illinois statute similar to 110 ILCS 1020/1. *Id.* Here, the State of Illinois has granted the University Officers the very police powers that the private security guards in *Wade* did not have.

Defendants further cite the 7th Circuit case of *Johnson v. LaRabida Children's Hospital*, 372 F.3d 894 (7th Cir. 2004) for the proposition that when a security officer is not permitted to exercise full police powers, he cannot be found to be acting under the color of law. However, in *Johnson*, the security officer was not "expected or authorized to carry out the functions of a police officer." *Johnson,* 372 F.3d at 897. Johnson also distinguished itself from the 7th Circuit case of *United States v. Hoffman* by noting that in *Hoffman,* "policemen were 'authorized on a continuing and full-time basis to search actively for criminals and ... to use the powers of the state when their search [was] successful.'" *Id.* (citing *United States v. Hoffman*, 498 F.2d 879, 881 (7th Cir. 1974)). Here, as in *Hoffman*, the State of Illinois has authorized the University officers to exercise full police powers. The University officers were exercising those powers when they seized and used excessive force against the Plaintiff on October 18, 2008.

## C.     The University officers are not entitled to good faith immunity[7]

The "issue of probable cause to arrest and qualified immunity are often analyzed together." *Thompson v. Wagner,* 319 F.3d 931, 935 (7th Cir. 2003). As a result, the analysis set forth above demonstrating that there was no reasonable suspicion to detain nor probable cause to arrest the Plaintiff is determinative of the fact that qualified immunity does not apply here. Also, the Court cannot grant a summary judgment based upon qualified immunity where there are credibility issues to be determined. *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004). In this case the credibility issues in the Defendant officers' testimony, as shown in the Plaintiff's statement of facts, are illustrative. Lastly, while the University Officers deny that they are police for purposes of §1983 they still request an affirmative defense of qualified immunity under §1983. They simply cannot have it both ways. Hence, for all the reasons set forth above, qualified immunity should not be granted.

## D.     The University Officers battered the Plaintiff

As the Defendants' brief illustrates, battery as the "unauthorized" touch of another person that is harmful or offensive in nature. *See Johnson v. Jackson*, 43 Ill.App.2d 251, 193 N.E.2d 485 (1st Dist. 1963); 720 ILCS 5/7-5. The University officers committed a battery upon the Plaintiff when they repeatedly struck and kicked him without any provocation. (P. ¶¶9-14). At no time did Boyle strike any of the University officers. (Id.). Therefore, there was no justification for University officers' use of force against the Plaintiff under 720 ILCS 5/7-5 or 7-6 and as such summary judgment on Plaintiff's battery claim should be denied.

---

[7] The Supreme Court has established a two part test to determine whether Defendants' actions entitle them to qualified immunity, "[f]irst, we consider whether, taken in the light most favorable to [Plaintiff], the facts alleged amount to a constitutional violation. *Phelan v. Village of Lyons*, 531 F.3d 484, 487 (7th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Second, we ask whether the right was clearly established at the time of the alleged violation." *Id*.

17

E.  **The University officers can be held liable for Malicious Prosecution**

The Defendants fail to mention in their brief that Moore and Torres went to the CPD station, signed criminal complaints against the Plaintiff, and testified in criminal court against the Plaintiff. (P. ¶¶18,20). Based on these facts, Moore and Torres cannot argue that they did not initiate proceedings against the Plaintiff. It is telling that despite the Defendant officers' fantastic stories about bear hugs and wrestling, Boyle was never charged with battery. (P. ¶¶18). This is sufficient action on the part of the University officers to meet the first requirement (commencement) and fourth requirement (malice) of a malicious prosecution claim under *Joyner v. Benton, Comm. Bank,* 81 Ill. 2d 40, 45 (1980).

While probable cause is typically a proper defense to a malicious prosecution claim, it is not in this case. The University Officers had no probable cause to sign criminal complaints against the Plaintiff because he was not resisting a peace officer as shown above. Despite the fact that Officers Moore and Torres had to sign *multiple* versions of the criminal complaint against the Plaintiff on his court date, the charges were still dropped against the Plaintiff. (P. ¶20). Therefore, for all of the reasons stated above, summary judgment on Plaintiff's malicious prosecution claim should be denied.

V.  **CONCLUSION**

WHEREFORE, the Plaintiff, CHARLES BOYLE, by and through his attorneys, ED FOX & ASSOCIATES, respectfully requests that this Honorable Court deny the University of Chicago Defendants' Motion for Summary Judgment on all counts.

BY:  s/ Jonathan R. Ksiazek
Jonathan R. Ksiazek
ED FOX & ASSOCIATES
300 West Adams, Suite 330
Chicago, Illinois 60606
(312) 345-8877

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES BOYLE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 09 C 1080 |
| | ) | |
| v. | ) | JUDGE BUCKLO |
| | ) | |
| UNIVERSITY OF CHICAGO, *et al*. | ) | MAGISTRATE JUDGE DENLOW |
| | ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

To: Steven Puiszis  Helen C. Gibbons
 Hinshaw & Culbertson  Assistant Corporation Counsel
 222 North LaSalle Street  30 N. LaSalle Street, Suite 1400
 Suite 300  Chicago, IL 60602
 Chicago, IL 60601-1081

**PLEASE TAKE NOTICE** that on May 6, 2010, the undersigned filed with the Clerk of this Court, **PLAINTIFF'S RESPONSE IN OPPOSITION TO THE UNIVERSITY OF CHICAGO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, service of which is being made upon you.

 s/Jonathan R. Ksiazek
 Jonathan R. Ksiazek
 ED FOX & ASSOCIATES
 300 West Adams, Suite 330
 Chicago, IL 60606
 (312) 345-8877

**PROOF OF SERVICE**

I, Jonathan R. Ksiazek, an attorney, under penalty of perjury, and state that on May 6, 2010, service is being made in accordance with the General Order on Electronic Case Filing section XI.

 s/Jonathan R. Ksiazek
 Jonathan R. Ksiazek