*MHN*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHARLES BOYLE,          )
                        )
        Plaintiff,      )       Case No.: 09 C 1080
                        )
        v.              )       JUDGE BUCKLO
                        )
UNIVERSITY OF CHICAGO, *et al.*   )   MAGISTRATE JUDGE DENLOW
                        )
        Defendants.     )

**DOCKETED**

MAY 1 1 2010

## PLAINTIFF'S APPENDIX OF EXHIBITS IN SUPPORT HIS
## OF RESPONSE IN OPPOSITION TO THE CITY OF CHICAGO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

Ex. A   Deposition of Charles Boyle

Ex. B   Deposition of Ashley Glover

Ex. C   Deposition of Kenneth Roberson

Ex. D   Deposition of Clarence Moore

Ex. E   Deposition of Larry Torres

Ex. F   Deposition of Vincent Darling

Ex. G.  Deposition of Carl Martin

Ex. H   Deposition of Oscar Galarza

Ex. I   Deposition of Arthur Gillespie

Ex. J   Deposition of Michael Kwiatkowski

Ex. K   Transcript of Criminal Court Hearing on
        January 20, 2009

**F I L E D**
5 - 7 - 2010
MAY - 7 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

---

[1] Plaintiff's Counsel attempted to file the instant Appendix and attached Exhibits on May 6, 2010 with D.E. # 58, but encountered technical issues with the CM/ECF system.

*63*

Respectfully submitted,

s/Jonathan R. Ksiazek
Jonathan R. Ksiazek
ED FOX & ASSOCIATES
300 West Adams, Suite 330
Chicago, Illinois 60606
(312) 345-8877
jksiazek@efox-law.com

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES BOYLE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 09 C 1080 |
| | ) | |
| v. | ) | JUDGE BUCKLO |
| | ) | |
| UNIVERSITY OF CHICAGO, *et al.* | ) | MAGISTRATE JUDGE DENLOW |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

To:  Steven Puiszis                    Helen C. Gibbons
     Hinshaw & Culbertson              Assistant Corporation Counsel
     222 North LaSalle Street          30 N. LaSalle Street, Suite 1400
     Suite 300                         Chicago, IL 60602
     Chicago, IL 60601

PLEASE TAKE NOTICE that on May 7, 2010, the undersigned filed with the Clerk of this Court, **PLAINTIFF'S APPENDIX OF EXHIBITS IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO THE CITY OF CHICAGO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,** service of which is being made upon you.

                                        s/Jonathan R. Ksiazek
                                        Jonathan R. Ksiazek
                                        ED FOX & ASSOCIATES
                                        300 West Adams, Suite 330
                                        Chicago, IL 60606
                                        (312) 345-8877

## PROOF OF SERVICE

I, Jonathan R. Ksiazek, an attorney, under penalty of perjury, and state that on May 7, 2010, service is being made in accordance with the General Order on Electronic Case Filing section XI.

                                        s/Jonathan R. Ksiazek
                                        Jonathan R. Ksiazek

3

# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHARLES BOYLE,                    )

    Plaintiff,            )

   vs.                    ) No. 09 C 1080

UNIVERSITY OF CHICAGO POLICE    )

OFFICER LARRY TORRES, STAR #1028,  )

et al.,                    )

    Defendants.            )

   The deposition of CHARLES BOYLE called for

examination pursuant to Notice and the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Jennifer A. Buckley, a notary public within and for the

County of Cook and State of Illinois, at 222 North

LaSalle Street, Suite 300, Chicago, Illinois, on the

26th day of October 2009, at the hour of 2:00 p.m.

Reported By:  Jennifer A. Buckley, CSR

License No. 084-003632



2

1    APPEARANCES:

2         ED FOX & ASSOCIATES, by

3         MR. JONATHAN R. KSIAZEK,

4         300 West Adams Street, Suite 330

5         Chicago, Illinois 60606

6         (312) 345-8877

7            Representing the Plaintiff,

8

9         HINSHAW & CULBERTSON, LLP, by

10        MR. STEVE PUISZIS,

11        222 North LaSalle Street, Suite 300

12        Chicago, Illinois 60601

13        (312) 704-3000

14           Representing the University of Chicago,

15

16

17

18

19

20

21

22

23

24



3

1    Appearances continued:

2        ASSISTANT CORPORATION COUNSEL, by

3        MS. HELEN GIBBONS and

4        MS. LIZA FRANKLIN,

5        30 North LaSalle Street, Suite 900

6        Chicago, Illinois 60602

7        (312) 744-3982

8            Representing Chicago Police Officers

9            Darling and Martin,

10

11       THE UNIVERSITY OF CHICAGO, by

12       MR. THEODORE C. STAMATAKOS,

13       5801 South Ellis Avenue, 503

14       Chicago, Illinois 60637

15       (773) 702-7516

16           Representing University of Chicago.

17

18

19

20

21

22

23

24

4

1                    I N D E X

2    WITNESS                    EXAMINATION

3    CHARLES BOYLE

4    By Mr. Puiszis                  6

5    By Ms. Gibbons                 111

6    By Mr. Puiszis                 124

7

8

9

10                  E X H I B I T S

11   NUMBER                    MARKED FOR ID

12          Boyle Deposition Exhibit

13   Exhibit 1                   81

14   Exhibit 2                   82

15   Exhibit 3                   83

16   Exhibit 4                  105

17

18

19

20

21

22

23

24

5

1             (Witness sworn.)

2      MR. PUISZIS: Would you please state your full name

3   and spell your last name for the benefit of the court

4   reporter.

5      THE WITNESS: Could you repeat that for me, please.

6      MR. PUISZIS: Would you please state your full name

7   and spell your last name for the benefit of the court

8   reporter.

9      THE WITNESS: Oh, my name is Charles DeAngelo DuPre

10  Boyle. The last name is B-o-y-l-e.

11     MR. PUISZIS: Mr. Boyle, we're here to ask you some

12  questions about a lawsuit that you filed. If at any

13  time you don't hear my question or don't understand it,

14  please tell me and I'll be glad to repeat or restate the

15  question. All right?

16     THE WITNESS: All right. Thank you.

17     MR. PUISZIS: The court reporter is going to be

18  taking down everything we say in the room today. While

19  she's very good, she's can't take down a nod of the head

20  or a shrug of the shoulders. So while I'll know what

21  your answer is, she won't be able to get it down on the

22  machine, so please keep all your answers verbal in

23  nature.

24     THE WITNESS: Sure thing.

6

1    MR. PUISZIS: Finally, the court reporter can't

2    take down two people speaking at one time. So there'll

3    be times during the deposition when you recognize what

4    my question is, but let me finish it before you begin

5    answering it so the court reporter can get an accurate

6    transcript of everything that's said today. All right?

7    THE WITNESS: Understood.

8              CHARLES BOYLE,

9    called as a witness herein, having been first duly

10   sworn, was examined and testified as follows:

11             EXAMINATION

12   BY MR. PUISZIS:

13   Q    Okay. Now, you told us your full name. Have

14   you ever been known by any other name?

15   A    Yes.

16   Q    What other name?

17   A    My birth name I was Charles Cain with the

18   middle names that I stated before. It was Charles

19   DeAngelo Dupre Cain as my birth name. My name was

20   changed, but it wasn't used until the year 2005 like my

21   senior year of high school. But it was changed from I'm

22   not sure what year. But it was changed very early, but

23   I didn't use it because all my school records were in my

24   original name. So it was used Charles Boyle, and

7

1    sometimes they were used in conjunction as Charles Cain

2    Boyle.

3       Q    Okay.  So is Cain C-a-i-n or C-a-n-e?

4       A    C-a-i-n.

5       Q    And that's your birth name?

6       A    Yes, sir.

7       Q    Okay.  And you said it was changed early on.

8    Do you know when your name was changed?

9       A    I want to say 1996.  That's a rough estimate,

10   though.

11      Q    How old were you in 1996 approximately?

12      A    9.

13      Q    Do you know why your name was changed?

14      A    That is the name of my mother's father which

15   would be my grandfather and we actually went to live

16   with him during his elderly age where he resided in

17   Memphis, Tennessee, and I believe he wanted under the

18   circumstances to take his name.

19      Q    So is Boyle your maternal grandfather's name?

20      A    Yes.

21      Q    And do you know where your name was changed?

22   Was it in Memphis, Tennessee, or in Chicago?

23      A    I'm pretty sure it was in Chicago.

24      Q    Do you know if any papers were filed to

8

1    change your name legally?

2    A   I'm pretty sure they were.

3    Q   Do you know who has copies of those papers?

4    A   City Hall I'm guessing.

5    Q   How old are you, sir?

6    A   I'm 22-years-old.

7    Q   And you were born in Chicago?

8    A   Yes.

9    Q   Can you tell me about your educational

10   background?

11   A   Educational background I graduated high

12   school from Kenwood Academy High School located in Hyde

13   Park in Chicago. I went to college at the University of

14   Illinois for a year and a half, walked on. I played

15   football in high school as well all conference all four

16   years. I'll just throw that in there. I played

17   football a lot at U of I. I played for just a small

18   amount of time due to injury or whatever. And then I

19   took a year off to work at Chicago Public Schools and

20   then I enrolled at Columbia College where I am currently

21   in school.

22   Q   So when did you graduate from Kenwood

23   Academy?

24   A   The year 2005.

9

1    Q    And you told us you were a football player

2    for four years at Kenwood?

3    A    Yes.

4    Q    All conference all four years?

5    A    Yes.

6    Q    What position did you play?

7    A    I played defensive tackle. I played

8    offensive line. I played guard. I couldn't play

9    tackle. I'd get crushed. I played guard and then later

10    I played fullback last year, my last year there. And I

11    was on the all conference two years, you know.

12    Q    Any scholarship offers for football?

13    A    I started to get some, but there was a lot of

14    coach changing. 2005 Ron Turner actually got fired for

15    Ron Zook. And so when I was in negotiations with them,

16    a lot of stuff just went strange and I didn't want to go

17    there so I stayed in contact with the coach there and

18    walked on.

19    Q    Okay. Can you give me your height and weight

20    approximately?

21    A    I am five-eleven and three-fourths I believe

22    and 240 pounds.

23    Q    And on October 18 of 2008 were you

24    approximately the same height and weight?

10

1    A    I want to say so. I might have been a little

2    slimmer actually, maybe 235.

3    Q    I take it to be a D1 recruit you had to be

4    pretty strong in high school?

5    A    Yeah, I was pretty strong in high school.

6    Q    Lifted a lot of weights?

7    A    Oh, yeah.

8    Q    What was your best lift?

9    A    Bench.

10   Q    How much have you benched?

11   A    Max I probably maxed out at three not that

12   much. Maybe I want to say like 340 or something, 345 or

13   something like that.

14   Q    Do you still lift today?

15   A    Not really. I'm a more cardio guy now.

16   Q    Okay. What about in terms of squats, what's

17   your best squat?

18   A    I actually injured myself squatting. I

19   forgot what exactly I was doing on the squat, but I know

20   I heard a crack that sounded pretty bad. I don't like

21   squatting that much.

22   Q    Before you were hurt what was your maximum

23   with the squat?

24   A    Maybe something I could probably squat three

11

1    something, like a real nice squat maybe 300 something.

2        Q    What about leg press?  If you're a fullback,

3    you got to have pretty strong legs.

4        A    Leg press probably like I want to say like

5    700 pounds.

6        Q    Okay.  Now, can I have your date of birth?

7        A    It is 4/7/87.

8        Q    You told us you're currently going to

9    Columbia College?

10       A    Yes.

11       Q    What are you working on towards your degree?

12       A    I'm working on music business.

13       Q    Music business?

14       A    Yes, sir.

15       Q    And what college were you enrolled in at

16   University of Illinois?

17       A    Liberal arts and sciences.

18       Q    Had you declared a major at U of I?

19       A    I actually changed.  I actually worked at

20   when I was like 16, I worked at Leo Burnett and I

21   started to discover an interest for advertising for some

22   odd reason.  So I looked into advertising at first.

23   Well, business was my first intent, getting into the

24   college of business but then I started looking into

12

1    advertising.  And then I realized, hey, you're changing

2    majors a lot too much.  So I decided to stay with

3    business but more so what aspect I was interested in.

4        Q    Okay.  Now, between University of Illinois

5    and Columbia College any other school?

6        A    No.

7        Q    Okay.  When did you leave U of I?  You said

8    you were there for about a year and a half.

9        A    I left U of I at the end of I want to say

10   that would be fall of -- wait.  The first semester

11   starts in the fall.  Second semester is in the spring.

12   So I left after the first semester of my second year.

13       Q    Which would have been approximately when?

14       A    I don't think the year is up yet, so I want

15   to say '06 spring.  I want to say spring '06 because the

16   year doesn't change until -- that's when you get the

17   break for a semester.  So I want to say '06.

18       Q    So it would have been around December of

19   2006?

20       A    Yeah, something like that.

21       Q    And then when did you re-enroll at Columbia

22   College?

23       A    Last year.

24       Q    2008?

13

1    A    Yes.

2    Q    Did you do -- what do you do with yourself

3    between December of 2006 and then when you re-enrolled

4    in 2008 at Columbia?

5    A    What did I do with myself?

6    Q    Yeah.

7    A    I worked at Chicago Public Schools as an

8    intern in the office of special ed services.

9    Q    Office of special?

10   A    Special ed services delivering special needs

11   children but I was doing more clerical work.

12   Q    How long did you work for Chicago Public

13   Schools?

14   A    I want to say a year and a couple months.

15   Q    What was your reason for leaving Chicago

16   Public Schools?

17   A    I was an intern.

18   Q    So why did you leave? It sounded like a

19   pretty good gig.

20   A    It was pretty good. There was a lot of

21   layoffs going on, and I was thinking about going back to

22   school so it worked out.

23   Q    Did you go to work anywhere else after

24   Chicago Public Schools?

14

1    A    Yes. I then went to work at Old Saint

2    Patrick's Church. Can I say something?

3    Q    Sure.

4    A    I've never actually -- that was something I

5    always used to say just bragging around the guys. It's

6    actually never been measured even though my stat sheets

7    that I send to colleges I never was on there so I

8    actually don't know. It's never been measured. But

9    since I've been asked that like a lot by a lot of guys,

10   I don't know. I just always throw that out. It sounds

11   like a good number. And Garrett Wolf said he pressed a

12   thousand pounds. I was like I could do 700.

13   Q    Who was your supervisor when you were at

14   Chicago Public Schools?

15   A    A Miss . . . I'm still trying to think of

16   her name. Renee Grant Mitchell.

17   Q    Was she your superior or supervisor the

18   entire time you were there?

19   A    She was the superior the entire -- my direct

20   supervisor, it changed one. So I don't remember her

21   name. I just know that was the boss of bosses.

22   Q    And how did you get the job at Old Saint

23   Pat's?

24   A    My uncle by marriage actually used to work

15

1   there. Well, he worked there for a long time but he's

2   actually deceased now.

3        Q    What was his name?

4        A    His name is Mr. Sean Darke, and that's

5   D-a-r-k-e.

6        Q    And so did you submit an application? How

7   did you get the job?

8        A    Yeah. I had to go through there was an

9   application process. There was an interviewing process

10  just like general. I had to do everything everybody

11  else does to get a job.

12       Q    Okay. Who's your supervisor over at Old

13  Saint Pat's?

14       A    Sean Darke.

15       Q    Your uncle?

16       A    Yep.

17       Q    What did you do for Old Saint Pat's?

18       A    Event coordination and custodial work.

19       Q    And how long did you work for Old Saint

20  Pat's?

21       A    I want to say roughly seven months.

22       Q    What was your reason for leaving?

23       A    Got a better job.

24       Q    Which was?

16

1    A    I now work at Colorado Tech University

2    on-line. It's an on-line university. But I work for a

3    temp agency. It's called Staffing Now.

4    Q    I'm sorry. Staffing?

5    A    Now.

6    Q    Okay. Before we leave Old Saint Pat's did

7    you ever run into my friend Father Wall?

8    A    Oh, yeah. Oh, yeah. Wall was a great guy.

9    Q    What about Monseniur Catwell?

10   A    Yeah. Do you know Father Hurley?

11   Q    Yeah. So what did you do for Colorado Tech?

12   A    I'm a peer qualifier which basically I help

13   admissions advisors with inquiries we get about our

14   school. So I assist in admissions.

15   Q    And that's an on-line university?

16   A    Yes, sir.

17   Q    And you said you're actually employed by

18   Staffing Now. Where are they located?

19   A    They're downtown on Jackson and I'm not sure.

20   I just know it's on Jackson.

21   Q    And how did you get that job?

22   A    Monster.com I believe or Careerbuilders.

23   Q    I'm sorry?

24   A    Monster.com or Careerbuilders just like job

17

1    searching.

2        Q    And what do you do as a peer qualifier?

3        A    When people send us inquiries about

4    information about our university, what we do is we like

5    to get back to contact with them to ensure we get the

6    correct information about whatever programs they're

7    seeking to look into. If they're interested in getting

8    further into the school, to get them with somebody who

9    can help them with that.

10       Q    Okay. Now, is that how you were employed on

11   October 18 of 2008?

12       A    Yes.

13       Q    Were you in school, had you enrolled at

14   Columbia at that time?

15       A    I don't know. I don't think so, though, but

16   I honestly don't know.

17       Q    How many hours a week do you work for

18   Colorado Tech?

19       A    Currently I work 40 hours a week.

20       Q    Is there a set time frame that you work from

21   day-to-day?

22       A    Yes. 12:30 to 9:00 p.m.

23       Q    When do you go to school?

24       A    I go to school in the mornings on Tuesdays

18

1    and Thursdays and Fridays.

2        Q    How many hours are you carrying?

3        A    I am carrying six.

4        Q    Okay.  And on October 18 of 2008 how many

5    hours a week were you working?

6        A    I was working 20.

7        Q    20 hours?

8        A    Yeah.

9        Q    Do you remember what hours you were working?

10       A    No, I don't remember exactly what hours I was

11   working.

12       Q    Okay.  Now, October 18 of 2008 was a

13   Saturday, right?

14       A    Uh-huh.

15       Q    Okay.  Did you work on Friday?

16       A    Did I work that day?  I don't think I worked

17   that Friday, but I know I had to work that Saturday.  I

18   don't know.  Yeah.  I don't think so.  I don't think I

19   worked that Friday.

20       Q    Okay.  Do you know -- what do you remember

21   doing on Friday before the incident?

22       A    The day before the incident?

23       Q    Well, if it happened on a Saturday morning,

24   then what would you be doing that Friday?

19

1    A    What did I do that Friday? Pretty

2    much -- did I work that day? Okay. I think -- I don't

3    know. I know I came in the house and I sat down for a

4    while and I was just relaxing. And the aunt of one of

5    my very, very close friends, she gave me a call and told

6    me that my friend was sick who's actually a girl. And I

7    wanted to go see her and make sure she was okay. It

8    took like I took her something to make sure she was all

9    right and I just kind of chilled out over there.

10    Q    Where do you currently live?

11    A    I currently live at 6700 South Merrill.

12    Would you want like my apartment number as well?

13    Q    It's 3W, isn't it?

14    A    Yes, sir.

15    Q    How long have you lived at that address?

16    A    Two years I think.

17    Q    Before that where did you live?

18    A    6733 South Chappell.

19    Q    How long did you live there?

20    A    I want to say eight years.

21    Q    Okay. Do you live alone at 6700 South

22    Merrill?

23    A    No.

24    Q    Who lives there with you?

20

1     A    My mom.

2     Q    What's your mom's name?

3     A    My mom's name is Angela Boyle.

4     Q    How old is she?

5     A    My mother is, she's getting up there, she's

6   47 I think.

7     Q    Does she work outside the home?

8     A    Could you say that again?

9     Q    Does she work outside the home?

10    A    No, sir.

11    Q    Do you have any brothers or sisters?

12    A    Yes.

13    Q    Can you tell me their names and ages?

14    A    Yes.  My brother is Anthony Boyle and he is,

15   this guy is 20.  Yeah, he's 20.  And Antonio Boyle.

16   Yeah, I know they have the same name.  Antonio Boyle, he

17   turns 18 November 13.  So he's 17.

18    Q    Okay.

19    A    My brother Princeton Cain, he is 25.  And

20   that's all those guys.  And my brother Danzel Lampkins,

21   that's my half brother.

22    Q    How do you spell his last name?

23    A    L-a-m-p-k-i-n-s.  And Sherita Lampkins I

24   believe and Danzel is 18.  He just turned 18 on October

21

1    7. And Sherita is 19.

2    Q    Okay. Is your dad still alive?

3    A    Yes.

4    Q    What's his name?

5    A    His name is Charles Lampkins.

6    Q    And what's your dad do for a living, do you

7    know?

8    A    No.

9    Q    Do you have any family member in law

10   enforcement?

11   A    No, not that I know of.

12   Q    Do you have an uncle that's a police chief

13   anywhere?

14   A    No, not that I know of.

15   Q    Did you call any police officer the night of

16   your arrest?

17   A    I called not the night of my arrest but when

18   I received a phone call in lockup, is that the proper

19   term for it, when I was in lockup and I got a call, I

20   called my girlfriend and her father's a police officer.

21   Q    Where is he a police officer at?

22   A    In the City of Maywood.

23   Q    Is he the chief in Maywood?

24   A    No. I believe -- I don't want to

22

1    misrepresent his rank, but I know he's not the chief.

2      Q    Do you know what his name is?

3      A    Yes.  His name is Richard Robinson.

4      Q    What is your girlfriend's name?

5      A    Alicia Robinson.

6      Q    Are you still boyfriend and girlfriend with

7    Alicia?

8      A    Yeah.

9      Q    Did Mr. Robinson come and visit you at the

10   21st police lockup that night or that morning?

11     A    I was told he was there, but they wouldn't

12   let him see me.

13     Q    So your testimony is he didn't see you that

14   morning?

15     A    Yeah.

16     Q    So did you call your girlfriend or did she

17   call you while you were in the lockup?

18     A    I called her.

19     Q    What was your reason for calling her?

20     A    Because I knew that she would answer the

21   phone.  That's my girlfriend.  And if something is

22   wrong, she's my girlfriend.  If I call her and something

23   is wrong with me, she's going to notify everybody

24   immediately.

23

1    Q   Do you recall what you said to her and what

2  she said to you during this phone call?

3    A  No. I just know I let her know that I

4  was -- I basically just let her know, okay, I let her

5  know where I was at and that I was okay or whatever

6  because as I was leaving the scene from what happened, I

7  let my friends know to, you know, let everybody, you

8  know, make sure everybody knows where I'm at. That way

9  they're not wondering what's going on with me. So I

10  basically just called her so she wouldn't, you know,

11  freak.

12    Q   Okay. Do you recall saying anything else to

13  her other than to let her know you were okay?

14    A  No. Other than that, no.

15    Q   Okay. Who posted your bond that night or

16  that morning?

17    A  I don't know if I had one.

18    Q   Did you talk to Mr. Robinson at any time on

19  October 18 or any of the days thereafter?

20    A  After I don't remember. I don't remember if

21  I talked to him after that.

22    Q   Did you ask your girlfriend to have her

23  father come down to the 21st District lockup?

24    A  I don't think so. I think that was she did

24

1    that of her own.

2        Q    Does she live in Maywood?

3        A    No.  She lives in Bellwood.

4        Q    And Mr. Robinson lives in Bellwood?

5        A    Yes.

6        Q    Do you know if -- now, eventually you hooked

7    up with Ashley Glover, Steve Sinclair, and another

8    gentleman, right?

9        A    Eventually when?

10       Q    Pardon?

11       A    Like what period of time are you talking

12   about?

13       MR. KSIAZEK:  I object to form and foundation.

14   BY MR. PUISZIS:

15       Q    Where were you coming from before the arrest

16   occurred?

17       A    Like a club/lounge.  I think it's Ole Lounge.

18       Q    Before we get into the O Lounge --

19       A    I think it's Ole like Ole.

20       Q    O-l-d or O-l-e?

21       A    Ole, yeah.

22       Q    Like Ole?

23       A    Yeah.

24       Q    Have you ever been in a union?

25

1    A    Like a job union or anything?

2    Q    Yeah.

3    A    No, not to my knowledge.

4    Q    Have you ever been arrested before?

5    A    Before this incident, no.

6    Q    Ever been arrested since?

7    A    No.

8    Q    Have you ever filed a lawsuit other than this

9    one?

10    A    No.

11    Q    How were you dressed that night?

12    A    I was dressed pretty nicely. I had on a

13    striped blue and white LaCoste polo shirt. I had on my

14    black and white vintage acid wash jacket. I had on a

15    pair of Ralph Polo skinny jeans. I had on a pair of Air

16    Jordan sneakers and a Bulls new era hat, fitted cap.

17    Q    And how did you get to the Ole Lounge?

18    A    We drove. Well, we drove Ashley's car.

19    Q    By the way, do you have any identity on

20    Facebook?

21    A    Just Charles Cain.

22    Q    What's it called Charles?

23    A    Charles Cain, C-a-i-n, like my original name.

24    Q    Charles K?

26

1    A    Cain, C-a-i-n.

2    MR. KSIAZEK:  I object to relevance.

3    BY MR. PUISZIS:

4    Q    And what about Twitter, are you on Twitter at

5    all?

6    MR. KSIAZEK:  Continuing objection.

7    THE WITNESS:  Charles Cain.

8    BY MR. PUISZIS:

9    Q    Again Charles Cain?

10   A    Yeah.

11   Q    Other than Facebook and Twitter, any other

12   social networking sites that you visit or that you've

13   got an identity on, Friendster, My Space?

14   A    My Space, yeah.  My Space I don't use that

15   account that much, but I think it's either Apollo Cain

16   or Charles Cain.

17   Q    Have you ever taken any information down off

18   of any of these sites such as --

19   A    Such as?

20   Q    -- Facebook or My Space?

21   MR. KSIAZEK:  Objection to form, vague.

22   THE WITNESS:  Not that I know of.  I might

23   have -- I don't know.  I don't think I've like really

24   tampered with it that much.  I've got over 200 pictures

27

1    up. I don't know.

2    BY MR. PUISZIS:

3        Q    Do you have to be a friend to visit your

4    Facebook or My Space account?

5        A    Absolutely not.

6        Q    It's open to anyone. Have you ever put out

7    any tweets about this lawsuit?

8        A    No.

9        Q    Or about the arrest?

10       A    No.

11       Q    Now, you say that there was a group of you

12   who drove in Ashley's car. You said we drove there.

13   Who was all together when you drove, collectively drove

14   to the Ole Lounge?

15       A    There was me. There was Kenneth. There was

16   Ashley, and there was Steven.

17       Q    Okay. And can I get Kenneth's last name?

18       A    Roberson.

19       Q    Ashley?

20       A    Glover.

21       Q    And what is Steven's last name?

22       A    Sinclair.

23       Q    How long have you known Kenneth Roberson for?

24       A    I've known Kenneth for a great majority of my

28

1    life, maybe seven, eight years of age.

2        Q    How long have you known Steven Sinclair for?

3        A    For about the same amount of time.

4        Q    Would you describe them as close friends?

5        A    Yeah, I'm pretty close friends.

6        Q    How long have you known Ashley Glover for?

7        A    I've known Ashley for at this point about

8    five years, about five, going on six years.

9        Q    Okay.  Now, what time did you and Kenneth and

10   Steven and Ashley get together that night?

11       A    I want to say it was around maybe I don't

12   have an exact time but something around like normal

13   going out time for us maybe 10:00 o'clock, 11:00,

14   something like that.

15       Q    Do you own a car?

16       A    No.

17       Q    You do have a license, though, right?

18       A    Yes.

19       Q    Did somebody pick you up or did you go to

20   someone's house?  How did this all start to happen?

21       A    I got picked up from my house.

22       Q    67th and Merrill?

23       A    Yes.

24       Q    Who was in the car when you were picked up?

29

1    A    Ashley, Steven, and Kenneth.

2    Q    And did you know where you were going?

3    A    Yes.

4    Q    So this is something that you guys had talked

5    about and planned on going?

6    A    Yeah.

7    Q    Where is the Ole Lounge located?

8    A    I actually don't know. I just know it's

9    north.

10   Q    When you say north, is it north side of

11   Chicago or just north of where you lived?

12   A    Yeah, north side of Chicago.

13   Q    Do you know how far north? I mean is it

14   Wrigleyville? Is it Lakewood Balmoral? Is it, you

15   know, Rush Street? Do you know approximately what

16   neighborhood or how far?

17   A    I'm not sure what neighborhood. I forget.

18   Q    Who drove?

19   A    Steven.

20   Q    Why did Steve drive?

21   A    I don't know. It was his girlfriend's car.

22   Q    Had you ever been in that vehicle before?

23   A    Yes.

24   Q    How many times?

30

1    A    I don't know.

2    Q    Do you recall any problems with the vehicle

3    on any other occasion?

4    A    No.

5    Q    Do you know if that car is owned by Ashley or

6    Ashley's father?

7    A    It might be owned by, it might be owned by

8    Ashley and her mother perhaps.  I'm not sure of the

9    details.

10    Q    Okay.  So you guys got together and left

11    around 10:00, 11:00, somewhere in that area.  What time

12    did you leave -- so did you go directly to the Ole

13    Lounge?

14    A    Yeah.

15    Q    Do you recall about what time you arrived?

16    A    No.

17    Q    You were 21 at the time, right?

18    A    Yeah, I'm assuming so.

19    Q    How old were Steven, Kenneth, and Ashley in

20    relation to you, same?

21    A    I believe same.

22    Q    And did the Ole Lounge sell liquor?

23    A    Yes.

24    Q    Did you have anything of an alcoholic nature

31

1    to drink while you were there?

2        A    I believe I may have had a beer.

3        Q    Just one?

4        A    Yeah, if even that.

5        Q    What about Steve and Kenneth?

6        A    I'm not sure.  If they drank, they probably

7    had -- I don't think Steve drank at all.  If Ashley

8    drank, it was probably just one drink because we were

9    actually there to meet the promoter who promotes the

10   club so we weren't there really to party.

11       Q    And what about Kenneth, did he have anything

12   of an alcoholic nature?

13       A    Not that I know of.

14       Q    What was the name of the promoter you were

15   there to meet?

16       A    I don't remember his name.  Steven kind of

17   just wanted me to go, you know, just in case the guy,

18   you know, said something that he couldn't negotiate or

19   something like that because that's what I like to focus

20   on business.  Just in case he said anything, you know,

21   that he didn't agree with, just kind of a comforting

22   situation.

23       Q    What was Steven's interaction with this

24   promoter for?

32

1   A   I believe to deejay a party for him.

2   Q   So Steven is a deejay?

3   A   Yeah.

4   Q   Does he have a name?

5   A   Steve & Midas.

6   Q   Steve & Midas?

7   A   Yeah.

8   Q   Who's Midas?

9   A   Like the Greek God who turns everything into

10  gold.

11  Q   He's the only deejay.  There's not a second

12  deejay that takes the role of Midas?

13  A   No.  I'm saying he'll go by either one I

14  guess depending on what he does but mainly Midas.

15  Q   Do you ever deejay with him?

16  A   I've deejayed once, yeah, I've deejayed once

17  with him.

18  Q   Was the promoter there?

19  A   Yeah.

20  Q   Did you strike a deal or did Steven strike a

21  deal?

22  A   I don't remember.  I think he was just like,

23  man, I need you guys to -- we can meet up again or

24  something like that so we can talk it out and get a date

33

1    solidified.

2        Q    Was a date ever solidified?

3        A    Not that I know of.  I didn't attend a second

4    meeting if there was one.

5        Q    Did Steven ever do a show for this promoter?

6        A    Not that I know of.

7        Q    Did you get a copy of the promoter's card?

8        A    No.

9        Q    Did Steven?

10       A    I don't know.

11       Q    What's Kenneth do?

12       A    What does Kenneth do?  Kenneth works.

13       Q    Do you know what he does for a living?

14       A    I believe -- I'm not sure.  I think he works

15   at -- I'm not sure, but I know he does work.

16       Q    Okay.  Does Steven do anything other than

17   deejay?

18       A    Not that I know of.  At that time I believe

19   he was working somewhere.  I believe he was working at,

20   I believe he was working at Best Buy at the time.  Yeah,

21   I think he was.

22       Q    I'm sorry.  I missed that.

23       A    I think he was working at Best Buy as a

24   Fidart (phonetic) technician.  I'm not sure, though.  I

34

1    think so, though.

2    Q    What about Ashley, was she working?

3    A    Yeah, Ashley works. I'm not sure where she

4    worked at the time either, a clothing store I think.

5    Q    So how long were you at the Ole Lounge for?

6    A    I'm not sure. I just know it wasn't too

7    long.

8    Q    Do you remember how long it took you to get

9    there?

10    A    Maybe -- not exactly. Maybe roughly 25

11    minutes, something like that.

12    Q    Okay. Can you describe the promoter for me?

13    A    I just remember him as a tall guy, well

14    dressed. Other than that, I really don't know.

15    Q    Was he African-American, white?

16    A    He was African-American.

17    Q    When you say he was tall --

18    A    Taller than me. I don't know if that's

19    necessarily tall, but he was taller than me.

20    Q    Okay. Facial hair?

21    A    I don't know.

22    Q    Were you introduced to him?

23    A    I honestly don't remember.

24    Q    So you were at the Ole Lounge. Were you

35

1    there until closing time?

2        A    No.

3        Q    Do you know what time that lounge closes?

4        A    No. I know it wasn't closing when we left.

5        Q    And I take it the four of you -- it was only

6    four of you who went there?

7        A    Yeah.

8        Q    So the four of you went there. You were

9    there for a period of time and then you left?

10       A    Yes.

11       Q    Where did you go?

12       A    We were on our way home and I believe Kenneth

13   suggested, Kenneth suggested that he needed to make

14   some -- he needed to deposit some money or something

15   like that. So he was like can we stop at the ATM. All

16   right.

17       Q    Where does Kenneth live?

18       A    Kenneth lives in Calumet City.

19       Q    What did Steven Sinclair, where did he live?

20       A    He lives on the south side. I'm not sure of

21   his exact address right now.

22       Q    Well, in October of '08 where did he live?

23       A    I'm not sure of his address at that time

24   either. I believe it should be written down somewhere.

36

1    Q   What about Ashley?

2    A   She resides in -- she also resides in the

3  suburbs.

4    Q   So what brought you to 53rd Street?

5    A   What brought us to 53rd Street?  To stop at

6  the ATM.

7    Q   Who knew there was an ATM there?

8    A   All of us considering the fact that they went

9  to Kenwood with me.  It's right down the street from our

10  school so we figured, you know.

11    Q   Where is that ATM located?

12    A   I want to say 53rd and Blackstone.

13    Q   So Kenneth said he wanted to deposit

14  something in the ATM?

15    A   Yeah.  He said he needed to make a

16  transaction, so we're like all right.

17    Q   Where were you guys planning on going after

18  you left the Ole Lounge?

19    A   Going home.

20    MR. KSIAZEK:  Do you want to take a break?

21    THE WITNESS:  Yeah, sure.  That would be great.

22         (A short break was taken.)

23  BY MR. PUISZIS:

24    Q   About how long did it take you to get from

37

1    the Ole Lounge to near the ATM where this incident

2    happened?

3        A    I'm not sure.

4        Q    Well, if it took you 25 minutes from your

5    home at 67th and Merrill, would it be about the same

6    time from the Ole Lounge --

7        A    Somewhere close to that.

8        Q    Roughly 20, 25 minutes, something like that?

9        A    Yeah, maybe 15 minutes.

10       Q    Did you guys stop anywhere to get anything to

11   eat?

12       A    Yeah.  As a matter of fact, we did.  We

13   stopped to have some pizza.

14       Q    Where did you stop for pizza at?

15       A    There's I believe it's called Sarpino's.

16       Q    Where at?

17       A    It's right across the street from -- it's

18   diagonal from Ole Lounge.

19       Q    Now, did any problem with the car begin on

20   the way home?

21       A    No.  Until you mean like as we started our

22   way home?

23       Q    Yeah.  At any point after you started home,

24   did anything unusual happen with the car?

38

1    A   Yes. When we were on our way to the ATM,

2    like the horn started to sound.

3    Q   Now, when you say you were on the way to the

4    ATM, about where were you -- where was the vehicle

5    located when the horn started to sound?

6    A   Maybe a block, maybe a block to two blocks

7    away.

8    Q   When you say the horn began to sound, was

9    it --

10    A   It was a constant sound.

11    Q   Constant. So it was uninterrupted just like

12    a long horn blaring?

13    A   Yeah. And it just stopped.

14    Q   Do you know how long that horn was blaring

15    for?

16    A   No.

17    Q   Did it blow for the entire two or three

18    blocks?

19    A   No.

20    Q   Where were you positioned in the car on the

21    way home?

22    A   I believe I was in the backseat.

23    Q   Driver's side, passenger's side?

24    A   Don't know that one exactly.

39

1   Q   Who was driving?

2   A   Steven.

3   Q   Where was Ashley?

4   A   Passenger's side.

5   Q   I'm sorry?

6   A   Passenger's side.

7   Q   Front or back?

8   A   Front.

9   Q   So Kevin was in the back with you?

10  A   Yes, Kenneth was in the back.

11  Q   I'm sorry. Were you listening to music on

12  the way home?

13  A   I don't remember.

14  Q   What do you remember doing on the way home?

15  A   Sitting there riding.

16  Q   Did anyone say anything when the horn started

17  going off?

18  A   No, not that I know of.

19  Q   And do you remember how long approximately

20  the horn went off for?

21  A   No.

22  Q   Do you know what caused the horn to stop?

23  A   No.

24  Q   Do you know what caused it to start?

40

1    A    Not really.  Earlier like when we were

2    leaving out to go out, something was expressed something

3    was wrong with one -- you know, something was wrong.

4    And that was pretty much it.  I didn't know any details

5    of what was going on.

6    Q    Who said that there was something wrong?

7    A    Ashley did.

8    Q    And where did this conversation take place?

9    A    In the car I'm guessing.  I don't know

10   really.

11   Q    On the way to the lounge?

12   A    Yeah, I'm assuming.

13   Q    What did she say about something being wrong

14   with the car?

15   A    I'm not sure exactly.  I just remember she

16   said something was wrong with it.

17   Q    Does Steven or Kenneth own a car?

18   A    I believe Kenneth may own one now.

19   Q    What about --

20   A    Did you say something after?

21   Q    What about back then, did Kenneth own a car

22   then?

23   A    I didn't know if he owned one.

24   Q    What about Steven, did he own one back then?

41

1    A    Not that I know of.

2    Q    So can you describe for me as you were

3    driving eastbound on 53rd Street and I'm not saying you

4    driving but you in the backseat, the car is going

5    eastbound on 53rd Street, what happened?

6    A    Could you elaborate like what happened?

7    Q    Well, the horn started going off at some

8    point, right?

9    A    Uh-huh.

10   Q    How fast was the vehicle traveling at that

11   point in time, do you know?

12   A    The speed limit.

13   Q    After the horn goes off, what's the next

14   thing you remember happening as the car is going

15   eastbound on 53rd Street?

16   A    Us turning.

17   Q    Where did you turn?

18   A    We were coming the block before Blackstone to

19   make us go east on 53rd Street. It's kind of before.

20   So we're traveling south.

21   Q    You're going southbound on what, Blackstone?

22   A    No. Whatever block is before Blackstone.

23   I'm not sure right now.

24   Q    And is that where the horn began to blow as

42

1    you're going southbound?

2        A    Yeah.

3        Q    And then you take a right turn to go

4    eastbound --

5        A    Left.

6        Q    Left turn?

7        A    Left turn.

8        Q    And you're going eastbound on 53rd Street?

9        A    Yep.

10       Q    How far eastbound did you go?

11       A    Maybe a block.

12       Q    The horn is still blowing?

13       A    No.

14       Q    When did the horn stop?

15       A    Not exactly sure but it was some time between

16   us pulling up to the stop sign that appears there and us

17   making the turn.

18       Q    So the horn had stopped before you were

19   actually traveling eastbound on 53rd Street?

20       A    Don't know exactly.

21       Q    Do you know if you had been driving eastbound

22   on 53rd Street at all while the horn was still going?

23       A    I don't believe so.

24       Q    Anything that would refresh your recollection

43

1     as to where the vehicle was at when the horn stopped?

2       A   No. I know that -- well, I don't know

3     exactly when it like when it stopped. But I know it

4     stopped like before we actually like fully turned. Like

5     before we actually made our turn, I know it stopped.

6       Q   So when you say before you made your turn,

7     are you saying before you made the turn to go eastbound

8     on 53rd Street it fully stopped?

9       A   It had stopped. But exactly like what point

10    in time it did, I don't know.

11       Q   Do you know if having a horn blare

12    continuously for a block or so would violate any

13    municipal ordinance in the City of Chicago?

14       A   I'm not sure if it was blaring for a block or

15    so, and no to the second part.

16       Q   I'm sorry?

17       A   I'm saying, no, I don't know if it violates

18    anything.

19       Q   Do you remember driving past the Dunkin'

20    Donuts?

21       A   Yeah.

22       Q   You're saying the horn wasn't blaring as you

23    drove past the Dunkin' Donuts?

24       A   No, not to my knowledge.

44

1    Q    What happened next?

2    A    What happened next is we came down a block or

3    so going eastbound.  We pulled over so they could go to

4    the ATM.

5    Q    Can you describe for me how the vehicle

6    pulled over?

7    A    Just normal as you pull over to the parking

8    spot.

9    Q    Did you see the -- did you feel the car hit

10   the curb?

11   A    No.

12   Q    Did you see any squad car with its lights or

13   siren activated before the vehicle pulled to the curb?

14   A    No.

15   Q    So it would be fair to say that -- I'm sorry.

16   Who was driving, Kenneth?

17   A    Steven.

18   Q    Steven.  Would it be fair to say that Steven

19   did not pull the car over in response to any officer

20   signaling with his lights or siren to pull over?

21   A    You're saying that it's safe to assume that

22   he -- could you repeat the question for me?

23   Q    Okay.  Would it be fair to say that Steven

24   did not pull the vehicle to the curb in response to a

45

1    police officer activating his lights and siren?

2        A    Yes.

3        Q    What happened after the vehicle stopped at

4    the curb?

5        A    After we pulled over, they got out of their

6    car. Steven and Kenneth got out of the car.

7        Q    Where did they go?

8        A    To the ATM.

9        Q    What did you do?

10       A    I sat in the car for a second. And while

11   they were getting out, they were like why don't you take

12   a look. Why don't you take a look under the hood and

13   see what was going on.

14       Q    Well, there wasn't a problem anymore, was

15   there?

16       A    Yeah. But in order to stop the problem from

17   happening again, I think I should take a look at it.

18       Q    But you're saying that the horn hadn't been

19   blowing at while you were on 53rd Street?

20       A    No, it wasn't but they said do you want to

21   take a look at it.

22       Q    Let me ask you this. The horn hadn't blown

23   at all between the time you were picked up and the Ole

24   Lounge and then the Ole Lounge until you got to the

46

1    point where you were traveling southbound near 53rd

2    Street, right?

3        A    No.  Just Ashley expressing that she had had

4    a problem.  But the problem never occurred until that

5    time.

6        Q    Okay.  So if you had been in the car for 40

7    minutes, the horn would have been going on for how long,

8    less than a minute according to your testimony?

9        A    Not sure.

10       Q    Do you have any automotive background or

11   knowledge of cars or anything?

12       A    Not professionally.

13       Q    Ever owned a car?

14       A    I may have -- no.  Wait.  I had a car for a

15   short amount of time.

16       Q    How short a period of time?

17       A    I'm not sure.

18       Q    Who did you get the car from?

19       A    I actually got the car from my dad.

20       Q    How long did you have it for?

21       A    Not sure.  It was a very short.

22       Q    What's very short?

23       A    Not sure.

24       Q    Less than a week?

47

1    A   I wouldn't say it was less than a week.

2    Q   Less than a month?

3    A   I'm not sure exactly the time frame I had the

4   car.

5    Q   What kind of car was it?

6    A   It was a Cutlass Sierra station wagon.  Yeah.

7   I don't remember what year either.

8    Q   And you anticipated my question.  Do you

9   remember the year?

10    A   No.

11    Q   Do you remember the color?

12    A   No, not exactly.  I think it was like some

13   shade of brown or something like that.

14    Q   What did you do with the car?

15    A   After I found out that it was -- I junked it.

16    Q   What did you find out about the car?

17    A   That it was just too much.  I was going to

18   have to put too much work into it.

19    Q   Where did you junk it at?

20    A   With the company who does that.

21    Q   Where is it located?

22    A   Not sure.

23    Q   Still have the title to the car?

24    A   No.

48

1    Q   Have any sales receipts?

2    A   No.

3    Q   Was the car stolen at all?

4    A   No.

5    MR. KSIAZEK: Objection, relevance.

6    BY MR. PUISZIS:

7    Q   Do you remember when it was that you had this

8   car for a relatively short period of time?

9    A   No, not exactly.

10    Q   Were you in high school?

11    A   I wasn't in high school, no. I was in

12   college.

13    Q   When you were down at U of I?

14    A   No. It was while I was living here at that

15   address I live at now.

16    Q   So it would have been in the last two years?

17    A   Yeah.

18    Q   If I wanted to find this junk company, do you

19   remember where it's located?

20    A   No.

21    Q   Is it on the south side of Chicago?

22    A   I don't know.

23    Q   On the north side of Chicago?

24    A   Don't know.

49

1    Q    West side?

2    A    Don't know.

3    Q    Do you remember anything about the company

4    name?

5    A    No, not that I remember.

6    Q    How did you find it?

7    A    A flyer.

8    Q    How did you know you were going to have to

9    put a lot of work into the car?

10   A    I actually had it looked at.

11   Q    By whom?

12   A    A mechanic in I want to say that's -- a

13   mechanic in Oak Park.

14   Q    What's the mechanic's name?

15   A    I don't remember exactly his name.  It's

16   Officer Robinson, it's his mechanic.

17   Q    I'm sorry?

18   A    Officer Robinson, it's his mechanic who

19   referred me to the guy in Oak Park.  Jiffy Lube I think

20   or something like that.

21   Q    There's a Jiffy Lube right off the Eisenhower

22   and Harlem and Jackson.  Was that the one you went to?

23   A    I'm not sure.

24   Q    So Steven and Kenneth got out of the car to

50

1    go to the ATM. How far from the ATM was the car

2    stopped?

3        A    From where he stopped?

4        Q    From where the ATM is located to where the

5    car was stopped, what's the distance?

6        A    I'm not sure, not very far, though, maybe not

7    even a half a block.

8        Q    Why did you stop a half a block from the ATM?

9        A    It was like the closest part.

10       Q    Can you describe for me exactly on the street

11   where the vehicle came -- where you stopped that car or

12   where the car was stopped?

13       A    Say that again for me.

14       Q    Can you tell me exactly where in relation to

15   the intersection of 53rd and Blackstone where that

16   vehicle you were in was stopped?

17       A    We were parked it may have been like a car or

18   two in front of us from the corner of 53rd and

19   Blackstone.

20       Q    And you're facing eastbound, right?

21       A    Yes.

22       Q    Which puts you on the south side of the

23   street, right?

24       A    Yes.

51

1    Q   Okay. Where's the ATM? When Steven and

2   Kenneth got out of the car to walk to the ATM, which

3   direction did they travel?

4    A   East.

5    Q   Okay. For how far?

6    A   Maybe a little bit shorter than a half a

7   block.

8    Q   Why couldn't you just pull up right in front

9   of the ATM?

10    A   Because there wasn't a spot there.

11    Q   Is it in a bank?

12    A   Is the ATM in a bank?

13    Q   Yeah.

14    A   Yeah.

15    Q   Couldn't you pull in the bank parking lot?

16    A   The bank to my knowledge doesn't have a

17   parking lot, that branch rather.

18    Q   There's no parking spots in front of the bank

19   on the street?

20    A   At that time I don't think there were any.

21    Q   Ashley stayed in the car, right?

22    A   Yeah.

23    Q   So describe for me what you did when you got

24   out of the car.

52

1    A    When I got out of the car, I got out of the

2    car and walked to the hood.

3    Q    What did you do then?

4    A    I lifted up the hood and was looking for the

5    I'm not sure what you call it but the hook to prop up

6    the hood.

7    Q    Did you find it?

8    A    Eventually, yes.

9    Q    Okay.  What happened then?

10   A    I was approached by someone that told me to

11   put my F'g hands up.

12   Q    Did you see police lights at all?

13   A    No.

14   Q    Did you hear a police siren at all?

15   A    No.

16   Q    Who was this person who said put your F'g

17   hands up?

18   A    At that time I didn't know who it was.

19   Q    What did you do?

20   A    I put my hands up.

21   Q    What happened next?

22   A    I just turned around and I said, what?  He

23   said, put your F'g hands up.  My hands are up.  And I

24   just asked him that.

53

1    Q    I'm sorry. I missed what you last said.

2    A    I put my hands up and slowly turned around.

3    Q    And what did you see when you slowly turned

4    around?

5    A    I saw a man in a hat, dark coat, glasses.

6    Q    One or two?

7    A    It was one person that approached me, but

8    another officer was with him.

9    Q    Can you describe this person who approached

10   you?

11   A    The person who approached me, he was not

12   really dark, maybe a couple shades lighter than myself,

13   maybe average height, mustache, glasses. That's pretty

14   much that.

15   Q    I take it this was an African-American?

16   A    Yes.

17   Q    And you said he was wearing a dark coat?

18   A    Yeah.

19   Q    How else was he dressed?

20   A    At that time I just know he had a hat on.

21   Q    Did you see what the hat said?

22   A    No.

23   Q    Did you know he was a police officer?

24   A    Not at that moment. He never announced

54

1    himself to be a police officer.

2        Q    What's the next thing that happened?

3        A    After that I just put my hands up and turned

4    to him and he said quickly, whose car is this?

5        Q    What did you say?

6        A    I said it's hers.  I pointed with my hand up

7    I pointed towards her and said it's hers.

8        Q    What's the next thing that happened?

9        A    She said, yes, it's my car.  I think he might

10   have repeated it.  He might have said whose car is this

11   again, and I know she basically said it's mine.

12       Q    How did she say that?

13       A    Did you say how did she say that?

14       Q    Uh-huh.

15       A    She said it.

16       Q    Well, the hood was up, right?

17       A    Uh-huh.

18       Q    Did she get out of the car?

19       A    No.

20       Q    You were still standing in front of the car?

21       A    Yes.

22       Q    What kind of car was this by the way?

23       A    It is I think it's a Chrysler, not sure of

24   the year.

55

1     Q   Color?

2     A   Not exactly sure but I believe it's like a

3   tan, champagne type of color.

4     Q   Was it a Sedan or a minivan or what?

5     A   It's a four door Sedan.

6     Q   Were the windows rolled up or windows rolled

7   down?

8     A   When?

9     Q   When you were talking to the officer.

10     A   I don't know.

11     Q   So the officer asked you at least once, maybe

12   twice whose car this is and you say it's hers.  What's

13   the next thing that happens?

14     A   I looked at him for, you know, like a look of

15   approval like all right.  And then he just kind of just

16   looked at me like with the play face.  I kind of reached

17   back to go under the hood again.

18     Q   So did you turn your back to him?

19     A   It was he's like on my side.

20     Q   Okay.  So you're in front of the car.  You'd

21   be facing what, eastbound?

22     A   No.

23     Q   If you turned to see him?

24     A   If I turned to see him, I would be

56

1    facing -- if I turned directly to him, I would be facing

2    north.

3        Q    Let me see -- I just want to just understand

4    it, get it in my mind's eye.  The car is facing

5    eastbound.  The hood is up.  You're turned to face the

6    car, right?

7        A    Uh-huh.

8        Q    Are you standing in the front of it, or are

9    you standing on the side of it?

10       A    I'm standing on the front of it.

11       Q    So you're facing westbound, right?

12       A    Yeah.

13       Q    So then someone comes up to you and says get

14   your F'g hands up, right?

15       A    Uh-huh.

16       Q    So you put your hands up and then you turn,

17   right?

18       A    Uh-huh.

19       Q    To face this person?

20       A    Uh-huh.

21       MR. KSIAZEK:  You have to answer yes.

22       THE WITNESS:  Yes.

23   BY MR. PUISZIS:

24       Q    Where is he in relation to you when you have

57

1    your hands up?

2        A    When I have my hands up facing the car and I

3    turn to face him, I have to face north.

4        Q    So if you want to face him, you have to face

5    north.  So you turn to your right then or essentially --

6        A    Yeah, like open up to my right.

7        Q    Okay.  How far is the distance between you

8    and he?

9        A    Not much at all.

10       Q    When you say not much at all?

11       A    Close.

12       Q    When you say close, close as I am to you

13   right now?

14       A    A little bit closer.

15       Q    A little bit closer.  How far would you say

16   we're apart right now?

17       A    In terms of feet?

18       Q    Yeah.

19       A    I'm not sure.

20       Q    Three, four feet?

21       A    Yeah.

22       Q    Would he have been as close as your lawyer is

23   to you right now?

24       A    Yeah.

58

1    MR. PUISZIS: So what would you say, Jonathan, two

2    feet?

3    MR. KSIAZEK: A foot and a half, two feet.

4    BY MR. PUISZIS:

5    Q    Okay. A foot and a half, two feet. That's

6    fine. Did the officer have a weapon drawn?

7    A    No.

8    Q    Okay. Did you see a second officer anywhere

9    during this time frame after you turn to the officer?

10    A    I don't remember seeing him until a little

11    bit later, but I know he was there.

12    Q    Okay. So you're turned to the north. You're

13    facing him. You tell him it's her car, and you kind of

14    point to Ashley?

15    A    Kind of use my left hand to point at her.

16    Q    And then you said you turned to go back under

17    the hood?

18    A    Yes. But I didn't turn all the way back

19    around. I just . . .

20    Q    You started to go back towards the hood?

21    A    Yeah.

22    Q    So you would have turned to your left to go

23    back under the hood?

24    A    Yeah.

59

1    Q    What happened then?

2    A    Maybe a couple of seconds and he's like show

3    me some damn ID.  Excuse my language.  Is that proper?

4    Q    Okay.  What did you do then when he asked you

5    to see some ID?

6    A    I asked him why.

7    Q    Why didn't you show him your ID?

8    A    Because I wanted to know why.

9    Q    Did you know he was a police officer at that

10   point in time?

11   A    He never expressed.

12   Q    Well, did you know he was a police officer?

13   A    No.

14   Q    So you feel comfortable turning your back on

15   someone you don't know 2:30 in the morning on a street

16   where no one else is around not knowing if he's a police

17   officer or not?

18   MR. KSIAZEK:  Objection to form.

19   THE WITNESS:  Could you repeat that for me?

20   BY MR. PUISZIS:

21   Q    Okay.  You say you didn't know he was a

22   police officer?

23   A    Uh-huh.  Initially I didn't know he was a

24   police officer.

60

1   Q   At some point you learned he was a police

2   officer?

3   A   By my assumption.

4   Q   When did you assume he was a police officer?

5   A   When I turned around and looked at him.

6   Q   So when he said put up your F'g hands or

7   whatever you said, you turned to look at him and at that

8   point you assumed he was a police officer, right?

9   A   Yeah, just because of the question.

10  Q   Okay.  So when he asked you to see some ID

11  and you assumed he was a police officer, why didn't you

12  show him your ID?

13  A   Because I just wanted to know why he wanted

14  to see my ID after he asked whose car is this.

15  Q   Have you ever spoken to Mr. Robinson about

16  the fact that a police officer can ask people for their

17  identification when a vehicle is stopped?

18  A   The vehicle wasn't stopped.  So to my

19  knowledge I've never spoken to him about anything like

20  that.

21  Q   Did you ever speak to Officer Robinson about

22  this incident at all?

23  MR. KSIAZEK:  Objection, asked and answered.

24  THE WITNESS:  Not that I know of.

61

1    BY MR. PUISZIS:

2        Q    You never asked him if the officers violated

3    your rights?

4        A    We didn't talk much in depth about it.

5        Q    You never asked him if the officers ever did

6    anything wrong?

7        A    There definitely was an expression if

8    something was wrong but not in regards to the question

9    you're asking.

10       Q    Tell me about what you said to Officer

11   Robinson and what he said to you when you had this

12   conversation about whether or not the officers did

13   anything wrong.

14       A    Our conversation was more on the grounds of

15   me being hurt.

16       Q    Can you tell me what you said to him and what

17   he said to you about you being hurt.

18       A    I don't know exactly.  I just know he asked,

19   you know, just a general conversation of, you know, how

20   I'm doing.

21       Q    I'm sorry?

22       A    Of how I'm doing.  This was later.

23       Q    Not that night or not the next day?

24       A    No.

62

1    Q   Okay. By the way, how did you get home from

2    the 21st District police station?

3    A   Public transit.

4    Q   So when the officer asked to see some

5    identification, you never showed it to him, right?

6    A   I asked him why, so no.

7    Q   My question was, when the officer asked you

8    for identification, you didn't show it to him, did you?

9    A   No.

10    Q   Anyone ever tell you that refusing to obey a

11    lawful police officer provides probable cause to make an

12    arrest?

13    A   No.

14    Q   Okay. After you ask the officer why, what's

15    the next thing that happened?

16    A   He just said like just because I said so.

17    Just show me some F'g ID.

18    Q   What's the next thing that happened after he

19    asks you a second time -- he asks you to show him some

20    identification a second time?

21    A   At this point I detected a little hostility

22    in his tone so I expressed to him that, sir, I'm not

23    getting an attitude or anything like that with you at

24    all. I don't have a problem with authority. I said I'm

63

1   not getting attitude with you or anything. I'm just

2   asking why.

3       Q    What's the next thing that happened?

4       A    He said I see how we're going to have to deal

5   with you.

6       Q    What happened then?

7       A    He grabbed me from where I was standing. He

8   turned me around and like slammed me into a car near us.

9       Q    He grabbed you and then he turned you around

10  and what did he do to you, Charles?

11      A    Slammed me into a car. I don't know whether

12  it was their car or not.

13      Q    Okay. Where was this car that he slammed you

14  into?

15      A    Close to us. It was in front of us. It was

16  in front of -- somewhere in front of Ashley's car.

17      Q    Okay. When you say it was close to Ashley's

18  car, where was it in relation to Ashley's car?

19      A    I'm not sure. I just know it was in front of

20  us. Like in going east, it was in front of us.

21      Q    How many feet between that car and Ashley's

22  car?

23      A    I'm not sure.

24      Q    Did the officer actually walk you over

64

1     several feet and then slam you to the car?

2         A    Yeah. It was kind of like a swing.

3         Q    Okay. How did the officer grab you?

4         A    He grabbed me by the back of my collar. I'm

5     not sure what place, but I know it was by my back.

6         Q    Okay. Now, you had said you had turned to

7     the left to go back under the hood. And is it while you

8     were under the hood that the officer asked you for some

9     ID?

10        A    Yeah.

11        Q    While you were still under the hood, is that

12    when you said why or did you turn to face the officer

13    and say why?

14        A    Yeah, I turned to face him.

15        Q    You turned to face the officer and you said

16    why, and then he said something to the effect because I

17    said so, show me some ID, right?

18        A    Uh-huh.

19        Q    Were you still face-to-face with the officer

20    at the time?

21        A    He was still like on my side. I didn't -- I

22    never, well, I kind of turned around but it was more

23    opening up like I expressed to you the first time.

24        Q    Right. When he asked you the second time to

65

1    see some identification, can you describe more of what

2    part of your body would be aligned with the officer's

3    chest? Would it be your left shoulder, your right

4    shoulder, your chest, your back, or what?

5    A   It would be kind of my I'm assuming my chest.

6    Q   So you were almost face-to-face then?

7    A   Yeah.

8    Q   Okay. And how far apart were the two of you?

9    A   A little -- I'm not sure, something along the

10    same amount of feet we discussed but we weren't that

11    close but he had backed up a little bit.

12    Q   Okay.

13    A   He didn't necessarily back up. But by me

14    stepping by the car put me a little bit distance.

15    Q   So there was a little bit more distance

16    between the two of you than the first time he asked for

17    some identification, right?

18    A   Yeah.

19    Q   By the way, the second time he asked to see

20    some identification, had you seen the second officer

21    from the University of Chicago at all?

22    A   Not that I recall, not that I recall at this

23    point.

24    Q   By the way, do you know where the University

66

1    of Chicago squad car was in relation to Ashley's car?

2    Was it parked behind it, in front of it?  Was it on the

3    street?

4       A    I'm not sure.  It might have been -- I'm not

5    sure.

6       Q    Had you seen the Mars lights on the squad

7    car, the flashing red lights on at all?

8       A    No.

9       Q    So you're face-to-face to him or

10   chest-to-chest with him and then he grabbed -- this

11   officer grabbed you by the back of your collar?

12      A    Uh-huh.

13      Q    And then what did he do?

14      A    He pushed me into the car.  He like slammed

15   me into a car.

16      Q    Do you remember taking any steps before you

17   came into contact with this other car?

18      A    No.

19      Q    Okay.

20      A    You mean like steps in voluntary steps?

21      Q    No.  Did you step at all or was this

22   something out of WWF where he literally takes you and

23   threw you into the turn buckle?

24      A    Nothing like that.  I had to step.  I didn't

67

1    like leave my feet.

2        Q    Do you remember how many steps you took?

3        A    No.

4        Q    What happened next after you say this officer

5    slammed you into another car?

6        A    When he slammed me into another car after he

7    said, you know, I see how we're going to have to deal

8    with you, the other officer he came up and he punches

9    me.

10       Q    I'm sorry?

11       A    He strikes me in the lower back.

12       Q    Okay.  So when you get slammed into this

13   other car -- by the way, do you know what kind of

14   vehicle this other car is?

15       A    No.

16       Q    Do you remember if you were slammed into the

17   hood or the trunk or what part of the car your body

18   comes into contact with?

19       A    No.

20       Q    Okay.  Are you actually bent over the vehicle

21   at all?

22       A    No, I wasn't like all the way bent over.  So

23   no.  I don't know.

24       Q    What part of your body actually came into

68

1    contact with the vehicle?

2        A    My head.

3        Q    Your head?

4        A    Yeah.

5        Q    Was this a truck?

6        A    It might not have been a truck, but I think

7    it was just a regular car. I don't know what type of

8    car it was.

9        Q    Okay. Were Steven and Kenneth a half a block

10   down at this point by the ATM?

11       A    Yes. Were they by the ATM or were they in

12   it?

13       Q    You tell me. Do you know one way or another?

14       A    They were in it.

15       Q    They were in it. So neither Steven nor

16   Kenneth observed this part of the incident, right, to

17   your knowledge?

18       A    To my knowledge I don't know.

19       Q    Well, you said they went to go down to the

20   ATM which is about a half a block down, right?

21       A    Uh-huh.

22       Q    Was it a half a block east or a half a block

23   west?

24       A    It's a half a block east.

69

1    Q    And they had to go into the ATM?

2    A    Yes.

3    Q    Had either Steven or Kenneth ever told you

4    they saw any part of this incident at this point where

5    the officer initially slammed you into the car?

6    A    They didn't get into detail of what exactly

7    they saw.

8    Q    Was this car that you were slammed into, that

9    was east of Ashley's car, right?

10   A    Facing east, yeah.

11   Q    Were there other cars parked in front of this

12   car as you were going eastbound?

13   A    Was there more cars in front of her car?

14   Q    The car in front of Ashley's car, were there

15   other cars as you would go eastbound on 53rd Street?

16   A    I don't know.

17   Q    Were there -- do you remember if there was

18   trees on the south side of 53rd Street as you go

19   eastbound from where Ashley's car toward the ATM?

20   A    I don't know.

21   Q    But during the time frame when you get

22   slammed into the car, Steven and Kenneth were in the

23   ATM?

24   A    Yeah.

70

1    Q    Okay. You say this second officer came up

2    and punched you in the back?

3    A    Uh-huh.

4    MR. KSIAZEK: That's a yes, right?

5    THE WITNESS: Yes. Sorry about that.

6    BY MR. PUISZIS:

7    Q    What part of your head came into contact with

8    the car?

9    A    Kind of like the side like in the front of my

10   head. It was kind of like a collision. I can't

11   describe.

12   Q    Do you remember which side of your head?

13   A    No.

14   Q    Right side, left side?

15   A    No, I don't know.

16   Q    What happened when your head allegedly came

17   into contact with this other car?

18   A    What happened after that?

19   Q    Yeah.

20   A    The other police officer came up and punched

21   me in the back.

22   Q    Okay. What happened then?

23   A    He's like we're going to get your ass.

24   That's what he says to me.

71

1     Q     What's the next thing that happened?

2     A     This is when I become a little bit scared and

3     I'm just like, you know, I like turned around, like I

4     tried to turn around. I'm like hold on. I'm not doing

5     anything. Please stop hitting me.

6     Q     What happened when you tried to turn around?

7     A     They just continued to hit me.

8     Q     They continued to hit you?

9     A     Yeah.

10    Q     How long did they continue to hit you?

11    A     As far as time, I'm not sure.

12    Q     Where did you get hit?

13    A     Pretty much in the body. It was just hits.

14    It was just a flurry of hits on the body, a couple

15    shots.

16    Q     What were you doing during this time fame?

17    A     Nothing.

18    Q     Nothing? You weren't trying to defend

19    yourself?

20    A     No. At most, no, I wasn't trying to defend

21    myself.

22    Q     Where are your hands?

23    A     My hands were to my side.

24    Q     What happened next?

72

1    A   What happened next?  They continued trying to

2  wrestle me and trying to hit me and they kept screaming

3  shut the F up, shut the F up repeatedly and kept hitting

4  me.  And then the next thing he said stop resisting.

5    Q   And you weren't doing anything I take it,

6  right?

7    A   No.

8    Q   So these officers continued to beat you for

9  how long of a period of time?

10    A   I'm not sure on the time frame.

11    Q   A minute, two minutes?

12    A   I don't know.  It's kind of hard to keep

13  track of time.

14    Q   How many times would you say you were hit?

15    A   That whole night?

16    Q   Well, during this incident before you were

17  put in the handcuffs, how many times were you hit?

18    A   A lot.

19    Q   Can you give me an estimate?

20    A   Numbers, I can't give you an estimate of

21  numbers.  I just know a lot.  At this point in the

22  series of being hit before I got cuffed there was

23  kicking.  There was hitting.  There was stomping.  I

24  don't know.

73

1    Q    And you weren't doing anything to resist the

2    officers at all?

3    A    No.  And I expressed this repeatedly.

4    Q    Do you know why the two officers at the scene

5    would have called in an officer needs assistance if you

6    were not doing anything to resist?

7    A    I don't know.  The point they were wrestling,

8    they were hitting, they kept trying to like wrestle me

9    to the ground.  While they were trying to wrestle me to

10   the ground, they kept hitting me.  I kept expressing to

11   them I'm not resisting.

12   Q    Do you remember actually picking up one of

13   the officers, carrying them over to the squad car and

14   putting them back down on the passenger's side of the

15   squad car front seat and the other officer then jumping

16   on your back?

17   A    Could you say that again?

18   Q    Do you remember actually picking up one of

19   the University of Chicago officers, carrying them over

20   to the squad car and putting them straight over on the

21   backseat and the other officer jumping on your back?

22   A    Absolutely not.

23   Q    Do you remember kicking an officer from the

24   University of Chicago in the face and breaking his

74

1    glasses during this incident when you weren't resisting?

2        A    No.  His glasses fell off while he was

3    wrestling me.  I do remember that.

4        Q    You remember an officer's glasses falling off

5    while you were wrestling?

6        A    I remember them falling off.  I remember him

7    expressing my glasses fell or you made my glasses fall.

8    We're going to kill you or something along those.  I

9    said I'm sorry.  I'm not resisting.  I didn't mean to

10   make your glasses fall or anything like that, and they

11   just persisted.

12       Q    You don't remember one of the officers

13   grabbing your legs while you were on the ground and you

14   kicking him in the face?

15       A    While I was on the ground?

16       Q    Yeah.

17       A    No.  Before that incident I want to answer

18   your question you asked before then as far as the ground

19   like why didn't they call for backup.  Did you want that

20   question answered?

21       Q    I think you already answered the question.

22   What I'd like now is the answer to this question.  Do

23   you remember kicking one of the officers in the face

24   when he had your legs on the ground?

75

1    A    No.

2    Q    Now, you indicated you were wrestling with

3    the officers?

4    A    No, I wasn't wrestling.  They were trying to

5    wrestle me.

6    Q    They were trying to wrestle you.  What were

7    you doing then?

8    A    Nothing.  I was just crouched.

9    Q    You were just crouched?

10   A    Yeah.

11   Q    The officers ever get you to the ground?

12   A    Eventually.

13   Q    How long did it take the officers to get you

14   to the ground?

15   A    Not sure.  While I was crouched and while I

16   was wrestling, an officer he pulls out what I found out

17   to be his flashlight.  He hits me in the stomach with

18   it.  One of the officers like pulls down my pants, and

19   I'm steadily screaming to them I'm not resisting.

20   Please stop hitting me.  I continuously expressed this.

21   They're like just stop, stop moving.  And just kept

22   hitting me.

23        And at this point I had kind of like

24   took -- he pulled my pants and underwear down, which was

76

1    it was ridiculous and humiliating. He pulled my pants

2    down or whatever. And I pulled my underwears back up

3    and my pants halfway back up. I'm like pulling them

4    like this while I'm crouched down being hit. I'm like

5    please stop. I'm not resisting. I actually broke to

6    one knee. Once he hit me or whatever I just broke to

7    one knee to let him know I'm not resisting continuously.

8        Q    And they continued to hit you?

9        A    Yeah. Wouldn't stop for a second, though, so

10   they could call backup.

11       Q    Do you remember which officer pulled out the

12   flashlight and struck you with it?

13       A    I believe it was -- I'm not sure. I'm not

14   sure.

15       Q    Do you remember if it was the

16   African-American officer who initially approached you or

17   if it was the Hispanic officer who was his partner?

18       A    I'm not sure. I believe it to be the

19   Hispanic officer.

20       Q    Which officer was it that pulled your pants

21   down and your underwear down?

22       A    That's the Hispanic officer.

23       Q    Do you know which officer called for a 10-1

24   officer needs assistance?

77

1    A    I'm not sure.

2    Q    In your mind the officers didn't need

3    assistance because you weren't resisting at all, right?

4    Is that a yes?

5    A    Yes.  I'm sorry.

6    Q    How long would you say you were being hit and

7    the officers were trying to wrestle you to the ground

8    until additional officers arrived on the scene?

9    A    I'm not sure.

10   Q    Do you remember additional officers arriving

11   at the scene from the University of Chicago?

12   A    Yes.

13   Q    How many additional officers arrived?

14   A    I'm not sure.

15   Q    Now, you've told us that the officers hit you

16   with their fists.  One slammed you into the car, slammed

17   your head into the car, and another one hit you with his

18   flashlight.  Did the officers do anything other than hit

19   you with a flashlight, slam your head into the car, and

20   then beat you with their fists?

21   A    Did those two do anything besides that or the

22   officers in general?

23   Q    Well, let's start with those two.  Did those

24   two do anything other than that to you?  Did any of them

78

1    kick you, knee you, mace you, do anything else to you?

2        A    I'm not sure who else was kicking me. I'm

3    assuming they took part.

4        Q    Do you know who it was that was kicking you?

5        A    When the other officer showed up, all I heard

6    was like a car door slam and people running. And I just

7    know somebody out of nowhere just came up and kicked me

8    in my chest, neck area like in here like right by my

9    collar bone.

10       Q    How long did this incident with the officers

11   run? How long did it take?

12       A    I'm not sure.

13       Q    So we know one officer kicked you in the

14   chest, neck area. Your head was slammed into a car.

15   Officers beat you with their fists. Another hit you in

16   the stomach with a flashlight. What else did they do to

17   you?

18       A    When someone kicked me in the neck, I

19   remember someone kicking me directly in the back. Like

20   right after he kicked me in the neck, somebody came

21   right behind him and kicked me in the back.

22       Q    Okay. You said the officers punched you.

23   You said one officer punched you in the back. Where

24   else were you punched?

79

1    A    I was punched in the chest. I probably got

2    punched in the face. They were just punching all over.

3    Q    I know I may have asked this already and I

4    apologize. But until the time you were put in

5    handcuffs, how many times would you say you were punched

6    by an officer?

7    A    I don't know.

8    Q    Can you give me a ballpark?

9    A    No, I can't even give you a ballpark. I just

10   know it was a lot of punches. I couldn't count.

11   Q    More than ten?

12   A    I can't really give you a number. I'm sure

13   more than ten.

14   Q    More than 20?

15   A    I don't want to -- I just know it was a lot

16   of punches. I don't know. I wasn't counting.

17   Q    You've seen guys goofing around punching each

18   other, and I'm sure you've done this with your friends

19   just like rock 'em sock 'em robots not really hurting

20   anybody. That's not the type of punches that were being

21   thrown here, were they?

22   A    No. Those were combative punches. Maybe

23   having fun in a boxing match, they might count or I

24   might count. But by me being attacked I have no time to

80

1    count.

2        Q     But did you see the officers actually lean

3    back and put their body weight into these punches?

4        A     I felt the punches.

5        Q     And it hurt?

6        A     Yeah.

7        Q     And you were injured?

8        A     Yeah.

9        Q     Now, the next -- after you were taken to the

10   21st police station lockup and released you went home,

11   right?

12       A     After I went to?

13       Q     After you were at the 21st police station,

14   21st police district station, you went home, right?

15       A     Uh-huh.

16       Q     Had photos taken of you?

17       A     Uh-huh.

18       Q     How long after the incident were these photos

19   taken of you?

20       A     How long after the incident?

21       Q     Yeah.

22       A     They were taken as soon as I got home from

23   the police station.

24       MR. PUISZIS:  Let's mark this, first of all, as

81

1    Charles Boyle Deposition Exhibit No. 1 for

2    identification purposes.

3                    (Boyle Deposition Exhibit No. 1

4                    was marked for identification.)

5    BY MR. PUISZIS:

6        Q    Mr. Boyle, could you take a look at that

7    photograph, please.  And there's a Bates stamp number on

8    the side there.  Do you see the number?

9        A    Yeah.

10       Q    What's the number for the record?

11       A    This number on the left-hand side?

12       Q    Yeah.

13       A    It's 000094.

14       Q    Do you recognize that as one of the

15   photographs that were taken of you immediately after

16   this incident?

17       A    Yes.

18       Q    Okay.  Does that photograph truly and

19   accurately depict the condition of your face following

20   the incident of October 18, 2008?

21       A    Could you say that again?

22       Q    Does the photograph truly and accurately

23   depict the condition of your face as it existed on

24   October 18, 2008?

82

1    A    Yes.

2    Q    Now, were these photographs taken before or

3    after you went to the hospital?

4    A    Before.

5    Q    Who took the photographs?

6    A    Me.

7    Q    These are photographs you took of yourself?

8    A    Yes.

9    Q    Were you planning to file a lawsuit?

10   A    I just know I wanted to take -- I just know I

11   wanted to take pictures of what happened.

12   Q    What was your reason for wanting to take

13   pictures?

14   A    I'm not very, very familiar with how the

15   legal system works but I knew that I didn't want -- you

16   know, I knew I was going to take some action. I knew I

17   was going to take some action.

18       MR. PUISZIS: Can you mark this Deposition Exhibit

19   No. 2.

20              (Boyle Deposition Exhibit No. 2

21               was marked for identification.)

22   BY MR. PUISZIS:

23   Q    Charles, could you take a look at that

24   photograph for me which has been marked Deposition

83

1    Exhibit 2 for identification purposes.  Do you recognize

2    that as another one of the photographs you took of

3    yourself?

4        A    Yes.

5        Q    Does that photograph truly and accurately

6    depict the condition of your face as it existed on

7    October 18 of 2008?

8        A    Yes.

9        MR. PUISZIS:  Let's mark this as Deposition Exhibit

10   3, and for the record this one is Bates stamped 000086.

11                    (Boyle Deposition Exhibit No. 3

12                    was marked for identification.)

13   BY MR. PUISZIS:

14       Q    Charles, would you please take a look at

15   Deposition Exhibit 3, please.

16       A    That would be this, correct?

17       Q    Do you recognize that as another photograph

18   you took of yourself immediately following this incident

19   before you even went to the hospital on October 18,

20   2008?

21       A    Yes.

22       Q    Does that photograph truly and accurately

23   depict the condition of your face as it existed on

24   October 18, 2008?

84

1    A    I may have taken a better picture of my eye

2    but yes.

3    Q    But that photograph does truly and accurately

4    depict the condition of your face?

5    A    Yes.

6    Q    What kind of camera were you using to take

7    that photograph?

8    A    A normal basic digital camera.

9    Q    Did you take photographs of your elbow?

10   A    I'm not sure.  I may have.

11   Q    Now, do you remember how many officers it

12   took to put you in handcuffs that night?

13   A    I'm not sure.  After -- when I got kicked in

14   the back, I was immediately like on my stomach.  My face

15   was touching the ground.  So I'm not sure and I just

16   know I was repeatedly kicked after that but I'm not sure

17   of how many officers it took to cuff me.

18   Q    Do you remember it took four officers to put

19   you in handcuffs that night?

20   A    If it took four officers to put me in

21   handcuffs, not that I know of.  I believe one person put

22   the cuffs on me.

23   Q    Now, after you -- let's focus from the time

24   you were put in handcuffs.  You were on the ground,

85

1    right?

2        A    Yeah.

3        Q    The officers got you up off the ground?

4        A    Yeah.

5        Q    How did they do that, grabbed you by the arms

6    and lifted you up?

7        A    I don't remember. I just know they pulled me

8    up.

9        Q    Okay. What happened after you were lifted up

10   off the ground after you were placed in handcuffs?

11       A    I was facing the street and where I saw CPD

12   officers. They asked me, what are you doing and why are

13   you causing trouble? And I expressed to them that I

14   have never been arrested. I'm not causing any trouble,

15   you know, I don't get into any trouble. That's what I

16   basically expressed to them. At that point an officer,

17   I believe one of the officers I remember them telling me

18   to shut up and then they slammed me into the car. I

19   don't remember what car this was, but I know it was the

20   trunk of the car, slammed me on to the trunk of the car

21   face and all. And I remember the black officer leaned

22   over to me and expressed to me shut up. If this was a

23   couple years ago, I would have killed you.

24       Q    Okay. There was a lot there and I want to

86

1    make sure I understand what you were saying.

2        A    Sure.

3        Q    You said they asked me why you were causing

4    trouble, and you said something to the effect about

5    never been arrested before, you never caused trouble,

6    words to that effect or something like that.  When you

7    said they asked you, who are you referring to?

8        A    The CPD officers.

9        Q    Do you know the name of the CPD officer who

10   asked you this question?

11       A    No.

12       Q    And then you said one of the officers told

13   you to shut up, right?

14       A    Shut the F up.

15       Q    Okay.

16       A    If that matters.

17       Q    I missed the F the first time, but which

18   officer said shut the F up?

19       A    I believe it was -- I'm not sure.  I remember

20   both of them saying something to me.  Both of the

21   initial officers, the Hispanic guy and the black

22   officer, I remember both of them saying something to me.

23   Like I just know the Hispanic officer was basically

24   assisting and basically saying shut up the kid or

87

1      something like that.

2          Q     But the officers who told you to shut up were

3      from the University of Chicago?

4          A     Yeah.

5          Q     And you said one of the officers slammed me

6      into the trunk?

7          A     That was Moore.  That was the black officer.

8          Q     So you know his name?

9          A     Yeah.

10         Q     How did you know his name?

11         A     I later learned his name.

12         Q     How did you later learn his name?

13         A     When they took me to the station on 20th

14     whatever street that is.  I don't remember the exact

15     street of that station.

16         Q     Were you transported to the police station in

17     a University of Chicago squad car --

18         A     No.

19         Q     -- or a Chicago Police squad car?

20         A     Chicago Police car.

21         Q     Okay.  Did you have any conversation with any

22     Chicago police officer while you were in their squad car

23     in route to the police station?

24         A     Yeah.  It was just something they were like,

88

1    are you all right? And I expressed to them no.

2        Q    Anything else? Any other conversation you

3    had with that officer?

4        A    In the car they just basically asked me, are

5    your cuffs too tight? And I said, yes, because the way

6    I was in the car I wasn't even sitting like straight up.

7    My cuffs were so tight I was like almost laying up

8    against the window behind the driver.

9        Q    Do you remember if they had you in one set of

10    cuffs or they had to put two sets of cuffs together?

11        A    Later they put two sets of cuffs on me.

12    Initially it was one set of cuffs.

13        Q    So they actually took one cuff off and put a

14    second set of cuffs and hooked the two handcuffs

15    together, right?

16        A    Repeat that.

17        Q    When we talk about two sets of handcuffs, a

18    lot of times when people are really big and muscular and

19    strong, they have trouble getting their hands behind

20    their back close enough so that they can get handcuffed

21    with a second set of cuffs.

22        A    There was a single set of cuffs initially.

23        Q    But then sometimes what officers will do is

24    they'll actually hook a pair of handcuffs together, put

89

1    one handcuff from one set of cuffs on one wrist, the

2    other handcuff from the other set of cuffs so it's two

3    links of handcuffs behind someone's back. When you said

4    there were two sets of handcuffs on you, was that what

5    the officers did?

6        A    No. You said something to the effect were

7    like two sets of handcuffs like for my feet. Like later

8    they handcuffed my hands to some chain that connected to

9    my feet way later. Initially one set of cuffs.

10       Q    I'm sorry. I apologize for the confusion.

11   At the scene or in route to the police station you were

12   always in one set of cuffs?

13       A    From my knowledge, yes, one set of cuffs.

14       Q    Okay. Fair enough. So you had these

15   conversations with the officers in route to the police

16   station lockup. What's the next thing that happened?

17       A    After I expressed to them my cuffs were too

18   tight and they just chatted a little bit, nothing big, I

19   just let them know I don't want to cause any trouble. I

20   don't want to cause anybody problems, and that was that.

21       Q    What's the next thing that happened?

22       A    When I got down to whatever station that is,

23   I hate to get the address wrong, is it 21?

24       Q    21st police station.

90

1    A    Yeah, 21st police station I was taken into

2    some strange room. I was handcuffed to a bench.

3    Q    What happened then?

4    A    They basically were trying to figure out I

5    guess what they were -- what the university police

6    wanted to charge me with.

7    Q    What were you charged with?

8    A    I believe -- I'm not sure exactly. I

9    believe -- I'm not sure.

10    Q    Were you fingerprinted, photographed, booked?

11    A    This was later after I was transported. I

12    was transported from -- after they did this talking,

13    they transported me from there to I believe which is

14    53rd Street lockup.

15    Q    And eventually you were fingerprinted,

16    photographed, booked?

17    A    Uh-huh.

18    Q    Okay. And did that happen -- where did that

19    happen, do you know?

20    A    Where did the fingerprinting and stuff?

21    Q    Yeah.

22    A    That was at 51st, yes.

23    Q    Did you see any of the University of Chicago

24    officers later that evening?

91

1    A   Later, what do you mean later that evening?

2    Q   At all while you were at either of the

3   Chicago police stations that you've mentioned to us.

4    A   At the first station which is at 20 . . .

5   MR. KSIAZEK:  21st.

6   THE WITNESS:  21st, yes.  21st Street station, yes,

7   they were there for most of the time.

8   BY MR. PUISZIS:

9    Q   Did you say anything to them, or did they say

10   anything to you during this time frame?

11    A   They said something to me.  When the CPD

12   officers left out, the University of Chicago police they

13   expressed something like it's amazing you're not

14   bleeding the way we whipped your ass.  We're good.  And

15   they kind of laughed it up.

16    Q   And where did this conversation occur?

17    A   At the 21st Street station.

18    Q   Where exactly were you located in the 21st

19   Street station?

20    A   I'm not sure.  I just know it was a room

21   with -- just a room, jury room.

22    Q   Were you still handcuffed to a bench?

23    A   I'm still handcuffed to a bench.

24    Q   And is that where Mr. Robinson arrived?

92

1    A   I'm not sure. At what case in point he met

2  with anybody, I'm not sure. All I know is later I was

3  told they wouldn't let him see me.

4    Q   Who told you they wouldn't let you see him?

5    A   Ashley told me that they wouldn't let me see

6  him.

7    Q   When did Ashley tell you that?

8    A   Like later, like later I guess like some time

9  after it all happened.

10    Q   The next day?

11    A   Maybe the next day.

12    Q   Do you remember what time you bonded out?

13    A   No.

14    Q   Did you have your cell phone with you after

15  you bonded out?

16    A   I don't know.

17    Q   Has Ashley or Steven or Kenneth or anyone

18  else told you that they took photographs of this

19  incident?

20    A   No.

21    Q   Has Steven or Ashley or Kenneth or anyone

22  that you know of told you they videotaped any part of

23  this incident?

24    A   No, to my knowledge, no.

93

1    Q    What exactly did Ashley say -- did you ever

2    see Ashley get out of the car?

3    A    Wait.  During what period of all that?

4    Q    During any part of this incident, did you

5    ever see her get out of the car?

6    A    No.

7    Q    What was the temperature like that night?

8    A    I'm not sure.  Average fall day I'm guessing.

9    Q    And at any time during this incident before

10   this beating occurred did you ever put the hood of the

11   car down?

12   A    I'm not sure what happened with the hood.

13   Q    But you don't remember putting the hood down?

14   A    No.

15   Q    And as far as you know, the hood was up

16   during this entire incident?

17   A    Not necessarily.  I don't know.

18   Q    Well, unless somebody took it down, it would

19   still be up, wouldn't it?

20   A    I don't know.

21   Q    Did you put the bar up to keep the hood up?

22   A    I believe hers had like an automatic.  I know

23   I found something and propped it up.

24   Q    And when you turned away from the car to talk

94

1    to the officer, the hood didn't fall down, did it?

2    A   No.

3    Q   Either of the times you turned away from the

4    hood to talk to the officer?

5    A   Did the hood go down?

6    Q   Yeah.

7    A   No, not that I know of.

8    Q   Do you know if Ashley still lives at 13033

9    Seeley in Blue Island?

10    A   I believe she does. I'm not sure, though.

11    Q   Do you know if Kenneth Roberson still lives

12    at 34 Warren in Calumet City?

13    A   I believe he does.

14    Q   Does Steven Sinclair still live at 7834 South

15    Langley in Chicago?

16    A   I'm not sure.

17    Q   Do you know where he lives?

18    A   I'm not sure. I'm not sure of the

19    confirmation of any of the addresses right now, but I

20    believe they do still live there.

21    Q   Do you know who Chris Golden is?

22    A   Yes.

23    Q   Who is she?

24    A   That's actually a guy.

95

1    Q    Who is he?

2    A    My barber.

3    Q    Your barber?

4    A    Yes.

5    Q    How did your barber happen to witness the end

6  of this incident?

7    A    Well, where that ATM is in the Hyde Park

8  area, my barber shop is only a couple of feet away from

9  it like in that, you know, it's not very far at all.

10   Q    Your barber shop is open at 2:30 in the

11  morning on a Saturday, no, Friday night?

12   A    Saturday.

13   Q    He lives at 55th and Everett?

14   A    Yeah.

15   Q    How was he at 53rd and Blackstone at 2:30 in

16  the morning?

17   A    I believe he was contacted.

18   Q    Who contacted your barber that night?

19   A    I'm not sure.

20   Q    Have you spoken to him about this incident?

21   A    You know, about what happened?

22   Q    Yeah.

23   A    No, not extensively at all.

24   Q    Did you tell him that you listed him as

96

1    someone who has --

2    A    Yes.

3    Q    So he's aware of that?

4    A    Yes.

5    Q    Who's Romell Walker?

6    A    That is his girlfriend.

7    Q    Whose girlfriend?

8    A    That's Chris's girlfriend.

9    Q    Okay.  Did Chris drive there to the scene?

10   A    I'm not sure.

11   Q    Do you know how his girlfriend happened to be

12   at the scene with him?

13   A    No.

14   Q    Do you know what part of the incident he

15   witnessed?

16   A    I'm assuming something towards the end

17   because I did see him.

18   Q    When did you see him during the course of

19   this incident?

20   A    While I was on the car, when I was pushed

21   down to the car by Moore, I was able to see him like on

22   the curb and hear him as well.

23   Q    How far away from you was he when this

24   allegedly happened?

97

1    A   I'm not sure as far as how close but he was

2  fairly close.  He was being -- they were being like

3  pushed back away from me.  They were being held on to

4  the curb, and I was like the car was in the street so.

5    Q   Well, is Chris also Kenneth and Steven's

6  barber?

7    A   Yes.  I don't know if he was Kenneth's at the

8  time but yes.

9    Q   So he's Steven's barber and may have been

10  Kenneth's?

11    A   Yes.

12    Q   Now, you've got some tattoos on your arms?

13    A   Yes.

14    Q   Can you tell me what they are?

15    A   I have a tattoo on my left arm which is of

16  the praying hands.

17    Q   Okay.  And what's that tattoo signify?

18    A   It's a phrase that my grandmother always

19  used.  Well, I mean I'm a Christian and my grandmother

20  was very religious.  And a phrase that she used to

21  say -- she always had praying hands around the house,

22  and it's always symbolic of Christianity from my

23  knowledge.  And the phrase that she used to say is pray

24  until it hurts and there's also a script around it, too.

98

| | | |
|---|---|---|
| 1 | Q | And then on the other arm? |
| 2 | A | I have a tattoo on my right arm which is of a |

cloud.

| 4 | Q | What's that signify? |
|---|---|---|
| 5 | A | Just my dreams. |
| 6 | Q | Now, you went to the emergency room that day. |

Which hospital did you go to? Was it Trinity?

| 8 | A | Yes. |
|---|---|---|
| 9 | Q | Were you admitted? |
| 10 | A | No. |
| 11 | Q | How long were you at the emergency room for? |
| 12 | A | I'm not sure. |
| 13 | Q | A couple of hours? |
| 14 | A | Yeah, perhaps. |
| 15 | Q | Were you discharged home in good condition? |
| 16 | A | I believe there was some more medical |

instructions besides that, but I was definitely good to

leave in a couple of hours.

| 19 | Q | Right. Did they indicate in their -- you've |
|---|---|---|

seen the medical records, haven't you?

| 21 | A | I might have. |
|---|---|---|
| 22 | Q | And they discharged you home and listed your |

condition as good?

| 24 | A | I'm not sure what that means. |
|---|---|---|

99

1    Q   Well, do you know what good condition means,

2    don't you, as opposed to bad condition?

3    A   There were medical instructions so I could be

4    100 percent.

5    Q   Right. Are you aware of the fact that they

6    indicated your head was atraumatic in the emergency

7    room?

8    A   Could you say that again?

9    Q   Are you aware of the fact that they listed

10    your head as atraumatic in the emergency room?

11    A   No.

12    Q   You know what atraumatic means, right?

13    A   No, sir.

14    Q   Are you aware of the fact that they said your

15    neck had a normal range of motion?

16    A   No.

17    Q   Are you aware of the fact that they listed

18    your cervical spine as nontender?

19    A   No.

20    Q   You know what the cervical spine is, right,

21    the neck?

22    A   Yeah.

23    Q   And you're aware of the fact that they listed

24    your chest as nontender?

100

1    A   No.

2    Q   Are you aware of the fact that they listed

3  your abdomen as nontender?

4    A   No.

5    Q   Now, this incident happened on October 18.

6  You went to South Shore Hospital nine days later?

7    A   Uh-huh.

8    Q   Why did you go to South Shore Hospital?

9    A   Because my elbow was still hurting.

10    Q   Do you remember telling the people at South

11  Shore Hospital you were physically assaulted by Chicago

12  Police while you were being arrested?

13    A   If they asked, I believe I did.

14    Q   Okay. Do you also remember telling an

15  Aguillina Aquillara at South Shore Hospital that you

16  made a report with the Chicago Police Department, you

17  were released shortly thereafter and that you were not

18  the suspect they were looking for? Do you remember

19  saying something to that effect to that particular

20  person at South Shore Hospital?

21    A   No.

22    Q   Well, if, in fact, you told someone that you

23  were released by the Chicago Police because you were not

24  the suspect they were looking for, that would not be

101

1    true, would it?

2        A    Could you say that again?

3        Q    If, in fact, you told someone at South Shore

4    Hospital that you were released by the Chicago Police

5    Department because you were not the suspect they were

6    looking for, that would not be true, would it?

7        A    It would not be true that if I did say that.

8    I didn't say it.

9        Q    You didn't say that?

10       A    No.

11       Q    So if this is in the medical records, the

12   medical records are in error?

13       A    Maybe I'm guessing grammatically or, you

14   know, as far as context because I don't believe that's

15   the nature of this situation.  So maybe it was

16   misunderstood.  I'm not sure.

17       Q    Have you ever used the name Charles DeAngelo?

18       A    No.

19       Q    Do you remember filing a complaint with the

20   City of Chicago and the University of Chicago Police

21   Department about officers involved in this arrest using

22   the name Charles DeAngelo?

23       A    No.

24       Q    Did you ever file a complaint with the

102

1    University of Chicago about the University of Chicago

2    officers involved in this incident?

3        A    Yeah, I tried to.

4        Q    Okay.  What name did you use when you did

5    that?

6        A    My name just Charles Boyle.

7        Q    You didn't use Charles DeAngelo?

8        A    No, I've never used that name.

9        Q    Did you make a complaint to the City of

10   Chicago --

11       A    No.

12       Q    -- about their officers?

13       A    No.

14       Q    No.  Do you remember being told by your

15   mother that the University of Chicago was trying to get

16   in contact with you about your complaint because they

17   were investigating the complaint you made about the

18   University of Chicago officers?

19       A    No.

20       Q    Do you remember -- do you have a cousin

21   Aaron?

22       A    Yes.

23       Q    Do you remember your cousin Aaron ever

24   telling you that Sergeant Kevin Murray from the

103

1    University of Chicago called him about your complaint

2    against the University of Chicago officers and asked

3    that you contact them?

4        A    No. I didn't receive that message. Kevin

5    Murray . . .

6        Q    Do you remember getting a certified letter to

7    the name of Charles DeAngelo?

8        A    No.

9        Q    At 6700 South Merrill about the University of

10   Chicago investigation?

11       A    No, not to my recollection.

12       Q    What happened to your pants in this incident?

13       A    Because of all the activity and being

14   attacked on the ground, like the denim is ripped, the

15   pants are ripped a little bit and my like the crotch

16   area where the zipper is was ripped up a little bit.

17       Q    Have you ever worn those pants since this

18   incident?

19       A    No.

20       Q    Do you still have them?

21       A    Yes.

22       Q    Okay. And what happened to your Air Jordans?

23       A    I still have them.

24       Q    Have you worn them since?

104

1    A    Yes.

2    Q    What about the coat you were wearing?

3    A    Yeah, I still have it.

4    Q    Any damage done to the coat?

5    A    A pocket got ripped but.

6    Q    Have you ever worn it since?

7    A    Yep.

8    Q    Do you have it?

9    A    Yep, yes. I'm sorry.

10   Q    So other than your pants being ripped a

11   little bit, any other damage to any other clothing you

12   wore?

13   A    Yeah, my shirt.

14   Q    What happened to your shirt?

15   A    My shirt was totally ripped from the top of

16   the collar all the way down to the like mid-chest area.

17   It was ripped up a little bit, filthy.

18   Q    How much did you pay for it?

19   A    I believe it was like 88 to 100, somewhere

20   around there.

21   Q    And what about the pants?

22   A    Something that was more than 100.

23   Q    Okay. Are you aware of the fact that you

24   listed $800 in damages for your clothing?

105

1    A    Considering the fact that my shoes were

2    damaged that I still wear them, though. Those

3    were -- yeah, I believe in totality that's how much it

4    was worth.

5        MR. PUISZIS: Can we mark this as Deposition

6    Exhibit 4, please.

7            (Boyle Deposition Exhibit No. 4

8            was marked for identification.)

9        MR. KSIAZEK: Can we take a break.

10           (A short break was taken.)

11   BY MR. PUISZIS:

12   Q    Charles, would you take a look at Deposition

13   Exhibit 4 for identification purposes, please. Do you

14   see that photograph?

15   A    You said do I see it?

16   Q    Yeah. Do you see it in front of you?

17   A    Yes.

18   Q    Do you recognize it as a photograph you took

19   of yourself?

20   A    Yes.

21   Q    Is that a picture of your chest?

22   A    Yes.

23   Q    Does that photograph truly and accurately

24   depict the condition of your chest as it existed on

106

1    October 18, 2008?

2        A    Yes, for the most part.

3        Q    I'm sorry.  Is that a yes?

4        A    Yes.

5        Q    Did you take any photographs of your stomach?

6        A    I don't know.

7        Q    Did you take any photographs of your back?

8        A    I don't remember if I did.

9        Q    Now, when you went to South Shore -- I'm

10   sorry.  You went to Trinity the day after this incident,

11   right?

12       A    Uh-huh.

13       Q    Were you given the name of a physician to

14   follow-up with?

15       A    I don't know.  I believe they always in your

16   discharge papers give someone.

17       Q    Right.  Well, my question is, did you

18   follow-up with that physician?

19       A    No.

20       Q    Did you follow-up with any physician?

21       A    Besides the trip to South Shore?

22       Q    Right.

23       A    No.

24       Q    Do you have a family doctor?

107

1    A    No.  I actually just actually located a

2    primary caretaker.

3    Q    Okay.  Well, I mean was there somebody who

4    when you were in high school and early in college you

5    went to for physicals to play football and stuff like

6    that?

7    A    In high school, yeah, my childhood doctor.

8    Q    Who was who?

9    A    Chanda Mindi (phonetic).

10   Q    I'm sorry?

11   A    Chanda Mindi.  This would be before, yeah, in

12   high school.

13   Q    And since you got out of high school you've

14   not seen a physician for any reason other than regarding

15   this incident?

16   A    Yeah, I've seen a physician.

17   Q    Is there a physician that you routinely go to

18   when you have problems like colds or flu or you hurt

19   yourself weightlifting or anything?

20   A    No, small stuff like that, no.

21   Q    So there hasn't been anybody you've routinely

22   gone to see since high school?

23   A    No.

24   Q    No.  Okay.  Now, you went to South Shore I

108

1   think it was nine days later. Why didn't you go back to

2   Trinity?

3       A   I believe South Shore was closer. And the

4   second time, I believe the second time I went I don't

5   believe I had a ride. I was on transit. That's a

6   further commute.

7       Q   Who took you to Trinity?

8       A   Ashley.

9       Q   Ashley did?

10      A   Yes.

11      Q   Why did she take you to Trinity?

12      A   Because she had a car.

13      Q   Did your mother accompany you to either

14  hospital visit?

15      A   I know she didn't. The first trip it was

16  just me. I don't know. I actually don't remember.

17      Q   In your Answers to Interrogatories you

18  indicate you missed a day of work?

19      A   Yes.

20      Q   Okay. Where were you working?

21      A   Staffing Now.

22      Q   I'm sorry?

23      A   Staffing Now where I'm currently employed.

24      Q   And you were earning $60 a day you claim?

109

1    A    Yes.

2    Q    And what was your reason -- what day did you

3    miss work?

4    A    The day because it was I believe it was the

5    night of because the day I was in jail, whatever time I

6    was in jail is the time that I missed.  And is that

7    correct, it was a Saturday or is that a -- I am just

8    asking.

9    Q    You were released on a Saturday?

10   A    Yeah.  That's the day I missed.

11   Q    Okay.  Well, you work from home, right?

12   A    No.

13   Q    I thought with Staffing Now you work at home?

14   A    Absolutely not.

15   Q    Where do you go to work?

16   A    The Merchandise Mart.

17   Q    And on October 18 you told me you were

18   working 20 hours a week?

19   A    At that point, yes, I was part-time.

20   Q    And what hours did you work on Saturday?

21   You're working 12:30 to 9:30 now I think or something

22   like that, right?

23   A    You said how many hours am I working now?

24   Q    No.  I think you said now when you're working

110

1    40 hours a week, your hours are generally from --

2       A    My shift is 12:30 to 9:00. But I've been

3    there two years and my shift has changed a couple of

4    times. So I don't remember what time frame I was

5    working.

6       Q    Do you remember what shift you were working

7    on October 18, 2008?

8       A    No.

9       Q    Okay. Do you know if you would have been

10   working during the time frame you were taking

11   photographs of yourself?

12      A    I'm not sure.

13      Q    Do you remember telling an investigator from

14   the City of Chicago who was investigating a complaint

15   that you didn't want to pursue a complaint against the

16   City of Chicago or the University of Chicago police

17   officers because you had another way of dealing with

18   this?

19      A    I don't remember saying that.

20      Q    Do you know when it was that you decided you

21   were going to file a lawsuit?

22      A    No. I don't remember at which point I wanted

23   to, you know, I actually got a lawyer to handle the

24   criminal part of the case.

111

1    Q   Right. You think if you had given the

2  officers your ID, none of this incident would have

3  happened?

4    MR. KSIAZEK: Objection as to speculation.

5  BY MR. PUISZIS:

6    Q   You can answer.

7    A   I'm not sure.

8    Q   Do you remember making bond at 11:15 on that

9  Saturday morning?

10    A   I don't know exactly what time it was.

11    Q   Well, whatever the bond says about the time

12  you were out, that would be correct, right?

13    A   I'm assuming so.

14    MR. PUISZIS: I don't have anything else right now,

15  Charles. Thank you. I may have after Helen asks but.

16    MS. GIBBONS: I just have a few questions.

17    THE WITNESS: Sure.

18          EXAMINATION

19  BY MS. GIBBONS:

20    Q   Hi, Mr. Boyle. My name is Helen Gibbons. I

21  represent the City of Chicago police officers Darling

22  and Martin. And I just wanted to kind of step back and

23  understand when exactly the first time you saw them was.

24  I believe you testified just earlier that it was after

112

1    you were in handcuffs and you were standing back up

2    again; is that right?

3        A    Yeah.

4        Q    And can you describe the University of

5    Chicago police uniform for me?

6        A    I don't know what the uniforms look like. It

7    was just dark. I just know they were dark.

8        Q    Do they look different than the Chicago

9    Police Department uniforms?

10        A    I'm not sure. He had on a coat. He had like

11    on a jacket I do believe, so I wouldn't know what his

12    uniform looked like.

13        Q    When you say he, which he are you referring

14    to?

15        A    The black University of Chicago officer.

16        Q    Okay. Now, how did you know that the two

17    officers you said were Chicago police officers? How did

18    you know they were CPD?

19        A    Because they were standing kind of -- they

20    were in the street and their car was behind them and

21    they were standing next to their car. So they kind

22    of -- they were like just standing there next to each

23    other, and their car was right there next to them. So

24    an assumption.

113

1    Q    Was it a marked squad car?

2    A    I believe, yeah, one of them, yeah.

3    Q    Did the marked squad car look different than

4    the University of Chicago squad cars?

5    A    I don't know.

6    Q    But you saw CPD on it?

7    A    I just saw the blue, and at that point I

8    think some more guys might have pulled up down the

9    street or something like that.  So there were, you know,

10   I don't know, though.

11   Q    Do you recall how many City of Chicago police

12   officers were on the scene?

13   A    No, not exactly, not exactly.  I just know

14   for sure there were at least two because I was in the

15   car with two.

16   Q    Do you recall seeing any officer with a white

17   shirt on while you were there?

18   A    Not to my knowledge.

19   Q    You saw them there and then the University of

20   Chicago police officers were walking you towards that

21   squad car?

22   A    Wait.  Say that again.

23   Q    You saw the City of Chicago police officers

24   when you stood back up, and then the University of

114

1    Chicago police officers were walking you towards them?

2    A   They kind of -- they weren't necessarily

3    walking me towards them.  But the way they lifted me up,

4    I was facing them.

5    Q   What side of the street were they on?

6    A   What side of the street?  They were in the

7    street, like in the middle of the street.

8    Q   Their car was just in the middle of the

9    street?

10    A   They were just in the street.

11    Q   About how many squad cars were there?

12    A   I don't know.

13    Q   More than two?

14    A   I don't know.

15    Q   More than three?

16    A   I don't know.

17    Q   How did you get from where you were initially

18    standing when you stood up to the City of Chicago squad

19    car?

20    A   How did I get inside that car?

21    Q   How did you get there and how did you get

22    inside?

23    A   How did I get to their car?

24    Q   Uh-huh.

115

1    A   I believe I was like handed over or something

2  like that. I'm not 100 percent sure. But I know I was

3  lifted up by somebody by the cuffs, slammed upon the

4  car, and I don't know how I made that transition

5  from -- maybe I was handed to them or something like

6  that. I don't know.

7    Q   Do you recall who actually put you into the

8  Chicago squad car?

9    A   No.

10    Q   When you were slammed onto the car the second

11  time, you were slammed after you stood up, right?

12    A   Yeah.

13    Q   Was that the same car you were initially

14  slammed into?

15    A   I don't know. I'm not sure. I'm not sure at

16  all. I just know that it was the trunk of a car. I

17  know that I was on a flat surface of a car because of

18  how my body was crouched, so I know it was part of a

19  car. What car, I mean I don't know.

20    Q   Now, it was that time you said somebody said

21  to some degree shut up. If this was a couple years ago,

22  I would have killed you?

23    A   Yes.

24    Q   Like when was that? When was that said to

116

1    you?

2        A    This was after I was lifted up off the

3    ground. I was facing the CPD as I said. They asked me

4    along the lines of -- you know, I told them my car is in

5    trouble. And when he slammed me on the car after saying

6    this, that's when he said it. Like all at once slammed

7    me on the car and went on to proceed with that

8    statement.

9        Q    Who slammed you onto the car?

10       A    I believe that would be the black officer of

11   University of Chicago.

12       Q    Now, the second officer who was the second

13   University of Chicago officer who was involved, was he

14   also standing near you at that point in time?

15       A    Yes.

16       Q    Do you recall seeing Steven and Kenneth at

17   this point in time when you were standing back up?

18       A    Not when I'm standing back up. When I'm

19   placed on the car, it gives me the vision to see the

20   curb, to see who's all on the curb. So, yes, I can see

21   them.

22       Q    Were they on the north side of the street or

23   the south side of the street?

24       A    That would be the south side of the street.

117

1    Q   Who are they standing with?

2    A   They are standing with police officers.

3   They're standing with, they're standing with Chris.

4   They're standing with Romell. They're standing with I

5   believe, yeah, that's who they're standing with. All

6   the parties I named they were standing there.

7    Q   Do you recall if they were standing with

8   University of Chicago police officers?

9    A   I don't know.

10    Q   Were they saying anything?

11    A   Were they saying anything? They were just

12   like saying a bunch of things like, are you all right?

13   They were talking to the police. It was just a lot of,

14   you know, there was a lot of talk. I don't know.

15    Q   Did you say anything to them?

16    A   No.

17    Q   And this whole time Ashley stays in the car?

18    A   I'm not sure. I don't think she was in the

19   car the whole time.

20    Q   But you don't recall seeing her across the

21   street with everybody else?

22    A   With everybody else, I believe she was out of

23   the car by then. I don't remember, though. She knows

24   for sure, but I believe she was out of the car by then.

118

1      Q      Do you recall when she got out of the car?

2      A      No, I don't have any knowledge when exactly

3   she may have gotten out of the car.

4      Q      Do you recall when Steven and Kenneth came

5   back to the area from the ATM?

6      A      I don't know what point in time they came

7   back from there when they came back from the ATM.

8      Q      Has your license ever been suspended?

9      A      No.

10      Q      Now, the two Chicago Police Department

11   officers, can you describe their physical appearances to

12   me?

13      A      Could you say that again?

14      Q      Can you describe the Chicago police officers'

15   physical appearance, please?

16      A      The Chicago police officers?

17      Q      Uh-huh.

18      A      One of them I believe he was a dark-skinned

19   guy, might have had some facial hair, about average

20   build. That's pretty much it. The other one I don't

21   remember exactly how he was.

22      Q      The first man you described, was he taller

23   than you or shorter than you?

24      A      I don't know.

119

1    Q   Do you remember if he was a heavier build or

2  a slimmer build?

3    A   I don't know.

4    Q   What kind of facial hair do you recall?

5    A   I don't know. I just remember him maybe

6  having some facial hair.

7    Q   Was he wearing glasses?

8    A   He might have. I'm not sure.

9    Q   Do you recall if he had any special kind of

10  haircut, if his hair was longer or short?

11    A   I don't know.

12    Q   The second officer, do you recall if he was

13  taller than you, shorter than you?

14    A   No, I don't remember.

15    Q   Was he black, white, Hispanic?

16    A   I don't know. He might have been black. I

17  don't know.

18    Q   Did you ask for treatment when you were in

19  the Chicago Police car?

20    A   They asked me was I okay. I told them I was

21  hurt and that was it.

22    Q   When you were later transported to the second

23  station where your fingerprints were taken, did they ask

24  you if you needed medical care?

120

1     A     I don't remember. I just remember them doing

2     a lot of hollering. I don't remember.

3     Q     A lot of what? I'm sorry?

4     A     A lot of hollering. I don't remember.

5     Q     What do you mean by hollering?

6     A     Just hollering. I was in a strange

7     atmosphere. I don't know.

8     Q     Were they hollering at you?

9     A     It was just strange. It was a really strange

10    atmosphere. I don't know.

11    Q     I just want to step back to when you're being

12    transported to the 21st District police station, the

13    first police station. What else was said between you

14    and the Chicago police officers?

15    A     On the ride there?

16    Q     Uh-huh.

17    A     Basically, you know, just are you all right?

18    Are the cuffs too tight? I just said, yeah, and they

19    said all right.

20    Q     Did you ask them anything about the other

21    police officers?

22    A     No.

23    Q     Did you know at this point in time that there

24    were University of Chicago police officers and City of

121

1    Chicago police officers?

2        A    From the point I was in the City of Chicago

3    Police Department car, I pretty much assumed they were

4    both type of police out there.

5        Q    Just to clarify, but did you know at that

6    point in time that previously when you were in the

7    process of being arrested that they were University of

8    Chicago police officers involved?

9        A    Wait.  Say that again.

10       Q    I'm just trying to understand when you came

11   to know that there's University of Chicago police

12   officers involved in this situation as well as City of

13   Chicago police officers.

14       A    Well, initially those were University of

15   Chicago police and then after that I was put in the

16   Chicago Police Department car.  So that's how I knew

17   there were two parties.  And as I stated, when they were

18   standing in front of the car, I assumed that they were

19   not University of Chicago police.

20       Q    What else was said to you in transport?

21       A    In transport to 21st nothing other than I

22   just let them know I'm not here to cause any trouble.

23       Q    What did they say to you?

24       A    They just said just be quiet, you know.

122

1      That's pretty much that.

2      Q     Did they say anything else?

3      A     No.

4      Q     Did you say anything else to them?

5      A     No.

6      Q     What about at the station, did you have any

7      conversations with any other Chicago police officers?

8      A     When I got there, I let them know what was

9      said to me. That's for sure. I let them know what was

10     said to me as in regards to the statement that the U of

11     C police made in saying that, you know, that it's

12     amazing that I'm not bleeding from the way they whipped

13     me and that they were kind of bragging on the fact what

14     they did and it seemed a little bit sympathetic towards

15     that. They were like that's messed up. It's messed up

16     what they did. And that was pretty much that.

17     Q     Did they say anything else?

18     A     No. They just said, you know, that's messed

19     up that they did that. I can't believe that they would

20     do that and, you know, they was like that's really

21     messed up. One of them said something along the lines

22     of they might have just got scared and just decided to

23     beat you up. That's messed up.

24     Q     Do you recall which officer said that?

123

1    A    No, not at all.

2    Q    How did you come to use Ed Fox as your

3    attorney in a criminal matter?

4    A    Just by searching.

5    Q    Where did you search?

6    A    Google.

7    MR. PUISZIS: It's called search engine

8    optimization.

9    BY MS. GIBBONS:

10   Q    I just want to step way back earlier that

11   evening. You mentioned something about how when you

12   guys were first going out, Ashley said something was up

13   with the car. She made some sort of indication.

14   A    Uh-huh.

15   Q    What did she say?

16   A    It was very, you know, I mean she didn't know

17   much about cars at all. So, you know, the way she was

18   just using was really vague terms like I don't know.

19   Something is wrong with my car. My horn is acting up,

20   you know, it's just something going on. It's nothing

21   too major, just, you know, she was just letting me know.

22   Q    So she did specify at that point in time

23   there was something funny about the horn?

24   A    It was a little bit all over the place. She

124

1    didn't know.  She was like something is wrong with my

2    car.  She was just a little bit all over it.

3       Q    I just want to understand a little bit more

4    about Chris Golden and his girlfriend.  You said

5    somebody called them?

6       A    Yes.

7       Q    Why do you think that somebody called them?

8       A    I guess because he's an older guy.  He's our

9    barber.  He's somebody we know that lives in the

10   neighborhood.  I'm kind of a member, you know, I went to

11   school in the neighborhood.  So he serves as a figure

12   for us.  I guess they got a little scared themselves and

13   called somebody who was older.

14      Q    He didn't tell you who called him?

15      A    No.

16      Q    Were you ever in the military?

17      A    No.

18   MS. GIBBONS:  I have nothing else.

19   MR. PUISZIS:  Just a couple follow-ups.

20              EXAMINATION

21   BY MR. PUISZIS:

22      Q    Charles, is there anything you can't do now

23   physically that you could do before this incident?

24      A    You mean like physically?

125

1    Q    Yeah, anything at all as a result of this

2    incident.

3    A    Not that I know of.

4    Q    Okay.  Going back and I apologize if I asked

5    this already.  I just want to make sure.

6    A    That's right.

7    Q    Chris Golden and Romell Walker, do you know

8    if they took any photographs or video of the incident?

9    A    Not to my knowledge.

10   Q    Okay.  Now, have you had any emotional

11   problems since this incident?

12   A    Absolutely.

13   Q    What kind of emotional problems have you had?

14   A    Just, just when I see police officers now,

15   I'm a little more scared more so as I wasn't because I

16   was comfortable being around officers considering the

17   fact that my girlfriend's -- I'm not scared of him.

18   Well, sometimes but, no, not scared of him.  But I get a

19   little scared now when I see certain police.  I still go

20   get my haircut in Hyde Park.  And when I see their cars,

21   I just get nervous.

22   Q    Okay.  Has that prevented you from doing

23   anything socially or engaging in any type of activity

24   you would have otherwise engaged in prior to this

126

1    incident?

2        A    I actually just started getting my haircut

3    back on 53rd where I was going to 51st to get it cut

4    just because I wasn't comfortable. I just felt bad.

5        Q    Other than changing your barber and there's

6    nothing you've done differently now as a result of this

7    incident than before?

8        A    Like as far as actions?

9        Q    Right.

10       A    No.

11       Q    Not had any nightmares, not waking up in cold

12   sweats thinking about police officers, anything like

13   that, right?

14       A    No. That's different. Speaking of that,

15   it's just thoughts.

16       Q    Just thoughts?

17       A    Yeah. I get thoughts all the time when I'm

18   around police officers just I don't know, just, you

19   know, a little scared.

20       Q    Other than, you know, being scared around

21   police officers, no other emotional problems that you've

22   had since this incident?

23       A    Besides being scared a little bit, a little

24   bit.

1     Q    Not seeing anyone in terms of psychologists,

2    psychiatrists, social worker, or anyone like that for

3    treatment about these feelings, right?

4    A    No. Excuse me. I'm sorry. Can I take a

5    break?

6             (A short break was taken.)

7    MR. PUISZIS: Then I don't have any other

8    questions. Charles, now that the dep is done, you have

9    a right to either look at the deposition and make sure

10    the court reporter got all the questions down and the

11    answers correct or you don't have to look at it and then

12    you can waive that right to look at the deposition. And

13    we always ask the deponent what they want to do.

14    MR. KSIAZEK: It's basically just for spelling if

15    you get some names wrong or something like that.

16    THE WITNESS: Should I take a look?

17    MR. KSIAZEK: It's up to you if you want to look

18    over it but you can't change any of your testimony. So

19    it's basically for any spelling errors.

20    THE WITNESS: It's okay.

21    MR. KSIAZEK: It's okay. Then we'll waive.

22    MR. PUISZIS: Okay. Signature is waived.

23             (Further deponent saith

24             naught.)

128

1  STATE OF ILLINOIS  )

2           ) SS:

3  COUNTY OF C O O K  )

4     I, JENNIFER A. BUCKLEY, a notary public within and

5  for the County of Cook and State of Illinois, do hereby

6  certify that heretofore, to-wit, on the 26th day of

7  October 2009, personally appeared before me, at 222

8  North LaSalle Street, Suite 300, Chicago, Illinois,

9  CHARLES BOYLE, in a cause now pending and undetermined

10  in the Circuit Court of Cook County, Illinois, wherein

11  CHARLES BOYLE is the Plaintiff, and UNIVERSITY OF

12  CHICAGO POLICE, et al., are the Defendants.

13     I further certify that the said witness was first

14  duly sworn to testify the truth, the whole truth and

15  nothing but the truth in the cause aforesaid; that the

16  testimony then given by said witness was reported

17  stenographically by me in the presence of the said

18  witness, and afterwards reduced to typewriting by

19  Computer-Aided Transcription, and the foregoing is a

20  true and correct transcript of the testimony so given by

21  said witness as aforesaid.

22     I further certify that the signature to the

23  foregoing deposition was waived by counsel for the

24  respective parties.

129

1    I further certify that the taking of this

2    deposition was pursuant to Notice, and that there were

3    present at the deposition the attorneys hereinbefore

4    mentioned.

5    I further certify that I am not counsel for nor in

6    any way related to the parties to this suit, nor am I in

7    any way interested in the outcome thereof.

8    IN TESTIMONY WHEREOF: I have hereunto set my hand

9    and affixed my notarial seal this 11th day of November

10   2009.

11

12

13

14                    _Jennifer Buckley_

15   ARY PUBLIC, COOK COUNTY, ILLINOIS

16

17

18

19

20

21

22

23

24

# EXHIBIT B

ORIGINAL

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
CHARLES BOYLE,              )
             Plaintiff,    )
        vs.                 )   No. 09 C 1080
UNIVERSITY OF CHICAGO       )
POLICE OFFICER LARRY TORRES,)
et al.,                     )
             Defendants.    )
```

The deposition of ASHLEY NICOLE GLOVER, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 222 North LaSalle Street, Suite 300, Chicago, Illinois, on November 11, 2009, at the hour of 10:15 o'clock a.m.

REPORTED BY:  MARLENE L. KING, C.S.R.
LICENSE NO.:  084-003326.

1

---

I N D E X

| WITNESS | EXAMINATION |
|---------|-------------|
| ASHLEY NICOLE GLOVER | |
| By Mr. Puiszis | 4 |
| By Ms. Gibbons | 151 |
| By Mr. Ksiazek | 160 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
|--------|---------------|
| Glover Deposition Exhibit | |
| No. 1 | 145 |
| No. 2 | 147 |
| No. 3 | 148 |

(EXHIBITS RETAINED BY MR. PUISZIS.)

3

---

1  APPEARANCES:
2       ED FOX & ASSOCIATES, by
3       MR. JONATHAN R. KSIAZEK,
4       300 West Adams Street,
5       Suite 330,
6       Chicago, Illinois 60606
7       (312) 345-8877
8            Representing the Plaintiff;
9       HINSHAW & CULBERTSON, LLP, by
10      MR. STEVEN M. PUISZIS,
11      222 North LaSalle Street,
12      Suite 300,
13      Chicago, Illinois 60601
14      (312) 704-3000
15           Representing University of
16           Chicago Police Officers;
17      CORPORATION COUNSEL, by
18      MS. HELEN GIBBONS,
19      30 North LaSalle Street,
20      Suite 900,
21      Chicago, Illinois 60602
22      (312) 744-3982
23           Representing City of Chicago
24           Police Officers.

2

---

1       MR. PUISZIS:  Can you swear the witness.
2            (WHEREUPON, the witness was
3            duly sworn.)
4       ASHLEY NICOLE GLOVER,
5  called as a witness herein, having been first
6  duly sworn, was examined and testified as
7  follows:
8            EXAMINATION
9  BY MR. PUISZIS:
10      Q.  All right.  Would you please tell us
11  your full name and spell your last name for
12  the benefit of the court reporter?
13      A.  Ashley Nicole Glover, G-l-o-v-e-r.
14      Q.  Ashley, we're going to ask you some
15  questions today about an incident involving
16  Charles Boyle.  Okay?
17           If at any time you don't hear my
18  question or don't understand my question, please
19  tell me, and I'll be glad to either repeat or
20  restate the question.  All right?
21      A.  Okay.
22      Q.  If you go ahead and answer the
23  question, everyone is going to assume that you
24  understood the question and that you heard the

4

1 (Pages 1 to 4)

1  question. All right?
2      A.  Okay.
3      Q.  The court reporter is going to be
4  taking down everything we say in the room today.
5  She can't take down a nod of the head or a shrug
6  of the shoulders.
7          So while I'll know what your answer
8  is, she won't be able to transcribe it on her
9  machine.  So would you please keep all of your
10  answers out loud, verbal in nature.  Okay?
11      A.  Okay.
12      Q.  Finally, you're going to probably know
13  from time to time what my question is before I
14  finish it.  Court reporter is great, but every
15  court reporter has difficulty taking down two
16  people speaking at one time.  So please wait
17  until my question is finished before you begin
18  the answer so we can make sure we have an
19  accurate record of everything that's said today.
20  All right?
21      A.  Okay.
22      Q.  Okay.  How old are you, Ashley?
23      A.  I'm 22.
24      Q.  And where do you currently live?

                                        5

1      A.  In Blue Island.
2      Q.  What's the address in Blue Island?
3      A.  13033 Seeley Avenue, Apartment 3,
4  Blue Island, and the Zip Code is 60406.
5      Q.  How long have you lived at that
6  address, about?
7      A.  About two years.
8      Q.  And who do you live there with?
9      A.  My mother.
10      Q.  Do you work or go to school?
11      A.  I go to school.
12      Q.  Where do you go to school at?
13      A.  Chicago State.
14      Q.  What year are you in?
15      A.  I am somewhere in between a junior
16  and a senior.
17      Q.  Okay.  And what is your major?
18      A.  Chemistry.
19      Q.  And are you working besides going to
20  school?
21      A.  Not right now, no.
22      Q.  And where did you go to high school?
23      A.  Whitney Young.
24      Q.  And where is that located?

                                        6

1      A.  It's like Jackson and Laflin.
2      THE WITNESS:  Whitney Young, Y-o-u-n-g.
3  BY MR. PUISZIS:
4      Q.  And where did you live while you were
5  attending Whitney Young?
6      A.  I had like three different addresses,
7  92nd and Blackstone, 62nd and Woodlawn,
8  and 83rd and Cregier.
9      Q.  Do you have any other brothers and
10  sisters?
11      A.  Can you repeat that?
12      Q.  Do you have any other brothers or
13  sisters?
14      A.  I have a younger sister.
15      Q.  And what's her name?
16      A.  Whitney.  Same last name.
17      Q.  Okay.  Now, do you own a car?
18      A.  Not anymore.
19      Q.  Okay.  When did you last own a car?
20      A.  Like three months ago.
21      Q.  Okay.  What kind of car was that?
22      A.  It was a 2006 Chrysler Sebring.
23      Q.  Who was the owner of that car?
24      A.  It was me and my mother.

                                        7

1      Q.  And why did you get rid of the car?
2      A.  It got damaged, and then the payments,
3  it was no point in paying for it, how much
4  damage got done to the car.
5      Q.  Who was driving it when it was damaged?
6      A.  A friend of mine.
7      Q.  Who was that?
8      A.  Her name is Quiltavia.
9      Q.  Were you in the car with her when it
10  was damaged?
11      A.  Uh-uh.  No.
12      Q.  How do you know Charles Boyle?
13      A.  He was a friend of my ex-boyfriend.
14      Q.  And what's your ex-boyfriend's name?
15      A.  Steven Sinclair.
16      Q.  How long did you date Steven Sinclair?
17      A.  Two years.
18      Q.  Why did you break up?
19      A.  Because he's a cheater.
20      Q.  Do you know where Steven lives?
21      A.  I have no idea.
22      Q.  When you were dating him, where did
23  he live?
24      A.  On 78th and -- what's the name of

                                        8

2 (Pages 5 to 8)

1 that? 78th and Langley, I think.
2 Q. When did you last see Steven Sinclair?
3 A. Maybe March.
4 Q. And when did you break up with him?
5 A. The beginning of January.
6 Q. And when did you first meet Charles
7 Boyle, about?
8 A. The fall of 2005.
9 Q. Do you recall the circumstances around
10 that meeting?
11 A. Yes. I was visiting my best friend at
12 U of I, and him and Steven had came to her dorm.
13 She was friends with Steven.
14 Q. Were you dating Steven at that time?
15 A. No. That was the first time I met him.
16 Q. And do you recall your best friend's
17 name?
18 A. Joyce Elam.
19 Q. Sorry?
20 A. Joyce Elam.
21 Q. Okay. And so how often would you see
22 Charles after that?
23 A. It wasn't that much at first, but after
24 I got involved with Steven, it was more so on
  9

1 like a weekly basis, bi-weekly basis.
2 Q. When did you start seeing Charles
3 on a weekly basis, would you say?
4 A. Maybe in like '07.
5 Q. Okay. And when did you start dating
6 Steven?
7 A. In '07.
8 Q. When you first met Charles, did you
9 know anything about him at the University of
10 Illinois?
11 A. Just that he went there, and he was
12 friends of Steven, and him and -- his brother
13 and my best friend were, I don't know what
14 you want to call it, involved with each other.
15 That's pretty much all I knew.
16 Q. Charles's brother and your sister?
17 A. My best friend.
18 Q. Oh, your best friend.
19 A. Yeh.
20 Q. Were involved?
21 A. Yeh.
22 Q. Romantically?
23 A. I don't know what you want to call it.
24 Q. Were they married or living together or
  10

1 any of that stuff?
2 A. No. They were involved with each
3 other. I don't know how you want to say it.
4 Q. Okay. Now, do you know for how long
5 Charles attended the University of Illinois?
6 A. I think two years.
7 Q. Okay. Do you know if he played
8 football at the University of Illinois while
9 he was there?
10 A. I don't think so. I don't know.
11 Q. Why do you say you don't think so?
12 A. I never recalled him saying anything
13 about -- I know he played football in high
14 school, but I don't recall anything about in
15 college.
16 Q. How do you know he played football in
17 high school?
18 A. Just kind of because Steven played
19 football in high school, and they talked all
20 the time about playing ball in high school.
21 Q. Where did Steven play ball in high
22 school?
23 A. They went to Hyde Park.
24 Q. He went to Hyde Park?
  11

1 A. I mean Kenwood. I'm sorry.
2 Q. Kenwood?
3 A. Yeh. I'm thinking of Kenwood in Hyde
4 Park.
5 Q. Okay. Did Steven and Charles play high
6 school football together?
7 A. Yes.
8 Q. Okay. Are you on Twitter?
9 A. I am.
10 Q. Do you follow Charles Boyle on Twitter?
11 A. I do.
12 Q. He's not known as Charles Boyle on
13 Twitter, though, is he?
14 A. I could look. I don't remember what
15 his name is offhand, but I could look it up real
16 quick.
17 Q. Okay.
18 A. On Twitter it's Charles Cain on
19 Twitter.
20 Q. Do you know why he uses the name
21 Charles Cain?
22 A. I have always known him as Charles
23 Cain.
24 Q. You have always known him as Charles
  12

McCorkle Court Reporters, Inc.
Chicago, Illinois (312) 263-0052

1    Cain?
2        A.  Yeh.
3        Q.  Okay.  Do you remember at one point on
4    Charles's Twitter account that beneath his name,
5    his picture there was this phrase that said
6    "Cain is coke"?
7        A.  Yeh.
8        Q.  When Charles said "Cain is coke," what
9    was that significant to?
10       MR. KSIAZEK:  Objection.  Relevance.
11   BY MR. PUISZIS:
12       Q.  If you know.
13       A.  I have no idea.
14       Q.  Okay.  Was he referring to Coca-Cola?
15       A.  I have absolutely no idea.
16       Q.  Well, in the African-American community
17   does the word "coke" have any significance that
18   an old white guy like me might not know about?
19       A.  I really -- the only thing I can think
20   of why he would say "Cain is coke" is another
21   way to say that, like "he's dope" because,
22   I don't know, "dope" and "coke" are
23   interchangeable or something like that.
24       Q.  I'm sorry?

13

1        A.  I guess "dope" and "coke" are
2    interchangeable.  I don't know.  That would be
3    the only thing I could think of of why he put
4    it that way.
5        Q.  Now, again, does the word "dope"
6    in the African-American community have any
7    significance that somebody like me would not
8    know about?
9        A.  Like -- let me try to think of a
10   synonym.  Means something positive.  I don't
11   know.  Like I would say that something that I
12   would like is dope or something like that.
13       Q.  When I see the word "coke," I either
14   think Coca-Cola or cocaine.
15       A.  Cocaine.
16       Q.  Is that what you understood that to be
17   or something different?
18       A.  I didn't -- when I saw that, I didn't
19   think of him referring to himself as cocaine.
20       Q.  Now, Charles is also a rapper, isn't
21   he?
22       A.  Yes, he is.
23       Q.  Does he rap under the name of Charles
24   Boyle?

14

1        A.  He raps either under Charles Cain or
2    Apollo Cain.
3        Q.  Have you ever heard any of his rap
4    songs?
5        A.  I've heard a few.
6        Q.  Any of them reference drugs?
7        A.  Off the top of my head I can't think
8    of one right now.  I haven't heard any in a
9    real long time.
10       Q.  Did any of them reference any criminal
11   case or criminal attorneys?
12       A.  Not that I can think of.
13       Q.  Any of them mention the police?
14       A.  To tell you the truth, I really can't
15   recall like any specific lyrics off the top of
16   my head, so I don't recall.
17       Q.  Okay.  Do you consider Charles a
18   friend?
19       A.  Yes.
20       Q.  How often do you see him?
21       A.  I don't see him that often anymore.
22   We're both kind of busy.  But I talk to him.
23       Q.  How often do you talk to him?
24       A.  Probably like once a week.

15

1        Q.  Have you ever dated him?
2        A.  Uh-uh.  No.
3        Q.  Where does Charles live?
4        A.  He stays on 67th -- or I'm not sure if
5    it's actually 67th, but off of 67th and -- I see
6    the street in my head.  I can't think of the
7    name.  I know it's east of Jeffery.  I just
8    can't think of the name of the street right now.
9        Q.  Have you ever been to his place?
10       A.  Yeh.
11       Q.  When was the last time you'd been to
12   his place?
13       A.  Probably over the summer.
14       Q.  Have you ever been to a concert where
15   he's rapped?
16       A.  No, I haven't.  That's bad, but no, I
17   haven't.  Wait.  I take that back.  Yes, I have.
18   I'm sorry.  I take that back.  Yes, I have.
19       Q.  When was that?
20       A.  It's probably like a year -- over a
21   year ago.
22       Q.  Now, do you know what Charles is doing
23   with himself right now?
24       A.  I know he's in school.  I think he's

16

4 (Pages 13 to 16)

1 still working.
2    Q. Where does he go to school?
3    A. He goes to Columbia.
4    Q. And where does he work?
5    A. That I don't know.
6    Q. Okay. Is he dating anyone, do you
7 know?
8    A. He's always had this on and off again
9 girlfriend. I don't know if they are together
10 right now because they're always on and off.
11    Q. Who is that?
12    A. Alicia.
13    Q. Alicia?
14    A. Alicia. It's spelled like Alicia,
15 though.
16    Q. Okay. Do you know Alicia's last name?
17    A. Robinson, I believe.
18    Q. Robinson?
19    A. Yeh.
20    Q. Does she follow him on Twitter as well?
21    A. I think so. I follow her on Twitter.
22 Yeh.
23    Q. Okay. Do you follow Steven on Twitter
24 still?

17

1    A. No. Never followed him on Twitter.
2    Q. Is he on Twitter?
3    A. I don't know. I have no idea. I think
4 he's still on Face Book, but that's about all.
5    Q. Are you a Face Book friend with
6 Charles?
7    A. Yep.
8    Q. Now, Charles has filed a lawsuit about
9 an incident that occurred where he was arrested.
10 Do you remember that incident?
11    A. Yes.
12    Q. What date did it happen on?
13    A. I don't remember the specific date,
14 though. I know it was in October of last year.
15    Q. Of 2008?
16    A. Yes.
17    Q. Okay. Do you recall what day of the
18 week it was?
19    A. I don't.
20    Q. Do you recall if it was a weekday
21 or a weekend?
22    A. I don't want to -- I don't want to
23 try to guess. I really can't remember. I just
24 know it was in the early, early, early morning

18

1 of whatever day that was. I don't want to try
2 to guess and be wrong.
3    Q. Do you recall what you had done earlier
4 that day?
5    A. We had went to I guess you could call
6 it a club. It was like a bar club.
7    Q. Okay. Before you went to the bar and
8 club, earlier that day what do you recall doing?
9    A. I was probably with my boyfriend
10 because what I remember is we all met up at
11 Charles's apartment to go down there. So in
12 that case most likely I was with him.
13    Q. I'm wondering were you going to school
14 at the time?
15    A. I couldn't remember if it was -- that's
16 what I was going to say. If it was during the
17 week, I was in class in the morning. If it was
18 the weekend, I probably was at work.
19    Q. Did you work on the weekends back in
20 October of 2008?
21    A. I quit right around that time, so it
22 depends on -- I can't remember the specific
23 date.
24    Q. Okay. Well, if you were in class that

19

1 day, what would you have done after school?
2    A. Came home, ate. Usually I do that.
3 And if Steven wasn't doing anything, I would
4 go over to his house.
5    Q. Now, what can you tell me about Steven?
6 In October of 2008, was he working?
7    A. Was he working?
8    Q. By "Steven" I mean Steven Sinclair,
9 your boyfriend.
10    A. I know. Because he was working at --
11 I'm not sure if that was -- which job he was
12 working because he was working at Macy's for
13 a little bit, and then he quit there, and he
14 had got a job at Circuit City. But I don't
15 know which he was at at that time or was it in
16 between. But that's what was going on around
17 that time.
18    Q. Okay. You said he worked somewhere
19 and quit, and I missed where he was working.
20    A. Macy's.
21    Q. Macy's? Downtown here in Chicago?
22    A. Yeh.
23    Q. Okay. And when he went to work for
24 Circuit City, where was that, if you remember?

20

5 (Pages 17 to 20)

1    A.  In Burbank, 76th or something like that
2  and Cicero.
3    Q.  Did Steven go to school at all?
4    A.  He went to University of -- he went
5  to U of I for his freshman year, and then he
6  didn't go back.  And then he attempted to go
7  to Columbia, but he couldn't pay for it, so he
8  only went there like a couple of weeks because
9  he found out his financial aid wasn't going
10  to cover it.
11    Q.  I'm sorry.  I missed what you just
12  said.
13    A.  He found out his financial aid wasn't
14  going to cover it, so he stopped going.
15    Q.  Okay.  Do you know anything about
16  him now currently?  Is he in school?  Working?
17    A.  I have no -- the last time I knew
18  anything about him was in March.  I have no
19  idea.
20    Q.  Where was Steven living in October of
21  2008, if you remember?
22    A.  He was -- I think he was either -- he
23  jumped back and forth between his mom and his
24  dad.  But his dad was on 70th and -- what's the
                                    21

1  name of the street?  70th and -- can't think of
2  the name of the street right now.  I'm really
3  bad with addresses.  It was either there -- I'm
4  going to remember in a second -- or the 78th
5  and Langley that I told you before.  70th and --
6    Q.  Okay.  So everybody would have met up
7  on that day, the October 2008 day, at Charles
8  Boyle's apartment?
9    A.  Yeh.
10    Q.  Okay.  What time did you arrive at
11  Charles Boyle's apartment that day?
12    A.  Probably around 10:00.  I'll take a
13  guess.  It was around 10:00.
14    Q.  Well, I don't want you to guess.  If
15  you know --
16    A.  I don't know the exact.  It would have
17  been sometime because the place where we were
18  going, I think we got there between 11:00 and
19  12:00.  So I want to say we got to Charles's
20  between 10:00 and 10:30.
21    Q.  Okay.  Now, how do you -- did someone
22  make arrangements for all of you to get together
23  or were there conversations earlier that day
24  or how did this all happen?
                                    22

1    A.  Because I know the reason they were
2  going down there was because Steven wanted to
3  go talk to -- was going to go meet somebody
4  who was there.  I think he was either a club
5  promoter -- because Steven was a DJ at the time.
6  I think he still is.
7    And he wanted to go meet somebody at
8  this particular club, and so I was with him
9  earlier, and I guess he wanted to introduce
10  Charles to whoever this guy was.  And Kenny DJs,
11  too, and I guess he just wanted to go.
12    So he told me about him wanting to go,
13  and he asked me could I take him, and I was like
14  that's fine.  And then he told me that he wanted
15  Charles, Charles and Kenny to go.  Kenny was
16  going to meet at his house, and then we were all
17  going to go to Charles's house and leave from
18  there.
19    Q.  Okay.  Now, at any time in the last
20  several weeks have you met with Charles's lawyer
21  about this case?
22    A.  No.
23    Q.  Have you talked to Mr. Ksiazek or
24  anyone from his law firm about this case at all
                                    23

1  in the last couple weeks?
2    A.  I just got a phone call this morning
3  just to make sure I was coming, you know, things
4  along that nature.  I didn't really even know
5  about this case until I got the subpoena a
6  couple weeks ago.
7    And I told Charles, "You could have
8  warned me about if I was going to come in."
9  He's like, "I'm sorry.  I wasn't sure if they
10  were going to need you or not."  But yeh.
11  I didn't even know.  Kind of surprised me.
12    Q.  You didn't know that Charles had filed
13  a lawsuit against the police?
14    A.  I mean, he was saying when the criminal
15  case -- because I was there for the criminal
16  case, and he was saying that he was -- you know,
17  he was -- he said something about doing it, but
18  I never heard anything else about it after that.
19  So. . .
20    Q.  What specifically do you remember
21  Charles saying about filing a lawsuit during
22  the time of the criminal case?
23    A.  He was just -- when the criminal case,
24  he was saying and his lawyer was saying at
                                    24

6 (Pages 21 to 24)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1  the time that they had to -- we had to get
2  through -- because he said he was really
3  thinking about a civil case, and the lawyer was
4  explaining to us that we had to go -- that he
5  had to go through the criminal case first and
6  get that dismissed before he could pursue an
7  actual civil case. And that's pretty much all
8  I heard about it, but I know he said he was
9  interested in doing it.
10     Q. Were you present when these
11  conversations between Charles and his lawyer
12  occurred?
13     A. This was the day at the criminal --
14     Q. The day you testified?
15     A. Yeh.
16     Q. And let me ask you. The day you
17  testified in the criminal case, were you
18  subpoenaed to appear in court that day?
19     A. No.
20     Q. You appeared because you were a friend
21  of Charles?
22     A. Yes.
23     Q. Was anyone there besides you and
24  Charles on his behalf?

25

1  for the civil lawsuit?
2     A. No.
3     Q. Do you know if Charles had to pay
4  anything for the criminal lawsuit?
5     A. I have no idea.
6     Q. So when you and Steven arrived -- I'm
7  sorry. Did Kenneth come over to your place
8  or Steven's place before you went to Charles's
9  apartment?
10     A. I think we left him. He met us at
11  Charles. Because he was supposed to catch
12  the bus over at Steven's, and he was taking a
13  really, really long time. So I think he just
14  met us. If I recall correctly, he just met us
15  over at Charles's.
16     Q. Okay. Did you leave from your place
17  or Steven's place to go to Charles?
18     A. Steven's. And it was his dad's house.
19  I remember that day. It was his dad's house.
20     Q. I'm sorry. You gave us a couple
21  different addresses.
22     A. I know. I can't remember the cross
23  street. It was the 70th. I know it was a few
24  blocks west of Jeffery. I just can't think of

27

1     A. Kenneth and Steven.
2     Q. Do you know if Kenneth or Charles --
3  I'm sorry. Do you know if Kenneth or Steven
4  were subpoenaed?
5     A. I have no idea.
6     Q. But you weren't.
7     A. Yeh.
8     Q. And this conversation that you just
9  talked about where Charles said something about
10  wanting to pursue a civil action and his lawyer
11  telling him we had to get through the criminal
12  case first, who was present for that
13  conversation?
14     A. I can't recall if Kenneth and Steven
15  were sitting right there. I really can't recall
16  if they were sitting right there. I know it was
17  outside while we were waiting -- while we were
18  waiting for it to start because it was running
19  late, and the lawyer just came over and talked
20  to us real quick.
21         I want to say they were sitting down
22  over there, but I wasn't sure if they were like
23  paying attention to the conversation.
24     Q. Charles say how he was going to pay

26

1  the exact street right now.
2     Q. Do you have a driver's license?
3     A. Yes.
4     Q. Okay. Did you drive to Charles's
5  apartment?
6     A. Yes.
7     Q. Okay. Did you actually go into
8  Charles's apartment?
9     A. Yes.
10     Q. Who was there when you went in?
11     A. I think it was just us. I don't know
12  if his mom was there. His mom sometimes is
13  there. But I don't recall if she was there
14  or not.
15     Q. Okay. When did Kenneth arrive in
16  relation to when you were there?
17     A. It was a couple minutes after, maybe
18  like five minutes after. We didn't stay there
19  that long.
20     Q. Okay. And then where did you go?
21     A. We went to the club. I can't think
22  of the name of it, either, though.
23     Q. Did you drive to the club?
24     A. No. Steven drove.

28

7 (Pages 25 to 28)

1    Q.   Why did Steven drive to the club?
2    A.   Whenever we're in the car together,
3  sometimes I don't feel like driving, and a lot
4  of the times if we're in the car together, I let
5  him drive. And plus he knew where it was at,
6  and I'm really bad with directions.
7    Q.   Do you remember the name of the club?
8    A.   I don't.
9    Q.   Do you recall where the club was
10  located?
11   A.   I know it was north, on the North Side.
12   Q.   What kind of car did you have at that
13  time?
14   A.   2006 Chrysler Sebring.
15   Q.   Is that a two-door or four-door?
16   A.   Four-door.
17   Q.   Do you have any problems with the
18  car at any time before this particular day?
19   A.   I had a shortage, I guess, and my horn
20  would randomly honk for no reason. That was
21  going on for a couple weeks before this
22  happened.
23   Q.   And when the horn would go off, how
24  long would it go for?

                                              29

1    A.   It depend, anywhere from like five
2  seconds to 30 seconds to -- it really depends.
3  I'd say anywhere from five seconds to it's gone
4  off a minute before.
5    Q.   Did you have anyone look at your car to
6  try and fix the horn problem prior to this day?
7    A.   The only person who looked at it was
8  the guy who told me it was a shortage. I asked
9  about when I went to go get an oil change and
10  tire rotation. I asked him about it.
11       He looked at it and told me it was
12  probably a shortage, and he tried to change
13  out -- I don't know what they're called. He
14  tried to change out something in the circuit
15  breaker, and it didn't really help it.
16       So he told me I'd probably need it --
17  he gave me a card of someone who does electric
18  circuits and stuff in cars who would be able
19  to further look at it. He just told me it was
20  a shortage in there.
21   Q.   How long before the day of this
22  incident did you have your oil changed and
23  the tire rotation?
24   A.   Two to three weeks before.

                                              30

1    Q.   Two to three weeks before?
2    A.   Yeh.
3    Q.   During the time you were driving the
4  car during that two to three weeks, would the
5  horn periodically go off?
6    A.   Yes.
7    Q.   How often would it go off?
8    A.   Every couple -- every other day,
9  probably.
10   Q.   And I think you said it would go
11  off from five seconds up to a minute?
12   A.   Yes. It was really random. I don't
13  know where. The length varied, the time of day.
14  It was just really random.
15   Q.   When you turned off the car, turned
16  off the power to the car, would the horn stop?
17   A.   Most of the time. But it did it before
18  like if the car was parked further from the
19  house, it went off a couple of times.
20   Q.   Does your car have an alarm?
21   A.   Yeh.
22   Q.   What kind of alarm did it have, if you
23  remember?
24   A.   I don't know. What do you mean by

                                              31

1  "what kind of alarm"?
2    Q.   Do you remember who made the alarm?
3    A.   Oh, no.
4    Q.   When the alarm would be activated,
5  would the horn go off?
6    A.   Yes.
7    Q.   So someone who didn't know that your
8  car had a short and heard the horn go off
9  might think the alarm was going off, correct?
10   A.   Correct.
11   Q.   And someone who heard the horn going
12  off who didn't know your car had a short in it
13  could think the alarm going off could be a
14  sign that it was a stolen car, correct?
15   A.   Correct.
16       MR. KSIAZEK: Objection to speculation.
17  BY MR. PUISZIS:
18   Q.   And the police officers from the
19  University of Chicago who pulled up behind your
20  car before this incident, they didn't know there
21  was a short before they pulled up, did they?
22       MR. KSIAZEK: If you know.
23       THE WITNESS: I don't know if they know.
24  Probably not. I mean, that's not something you

                                              32

8 (Pages 29 to 32)

1  would. . .
2  BY MR. PUISZIS:
3      Q.  I mean, have you ever seen either of
4  those two officers from the University of
5  Chicago before?
6      A.  No.
7      Q.  Ever spoken to them before?
8      A.  No.
9      Q.  Ever driven past them before, to your
10  knowledge?
11      A.  Not that I know of.
12      Q.  Did you ever put any -- and your car
13  didn't have any like big sign saying "my car has
14  got an electrical short," right?
15      A.  No.
16      Q.  Okay.  Did Steven know that your car
17  had an electrical short?
18      A.  Yes.
19      Q.  And that the horn would go off?
20      A.  Yes.
21      Q.  Had he ever been -- had he ever driven
22  it when the alarm went off?
23      A.  Yes.
24      Q.  Other than you and Steven, who else
                                                    33

1  would drive your car back in October of 2008?
2      A.  Nobody.
3      Q.  Okay.  Did Kenneth know about the horn
4  going off with the shortage in your electrical
5  system?
6      A.  I think I said something about it when
7  it started going off.  I think he knew.  If he
8  didn't know before, I said something about it
9  once it actually did start going off.
10      Q.  What about Charles Boyle?  Was he ever
11  in your car before this date?
12      A.  I think he was in the car before.
13      Q.  Okay.  Do you recall where and when?
14      A.  I can't recall right now.  Like I
15  would take them sometimes to if Steven had a
16  DJ gig, most of the times Charles would go with
17  him, and I have driven them to there a couple
18  of times.
19      Q.  I've seen somewhere with Charles, and
20  I don't know if it's on his Facebook page or
21  if it's on Raucous Music about a reference to
22  the "Odd Couple."  Do you know what I'm talking
23  about?
24      A.  Um-um.
                                                    34

1      Q.  Who is the "Odd Couple"?
2      A.  It's him and another rapper.  They're
3  like a duo.  They usually perform together.
4      Q.  So Charles is one member of the Odd
5  Couple?
6      A.  Yeh.
7      Q.  Do you know who the other rapper is
8  who's the other member of the Odd Couple?
9      A.  Yeh.
10      Q.  Do you know what his name is?
11      A.  You want his actual name or his --
12      Q.  I'll take any name he goes by.
13      A.  KC Jones.
14      Q.  KC Jones?
15      A.  Yeh.
16      Q.  Is that the name he uses when he raps?
17      A.  Well, KC is.  I know Jones is his
18  actual last name.  I think his first name is
19  Cameron.
20      Q.  Camera?
21      A.  Cameron.
22      Q.  And when you say KC, is it like K-C
23  or Casey spelled out, C-a-s-e-y?
24      A.  KC.
                                                    35

1      Q.  KC Jones like the basketball player
2  who used to play for the Boston Celtics?
3      MS. GIBBONS:  If you know.
4      MR. PUISZIS:  If you know.  Former all pro
5  guard?  In the Hall of Fame for the NBA?
6      MR. KSIAZEK:  What about Mutant Turtles,
7  Ninja Mutant Turtles?
8      MR. PUISZIS:  Just joking.
9  BY MR. PUISZIS:
10      Q.  How long had Steven known Charles,
11  do you know?
12      A.  Since they were young, like five,
13  six, seven, somewhere around there.  Like since
14  they were really young.  I want to say seven.
15      Q.  Okay.  What about Kenneth Roberson?
16      A.  I think they knew him when he was
17  younger, too, but I know Charles and Steven
18  knew each other first.
19      Q.  Do you remember how long it took to
20  drive from Charles's apartment to this lounge?
21      A.  About 20, 30 minutes.  Closer to 30.
22      Q.  When was the last time you talked to
23  Charles Boyle about this incident?
24      A.  Somewhere around the criminal court
                                                    36

9 (Pages 33 to 36)

1   date. I think I talked to him about it once
2   after.
3       Q. Have you read anything or reviewed
4   anything before the deposition today?
5       A. No.
6       Q. Read anything, reviewed anything in the
7   last few weeks?
8       A. No.
9       Q. Okay. Does the name Ole Lounge sound
10  like the name of the place where the four of you
11  went?
12      A. Was it Ole? I really don't remember.
13  Was it Ole? I can't remember.
14      Q. Okay. Do you know, do you recall the
15  name of the person that Steven was supposed to
16  meet?
17      A. Not at all.
18      Q. And what name does Steven use when he
19  DJs?
20      A. Mydas, M-y-d-a-s.
21      Q. M-y-d-a-s?
22      A. Yeh.
23      Q. Okay. Who is Wheezy?
24      A. I don't know.

37

1       Q. I mean one of Charles's Tweets said,
2   "Wheezy got a year in the joint"?
3       A. Oh, that's an actual famous rapper,
4   Little Wheezy. He goes by Wheezy.
5       Q. Okay. I take it Charles is really into
6   rapping?
7       A. And into hip hop, yeh.
8       Q. About what time did you arrive at
9   this location, whether it's a bar or a lounge,
10  whatever it was?
11      A. Somewhere between 11:00, 11:30.
12      Q. And was alcohol served at this
13  establishment?
14      A. At the establishment? Yeh.
15      Q. Did you have anything to drink?
16      A. I think I had a beer.
17      Q. Okay. Did Charles have anything to
18  drink?
19      A. Not that I can recall.
20      Q. What about Steven?
21      A. Not that I could recall, either.
22      Q. What about Kenneth?
23      A. Kenneth I don't know.
24      Q. Did you -- did the four of you all stay

38

1   together while you were in the lounge or bar?
2       A. No, no.
3       Q. Okay. Tell me, describe the inside
4   of this location for me, if you can.
5       A. We were upstairs, and if the bar is on
6   the left, it's like against the wall. And on
7   the right side there is a whole bunch of stools
8   and like little tables. And then further down
9   there is like open space for like a floor, and
10  then I think there is like seats.
11          But we were mostly across from the bar.
12  I know I stayed seated at one of the seats up
13  across from the bar because I know they were
14  going to go talk to people.
15      Q. Was there any music going on then?
16      A. Yeh.
17      Q. Was it a DJ? Was it a band?
18      A. It was a DJ.
19      Q. Okay. And did they -- did anyone
20  meet with the promoter that night?
21      A. Steven and Charles, I believe.
22      Q. Did they get his card?
23      A. I don't know. I wasn't with them when
24  they. . .

39

1       Q. Do you know where they met him?
2       A. I think either up towards the -- either
3   down -- I want to say it was downstairs, but I
4   know it wasn't by where the bar was. So if
5   there was an upstairs, downstairs, they were
6   either downstairs, or if it was just one level,
7   it was by the door because it wasn't around the
8   main floor.
9       Q. Okay. How long did the four of you
10  stay at this establishment?
11      A. Maybe like two hours, if it was that
12  long.
13      Q. Okay. Did you dance at all while you
14  were there?
15      A. Not really.
16      Q. Did you see Steven or Charles or
17  Kenneth dancing at all?
18      A. Not that I can recall at all. Might
19  have little bit to clown around, but like not
20  really dancing.
21      Q. What do you remember Charles having on?
22      A. He had on a sweater and some jeans.
23  And probably some gym shoes. He always has them
24  on.

40

10 (Pages 37 to 40)

1    Q.  Any type of hat?
2    A.  I think he had a cap on.
3    Q.  What kind of cap, if you remember?
4    A.  I don't.
5    Q.  Okay.  So you were there for I think
6  you said about two hours, right?
7    A.  Maybe something.  Maybe a little bit
8  less.
9    Q.  Maybe a little bit less.  Okay.
10     Where did you go from this
11  establishment?
12   A.  We went -- we went driving back towards
13  Charles, and Kenny and -- Kenny and Steve were
14  saying something about being hungry, and they
15  needed some cash.
16     And so both of them had Bank of
17  America, and only Bank of America we knew,
18  because we had already left north and downtown,
19  was in Hyde Park, so that's where we were going
20  to.
21   Q.  Nobody was making any type of a
22  deposit?
23   A.  Kenny was, I think.  I think he had --
24  what he was trying to do was put whatever he had
41

1  in and then get a $20 out, something like that.
2    Q.  He had the money on him when he came
3  to Charles's apartment, right?
4    A.  I believe so.
5    Q.  Why didn't he go to the ATM then?
6    A.  There wasn't one around there, and we
7  just went straight to the whatever the name of
8  the place is.
9    Q.  Okay.  So Kenny wanted to make a
10  deposit --
11   A.  What I think was he was trying to get
12  a whole 20.  I know at the Bank of Americas
13  you can deposit money straight into -- you could
14  put the money straight into the ATM, and it goes
15  directly, immediately goes into your account.
16  So then he could withdraw a whole 20 back
17  because he didn't have enough cash to take out
18  a 20 from the ATM.  I think that's how it was.
19  It was something like that.
20   Q.  Was Kenny working at the time?
21   A.  I don't know.
22   Q.  Okay.  And why did Steven want to go
23  to the ATM?
24   A.  I think he was trying to get something
42

1  to eat.  I don't know why.
2    Q.  Did you have any money on you?
3    A.  Uh-uh.
4    Q.  Is that a "no"?
5    A.  No.  I'm sorry.
6    Q.  That's all right.
7     What about Charles?  Did he have any
8  money on him?
9    A.  I don't know.
10   Q.  So what route do you remember taking
11  from the establishment you were at to near the
12  Bank of America ATM?
13   A.  Lake Shore Drive.
14   Q.  To what?
15   A.  We got off on -- I think you get off of
16  55th on Lake Shore.  It's either 55th or 53rd
17  you could get off of.
18   Q.  And then where did you go?
19   A.  Went down --
20   Q.  If you remember.
21   A.  -- 53rd or 57th.  I don't remember
22  which one it is right now, but we went down
23  in there and made a right off of Lake Park.
24   Q.  To what?
43

1    A.  We were going up to the Bank of
2  America.  I can't remember.  I'm really bad
3  with streets.  I'm really sorry.
4    Q.  No, that's okay.
5     But you took a right off of Lake Park.
6  What street did you turn onto, if you remember?
7    A.  I want to say it was 53rd.  Or 57th.
8  I don't know.  It's 53rd or 57th.  Whatever
9  street the bank was on.  I just can't remember
10  if it's 53rd or 57th.
11   Q.  Did you have a Bank of America ATM
12  card?
13   A.  No.
14   Q.  Did you have any ATM card back in
15  October of 2008?
16   A.  I think I was with Washington Mutual
17  at the time.
18   Q.  Okay.  So you turn onto whatever street
19  the bank is on, right?
20   A.  Yeh.
21   Q.  And you made a right turn to do that?
22   A.  Yeh.
23   Q.  Okay.  Steven was driving?
24   A.  Yep.
44

11 (Pages 41 to 44)

1    Q.   Where were you?
2    A.   In the passenger's seat.
3    Q.   In the front or back?
4    A.   Front.
5    Q.   Okay. Where was Kenneth seated, if you
6  know?
7    A.   I know Kenneth and Charles were in the
8  back. I don't remember which was on the driver
9  and which was on the passenger, though.
10   Q.   Okay. Now, anything unusual happen
11 as you were driving down 53rd Street?
12   A.   The horn went off. Right after we
13 made the turn, the horn started going off.
14   Q.   How long did the horn go off for?
15   A.   Until we turned to park. As we pulled
16 in to park.
17   Q.   Do you remember where it was that you
18 parked?
19   A.   Across the street from the Bank of
20 America.
21   Q.   Now, when you say "across the street,"
22 were you going eastbound or westbound, do you
23 remember?
24   A.   Westbound.

45

1  the court reporter, right?
2    A.   Yes.
3    Q.   Okay. Now, you pull -- the car pulls
4  over and parks, correct?
5    A.   Yes.
6    Q.   And I'll use my pen as pretending it's
7  your car. Now, where is the ATM in relation to
8  the street and your car?
9    A.   It is here (indicating).
10   Q.   Okay.
11   A.   Like up here (indicating).
12   Q.   So it would be on the opposite side of
13 the street, correct?
14   A.   Yes.
15   Q.   So if you are on the north side of the
16 street, the ATM is on the south side of the
17 street, right?
18   A.   Yes.
19   Q.   And it's about, what, 10 or 15 feet
20 maybe west of your location?
21   A.   Right.
22   Q.   Do you remember seeing a Dunkin Donuts
23 nearby?
24   A.   Yes.

47

1    Q.   So if you were going westbound --
2    A.   The bank is on the -- I'm sorry.
3    Q.   If you're going westbound, was the
4  Bank of America on the south side of the street
5  or was it on the north side of the street?
6    A.   It was on the south side of the street.
7    Q.   And was it directly across from where
8  they had parked the car?
9    A.   It was maybe a few feet ahead. Like it
10 was across the street, but it was a few feet
11 ahead of where the car was.
12   Q.   Now, when you say --
13   A.   It was almost directly across the
14 street.
15   Q.   When you say "directly across the
16 street," you're on 53rd Street or 57th Street.
17 You don't remember which street, right?
18   A.   Uh-huh.
19   Q.   Let's say my note pad here is whatever
20 street it is, 53rd or 57th. Okay? See the note
21 pad (indicating)?
22   A.   Yes.
23   Q.   Okay. You're going westbound, which
24 means you are going towards the direction of

46

1    Q.   Okay. And do you remember seeing a
2  University of Chicago squad car in front of the
3  Dunkin Donuts?
4    A.   I never saw the squad car. I didn't
5  see the squad car until it pulled up behind us.
6    Q.   And when the squad car pulled up behind
7  you, did it have its lights going?
8    A.   I don't recall.
9    Q.   When you saw the squad car pull up, you
10 knew it was some type of police, though, right?
11   A.   Yes.
12   Q.   No doubt in your mind.
13   A.   No.
14   Q.   When you were in high school, did you
15 ever receive any traffic safety training that
16 included discussions about what to do when the
17 police made a traffic stop?
18   A.   I'm pretty sure I did.
19   Q.   What do you remember being told
20 about when the police make a traffic stop?
21   A.   In recall (sic) to what I should do?
22   Q.   Yes.
23   A.   To pull over.
24   Q.   Did they tell you should you produce

48

12 (Pages 45 to 48)

1   any identification?
2       A.  If they asked for it, I believe,
3   and when they asked for it.
4       Q.  And so you knew that if a police
5   officer pulls up behind your car and asks you
6   for identification, you should produce it to the
7   officer, correct?
8       A.  Yes.
9       Q.  Now, what time was this that you were
10  going to the ATM or that Steven and Kenneth --
11      A.  It was early in the morning.  I don't
12  remember what time it was, though.
13      Q.  Sometime between 2:30 and 2:40 in the
14  morning sound about right?
15      A.  2:00 something.
16      Q.  There weren't many cars out on the
17  street that night at that hour of the morning,
18  was there?
19      A.  I don't believe so.
20      Q.  Were you tired?
21      A.  Not really.  I'm a night owl.  I was
22  up.
23      Q.  Okay.  I know sometimes when people
24  ride in the car, the motion just kind of gets
                                                49

1   them drowsy and puts them to sleep.  You weren't
2   like that?
3       A.  No.  I was fine.
4       Q.  So did -- were there any cars in
5   front or behind your car when it stopped?
6       A.  I don't recall if there was any behind,
7   but I know we were the closest parking spot to
8   the corner, so there was no car in front of us.
9       Q.  Do you remember there being a stop sign
10  at the intersection?
11      A.  Yes.
12      Q.  Okay.  So when your car came to a stop,
13  there was no car between you and the stop sign.
14      A.  No.
15      Q.  And do you know -- whatever street you
16  were on, whether it's 53rd or 57th, there is
17  a stop sign and then there is a street that
18  runs north and south, right?
19      A.  Yes.
20      Q.  Is that Blackstone?
21      A.  It was Blackstone.
22      Q.  Okay.  So would -- when the car came
23  to a stop, did Steven and Kenneth get out of
24  the car right away?
                                                50

1       A.  After we -- after he parked, turned off
2   the car, and that's when my horn start going
3   off.  And then so they got out of the car to go
4   to the ATM.  Charles was -- he said he would
5   look under my hood while they went to the ATM.
6       Q.  Okay.  So the horn went off when they
7   turned the power off on your car on the
8   ignition, right?
9       A.  As soon as we were pulling in, that's
10  when it went off.
11      Q.  Okay.  You didn't turn the car off
12  and then the horn stopped?  Stopped before?
13      A.  Stopped right before.  Horn stopped.
14      Q.  Up until that point the horn was
15  blaring continuously, right?
16      A.  Yes.
17      Q.  About for how long a period of time
18  would you say the horn was blaring continuously
19  as you drove down the street.  Not "you," but I
20  mean as the car went down the street.
21      A.  Maybe like 20, 20 seconds.
22      Q.  And how far had the car traveled during
23  that time frame while the horn was continuously
24  blaring from when it started to when it stopped?
                                                51

1       A.  Approximately like three blocks.
2       Q.  Three blocks?
3       A.  Yeh.
4       Q.  Okay.  And do you recall how fast you
5   were traveling down the street during that
6   three-block interval?
7       A.  That I don't know because I wasn't
8   driving.
9       Q.  I mean, was Steven speeding down the
10  street or was he driving at what you might
11  consider a normal rate?
12      A.  I think it was normal.
13      Q.  Okay.  Had any police officer stopped
14  you or stopped Steven when you were driving
15  that car on any other occasion when the horn
16  went off?
17      A.  Once.  It was me.
18      Q.  And what happened?
19      A.  I was actually -- it was when I was
20  on the E-way.  I had actually -- I don't know if
21  they really stopped me, but they pulled over and
22  turned their lights on and asked me what was
23  going on because they thought maybe the car had
24  just broke down.
                                                52

1    And the officer told me that I should
2  just take the streets to wherever I was going
3  until I could figure out why. Because I think
4  that was like maybe the second time it had did
5  that, had just started doing that.
6    Officer told me to take the street
7  because I would cause problems on the E-way with
8  the horn. You know, people were thinking that
9  I'm blaring the horn at them if it goes off.
10  That was about it.
11    Q. "E-way," you mean expressway?
12    A. Yes.
13    Q. Do you recall which expressway you were
14  on?
15    A. I-57.
16    Q. Oh, I-57. Okay. Was it a state
17  trooper who stopped?
18    A. Yes.
19    Q. Okay. Did he ask for or she ask for
20  identification?
21    A. Yes, she did.
22    Q. And did you produce the identification?
23    A. Yeh.
24    Q. And after you produced the

53

1  to go to the ATM. So how did they -- what route
2  did they take from the car to the ATM? Did they
3  just cross from the north side of the street to
4  the south side of the street?
5    A. Yeh.
6    Q. And how many lanes of traffic would
7  they have had to have crossed to get from the
8  north side of the street to the south side of
9  the street?
10    A. I think it's just one lane going both
11  directions.
12    Q. Okay. One lane plus parking?
13    A. Right.
14    Q. Okay. You didn't see him go down the
15  same side of the street your car was on across
16  Blackstone, did you?
17    A. No. The only reason that would have
18  happened is Kenneth was on the passenger's side,
19  and he had to walk in front of the car. But no,
20  they just went to the ATM.
21    Q. Okay. And how long after Steven and
22  Kenneth got out of the car did you see a police
23  car pull up behind?
24    A. It wasn't that long. It was less than

55

1  identification, there was no problem or no
2  incident with the state trooper, right?
3    A. No, besides telling me to take the
4  street.
5    Q. Now, was there any conversation in
6  the car after it stopped -- let me back up.
7    Between the time the car stopped and
8  when Kenneth and Steven got out of the car,
9  was there any conversation that anyone had?
10    A. They was just like Steven just said
11  something about the stupid horn, and then
12  Charles said that he'll get out and look because
13  it might -- I forgot what he said it might be.
14    He was coming up with something that it
15  might be, and he said he'd check it, check under
16  the hood. That's when Steven and Kenneth got
17  out of the car. Well, all three of them got out
18  of the car, actually.
19    Q. Okay. But the point I'm trying to get
20  at is was there any time interval between when
21  the car stopped and when they got out of the
22  car or did they get out right away?
23    A. I mean a couple of seconds after.
24    Q. Okay. So Steven and Kenneth were going

54

1  a minute I want to say.
2    Q. A minute?
3    A. Minute or less. Probably less.
4    Q. Do you know where that squad car came
5  from?
6    A. Behind us because it came from behind
7  and kind of pulled in front of the car.
8    Q. So how long after Steven and Kenneth
9  got out of the car did Charles get out of the
10  car?
11    A. They all got out the car together.
12    Q. And did you see where Charles went?
13    A. He went in front of my car to look
14  under the hood.
15    Q. Now, I'm sorry, I don't mean to be
16  jumping around, but do you remember as you
17  were driving to this location whether or not
18  you had the radio on?
19    A. I don't really remember.
20    Q. Do you recall if the windows were
21  rolled up or rolled down?
22    A. They probably were rolled up. It was
23  October.
24    Q. Have you looked at your testimony from

56

14 (Pages 53 to 56)

1    the criminal case at all anytime since?
2        A.  Uh-uh.  No.
3        MR. KSIAZEK:  That's a "no"?
4        THE WITNESS:  I'm sorry.  No.  I keep doing
5    that.  I'm sorry.  No.
6    BY MR. PUISZIS:
7        Q.  That's okay.
8        Do you remember how long after this
9    incident occurred that you testified at the
10   criminal trial?  Was it a matter of weeks or
11   months, couple months?
12       A.  I think it was a couple -- I think it
13   was a couple months.
14       Q.  Okay.  Now, you said Steven got out of
15   the car?
16       A.  Um-um.  Yes.
17       Q.  And he went to look under the hood.
18   What did you see him do?
19       A.  Charles.
20       Q.  I'm sorry.  What did you see Charles
21   do?
22       A.  He lifted up the hood, and I just saw
23   him put his head -- I couldn't really see once
24   he lifted the hood.  I just saw him put his head
                                                    57

1    down in there.
2        Q.  Okay.  And when he put the hood up,
3    did the hood stay up?
4        A.  He was holding it up, I believe.
5        Q.  Well, did you actually see him holding
6    it up with one of his arms or did he put a bar
7    up to hold the hood in place?
8        A.  The reason I believe he was holding
9    up the hood, because the hood came down after
10   he started -- after him and the police officers
11   started having whatever they were having.
12       Because I don't remember seeing him
13   take -- actually sitting down and taking down
14   the little stick to put the hood down.
15       Q.  Okay.  So the hood is up.  Now, how
16   long after the hood went up did the police
17   officers arrive?
18       A.  Maybe like 30, 40 -- it was a minute.
19   Probably less than another minute because he
20   really wasn't under there that long before he
21   came, the police officer came up.
22       Q.  Let me ask you.  Did your car have
23   a bar that would hold up the hood?
24       A.  Yes.
                                                    58

1        Q.  And where did the police squad car come
2    in relation to your vehicle?  Where did it stop?
3        A.  This is my vehicle.  It came up like
4    this (indicating).
5        Q.  So it pulled in front on an angle?
6        A.  Yeh.
7        Q.  And if your car was facing westbound,
8    would that squad car have also been facing
9    westbound kind of on an angle?
10       A.  Yeh.  Just the same direction just
11   pulled up in front on an angle.
12       Q.  And do you remember if this squad had
13   its lights on?
14       MR. KSIAZEK:  Asked and answered.
15   BY MR. PUISZIS:
16       Q.  At that point in time?
17       A.  I want to say they did, but I don't
18   recall completely.
19       Q.  Okay.  Now, do you know who the police
20   officers worked for when they pulled up?
21       A.  I saw the car.  It was University of
22   Chicago Police.
23       Q.  Okay.  Can you describe how the car
24   pulled up and parked as you described it for us?
                                                    59

1        A.  Pulled up the same direction, facing
2    west, and pulled up in the front on an angle.
3        Q.  Right.  What I'm trying to get at is
4    did that squad car, I mean, did it drive by very
5    quickly and screech its brakes and come to a
6    fast halt or did it kind of pull slowly and come
7    to a stop?
8        A.  It pulled -- I mean, it didn't come
9    to a screeching halt, but, you know, it drove
10   in a normal speed and just pulled over.
11       Q.  Okay.  And then the hood was up when
12   the car pulled in front, right?
13       A.  Yes.
14       Q.  What could you see as you sat there
15   with the hood up?
16       A.  With the hood up when they first came
17   there I couldn't really see.  I could just hear.
18   Because at that time when he got out the car
19   to go under the hood, I had cracked my window
20   because he was trying to ask me something about
21   the car or something, where something was under
22   the hood.
23       So all I could do was hear when the
24   hood was still up and the police officer had
                                                    60

15 (Pages 57 to 60)

1    asked him, "What are you doing," and "Whose car
2    is this?" At this time I couldn't see, really.
3        Q.   Now, you said Charles had said
4    something to you.  What do you remember him
5    saying to you?
6        A.   He was asking me where something was
7    under my circuit, something that I don't --
8    because I don't really know anything about cars,
9    but he was trying to ask me where something was
10   under the hood.
11       Q.   Okay.  Well, when the University of
12   Chicago car pulled up, how many men were inside
13   the car or how many people were inside the car?
14       A.   Two.
15       Q.   Two?  Okay.  Did both of them get out
16   of the car, could you see?
17       A.   I couldn't.  I saw both of them after
18   the fact, but I don't know if both of them got
19   out the car at first.
20       Q.   Okay.  And when whoever was in the
21   squad car got out, did you see what they did?
22       A.   I saw them walk over because it wasn't
23   really like -- my car was here, they were here
24   (indicating), so they just came around, and they

61

1    came around to Charles.
2        Q.   Okay.  Let me ask you, did the -- no
3    one stopped the car in response to the officers
4    activating their Mars lights, right?  The car
5    was stopped before that happened?
6        A.   If the lights were --
7        Q.   I mean, do you understand my question?
8        A.   I understand because I'm trying to
9    remember if -- because it's really hard to
10   recall when the lights had came on and
11   everything like that because I wasn't driving.
12   I couldn't really see to see when the -- because
13   I never really heard the sirens because the
14   windows were up at that time and stuff like
15   that.  I just know that they said that they had
16   saw the cop sitting.
17       Q.   Who said they had saw the cops?
18       A.   They said they had saw a cop by Dunkin
19   Donuts because that's when my hood start --
20   that's when the horn had started going off.
21   He was like -- he said something like, "Your
22   stupid horn, and there's a cop right there"
23   or something like that.
24       Q.   Who said that?

62

1        A.   Steven, I think.
2        Q.   So Steven had seen the squad car.
3        A.   Yeh, but I don't recall if the lights
4    were on or anything like that.  He didn't say
5    like when the lights had came on.  He was just
6    like "the stupid horn."
7             And since I didn't see them behind them
8    because I don't remember them being directly
9    behind them, I didn't think that they were
10   pulling us over until we had parked and they
11   had got out the car and they had came up.
12       Q.   Right.  So, I mean, but it was Steven's
13   intent to go to the ATM, and that's why he
14   stopped the car.
15       A.   Right.
16       Q.   He didn't stop the car in relation to
17   a signal by the police with their Mars lights
18   on, right?
19       A.   If they were on, no.
20       Q.   So what happens when this guy or these
21   guys from University of Chicago go up to
22   Charles?
23       A.   They asked him what is he doing and
24   asked whose car is this.

63

1        Q.   Can you describe their tone of voice?
2        A.   I'm not good with description, but it
3    wasn't friendly.
4        Q.   They didn't use any vulgarity, did
5    they?
6        A.   Not yet, no.
7        Q.   You'd agree that those are reasonable
8    questions to ask with a horn going off at 2:30
9    in the morning and not knowing if there is
10   a short in the car or the car is stolen, right?
11       A.   I guess.
12       Q.   Did Charles ever give the police his
13   identification?
14       A.   Not that I know of.
15       Q.   Did the police ask for his
16   identification?
17       A.   Yes, they did.
18       Q.   When the police asked for Charles's
19   identification, not knowing that the car was
20   stolen or not, what did he say?
21       A.   He asked them, he was like, you know,
22   "What do you need my ID for?  I just explained
23   to you that it's, you know, the young lady who
24   is sitting inside.  It's her car."

64

16 (Pages 61 to 64)

1    Q.  Was there anything improper in your
2  mind about the police asking Charles for his
3  identification, not knowing if that car is
4  stolen or not?
5    A.  No, not at that time.  No.
6    Q.  And if a police officer thinks that
7  a car might be stolen and he asks someone for
8  identification and they refuse to give it to
9  him, do you think that might raise the suspicion
10  level of the officers more?
11    MR. KSIAZEK:  Objection.  Calls for
12  speculation.
13    Answer.
14    THE WITNESS:  I mean, in that situation he
15  told him specifically that it was my car, and so
16  my thought would have been that he -- that's why
17  I waved my hand out, too, when he said that.
18    I thought he would have came to me and
19  asked me for, you know, the registration, my
20  license, anything like that if he was trying to
21  figure out whose car it was.  That's why Charles
22  was asking him, "Why do you need my I.D.?"
23  BY MR. PUISZIS:
24    Q.  When did the hood come down?
                                                      65

1    MR. KSIAZEK:  About three inches.
2    MR. PUISZIS:  Okay.
3    MS. GIBBONS:  Um-um.
4  BY MR. PUISZIS:
5    Q.  And could you see Charles's hands at
6  that point in time?
7    A.  No, not really.  I could only really
8  see -- it was more like lower abdomen level.
9  I couldn't really see upper.  I couldn't really
10  see his hands.
11    Q.  Okay.  You couldn't see what Charles
12  was doing with his hands or what the officers
13  were doing with their hands, right?
14    A.  Not at that time, no
15        (WHEREUPON, there was a
16         short interruption.)
17        (WHEREUPON, a short recess
18         was taken.)
19  BY MR. PUISZIS:
20    Q.  Now, I want to go back, and I don't
21  want to repeat questions, but let me -- I'm not
22  sure we talked about this.
23    When the police officers -- the police
24  officers asked him what he was doing and whose
                                                      67

1    A.  The hood came down sometime either
2  right before or right after they pushed Charles
3  down on the hood of the police car.  It was a
4  little bit before.
5    Q.  So was the hood up when Charles -- when
6  the police officer -- when the police officer
7  asked Charles for his identification?
8    A.  Yeh.
9    Q.  Okay.  So you couldn't see what was
10  happening in front of the car.  You could just
11  hear, right?
12    A.  I could only -- I could see like
13  through -- you know how there is a little gap
14  when you raise the hood up?  I can only see that
15  much space (indicating).  Really wasn't that
16  much because that was like -- that wasn't face
17  level.  That was body level.
18    Q.  And you held your fingers up.  About
19  how much distance could you see underneath the
20  hood of the car?
21    A.  Whatever (indicating).
22    Q.  Indicating for the record, what,
23  about three inches, two inches, between two
24  and three inches, something like that?
                                                      66

1  car is this.  You said that.  Did they ask him
2  those questions at the same time or was one
3  question first and the second question after?
4  Do you remember?
5    A.  I believe they were -- they might
6  have been behind -- I can't remember if they
7  were like directly behind each other.
8    Q.  Okay.  What did Charles say, if
9  anything --
10    A.  Because I remember his responses to
11  them.  I just don't know if they were together
12  or the questions were separately.
13    Q.  Okay.  Well, what did Charles say in
14  response to the question about what he was
15  doing?
16    A.  He said he was checking under my hood,
17  "checking under the hood."
18    Q.  Okay.  And what was his response when
19  they said, "Whose car is this?"
20    A.  He said, "It's her car in there."
21  He pointed at me.
22    Q.  Well, the hood was still up at that
23  point, right?
24    A.  Yes.
                                                      68

17 (Pages 65 to 68)

1    Q.  You couldn't see his hands, right?
2    A.  He said he pointed at me.
3    Q.  That's what he told you he did.
4    A.  Yes.
5    Q.  When did he tell you he pointed at you?
6    A.  When we talked after, after he had got
7  arrested.
8    Q.  You didn't actually see him point at
9  you.
10    A.  No, but I heard him say, "It's her car
11  in there," and that's when I -- you know, I did
12  like this (indicating).
13    Q.  You're raising your one hand up, and
14  you're moving your hand back and forth, right?
15    A.  Yeh.
16    Q.  Okay.  Did you stick your hand out
17  the side window or was it just up in front?
18    A.  Was it out the side window?  It might
19  have been out the side window.  I think it was
20  out the side window.
21    Q.  You think or do you know?
22    A.  I'm not sure.  I just remember waiving
23  my hand.  I'm pretty sure I stuck it out the
24  window because he wouldn't have been able to
                                                    69

1  see it.
2    Q.  Hood was still up at this point in
3  time, right?
4    A.  Yes.
5    Q.  Then what's the next thing you heard,
6  if anything?
7    A.  He asked him for his I.D., the officer
8  did, ask Charles for his I.D.
9    Q.  Did you hear one police officer's
10  voice or more than one police officer's voice?
11    A.  I heard one at that time.
12    Q.  Okay.  And Charles didn't produce the
13  identification, correct?
14    A.  No.  He responded saying, "Why do
15  you need my I.D.?  I just told you.  I just
16  explained to you it's her car in there."
17    Q.  And what happened after Charles said,
18  "Why do you need to see my I.D." and failed to
19  produce it?
20    A.  The officer -- officer said again,
21  you know, "You heard what I said.  I need to see
22  your I.D."  And Charles was like, "But I just
23  told you it was her car.  I'm not understanding"
24  or something along that line.
                                                    70

1    Q.  Okay.  So after the officer asked
2  Charles to produce identification a second time,
3  he failed to do so, right?
4    A.  Yes.
5    Q.  In fact, he refused to do so, right?
6    MR. KSIAZEK:  Objection.
7  Mischaracterization.
8    THE WITNESS:  Again, I told you what he did.
9  He responded saying that.  But no, he didn't
10  give him the I.D.
11  BY MR. PUISZIS:
12    Q.  Okay.  So after Charles failed to
13  produce his identification after being asked by
14  this officer a second time, what happened then?
15    A.  The officer said, "Give me your f-ing
16  I.D. right now."
17    Q.  By the way, do you know this officer
18  who's having this conversation with Charles,
19  did you see the officer at all?
20    A.  I saw him right after this because this
21  is when Charles -- see, as I'm telling it, I
22  can remember exactly when the hood come down.
23  Because after that, that's when Charles turned
24  around to face the officer because the officer
                                                    71

1  went to grab him.  That's when I saw who the
2  officer was, after that, but I hadn't seen him
3  up to this point.
4    Q.  So you didn't know if that officer
5  was white, black, Hispanic or even a female.
6    A.  Definitely was a male voice.
7  Definitely didn't sound like Hispanic or white.
8    Q.  Why do you say that?
9    A.  The way he was talking.
10    Q.  What was unusual about the way he was
11  talking?
12    A.  It was -- I know for sure it was a male
13  voice.  It was -- I don't know how to describe
14  it, but the tone and the way that he talked, his
15  words, it didn't sound Hispanic or white at all.
16    Q.  Okay.  But you'd agree with me you
17  didn't see the officer up to that point in time.
18    A.  Right.
19    Q.  And -- I'm sorry.  The officer said
20  something about wanting to see his I.D. right
21  now?
22    A.  With the word in between there, but
23  yes.
24    Q.  Okay.  And what did Charles say in
                                                    72

18 (Pages 69 to 72)

1  response when the officer said he wanted to see
2  his I.D. right now or words to that effect?
3      A.  I don't remember a response.  The next
4  thing I knew is that I saw the hood -- that's
5  when the hood had came down.  Charles turned
6  around I'm guessing.  That's why the hood
7  dropped.  I saw him.  He was no longer facing
8  the car.
9      MR. PUISZIS:  Ms. Reporter, can you read the
10  question and answer back?
11          (WHEREUPON, the record was read
12          by the reporter as requested.)
13  BY MR. PUISZIS:
14      Q.  Okay.  So did you hear Charles say,
15  "Here is my identification" or anything to that
16  effect?
17      A.  No.
18      Q.  Okay.  So we know an officer had asked
19  him three times for identification, right?
20      A.  Yeh.
21      Q.  And Charles had not produced that
22  identification after being asked three times,
23  right?
24      A.  Yes.

73

1  Charles's left.
2      A.  I think it was his left, yeh.
3      Q.  As you are facing him.
4      A.  Yeh.
5      Q.  Okay.  Now, can you describe this black
6  officer for me?
7      A.  I just know he was average height,
8  darker skin, not like extremely dark, but a
9  darker skin, and I don't remember much else
10  besides that.
11      Q.  Was he taller than Charles or shorter
12  than Charles?
13      A.  I'm not sure.  I don't want to guess.
14      Q.  Was he a young guy or was he an old
15  guy?
16      A.  What's your definition of "young"?  I
17  wouldn't say he was old.
18      Q.  How old would you say he was?
19      A.  Maybe, I don't know, 40s?  30s, 40s?
20      Q.  I'm really old, then, if 30s or 40s is
21  old.
22      A.  I mean, it wasn't old.  Like he wasn't
23  20, 22 or anything like that.
24      Q.  Okay.  So you thought he was in his 30s

75

1          (WHEREUPON, there was a
2          short interruption.)
3  BY MR. PUISZIS:
4      Q.  So the hood came down, and did you see
5  Charles turn around after the hood came down?
6      A.  When the hood came down, Charles was
7  already turned around.  He wasn't facing the car
8  anymore.
9      Q.  Okay.  And then the hood came down,
10  and Charles was turned around.  How many
11  officers were there, one or more than one?
12      A.  I think there were two by that time.
13      Q.  Okay.  Can you describe for me the
14  officer -- or where were the officers in
15  relation to Charles at that point in time after
16  the hood came down?
17      A.  One was -- I'm trying to remember where
18  the other one came.  I know specifically the
19  black one was on -- Charles was this way
20  (indicating).  He was like toward the left of
21  him kind of behind him.
22      Q.  So as you are seated in the car looking
23  through the front window, now that the hood had
24  gone down, you see a black officer standing to

74

1  or 40s.
2      A.  Yes.
3      Q.  Okay.  You know, Charles is kind of a
4  big guy, isn't he?
5      A.  Yes.
6      Q.  Strong guy?
7      A.  Yes.
8      Q.  How much do you think he weighs?
9      A.  I have no idea.
10      Q.  This guy wasn't nearly as big as
11  Charles, right?
12      A.  As big like -- no.  He wasn't like
13  as big, swollen as Charles, no, as muscular as
14  Charles.  I don't think so.
15      Q.  You have seen Charles with his shirt
16  off, right?
17      A.  I have.
18      Q.  He's pretty well-built, isn't he?
19      A.  Up here (indicating).  He has a lot of
20  upper. . .
21      Q.  He's got a lot of strength in his --
22  lot of big muscles in his chest and his
23  shoulders and his arms?
24      A.  Yes.

76

19 (Pages 73 to 76)

1    Q.  In fact, one of his pictures on his
2  Facebook has him posing with his shirt off like
3  this with his arms in front of him (indicating),
4  right?
5    A.  Probably so.
6    Q.  You don't remember seeing it?
7    A.  No.  But that could be very well true.
8    Q.  Okay.  Got a lot of strong muscles in
9  his back?
10    A.  I guess so.
11    Q.  Okay.  Now, after the officer asked
12  Charles to see the identification for the third
13  time, what's the next thing that happens?
14    A.  That's when I could fully see because
15  after that happened, Charles wasn't facing the
16  car.  The officer was on the side of him.  And
17  I'm guessing that he was trying to get him on
18  the hood of the car.  And so he is trying to
19  push him down, and Charles is like, "What are
20  you doing?"
21        And he's steadily trying to push him
22  down on the hood.  He's like, "What are you
23  doing?  What are you doing?"  And then it's kind
24  of when he snatched -- I don't know if that's --

77

1  he snatched him up by his collar and then pushed
2  him down on the hood.
3    Q.  Where was the other officer at this
4  point in time?
5    A.  I want to say he was helping him trying
6  to get him on the hood, but I really don't
7  recall the other officer until they got Charles
8  down to his knees.  So I can't remember exactly
9  where he was at.
10    Q.  I'm sorry.  You said you don't really
11  recall the other officer --
12    A.  Where he was at exactly until they
13  got him down, Charles down to his knees.
14    Q.  Well, when the hood goes down, you said
15  the black officer was standing to Charles's
16  left.  Did you see where the other officer was
17  at that point in time?
18    A.  I don't want to guess and say he was
19  on the other side, but I know he was there.  I
20  just really can't recall his exact orientation,
21  where exactly he was standing.
22    Q.  And did you ever hear -- when the hood
23  was up, did you ever hear more than one voice
24  speaking to Charles?

78

1    A.  Not that I remember.  I just remember
2  one.
3    Q.  Okay.  So you remember the black
4  officer at some point after the hood goes down
5  grabbing Charles?
6    A.  Uh-huh.
7    Q.  I think you said you saw him snatch
8  him?
9    A.  Yeh.  It was like grabbing him by his
10  shirt.
11    Q.  Okay.  So you saw this officer who
12  was on Charles's left grab him by his shirt?
13    A.  He was like to the left like right
14  behind him.  Like it would be over your
15  shoulder.
16    Q.  Okay.  Did this officer grab him with
17  one arm or both arms or one hand or both hands?
18    A.  I want to say it was one when he first
19  grabbed him.
20    Q.  Okay.  So the officer grabs him with
21  one arm.  Do you remember if he grabbed him with
22  his right hand or left hand?
23    A.  I don't remember.
24    Q.  Where did you say he grabbed him, by

79

1  his collar?
2    A.  His shirt collar.
3    Q.  His shirt?
4    A.  I think he had on this -- I want to
5  say he had on a sweater and like a shirt under.
6  I want to say it was a collar.  I knew it was
7  up in this area, up here (indicating), collar.
8    Q.  Okay.  So then this officer grabs him,
9  you think, by the shirt collar.  What do you
10  think happen after the officer grabs him by the shirt
11  collar?
12    A.  He grabs him, and Charles kind of
13  does -- I don't know what you want to call this,
14  shoulder roll (indicating).
15    Q.  He moved his shoulder, kind of rolling
16  his shoulder?
17    A.  Yeh.  He like rolled his shoulder back
18  once he grabbed him up.  He's like, "What are
19  you doing?"
20    Q.  Did you see the officer's hand come off
21  of Charles?
22    A.  Once he did this?
23    Q.  Once he did the shoulder roll.
24    A.  I think it did.

80

20  (Pages 77 to 80)

1    Q.  And then what's the next thing you
2  see happen after Charles did the shoulder roll?
3    A.  He tries with both of his hands to
4  push him down on the hood, the squad car.
5    Q.  Now, when you say "he," are you talking
6  about the black officer?
7    A.  Yes.
8    Q.  Okay.  Describe for me what the black
9  officer did with his hands to Charles, as best
10  you can recall.
11    A.  He goes like this (indicating).  After
12  Charles --
13    Q.  After Charles does the shoulder roll?
14    A.  He's like this (indicating).  Kind of
15  turned little bit after he does it.  So then the
16  officer I want to kind of say he grabs him, and
17  he's like pushing him down, trying to push him
18  down.
19    Q.  Okay.  You say the officer grabbed him.
20    A.  I don't know if you want to call it
21  "grab."  He started trying to shove him down,
22  push him down.
23    Q.  Did the officer use both hands or one
24  hand?

81

1    A.  He used both hands when he was trying
2  to get him on the car.
3    Q.  What part of Charles's body did the
4  officer's hands go onto?  Do you understand my
5  question?
6    A.  It was somewhere up here (indicating),
7  the upper body, shoulder region.
8    Q.  I want to make sure I understand
9  something.  You're sitting in your car on the
10  passenger's seat.
11    A.  Yes.
12    Q.  Charles had been under the hood, right?
13    A.  Right here under the hood.
14    Q.  Okay.  So when Charles was facing --
15  when Charles was looking under the hood,
16  he was facing in your direction, right?
17    A.  Looking -- yes.
18    Q.  Okay.  And the squad car is somewhere
19  behind him, right?
20    A.  Right.
21    Q.  Okay.  Now, Charles -- after the hood
22  comes down, you say Charles turns around?
23    A.  He's that way, though (indicating).
24    Q.  Which way, this way (indicating)?

82

1    A.  Turn a little bit more.
2    Q.  Turn little bit more.
3    A.  He is like that (indicating).  Turn
4  little bit more towards me.  He's like that.
5    Q.  So he would be facing southwest, right?
6    A.  Right.
7    Q.  And the officer is where in relation
8  to him as Charles is facing southwest?
9    A.  He is on your -- that side from behind.
10    Q.  Left?
11    A.  Yes.
12    Q.  Okay.  So the officer grabs Charles
13  probably on his left shoulder, and Charles does
14  a shoulder roll, right?
15    A.  Yes.
16    Q.  Okay.  Then the officer -- and Charles
17  is still facing southwest or does he turn a
18  little bit more?
19    A.  He turns a little bit more.
20    Q.  So he's almost facing straight south
21  now, right?
22    A.  Closer.  He's something like where you
23  are right now.
24    Q.  Okay.  So Charles's body is between you

83

1  and the officer, right?
2    A.  Right.
3    Q.  Okay.  You see where the officer's
4  hands go on Charles's body?
5    A.  Somewhere in -- I don't know the exact
6  region, but it's somewhere the upper -- this
7  upper portion of the body (indicating).
8    Q.  And you were pointing to your back,
9  right?
10    A.  Yeh.
11    Q.  So you see the officer's hands come
12  over his shoulder?
13    A.  It wasn't over his -- no.  The officer
14  is not in front of him.  The officer is behind
15  him.
16    Q.  So you see the officer's hands come
17  over his shoulder.
18    A.  It's not over, it's like --
19    MS. GIBBONS:  If I'm standing behind someone,
20  and I'm trying to push you like this
21  (indicating).
22    MR. PUISZIS:  Let Helen stand up.
23    MS. GIBBONS:  If I'm the officer, where am I
24  standing?

84

21  (Pages 81 to 84)

1    THE WITNESS: You are behind. You are more
2  like where his chair is at (indicating).
3    MR. PUISZIS: Indicating for the record
4  to Charles's left, your right, correct?
5    MS. GIBBONS: Correct.
6    Am I -- is the officer between Charles
7  and the car? Because that's what it seems like.
8    THE WITNESS: Between Charles and my car?
9    MS. GIBBONS: Um-um.
10   THE WITNESS: My car is here. He is still
11  in front of the car. He's just not facing me.
12   MS. GIBBONS: Okay. Sorry, because I'm
13  unclear, you are sitting like where you would
14  be in your car. That's how you are having it
15  go. The car is right here (indicating).
16   THE WITNESS: And you're in front of the car,
17  but you're turned that way (indicating).
18  BY MR. PUISZIS:
19   Q. And how far is the squad car from where
20  Charles --
21   A. It's like the hood of it is in front of
22  him.
23   Q. How many feet in front of him, one big
24  step?

85

1    A. Something like that.
2    Q. Two big steps?
3    A. It's not even that far.
4    Q. Three feet?
5    A. Between like three and -- probably like
6  three to five.
7    Q. Somewhere between three and five feet.
8    So you see the officer put his hands
9  up on Charles's back, right?
10   A. He's like trying to push him down
11  because the hood is right there. First he grabs
12  him by the shirt right here (indicating). So
13  Charles kind of rolls his shoulder. You see how
14  you naturally turned this way a little bit? So
15  when that happens, it might have been like that,
16  something like that. He's trying to push him
17  down on the car.
18   MS. GIBBONS: From the front.
19   THE WITNESS: From the front. I guess. I
20  remember hand back here.
21  BY MR. PUISZIS:
22   Q. From Charles's left side the officer is
23  pushing him?
24   A. I specifically remember a hand back

86

1  here, but I remember him using both of his
2  hands.
3    Q. Now, when Charles did the shoulder
4  roll, did you see any portion of his arm come
5  in contact with any portion of the officer?
6    A. No. I just saw him doing this
7  (indicating).
8    Q. Just saw him doing that. But from
9  where you were seated, you were below them,
10  right, because you are sitting in the car,
11  right?
12   A. Yeh. Yeh.
13   Q. Charles is standing up. Charles does
14  the shoulder roll. You don't know if any
15  portion of Charles's arm comes in any contact
16  with the officer?
17   A. I didn't see him come in contact with
18  the officer at all.
19   Q. You saw the officer's hand come off of
20  him?
21   A. When he did this, yeh, because it was
22  like he grabbed like someone's going like this
23  (indicating).
24   Q. So you saw Charles flail his shoulder,

87

1  right?
2    A. Yeh.
3    MR. KSIAZEK: Objection.
4  Mischaracterization. Shoulder roll.
5    MS. GIBBONS: She already answered.
6  BY MR. PUISZIS:
7    Q. So then you see the officer grab
8  Charles and push him, right?
9    A. He is trying to push him.
10   Q. Trying to push him.
11   A. Onto the car.
12   Q. Did you see Charles move at all or
13  did he just stay there?
14   A. No. He's like -- as he's trying to
15  push him, he is like he's pushing him down,
16  and Charles is like coming up like as he is
17  trying to push him down.
18   It's like someone is trying to push
19  you down, and you're not trying to immediately
20  go down. "What are you doing? What are you
21  doing?" So he's trying to push him on the car,
22  and --
23   Q. Well, did Charles move at all to his
24  left?

88

22 (Pages 85 to 88)

1    A.  I believe -- I believe he did.
2    Q.  Or to his right?
3    A.  To his right.
4    Q.  Okay.  How far did Charles move to his
5  right?
6    A.  A couple of steps.
7    Q.  Couple of steps.  So he was still
8  couple feet away from the squad car, right?
9    A.  Yes.
10    Q.  And you hear Charles say, "What are
11  you doing?  What are you doing," right?
12    A.  Yes.
13    Q.  Did the officer say anything in
14  response?
15    A.  Not at that point in time he didn't.
16    Q.  Okay.  Do you know where the other
17  officer is at this point in time?
18    A.  I want to say he's on the other side
19  because once they get him on the -- once they
20  try to get him on the car, the other officer --
21  I didn't know what it was at first.  He poked
22  him with something in the side.  I didn't know
23  what it was at first because the black officer
24  didn't do this, it was the other officer.  He
                                                    89

1  had to be on the other side of him.
2    Q.  What did you see the other officer poke
3  him with?
4    A.  I couldn't tell what it was.  I just
5  saw this motion and then Charles do something
6  like this (indicating), you know, like this and
7  fall to his knee.
8    Q.  Okay.  Did he have a taser?
9    A.  I don't think it was -- Charles told
10  me later that it was a club.
11    Q.  Billy club?
12    A.  Yes.
13    Q.  When did Charles tell you that the
14  other officer hit him with a billy club?
15    A.  Once we came and got home from jail.
16    Q.  Do you remember where this conversation
17  occurred where Charles told you that he was hit
18  by the other officer with a billy club?
19    A.  It was outside the jail on the drive
20  home.
21    Q.  Who was with you and Charles on the
22  drive home?
23    A.  It was me, Steven -- me and Steven
24  had came and got him.  I think that was it.
                                                    90

1  Was Alicia there?  I know Alicia was with us
2  because her father was the one trying to get
3  him out.  I can't remember if she was there for
4  the actual conversation, though.
5    Q.  Okay.  Can you describe the officer
6  that hit Charles with a billy club?
7    A.  All I know is that he was Hispanic.
8  He was shorter than the other two, than Charles
9  and the other officer.  That's all I know.
10    Q.  Okay.  So we jumped around a little
11  bit.  I apologize.  I shouldn't do that because
12  I don't want to go over and ask questions again
13  and again.
14       You saw Charles move a couple of feet
15  with the officer, right, the black officer?
16    A.  Um-um.
17    Q.  Did you see the black officer do
18  anything other than trying to push Charles?
19    A.  At that time, no.
20    Q.  Okay.  So Charles moves a couple
21  of steps, you described it for us, towards his
22  squad car.  What happens right after that?
23    A.  After he is moving, he is still trying
24  to -- that's when the officers are still trying
                                                    91

1  to push him down on the car.  Push him down on
2  the car, and I guess they went to -- I don't
3  know if they were trying to search him.  I don't
4  really know what they were doing.
5       And he's like, "What are you doing?"
6  He pops back up, and he is like, "What are you
7  guys," like "What are you doing" is all he kept
8  saying.  "What are you doing?"
9       The officer said something to him.
10  I don't recall what it was.  And the next thing
11  I remember is the thing with them getting him
12  down to his knees because I don't know if they
13  thought that he was trying -- I don't know what
14  they thought he was trying to do.  He popped
15  back up.  He's like, "What are you guys doing?
16  What are you doing?"
17    Q.  Did you take any photos of this
18  incident?
19    A.  No.  I just took photos of Charles
20  after, as soon as he came from the jail.
21    Q.  Okay.  Did anybody at the scene take
22  any photos of the incident?
23    A.  Not at the scene, no.  We just took
24  pictures after.
                                                    92

                          23  (Pages 89 to 92)

1     Q.  Right. But I mean Steven and Kenneth
2   didn't take any photographs or videotape to your
3   knowledge of anything?
4     A.  Uh-uh.
5     Q.  MR. KSIAZEK: That's a "no"?
6     THE WITNESS: No. Sorry.
7   BY MR. PUISZIS:
8     Q.  I'm sorry. And I'm not sure I
9   understood. You said after Charles moved a
10  couple steps to the left, the officer continued
11  to push him?
12    A.  He is still trying to get him down on
13  the hood of the police car.
14    MS. GIBBONS: Is he still to the side or in
15  front of him?
16    MR. KSIAZEK: Stay seated.
17    THE WITNESS: He is not in front of him.
18  He is still towards his left behind him. He is
19  actually more so behind him because he's trying
20  to push him down this way (indicating).
21  BY MR. PUISZIS:
22    Q.  Okay. So you see the officer continue
23  to push him towards the squad car, correct?
24    A.  Yes.

                                          93

1     Q.  So at some point do you see Charles
2   move a little bit more?
3     A.  Besides when he normally -- when he
4   moved at first? I don't remember him moving
5   too much more to the left after that.
6     Q.  Okay. So you remember Charles moving
7   a couple steps to the left. How far from the
8   squad car was he?
9     A.  The squad car is to your left, though.
10  The squad car is over on this side (indicating).
11    MS. GIBBONS: Turned this way (indicating).
12    THE WITNESS: If this is my car parked here,
13  the squad car is pulled right here (indicating).
14    MS. GIBBONS: The car is right here.
15  BY MR. PUISZIS:
16    Q.  So you see Charles moving a couple
17  steps?
18    A.  I should say to the right. He moved
19  couple steps to the right.
20    Q.  Okay. How far is he from the squad
21  car, now?
22    A.  Squad car is over here (indicating).
23  Not that far from it.
24    Q.  When you say "not that far," can you

                                          94

1   give me a best estimate, foot, two feet, three
2   feet?
3     A.  Maybe two feet.
4     Q.  Okay. So is the officer still pushing
5   him towards the squad car?
6     A.  Yes, but the squad car is on this side,
7   though (indicating), just --
8     MR. KSIAZEK: The left?
9     THE WITNESS: Yeh. My car, squad car is here
10  (indicating).
11  BY MR. PUISZIS:
12    Q.  Okay. So did Charles move away from
13  the squad car when the officer --
14    A.  It was a couple feet away from the
15  squad car.
16    Q.  Okay. So Charles moved away from the
17  squad car.
18    A.  Yes.
19    Q.  The officer is pushing him towards the
20  squad car, and Charles isn't going along with
21  the officer moving in that direction. Charles
22  actually moves a couple feet.
23    A.  A couple steps over to the right.
24    Q.  Farther away from the squad car.

                                          95

1     A.  Yes.
2     Q.  So if the officer is pushing him
3   towards the squad car and Charles is moving away
4   from the squad car --
5     A.  He's like, "What are you doing?" He's
6   moving. He's stepping. "What are you doing?
7   What are you doing?" That's when he moved -- he
8   moved a couple steps, and then officer came, and
9   he actually got him on the -- actually got him
10  pushed down on the car.
11    Q.  Okay. I want to stop for a second.
12  Gave us a lot of information. The officer is
13  pushing him towards the squad car. Charles
14  actually takes a couple steps away from the
15  squad car?
16    A.  Right.
17    Q.  Does that mean Charles is pushing
18  back -- if the officer is pushing him towards,
19  and Charles is moving away, Charles has got
20  to be pushing back on the officer, right?
21    A.  He wasn't pushing. That's why he moved
22  away. He is doing this (indicating). "What
23  were you doing? What are you doing?" He's
24  trying to make sure that he didn't touch him.

                                          96

1    MR. KSIAZEK: By saying "doing this," putting
2    your hands in the air?
3    THE WITNESS: Put his hands in the air.
4    "What are you doing? What are you doing?" He's
5    pushing him.
6    BY MR. PUISZIS:
7    Q.   But Charles is not going in the
8    direction he's pushing him, right?
9    A.   Right.
10   Q.   Charles is actually moving?
11   A.   He's taking steps, but he didn't push
12   him.
13   Q.   Well, the officer had his hands on
14   Charles, right, as Charles is moving to your
15   right?
16   A.   Right.
17   Q.   Do you see the officer having to
18   back up at all as Charles steps towards him?
19   A.   He is stepping away from him. If the
20   officer is here, Charles is moving to your
21   right. The officer is here. So he's stepping
22   away from him.
23        If you are the officer, he is stepping
24   away from you. He's stepping to the right. Do

97

1    directly in front of where you would be right
2    now.
3    Q.   You don't see Charles going down at
4    all, right? His upper body is not bending over?
5    And in fact Charles is moving away from the
6    squad car, right?
7    A.   Yes.
8    Q.   And this is after he did the shoulder
9    roll as we have described it.
10   A.   Right.
11   Q.   So what does the officer do, then,
12   as Charles moves to the right? Does he say
13   anything?
14   A.   I think he said something, but I don't
15   remember what he said.
16   Q.   So after Charles moves a couple steps
17   to the right, he's actually moving farther away
18   from the squad car?
19   A.   Right.
20   Q.   What does the officer do?
21   A.   He comes back. The officer is back
22   over where he is. He pulls him and pulls him
23   down on the car.
24   Q.   So he literally grabs Charles. What

99

1    you see what I'm saying?
2    Q.   Because I thought you said he was
3    trying to push Charles towards the squad car.
4    A.   And the car is right there
5    (indicating). The squad car is not over there.
6    It's over to -- on your left-hand side.
7    Q.   So how did the officer have ahold of
8    Charles as he was trying to push him to the
9    left?
10   A.   He's behind him.
11   Q.   Behind?
12   A.   He's towards his left side behind him.
13   He is trying to push him down that way, right
14   there (indicating). Car is like -- the squad
15   car, the hood of the car is like directly in
16   front of like where you are right now. Like
17   directly in front of him. He's trying to push
18   him down.
19   Q.   Okay. And so the officer's got him,
20   and he's trying to push him -- the officer is
21   trying to push Charles to the left.
22   A.   Like straight down.
23   Q.   Straight down, okay.
24   A.   Because the hood of the car is like

98

1    part of his body, what part of Charles's body
2    does the officer grab?
3    A.   This right here (indicating).
4    Q.   Indicating by both of his shoulders?
5    A.   Like I said before, I clearly remember
6    this one, but I don't remember where his -- that
7    would be your left hand. But I clearly remember
8    the right one on the back of Charles's left
9    shoulder.
10   Q.   Okay. So you see the right hand on the
11   back of Charles's shoulder.
12   A.   I don't know if he used the other one
13   to pull him, but I remember this one pushing
14   down on his left shoulder.
15   Q.   Okay. So how many feet forward does
16   Charles -- or to the side does Charles move
17   to get to the squad car?
18   A.   It's really not that far. Like
19   everything is really close distance. Nothing
20   is really far away from each other.
21   Q.   Well, I thought the squad car was three
22   to five feet?
23   A.   Like three feet, yes.
24   Q.   Okay. And Charles moved farther,

100

25 (Pages 97 to 100)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1    couple steps farther. So would it be fair
2    to say that Charles had to be moved three to
3    five feet in order to get on the front of the --
4    on the hood of the squad?
5        A. To get on -- they were standing -- they
6    weren't standing directly in front of my car
7    anymore. They were standing in front of the
8    squad car.
9        It's like -- remember I was saying that
10   the squad car was like three feet away from my
11   car? They were closer to the squad car than my
12   car. Not like they were standing right in front
13   of my car and they were trying to push him from
14   my car. They were standing like directly in
15   front of the squad car, if you can understand
16   what I'm saying.
17       Q. Okay. So what do you see happen to
18   Charles's body as the officer continues to
19   try and push him towards the squad car?
20       A. Like I say, he was moving. Once he got
21   him, he did actually get him on the squad car.
22       Q. How did he -- can you describe the
23   position of Charles's body in relation to the
24   squad car?

101

1        A. This is the hood (indicating). He's
2    leaned over. The squad car is facing this way.
3    He is leaned over on the hood, on the very edge
4    of the hood, on the right side of the car.
5        Q. Right side of the car. Now, if I use
6    the term "front quarter panel," do you know what
7    I'm talking about?
8        A. Yes.
9        Q. Okay. There is a wheel well there with
10   a front tire, and there is a portion of the
11   right side of the car called the right quarter
12   panel, right?
13       A. Okay.
14       Q. Where is Charles's body in relation to
15   that right front tire?
16       A. Meaning is it behind it, in front of
17   it, directly in front of it?
18       Q. Right. When he gets pushed onto the
19   hood of the squad.
20       A. Little bit before. It's almost like
21   the corner of the car that he got -- front right
22   corner of the car that he got pushed onto.
23       Q. So it would be between the right
24   front tire and the right bumper on the right?

102

1        A. Yes.
2        Q. Right front quarter panel of the car?
3        A. Yes.
4        Q. Now, did Charles's chest actually touch
5    the hood of the car?
6        A. I don't know if he actually touched
7    the hood, but I know he bent over onto the car.
8        Q. What did you see Charles do with his
9    hands?
10       A. They were on the car.
11       Q. So he put his hands on the hood of the
12   car?
13       A. Yes.
14       Q. Of the squad car.
15       A. Right.
16       Q. Okay. What did Charles do at that
17   point in time?
18       A. That's when I guess the officer was
19   trying to pat him or something like that.
20       Q. Do a frisk?
21       A. Yes.
22       Q. What specifically did you see the
23   officer do?
24       A. I just saw him doing this (indicating).

103

1        Q. When you say "doing this," you are
2    tapping your side?
3        A. Patting, patting. I'm sorry, patting.
4        Q. You saw him patting down his clothing
5    like he was searching for weapons, right?
6        A. Right.
7        Q. Okay. What's the next thing you see
8    happen after the officer starts patting him down
9    for weapons?
10       A. He was patting, and then Charles popped
11   up and was like, "What are you doing?"
12       Q. When you say "Charles popped up," what
13   specifically did he do?
14       A. Like this (indicating). It was like,
15   "What are you doing?"
16       Q. So Charles pushed up from the hood
17   of the car? You said he had his hands in front
18   of his chest now?
19       A. He's like, "What are you doing?"
20       Q. He said, "What are you doing" to the
21   officer?
22       A. Yes.
23       Q. And what's the position of the officer
24   when Charles does this?

104

26 (Pages 101 to 104)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1    A.  He was behind him.
2    Q.  Behind him?  Was he still hunched over
3  patting down his legs looking for a weapon?
4    A.  I don't -- I want to say he was,
5  but I'm not absolutely sure.
6    Q.  Okay.
7    A.  Because I think he did something,
8  and it made Charles pop up because he was
9  patting him.  I remember him patting him,
10  and the next thing I remember is Charles
11  popped up and was like, "What are you doing?"
12    Q.  When the officer -- when an officer
13  pats someone down, they typically go down the
14  leg, which means they have to hunch over to do
15  it or they have to go down to a knee to do it,
16  right?
17    A.  He didn't get down all the way that
18  far.
19    Q.  Okay.  But did you see the officer
20  hunch over to pat him down as you described it
21  for us?
22    A.  Yes.
23    Q.  So then while the officer is still
24  patting him down hunched over, Charles stands
                                               105

1    Q.  Kind of like the rib area?
2    A.  Yes.
3    Q.  Where my love handles would be?
4    A.  Yeh.
5    Q.  Okay.  So when Charles was hit with
6  this object that he later told you was a billy
7  club, what happened?
8    A.  He dropped to his knees.
9    Q.  He went down to both of his knees?
10    A.  I mean, I couldn't really see.
11  Remember, I'm still in the car?  So I couldn't
12  really see if it was both of his knees.  All I
13  could see is the top of his head.
14    Q.  Okay.  Do you hear the officer say
15  anything?
16    A.  He said something about him messing
17  up something, some article of clothing on him.
18    Q.  Who said that?
19    A.  The officer, the black officer.  That's
20  why I never understood what he was talking
21  about.
22    Q.  The black officer said something about
23  messing up his clothes?
24    A.  I think I want to say his shoes.
                                               107

1  up and says, "What are you doing," right?
2    A.  Yeh.
3    Q.  What did the black officer who was
4  patting him down do?
5    A.  He said something that I don't recall
6  what he said, and then -- he said something.
7  Then Charles said something.  I really don't
8  recall what they said.
9        They said something to each other, and
10  then that's when I saw the other officer hit
11  him in the side with whatever he hit him with.
12    Q.  Okay.  And you didn't see it?
13    A.  I just saw him get hit with something
14  in the side.
15    Q.  Okay.  Which side of Charles's body did
16  he get hit on?
17    A.  On the right side.
18    Q.  The right side?
19    A.  Yes.  That was the other officer who
20  hit him, not the black one.
21    Q.  Okay.  Where on Charles's body did he
22  get hit?
23    A.  On right -- I don't know what area you
24  want to call this (indicating).
                                               106

1    Q.  Okay.  So how long is Charles down on
2  his knees?
3    A.  Couple seconds because after that
4  he goes all the way down, and I don't see his
5  head -- I can't really see his head anymore.
6    Q.  You see Charles goes down?
7    A.  Yes.
8    Q.  What do you see happen?  You see
9  his head go down towards the ground?
10    A.  Yeh.
11    Q.  Does either officer do anything before
12  his head goes down to the ground?
13    A.  I couldn't see if they did anything
14  like with his feet before.  I couldn't see.
15  All I saw is the top of Charles's head, and
16  then I saw him -- I didn't see his head anymore.
17        And then after that I just saw the
18  officer raising his leg, lowering his leg,
19  raising, lowering, raising, lowering, raising,
20  lowering.
21    Q.  Okay.  So you see Charles's head go
22  down.
23    A.  Yeh.
24    Q.  Okay.  And you see -- now, which
                                               108

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1 officer was it, the black officer?
2 A. Both of them.
3 Q. Both officers.
4 A. Yes.
5 Q. You say their legs are going up?
6 A. Yes. You just see this (indicating).
7 You just see either going up and down or you see
8 it swinging.
9 Q. Okay. So what did you believe based
10 on those observations that you saw that the
11 officers were doing?
12 A. Kicking.
13 Q. So you saw both officers moving their
14 legs in a manner that led you to believe they
15 were kicking Charles.
16 A. Yes.
17 Q. Okay. Was Charles doing anything?
18 A. He was screaming out, "I'm not
19 resisting. Please stop kicking me." That's
20 why I thought they were kicking him.
21 Q. Okay. How many times did you see these
22 officers move their legs in a fashion that was
23 consistent with --
24 A. I can't even count.
                                              109

1 Q. I'm sorry?
2 A. I can't even count. It was going on
3 for -- before the other squad cars arrived.
4 It was a few minutes.
5 Q. So you saw these officers kicking him
6 for several minutes?
7 A. Yeh.
8 Q. Okay. Was Charles doing anything other
9 than saying, "I'm not resisting"?
10 A. He just kept yelling out, "Stop kicking
11 me. I'm not resisting. Stop kicking me. I'm
12 not resisting." I went like this a little bit
13 (indicating) because he's yelling out, "Stop
14 kicking me. I'm not resisting."
15         You can see I'm short, so I have to
16 lift up to actually see. So I see them kicking
17 him, and the next thing I know there is like
18 four other cop cars that pull up.
19 Q. Now, you said you lifted yourself up
20 to see?
21 A. Just a little bit. Just a little bit.
22 Q. So when you lifted yourself up in the
23 seat, tell us what you could see.
24 A. I just saw more of their legs. I could
                                              110

1 actually see up to like maybe like right here
2 (indicating) and actually see --
3 Q. Indicating for the record what part of
4 your legs could you see?
5 A. Up to the knee.
6 MR. KSIAZEK: Bottom of their knee?
7 THE WITNESS: Yes.
8 BY MR. PUISZIS:
9 Q. So you could see their head down
10 to about the bottom of their knees, right?
11 A. Yes.
12 Q. Could you see Charles?
13 A. I couldn't see Charles.
14 Q. Could you tell if Charles was face up
15 or face down?
16 A. I couldn't tell.
17 Q. Okay. And for a couple of minutes
18 you saw these officers moving their legs in
19 a fashion that you believe they were kicking
20 Charles?
21 A. And Charles is screaming out, "Stop
22 kicking me."
23 Q. Did Charles ever tell you what part
24 of his body was kicked?
                                              111

1 A. He was saying -- he said his face got
2 kicked a couple of times, and he said all of
3 his (indicating) -- what is this region?
4 MR. KSIAZEK: Chest?
5 THE WITNESS: Chest, abdomen. Upper body.
6 BY MR. PUISZIS:
7 Q. Okay. Do you know -- and how long did
8 this kicking go on for, about?
9 A. Just with them two?
10 Q. Yeh.
11 A. I want to say like two minutes, two,
12 three minutes.
13 Q. Two to three minutes?
14 A. Yeh.
15 Q. Okay. And where was Steven and Kenneth
16 during this time frame?
17 A. They -- I am not exactly sure when
18 they came out of the bank because I didn't get
19 approached by Steven until way -- when they had
20 already secured Charles and they were telling
21 me to get out the car.
22         So I'm not exactly sure when they were
23 over because I was trying to pay attention to
24 Charles and see what was happening. I'm not
                                              112

28 (Pages 109 to 112)

**113**

1 exactly sure when they came out the bank.
2    Q. Did they ever tell you when they came
3 out of the bank?
4    A. He was just saying -- Steven had said
5 something like by the time he had glanced out --
6 because that bank it's a window, and it's open
7 glass, and he was like by the time he had
8 glanced and saw them kicking, it was really
9 nothing he could do about it. So then he came
10 out like after -- after they had stopped --
11    Q. Okay.
12    A. -- I think he said.
13    Q. Steven said he could see where Charles
14 was being kicked by the officers when he was
15 inside the Bank of America ATM.
16    A. That's what he was saying, something
17 like that.
18    Q. That's what Steven told you.
19    A. Yeh.
20    Q. And when did Steven tell you that?
21    A. He was saying something like that on
22 the drive to go get -- to try to go get Charles.
23    Q. Okay. So you said that the two
24 officers from the University of Chicago kicked

**114**

1 Charles for what seemed to be like two or
2 three minutes, and then some other officers
3 arrived?
4    A. Yes. I want to say approximately three
5 or four more squad cars pulled up. They were
6 both Chicago Police, then University of Chicago
7 Police.
8    Q. The University of Chicago Police
9 officers' uniforms are the same as Chicago
10 Police officers' uniforms, aren't they?
11    A. For some reason I don't remember them
12 being exactly the same.
13    Q. Okay.
14    A. Or it's like a badge is different,
15 I think.
16    Q. Okay. Where did the squad cars -- did
17 they all come at one time or did they come at
18 different times?
19    A. It seemed like they came at one time
20 because it went from one to five like instantly
21 once they all -- I think they all came at the
22 same time.
23    Q. Would it be fair to say that Charles
24 was not doing anything to these officers,

**115**

1 according to your testimony?
2    A. When they were kicking him, no. He is
3 just screaming out, "Stop kicking me."
4    Q. Okay. Do you know why these two
5 officers who had Charles on the ground were
6 kicking him would call in for backup assistance
7 or call that an officer needs assistance?
8    A. I have no idea.
9    Q. Did you see Charles wrestle with either
10 of the officers at all?
11    A. Besides what I told you about him
12 moving away from them when they were trying
13 to push him down to the car, that was about it.
14    Q. Okay. Did you ever see Charles pick up
15 one of the officers?
16    A. No.
17    Q. Charles is strong enough to pick up
18 one of those officers, right, if he wanted to?
19    A. If he wanted to.
20    Q. Do you know what position Charles
21 played when he played football?
22    A. I don't know.
23    Q. Okay. Now, you said how many squads
24 showed up?

**116**

1    A. It was three to four.
2    Q. Three to four squads. Where did they
3 arrive?
4    A. They were in the street behind us.
5    Q. When you say "behind" you, towards the
6 rear of your car?
7    A. Yeh. They were all the way behind the
8 car on the street.
9    Q. Okay. And what happened when these
10 three to four squads pulled up?
11    A. Two of them hopped out of the
12 university police. It was either two or three
13 of them. Hopped out the university of police
14 car and ran up to where the other two officers
15 and Charles were and just immediately started
16 kicking.
17    Q. So two more University of Chicago
18 officers, according to your testimony, ran up
19 to Charles?
20    A. And they ran up and just immediately
21 started.
22    Q. And they began kicking him?
23    A. Yes.
24    Q. Can you describe these next two

1  officers for me?
2  A.  I really couldn't see them because when
3  I say they ran, they ran up, and then I couldn't
4  really see their face because their head was
5  down, and they just started kicking.
6  Q.  Okay.  Could you see their legs moving?
7  A.  Yes.
8  Q.  Okay.  Do you know if either of these
9  officers were black?
10  A.  I really couldn't tell you.
11  Q.  Do you know if they were Hispanic?
12  A.  I could not tell you what.  I never
13  really got like a clear view of what they looked
14  like.
15  Q.  But you knew they were from University
16  of Chicago.
17  A.  Yes.
18  Q.  How did you know they were from the
19  University of Chicago?
20  A.  When all the cars pulled up, them two
21  hopped out of a Chicago -- they were like one
22  of the -- if all four cars were pulling up, they
23  were towards the front.  They were in the front.
24  I saw them when they hopped out the car because
117

1  one of them didn't even close the door all the
2  way.  They hopped out the car and started
3  running.
4  Q.  Okay.
5  A.  Because you could hear the sirens when
6  they came up, so I turned to see when the
7  Chicago police and other university police came
8  up.  They hopped out the car.
9  Q.  The University of Chicago officers
10  hopped out of their cars.
11  A.  Yes.
12  Q.  How many squads from the City of
13  Chicago arrived on the scene?
14      (WHEREUPON, there was a
15      short interruption.)
16  BY MR. PUISZIS:
17  Q.  Let me start over.  How many City
18  of Chicago squad cars pulled up?
19  A.  I believe two.
20  Q.  And did they pull up also behind your
21  car?
22  A.  Yes.
23  Q.  Did you ever see any squads pull up
24  from the other direction, from the direction
118

1  you were facing as you were sitting in the car?
2  A.  I don't recall.
3  Q.  Okay.  So you told us that the two
4  University of Chicago officers ran up to Charles
5  and began kicking him.  What did you see the
6  City of Chicago officers do?
7  A.  They didn't really do anything.  I know
8  it was a City officer who talked to me after
9  they got Charles up, after they got Charles
10  off the ground.
11  Q.  Okay.  How do you know it was City of
12  Chicago squad cars located?
13  A.  The cars are different.
14  Q.  Okay.  Did they just sit in their squad
15  cars?
16  A.  They got out, but they didn't really
17  approach the scene until the University of
18  Chicago had got Charles I guess in cuffs and
19  off the ground.
20  Q.  How far from where Charles was located
21  were these City of Chicago squads that you
22  believe were City of Chicago squads located?
23  A.  They were like maybe two cars behind
24  me, if you want to do it in distance of cars.
119

1  Q.  And then how far were the University
2  of Chicago squad cars parked?
3  A.  The one that I saw specifically was
4  like a car behind me.
5  Q.  And was there two officers in that one
6  University of Chicago squad car or only one?
7  A.  Two.
8  Q.  Two officers and one University of
9  Chicago squad that you saw.
10  A.  Yes.
11  Q.  You saw one officer get out the
12  driver's side and one get out the passenger's
13  side, right?
14  A.  Yes.
15  Q.  And how long after these two additional
16  University of Chicago officers arrived in a
17  single squad car did they continue to kick
18  Charles for?
19  A.  Probably another minute or two,
20  two minutes.
21  Q.  Another minute or two.
22  A.  Two minutes.
23  Q.  Or two minutes?
24  A.  Yes.
120

30  (Pages 117 to 120)

1    Q.   So if we take the first two officers
2  were kicking Charles for two to three minutes,
3  right? And then these other two officers were
4  kicking him for about another two minutes. In
5  total the four University of Chicago officers
6  would have been kicking Charles for, what,
7  five minutes?
8    A.   About five.
9    Q.   And how frequently were they kicking
10  him? Was it like every chance they could?
11   A.   Yeh. It was constant.
12   Q.   Constant. So during the five minutes
13  that these four officers -- I'm sorry, not four
14  completely, but during the five minutes that
15  Charles was being kicked, how many times would
16  you say he was kicked, hundreds?
17   A.   I wouldn't even -- it might have been.
18  I wouldn't even be able to guess.
19   Q.   I take it Charles was just a mess after
20  this whole incident, wasn't he?
21   A.   He was pretty banged up. His clothes
22  were ripped. We took pictures afterwards.
23   Q.   Charles was all bruised up, right?
24   A.   He was bruised, yes.
                                        121

1  went down, but I never saw it.
2    Q.   When were they down?
3    A.   I don't know.
4    Q.   Okay. Did you ever see his underwear
5  pulled down?
6    A.   No, but I know this was ripped
7  (indicating).
8    MR. KSIAZEK:  The waist?
9    THE WITNESS:  The zipper and the waist was
10  ripped. Zipper was broke, and this was ripped
11  (indicating). And shirt, there was a big rip in
12  his shirt, too.
13  BY MR. PUISZIS:
14   Q.   Did you ever see Charles pull his pants
15  up?
16   A.   No.
17   Q.   Okay.
18   A.   I didn't see anything with his pants.
19   Q.   Did you ever see Charles kick any
20  University of Chicago officer?
21   A.   No.
22   Q.   Do you know how it was that three
23  University of Chicago officers were injured
24  in this incident?
                                        123

1    Q.   Where was he bruised up?
2    A.   His face, his arms. I had took him
3  to the hospital afterwards, too. He had
4  contusions, I forgot where, his ribs.
5    Q.   He had contusions on his ribs?
6    A.   I think it was on his ribs. He had
7  contusions somewhere. I can't remember where.
8    Q.   Okay. Did he have bruises on his ribs?
9    A.   I don't recall.
10   Q.   Did he have any broken ribs?
11   A.   No. I know there were no broken ribs.
12  I think it was contusions. And then he had
13  messed -- he had -- something was wrong with
14  his arm, too, like a bone in his arm.
15   Q.   Okay. Let me ask you. Did you ever
16  see any University of Chicago officer pull
17  Charles's pants down during the course of this
18  incident?
19   A.   I couldn't see that.
20   Q.   You didn't see that?
21   A.   I couldn't see that.
22   Q.   You never saw Charles's pants go down,
23  right?
24   A.   I couldn't see it, no. He told me they
                                        122

1    A.   I have no idea.
2    Q.   Did the University -- were the
3  University of Chicago officers injured by
4  kicking Charles?
5    A.   I wouldn't know.
6    Q.   Did you see any of the University of
7  Chicago officers injure Charles when they were
8  kicking him?
9    I'm sorry. Did you see any of the
10  University of Chicago officers injure one of
11  their shoulders while they were kicking Charles?
12   A.   No.
13   Q.   Did you ever see Charles kicking a
14  University of Chicago officer in the face and
15  break his glasses?
16   A.   No.
17   Q.   Did you ever hear that a University
18  of Chicago officer's glasses were broken in
19  this incident?
20   A.   No.
21   Q.   So as far as you know, Charles didn't
22  do anything that would have injured any
23  University of Chicago officer.
24   A.   No.
                                        124

31  (Pages 121 to 124)

1    Q.   Charles didn't do anything to resist
2 the officer's arrest, according to your
3 testimony, right?
4    A.   Not that -- no.
5    MR. KSIAZEK:   Got to speak up a little.
6    THE WITNESS:   Okay. I'm sorry.
7    MR. KSIAZEK:   That's a "no"?
8    THE WITNESS:   No.
9         He was constantly yelling out, "I'm not
10 resisting."
11 BY MR. PUISZIS:
12    Q.   Did you ever hear the University of
13 Chicago officers yell at him, "Stop resisting"?
14    A.   Yes. He was saying, "I'm not
15 resisting. I'm not resisting. Stop kicking
16 me. I'm telling you I'm not resisting."
17    Q.   So as the University of Chicago
18 officers were kicking him, they were also
19 yelling, "Stop resisting"?
20    A.   Yes. Yes. They yelled it out once,
21 and he started yelling, "I'm not resisting. I'm
22 not resisting. Just stop kicking me. I'm not
23 resisting."
24    Q.   Did you ever see three or four

125

1 to get my purse and stuff."
2         He's like, "Well, you heard what I
3 said. Get out. We're trying to figure out
4 whose car this is."
5         And I was like, "I told him already
6 this is my car. I can show you the
7 registration," and things of that nature,
8 "if you want it." He was like, "You heard me.
9 Get out the car now." So I got out the car.
10    Q.   Do you have any records about the sale
11 of the car?
12    A.   I have them at home, yes.
13    Q.   You do at home?
14    A.   Yes.
15    Q.   If we asked you to produce it
16 to Charles's attorney, could you do that?
17    A.   Yes.
18    Q.   Okay. So Charles gets handcuffed,
19 and he's picked up, and what happens to him?
20 He is brought to a squad car?
21    A.   Yes.
22    Q.   Did you see what kind of squad car
23 he went into?
24    A.   I don't remember which one it was.

127

1 University of Chicago officers on the ground
2 with Charles?
3    A.   No.
4    Q.   So after Charles was kicked for these
5 five minutes, what's the next thing that
6 happened?
7    A.   I just remember seeing him. I don't
8 remember how exactly they got him up. They got
9 him up. He was in handcuffs. And they took him
10 over to the squad car.
11    Q.   How did they pick him up?
12    A.   I don't remember how they picked him
13 up. When they were going to pick him up, that's
14 when the officer had came over to tell me to get
15 out the car.
16    Q.   What officer came over to you and asked
17 you to get out of the car?
18    A.   It was a Chicago police officer.
19    Q.   Okay. And what did you do when the
20 City of Chicago officer told you to get out of
21 the car?
22    A.   I was getting up to get out of the car,
23 and I told him, "All my stuff is in my car."
24 Like my purse and stuff was in there. "I need

126

1    Q.   Okay. And what happens to Charles
2 then?
3    A.   They take him I guess to jail.
4    Q.   Do you know where they took him to?
5    A.   I don't remember --
6    Q.   Okay.
7    A.   -- because I know they took him one
8 place, and then they moved him because we
9 wanted to go try to find him to pick him up.
10    Q.   Okay. Now, what did -- so the officer
11 told you to get out of the car. You eventually
12 got out of your car, right?
13    A.   Yes.
14    Q.   What happens after you got out of your
15 car?
16    A.   They searched the car.
17    Q.   Who searched the car?
18    A.   The Chicago police officer who told me
19 to get out.
20    Q.   And what happens then?
21    A.   And then I was talking to my boyfriend,
22 well, my ex-boyfriend, because I was upset at
23 this time. And then he told us to go home.
24    Q.   Who told you to go home?

128

32 (Pages 125 to 128)

1    A.  The officer.
2    Q.  Which one?
3    A.  Chicago police officer.
4    Q.  Chicago police officers.
5        Okay.  You were talking to Steven
6   Sinclair?
7    A.  Yes.
8    Q.  What were you staying to Steven, and
9   what is he saying to you?
10   A.  I mean, he was telling me to calm down.
11  I was crying.  He was telling me to "calm down"
12  and "everything is going to be okay," and I am
13  like, "I was trying to just get my stuff out the
14  car."
15       Because the guy who was -- he was
16  yelling, and he's like, "Just get out the car
17  now."  I was like, "I want my stuff."  He is
18  like, "Calm down.  Everything is going to be
19  okay."  You know, "Let them do whatever they
20  want to do because we don't want any more
21  issues."  So they tore up the car searching
22  the car, and they said we can go home.
23   Q.  Okay.  And did you go home?
24   A.  No.

129

1    Q.  Where did you go?
2    A.  We went to go try to find where Charles
3   was at.
4    Q.  Okay.  How did you know to go look for
5   Charles?
6    A.  My ex had asked one of the officers
7   if we wanted to find him or where was he being
8   taken to, and how could we find him.  And so
9   they told him.  Then we called up his girlfriend
10  and found his girlfriend, and then we tried to
11  find him.
12   Q.  Okay.  You called Alicia?
13   A.  Yes.
14   Q.  Who called Alicia?
15   A.  It was either me or Steven.  I don't
16  remember.
17   Q.  Do you remember what you or Steven
18  said to Alicia and what she said in response?
19   A.  We just told him that Charles just got
20  arrested for no reason, and we're trying to find
21  out where he's at.  She told us that she was
22  going to call her dad and call us back.
23   Q.  Okay.  And did she call you back?
24   A.  Yes.

130

1    Q.  And what did she say to you or what did
2   you say to her?
3    A.  She told us to meet her father.  Her
4   father was either a detective, an officer.  I
5   can't remember what he was.
6    Q.  And where did you go next?
7    A.  We went to the station that they
8   originally -- I don't remember what station it
9   was, but the station they originally told us
10  that he was going to be at, we went there,
11  and they told us that they moved him.
12   Q.  And was Alicia's father there?
13   A.  Yes.  He met us there.
14   Q.  What's his name?
15   A.  I do not recall at all what's his first
16  name.
17   Q.  And did he do the talking or did one
18  of you guys do the talking?
19   A.  He did the talking, I believe.
20   Q.  What do you remember him saying?
21   A.  He was just asking him where was he
22  at, what exactly was he being arrested for and
23  what did he -- I don't know if he had bail or
24  something like -- he was asking him just simple

131

1   question.
2    Q.  Okay.  And by the way, did you ever get
3   the horn fixed?
4    A.  Eventually I did.
5    Q.  How long after this incident did you
6   get the horn fixed?
7    A.  Maybe a couple weeks.
8    Q.  Who fixed your horn?
9    A.  I don't remember the guy's name, but
10  some guy that Steven knew because at Circuit
11  City they have a place where they install car
12  radios and do stuff like that.  He said the guy
13  up there knows how to work with electric systems
14  in cars, so I let him do it.
15       (WHEREUPON, there was a
16       short interruption.)
17  BY MR. PUISZIS:
18   Q.  So did you go to another police station
19  then?
20   A.  Yes.
21   Q.  By the way, were you driving or was
22  Steven driving?
23   A.  Pretty sure Steven was driving because
24  I was too disoriented to drive.

132

33 (Pages 129 to 132)

1    Q.  Do you remember where you went after
2  the first police station?
3    A.  We went to the other station, and they
4  told us that he couldn't be released until
5  whatever time it was.
6    Q.  And did Mr. Robinson do the speaking
7  again?
8    A.  No.  He wasn't with us when we went to
9  the other station.
10    Q.  What did he do after he went to the
11  first station?
12    A.  We stepped outside, you know, and he
13  asked us what happened.  He asked me for my
14  I.D., for my license, and then my registration
15  and stuff like that.
16    Q.  Why did he ask you for that?
17    A.  Because he was saying when he was
18  asking the people about what happened inside,
19  they were talking about stolen car, so he asked
20  me for my license and my registration number and
21  my license plate number.
22    Q.  Besides asking for your license and
23  registration, did he have any other conversation
24  with you?

                                          133

1    A.  It was me, Steven, and I think Kenny
2  was still in the car.  I don't remember Kenny
3  being there when we went to the second station,
4  but the first one I do.
5    Q.  Okay.  And who went into the police
6  station?
7    A.  We all did.
8    Q.  All three of you did.
9    A.  Yes.
10    Q.  Okay.  Did you have any conversation,
11  the three of you, about the incident on the way
12  to the first police station?
13    A.  Yes.
14    Q.  Was this while you were in the car?
15    A.  Yes.
16    Q.  Okay.  Please tell us as best you can
17  recall what you or Steven or Kenny said about
18  the incident and who said what.
19    A.  Like I told you before, that's when
20  Steven had said something about seeing what
21  was going on from the window or from inside
22  the ATM, and by that time he couldn't do
23  anything, anyway.  So he waited to come out.
24    And then he said when he came out, they

                                          135

1    A.  He just told us what we needed to do
2  to get Charles out, and he just asked us, just
3  making sure we didn't see Charles hit or touch
4  the officer.
5    And then he said he was going to call
6  us, keep in contact with us, but I don't think
7  I ever talked to him after that, though.
8    Q.  Mr. Robinson doesn't have any personal
9  knowledge of what happened at the scene that
10  night, right?
11    A.  Uh-uh.
12    Q.  Is that a "no"?
13    A.  Sorry.  No.
14    Q.  Okay.  So you went to another police
15  station then?
16    A.  Yes.
17    Q.  What happened when you got to the other
18  police station?
19    A.  They told us that he couldn't get out
20  until -- I forgot what time in the morning it
21  was.
22    Q.  Okay.  I'm sorry.  If I asked this
23  already, I apologize.  When you went to the
24  first station, who was in the car?

                                          134

1  had already had him, I guess.  And he came over
2  to me, and that's when they were trying to
3  get -- that's when they were telling me to get
4  out the car.
5    Q.  Okay.  Did you have any other
6  conversation with Steven or Kenny on the way
7  to the first police station other than that?
8    A.  Not really.  They two were basically
9  trying to say what they saw.
10    Q.  Did Kenny say what he saw?
11    A.  I don't even recall what Kenny said.
12    Q.  Okay.  Now, after you had that
13  conversation and you went to the police station,
14  did you have any further conversation with
15  Steven or Kenny about this incident that night?
16    A.  Not that I remember.  Not outside the
17  first initial on the first drive to the first
18  station.
19    Q.  Okay.  Now, the three of you went to
20  the first police station.  You were told he was
21  at a different police station.  Who then went to
22  the second police station?
23    A.  Me and Steven.
24    Q.  What happened to Kenny?

                                          136

34 (Pages 133 to 136)

1    A.  He got Alicia's dad to drop him off at
2  home because I think he had to work -- I think
3  he had to do something in the morning. Might
4  have been work.
5    Q.  So it was just you and Steven went
6  to the station, the second station?
7    A.  Yeh.
8    Q.  What happened when you got to the
9  second station? Did you have to wait for a
10  while?
11    A.  Yeh. I stayed in the car. Steven had
12  went in.
13    Q.  And how long was Steven inside the
14  station for?
15    A.  Maybe like 15 minutes.
16    Q.  And what happened after 15 minutes?
17    A.  He came back and said that they can
18  release him -- I couldn't remember the time,
19  until what time. Later on that morning.
20    Q.  So what did you and Steven do?
21    A.  We left.
22    Q.  Where did you go?
23    A.  Went home.
24    Q.  Dropped Steven off?

137

1    A.  Yes.
2    Q.  And then you drove home from Steven's
3  house?
4    A.  Yes.
5    Q.  And what did you do after you got home?
6    A.  Went to sleep for a little bit.
7    Q.  Okay. After you slept, what happened?
8    A.  I went to -- I didn't pick him up. I
9  just remember I took him to the hospital once
10  he came out.
11    Q.  Took who to the hospital?
12    A.  Charles. Me, Charles and his mom.
13    Q.  Why did you take Charles to the
14  hospital?
15    A.  Because there nobody else have a car to
16  drive him.
17    Q.  How did you know to take Charles to
18  the hospital or how did you know --
19    A.  He asked me. He called me and asked me
20  to get him and take him to the hospital and told
21  me to bring my camera so I could take pictures.
22    Q.  How did he know that you had a camera?
23    A.  Because I always -- usually always --
24  I had my camera with me in my purse. I always

138

1  have my camera with me.
2    Q.  And you didn't take any pictures of
3  this incident.
4    A.  No. I was not thinking at that time.
5    Q.  I'm sorry?
6    A.  I wasn't thinking about my camera at
7  the time.
8    Q.  Okay. So do you recall what time it
9  was that Charles called you?
10    A.  I don't recall at all, sometime in the
11  morning.
12    Q.  Did he say anything to you other than
13  asking you to come and take him to the hospital
14  and bring your camera?
15    A.  That's all. He was just like, "Can you
16  come? I want to take some pictures. Bring your
17  camera, and then I want to go to the hospital."
18    Q.  So you then drove to his house?
19    A.  Yes.
20    Q.  Did you take pictures before you went
21  to the hospital or before you went to the
22  hospital?
23    A.  Before.
24    Q.  How many pictures did you take?

139

1    A.  It was a lot, between -- it was
2  probably like between 40 and 50.
3    Q.  Okay. And you were taking these photos
4  for what reason?
5    A.  He said he wanted to keep them.
6  He wanted pictures of his injuries.
7    Q.  Okay. So you were taking photos
8  of his body to show his injuries, right?
9    A.  I took some of them. He took some of
10  them, yes.
11    Q.  Now, he took his shirt off at some
12  point for some of these photos, right?
13    A.  Yes.
14    Q.  What did you see on his body when he
15  took his shirt off? Did you see any bruises?
16    A.  I don't remember if I saw bruises on
17  his body. I want to say that there was some
18  like on his back and on his shoulder. I mean
19  not on his shoulder, but on his side. I
20  remember some on his back, but I don't remember
21  if there was any like on his shoulder -- I mean
22  his chest or his abdomen area.
23    Q.  Did you take any photos of his back and
24  his side?

140

35 (Pages 137 to 140)

1    A.  I took photos of his back, yes.
2    Q.  Okay.  And any photos of his injuries?
3    A.  He had bruises on his face.  We took
4    pictures of that.  He had bruises all up and
5    down his arm, so we took pictures of that.
6         His shirt was ripped, and I told you
7    his pants and his zipper, that was ripped.  We
8    took pictures of that.
9    Q.  Did you see Charles do anything that
10   would cause any injuries to the University of
11   Chicago officers?
12   A.  No.
13   MR. PUISZIS:  Let me stop for two minutes.
14   I'm going to go up to the fifth floor.  I have
15   to take the elevator because they're doing some
16   work on the internal stair.
17        (WHEREUPON, a short recess
18         was taken.)
19   BY MR. PUISZIS:
20   Q.  Ashley, by the way, how tall are you,
21   just so I know?
22   A.  Four-eleven.
23   MR. KSIAZEK:  Is that on or off the record?
24   MR. PUISZIS:  On the record.
                                          141

1    BY MR. PUISZIS:
2    Q.  Do you know if Charles had any money
3    that night?
4    A.  I don't know.
5    Q.  Okay.  What hospital did you take
6    Charles to?
7    A.  I don't remember.
8    Q.  Do you know if Charles should have
9    been working the day photographs of him were
10   taken?
11   A.  I don't know if he had to work or not.
12   Q.  Did you see Charles limping around at
13   all?
14   A.  I don't think he was limping.
15   Q.  Well, with the beatdown he got from
16   the officers from the University of Chicago,
17   he must have had some problems moving, right?
18   A.  He just said he was really sore.
19   I remember he was saying he was sore.
20   Q.  Okay.  When did he say he was really
21   sore?
22   A.  When I saw him when I came to -- with
23   the camera to take him to the hospital.
24   Q.  Okay.  Now, did you have any other
                                          142

1    conversations with Charles that day when you
2    took him to the hospital?
3    A.  While we were in the waiting room in
4    the ER, we were talking a little bit.
5    Q.  What do you remember talking to
6    Charles about in the waiting room of the ER?
7    A.  I was just -- he was just telling me
8    what was wrong or what he thought was wrong with
9    him and that he was telling me -- because when I
10   told you before I couldn't really see how he was
11   on the ground, he was just telling me he was
12   like on the ground, and he was trying to protect
13   his body from the hits or from the kicks and
14   that he was -- he asked me did I hear him
15   yelling out, you know, "I'm not resisting.  Stop
16   kicking me.  I can't breathe.  I can't breathe."
17   I told him, "Yeh.  I heard that."  And that was
18   pretty much it.
19   Q.  Okay.  Did you see him have any
20   problems moving his arms?
21   A.  Right -- one of his arms.  That's what
22   I was trying to tell you before.  It's like
23   forearm.  Something was wrong with it.
24   Q.  How long was he in the emergency room
                                          143

1    for?
2    A.  Well, we were waiting for a couple
3    hours, but he was actually in there maybe like
4    30 minutes.
5    Q.  So he was actually examined, 30 minutes
6    later he was released.
7    A.  Yes.
8    Q.  Okay.  Do you know what they did for
9    him in the emergency room?
10   A.  I don't know.
11   Q.  Do you know if Charles planned to sue
12   at that point in time?
13   A.  I believe he said that he was
14   interested.
15   Q.  In suing?
16   A.  Yes.
17   Q.  So before Charles went to the emergency
18   room, he said --
19   A.  No, after.  After.  After emergency
20   when we were getting ready to leave.
21   Q.  So in the emergency room while you
22   were getting ready to leave, Charles said
23   he was interested in filing a lawsuit.
24   A.  Yes.
                                          144

                              36  (Pages 141 to 144)

1  MR. PUISZIS: Okay. Can we mark this as
2  Glover Deposition Exhibit 1 for identification
3  purposes, please?
4  (WHEREUPON, Glover Deposition
5  Exhibit No. 1 was marked for
6  identification.)
7  BY MR. PUISZIS:
8  Q. Ashley, I'm going to show you and
9  Charles's attorney a photograph of Charles
10  that was taken at the Chicago police station
11  the night of the incident. Take a look at that,
12  please.
13  A. Uh-huh.
14  Q. Does that photograph truly and
15  accurately depict Charles's condition following
16  this incident where he was kicked for five
17  minutes by four officers from the University of
18  Chicago?
19  A. I mean, you really can't see anything
20  on him, but I guess.
21  Q. My question was does that photograph
22  truly and accurately depict how he looked
23  following the incident as you've described it?
24  A. Yes. I guess. Yes.
                                        145

1  to the emergency room or that Charles took of
2  himself?
3  A. Yes. They were in his bathroom.
4  Q. Do those photographs truly and
5  accurately depict Charles's condition as it
6  existed on the day following this incident
7  before you went to the emergency room?
8  A. Yes.
9  MR. PUISZIS: Why don't we mark this as
10  Glover Deposition Exhibit 2 for identification
11  purposes, please.
12  (WHEREUPON, Glover Deposition
13  Exhibit No. 2 was marked for
14  identification.)
15  BY MR. PUISZIS:
16  Q. Is that another photograph -- for the
17  record is that another photograph you took of
18  Charles or that Charles took of himself on
19  the day of the incident following --
20  A. Yes.
21  Q. -- following this occurrence before
22  you went to the emergency room?
23  A. Yes.
24  Q. Does that photograph truly and
                                        147

1  Q. I'm going to show you -- oh, by the
2  way, I asked you, but I don't know if you
3  answered the question. Do you remember what
4  emergency room you took him to?
5  A. I don't remember which one it was.
6  Q. Okay. Do you know why you went to the
7  one particular emergency room versus another?
8  A. No. That was just -- that was just
9  the one he told me to take, and I don't think
10  it was that far from his house.
11  Q. Okay. Do you know if he had a family
12  physician or anything?
13  A. I don't think he did.
14  Q. Okay. I'm going to show you four
15  photos that were previously marked at Charles's
16  deposition. These were marked Charles Boyle
17  Deposition Exhibits 1, 2, 3 and 4. Would you
18  please take a look at those photographs?
19  A. Um-um.
20  Q. Do those photos truly and accurately
21  depict the condition of Charles -- let me stop
22  you. Withdraw the question and rephrase it.
23  Are those four photographs four of the
24  photographs you took of Charles before he went
                                        146

1  accurately depict Charles's condition as it
2  existed at the time the photograph was taken?
3  A. Yes.
4  Q. Do you see any marks or bruises or
5  anything on Charles's face?
6  A. That (indicating) and bruise on the
7  side of his face.
8  MR. PUISZIS: Okay. Let me mark this as a
9  deposition exhibit.
10  (WHEREUPON, Glover Deposition
11  Exhibit No. 3 was marked for
12  identification.)
13  BY MR. PUISZIS:
14  Q. Is that another photograph of Charles
15  that you took or that was taken of him before
16  he went to the emergency room?
17  A. Yes.
18  Q. Does that photograph truly and
19  accurately depict Charles's condition as
20  it existed following this incident?
21  A. Yes. Yes.
22  Q. Okay. Now, you told us about the
23  conversation you had with Charles in the
24  emergency room. Did you have any other
                                        148

37 (Pages 145 to 148)

1 conversations with him about the incident at
2 any time since then?
3    A. I think maybe right before the criminal
4 case, but it was more so with his lawyer, but he
5 was there.
6    Q. So you had a conversation with Charles
7 and his attorney?
8    A. Yes.
9    Q. Okay. What did you say to the
10 attorney, and what was said to you?
11    A. He just asked me just to summarize what
12 happened, and he just told me when I go in, just
13 make sure I understand the question fully, and,
14 you know, tell them what I told him is pretty
15 much it.
16    Q. Okay. Did you talk to Charles about
17 what happened?
18    A. Like I said, I talked to him and talked
19 to him and his lawyer.
20    Q. Okay. Did you hear Charles say
21 anything about what happened?
22    A. He told me -- well, we were in the
23 hospital or in the emergency room. I told
24 you we were having the conversation because I
149

1    A. I couldn't really see it. All I knew,
2 it was black, and I saw a thrust motion to his
3 side, and I saw Charles jerk and go to his knee.
4    Q. Can you describe how large this black
5 object was?
6    A. I couldn't really see it because
7 however they were holding it, I guess the guy --
8 I saw his right hand, so I couldn't see it
9 against his body. So I just saw the end of
10 it. It was black, and it poked him in the side.
11    Q. And was this -- that was the Hispanic
12 officer, right?
13    A. Yeh.
14    Q. I'm sorry if I asked this already. I
15 apologize. When is the last time you saw
16 Charles?
17    A. Over the summer.
18    Q. Over the summer?
19    A. Yeh.
20    MR. PUISZIS: I don't have anything else
21 right now.
22        EXAMINATION
23 BY MS. GIBBONS:
24    Q. I just have a handful of questions. I
151

1 couldn't really see everything. And that's when
2 he told me that it was a billy club that he got
3 hit with because I told him I saw him get hit in
4 the side with something, and I told him he got
5 tasered, and he was like, "No. It was a billy
6 club."
7    Q. So you told him you thought he had been
8 tasered, and he said, no, he was hit by a billy
9 club.
10    A. Yes. That's when he dropped down, and
11 one of them had kicked him, and that's why he
12 fell. And then he was like they started kicking
13 him, and he asked me did I hear him yelling out
14 what he was yelling out, and I told him yes.
15    He was like, "I couldn't breathe, so I
16 told him to stop kicking me because I couldn't
17 breathe." And next thing he knew it was four of
18 them kicking him, and they got him up, and they
19 arrested him.
20    Q. Now, did you take a photograph of the
21 side of him where he got hit by the billy club?
22    A. I don't remember.
23    Q. Can you describe the object that you
24 saw him get hit with?
150

1 just want to go back to the incident itself and
2 talk about when exactly you first saw the
3 Chicago police officers and your interactions
4 with them.
5    A. Okay.
6    Q. So from what I remember what you
7 previously testified to, Charles was still
8 struggling with the two University of Chicago
9 police officers when three or four squad cars
10 all kind of came up at the same time?
11    A. Yes.
12    Q. And how many of the squad cars were
13 behind you?
14    A. Like I think there were like three
15 behind me.
16    Q. And were there any in front of you
17 in your line of sight?
18    A. I don't remember at all. I just
19 remember the ones behind me because when I heard
20 the sirens, you know, I turned back around, and
21 I saw them pulling up. So I don't remember
22 if -- it could have been some that came this
23 way, but I really don't remember.
24    Q. And the three or so that came from
152

38 (Pages 149 to 152)

1  behind, do you recall how many were University
2  of Chicago?
3     A.  I think there were two.
4     Q.  And can you remember what order they
5  came in?  I'm just trying to figure out like how
6  they were parked.
7     A.  I remember the university ones being in
8  the front.
9     Q.  Okay.  And the Chicago?
10    A.  Being behind them.
11    Q.  Okay.  And you don't recall that the
12 Chicago police officers got out of their car
13 at that point in time, did they?
14    A.  I believe they got out their car, but
15 they didn't like approach like where the scene
16 was happening with the university police and
17 Charles when they -- like they could have got
18 out the car, but they didn't come up to the
19 scene.
20    Q.  Were they standing near their car?
21    A.  Yes.
22    Q.  So they were standing behind basically
23 your car and the two other University of Chicago
24 police cars?

153

1     A.  Yes.
2     Q.  Can you approximate about how many car
3  lengths you believe they were back, to the best
4  that you can?
5     A.  Maybe two or three.
6     Q.  And do you recall how many Chicago
7  police officers you saw in the scene at any
8  point in time?
9     A.  It was no more than like three or four.
10 Might have been four.  I don't remember.  I know
11 it was way more university cops than it was
12 Chicago police officers.
13    Q.  Now, the one squad car you do recall
14 seeing from the City of Chicago, how many
15 officers were in that squad car?
16    A.  I think there were two.
17    Q.  Was it one of those officers who came
18 and spoke to you?
19    A.  I believe so.
20    Q.  Can you describe that officer for me?
21    A.  I just remember him being black.  I
22 don't remember what he looked like or anything
23 like that.  I really don't recall.  I just know
24 he was yelling at me to get out the car, and I'm

154

1  like, "I want to get my stuff."  I don't
2  really -- I wasn't really like looking at his
3  face.
4     Q.  And you mentioned that the Chicago
5  police officer searched your car?
6     A.  Yes.
7     Q.  Now, was it that officer who spoke to
8  you?
9     A.  It was him and another officer.
10    Q.  Did you see what direction these
11 officers approached your car from?
12    A.  It was from behind, but I don't know
13 what side of the vehicle it was.
14    Q.  Did you have any other conversations
15 with any City of Chicago police officers?
16    A.  Not outside of them with the car,
17 and I was trying to tell them the registration.
18 Outside of that and registration of the car I
19 didn't really talk to them.  Steven had spoken
20 to them after that.
21    Q.  How do you know that?
22    A.  Because he walked over to one of the
23 cops to ask them about Charles and stuff like
24 that.

155

1     Q.  Where did this take place, on the side
2  of the street where your car was parked?
3     A.  Yes.
4     Q.  Okay.  In front of your car or behind
5  your car?
6     A.  It was -- my car is parked.  It was
7  on the sidewalk he was talking to them on.
8     Q.  Now, were these the same officers who
9  searched your car and spoke to you and told you
10 to get out of your car?
11    A.  I don't recall -- I'm sorry.
12    Q.  That's okay.
13    A.  I don't recall if it was the same
14 officer.
15    Q.  Do you recall seeing any Chicago police
16 officers wearing a white shirt?
17    A.  I don't recall.
18    Q.  Just going back when you first -- when
19 the car first pulled over to the curb, did you
20 have to pop the hood to like unlatch it?
21    A.  Yes.
22    Q.  Did you pop the hood or did Steven?
23    A.  I popped the hood.  I reached over and
24 popped the hood.

156

39 (Pages 153 to 156)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1    Q.   Now, during this whole incident when
2  Charles is interacting with the University of
3  Chicago police officers, what are you doing?
4  Are you upset?  Are you crying?  At one point
5  you mentioned you were crying.
6    A.   When I got out the car -- when I was
7  in the car, I was just scared.  So I was kind
8  of like, I don't know, I'm just trying to pay
9  attention to what's going on.  I'm not really
10 thinking.
11       I didn't start thinking until the cop
12 came and told me to get out the car, and that's
13 when like everything hit me, and I just started
14 crying, and I got real upset like once I kind
15 of snapped back into it and the cop came over.
16 So I was fine until he came over and was yelling
17 at me to get out of the car.
18   Q.   Were you hyperventilating or anything
19 while you were inside the car or outside the
20 car?
21   A.   I could have been outside the car.
22   Q.   But not that you recall when you were
23 inside the car.
24   A.   No.

157

1    Q.   In the Sebring, in the front seat, do
2  they have headrests that you can move up and
3  down or is it like a one piece seat?
4    A.   You can move it up and down.
5    Q.   Do you recall if it was up or down?
6    A.   I don't recall.
7    Q.   On the passenger's side or driver's
8  side?
9    A.   I don't remember at all.
10   Q.   Has Charles spoken to you about how
11 he feels after this interaction?
12   A.   Just period or regards to --
13   Q.   Just emotionally or how he feels
14 about -- how it's affected him?
15   A.   Afterwards -- I know he was upset, and
16 he just kind of felt like it happened to him for
17 no reason.  So he was kind of upset about that,
18 like he was, "I understand if I was out here,
19 you know, being unproductive and I'm doing --
20 you know, I'm out here actually doing wrong,
21 but I didn't do anything for this to happen."
22 Pretty much all he said about it.
23   Q.   Has he -- did he ever mention anything
24 about seeking counseling in any way?

158

1    A.   Not that I know of.
2    Q.   Did you suggest that maybe he should
3  seek counseling?
4    A.   No.
5    Q.   The other CPD officers, Chicago police
6  officers that you saw on the scene, do you
7  recall what race they were?  You mentioned that
8  there was the one black officer.  Do you recall
9  anything about the other guys?
10   A.   No.
11   Q.   Were they all guys?  Were there any
12 women?
13   A.   I don't recall any women.  Wait.  Was
14 there a woman?  I just recall guys because I
15 remember only had interaction with the one.  So
16 that's the only guy I kind of recall, and I
17 remember him being black, but that's the only
18 person I really had interaction with.  So I
19 didn't really pay attention.
20       I just know there's two people
21 searching my car, and one of them I interacted
22 with, and the rest of them I don't remember.
23       MS. GIBBONS:  I have nothing further.
24       MR. KSIAZEK:  I just have a few questions.

159

1              EXAMINATION
2  BY MR. KSIAZEK:
3    Q.   Okay.  When you said that the car
4  pulled to the side street and parked, can you
5  describe how it parked?
6    A.   Just pulled in.  It's along the side
7  of the street.  Didn't have to like parallel or
8  anything.  Just pulled in and parked the car.
9    Q.   Do you know if the car actually hit
10 the curb?
11   A.   Not that I recall.
12   Q.   Did you feel the car shake at all?
13   A.   No.
14   Q.   Was the steering stuck at any point
15 when you were driving down 53rd Street before
16 you parked?
17   A.   No.
18   Q.   Have you ever had any problems with
19 the steering on that vehicle?
20   A.   No.
21   Q.   Do you recall the black officer from
22 the University of Chicago who you said you
23 first saw, do you recall him wearing glasses?
24   A.   I don't remember if he wore glasses.

160

40 (Pages 157 to 160)

1    Q.  Now, when you said that Charles was
2 walking away, you said he stepped to his right
3 a few steps. Were the University of Chicago
4 officers' hands on Charles at that point when
5 he was trying to walk away?
6    A.  Yes, because they were trying to push
7 him.
8    Q.  So he took two steps to his right while
9 they were still trying to push him?
10    A.  Yes.
11    Q.  Do you know where their hands were
12 located on his body when he was trying to take
13 these -- when he took these two steps to his
14 right?
15    A.  They were somewhere on his upper
16 shoulder region.
17    Q.  Now, when the University of Chicago
18 officers were patting Mr. Boyle down, do you
19 know how far they actually knelt down or bent
20 over to pat Charles down?
21    A.  It wasn't that far. I don't know if
22 that helps. They didn't like get all the way
23 down to his ankles or his knees or anything.
24    Q.  Did they get down to his waist, do you
                                                    161

1 remember?
2    A.  Yeh.
3    Q.  But they didn't get down to his knees?
4    A.  No.
5    Q.  Okay. Do you know, did you ever hear
6 when the University of Chicago officers were
7 kicking Mr. Boyle, did you ever hear him say,
8 "I can't breathe"?
9    A.  He said it like two, three times.
10    Q.  Do you know when he said it? Did he
11 say it when the two University of Chicago
12 officers were the only ones that were kicking
13 him?
14    A.  I believe it was when it was the four
15 because I know the two he was saying that he
16 just kept saying, "Stop kicking me. Please stop
17 kicking me." I believe it was with the four
18 when he said, "I can't breathe. I can't
19 breathe."
20    Q.  Did you ever see any of the University
21 of Chicago officers actually throw Charles onto
22 their squad car?
23    A.  When they pushed him onto the squad
24 car, yes.
                                                    162

1    Q.  Did they push him or did they throw
2 him?
3    MR. PUISZIS: Objection to the
4 characterization.
5    THE WITNESS: I don't know what word I want
6 to use. They got him on the car. They forced
7 him on the car.
8 BY MR. KSIAZEK:
9    Q.  Did you stop for food any time on the
10 way home from the club before this incident
11 occurred?
12    A.  No.
13    Q.  No? Do you recall anyone saying
14 anything about Sarpeno's?
15    A.  That's a food place.
16    Q.  Yeh. Did anyone say anything --
17    A.  I just remember them talking about
18 food. I don't remember what exactly they were
19 talking about, though.
20    MR. KSIAZEK: Okay. I don't have anything
21 further.
22    MR. PUISZIS: Nothing further.
23    MS. GIBBONS: Nothing further.
24    MR. PUISZIS: You have got the right, when
                                                    163

1 the transcript is ordered, to read your
2 testimony if you want to or you can rely on
3 the accuracy of the court reporter in getting
4 down everything accurately that we said in
5 the room today.
6    So it's an option we give every witness
7 if they want to read the transcript or they want
8 to waive that right.
9    THE WITNESS: Okay. I want a copy of it.
10    MR. KSIAZEK: You want to look at it?
11    THE WITNESS: Yeh.
12    MR. PUISZIS: So signature's reserved. Okay.
13 Thank you.
14    MR. KSIAZEK: Thank you very much for coming.
15    MS. GIBBONS: Thank you, Ashley.
16    (FURTHER DEPONENT SAITH NAUGHT.)
17
18
19
20
21
22
23
24
                                                    164

41 (Pages 161 to 164)

1    IN THE UNITED STATES DISTRICT COURTS
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4    CHARLES BOYLE,          )
5         Plaintiff,      )
6    vs.               ) No. 09 C 1080
7    UNIVERSITY OF CHICAGO       )
8    POLICE OFFICER LARRY TORRES, )
9    et al.,            )
10        Defendants.    )
11
12        I, ASHLEY NICOLE GLOVER, being first duly
13   sworn, on oath say that I am the deponent in the
14   aforesaid deposition taken on November 11, 2009;
15   that I have read the foregoing transcript of my
16   deposition, and affix my signature to same.
17   _____
        ASHLEY NICOLE GLOVER
18
19   Subscribed and sworn to
     before me this 5th day
20   of January, 2010.
21
22   Notary Public
23
24
                                              165

1    the foregoing is a true and correct transcript
2    of the testimony so given by said witness as
3    aforesaid.
4        I further certify that the signature to
5    the foregoing deposition was reserved by counsel
6    for the respective parties and that there were
7    present at the deposition the attorneys
8    hereinbefore mentioned.
9        I further certify that I am not counsel
10   for nor in any way related to the parties to
11   this suit, nor am I in any way interested in the
12   outcome thereof.
13       IN TESTIMONY WHEREOF: I have hereunto
14   set my hand and affixed my notarial seal this
15   5th day of January, 2010.
16
17
18   _Marlene L. King_____
19   NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20
21
22
23
24
                                              167

1    STATE OF ILLINOIS    )
2                     ) SS:
3    COUNTY OF C O O K   )
4        I, MARLENE L. KING, a notary public
5    within and for the County of Cook County and
6    State of Illinois, do hereby certify that
7    heretofore, to-wit, on November 11, 2009,
8    personally appeared before me, at 222 North
9    LaSalle Street, Suite 300, Chicago, Illinois,
10   ASHLEY NICOLE GLOVER, in a cause now pending
11   and undetermined in the United States District
12   Courts for the Northern District of Illinois,
13   Eastern Division, wherein CHARLES BOYLE is the
14   Plaintiff, and UNIVERSITY OF CHICAGO POLICE
15   OFFICER LARRY TORRES, et al., are the
16   Defendants.
17       I further certify that the said ASHLEY
18   NICOLE GLOVER was first duly sworn to testify
19   the truth, the whole truth and nothing but the
20   truth in the cause aforesaid; that the testimony
21   then given by said witness was reported
22   stenographically by me in the presence of
23   the said witness, and afterwards reduced to
24   typewriting by Computer-Aided Transcription, and
                                              166

1              McCorkle Court Reporters, Inc.
               200 N. LaSalle Street Suite 300
2               Chicago, Illinois 60601-1014
3    CERTIFIED MAIL
4    DATE: January 5, 2010
5    MS. ASHLEY NICOLE GLOVER,
     13033 Seeley Avenue,
6    Apartment 3,
     Blue Island, Illinois 60406
7
     IN RE: Boyle vs. University of Chicago
8    DATE OF DEPOSITION: November 11, 2009
9    Dear Ms. Glover:
10      Your deposition in the above-entitled cause
     is now ready for reading and signing as required
11   by law.
12      Please call the Signature Department upon
     receipt of this letter to schedule an
13   appointment to come to the above address to read
     and sign your deposition.  You have 28 days from
14   the date of this correspondence in which
     to appear for reading and signing.
15
        If you fail to appear or notify us so that we
16   may make arrangements for another appointment,
     your deposition will be completed and forwarded
17   to the attorneys and will be "... used as fully
     as though signed."
18
     _____ Procedure outlined in Rule 207 (a)
19       of the Illinois Supreme Court Rules
20   _____ Procedure outlined in Rule 30 (e) of
         the Rules of Civil Procedure for the
21       U.S. District Courts
     Sincerely,
22
     Margaret Selina        Court Reporter:
23   Signature Department    MARLENE L. KING
24   cc: All attorneys of record.
                                              168

**A**

abdomen
  67:8 112:5
  140:22
able
  5:8 30:18
  69:24 121:18
above-entitled
  168:10
absolutely
  13:15 105:5
account
  13:4 42:15
accuracy
  164:3
accurate
  5:19
accurately
  145:15,22
  146:20 147:5
  148:1,19
  164:4
action
  26:10
activated
  32:4
activating
  62:4
actual
  25:7 35:11,18
  38:3 91:4
Adams
  2:4
additional
  120:15
address
  6:2,6 168:13
addresses
  7:6 22:3 27:21
affix
  165:16
affixed
  167:14
aforesaid
  165:14 166:20
  167:3
African-Ame...
  13:16 14:6
ago
  7:20 16:21
  24:6
agree
  64:7 72:16
ahead
  4:22 46:9,11
ahold
  98:7
aid
  21:9,13
air
  97:2,3
al
  1:9 165:9
  166:15
alarm
  31:20,22 32:1
  32:2,4,9,13
  33:22
alcohol
  38:12
Alicia
  17:12,13,14,14
  91:1,1
  130:12,14,18
Alicia's
  17:16 131:12
  137:1
America
  41:17,17 43:12
  44:2,11
  45:20 46:4

113:15
Americas
  42:12
angle
  59:5,9,11 60:2
ankles
  161:23
answer
  4:22 5:7,18
  65:13 73:10
answered
  59:14 88:5
  146:3
answers
  5:10
anybody
  92:21
anymore
  7:18 15:21
  74:8 101:7
  108:5,16
anytime
  57:1
anyway
  135:23
apartment
  6:3 19:11 22:8
  22:11 27:9
  28:5,8 36:20
  42:3 168:6
Apollo
  15:2
apologize
  91:11 134:23
  151:15
appear
  25:18 168:14
  168:15
APPEARANCES
  2:1
appeared
  25:20 166:8
appointment
  168:13,16
approach
  119:17 153:15
approached
  112:19 155:17
approximate
  154:2
approximately
  52:1 114:4
area
  80:7 106:23
  107:1 140:22
arm
  79:17,21 87:4
  87:15 122:14
  122:14 141:5
arms
  58:6 76:23
  77:3 79:17
  122:2 143:20
  143:21
arrangements
  22:22 168:16
arrest
  125:2
arrested
  18:9 69:7
  130:20
  131:22
  150:19
arrive
  22:10 28:15
  38:8 58:17
  116:3
arrived
  27:6 110:3
  114:3 118:13
  120:16

article
  107:17
Ashley
  1:12 3:3 4:4
  4:13,14 5:22
  141:20 145:8
  164:15
  165:12,17
  166:10,17
  168:5
asked
  23:13 30:8,10
  49:2,3 52:22
  59:14 61:1
  63:23,24
  64:18,21
  65:19 66:7
  67:24 70:7
  71:1,13
  73:18,22
  77:11 126:16
  127:15 130:6
  133:13,13,19
  134:2,22
  138:19,19
  143:14 146:2
  149:11
  150:13
  151:14
asking
  61:6 65:2,22
  131:21,24
  133:18,22
  139:13
asks
  49:5 65:7
assistance
  115:6,7
ASSOCIATES
  2:2
assume
  4:23
ate
  20:2
ATM
  42:5,14,18,23
  43:12 44:11
  44:14 47:7
  47:16 49:10
  51:4,5 55:1
  55:2,20
  63:13 113:15
  135:22
attempted
  21:6
attended
  11:5
attending
  7:5
attention
  26:23 112:23
  157:9 159:19
attorney
  127:16 145:9
  149:7,10
attorneys
  15:11 167:7
  168:17,24
Avenue
  6:3 168:5
average
  75:7
a.m
  1:20

**B**

B
  3:10
back
  16:17,18 19:19
  21:6,23 34:1

41:12 42:16
  44:14 45:3,8
  54:6 67:10
  69:14 73:10
  77:9 80:17
  84:8 86:9,20
  86:24 92:6
  92:15 96:18
  96:20 97:18
  99:21,21
  100:8,11
  130:22,23
  137:17
  140:18,20,23
  141:1 152:1
  152:20 154:3
  156:18
  157:19
backup
  115:6
bad
  16:16 22:3
  29:6 44:2
badge
  114:14
bail
  131:23
ball
  11:20,21
band
  39:17
banged
  121:21
bank
  41:16,17 42:12
  43:12 44:1,9
  44:11,19
  45:19 46:2,4
  112:18 113:1
  113:3,6,15
bar
  19:6,7 38:9
  39:1,5,11,13
  40:4 58:6,23
based
  109:9
basically
  136:8 153:22
basis
  10:1,1,3
basketball
  36:1
bathroom
  147:3
beatdown
  142:15
beer
  38:16
began
  116:22 119:5
beginning
  9:5
behalf
  25:24
believe
  17:17 39:21
  42:4 49:2,19
  58:4,8 68:5
  89:1,1 109:9
  109:14
  111:19
  118:19
  119:22
  131:19
  144:13
  153:14 154:3
  154:19
  162:14,17
bending
  99:4
beneath

13:4
benefit
  4:12
bent
  103:7 161:19
best
  9:11,16 10:13
  10:17,18
  81:9 95:1
  135:16 154:3
big
  33:13 76:4,10
  76:12,13,22
  85:23 86:2
  123:11
billy
  90:11,14,18
  91:6 107:6
  150:2,5,8,21
bit
  20:13 40:19
  41:7,9 66:4
  81:15 83:1,2
  83:4,18,19
  86:14 91:11
  94:2 102:20
  110:12,21,21
  138:6 143:4
bi-weakly
  10:1
black
  72:5 74:19,24
  75:5 78:15
  79:3 81:6,8
  89:23 91:15
  91:17 106:3
  106:20
  107:19,22
  109:1 117:9
  151:2,4,10
  154:21 159:8
  159:17
  160:21
Blackstone
  7:7 50:20,21
  55:16
blaring
  51:15,18,24
  53:9
blocks
  27:24 52:1,2
Blue
  6:1,2,4 168:6
body
  66:17 82:3,7
  83:24 84:4,7
  99:4 100:1,1
  101:18,23
  102:14
  106:15,21
  111:24 112:5
  140:8,14,17
  143:13 151:9
  161:12
bone
  122:14
Book
  18:4,5
Boston
  36:2
bottom
  111:6,10
boyfriend
  19:9 20:9
  128:21
Boyle
  1:4 4:16 8:12
  9:7 12:10,12
  14:24 34:10
  36:23 146:16
  161:18 162:7

165:4 166:13
  168:7
Boyle's
  22:8,11
brakes
  60:5
break
  8:18 9:4
  124:15
breaker
  30:15
breathe
  143:16,16
  150:15,17
  162:8,18,19
bring
  138:21 139:14
broke
  52:24 123:10
broken
  122:10,11
  124:18
brother
  10:12,16
brothers
  7:9,12
brought
  127:20
bruise
  148:6
bruised
  121:23,24
  122:1
bruises
  122:8 140:15
  140:16 141:3
  141:4 148:4
bumper
  102:24
bunch
  39:7
Burbank
  21:1
bus
  27:12
busy
  15:22

**C**

C
  1:6 165:6
  166:3
Cain
  12:18,21,23
  13:1,6,8,20
  15:1,2
call
  10:14,23 19:5
  24:2 80:13
  81:20 106:24
  115:6,7
  130:22,22,23
  134:5 168:12
called
  1:13 4:5 30:13
  102:11 130:9
  130:12,14
  138:19 139:9
Calls
  65:11
calm
  129:10,11,18
camera
  35:20 138:21
  138:22,24
  139:1,6,14
  139:17
  142:23
Cameron
  35:19,21

| | | | | | |
|---|---|---|---|---|---|
| **cap** | 120:6,17 | **Charles** | 112:20,24 | 116:17 | **cocaine** |
| 41:2,3 | 126:10,15,17 | 1:4 4:16 8:12 | 113:13,22 | 117:16,19,21 | 14:14,15,19 |
| **car** | 126:21,22,23 | 9:6,22 10:2 | 114:1,23 | 118:7,9,13 | **Coca-Cola** |
| 7:17,19,21,23 | 127:4,6,9,9 | 10:8 11:5 | 115:5,9,14 | 118:18 119:4 | 13:14 14:14 |
| 8:1,4,9 29:2 | 127:11,20,22 | 12:5,10,12 | 115:17,20 | 119:6,12,18 | **Code** |
| 29:4,12,18 | 128:11,12,15 | 12:18,21,22 | 116:15,19 | 119:21,22 | 6:4 |
| 30:5 31:4,15 | 128:16,17 | 12:24 13:8 | 119:4,9,9,18 | 120:2,6,9,16 | **coke** |
| 31:16,18,20 | 129:14,16,21 | 14:20,23 | 119:20 | 121:5 122:16 | 13:6,8,17,20 |
| 32:8,12,14 | 129:22 | 15:1,17 16:3 | 120:18 121:2 | 123:20,23 | 13:22 14:1 |
| 32:20 33:12 | 132:11 | 16:22 18:6,8 | 121:6,15,19 | 124:3,7,10 | 14:13 |
| 33:13,16 | 133:19 | 22:7,11 | 121:23 | 124:14,18,23 | **collar** |
| 34:1,11,12 | 134:24 135:2 | 23:10,15,15 | 123:14,19 | 125:13,17 | 78:1 80:1,2,6 |
| 46:8,11 47:3 | 135:14 136:4 | 24:7,12,21 | 124:4,7,11 | 126:1,18,20 | 80:7,9,11 |
| 47:7,8 48:2 | 137:11 | 25:11,21,24 | 124:13,21 | 128:18 129:3 | **college** |
| 48:4,5,6,9 | 138:15 | 26:2,9,24 | 125:1 126:2 | 129:4 141:11 | 11:15 |
| 49:5,24 50:5 | 153:12,14,18 | 27:3,11,17 | 126:4 127:18 | 142:16 | **Columbia** |
| 50:8,12,13 | 153:20,23 | 34:10,16,19 | 128:1 130:2 | 145:10,18 | 17:3 21:7 |
| 50:22,24 | 154:2,13,15 | 35:4 36:10 | 130:5,19 | 152:3,8 | **come** |
| 51:2,3,7,11 | 154:24 155:5 | 36:17,23 | 134:2,3 | 153:2,9,12 | 24:8 27:7 59:1 |
| 51:20,22 | 155:11,16,18 | 38:5,17 | 138:12,12,13 | 153:23 154:6 | 60:5,6,8 |
| 52:15,23 | 156:2,4,5,6 | 39:21 40:16 | 138:17 139:9 | 154:12,14 | 65:24 71:22 |
| 54:6,7,8,17 | 156:9,10,19 | 40:21 41:13 | 141:9 142:2 | 155:4,15 | 80:20 84:11 |
| 54:18,21,22 | 157:6,7,12 | 43:7 45:7 | 142:6,8,12 | 156:15 157:3 | 84:16 87:4 |
| 55:2,15,19 | 157:17,19,20 | 51:4 54:12 | 143:1,6 | 159:5 160:22 | 87:17,19 |
| 55:22,23 | 157:21,23 | 56:9,12 | 144:11,17,22 | 161:3,17 | 114:17,17 |
| 56:4,7,9,10 | 159:21 160:3 | 57:19,20 | 145:9 146:16 | 162:6,11,21 | 135:23 |
| 56:11,13 | 160:8,9,12 | 61:3 62:1 | 146:21,24 | 165:7 166:9 | 139:13,16 |
| 57:15 58:22 | 162:22,24 | 63:22 64:12 | 147:1,18,18 | 166:14 168:2 | 153:18 |
| 59:1,7,8,21 | 163:6,7 | 65:2,21 66:2 | 148:14,23 | 168:7 | 168:13 |
| 59:23 60:4 | **card** | 66:5,7 67:11 | 149:6,16,20 | **Chrysler** | **comes** |
| 60:12,18,21 | 30:17 39:22 | 68:8,13 70:8 | 151:3,16 | 7:22 29:14 | 82:22 87:15 |
| 61:1,12,13 | 44:12,14 | 70:12,17,22 | 152:7 153:17 | **Cicero** | 99:21 |
| 61:13,16,19 | **cars** | 71:2,12,18 | 155:23 157:2 | 21:2 | **coming** |
| 61:21,23 | 30:18 49:16 | 71:21,23 | 158:10 161:1 | **circuit** | 24:3 54:14 |
| 62:3,4 63:2 | 50:4 61:8 | 72:24 73:5 | 161:4,20 | 20:14,24 30:14 | 88:16 164:14 |
| 63:11,14,16 | 110:3,18 | 73:14,21 | 162:21 165:4 | 61:7 132:10 | **community** |
| 63:24 64:10 | 114:5,16 | 74:5,6,10,15 | 166:13 | **circuits** | 13:16 14:6 |
| 64:10,19,24 | 117:20,22 | 74:19 75:11 | **Charles's** | 30:18 | **completed** |
| 65:3,7,15,21 | 118:10,18 | 75:12 76:3 | 10:16 13:4 | **circumstances** | 168:16 |
| 66:3,10,20 | 119:12,13,15 | 76:11,13,14 | 19:11 22:19 | 9:9 | **completely** |
| 68:1,19,20 | 119:23,24 | 76:15 77:12 | 23:17,20 | **City** | 59:18 121:14 |
| 69:10 70:16 | 120:2 132:14 | 77:15,19 | 27:8,15 28:4 | 2:23 20:14,24 | **Computer-Aided** |
| 70:23 73:8 | 152:9,12 | 78:7,13,24 | 28:8 36:20 | 118:12,17 | 166:24 |
| 74:7,22 | 153:24 | 79:5 80:12 | 38:1 42:3 | 119:6,6,11 | **concert** |
| 77:16,18 | **case** | 80:21 81:2,9 | 64:18 67:5 | 119:21,22 | 16:14 |
| 81:4 82:2,9 | 15:11 19:12 | 81:12,13 | 75:1 78:15 | 126:20 | **condition** |
| 82:18 85:7,8 | 23:21,24 | 82:12,14,15 | 79:12 82:3 | 132:11 | 145:15 146:21 |
| 85:10,11,14 | 24:5,15,16 | 82:21,22 | 83:24 84:4 | 154:14 | 147:5 148:1 |
| 85:15,16,19 | 24:22,23 | 83:8,12,13 | 85:4 86:9,22 | 155:15 | 148:19 |
| 86:17 87:10 | 25:3,5,7,17 | 83:16 85:6,8 | 87:15 100:1 | **civil** | **consider** |
| 88:11,21 | 26:12 57:1 | 85:20 86:13 | 100:8,11 | 1:14 25:3,7 | 15:17 52:11 |
| 89:8,20 | 149:4 | 87:3,13,13 | 101:18,23 | 26:10 27:1 | **consistent** |
| 91:22 92:1,2 | **Casey** | 87:24 88:8 | 102:14 103:4 | 168:20 | 109:23 |
| 93:13,23 | 35:23 | 88:12,16,23 | 106:15,21 | **class** | **constant** |
| 94:8,9,10,12 | **cash** | 89:4,10 90:5 | 108:15,21 | 19:17,24 | 121:11,12 |
| 94:13,14,21 | 41:15 42:17 | 90:9,13,17 | 122:17,22 | **clear** | **constantly** |
| 94:22 95:5,6 | **catch** | 90:21 91:6,8 | 127:16 145:9 | 117:13 | 125:9 |
| 95:9,9,13,15 | 27:11 | 91:14,18,20 | 145:15 | **clearly** | **contact** |
| 95:17,20,24 | **cause** | 92:19 93:9 | 146:15 147:5 | 100:5,7 | 87:5,15,17 |
| 96:3,4,10,13 | 53:7 141:10 | 94:1,6,16 | 148:1,5,19 | **close** | 134:6 |
| 96:15 98:3,4 | 166:10,20 | 95:12,16,20 | **cheater** | 100:19 118:1 | **continue** |
| 98:5,14,15 | 168:10 | 95:21 96:3 | 8:19 | **closer** | 93:22 120:17 |
| 98:15,24 | **cc** | 96:13,17,19 | **check** | 36:21 83:22 | **continued** |
| 99:6,18,23 | 168:24 | 96:19 97:7 | 54:15,15 | 101:11 | 93:10 |
| 100:17,21 | **Celtics** | 97:10,14,14 | **checking** | **closest** | **continues** |
| 101:6,8,10 | 36:2 | 97:18,20 | 68:16,17 | 50:7 | 101:18 |
| 101:11,11,12 | **CERTIFIED** | 98:3,8,21 | **Chemistry** | **clothes** | **continuously** |
| 101:13,14,15 | 168:3 | 99:3,5,12,16 | 6:18 | 107:23 121:21 | 51:15,18,23 |
| 101:19,21,24 | **certify** | 99:24 100:16 | **chest** | **clothing** | **contusions** |
| 102:2,4,5,11 | 166:6,17 167:4 | 100:16,24 | 76:22 103:4 | 104:4 107:17 | 122:4,5,7,12 |
| 102:21,22 | 167:9 | 101:2 103:8 | 104:18 112:4 | 107:21 | **conversation** |
| 103:2,5,7,10 | **chair** | 103:16 | 112:5 140:22 | **clown** | 26:8,13,23 |
| 103:12,14 | 85:2 | 104:10,12,16 | **Chicago** | 40:19 | 54:5,9 71:18 |
| 104:17 | **chance** | 104:24 105:8 | 1:7,19 2:6,13 | **club** | 90:16 91:4 |
| 107:11 | 121:10 | 105:10,24 | 2:16,21,23 | 19:6,6,8 23:4 | 133:23 |
| 112:21 | **change** | 106:7 107:5 | 6:13 20:21 | 23:8 28:21 | 135:10 136:6 |
| 115:13 116:6 | 30:9,12,14 | 108:1,6 | 32:19 33:5 | 28:23 29:1,7 | 136:13,14 |
| 116:8,14 | **changed** | 109:15,17 | 48:2 59:22 | 29:9 90:10 | 148:23 149:6 |
| 117:24 118:2 | 30:22 | 110:8 111:12 | 61:12 63:21 | 90:11,14,18 | 149:24 |
| 118:8,21 | **characteriz...** | 111:13,14,20 | 113:24 114:6 | 91:6 107:7 | **conversations** |
| 119:1 120:4 | 163:4 | 111:21,23 | 114:6,8,9 | 150:2,6,9,21 | 22:23 25:11 |
| | | | | 163:10 | |

143:1 149:1
155:14
Cook
1:17 166:5
167:19
cop
62:16,18,22
110:18
157:11,15
cops
62:17 154:11
155:23
copy
164:9
corner
50:8 102:21,22
CDRPDRATIDN
2:17
correct
32:9,10,14,15
47:4,13 49:7
70:13 85:4,5
93:23 167:1
correctly
27:14
correspondence
168:14
counsel
2:17 167:5,9
counseling
158:24 159:3
count
109:24 110:2
County
1:17 166:3,5,5
167:19
couple
21:8 24:1,6
27:20 28:17
29:21 31:8
31:19 34:17
34:22 35:1,5
35:8 54:23
57:11,12,13
89:6,7,8
91:14,20
93:10 94:7
94:16,19
95:14,22,23
96:8,14
99:16 101:1
108:3 111:17
112:2 132:7
144:2
course
122:17
court
1:1 4:12 5:3
5:14,15
25:18 36:24
47:1 164:3
168:1,19,22
Courts
1:15 165:1
166:12
168:21
cover
21:10,14
CPD
159:5
cracked
60:19
Cregier
7:8
criminal
15:10,11 24:14
24:15,22,23
25:5,13,17
26:11 27:4
36:24 57:1
57:10 149:3

cross
27:22 55:3
crossed
55:7
crying
129:11 157:4,5
157:14
cuffs
119:18
CULBERTSON
2:9
curb
158:19 160:10
currently
5:24 21:16
C-a-s-e-y
35:23
C.S.R
1:23

D

D
3:1
dad
21:24,24
130:22 137:1
dad's
27:18,19
damage
8:4
damaged
8:2,5,10
dance
40:13
dancing
40:17,20
dark
75:8
darker
75:8,9
date
8:16 18:12,13
19:23 34:11
37:1 168:4,8
168:14
dated
16:1
dating
8:22 9:14 10:5
17:6
day
18:17 19:1,4,8
20:1 22:7,7
22:11,23
25:13,14,16
25:18 27:19
29:18 30:6
30:21 31:8
31:13 142:9
143:1 147:6
147:19
165:19
167:15
days
168:13
Dear
168:9
Defendants
1:10 165:10
166:16
Definitely
72:6,7
definition
75:16
Department
168:12,23
depend
30:1
depends
19:22 30:2
depict

145:15,22
146:21 147:5
148:1,19
deponent
164:16 165:13
deposit
41:22 42:10,13
deposition
1:12 3:12 37:4
145:2,4
146:16,17
147:10,12
148:9,10
165:14,16
167:5,7
168:8,10,13
168:16
depositions
1:15
describe
39:3 59:23
64:1 72:13
74:13 75:5
81:8 91:5
101:22
116:24
150:23 151:4
154:20 160:5
described
59:24 91:21
99:9 105:20
145:23
description
64:2
detective
131:4
different
7:6 14:17
27:21 114:14
114:18
119:13
136:21
difficulty
5:15
direction
46:24 59:10
60:1 82:16
95:21 97:8
118:24,24
155:10
directions
29:6 55:11
directly
42:15 46:7,13
46:15 63:8
68:7 98:15
98:17 99:11
101:6,14
102:17
discussions
48:16
dismissed
25:6
disoriented
132:24
distance
66:19 100:19
119:24
District
1:1,2,14 165:1
165:2 166:11
166:12
168:21
Division
1:3 165:3
166:13
DJ
23:5 34:16
39:17,18
DJs
23:10 37:19

doing
16:22 19:8
20:3 24:17
25:9 53:5
57:4 61:1
63:23 67:12
67:13,24
68:15 77:20
77:23,23
80:19 87:6,8
88:20,21
89:11,11
92:4,5,7,8
92:15,16
96:5,6,7,22
96:23,23
97:1,4,4
104:2 104:1
104:11,15,19
104:20
105:11 106:1
109:11,17
110:8 114:24
141:15 157:3
158:19,20
Donuts
47:22 48:3
62:19
door
40:7 118:1
dope
13:21,22 14:1
14:5,12
dorm
9:12
doubt
48:12
downstairs
40:3,5,6
downtown
20:21 41:18
drink
38:15,18
drive
28:4,23 29:1,5
34:1 36:20
43:13 60:4
90:19,22
113:22
132:24
136:17
138:16
driven
33:9,21 34:17
driver
45:8
driver's
28:2 120:12
158:7
driving
8:5 29:3 31:3
41:12 44:23
45:11 52:8
52:10,14
56:17 62:11
132:21,22,23
160:15
drop
137:1
dropped
73:7 107:8
137:24
150:10
drove
28:24 51:19
60:9 138:2
139:18
drowsy
50:1
drugs
15:6

duly
4:3,6 165:12
166:18
Dunkin
47:22 48:3
62:18
duo
35:3

E

e
3:1,10 168:20
earlier
19:3,8 22:23
23:9
early
18:24,24,24
49:11
east
16:7
eastbound
45:22
Eastern
1:3 165:3
166:13
eat
43:1
ED
2:2
edge
102:3
effect
73:2,16
either
4:19 14:13
15:1 21:22
22:3 23:4
28:22 33:3
38:21 40:2,2
40:6 43:16
66:1 108:11
109:7 115:9
116:12 117:8
130:15 131:4
Elam
9:18,20
electric
30:17 132:13
electrical
33:14,17 34:4
elevator
141:15
emergency
143:24 144:9
144:17,19,21
146:4,7
147:1,7,22
148:16,24
149:23
emotionally
158:13
ER
143:4,6
establishment
38:13,14 40:10
41:11 43:11
estimate
95:1
et
1:9 165:9
166:15
eventually
128:11 132:4
everybody
22:6
ex
130:6
exact
22:16 28:1
78:20 84:5
exactly

71:22 78:8,12
78:21 112:17
112:22 113:1
114:12 126:8
131:22 152:2
163:18
examination
1:13 3:2 4:8
151:22 160:1
examined
4:6 144:5
exhibit
3:12 145:2,5
147:10,13
148:9,11
Exhibits
3:17 146:17
existed
147:6 148:2,20
explained
64:22 70:16
explaining
25:4
expressway
53:11,13
extremely
75:8
ex-boyfriend
8:13 128:22
ex-boyfriend's
8:14
E-way
52:20 53:7,11

F

face
18:4,5 66:16
71:24 111:14
111:15 112:1
117:4 122:2
124:14 141:3
148:5,7
155:3
Facebook
34:20 77:2
facing
59:7,8 60:1
73:7 74:7
75:3 77:15
82:14,16
83:5,8,17,20
85:11 102:2
119:1
fact
61:18 71:5
77:1 99:5
fail
168:15
failed
70:18 73:3,12
fair
101:1 114:23
fall
9:8 90:7
Fame
36:5
family
146:11
famous
38:3
far
51:22 85:19
86:3 89:4
94:7,20,23
94:24 100:18
100:20
105:18
119:20 120:1
124:21
146:10
161:19,21

farther
95:24 99:17
100:24 101:1
fashion
109:22 111:19
fast
52:4 60:6
father
91:2 131:3,4
131:12
feel
29:3 160:12
feels
158:11,13
feet
46:9,10 47:19
85:23 86:4,7
89:8 91:14
95:1,2,3,14
95:22 100:15
100:22,23
101:3,10
108:14
fell
150:12
felt
158:16
female
72:5
fifth
141:14
figure
53:3 65:21
127:3 153:5
filed
18:8 24:12
filing
24:21 144:23
Finally
5:12
financial
21:9,13
find
128:9 130:2,7
130:8,11,20
fine
23:14 50:3
157:16
fingers
66:18
finish
5:14
finished
5:17
firm
23:24
first
4:5 9:6,15,23
10:8 25:5
26:12 35:18
36:18 60:16
61:19 68:3
79:18 86:11
89:21,23
94:4 121:1
131:15 133:2
133:11
134:24 135:4
135:12 136:7
136:17,17,17
136:20 152:2
156:18,19
160:23
165:12
166:18
five
28:18 30:1,3
31:11 36:12
86:6,7
100:22 101:3
114:20 121:7

121:8,12,14
126:5 145:16
fix
30:6
fixed
132:3,6,8
flail
87:24
floor
39:9 40:8
141:14
follow
12:10 17:20,21
17:23
followed
18:1
following
145:15,23
147:6,19,21
148:20
follows
4:7
food
163:9,15,18
foot
95:1
football
11:8,13,16,19
12:6 115:21
forced
163:6
forearm
143:23
foregoing
165:15 167:1,5
forgot
54:13 122:4
134:20
Former
36:4
forth
21:23 69:14
forward
100:15
forwarded
168:16
found
21:9,13 130:10
four
37:10 38:24
40:9 110:18
114:5 116:1
116:2,10
117:22 121:5
121:13,13
125:24
145:17
146:14,23,23
150:17 152:9
154:9,10
162:14,17
four-door
29:15,16
Four-eleven
141:22
FOX
2:2
frame
51:23 112:16
frequently
121:9
freshman
21:5
friend
8:6,13 9:11
10:13,17,18
15:18 18:5
25:20
friendly
64:3
friends

9:13 10:12
friend's
9:16
frisk
103:20
front
45:3,4 48:2
50:5,8 55:19
56:7,13 59:5
59:11 60:2
60:12 66:10
69:17 74:23
77:3 84:14
85:11,16,21
85:23 86:18
86:19 93:15
93:17 98:16
98:17 99:1
101:3,6,7,12
101:15 102:6
102:10,15,16
102:17,21,24
103:2 104:17
117:23,23
152:16 153:8
156:4 158:1
full
4:11
fully
77:14 149:13
168:17
further
30:19 31:18
39:8 136:14
159:23
163:21,22,23
164:16
166:17 167:4
167:9
f-ing
71:15

_G_

gap
66:13
getting
92:11 126:22
144:20,22
164:3
Gibbons
2:18 3:5 36:3
67:3 84:19
84:23 85:5,9
85:12 86:18
88:5 93:14
94:11,14
151:23
159:23
163:23
164:15
gig
34:16
girlfriend
17:9 130:9,10
give
64:12 65:8
71:10,15
95:1 164:6
given
166:21 167:2
glad
4:19
glanced
113:5,8
glass
113:7
glasses
124:15,18
160:23,24
Glover
1:12 3:3,12

4:4,13 145:2
145:4 147:10
147:12
148:10
165:12,17
166:10,18
168:5,9
go
4:22 6:10,11
6:12,22 17:2
19:11 20:4
21:3,6,6
23:3,3,7,11
23:12,15,17
25:4,5 27:17
28:7,20
29:23,24
30:9 31:5,7
31:10 32:5,8
33:19 34:16
39:14 41:10
42:5,22
43:18 45:14
51:3 55:1,14
60:19 63:13
63:21 67:20
82:4 84:4
85:15 88:20
91:12 105:13
105:15 108:9
108:21 112:8
113:22,22
122:22 128:9
128:23,24
129:22,23
130:1,2,4
131:6 132:18
137:22
139:17
141:14
149:12 151:3
152:1
goes
17:3 35:12
38:4 42:14
42:15 53:9
78:14 79:4
81:11 108:4
108:6,12
going
4:14,23 5:3,12
6:19 19:13
19:16 20:16
21:9,14,14
22:4,18 23:2
23:3,16,17
24:8,10
26:24 29:21
32:9,11,13
34:4,7,9
39:14,15
41:19 44:1
45:13,22
46:1,3,23,24
48:7 49:10
51:2 52:23
53:2 54:24
55:10 62:20
64:8 87:22
95:20 97:7
99:3 109:5,7
110:2 126:13
129:12,18
130:22
131:10 134:5
135:21
141:14 145:8
146:1,14
156:18 157:9
good
64:2

grab
72:1 79:12,16
81:21 88:7
100:2
grabbed
79:19,21,24
80:18 81:19
87:22
grabbing
79:5,9
grabs
79:20 80:8,10
80:12 81:16
83:12 86:11
99:24
great
5:14
ground
108:9,12 115:5
119:10,19
126:1 143:11
143:12
guard
36:5
guess
14:1 18:23
19:2,5 22:13
22:14 23:9
23:11 29:19
64:11 75:13
77:10 78:18
86:19 92:2
103:18
119:18
121:18 128:3
136:1 145:20
145:24 151:7
guessing
73:6 77:17
guy
13:18 23:10
30:8 63:20
75:14,15
76:4,6,10
129:15
132:10,12
151:7 159:16
guys
63:21 92:7,15
131:18 159:9
159:11,14
guy's
132:9
gym
40:23
G-l-o-v-e-r
4:13

_H_

H
3:10
Hall
36:5
halt
60:6,9
hand
65:17 69:13,14
69:16,23
79:17,22,22
80:20 81:24
86:20,24
87:19 100:7
100:10 151:8
167:14
handcuffed
127:18
handcuffs
126:9
handful
151:24
handles

107:3
hands
67:5,10,12,13
69:1 79:17
81:3,9,23
82:1,4 84:4
84:11,16
86:8 87:2
97:2,3,13
103:9,11
104:17 161:4
161:11
happen
18:12 22:24
45:10 80:10
81:2 101:17
104:8 108:8
158:21
happened
29:22 52:18
55:18 62:5
70:17 71:14
77:15 107:7
116:9 126:6
133:13,18
134:9,17
136:24 137:8
137:16 138:7
149:12,17,21
158:16
happening
66:10 112:24
153:16
happens
63:20 77:13
86:15 91:22
127:19 128:1
128:14,20
hard
62:9
hat
41:1
head
5:5 15:7,16
16:6 57:23
57:24 107:13
108:5,5,9,12
108:15,16,21
111:9 117:4
headrests
158:2
hear
4:17 60:17,23
66:11 70:9
73:14 78:22
78:23 89:10
107:14 118:5
124:17
125:12
143:14
149:20
150:13 162:5
162:7
heard
4:24 15:3,5,8
24:18 25:8
32:8,11
62:13 69:10
70:5,11,21
127:2,8
143:17
152:19
height
75:7
held
66:18
Helen
2:18 84:22
help
30:15
helping

78:5
helps
161:22
hereinbefore
167:8
heretofore
166:7
hereunto
167:13
he'll
54:12
high
6:22 11:13,17
11:19,20,21
12:5 48:14
HINSHAW
2:9
hip
38:7
Hispanic
72:5,7,15 91:7
117:11
151:11
hit
90:14,17 91:6
106:10,11,13
106:16,20,22
107:5 134:3
150:3,3,8,21
150:24
157:13 160:9
hits
143:13
hold
58:7,23
holding
58:4,5,8 151:7
home
20:2 90:15,20
90:22 127:12
127:13
128:23,24
129:22,23
137:2,23
138:2,5
163:10
honk
29:20
hood
51:5 54:16
56:14 57:17
57:22,24
58:2,3,7,9,9
58:14,15,16
58:23 60:11
60:15,16,19
60:22,24
61:10 62:19
65:24 66:1,3
66:5,14,20
68:16,17,22
70:2 71:22
73:4,5,6
74:4,5,6,9
74:16,23
77:18,22
78:2,6,14,22
79:4 81:4
82:12,13,15
82:21 85:21
86:11 93:13
98:15,24
101:4 102:1
102:3,4,19
103:5,7,11
104:16
156:20,22,23
156:24
hop
38:7
hopped

116:11,13
117:21,24
118:2,8,10
horn
29:19,23 30:6
31:5,16 32:5
32:8,11
33:19 34:3
45:12,13,14
51:2,6,12,13
51:14,18,23
52:15 53:8,9
54:11 62:20
62:22 63:6
64:8 132:3,6
132:8
hospital
121:3 138:9,11
138:14,18,20
139:13,17,21
139:22 142:5
142:23 143:2
149:23
hour
1:20 49:17
hours
40:11 41:6
144:3
house
20:4 23:16,17
27:18,19
31:19 138:3
139:18
146:10
hunch
105:14,20
hunched
105:2,24
hundreds
121:16
hungry
41:14
Hyde
11:23,24 12:3
41:19
hyperventil...
157:18

I

ID
3:11 64:22
idea
8:21 13:13,15
18:3 21:19
26:5 27:5
76:9 115:8
124:1
identification
49:1,6 53:20
53:22 54:1
64:13,16,19
65:3,8 66:7
70:13 71:2
71:13 73:15
73:19,22
77:12 145:2
145:6 147:10
147:14
148:12
ignition
51:8
Illinois
1:2,18,19 2:6
2:13,21
10:10 11:5,8
165:2 166:1
166:6,9,12
167:19 168:2
168:6,19
immediately
42:15 88:19

116:15,20
improper
65:1
inches
66:23,23,24
67:1
incident
4:15 18:9,10
30:22 32:20
36:23 54:2
57:9 92:18
92:22 121:20
122:18
123:24
124:19 132:5
135:11,18
136:15 139:3
145:11,16,23
147:6,19
148:20 149:1
152:1 157:1
163:10
included
48:16
indicating
46:21 47:9,11
59:4 61:24
66:15,21,22
69:12 74:20
76:19 77:3
80:7,14
81:11,14
82:6,23,24
83:3 84:7,21
85:2,3,15,17
86:12 87:7
87:23 90:6
93:20 94:10
94:11,13,22
95:7,10
96:22 98:5
98:14 100:3
100:4 102:1
103:24
104:14
106:24 109:6
110:13 111:2
111:3 112:3
123:7,11
148:6
information
96:12
initial
136:17
injure
124:7,10
injured
123:23 124:3
124:22
injuries
140:6,8 141:2
141:10
inside
39:3 61:12,13
64:24 113:15
133:18
135:21
137:13
157:19,23
install
132:11
instantly
114:20
intent
63:13
interacted
159:21
interacting
157:2
interaction
158:11 159:15

159:18
interactions
152:3
interchange...
13:23 14:2
interested
25:9 144:14,23
167:11
internal
141:16
interruption
67:16 74:2
118:15
132:16
intersection
57:20
interval
52:6 54:20
introduce
23:9
involved
9:24 10:14,20
11:2
involving
4:15
Island
6:1,2,4 168:6
issues
129:21
I-57
53:15,16
I.D
65:22 70:7,8
70:15,18,22
71:10,16
72:20 73:2
133:14

J

Jackson
7:1
jail
90:15,19 92:20
128:3
January
9:5 165:20
167:15 168:4
jeans
40:22
Jeffery
16:7 27:24
jerk
151:3
job
20:11,14
joint
38:2
joking
36:8
JONATHAN
2:3
Jones
35:13,14,17
36:1
Joyce
9:18,20
jumped
21:23 91:10
jumping
56:16
junior
6:15

K

K
166:3
KC
35:13,14,17,22
35:24 36:1
keep

5:9 57:4 134:6
140:5
Kenneth
26:1,2,3,14
27:7 28:15
34:3 36:15
38:22,23
40:17 45:5,7
41:17 48:10
49:4 73:4
80:6 117:15
132:10
150:17 151:1
Kenny
23:10,15,15
41:13,13,23
42:9,20
135:1,2,17
136:6,10,11
136:15,24
Kenwood
12:1,2,3
kept
92:7 110:10
162:16
kick
120:17 123:19
kicked
111:24 112:2
113:14,24
121:15,16
126:4 145:16
150:11
kicking
109:12,15,19
109:20 110:5
110:10,11,14
110:16
111:19,22
112:8 113:8
115:2,3,6
116:16,22
117:5 119:5
121:2,4,6,9
124:4,8,11
124:13
125:15,18,22
143:16
150:12,16,18
162:7,12,16
162:17
kicks
143:13
kind
7:21 11:18
15:22 24:11
29:12 31:22
32:1 41:3
49:24 56:7
59:9 60:6
74:21 76:3
77:23 80:12
80:15 81:14
81:16 86:13
107:1 127:22
152:10 157:7
157:14
158:16,17
159:16
KING
1:16,23 166:4
168:23
knee
90:7 105:15
111:5,6
151:3
knees
78:8,13 92:12
107:8,9,12
108:2 111:10
161:23 162:3

knelt
161:19
knew
10:15 21:17
29:5 34:7
36:16,18
41:17 46:10
49:4 73:4
80:6 117:15
132:10
150:17 151:1
know
5:7,12 8:12,20
10:9,13,23
11:3,4,7,10
11:13,16
12:20 13:12
13:18,22
14:2,8,11
16:7,22,24
17:5,7,9,16
18:3,14,24
20:10,15
21:15 22:15
22:16 23:1
24:3,4,11,12
24:16 25:8
26:2,3,16
27:3,22,23
28:11 29:11
30:13 31:13
31:24 32:7
32:12,20,22
32:23,23
33:11,16
34:3,8,20,22
35:7,10,17
36:3,4,11,17
37:14,24
38:23 39:12
39:13,23
40:1,4 42:12
42:21 43:1,9
44:8 45:6,7
49:23 50:7
50:15 52:7
52:20 53:8
56:4 59:19
60:9 61:8,18
62:15 64:14
64:21,23
65:19 66:13
68:11 69:11
69:21 70:21
71:17 72:4
72:12,13
73:18 74:18
77:19 76:3
77:24 78:19
80:13 81:20
84:5 87:14
89:16,21,22
90:6 91:1,7
91:9 92:3,4
92:12,13
100:12 102:6
103:6,7
106:23
110:17 112:7
115:4,20,22
117:8,11,18
119:7,11
122:11 123:3
123:6,22
124:5,21
128:4,7
129:19 130:4
131:23
133:12
138:17,18,22
141:21 142:2

142:4,8,11
143:15 144:8
144:10,11
146:2,6,11
149:14
152:20
154:10,23
155:12,21
157:8 158:15
158:19,20
159:1,20
160:9 161:11
161:19,21
162:5,10,15
163:5
**knowing**
64:9,19 65:3
**knowledge**
33:10 93:3
134:9
**known**
12:12,22,24
36:10
**knows**
132:13
**Ksiazek**
2:3 3:6 13:10
23:23 32:16
32:22 36:6
57:3 59:14
65:11 67:1
71:6 88:3
93:5,16 95:8
97:1 111:6
112:4 123:8
125:5,7
141:23
159:24 160:2
163:8,20
164:10,14
**K-C**
35:22

**L**

**L**
1:16,23 166:4
168:23
**lady**
64:23
**Laflin**
7:1
**Lake**
43:13,16,23
44:5
**lane**
55:10,12
**lanes**
55:6
**Langley**
9:1 22:5
**large**
151:4
**LARRY**
1:8 165:8
166:15
**LaSalle**
1:18 2:11,19
166:9 168:1
**late**
26:19
**law**
23:24 168:11
**lawsuit**
18:8 24:13,21
27:1,4
144:23
**lawyer**
23:20 24:24
25:3,11
26:10,19
149:4,19

**leaned**
102:2,3
**leave**
23:17 27:16
144:20,22
**led**
109:14
**left**
27:10 39:6
41:18 74:20
75:1,2 78:16
79:12,13,22
83:10,13
85:4 86:22
88:24 93:10
93:18 94:5,7
94:9 95:8
98:9,12,21
100:7,8,14
137:21
**left-hand**
98:6
**leg**
105:14 108:18
108:18
**legs**
105:3 109:5,14
109:22
110:24 111:4
111:18 117:6
**length**
31:13
**lengths**
154:3
**letter**
168:12
**Let's**
46:19
**level**
40:6 65:10
66:17,17
67:8
**license**
1:24 28:2
65:20 133:14
133:20,21,22
**lift**
110:16
**lifted**
57:22,24
110:19,22
**lights**
48:7 52:22
59:13 62:4,6
62:10 63:3,5
63:17
**limping**
142:12,14
**live**
70:24 152:17
**literally**
99:24
**little**
20:13 38:4
39:8 40:19
41:7,9 58:14
66:4,13
81:15 83:1,2
83:4,18,19
86:14 91:10
94:2 102:20
110:12,21,21
125:5 138:6
143:4
**live**
5:24 6:8 7:4
8:23 16:3
**lived**
6:5
**lives**
8:20

**living**
10:24 21:20
**LLP**
2:9
**located**
6:24 29:10
119:20,22
161:12
**location**
38:9 39:4
47:20 56:17
**long**
6:5 8:16 11:4
15:9 27:13
28:19 29:24
30:21 36:10
36:19 40:9
40:12 45:14
51:17 55:21
55:24 56:8
57:8 58:16
58:20 108:1
112:7 120:15
132:5 137:13
143:24
**longer**
73:7
**look**
12:14,15 30:5
30:19 51:5
54:12 56:13
57:17 130:4
145:11
146:18
164:10
**looked**
30:7,11 56:24
117:13
145:22
154:22
**looking**
74:22 82:15,17
105:3 155:2
**lot**
29:3 76:19,21
76:22 77:8
96:12 140:1
**loud**
5:10
**lounge**
36:20 37:9
38:9 39:1
**love**
107:3
**lower**
67:8
**lowering**
108:18,19,19
108:20
**lyrics**
15:15

**M**

**M**
2:10
**machine**
5:9
**Macy's**
20:12,20,21
**MAIL**
168:3
**main**
40:8
**major**
6:17
**making**
41:21 134:3
**male**
72:6,12
**manner**
109:14

**March**
9:3 21:18
**Margaret**
168:22
**mark**
145:1 147:9
148:8
**marked**
3:11 145:5
146:15,16
147:13
148:11
**marks**
148:4
**MARLENE**
1:16,23 166:4
168:23
**married**
10:24
**Mars**
62:4 63:17
**matter**
57:10
**McCorkle**
168:1
**mean**
12:1 20:8
24:14 31:24
32:24 33:3
38:1 51:20
52:9 53:11
54:23 56:15
60:4,8 62:7
63:12 65:14
75:22 93:1
96:17 107:10
129:10
140:18,21
145:19
**Meaning**
102:16
**means**
14:10 46:24
105:14
**meet**
9:6 23:3,7,16
37:16 39:20
131:3
**meeting**
9:10
**member**
35:4,8
**men**
61:12
**mention**
15:13 158:23
**mentioned**
155:4 157:5
159:7 167:8
**mess**
121:19
**messed**
122:13
**messing**
107:16,23
**met**
9:15 10:8
19:10 22:6
23:20 27:10
27:14,14
40:1 131:13
**mind**
48:12 65:2
**mine**
8:6
**minute**
30:4 31:11
56:1,2,3
58:18,19
120:19,21
**minutes**

28:17,18 36:21
110:4,6
111:17
112:11,12,13
114:2 120:20
120:22,23
121:2,4,7,12
121:14 126:5
137:15,16
141:13 144:4
144:5 145:17
**Miscôbaracte...**
71:7 88:4
**missed**
20:19 21:11
**mom**
21:23 28:12,12
138:12
**money**
42:2,13,14
43:2,8 142:2
**months**
7:20 57:11,11
57:13
**morning**
18:24 19:17
24:2 49:11
49:14,17
64:9 134:20
137:3,19
139:11
**mother**
6:9 7:24
**motion**
49:24 90:5
**move**
88:12,23 89:4
91:14 94:2
95:12 100:16
109:22 158:2
158:4
**moved**
80:15 93:9
94:4,18
95:16 96:7,8
96:21 100:24
101:2 128:8
131:11
**moves**
91:20 95:22
99:12,16
**moving**
69:14 91:23
94:4,6,16
95:21 96:3,6
96:19 97:10
97:14,20
99:5,17
101:20
109:13
111:18
115:12 117:6
142:17
143:20
**muscles**
76:22 77:8
**muscular**
76:13
**music**
34:21 39:15
**Mutant**
36:6,7
**Mutual**
44:16
**Mydas**
37:20
**M-y-d-a-s**
37:20,21

**N**

**N**
3:1 168:1
**name**
4:11,11 7:15
7:16 8:8,14
8:24 9:17
12:15,20
13:4 14:23
16:7,8 17:16
22:1,2 28:22
29:7 35:10
35:11,12,16
35:18,18
37:9,10,15
37:18 42:7
131:14,16
132:9
**naturally**
86:14
**nature**
5:10 24:4
127:7
**NAUGHT**
164:16
**NBA**
36:5
**near**
43:11 153:20
**nearby**
47:23
**nearly**
76:10
**need**
24:10 30:16
64:22 65:22
70:15,18,21
126:24
**needed**
41:15 134:1
**needs**
115:7
**never**
11:12 18:1
24:18 48:4
62:13 107:20
117:12
122:22 123:1
**Nicole**
1:12 3:3 4:4
4:13 165:12
165:17
166:10,18
168:5
**night**
39:20 49:17,21
134:10
136:15 142:3
145:11
**Ninja**
36:7
**nod**
5:5
**normal**
52:11,12 60:10
**normally**
94:3
**north**
1:18 2:11,19
29:11,11
41:18 46:5
47:15 50:18
55:3,8 166:8
**Northern**
1:2 165:2
166:12
**notarial**
167:14
**notary**
1:16 165:22
166:4 167:19
**note**

46:19,20
notify
168:15
November
1:19 165:14
166:7 168:8
number
3:11 133:20,21

**O**

0.
166:3,3
oath
165:13
object
107:6 150:23
151:5
Objection
13:10 32:16
65:11 71:6
88:3 163:3
observations
109:10
occasion
52:15
occurred
18:9 25:12
57:9 90:17
163:11
occurrence
147:21
October
18:14 19:20
20:6 21:20
22:7 34:1
44:15 56:23
Odd
34:22 35:1,4,8
offhand
12:15
officer
1:8 49:5,7
52:13 53:1,6
58:21 60:24
65:6 66:6,6
70:7,20,20
71:1,14,15
71:17,19,24
71:24 72:2,4
72:17,19
73:1,18
74:14,24
75:6 77:11
77:16 78:3,7
78:11,15,16
79:4,11,16
79:20 80:8
80:10 81:6,9
81:16,19,23
83:7,12,16
84:1,13,14
84:23 85:6
86:8,22 87:5
87:16,18
88:7 89:13
89:17,20,23
89:24 90:2
90:14,18
91:5,9,15,15
91:17 92:9
93:10,22
95:4,13,19
95:21 96:2,8
96:12,18,20
97:13,17,20
97:21,22,23
98:7,20
99:11,20,21
100:2 101:18
103:18,23
104:8,21,23

105:12,12,19
105:23 106:3
106:10,19
107:14,19,19
107:22
108:11,18
109:1,1
115:7 119:8
120:11
122:16
123:20
124:14,23
126:14,16,18
126:20
128:10,18
129:1,3
131:4 134:4
151:12
154:20 155:5
155:7,9
156:14 159:8
160:21 165:8
166:15
officers
2:16,24 32:18
33:4 58:10
58:17 59:20
62:3 65:10
67:12,23,24
74:11,14
91:24 109:3
109:11,13,22
110:5 111:18
113:14,24
114:2,9,10
114:24 115:5
115:10,15,18
116:14,18
117:1,9
118:9 119:4
119:6 120:5
120:8,16
121:1,3,5,13
123:23 124:3
124:7,10
125:13,18
126:1 129:4
130:6 141:11
142:16
145:17 152:3
152:9 153:12
154:7,12,15
154:17
155:11,15
156:8,16
157:3 159:5
159:6 161:4
161:18 162:6
162:12,21
officer's
70:9,10 80:20
82:4 84:3,11
84:16 87:19
98:19 124:18
125:2
oh
10:18 32:3
38:3 53:16
146:1
oil
30:9,22
okay
4:16,21 5:2,10
5:11,21,22
6:17 7:17,19
7:21 9:21
10:5 11:4,7
12:5,8,17
13:3,14
15:17 17:6
17:16,23

18:17 19:7
19:24 20:18
20:23 21:15
22:6,10,24
23:19 27:16
28:4,7,15,20
33:16 34:3
34:13 36:15
37:9,14,23
38:5,17 39:3
39:19 40:9
40:13 41:5,9
42:9,22 44:4
44:18,23
45:5,10
46:20,23
47:3,10 48:1
49:23 50:12
50:22 51:6
51:11 52:4
52:13 53:16
53:19 54:19
54:24 55:12
55:14,21
57:7,14 58:2
58:15 59:19
59:23 60:11
61:11,15,20
62:2 66:9
67:2,11 68:8
68:13,18
69:16 70:12
71:1,12
72:16,24
73:14,18
74:9,13 75:5
75:24 76:3
77:8,11 79:3
79:11,16,20
80:8 81:8,19
82:14,18,21
83:12,16,24
84:3 85:12
89:4,16 90:8
91:5,10,20
92:21 93:22
94:6,20 95:4
95:12,16
96:11 98:19
98:23 100:10
100:15,24
101:17 102:9
102:13
103:16 104:7
105:6,19
106:12,15,21
107:5,14
108:1,6,21
108:24 109:9
109:17,21
110:8 111:17
112:7,15
113:11,23
114:13,16
115:4,14,23
116:9 117:6
117:8 118:4
119:3,11,14
122:8,15
123:4,17
125:6 126:19
127:18 128:1
128:6,10
129:5,12,19
129:23 130:4
130:12,23
132:2 134:14
134:22 135:5
135:10,16
136:5,12,19
138:7 139:8

140:3,7
141:2 142:5
142:20,24
143:19 144:8
145:1 146:6
146:11,14
148:8,22
149:9,16,20
152:5 153:9
153:11 156:4
156:12 160:3
162:5 163:20
164:9,12
old
5:22 13:18
75:14,17,18
75:20,21,22
Ole
37:9,12,13
once
15:24 34:9
37:1 52:17
57:23 80:18
80:22,23
89:19,19
90:15 101:20
114:21
125:20 138:9
157:14
ones
152:19 153:7
162:12
open
39:9 113:6
opposite
47:12
option
164:6
order
101:3 153:4
ordered
164:1
orientation
78:20
originally
131:8,9
outcome
167:12
outlined
168:18,20
outside
26:17 90:19
133:12
136:16
155:16,18
157:19,21
owl
49:21
owner
7:23
o'clock
1:20

**P**

pad
46:19,21
page
34:20
panel
102:6,12 103:2
pants
122:17,22
123:14,18
141:7
parallel
160:7
park
11:23,24 12:4
41:19 43:23
44:5 45:15
45:16

parked
31:18 45:18
46:8 51:1
59:24 63:10
94:12 120:2
153:6 156:2
156:6 160:4
160:5,8,16
parking
50:7 55:12
parks
47:4
part
82:3 100:1,1
111:3,23
particular
23:8 29:18
146:7
parties
167:6,10
passenger
45:9
passenger's
45:2 55:18
82:10 120:12
158:7
pat
103:19 105:20
161:20
pats
105:13
patting
104:3,3,3,4,8
104:10 105:3
105:9,9,24
106:4 161:18
pay
21:7 26:24
27:3 112:23
157:8 159:19
paying
8:3 26:23
payments
8:2
pen
47:6
pending
166:10
people
5:16 39:14
49:23 53:8
61:13 133:18
159:20
perform
35:3
period
51:17 158:12
periodically
31:5
person
30:7 37:15
159:18
personal
134:8
personally
166:8
pertaining
1:15
phone
24:2
photograph
145:9,14,21
147:16,17,24
148:2,14,18
150:20
photographs
93:2 142:9
146:18,23,24
147:4
photos
92:17,19,22

140:3,7,12
140:23 141:1
141:2 146:15
146:20
phrase
13:5
physician
146:12
pick
115:14,17
126:11,13
128:9 138:8
picked
126:12 127:19
picture
13:5
pictures
77:1 92:24
121:22
138:21 139:2
139:16,20,24
140:6 141:4
141:5,8
piece
158:3
place
16:9,12 22:17
27:7,8,16,17
37:10 42:8
58:7 128:8
132:11 156:1
163:15
Plaintiff
1:5 2:8 165:5
166:14
planned
144:11
plate
133:21
play
11:21 12:5
36:2
played
11:7,13,16,18
115:21,21
player
36:1
playing
11:20
please
4:10,18 5:9,16
109:19
135:16 145:3
145:12
146:18
147:11
162:16
168:12
plus
29:5 55:12
point
8:3 13:3 51:14
54:19 59:16
67:6 68:23
69:8 70:2
72:3,17
74:15 78:4
78:17 79:4
89:15,17
94:1 103:17
140:12
144:12
153:13 154:8
157:4 160:14
161:4
pointed
68:21 69:2,5
pointing
84:8
poke
90:2

poked
89:21 151:10
police
1:8 2:16,24
15:13 24:13
32:18 48:10
48:17,20
49:4 52:13
55:22 58:10
58:16,21
59:1,19,22
60:24 63:17
64:12,15,18
65:2,6 66:3
66:6,6 67:23
67:23 70:9
70:10 93:13
114:6,7,8,10
116:12,13
118:7,7
126:18
128:18 129:3
129:4 132:18
133:2 134:14
134:18 135:5
135:12 136:7
136:13,20,21
138:22
145:10 152:3
152:9 153:12
153:16,24
154:7,12
155:5,15
156:15 157:3
159:5 165:8
166:14
pop
105:8 156:20
156:22
popped
92:14 104:10
104:12
105:11
156:23,24
pops
92:6
portion
84:7 87:4,5,15
102:10
posing
77:2
position
101:23 104:23
115:20
positive
14:10
power
31:16 51:7
presence
166:22
present
25:10 26:12
167:7
pretending
47:6
pretty
10:15 25:7
48:18 69:23
76:18 121:21
132:23
143:18
149:14
158:22
previously
146:15 152:7
prior
30:6
pro
36:4
probably
5:12 15:24

16:13,20
19:9,18
22:12 30:12
30:16 31:9
32:24 40:23
56:3,22
58:19 77:5
83:13 86:5
120:19 140:2
problem
30:6 54:1
problems
29:17 53:7
142:17
143:20
160:18
Procedure
1:14 168:18,20
168:20
produce
48:24 49:6
53:22 70:12
70:19 71:2
71:13 127:15
produced
53:24 73:21
promoter
23:5 39:20
protect
143:12
public
1:16 165:22
166:4 167:19
Puiszis
2:10 3:4,17
4:1,9 7:3
13:11 32:17
33:2 36:4,8
36:9 57:6
59:15 65:23
67:2,4,19
71:11 73:9
73:13 74:3
84:22 85:3
85:18 86:21
88:6 93:7,21
94:15 95:11
97:6 111:8
112:6 118:16
123:13
125:11
132:17
141:13,19,24
142:1 145:1
145:7 147:9
147:15 148:8
148:13
151:20 163:3
163:22,24
164:12
pull
47:3 48:9,23
55:23 60:6
100:13
110:18
118:20,23
122:16
123:14
pulled
32:19,21 45:15
48:5,6 52:21
56:7 59:5,11
59:20,24
60:1,2,8,10
60:12 61:12
94:13 114:5
116:10
117:20
118:18 123:5
156:19 160:4
160:6,8

pulling
51:9 63:10
117:22
152:21
pulls
47:3 49:5
99:22,22
purposes
145:3 147:11
purse
126:24 127:1
138:24
pursuant
1:13
pursue
25:6 26:10
push
77:19,21 81:4
81:17,22
84:20 86:10
86:16 88:8,9
88:10,15,17
88:18,21
91:18 92:1,1
93:11,20,23
97:11 98:3,8
98:13,17,20
98:21 101:13
101:19
115:13 161:6
161:9 163:1
pushed
66:2 78:1
96:10 102:18
102:22
104:16
162:23
pushing
81:17 86:23
88:15 95:4
95:19 96:2
96:13,17,18
96:20,21
97:5,8
100:13
put
14:3 33:12
41:24 42:14
57:23,24
58:2,6,14
86:8 97:3
103:11
puts
50:1
putting
97:1

Q

quarter
102:6,11 103:2
question
4:18,18,20,23
4:24 5:1,13
5:17 62:7
68:3,3,14
73:10 82:5
132:1 145:21
146:3,22
149:13
questions
4:15 64:8
67:21 68:2
68:12 91:12
151:24
159:24
quick
12:16 26:20
quickly
60:5
Quiltavia
8:8

quit
19:21 20:13,19

R

R
2:3
race
159:7
radio
56:18
radios
132:12
raise
65:9 66:14
raising
69:13 108:18
108:19,19,19
ran
116:14,18,20
117:3,3
119:4
random
31:12,14
randomly
29:20
rap
14:23 15:3
rapped
16:15
rapper
14:20 35:2,7
38:3
rapping
38:6
raps
15:1 35:16
rate
52:11
Raucous
34:21
reached
156:23
read
37:3,6 73:9,11
164:1,7
165:15
168:13
reading
168:10,14
ready
144:20,22
168:10
real
12:15 15:9
26:20 157:14
really
13:19 15:14
18:23 22:2
24:4 25:2
26:15 27:13
27:13 29:6
30:2,15
31:12,14
36:14 37:12
38:5 40:15
40:20 44:2,3
49:21 52:21
56:19 57:23
58:20 60:17
61:2,8,23
62:9,12,13
66:15 67:7,7
67:9,9 75:20
78:6,10,20
92:4 100:18
100:19,20
106:7 107:10
107:12 108:5
113:8 117:2
117:4,10,13
119:7,16

136:8 142:18
142:20
143:10
145:19 150:1
151:1,6
152:23
154:23 155:2
155:2,19
157:9 159:18
159:19
rear
116:6
reason
23:1 29:20
55:17 58:8
114:11
130:20 140:4
158:17
reasonable
64:7
recall
9:9,16 11:14
15:15,16
18:17,20
19:3,8 26:14
26:15 27:14
28:13 29:9
34:13,14
37:14 38:19
38:21 40:18
48:8,21 50:6
52:4 53:13
56:20 59:18
62:10 63:3
78:7,11,20
81:16 92:10
106:5,8
119:2 122:9
131:15
135:17
136:11 139:8
139:10 153:1
153:11 154:6
154:13,23
156:11,13,15
156:17
157:22 158:5
158:6 159:7
159:8,13,14
159:16
160:11,21,23
163:13
recalled
11:12
receipt
168:12
receive
48:15
recess
67:17 141:17
record
5:19 66:22
73:11 85:3
111:3 141:23
141:24
147:17
168:24
records
127:10
reduced
166:23
reference
15:6,10 34:21
referring
13:14 14:19
refuse
65:8
refused
71:5
regards
158:12

region
82:7 84:6
112:3 161:16
registration
65:19 127:7
133:14,20,23
155:17,18
related
167:10
relation
28:16 47:7
59:2 63:16
74:15 83:7
101:23
102:14
release
137:18
released
133:4 144:6
rely
164:2
remember
12:14 13:3
18:10,13,23
19:10,15,22
20:24 21:21
22:4 24:20
27:19,22
29:7 31:23
32:2 36:19
37:12,13
40:21 41:3
43:10,20,21
44:2,6,9
45:8,17,23
46:17 47:22
48:1,19
49:12 50:9
56:16,19
57:8 58:12
59:12 61:4
62:9 63:8
68:4,6,10
69:22 71:22
73:3 74:17
75:9 77:6
78:8 79:1,1
79:3,21,23
86:20,24
87:1 90:16
91:3 92:11
94:4,6 99:15
100:5,6,7,13
101:9 105:9
105:10
107:11
114:11 122:7
126:7,8,12
127:24 128:5
130:16,17
131:5,8,20
132:9 133:1
135:2 136:16
137:18 138:9
140:16,20,20
142:7,19
143:5 146:3
146:5 150:22
152:6,18,19
152:21,23
153:4,7
154:10,21,22
158:9 159:15
159:17,22
160:24 162:1
163:17,18
repeat
4:19 7:11
67:21

rephrase
146:22
reported
1:23 166:21
reporter
4:12 5:3,14,15
47:1 73:9,12
164:3 168:22
Reporters
168:1
Representing
2:8,15,23
requested
73:12
required
168:10
reserved
164:12 167:5
resist
125:1
resisting
109:19 110:9
110:11,12,14
125:10,13,15
125:15,16,19
125:21,22,23
143:15
respective
167:6
responded
70:14 71:9
response
62:3 68:14,18
73:1,3 89:14
130:18
responses
68:10
rest
159:22
restate
4:20
RETAINED
3:17
reviewed
37:3,6
rib
107:1
ribs
122:4,5,6,8,10
122:11
rid
8:1
ride
49:24
right
4:10,20 5:1,20
6:21 15:8
16:8,23
17:10 19:21
22:2 26:15
26:16 28:1
33:14 34:14
39:7 41:6
42:3 43:6,22
43:23 44:5
44:19,21
45:12 46:17
47:1,17,21
48:10 49:14
50:18,24
51:8,13,15
54:2,22
55:13 60:3
60:12 62:4
62:22 63:12
63:15,18
64:10 66:2,2
66:11 67:13
68:23 69:1
69:14 70:3
71:3,5,16,20

72:18,20
73:2,19,23
76:11,16
77:4 79:13
79:22 82:12
82:13,16,19
82:20 83:5,6
83:14,21,23
84:1,2,9
85:4,15 86:9
86:11,12
87:10,11
88:1,8 89:2
89:3,5,8,11
91:15,22
93:1 94:13
94:14,18,19
95:23 96:16
96:20 97:8,9
97:14,15,16
97:21,24
98:4,13,16
99:1,4,6,10
99:12,17,19
100:3,8,10
101:12 102:4
102:5,11,11
102:12,15,18
102:21,23,24
102:24 103:2
103:15 104:5
104:6 105:16
106:1,17,18
106:23 111:1
111:10
115:18
120:13 121:3
121:23
122:23 125:3
128:12
134:10 140:8
140:12
142:17
143:21 149:3
151:8,12,21
161:2,8,14
163:24 164:8
rip
123:11
ripped
121:22 123:6
123:10,10
141:6,7
Roberson
36:15
Robinson
17:17,18 133:6
134:8
roll
80:14,23 81:2
81:13 83:14
87:4,14 88:4
99:9
rolled
56:21,21,22
80:17
rolling
80:15
rolls
86:13
Romantically
10:22
room
5:4 143:3,6,24
144:9,18,21
146:4,7
147:1,7,22
148:16,24
149:23 164:5
rotation
30:10,23

route
43:10 55:1
Rule
168:18,20
Rules
1:13 168:19,20
running
26:18 118:3
runs
50:18

S

S
3:10
safety
48:15
SAITH
164:16
sale
127:10
Sarpeno's
163:14
sat
60:14
saw
14:18 48:4,9
57:22,24
59:21 61:17
61:22 62:16
62:17,18
71:20 72:1
73:4,7 79:7
79:11 87:6,8
87:19,24
90:5 91:14
103:24 104:4
106:10,13
108:15,16,17
109:10,13
110:5,24
111:18 113:8
117:24 120:3
120:9,11
122:22 123:1
136:9,10
140:16
140:22 150:3
150:24 151:2
151:3,8,9,15
152:2,21
154:7 159:6
160:23
saying
11:12 24:14,16
24:21,24,24
33:13 41:14
61:5 70:14
71:9 92:8
97:1 98:1
101:9,16
110:9 112:1
113:4,16,21
125:14 129:9
131:20
133:17
142:19
162:15,16
163:13
says
106:1
scared
157:7
scene
92:21,23
118:13
119:17 134:9
153:15,19
154:7 159:6
schedule
168:12
school

6:10,11,12,20
6:22 11:14
11:17,19,20
11:22 12:6
16:24 17:2
19:13 20:1
21:3,16
48:14
screaming
109:18 111:21
115:3
screech
60:5
screeching
60:9
seal
167:14
search
92:3
searched
128:16,17
155:5 156:9
searching
104:5 129:21
159:21
seat
45:2 82:10
110:23 158:1
158:3
seated
39:12 45:5
74:22 87:9
93:16
seats
39:10,12
Sebring
7:22 29:14
158:1
second
22:4 53:4 68:3
71:2,14
96:11 135:3
136:22 137:6
137:9
seconds
30:2,2,3 31:11
51:21 54:23
108:3
secured
112:20
see
9:2,21 14:13
15:20,21
16:5 40:16
46:20 48:5
55:14,22
56:12 57:18
57:20,23
58:5 60:14
60:17 61:2
61:16,21
62:12,12
63:7 66:9,12
66:14,19
67:5,8,9,10
67:11 69:1,8
70:1,18,21
71:19,21
72:17,20
73:1 74:4,24
77:12,14
78:16 80:9
80:20 81:2
84:3,11,16
86:8,13 87:4
87:17 88:7
88:12 90:2
91:17 93:22
94:1,16
97:17 98:1
99:3 100:10

101:17 103:8
103:22 104:7
105:19
106:12
107:10,12,13
108:4,5,6,8
108:8,13,14
108:16,21,24
109:6,7,7,21
110:15,16,16
110:19,23
111:12,13
112:24
113:13 115:9
115:14 117:2
117:4,6
118:6,23
119:5 122:16
122:19,20,21
122:24 123:4
123:14,18,19
124:6,9,13
125:24
127:22 134:3
140:14,15
141:9 142:12
143:10,19
145:19 148:4
150:1 151:1
151:6,8
155:10
162:20
seeing
10:2 47:22
48:1 58:12
77:6 126:7
135:20
154:14
156:15
seek
159:3
seeking
158:24
Seeley
6:3 168:5
seen
33:3 34:19
63:2 72:2
76:15
senior
6:16
separately
68:12
served
38:12
set
167:14
Setina
168:22
seven
36:13,14
shake
160:12
shirt
76:15 77:2
79:10,12
80:2,3,5,9
80:10 86:12
123:11,12
140:11,15
141:6 156:16
shoes
40:23 107:24
Shore
43:13,16
short
32:8,12,21
33:14,17
64:10 67:16
67:17 74:2

110:15
118:15
132:16
141:17
shortage
29:19 30:8,12
30:20 34:4
shorter
75:11 91:8
shoulder
79:15 80:14,15
80:16,17,23
81:2,13 82:7
83:13,14
84:12,17
86:13 87:3
87:14,24
88:4 99:8
100:9,11,14
140:18,19,21
161:16
shoulders
5:6 76:23
100:4 124:11
shove
81:21
show
127:6 140:8
145:8 146:1
146:14
showed
115:24
shrug
5:5
sic
48:21
side
29:11 39:7
46:4,5,6
47:12,15,16
55:3,4,8,8
55:15,18
69:17,18,19
69:20 77:16
78:19 83:9
86:22 89:18
89:22 90:1
93:14 94:10
95:6 98:6,12
100:16 102:4
102:5,11
104:2 106:11
106:14,15,17
106:18
120:12,13
140:19,24
148:7 150:4
150:21 151:3
151:10
155:13 156:1
158:7,8
160:4,6
sidewalk
156:7
sight
152:17
sign
32:14 33:13
50:9,13,17
168:13
signal
63:17
signature
165:16 167:4
168:12,23
signature's
164:12
signed
168:17
significance
13:17 14:7

significant
13:9
signing
168:10,14
simple
131:24
Sincerely
168:21
Sinclair
8:15,16 9:2
20:8 129:6
single
120:17
sirens
62:13 118:5
152:20
sister
7:14 10:16
sisters
7:10,13
sit
119:14
sitting
26:15,16,21
58:13 62:16
64:24 82:9
85:13 87:10
119:1
situation
65:14
six
36:13
skin
75:8,9
sleep
50:1 138:6
slept
138:7
slowly
60:6
snapped
157:15
snatch
79:7
snatched
77:24 78:1
somebody
14:7 23:3,7
someone's
87:22
songs
15:4
soon
51:9 92:20
sore
142:18,19,21
sorry
9:19 12:1
13:24 16:18
21:11 24:9
26:3 27:7,20
43:5 44:3
46:2 56:15
57:4,5,20
72:19 78:10
85:12 93:6,8
104:3 110:1
121:13 124:9
125:6 134:13
134:22 139:5
151:14
156:11
sound
37:9 49:14
72:7,15
south
46:4,6 47:16
50:18 55:4,8
83:20
southwest
83:5,8,17
space
39:9 66:15
speak
125:5
speaking
5:16 78:24
133:6
specific
15:15 18:13
19:22
specifically
24:20 65:15
74:18 86:24
103:22
104:13 120:3
speculation
32:16 65:12
speed
60:10
speeding
52:9
spell
4:11
spelled
17:14 35:23
spoke
154:18 155:7
156:9
spoken
33:7 155:19
158:10
spot
50:7
squad
48:2,4,5,6,9
56:4 59:1,8
59:12 60:4
61:21 63:2
81:4 82:18
85:19 89:8
91:22 93:23
94:8,9,10,13
94:20,22
95:5,6,9,13
95:15,17,20
95:24 96:3,4
96:13,15
98:3,5,14
99:6,18
100:17,21
101:4,8,10
101:11,15,19
101:21,24
102:2,19
103:14 110:3
114:5,16
118:18
119:12,14
120:2,6,9,17
126:10
127:20,22
152:9,12
154:13,15
162:22,23
squads
115:23 116:2
116:10
118:12,23
119:21,22
SS
166:2
stair
141:16
stand
84:22
standing
74:24 78:15,21
84:19,24
87:13 101:5
101:6,7,12
101:14
153:20,22
stands
105:24
start
10:2,5 26:18
34:9 51:2
62:19 118:17
157:11
started
34:7 45:13
51:24 53:5
58:10,11
62:20 81:21
116:15,21
117:5 118:2
125:21
150:12
157:13
starts
104:8
state
1:17 6:13
53:16 54:2
166:1,6
States
1:1,14 165:1
166:11
station
131:7,8,9
132:18 133:2
133:3,9,11
134:15,18,24
135:3,6,12
136:7,13,18
136:20,21,22
137:6,6,9,14
145:10
stay
28:18 38:24
40:10 58:3
88:13 93:16
stayed
39:12 137:11
staying
129:8
stays
16:4
steadily
77:21
steering
160:14,19
stenographi...
166:22
step
85:24
stepped
133:12 161:2
stepping
96:6 97:19,21
97:23,24
steps
86:2 89:6,7
91:21 93:10
94:7,17,19
95:23 96:8
96:14 97:11
97:18 99:16
101:1 161:3
161:8,13
Steve
41:13
Steven
2:10 8:15,16
8:20 9:2,12
9:13,14,24
10:6,12
11:18,21
12:5 17:23
20:3,5,8,8
21:3,20 23:2
23:5 26:1,3
26:14 27:6
28:24 29:1
33:16,24
34:15 36:10
36:17 37:15
37:18 38:20
39:21 40:16
42:22 44:23
49:10 50:23
52:9,14 54:8
54:10,16,24
55:21 56:8
57:14 63:1,2
90:23,23
93:1 112:15
112:19 113:4
113:13,18,20
129:5,8
130:15,17
132:10,22,23
135:1,17,20
136:6,15,23
137:5,11,13
137:20,24
155:19
156:22
Steven's
27:8,12,17,18
63:12 138:2
stick
58:14 69:16
stolen
32:14 64:10,20
65:4,7
133:19
stools
39:7
stop
31:16 48:17,20
50:9,12,13
50:17,23
59:2 60:7
63:16 96:11
109:19
110:10,11,13
111:21 115:3
125:13,15,19
125:22
141:13
143:15
146:21
150:16
162:16,16
163:9
stopped
21:14 50:5
51:12,12,13
51:13,24
52:13,14,21
53:17 54:6,7
54:21 62:3,5
63:14 113:10
straight
42:7,13,14
83:20 98:22
98:23
street
1:18 2:4,11,19
16:6,8 22:1
22:2 27:23
28:1 44:6,9
44:18 45:11
45:19,21
46:4,5,6,10
46:14,16,16
46:16,17,20
47:8,13,16
47:17 49:17
50:15,17
51:19,20
52:5,10 53:6
54:4 55:3,4
55:8,9,15
116:4,8
156:2 160:4
160:7,15
166:9 168:1
streets
44:3 53:2
strength
76:21
strong
76:6 77:8
115:17
struggling
152:8
stuck
69:23 160:14
stuff
11:1 30:18
62:14 126:23
126:24 127:1
129:13,17
132:12
133:15 155:1
155:23
stupid
54:11 62:22
63:6
subpoena
24:5
subpoenaed
25:18 26:4
Subscribed
165:19
sue
144:11
suggest
159:2
suing
144:15
suit
167:11
Suite
1:19 2:5,12,20
166:9 168:1
summarize
149:11
summer
16:13 151:17
151:18
supposed
27:11 37:15
Supreme
168:19
sure
5:18 16:4
20:11 24:3,9
26:22 48:18
67:22 69:22
69:23 72:12
75:13 82:8
93:8 96:24
105:5 112:17
112:22 113:1
132:23 134:3
149:13
surprised
24:11
suspicion
65:9
swear
4:1
sweater
40:22 80:5
swinging
109:8
swollen
76:13
sworn
4:3,6 165:13
165:19
166:18
synonym
14:10
system
34:5
systems
132:13

T

T
3:10
tables
39:8
take
5:5 16:17,18
22:12 23:13
34:15 35:12
38:5 42:17
53:2,6 54:3
55:2 58:13
92:17,21
93:2 121:1
121:19 128:3
138:13,17,20
138:21 139:2
139:13,16,20
139:24
140:23
141:15 142:5
142:23
145:11 146:9
146:18
150:20 156:1
161:12
taken
1:16 67:18
130:8 141:18
142:10
145:10 148:2
148:15
165:14
takes
96:14
talk
15:22,23 23:3
39:14 149:16
152:2 155:19
talked
11:19 23:23
26:9,19
36:22 37:1
67:22 69:6
72:14 119:8
134:7 149:18
149:18
talking
34:22 72:9,11
81:5 102:7
107:20
128:21 129:5
131:17,18,19
133:19 143:4
143:5 156:7
163:17,19
tall
141:20
taller
75:11
tapping
104:2
taser
90:8
tasered
150:5,8
tell
4:10,19 15:14
20:5 39:3
48:24 69:5
90:4,13
110:23
111:14,16,23

113:2,20
117:10,12
126:14
135:16
143:22
149:14
155:17
telling
26:11 54:3
71:21 112:20
125:16
129:10,11
136:3 143:7
143:9,11
term
102:6
testified
4:6 25:14,17
57:9 152:7
testify
166:18
testimony
56:24 115:1
116:18 125:3
164:2 166:20
167:2,13
Thank
164:13,14,15
thereof
167:12
thing
13:19 14:3
70:5 73:4
77:13 81:1
92:10,11
104:7 105:10
110:17 126:5
150:17
things
24:3 127:7
think
9:1 11:6,10,11
13:19 14:3,9
14:14,19
15:7,12 16:6
16:8,24
17:21 18:3
21:22 22:1
22:18 23:4,6
27:10,13,24
28:11,21
31:10 32:9
32:13 34:6,7
34:12 35:18
36:16 37:1
38:16 39:10
40:2 41:2,5
41:23,23
42:11,18,24
43:15 44:16
52:12 53:3
55:10 57:12
57:12 63:1,9
65:9 69:19
69:21 74:12
75:2 76:8,14
79:7 80:4,9
80:24 90:9
90:24 99:14
105:7 107:24
113:12
114:15,21
122:6,12
134:6 135:1
137:2,2
142:14 146:9
146:13 149:3
152:14 153:3
154:16
thinking
12:3 25:3 53:8
139:4,6
157:10,11
thinks
65:6
third
77:12
thought
52:23 65:16,18
75:24 92:13
92:14 98:2
100:21
109:20 143:8
150:7
three
7:6,20 30:24
31:1,4 52:1
52:2 54:17
66:23,24
67:1 73:19
73:22 86:4,5
86:6,7 95:1
100:21,23
101:2,10
112:12,13
114:2,4
116:1,2,10
116:12 121:2
123:22
125:24 135:8
135:11
136:19 152:9
152:14,24
154:5,9
162:9
three-block
52:6
throw
162:21 163:1
thrust
151:2
time
4:17 5:13,13
5:16 9:14,15
11:20 15:9
16:11 19:14
19:21 20:15
20:17 21:17
22:10 23:5
23:19 24:22
25:1 27:13
29:13,18
31:3,13,17
36:22 38:8
42:20 44:17
49:9,12
51:17,23
53:4 54:7,20
59:16 60:18
61:2 62:14
65:5 67:6,14
68:2 70:3,11
71:2,14
72:17 74:12
74:15 77:13
78:4,17
89:15,17
91:19 103:17
112:16 113:5
113:7 114:17
114:19,22
128:23 133:5
134:20
135:22
137:18,19
139:4,7,8
144:12 148:2
149:2 151:15
152:10
153:13 154:8
163:9
times
29:4 31:19
34:16,18
73:19,22
109:21 112:2
114:18
121:15 162:9
tire
30:10,23
102:10,15,24
tired
49:20
today
4:15 5:4,19
37:4 164:5
told
22:5 23:12,14
24:7 30:8,11
30:16,19
48:19 53:1,6
65:15 69:3
70:15,23
71:8 90:9,17
107:6 113:18
115:11 119:3
122:24
126:20,23
127:5 128:11
128:18,23,24
130:9,19,21
131:3,9,11
133:4 134:1
134:19
135:19
136:20
138:20 141:6
143:10,17
146:9 148:22
149:12,14,22
149:23 150:2
150:3,4,7,14
150:16 156:9
157:12
tone
64:1 72:14
top
15:7,15 107:13
108:15
tore
129:21
TORRES
1:8 165:8
166:15
total
121:5
touch
96:24 103:4
134:3
touched
103:6
to-wit
166:7
traffic
48:15,17,20
55:6
training
48:15
transcribe
5:8
transcript
164:1,7 165:15
167:1
Transcription
166:24
traveled
51:22
traveling
52:5
trial
57:10
tried
30:12,14
130:10
tries
81:3
trooper
53:17 54:2
true
77:7 167:1
truly
145:14,22
146:20 147:4
147:24
148:18
truth
15:14 166:19
166:19,20
try
14:9 18:23
19:1 30:6
89:20 101:19
113:22 128:9
130:2
trying
41:24 42:11,24
54:19 60:3
60:20 61:9
62:8 65:20
74:17 77:17
77:18,21
78:5 81:17
81:21 82:1
84:20 86:10
86:16 88:9
88:10,14,17
88:18,19,21
91:2,18,23
91:24 92:3
92:13,14
93:12,19
96:24 98:3,8
98:13,17,20
98:21 101:13
103:19
112:23
115:12 127:3
129:13
130:20 136:2
136:9 143:12
143:22 153:5
155:17 157:8
161:5,6,9,12
turn
44:6,18,21
45:13 51:11
74:5 83:1,2
83:3,17
turned
31:15,15 45:15
51:1,7 52:22
71:23 73:5
74:7,10
81:15 85:17
86:14 94:11
118:6 152:20
turns
82:22 83:19
Turtles
36:6,7
Tweets
38:1
Twitter
12:8,10,13,18
12:19 13:4
17:20,21,23
18:1,2
two
5:15 6:7 8:17
11:6 30:24
31:1,4 33:4
40:11 41:6
61:14,15
66:23,23
74:12 86:2
91:8 95:1,3
112:9,11,11
112:13
113:23 114:1
115:4 116:11
116:12,14,17
116:24
117:20
118:19 119:3
119:23 120:5
120:7,8,15
120:19,20,21
120:22,23
121:1,2,3,4
136:8 141:13
152:8 153:3
153:23 154:5
154:16
159:20 161:8
161:13 162:9
162:11,15
two-door
29:15
type
41:1,21 48:10
typewriting
166:24
typically
105:13

U

U
9:12 21:5
Uh-huh
46:18 79:6
145:13
Uh-uh
8:11 16:2 43:3
57:2 93:4
134:11
Um-um
34:24 57:16
67:3 85:9
91:16 146:19
unclear
85:13
underneath
66:19
understand
4:18 62:7,8
82:4,8
101:15
149:13
158:18
understanding
70:23
understood
4:24 14:16
93:9 107:20
underwear
123:4
undetermined
166:11
uniforms
114:9,10
United
1:1,14 165:1
166:11
university
1:7 2:15 10:9
11:5,8 21:4
32:19 33:4
48:2 59:21
61:11 63:21
113:24 114:6
114:8 116:12
116:13,17
117:15,19
118:7,9
119:4,17
120:1,6,8,16
121:5 122:16
123:20,23
124:2,3,6,10
124:14,17,23
125:12,17
126:1 141:10
142:16
145:17 152:8
153:1,7,16
153:23
154:11 157:2
160:22 161:3
161:17 162:6
162:11,20
165:7 166:14
168:7
unlatch
156:20
unproductive
158:19
unusual
45:10 72:10
upper
67:9 76:20
82:7 84:6,7
99:4 112:5
161:15
upset
128:22 157:4
157:14
158:15,17
upstairs
39:5 40:5
use
37:18 47:6
64:4 81:23
102:5 163:6
uses
12:20 35:16
usually
20:2 35:3
138:23
U.S
168:21

V

varied
31:13
vehicle
59:2,3 155:13
160:19
verbal
5:10
versus
146:7
videotape
93:2
view
117:13
visiting
9:11
voice
64:1 70:10,10
72:6,13
78:23
vs
1:6 165:6
168:7
vulgarity
64:4

W

waist
123:8,9 161:24
wait
5:16 16:17
137:9 159:13
waited
135:23

```
waiting                 98:13 102:2        we're              X                 1:24               166:8
  26:17,18 143:3        105:17 108:4         4:14 15:22        3:1,10            09                 28
  143:6 144:2           112:19 116:7         29:2,4 127:3                        1:6 165:6          168:13
waive                   118:2 132:2          130:20           Y
  164:8                 132:21             wheel              year                  1                   3
waiving                 135:11 136:6         102:9             6:14 16:20,21    1                  3
  69:22                 141:20 146:2       Wheezy               18:14 21:5        3:13 145:2,5       3:15 6:3
walk                    152:23               37:23 38:2,4,4     38:2               146:17           146:17
  55:19 61:22           154:11             WHEREOF            years             10                 148:11 168:6
  161:5                 158:24               167:13            6:7 8:17 11:6      47:19            30
walked                  161:22            white                yeh                10:00            2:19 30:2
  155:22                163:10              13:18 72:5,7        10:19,21 12:3     22:12,13,20       36:21,21
walking                 167:10,11           72:15 156:16        13:2,7 16:10     10:15             58:18 144:4
  161:2               weapon              Whitney               17:19,22         1:20              54:5 168:20
wall                    105:3               6:23 7:2,5,16       20:22 22:9       10:30            30s
  39:6                weapons            window                 24:10 25:15      22:20             75:19,20,24
want                    104:5,9            60:19 69:17,18       26:7 31:2,21     1080             300
  10:14,23 11:3       wearing               69:19,20,24        35:6,9,15        1:6 165:6          1:19 2:4,12
  18:22,22             156:16 160:23       74:23 113:6         37:22 38:7       11                  166:9 168:1
  19:1 22:14          week                 135:21              38:14 39:16      1:19 165:14      312
  22:19 26:21          15:24 18:18        windows               44:20,22        166:7 168:8        2:7,14,22
  35:11 36:14          19:17                56:20 62:14        49:15 52:3       11:00            330
  40:3 42:22          weekday            withdraw               53:23 55:5      22:18 38:11        2:5
  44:7 56:1            18:20                42:16 146:22        59:6,10 63:3     11:30            345-8877
  59:17 67:20         weekend            witness                66:8 69:15      38:11              2:7
  67:21 75:13          18:21 19:18          3:2 4:1,2,5        73:20 75:2,4     12:00
  78:5,18             weekends              7:2 32:23          79:9 80:17       22:19                 4
  79:18 80:4,6         19:19                57:4 65:14         84:10 87:12      13033            4
  80:13 81:16         weekly               71:8 85:1,8        87:12,21         6:3 168:5          3:4 146:17
  81:20 82:8           10:1,3               85:10,16          88:2 95:9        145              40
  89:18 91:1          weeks                 86:19 93:6        106:2 107:4       3:13               58:18 140:2
  96:11 105:4          21:8 23:20           93:17 94:12       108:10,23        147              40s
  106:24                24:1,6 29:21        95:9 97:3         110:7 112:10      3:14               75:19,19,20
  107:24                30:24 31:1,4       111:7 112:5        112:14           148                76:1
  112:11 114:4          37:7 57:10         123:9 125:6        113:19 116:7      3:15
  119:24 127:8          132:7              128:8 163:5        121:11 137:7      15                   5
  129:17,20,20        weighs               164:6,9,11        137:11            47:19 137:15      5
  139:16,17            76:8                166:21,23         143:17              137:16            168:4
  140:17 152:1        well-built           167:2             151:13,19         151              5th
  155:1 163:5          76:18             woman               162:2 163:16      3:5                165:19 167:15
  164:2,7,7,9         went                 159:14            164:11            160              50
  164:10               10:11 11:23,24    women               yell               3:6                140:2
wanted                  19:5,7 20:23       159:12,13          125:13                              53rd
  23:2,7,9,11,14       21:4,4,8          wondering            yelled               2                43:16,21 44:7
  42:9 73:1            27:8 28:10           19:13              125:20           2                  44:8,10
  115:18,19            28:21 30:9        Woodlawn             yelling            3:14 146:17        45:11 46:16
  128:9 130:7          31:19 33:22          7:7                110:10,13        147:10,13          46:20 50:16
  140:5,6              37:11 41:12       word                 125:9,19,21      2:00               160:15
wanting                41:12 42:7          13:17 14:5,13      129:16           49:15            55th
  23:12 26:10          43:19,22             72:22 163:5       143:15           2:30               43:16,16
  72:20                45:12 51:5,6      words                150:13,14        49:13 64:8       57th
warned                 51:10,20            72:15 73:2         154:24           2:40               43:21 44:7,8
  24:8                 52:16 55:20       wore                 157:16           49:13              44:10 46:16
Washington             56:12,13            160:24            Yep              20                 46:20 50:16
  44:16                57:17 58:16       work                 18:7 44:24       36:21 42:12,16
wasn't                 72:1 92:2           6:10 17:4         young              42:18 51:21          6
  9:23 20:3 21:9       107:9 110:12         19:18,19          6:23 7:2,5       51:21 75:23      60406
  21:13 24:9           114:20 123:1         20:23 132:13       36:12,14        200                6:4 168:6
  26:22 39:23          127:23 130:2        137:2,4            64:23 75:14      168:1            60601
  40:4,7 42:6          131:7,10            141:16             75:16            2005               2:13
  52:7 55:24          133:1,3,8,10       worked              younger            9:8              60601-1014
  58:20 61:22          134:14,23           20:18 59:20        7:14 36:17       2006               168:2
  62:11 64:3           135:3,5           working             Y-o-u-n-g         7:22 29:14       60602
  66:15,16             136:13,19,21        6:19 17:1 20:6      7:2             2008               2:21
  74:7 75:22           137:5,12,23         20:7,10,12                           18:15 19:20      60606
  75:22 76:10          138:6,8             20:12,19              Z              20:6 21:21        2:6
  76:12 77:15          139:20,21           21:16 42:20                          22:7 34:1       62nd
  84:13 96:21          144:17 146:6        142:9             Zip              44:15                7:7
  121:20 133:8         146:24 147:7      wouldn't             6:4             2009               67th
  139:6 155:2          147:22              69:24 75:17       zipper            1:20 165:14       16:4,5,5
  161:21               148:16              121:17,18          123:9,10 141:7    166:7 168:8
waved                weren't               124:5                              2010
  65:17                26:6 49:16        wrestle                 $             165:20 167:15         7
way                     50:1 101:6         115:9            $20                168:4            70th
  13:21 14:4         west                wrong                42:1           207                21:24 22:1,5
  71:17 72:9           2:4 27:24           19:2 122:13                         168:18             27:23
  72:10,14             47:20 60:2          143:8,8,23           0             22               704-3000
  74:19 82:23        westbound             158:20           07                5:23 75:23         2:14
  82:24,24             45:22,24 46:1                          10:4,7          222              744-3982
  85:17 86:14          46:3,23 59:7           X             084-003326         1:18 2:11          2:22
  93:20 94:11          59:9
```

```
76th
 21:1
78th
 8:24  9:1  22:4

_____ 8 _____
83rd
 7:8

_____ 9 _____
900
 2:20
92nd
 7:7
```

```
 1                  McCorkle Court Reporters, Inc.
                    200 N. LaSalle Street  Suite 300
 2                     Chicago, Illinois 60601-1014
 3    CERTIFIED MAIL
 4    DATE:  January 5, 2010
 5    MS. ASHLEY NICOLE GLOVER,
      13033 Seeley Avenue,
 6    Apartment 3,
      Blue Island, Illinois  60406
 7
      IN RE:  Boyle vs. University of Chicago
 8    DATE OF DEPOSITION:  November 11, 2009
 9    Dear Ms. Glover:
10       Your deposition in the above-entitled cause
      is now ready for reading and signing as required
11    by law.
12       Please call the Signature Department upon
      receipt of this letter to schedule an
13    appointment to come to the above address to read
      and sign your deposition.  You have 28 days from
14    the date of this correspondence in which
      to appear for reading and signing.
15
         If you fail to appear or notify us so that we
16    may make arrangements for another appointment,
      your deposition will be completed and forwarded
17    to the attorneys and will be "... used as fully
      as though signed."
18
                _____ Procedure outlined in Rule 207 (a)
19                       of the Illinois Supreme Court Rules
20              _____ Procedure outlined in Rule 30 (e) of
                         the Rules of Civil Procedure for the
21                       U.S. District Courts
      Sincerely,
22
      Margaret Setina              Court Reporter:
23    Signature Department         MARLENE L. KING
24    cc:  All attorneys of record.
                                                      168
```

# EXHIBIT C

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,          )
          Plaintiff,    )
     -vs-               )  No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE  )
OFFICER LARRY TORRES, ET AL., )
          Defendants.   )

The deposition of KENNETH ROBERSON called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Frances S. Lucente CSR, a notary public within and for the County of Cook and State of Illinois, at 222 North LaSalle Street, Chicago, Illinois, on the 1st day of December, 2009, at the hour of 2:00 p.m.

Reported by:  Frances S. Lucente, CSR
License No.:  084-004005

1

---

1  APPEARANCES:
2  ED FOX & ASSOCIATES, by
3  JONATHAN R. KSIAZEK, ESQ.
4  300 WEST ADAMS STREET, SUITE 330
5  CHICAGO, ILLINOIS  60606
6  (312) 345-8877
7      Representing the Plaintiff,
8
9  HINSHAW & CULBERTSON, LLP, by
10  STEVE PUSZNIS, ESQ.
11  222 NORTH LASALLE STREET, SUITE 300
12  CHICAGO, ILLINOIS  60601
13  (312) 704-3000
14      Representing Defendant, University of
15      Chicago

2

---

1  APPEARANCES CONTINUED:
2
3      ASSISTANT CORPORATION COUNSEL, by
4      HELEN GIBBONS, ESQ.
5      30 NORTH LASALLE STREET, SUITE 900
6      CHICAGO, ILLINOIS  60602
7      (312) 744-3989
8          Representing City of Chicago
9          Police Officers.

3

---

1                  I N D E X
2  WITNESS                    EXAMINATION
3  Kenneth Roberson
4    By Mr. Pusznis              5
5    By Ms. Gibbons             82
6    By Mr. Ksiazek             85
7
8
9
10  NO EXHIBITS MARKED

4

---

1 (Pages 1 to 4)

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1          (Witness sworn.)
2          KENNETH ROBERSON,
3    called as a witness herein, having been first duly
4    sworn, was examined and testified as follows:
5          EXAMINATION
6    BY MR. PUSZNIS:
7     Q.   Would you please tell us your full name
8    and spell your last name for the benefit of the
9    court reporter.
10    A.   Kenneth Roberson, R-o-b-e-r-s-o-n.
11    Q.   Kenneth, we're going to be asking you some
12   questions today about an incident involving Charles
13   Boyle. If at any time you don't hear my question
14   or don't understand it, please tell me. Okay?
15    A.   Okay.
16    Q.   If you go ahead and answer the question,
17   everyone is going to assume that you heard the
18   question and that you understood it. All right?
19    A.   Okay.
20    Q.   The court reporter is going to be taking
21   down everything anyone says in the room today. She
22   can't take down a nod of the head or a shrug of the
23   shoulders. So while I'll know what your answer is,
24   she won't be able to transcribe it into deposition

5

1    testimony. So please keep all of your answers out
2    loud, verbal in nature. Okay?
3     A.   Okay.
4     Q.   Finally, you're probably going to know
5    what my question is before I finish it. Please
6    wait until my question is finished before you begin
7    answering my question because the court reporter --
8    while she's very good -- has trouble taking down
9    two people speaking at one time. All right?
10    A.   Yes.
11    Q.   We've got some background noise here so
12   please -- you sound like you're a little
13   soft-spoken. Please try to keep your voice up so
14   the court reporter doesn't have any trouble hearing
15   you.
16    A.   Okay. I understand.
17    Q.   How old are you?
18    A.   22.
19    Q.   When was the last time you ever saw Steve
20   Sinclair?
21    A.   I haven't seen him in a while, but I've
22   spoken to him.
23    Q.   Where's he at?
24    A.   I'm not sure where he is. Usually, when I

6

1    speak to him it's usually just over the phone,
2    converstae (sic) or something like that.
3     Q.   Where does he live?
4     A.   His last known address that I knew was his
5    mother's house.
6     Q.   Which was where?
7     A.   78th and Langley.
8     Q.   He's not in prison, is he?
9     A.   No.
10    Q.   Did you call him, or does he call you?
11    A.   He usually calls me.
12    Q.   What's his phone number?
13    A.   I don't have his phone number off the top
14   of my head. He usually calls private or
15   restricted, or he'll call when he's with a mutual
16   friend of ours.
17    Q.   Is he living in Illinois?
18    A.   Yes, because we go to the same barbershop.
19    Q.   So you still see him?
20    A.   I haven't seen him, but we have the same
21   barber. The barber and I may have a conversation
22   about him.
23    Q.   Is he going to school?
24    A.   Not to my knowledge.

7

1     Q.   Is he working?
2     A.   No.
3     Q.   Is he in a hospital somewhere?
4     A.   No.
5     Q.   What's he doing with his life?
6     A.   He DJs.
7     Q.   He DJs?
8     A.   Yes.
9     Q.   You have no idea about his whereabouts?
10    A.   The last I heard of his whereabouts, he
11   was staying with his mother. They got into some
12   type of altercation and he moved out, but I'm not
13   sure where he lives.
14    Q.   How long ago did he move out?
15    A.   I'm not sure. At least three or four
16   months.
17    Q.   Do you know what the nature of the
18   altercation was with his mom?
19    A.   No.
20    Q.   Where do you live?
21    A.   In Calumet City.
22    Q.   What's the address?
23    A.   34 Warren.
24    Q.   34 Warren?

8

2 (Pages 5 to 8)

1    A. Yes.
2    Q. How long have you lived at that address?
3    A. Well, my mother's lived there for about
4    seven years. I recently moved in sometime last
5    year.
6    Q. Where did you live before that?
7    A. With my aunt.
8    Q. Where does she live?
9    A. 75th and King Drive.
10   Q. 75th and King Drive?
11   A. Yes.
12   Q. Are you related to Charles Boyle at all?
13   A. No. We've just been friends since
14   kindergarten.
15   Q. What about Steven Sinclair, do you know if
16   Steven is related to Charles?
17   A. No, they're not related. We've all been
18   friends since kindergarten.
19   Q. Because one of the police officers who
20   have been deposed said that he spoke to someone who
21   was Charles's cousin at the scene. Do you know who
22   that might have been?
23   A. No.
24   Q. So you've basically known Charles your

9

1    entire life?
2    A. Yeah. I mean, if we're out somewhere and
3    someone asks us since we've known each other so
4    long we consider each other family.
5    Q. Can you tell me about your educational
6    background.
7    A. I went to Kenwood Academy High School.
8    Q. Did you graduate?
9    A. Yes.
10   Q. When did you graduate?
11   A. 2005.
12   Q. What did you do after that?
13   A. I started going to Northern Illinois
14   University.
15   Q. How long did you go to Northern Illinois?
16   A. I went there for a semester, and then I
17   came home and I attended Harper College in
18   Palatine, Illinois. I couldn't get any financial
19   aid so I've been working since.
20   Q. How long did you go to Harper College?
21   A. A semester.
22   Q. So you finished a year in college about?
23   A. Yeah.
24   Q. Where are you currently working now?

10

1    A. I work for a temp agency called Salem,
2    Inc.
3    Q. Salem, Inc.?
4    A. Yes. I work in a call center at Computer
5    Share.
6    Q. What do you do there?
7    A. I started off as a customer service
8    representative on the phone doing proxy
9    solicitation for mutual funds. Now, I'm in the
10   quality department screening calls to make sure the
11   agents are making quality calls.
12   Q. When you say agents are making quality
13   calls, on whose behalf, what company?
14   A. Computer Share.
15   Q. Computer Share?
16   A. Computer Share Fund Services.
17   Q. Fund Services?
18   A. Yes.
19   Q. Where are they located? Where is your
20   office located?
21   A. Two North LaSalle.
22   Q. How long have you been employed for
23   Computer Share Fund Services?
24   A. I originally started there in March of

11

1    '07, and since it's a temp job it goes up and
2    down. I was laid off for a while, then I worked at
3    Value City department store and came back to
4    Computer Share in April of this year and I've been
5    there ever since.
6    Q. You've been there since?
7    A. Yes.
8    Q. What did you do at Value City, were you a
9    salesman?
10   A. Yeah, I worked the sales floor in the
11   houseware department.
12   Q. Ever been a member of the union?
13   A. No.
14   Q. No military background?
15   A. No.
16   Q. Have you ever been convicted of a crime?
17   A. No.
18   Q. Have you ever been married?
19   A. No.
20   Q. Do you also work with Charles Boyle?
21   A. No.
22   Q. Are you a DJ?
23   A. Part time, yes.
24   Q. Do you use any particular name as a DJ?

12

3 (Pages 9 to 12)

1 　A. Yes.
2 　Q. What's that?
3 　A. DJ K-Mac. That stands for DJ K-Mac.
4 　Q. Have you done any work on any of Charles's
5 music?
6 　A. Yes.
7 　Q. What do you do with regard to Charles's
8 music?
9 　A. I've composed a few beats for him. I've
10 sat in on his recording sessions, somewhat
11 engineered some of his projects. I've DJ'd parties
12 that we've thrown together.
13 　Q. Now when you say you've engineered several
14 of his projects, is that what somebody might refer
15 to as mixing his songs?
16 　A. Yeah. I have recorded him, mixed, you
17 know, gave positive feedback, negative feedback,
18 just critiqued his music.
19 　Q. How many songs has he recorded?
20 　A. Honestly, I couldn't say. He records day
21 and night.
22 　Q. Where does he record?
23 　A. He has a home studio.
24 　Q. A home studio?
　　　　　　　　　　　　　　　　　13

1 beat, not just like spoken words.
2 　Q. Right. Besides being a DJ, do you have
3 any involvement in the music industry?
4 　A. Not really.
5 　Q. How often would you and Charles DJ
6 together at parties?
7 　A. Well, it used to be I would DJ like two
8 times a week or when we threw parties, when we
9 didn't throw parties like every couple of months.
10 　Q. Is Steven also a DJ?
11 　A. Yes, at one point he was my DJ partner.
12 　Q. Why isn't he your DJ partner any longer?
13 　A. I mean, we still talk about doing certain
14 things together and DJ-ing certain parties
15 together. Right now I'm more focused on working.
16 It's like since he has no job he has more time to
17 dedicate to it.
18 　Q. Now the three of you went to grammar
19 school. When I say the three of you, Steven
20 Sinclair, yourself and Charles Boyle went to school
21 together -- grammar school and high school?
22 　A. Yes.
23 　Q. Has Charles always lived in the Chicago
24 area?
　　　　　　　　　　　　　　　　　15

1 　A. Yes.
2 　Q. Does he sell his music?
3 　A. Not to my knowledge because even their
4 latest projects that I haven't been a part of he
5 offered free downloads.
6 　Q. Would you describe his music as rap?
7 　A. Not really. He's more of a -- to me
8 there's a difference between rap and hip hop. He's
9 more of a hip hop artist.
10 　Q. I'm like a 50-year-old out-of-touch white
11 guy. What's the difference between rap and hip
12 hop?
13 　A. Rap is more of, you know, people who like
14 grasp nothing from it. It's just them talking
15 about nonsense. Hip hop is more dealing with
16 people who have something to say and have a story
17 to tell.
18 　Q. You would describe his music more as hip
19 hop than rap?
20 　A. Yes.
21 　Q. But does he sing or does he speak during
22 the course of his songs or his music or shout?
23 　A. It's more -- I don't know how I would say
24 it, but it's like speaking but speaking to the
　　　　　　　　　　　　　　　　　14

1 　A. As far as I can remember, yeah. There may
2 have been one point in time where he might have
3 mentioned living like in Memphis.
4 　Q. How long did he live in Memphis for?
5 　A. I'm not sure. We were pretty young. I
6 know there was one point in time when he
7 transferred from our grammar school.
8 　Q. Have you always known him as Charles
9 Boyle?
10 　A. I've known him as Charles Cain.
11 　Q. Does he do his hip hop songs under the
12 name Apollo Cain?
13 　A. Yes.
14 　Q. Do you know why he uses Apollo?
15 　A. I know it has something to do with Greek
16 mythology because growing up as kids, Charles and
17 Steven reminded us of Apollo.
18 　Q. Did Charles play football at Kenwood?
19 　A. Yes.
20 　Q. How long was he on the veracity for?
21 　A. I'm not sure, but I think he got promoted
22 to veracity sophomore year.
23 　Q. Did he play football in college?
24 　A. No.
　　　　　　　　　　　　　　　　　16

4 (Pages 13 to 16)

1    Q. When was the last time you saw Charles?

2    A. I'd say about two or three months ago.

3    Q. When was the last time you saw Ashley

4  Glover?

5    A. I haven't seen Ashley Glover since -- it's

6  been a while -- the last time we all went to court

7  together.

8    Q. You went to court on Charles's behalf?

9    A. I went, but they didn't need me.

10    Q. Okay. But you were there?

11    A. Yes.

12    Q. You weren't subpoenaed?

13    A. No, they just called me and asked me would

14  I come.

15    Q. You went because you and he are close

16  friends?

17    A. Yeah, I guess, and they had asked me.

18    Q. Would it be fair to describe your

19  relationship with Charles as a close friend?

20    A. A close friend. I consider him something

21  like a brother.

22    Q. Do you know what he's doing right now in

23  terms of working or going to school?

24    A. The last time I know he was going to

17

1  Columbia College.

2    Q. Do you know if he's working?

3    A. From what I remember he was working for

4  CTU on-line.

5    Q. I'm sorry?

6    A. CTU on-line, Colorado Technical University

7  on-line.

8    Q. Do you recall the date of this incident

9  that gives rise to this lawsuit?

10    A. I'm not sure the actual date. I know it

11  was somewhere around October of last year.

12    Q. Do you remember what day of the week it

13  was?

14    A. It had to be a Friday or Saturday night

15  because we had gone out.

16    Q. Were you working back then?

17    A. Yes, I was working at Value City

18  department store.

19    Q. Do you recall if you worked that day?

20    A. More than likely I didn't work because I

21  went out. I'm leaning more towards it being a

22  Friday, because I didn't work Wednesday or Fridays.

23    Q. But would you have worked on Saturday

24  then?

18

1    A. Yes, but normally when I work on Saturday

2  I close, so I wouldn't have been out with him.

3    Q. So you're thinking this was a Friday night

4  that you went out?

5    A. Yeah.

6    Q. Now had you and Steven and Charles made

7  plans to go out before you actually went out that

8  night or that day?

9    A. Not really. Steven's idea to go out was

10  spur of the moment. A lot of stuff with him is

11  just spur of the moment.

12    Q. So how did you guys -- when I say you guys

13  I'm talking about you, Steven and Charles -- make

14  plans to go out?

15    A. I believe Steven was with Ashley, and we

16  all met at Charles's house. I drove my car to

17  Charles's house and parked my car on his block. I

18  got in the car with them, and we just all decided

19  to go out to a club.

20    Q. Was there any reason why you went out to

21  this club?

22    A. I believe Steven had some promoters that

23  wanted to meet with him about DJ-ing.

24    Q. What time did you meet up with Steven and

19

1  Charles and Ashley at Charles's apartment?

2    A. Say probably late in the 8:00 o'clock hour

3  or early in the 9:00 o'clock hour.

4    Q. Did you actually go into Charles's

5  apartment?

6    A. I believe so, but I can't be for sure.

7    Q. Did you hang out at Charles's apartment

8  for any period of time?

9    A. Probably not.

10    Q. Who then drove to this club or bar or

11  wherever you guys went to?

12    A. Steven drove Ashley's car.

13    Q. What kind of car was it?

14    A. A Chrysler Seebring.

15    Q. And where did you drive to?

16    A. I don't recall the name of the club, but

17  it was on the north side.

18    Q. Do you recall where on the north side?

19    A. Not exactly because I wasn't really

20  driving.

21    Q. Okay. Do you remember the club name or

22  the bar name?

23    A. No.

24    Q. How old were you on that particular day in

20

5 (Pages 17 to 20)

1    2008?
2        A.  21.
3        Q.  Was everybody in your group 21 or older?
4        A.  I believe so because we all got in the
5    club.  I know Charles, Steven and I were.
6        Q.  Does the name Club Olay sound correct?
7        A.  I'm not sure.
8        Q.  What happened when you arrived at this
9    club or this bar?
10       A.  Hanging out I saw a few people that I knew
11   from previous clubs and DJ-ing parties and clubs.
12   I talked to them.  I remember having two drinks.
13   I had one Corona and a Long Island Iced Tea.
14       Q.  Who were the people that you knew from
15   these DJ parties and other clubs?
16       A.  A guy named Isiah and Pierre.
17       Q.  Do you know their last names?
18       A.  No.
19       Q.  And did Charles have anything to drink?
20       A.  I think he had some -- I don't know if he
21   drunk the whole beer.  I think he had a Corona.
22       Q.  What about Steven, did he have anything to
23   drink?
24       A.  I'm not sure about Steven because he was

21

1    with Ashley most of the night and moving around
2    talking to different people.
3        Q.  How long were you at this establishment
4    for?
5        A.  A few hours.
6        Q.  Did Steven meet these promoters?
7        A.  I do believe I seen him talking to a few
8    people.  I'm not sure if he was actually talking
9    business with them.
10       Q.  Were you and he still DJ-ing together at
11   the time?
12       A.  Yeah.
13       Q.  So when he was meeting with these
14   promoters weren't you with him?
15       A.  Not exactly, because some things we do
16   together and certain things I don't get involved
17   in.  Normally, like if they want us to DJ as a team
18   then I will be involved; but if it was just him and
19   what we call a solo mission, then it was just for
20   his benefit.
21       Q.  Do you know if promoters wanted him for a
22   solo mission or to work with you?
23       A.  More than likely it was probably for a
24   solo mission because I had no involvement in it.

22

1        Q.  Now after you were at this bar or lounge
2    for a couple of hours, what happened?
3        A.  Pretty much I got back in Ashley's car and
4    left.
5        Q.  Had you ever been in Ashley's car before?
6        A.  Maybe twice.
7        Q.  When was the last time prior to this
8    incident that you had been in Ashley's car?
9        A.  Maybe a few weeks earlier.
10       Q.  Anything unusual happen to that car when
11   you were in it a few weeks earlier?
12       A.  No.
13       Q.  After you left the bar, where did the four
14   of you go?
15       A.  We were headed back to Charles's house,
16   and we were on Lake Shore Drive.  Steven and I
17   needed to go to the bank.  We both have Bank of
18   America.  We went to the Bank of America on 53rd
19   Street in Hyde Park.
20       Q.  Why did you need to go to the bank?
21       A.  In the bar when I bought my drinks I had
22   swiped my card, and I knew there wasn't that much
23   money in my card.  I wanted to make a deposit
24   before the money was taken out and I was charged an

23

1    overdraft fee.
2        Q.  If you had the cash on you, why didn't you
3    just pay with the cash?
4        A.  I don't know.
5        Q.  Why did Steven want to go to the bank?
6        A.  I think he wanted to make a deposit and
7    withdrawal.
8        Q.  Why not make a deposit and withdrawal
9    before you guys went to the bar?
10       A.  I have no idea.  Before we went to the bar
11   I had no need to even make a deposit until I swiped
12   the card.
13       Q.  Was this a debit card?
14       A.  Yes.
15       Q.  For your checking account?
16       A.  Well, it wasn't for -- yeah.
17       Q.  How much did you have in your account when
18   you went to the bar that day?
19       A.  I'm not sure.
20       Q.  How much was the drink?
21       A.  I'm not exactly sure, but usually Long
22   Island Iced Teas can range from like $8 to $10.
23       Q.  Would it be fair to say that you had less
24   than $8 to $10 in your checking account when you

24

1   went to the bar that evening?
2       A. Yeah.
3       Q. How much in cash did you have?
4       A. Probably 200-something dollars.
5       Q. Of the 200, how much were you going to
6   deposit?
7       A. I think I deposited like $30 that night.
8       Q. Where did you get the $200 from?
9       A. Working at Value City.
10      Q. A paycheck?
11      A. Yeah.
12      Q. Now did you guys have any plans to go
13  anywhere other than to Charles's apartment as you
14  were driving on Lake Shore Drive?
15      A. I hadn't had any other plans besides when
16  we stopped at the bank because I was going to get
17  my car.
18      Q. Had anyone indicated they wanted to get
19  something to eat?
20      A. If I'm not mistaken, we may have had pizza
21  that night. I believe we had already went to
22  Sarpino's.
23      Q. So your recollection is that you guys had
24  already been to Sarpino's?
                                                25

1   A. Yeah.
2       Q. Where is the Sarpino's located that you
3   went to?
4       A. It's on the north side because we were
5   already up north.
6       Q. You guys didn't need to go to the ATM to
7   get money to go to Sarpino's?
8       A. No, because at Sarpino's they have like
9   five-five-five, like you order three or more medium
10  pizzas and they're $5.
11      Q. So who paid at Sarpino's?
12      A. Since you had to order altogether, I think
13  we all put in like whatever change we had.
14      Q. Now what route did you take from the bar
15  to get to Sarpino's?
16      A. You come outside the bar, and I believe
17  you make a left on the main street. I'm not sure
18  of the street name. Sarpino's is right on the main
19  street that goes east and west.
20      Q. Do you recall the name of the street that
21  Sarpino's was on?
22      A. No.
23      Q. How long were you at Sarpino's for?
24      A. Not long because we got the pizzas and ate
                                                26

1   in the car.
2       Q. After you went to Sarpino's and got these
3   pizzas where did you go?
4       A. To the Bank of America.
5       Q. What route did you take from Sarpino's to
6   get to the Bank of America?
7       A. We got on Lake Shore Drive.
8       Q. How far did you go on Lake Shore Drive
9   before you got off of it?
10      A. To the 47th Street exit.
11      Q. To 47th Street?
12      A. Yes. You take Lake Park down to 53rd and
13  53rd over to Blackstone where the Bank of America
14  is located.
15      Q. Which way were you driving on 53rd Street,
16  eastbound or westbound? I'm not familiar with that
17  part of town.
18      A. I believe we made a right onto Blackstone.
19  We took Blackstone to 52nd, then made a left and
20  went to -- what's the next street -- Dorchester.
21  We then came down Dorchester to 53rd, and then we
22  were going eastbound onto 53rd.
23      Q. So if you would divide 53rd in half, you
24  would be on the south side of 53rd going eastbound?
                                                27

1   A. Yes.
2       Q. Who was driving at the time?
3       A. Steven.
4       Q. Where were you positioned in the vehicle?
5       A. I was in the back seat.
6       Q. On which side?
7       A. I can't remember. I'm not sure. I would
8   say I was behind Steven because Charles is a little
9   bigger than I, and Steven drives with the seat back
10  sometimes.
11      Q. Did anything unusual happen with the car
12  as you guys were driving to Bank of America?
13      A. The horn just started mysteriously going
14  off.
15      Q. I'm sorry?
16      A. The horn started mysteriously going off.
17      Q. Where was the car located approximately
18  when the horn started going off?
19      A. When I heard it going off, Steven was
20  getting ready to park a little bit in front of the
21  Dunkin' Doughnuts that's on 53rd.
22      Q. Well, you heard it as soon as the horn
23  went off; right?
24      A. Yeah.
                                                28

7 (Pages 25 to 28)

1    Q.  So you recall being on 53rd Street when
2  the horn went off?
3    A.  Yes.
4    Q.  How long did the horn go off for?
5    A.  The horn was still going off when we put
6  the car in park. Steven and I got out to go to
7  Bank of America. Charles got out to see could he
8  possibly stop it.
9    Q.  I mean from the time the car came to a
10  stop when it was parked, how long had the car's
11  horn been going off?
12    A.  About 45 seconds to a minute.
13    Q.  Where exactly did Steven park the car?
14    A.  He parked it on 53rd Street.
15    Q.  Is there any stop sign at the intersection
16  of 53rd and Blackstone for eastbound traffic?
17    A.  Yes, a stop sign, but he parked his car
18  way before the stop sign.
19    Q.  How much distance was there between the
20  stop sign and the front of the car where Steven
21  parked at?
22    A.  At least like 15 feet.
23    Q.  Was there any car between where Steven
24  parked Ashley's car and the stop sign?

29

1    A.  I'm not sure if it was when we were going
2  into the bank, but I noticed when we came out the
3  bank there was no car out there except for the
4  police cars.
5    Q.  So as far as you can recall there was no
6  car parked between Ashley's car and the stop sign?
7    A.  No. There may have been cars behind
8  Steven.
9    Q.  But none in front?
10    A.  No.
11    Q.  It would have been physically impossible
12  for a police officer to throw Charles into the rear
13  of a car that was parked there because there was no
14  car parked there, right?
15    A.  I wouldn't say impossible because when I
16  came out the ATM he was shoved on the back of the
17  police car.
18    Q.  Well, I'm not talking about the police car
19  now. I'm talking about another passenger car
20  parked between the stop sign and Ashley's car.
21  If there was no car there, it would have been
22  impossible for the police to throw Charles's head
23  into a car that wasn't there; agree?
24    A.  I wouldn't say impossible because I can't

30

1  recall if there was a car there or not.
2    Q.  Okay. Now the Bank of America ATM is not
3  on the block where you guys parked the car. It's
4  another block east, isn't it?
5    A.  It's not a whole block east.
6    Q.  There's a street there, Blackstone, and
7  then there's the start of another block and the ATM
8  is down in that next block; isn't it?
9    A.  It's right down the corner.
10    Q.  There are some businesses between 53rd and
11  Blackstone and where the ATM is, isn't there?
12    A.  There's a Dunkin' Doughnuts and then
13  there's a building and then there's the Bank of
14  America across the street.
15    Q.  So the Bank of America -- your testimony
16  is -- is right on the corner there at 53rd and
17  Blackstone.
18    A.  The Giordano's is right there at the
19  corner. The Bank of America building is connected
20  on with the Giordano's building.
21    Q.  Is the Giordano's between --
22    A.  The Giordano's is actually on Blackstone.
23    Q.  Is it between Blackstone and the ATM --
24  the Bank of America where the ATM is located?

31

1    A.  Could you rephrase the question.
2    Q.  You've got 53rd Street that runs east and
3  west, and then you've got Blackstone that runs
4  north and south; right?
5    A.  Yes.
6    Q.  So on the southeast corner of 53rd and
7  Blackstone there's a Giordano's, correct?
8    A.  It's a little bit farther south of the
9  corner.
10    Q.  What's right on the corner of 53rd and
11  Blackstone, or what was right on the corner of 53rd
12  and Blackstone on this date in October of 2008?
13    A.  I'm not sure, but I know the Bank of
14  America building is connected with the Giordano's
15  building.
16    Q.  How far from where the sidewalk is on the
17  east side of Blackstone do you have to walk to get
18  to where the Bank of America building is located --
19  where the entrance of the Bank of America building
20  is located?
21    A.  It's a little walk.
22    Q.  What's a little walk?
23    A.  Maybe about a minute walk.
24    Q.  About a minute walk?

32

8 (Pages 29 to 32)

1    A.   Yeah, if that.
2    Q.   In terms of distance, can you estimate it
3  for me?
4    A.   Not really.
5    Q.   There's also parking on that block where
6  the Bank of America ATM is located, right?
7    A.   It's parking, but most of the time when
8  you go to the Hyde Park area there's rarely
9  anywhere to park.
10   Q.   Well, let me ask you, this was 2:30 in the
11  morning, wasn't it, or thereabouts, or was it
12  closer to 3:00?
13   A.   Maybe somewhere around there.  I'm not
14  sure, but no matter what time you go to Hyde Park
15  there's rarely anywhere to park.
16   Q.   So your testimony is there were no parking
17  spots available in the block on 53rd Street east of
18  Blackstone where the Bank of America is located?
19   A.   I'm not saying that because I wasn't
20  driving so therefore it wasn't my decision to
21  determine where we parked.
22   Q.   So when you got out of the car, Ashley's
23  car, the horn was still going?
24   A.   Yeah.
                                                    33

1  stop blaring as you were walking towards the ATM?
2    A.   I can't recall because me and Steven were
3  having a conversation walking to the bank.
4    Q.   What were you and Steven talking about?
5    A.   Probably our normal talk -- females.
6    Q.   Now there was a University squad car
7  parked in front of the Dunkin' Doughnuts, wasn't
8  there?
9    A.   Yeah, I recall seeing the University of
10  Chicago Police over by Dunkin' Doughnuts.
11   Q.   Did anyone say anything as Ashley's car
12  passed the University of Chicago Officers with the
13  horn blaring the way it was?
14   A.   No, they didn't say anything to us because
15  we walked out the car and walked to the bank.
16   Q.   No, I said was anyone inside of your
17  car -- when I say your car, I'm talking about
18  Ashley's car -- did anyone inside of Ashley's car
19  say anything to one another as the car passed the
20  University of Chicago squad?
21   A.   I don't believe so.  I noticed they were
22  there.  No one usually says anything.  You just
23  notice your surroundings.
24   Q.   Let me ask you, when you were at Kenwood
                                                    35

1    Q.   Do you know how long the horn continued to
2  blow after you got out of the car?
3    A.   No, because once Charles said he was going
4  to see what was going on with it, me and Steven
5  continued to go to the bank.
6    Q.   Now this was sometime between 2:30 and
7  3:00 in the morning, correct?
8    A.   I'm not sure.  It was so long ago.
9    Q.   I'm sorry?
10   A.   I'm not sure.  It was so long ago.
11   Q.   What were the lighting conditions like at
12  2:30 or 3:00 o'clock in the morning?
13   A.   It's pretty dark with the exception of the
14  street lights lighting the street up.
15   Q.   Was the Bank of America ATM on the same
16  side of the street as Ashley's car was parked?
17   A.   Yeah, it was on the southbound side of the
18  street, but you have to cross the crosswalk to get
19  there.
20   Q.   But you didn't have to cross to the other
21  side of 53rd Street to get there?
22   A.   Not to the north side, but you continued
23  to cross east.
24   Q.   Right.  Do you recall hearing the horn
                                                    34

1  do you remember a black Chicago Police Officer
2  coming to Kenwood talking to the students about how
3  they should handle themselves when they were
4  stopped by the police on the street?
5    A.   No.
6    Q.   You don't remember anything like that?
7    A.   No.
8    Q.   You never received any presentation from a
9  police officer how to handle a street stop?
10   A.   No.
11   Q.   I'm not talking about you generally.  I'm
12  just talking about everybody at your high school.
13   A.   I don't recall anything like that.
14   Q.   Do you recall Ashley saying anything like,
15  damn, the horn is going off just as we're passing
16  the police or anything like that?
17   A.   No.  I try to tune Ashley out.
18   Q.   Why is that?
19   A.   She's very annoying.
20   Q.   Why is she very annoying?
21   A.   Because she just complains.
22   Q.   Do you remember anyone saying or
23  commenting on the fact that the horn was blaring as
24  you were driving by the University of Chicago
                                                    36

9 (Pages 33 to 36)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1 squad?
2   A. No, but I mean the horn -- I don't recall
3 anyone saying anything, but I'm pretty sure if
4 someone said anything it probably wasn't because
5 the police were there. It's just horns going off
6 and alarms going off could be just completely
7 annoying.
8   Q. I'm sorry?
9   A. Car alarms, horns, anything of that nature
10 is just completely annoying.
11   Q. When a horn goes off and blares for a
12 while, that can be an indication that an alarm on a
13 car was activated; correct?
14   A. Yeah, you could say that because my car
15 does that.
16   Q. So a police officer seeing a car driving
17 down the street with the horn blowing, not knowing
18 if there's a problem with the electrical system in
19 the car could think that it's the alarm of the car
20 going off; right?
21   MR. KSIAZEK: Objection, speculation. Go
22 ahead.
23   THE WITNESS: I could see how you could infer
24 that.
37

1 BY MR. PUSZNIS:
2   Q. So you could see how an officer hearing a
3 horn going off as a car is driving down the street
4 could infer that a car is possibly stolen; correct?
5   A. I could see that. If that was the case,
6 if they saw us, why would they even let us get out
7 the car and walk away?
8   Q. That wasn't my question. My question was
9 if a police officer sees a car driving down the
10 street with the horn going off, they could think
11 that the car was stolen; correct?
12   A. Sure.
13   Q. And when a police officer pulls up to what
14 potentially is a stolen car, who poses the most
15 danger to a police officer -- the people that are
16 at the car or the people who have walked away from
17 the car?
18   MR. KSIAZEK: Objection, speculation.
19   THE WITNESS: That's a difficult question to
20 answer. It depends how you look at the situation.
21   MR. PUSZNIS: Right.
22 BY MR. PUSZNIS:
23   Q. Do you think it would be appropriate for a
24 police officer coming up to a car, not knowing if
38

1 it's stolen or not, to ask someone questions like
2 who's car is this and can I see your
3 identification, please?
4   A. Would I think that's inappropriate?
5   Q. Yeah.
6   A. I wouldn't say it's inappropriate.
7   Q. In fact, it's good police work; isn't it?
8   A. I mean, if I was the cop in that situation
9 I would ask that question.
10   Q. You and Steven got out of the car, and you
11 began walking to the ATM; correct?
12   A. Yes.
13   Q. Did you ever turn around and look back in
14 the direction of the car before you got into the
15 ATM?
16   A. I did.
17   Q. You did. Okay. Where were you about or
18 where were you located when you turned around and
19 looked at the car?
20   A. Crossing the street at Blackstone.
21   Q. I'm sorry?
22   A. Crossing the street at Blackstone.
23   Q. What did you see as you turned around and
24 looked?
39

1   A. Charles was raising the hood up looking
2 under it.
3   Q. Did you see where the University of
4 Chicago Police Officers were at that point in time?
5   A. The car was still by the Dunkin'
6 Doughnuts.
7   Q. So would it be fair to say that the
8 University of Chicago Officers did not signal the
9 car to come over to the curb?
10   A. No, we were already parked.
11   Q. Was anybody else on the street that night
12 at that hour of the morning when you and Steven got
13 out of the car to walk to the ATM?
14   A. Not that I remember.
15   Q. What did you do after you turned around
16 and looked back at the car when Charles was lifting
17 up the hood?
18   A. Nothing, continued to walk to the bank.
19   Q. Did you go into the bank?
20   A. Yeah, Steven and I both went into the bank
21 and used the ATMs.
22   Q. Before you actually entered the bank, did
23 you look back towards Ashley's car?
24   A. No.
40

10 (Pages 37 to 40)

1     Q. Now to get into the bank do you have to
2  use your ATM card?
3     A. You have to use your ATM debit card or
4  some form of credit card or something to get into
5  the bank.
6     Q. Right. Where is the ATM machine when
7  you're inside the bank?
8     A. As you go into the bank facing this way,
9  the ATMs are on an angle angled towards her.
10    Q. So let's imagine the doors to this room,
11 which are to my right and your left are the front
12 doors to the ATM. Can we just assume that for a
13 second. You and Steven are walking into the ATM
14 now. Okay. Where are the actual money machines
15 located inside of the Bank of America?
16    A. Like angled onto this wall.
17    Q. So it would be angled to your right as
18 you're going in, correct?
19    A. Yeah.
20    Q. How many feet inside the door did you have
21 to walk in order to get to those ATMs?
22    A. About five or six or seven steps.
23    Q. So would it be fair to say that it's
24 anywhere from 5 to 10 feet inside the Bank of

41

1  America where the ATM is located?
2     A. Yeah.
3     Q. As you're standing in front of the ATM,
4  what can you see?
5     A. Nothing.
6     Q. When you were inside the ATM did you hear
7  anything?
8     A. I didn't hear anything. There were two
9  ATMs in there; but the one I had started to use, it
10 wouldn't accept the cash deposit so I had to wait
11 for Steven to finish with his ATM and then start my
12 deposit. He had walked away from the ATM and was
13 over by the glass windows.
14    Q. Did you ever walk over by the glass
15 windows while you were waiting for Steven to use
16 the ATM?
17    A. No, because I recall messing with him
18 while he was at the ATM just playing with him like
19 I'm going to see your PIN number, just messing with
20 him.
21    Q. How long did it take Steven to use the ATM
22 about?
23    A. About four minutes.
24    Q. Four minutes? Okay. Then how long did it

42

1  take for you to use the ATM?
2     A. About two minutes because I just made a
3  quick cash deposit. Steven was by the windows. He
4  had seen the lights flashing and everything so he
5  had kind of rushed me out of there.
6     Q. Well, would it be fair to say that you
7  were inside the ATM for approximately six minutes
8  then?
9     A. Approximately somewhere around there.
10    Q. Now while you were using the ATM did
11 Steven say anything?
12    A. Yeah. He rushed me out of there, had
13 mentioning a bunch of flashing lights that looked
14 like the police were over there. He had rushed me
15 out of there. I made my deposit, and we left the
16 bank together.
17    Q. When you stepped outside of the ATM, how
18 far were you from Ashley's car at that point?
19    A. Across Blackstone on the farther east side
20 of the street.
21    Q. In terms of the distance between the front
22 of Ashley's car and where you were standing as you
23 stepped outside the doors of the ATM, what would
24 that distance be approximately?

43

1     A. I'm not sure.
2     Q. Less than a block?
3     A. Yeah, it's way less than a block.
4     Q. The size of a football field?
5     A. I'm not sure if it's that long.
6     Q. Tell me what you saw when you first
7  stepped out of the ATM and looked in the direction
8  of Ashley's car.
9     A. I couldn't see Charles at all, but I did
10 see Ashley on the passenger side of her car. She
11 did look all distraught, so me and Steven hurried
12 up and went over there to see what was going on.
13    Q. So from where you were standing outside
14 the ATM, you could see Ashley seated inside the
15 vehicle?
16    A. Yeah.
17    Q. And you could tell from that distance that
18 she looked distraught?
19    A. Yes.
20    Q. How many squad cars did you see at that
21 time, one or more than one?
22    A. It was more than one, and then the other
23 cars were pulling up.
24    Q. So when you walked out of the ATM and you

44

11  (Pages 41 to 44)

1  looked and could see Ashley, you couldn't see
2  Charles?
3      A. No, I couldn't see him at that point. As
4  we got closer and walked over to see what was going
5  on, Steven was in front of me asking what was going
6  on. And then once we got around to see what was
7  going on, Charles was on the ground. They were
8  kicking and stomping him. Steven was like what are
9  you all doing that for. One of the cops asked
10  Steven did he want to be next.
11     Q. Well, my point is during the six minutes
12  or so you were inside the ATM, you didn't see what
13  happened between Charles and any police officers on
14  the street; correct?
15     A. No.
16     Q. When you first stepped out of the ATM, you
17  couldn't see Charles and what interaction, if any,
18  he had with any police officers; correct?
19     A. No.
20     Q. Where were you the first time you saw
21  Charles?
22     A. Back onto that side of 53rd, and I had
23  stepped around the police car. I came around the
24  police car. They had him on the ground, kicking

45

1  and stomping him. He's yelling I'm already
2  handcuffed, why are you constantly kicking and
3  stomping me.
4      Q. We'll get into that. It wasn't until you
5  came around the police car that you could see
6  Charles, right?
7      A. Right.
8      Q. Where was the police car in relation to
9  Ashley's car?
10     A. Angled off into the middle of the street
11  in front of Ashley's car to the left of it.
12     Q. Was it angled towards the curb or away
13  from the curb?
14     A. The back end was towards the curb. The
15  front end was away from the curb. If this is the
16  side of the street, the car was angled that way.
17     Q. So the police pulled in front of the car?
18     A. No. Say a car is coming this way and you
19  want to cut it off, they kind of swerved in and
20  swerved out.
21     Q. Where was Charles positioned in relation
22  to the front of Ashley's car and the rear of that
23  squad car?
24     A. In the middle of the street in between

46

1  both cars.
2      Q. How many officers were on the scene at
3  that point in time?
4      A. About four or five.
5      Q. Do you know if they were University of
6  Chicago Officers?
7      A. University of Chicago Officers, and then
8  the Chicago police came.
9      Q. We'll get into that. So you saw four to
10  five University of Chicago Officers at that point
11  in time when you walked around the squad car;
12  right?
13     A. Yeah.
14     Q. You said Charles was on the ground?
15     A. Yeah.
16     Q. Was anybody holding him down?
17     A. I wouldn't say holding him down, but if
18  you're getting kicked and stomped in the middle of
19  the street it's kind of hard for you to get up and
20  get away from that if you're handcuffed.
21     Q. When you saw Charles on the ground he was
22  handcuffed?
23     A. Yeah.
24     Q. And was he handcuffed in front or behind?

47

1      A. His hands were behind his back.
2      Q. Was he laying on the ground, or was he on
3  his knees? What actual position was he in?
4      A. He was laying on the ground, but at one
5  point in time he was on his knees trying to get up.
6      Q. Now you said that there were four to five
7  University of Chicago Officers, I think you
8  described it as kicking and stomping him?
9      A. Yeah.
10     Q. When you first saw Charles he was on his
11  knees?
12     A. I don't know if he was on his knees prior
13  to when I first saw him, but when I came over he
14  was on the ground.
15     Q. Was he on his knees when you first saw
16  him, or was he laying face down on the ground when
17  you first saw him?
18     A. To my recollection face down.
19     Q. There were four to five University of
20  Chicago Officers standing around him?
21     A. Yeah.
22     Q. Can you describe any of them for me?
23     A. Not really.
24     Q. I mean, were any of them Asian?

48

12 (Pages 45 to 48)

1    A. I remember a black one. I do remember
2  some type of Hispanic one.
3    Q. I'm sorry?
4    A. I remember a black one and a Hispanic one.
5    Q. Did you see any white officers?
6    A. Not really sure.
7    Q. Did you see any Asian officers?
8    A. Not to my knowledge.
9    Q. I'm sorry?
10   A. Not to my knowledge.
11   Q. How many black and Hispanic officers did
12  you see from the University of Chicago when you
13  first went around the squad car?
14   A. I'm not sure like the number as far as
15  their ethnicity, because when I walked up their
16  backs were to me and they were constantly kicking
17  and stomping.
18   Q. So Charles is on the ground. These four
19  to five University of Chicago Officers are facing
20  him with their backs to you. You see them kicking
21  and stomping him. Is that what you've described
22  for us?
23   A. Yeah.
24   Q. How many times would you say these four to
                                                      49

1  five University of Chicago Officers kicked and
2  stomped Charles?
3    A. I'm not sure of the number, but it was
4  repeatedly because he was constantly saying I'm
5  already down why are you kicking and stomping me.
6    Q. Did they stop for a period of time, or is
7  this constant kicking?
8    A. It was constant at first, but it pretty
9  much slowed down as people started to gather.
10   Q. Well, how many times did you see a
11  University of Chicago Officer kick or stomp Charles
12  as he was handcuffed on the ground?
13   A. It was repeatedly, so at least six or
14  seven times.
15   Q. How long of a period of time did this
16  kicking and stomping occur for?
17   A. I'd say about -- between 5 to 10 minutes.
18   Q. I'm sorry?
19   A. Between 5 to 10 minutes.
20   Q. Between 5 and 10 minutes?
21   A. Yeah. The Chicago Police eventually
22  showed up. It was like when they showed up it kind
23  of calmed down.
24   Q. Was this kicking and stomping constant
                                                      50

1  during the 5 to 10 minutes?
2    A. Yeah.
3    Q. Was any University of Chicago officer
4  doing more of this kicking and stomping during the
5  5 to 10 minutes than any other officer?
6    A. It's mainly the Hispanic one.
7    Q. It was mainly the Hispanic one?
8    A. The Hispanic one and the African-American
9  male. I can't really describe him, but I noticed
10  he had like a funny mustache.
11   Q. The Hispanic officer and the
12  African-American male officer with a funny mustache
13  were doing most of the kicking?
14   A. Yeah.
15   Q. Did you see any University of Chicago
16  Officer on the ground looking for his glasses that
17  had been broken?
18   A. Yeah, because I do recall someone making a
19  statement like you're lucky this wasn't 10 years
20  ago because I would have killed you, you made me
21  break my glasses.
22   Q. Do you know if Charles kicked that officer
23  in the face and broke his glasses?
24   A. No, I am not sure if that happened, or if
                                                      51

1  it had happened if it was before I came out there.
2    Q. But you do remember a University of
3  Chicago Officer looking for his glasses?
4    A. Yeah.
5    Q. Where were these University of Chicago
6  Officers kicking and stomping Charles's body during
7  this 5- to 10-minute period of time?
8    A. All over from head down.
9    Q. You said from the head down. Was he
10  actually kicked in the head?
11   A. Yeah.
12   Q. Did you see the officers kicking Charles
13  in the head?
14   A. Yeah.
15   Q. Did you see the officers kicking Charles
16  in the face?
17   A. Face, side, ribs.
18   Q. Anywhere else?
19   A. It was pretty much all over.
20   Q. And when they kicked Charles did they hurt
21  him?
22   A. I would say so. If anyone is getting
23  kicked and stomped all over, I'm pretty sure they
24  will be hurting.
                                                      52

13 (Pages 49 to 52)

1    Q. This isn't like WWF where they're
2  pretending that they're --
3    A. Right, when you're getting kicked and
4  stomped with boots I'm sure it would hurt.
5    Q. And it would leave marks and bruises,
6  right?
7    A. Yeah.
8    Q. Let me show you what has been previously
9  marked as Glover Deposition Exhibit No. 2 and
10  Charles Boyle Deposition Exhibit No. 1. Do you
11  know when those photographs were taken?
12    A. No.
13    Q. Did you know if they were taken before or
14  after Charles was kicked and beat and stomped for 5
15  to 10 minutes by the University of Chicago
16  Officers?
17    A. I'm not sure. I wasn't there when the
18  pictures were taken.
19    Q. Do you know if this is how Charles looked
20  after he was beat and kicked and stomped by the
21  University of Chicago Officers for 5 to 10 minutes?
22    A. I'm not sure, because once they got him up
23  and put him in the car they took him to the police
24  station. When Steven and I went to police station

53

1  to see what was going on, they wouldn't tell us
2  anything or let us see him.
3    Q. But my question is do you know if these
4  photos show how Charles appeared after the
5  University of Chicago Officers allegedly kicked and
6  beat and stomped him for 5 to 10 minutes?
7    A. I don't know because after this incident I
8  spoke with Charles but I hadn't seen him.
9    Q. Well, did you see Charles after he was
10  picked up off of the street?
11    A. Not clearly because he was surrounded by
12  officers.
13    Q. I assume if Charles was kicked in the face
14  and repeatedly stomped for 5 to 10 minutes he would
15  have been cut or bruised or bleeding, correct?
16    MR. KSIAZEK: Objection, speculation.
17    MR. PUSZNIS: You can answer the question.
18    THE WITNESS: I'm trying to -- it's hard to say
19  because you can be in fights and can get beat bad
20  but don't necessarily end up bleeding or cut or
21  anything, just be in pain and have bruises.
22  BY MR. PUSZNIS:
23    Q. If you're kicked and stomped, as you've
24  described it, for 5 or 10 minutes with boots by

54

1  five police officers that's going to leave some
2  marks; wouldn't it?
3    A. You're going to have bruises, but it's not
4  certainty that you're going to bleed or anything.
5    Q. If you were kicked in the face for this 5
6  to 10 minutes, you would be bruised; wouldn't you?
7    A. Yeah.
8    Q. You might have a black eye?
9    A. If you say so.
10    Q. If you were kicked in the face your face
11  might be cut?
12    MR. KSIAZEK: Objection, speculation.
13    THE WITNESS: I would say so.
14  BY MR. PUSZNIS:
15    Q. If you were kicked in the head you might
16  suffer a concussion, right?
17    MR. KSIAZEK: Speculation.
18    THE WITNESS: Not all the time.
19  BY MR. PUSZNIS:
20    Q. So you saw these University of Chicago
21  Officers kicking Charles while he was handcuffed
22  and stomping Charles for 5 to 10 minutes on the
23  ground. What happened next? What caused them to
24  stop?

55

1    A. I would say all the commotion and
2  attention they were getting because just random
3  people came outside. Our barber had walked from
4  his home to 53rd where the incident was going on.
5    Q. What's your barber's name?
6    A. Chris.
7    Q. What's his last name?
8    A. Golden.
9    Q. Where does he live?
10    A. The last time I visited his home he was in
11  Hyde Park.
12    Q. Where in Hyde Park?
13    A. On 51st and Woodlawn.
14    Q. How far is that from the location of where
15  this 5 to 10 minute beat-down occurred?
16    A. About three blocks away.
17    Q. Anyone call Chris?
18    A. I think Steven had spoke to him.
19    Q. Why did Steven call Chris?
20    A. Because at that time Chris was more than
21  just a barber. He was someone like -- well, he's
22  Steven's manager now. I guess it was someone that
23  Steven called that he probably could trust.
24    Q. Anyone take any photographs?

56

14 (Pages 53 to 56)

1    A.  Not to my knowledge because -- I don't
2  know if anybody took any pictures, but I know
3  Ashley Glover had her camera on her that night.
4    Q.  I'm sorry?
5    A.  I don't know if anyone took any pictures,
6  but I know Ashley had her camera on her that night.
7    Q.  Did you see Ashley take any photographs?
8    A.  I didn't see her take any photographs.
9    Q.  Now who else besides your barber walked
10  over after Steven called him?
11    A.  I know some female and maybe a few other
12  people who probably had just -- you know when
13  there's commotion and people just tend to gather to
14  see what's going on.
15    Q.  How long after you saw Charles being
16  kicked and stomped by the University of Chicago
17  Officers did Steven call his barber?
18    A.  I'm not sure.  I just noticed he was on
19  the phone with someone, and then a few minutes
20  later Chris showed up.
21    Q.  At what point during this incident did
22  Chris show up?
23    A.  Chris had showed up after they had picked
24  Charles up off the ground and his pants were
                                                    57

1  anything like that.
2    Q.  The term is sagging?
3    A.  Yeah.
4    Q.  You never sagged your pants?
5    A.  Not really, because we always talked about
6  other people.
7    Q.  Do you know how those pants got pulled
8  down?
9    A.  No.
10    Q.  Now at some point during this 5 to 10
11  minutes of kicking and stomping Charles, Steven
12  said something?
13    A.  Steven said something as soon as he and I
14  walked up from the bank.  He was like what's going
15  on here, and the cop was like do you want to be
16  next.  That's when we kind of backed away and just
17  walked around.
18    Q.  What officer said do you want to be next?
19    A.  I don't recall his name or anything like
20  that.
21    Q.  Can you describe him?
22    A.  Not really.  It was so long ago.
23    Q.  Do you remember if he was
24  African-American, white, Hispanic, Asian?
                                                    59

1  halfway down.  They had put him up against the
2  University of Chicago police car.
3    Q.  When did Charles's pants come halfway
4  down?
5    A.  His pants were halfway down while he was
6  on the ground being kicked and stomped.
7    Q.  Were his boxers pulled down too?
8    A.  I didn't see his boxers pulled down.
9    Q.  I'm sorry?
10    A.  I didn't see his boxers pulled down.
11    Q.  Was he wearing briefs?
12    A.  I'm not sure.
13    Q.  How far down were his pants pulled?
14    A.  Say like right in the mid -- not
15  completely down but not up.
16    Q.  So kind of like mid hip level?
17    A.  A little bit lower than that.
18    Q.  A little bit lower than that?
19    A.  Yeah.
20    Q.  I know from my kids that they usually wear
21  their pants down low.  How far down below where
22  Charles normally wore his pants were these pants
23  pulled?
24    A.  We never really sagged our pants or
                                                    58

1    A.  No.
2    Q.  So these University of Chicago Officers
3  knew that you and Steven were there as well as
4  Ashley, right, during this 5 to 10 minutes that --
5    A.  Yeah, because Ashley was there the whole
6  time.
7    Q.  Right.  Now did you or Steven say anything
8  else to Charles or to the officers during this 5 to
9  10 minutes of beating and stomping as you've
10  described it for us?
11    A.  No, because we didn't really say anything
12  because we didn't want anything to get more out of
13  hand than it already was once Steven asked what was
14  going on and they asked him did he want to be
15  next.  We basically were talking to Ashley.  Ashley
16  what's going on, but she was too shaken up to
17  really talk about it.
18    Q.  When did you start to see other people
19  arrive at the scene after you started talking to
20  Ashley?
21    A.  About two minutes after we got there.
22    Q.  How many other people started showing up?
23    A.  It wasn't that many, about seven or eight
24  people.
                                                    60

15 (Pages 57 to 60)

1  Q. Seven to eight people, did you get any of
2  their names?
3  A. No.
4  Q. So this kicking and stomping was still
5  going on while the seven to eight witnesses were
6  there, correct?
7  A. It wasn't going on too much longer. Once
8  the Chicago Police had showed up, shortly after
9  that it was like it's all calmed down from there.
10 As opposed to them trying to take one side or the
11 other, they were really just trying to calm the
12 situation down.
13 Q. So would it be fair to say that the
14 University of Chicago Officers didn't care if there
15 were witnesses there, and they kicked Charles and
16 stomped Charles for 5 to 10 minutes out on the
17 street?
18 MR. KSIAZEK: Objection, speculation.
19 THE WITNESS: Obviously, I would say they
20 didn't care because they continued to do it
21 anyway.
22 BY MR. PUSZNIS:
23 Q. Did you see the officers from the
24 University of Chicago do anything other than kick
                                                    61

1  and stomp Charles during this 5 to 10 minutes?
2  A. I'm trying to think. Not so much, just
3  doing anything else.
4  Q. Did you see them punch Charles or hit him
5  with any type of an object?
6  A. I don't recall any objects. It may have
7  been punches, kicks, that's all the same, blows.
8  Q. What was Charles saying during this 5 to
9  10 minutes he was being kicked and stomped?
10 A. He's constantly yelling I'm already down
11 why do you keep hitting me, I can't do anything, I
12 can't resist or anything like that so why do you
13 keep hitting me.
14 Q. Did you hear him say anything else?
15 A. Nothing else other than why are you
16 constantly hitting me, kicking me, punching me,
17 stuff like that.
18 Q. When the City of Chicago Officers arrived,
19 what happened?
20 A. Excuse me?
21 Q. When the City of Chicago Officers arrived,
22 what happened?
23 A. They pretty much tried to calm the
24 situation down. They eventually picked Charles up
                                                    62

1  off the ground, put him on the car and everything.
2  Chris was there by that time. Chris was trying to
3  explain to them how he was a good kid and trying to
4  see what was going on. The Chicago Police was
5  telling us where he would be taken to.
6  Q. Now did you see the City of Chicago
7  Officers actually pick Charles up off of the
8  ground?
9  A. I'm not sure which officer picked him up
10 off the ground, but they came over. Their main
11 objective was not to try to cause any more
12 commotion or anything. They were just trying to
13 calm the situation down, so I'm not sure who picked
14 him up off the ground.
15 Q. Did you see any City of Chicago Officer
16 search Ashley's car?
17 A. No.
18 Q. Were you present for any conversation
19 between Ashley and any University of Chicago
20 Officer or City of Chicago Police Officer?
21 A. No.
22 Q. Did you have any conversation with any of
23 the University of Chicago Officers at any time on
24 the scene?
                                                    63

1  A. No.
2  Q. Did Steven have any conversation with any
3  of the University of Chicago Officers at the scene
4  other than what you've already described for us?
5  A. I believe one of them had posed a
6  statement of what are you all doing here or who's
7  car is this, and Steven told him it was my
8  girlfriend's car. Yeah, they were talking to him
9  because he was originally the one driving.
10 Q. Did you provide your name and address and
11 any identifying information to the University of
12 Chicago Officers?
13 A. I don't recall.
14 Q. Did Steven provide his name and address
15 and identifying information to University of
16 Chicago Officers?
17 A. I don't recall.
18 Q. Do you know about Ashley, whether she did?
19 A. Maybe she did because it was her car -- to
20 prove it was her car.
21 Q. But you don't know one way or the other?
22 A. No.
23 Q. When you walked back over to where the
24 squad car was and Ashley's car was, was the hood
                                                    64

16 (Pages 61 to 64)

1    still up?
2        A.  I can't remember.
3        Q.  When you turned around as you were walking
4    towards the ATM -- I want to go back to when you
5    were walking towards the ATM.  You said you turned
6    around.  You looked, and you saw Charles under the
7    car; right?
8        A.  Yeah, looking under the hood, raising the
9    hood up and looking under it.
10       Q.  Did he put the bar up that holds the hood
11   up to the car?
12       A.  I don't know if the car had a bar.
13       Q.  At some point did the horn stop?
14       A.  Yeah, because when we came out of the ATM
15   it wasn't going off anymore.
16       Q.  Charles is a big guy, isn't he?
17       A.  Somewhat, not so much anymore.
18       Q.  He's strong, isn't he?
19       A.  Yeah.
20       Q.  Was he All City playing football?
21       A.  I'm not sure.
22       Q.  Now you saw Charles lift it up.  You don't
23   know whether it was a University of Chicago Officer
24   or a City of Chicago Officer or who did that?

65

1        A.  Lifted the hood up?
2        Q.  No, lifted Charles up off of the ground?
3        A.  No, I don't recall that.
4        Q.  Eventually, Charles was taken over and
5    placed in a City of Chicago squad car?
6        A.  I'm not sure what squad car, but I know he
7    ended up at a Chicago Police Department.
8        Q.  What did you and Ashley and Steven do when
9    Charles was taken from the scene to the City of
10   Chicago Police Station?
11       A.  Ashley dropped me and Steven off to my
12   car, then Steven and I went over to the police
13   station where Charles was.
14       Q.  Did Ashley go too?
15       A.  I don't believe she was with us.  It was
16   just Steven and I, because when we got there they
17   wouldn't answer any questions we had or anything.
18       Q.  Do you recall seeing Ashley at the 21st
19   District station at any time after the incident?
20       A.  I'm not sure.  I know Steven and I rode
21   together.
22       Q.  Now how long did you stay at the 21st
23   District station?
24       A.  Not too long, maybe about 20 or 30

66

1    minutes.
2        Q.  What did you do after the 20 to 30
3    minutes?
4        A.  We went outside and talked, and we were
5    outside talking to -- Charles's girlfriend at that
6    time, her father.
7        Q.  Do you remember his name?
8        A.  No.
9        Q.  Do you recall if he was a police officer?
10       A.  Yes.  He's a police officer in Bellwood or
11   Maywood, somewhere out there.
12       Q.  Now after this 20 to 30 minutes passed,
13   what did you do?
14       A.  Dropped Steven off at home and then I went
15   home.
16       Q.  Then you went home?
17       A.  Yeah.
18       Q.  Do you recall Charles saying anything to
19   you or Ashley or Steven before he was transported
20   from the scene at any point in time?
21       A.  Not really.  The only thing he said was
22   once he was off the ground in the police car that
23   if he needed any money for bail could I look out
24   for him.

67

1        Q.  Was that what he said to you?
2        A.  Yeah, that's the only thing he shouted out
3    to me.
4        Q.  Did you say anything in response?
5        A.  I got you.
6        Q.  That's because you had money still on you?
7        A.  I had money still on me and money at
8    home.
9        Q.  Did you ever learn that night what Charles
10   was being arrested for?
11       A.  Not that night.
12       Q.  When you spoke to Mr. Robinson, what did
13   you say to him -- or what did Steven say to him and
14   what did he say in response?
15       A.  He was just asking what happened from our
16   perspective, and Steven and I was telling him we
17   really don't know what started off the whole
18   altercation or everything.  We just know that when
19   we came out they were attacking him once he was
20   handcuffed and on the ground and everything, and
21   they didn't stop.  That's all we saw.  We didn't
22   know what had kicked it off or what had started it
23   from the beginning.
24       Q.  Did Mr. Robinson say anything else?

68

17 (Pages 65 to 68)

1   A.  Not really.  He was just mainly talking
2   about how his daughter had woken him up out of his
3   sleep to go see about Charles.
4   Q.  Did you know at that point in time if
5   Charles was going to get a D-Bond or an I-Bond?
6   A.  No.
7   Q.  Did you know when Charles was going to be
8   released or when his bond was going to be set?
9   A.  No.
10   Q.  Did you see Charles at all at the
11   21st District station?
12   A.  No.
13   Q.  Did you see any of the University of
14   Chicago Officers at the 21st District station?
15   A.  No, I just seen the Chicago Police.
16   Q.  Now you said you waited at the 21st
17   District station for a period of time, about 20 to
18   30 minutes, and then you dropped Steven off at home
19   and you went home; right?
20   A.  Yeah, we were waiting because Charles's
21   girlfriend was calling us and telling us that her
22   father was on his way.
23   Q.  So you waited for him to arrive.  You had
24   the conversation with him, and then you left?

69

1   going to sue the University of Chicago by that
2   point in time?
3   A.  No.
4   Q.  Did he say anything to you about filing a
5   lawsuit at that time?
6   A.  No, he really just kept the conversation
7   short.
8   Q.  Do you know if he had taken photographs of
9   himself before or after he spoke to you that day?
10   A.  No.
11   Q.  When was the next time you saw Charles in
12   person?
13   A.  It was quite a while because during that
14   time I was working a lot.  I really didn't have
15   time to really go anywhere.
16   Q.  When someone describes themselves as coke
17   c-o-k-e, what does that mean?
18   MR. KSIAZEK:  Objection, relevance.  Go ahead
19   and answer.
20   THE WITNESS:  As coke?
21   MR. PUSZNIS:  Yeah.
22   THE WITNESS:  I haven't heard that before.
23   BY MR. PUSZNIS:
24   Q.  Well, you follow Charles on Twitter,

71

1   A.  Yeah.
2   Q.  When did you next speak to Charles about
3   this incident?
4   A.  Later the next day, I believe, but he
5   wasn't really talking about the incident because he
6   didn't really want to talk about it.  He was just
7   letting me know that he was at home, and he was
8   going to the doctor and stuff.
9   Q.  So he called you from his home and told
10   you he was going to the doctor?
11   A.  Yeah.
12   Q.  Do you recall what time that conversation
13   occurred?
14   A.  No.
15   Q.  Do you know if anyone was with him at that
16   time?
17   A.  I know he said something about his cousin
18   had came to get him.
19   Q.  Is Ashley his cousin?
20   A.  No.
21   Q.  Who was his cousin?
22   A.  He didn't say what cousin.  He just said
23   cousin.
24   Q.  Do you know if Charles had decided he was

70

1   right?
2   A.  No.  Well, I'm on Twitter, but I rarely
3   log into Twitter.
4   Q.  At one point when you logged onto Twitter
5   for Charles, there was a statement that says cane
6   is coke.  Do you know what he meant by that?
7   A.  No.
8   Q.  Is he referring to Coca-Cola?
9   A.  I'm not sure.
10   Q.  Or do you know if he was referring to
11   something else when he was referring to himself as
12   coke?
13   A.  I'm not sure.  I rarely pay attention to
14   anything on Twitter.
15   Q.  Are you one of his Facebook friends?
16   A.  Yeah.
17   Q.  He puts his music up on Facebook, right?
18   A.  Yeah.
19   Q.  Between the music that he puts up on his
20   Facebook account and the music that you've mixed
21   for him, you're familiar with some of his lyrics;
22   aren't you?
23   A.  Yeah.
24   Q.  We've already established that Charles

72

18 (Pages 69 to 72)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1   puts out music under the name of Apollo Cane,
2   right?
3       A. Yes.
4       Q. Are you familiar with the song called
5   Diamonds?
6       MR. KSIAZEK: Objection, relevance.
7       THE WITNESS: Not off the title. I'd probably
8   have to hear it to know what you're talking about.
9       MR. PUSZNIS: Something about diamonds on my
10  neck, diamonds on my neck, diamonds on my neck is
11  the chorus?
12      A. Okay, I know what you're talking about.
13      Q. Are you familiar with those lyrics?
14      A. Not really. I know the song. I know the
15  song, yeah.
16      Q. That's one of Charles's songs, right?
17      A. Yes.
18      Q. One of the lines in the song is smoking
19  pounds of green, smoking pounds of green, smoking
20  pounds of green, diamonds on my neck, diamonds on
21  my neck, diamonds on my neck; right?
22      MR. KSIAZEK: Objection, relevance.
23  BY MR. PUSZNIS:
24      Q. When Charles talks about smoking pounds of

73

1   A. I mean, probably so.
2       Q. Does he refer to blacks as niggers in his
3   songs?
4       MR. KSIAZEK: Objection, relevance.
5       THE WITNESS: Yeah. That's anyone who has some
6   type of art and they have a creative passion for
7   something they express themselves.
8   BY MR. PUSZNIS:
9       Q. I understand. Are you familiar with the
10  song called Da Best by Apollo Cane?
11      A. Yeah.
12      Q. There's a line in there, hey, hey P, KC KC
13  Midas DJ, let's go. Is he referring to you in that
14  line about let's go?
15      A. With the DJ that could refer to me,
16  Steven, or some other DJs we know.
17      Q. Okay. In the song do you know what he
18  refers to when it says it's AP? Does that mean
19  Apollo Cane?
20      A. Yeah.
21      Q. So when he says it's AP, I kill the
22  cracker like a muffin, do you know what he's
23  referring to?
24      MR. KSIAZEK: Objection, relevance.

75

1   green, what is he referring to?
2       A. Smoking pounds of green, that actual line
3   actually came from another artist, Notorious Big.
4       Q. I'm sorry?
5       A. That line came from Notorious Big.
6       Q. What's that referring to, smoking pounds
7   of green?
8       A. Probably marijuana.
9       Q. So Charles sings hip hop songs about
10  smoking marijuana?
11      MR. KSIAZEK: Objection, relevance.
12      THE WITNESS: I wouldn't say it's about him
13  smoking marijuana. You know how you have certain
14  people that you admire, like everyone who rap sings
15  or does hip hop, sometimes they will incorporate
16  someone else's lyrics into their own song.
17      Q. I don't mean to use this offensively, but
18  these are the words of his song. In the song
19  Diamonds, does he say these niggers need to jump on
20  my dick KKKK?
21      MR. KSIAZEK: Objection, relevance.
22  BY MR. PUSZNIS:
23      Q. Do you know if he uses that language in
24  that song?

74

1       THE WITNESS: No.
2   BY MR. PUSZNIS:
3       Q. When he says I'm high all the time so I'm
4   having grind, do you know what he's referring to?
5       A. No.
6       MR. KSIAZEK: Objection, relevance.
7   BY MR. PUSZNIS:
8       Q. Do you know if he's talking about being
9   high all the time he's talking about being on
10  marijuana or some type of drugs?
11      MR. KSIAZEK: Objection, relevance.
12      THE WITNESS: No. Because in our world you can
13  be high off of something and it doesn't have to be
14  drugs. You know, if you have a female and you're
15  in love with her, you're high off of love, anything
16  like that. It's all how you perceive it.
17  BY MR. PUSZNIS:
18      Q. Are you familiar with a song called
19  Bidnezz, B-i-d-n-e-z-z, by Apollo Cane?
20      A. No.
21      Q. Ever hear him say words I'm crushing
22  anybody dat, d-a-t, standing in my way. AP is on
23  the scene, man, that's all I gotta say?
24      MR. KSIAZEK: Objection, relevance.

76

19 (Pages 73 to 76)

1
2    BY MR. PUSZNIS:
3        Q.   Ever hear that song?
4        A.   I can't recall.  Some music I have.  Some
5    music I don't have.
6        MR. KSIAZEK:  Are you going to go through every
7    song?
8        MR. PUSZNIS:  No, just a few.
9    BY MR. PUSZNIS:
10       Q.   You're familiar with the song, Yo, aren't
11   you?
12       A.   Yo.
13       Q.   Yes?
14       A.   That's not Charles's song.  It's someone
15   else's song.
16       Q.   Who's song is it?
17       A.   It's a KC song.
18       Q.   It's the other guy that he sings with or
19   does hip hop with, right?
20       A.   Yeah.
21       Q.   What about lyrics to D Boyz?
22       A.   Who?
23       Q.   D Boyz, B-o-y-z?
24       A.   D Boyz.
                                              77

1        Q.   Uh-huh.
2        A.   Meaning, B Boyz.
3        Q.   D Boyz, yeah?
4        A.   B Boyz -- they have a song called B Boyz,
5    not D Boyz.
6        Q.   Are you familiar with that?
7        A.   Yeah.
8        Q.   Does he refer to himself as a knockout
9    artist trying to get rich?
10       MR. KSIAZEK:  Objection, relevance.
11       THE WITNESS:  Yeah, but a knockout artist is an
12   artist who comes up on the scene and just blows
13   everyone away by their talent.
14   BY MR. PUSZNIS:
15       Q.   Have you heard of a song called Cronym,
16   C-r-o-n-y-m, I think it's spelled?
17       MR. KSIAZEK:  Objection, relevance.
18       THE WITNESS:  I've heard of something called
19   Acronym.
20   BY MR. PUSZNIS:
21       Q.   On that song, doesn't he say you got a
22   right to kill brothers like the KKK?
23       MR. KSIAZEK:  Objection, relevance to this
24   whole line of questions.
                                              78

1        THE WITNESS:  Yes.
2    BY MR. PUSZNIS:
3        Q.   He does?
4        A.   But I think he's talking more as far as
5    being a hip hop artist/battler, you have a right to
6    demolish your opponent lyrically.
7        Q.   Are you familiar with a song called Party
8    Animal?
9        MR. KSIAZEK:  Objection, relevance.
10       THE WITNESS:  Yeah.
11   BY MR. PUSZNIS:
12       Q.   Why did you laugh about that one?
13       A.   It's one of the songs I listen to a lot.
14       Q.   Of Charles's?
15       A.   Yeah.
16       Q.   In one of the lines in there he's looking
17   for a chick to ride him like a Harley?
18       MR. KSIAZEK:  Objection, relevance.
19       THE WITNESS:  Yeah.
20   BY MR. PUSZNIS:
21       Q.   What about Led's Do It, is that one of
22   Charles's songs?
23       A.   Led's Do It.
24       MR. KSIAZEK:  Objection, relevance.
                                              79

1        THE WITNESS:  I'm not sure if that's his song
2    or KC's song.
3    BY MR. PUSZNIS:
4        Q.   Do you know if there's lyrics or lines in
5    there about let me get off le cochran with a case?
6        MR. KSIAZEK:  Objection, relevance.
7        THE WITNESS:  Yes.
8    BY MR. PUSZNIS:
9        Q.   Was he referring to Johnny Cochran?
10       A.   Probably.  It also depends on how you use
11   get off.
12       Q.   Was he referring to his criminal case?
13       A.   I'm not sure.  That song might have been
14   recorded before all this happened.
15       Q.   Has he ever done any songs about being
16   arrested by the police?
17       A.   Not to my knowledge.  If he has, it's
18   probably just from growing up in our surroundings.
19       Q.   I'm not sure I understand.  What do you
20   mean?
21       A.   As far as our surroundings?
22       Q.   Yes.
23       A.   Growing up in our neighborhood it's
24   always, you know, the young black male is being
                                              80

20  (Pages 77 to 80)

1  harassed or everything by the police. So if he's
2  raping about being arrested by the police, you
3  can't help but to rap or tell a story about the
4  things you see on a daily basis.
5      Q.  Have you spoken to Charles about your
6  deposition?
7      A.  Not too much about it. I just called him
8  when Mr. Ksiazek first called me and left me a
9  voicemail. I just called to see who Mr. Ksiazek
10  was. We didn't discuss too much about what was
11  going on.
12      Q.  Have you seen any of the University of
13  Chicago Officers involved in this incident since?
14      A.  Just the time we went to court.
15      Q.  Did Charles ever have any run-ins with the
16  University of Chicago Officers before this?
17      A.  No.
18      Q.  Had he ever been arrested by University of
19  Chicago Officers or by City of Chicago Officers
20  before this?
21      A.  Not to my knowledge.
22      Q.  To your knowledge had he ever been
23  harassed by the police on any prior occasion?
24      A.  No.
                                              81

1      Q.  I'm sorry?
2      A.  Not to my knowledge.
3      MR. PUSZNIS: I don't have anything else right
4  now. Thanks, Kenneth.
5              EXAMINATION
6  BY MS. GIBBONS:
7      Q.  My name is Helen Gibbons. I'm one of the
8  attorneys for the City of Chicago and the City of
9  Chicago Police Officers. I just want to step back
10  to the incident itself and get a clearer picture of
11  when you first saw the Chicago Police Officers on
12  the scene. Can you tell me when you first noticed
13  the Chicago Police Officers as opposed to the
14  University of Chicago Police Officers?
15      A.  Well, the University of Chicago Police
16  Officers were there the whole time. The Chicago
17  Police Officers had really came to try to diffuse
18  the situation.
19      Q.  Do you recall about how many Chicago
20  Police Officers were on the scene?
21      A.  It wasn't that many. I'd say two or three
22  maybe four, if I'm not mistaken.
23      Q.  Do you remember how many Chicago squad
24  cars there were?
                                              82

1      A.  One or two.
2      Q.  Do you recall seeing a Chicago Police
3  Officer with a white shirt on?
4      A.  I can't recall.
5      Q.  Do you recall the Chicago Police Officers
6  that you did see, what did they look like, what
7  race, were they male, female, any of that
8  information?
9      A.  I can't really recall because it's so long
10  ago and I don't want to be wrong.
11      Q.  When they first came and they were there
12  to diffuse the situation, was Charles still on the
13  ground or was he standing?
14      A.  Like I said, he was still on the ground.
15  That's why I'm not sure who picked him up.
16      Q.  Was he still being beaten at that point in
17  time?
18      A.  I would say it was towards them giving
19  their final blows.
20      Q.  When it was towards them giving their
21  final blows, you mean them as the University of
22  Chicago Police Officers?
23      A.  Yeah, because I can't recall the Chicago
24  Police Officers really trying to get involved in
                                              83

1  the situation.
2      Q.  But you said that they were there to
3  diffuse the situation?
4      A.  Like trying to see what was going on for
5  themselves and trying to calm it down.
6      Q.  Now you had mentioned that after all of
7  this happened that you didn't really see Charles
8  for a while, but did you talk to him?
9      A.  Yeah, I called to check on him, make sure
10  did he need anything.
11      Q.  How did he seem to you?
12      A.  I guess he was as well as could be
13  expected, so we didn't go into any details of what
14  was wrong with him or anything. We just had a
15  normal conversation. I asked if he needed
16  anything. We talked about music mostly. That's
17  about it. Mostly when I talked to Charles, it was
18  about music, or he wants to know how my daughter is
19  doing or something of that nature.
20      Q.  Did he take any time off from performing
21  or DJ-ing or writing music that you know of because
22  of this incident?
23      A.  I don't know if he took any time off from
24  performing or anything, but I'm pretty sure he kept
                                              84

21  (Pages 81 to 84)

1   writing.
2       MS. GIBBONS: I have nothing further.
3           EXAMINATION
4   BY MR. KSIAZEK:
5       Q.  I want to go back to when you said that
6   Steven parked the car before the ATM.
7       A.  Yeah.
8       Q.  Can you describe how Steven parked the car
9   on 53rd Street?
10      A.  Steven has this thing that if you don't
11  touch the curb you're not parking right, so he
12  likes to drive up on the curb and come down and
13  park. That way you knows he's close enough to the
14  curb.
15      Q.  Did you see the car actually touch the
16  curb?
17      A.  Gently.
18      Q.  Just kind of bump up against it?
19      A.  Yeah.
20      Q.  Did the car actually shake when it hit the
21  curb, or was it just gently?
22      A.  Just gently.
23      Q.  Do you know how fast the car was going
24  when it gently went up against the curb?

85

1   when the transcript is ordered, will type it up.
2   You have a right to take a look at the transcript
3   to read it over to make sure that all the questions
4   were taken down correctly and that the answers were
5   also transcribed correctly. You can't change your
6   testimony, but if there's a typo or something in
7   there that's misspelled or something you've got a
8   right to take a look at it if you want to. We
9   always offer people the opportunity to read the
10  transcript over if they want to. The court
11  reporter will contact you. You probably have to
12  come to her office to take a look at it, but that's
13  your option. That's your right if you want to do
14  it. The question is do you want to take a look at
15  the transcript, or do you trust the court reporter
16  to get down everything accurately that was asked
17  and your answers.
18      THE WITNESS: I'll look at it.
19      MR. PUSZNIS: Signature will be reserved.
20          (FURTHER DEPONENT SAITH NOT.)
21          (Whereupon, the deposition
22          concluded at 4:05)
23
24

87

1       A.  It couldn't have been going no more than
2   five miles because he was pulling into the parking
3   spot.
4       Q.  You said something about them throwing
5   Charles on top of a car. Do you recall saying
6   that?
7       A.  Yeah, it was pretty much them picking him
8   up off the ground, pushing him on the side of the
9   University of Chicago police car and patting him
10  down to see if he had anything on him.
11      Q.  How do you know that the University of
12  Chicago Officers picked him up off the floor?
13      A.  I said I couldn't recall who picked him up
14  and put him on the car.
15      Q.  When did that happen?
16      A.  This was after the Chicago Police were on
17  the scene.
18      Q.  That was after they were kicking and
19  striking him?
20      A.  Yeah.
21      MR. KSIAZEK: I don't think I have anything
22  further.
23      MR. PUSZNIS: I don't have anything else.
24  Kenneth, your dep is now done. The court reporter,

86

1           IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4   CHARLES BOYLE,              )
5       Plaintiff,             )
6       -vs-                   ) No. 09 C 1080
7   UNIVERSITY OF CHICAGO POLICE )
8   OFFICER LARRY TORRES, ET AL., )
9       Defendants.            )
10
11      This is to certify that I have read the
12  transcript of my deposition taken in the
13  above-entitled cause by Frances S. Lucente,
14  Certified Shorthand Reporter, on December 1, 2009,
15  and that the foregoing transcript accurately states
16  the questions asked and the answers given by me as
17  they now appear.
18
19          KENNETH ROBERSON
20  SUBSCRIBED AND SWORN TO
21  before me this _____ day
22  of _____ 2010.
23  _____
24      Notary Public

88

22  (Pages 85 to 88)

1  STATE OF ILLINOIS )
2              ) SS:
3  COUNTY OF C O O K )
4      I, Frances S. Lucente, a notary public within
5  and for the County of Cook County and State of
6  Illinois, do hereby certify that heretofore,
7  to-wit, on the 1st day of December, 2009,
8  personally appeared before me, at 222 North LaSalle
9  Street, Chicago, Illinois, KENNETH ROBERSON, in a
10  cause now pending and undetermined in the Circuit
11  Court of Cook County, Illinois, wherein CHARLES
12  BOYLE is the Plaintiff, and UNIVERSITY OF CHICAGO
13  POLICE OFFICER LARRY TORRES, ET AL, are the
14  Defendants.
15      I further certify that the said witness was
16  first duly sworn to testify the truth, the whole
17  truth and nothing but the truth in the cause
18  aforesaid; that the testimony then given by said
19  witness was reported stenographically by me in the
20  presence of the said witness, and afterwards
21  reduced to typewriting by Computer-Aided
22  Transcription, and the foregoing is a true and
23  correct transcript of the testimony so given by
24  said witness as aforesaid.

89

1      I further certify that the signature to the
2  foregoing deposition was reserved by counsel for
3  the respective parties.
4      I further certify that the taking of this
5  deposition was pursuant to Notice, and that there
6  were present at the deposition the attorneys
7  hereinbefore mentioned.
8      I further certify that I am not counsel for nor
9  in any way related to the parties to this suit, nor
10  am I in any way interested in the outcome thereof.
11      IN TESTIMONY WHEREOF: I have hereunto set my
12  hand and affixed my notarial seal this 8th day of
13  January, 2010.
14
15
16
17
18
19  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20
21
22
23
24

90



1              McCorkle Court Reporters, Inc.
            200 N. LaSalle Street Suite 300
2              Chicago, Illinois 60601-1014
3  CERTIFIED MAIL
4  January 8, 2010
5  Mr. Kenneth Roberson
   c/o Jonathan R. Ksiazek
6  300 West Adams Street, Suite 330
   Chicago, Illinois  60606
7
   IN RE:  CHARLES BOYLE V. UNIVERSITY OF CHICAGO
8  DATE OF DEPOSITION: DECEMBER 1, 2009
9  Dear Mr. Roberson:
10  Your deposition in the above-entitled cause is now
   ready for reading and signing as required by law.
11
   Please call the Signature Department upon receipt
12  of this letter to schedule an appointment to come
   to the above address to read and sign your
13  deposition.  You have 28 days from the date of
   this correspondence in which to appear for reading
14  and signing.
15  If you fail to appear or notify us so that we may
   make arrangements for another appointment, your
16  deposition will be completed and forwarded to the
   attorneys and will be "... used as fully as though
17  signed."
18  _____ Procedure outlined in Rule 207 (a) of
            the Illinois Supreme Court Rules
19
   _____ Procedure outlined in Rule 30 (e) of
20          the Rules of Civil Procedure for the U.S.
            District Courts
21
   Sincerely,
22
   Margaret Setina      Court Reporter:
23  Signature Department    Frances S. Lucente, CSR
24  cc: Helen Gibbons, Esq.   Steve Pusznis, Esq.

91

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

CHICAGO POLICE DEPARTMENT
**ARREST REPORT**
3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11, 420C(REV. 6/30)

**FINAL APPROVAL**

CB #: 17392877
IR #: 1958062
YD #:
RD #: HP634061
EVENT #: 0829202513

| ARREST REPORTING |
|---|

**OFFENDER**

Name: **BOYLE, Charles D**
Res: 6733 S Chappel Ave
Chicago, IL 60649
773-363-2575
Beat: 331

Empl: Church
Maintenance
DOB: 07 May 1987
AGE: 21 years
POB: Illinois
SSN: 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
DLN: B40014487100 -US
ARMED WITH Unarmed

Male
Black
5' 09"
197 lbs
Brown Eyes
Black Hair
Short Hair Style
Dark Complexion

Marks:  Tattoo Cloud on Upper Right Arm
Tattoo Praying Hands on Upper Left Arm

**INCIDENT**

Arrest Date: 18 October  2008 02:56     TRR Completed? No
Location: 1435 E 53rd St              Beat: 2132
Chicago, IL  60615
304 -  Street
Holding Facility: District 002 Male Lockup
Resisted Arrest?  Yes

Total No Arrested:1     Co-Arrests          Assoc Cases
DCFS Ward ?  No
Dependent Children? No

**CHARGES**

| | | | |
|---|---|---|---|
| 1 | Offense As Cited | **720 ILCS 5.0/31-1-A** | |
| | | RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP | |
| | | Class A - Type  M | |
| 2 | Offense As Cited | **720 ILCS 5.0/31-1-A** | |
| | | RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP | |
| | | Class  A - Type  M | |

Victim

**RECOVERED NARCOTICS**

NO NARCOTICS RECOVERED

IR #1958062

**WARRANT**

NO WARRANT IDENTIFIED

CB #17392877

Print Generated By: NITSCHE, Lawrence ( IL16CPDAAI )         Page 1 of 5
powered by: CLEAR Technology

20 MAR 2009 12:10

**EXHIBIT**
tabbies
1
12/10/9u

Boyle, 09 C 1080
**FCRL 0011**

Chicago Police Department - ARREST Report

CB #: 17392877
BOYLE, Charles

## ARREST REPORTING

**NON-OFFENDER(S)**

**ARRESTEE VEHICLE**

NO ARRESTEE VEHICLE INFORMATION ENTERED

**PROPERTIES**

Confiscated Properties :
All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR    BOYLE, Charles,    NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

**INCIDENT NARRATIVE**

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)

IN SUMMARY : A/O'S RESPONDED TO ASSIST UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL SPOKE WITH U OF C POLICE OFFICER MOORE, CLARENCE #1012, AND U OF C OFFICER TORRES, LARRY #1028, WHO RELATED TO A/O'S THAT THE ABOVE LISTED OFFENDER BOYLE, CHARLES D., REFUSED TO PRODUCE ID UPON AN INVESTIGATORY STREET STOP, AND DURING A PROTECTIVE PATDOWN OFFENDER BECAME COMBATIVE BY FLAILING HIS ARMS AND PULLING AWAY. OFFENDER TAKEN INTO CUSTODY ON SIGNED COMPLAINTS, READ RIGHTS PER MIRANDA AND TRANSPORTED TO 021 DISTRICT FOR FURTHER PROCESSING. OFC TORRES ADVISED OF COURT INFO.

**COURT INFO**

Desired Court Date:    04 December 2008
Branch: 34-2   155 W 51ST ST - Room
Court Sgt Handle? Yes
Initial Court Date:  04 December 2008
Branch: 34-2   155 W 51ST ST - Room
Docket #:

**BOND INFO**

Bond Date: 18 October 2008 11:8
Type:    Recognizance
Receipt #: I6770331
Amount:   $1,000.00

Boyle, 09 C 1080
FCRL 0012

**Chicago Police Department - ARREST Report**

CB #: 17392877

BOYLE, Charles

## ARREST REPORTING

### ATTESTING OFFICER:

I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

| Attesting Officer: | #19135 | DARLING, V (PC0R101) | 18 OCT 2008 04:39 |
|---|---|---|---|

### ARRESTING OFFICER(S):

| | | | Beat |
|---|---|---|---|
| 1st Arresting Officer: | #19135 | DARLING, V (PC0R101) | 2132 |
| 2nd Arresting Officer: | #17246 | MARTIN, C E (PC0S916) | 2132 |

### APPROVING SUPERVISOR:

| Approval of Probable Cause : | #339 | STOPPA, K A (PC0F280) | 18 OCT 2008 04:40 |
|---|---|---|---|

*REPORTING PERSONNEL* (vertical label)

powered by: CLE**AR** Technology

**Boyle, 09 C 1080**
**FCRL 0013**

Chicago Police Department - ARREST Report

CB #: 17392877

BOYLE, Charles

## ARREST PROCESSING REPORT

| LOCKUP KEEPER PROCESSING | | | | |
|---|---|---|---|---|
| Holding Facility: District 002 Male Lockup | | | Time Last Fed: 18 October 2008 07:22 | |
| Received in Lockup: 18 October 2008 07:21 | | | Time Called: | Phone#: |
| Prints Taken: 18 October 2008 07:58 | | | Cell #: 2/3 | |
| Palmprints Taken: Yes | | | | |
| Photograph Taken: 18 October 2008 07:57 | | | Transport Details : 2PO 2132 18-OCT-2008 03:00 | |
| Released from Lockup: 18 October 2008 11:15 | | | | |

| VISUAL CHECK OF ARRESTEE | | ARRESTEE QUESTIONNARIE | |
|---|---|---|---|
| Is there obvious pain or injury? | No | Presently taking medication? | No |
| Is there obvious signs of infection? | No | (If female)are you pregnant? | No |
| Under the influence of alcohol/drugs? | No | First time ever been arrested? | No |
| Signs of alcohol/drug withdrawal? | No | Attempted suicide/serious harm? | No |
| Appears to be despondent? | No | Serious medical or mental problems? | No |
| Appears to be irrational? | No | Are you receiving treatment? | No |
| Carrying medication? | No | | |

**RETURN TO HOLDING FACILITY COMMENTS:**

**QUESTIONNAIRE REMARKS:**

**LOCKUP KEEPER COMMENTS:**

**EMERGENCY CONTACT**

Name : SINCLAIR, Steven

Res: 1735 E 79th St, #2FL          Beat:0414
Chicago, IL 60649
773-574-4135

**INTERVIEW LOG**

NO INTERVIEWS LOGGED

**VISITOR LOG**

NO VISITORS LOGGED

Print Generated By: NITSCHE, Lawrence ( IL16CPDAAI )          Page 4 of 5          20 MAR 2009 12:10

powered by: CLEAR Technology

Boyle, 09 C 1080
FCRL 0014

Chicago Police Department - ARREST Report

CB # 17392877

BOYLE, Charles

## ARREST PROCESSING REPORT

**MOVEMENT LOG**

MOVEMENT LOG INFORMATION NOT AVAILABLE

**WC COMMENTS**

Watch Commander Comments;

REL w/o CHARGING

DOES NOT APPLY TO THIS ARREST

**PROCESSING PERSONNEL**

ARRESTEE PROCESSING PERSONNEL:

Beat

| | | |
|---|---|---|
| Searched By: | #4299 | DRIVER, F T (PC0E416) |
| Lockup Keeper: | #9865 | LAMAR, W L (PC0L482) |
| Assisting Arresting Officer: | #1012 | MOORE, C |
| Assisting Arresting Officer: | #1028 | TORRES, L |
| Fingerprinted By: | #9865 | LAMAR, W L (PC0L482) |

APPROVAL PERSONNEL:

Beat

| | | | |
|---|---|---|---|
| Final Approval of Charges : | #55 | FLUDER, J A(PC02957) | 18 OCT 2008 11:04 |

Boyle, 09 C 1080
FCRL 0015

CHICAGO POLICE DEPARTMENT
# ORIGINAL CASE INCIDENT REPORT
3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11.348(6/03)-C)

RD #: **HP634061**
EVENT #: 0829202513

Case ID: 8562346 CASR229

This Document is not an official copy. It is a computerized version of data entered from an original case report. A copy of the original case report can be obtained from the Records Division

## INCIDENT

**ASSIGNED TO ADMINISTRATIVE PERSONNEL**

IUCR: 3710 - Interfere With Public Officer - Resist/Obstruct/Disarm Officer

Occurrence Location: 1435 E 53rd St
Chicago IL 60615
304 - Street

Beat: 2132

Unit Assigned: 2132
RO Arrival Date: 18 October 2008 02:43

# Offenders: 1

Occurrence Date: 18 October 2008 02:37

## NON-OFFENDER

**VICTIM**

Name: MOORE, Clarence

Res: 5555 S Ellis Ave
Chicago IL 60637

Beat: 2133

Beat: 5100

**Demographics**
Male
Black

Age: 55 Years

**Other Communications and Availability**

Business Phone: 773-702-8181

**VICTIM**

Name: TORRES, Larry

Res: 5555 S Ellis Ave
Chicago IL 60637

Beat: 2133

Beat: 5100

**Demographics**
Male
White

Age: 40 Years

**Other Communications and Availability**

Business Phone: 773-702-8181

## SUSPECTS

**Suspect # 1**                    In Custody

Name: BOYLE, Charles D

Res: 6733 S Chappel Ave
Chicago IL 60649

Beat: 0331

**Demographics**
Male
Black
5'09.
197 lbs
Brown Eyes
Black Hair
Dark Complexion

Age: 21 years

**Other Communications and Availability**

## RELATIONSHIP

| (Victim) | | ( Offender ) |
|---|---|---|
| MOORE, Clarence | is a   No Relationship of | BOYLE, Charles,D |

RD #: HP634061

Print Generated By: KOOISTRA,MARK   (PC0D786)        Page 1 of 2                    20-MAR-2009 12:04

powered by CLEAR Technology



EXHIBIT
*2*
tabbies®
12/1/09 µ

Boyle, 09 C 1080
FCRL 0008

**Chicago Police Department - Incident Report**

RD #: HP634061

| | | Star No | Emp No | Name | User | Date | Unit | Beat |
|---|---|---|---|---|---|---|---|---|
| **PERSONNEL** | Reporting Officer | 19135 | #33994 | DARLING, Vincent | (PC0R101) | 19 Oct 2008 09:03 | 021 | 2132 |
| | Reporting Officer | 17246 | #49591 | MARTIN, Carl, E | (PC0S916) | 19 Oct 2008 09:03 | 021 | 2132 |

Boyle, 09 C 1080
FCRL 0009

CLEAR Data Warehouse
Arrest Narrative For Arrest ID 15290500
Report Date= 3/20/2009

The narrative contained herein has been transcribed from the original arrest report and is therefore not official!

NARRATIVE

IN SUMMARY : A/O'S RESPONDED TO ASSIST UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL SPOKE WITH U OF C POLICE OFFICER MOORE, CLARENCE #1012, AND U OF C OFFICER TORRES, LARRY #1028, WHO RELATED TO A/O'S THAT THE ABOVE LISTED OFFENDER BOYLE, CHARLES D., REFUSED TO PRODUCE ID UPON AN INVESTIGATORY STREET STOP, AND DURING A PROTECTIVE PATDOWN OFFENDER BECAME COMBATIVE BY FLAILING HIS ARMS AND PULLING AWAY. OFFENDER TAKEN INTO CUSTODY ON SIGNED COMPLAINTS, READ RIGHTS PER MIRANDA AND TRANSPORTED TO 021 DISTRICT FOR FURTHER PROCESSING. OFC TORRES ADVISED OF COURT INFO.

Boyle, 09 C 1080
FCRL 0010

EXHIBIT

3

12-11-09/c

ERAL OFFENSE REPORT
AGO POLICE

| 1. OFFENSE/INCIDENT–PRIMARY CLASSIFICATION | IUCR OFF. CODE | 2. SECONDARY CLASSIFICATION | | I.R.O. NO. |
|---|---|---|---|---|
| INTERFERENCE WITH PUBLIC OFFICER | 3 7 0 | RESIST | | HP - 634061 |

| 4. ADDRESS OF OCCURRENCE | | | 5. FIRE RELATED | 6. DATE OF OCCURRENCE – TIME | 7. BEAT OF OCCUR. | 8. BEAT/UNIT ASSIGN |
|---|---|---|---|---|---|---|
| RD / DIR / STREET | APT. NO. | | ☐ 1 YES ☒ NO | DAY 18 MO. OCT YR. 08 0237 | 2132 | 2132 |
| 1 4 3 5 E 53rd St | | | | | | |

9. TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE)
STREET

| 10. LOCATION CODE | 11. DATE R.O. ARRIVED – TIME | 12. ASSIGNED BY | ☐ 1 T.C.I.S. |
|---|---|---|---|
| 3 0 4 | 18 OCT 08 0243 | ☐ 2 ON VIEW | ☐ 3 SUPERVISOR |

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 21. NAME (LAST–FIRST–M.I.) | IDENTITY VERIFIED | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE (773) | 26. TIME AVAIL. | 27. OCCUPATION | | 29. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|---|
| MOORE, CLARENCE (U of C, P.D) | | 5555 S. ELLIS | M 1 55 | DNA | 702-8181 | ANY | POLICE OFC | ☒ | 24 |
| TORRES, LARRY (U of C, P.D) | | 5555 S. ELLIS | M 2 40 | DNA | 702-8181 | ANY | POLICE OFC | ☒ | 24 |

PARENT/GUARDIAN, IF JUVENILE

RACE CODES
1-BLACK  3-BLACK-HISPANIC  5-AMER. IND./ALASK. NAT.
2-WHITE  4-WHITE-HISPANIC  6-ASIAN/PACIFIC ISLANDER

| 31. ☐ 1 DISCOVERED ☐ 2 WITNESSED ☐ 3 REPORTED OFFENSE | 32. | 33. | 34. | 35. |
|---|---|---|---|---|

* USE CORRESPONDING CODE FOR ALL "35" RELATIONSHIPS   * DO NOT LEAVE RELATIONSHIP CODE BLANK
OFFENDER/VICTIM RELATIONSHIP CODES
01 - WIFE          09 - BROTHER         17 - BROTHER-IN-LAW    25 - CARETAKER
02 - HUSBAND       10 - SISTER          18 - SISTER-IN-LAW
03 - FORMER WIFE   11 - AUNT            19 - OTHER RELATIVE
04 - FORMER HUSBAND 12 - UNCLE          20 - GIRLFRIEND (INCLUDES "FORMER")
05 - MOTHER        13 - MOTHER-IN-LAW   21 - BOYFRIEND (INCLUDES "FORMER")
06 - FATHER        14 - FATHER-IN-LAW   22 - FRIEND/ACQUAINTANCE
07 - SON           15 - SON-IN-LAW      23 - OTHER SPECIFY
08 - DAUGHTER      16 - DAUGHTER-IN-LAW 24 - STRANGER

| 41. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42. HOME ADDRESS | 43. SEX–RACE–AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC. | 46. C.B./I.R. NO. | 49. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| BOYLE, CHARLES D. D. | 6733 S. CHAPPEL | M 1 21 | 5'09" | 197 | BR | BLK | DARK | TATOO CLOUD R ARM "PRAYING HANDS | 17392877 | 24 |

| 51. OBJECT/WEAPON ☒1 USED ☐2 DISPLAYED ☐3 JUNK | 52. FIREARM FEATURES | 53. POINT/ENTRY | 54. POINT/EXIT | 55. BURGLAR ALARM | 56. SAFE BURGLARY METHOD | 57. IF RESIDENCE, WHERE WERE OCCUPANTS |
|---|---|---|---|---|---|---|
| ☐01 HAND GUN ☐08 EXPLOSIVE | ☐01 CHROME/NICKEL | ☐01 FRONT DOOR | ☐01 FRONT DOOR | ☒01 NA | ☐01 TORCH ☐06 PEEL | ☐01 WORK ☐05 DISTURB |
| ☐02 SHOTGUN ☐09 LIQUID/GAS | ☐02 BLUE STEEL | ☐02 REAR DOOR | ☐02 REAR DOOR | ON PREMISE | ☐02 PUNCH ☐07 OPEN | ☐02 VISITING ☐07 UNKNOWN |
| ☐03 RIFLE ☐10 BOTTLE/GLASS | ☐03 SHORT BARREL | ☐03 WINDOW | ☐03 WINDOW | ☐1 YES ☐2 NO | ☐03 EXPLOSIVE ☐08 UNKNOWN | ☐03 VACATION ☒08 DNA |
| ☐04 KNIFE ☐11 RAZOR | ☐04 LONG BARREL | ☐04 ROOF | ☐04 ROOF | ALARM CIRCUMVENTED | ☐04 DRILL ☒09 DNA | ☐04 WEDDING |
| ☐05 VEHICLE ☐12 PRY TOOL | ☐05 SAWED OFF | ☐05 FLOOR | ☐05 FLOOR | ☐1 YES ☐2 NO | ☐05 REMOVED | ☐05 FUNERAL/WAKE |
| ☒06 BLUNT INSTRUMENT ☐13 HAND, FEET | ☐06 OTHER | ☐06 SIDE DOOR | ☐06 SIDE DOOR | | | |
| ☐07 THROWN OBJECT ☐14 OTHER | ☐07 UNKNOWN | ☐07 OTHER | ☐07 OTHER | 58. UNUSUAL CHARACTERISTICS OF OFFENSE | | 59. GANG RELATED AFFILIATION |
| ☐15 DNA | ☒08 DNA | ☐08 UNKNOWN | ☐08 UNKNOWN | SEE NARRATIVE | | ☐ VICTIM DNA |
| | | ☐09 DNA | ☐09 DNA | | | ☐ OFFENDER DENIED |

71. DESCRIBE PROPERTY IN NARRATIVE

T = TAKEN ; R = RECOVERED

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 5 OFFICE EQUIPT. | 6 TV, RADIO, STEREO | 7 HOUSEHOLD GOODS | 8 CONSUM. GOODS | 9 FIREARMS | A Narc./Dang. Drugs | J OTHER | K NONE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐ |
| ☐R | ☐R | ☐R | ☐R | ☐R | ☐R-S | ☐R | ☐R | ☐R | ☐R | ☐R | |

| 72. VEHICLE/TRAILER | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | | | STATE LICENSE NO. | STATE | EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐STOLEN ☐THEFT FROM | | | | | | | | | | | | |
| ☐OFFENDER'S | | | | | | | | | | | | |

NARRATIVE (Do not duplicate in report information – for explanation or additional information only)

EVENT # 02513 IN SUMMARY: R/O'S RESPONDED TO AN ASSIST THE UNIVERSITY OF CHICAGO POLICE, UPON
ARRIVAL U of C POLICE OFC MOORE #1012, AND U of C POLICE OFC TORRES #1028 HAD ABOVE OFFENDER IN CUSTODY IN
THAT HE BECAME COMBATIVE ON AN INVESTIGATORY STREET STOP, BY FLAILING HIS ARMS AND PULLING AWAY
DURING A PROTECTIVE PATDOWN, VICTIMS REQUESTED ASSISTANCE OFFENDER READ RIGHTS AND

| SOBRIETY OF VICTIM | |
|---|---|
| ☒ SOBER ☐ HBD | |
| 92. FLASH MESSAGE SENT ☐1 YES ☒ NO | TIME |

| EXTRA COPIES REQUIRED ☒ NORMAL | CONT'D. ☐ OTHER SIDE | 93. OFFICER NOTIFYING FOLLOW-UP INVESTIG. UNIT | UNIT NOTIFIED | PERSON ☐ NOTIFIED | DATE (DAY-MO-YR) | TIME |
|---|---|---|---|---|---|---|
| | ☐R.O. | BY REPORT | | | | |

| 3 FIRST OFFICER AT SCENE | 94. OFFICER NOTIFYING ☐1ST DIS ☐ E.T. ☐ M.E. | PERSON ☐ NOTIFIED ☐ ARRIVED | DATE (DAY-MO-YR) | TIME |
|---|---|---|---|---|
| UNIVERSITY OF CHICAGO | | | | |

| REPORTING OFFICER NAME (PRINT) | STAR NO. | OFFICER'S SIGNATURE | DATE INVEST. COMPLETED–TIME | 97. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|
| D. DALLAS | 19135 | | 18 OCT 08 0455 | | |
| C. MARTIN | 17246 | | | APPROVAL SIGNATURE | DATE APPROVED | TIME |

RD (Rev. 8/95)

TRANSPORTED TO 021 DIST FOR FURTHER PROCESSING.

BT# 2120, 2131 ON SCENE. A/O'S HAVE NO

KNOWLEDGE OF EVENTS

CMPLT INFO : 34-2

04 DEC 08

0900 HRS

R.D. NO
HP - 634061

C - 00003

| | | I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE. | SUPERVISOR'S SIGNATURE | DATE (DAY-MO-YR.) |
|---|---|---|---|---|

**FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY**

| UCR OFFENSE CODE — ☐1 CORRECT ☐2 REVISED | REV. CODE | UCR METHOD CODE | METHOD ASSIGNED ☐1 FIELD ☐2 ADMIN. ☐3 SUMMARY | UNIT NO. | OFFICER ASSIGNED STAR NO. | DATE ASSIGNED | SUPV. STAR NO. | INVESTIGATIVE FILE ☐1 YES ☐2 NO | REASSIGNED ☐1 YES ☐2 NO |
|---|---|---|---|---|---|---|---|---|---|

| OFFICER REASSIGNED — STAR NO. | DATE | STATUS ☐0 PROGRESS ☐3 CLEARED CLOSED ☐6 EXC. CLEARED OPEN | ☐1 SUSPENDED ☐4 CLEARED OPEN | ☐2 UNFOUNDED ☐5 EXC. CLRD. CLOSED ☐7 CLOSED—NON-CRIMINAL | IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST) ☐1 ARREST & PROSECUTION | ☐2 DIRECTED TO FAMILY COURT | ☐3 COMPL. REFUSED TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPTIONAL ☐ADU ☐JUV |

| VICTIM IDENTIFIERS ☐1 CORRECT ☐2 REVISED | VICTIM NO. | REVISED NAME | | REVISED ADDRESS | | | | REVISED PHONE NO. ☐HOME ☐BUSINESS | |

| VALUE OF PROPERTY TAKEN/RECOVERED | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT. | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMT. ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R | 9 HOUSEHOLD GOODS ☐T $ ☐R | 10 CONSUM. GOODS ☐T $ ☐R | 11 FIREARMS ☐T $ ☐R | 14 NARC/DANG. DRUGS ☐T $ ☐R | 15 OTHER ☐T $ ☐R | 16 NONE ☐T ☐R |

| SERIAL NOS. OR IDENTIFICATION NOS. | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED |
|---|---|---|---|---|

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

| PREPARED BY — SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) | APPROVED BY — SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) |
|---|---|---|---|---|---|

McCorkle Court Reporters, Inc.
200 N. LaSalle Street  Suite 300
Chicago, Illinois 60601-1014

CERTIFIED MAIL

January 8, 2010

Mr. Kenneth Roberson
c/o Jonathan R. Ksiazek
300 West Adams Street, Suite 330
Chicago, Illinois  60606

IN RE:  CHARLES BOYLE V. UNIVERSITY OF CHICAGO
DATE OF DEPOSITION: DECEMBER 1, 2009

Dear Mr. Roberson:

Your deposition in the above-entitled cause is now ready for reading and signing as required by law.

Please call the Signature Department upon receipt of this letter to schedule an appointment to come to the above address to read and sign your deposition.   You have 28 days from the date of this correspondence in which to appear for reading and signing.

If you fail to appear or notify us so that we may make arrangements for another appointment, your deposition will be completed and forwarded to the attorneys and will be "... used as fully as though signed."

_____    Procedure outlined in Rule 207 (a) of
          the Illinois Supreme Court Rules

_____    Procedure outlined in Rule 30 (e) of
          the Rules of Civil Procedure for the U.S.
          District Courts

Sincerely,

Margaret Setina                 Court Reporter:
Signature Department            Frances S. Lucente, CSR
cc: Helen Gibbons, Esq.         Steve Pusznis, Esq.

                                                    91

# EXHIBIT D

ORIGINAL

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
CHARLES BOYLE,              )
          Plaintiff,        )
     -vs-                   ) No. 09 C 1080
UNIVERSITY OF CHICAGO       )
POLICE OFFICER LARRY        )
TORRES, et al.,             )
          Defendants.       )
          The deposition of CLARENCE MOORE, called
for examination pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before ATHANASIA MOURGELAS, a notary public
within and for the County of Cook and State of
Illinois, at 222 North LaSalle Street, Suite
300, Illinois, on the 10th day of November,
2009, at the hour of 2:22 o'clock p.m.


Reported by:  Athanasia Mourgelas
License No. 084-004329
```

**Page 2**

```
 1  APPEARANCES:
 2     ED FOX & ASSOCIATES, by
 3     MR. JONATHAN R. KSIAZEK,
 4     300 West Adams Street, Suite 330,
 5     Chicago, Illinois 60606,
 6     (312) 345-8877,
 7        Representing the Plaintiff;
 8
 9     HINSHAW & CULBERTSON, by
10     MR. STEVE M. PUISZIS,
11     222 North LaSalle Street, Suite 300,
12     Chicago, Illinois 60601,
13     (312) 704-3000,
14        Representing the Defendant,
15        University of Chicago Police
16        Officers;
17
18     ASSISTANT CORPORATION COUNSEL, by
19     MS. HELEN C. GIBBONS,
20     30 North LaSalle Street, Room 900,
21     Chicago, Illinois 60602,
22     (312) 744-3982,
23        Representing the Defendant,
24        City of Chicago.
```

**Page 3**

```
 1              I N D E X
 2  WITNESS                    EXAMINATION
 3  CLARENCE MOORE
 4    By Mr. Ksiazek              6
 5    By Ms. Gibbons            114
 6    By Mr. Puiszis            115
 7    By Mr. Ksiazek (further)  130
 8
 9
10
11
12
13
14           E X H I B I T S
15  NUMBER                 MARKED FOR ID
16  PLAINTIFF'S Deposition Exhibit
17    No. 11                   102
18    No. 12                   106
19
20
21
22
23
24
```

**Page 4**

```
 1        (Whereupon, the deposition
 2        commenced at 2:22 o'clock p.m.)
 3        (Witness sworn.)
 4     MR. KSIAZEK: Would you please state your
 5  name for the record spelling your last name.
 6     THE WITNESS: My name is Clarence, middle
 7  initial E, last name is Moore, M-O-O-R-E.
 8     MR. KSIAZEK: Mr. Moore, have you ever had
 9  your deposition taken before?
10     THE WITNESS: Yes. But I don't recall how
11  long ago.
12     MR. KSIAZEK: Was it more than five years
13  ago?
14     THE WITNESS: Definitely.
15     MR. KSIAZEK: Okay. I'll just remind you of
16  a few of the ground rules for a deposition since
17  it's been a little while. Basically I'm going
18  to ask you some questions about the incident
19  that happened on October 18th, 2008. I'm going
20  to ask that you answer my questions to the best
21  of your knowledge and answer all my questions
22  truthfully. Okay?
23     THE WITNESS: Yes.
24     MR. KSIAZEK: And if you answer my
```

1 (Pages 1 to 4)

1    questions, I'll have to assume that you
2    understood my question. And if there's any
3    question that you don't understand for any
4    reason, just let me know, and I'll rephrase or
5    I'll try and re-ask it another way. Okay?
6        THE WITNESS: Okay.
7        MR. KSIAZEK: When I'm asking my questions,
8    I will -- there will be some points when I
9    might -- I'm sorry, you might answer uh-uh or
10   uh-huh or shake your head, so please try and
11   answer all questions verbally like you're doing
12   right now, that way the court reporter can pick
13   up all your answers. Okay?
14       THE WITNESS: No problem.
15       MR. KSIAZEK: And I will try not -- and I'll
16   do my best to not talk over you. I just ask
17   that you do the same for me when I'm asking a
18   question and I'll try not to talk over you when
19   you're giving your answer. If that does happen,
20   then -- we just need to have a clear transcript,
21   so I'll do my best and you can just re-state
22   your answer if that happens. Okay?
23       THE WITNESS: No problem.
24       MR. KSIAZEK: And also, if you need to take

5

1    a break at any point when I'm asking you a
2    question, feel free to say that you want to take
3    a break. Just before you take that break, make
4    sure that you have answered any pending
5    questions that are out there. Okay?
6        THE WITNESS: Okay.
7            CLARENCE MOORE,
8    having been first duly sworn, was examined and
9    testified as follows:
10           EXAMINATION
11   BY MR. KSIAZEK:
12       Q. What documents did you review in
13   preparation for your deposition today?
14       A. My court testimony and Answers to
15   Interrogatories.
16       Q. Are you referencing your testimony on
17   January 20th, 2009?
18       A. You know, I didn't check the date.
19       Q. But that was at the motion to suppress
20   hearing, is that what you're speaking of?
21       A. Yes.
22       Q. And your interrogatories you said?
23       A. Yes.
24       Q. Did you review any police reports in

6

1    this matter?
2        A. No.
3        Q. Is there anything preventing you from
4    testifying truthfully today?
5        A. No.
6        Q. What's your educational background?
7        A. One year of college.
8        Q. Where did you attend college?
9        A. Western Michigan University, Kalamazoo,
10   Michigan.
11       Q. When did you attend Western Michigan
12   University?
13       A. 1971 and 1972.
14       Q. And what degree were you seeking when
15   you attended Western Michigan University for one
16   year?
17       A. I think I majored in poli-sci and
18   business administration.
19       Q. Is there a reason why you only attended
20   for one year?
21       A. I couldn't afford it.
22       Q. How tall are you, sir?
23       A. 5', 9".
24       Q. And how much do you weigh?

7

1        A. 200.
2        Q. Did you weigh about 200 pounds in
3    October of 2008?
4        A. Yeah, 205.
5        Q. And how old are you?
6        A. 56 years old.
7        Q. What is your current position?
8        A. Currently I'm full-time employment with
9    the University of Chicago, Sergeant of Police.
10       Q. How long have you worked for the
11   University of Chicago as a police officer?
12       A. Full-time?
13       Q. Sure. Well, in total actually?
14       A. Well, there's a break in there -- in
15   total? I'm trying to figure it out.
16       Q. No problem.
17       A. Well, from August 9th to present. Then
18   from the date of this incident, then sometime in
19   there I was laid off. So there was a period --
20   August 9th to present is what?
21       Q. August 9th of 2009?
22       A. Yes. And part-time prior to that.
23   Probably two or three months. It's an estimate.
24       Q. So just to recap, August 9th to the

8

1  present, you've worked full-time for the
2  University of Chicago?
3     A.  Uh-huh.
4     Q.  That's a yes?
5     A.  Yes.
6     Q.  Have you been a sergeant from August
7  9th, 2009 to the present?
8     A.  Yes.
9     Q.  And then when was the date prior to
10 August 9th, 2009 when you last worked for the
11 University of Chicago?
12    A.  I started October 9th, the night of
13 this incident was my first day, and I believe it
14 was in May that that part-time ended, May of
15 2009. And I'm guessing.
16    Q.  Sure. And when you were part-time at
17 the University of Chicago, what was your rank
18 from 2007 to May of 2009?
19    A.  Patrol officer.
20    Q.  You said you were working -- actually,
21 where were you working in between May of 2009
22 and August of 2009?
23    A.  I'm sorry?
24    Q.  Where were you working from May of 2009
                                          9

1     A.  Yes.
2     Q.  Okay. How long have you worked for the
3  Chicago police officer -- Chicago Police
4  Department?
5     A.  24 years.
6     Q.  Do you still work for the Chicago
7  Police Department?
8     A.  No.
9     Q.  So when was your last day at the
10 Chicago Police Department?
11    A.  August 8th, 2009.
12    Q.  So if I have my dates correct, you
13 started at the Chicago Police Department
14 approximately 1975?
15    A.  No.
16    Q.  When did you start?
17    A.  May 6th, 1985.
18    Q.  So May 6th, 1985, what was your rank
19 when you started at the Chicago Police
20 Department?
21    A.  I started as a patrol officer.
22    Q.  What was the highest rank that you
23 achieved at the Chicago Police Department?
24    A.  Patrol officer.
                                          11

1  to August of 2009?
2     A.  I don't understand that question, where
3  was I working.
4     Q.  Yeah. Did you have a job during that
5  time? You said you were -- you've been working
6  for the University from August 9th to the
7  present; right?
8     A.  Yes.
9     Q.  And you worked part-time for the
10 University of Chicago from October 18th, 2007 to
11 May of 2009; right?
12    A.  That's correct.
13    Q.  Okay. So where were you working from
14 May of 2009 to August of 2009?
15    A.  I'm still trying to get a clarity of
16 what you mean by where was I working.
17    MR. PUISZIS: Were you employed?
18    THE WITNESS: Was I employed somewhere else?
19    MR. PUISZIS: Yeah.
20    MR. KSIAZEK: Yeah.
21    THE WITNESS: Okay. Thank you. Yes, I was
22 a Chicago police officer.
23 BY MR. KSIAZEK:
24    Q.  A Chicago police officer?
                                          10

1     Q.  Did you have a beat that you were
2  assigned to when you first started?
3     A.  Started where, sir?
4     Q.  At the Chicago Police station --
5  Chicago --
6     MR. PUISZIS: 24 years ago, you want to know
7  what the beat was? Is it really relevant?
8  BY MR. KSIAZEK:
9     Q.  What was your beat when you left in
10 August of 2009?
11    A.  I didn't have a beat.
12    Q.  What was your assignment?
13    A.  I was in the Traffic Safety Unit.
14    Q.  How long were you a traffic safety
15 officer for?
16    A.  I wasn't a traffic safety officer but I
17 was in the unit from '98 until I left -- no --
18 yes, '98 until I left. I was a driving
19 instructor, and I did traffic safety
20 presentations.
21    Q.  You said you were a patrol officer, did
22 you go on patrol while you were a traffic
23 safety --
24    MR. PUISZIS: Objection, he's told you --
                                          12

3 (Pages 9 to 12)

1  well, you can go ahead and answer the question
2  again about what you did as a traffic safety
3  officer.
4  BY MR. KSIAZEK:
5     Q.  Did you patrol the streets?
6     A.  As a traffic safety officer?
7     Q.  Yes.
8     A.  No.
9     Q.  Why did you start work part-time for
10 the University of Chicago Police Department?
11    A.  Extra income.
12    Q.  And why did -- the first time that you
13 began working for the University of Chicago, why
14 did you leave in May of 2009?
15    A.  I was laid off.
16    Q.  How many hours were you working when
17 you were working part-time for the University of
18 Chicago?
19    A.  I have no idea.  It was nothing
20 consistent.
21    Q.  On average, can you say how many hours
22 a week did you work?
23    A.  A week, no, I can't tell you.
24    Q.  How about in a month?
13

1     A.  As I said before, I don't -- I can't
2  tell you.  It is a question that you're asking
3  me right now and I have no recollection to give
4  you an average of what I was working per month.
5  It was nothing consistent.
6     Q.  Did you have -- were you assigned to a
7  beat when you started at the University of
8  Chicago as a police officer?
9     MR. PUISZIS:  I object.  You know, what he
10 did on any day after this occurrence would be
11 irrelevant, but go ahead and answer the
12 question.
13 BY MR. KSIAZEK:
14    Q.  That's what I said when you first
15 started at the University of Chicago, did you
16 have a beat that you were assigned to?
17    A.  Yes.
18    Q.  What was the beat that you were
19 assigned to?
20    A.  They varied.
21    Q.  What beat were you assigned to on
22 October 18th, 2008?
23    A.  109, Beat 109.
24    Q.  And this was your first day on the job
14

1  as you said?
2     A.  That is correct.
3     Q.  Did you attend any training before
4  going out on patrol on October 18th, 2008 at the
5  University of Chicago?
6     A.  Prior to?
7     Q.  Yes.
8     A.  No.  That was my training day.
9     Q.  So you were essentially being trained
10 when you went out on your patrol on October
11 18th, 2008?
12    A.  I need you to clarify what you mean by
13 beat training.
14    Q.  Sure.  You said that was my training on
15 October 18th, 2008, what do you mean by that?
16    A.  I said that was a training day.
17    Q.  Okay.  That was a training day, what do
18 you mean by that?
19    A.  What I mean by that?
20    Q.  Yes.
21    A.  That was my first day out.
22    Q.  What was your understanding of what
23 your training was going to be?
24    A.  To learn that patrol, that area.
15

1     Q.  Anything else?
2     A.  No.
3     Q.  Did you have any training in regards to
4  the policies and procedures of the University of
5  Chicago Police Department prior to October 18th,
6  2008?
7     A.  No.
8     Q.  Did you have any training about the
9  policies and procedures of the University of
10 Chicago Police Department on October 18th, 2008?
11    A.  I'm going to have to ask you to re-ask
12 that question.
13    Q.  Sure.  Did anyone sit down with you and
14 say these are our policies and procedures that
15 we follow on October 18th, 2008 at the
16 University of Chicago?
17    A.  When you say anyone, can you be a
18 little more specific on that question?
19    Q.  Did a fellow patrol officer sit down
20 with you and go through the policies and
21 procedures at the University of Chicago Police
22 Department?
23    A.  Are you asking me did anyone go through
24 all the policies and procedures with the
16

4 (Pages 13 to 16)

1 University of Chicago?
2  Q. I'm asking you if anyone at the
3 University of Chicago Police Department sat down
4 with you and explained any of the policies or
5 procedures that they had at the University of
6 Chicago Police Department on October 18th, 2008?
7  A. To some extent.
8  Q. Who sat down with you and explained to
9 you the policies and procedures?
10  A. Well, there's no sit down. Officer
11 Torres was assigned with me that night. And
12 during the course of that night, he gave me some
13 information about the beats and things like
14 that.
15  Q. Okay. So he gave you information about
16 the beat, what information did he give you?
17  A. Talked about the University police
18 boundaries in terms of where they patrol. We
19 talk about different codes.
20  Q. Did you talk about any arrest
21 procedures?
22  A. No, not that I recall.
23  Q. Did you talk about any detaining
24 procedures?

17

1  A. No, not that I recall.
2  Q. Was the only one that you talked to on
3 October -- was Officer Torres the only one you
4 talked to on October 18th, 2008 about the
5 policies and procedures of the University of
6 Chicago Police Department?
7  A. No.
8  Q. Who else did you talk to?
9  A. I can't recall who all I talked to
10 during the course of that day. I can't even
11 tell you who the watch commander was back then.
12 I can't tell how many people I talked to or what
13 we talked about.
14  Q. Well, do you know if you talked about
15 the policies and procedures before you went out
16 on your patrol that day or was it after you came
17 back from your patrol?
18  A. I have a -- I can't understand your
19 question. You're asking me policies and
20 procedures and that could be really broad. If
21 you could ask me something specific, I could say
22 yes or no to. But policies and procedures, I
23 don't know what you're talking about
24 specifically.

18

1  Q. Well, I'm talking about any policies
2 and procedures. I'm talking about detaining.
3 I'm talking about what your duties are.
4  MR. PUISZIS: The thing is he's been a
5 police officer for 20 years beforehand. And if
6 you're talking about policies and procedures as
7 opposed to general orders, you're talking light
8 years differ so --
9 BY MR. KSIAZEK:
10  Q. Okay. Let's go this way. Did you look
11 at any general orders before you went out on
12 patrol on October 18th, 2008?
13  A. No.
14  MS. GIBBONS: Objection, vague.
15 BY MR. KSIAZEK:
16  Q. Did Officer Torres say anything to you
17 prior to going out on your patrol that day about
18 the training that you were going to undertake?
19  A. I don't recall.
20  Q. And what shift were you working on
21 October 18th, 2008?
22  A. The first watch.
23  Q. Does that start at midnight?
24  A. I believe it was 11:00 to 7:00, 11:00

19

1 p.m. to 7:00 a.m.
2  Q. And you were in a patrol car that
3 night?
4  A. Yes.
5  Q. Were you driving a patrol car?
6  A. Torres started driving. Yes, I drove
7 the car later on that day.
8  Q. When did -- you said Officer Torres
9 started driving?
10  A. Yes.
11  Q. When did you actually drive?
12  A. I don't recall what time.
13  Q. At some point you were at Dunkin'
14 Donuts that night; right?
15  A. That is correct.
16  Q. Were you driving before you arrived at
17 the Dunkin' Donuts?
18  A. Yes.
19  MR. PUISZIS: Let me just take a break.
20   (Whereupon, a short break was
21   taken.)
22  MR. KSIAZEK: We're back on the record.
23 BY MR. KSIAZEK:
24  Q. Let's actually go back a little bit.

20

5 (Pages 17 to 20)

1   Were you ever disciplined while you were an
2   officer at the Chicago Police Department?
3       A.   What do you mean by disciplined?
4       Q.   Did you ever have any complaints filed
5   against you?
6       MR. PUISZIS:  Objection, irrelevant.
7       MS. GIBBONS:  I'll join.
8       THE WITNESS:  You've got to be a little bit
9   more specific.
10  BY MR. KSIAZEK:
11      Q.   I'm asking you if you ever had any
12  civilian complaints filed against you when you
13  were working at the Chicago Police Department?
14      A.   Okay.  And what kind of specific
15  complaints?
16      Q.   I'm sorry, I'm asking about any
17  complaints?
18      MR. PUISZIS:  Objection, any complaint would
19  be irrelevant.
20      MS. GIBBONS:  I'll join.
21      THE WITNESS:  I need you to be more
22  specific.
23  BY MR. KSIAZEK:
24      Q.   Well, if you can recall any, then I'm

                                        21

1   against you?
2       A.   He said I beat him in the head with a
3   retractable baton.
4       Q.   Were you sued as a result of this
5   incident?
6       A.   No.
7       Q.   Do you know what the outcome of this --
8   was an investigation undertaken?
9       A.   Yes.
10      Q.   Do you know what the result of this
11  investigation was?
12      A.   It was either unfounded or not
13  sustained, one of them.
14      Q.   Any other complaints filed against you
15  for excessive force?
16      A.   Not that I recall.
17      MR. PUISZIS:  By the way while we're at it
18  on this one, did the guy who filed the complaint
19  against you attempt to do anything to you?
20      THE WITNESS:  Yeah, he tried to stab me with
21  an ice pick.  He was arrested.
22      MR. PUISZIS:  And was this during the course
23  of any type of an investigation?
24      THE WITNESS:  Not car accident.  An

                                        23

1   going to ask you to tell me about them.  If you
2   can't recall any, then you can say so.  Did you
3   have any -- do you remember any?
4       A.   I don't understand your question.
5   You're referring too generally to even respond
6   to.
7       Q.   Have you ever had any complaints filed
8   against you for use of excessive force while you
9   were at the Chicago Police Department?
10      A.   Yes.
11      Q.   When did you have complaints filed
12  against you for excessive force?
13      A.   Not complaints.
14      Q.   Okay.  What then?
15      A.   When?  Sometime in -- I don't remember
16  the exact date, late '90's.
17      Q.   What was the circumstances of this
18  complaint?
19      MR. PUISZIS:  Again, just a continuing
20  objection, irrelevant.
21  BY MR. KSIAZEK:
22      Q.   Who filed the complaint against you?
23      A.   I don't recall his name at this time.
24      Q.   Do you know why the complaint was filed

                                        22

1   investigation.  And he was found guilty of
2   attempted aggravated battery.
3   BY MR. KSIAZEK:
4       Q.   Have you ever been sued in your
5   capacity as a Chicago Police Officer before?
6       A.   Not that I recall.
7       Q.   You've told us -- I'm not sure if I
8   asked this already.  Were there any other
9   excessive force complaints?
10      A.   Not that I recall.
11      Q.   Any complaints filed against you for
12  wrongful arrests?
13      A.   Not that I recall.
14      Q.   And were you working as a patrol
15  officer when this excessive force complaint was
16  filed against you in the late '90's?
17      A.   I was working as a tactic officer.
18      Q.   Have you ever been suspended from the
19  Chicago Police force?
20      A.   No.
21      Q.   Any other complaints that you can
22  recall being filed against you in your time at
23  the Chicago Police Department?
24      A.   Again, you have to explain what you

                                        24

6  (Pages 21 to 24)

1 mean by complaints.
2 Q. Well, you gave me an example about an
3 excessive force complaint that was filed against
4 you; right?
5 A. You asked a specific question and I can
6 relate to that question, that's why I answered
7 it that way.
8 Q. Can you recall any other complaints
9 that were filed against you that were like the
10 excessive force one that might have been for
11 some other reason?
12 A. The way you're paraphrasing this
13 question I can say not the way you're
14 paraphrasing that question. That's all I can
15 say.
16 Q. Have you ever been written up while you
17 were working for the Chicago Police Department?
18 MR. PUISZIS: Objection. What do you mean
19 by written up?
20 THE WITNESS: I have to ask the same
21 question, what do you mean by written up? I've
22 gotten 56 or 57 commendations, that's a write
23 up. I mean, what are you asking me?
24 MR. PUISZIS: Do you want to tell us about

25

1 your 56 commendations?
2 MR. KSIAZEK: We'll have a chance to go over
3 those but --
4 BY MR. KSIAZEK:
5 Q. Have you ever been investigated by IED
6 for any reason beyond -- besides the one that
7 you just told me about for excessive force?
8 A. Investigated by who?
9 Q. Internal Affairs.
10 A. Oh, no, not that I know of.
11 Q. But an investigation was undertaken in
12 this excessive force case that you've told us
13 about; right?
14 A. By whom?
15 Q. By IED. By Internal Affairs.
16 A. Not -- no. Internal Affairs, I mean,
17 not that I know of. I've never had any
18 investigation by Internal Affairs that I had to
19 address.
20 Q. Okay. Who investigated the excessive
21 force complaint against you?
22 A. Office of Professional Standards back
23 then.
24 Q. So have you ever had any other -- have

26

1 you ever been notified by the Office of
2 Professional Standards that any other complaints
3 have been filed against you?
4 A. I don't recall.
5 Q. Do you recall any other Office of
6 Professional Standards investigation that you've
7 had to respond to?
8 A. I do not recall at this time.
9 Q. When you said this was your first day
10 and this was your first day of training on
11 October 18th, 2008; right?
12 A. Yes.
13 Q. How many days were you -- how many days
14 ultimately were you trained at the University of
15 Chicago Police Department?
16 A. I think there were a total of six what
17 they call ride-alongs.
18 Q. Were these all with Officer Torres?
19 A. No.
20 Q. Who else did you have these ride-alongs
21 with?
22 A. I don't recall specifically who they
23 were at this time.
24 Q. Do you know why in August of 2009 you

27

1 were hired back as a full-time sergeant by the
2 University of Chicago Police Department? I'm
3 asking just because you left as a patrol
4 officer; right?
5 A. I took an exam, I was interviewed and
6 obviously I did very well because they hired me.
7 Q. So we talked about the Dunkin' Donuts;
8 right? At some point on October 18th, 2009, you
9 were at Dunkin' Donuts; right?
10 A. That's correct.
11 Q. And what, if anything, happened when
12 you were at the Dunkin' Donuts?
13 A. At which point, in the store, out the
14 store? Help me out.
15 Q. Did you hear anything when you were
16 inside the Dunkin' Donuts?
17 A. Inside?
18 Q. Inside the Dunkin' Donuts.
19 A. I heard other people talking inside the
20 Dunkin' Donuts.
21 Q. Did you hear a horn inside the Dunkin'
22 Donuts?
23 A. No.
24 Q. At what point did you hear the horns?

28

1    A.  After leaving -- exiting Dunkin' Donuts
2  walking back toward my squad car.
3    Q.  So you were outside the doors of
4  Dunkin' Donuts when you heard the horn go off?
5    A.  That is correct.
6    Q.  How far were you away from the doors of
7  Dunkin' Donuts when you heard the horn sound
8  off?
9    A.  I don't recall.
10    Q.  Had you just stepped outside the doors
11  or was the door closed behind you?
12    MR. PUISZIS: Objection, asked and answered.
13  He's already said he doesn't recall.
14    MR. KSIAZEK: I'm trying to see if he does
15  recall.
16    MR. PUISZIS: At some point it gets
17  badgering. This is the third time you've asked
18  him where he was when he heard. I didn't object
19  the second time. You asked him a third and a
20  fourth time but I'm going to start objecting.
21  Because a deposition that should take an hour
22  will take three hours this way.
23    So you can answer the question a third
24  time.

                                    29

1    THE WITNESS: What's the question again?
2  BY MR. KSIAZEK:
3    Q.  How far away were you from the door,
4  you don't recall?
5    A.  Yes.
6    Q.  What did you do when you heard the horn
7  sound?
8    A.  I looked in the direction, which I
9  thought it was coming from.
10    Q.  Where was Officer Torres when you first
11  heard the horn?
12    A.  Standing somewhere near me.
13    Q.  Did you say anything to Officer Torres
14  when you heard the horn sounding?
15    A.  No.
16    Q.  Did Officer Torres say anything to you
17  when you heard the horn sounding?
18    A.  Can you repeat that question?
19    Q.  Sure. Did Officer Torres say anything
20  to you when you first heard the horn sound?
21    A.  I don't recall.
22    Q.  If you can, can you describe how the
23  horn sounded?
24    A.  Yes.

                                    30

1    Q.  How did it sound?
2    A.  It was a continuous horn sound,
3  uninterrupted.
4    Q.  So after hearing this horn sound, what
5  did you do? You're standing outside the Dunkin'
6  Donuts; right?
7    A.  Yes.
8    Q.  You hear the horn sound; right?
9    A.  Yes.
10    Q.  After hearing the horn sound, what did
11  you do?
12    MR. PUISZIS: Objection, it's been asked and
13  answered. He said he looked in the direction
14  that he thought it was coming from. If you want
15  to have him answer it a second time, he can do
16  so.
17  BY MR. KSIAZEK:
18    Q.  After looking in the direction that the
19  horn was coming from, what did you do after
20  that?
21    A.  I didn't do anything.
22    Q.  Did you get in your car?
23    A.  No.
24    Q.  Did Officer Moore get in the car?

                                    31

1    A.  I'm sorry?
2    Q.  Did -- excuse me, did Officer Torres
3  get inside of the car?
4    A.  When?
5    Q.  After you looked to see where the horn
6  was coming from; right?
7    A.  Sir, I said I looked in the direction
8  where the horn was coming from.
9    Q.  What did you see when you looked in the
10  direction where the horn was coming from?
11    A.  I saw nothing at first.
12    Q.  At some later point did you see a car?
13    A.  Yes.
14    Q.  When did you see that car?
15    A.  When it came in my sight.
16    Q.  How much time passed when you first
17  heard the horn and when it came into your sight?
18    A.  I have no idea.
19    Q.  Was the horn still going and continuous
20  this whole time?
21    A.  Yes, sir.
22    Q.  Okay. And once the vehicle was in your
23  sight, could you describe the vehicle?
24    A.  I believe it was a gray car. I think

                                    32

8 (Pages 29 to 32)

1 it was a Chrysler product.
2 Q. Did the Chrysler pass right by you?
3 A. It headed eastbound on the street.
4 Yes, it did pass by me.
5 Q. And this was 53rd Street?
6 A. Yes.
7 Q. And 53rd Street is an east, westbound
8 street?
9 A. That is correct.
10 Q. So after you -- did the car pass by you
11 when you were standing in front of the Dunkin'
12 Donuts?
13 A. Yes.
14 Q. And after the car passed by you on the
15 Dunkin' Donuts, was the horn still going off?
16 A. Yes.
17 Q. Did you say anything to Officer Torres
18 or did he say anything to you after the car
19 passed by you and the horn was still going off?
20 A. I don't recall at that point.
21 Q. After the car passed by you, did you
22 then get inside of your patrol car?
23 A. At some time, yes.
24 Q. Did you keep looking at the gray

33

1 Chrysler as it continued eastbound on 53rd
2 Street?
3 A. Yes.
4 Q. What did you see the gray Chrysler do
5 as you kept watching it drive down 53rd Street?
6 A. It -- the horn is steady, still
7 constant horn noise and it kind of drifted into
8 the curb east of us, hit the curb and stopped
9 abruptly with the horn still going off.
10 Q. Were you standing outside of your car
11 when you observed this happen?
12 A. Yes.
13 Q. When you said that it drifted into the
14 curb, can you describe the motion of the car?
15 A. The difference in someone parking a
16 vehicle versus them -- the vehicle hit the curb
17 like it wasn't being steered into the curb.
18 Q. Did you see the tires actually move to
19 the point where it was moving over to the curb?
20 MR. PUISZIS: Did you see the tires turn?
21 THE WITNESS: I saw the vehicle moving. I
22 couldn't see the -- you want to ask me that
23 question again, please.
24

34

1 BY MR. KSIAZEK:
2 Q. Sure. Well, how do you -- why do you
3 think that it was drifting like it wasn't being
4 steered?
5 A. Because it actually ran into the curb
6 instead of like it was being parked and bumped
7 up against the curb and then bounced off a
8 little bit and stopped abruptly as if the driver
9 didn't have control of the vehicle.
10 Q. Did you see the car shake?
11 A. From bouncing off the curb?
12 Q. Yes.
13 A. Yes.
14 Q. Now, at this point when you saw the car
15 hit the curb and come to a stop, right, you saw
16 the car come to a stop?
17 A. Yes.
18 Q. When you saw the car come to a stop,
19 did you have any reason to believe that this car
20 was a stolen vehicle?
21 A. Did I have any reason to believe --
22 yes, it became a suspicious vehicle to me at
23 that point.
24 Q. At what point, when it was parked at

35

1 the curb?
2 A. The way it was -- the way it stopped,
3 the horn constantly going off and it seemed like
4 -- the driver was not in control.
5 Q. So you said it was a suspicious
6 vehicle; right? Did you have any reason to
7 believe it was a stolen vehicle?
8 A. That thought came across my mind.
9 Q. And why did that thought come across
10 your mind?
11 MR. PUISZIS: Objection, asked and answered.
12 You can answer it a second time.
13 THE WITNESS: Based on my experience as a
14 police officer.
15 BY MR. KSIAZEK:
16 Q. At some point did the horn go off? Did
17 the horn stop sounding?
18 A. At what --
19 Q. Was there a point where the horn
20 stopped sounding?
21 A. I don't understand your question.
22 Q. Okay. After the car hit the curb, was
23 the horn still going off?
24 A. Yes.

36

9 (Pages 33 to 36)

1    Q.  And after you saw the car hit the curb,
2  did you get inside of your vehicle?
3    A.  Yes.
4    Q.  And when you were inside your vehicle,
5  was the horn still going off?
6    A.  Yes.
7    Q.  Did you drive towards where the
8  Chrysler had stopped against the curb?
9    A.  Yes.
10    Q.  And when you were driving towards when
11  -- where the Chrysler had stopped against the
12  curb, was the horn still going off in the
13  Chrysler?
14    A.  Yes.
15    Q.  Now, you got to where the Chrysler was;
16  right?  You drove your car down 53rd Street;
17  right?
18    A.  I drove the car east, yes, on 53rd.
19    Q.  And you drove towards where the
20  Chrysler had stopped against the curb; right?
21    A.  Yes.
22    Q.  At some point you stopped your car;
23  right?
24    A.  Yes.
                                              37

1    Q.  And when you stopped your car, was the
2  horn still going off?
3    A.  Yes.
4    Q.  Okay.  When you were inside of your
5  vehicle driving eastbound on 53rd Street towards
6  where the gray Chrysler was, did you have any
7  conversations with Officer Torres?
8    A.  Yes.
9    Q.  What did you say to Officer Torres and
10  what did he say to you?
11    A.  What I said to him, what do you think,
12  what we got, a stolen car, do you think somebody
13  is in trouble.
14    Q.  What did he say in response?
15    A.  Let's check it out, something to that
16  effect.
17    Q.  Approximately how long did it take you
18  to drive down 53rd Street eastbound to get to
19  where the gray Chrysler had stopped?
20    A.  Not long.
21    Q.  Do you know how many feet you had to
22  drive or how many blocks you had to drive?
23    A.  No blocks.  A matter of feet.
24    Q.  Where did you stop the car in relation
                                              38

1  to where the Chrysler was stopped, did you stop
2  in front or behind the Chrysler?
3    A.  Behind it.
4    Q.  Were you directly behind the Chrysler
5  or were you to its right or left?
6    A.  To its -- both cars facing the same
7  direction.
8    Q.  Both cars facing east, right.
9    A.  I would be to the left.
10    Q.  And were you actually in the street of
11  like the eastbound lane of 53rd Street or were
12  you sort of in the parking spot there?
13    A.  That was two questions --
14    Q.  Okay.  Were you actually parked in the
15  street in the eastbound lane of 53rd Street?
16    A.  The vehicle was stopped in the street.
17  The squad car I was driving was stopped in the
18  street, in the angle behind the vehicle, behind
19  the Chrysler.
20    Q.  As you were approaching the Chrysler
21  and driving down eastbound on 53rd Street, did
22  you see anyone leave the gray Chrysler, exit the
23  gray Chrysler?
24    A.  Okay.  You're asking me did I see
                                              39

1  anybody exit the vehicle?
2    Q.  As you were driving down 53rd Street,
3  yes.
4    A.  No.
5    Q.  Once you stopped your vehicle, did you
6  see anyone exit the gray Chrysler?
7    A.  Yes.
8    Q.  Who did you see exit the gray Chrysler,
9  if you know?
10    A.  Two.  One person exit -- one male _xit
11  from the left side and another male exit from
12  the passenger side.
13    Q.  What did you see these two subjects do
14  once they exited the vehicle?
15    A.  They exited the vehicle.  They did not
16  look behind them, and they walked eastbound on
17  53rd Street.
18    Q.  Was there a Bank of America just a
19  little bit down on 53rd Street that you saw?
20    A.  Yes.
21    Q.  Do you know how far down that Bank of
22  America was from where this Chrysler was parked?
23    A.  I don't understand what you mean by how
24  far.
                                              40

10  (Pages 37 to 40)

1   Q.  How many feet was it away from where
2   the Chrysler was parked?
3   A.  I have no idea how many feet it is.
4   Q.  Okay.  So you said these two subjects
5   exited the vehicle and they walked eastbound
6   down 53rd Street?
7   A.  Yes.
8   Q.  And this happened while you were still
9   inside your patrol car; right?
10  A.  Yes.
11  Q.  Once you stopped your patrol car and
12  saw the two subjects exit the vehicle, did you
13  say anything to Officer Torres?
14  A.  I probably did.  I don't recall exactly
15  what I said.
16  Q.  Did Officer Torres say anything to you?
17  A.  I don't recall.
18  Q.  Now, why didn't you exit your vehicle
19  and go after these two subjects?
20  A.  I have to say this, I don't understand
21  your question.
22  Q.  Okay.  So your vehicle was stopped;
23  right?
24  A.  Yes.

41

1   Q.  While your vehicle was stopped, you saw
2   a person, a male subject exit the driver door of
3   the vehicle; right?
4   A.  Yes.
5   Q.  And you also saw another subject exit
6   from the -- was it the rear passenger door?
7   A.  I didn't say that.  I said from the
8   passenger side.
9   Q.  So it was the passenger side front door
10  they exited from?
11  A.  I don't recall.
12  Q.  Okay.  Regardless, you saw another
13  person, a subject exit from the passenger side?
14  A.  That is correct.
15  Q.  And this happened while you had --
16  right after you arrived in your patrol car next
17  to the gray Chrysler; right?
18  MR. PUISZIS:  Objection, asked and answered
19  now on the fourth time I think.  You can go
20  ahead and answer it again.
21  THE WITNESS:  Well, you said next to.  I
22  never was next to the car.  So I can't say right .
23  to that because I was not right next to the car.
24  I was behind it.

42

1   BY MR. KSIAZEK:
2   Q.  Okay.  Well, when you saw the driver
3   exit the vehicle, why didn't you get out of your
4   vehicle and go and try and talk to him?
5   A.  Okay.  You're asking me why.  The way
6   this is happening, I'm sitting and watching --
7   I'm observing.  Okay.  That's the only way I can
8   tell you.  I'm watching to see what's going on
9   here.
10  Q.  You said earlier that this was a
11  suspicious vehicle; right?
12  A.  In my mind, yes.
13  Q.  So the driver of the suspicious vehicle
14  just exited from the vehicle; right?
15  A.  Yes.
16  Q.  And you sat and you observed this
17  driver of the suspicious vehicle walk away from
18  the vehicle at that point; right?
19  MR. PUISZIS:  Objection.  Now this is the
20  fifth time you've asked the question.  Subject
21  to the objection, you could answer it a fifth
22  time.
23  BY MR. KSIAZEK:
24  Q.  Yes?

43

1   A.  Yes to what?  Say it again.
2   Q.  You saw the driver of a suspicious
3   vehicle get out of the vehicle and walk away;
4   right?
5   A.  Yes, he's walking away.
6   Q.  Okay.  And you didn't stop that driver
7   of the suspicious vehicle at that point?
8   A.  I'm still in my car, sir.
9   Q.  You didn't stop the passenger of this
10  suspicious --
11  A.  I'm still in my car as they're walking.
12  Q.  Did you see anyone else exit from the
13  vehicle while you were still sitting in your
14  car?
15  A.  Yes.
16  Q.  Who did you see exit from the vehicle
17  while you were still sitting in your car?
18  A.  Mr. Boyle.
19  Q.  Do you know from what door Mr. Boyle
20  exited when he exited the vehicle?
21  A.  He got out on the left side of the car.
22  Q.  And that would be the passenger rear
23  seat of the car?
24  A.  No, the driver side of the car.

44

11  (Pages 41 to 44)

1    Q.  Right, you said the left side?
2    A.  Yes.
3    Q.  He got out from the back driver side
4  door; right?
5    A.  He got out of the left side of the car.
6  I'm behind the car.
7    Q.  What did you see Mr. Boyle do once he
8  got out of the car?
9    A.  Mr. Boyle got out of the car.  He also
10  did not look back at us.  He walked forward
11  about two or three steps in front of the car.
12  By this time, I'm out of my car.  He walked two
13  or three steps in front of the car, then he
14  stopped, turned around, came back to the hood,
15  raised the hood and the horn was still going on,
16  continuously sounding.
17    Q.  When --
18    A.  Excuse me for a second.  May I ask you
19  something?
20    MR. PUISZIS:  Let's take a break.
21    (Whereupon, a short break was
22    taken.)
23    MR. KSIAZEK:  We're back on the record.
24
45

BY MR. KSIAZEK:
2    Q.  The last thing you told me was that
3  Mr. Boyle got out of the car, walked forward two
4  to three steps in front of the car, stopped,
5  came back around and raised the hood; is that
6  right?
7    A.  He walked -- let me say it again.
8    Q.  Sure.
9    A.  He walked two or three steps in front
10  of the car.  He turned around.  He came directly
11  back to the hood of the car and opened the hood
12  of the car.
13    Q.  And when you saw Mr. Boyle raise the
14  hood of the car, you were out of the car at that
15  point; right?
16    A.  Sometime in all this observation, I'm
17  out the car walking toward and watching him
18  outside of the car.  And specifically what time
19  or how many seconds, I don't recall that.
20    Q.  Okay.  And did you see anyone else
21  still in the car after the two subjects left,
22  exit the vehicle and Mr. Boyle exit the vehicle?
23    A.  Yes, there was still someone else in
24  that car.
46

1    Q.  Was it a female in the car?
2    A.  I later found out it was a female.
3    Q.  How did you find that out?
4    A.  She looked like a female.
5    Q.  Did you talk to her?
6    MR. PUISZIS:  Objection.  At what point?
7  BY MR. KSIAZEK:
8    Q.  Did you talk to her after you got out
9  of your car, immediately after you got out of
10  your car?
11    A.  No.
12    Q.  But you did notice her after you got
13  out of your car?
14    A.  Oh, definitely.
15    Q.  Once you got out of your car and you
16  saw Mr. Boyle raise the hood, what did you do?
17    A.  I looked to see where the other two
18  guys were.
19    Q.  Did you see the other two subjects at
20  that point?
21    A.  No.  They had disappeared in the
22  vestibule of where that bank was.
23    Q.  Did you see them actually go into the
24  vestibule?
47

1    A.  No.  When you say did I see them go
2  into the vestibule?
3    Q.  Yeah, did you see them go --
4    A.  I cannot see the doors from the bank.
5  From where we were, you can't see the doors.
6  All I can tell you is they were out of sight.
7    MR. PUISZIS:  Don't guess and don't
8  speculate.  If they're out of sight, they're out
9  of sight.
10  BY MR. KSIAZEK:
11    Q.  This is a lighted -- 53rd Street was
12  lighted at that point in night; right?
13    A.  2:30 in the morning, artificial
14  lighting.
15    Q.  So after you were looking to see where
16  the other two guys were, did Officer Torres say
17  anything to Mr. Boyle?
18    A.  We both asked -- I asked him whose car
19  it was.
20    Q.  So you asked Mr. Boyle whose car it
21  was?
22    A.  I asked.  Torres asked.
23    Q.  Who asked first?
24    A.  I don't recall.
48

12 (Pages 45 to 48)

1    Q.  Okay.  When you asked Mr. Boyle whose
2  car it was, how did he respond?
3    A.  He didn't.
4    Q.  What was Mr. Boyle doing when you asked
5  him whose car it was?
6    A.  Standing there looking at me at that
7  point.
8    Q.  Now, before you asked Mr. Boyle whose
9  car it was, what was he doing?
10    A.  I don't recall specifically.  He's in
11  front of the car.  He had the hood up.  The horn
12  is going off.  I've got something going on.  I
13  don't know who this guy is.  And I asked whose
14  car was it.
15    Q.  He's actually leaned over inside of the
16  hood of the car?
17    A.  I didn't say that.  I told you I don't
18  recall.
19    Q.  Now, when Officer Torres asked him
20  whose car it was, did Mr. Boyle respond to that?
21    A.  No.  From my recollection when I asked
22  him, he never answered the question whose car it
23  was, when I asked him or Torres asked.  As far
24  as I recall, he never answered that question.
                                                    49

1    Q.  When either yourself or Officer Torres
2  asked Mr. Boyle whose car it was, did he raise
3  his arm at any point and point to the car?
4    A.  No, not -- no.
5    Q.  Did you hear the female that was still
6  in the car at that point, did you hear her say
7  anything when you asked Mr. Boyle whose car it
8  was?
9    A.  No.
10    Q.  Did you hear her say anything when
11  Officer Torres asked whose car it was?
12    A.  No.
13    Q.  So what did you do after Mr. Boyle did
14  not respond to your question whose car is it?
15    A.  I asked him again.
16    Q.  And how did he respond the second time
17  you asked him whose car it was?
18    A.  Somewhere in this exchange he said the
19  horn is stuck.  I said, I know that, whose car
20  is it.  He didn't respond.  I asked him for some
21  ID.  He didn't respond.
22    Q.  Did you ask him for ID immediately
23  after you asked him whose car it was?
24    A.  Sir, what's your name again?
                                                    50

1    Q.  My name is Mr. Ksiazek.
2    A.  Mr. Ksiazek.
3    Q.  Yes.
4    A.  I've got suspicious vehicle, horn going
5  off.  I've got a person standing in front of me
6  that's evasive.  I don't recall exactly how
7  questions were asked beyond that.  I don't know
8  if it was seconds.  I can't give you those kind
9  of answers.  I don't know.  I don't recall.
10    Q.  I'm just asking to the best of your
11  ability to tell me what happened that night.
12  Okay.
13    A.  If you would ask me specifically
14  something that I am capable of answering, I can
15  tell you exactly what happened.  So what's your
16  last question?
17    Q.  So after you asked him for ID and he
18  didn't respond, what happened after that?
19    A.  After I told you he said the horn was
20  blowing?
21    Q.  Sure.  Yeah, you said he told you that
22  the horn is stuck; right?
23    A.  Yes.
24    Q.  And --
                                                    51

1    A.  I said I see that, and I asked him for
2  some ID.  He did not respond.  Somewhere in that
3  same time Torres is asking him for ID.  He did
4  not respond.  He never -- he did not give any
5  ID.  Somewhere in that -- those seconds he said
6  to Officer Torres, I don't have to show you
7  anything.  I said, let's step over to the car.
8  At that time he pushed off.  He pushed us both
9  off.
10    Q.  And when you said to Mr. Boyle to walk
11  over to the car --
12    A.  I didn't say walk over to the car.
13    Q.  What did you say?
14    A.  Step over to the car.
15    Q.  Step over to the car.  You told
16  Mr. Boyle to step over to the car, did you guide
17  him over to the car?
18    A.  He pushed off.
19    Q.  Did he push off immediately after you
20  told him to step over to the car?
21    A.  Somewhere in that exchange, that's when
22  he got -- he pushed.  I'm using my hands to
23  usher him in the direction indicating which way
24  I would like for him to move to step over the
                                                    52

13 (Pages 49 to 52)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1    car, he pushed off.
2        Q.  Did you ever touch him with your hands
3    when you were ushering him over?
4        A.  Let me ask you this, are you asking me
5    did I do a deliberate grab on him?
6        Q.  I'm asking you when you told him step
7    over to the car and you ushered him over to the
8    car, did you physically touch Mr. Boyle?
9        A.  I don't recall.  I recall him pushing
10   off.  I recall him creating contact, pushing me
11   off.
12       Q.  Did he push you?
13       A.  Yes.
14       Q.  How did he push you?
15       A.  He pushed me with his hands and his
16   arms.
17       Q.  It was with both arms?
18       A.  No.  He was using the other arm to push
19   Torres.
20       Q.  Okay.  So he pushed you with one arm
21   while he pushed Officer Torres with the other
22   arm?
23       A.  He pushed us both off.  I'm on one side
24   and Torres is on the other side.  He made

                                                  53

1    down and now the wrestling match was on.  He's
2    resisting us totally.  He's swinging us around
3    now.  He's literally fighting with us.
4        Q.  Okay.  When both yourself and Officer
5    Torres grabbed Mr. Boyle's arms, did he say
6    anything to you?
7        A.  No.
8        Q.  Did he say anything to you when he
9    pushed both yourself and Officer Torres away?
10       A.  He blurted out something but I don't
11   recall what he said.  It wasn't nothing in
12   cooperation, that's for sure.
13       Q.  When you first asked Mr. Boyle whose
14   car it was, was that the first thing you said to
15   Mr. Boyle?
16       A.  Yes.
17       Q.  Did you identify yourself before you
18   said whose car is this?
19       A.  In terms of what?
20       Q.  Did you say I'm a police officer, whose
21   car is this?
22       A.  Sir, I'm in full uniform, I've got a
23   badge, a radio, it's obvious I'm the police in a
24   squad car that says University of Chicago

                                                  55

1    contact with both of us.
2        Q.  Do you know if you were on his left
3    side or his right side?
4        A.  I don't recall exactly.
5        Q.  After he pushed both of you off, what
6    happened?
7        A.  You're asking what did I do?
8        Q.  What did you do after he pushed you
9    off?
10       A.  I grabbed his arm.
11       Q.  Why did you grab his arm?
12       A.  The man just pushed the police.
13       Q.  Do you know what arm you grabbed of
14   his?
15       A.  Exactly, no.
16       Q.  What did Officer Torres do?
17       A.  He grabbed him, too.
18       Q.  Did he also grab Mr. Boyle's arms?
19       A.  Yes.
20       Q.  So as you -- after you grabbed one of
21   Mr. Boyle's arms and Officer Torres grabbed
22   Mr. Boyle's arms, what did you do at that point?
23       A.  We're now trying to control him.  I
24   believe Officer Torres was telling him to calm

                                                  54

1    Police.  I felt that was enough of identifying
2    myself.  And, yes, at one point I did tell him.
3        Q.  When did you tell him that you were a
4    police officer?
5        A.  During his resisting.
6        Q.  You said Officer Torres told him to
7    calm down; is that right?
8        A.  I remember hearing him say that, relax
9    something to that point, trying to get the guy
10   to get some control of this guy.  So he gave a
11   verbal command of relax.
12       Q.  Okay.  And when you say it was a
13   wrestling match at that point, after Officer
14   Torres told him to calm down or relax, was it
15   like WWF Wrestling, what do you mean?
16       A.  I never watched it.
17       Q.  Well, what do you mean by it was a
18   wrestling match?
19       A.  Mr. Boyle was not cooperating.
20   Mr. Boyle was resisting.  Mr. Boyle tensed up.
21   He flexed.  He's strong.  He's pulling us.  He's
22   doing more pulling and turning than we are.  I'm
23   trying to hold onto him.
24       Q.  What part of his body were you trying

                                                  56

14 (Pages 53 to 56)

1  to hold onto, his arm?
2      A.  Yeah, it hasn't changed.  It's the same
3  answer, his arms.  I'm trying to make sure he
4  doesn't get a chance to strike me, make sure
5  he's not given a chance to -- get ahold of him.
6  We're trying to restrain this guy.
7      Q.  Have you ever seen like wrestling in
8  the Olympics, have you ever seen that?
9      A.  No.
10     Q.  Have you ever seen wrestling in
11 college?
12     A.  I need to ask what -- have I ever seen
13 wrestling, sir?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Where have you seen wrestling?
17     MR. PUISZIS:  Objection, irrelevant.
18     THE WITNESS:  Where?
19 BY MR. KSIAZEK:
20     Q.  Yes.
21     A.  I used to try wrestling a little bit --
22 I've seen me try to wrestle.  I think when I was
23 in elementary school I might have went off for
24 the wrestling team.  Somewhere in the 1960's.
                                            57

1      A.  Because of the force that was being
2  used to resist us.  The force that was being
3  used directed toward us.  The tension I could
4  feel in his arms.  He's flinging his arms.  He's
5  literally trying to fling his arms like he's
6  trying to throw a punch.
7      Q.  And were you actually preventing him
8  from throwing a punch when you were grabbing
9  onto his arms?
10     A.  I definitely was trying to protect
11 myself and my partner.
12     Q.  And at that point your partner was also
13 holding onto Mr. Boyle?
14     A.  We were both in the same predicament.
15     Q.  Did you ever see Mr. Boyle pick up your
16 partner, physically pick him up?
17     A.  Yes.
18     Q.  When did you see Mr. Boyle physically
19 pick up your partner?
20     A.  As we were trying to get control of
21 this young man, he led us from this -- just led
22 us from the front of that Chrysler to the back
23 of that Chrysler.  We ended up toward the -- let
24 me slow down so you can get all this.
                                            59

1  But specifically WWF, whatever you said, no,
2  never watched it.
3      Q.  Okay.  So as you were trying to hold
4  on --
5      MR. PUISZIS:  You're not missing much.
6      THE WITNESS:  Yeah.  I mean, I saw them
7  bunch off a rope and that's enough for me.
8  That's not wrestling as far as I'm concerned.
9  BY MR. KSIAZEK:
10     Q.  When you were trying .o hold onto
11 Mr. Boyle's arm as he was -- you said he was
12 struggling with you; right?
13     MR. PUISZIS:  You can go ahead for a third
14 time.
15     THE WITNESS:  Yes.
16 BY MR. KSIAZEK:
17     Q.  What was Officer Torres doing when you
18 were holding onto Mr. Boyle's arm?
19     A.  Mr. Boyle -- when I say we were holding
20 onto him and trying to restrain him, Mr. Boyle
21 was trying to throw I believe was -- if we let
22 go, if he would have broke loose, he would have
23 punched one of us.
24     Q.  Why do you believe that?
                                            58

1      Q.  You can keep saying.
2      A.  The struggle went from the front of the
3  car, the Chrysler, down the left side of the
4  Chrysler, in between my squad car and the
5  Chrysler, toward the curb.  We're struggling
6  with this young man.  We're trying to get
7  somewhere where we can get control of him.  He
8  forced -- Torres's door was still open, the
9  passenger door of our squad car was open.
10     At that point somewhere in there he
11 lifted Torres up with me still holding him.
12 Torres fell back toward into the squad car.  I'm
13 trying to pull -- your client lifted Torres and
14 me up.
15     Q.  So he lifted Officer Torres up and
16 placed him in the squad car?
17     A.  That's not what I said.
18     Q.  What did you say?
19     A.  Your question was there ever a time
20 that he ever lifted --
21     Q.  Officer Torres?
22     A.  Torres, which I interpreted as the
23 point where Boyle's body used his body to lift
24 Torres off the ground, and that's what I've just
                                            60

15 (Pages 57 to 60)

1  described.
2  Q.  Did Mr. Boyle ever lift you up off the
3  ground?
4  A.  As he got -- I'm pulling on him trying
5  to get him off of Torres because Torres now is
6  pinned in between the car, so I'm pulling toward
7  him.  When Boyle lifted him up, I used my body
8  leverage to flip all three of us to the ground.
9          Meanwhile into that, somewhere in that
10 struggle, Officer Torres was able to use one
11 hand to get to the radio that was attached to
12 his shoulder and call for help, 10-1.
13 Q.  Did you have a radio on your uniform
14 that night?
15 A.  No.
16 Q.  Do you know if Officer Torres radioed
17 dispatch before you exited your vehicle to tell
18 them that you were investigating a suspicious
19 car, a suspicious vehicle?
20 A.  Okay.  You asked me did I know if
21 Officer Torres, I don't recall.
22 Q.  And now you used your own body leverage
23 to flip yourself, Mr. Boyle and Officer Torres
24 onto the ground, is that your testimony?

61

1      MR. PUISZIS:  Objection, asked and answer
2  again.  But you can go ahead and tell him a
3  second time.
4      THE WITNESS:  I didn't intentionally try to
5  flip myself to the ground.  I wanted to get your
6  client on the ground and I inadvertently -- the
7  weight took me down, too.  So all three of us
8  hit the ground, if that's what you want to know.
9  BY MR. KSIAZEK:
10 Q.  So that's a yes; right?
11 A.  Did all three of us hit the ground, is
12 that what you're asking me?
13 Q.  Yes.  Well, you flipped all three of
14 you to the ground; right?
15 A.  I used my leverage to try to get your
16 client off balance to the ground and
17 subsequently all three of us landed to the
18 ground.
19 Q.  Was officer -- Mr. Boyle -- when you
20 flipped or you used your leverage to flip
21 Mr. Boyle and Officer Torres onto the ground,
22 was Mr. Boyle inside of your squad car or was he
23 outside the squad car?
24     MR. PUISZIS:  Are you asking him when all

62

1  three of them went to the ground, were they in
2  the squad or out the squad.
3      MR. KSIAZEK:  Well, I'm asking him --
4      MR. PUISZIS:  Because he's already described
5  what happened outside the squad.  And I object
6  to you trying to change his testimony by
7  changing some of the words of what he said.  So
8  if you're going to use what he said as a
9  predicate to your next question, describe what
10 he said accurately.  Object to the
11 mischaracterization.
12     MR. KSIAZEK:  I'm trying to understand it
13 and I'm trying to clarity it if for the record
14 so --
15 BY MR. KSIAZEK:
16 Q.  When you flipped Mr. Boyle onto the
17 ground, where was Mr. Boyle located?
18 A.  Well, when we all hit the ground,
19 Mr. Boyle was still in between the two of us.
20 Q.  And Officer Torres was in the vehicle
21 at that point or was he outside of the vehicle
22 at that point?
23 A.  Sir, we can't be on the ground and in
24 the vehicle at the same time.  So I'm not trying

63

1  to be -- you know, your question, I don't
2  understand the question.  So if you're asking me
3  are we in -- we can't be in the vehicle and on
4  the ground at the same time.
5  Q.  Well, when you flipped Mr. Boyle to the
6  ground; right?
7      MR. PUISZIS:  Again, I object.  This is the
8  fourth time you've asked and he described what
9  he did.
10 BY MR. KSIAZEK:
11 Q.  I'm asking where was Mr. Boyle when you
12 flipped him to the ground?
13     MR. PUISZIS:  And I object to the reference
14 to flipping him to the ground.  He said he
15 lifted up and used -- Mr. Boyle was lifting them
16 up.  He used his leverage and all three of them
17 fell to the ground.  So I object to your
18 characterization of flipping him to the ground.
19 BY MR. KSIAZEK:
20 Q.  When you used your leverage to take
21 Mr. Boyle down to the ground, where was
22 Mr. Boyle located?
23     MR. PUISZIS:  Before he went to the ground
24 or after he went to the ground?

64

16 (Pages 61 to 64)

BY MR. KSIAZEK:
1  Q.  Before he went to the ground?
3  A.  Good question. Okay. He's still in
4  between the both of us.
5  Q.  Where?
6  A.  When you say where, sir?
7  Q.  Were the three of you in between the
8  silver Chrysler and your patrol car?
9  A.  You know what, I answered that a long
10  time ago.
11  MR. PUISZIS: But when you hit the ground.
12  MR. KSIAZEK: When you hit the ground.
13  MR. PUISZIS: When all three of you fell to
14  the ground, were you --
15  THE WITNESS: We were where I told him where
16  we were then. Boyle had just lifted Torres into
17  our squad car. The door was open, the passenger
18  door of the squad car was open. That's when you
19  asked me at any time did Boyle -- did I see
20  Boyle lift Torres. You asked me that
21  question, and I told specifically when I saw
22  that, that was outside our car door where he
23  lifted him up into that car door and then get
24  him -- then when we went to get him off, that's

65

1  when he lifted -- Boyle used his weight and he
2  lifted Torres up.
3  I used my leverage to put -- try to put
4  him down on the ground. All three of us hit the
5  ground, on the ground outside the squad car.
6  We're way behind the Chrysler. Remember we
7  started from the front of the Chrysler, all the
8  way down the side, closer to the curb, then back
9  into by our squad car because we're trying to
10  get a place where we can try to use something to
11  get control. Okay. That's where we are.
12  BY MR. KSIAZEK:
13  Q.  Okay. Did you have your handcuffs out
14  at this point when you were on the ground?
15  A.  I could not get to my handcuffs because
16  your client was a handful. I could not get to
17  any handcuffs. I couldn't get to anything other
18  than trying to keep this guy from swinging and
19  hitting someone. I'm trying to maintain
20  control.
21  Q.  Okay. When the three of you first fell
22  onto the ground, how did Mr. Boyle fall to the
23  ground, was it belly up or was his back on the
24  ground -- I'm sorry, was his belly up or was his

66

1  back up?
2  A.  His belly was not up. He did not fall
3  on his back.
4  Q.  So he fell on his belly?
5  A.  I don't know -- he did not fall on his
6  belly either.
7  Q.  Did he fall on his side?
8  A.  He's not trying to fall at all. He's
9  going -- we're all going to the ground. The way
10  you're characterizing the fall is if he
11  completely on his own hit the ground on his
12  belly or on his back. That did not happen.
13  Q.  Okay. Describe how yourself -- well,
14  you already described that so we won't go into
15  that.
16  A.  Thank you.
17  Q.  But once you're on the ground, where
18  are you located? Where are you located in
19  relation to Mr. Boyle?
20  A.  Sir, I don't recall. At one point I'm
21  on the bottom of the pile, I'm on the side of
22  the pile. Boyle is trying to get up. I'm
23  trying to get up over him. He's trying to get
24  me down. He gets Torres down. We're back and

67

1  forth here.
2  He's kicking. He's trying to punch.
3  At one point you fall loose. He throws an arm.
4  This is a person not being -- he's totally --
5  he's uncontrollable. He's very -- he's
6  resisting. He's fighting with us.
7  Q.  When you first fell to the ground, do
8  you recall if you were on top of Mr. Boyle, if
9  you're underneath Mr. Boyle? Do you recall
10  where you were located?
11  A.  Obviously I didn't answer you directly.
12  No, I don't recall. What I recall is what I
13  told you prior to.
14  Q.  When you said he was kicking, did he
15  kick you?
16  A.  He probably did.
17  Q.  Do you know when he kicked you?
18  A.  What do you mean by when? Are you
19  asking me the exact time?
20  Q.  I'm not asking you the exact time. I'm
21  saying you fell to the ground; right? All three
22  of you were on the ground; right?
23  MR. PUISZIS: Objection, asked and answered
24  for like the seventh time now.

68

17 (Pages 65 to 68)

BY MR. KSIAZEK

1     Q.  After you fell on the ground, when did
2  he kick you?
3     A.  Sometime in that struggle.
4     Q.  Okay.  When did he punch you after the
5  three of you fell to the ground?
6     A.  I didn't say he punched me.
7     Q.  Well, you said he was punching, did he
8  punch you?  Did he punch you?
9     A.  Did his fist hit me in the face?
10    Q.  Yes.
11    A.  No.
12    Q.  Did his fist hit Officer Torres in the
13 face?
14    A.  I don't recall.
15    Q.  Do you recall him kicking Officer
16 Torres?
17    A.  I don't know for sure but I'm quite
18 sure Torres got kicked.
19    Q.  Well, is it you're quite sure or you
20 don't know?
21    A.  Well, the man is kicking at both of us
22 and we're trying to restrain him.  If you're
23 kicking and somebody is holding you, you're

69

1  going to possibly get contact.  You asked me did
2  he get kicked?
3     Q.  Right.
4     A.  I don't recall, but I'm quite sure he
5  did have contact with his feet because the man
6  was kicking on both of us and we're on top of
7  him, we're on the bottom of him, we're on the
8  side of him.
9     Q.  Were you saying anything to Mr. Boyle?
10    A.  Stop, sir.
11    Q.  Did he say anything in response once
12 you said to him stop, sir?
13    A.  He said a lot of things.  I don't
14 remember exactly what he said.  Most of it was
15 not pleasant, so there was some curse words.
16 There was a lot of stuff being said.  I wasn't
17 interested.  I'm trying to get control of a
18 person here.  And at this point he's very
19 dangerous to me.
20    Q.  Why is he dangerous to you?
21    A.  Because he's resisting the police, and
22 he's trying to fight with the police.
23    Q.  You said he said some curse words, can
24 you say those curse words?

70

1     A.  I just told you what I said, I didn't
2  recall what he said.
3     Q.  Now, at some point did other University
4  of Chicago officers arrive?
5     A.  Yes.
6     Q.  When did you first see other University
7  of Chicago officers arrive?
8     A.  When they were trying to help me
9  control your client, arrest your client at this
10 point because he's under arrest.
11    Q.  When you saw the other University of
12 Chicago officers arrive, did you have your
13 handcuffs out at that point?
14    A.  No.
15    Q.  Were you trying -- so you weren't
16 trying to put Mr. Boyle into handcuffs when the
17 other University of Chicago officers arrived?
18    A.  When the other University police
19 officers at the time that you sound like you're
20 framing when they arrived, I'm still struggling
21 with your client.  We do not have control.  He's
22 still resisting.  The arrest process is real
23 simple.  If the officer says your under arrest,
24 you put your hands behind your back.  The only

71

1  thing that goes on you is handcuffs.  That never
2  happened in that process with your client.
3     Q.  Okay.  As a University of Chicago
4  police officer, you're not allowed to arrest
5  someone, though; right?
6     A.  That's not right.
7     Q.  You're allowed to arrest someone as a
8  University of Chicago police officer?
9     A.  Yes.
10    Q.  Do you know who the first University of
11 Chicago officer was to arrive at the scene
12 besides yourself and Officer Torres?
13    A.  No.
14    Q.  Do you know how many University of
15 Chicago officers arrived as back-up?
16    A.  At the time of the incident?
17    Q.  When was the first time -- how many
18 University of Chicago officers did you first see
19 as back-up?
20    A.  I don't know how many I saw as back-up.
21    Q.  Okay.  Do you know how many University
22 of Chicago officers were helping you to arrest
23 Mr. Boyle?
24    A.  At the time this situation was going

72

18 (Pages 69 to 72)

1  on, I did not count the officers whether they
2  were University officers or whether they were
3  Chicago officers there. I did not count
4  officers. I cannot tell you.
5      Q. Did you recognize -- I know this was
6  your first day, but did you recognize any of the
7  University of Chicago officers who came to
8  assist you?
9      A. Recognize them how?
10     Q. Did you know their names?
11     A. At the time we were trying to control
12 -- you're asking me did I know -- I don't
13 understand your question at all.
14     Q. Okay.
15     A. I'm sorry.
16     Q. Sure. Did you know -- well, as of
17 today's date, do you know who came and assisted
18 you with arresting Mr. Boyle from the University
19 of Chicago Police Department?
20     A. Yes.
21     Q. Who came and assisted you?
22     A. Officer Galarza, Kwiatkowski and there
23 were some other officers there. Whoever is on
24 that report, that's who came.

73

1      Q. And how did you later learn that those
2  were the officers that came to assist you with
3  Mr. Boyle?
4      A. I don't understand your question at
5  all.
6      Q. When did you learn that Officers
7  Galarza, Gillespie, Kwiatkowski came and
8  assisted you with -- when did you learn that
9  those were the officers that were assisting you
10 to arrest Mr. Boyle?
11     A. What do you mean by learn?
12     Q. Well, you didn't know that those --
13 that Officer Galarza, Gillespie and Kwiatkowski
14 were the ones assisting on October 18th, 2008;
15 right?
16     A. No, I didn't -- see I don't -- look,
17 your questions are so vague. You're asking me
18 learn, no. I did not care what officers were
19 there to help. They were there to help. I did
20 not have time to count. I can't recollect
21 counting one, two, three, four. I didn't have
22 time to look at anybody's -- they were in
23 uniform, they were University of Chicago Police.
24     How we learned later after this guy was

74

1  arrested with two sets of cuffs on because we
2  wouldn't had put one set on him and everything
3  is quiet, then you have an opportunity to see
4  who's there.
5      Q. Okay. So after everything was quiet
6  and you saw who is there, was it then that you
7  realized that it was Galarza, Gillespie and
8  Kwiatkowski that helped you assisting to arrest
9  Mr. Boyle?
10     A. I learned -- yes. And when you asked
11 how Galarza had his shoulder injury, because he
12 got kicked. Gillespie's glasses got slapped off
13 and knocked off his face. Everybody is
14 assessing their injuries now.
15     Q. But did you see Officer Galarza
16 actually get kicked when Mr. Boyle was on the
17 ground?
18     A. Yes, I sure did.
19     Q. How did Mr. Boyle kick Officer Galarza?
20     A. When he was tossing around and we're
21 trying to get cuffs on him now because now help
22 is there now I got handcuffs, he spins around.
23 He's wrestling around and he raised his -- he
24 was -- his in the legs were big and kicked out.

75

1  He kicked Galarza on the shoulder.
2      Q. Okay. Did you see Mr. Boyle kick
3  Officer Gillespie?
4      A. Somewhere in there I could see him
5  getting kicked, and I saw his glasses fall off
6  his face. My glasses went off my face.
7      Q. You were wearing glasses that night?
8      A. Yes.
9      Q. And did you see where Officer
10 Gillespie's glasses landed?
11     A. No. Somewhere in the vicinity. I saw
12 him pick them up.
13     Q. Did he pick them up in one piece?
14     A. No, his glasses were mangled I believe.
15 I think he had to send home to get -- to have
16 another pair brought or something like that. I
17 don't recall. I knew there was some
18 conversation about that.
19     Q. But do you know if they were still in
20 one piece or if they were actually in more than
21 one piece?
22     MR. PUISZIS: He's asked and answered the
23 question, Counsel.
24     THE WITNESS: I used the word mangled.

76

19 (Pages 73 to 76)

BY MR. KSIAZEK:

Q. Okay. How far did your glasses fly off your face?

A. Further than we can reach them for sure. I had to look for them.

Q. At some point was Mr. Boyle actually placed in handcuffs?

A. Two sets of handcuffs.

Q. Two sets of handcuffs?

A. He never stopped struggling. We could not convince him to cuff him at all. One cuff and we still could not get his hands behind his back to conventional cuff him.

Q. So was it a set of cuffs for his legs?

A. No.

Q. Where were the two cuffs?

A. I was able to get one cuff on him, one of my sets of cuffs and some other officer came out with another set of cuffs. We connected the end, the free end of my set of cuffs and the free end of the other officer's set of cuffs and we were able to get Mr. Boyle's hands in the proximity to where those two sets of cuffs and the other cuff could be used to cuff the other

77

free hand.

Q. So it was your cuffs and another officer's cuffs?

A. I have no idea who they were at this time.

Q. And you got him in cuffs while he's still on the ground; right?

A. Yes. He never cooperated at any point other than to the point where we're on the ground.

Q. What did you do once Boyle was in cuffs on the ground?

A. I asked him for some assistance. We got him up off the ground, and he was placed on the back of a squad car and leaned forward because he still was resisting. So I had him bent over the trunk of a car, I don't remember if it was my squad car or somebody else's car.

He was bent over with his chest over the trunk of the car in a subdued manner so he could not raise back up. I'm telling this man to calm down. It's over. You're under arrest.

Q. After you told him that he was under arrest, was that at the point where he calmed

78

down or did he keep struggling?

A. Ask your question. Help me out here.

Q. Did he calm when you told him to calm down when he was under arrest?

A. You're asking me when I was speaking to him did he stop, no. He still needed someone there with him.

Q. Were you the only officer who was standing by him at that point?

A. I don't recall.

Q. How did he keep struggling when you told him to calm down, that he's under arrest?

A. He was trying to raise up off the car, trying to stand up.

Q. And what did you do once he tried to raise above the car and stand up?

A. Just place my hand on his back firmly, calm down, you're not going anywhere. That kind of language.

Q. At that point did he calm down?

A. Somewhere down the line he did calm down where to the point where he could be transported to a squad car and be taken into the 21st District and processed, yes.

79

Q. Well, that's a large period of time there so --

A. I don't know what's large to you or not. The question was just as large.

Q. Okay. So after you placed your hand on his back firmly, did you walk him over -- well, actually at that point did you notice any Chicago Police Officers at the scene?

A. Chicago Police Officers was there prior to that point --

Q. When did you first --

A. -- I believe. I have no idea of when they got there. I was not -- I'm only going to repeat what I said before, I don't know. I was in a struggle. I was in a fight. I'm trying to protect myself and trying to restrain a person who's not cooperating. Okay. I have no idea of what time, who was there first, UCP officers, Chicago Police Officers, who drove past, who did not stop, I don't.

Q. Did you personally walk -- you don't know, you testified you don't know. I'm sorry.

A. Thank you.

Q. At some point he was placed in a squad

80

20 (Pages 77 to 80)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1  car, though, in the CPD squad car, though;
2  right?
3      A.  Yes, I believe he was transported by
4  CPD.  I'm not sure.
5      Q.  Did you have any conversations -- well,
6  did you recognize the Chicago Police Officers
7  who were at the scene that day?
8      A.  By uniform, of course.
9      Q.  Did you recognize them by name?
10     A.  No.
11     Q.  Did you have any conversations with the
12  Chicago Police Officers who were at the scene
13  once Mr. Boyle was subdued?
14     A.  I don't recall.  And what I don't
15  recall is specifically talking whether or not I
16  said something, whether I said anything.  I
17  don't recall.  To answer your question
18  specifically, I don't recall.
19     Q.  You just recall Mr. Boyle being inside
20  the Chicago Police officer patrol car?
21     A.  You asked me that already.
22     Q.  I know.
23     A.  I don't --
24     Q.  I'm asking you if you remember that?
                                                81

1      A.  Do I remember what?
2      Q.  Mr. Boyle actually being placed inside
3  the Chicago Police car?
4      A.  As I said earlier, I can't remember if
5  he was transferred by UCPD or CPD.  I think he
6  was -- I'm almost sure it was UCPD -- I mean,
7  Chicago Police.  What conversation I had with
8  the Chicago Police, I don't recall specifically.
9  I'm quite sure we did.  I don't know what it
10  was.  It had to be something about the situation
11  if I did.
12     Q.  Okay.  Did you have any conversations
13  with any of the witnesses who were at the scene
14  on October 18th, 2008?
15     A.  And who are you speaking of?
16     Q.  Did you have any conversations with
17  Ashley Glover at the scene?
18     A.  Yes.
19     Q.  When did you have this conversation?
20     A.  After Boyle was under -- in cuffs, she
21  now was standing outside the car.  Prior to the
22  struggle, she never got out the car.  I never
23  saw her out the car.  And I asked her what's
24  wrong with him, what's going on here, is he
                                                82

1  drunk, is he mental.
2      Q.  What did she say when you asked her
3  that?
4      A.  She didn't answer me.  One of the other
5  guys, that one of the guys that disappeared and
6  is now back on the inside, he told her to shut
7  up, don't say nothing to nobody.  Which one said
8  that, I don't know.  I just knew it was one of
9  the two that was with her.
10     Q.  Is this the only conversation that you
11  had with Ashley Glover or one of the two guys
12  who had come back on the scene?
13     A.  I don't recall any other -- I'm trying
14  to find out who he was.  We still didn't know
15  who he was.  We probably asked him what was his
16  name.  We probably would have asked him a whole
17  lot of information.
18     Q.  At any point did you get his
19  identification?
20     A.  Yeah.  Somebody got it.  I don't
21  remember who.  To answer your question did I get
22  his identification, did I physically get it?
23     Q.  Sure, did you physically get it?
24     A.  Not on the scene.
                                                83

1      Q.  But you said another officer did;
2  right?
3      A.  Somebody had to.  I don't know who.
4      Q.  Was it at that point that you learned
5  that this was Charles Boyle?
6      A.  At what point, sir?
7      Q.  When the officer got identification
8  from Mr. Boyle.
9      A.  I wasn't with him when he got the
10  identification.  I told you I didn't know.
11     Q.  Okay.  So after Mr. Boyle went away in
12  the squad car, did you say he went to the 21st
13  District?
14     A.  I'm sorry?
15     Q.  Did you say he went to the 21st
16  District?
17     A.  Yes.
18     Q.  And after he went to the 21st District,
19  were you still at the scene after Mr. Boyle had
20  been taken away from the scene?
21     A.  Help me understand this, are you asking
22  me when Boyle -- when he was transported away,
23  was I still standing at that scene?
24     Q.  That's what I'm asking you, yes.
                                                84

1    A. Yes.
2    Q. How long did you remain at the scene
3 after Mr. Boyle had been taken away?
4    A. I don't know how long I remained at the
5 scene. I can tell you what I did next. Officer
6 Torres and I went to the 21st District.
7    Q. Okay. Did you have any conversations
8 with Mr. -- Officer Torres as yourself and him
9 traveled to the 21st District?
10    A. I'm quite sure we did. What we talked
11 -- yes, we did.
12    Q. Do you remember what you talked about
13 on the way there?
14    A. Verbatim, no.
15    Q. Do you remember the general subject of
16 the conversation?
17    A. I'm quite sure it was about what we
18 just endured. I know we were both -- I know I
19 expressed that we did a good job in restraining
20 this guy. I expressed that the response was
21 good. Everybody acted accordingly. This young
22 man was very combative, and he did not get hurt.
23    Q. This was your first day at the job and
24 you said all this?

85

1    A. Yes. Thank you.
2    Q. Do you know if Officer Torres said
3 anything in response to you when you expressed
4 these sentiments?
5    A. He expressed the same thing in so many
6 words. We also talked about the fear that we
7 were just placed in.
8    Q. What did you say the fear that you were
9 just placed in?
10    A. He could have got a gun. He could have
11 grabbed my gun. I didn't know if he had a
12 weapon when we were going through all this.
13 We're working together. This is not the end of
14 our day so we're sitting here talking about this
15 scenario, going through it, talking about
16 officer safety because you're right, this is the
17 first day, this is the first time I met Officer
18 Torres.
19    I have no knowledge of his prior police
20 experience, so this was a good time for us to
21 talk. We talked then, and we talked later about
22 officer safety and what we could have done
23 differently, if we could have done anything
24 differently. And it came out that we did it

86

1 right in terms of our safety and this young
2 man's safety.
3    Q. Did Officer Torres say anything to you
4 while you were on your way to the 21st District
5 about any injuries?
6    A. I don't recall Officer Torres. I told
7 him about mine. My wrist was hurting. I
8 sprained my wrist in this. I knew Galarza was
9 going to the hospital. And Gillespie, I didn't
10 know the extent of his injury at that time.
11    Q. How did you know Officer Galarza was
12 going to the hospital?
13    A. Because I heard it on the scene. I
14 think he even said -- as I recall, he said I
15 have to go get my shoulder looked at and he went
16 to the emergency room.
17    Q. How did you sprain your wrist?
18    A. Wrestling with your client, sir, trying
19 to handcuff your client.
20    Q. Was this when you were on the ground?
21 This was when you're wrestling on the ground;
22 right?
23    A. Through the whole ordeal. The young
24 man was very strong. How old is he? 21 or

87

1 something like that? I'm 56. There's a little
2 difference in muscles.
3    Q. Do you recall any time during this
4 altercation that Officer Torres had the wind
5 knocked out of him?
6    A. I remember him being winded. I
7 remember at some point in this ordeal him
8 gasping.
9    Q. Do you remember if he was hunched over
10 at any point during the altercation trying to
11 catch his breath?
12    A. Okay. Because hunched over -- we were
13 hunched over a lot during this.
14    Q. Do you remember if he was hunched over
15 trying to catch his breath?
16    A. I remember that.
17    Q. When was he hunched over?
18    A. I can't -- whenever he could catch his
19 breath. It was several opportunities in there
20 that he was able to catch his breath. You had
21 to catch a breath with this guy.
22    Q. So at some point you arrived at the
23 21st District; right?
24    A. That's correct.

88

22 (Pages 85 to 88)

1    Q.  And once you arrived at the 21st
2  District, what did you personally do?
3    A.  Sat down.
4    Q.  Do you know where you sat down?
5    A.  In the holding room where the officers
6  were starting -- the Chicago Police Department
7  was starting their paperwork.
8    Q.  Was Mr. Boyle there with --
9    A.  Yes.
10   Q.  -- yourself?
11        Where was Officer Torres?
12   A.  He was in and out of the room.
13   Q.  Okay.  Did you talk to the Chicago
14  Police Department officers while they were
15  filling out the paperwork?
16   A.  Yes.
17   Q.  What did you tell the Chicago Police
18  Department officers as they were filling out
19  paperwork?
20   A.  Basically what happened.
21   Q.  What exactly did you tell them?
22   A.  The same thing I told you about the
23  vehicle, the horn sounding, constantly sounding,
24  observing the vehicle, abruptly stopping to the

89

1  the police report.  That's how they wrote it.
2  They do their police report.  We do our police
3  report.  Officer Torres was in charge of our
4  police report.
5    Q.  Did you fill out any paperwork that
6  night on October 18th, 2008?
7    A.  I don't recall.  When you say any
8  paperwork, I might have did a contact card.  I
9  don't recall what paperwork I did do.
10   Q.  Did you file any police reports that
11  night?
12   A.  I don't recall what I filled out.
13   Q.  Did you fill out an injury report?
14   A.  Yes.
15   Q.  This has been marked previously as
16  Plaintiff's Exhibit 2.  I'm showing you what has
17  been Bates stamped 109 through 0114.  And I'm
18  specifically showing you Bates stamp numbers
19  00113 and 00114, and I'll let you take a look at
20  this document.
21   A.  Okay.
22   Q.  This is the injured personal report
23  that you've just referred to?
24   A.  Uh-huh.

91

1  curb.  Two guys got out.  What we talked about
2  with Boyle.  Boyle started refusing the
3  information, pushed off on us and it took how
4  many officers, was there six, seven officers,
5  and one of those sets of cuffs on him is mine.
6    Q.  Did they say anything in response when
7  you told them what happened?
8    A.  Specifically what are you asking me --
9    Q.  Well, you were there.
10   A.  -- to say?
11        I mean, I could tell you that we talked
12  about our years of experience -- I mean, there
13  was a lot of conversation.  Please ask me
14  something specific so I can answer you.
15   Q.  I'm asking specifically after you told
16  the Chicago Police Department officers the story
17  that you just told me --
18   A.  Okay.
19   Q.  -- what specific statements did they
20  make to you?
21   A.  I don't recall.
22   Q.  Did they write down what you told them
23  on their police report, if you know?
24   A.  I don't recall.  I -- I'd have to read

90

1    Q.  And you filled this out yourself?
2    A.  No.
3    Q.  Who filled this out for you?
4    A.  Reporting Officers R. Hill.
5    Q.  Do you know when Officer Hill filled
6  this out for you?
7    A.  Whatever date and time it says here.
8    Q.  Do you know when you spoke with Officer
9  Hill?
10   A.  Whatever date and time is on here.  I
11  can't read it.
12   Q.  Well, I can't read it either so --
13   A.  I can't -- you know, what do you want
14  me to do?
15   Q.  Do you know --
16   A.  Hold on a second here, it says here
17  date reported.  I see why you can't read it.
18  Yeah.  Okay.
19   Q.  So if you look at Page 2 of this
20  document -- I'm sorry, it's the last page of
21  Exhibit 2, which is Bates stamped 01114.  This
22  is a paragraph that was written in summary
23  regarding your injuries; correct?  You can read
24  that paragraph and then I'll ask you about it.

92

23 (Pages 89 to 92)

1    A.   Yes.
2    Q.   So is that a true and correct
3  statement?
4    A.   It's a summary.
5    Q.   It's a summary?
6    A.   Yes.
7    Q.   But is the summary correct?
8    A.   Yes.
9    Q.   And is that what you told Officer Hill
10 at some point on October 18th, 2008?
11   A.   This is a summary.
12   Q.   Is it a summary of what you told
13 Officer Hill?
14   A.   The bottom line is my left wrist was
15 injured in the process of handcuffing and
16 placing offender in custody.
17   Q.   Okay.
18   A.   Okay.  That is correct.
19   Q.   So you never -- or you didn't fill out
20 an injury report yourself, Officer Hill filled
21 it out for you?
22   A.   Yes.  When you say fill out the report,
23 you said made a report?
24   Q.   I might have said made the report.

93

1    A.   If you had asked me did I handwrite the
2  report and sign off as if I wrote the report, I
3  would have told you.
4    Q.   Do you know what Mr. Boyle was charged
5  with?
6    A.   Obstruction and resisting.  I didn't
7  review the police report when I came in here.
8    Q.   Do you know how long you were at the
9  21st District for?
10   A.   No.
11   Q.   Did you have any conversations with
12 Mr. Boyle when you were at the 21st District?
13   A.   With Mr. Boyle?
14   Q.   Yes.
15   A.   Yes.
16   Q.   What did you say to him and what he did
17 say?
18   A.   I asked him what was wrong with him.
19   Q.   When did you ask him what was wrong
20 with him?
21   A.   When we were at the 21st District.
22   Q.   Was it before or after the paperwork
23 was being filled out?
24   A.   Before or after or during, I'm not

94

1  sure.
2    Q.   How did he respond when you asked him
3  what was wrong with him?
4    A.   He didn't.
5    Q.   Did you say anything else to him?
6    A.   Yes, I said why were you doing all
7  this.
8    Q.   And what did he say if anything in
9  response?
10   A.   He didn't.
11   Q.   Did you say anything else to Mr. Boyle?
12   A.   I probably asked him that again and
13 what he said to me, he told me about he played
14 football at Kenwood and probably -- and I assume
15 he was talking about why he was able to toss us
16 around, but I think he said he went to school,
17 to college.  I don't remember if he tried to say
18 he had a job or anything.  I asked him again
19 whose car was that.  He didn't tell me.  I asked
20 him had he been drinking.  I asked him was he on
21 medication, something to that effect.
22   Q.   Did he give you answers to those
23 questions?
24   A.   No.

95

1    Q.   Did you have a conversation with
2  Officer Torres when you were at the 21st
3  District?
4    A.   Yeah.  Sure.
5    Q.   What did you say to Officer Torres?
6    A.   I don't recall the specifics.
7    Q.   Do you remember generally what the
8  conversation was about?
9    A.   We were probably talking about the
10 report.  I was probably asking about the
11 paperwork we need to do, what we need to do, you
12 know.
13   Q.   Have you ever filled out a Chicago
14 Police Report before in your time as a Chicago
15 police officer?
16   A.   Yes.
17   Q.   So you knew how to fill out a Chicago
18 Police Report; right?
19   A.   Yes.
20   Q.   Did you know how to fill out a
21 University of Chicago Police Report on October
22 18th, 2008?
23   A.   I don't understand what you mean did I
24 know how to.  If you give me a report, if I read

96

24 (Pages 93 to 96)

1  it, I could fill in the blanks. I mean, what
2  are you trying to ask me?
3      Q. Well, you had never filled out a
4  University of Chicago Police Report prior to
5  that date; right?
6      A. That is correct.
7      Q. Once the paperwork was all filled out,
8  what did you do?
9      A. From we -- are we still at the 21st
10  District?
11      Q. Yes, still at the 21st District. All
12  the paperwork is done, what do you do?
13      A. I left the station.
14      Q. You left immediately after the
15  paperwork was done?
16      A. Sir, what do you mean immediately?
17      Q. Well --
18      A. After the process was over, we left the
19  station.
20      Q. By process, do you mean paperwork?
21      A. Paperwork. We done everything we're
22  supposed to do in terms of this process so we
23  leave.
24      Q. Was there anything else that you and
                                               97

1  Officer Torres had to do besides paperwork?
2      A. In terms of what?
3      Q. With Mr. Boyle.
4      A. No. Other than appear in occur.
5      Q. We'll talk about that in a second. Did
6  you have any conversations with Officer Torres
7  after you left the station about what happened
8  with Mr. Boyle?
9      A. Yes.
10      Q. When did you have this conversation?
11      A. Sometime after we left the station. In
12  the same nature that I told you before that we
13  talked about.
14      Q. The same nature, what are you --
15      A. In terms of what happened, how we did,
16  you know, how we acted properly. That's about
17  it in terms of this. Then we continued with the
18  rest of our tour.
19      Q. So you continued on patrol?
20      A. Yes.
21      Q. Did you say you might have filled out
22  one of the contact cards for --
23      A. If you want to show me all the
24  document, I can show you what's my handwriting
                                               98

1  because I told you I didn't recall.
2      Q. All right. I'll show you what has been
3  previously marked as Plaintiff's Exhibit 3 and
4  4. These are the contact cards that have been
5  provided by your counsel.
6          Is any of the handwriting on either
7  Plaintiff's Exhibit 3 or Plaintiff's Exhibit 4
8  your handwriting?
9      MS. GIBBONS: Just to make the record clear,
10  it was a group exhibit.
11      MR. KSIAZEK: I'm sorry, you're right.
12      THE WITNESS: It looks like -- you know
13  what, these contact cards would have been signed
14  on the back. Where is the back?
15  BY MR. KSIAZEK:
16      Q. I don't have the back.
17      A. All right. This is close to my
18  handwriting. Ashley Glover, yeah.
19      Q. What other information is located on
20  the back of the contact card?
21      A. There would have been a place for them
22  to be signed. That's about it. Whether they
23  got signed on, I don't know. I don't think I
24  filled out any of this stuff. I mean, this one
                                               99

1  here looks like it's two different handwriting
2  on this one so I really don't know. I can't
3  tell by this.
4      Q. Okay. Have you read the University of
5  Chicago Police Report in this case?
6      A. Not today.
7      Q. Not today, but did you read it at some
8  point?
9      A. Yeah, at some point.
10      Q. When did you read it?
11      MR. PUISZIS: Objection, irrelevant. You
12  can go ahead and answer the question.
13      THE WITNESS: When did I read it?
14  BY MR. KSIAZEK:
15      Q. Yes.
16      A. Specifically what date and what time, I
17  don't recall.
18      Q. Did you read it before you attended
19  court on January 20th, 2009?
20      A. I don't recall if I did or didn't.
21      Q. You said you did attend court in
22  conjunction with this case?
23      A. Every court appearance.
24      Q. So do you recall when the first court
                                              100

25 (Pages 97 to 100)

1  appearance was?
2      A.  The exact date, no.
3      Q.  If I told you it was December 9th,
4  2008, would that sound about right?
5      A.  I would assume you're telling me the
6  truth so --
7      Q.  And you attended court a second time;
8  right?
9      A.  Yes.
10     Q.  And do you know if that was on January
11  20th, 2009?
12     A.  I don't recall, but if you told me that
13  again, I would have to assume that you're being
14  honest and telling me the truth.  And I would
15  say yes.
16     Q.  You said earlier you did review your
17  testimony from the motion to suppress hearing on
18  January 20th, 2009?
19     A.  I reviewed the testimony prior to
20  coming in here today.
21     Q.  Did you ever fill out a complaint in
22  conjunction with this case?
23     A.  When you say fill out --
24     Q.  Did you ever write a complaint to be

101

1  filed in the Circuit Court of Cook County.  You
2  should ask him if you want to get in this
3  minutia, ask him where he signed it.
4  BY MR. KSIAZEK:
5      Q.  You signed this document; right?
6      A.  The original document, yes.
7      Q.  So where did you sign this document?
8      A.  I signed the complaint at the police
9  station.
10     Q.  And that was on October 18th, 2008;
11  right?
12     A.  Yes.
13     Q.  And the complaint reads resisting or
14  obstructing a peace officer and that he
15  knowingly resisted performance -- is that
16  performance?
17     A.  Yes.
18     Q.  Of PO Moore of an authorized act within
19  his official capacity to be a peace officer
20  engaged in the execution of his duties and that
21  he resisted investigatory stop by failing to
22  produce ID and became combative by flailing his
23  arms.
24         Did I read that correctly; right?

103

1  filed in the Circuit Court against Mr. Boyle?
2      A.  Are you asking me did I personally --
3      Q.  Yes.
4      A.  -- write the complaint?
5      Q.  Yes.
6      A.  And write in there all the wording in
7  the complaint?
8      Q.  I'm asking you that; yes.
9      A.  No.
10     Q.  Did you ever sign a complaint?
11     A.  Yes, I believe I did.
12     MR. KSIAZEK:  We'll mark this as Exhibit 11.
13         (Whereupon, PLAINTIFF'S
14          Deposition Exhibit No. 11 was
15          marked for identification.)
16  BY MR. KSIAZEK:
17     Q.  This is a complaint that you signed in
18  Circuit Court of Cook County, Illinois; correct?
19     MR. PUISZIS:  I object.  I don't know that
20  he signed it in the Circuit Court of Cook
21  County.
22     MR. KSIAZEK:  Well, the complaint is in the
23  Circuit Court of Cook County.
24     MR. PUISZIS:  The complaint is ultimately

102

1      MR. PUISZIS:  I object because I don't
2  believe the complaint that was signed in the
3  police station included by flailing his arms and
4  you know it, Counsel, if you read the
5  transcript.
6      THE WITNESS:  And my answer concurs with
7  counsel.
8  BY MR. KSIAZEK:
9      Q.  So you signed everything by flailing by
10  his arms?
11     MR. PUISZIS:  And there's also Chicago, Cook
12  County, Illinois above.
13  BY MR. KSIAZEK:
14     Q.  But you did not write that; right?
15     A.  That is correct.
16     Q.  So the Chicago Police Officers wrote
17  that; correct?
18     A.  Which part of this?
19     Q.  That paragraph that I just read where
20  it states committed the offense of?  And, in
21  fact, the Chicago Police Officers wrote this
22  whole document except for your signature; right?
23     MS. GIBBONS:  Objection, foundation.
24

104

26  (Pages 101 to 104)

BY MR. KSIAZEK:

1 Q. Is that a yes?

2 A. Say that again.

3 Q. The Chicago Police Officers wrote everything on this complaint except for your signature; right?

MS. GIBBONS: Same objection.

MR. PUISZIS: Well, there's language in here that was added to my understanding in court, and I don't believe that was -- the police officers who added that. I think it was the prosecutor who did. So I'd object to the question.

MS. GIBBONS: I join.

BY MR. KSIAZEK:

Q. But you can answer the question. So the Chicago Police Officers wrote everything on this document excluding what we have talked about and your signature; right?

A. That's correct.

Q. Does the statement here that says -- that paragraph that I read to you starting with committing the offense of, is that a true and correct statement of what happened that night on October 18?

105

A. Resisting obstructing, yes. Being combative, yes. Failing to produce ID, yes. Resisting an investigation stop, yes.

MR. KSIAZEK: I will make this Plaintiff's Exhibit 12.

(Whereupon, PLAINTIFF'S Deposition Exhibit No. 12 was marked for identification.)

BY MR. KSIAZEK:

Q. You did actually testify in court on January 20th, 2009; correct?

A. Again, if that's the day you're telling me, I have to assure that you're being correct and truthful, yes.

Q. Sure. And you were under oath; right?

A. Yes.

Q. What I've handed you and what's been marked for identification purposes as Plaintiff's Exhibit 12. These are your Answers to Plaintiff's Interrogatories.

Do you recognize this document?

A. Yes.

Q. Okay. If you turn to the last page, on Page 10, that's your signature on the last page;

106

correct?

A. Yes.

Q. If you turn to Page 3, in the middle of the page, the second paragraph and the second sentence of the second paragraph says, Officer Gerald Johnson and Lieutenant White from the University of Chicago Police Department were on the scene at some point?

A. Yes.

Q. Did you see Officer Johnson and Lieutenant White on the scene on October 18th, 2008?

A. Yes.

Q. When did you see them on the scene?

A. Sometime during that ordeal.

Q. Do you know if it was before or after Mr. Boyle was in handcuffs?

A. I don't know.

I need a restroom break.

(Whereupon, a short break was taken.)

MR. KSIAZEK: We're back on the record.

THE WITNESS: Yes, sir.

107

BY MR. KSIAZEK:

Q. If I could direct your attention in Plaintiff's Exhibit 12 to Page 8, and we're looking at question number 11.

A. Yes, sir.

Q. And your answer to question 11 you state, subject to those -- and this is the last two sentences in your answer to question 11. Subject to those objections and without waiving the same, I am not aware of any complaints ever having been filed against me with the University of Chicago other than this one.

Have you had any complaints filed against you since you sent these documents on -- or since you signed this document on July 21st, 2009?

A. Say that again, please.

Q. Have you had any complaints filed against you while in your capacity as University of Chicago police officer since you provided these answers to your counsel?

A. No. You're talking about outside of this case; right?

Q. Right.

108

27 (Pages 105 to 108)

1    A.  Excluding this case.
2    Q.  Is there any other information
3  regarding the incident on October 18th, 2008
4  that we haven't talked about today that you're
5  aware of?
6    MR. PUISZIS:  I object to the vagueness of
7  the question.
8  BY MR. KSIAZEK:
9    Q.  Is there anything else you want to
10  state today about what happened on October 18th,
11  2008 that we haven't talked about previously?
12    MR. PUISZIS:  Objection to the vagueness of
13  the question.  Anything else he wants to state?
14  If you have a specific question, then ask him a
15  specific question.
16    Do you have anything else you want to
17  state?
18    THE WITNESS:  Well, I'm waiting on to get
19  some -- all I'm going to do is ask you again
20  specifically what you want me to answer so I can
21  answer it.
22  BY MR. KSIAZEK:
23    Q.  Have you talked to Officer Torres since
24  October 18th, 2008 about what happened on that
                                          109

1  date?
2    A.  No.
3    Q.  You haven't?
4    A.  No.  The court date, that kind of
5  thing, court notifications, when is your, you
6  know, dates.
7    Q.  Did you talk to him when yourself and
8  Officer Torres appeared in court?
9    Did you talk to Officer Torres about
10  this case about what happened on October 18th,
11  2008 when yourself and Officer Torres appeared
12  in court?
13    A.  At what point?
14    Q.  Did you talk to him on December 9th,
15  2008, Officer Torres?
16    A.  December 9th?
17    Q.  Yes.  When you first appeared in court
18  in regards to the criminal case against
19  Mr. Boyle, did you talk to Officer Torres at
20  that point?
21    MR. PUISZIS:  About this case or about --
22    MR. KSIAZEK:  About this, that's what I'm
23  asking.
24    MR. PUISZIS:  -- or things in general?
                                          110

1    THE WITNESS:  And I'm not trying to agitate
2  you or anything but I need to know exactly what
3  you're talking about.  Are you talking about
4  after when we testified and go out in the hall
5  and don't talk about this or are you trying to
6  get to that or are you saying before we went to
7  court, you know, hey, we're going to court.
8  What are you saying?  Ask me something --
9  BY MR. KSIAZEK:
10    Q.  Did you talk before you went to court?
11  Did you talk with Officer Torres before you went
12  to court on December 9th, 2008?
13    A.  Yes.
14    Q.  What did you say to Officer Torres on
15  December 9th, 2008?
16    A.  I can't believe this is still going on.
17  This guy was wrong, and now he's trying to sue.
18    Q.  Well, that was actually his criminal
19  case.
20    A.  Excuse me?  You asked me about December
21  9th.
22    Q.  Right.
23    A.  Okay.  That's the kind of conversation
24  I had with him.
                                          111

1    Q.  Did he say anything in response?
2    A.  Pretty much he agreed.
3    Q.  Where did you have that conversation?
4    A.  Where?
5    Q.  Where.
6    A.  I don't recall.  I don't know if that's
7  the day he drove us to court or if it was
8  another day.
9    Q.  Did you have a conversation with
10  Officer Torres once you were inside the
11  courthouse about this case?
12    A.  No.
13    Q.  Did you have a conversation on January
14  20th, 2009 with Officer Torres about this case,
15  either before court, during court, after court?
16    A.  Before court, we did have a
17  conversation because I do recall talking to him
18  about finally his witnesses -- that was the last
19  court case, right, the January that you asked me
20  about; is that correct?
21    Q.  I think so, yes.
22    A.  I mean, you gave me the dates so I
23  don't recall.  So, yeah, we talked -- I remember
24  talking to him about, oh, the guys, those three
                                          112

28 (Pages 109 to 112)

1 people finally showed up. So we had that kind
2 of conversation.
3    Q. Do you know exactly what you said to
4 him and what he said to you?
5    A. Not verbatim, no. I know he responded
6 to me, yeah, now they're coming, why weren't
7 they here before, that kind of comment.
8    Q. And have you spoken to Officer Torres
9 about this case since January 20th, 2009?
10    MR. PUISZIS: When you say about this case,
11 what do you mean? About the fact they've been
12 sued, about the fact that there's depositions
13 pending, about the substance of what happened?
14 Because unless it's about the substance of what
15 happened, it's irrelevant and immaterial.
16 BY MR. KSIAZEK:
17    Q. You can answer the question.
18    A. We did talk about the deposition
19 because it was changed and he called me and
20 asked me what date it was. I looked at the
21 schedule that they printed out and I gave him
22 the date he was supposed to go.
23    MR. KSIAZEK: Nothing further at this time.
24
          113

1          EXAMINATION
2 BY MS. GIBBONS:
3    Q. Officer Moore, I just have a few
4 questions for you. Taking you back to the date
5 of the incident, I know there was a lot going on
6 but I'm just trying to best understand when you
7 first saw the Chicago Police Department on the
8 scene.
9      As I recall, you testified that it
10 wasn't until Mr. Boyle was up and you had him
11 handcuffed and against a squad car; is that
12 correct?
13    A. I think so. I don't recall exactly
14 when they were there. I do remember seeing a
15 squad car. I don't recall exactly what time
16 they got there or anything like that.
17    Q. Do you recall approximately how many
18 Chicago police officers were on the scene?
19    A. I don't remember. I know -- I remember
20 one car. I don't remember -- I'm quite sure
21 afterwards there might have been some cars that
22 drove passed but I don't remember.
23    Q. Do you recall seeing a Chicago Police
24 sergeant or a supervisor in a white shirt on the
          114

1 scene?
2    A. I don't recall. Our supervisors were
3 wearing white shirts, too, so I don't recall.
4    MS. GIBBONS: I have nothing further.
5          EXAMINATION
6 BY MR. PUISZIS:
7    Q. Officer Moore, on October 18th of 2008,
8 how old were you, sir?
9    A. 55.
10    Q. And do you normally go looking to
11 wrestle with 21-year old former football players
12 in your capacity either as a Chicago police
13 officer or a University of Chicago police
14 officer?
15    A. No, sir.
16    MR. KSIAZEK: That's leading. Objection.
17 BY MR. PUISZIS:
18    Q. You had mentioned earlier about you
19 thought that -- you were questioned about why
20 the vehicle was suspicious and you said
21 something about your experience as a police
22 officer, do you remember that?
23    A. Yes.
24    Q. Can you tell us or share with us what
          115

1 your experience was as a police officer that led
2 you to believe that was a suspicious vehicle or
3 why you thought it might be stolen?
4    A. Well, in my experience if the horn is
5 stuck in the horn position constantly blowing,
6 it could mean somebody shorted out the alarm
7 system or tried to hot wire the car. The other
8 thing was the way this car abruptly hit the
9 curb, it was like the steering could have locked
10 up on the driver.
11    Q. Now, what's the significance of the
12 steering locking up on the driver as it relates
13 to possibly being a stolen vehicle?
14    A. The column could have been peeled and
15 they used a prying object to engage into start.
16    Q. And when you said that the --
17    A. Steering column.
18    Q. -- steering column, you talked about
19 hot wiring, what could happen when you hot wire
20 a car that would cause the alarm to go off or
21 would cause the horn to go off?
22    A. Well, if the alarm is connected to the
23 horn, if the alarm mechanism, the noise
24 mechanism is the horn, then if that's interfered
          116

29 (Pages 113 to 116)

1  with, it would make the horn go into a stop --
2  constant horn instead of an alarming horn with
3  intermittent sounds.
4  Q. Well, you were a Chicago police officer
5  for 24 years before this incident?
6  A. Yes.
7  Q. Can you tell us what areas of the City
8  you worked?
9  A. I worked in the 3rd District at 7040
10  South Cottage Grove. I came on the job in May
11  of '85. I did my time in the academy. And as
12  of February of '86, I was on a tactical unit. I
13  worked all the way up until the tactical unit in
14  the 3rd District until 1998.
15  Q. Now, does the part of the University of
16  Chicago jurisdiction or boundaries include the
17  3rd Police District?
18  A. That is correct.
19  Q. So you've had experience with
20  University of Chicago officers during the time
21  you were a Chicago police officer working in the
22  3rd District; correct?
23  A. Correct.
24  Q. And you were aware of the fact that
117

1  that the University of Chicago officers are
2  involved in; correct?
3  A. That is correct.
4  Q. Now, besides being a police officer, do
5  you have any other experience in any other
6  capacity that led you to have experience with
7  vehicles that may have been stolen or hot wired
8  or had their ignition lock broken?
9  A. My dad owned a gas station from 1962
10  until 1976. 1975 I was part owner of a gas
11  station, so I grew up around his cars.
12  Q. And did you ever have occasion to
13  repair vehicles after the engine column was
14  peeled, after vehicles were hot wired or after
15  the ignition lock was broken?
16  A. Yes.
17  Q. Okay. And have you firsthand
18  experience with observing cars having problems
19  with steering after the ignition lock was
20  broken and the steering column peeled as you've
21  described for us a little while ago?
22  MR. KSIAZEK: Objection, leading.
23  THE WITNESS: Yes, professionally as a
24  police officer and personally and back in the
119

1  typically Chicago police officers fill out
2  complaint forms; correct?
3  A. Yes.
4  Q. University of Chicago officers usually
5  don't fill out complaint forms; correct?
6  A. That is correct.
7  MR. KSIAZEK: Leading. Objection.
8  BY MR. PUISZIS:
9  Q. Who decides what charges to be placed,
10  the University of Chicago officers or someone
11  else?
12  A. Someone else. Ultimately it's someone
13  else.
14  Q. Does the Process of Felony Review get
15  involved at all?
16  A. At the Chicago police level, yes.
17  Q. And just so the record is clear, what
18  is Felony Review, and what does that entail?
19  A. That entails from my experience as a
20  Chicago police officer, the State's Attorney
21  hearing the facts in the case and make a
22  decision of whether or not they're going to
23  prove felony charges or not.
24  Q. Okay. And again, that's not something
118

1  day. As a police officer, I have been involved
2  in numerous stolen car arrests, recoveries and
3  actually I've had vehicles, attempted to drive
4  vehicles that the columns have been peeled and
5  actually know how that steering can lock up on
6  you.
7  BY MR. PUISZIS:
8  Q. So when you observed the vehicle veer
9  or I forget exactly the term you used, and
10  bounce into the curb, based on your years of
11  experience as a Chicago police officer and as
12  working in a garage mechanic repairing stolen
13  vehicles, what did you reasonably believe based
14  on that years of experience and your
15  observations that day?
16  A. I believe the driver of that car was
17  not in control of that steering and that
18  steering could possibly have been locked.
19  Q. And is that a factor that led you to
20  believe could indicate that this may have been a
21  stolen vehicle?
22  A. Yes.
23  Q. And you didn't know if it was stolen or
24  not but you certainly had suspicions at that
120

30 (Pages 117 to 120)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1    time, would that be fair to say?
2        A.   Yes, that suspicion and others.
3        Q.   Is it lawful to resist any arrest --
4        A.   No.
5        Q.   -- Officer Moore?
6        A.   No.
7        Q.   The University of Chicago officers are
8    permitted to detain people on the street;
9    correct?
10       A.   Yes.
11       MR. KSIAZEK: Objection, leading.
12   BY MR. PUISZIS:
13       Q.   And are University of Chicago officers
14   permitted to place people into handcuffs for
15   their safety while they're being detained?
16       A.   Yes.
17       Q.   And typically if a University of
18   Chicago officer observes conduct that he or she
19   reasonably believes may constitute a crime, are
20   they permitted to detain someone and call the
21   Chicago Police?
22       A.   Yes.
23       Q.   Now, you described during the course of
24   the struggle, the point in time when you and
                                                    121

1    Officer Torres and the plaintiff Mr. Boyle fell
2    to the ground; correct?
3        A.   Yes.
4        Q.   And this was at a point in time shortly
5    after Officer Torres had been pushed into the
6    open doorway area of your squad; correct?
7        A.   That's correct.
8        Q.   Okay. Now, after the three of you fell
9    to the ground, did the struggle end then?
10       A.   No.
11       Q.   What happened?
12       A.   We did the best we could to hold on to
13   this young man and to obstruct his attempt to
14   break loose and strike out. Subsequently, okay.
15   But once help came, that was the only time we
16   were able to control him enough to handcuff him.
17   And as I stated before, he was still so
18   uncontrollable. He could not be handcuffed
19   conventionally with one pair of cuffs.
20       Q.   But did you remain in the area of the
21   passenger side of your squad or did the
22   struggle, move from that location to another
23   location?
24       A.   No. We were -- once we were on the
                                                    122

1    ground near approximately the passenger door,
2    that area, we struggled with this young man to
3    the back of the vehicle and closer to the main
4    lane of the street.
5        Q.   When you say the back of the vehicle,
6    are you talking about the Chrysler or the back
7    of your squad?
8        A.   The back of the squad.
9        Q.   And so at some point then you were in
10   the middle or close to the middle of the street?
11       A.   Yes.
12       Q.   Okay. Let's back up a second. The
13   Chrysler was against the curb; correct?
14       A.   Yes.
15       Q.   Your squad was positioned behind it and
16   on an angle?
17       A.   Yes.
18       Q.   And was the back of your car extending
19   into the middle lane of traffic?
20       A.   Yeah, kind of --
21       MR. KSIAZEK: Objection, leading.
22       THE WITNESS: -- sort of. Yes, kind of,
23   sort of. It was not crossed into the opposite
24   lane of traffic.
                                                    123

1    BY MR. PUISZIS:
2        Q.   Right. But typically when you see a
3    squad -- typically when you see police pull
4    behind someone, they position their vehicle part
5    way into the next lane of traffic to protect
6    them as they approach the driver side door;
7    correct?
8        A.   That's correct.
9        Q.   And that's something that officers are
10   trained to do; correct?
11       A.   Correct.
12       MR. KSIAZEK: Objection, foundation.
13   BY MR. PUISZIS:
14       Q.   So that you aren't hit by another
15   vehicle as you walk towards the driver side of
16   the door; correct?
17       A.   That's correct.
18       Q.   Now, as you said you were observing
19   what was happening and you saw two men get out
20   of the car and walk away from the vehicle;
21   correct?
22       A.   That's correct.
23       Q.   There were still two people either
24   inside the vehicle or at some point one inside
                                                    124

31 (Pages 121 to 124)

1  and one outside the vehicle; correct?
2      A.  Yes.
3      Q.  And you were trying to determine if
4  what was happening if that was a stolen car;
5  correct?
6      MR. KSIAZEK:  Objection, leading.
7  BY MR. PUISZIS:
8      Q.  As you approached the vehicle?
9      A.  Correct.
10     Q.  Now, was it your intent to place
11 Charles Boyle under arrest as you walked towards
12 him and he was then asked whose car this was?
13     A.  No, that was not my intent.
14     Q.  Now, of the four people who were in the
15 car, who was the greatest threat to your and
16 Officer Torres's safety, the person in the car,
17 the person in the front of the car or the two
18 guys who walked away and was out of your sight?
19     MR. KSIAZEK:  Objection to the
20 characterization as a threat.
21     THE WITNESS:  The person in front of the
22 car, Mr. Boyle.
23 BY MR. PUISZIS:
24     Q.  Have you been trained in, you know,

125

1  terms of how to safely handle police stops?
2      A.  Yes.
3      Q.  Have you been trained on assessing
4  threat levels as a police officer?
5      A.  Yes.
6      Q.  And have you had on-the-job experience
7  in your 24 years as a Chicago police officer in
8  this regard?
9      A.  Yes.
10     Q.  At some point do you remember Mr. Boyle
11 actually being on all fours being on the ground
12 and trying to get up --
13     A.  Yes.
14     Q.  -- during the course of struggle?
15         Do you remember during the course of
16 these events that that occurred?
17     A.  Not exactly, but other than it was in
18 the street, we were still in the street.  And it
19 was after we had all went to the ground and he
20 was still trying to get up.
21     Q.  How would you describe Mr. Boyle, was
22 he a weakling or was he a strong young man?
23     A.  Very strong young man.
24     Q.  About how far did you have to drive the

126

1  squad from where it was parked to where you
2  positioned it behind the silver Chrysler before
3  this incident occurred?
4      A.  The exact footage, I can't tell you.
5  I'd say 20, 30 feet, two car lengths, a car
6  length and a half.  I'm not sure.
7      Q.  Was there anything unusual about the
8  fact that the two people got out of the car
9  almost immediately after the vehicle had
10 occurred?
11     A.  Yes.
12     Q.  What was unusual about that?
13     A.  One, they didn't look back.
14     Q.  What was the significance of them not
15 looking back in your mind as a police officer
16 with over 24 years of experience?
17     A.  The significance was that they know
18 they passed the police, the horn is constantly
19 going on, the horn sounding and they hit the
20 curb abruptly.  And they get out of the car,
21 they didn't look back.  And they were like
22 determined to just walk away.
23         But in assessing all this, that -- as
24 far as when they were walking further east, in

127

1  assessing them walking away, then Boyle gets out
2  of the car, they disappear in the vicinity of
3  that bank.  They're no longer visible.  Now
4  Boyle was there.
5          So our focus had to be turned on Boyle,
6  and the horn is still going off and there's
7  somebody else in the vehicle.  So a stolen car,
8  do we have a person in distress that was pushing
9  the horn, we don't know what we had in terms of
10 that.  So everything was still up in the air
11 there.
12         Leaning more towards a stolen car, bank
13 vicinity, another person in the car.  In my
14 experience, it could have been anything, stolen
15 car, somebody at the ATM machine, forcing
16 somebody to make a payment, we don't know.
17     Q.  And what time of the day or evening was
18 this?
19     A.  This is approximately 2:30 in the
20 morning which is even more concerning.
21     Q.  Why is that?
22     A.  At 2:30 in the morning, just being 55
23 years old, who's goes to the ATM or what purpose
24 are you going to a bank at 2:30 in the morning.

128

32 (Pages 125 to 128)

1　Even the liquor store is now closed.  So very,
2　very unusual.
3　　Q.  And were there parking spots do you
4　know in front of that Bank of America on 53rd
5　Street?
6　　A.  The parking on that whole south side
7　was very scarce.  There was plenty -- I mean,
8　there was no parking pretty much.
9　　Q.  I'm sorry, there was --
10　　A.  At that time of night on 53rd and
11　especially at night there was not that many cars
12　parked there.  There was plenty of parking
13　spaces out there.
14　　Q.  So if somebody wanted to go to the ATM,
15　they could have parked at or near in front of
16　the Bank of America?
17　　A.  Yes.  And even in this case, this guy
18　headed up -- the way -- he had no cars to avoid.
19　It was like he's just crashed into the curb
20　almost because he had nothing there interfering
21　or going into the curb.  He didn't have to park.
22　He could have just drove up and parked in front
23　of the place or wherever he wanted to go.
24　　MR. PUISZIS:  Thank you.  I don't have

129

1　anything else.
2　　　FURTHER EXAMINATION
3　BY MR. KSIAZEK:
4　　Q.  When you were parked behind this
5　Chrysler and you saw the driver get out of the
6　vehicle, your partner Officer Torres didn't call
7　for back-up; right?
8　　A.  No.
9　　Q.  Okay.  And when you saw Mr. Boyle get
10　out of the car, you didn't call for back-up;
11　right?
12　　A.  We were out the car.  No, we did not
13　call for back-up at that point.
14　　Q.  Even though all these things were going
15　on, the driver and the passenger were walking
16　down the street out of your point of view and
17　Mr. Boyle was in front of the car?
18　　A.  There was no physical contact with
19　these guys at this point, there was no weapon
20　being displayed at us.  You know, we're -- I did
21　not call for back-up at this point.
22　　We called for back-up but we couldn't
23　control your client.  And if he had complied, we
24　would not have to call for back-up.

130

1　　MR. KSIAZEK:  I think that's all I have.
2　　MS. GIBBONS:  I have nothing further.
3　　MR. PUISZIS:  Neither do I.  Signature is
4　reserved.
5　　　(Whereupon, the deposition
6　　　concluded at 5:15 o'clock
7　　　p.m.)
8　　(FURTHER DEPONENT SAITH NAUGHT.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

131

1　　IN THE UNITED STATES DISTRICT COURT
2　　NORTHERN DISTRICT OF ILLINOIS
3　　　EASTERN DIVISION
4　CHARLES BOYLE,　　　)
5　　Plaintiff,　　)
6　　-vs-　　　)  No. 09 C 1080
7　UNIVERSITY OF CHICAGO　　)
8　POLICE OFFICER LARRY　　)
9　TORRES, et al.,　　　)
10　　Defendants.　)
11　　I, CLARENCE MOORE, being first duly
12　sworn, on oath say that I am the deponent in the
13　aforesaid deposition taken on the 10th day of
14　November, 2009; that I have read the foregoing
15　transcript of my deposition, consisting of pages
16　6 through 130 inclusive, and affix my signature
17　to same.
18　　　_____
19　　　CLARENCE MOORE
20　Subscribed and sworn to
21　before me this _____ day
22　of _____, 2010.
23　　_____
24　　Notary Public

132

33 (Pages 129 to 132)

1  STATE OF ILLINOIS    )
2                       ) SS:
3  COUNTY OF C O O K    )
4       I, ATHANASIA MOURGELAS, a notary public
5  within and for the County of Cook County and
6  State of Illinois, do hereby certify that
7  heretofore, to-wit, on the 10th day of November,
8  2009, personally appeared before me, at 222
9  North LaSalle Street, Suite 300, Chicago,
10 Illinois, CLARENCE MOORE, in a cause now pending
11 and undetermined in the Circuit Court of Cook
12 County, Illinois, wherein CHARLES BOYLE, is the
13 Plaintiff, and UNIVERSITY OF CHICAGO POLICE
14 OFFICER, et al., are the Defendants.
15      I further certify that the said CLARENCE
16 MOORE was first duly sworn to testify the truth,
17 the whole truth and nothing but the truth in the
18 cause aforesaid; that the testimony then given
19 by said witness was reported stenographically by
20 me in the presence of the said witness, and
21 afterwards reduced to typewriting by
22 Computer-Aided Transcription, and the foregoing
23 is a true and correct transcript of the
24 testimony so given by said witness as aforesaid.

                                                    133

---

1   McCorkle Court Reporters, Inc.
2   200 N. LaSalle Street Suite 300
    Chicago, Illinois 60601-1014
3
4   January 6th, 2010
    Mr. Steve M. Puiszis
5   Hinshaw & Culbertson
    222 North LaSalle Street
6
    IN RE: Boyle v. University of Chicago, et al.
7   COURT NUMBER: 09 C 1080
    DATE TAKEN: November 10, 2009
8   DEPONENT: Clarence Moore
9   Dear Mr. Puiszis:
10  Enclosed is the deposition transcript for the
    aforementioned deponent in the above-entitled
11  cause. Also enclosed are additional signature
    pages, if applicable, and errata sheets.
12
    Per your agreement to secure signature, please
13  submit the transcript to the deponent for review
    and signature. All changes or corrections must
14  be made on the errata sheets, not on the
    transcript itself. All errata sheets should be
15  signed and all signature pages need to be signed
    and notarized.
16
    After the deponent has completed the above,
17  please return all signature pages and errata
    sheets to me at the above address, and I will
18  handle distribution to the respective parties.
19  If you have any questions, please call me at the
    phone number below.
20
21  Sincerely,
    Margaret Setina        Athanasia Mourgelas
22  Signature Department    Court Reporter
            (312) 263-0052
23  cc: Mr. Ksiazek, Ms. Gibbons.
24

                                                    135

---

1        I further certify that the signature to
2  the foregoing deposition was reserved by counsel
3  for the respective parties.
4        I further certify that the taking of this
5  deposition was pursuant to notice and that there
6  were present at the deposition the attorneys
7  hereinbefore mentioned.
8        I further certify that I am not counsel
9  for nor in any way related to the parties to
10 this suit, nor am I in any way interested in the
11 outcome thereof.
12       IN TESTIMONY WHEREOF: I have hereunto
13 set my hand and affixed my notarial seal this
14 6th day of January, 2010.
15
16
17
18
19
20 NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21 LIC. NO. 84-4329
22
23
24
                                                    134

34 (Pages 133 to 135)

**EXHIBIT**
Plaintiff's
11
091 MWFHD

(Agency #)

-0655, CCMC-0222 & CCMC-0225)    CCCR N654-100M-10/10/06

THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

of Illinois,

Plaintiff

v.                                      No. _____

, CHARLES D.

Defendant

MOORE, CLARENCE, E. _____, complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES _____ of 6733 SOUTH CHAPPEL _____ has, on or about
(Defendant)                              (Address)

18 OCT 08 , at the location of 1435 EAST 53RD ST, Chicago, Cook Cty, IL.
(Date)                                   (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER

in that he KNOWINGLY RESISTED THE PERFORMANCE OF PO MOORE OF AN AUTHORIZED
ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE
EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP
+ FAILING TO PRODUCE ID AND BECAME COMBATIVE BY Flailing his arms

in violation of 720 _____ Illinois Compiled Statutes 5 / 31-1
(Chapter)                               (Act)        (Sub Section)

AOIC Code

X P.O. Clarence E. Moore
(Complainant's Signature)

5555 S. Ellis
(Complainant's Address)

773-702-81-81
(Complainant's Telephone)

OCT 21

STATE OF ILLINOIS }
COOK COUNTY       } ss:

X P.O. Clarence E. Moore
(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the
same is true.

X P.O. Clarence E. Moore
(Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER , 2008

C. Martin
(Judge's/Clerk's/Law Enforcement Officer's Signature)

# 17246
(Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,   Judge _____
  or                                                                    Judge's No.
WARRANT ISSUED,   Bail set at: _____
  or
BAIL SET AT: _____ Judge _____ 000015
                                                                    Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
ORIGINAL - COURT FILE

34-2   4 DEC/0900   CPD/Cook
(Court Branch #   (Court Date/Time)   (Arresting Agency #)
or District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 (        )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                   Plaintiff

    v.                     No. _____

BOYLE, CHARLES D.

                   Defendant

MOORE, CLARENCE E.
(Complainant's Name Printed or Typed) , complainant, now appears before

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES of 6733 SOUTH CHAPPEL has, on or about
   (Defendant)            (Address)

18 OCT 08 , at the location of 1435 EAST 53RD ST Chicago, Cook County,
  (Date)                   (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that (1) KNOWINGLY RESISTED THE PERFORMANCE OF PO MOORE OF AN AUTHORIZED
ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE
EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP
(FAILING TO PRODUCE ID AND BECAME COMBATIVE BY FLAILING HIS ARMS

in violation of 720 Illinois Compiled Statutes 5 / 31-1
     (Chapter)                  (Act)       (Sub Section)

AOIC Code

X P.O. _____
           (Complainant's Signature)

5555 S. ELLIS
(Complainant's Address)

773-702-81-81
(Complainant's Telephone)

STATE OF ILLINOIS } ss:
COOK COUNTY

X P.O. Clarence E. Moore
(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X P.O. _____
(Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER , 2008

C. Martin # 17246
(Judge's/Clerk's/Law Enforcement Officer's Signature)   (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED, Judge _____
   or                                         Judge's No.

WARRANT ISSUED, Bail set at: _____
   or
BAIL SET AT: _____ Judge _____   000016
                                           Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
ORIGINAL - COURT FILE

34-2   4 DEC / 0900   CPD/Cook
(Court Branch #   (Court Date/Time)   (Arresting Agency #)
or District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 ( )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                Plaintiff

      v.                    No. _____

BOYLE, CHARLES D.
                      Defendant

MOORE, CLARENCE E. _____, complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES   of 6733 SOUTH CHAPPEL   has, on or about
(Defendant)   (Address)

18 OCT 08 , at the location of 1435 EAST 53RD ST Chicago, Cook County, IL
(Date)   (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that he KNOWINGLY RESISTED THE PERFORMANCE OF PO Moore OF AN AUTHORIZ
ED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE
EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP
OF A SUSPICIOUS PERSON by becoming COMBATIVE and flailing his arms

in violation of 720   Illinois Compiled Statutes   5   31-1
(Chapter)   (Act)   (Sub Section)

AOIC Code

[ ][ ][ ][ ][ ][ ]

X P.O. Clarence E. Moore
(Complainant's Signature)

5555 S. ELLIS
(Complainant's Address)

773-702-81-81
(Complainant's Telephone)

X P.O. Clarence E. Moore
(Complainant's Name Printed or Typed)

STATE OF ILLINOIS }
COOK COUNTY }  ss:

X P.O. Clarence E. Moore
(Complainant's Signature)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the
same is true.

Subscribed and sworn to before me on this 18 day of OCTOBER , 2008

C. Martin _____   # 17246
(Judge's/Clerk's/Law Enforcement Officer's Signature)   (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,   Judge _____
  or
                                       Judge's No.

WARRANT ISSUED,   Bail set at: _____
  or

BAIL SET AT: _____   Judge _____   000017
                                              Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ORIGINAL - COURT FILE

34-2   4 DEC / 0900   CPD / Cook
(Court Branch #    (Court Date/Time)   (Arresting Agency #)
or District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 (          )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                               Plaintiff

        v.                             No. _____

**BOYLE, CHARLES D.**
                             Defendant

**MOORE, CLARENCE E.** _____, complainant, now appears before

the Circuit Court of Cook County and states the following:

That: **BOYLE, CHARLES** of **6733 SOUTH CHAPEL** has, on or about
    (Defendant)             (Address)

**18 OCT 08**, at the location of **1435 EAST 53RD ST** Chicago, Cook County, IL
  (Date)                    (Place of Offense)

committed the offense(s) of **RESISTING OR OBSTRUCTING A PEACE OFFICER**
in that s/he **KNOWINGLY RESISTED THE PERFORMANCE OF PO MOORE OF AN AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN INVESTIGATORY STOP** ~~by~~ *Flaeling his arms*
**~~possible stolen~~**
in violation of **720** Illinois Compiled Statutes **5** **31-1**
     (Chapter)                           (Act)       (Sub Section)

**AOIC Code**

[ ][ ][ ][ ][ ][ ]

X P.O. Clarence E. Moore
                  (Complainant's Signature)

**5555 S. ELLIS**
              (Complainant's Address)

**773-702-8181**
           (Complainant's Telephone)

X P.O. CLARENCE E. MOORE
         (Complainant's Name Printed or Typed)

**STATE OF ILLINOIS**
**COOK COUNTY** } ss:

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

             X P.O. Clarence E. Moore
                 (Complainant's Signature)

Subscribed and sworn to before me on this **18** day of **OCTOBER**, **2008**

**C. Mertz** _____   **# 17246**
(Judge's/Clerk's/Law Enforcement Officer's Signature)   (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

**SUMMONS ISSUED, Judge** _____
     **or**                                       Judge's No.

**WARRANT ISSUED, Bail set at:** _____
     **or**

**BAIL SET AT:** _____ **Judge** _____
                                           Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
ORIGINAL - COURT FILE

000018

34-2   4DEC/0900   CPD/Cook
(Court Branch #   (Court Date/Time)   (Arresting Agency #)
District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 (     )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                                    Plaintiff

v.                                                    No. _____

BOYLE, CHARLES D.
                                    Defendant

TORRES, LARRY #1028 U OF C POLICE _____, complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES D        of 6733 SOUTH CHAPPEL        has, on or about
       (Defendant)                  (Address)

18 OCT 08   , at the location of 1435 EAST 53RD STREET, Chicago, Cook County
(Date)                                  (Place of Offense)                          IL

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that he KNOWINGLY RESISTED THE PERFORMANCE OF PO TORRES OF AN
AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER
INGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN
INVESTIGATORY STOP BY FAILING TO PRODUCE IA AND BECAME COMBATIVE BY
FLAILING HIS ARMS

in violation of 720   Illinois Compiled Statutes   5          /31-1
            (Chapter)                              (Act)      (Sub Section)

AOIC Code                                    X _____
                                             (Complainant's Signature)
[   ][   ][   ][   ][   ][   ]                5555 S ELLIS
                                             (Complainant's Address)
                                             773-802-8181
                                             (Complainant's Telephone)

STATE OF ILLINOIS  }
COOK COUNTY        } ss:                      X _____ L TORRES
                                             (Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the
same is true.

                                             X _____
                                             (Complainant's Signature)

Subscribed and sworn to before me on this   18   day of   OCTOBER   , 2008

C. Martin                                    #12246
(Judge's/Clerk's/Law Enforcement Officer's Signature)        (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,   Judge _____
    or                                                           Judge's No. _____
WARRANT ISSUED,   Bail set at: _____
    or
BAIL SET AT: _____   Judge _____
                                                           Judge's No. _____

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS   000019

EXHIBIT A

34-2    4 DEC/0900    CPD/Cook
(Court Branch #    (Court Date/Time)    (Arresting Agency #)
or District #)

Misdemeanor Complaint    (This form replaces CCG-0655, CCMC-0322 & CCMC-0335)    CCCR N654-100M-10/10/06 (    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                              Plaintiff

        v.    No. _____

BOYLE, CHARLES D.
                          Defendant

TORRES, LARRY #1028 U OFC POLICE
          (Complainant's Name Printed or Typed)       , complainant, now appears before

the Circuit Court of Cook County and states the following:

That: BOYLE; CHARLES D   of 6733 SOUTH CHAPPEL   has, on or about
    (Defendant)               (Address)

18 OCT 08, at the location of 1435 EAST 53RD STREET, Chicago Cook County
(Date)                    (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that (he/she) KNOWINGLY RESISTED THE PERFORMANCE OF PO TORRES OF AN
AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER
ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN
INVESTIGATORY STOP BY FAILING TO PRODUCE ID AND BECAME COMBATIVE BY
PULLING HIS ARM

in violation of 720   Illinois Compiled Statutes   5   /31-1
     (Chapter)                      (Act)      (Sub Section)

AOIC Code

X _J ___ Torres
(Complainant's Signature)

5555 S ELLIS
(Complainant's Address)

773-802-8181
(Complainant's Telephone)

STATE OF ILLINOIS }
COOK COUNTY } ss:

X _J ___ L TORRES
(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X _J ___ Torres
(Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER, 2008

C. Martin
(Judge's/Clerk's/Law Enforcement Officer's Signature)

#17246
(Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,   Judge _____
    or                                    Judge's No.

WARRANT ISSUED,   Bail set at: _____
    or

BAIL SET AT: _____ Judge _____
                                          Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
ORIGINAL - COURT FILE

000020

34-2   4DEC/0900   CPD/Cook
(Court Branch #   (Court Date/Time)   (Arresting Agency #)
or District #)

Misdemeanor Complaint   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 ( )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

Plaintiff

No. _____

v.

BOYLE, CHARLE D.

Defendant

TORRES, LARRY #1028 U OF C POLICE _____ , complainant, now appears before
(Complainant's Name Printed or Typed)

the Circuit Court of Cook County and states the following:

That: BOYLE, CHARLES D. of 6733 SOUTH CHAPPEL has, on or about
(Defendant)   (Address)

18 OCT 08 , at the location of 1435 EAST 53RD STREET Chicago Cook Co. IL
(Date)   (Place of Offense)

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER
in that s/he KNOWINGLY RESISTED THE PERFORMANCE OF PO TORRES OF AN
AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER
ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN
INVESTIGATORY STOP ~~BY REACHING~~ ~~INTO~~ ~~HIS COAT ON BECOMING~~ and
BECAMING COMBATIVE BY
flailing his arms

in violation of 720 Illinois Compiled Statutes 5 / 31-1
(Chapter)   (Act)   (Sub Section)

### AOIC Code

| | | | | | |
|-|-|-|-|-|-|

X _____
(Complainant's Signature)

5555 S ELLIS
(Complainant's Address)

773-702-8181
(Complainant's Telephone)

**STATE OF ILLINOIS**
**COOK COUNTY** } ss:

X _____ LARRY L TORRES
(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X _____
(Complainant's Signature)

Subscribed and sworn to before me on this 18 day of OCTOBER , 2008

C. Martin _____   #17246
(Judge's/Clerk's/Law Enforcement Officer's Signature)   (Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,   Judge _____
or
_____
Judge's No.

WARRANT ISSUED,   Bail set at: _____
or
BAILSET AT: _____   Judge _____
_____
Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
ORIGINAL - COURT FILE

000021

34-2   4 DEC / 0900   CPD / Cook
_(Court Branch #_      _(Court Date/Time)_    _(Arresting Agency #)_
_or District #)_

**Misdemeanor Complaint**   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)   CCCR N654-100M-10/10/06 (          )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                      **Plaintiff**

      v.   No. _____

BOYLE, CHARLE D.
_____ **Defendant**

TORRES, LARRY #1028 U OF C POLICE
_____, complainant, now appears before
_(Complainant's Name Printed or Typed)_

the Circuit Court of Cook County and states the following:

That: BOYLE; CHARLES D   of 6733 SOUTH CHAPPEL   has, on or about
    _(Defendant)_                              _(Address)_

18 OCT 08, at the location of 1435 EAST 53RD STREET, Chicago Cook County,
_(Date)_                                  _(Place of Offense)_

committed the offense(s) of RESISTING OR OBSTRUCTING A PEACE OFFICER

in (that) (s)he KNOWINGLY RESISTED THE PERFORMANCE OF PO TORRES OF AN
AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY TO BE A PEACE OFFICER
ENGAGED IN THE EXECUTION OF HIS DUTIES, IN THAT HE RESISTED AN
INVESTIGATORY STOP ~~...~~ possible stolen

in violation of 720   Illinois Compiled Statutes   5 / 31-1
    _(Chapter)_                                 _(Act)_   _(Sub Section)_

**AOIC Code**

X _____
    _(Complainant's Signature)_

5555 S ELLIS
_(Complainant's Address)_

773-802-8181
_(Complainant's Telephone)_

**STATE OF ILLINOIS**
**COOK COUNTY** } **ss:**

X _____ L TORRES _____
    _(Complainant's Name Printed or Typed)_

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

X _____
    _(Complainant's Signature)_

Subscribed and sworn to before me on this ___18___ day of ___OCTOBER___, 2008

_C. Martin_ _____   #17246
_(Judge's/Clerk's/Law Enforcement Officer's Signature)_   _(Law Enforcement Officer's Badge No.)_

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

**SUMMONS ISSUED,**   Judge _____
    **or**                                                         _Judge's No._

**WARRANT ISSUED,**   Bail set at: _____
    **or**

**BAIL SET AT:** _____   Judge _____
                                                _Judge's No._

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

000022

ORIGINAL - COURT FILE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,                              )
                         Plaintiff,         )
                                            )
v.                                          )
                                            )        No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE                )
OFFICER LARRY TORRES, et al.,               )
                                            )
                         Defendants.        )

## DEFENDANT MOORE'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

NOW COMES the Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER CLARENCE E. MOORE, Star #1012 ("Moore"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information and belief, and are made without prejudice to the objections set forth herein. Defendant specifically reserves the right to amend and/or supplement his responses at any time to introduce information

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1. Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:** Clarence E. Moore. My attorney, Steven Puiszis, consulted with me in preparing these answers.

2. Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

**ANSWER:**   Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well as a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and the handcuffing him. Officer Moore injured his left wrist and Officer Galarza injured his shoulder in the process. Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin of the City of Chicago. Other offiers from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

3.     Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

<u>ANSWER:</u>     Objection, defendant objects to this Interrogatory on the grounds that it seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify anyone believed "to have knowledge supporting the defendant" and also asks for a summary of "what knowledge" this defendant "believes each person may possess." That information is more proper the subject of a deposition and to require the provision of such a summary is overbroad, harassing and unduly burdensome. Subject to those objections and without waiving same, see those individuals listed in Interrogatory No. 2 and defendants who were identified in the University of Chicago defendants' Rule 26 Disclosures. The University of Chicago officers would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4.     Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

a.     Why he/she was at that location;

b.     Whether he/she had any physical contact with Plaintiff;

c.     Whether he/she participated in the arrest of Plaintiff;

d.     Whether he/she participated in the search of Plaintiff;

e.     Whether he/she had any participation in the bringing of criminal charges against Plaintiff.

<u>ANSWER:</u>     Objection. Defendant objects to this Interrogatory as being vague and ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against the defendant include assertions relating to his arrest and to the purported use of force against him as well as a state law claim of malicious prosecution. Subparagraph (e) is vague and ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

criminal charges." Subject to those objections and without waiving same, see my answer to Interrogatory No. 2.

Officer Torres and I and had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past them with its horn continuously blowing and then observe the vehicle swerve to the curb and bump it. They initially investigated what was happening. The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance. The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar, Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officer Torres and I would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and the Complaints were signed by both me and Officer Torres.

5.    If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

ANSWER:    I do not personally know of any such investigation. However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6.     State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:**     I injured my left wrist. I believe it was sprained and I treated it with ice and range of motion exercises. I understand that Officer Gillespie was kicked in the head during the incident and his glasses were broken. I also understand that Officer Galarza injured his shoulder, but I do not know what treatment he received.

7.     Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:**     Objection. This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc. Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it. Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact. I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we turn any such person over to the Chicago Police who will then transport that person to a local

6

police station and process that person, including taking booking photos, filling out arrest reports, filing criminal complaints and seeking approval by the State's Attorney working felony review of felony charges. While University of Chicago employees write out our own reports, we do not prepare criminal complaints and do not process an arrestee during the booking process.

8. Please state how long and in what capacity you have been employed by the University of Chicago Police Department. Your response should include a brief description of your change in assignments and/or rank if any, and when those changes occurred. Your response should also include whether you were concurrently employed by the City of Chicago as a police officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:** The date of the incident involving Charles Boyle, was my second day on the job for the University.

9. Please describe your assignment with the University of Chicago Police Department on October 18, 2008. Your response should include the actual time you began and ended your duties.

**ANSWER:** On October 18, 2008, I was working on the midnight shift for the University of Chicago on assignment 109. I was riding along with Officer Larry Torres to learn the University's procedures.

10. State the case number, caption, and jurisdiction of all civil cases in which you were named a defendant during the course of your employment with the University of Chicago Police Department and/or the City of Chicago Police Department.

**ANSWER:** Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in a capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are substantially similar in nature. Subject to those objections and without waiving same, I do not

7

recall ever having been sued as a Chicago Police Officer and I have never been previously sued in my capacity as a University of Chicago Police officer.

11.    Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

**ANSWER:**    Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in some capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are substantially similar in nature. Subject to those objections and without waiving same, I am not aware of any complaints ever having been filed against me with the University of Chicago other than this one. I have not had any complaints filed against me as a Chicago police officer during the past five years.

12.    Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

**ANSWER:**    Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13.    State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

8

**ANSWER:** I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14. State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:** Defendant objects to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving said objection, this defendant states this is unknown to me at this time.

15. State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

**ANSWER:** Yes. I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46.

16. State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:** I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46 and appeared at that hearing in my capacity as a police officer for the University of Chicago.

17. State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:** Objection. This Interrogatory calls for attorney work product. Defendant further objects to this Interrogatory as overbroad, and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion. Defendant further objects that it is unduly burdensome and harassing. Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of

9

Chicago Defendants' Response to Plaintiff's Production Request and these Answers to Interrogatories.

By: _____

Officer Clarence E. Moore

SUBSCRIBED AND SWORN TO
before me this _21st_ day of
July, 2009.

_____
Notary Public

OFFICIAL SEAL
JODY A DONNE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/24/12

10

# EXHIBIT E

ORIGINAL

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHEASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,              )
    Plaintiff,       )
  vs.                       ) No. 09 CH 1080
UNIVERSITY OF CHICAGO POLICE )
OFFICER LARRY TORRES, et al.,)
    Defendants.      )

    The discovery deposition of LARRY TORRES,
taken in the above-entitled cause, before
Karen E. Dominick-Rigoni, a Registered
Professional Reporter of Cook County, Illinois,
on the 9th day of November, 2009, at the hour of
10:08 a.m. at 222 North LaSalle Street,
Suite 300, Chicago, Illinois, pursuant to
notice.

Reported by: Karen E. Dominick-Rigoni, CSR, RPR
License No.: 084-004480

**Page 2**

1  APPEARANCES:
2    ED FOX & ASSOCIATES, By
3    MR. JONATHAN R. KSIAZEK
    300 West Adams Street, Suite 330
    Chicago, Illinois 60606
4    (312) 345-8877
5      Representing the Plaintiff;
6
7    HINSHAW & CULBERTSON, LLP, By
    MR. STEVEN M. PUISZIS
8    222 North LaSalle Street, Suite 300
    Chicago, Illinois 60601
    (312) 704-3000
9
    - AND -
10
    CITY OF CHICAGO - DEPARTMENT OF LAW
11   EMPLOYMENT AND POLICY LITIGATION
    DIVISION, By
12   MS. HELEN GIBBONS
    30 North LaSalle Street, Room 900
13   Chicago, Illinois 60602
    (312) 742-3541
14
    Representing the Defendants.

**Page 3**

INDEX
WITNESS                   EXAMINATION
LARRY TORRES
  By Mr. Ksiazek......................4, 139
  By Ms. Gibbons...................125
  By Mr. Puiszis...................129

EXHIBITS
NUMBER                   MARKED FOR ID
Torres Deposition Exhibit
  No. 1............................90
  No. 2............................97
  No. 3............................111
  No. 4............................112
  No. 5............................114
  No. 6............................117
  No. 7............................122

**Page 4**

1      MR. KSIAZEK: Mr. Torres, would you please
2  state your name -- full name for the record and
3  spell the last.
4      THE WITNESS: Larry Torres, T-o-r-r-e-s.
5      (Witness sworn.)
6      LARRY TORRES,
7  called as a witness herein, having been first
8  duly sworn, was examined and testified as follows:
9      EXAMINATION
10 BY MR. KSIAZEK:
11   Q.  Now that you're sworn, have you ever
12 had your deposition taken before?
13   A.  No.
14   Q.  So this is the first time you've taken
15 a deposition?
16   A.  Yes.
17   Q.  Okay. I'll just explain some basic
18 ground rules. Since this is your first time,
19 basically I'm going to be asking you some
20 questions and I ask that you answer truthfully
21 and to the best of your knowledge; is that okay?
22   A.  Yes.
23   Q.  And I'm going to ask that you answer
24 all my questions verbally. So just like you

1  (Pages 1 to 4)

1 answered yes just now, I'd ask that you answer
2 with a yes or no or whatever answer you provide,
3 just make sure not to shake your head or don't
4 say any uh-huhs or uh-uhs just because the court
5 reporter can't pick that up, okay?
6    A.  Okay.
7    Q.  I will try my best not to talk over you
8 just because we don't want to cause confusion
9 for the court reporter, and then I just ask that
10 you try not to talk over me and just the
11 transcript reads out better that way, okay?
12    A.  Okay.
13    Q.  And, lastly, if you ever need to take a
14 break, then you can just ask for a break.  Just
15 make sure that if you do ask for a break, you
16 have answered my question before you do ask for
17 a break; is that fair?
18    A.  Okay.
19    Q.  Okay.  If I could ask, what documents
20 did you review in preparation for your
21 deposition today?
22    A.  I just overlooked my initial report.
23    Q.  The police report?
24    A.  Correct.

5

1 school?
2    A.  For a company called Clean Way
3 Sweeping.
4    Q.  What were you doing for Clean Way?
5    A.  Driving a truck.
6    Q.  How long did you work for Clean Way?
7    A.  Approximately three years.
8    Q.  What did you do -- or why did you leave
9 Clean Way?
10    A.  I got another job.
11    Q.  And where did you work after Clean Way?
12    A.  The City of Chicago.
13    Q.  Were you working as an officer?
14    A.  No.  As a garbage man.
15    Q.  How long did you work as a garbage man
16 for the city?
17    A.  About four years.
18    Q.  And what did you -- why did you
19 leave the city as a garbage man?
20    A.  Because I wanted to become a police
21 officer.
22    MR. PUISZIS:  It was a smelly job, right?
23    THE WITNESS:  I couldn't take the smell.
24

7

1    Q.  And you understand you're under oath
2 and you have an obligation to testify truthfully
3 today?
4    A.  Yes.
5    Q.  Is there any preventing you today from
6 testifying truthfully?
7    A.  No.
8    Q.  Just some background information.  What
9 is your educational background?
10    A.  I graduated high school and I had some
11 college.
12    Q.  When did you graduate high school?
13    A.  '88.
14    Q.  Where did you graduate from?
15    A.  Leo High School.
16    Q.  Is that -- where is that located?
17    A.  79th and Sangamon.
18    Q.  Okay.  And did you immediately go to
19 college after that?
20    A.  No.
21    Q.  Okay.  What did you do after graduating
22 from high school?
23    A.  I worked.
24    Q.  And where did you work after high

6

1 BY MR. KSIAZEK:
2    Q.  Okay.  So you said you worked for three
3 years for Clean Way, for four years as a garbage
4 man, so that would be about 1995 when you left
5 the city as a garbage man?
6    A.  Well, no, because I was working for
7 Clean Way while I was still in school.
8    Q.  Okay.  So when did you leave the city
9 as a garbage man?
10    A.  I believe it was '92.
11    Q.  And is that when you went to become an
12 officer?
13    A.  Correct.
14    Q.  Okay.  Did you go to college in 1992?
15    A.  I was going to night classes.
16    Q.  You were going to night classes.
17    When did you go to night classes?
18    A.  I'm trying to think exactly what year
19 it was, because I just took several classes in
20 criminal justice.
21    Q.  Do you recall if it was when you were
22 working for Clean Way or for when you were
23 working as a garbage man?
24    A.  Garbage man.

8

2 (Pages 5 to 8)

Q. Where did you take these night classes?
A. Daley College.
Q. Do you recall how long -- for how many years you took these classes?
A. Two years.
Q. Did you graduate with a degree?
A. No.
Q. Okay. So 1992, did you become an officer with the city?
A. No.
Q. Okay. Where did you -- what did you do after working as a garbage man?
A. I became a police officer with the Cook County Forest Preserve Police.
Q. What were -- what was your job title as a Cook County Forest Preserve? Were you a patrol officer?
A. Yes.
Q. What were your duties as a patrol officer with the forest preserve?
A. Patrol the forest preserves.
Q. Did you have a -- what was your assignment during that time?
A. My assignment?

9

Q. Yes. Did you work in a specific forest preserve?
A. No. Anywhere in Cook County.
Q. Okay. How long did you work for the Cook County Forest Preserve?
A. For, let's see, I believe it was three years over.
Q. And why did you leave the Cook County Forest Preserve?
A. For another job.
Q. Were you ever disciplined as part of your job at the Cook County Forest Preserve?
A. No.
Q. Did you ever get written up when you worked for the Cook County Forest Preserve?
A. No.
Q. So what job did you -- what job did you acquire after you worked for the Cook County Forest Preserve?
A. I then had worked for the Department of Streets and Sanitation for the City of Chicago as a foreman.
Q. As a foreman you said?
A. Correct.

10

Q. And this was approximately 1995?
A. Approximately.
Q. How long did you work for Department of Streets and Sanitation?
A. Until 2005.
Q. And what did you do in 2005?
A. I then resigned from the City of Chicago.
Q. Why did you resign?
A. To become a police officer.
Q. And where were you employed in 2005 as a police officer?
A. I was a -- I always did part-time in between all this. I was a Crestwood Police officer and I did the Merrionette Park part-time.
Q. Okay. So you worked at Crestwood?
A. Crestwood.
Q. And Merrionette Park?
A. Merrionette Park. I was doing that part-time.
Q. Do you recall what years you were working at Crestwood part-time?
A. I would say -- Crestwood or?

11

Q. Just Crestwood for now.
A. I believe it was -- it was so long ago.
Q. Go ahead.
A. Maybe '93, '95. I'm not sure.
Q. Do you mean 1993 to 1995 or '93 or '95?
A. '93 or '95. I'm not sure what year I started over.
Q. Okay. How long did you work there part-time?
A. Two years.
Q. And why did you leave Crestwood?
A. To go to Merrionette Park. I just jumped around.
Q. And were you ever disciplined as part of your duties at Crestwood while you were a part-time officer there?
A. No.
Q. Were you ever written up?
A. No.
Q. So how long did you work for Merrionette Park as a part-time officer?
A. 2000 to 2007.
Q. How many hours did you work part-time for Crestwood on, let's say, a weekly basis?

12

3 (Pages 9 to 12)

1    A.  It was only approximately 12 hours a
2  week.
3    Q.  Do you recall what shift you worked?
4    A.  Nights.
5    Q.  Would that be the first shift maybe?
6    A.  Midnights.
7    Q.  Midnight shift.
8        And how many hours a week did you work
9  for Merrionette Park part-time?
10    A.  It was approximately two days a week,
11  too, so that was like -- the shifts are usually
12  six hours or 12 hours, too.  When they're
13  part-time, they're not a full eight hours.
14    Q.  And would you still work the night
15  shift for Merrionette Park?
16    A.  Yes.
17    Q.  Were you ever disciplined when you
18  worked for Merrionette Park?
19    A.  No.
20    Q.  And did you ever receive any write-ups
21  when you worked there?
22    A.  No.
23    Q.  What were you a patrol officer for --
24    A.  Yes.

13

1  University of Chicago?
2    A.  January of '07.
3    Q.  Is that why you left your part-time
4  position with Merrionette Park?
5    A.  Yes.
6    Q.  Okay.  Have you ever served in the
7  military?
8    A.  No.
9    Q.  Okay.  Officer, how tall are you?
10    A.  Five eleven.
11    Q.  And how much do you weigh?
12    A.  Approximately 200.
13    Q.  How old are you?
14    A.  40.
15    Q.  So do you still work for the
16  University of Chicago Police Department?
17    A.  Yes.
18    Q.  And you've worked for the University of
19  Chicago since January of '07 through today's
20  date?
21    A.  Correct.
22    Q.  Have you had any other jobs in between
23  January '07 and today's date?
24    A.  No.

15

1    Q.  -- Crestwood?
2        And a patrol officer for
3  Merrionette Park?
4    A.  Yes.
5    Q.  Did you have a beat that you were
6  assigned to?
7    A.  No.
8    Q.  So how would you get your assignments?
9    A.  Just dispatch.
10    Q.  And is that the same with
11  Merrionette Park?
12    A.  Yes.
13    Q.  You didn't have an assigned beat?
14    A.  No.
15    Q.  So when did you start working for the
16  City of Chicago as a police officer?
17    A.  I never was a police officer.
18    Q.  Oh, I'm sorry.
19        Okay.  Where did you -- when did you
20  obtain a full-time police officer job?
21    A.  I was full-time with the forest
22  preserve and then I became with the
23  University of Chicago.
24    Q.  When did you start with the

14

1    Q.  So what is your position with the
2  University of Chicago?
3    A.  My current position?
4    Q.  Yes.
5    A.  I'm a sergeant with patrol.
6    Q.  And what does that -- what does being a
7  sergeant entail?  What are your duties?
8    A.  Just supervisor.  I supervise
9  patrolmen.
10    Q.  Do you go on patrol yourself?
11    A.  Yes.
12    Q.  On October 18, 2008, what was your
13  rank?
14    A.  Patrolman.
15    Q.  Okay.  When did you become a sergeant?
16    A.  August 9 of this year.
17    Q.  Can you describe the training or did
18  you receive any training to become a police
19  officer at the University of Chicago?
20    A.  With the University of Chicago?
21    Q.  Yes.
22    A.  Just basic house training they call it,
23  which is you just learn their certain areas,
24  beats.

16

4 (Pages 13 to 16)

1    Q. Do you remember how long this training
2  was?
3    A. The university's training, I believe it
4  was six weeks.
5    Q. Did you receive any other training
6  besides basic -- or, actually, let's go back.
7    What do you mean by "basic house
8  training"?
9    A. Well, I did my initial training with
10  the Chicago Police Academy when I became a
11  forest preserve police. But when you go to
12  different departments, they have different
13  ordinances and reports and you just generally
14  learn their areas and reports.
15    Q. Do you know when you received your
16  basic training, what year, when you went to the
17  forest preserve?
18    A. I believe that was when I started at
19  the forest preserve. It was either '93 or '95.
20  It was -- you go to the Chicago Police Academy
21  for 16-week training.
22    Q. Okay. What shift do you currently
23  work?
24    A. Midnights.
                                                    17

1    Q. And were you working that same shift on
2  October 18, 2008?
3    A. Yes.
4    Q. Were you working with a partner on
5  October 18, 2008?
6    A. Yes.
7    Q. Who were you working with?
8    A. Officer Moore.
9    Q. Do you know how long Officer Moore had
10  been working for the University of Chicago
11  Police Department on October 18, 2008?
12    A. He was just recently hired.
13    Q. And do you know why you were assigned
14  to work with Officer Moore?
15    A. They just -- in the roll call room,
16  they just assign people to each other. You
17  don't pick.
18    Q. Had you worked with Officer Moore
19  previous to October 18, 2008?
20    A. No.
21    Q. So this is your first time working with
22  him?
23    A. Correct.
24    Q. Was it your understanding that you were
                                                    18

1  training Officer Moore on October 18, 2008?
2    A. Yes.
3    Q. Were you given special instructions in
4  regards to how to train Officer Moore on
5  October 18, 2008?
6    A. No.
7    Q. So what is your understanding of what
8  your duties were in regards to training
9  Officer Moore?
10    A. Basically just show him the area
11  because he's a Chicago Police officer, so he has
12  all the training he needs.
13    Q. So basically you were just driving --
14    A. Showing him the area, our boundaries.
15    Q. Okay. Were you driving a patrol car
16  that day --
17    A. Yes.
18    Q. -- on October 18?
19    MR. PUISZIS: Let him finish his question
20  before you answer.
21    BY MR. KSIAZEK:
22    Q. Can you just briefly describe what a
23  University of Chicago patrol car looks like.
24    A. They're all white with lettering on the
                                                    19

1  side that says Police. It's, like, a maroon
2  color and underneath it says University of
3  Chicago.
4    Q. And do you know what beat you were
5  working on October 18, 2008?
6    A. 109.
7    Q. What are the boundaries of Beat 109?
8    A. That would be 61st to 64th, then it
9  would be Cottage Grove to Lake Shore Drive.
10    Q. And who was driving the patrol car on
11  October 18, 2008?
12    A. Officer Moore.
13    Q. Why was he driving that day?
14    A. He chose to.
15    Q. As a University of Chicago Police
16  officer, what is your jurisdiction?
17    MR. PUISZIS: Objection, I'm not sure I
18  understand the question.
19    BY MR. KSIAZEK:
20    Q. Let me see if I can clarify. What --
21  do you have a separate jurisdiction from the
22  Chicago Police Department?
23    MR. PUISZIS: Again, I object, I'm not sure I
24  understand.
                                                    20

5 (Pages 17 to 20)

1    MS. GIBBONS: Join in the objection.
2  BY MR. KSIAZEK:
3    Q.  Does your boundaries -- does University
4  of Chicago's boundaries overlap with the
5  Chicago Police's boundaries with their
6  jurisdiction?
7    MS. GIBBONS: Objection, vague.
8  BY MR. KSIAZEK:
9    Q.  If you know.
10   A.  Do they overlap?
11   Q.  Yes.
12   A.  What do you mean by "overlap"?
13   Q.  Well, let's say hypothetically you were
14  to pull someone over, does the University of
15  Chicago have sole jurisdiction over an area or
16  does it overlap with the Chicago Police
17  Department? I guess I'm asking do you work in
18  conjunction with the University of Chicago --
19  or, I'm sorry, the Chicago Police Department or
20  do you have your own separate area?
21   MR. PUISZIS: You mean, do they -- certain
22  areas they patrol exclusively without any
23  City of Chicago?
24   MR. KSIAZEK: That would be a better

21

1  question, yes.
2  BY MR. KSIAZEK:
3    Q.  Are there any areas that you patrol
4  exclusively where the city does not?
5    A.  No.
6    Q.  What is the extent of the University of
7  Chicago's police powers?
8    A.  As to what? What do you mean?
9    Q.  Can you arrest a suspect?
10   A.  We detain for the City of Chicago.
11   Q.  What do you mean by "detain"?
12   A.  Well, we don't actually make the full
13  arrest. Chicago Police Department makes the
14  arrest. They do the processing and everything.
15  We assist them in calls and we detain people for
16  the City of Chicago.
17   Q.  Do you write reports?
18   A.  We write our own reports.
19   Q.  Do you have the occasion to look at any
20  reports of stolen vehicles? Can you see whether
21  or not a vehicle is stolen on your computer?
22   A.  On a computer?
23   Q.  Yes. Well, actually, let me go back.
24  Do you have a computer in your car, your patrol

22

1  car?
2    A.  Yes.
3    Q.  And did you have a computer in your car
4  on October 18, 2008?
5    A.  No.
6    Q.  So on October 18, 2008, you didn't have
7  the opportunity to look whether or not a car was
8  stolen?
9    A.  Repeat that question.
10   Q.  Sure. On October 18, 2008, you were
11  working without a computer, right?
12   A.  Correct.
13   Q.  So if you got information from a
14  suspect, could you look up any information about
15  that suspect on -- in any way?
16   A.  If I had a computer, I could.
17   Q.  How would you receive information from
18  a suspect without a computer?
19   A.  Through a radio.
20   Q.  So on October -- in October 2008, you'd
21  have to radio to dispatch to get information --
22   A.  Correct.
23   Q.  -- about a suspect?
24   And if you were to run a plate for

23

1  instance, you'd have to radio that to dispatch,
2  too?
3    A.  Yes.
4    Q.  Okay. Did you have the occasion to be
5  at approximately 1435 East 53rd Street that
6  night on October 18, 2008?
7    A.  Was I there? Yes.
8    Q.  Do you recall what time you were there?
9    A.  Approximately 2:30 in the morning.
10   Q.  What were you doing on 53rd Street at
11  about 2:30 in the morning?
12   A.  I was -- went for coffee at Dunkin'
13  Donuts.
14   Q.  Do you know if that Dunkin' Donuts is
15  open 24/7?
16   A.  Yes.
17   Q.  Was Officer Moore with you at that
18  time?
19   A.  Yes.
20   Q.  So both Officer Moore and yourself went
21  inside the Dunkin' Donuts for coffee?
22   A.  Correct.
23   Q.  And what happened after you got the
24  coffee from Dunkin' Donuts?

24

6 (Pages 21 to 24)

1    A.  As we proceeded to exit the building,
2  we heard a car horn, and when we opened the
3  door, we walked out, we seen a car with the horn
4  driving past.
5    Q.  So you heard the horn while you were
6  inside Dunkin' Donuts?
7    A.  The doorway, we were coming out, just
8  about outside the door.  Were in the door.
9  There's two doors.
10    Q.  Okay.  When you say there's two
11  doorways, was the first -- let's say, the main
12  entrance door, was that door open?
13    A.  The street -- from the street side or
14  inside?
15    Q.  From the street side.
16    A.  No.
17    Q.  Was the inside door, as you say, the
18  second door, not the street door, but the inside
19  door, was that door open?
20    A.  No.
21    Q.  So both doors were closed --
22    A.  Closed, correct.
23    Q.  -- when you heard the horn?
24    A.  Correct.
                                           25

1    Q.  Can you describe the horn noise that
2  you heard when you were inside the Dunkin'
3  Donuts?
4    A.  Just a consistent, like, horn.  It
5  didn't -- it was consistent.  It wasn't a
6  beeping.  It was just a --
7    Q.  Was it loud or --
8    A.  Yes.
9    Q.  -- was it soft?
10    A.  Loud.
11    Q.  Did -- after you heard this horn, did
12  you look up to see if there was a car that this
13  horn was coming from?
14    A.  Yes.  We seen a car drive by with the
15  horn blowing still.
16    Q.  So when you first heard the horn, did
17  you see a car at that point?
18    A.  No.
19    Q.  When did you first see the car?
20    A.  As we exited the building.
21    Q.  Approximately how much time had passed
22  in between when you first heard the horn and
23  when you saw the car?
24    A.  Seconds.
                                           26

1    Q.  And what did you do once you first
2  noticed this car?
3    A.  I proceeded to walk into my patrol car.
4    Q.  Did Officer Moore do the same thing?
5    A.  Yes.
6    Q.  Did you keep the car in your sight as
7  you were heading towards your patrol car?
8    A.  Yes.
9    Q.  What did you notice, if anything, about
10  the car as you were walking towards your own
11  car?
12    A.  I noticed that the car pulled over
13  abruptly and hit the curb with the tires.
14    Q.  All right.  How far away was -- let's
15  go back.
16    In what direction of travel was the car
17  that the horn was going off?  What direction of
18  travel was that car traveling?
19    A.  Eastbound on 53rd.
20    Q.  And as I understand it, 53rd Street is
21  an east/west street?
22    A.  Correct.
23    Q.  And your own car was parked in front --
24    A.  Correct.
                                           27

1    Q.  -- of the Dunkin' Donuts?
2    A.  Correct.
3    MR. PUISZIS:  Let him finish his question
4  before you answer it, okay?
5  BY MR. KSIAZEK:
6    Q.  And what car was -- or what direction
7  was your car facing when it was parked on the
8  street?
9    A.  Eastbound.
10    Q.  Okay.  You said that the car pulled
11  over and abruptly hit the curb with its tires.
12  How far away when you exited the Dunkin' Donuts
13  was this car from you at that point?
14    A.  When I exited the door?
15    Q.  Right.  When you first exited the
16  Dunkin' Donuts, how far away was the car with
17  the horn away from you?
18    A.  It was right in front of us.
19  Approximately 20 feet then.
20    Q.  So if you were to walk straight ahead
21  about 20 feet, you would have gotten straight to
22  the car?  Was it right in front of you on the
23  street in your field of vision or was it to your
24  left or right?
                                           28

7 (Pages 25 to 28)

```
 1     A.  When I opened the door, it was right in
 2  front of me.
 3     Q.  So straight ahead in your field of
 4  vision?
 5     A.  Correct.
 6     Q.  And how long -- how much time had
 7  passed between when you saw the car as you were
 8  walking outside the Dunkin' Donuts and when it
 9  pulled over and hit the curb as you stated?
10     A.  How long was it?
11     Q.  Yeah.  How much time had passed?
12     A.  A minute or so.
13     Q.  Approximately how far had the car
14  traveled from what you could tell?
15     A.  From where, the curb?
16     Q.  Right.  I'm sorry, when you first saw
17  it as you walked outside the Dunkin' Donuts to
18  when it can curbed, yes.
19     A.  How far from the point where I seen it
20  to the point where it curbed, how far was that
21  distance?
22     Q.  Correct.  Yes.
23     A.  Approximately 75 feet, 100 feet.
24     MR. PUISZIS:  So a minute or so it took to
                                                    29
```

```
 1  the car curbed, the horn --
 2     A.  The noise stopped, correct.
 3     Q.  Now, you say that the car pulled over
 4  and abruptly hit the curb with its tires.  Can
 5  you describe how this occurred?
 6     MR. PUISZIS:  Objection, asked and answered.
 7  You can go ahead and answer it again.
 8     THE WITNESS:  It pulled over at a quick
 9  speed, hit the curb and stopped.
10  BY MR. KSIAZEK:
11     Q.  Did you actually see the tires hit the
12  curb itself?
13     A.  Yes.
14     Q.  How much force, I guess, would you say
15  the tires struck the curb with?
16     MR. PUISZIS:  Objection, characterization.  I
17  don't know that I understand the question, "how
18  much force".
19     MS. GIBBONS:  Join in the objection.
20  BY MR. KSIAZEK:
21     Q.  Was it -- did it hit it strongly?  Did
22  it sort of bump up against the curb?
23     MR. PUISZIS:  Objection, I don't understand
24  the question.  But if you understand the
                                                    31
```

```
 1  travel that distance?
 2     THE WITNESS:  As soon as I seen the car, it
 3  curbed.
 4  BY MR. KSIAZEK:
 5     Q.  Was there a lot of traffic on that
 6  night?
 7     A.  I don't recall seeing cars out there.
 8     Q.  So as far as you recall, this was the
 9  only car --
10     A.  Correct.
11     Q.  -- that was out there?
12     Now, at any point, did the horn stop
13  going off in between when you first saw the car
14  outside the Dunkin' Donuts and when it pulled
15  over to the curb?
16     A.  When did it stop?
17     Q.  At any point, did it stop in between
18  when the car -- when you first saw the car and
19  when it pulled over the curb?
20     A.  It stopped when the car curbed.
21     Q.  Did it immediately stop once it curbed
22  or was it a few seconds after or --
23     A.  I don't recall.
24     Q.  But you just recall about the time when
                                                    30
```

```
 1  question, you can go ahead and answer it.  I'm
 2  not sure if anyone can talk about how strongly
 3  something bumps a curb.
 4     MS. GIBBONS:  I join.
 5  BY MR. KSIAZEK:
 6     Q.  If you know.
 7     A.  No.
 8     Q.  Did you see the car shake at any point
 9  when it hit the curb?
10     A.  Yes.
11     Q.  Can you describe how the car shook when
12  it hit the curb?
13     A.  Side to side.
14     Q.  How -- approximately how many times did
15  it shake?
16     A.  It just shook.  I wasn't counting.
17     Q.  Did you have any conversation with
18  Officer Moore when you first heard the horn
19  sounding?  Did you say anything to him and did
20  he say anything to you?
21     A.  Officer Moore stated let's check the
22  car out.
23     Q.  Was this when you were still inside the
24  Dunkin' Donuts?
                                                    32
```

8  (Pages 29 to 32)

1    A.  As we were walking to our vehicle.
2    Q.  So this was after the car had gone past
3  you?
4    A.  Yes.
5    Q.  Did you say anything in response to
6  Officer Moore when he said let's check out the
7  vehicle?
8    A.  No.
9    Q.  So what did you proceed to do after you
10  saw the car hit the curb?
11    A.  Well, at that time, I was inside
12  sitting down in the passenger side and I just --
13  I just kept staring at the car the whole time
14  when Officer Moore pulled up.
15    Q.  Okay.  Where -- were you inside the car
16  when you saw the car with the horn actually hit
17  the curb?
18    A.  I was getting into the car.
19    Q.  So you were in the process of getting
20  into your car?
21    A.  Correct.  Looking at the car.
22    Q.  Now, can you describe the vehicle that
23  you saw that the horn was going off in?
24    A.  It was a silver Chrysler, four-door.
                                                33

1    Q.  Did you say anything in response?
2    A.  I said okay.
3    Q.  And what did you understand him to mean
4  by that statement?
5    A.  To what?
6    MR. PUISZIS:  Objection, calls for a
7  characterization.
8  BY MR. KSIAZEK:
9    Q.  Well, what is your understanding of
10  that statement?
11    A.  Say it again.
12    Q.  What did you understand that statement
13  to mean, by he said let's make sure everything
14  was all right?
15    A.  To check the safety concerns of that
16  vehicle.
17    Q.  Did you -- at that point when you got
18  into the car and the horn was going off, did you
19  think that the vehicle was stolen?
20    A.  Possible.
21    Q.  And why did you think that?
22    A.  Because the horn was going off.
23    Q.  What about the horn going off made you
24  think that the vehicle might be stolen?
                                                35

1    Q.  Do you know what year it was?
2    A.  No.
3    Q.  Did you turn on your lights once you
4  got inside the vehicle?
5    A.  I don't recall.  I wasn't driving.
6    Q.  Okay.  Do you recall if Officer Moore
7  turned on the lights once you got in the
8  vehicle?
9    A.  No, I don't recall.
10    Q.  So are you unsure whether or not the
11  lights were on?
12    MR. PUISZIS:  He said he didn't know.  He
13  doesn't remember.  So, I mean, I don't know how
14  he can say anything more if he doesn't remember.
15  Objection, sorry.
16  BY MR. KSIAZEK:
17    Q.  Approximately how long did it take for
18  you -- yourself and Officer Moore to travel to
19  the -- where the vehicle had curbed itself?
20    A.  A couple minutes.
21    Q.  Did you have any conversations with
22  Officer Moore once you were inside the vehicle?
23    A.  He just said let's make sure
24  everything's all right with this car.
                                                34

1    A.  Because most older cars, the alarm
2  system is a horn.
3    Q.  Did this car appear to you to be a
4  newer car or an older car?
5    A.  It looked older.
6    Q.  And did you have any other reason to
7  believe that this vehicle was stolen besides the
8  fact that the horn was going off?
9    A.  No.
10    Q.  Did you tell Officer Moore that you
11  believed that this vehicle might be stolen while
12  you were inside your car?
13    A.  No.
14    Q.  Did you tell dispatch that you thought
15  you might be in pursuit of a stolen car?
16    A.  No.
17    MR. PUISZIS:  Objection, the car was already
18  stopped.
19    MS. GIBBONS:  Join in that objection.
20  BY MR. KSIAZEK:
21    Q.  Did you call -- did you tell officer --
22  did you tell dispatch that you were stopping to
23  investigate a possible stolen car?
24    A.  No.
                                                36

9 (Pages 33 to 36)

1    Q.  So did you have any information about
2    the vehicle when you -- yourself and
3    Officer Moore stopped except for the -- about
4    the Chrysler that you spoke of besides the fact
5    that the horn was going off, any other
6    information about the vehicle?
7        MR. PUISZIS:  At what point?
8        MR. KSIAZEK:  When they first stopped their
9    car next to the --
10       MR. PUISZIS:  Oh, when the officer stopped.
11       MR. KSIAZEK:  When the officer stopped --
12   right, I'm sorry.
13       THE WITNESS:  Repeat that.
14   BY MR. KSIAZEK:
15       Q.  Sure.  Did you have any information
16   about the Chrysler when yourself and Officer
17   Moore stopped your vehicle next to the Chrysler?
18       A.  No.
19       Q.  So the only thing you knew about the
20   Chrysler was that the horn was going off?
21       A.  Correct.
22       Q.  Okay.  Did you notice -- what did you
23   notice as you were driving towards the Chrysler,
24   if anything?
37

1        A.  I noticed when it hit the curb, two
2    people got out quickly and walked away from my
3    eyesight.
4        Q.  And where were these two people --
5    where did these two people exit from in the car,
6    was it the driver's side or the passenger's
7    side?
8        A.  One was the driver, the other one was
9    the passenger rear.
10       Q.  And approximately -- you said they
11   walked out of your eyesight.  Approximately how
12   far from you did they walk?
13       A.  To the corner.
14       Q.  Do you know if there's any businesses
15   or stores on that corner where they walked
16   towards?
17       A.  There's a lot of businesses and stores.
18       Q.  What businesses and stores are on
19   53rd Street along this area that we're talking
20   about right now?
21       MR. PUISZIS:  You mean that are open at 2:30
22   in the morning?
23       MR. KSIAZEK:  I'm just talking about in
24   general.
38

1        THE WITNESS:  I mean, quite a few.  There's a
2    bank.  There's a Boston Market.  There's quite a
3    few, but nothing open at that time.
4    BY MR. KSIAZEK:
5        Q.  Well, you said there was a bank, right?
6        A.  Correct.
7        Q.  And according to your knowledge, you
8    could possibly access the ATMs at 2 o'clock in
9    the morning?
10       A.  Yes, they're 24 hours.
11       Q.  And you said the Dunkin' Donuts was
12   open 24/7, right?
13       A.  Correct.
14       Q.  You said these two people walked away
15   from your eyesight?
16       A.  Correct.
17       Q.  Did they ever run or jog?
18       A.  No.
19       Q.  Was there anything suspicious about the
20   fact that they walked away from the car?
21       A.  Yes, with the horn going -- when the
22   car curbed so quick at 2:30 in the morning, you
23   know, two gentlemen exited the vehicle right
24   away, we thought there might be a problem.
39

1        Q.  And did you ever try to go after this
2    driver and passenger of the car?
3        A.  No.
4        Q.  Why not?
5        A.  Because we grabbed the other guy who
6    exited the vehicle out at the same -- later.
7    That's who we stopped, was Mr. Boyle.
8        Q.  Okay.  Where were you when you saw the
9    driver and passenger get out of the car?
10       A.  I was in the passenger seat of the
11   squad car.
12       Q.  Okay.  How far away were you from the
13   Chrysler?
14       A.  Ten feet.
15       Q.  So were you still approaching the
16   Chrysler or were you stopped?
17       A.  Approaching it.
18       Q.  So you were about ten feet from the
19   Chrysler and you had not stopped yet?
20       A.  Correct.
21       Q.  Was the street lighted at 2:30 in the
22   morning?
23       A.  Yes, there's streetlights.
24       Q.  Did you say anything to Officer Moore,
40

10  (Pages 37 to 40)

1    did Officer Moore say anything to you when you
2    observed these individuals -- the two
3    individuals exit the car from the driver and
4    passenger side?
5        A.  No.
6        Q.  Did you radio to dispatch for backup
7    once you saw these two individuals leave their
8    car?
9        A.  No.
10       Q.  Why not?
11       A.  First we were trying to find out what
12   the problem was.
13       Q.  So did you feel that the problem, the
14   horn going off, was more important than these
15   two individuals walking away from the car?
16       A.  No.  There was two other individuals
17   still there.
18       Q.  So at some point, did you actually --
19   did Officer Moore actually stop the car --
20       A.  Yes.
21       Q.  -- next to the Chrysler?
22       A.  Yes.
23       Q.  Where in relation to the Chrysler did
24   Officer Moore park your patrol car?

41

1        A.  I don't recall the exact spot.
2        Q.  Was it behind the Chrysler?
3        A.  I don't remember.
4        Q.  Let me ask it this way:  When you
5    left -- when you exited the vehicle, in what
6    direction did you have to travel to approach the
7    Chrysler?
8        A.  When I stepped out, my door was right
9    there by the car, so we were just a matter of
10   feet away.
11       Q.  So if I understand this correctly, when
12   you opened your door and you stepped out, was
13   the Chrysler to your right?
14       A.  Yes.
15       Q.  And approximately how many feet was in
16   between yourself -- or, I'm sorry, your patrol
17   car and the Chrysler?
18       A.  Ten feet.
19       Q.  Was that from your passenger side door
20   to the driver's side door of the Chrysler?
21       A.  I don't recall if -- you're saying that
22   if my door was next to the driver's door?
23       Q.  Right.  So you said you don't recall
24   whether you parked alongside the Chrysler or if

42

1    you're parked behind, right?
2        A.  Correct.
3        Q.  Okay.  But you did say that when you
4    opened your door, it was about ten feet from --
5    to walk to the Chrysler, right?
6        A.  Correct.
7        Q.  And so -- and you said you -- did you
8    say which direction you walked towards to get
9    towards the Chrysler?
10       A.  Just walked right -- straight to the
11   Chrysler.
12       Q.  Straight.  So if 53rd Street is an
13   east/west street, do you know if you walked
14   north or south?
15       A.  I don't remember.  The whole time I was
16   watching the people in the car and the car.  I
17   just jumped out of the car.  I can't recall
18   exactly where our car was positioned.
19       Q.  So if you were watching the people in
20   the car, does that mean that you were able to
21   look out your passenger side window and you
22   could see the people and the car when you looked
23   to your right outside your passenger side
24   window?

43

1        A.  When I first seen the people, I was
2    looking at them through the --
3        Q.  Through the front?
4        A.  -- through the front windshield,
5    correct, because we were still in motion.
6        Q.  Okay.  Was there a point when you were
7    able to look to the right and see the people?
8        A.  No, but --
9        Q.  You were always looking -- I'm sorry, I
10   didn't mean to interrupt.
11       A.  No.  They were -- like I said, I was
12   watching them when they exited the vehicle.  At
13   the time, we were still in motion and I was
14   watching them through the windshield.
15       Q.  Were you always watching the people
16   through the windshield or did you ever look to
17   your right and see the people through the -- to
18   the right window there?
19       A.  I don't recall.  I don't.
20       Q.  You said you were observing the people
21   in the car, though, right?
22       A.  Yes.
23       Q.  So what did you see -- once your
24   vehicle was stopped, what did you see the people

44

11  (Pages 41 to 44)

1   in the car do?
2       A.  What did I see the people in the car
3   do?  They exited the vehicle.  You're talking
4   about the driver and the --
5       Q.  Well, I'm actually speaking about -- so
6   you saw the driver and the passenger exit the
7   vehicle?
8       A.  Correct.
9       Q.  How many other people -- were there any
10  other people in the car?
11      A.  Yes.
12      Q.  How many other people were in the car?
13      A.  Two.
14      Q.  And can you describe these individuals
15  that were in the car?
16      A.  One was a female in the front seat,
17  passenger front.
18      Q.  Okay.
19      A.  And then Mr. Boyle had exited the
20  vehicle as we stopped and got out of the car.
21      Q.  So right as you stopped, right as you
22  stopped your vehicle, was that when Mr. Boyle
23  got out of his car?
24      A.  He was already getting out of his car.
                                                45

1   your car?  When you saw -- what did you do after
2   you got out of your car?
3       A.  I approached Mr. Boyle.
4       Q.  What did Officer Moore do at that
5   point?
6       A.  He exited the vehicle.  We both
7   approached Boyle.
8       Q.  As you approached Mr. Boyle, what was
9   he doing at that point?
10      A.  He was looking under the hood.
11      Q.  Was his back to you as you approached
12  him?
13      A.  Yes.
14      Q.  And was he bent over, like, inside the
15  hood there?
16      A.  Yes.
17      Q.  How far away were you from Mr. Boyle
18  when you -- at that point?
19      MR. PUISZIS:  At what point?  Objection.
20  BY MR. KSIAZEK:
21      Q.  Okay.  When -- did you have a
22  conversation with Mr. Boyle?
23      A.  I asked him a question.
24      Q.  Okay.  How far away from Mr. Boyle were
                                                47

1   Everybody was exiting the car.  Two people
2   exited, they walked, Boyle exited a couple
3   seconds later after those other two.
4       Q.  And when Boyle exited, you had not
5   stopped your car yet, though?
6       A.  No.
7       Q.  Where did Mr. Boyle go?
8       A.  To the front of the car and opened the
9   hood.
10      Q.  Were you stopped when you saw Mr. Boyle
11  go to the front of the car?
12      A.  Yes, we stopped.
13      Q.  Okay.  When you were stopped -- right
14  at the point where you were stopped, where was
15  Mr. Boyle?
16      A.  At the front of the car.
17      Q.  And so you were -- were you still in
18  the car when he opened up the hood?
19      A.  Yes.  I was exiting the vehicle at the
20  time he was opening up the hood.
21      Q.  Did Mr. Boyle walk or run when he
22  walked -- went to the hood of the car?
23      A.  Walked.
24      Q.  And when did you actually get out of
                                                46

1   you when you asked him this question?
2       A.  Maybe a foot.
3       Q.  Were you directly behind him when
4   you -- about a foot behind him at that point?
5       A.  Yes, I was right behind him.
6       Q.  What did you ask Mr. Boyle?
7       A.  I said, whose car is this?
8       Q.  And what did he say?
9       A.  Why?
10      Q.  What did you say in response?
11      A.  I said, do you have any identification
12  on you?
13      Q.  And what was his response to your
14  question?
15      A.  He didn't respond.
16      Q.  Was -- when you were having this
17  conversation with Mr. Boyle, was he continuing
18  to be -- was he still underneath the hood?
19      A.  No.  He turned around and faced us.
20      Q.  And when did he turn around to face
21  you?
22      A.  When I asked him the question.
23      Q.  Why did you ask him whose car it was?
24      A.  Because I wanted to know whose car it
                                                48

                    12  (Pages 45 to 48)

1   was.
2       Q.  And why did you ask him for ID?
3       A.  Why?
4       Q.  Yes.
5       A.  Because normally everyone we stop on
6   the street, we usually try to get a piece of
7   identification for the person so you know who
8   you're talking to.
9       Q.  Did you identify yourself as an
10  officer?
11      A.  Did I identify myself?
12      Q.  As an officer, yes.
13      A.  No. I had a uniform on.
14      Q.  You didn't say I'm Officer Torres,
15  though?
16      A.  No.
17      Q.  You said he didn't respond after you
18  asked him for ID, right?
19      A.  Correct.
20      Q.  So what happened after you asked him
21  for identification?
22      A.  Officer Moore then asked him to step
23  over by our car.
24      Q.  Did Officer Moore at any point identify
                                              49

1       after that?
2       A.  Well, in the process of asking, he
3   said, sir, could you step over by the car and he
4   went to guide his arm towards our car and that's
5   when Mr. Boyle became aggressive and he pulled
6   away and pushed Officer Moore's arm away.
7       Q.  Did Mr. Boyle say anything in response
8   to Officer Moore's question to step over by the
9   car -- or direction to step over by the car?
10      A.  Did he say anything?
11      Q.  Yeah, did Mr. Boyle say anything in
12  response?
13      A.  No.
14      Q.  And you said that Officer Moore guided
15  Mr. Boyle's arm over to the car. Can you
16  describe how he did this?
17      A.  Describe it?  He, with his hand, like,
18  pushing away towards the car to guide him
19  towards the car.
20      Q.  Did he grab his arm?
21      A.  No.
22      Q.  Did he touch officer -- I'm sorry, did
23  he touch Mr. Boyle?
24      A.  His arm.
                                              51

1   himself as an officer?
2       A.  No.
3       Q.  And you said you noticed that there was
4   a female passenger inside the car?
5       A.  Correct.
6       Q.  Did you hear -- did you have a
7   conversation with her -- or, actually, did you
8   hear her say anything while you were having this
9   conversation with Mr. Boyle?
10      A.  No.
11      Q.  Do you recall if the windows on the car
12  were open or closed?
13      A.  Closed.
14      Q.  Were all the windows closed, all four?
15      A.  As far as I could see, yes.
16      Q.  And were there any cars parked ahead or
17  in front of where this Chrysler was parked?
18      A.  No.
19      Q.  So this Chrysler was the only car
20  parked on that side of the street as far as you
21  could tell?
22      A.  Yes.
23      Q.  Okay.  Now, once Officer Moore asked
24  Mr. Boyle to step over by the car, what happened
                                              50

1       Q.  Which part of his arm?
2       A.  It's, like, by his elbow.
3       Q.  So he sort of touched his elbow to sort
4   of guide him over to the car; is that what your
5   testimony is?
6       A.  Yes.
7       Q.  Did he push him over to the car?
8       A.  No.
9       Q.  Did he sort of -- how far -- let me go
10  back.
11          How far did Officer Moore guide
12  Mr. Boyle before he became aggressive?
13          MS. GIBBONS:  Objection, vague.
14          MR. PUISZIS:  You can go ahead and answer it.
15  I mean, did he take a step or something?
16          MR. KSIAZEK:  Sure.
17          MR. PUISZIS:  Did he take two or three steps
18  or take any steps?
19          THE WITNESS:  He didn't take no steps. He
20  just --
21  BY MR. KSIAZEK:
22      Q.  So Officer Moore attempted to push --
23  to place his hand on Mr. Boyle's elbow?
24      A.  Yes.
                                              52

                                    13 (Pages 49 to 52)

1    Q. And Mr. Boyle didn't move at all?
2    A. No. When Officer Moore guided him over
3  to the car, that's when he pushed away from
4  Officer Moore.
5    Q. Well, how did Officer Moore get him
6  over to the car?
7    A. We didn't.
8    Q. Well, you just said that when --
9    A. He was guiding him to the car to say
10  let's go this way to the car -- by our squad
11  car.
12   Q. Okay. So --
13   A. Because he was in front of his car.
14   Q. Sure.
15   A. So we wanted to bring him over by our
16  car.
17   Q. So did Mr. Boyle walk over to your car
18  by his own volition?
19   A. No. He never walked to our car.
20   Q. So he never was by your car?
21   A. No.
22   Q. Okay. So where -- where in relation to
23  your car and the Chrysler that was there did
24  Mr. Boyle start becoming aggressive?

53

1    A. In front of his car.
2    Q. Did he become aggressive immediately
3  after Officer Moore attempted to guide his arm
4  or had some time passed in between?
5    A. What do you mean by "time passed"?
6    Q. Was there a few seconds when
7  Officer Moore attempted to guide him by his
8  elbow and then he became aggressive or did he
9  immediately become aggressive as soon as
10  Officer Moore touched his elbow?
11   A. Maybe a couple seconds, just like --
12   Q. What do you mean by Mr. Boyle became
13  aggressive?
14   A. He pushed Officer Moore's arm away.
15   Q. And how did he -- how did he push his
16  arm away?
17   A. In a swinging motion, pushed it away.
18   Q. What happened after Mr. Boyle pushed
19  Officer Moore's arm away?
20   A. I then grabbed Boyle's arm and told him
21  to relax.
22   Q. Which arm did you grab of Mr. Boyle's?
23   A. His right arm.
24   Q. Was that the same arm that

54

1  Officer Moore was attempting to guide?
2    A. No.
3    Q. So Officer Moore's attempting to guide
4  his left arm?
5    A. Correct.
6    Q. And you grabbed his right arm?
7    A. Correct.
8    Q. And where were you located in
9  relation -- so were you on Mr. Boyle's right
10  side at that point?
11   A. Directly behind him.
12   Q. You were directly behind him. And
13  where was Officer Moore located?
14   A. In front of him.
15   Q. So what happened after you grabbed his
16  arm and told him to relax?
17   A. Then he became very aggressive and just
18  started basically wrestling with us.
19   Q. Did Mr. Boyle say anything to you after
20  you told him to relax?
21   A. No.
22   Q. Okay. Describe how Mr. Boyle started
23  to wrestle with you.
24   A. As I grabbed his arm, he pulled away

55

1  from me, and then Officer Moore grabbed his
2  other arm and he kept pulling away from us and
3  then we repeatedly told him stop resisting, stop
4  resisting. And then he -- as we were wrestling
5  with him, he grabbed me in a bear hug and he
6  grabbed me and he started running with me into
7  my squad car.
8    Q. Okay. Were you putting him under
9  arrest at this point?
10   A. No. We were just going to do a contact
11  card on him. Any time we stop an individual,
12  you got to do a contact card.
13   Q. So why didn't you tell him to stop
14  resisting?
15   A. Because at the time, we were trying to
16  detain him so we could -- further questions.
17   Q. Why were you trying to detain him for
18  further questions?
19   A. Because he wasn't cooperating.
20   Q. At that point, you just had asked him
21  for his ID, though, right?
22   A. Correct, but then when we pushed away
23  from Officer Moore, he committed battery to an
24  officer.

56

14 (Pages 53 to 56)

1    Q.   But Officer Moore had touched him
2  first, right?
3    A.   Touched his arm, correct.
4    Q.   So by wrestling, is it my understanding
5  that you basically mean that he was trying to
6  pull away from both yourself and Officer Moore?
7    A.   He did both that, plus grabbed me in a
8  bear hug.
9    Q.   How did he grab you in a bear hug? Can
10 you describe that?
11   A.   Wrapped his arms around me and lifted
12 me up?
13   Q.   Did his arms go all the way around you?
14   A.   Yes.
15   Q.   And did they interlock?
16   A.   I don't know if they interlocked.
17   Q.   So he was behind you when he bear
18 hugged you?
19   A.   He was behind me?
20   Q.   Where was he located to you when he
21 bear hugged you?
22   A.   After I grabbed his arm, he pulled
23 away, he then turned towards me.
24   Q.   So he was facing you when he --
                                        57

1    A.   No.
2    Q.   Go ahead.
3    A.   I was directly behind him, and then
4  when he pushed Moore away, I grabbed his right
5  arm. He then turned at me, so he turned his
6  body around at me.
7    Q.   So he was facing you when he turned
8  around towards you, right?
9    A.   When are you talking about?
10   Q.   Right before he bear hugged you.
11   A.   Correct.
12   Q.   He turned and faced you, right?
13   A.   Correct.
14   Q.   So he was facing you, you could see his
15 eyes, --
16   A.   Correct.
17   Q.   -- when he gave you a bear hug?
18   A.   Correct.
19   Q.   And so he wrapped his arms around
20 you -- around your back?
21   A.   Correct.
22   Q.   Did he say anything as he was bear
23 hugging you?
24   A.   No.
                                        58

1    Q.   You said he slammed you into the car?
2    A.   Correct.
3    Q.   What car did he slam you into?
4    A.   My patrol car.
5    Q.   Well, how did you get -- how did he
6  slam you into your patrol car if you were --
7  when you approached him, you were right next to
8  his car -- not his car, the Chrysler?
9    A.   Everything happened so fast. We were
10 twisting and turning. All I know is at the time
11 he grabbed me and he started running -- pushing
12 me, lifted me and I was going backwards, so I
13 don't know how -- which way -- how we spun
14 around, but he wound up pushing me into my
15 patrol car.
16   Q.   Do you know what direction that -- you
17 said he pulled you up and lifted you?
18   A.   Correct.
19   Q.   So do you know what direction he
20 actually --
21   A.   No. I was --
22   Q.   How hard did he slam you against the
23 patrol car?
24   A.   Hard enough to knock the wind out of
                                        59

1  me.
2    Q.   So what happened after he picked you up
3  and slammed you on the patrol car?
4    A.   Officer Moore began trying to get him
5  off me and then I got on the radio and called
6  for assistance.
7    Q.   So you actually called for assistance
8  to dispatch?
9    A.   Correct.
10   Q.   Did -- while -- after Mr. Boyle picked
11 you up and slammed you against the patrol car --
12      MR. PUISZIS:  I don't think he said
13 "against", but subject to the objection.
14      MR. KSIAZEK:  Sure.
15 BY MR. KSIAZEK:
16   Q.   After, let's just say, Mr. Boyle bear
17 hugged you, did he say anything to you at that
18 point?
19   A.   No.
20   Q.   And did you say anything to him?
21   A.   No.
22   Q.   Did Officer Moore say anything?
23   A.   I don't recall.
24   Q.   Did you hear the woman who was located
                                        60

15 (Pages 57 to 60)

1   in the vehicle say anything at this point?
2     A. I don't know. Everything happened so
3   fast.
4     Q. So what happened after you radio to
5   dispatch for help?
6     A. He then turned around and started
7   wrestling with Officer Moore again, and I was
8   trying to grab his legs so we could get him down
9   on the ground. And then next thing I know, the
10   other squads pulled up.
11     Q. Okay. Let's go through that a little
12   bit closer. So you -- he was wrestling with
13   Officer Moore?
14     A. Correct.
15     Q. Can you describe how he was wrestling
16   with Officer Moore?
17     A. He had his back towards me, so they
18   were -- I could just see them two. They were
19   face to face. And then I proceeded to go after
20   Boyle again from behind because now he had his
21   back towards me because he was face to face with
22   Officer Moore.
23     Q. So were they actually touching each
24   other?

61

1     A. They were being physical, correct.
2     Q. What do you mean by "being physical"?
3     A. Well, they were wrestling. I couldn't
4   see exactly what was going on because he had his
5   back to me.
6     Q. Who's -- was that Officer Moore's or
7   Boyle's back?
8     A. Boyle.
9     Q. What did you see Officer Moore doing?
10     A. Trying to detain him. They were both
11   wrestling back and forth.
12     Q. I guess I don't quite understand what
13   you mean by "wrestling". Were they sort of
14   grabbing each other? Were their hands touching?
15   What do you mean?
16     A. Making contact with each other.
17     Q. What parts of their bodies were making
18   contact with each other?
19     A. Their hands and arms.
20     Q. Where was Mr. Boyle's hands and arms
21   coming in contact with Officer Moore?
22     A. Exactly, I don't know. They were --
23   all I could see is Boyle's hands from the rear.
24   I couldn't tell you exactly where he was

62

1   touching Moore.
2     Q. Okay. And where were Officer Moore's
3   hands and arms coming into contact with
4   Mr. Boyle?
5     A. On his hands and arms, too.
6     Q. So were they kind of sort of -- so were
7   both of their hands on their shoulders or where
8   were they -- do you know where they were
9   located?
10     A. No.
11     Q. But at some point, you tried to get his
12   legs, Mr. Boyle's legs?
13     A. Correct.
14     Q. When did you attempt to get Mr. Boyle's
15   legs together?
16     A. After he threw me against the car, then
17   he proceeded to go, you know, after Moore and
18   then that's when he had -- Boyle had his back to
19   me and I -- from behind, I radioed in for
20   assistance and then I went and I tried to grab
21   his legs so we could get him down on the ground.
22     Q. All right. You said you had the wind
23   knocked out of you.
24     A. Correct. This was a couple seconds,

63

1   though, in between here.
2     Q. So how long did you have the wind
3   knocked out of you for?
4     A. Seconds.
5     Q. So for a couple seconds, you had the
6   wind knocked out of you, you got up, you radioed
7   for help?
8     A. Correct.
9     Q. And then you tried to get Mr. Boyle's
10   legs together?
11     A. Correct.
12     Q. What happened when you tried to get his
13   legs together?
14     A. And then the other assisting officers
15   came and then I just -- I kind of -- they took
16   over then, the assisting officers.
17     Q. So where -- what exactly was happening
18   when the assisting officers came? How you tried
19   to get Mr. Boyle's legs together at that point
20   or no?
21     A. I tried, and then when the other units
22   came, I let him go because I was out of wind,
23   and, like I said, they took over from there.
24     Q. Okay. So they arrived after you tried

64

16 (Pages 61 to 64)

1   to get his legs together?
2       A.   Correct.
3       Q.   Was it immediately after or did some
4   time pass in between?
5       A.   As soon as I grabbed his legs, they
6   pulled up, they grabbed him, so I would say
7   immediately then I guess.
8       Q.   At any point was Mr. Boyle on the
9   ground during -- from when you first approached
10  him by the hood and when you tried to get his
11  legs together?
12      A.   No.
13      Q.   Okay. What happened when the other
14  officers arrived after you had tried to get his
15  legs together?
16      A.   I basically -- I stayed right where I
17  was at. I was out of wind. And the other
18  officers, the assisting officers, took care of
19  the situation. From thereon, I didn't -- I was
20  winded. I just kind of leaned over and was
21  gasping.
22      Q.   What do you mean -- or what did you see
23  the other officers do once they arrived at the
24  scene?

                                                    65

1       A.   They tried to place him in custody and
2   he was still wrestling with them.
3       Q.   Do you recall who exactly -- or how
4   many squad cars arrived at the scene?
5       A.   Several.
6       Q.   Do you know any of the officers that
7   did arrive that night?
8       A.   Yes.
9       Q.   Who do you know that arrived that
10  night?
11      A.   Officer Galarza, Officer Gillespie,
12  Officer Mike Kwiatkowski.
13      Q.   Kwiatkowski?
14      A.   Kwiatkowski. A bunch of us and other
15  units, but those are the main officers that
16  actually finally got him down and handcuffed
17  him.
18      Q.   Were those -- those three officers that
19  you stated, Galarza, Gillespie and Kwiatkowski,
20  were those -- did those three officers arrive,
21  as you stated, right after you tried to get his
22  legs together? Were those officers all there?
23      A.   I don't know what order they arrived,
24  but all I know is they were all there.

                                                    66

1       Q.   Okay. And then you did say that
2   Mr. Boyle was still wrestling with these other
3   officers once they arrived. Can you describe
4   how he was wrestling with them?
5       A.   They were trying to get him down on the
6   ground and handcuff him and he was fighting with
7   them.
8       Q.   How were they trying to get him to get
9   down on the ground?
10      A.   I was at the time -- like I said, I was
11  leaning over, so I don't -- I can't recall
12  exactly what they were doing -- how they were
13  doing it because I was then leaning over because
14  I was -- I was gasping for air. I was
15  short-winded.
16      Q.   Well, where were you leaning over?
17      A.   Just leaning over.
18      Q.   Against your car?
19      A.   No.
20      Q.   Just on the side of the road there?
21      A.   On the street.
22      Q.   How long were you leaning over for?
23      A.   Seconds.
24      Q.   So you did see them wrestle with

                                                    67

1   Mr. Boyle, right?
2       A.   Yes.
3       Q.   And you saw them attempt -- the other
4   officers attempt to place him under arrest?
5       A.   Correct.
6       Q.   And what did you see?
7       A.   They were just -- they were telling him
8   stop resisting, to put his hands behind his back
9   and he wouldn't do that. They were trying to
10  grab his arms and place handcuffs on him.
11      Q.   Did he say anything in response to --
12  well, first of all, do you know who told him to
13  stop resisting?
14      A.   I heard several officers saying that.
15      Q.   Specifically do you know which ones
16  said that?
17      A.   No, I couldn't tell you.
18      Q.   And did Mr. Boyle say anything in
19  response when they told him to stop resisting?
20      A.   No.
21      Q.   Okay. Was Mr. Boyle still standing
22  when -- or was he standing when they told him to
23  stop resisting?
24      A.   At that time, they had just gotten down

                                                    68

17 (Pages 65 to 68)

1    on the ground.
2        Q.  Okay.  How did they get him down on the
3    ground?
4        A.  I don't know.
5        Q.  And how was Mr. Boyle on the ground?
6    Was he laying down?  Was he face first?  What
7    position was his body in?
8        A.  When I seen him on the ground, he was
9    facedown on the ground.
10       Q.  Was he doing anything while he was
11   facedown on the ground?
12       A.  Yeah, he was stretching his arms and
13   legs out and swinging.
14       Q.  He was actually swinging while he was
15   down on the ground?
16       A.  Because they were trying to get his
17   hands behind his back and he wouldn't let them.
18       Q.  Okay.  Did you see how Mr. Boyle was
19   brought down to the ground?
20       A.  No.
21       Q.  Okay.  What happened after the other
22   officers were attempting to place him under
23   arrest?  Did they get him under arrest?  Did
24   they get him in cuffs?
                                                69

1        A.  Yes.  Correct.
2        Q.  Did you see them place him in
3    handcuffs?
4        A.  No.
5        Q.  Why didn't you see them place him in
6    handcuffs?
7        A.  Because there were several officers
8    there, and I don't know who placed him in
9    handcuffs, but I was standing right there.  I
10   just couldn't tell you who exactly placed -- are
11   you asking me who put the handcuffs on?
12       Q.  I'm just asking you if you actually did
13   see them, whoever it was, place handcuffs on
14   him?
15       A.  I didn't see exactly, no.  I seen them
16   trying to put the handcuffs, but I didn't know
17   who put the handcuffs on.
18       Q.  So what did they do -- well, how many
19   officers were trying to get the handcuffs on
20   him?
21       A.  Three that I can recall, but there were
22   so many officers around, but I don't remember.
23   Three at the time.
24       Q.  Do you know what Officer Moore was
                                                70

1    doing when they were trying to get the handcuffs
2    on him?
3        A.  No, I don't remember.  I don't know
4    what he was doing.
5        Q.  Did you see him in that area?
6        A.  I don't recall.
7        Q.  Once they did have him in the
8    handcuffs, what did you see the other officers
9    do?
10       A.  After they handcuffed him?
11       Q.  Right.
12       A.  They placed him in the squad car,
13   transported him to the 21st District.
14       Q.  Okay.  Did they have to pull him up or
15   did he stand up voluntarily?
16       A.  I don't recall.  I don't know.
17       Q.  And where on the street was Mr. Boyle
18   actually on the ground in relation to his car --
19   or not his car, excuse me, the Chrysler?
20       A.  I can't recall exactly where he was,
21   because he was just on the street.  Everything
22   happened so fast.
23       Q.  Do you know in relation to your squad
24   car where Mr. Boyle was?
                                                71

1        A.  I can't recall.
2        Q.  Was it in between -- in the distance in
3    between your car and the Chrysler that was on
4    the street there?
5        A.  I don't recall.  There were so many
6    people.
7        Q.  Do you know if it was on the sidewalk?
8        A.  It was definitely on the street.
9        Q.  It was on the street.
10           Now, at some point, did Chicago Police
11   officers arrive?
12       A.  Correct.
13       Q.  And when did they arrive?
14       A.  I couldn't tell you exactly when, but
15   they arrived.
16       Q.  Do you recall having any conversations
17   with them?
18       A.  The Chicago Police?
19       Q.  Yes.
20       A.  At what time?
21       Q.  Well, you said you don't remember when
22   they arrived, but at some point they did arrive?
23       A.  Correct.
24       Q.  And they came to the scene of the
                                                72

18  (Pages 69 to 72)

1    incident here, right?
2        A.  Correct.
3        Q.  Was this before or after Mr. Boyle was
4    placed in handcuffs?
5        A.  I don't recall.  I would imagine when
6    they were trying to place him in handcuffs.
7        Q.  So you think they arrived when he was
8    trying to be -- when he was being put in
9    handcuffs?
10       A.  Correct.
11       MR. PUISZIS:  When do you first recall seeing
12   officers from Chicago there?
13       THE WITNESS:  Well, there was officers from
14   what they call a 10-1.  There were officers from
15   all over.  They just came so quick.
16       MR. PUISZIS:  But when do you recall Chicago
17   officers as opposed to the University of Chicago
18   officers?
19       THE WITNESS:  When -- after I leaned up and I
20   was gasping for air, I was leaning over, when I
21   leaned up, I seen Chicago and ourselves.
22       MR. PUISZIS:  And this was before or after he
23   was put in cuffs?
24       THE WITNESS:  Before.
                                                    73

1    BY MR. KSIAZEK:
2        Q.  What were the Chicago Police officers
3    doing when you saw them?
4        A.  What were they doing?
5        Q.  Yeah.
6        A.  You know what, I don't recall because
7    everything -- like I said, I was bent down and I
8    put my head up and they were already on the
9    ground.
10       Q.  The Chicago Police officers were on the
11   ground?
12       A.  No.  No.  The Officers Galarza,
13   Kwiatkowski and Gillespie.
14       Q.  Okay.  Where were the Chicago Police
15   officers when you first saw them?
16       A.  They were standing around.
17       Q.  How far away from you were they?
18       A.  There were several of them.  How far?
19   I mean, a matter of feet away from me.
20       Q.  Okay.  After you had caught your breath
21   or, you know, were done leaning over, did you
22   have a conversation with the Chicago Police
23   officers at the scene?
24       A.  Did I?
                                                    74

1        Q.  Yes.
2        A.  No.
3        Q.  Did you -- I'm sorry, go ahead.
4        A.  I mean, when exactly are you talking
5    about?  Because what happened was once they
6    placed him in custody, you know, I did an
7    initial report.  I just told them I'd meet them
8    at the 21st District, the transporting car.
9        Q.  So that's all you said -- was that all
10   you said to the Chicago Police officers, I'll
11   meet you at the 21st District?
12       A.  Correct.
13       Q.  Did you tell them any details about
14   what happened?
15       A.  They asked what happened --
16   Officer Darling asked me what had happened, and
17   I told him that we were trying to get some
18   information from him and he resisted from us.
19       Q.  So officer -- did Officer Darling
20   approach you and ask you what happened?
21       A.  No.  He was -- they were standing by
22   their car.
23       Q.  Okay.  So how did this conversation
24   start?
                                                    75

1        A.  I walked over to them.  I'm trying to
2    get all my thoughts together.
3        Q.  Sure.  So after you caught your
4    breath -- was this before or after you caught
5    your breath?
6        A.  After.
7        Q.  Okay.  So after you caught your breath,
8    you walked over to Officer Darling?
9        A.  After they placed him in custody and
10   they put him -- and then I walked over there,
11   yeah.
12       Q.  So they placed him in custody.  Was he
13   in the squad car at that point?
14       A.  No.
15       Q.  So he was standing -- Mr. Boyle was
16   standing outside the squad car?
17       A.  Correct.
18       Q.  And while Mr. Boyle was standing
19   outside the squad car, you walked over to
20   Officer Darling?
21       A.  Correct.
22       Q.  And you told Officer Darling what
23   happened?
24       A.  Correct.
                                                    76

19  (Pages 73 to 76)

```
 1      Q.  Okay.  Do you remember specifically
 2   what you said to him besides what you had
 3   already stated?
 4      A.  No, not specifically.
 5      Q.  Did he say anything in response to you?
 6      A.  I don't recall.
 7      Q.  And then at that point, did you tell
 8   him that you would meet them at the
 9   21st District?
10      A.  Excuse me?
11      Q.  When did you tell the Chicago Police
12   officers that you'd meet them at the
13   21st District?
14      A.  When they placed him inside the
15   vehicle.
16      Q.  Okay.  Did they place him inside the
17   vehicle while you were having this conversation
18   with Officer Darling?
19      A.  Correct.
20      Q.  And what did you do after they placed
21   Mr. Boyle inside the vehicle?
22      A.  What did I do?  I went to the
23   21st District.
24      Q.  Did you -- before you went to the
                                             77
```

```
 1      A.  No.
 2      Q.  And at any point during this
 3   altercation, did Mr. Boyle strike you besides
 4   what you testified about with the bear hug?
 5      A.  Did he strike me?
 6      Q.  Yes.
 7      A.  No.
 8      Q.  Did -- do you recall Mr. Boyle saying
 9   anything when he was being placed in the squad
10   car?
11      A.  No.
12      Q.  Do you recall any other conversations
13   or anything that Mr. Boyle might have said
14   during this whole altercation that we haven't
15   talked about before?
16      A.  I don't recall him saying anything at
17   that time.
18      Q.  Do you recall any other conversations
19   that you had with Officer Moore during this
20   whole altercation that we haven't talked about
21   previously?
22      A.  What do you mean by --
23      Q.  From the point when yourself and
24   Officer Moore first heard the horn honking to
                                             79
```

```
 1   21st District, did you interview any of the
 2   witnesses at the scene?
 3      A.  Other officers from the University of
 4   Chicago were asking people questions of what
 5   happened and getting stuff.  Myself, I walked
 6   back to the car.
 7      Q.  Do you remember which officers were
 8   getting information from the witnesses?
 9      A.  The same officers that were involved in
10   detaining him.
11      Q.  So Galarza, Gillespie and Kwiatkowski?
12      A.  Correct.
13      Q.  What did Officer Moore do if you can
14   recall?
15      A.  I can't recall.
16      Q.  But did he travel with you to the
17   21st District?
18      A.  Yes.
19      Q.  Do you recall if he was asking any
20   questions of the witnesses at the scene?
21      A.  I don't recall.
22      Q.  You didn't -- during your whole
23   interaction with Mr. Boyle, did you ever ask him
24   for his registration of the vehicle?
                                             78
```

```
 1   when Mr. Boyle was placed into the squad car, do
 2   you recall any conversations between yourself
 3   and Officer Moore that you haven't previously
 4   testified about?
 5      A.  No.
 6      Q.  Do you recall -- did you have any
 7   conversations with Officer Gillespie once he
 8   arrived at the scene?
 9      A.  No.  Basically after -- no, I didn't.
10      Q.  Did you have any conversations with
11   Officer Galarza once he arrived at the scene?
12      A.  No.
13      Q.  And did you say anything to any of the
14   other officers who arrived at the scene?
15      A.  After the scene, I went and sat in the
16   car, and then the other officers were getting
17   all the information and I decided to meet them
18   back at the station.
19      Q.  You told them to meet you back at the
20   station?
21      A.  I'll meet them back at the station
22   because I was doing the report.  At our station,
23   though, not at the --
24      Q.  Did they say anything to you in
                                             80
```

20  (Pages 77 to 80)

1    response?
2        A.  Not that I could recall, no.
3        Q.  Do you recall them telling you anything
4    that they might have learned after talking to
5    the witnesses at the scene?
6        A.  I don't remember.
7        Q.  Okay.  So how long did this whole
8    altercation take place from when you first heard
9    the horn honking when you were inside the
10   Dunkin' Donuts to when you -- Mr. Boyle was
11   sitting in the car in handcuffs?
12       A.  I don't know.  It happened real quick.
13   Approximate time I couldn't tell you.  It's
14   just -- I couldn't tell you exact time.  I don't
15   know how long.
16       Q.  Do you know if it was longer than
17   ten minutes?
18       A.  I don't know.
19       Q.  Was it longer than a half an hour?
20       MR. PUISZIS:  He just said he didn't know, so
21   I object to badgering the witness.
22       BY MR. KSIAZEK:
23       Q.  How long of a drive is it from where
24   you're located on 53rd Street to the

                                          81

1    21st District, if you know?
2        A.  A few minutes.
3        Q.  And so yourself and Officer Moore --
4        A.  Correct.
5        Q.  -- both traveled to the 21st District?
6        A.  Correct.
7        Q.  How long were you sitting in the car --
8    you said you went and sat in the car while the
9    other officers were talking to the witnesses.
10   How long were you sitting in the car before you
11   went to go to the 21st District?
12       A.  I couldn't recall exact time.  I don't
13   know how long.
14       Q.  Do you recall what witnesses these
15   other officers were speaking to?
16       A.  The other people that were in the
17   vehicle.
18       Q.  Did you say anything to Officer Moore
19   or did Officer Moore say anything to you while
20   you were driving to the 21st District?
21       A.  I don't recall.  I might have.  I don't
22   recall exactly what I said.
23       Q.  Now, were you injured besides losing --
24   getting the wind knocked out of you, were you

                                          82

1    injured as a result of this altercation?
2        A.  No.
3        Q.  Do you know if Officer Moore was
4    injured?
5        A.  Yes.  He mentioned his wrist was
6    hurting.
7        Q.  Did he say anything about how his wrist
8    was injured?
9        A.  From the altercation.
10       Q.  When did you have this conversation
11   about Officer Moore being injured?
12       A.  He stated that to me in the car when we
13   were going to the 21st District.
14       Q.  Do you recall exactly what he said?
15       A.  No, I don't.
16       Q.  Did you see Officer Moore's wrist?
17       A.  Did I look at it?
18       Q.  Did you look at it?
19       A.  Yeah.
20       Q.  What did you see?
21       A.  It just looked like it was puffy, like
22   a little swollen.
23       Q.  What happened once you arrived at the
24   21st District station?

                                          83

1        A.  What exactly do you mean?
2        Q.  What, if anything, happened?  Did you
3    talk with Mr. Boyle once you got there?
4        A.  No.
5        Q.  What did you do once you walked into
6    the 21st station?
7        A.  Basically Officer Moore took over
8    the -- was talking with the officers -- the
9    Chicago Police officers -- and getting all their
10   stuff ready for the report, file the report.
11       Q.  Was what did you hear Officer Moore say
12   to the CPD officers when they were getting ready
13   to do their report?
14       A.  He was just telling them exactly what
15   happened.
16       Q.  Do you recall what specifically he said
17   and what the officer said -- the Chicago Police
18   officer said in response?
19       A.  No.
20       Q.  Do you have sort of a general idea of
21   what he said?
22       A.  They were in one room, I was in the
23   other room doing the -- started the report, so I
24   couldn't exactly hear exactly what was going on.

                                          84

1    Q.  In what room were officer -- was
2  Officer Moore and these Chicago Police officers
3  in?
4    A.  The booking room.
5    Q.  And what room were you in?
6    A.  There's an adjoining -- there's an
7  adjacent room right next to that.  I was right
8  next to it.
9    Q.  Was anyone else in the room where you
10  were located?
11    A.  No.
12    Q.  And was anyone else in the booking room
13  where the Chicago Police officers and
14  Officer Moore was located?
15    A.  They had the two officers, Chicago
16  Police officers that were doing the booking, you
17  had Officer Moore in there and then you had
18  Boyle in there.
19    Q.  Okay.  So you -- well, what did you do
20  once you were in that separate room?  You said
21  you started writing the report?
22    A.  Yeah, we have our own reports we have
23  to write.
24    Q.  Did you have that paperwork handy with
                                                            85

1  know, but we were there a long time.
2    Q.  Why were you there a long time?
3    A.  Officer Moore was doing the report.
4  There are several different reports that we do,
5  and I was doing some of it and then Moore was
6  doing the other half of it.
7    Q.  Okay.  So when you're filling out a
8  report, what do you mean by "several different
9  reports"?
10    A.  Well, there's a contact card or arrest
11  card, just different things that we need for our
12  reports, and a general report.
13    Q.  Are there any other documents or
14  paperwork that you have to fill out in an
15  incident such as this besides the contact card,
16  arrest card and general report?
17    A.  No.  That's basically it.
18    Q.  So you testified that that's basically
19  the reason why you were there for a long time?
20    A.  Correct, because we have to wait --
21  because Chicago does everything and we get it
22  from Chicago.
23    Q.  Okay.  So why do you do that?
24    A.  That's the procedure.
                                                            87

1  you or where did you get that paperwork from?
2    A.  I keep it with me in my vest.
3    Q.  Did you have any conversations with
4  Mr. Boyle when you were in the 21st District?
5    A.  No.
6    Q.  Did you -- did Mr. Boyle say anything
7  to you while --
8    A.  No.
9    Q.  Did you have any conversations besides
10  what we've talked about with the Chicago Police
11  officers once you were at the 21st District?
12    A.  Could you repeat that.
13    Q.  Sure.  Did you talk to any of the
14  Chicago Police officers that had arrested
15  Mr. Boyle while you were at the 21st District?
16    A.  No.  Officer Moore was handling all
17  that.
18    Q.  So you had no interaction at all with
19  the Chicago Police officers?
20    A.  Not at that time, no.  I was sitting in
21  the other room.
22    Q.  And how long did you spend at the
23  21st District?
24    A.  We were quite a -- exactly, I don't
                                                            86

1    Q.  So do you look at the Chicago Police
2  officers' report when you're filling out your
3  own report?
4    A.  No.
5    Q.  Why does the Chicago Police Department
6  write their report first, though?
7    MS. GIBBONS:  Objection, foundation.
8  BY MR. KSIAZEK:
9    Q.  You can answer the question.
10    A.  What's that?
11    Q.  Why does the Chicago Police officers
12  get to write their report or do their paperwork
13  first?
14    A.  It's not basically who does first.
15  It's just that we need certain things off of
16  their report.
17    Q.  What information do you need?
18    A.  We need just officer's name, the badge
19  number and RD number.  Some officers don't pull
20  an RD number up right away.  Sometimes they wait
21  a little bit.  They write up something before
22  they pull an RD up.  It's based on -- each
23  officer's got different ways of reporting --
24  writing.
                                                            88

22 (Pages 85 to 88)

1  Q.  So after you finished writing the
2  report, did you leave the 21st District after
3  that?
4  A.  Yes.
5  Q.  Were any other Chicago -- I'm sorry,
6  University of Chicago Police officers at the
7  station besides yourself and Officer Moore?
8  A.  No.
9  Q.  And how many University of Chicago
10  Police officers was Officer Moore talking to to
11  help fill out the report?
12  MR. PUISZIS:  You said University of Chicago.
13  BY MR. KSIAZEK:
14  Q.  I'm sorry, Chicago Police Department
15  officers.
16  A.  Repeat that.
17  Q.  How many Chicago Police Department
18  officers was Officer Moore talking to?
19  MR. PUISZIS:  Objection.  If you know.  He
20  said he was in a different room.
21  MR. KSIAZEK:  Right.
22  BY MR. KSIAZEK:
23  Q.  If you know.
24  A.  No, I don't.

89

1  MR. KSIAZEK:  Mark this Exhibit 1.
2  (Whereupon, Torres Deposition
3  Exhibit No. 1 was marked for
4  identification.)
5  BY MR. KSIAZEK:
6  Q.  Okay.  I'm showing you what has been
7  marked for identification purposes as Exhibit 1,
8  and this has been provided by your counsel.  Has
9  the Bates stamps 0047, 0048 and 0049 at the
10  bottom of the page.  Do you see those stamps,
11  Officer?
12  A.  Yes.
13  Q.  And so this is a dispatch tape from
14  October 18, 2008.  Have you seen this transcript
15  before?
16  A.  No.
17  Q.  Okay.  So on this document, it says a
18  starting time of 2:37 hours, right?  Do you see
19  that at the top?
20  A.  Yes.
21  Q.  Is that approximately when this
22  incident took place from the best of your
23  memory?
24  A.  Yes.

90

1  Q.  Okay.  Now, under the first two
2  sentences here, dispatch, go ahead unit.  You
3  stated earlier that you had called dispatch,
4  right?
5  A.  When?
6  Q.  When you were calling for backup.
7  A.  Correct.
8  Q.  So if this is dispatch saying go ahead
9  unit, do you recall dispatch telling you to go
10  ahead?
11  A.  I don't remember.
12  Q.  You don't remember dispatch telling you
13  to go ahead on October 18, 2009 -- or 2008,
14  excuse me.
15  A.  No.
16  Q.  So it says unit on the next line.  Did
17  you tell dispatch, 1424 55th Street, hurry up?
18  Did you make that statement?
19  A.  As far as I can recall, yes, if it's
20  there.  I don't recall.
21  Q.  That sounds like something you might
22  have said?
23  A.  Correct.
24  Q.  And do you recall dispatch saying back

91

1  to you, any unit on the scene with him?  109.
2  Do you recall that statement being made to you?
3  A.  Yes.
4  Q.  Okay.  And 109, that is -- that was
5  your unit number?
6  A.  Correct.
7  Q.  So under where it says 109, it says
8  send me a car over here.  Did you make that
9  statement to dispatch?
10  A.  Yes.
11  Q.  Now, you didn't say you wanted a car
12  sent over there, right?
13  A.  No.  Just whatever it says.
14  Q.  And you didn't say there's -- the
15  suspect is being aggressive, right?
16  A.  At that time, no.
17  Q.  So you didn't say anything about a
18  stolen vehicle at that time?
19  A.  No.
20  Q.  Okay.  Dispatch asked you for the
21  address.  He said, I need the address, 109,
22  what's your location, right?
23  A.  Correct.
24  Q.  And you told him 53rd and Blackstone,

92

23 (Pages 89 to 92)

1  right?
2      A.  Correct.
3      Q.  And that's where this incident took
4  place, right?
5      A.  Correct.
6      Q.  Okay.  So dispatch said in response,
7  53rd and Blackstone, we got a 10-1.  What does
8  10-1 mean?
9      A.  Officer needs assistance, help.  It's
10  the code for police.
11     Q.  Is it just general assistance?
12     A.  No.  A 10-1 is like, you know, an
13  officer needs help.
14     Q.  And did you tell him that you needed
15  help?  I mean, you said send me a car over here,
16  right?
17     A.  Yes.  I was -- as I was making these
18  radio things, I was still in the process with
19  this guy.  So whenever I was yelling -- trying
20  to grab my radio and yell, that's what I was
21  doing.  It wasn't -- I wasn't just sitting
22  there.  I was still wrestling with the guy while
23  I'm trying to call.
24     Q.  Okay.  So if you look down where it

                                              93

1  says dispatch, 101, what you got over there?
2  One, zero, one, what do you have?  Do you see
3  that -- where dispatch said that, right?  It's
4  in the middle of the page.  And then the next
5  sentence says unknown, we got one guy on the
6  ground, we got two officers, right?
7      A.  Yes.
8      Q.  So if you know, do you know if that was
9  referring to yourself and Officer Moore with
10  Mr. Boyle on the ground?
11     A.  I have no idea.
12     Q.  Okay.  And then where dispatch says,
13  53 and Blackstone, okay, units, do we have
14  everything under control at 53 and Blackstone.
15  And there's an unknown, it says, everybody take
16  a slow down.  Did you say everyone take a slow
17  down?
18     A.  No.
19     Q.  Do you know who said everyone take a
20  slow down?
21     A.  No.
22     Q.  Do you recall hearing over dispatch,
23  though, okay, units, slow it down at 53 and
24  Blackstone, slow it down?

                                              94

1      A.  Yes.
2      Q.  You recall hearing that.
3      Okay.  And then on the second page on
4  what's Bates stamped 0048, you see where it
5  says, 101, please run driver's license for me,
6  driver's license B, boy, 400-1448-7100?  You see
7  where it says that?
8      A.  Yes.
9      Q.  Do you know how they got that driver's
10  license?
11     A.  No, I don't.
12     Q.  Okay.  Who -- do you know who's driving
13  Car 101?
14     A.  No, I don't.
15     Q.  But you had never gotten Mr. Boyle's
16  driver's license, right?
17     A.  No.
18     Q.  And when dispatch -- a few lines down
19  dispatch said, you should be talking to a
20  Charles Boyle, 6733 South Chappell, he's clear,
21  squad.  Did you hear that from dispatch?
22     A.  No.
23     Q.  You didn't hear that?
24     A.  I don't recall that.

                                              95

1      Q.  Okay.  Up -- prior to that point, even
2  if you didn't hear that, did you know that the
3  person that you approached was Mr. -- or when
4  did you learn Mr. Boyle's name?
5      A.  I recall at the station, 21st District.
6      Q.  So you didn't know his name before you
7  got to the 21st District?
8      A.  No.
9      Q.  And where it says 105, 105, dash, while
10  we're at it, can you run a plate that this guy
11  was in.  Dispatch asks, what was it.
12  105 states, Illinois, X-ray 398206, correct?
13     A.  Correct.
14     Q.  You never called dispatch and asked
15  them to run the plates, right?
16     A.  Correct.
17     Q.  And even when you thought it was a
18  stolen vehicle when you first heard the horn
19  honking, you never radioed dispatch and asked
20  them to run the license plate number?
21     A.  No, we didn't.
22     Q.  And when you first approached the
23  vehicle, you didn't call dispatch and ask them
24  to run the license place number?

                                              96

                              24 (Pages 93 to 96)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1    A.  At that time, no.
2    Q.  Why didn't you do that?
3    A.  Because we never assumed it was stolen,
4  stolen.  We wasn't sure if it was stolen or if
5  somebody was -- needed help.
6    Q.  You never assumed that it was stolen,
7  though?
8    A.  Exactly.
9    MR. KSIAZEK:  We'll mark this as Plaintiff's
10  Exhibit 2.
11    (Whereupon, Torres Deposition
12    Exhibit No. 2 was marked for
13    identification.)
14  BY MR. KSIAZEK:
15    Q.  Do you recognize what I've marked as
16  Plaintiff's Exhibit 2?  This is what has been
17  Bates stamped 0109UC through 0114.
18    A.  Okay. Yes.
19    Q.  Do you recognize this document?
20    A.  This top one?
21    Q.  Yes.
22    A.  Yes.
23    Q.  And this is the police report that you
24  wrote, right, these first two pages, 0109 and
                                              97

1  report that you wrote at the 21st District?
2    A.  Probably threw it out.  I scratch --
3  for scratch.
4    Q.  But you wrote it on a document that
5  looks just like this?
6    A.  No, I didn't write this -- I keep a pad
7  with me and I write information.
8    Q.  Okay.  But you didn't have this
9  actual report format in front of you at the
10  21st District?
11    A.  At the 21st, yes.
12    Q.  Okay.  So you had this format at the
13  21st District?
14    A.  Yes.
15    Q.  Did you write out a report like this at
16  the 21st District?
17    A.  Yes.
18    Q.  And your testimony is that you threw
19  that out?
20    A.  The original one I wrote?
21    Q.  The original one that you wrote, yeah.
22  Is it your testimony that you threw the original
23  report that you wrote at the 21st District away
24  in the garbage?
                                              99

1  0110?
2    A.  Yes.
3    Q.  Okay.  You didn't write the last four
4  pages, 0111 through 0114?
5    A.  No.
6    Q.  Okay.  So on the top, on suspicious --
7  or, I'm sorry, under classification, you wrote
8  suspicious person, slash, auto.  Why did you
9  write that?
10    A.  That's what my supervisor gave me at
11  the time.
12    Q.  When did your supervisor give that to
13  you?
14    A.  When I was in the station.
15    Q.  Which station?
16    A.  Our station.
17    Q.  So did you write this report at
18  your station or did you write it at the
19  21st District?
20    A.  I wrote one at 21st, but I rewrote it
21  at our station, because these are handwritten
22  and sometimes you just jot down stuff and
23  then -- before you hand it in, it's got to be --
24    Q.  Do you -- what did you do with the
                                              98

1    A.  Yes.  Well, I don't know if I threw it
2  away at the 21st District.  I kept it with me
3  and bring it to my station.
4    Q.  Okay.  So you're saying that you threw
5  it away when you got at your station?
6    A.  After I --
7    Q.  Okay.  So what did you do with that
8  first report that you got?
9    A.  The one I originally started with,
10  yeah, I threw that away because this was my --
11  the report that I was handing in to my
12  supervisor.
13    Q.  You threw that one away at your
14  station?
15    A.  Correct.
16    Q.  At the University of Chicago Station?
17    A.  Correct.
18    Q.  Where is the University of Chicago
19  Station -- Police Station related -- located in
20  relation to the 21st District?  How far away is
21  it?
22    A.  I don't know exactly how far.  It's on
23  5555 Ellis.  That was our old station.
24    Q.  And that was in 2008?
                                              100

25 (Pages 97 to 100)

1    A.  Correct.
2    Q.  That was your old station.
3        Do you know when exactly you threw that
4    old report away?
5    A.  That day when I did this one.
6    Q.  So you wrote -- so you wrote this new
7    report, right?
8    A.  Correct.
9    Q.  And then after you wrote this new
10   report, you threw the old report away?
11   A.  Correct.
12   Q.  Is it your common practice to write
13   two different reports?
14   A.  Sometimes I do that. It doesn't bother
15   me to rewrite a report.
16   Q.  And you said you had notes. You had a
17   notepad with you?
18   A.  Yes.
19   Q.  Did you keep any of those notes that
20   you wrote down?
21   A.  No.
22   Q.  What did you do with those notes?
23   A.  Probably threw it away with the other
24   report. Because I'm not really a good writer or
                                                101

1    speller, so I have to write stuff down in order
2    to put a report because some supervisors are
3    very picky in how you write a report.
4    Q.  Sure. But you would agree with me that
5    any information that you write down after --
6    after an incident, that's relevant information,
7    right?
8    A.  Not all of it, no.
9    Q.  Why wouldn't it be relevant
10   information?
11   A.  Because sometimes I have a scratch
12   piece of paper that I wrote other stuff down on
13   from prior incidents or stuff that has nothing
14   to do with this one.
15   Q.  Sure. But if you had information
16   about, let's say, this specific incident that
17   you wrote down, you would agree that that
18   information would be relevant to this report,
19   right?
20   A.  At that time, yes.
21   Q.  And it'd be relevant to the
22   investigation as a whole, right?
23   A.  Yes, I guess.
24   Q.  So why did you throw it away then?
                                                102

1    A.  I can't answer that. I don't know. I
2    frequently do that. I rewrite stuff.
3    Q.  You frequently throw away notes and
4    information you have about cases?
5    A.  On my scratch pad, yes, and stuff I
6    rewrite, yes. Because like I said, sometimes
7    you classify one thing and then a supervisor
8    says, no, reclassify it, so you can't scratch it
9    out, so you have to rewrite it. And that's --
10   at the time, that's what my supervisor told me
11   to put down as a classification.
12   Q.  Who's your supervisor?
13   A.  At that time, it was Sergeant
14   McClinton.
15   Q.  Okay. Do you know why he told you to
16   put that down?
17   A.  No. But that's part of the problem we
18   have. That's why I say about throwing it away,
19   it happens often. You classify something and
20   it's -- the sergeant's got to have the final
21   approval. So if he says that's not the
22   classification, you have to put down what the
23   sergeant says.
24   Q.  Do you recall anything about what your
                                                103

1    notes that you threw away you said, do you
2    recall anything that you wrote down or anything
3    that those notes said?
4    A.  That was -- it was basically this
5    RD number, just stuff like this, and then I was
6    trying to remember what officers were on the
7    scene. Just gathering a little information here
8    and there.
9    Q.  So when did you have this conversation
10   with your Sergeant McClinton? Is that his name?
11   A.  Correct.
12   Q.  When did you have this conversation
13   about putting suspicious person, slash, auto on
14   this report?
15   A.  At what time? I don't know. It was
16   that night, though.
17   Q.  Was it on October 18?
18   A.  Correct.
19   Q.  What did you say to him and what did he
20   say to you?
21   A.  I don't recall everything. It's been a
22   while.
23   Q.  Did you talk to him about the incident
24   on 53rd?
                                                104

26  (Pages 101 to 104)

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois    (312) 263-0052**

1    A. Oh, yes.
2    Q. What did you tell him?
3    A. I told him exactly what happened.
4    Q. Do you recall exactly what you said to
5 him?
6    A. No.
7    Q. But he told you to put suspicious
8 person, slash, auto on the top?
9    A. Correct.
10    Q. And then you say on box, I believe it's
11 seven, time of occurrence, that says 2:38. So
12 is that about the time dispatch said 2:37, so
13 that's about when this incident occurred?
14    A. Approximately.
15    Q. Okay. And under circumstances in this
16 Box 26 I believe, in the middle of the page, do
17 you see vehicle of offender, it says '06
18 Chrysler? Do you see that?
19    A. Yes.
20    Q. That's -- that was the correct vehicle
21 that was -- that Mr. Boyle exited from?
22    A. Yes.
23    Q. And under 27, do you see weapons?
24    A. Yes.
                                    105

1    Q. Do you know what that circle indicates?
2 Is it used or no, not used or what is that?
3    A. What circle? Right here?
4    Q. The circle -- it seems to be around the
5 word used.
6    A. It's a D, slash, NA, does not apply.
7    Q. Okay. That works.
8       If you could switch to page two which
9 is Bates stamped at the bottom U/C0110. I would
10 ask that if you read the paragraph that you
11 wrote here, and then I'll ask you a few
12 questions about it.
13    A. Sure.
14    Q. Okay. And you wrote this paragraph on
15 page two of this document, correct?
16    A. Yes.
17    Q. So according to your knowledge, is this
18 paragraph true and correct to the best of your
19 recollection?
20    A. Yes.
21    Q. Okay. It states the vehicle -- and it
22 says one, two, three, four lines down, "the
23 vehicle then curbed quickly and two male
24 subjects exited the vehicle." Did you say --
                                    106

1 you don't say anything in this police report
2 about the vehicle hitting the curb, right?
3    A. No, I didn't state it in here, no.
4    Q. And why didn't you put that in the
5 report?
6    A. I don't know. I didn't.
7    Q. And then if you look about the middle
8 of the page, it states ROs, which stands for
9 responding officers, right?
10    A. Or reporting officer.
11    Q. Or reporting officers, excuse me.
12       Reporting officers approached Boyle and
13 asked who vehicle was it. Boyle answered why.
14 ROs then asked for an ID, and at this time
15 became evasive. Do you know what you meant by
16 when you said evasive?
17    A. Evasive, he wasn't -- you know, when
18 we're asking him something, he wasn't being --
19 what's the word I'm looking for? I'm brain dead
20 right now. Just, you know, he wasn't following
21 our directions. You know, he wasn't -- he was
22 just --
23    Q. That's fine.
24       And he says he refused to produce an
                                    107

1 ID.
2    A. Yes.
3    Q. And so that's right? He refused to
4 give you an ID, right?
5    A. Correct.
6    Q. Okay. Did you -- then it said Boyle
7 became very combative and Torres called for
8 assistance, right?
9    A. Correct.
10    Q. Now, you didn't put in here that he
11 became combative with yourself, right?
12    A. No.
13    Q. Okay. And I'll just ask again, what
14 did you mean by -- when you wrote combative?
15    A. He was resisting. He was fighting with
16 us.
17    Q. But you didn't put in -- well, I'm
18 sorry. You did put in here that he began
19 fighting, right?
20    A. Correct.
21    Q. Officer then began fighting.
22       Well, you put in here, began fighting
23 with Officer Moore, Torres, Galarza and
24 Kwiatkowski. So you put in here that he was
                                    108

27 (Pages 105 to 108)

1    fighting with four officers, right?
2        A. Correct.
3        Q. And before that, however, you don't
4    state in the report that he was fighting with
5    just yourself and Officer Moore, right?
6        A. What are you talking about?
7        Q. Well, I'm saying in this paragraph,
8    describing what happened at the scene.
9        MR. PUISZIS: You mean other than where he
10   says he became very combative?
11       MR. KSIAZEK: Right. I'm saying before --
12   before that, he didn't put that he was fighting.
13       MR. PUISZIS: I mean, the police report is
14   supposed to be a summary, okay. You want to
15   make a big deal out of this, go ahead.
16       You can -- I don't know if there's a question
17   pending. Why don't you let him ask you a
18   question. I'm sorry.
19       THE WITNESS: Our reports are just for our
20   department. That doesn't go any further than
21   our department. That's why everything goes
22   based on the Chicago Police Department. Ours
23   are just basically summaries.
24
                                                  109

1    BY MR. KSIAZEK:
2        Q. Okay. And then at the bottom you say,
3    Officer Gillespie's glasses were broken?
4        A. Correct. My sergeant told me to put
5    that at the bottom of the report.
6        Q. But you had no knowledge about
7    Officer Gillespie's glasses being broken besides
8    what your sergeant told you?
9        A. Correct.
10       Q. Okay. You said you did not fill out
11   the contact cards at the scene?
12       A. At the scene?
13       Q. Yes, at the scene of the incident on
14   53rd Street there.
15       A. What do you mean?
16       Q. You did not fill any contact cards out?
17       A. Did I fill out the contact cards on the
18   scene?
19       Q. Yes.
20       A. Not that I recall.
21       Q. Did you fill out any contact cards in
22   general?
23       A. Yes.
24       Q. Okay. And did you fill out the arrest
                                                  110

1    card?
2        A. Yes.
3        MR. KSIAZEK: We'll mark this for
4    identification purposes as Plaintiff's
5    Exhibit 3.
6             (Whereupon, Torres Deposition
7              Exhibit No. 3 was marked for
8              identification.)
9    BY MR. KSIAZEK:
10       Q. So you filled out what has been marked
11   as Plaintiff's Exhibit 3?
12       A. Yes.
13       Q. Okay. Where it says where employed,
14   St. Patrick's Church, how did you learn that
15   information?
16       A. I got it from the officers at the
17   21st District.
18       Q. Okay. So did you talk to the
19   Chicago Police officers?
20       A. I didn't. Moore did.
21       Q. Okay. So Officer Moore talked to the
22   Chicago Police officers and got this knowledge?
23       A. Correct.
24       Q. And then Officer Moore told you that?
                                                  111

1        A. Correct.
2        Q. Did you learn any of the information on
3    this arrest card firsthand or was it all from
4    Officer Moore?
5        A. Officer Moore.
6             (Whereupon, Torres Deposition
7              Exhibit No. 4 was marked for
8              identification.)
9    BY MR. KSIAZEK:
10       Q. So these are contact -- what has been
11   marked as Plaintiff's Exhibit 4 are contact
12   cards for Steven Sinclair, Kenneth Roberson, and
13   those are on -- what's been marked as 0064,
14   Bates stamped, and then Ashley Glover is on
15   Bates stamped 0065. And, Officer, did you fill
16   out these contact card reports?
17       A. Yes, I did.
18       Q. Okay. And how did you learn these
19   individuals' names?
20       A. Other officers that were on the scene
21   that gave me their contact cards which was -- I
22   couldn't read it, so I rewrote it on these
23   cards. This was later.
24       Q. When did you fill these out?
                                                  112

                              28 (Pages 109 to 112)

1  A. When I went back to my station, and
2  towards the end of the night when these other
3  officers gave me their -- they did contact cards
4  on the scene that they gave me and they weren't
5  legible and I rewrote them.
6  Q. Okay. Is it your understanding that
7  these were the passengers in the Chrysler that
8  was at the scene that night?
9  A. Correct. That's what they stated.
10  Q. Did they state anything else?
11  A. Not that I could recall.
12  Q. All right. Did you ever have the
13  occasion to attend court for -- in connection
14  with this case? Did you attend any hearings
15  that Mr. Boyle was present at?
16  A. Yes, I went to court. There were
17  several different court dates.
18  Q. Do you recall what the dates were?
19  A. No, I don't.
20  Q. Are there any documents that would
21  refresh your recollection as to when you arrived
22  at court?
23  A. I just got subpoenas, so whenever.
24  MR. KSIAZEK: All right. I'll show you what
113

1  we'll mark as Exhibit 5 here.
2  (Whereupon, Torres Deposition
3  Exhibit No. 5 was marked for
4  identification.)
5  BY MR. KSIAZEK:
6  Q. And this is -- I believe this is a
7  report that you filled out.
8  A. Court report.
9  Q. Court report.
10  Okay. And it says -- on the bottom, it
11  says Officer Torres. That's your handwriting
12  and name, correct?
13  A. Correct.
14  Q. Okay. So according to the first page
15  of this document, which is Bates stamped 0052,
16  you appeared on December 12, 2008. And then
17  according to the first paragraph up here, the
18  case was continued to January 20, 2009?
19  A. Correct.
20  Q. And you wrote that paragraph up top?
21  A. Yes.
22  Q. Okay. And you wrote the second
23  paragraph here?
24  A. Yes.
114

1  Q. Where it says "in summary".
2  A. Yes. It's just a little --
3  Q. If you would turn to the second page.
4  This is a document indicating that -- it says
5  Arrest Clearing and Closing, slash, Offense
6  Clear Up, slash, Court Info, correct?
7  A. Correct.
8  Q. And the date on this is January 20,
9  2009?
10  A. Correct.
11  Q. Okay. Then if you turn to the third
12  page, what has been marked Bates stamped 0061,
13  that's your name at the bottom, correct?
14  A. Yes.
15  Q. You're Torres, and your star number is
16  1028?
17  A. Correct.
18  Q. Okay. So you -- this paragraph, "in
19  summary" -- what begins "in summary", the first
20  paragraph,--
21  A. Yes.
22  Q. -- you wrote that paragraph, correct?
23  A. Yes.
24  Q. And then on the second paragraph it
115

1  states, "On January 20, 2009, ROs returned to
2  Branch 46 in front of Judge Donnelly who
3  dismissed all charges against Charles Boyle due
4  to CPD complaints written wrong." Do you know
5  what you meant by that?
6  A. Well, like I said, the judge based it
7  on what the judge had told us that Chicago
8  actually didn't do the arrest -- I mean, they
9  weren't there. They were just basically doing
10  the paper. And we as the arresting agency, our
11  reports didn't conflict he said, because there's
12  a Chicago report and then there's our reports.
13  Q. So the judge actually said that the
14  reports conflict?
15  MR. PUISZIS: Objection, there's a transcript
16  of what the judge said. What he's -- now you're
17  asking him to repeat hearsay. The transcript
18  will speak for itself.
19  If you remember what the judge said, you can
20  go ahead and answer the question.
21  BY MR. KSIAZEK:
22  Q. Do you remember what the judge said?
23  A. Not exactly, no.
24  MR. KSIAZEK: This will be Exhibit 6.
116

29 (Pages 113 to 116)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1        (Whereupon, Torres Deposition
2        Exhibit No. 6 was marked for
3        identification.)
4    BY MR. KSIAZEK:
5      Q. Do you recognize this document?
6      A. I mean, I've never seen it before, but
7    this is --
8      Q. You've never -- I'm sorry, go ahead.
9      A. -- general order.
10     Q. Okay. Have you seen this document
11   before, this general order?
12     A. This specific one, no.
13     Q. Okay. Have you seen a general order in
14   regards to questioning and frisk without arrest
15   from the Chicago -- University of Chicago Police
16   Department?
17     A. No.
18     Q. So you've never seen this document
19   before?
20     A. This specific one, no.
21     Q. Okay. Have you seen something similar
22   to this document?
23     A. They have general orders. Just, you
24   know, they have a general order book, but they

117

1    don't -- you know, we don't look at every single
2    general order. I mean, we don't have the --
3    it's not like they pass out general orders with
4    our department. They just have a book there.
5      Q. All right. Well, under -- this is
6    titled Questioning and Frisk Without Arrest, and
7    I believe this was issued February 1, 1990
8    according to this document, and this was
9    produced by your counsel. So under Guidelines
10   for a Stop, it states: "Will be made only when
11   the officer has a reasonable belief that a crime
12   is being committed, is about to be committed or
13   has been committed by the person stopped."
14       Did you believe when you stopped on
15   October 18, 2008, that a crime was being
16   committed, about to be committed or --
17     MR. PUISZIS: I object to this as an
18   incomplete hypothetical because you see
19   paragraph two says, "May be made with less than
20   probable cause to arrest", yada, yada, yada.
21     MR. KSIAZEK: And I was going to get there,
22   too.
23     MR. PUISZIS: Well, then ask him -- ask the
24   question the fair way and read the whole thing

118

1    into the record, because asking it in -- asking
2    it in specific portions of it is improper
3    because these are procedures and all of the
4    particular parts of the procedure may or may not
5    be applicable.
6      MR. KSIAZEK: All right. Well, I'll read the
7    whole thing in the record then.
8    BY MR. KSIAZEK:
9      Q. So that was paragraph one.
10       Paragraph two, "May be made with less
11   than probable cause to arrest but the facts
12   involving the stop must constitute 'reasonable
13   suspicion.'"
14       "The officer will identify himself and
15   state the purpose for the 'Stop.'"
16       Persons -- on paragraph four: "Persons
17   will be detained for a reasonable period of time
18   only."
19       Paragraph five: "Detention and
20   questioning will be conducted in the vicinity of
21   where the person was stopped."
22       Have I read that correctly?
23     A. Yes.
24     Q. Okay. So did you have a reasonable

119

1    belief that a crime was about to be committed or
2    did you have reasonable suspicion to believe
3    that a crime was about to be committed or
4    committed on October 18, 2008?
5      MR. PUISZIS: Are you saying that every time
6    an officer walks up to somebody on the street,
7    the only time they can question or talk to the
8    person is when these five guidelines are
9    applicable? Was this man ever taken into
10   detention before the wrestling began?
11     MR. KSIAZEK: Well, he was stopped.
12     MR. PUISZIS: Did the officer stop him?
13     MR. KSIAZEK: They asked him for
14   identification.
15     MR. PUISZIS: So that's -- that -- an officer
16   has to have probable cause to believe a crime is
17   committed before he can ask someone for
18   identification?
19     MR. KSIAZEK: I'm just reading the document.
20     MR. PUISZIS: Well, you know, the thing is,
21   you know, procedures -- departmental procedures
22   are not the groundwork for a 1983 claim.
23   There's plenty of cases out there that say you
24   can violate departmental procedures as long as

120

30  (Pages 117 to 120)

1    you're in compliance with the law. That's fine.
2    So I object to the whole line of questioning as
3    being irrelevant and immaterial, but go ahead
4    and ask him any questions you want. This is all
5    irrelevant to whether or not, you know, there
6    was even Fourth Amendment implicated at any
7    point before the wrestling started occurring.
8        MS. GIBBONS: I'll join.
9        MR. PUISZIS: So, I'm sorry, I didn't mean
10   to --
11       MR. KSIAZEK: That's fine.
12   BY MR. KSIAZEK:
13       Q. Do you have a reasonable belief that a
14   crime was committed or about to be committed?
15       A. Yes.
16       Q. What crime?
17       A. Well, we had a suspicion with the
18   vehicle with the horn going off.
19       Q. Okay. Did you identify yourself and
20   state the purpose for why you were asking
21   questions of Mr. Boyle?
22       A. Did I what?
23       Q. Did you identify yourself to Mr. Boyle?
24       A. No.

121

1        Q. And did you tell Mr. Boyle why you were
2    stopping him?
3        MR. PUISZIS: Objection, they never stopped
4    him.
5        Subject to the objection, you can answer the
6    question.
7    BY MR. KSIAZEK:
8        Q. You can answer the question.
9        A. We questioned him.
10       MR. KSIAZEK: This will be the last thing, I
11   promise. Mark this as Exhibit 7.
12           (Whereupon, Torres Deposition
13            Exhibit No. 7 was marked for
14            identification.)
15   BY MR. KSIAZEK:
16       Q. I've handed you what's been marked as
17   Plaintiff's Exhibit 7 and these are your
18   interrogatories, correct, your answers to your
19   interrogatories?
20       A. Yes.
21       Q. Okay. And on the last page, page nine,
22   that's your signature right on the bottom of the
23   page there?
24       A. Yes.

122

1        Q. Okay. And you say on -- okay, you say
2    on page five under the answer to question five,
3    on very bottom of the page it says, may have
4    knowledge of a conversation with the plaintiff
5    when he refused to tell him about the incident
6    or said he had another way he was going to deal
7    with this or words to that effect.
8        Do you know anything about those
9    statements that were made on the very -- it's
10   the last three lines?
11       A. Oh, no.
12       MR. PUISZIS: He knows nothing about the
13   complaint your client filed against them under a
14   different name.
15   BY MR. KSIAZEK:
16       Q. Okay. Under question nine, your
17   answer -- the question is "Please describe your
18   assignment with the University of Chicago Police
19   Department on October 18, 2008." Your response
20   should include the actual time you began and
21   ended your duties." Your answer is, on
22   October 18, I was working for the University of
23   Chicago on the midnight shift. I was working
24   assignment 109. Clarence Moore was riding with

123

1    me to learn the University's practices and
2    procedures. When you say practices and
3    procedures, is that what you meant by --
4        A. The boundaries and our reports.
5        Q. And under answer number ten you say
6    you've never previously been sued in your
7    capacity as a University of Chicago Police
8    officer. Is that still correct?
9        A. Yes.
10       Q. Okay. Besides this lawsuit obviously.
11       MS. GIBBONS: Just really quickly, on
12   page five, are those notes from you, the written
13   notes on the interrogatories? Just curious, are
14   they yours?
15       MR. KSIAZEK: No, they're not.
16       MS. GIBBONS: You produced this copy, okay.
17       MR. KSIAZEK: No, they're not.
18   BY MR. KSIAZEK:
19       Q. Actually, I should ask. On page five,
20   did you circle Aguilar and put a question mark
21   on that?
22       A. Yeah, that was the wrong name.
23       Q. Are those your initials, LT?
24       A. Yes.

124

31 (Pages 121 to 124)

1    Q.  And also on page five under Salvatore
2    or Salvatore (different pronunciation), you put
3    question marks next to it?
4    A.  Yeah, I didn't know who that was when I
5    was reading it.
6    Q.  Is there any other information relating
7    to the incident on October 18, 2008 that we
8    haven't talked about here today?
9    A.  No.
10    MR. KSIAZEK:  I don't believe I have any
11    other questions.
12    MS. GIBBONS:  I just have a few if you don't
13    mind, Steve.
14    MR. PUISZIS:  Okay.
15            EXAMINATION
16    BY MS. GIBBONS:
17    Q.  Officer Torres, I'm Helen Gibbons.  I
18    represent the City of Chicago and the City of
19    Chicago Police officers in this matter.  I just
20    wanted to quickly go back to the actual incident
21    when Mr. Boyle was taken into custody.  You
22    don't recall exactly when the Chicago Police
23    Department officers arrived on the scene, do
24    you?
                                                125

1    A.  Not exactly, no.  Like I said,
2    everything happened so fast, that when I was --
3    when I called for 10-1, they came.  It was just
4    like a relief for me.  I just kind of -- the
5    next thing you know, there's just cars from all
6    over.
7    Q.  Do you recall -- I'm sorry, were you
8    done?
9    A.  I mean, I just don't remember
10    exactly -- there was a lot of Chicago Police
11    there, but what -- exactly what time and how
12    they got there, when they got there, I don't
13    know exactly, because as I said, they just
14    flooded -- you know, when they call a 10-1, it's
15    just like they come from everywhere.
16    Q.  Do your recall approximately how many
17    City of Chicago Police officers were on the
18    scene?
19    A.  No, I couldn't say exactly.  I don't
20    know exactly.
21    Q.  Were there more than two?
22    A.  Oh, yes.
23    Q.  Was there a supervisor or a sergeant in
24    a white shirt?
                                                126

1    A.  Yes, from the Chicago Police.
2    Q.  And just can you recall when the other
3    University of Chicago Police officers were
4    working to get Mr. Boyle into custody, do you
5    recall seeing the City of Chicago Police
6    officers there at that point in time?
7    A.  No.
8    Q.  Okay.  And what's the University of
9    Chicago Police uniform look like?
10    A.  Just like Chicago's.  Well, we changed
11    it now, but back then it was just like
12    Chicago's.
13    Q.  Can you just tell me a little bit --
14    A.  Like a blue shirt with either black
15    vest or blue vest.  The only difference was our
16    patch and our stars, but other than that, it
17    looked just like Chicago.
18    Q.  And do you recall which city
19    university -- I'm sorry, City of Chicago Police
20    officers by name you dealt with?  Do you recall
21    any of the Chicago Police officers' names?
22    A.  That night?
23    Q.  Uh-huh.
24    A.  I just remember Darling and -- because
                                                127

1    what it is, I was out of -- might be 109.  I
2    know a lot of guys -- that's in the
3    3rd District, so I kind of know them all by name
4    and face.  But because I was up there getting
5    coffee, that's the 21st District, and I never
6    used to deal with the 21st District.  I
7    basically deal with -- because our thing goes
8    into the 21st, to the 2nd and to the
9    3rd District, so we deal with three different
10    districts.  So I'm familiar with all the guys in
11    the 3rd District where I was working.  That's my
12    beat actually.
13    Q.  So no guys from the 3rd District were
14    there?
15    A.  No.  Actually, there was a 3rd District
16    car there, but I don't know who it was, because
17    I remember them saying -- the guys in the
18    station, they're saying that guys came from all
19    over.
20    Q.  But you don't recall specifically who
21    it was?
22    A.  No.
23    Q.  You just heard about it?
24    A.  Yeah.  I said everything happened so
                                                128

32 (Pages 125 to 128)

1  fast. All this happened in a matter of -- it
2  seemed like, you know, minutes.
3      Q. Do you recall who placed Mr. Boyle into
4  the squad car?
5      A. No. I believe it was one of our guys
6  that actually put him in the car. I'm not
7  certain with that. But usually if it's one of
8  our people, we put them in the car, but it
9  doesn't always happen that way. Depending on
10  whoever's driving the car, the officer from
11  Chicago, they might want to pat them down and
12  throw them in the car themselves. It's kind of
13  hard when you're working with two different
14  departments.
15      Q. But did you see Mr. Boyle get placed
16  into a squad car?
17      A. No, I didn't see him actually getting
18  put into the car, no.
19      MS. GIBBONS: That's all. I have nothing
20  further at this point.
21          EXAMINATION
22  BY MR. PUISZIS:
23      Q. Your police report, is it meant to be a
24  summary?

129

1  classification?
2      A. Correct.
3      Q. Now, are you allowed to make narcotics
4  arrests?
5      A. No.
6      Q. Do you participate in the narcotics
7  investigations?
8      A. No.
9      Q. Are you allowed to write traffic
10  tickets?
11      A. No.
12      Q. So you don't have full police powers as
13  such, do you?
14      A. No.
15      Q. And the jurisdiction where you work --
16  I'm sorry, not the jurisdiction, but the areas
17  that you work as a University Chicago -- on
18  behalf of the University of Chicago, there's
19  also Chicago Police officers that work that --
20  those areas as well, correct?
21      A. Correct.
22      Q. So what you do for the University of
23  Chicago in terms of the safety of its students
24  is not exclusive to the University of Chicago by

131

1      A. Yes.
2      Q. It's not meant to be a transcript?
3      A. No.
4      Q. And if you had known you were going to
5  be sued by Charles Boyle, would you have
6  included additional information --
7      A. Oh, definitely.
8      Q. -- in your report?
9      A. Definitely.
10      Q. Is there anything in your report that
11  was marked as an exhibit that -- you said you
12  had started a report and then rewrote it --
13      A. Yeah.
14      Q. -- at the University of Chicago.
15      A. Correct.
16      Q. Anything in that original report that
17  you began at the University of Chicago that is
18  not contained in this report that was marked as
19  Exhibit --
20      MR. KSIAZEK: Two.
21  BY MR. PUISZIS:
22      Q. -- 2 for identification purposes?
23      A. No.
24      Q. And the principal change dealt with the

130

1  any stretch of the imagination, is it?
2      A. No.
3      Q. And what's your understanding of your
4  responsibility as an officer for the University
5  of Chicago?
6      A. Is to protect the students and the
7  property of the University of Chicago.
8      Q. Now, at 2:35 or 2:38 in the morning
9  when this incident happened, were there any
10  other vehicles on the street?
11      A. No, not that I recall.
12      Q. The uniform you wear, does it have your
13  nametag on it?
14      A. Yes.
15      Q. Okay. And would someone looking at you
16  recognize that you're some type of law
17  enforcement officer?
18      A. Yes.
19      Q. Now, you heard the horn go off. You
20  saw the car abruptly pull to the curb, right?
21      A. Correct.
22      Q. The following block, there's the
23  Bank of America with an ATM?
24      A. Yes.

132

33 (Pages 129 to 132)

1    Q.  Are parking spots up there?
2    A.  Yes.
3    Q.  If people wanted to go to an ATM, could
4  they have parked there?
5    A.  Yes.
6    Q.  You saw two men after the car hit the
7  curb get out of the car right away?
8    A.  Correct.
9    Q.  Okay.  And they walked and you lost
10  sight of them, right?
11   A.  Correct.
12   MR. KSIAZEK:  Objection, leading.
13  BY MR. PUISZIS:
14   Q.  In terms of a potential hazard to you
15  as an officer, who represents the greatest
16  hazard to you, the people in the car or the
17  people who had walked some distance away from
18  the car that were now out of your sight?
19   A.  The people in the car.
20   Q.  When an ignition lock is broken -- or
21  one of the ways to steal a car is to break an
22  ignition lock and peel the column, steering
23  column, right?
24   A.  Right.

133

1    MR. KSIAZEK:  Objection, leading.
2  BY MR. PUISZIS:
3    Q.  When that happens, would there be
4  trouble steering a car from time to time?
5    A.  Yes.
6    Q.  You didn't know whether that car was
7  stolen or not, right?
8    A.  Correct.
9    Q.  But one of the things you understood or
10  you were trained was that when a vehicle is
11  stolen, if it has an alarm system, it can
12  activate the horn of the car, correct?
13   A.  Correct.
14   MR. KSIAZEK:  Objection, leading.
15  BY MR. PUISZIS:
16   Q.  And is that something you learned in
17  the police academy?
18   A.  Yes.
19   Q.  And so the -- would it be fair to say
20  that the horn going off and the manner in which
21  the car went to the curb was at least consistent
22  with the possibility of there being a stolen
23  vehicle?
24   A.  Yes.

134

1    MR. KSIAZEK:  Objection, leading.
2  BY MR. PUISZIS:
3    Q.  Sometimes when people honk the horn or
4  blow their horn, it's also a sign that they may
5  need assistance?
6    A.  Yes.
7    Q.  So did you feel you were doing anything
8  improper or violating anyone's rights by driving
9  over to see what was going on with that car
10  given the fashion in which it stopped?
11   A.  No.
12   Q.  Now, you saw two men get out of the car
13  and walk quickly away from it, correct?
14   A.  Correct.
15   Q.  You saw Mr. Boyle get out of the car,
16  correct?
17   A.  Correct.
18   Q.  Was it your intent at that point to put
19  Mr. Boyle under arrest?
20   A.  No.
21   Q.  What was your purpose in approaching
22  Mr. Boyle?
23   A.  To see what the problem was with the
24  car, to find out if it was stolen or if there

135

1  was -- somebody needed assistance.  And
2  basically if everything would have worked out
3  right, we would have just did a -- filled out a
4  contact card and that would have been it.
5    Q.  When you asked for his -- when you
6  asked him whose vehicle was this, what did he
7  say?
8    A.  Why?
9    Q.  Did he tell you who owned the car?
10   A.  No.
11   Q.  When you asked him for identification,
12  did he provide you with any identification?
13   A.  No.
14   Q.  Typically if someone is not violating
15  the law -- or let me withdraw it and ask it this
16  way:  Has it been your experience, Officer, that
17  when someone is not violating the law, they will
18  provide information to a police officer upon
19  request?
20   A.  Yes.
21   MR. KSIAZEK:  Objection, speculation.
22   THE WITNESS:  Yes.
23  BY MR. PUISZIS:
24   Q.  Now, when Mr. Boyle picked you up, you

136

34  (Pages 133 to 136)

1   were off your feet?
2     A. Correct.
3     Q. And he was moving you back towards your
4   squad car?
5     A. Yes.
6     Q. Kind of like how a linebacker tackles a
7   running back, locks him up and runs him back?
8     A. Yes.
9     MR. KSIAZEK: Objection, foundation.
10  BY MR. PUISZIS:
11    Q. And do you remember what he -- you
12  know, did he put you somewhere? Did he throw
13  you on top of the car? Did he throw you in your
14  squad car? What happened to you?
15    A. I fell into the passenger side.
16    Q. You actually fell into the passenger
17  side seat of your car?
18    A. Car.
19    Q. And then did Officer Moore jump on his
20  back to try and pull him off of you?
21    A. Yes.
22    MR. KSIAZEK: Objection, leading.
23  BY MR. PUISZIS:
24    Q. Did you have any idea what his intent

137

1   obtained the contact cards from?
2     A. Do I know who wrote them?
3     Q. Yeah.
4     A. No, I don't.
5     Q. Do you recall at what point during the
6  course of this whole incident that Mr. Boyle
7  actually was taken down to the ground?
8     A. Do I recall at what point?
9     Q. Yeah.
10    A. At what time? No, not exactly because
11  I didn't actually take him down.
12    MR. PUISZIS: Thank you. I don't have any
13  other questions.
14        FURTHER EXAMINATION
15  BY MR. KSIAZEK:
16    Q. The parking spots that you said about
17  the bank, the ATM, was it on the street or was
18  it an actual lot?
19    A. It's a street.
20    Q. So the parking spot was actually on the
21  street?
22    A. For that ATM, if you're going to that
23  ATM, it's on the street.
24    MR. KSIAZEK: I don't have anything further.

139

1   was when he threw you into -- onto the seat on
2  the passenger side of your vehicle?
3     A. No.
4     Q. Was he still face to face with you?
5     A. Yes.
6     Q. Had you struck him or hit him or done
7  anything to cause that type of activity or
8  response from him?
9     A. No.
10    Q. Now, once Officer Moore grabbed -- or
11  jumped on his back, is that when you radioed --
12    A. Yes.
13    Q. -- requesting assistance?
14    MR. KSIAZEK: Objection, leading.
15  BY MR. PUISZIS:
16    Q. Do you know how many officers from the
17  University of Chicago responded to that request
18  for assistance?
19    A. I believe all of them.
20    Q. Was it more than just the officers
21  named in this lawsuit?
22    A. Yes.
23    Q. Do you know who actually would have
24  spoken to the witnesses at the scene who you

138

1     MR. PUISZIS: We'll reserve signature.
2       FURTHER DEPONENT SAITH NAUGHT
3     (Witness was excused at 12:46 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

140

35 (Pages 137 to 140)

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

```
 1
 2    IN THE UNITED STATES DISTRICT COURT FOR THE
 3         NORTHEASTERN DISTRICT OF ILLINOIS
 4                  EASTERN DIVISION
 5
 6    CHARLES BOYLE,          )
          Plaintiff,          )
 7        vs.                 ) No. 09 CH 1080
      UNIVERSITY OF CHICAGO POLICE )
 8    OFFICER LARRY TORRES, et al.,)
          Defendants.         )
 9
10       This is to certify that I have read the
11    transcript of my deposition taken in the
12    above-entitled cause by KAREN E.
13    DOMINICK-RIGONI, Registered Professional
14    Reporter, on November 9, 2009, and that the
15    foregoing transcript accurately states the
16    questions asked and the answers given by me as
17    they now appear.
18
19       _____
              LARRY TORRES
20    SUBSCRIBED AND SWORN TO
21    Before me this _____, day
22    of _____, 2010.
23
24    Notary Public
                                              141
```

```
 1    of the testimony so given by said witness as
 2    aforesaid.
 3       I further certify that the signature
 4    to the foregoing deposition was not waived by
 5    counsel for the respective parties.
 6       I further certify that the taking of
 7    this deposition was pursuant to notice, and that
 8    there were present at the deposition the
 9    attorneys hereinbefore mentioned.
10       I further certify that I am not
11    counsel for nor in any way related to the
12    parties to this suit, nor am I in any way
13    interested in the outcome thereof.
14       IN TESTIMONY WHEREOF: I have
15    hereunto set my hand and affixed my signature
16    this 12th day of January, 2010.
17
18
19
20       _____
21       KAREN E. DOMINICK-RIGONI, CSR, RPR
22       COOK COUNTY, ILLINOIS
23
24
                                              143
```

```
 1    STATE OF ILLINOIS    )
 2                         ) SS:
 3    COUNTY OF C O O K     )
 4       I, KAREN E. DOMINICK-RIGONI, a
 5    Registered Professional Reporter within and for
 6    the County of Cook County and State of Illinois,
 7    do hereby certify that heretofore, to-wit, on
 8    the 9th day of November, 2009, personally
 9    appeared before me, at 222 North LaSalle Street,
10    Suite 300, Chicago, Illinois, LARRY TORRES, in a
11    cause now pending and undetermined in the
12    Circuit Court of Cook County, Illinois, wherein
13    CHARLES BOYLE is the Plaintiff, and UNIVERSITY
14    OF CHICAGO POLICE OFFICER LARRY TORRES, ET AL.
15    are the Defendants.
16       I further certify that the said
17    witness was first duly sworn to testify the
18    truth, the whole truth and nothing but the truth
19    in the cause aforesaid; that the testimony then
20    given by said witness was reported
21    stenographically by me in the presence of the
22    said witness, and afterwards reduced to
23    typewriting by Computer-Aided Transcription, and
24    the foregoing is a true and correct transcript
                                              142
```

```
 1            McCORKLE COURT REPORTERS, INC.
              200 North LaSalle Street, Suite 300
 2               Chicago, Illinois 60601-2956
                        (312) 263-0052
 3
      January 12, 2010
 4
          HINSHAW & CULBERTSON, LLP
 5    ATTN: MR. STEVEN M. PUISZIS
      222 North LaSalle Street, Suite 300
 6       Chicago, Illinois 60601
 7       IN RE: BOYLE vs. UNIVERSITY OF CHICAGO
      COURT NUMBER: 09 CH 1080
 8       DATE TAKEN: 11/09/09
          DEPONENT: LARRY TORRES
 9
      Dear Mr. Puiszis:
10
      Enclosed is the deposition transcript for the
11    aforementioned deponent in the above-entitled
      cause. Also enclosed are additional signature
12    pages, if applicable, and errata sheets.
13    Per your agreement to secure signature, please
      submit the transcript to the deponent for review
14    and signature. All changes or corrections must
      be made on the errata sheets, not on the
15    transcript itself. All errata sheets should be
      signed and all signature pages need to be signed
16    and notarized.
17    After the deponent has completed the above,
      please return all signature pages and errata
18    sheets to me at the above address, and I will
      handle distribution to the respective parties.
19
      If you have any questions, please call me at the
20    above phone number.
21    Sincerely,
22    Margaret Setina     Court Reporter:
      Signature Department  Karen E. Dominick-Rigoni
23                          CSR, RPR
24    cc: All parties.
                                              144
```

36  (Pages 141 to 144)

The University of Chicago Police – Dispatch Tape – 18 October 2008

Starting time:    0237 hours

| | |
|---|---|
| Dispatch | Go head unit |
| Unit | 1424 55th Street, hurry up |
| Dispatch | Any unit on the scene with him? 109 |
| 109 | Send me a car over here |
| Dispatch | I need the address, 109 what's your location? |
| 109 | 53rd and Blackstone |
| Dispatch | 53rd and Blackstone, we got a 10-1, 10-1 53rd and Blackstone |
| 101 | 101 enroute 53rd and Blackstone right? |
| Dispatch | 53 and Blackstone, 5-3 and Blackstone, we got a 10-1 |
| 130 | Take my two (2) cars right now |
| Dispatch | 105 and 106 you headed? |
| 105 | 5 going |
| 101 | 101, 23 (twenty-three) |
| Dispatch | 101 what you got over there? One, zero, one what do you have? 101 do you see 109? Okay units we got the city coming can somebody get there? Next unit on the scene tell me what you got. |
| Unknown | We got one guy on the ground we got two (2) officers. |
| Dispatch | 53 and Blackstone I need every officer we got to get to 5-3 and Blackstone. |
| 100 | 100 is in enroute. |
| Dispatch | 53 and Blackstone, okay units do we have everything under control at 53 and Blackstone? |
| Unknown | Everybody take a slow down |
| 100 | Slow it down |
| Dispatch | Okay units slow it down at 53 and Blackstone, slow it down. Slow it down at 53 and Blackstone. 53 and Blackstone units slow it down. |

U-2020
Page 1 of 3

U/C
0047



TORRES
EXHIBIT NO. /
11·09·05 KOR

| | |
|---|---|
| 105 | Squad give it a disregard we have enough units on the scene |
| Dispatch | Okay 105 is giving disregard, enough units on the scene 53 and Blackstone. |
| 106 | 6 – 10-4 |
| 101 | 101 |
| Dispatch | 101 |
| 101 | Please run driver's license for me, driver's license, B-boy 40014487100. |
| Dispatch | 10-4 |
| Dispatch | Okay 106, that driver's license, 103 |
| 100 | There is a (indistinct) what you need dispatch? |
| Dispatch | Someone there ran a drivers license, I want to give them the information. |
| 106 | Oh go ahead squad, squad go ahead with the drivers license info |
| Dispatch | You should be talking to a Charles Boyle, 6733 S. Chappell he's clear squad. |
| Unknown | Any priors or any contact cards or anything |
| Dispatch | We're checking through the computer |
| 105 | 105 – while you're at it can you run a plate that this guy was in? |
| Dispatch | What was it? |
| 105 | Illinois, X-ray 398206 |
| Dispatch | 10-4 |
| 100 | 100 to 103 |
| 103 | 3 go |
| 100 | You got an extra pair of glasses, or do you need to go home and get some or anything? |
| 103 | I'm going to have get some Lt. cause I can't see anything. |
| 100 | Okay park, your car and I'll give you a ride home to get some if you got an extra pair. |

U-2020
**Page 2 of 3**

U/C
0048

| | |
|---|---|
| 109 | One zero nine |
| Dispatch | 109 – |
| 109 | Alright I got an IL DL when ready? |
| Dispatch | Go with it |
| 109 | Disregard, disregard |
| Unknown | 17 paw on that escort |
| Dispatch | 10-4, the drivers license or the plate, X-ray 3908206 coming back clear valid on an 06 Chrysler, 4 door. Margo and Ashley Glover, 13033 Seeley in Blue Island. |
| 105 | 105 – 10-4 if you can hold that information |
| Dispatch | Printing it as we speak |

U-2020
Page 3 of 3

U/C
0049

| 1. TYPE OF INCIDENT | 2. CLASSIFICATION CODE | 3. CLASSIFICATION |
|---|---|---|
| □ SERVICE ☒ CRIME □ ATTEMPT OF OFFENSE | 47 | SUSPICIOUS PERSON / AUTO |

**SCENE**

| 5. ADDRESS OF OCCURRENCE | | 6. DATE OCC (DAY-MO-YR) | 7. TIME OF OCCURRENCE |
|---|---|---|---|
| 1435 E 53 ST | | 18 OCT 08 | 0735 |

| 4. APT OR ROOM NUMBER OTHER INFO | 8. U OF C PROPERTY | □ RESIDENCE ☒ ON STREET □ IN ALLEY | 10. DATE REPORTED | 11. TIME REPORTED |
|---|---|---|---|---|
| N/A | □ NON U OF C PROPERTY | □ NON RESIDENCE □ OUTSIDE AREA OF AUTHORITY | 18 OCT 08 | 0735 |

GIVE NAME OF BLDG OR TYPE OF STRUCTURE WHERE INCIDENT OCCURED: STREET   BUILDING CODE: N/A   12. REPORTED VIA □ U.C. RADIO ☒ CPD RADIO / □ ON VIEW / □ OTHER

ALL INFORMATION, DESCRIPTIONS AND STATEMENTS IN THIS REPORT ARE APPROXIMATIONS OR SUMMARIZATIONS UNLESS INDICATED OTHERWISE

**COMPL/VICTIM**

| 13. ☒ COMPLAINANT □ VICTIM | ADDRESS | APT OR ROOM NO | 15. HOME PHONE | 16. TIME AVAILABLE |
|---|---|---|---|---|
| L Torres | 5555 S ELLIS | N/A | 762-8181 | ANY |

| 14. a □ FAC DEPT & POSITION b ☒ STU c □ STAFF | □ ALUMNI EMPLOYER □ PAT □ NON-UofC | □ RELATIVE OF □ FAC □ STAFF □ STU COMPLETE INFO IN LINE # 26 | SEX M | RACE W | AGE 39 | 17. BUSINESS PHONE 762-8181 | 18. TIME AVAILABLE ANY |
|---|---|---|---|---|---|---|---|
| Police Officer | U of C | | | | | | |

| 19. □ ILLNESS □ INJURY | □ TREATED □ RELEASED | IF ADMITTED | ROOM NO | PHYSICIAN | HOSPITAL |
|---|---|---|---|---|---|

**OFFENDER/SUSPECT/VICTIM/WITNESS**

| 20. NAME OF ☒ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX M | RACE B | AGE 18 | HT 5'9" | WT 147 | EYES Brn | HAIR Blk | BUILD Medium | COMPLEXION DRK | U OF C AFFILIATED □ YES ☒ NO / □ FAC □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| O Boyle CHARLES | ADDRESS 6733 S Chappel | | | | | | | PHONE 363-2575 | | DEPT ☒ UCPD ARREST |

| 21. NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ NO / □ FAC □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| O | ADDRESS N | | | | | | | PHONE A | | DEPT □ UCPD ARREST |

| 22. NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ NO / □ FAC □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| O | ADDRESS N | | | | | | | PHONE A | | DEPT □ UCPD ARREST |

| 23. NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ NO / □ FAC □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| O | ADDRESS N | | | | | | | PHONE A | | DEPT □ UCPD ARREST |

| 24. NAME OF □ OFFENDER □ SUSPECT □ VICTIM □ WITNESS □ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED □ YES □ NO / □ FAC □ STU □ STAFF |
|---|---|---|---|---|---|---|---|---|---|---|
| O | ADDRESS N | | | | | | | PHONE A | | DEPT □ UCPD ARREST |

| 25. HOW MANY OFFENDERS 1 | SUSPECTS 0 | WITNESSES 0 | ARRESTED 1 | VEHICLE 1 | CONTACT CARDS ISSUED | ARREST CARDS MADE |
|---|---|---|---|---|---|---|

**CIRCUMSTANCES**

| 26. VEHICLE OF ☒ OFFENDER □ SUSPECT | YEAR 06 | MAKE CHRYSLER | MODEL PASS | BODY STYLE 4 DR | COLOR Silver | STATE LICENSE NO X398206 | STATE IL | EXP YR 08 | OTHER IDENTIFYING MARKS N/A |
|---|---|---|---|---|---|---|---|---|---|

| 27. WEAPONS □ NONE ☒ USED □ NOT DISPLAYED | □ HAND GUN □ RIFLE □ SHOT GUN | CAL/GA COLOR □ BLUE STEEL □ NICK/CHROME □ OTHER | □ KNIFE OR CUTTING INSTRUMENT TYPE | □ OTHER WEAPON (SPECIFY TYPE) A |
|---|---|---|---|---|

| 28. POSSIBLE POINT OF ENTRY | 29. POSSIBLE POINT OF EXIT | 30. POSSIBLE TOOLS USED | 31. HOW WERE TOOLS USED? |
|---|---|---|---|

| 32. BURG ALARM ON PREMISES □ YES □ NO ☒ DNA | 33. ALARM CIRCUMVENTED □ YES □ NO ☒ DNA | 34. TOOL MARKS OBSERVED □ YES □ NO ☒ DNA | 35. WERE OCCUPANTS AT HOME □ YES □ NO ☒ DNA |
|---|---|---|---|

**PROPERTY**

| 36. DESCRIBE PROPERTY □ TAKEN □ DAMAGED □ LOST □ MISSING □ RECOVERED □ FOUND LIST BY LINE NO IN NARR ☒ DNA | LIST TOTAL DOLLAR VALUE OF TAKEN LOST OR MISSING PROPERTY ONLY $ | 1. □ MONEY $ | 2. □ TV RADIO STEREO etc. $ | 3. □ COMPUTER EQUIP. $ | 4. □ OFFICE EQUIP $ | 5. □ CLOTHING $ | 6. □ JEWELRY $ |
|---|---|---|---|---|---|---|---|
| | | 7. □ BICYCLE $ | 8. □ MEDICAL EQUIP $ | 9. □ PHOTO EQUIP $ | 10. □ HOUSEHOLD ITEMS $ | 11. □ BOOKS $ | 12. □ OTHER $ |

| 37. VEHICLE OR TRAILER (SPECIFY TYPE) | YEAR | MAKE | MODEL | BODY STYLE | COLOR | STATE LICENSE | STATE | YEAR | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|---|---|

| 38. OWNER OF PROPERTY □ U OF C □ STUDENT □ PATIENT □ RELATIVE □ FACULTY □ STAFF □ ALUMNI □ OTHER | CPD INVENTORY # N | UCPD INVENTORY A |
|---|---|---|

**PERSONNEL**

| 39. REPORTING OFFICER'S NAME (PRINT) Torres | OFFICER'S ASSIGNMENT 109 | OFFICER'S SIGNATURE | 40. CPD BEAT ASSIGNED NO 2132 | NOTIFIED BY COMPL OR VICTIM □ CPD REFUSED REPORT □ COMPL REFUSED CPD |
|---|---|---|---|---|

| 41. ASSIST UNITS (PRINT NAMES AND ASSIGNMENTS) 106, 101, 100, Q120, 2131 | 42. CPD OFFICER (PRINT NAME) STAR NO RD NO DARING 19135 HP65406 |
|---|---|

| 43. ARRESTING SUPERVISOR'S NAME (PRINT) | APPROVAL SIGNATURE | 44. CPD UNITS ASSIGNED N |
|---|---|---|

**NOTIFICATIONS**

| 45. □ DIRECTOR □ ASSOC DIR □ ASSI DIR | TIME | 1. □ CENTRAL ADMIN - TIME | 2. □ DEAN OF STUDENTS - TIME | 3. □ SICC - TIME | 4. □ OTHER - TIME |
|---|---|---|---|---|---|

| 46. PERSON MAKING NOTIFICATION | 47. COPY SENT BY Lt C | 48. □ COPY SENT TO (DATE/TIME) □ REAL ESTATE OPERATIONS □ DEAN OF STUDENTS □ OTHER (SPECIFY) | 18 OCT 0600 HARRIS, RICHARDSON, LILLIE |
|---|---|---|---|

| 49. MUG SHOT □ YES □ WILL CONTACT □ REFUSED ☒ DNA | | 50. SICC LETTER □ RISK MGM (CHAMP) SIGNED / RETURNED □ REFUSED ☒ DNA |
|---|---|---|

THE UNIVERSITY OF CHICAGO POLICE DEPARTMENT I        U/C0109

| | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO | STATE | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|
| OPERATOR 1 VEHICLE 1 | | | | | | | |
| OPERATOR 2 VEHICLE 2 | | | | | | | |

1. Follow dotted lines to draw outline of roadway at place of accident.
2. Number each vehicle and show direction of travel by arrow.
→ 1 2 ←
Use solid line to show path before accident. → 2
dotted line after accident ----→ 2
4. Show pedestrian by: ○
5. Show utility poles by: ⊕
6. Show motorcycle by: ⊖⊖

IDENTIFY STREETS BY NAME OR NUMBER

DRAW ARROW INDICATING NORTH

D-N-A

| Direction of Travel | (Circle) N S E W |
|---|---|
| Vehicle 1 | 1 2 3 4 |
| Vehicle 2 | 1 2 3 4 |

51. NARRATIVE:

Description of Offender M/B 5'9 247 lbs Blk hair Brn eyes Gray Jacket Blue Jeans White + Blk gym shoes

In Summary on 18 Oct 08 at approx 2:38 hrs while on Patrol R/O's Moore #1612 and Torres #1028 noticed a silver Chrysler driving East bound on 53st with horn sounding while driving. The vehicle then curbed quickly and two male subjects existed vehicle and began walking East bound on 53rd st. The third subject now known as O'Boyle, Charles 4/27/87 (Offender) exited vehicle and opened hood of vehicle. R/O's approached O'Boyle and asked who vehicle was it. O'Boyle answered why! R/O's then asked for an I.D. And at this time became evasive and refused to produce an I.D. O'Boyle then became very combative and H/O Torres called for assistance. Offender then began fighting with officer's Moore, Torres, Galarza + Kwiatkowski, during the altercation arrest officer's Galarza + Moore got injured. OFC. Moore injured left wrist. Offender was transported to 21st Dist. by beat 2132 for Processing. Offender was charged with Interference to Police officer (Resisting) Court date 04 Dec 08 branch 39-2 Time 0900 hrs

OFC. Gillespe glasses were broken.

U/C0110

| 1 TYPE OF INCIDENT | 2 CLASSIFICATION CODE | 3 CLASSIFICATION | | 6 DATE OCC (DAY-MO-YR) | 7 TIME OF OCCURRENCE |
|---|---|---|---|---|---|
| ☑ SERVICE ☐ OFFENSE ☐ ATTEMPTED OFFENSE | 61 | INJURED PERSON | | 18 OCT 08 | 0258 |

| 4 ADDRESS OF OCCURRENCE | | | 8 DATE REPORTED | 9 TIME REPORTED |
|---|---|---|---|---|
| 5503 ST. CHICAGO IL. 606 | | | 18 OCT 08 | 0938 |

| 8 APT OR ROOM NUMBER | 9 ☐ U OF C PROPERTY ☐ RESIDENCE ☐ ON STREET ☐ IN ALLEY | 10 ☐ REPORTED VIA: ☐ U.C. RADIO ☐ CPD RADIO |
|---|---|---|
| N/A | ☐ U OF C PROPERTY ☐ NON-RESIDENCE ☐ OUTSIDE AREA OF AUTHORITY | ☐ IN VIEW ☐ OTHER |

| GIVE NAME OF BLDG. OR TYPE OF LOCATION WHERE INCIDENT OCCURRED | BUILDING CODE |
|---|---|
| STREET | |

ALL INFORMATION, DESCRIPTIONS AND STATEMENTS IN THIS REPORT ARE APPROXIMATIONS OR SUMMARIZATIONS UNLESS INDICATED OTHERWISE

| 13 ☐ COMPLAINANT ☐ VICTIM | ADDRESS | 14 HOME PHONE | 15 TIME AVAILABLE |
|---|---|---|---|
| OSCAR R. GALARZA 5555 S. Ellis Chicago IL. | | 702-8181 | July |

| 16 ☐ FAC. DEPT & POSITION ☐ ALUMNI EMPLOYER | g ☐ RELATIVE OF | SEX | RACE | AGE | 17 BUSINESS PHONE | 18 TIME AVAILABLE |
|---|---|---|---|---|---|---|
| ☐ STU UofC ☐ PAT ☐ NON-UNIV | ☐ FAC ☐ STAFF ☐ STU: COMPLETE INFO IN LINE #24 | M | H | 24 | 702-8181 | July |

| 19 ☐ ILLNESS ☑ INJURY | ☑ TREATED ☐ ADMITTED | ☑ RELEASED | IF ADMITTED | ROOM | PHYSICIAN | HOSPITAL |
|---|---|---|---|---|---|---|
| | | | | 19 | Dr. Oxterik | N/A |

| 20 NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☑ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|
| LARRY TORRES | M | H | 41 | 509 | 150 | Bro | Blk | MDM | Light | ☐ FAC ☐ NO ☐ STU |
| ADDRESS 5555 S. Ellis | | | | | | | PHONE 702-8181 | | | DEPT. ☐ STAFF ☐ UCPD ARREST |

| 21 NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|
| N/A | | | | | | | | | | ☐ YES ☐ FAC ☐ NO ☐ STU |
| ADDRESS | | | | | | | PHONE | | | DEPT. ☐ STAFF ☐ UCPD ARREST N/A |

| 22 NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|
| N/A | | | | | | | | | | ☐ YES ☐ FAC ☐ NO ☐ STU |
| ADDRESS | | | | | | | PHONE | | | DEPT. ☐ STAFF ☐ UCPD ARREST N/A |

| 23 NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|
| N/A | | | | | | | | | | ☐ YES ☐ FAC ☐ NO ☐ STU |
| ADDRESS | | | | | | | PHONE | | | DEPT. ☐ STAFF ☐ UCPD ARREST N/A |

| 24 NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION | U OF C AFFILIATED |
|---|---|---|---|---|---|---|---|---|---|---|
| N/A | | | | | | | | | | ☐ YES ☐ FAC ☐ NO ☐ STU |
| ADDRESS | | | | | | | PHONE | | | DEPT. ☐ STAFF ☐ UCPD ARREST N/A |

| 25 IDENTIFY OFFENDER | | | | | | | | 2ND RESTRAINTS MADE? |
|---|---|---|---|---|---|---|---|---|
| N/A | | | | | | | | |

| 26 VEHICLE OF ☐ OFFENDER ☐ SUSPECT | YEAR | MAKE | MODEL | BODY STYLE | COLOR | STATE LIC PLATE NO | STATE | YEAR | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|---|---|

| 27 WEAPONS ☐ NONE ☐ USED ☐ NOT DISPLAYED | ☐ HAND GUN ☐ RIFLE ☐ SHOT GUN | LENGTH ☐ BLUE STEEL ☐ NICKEL/CHROME TYPE | CALIBER OR GAUGE | OTHER WEAPON (SPECIFY TYPE) |
|---|---|---|---|---|
| N/A | | | | |

| 28 POSSIBLE POINT OF ENTRY | 29 POSSIBLE MEANS OF ENTRY | 30 POSSIBLE DOORS USED | 31 HOW WERE TOOLS USED? |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| 32 USING ALARM OR PREMISES | 33 ALARM/SUM ACTIVATED | 34 TIME STORES FINISHED | 35 WERE PREMISES AT HOME? |
|---|---|---|---|
| ☐ YES ☐ NO ☐ N/A | ☐ YES ☐ NO ☐ N/A | ☐ YES ☐ NO ☐ N/A | ☐ YES ☐ NO ☐ N/A |

| 36 DESCRIBE PROPERTY | 37 TOTAL DOLLAR VALUE (IF TAKEN) (LIST COMMISSION) | 1 CURRENCY | 2 TV RADIO STEREO etc. | 3 COMPUTER EQUIP | 4 OFFICE EQUIP | 5 CLOTHING | 6 JEWELRY |
|---|---|---|---|---|---|---|---|
| ☐ TAKEN ☐ DAMAGED ☐ LOST ☐ MISSING ☐ RECOVERED ☐ FOUND | $ | $ | $ | $ | $ | $ | $ |
| USED IN NO HAZARD ☐ DNA | | 7 BICYCLE | 8 MEDICAL EQUIP | 9 PHOTO EQUIP | 10 HOUSEHOLD ITEMS | 11 BOOKS | 12 OTHER |
| | | $ | $ | $ | $ | $ | $ |

| 37 VEHICLE OR TRAILER (SPECIFY TYPE) | YEAR | STATE | MODEL | BODY STYLE | COLOR | STATE LICENSE | STATE | YEAR | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|---|---|

| 38 OWNER OF PROPERTY | UCPD INVENTORY # |
|---|---|
| ☐ U OF C ☐ STUDENT ☐ RELATIVE ☐ FACULTY ☐ STAFF ☐ ALUMNI ☐ OTHER | N/A N/A |

| 39 REPORTING OFFICER'S NAME (PRINT) | IDENTIFY | BADGE ASSIGNED | 40 CPD BEAT ASSIGNED | NO | 41 NOTIFIED BY COMPL OR VICTIM ☐ CPD REFUSED REPORT ☐ COMPL REFUSED CPD |
|---|---|---|---|---|---|
| OFFICER LIST | 131 | | N/A | | |

| 41 ASSIST UNITS (PRINT NAME AND ASSIGNMENT) | 42 CPD OFFICER (PRINT NAME) STAR NO | RD NO |
|---|---|---|
| N/A | N/A | |

| 43 APPROVED, SUPERVISOR (PRINT) | APPROVED, SIGNATURE | 44 RECORDS APPROVED | DATE |
|---|---|---|---|
| R.Y. CAHILLAN, SGT. | R.Y. Cahillan, Sr. | N/A | |

| 45 ☐ UNFOUNDED ☐ ASSIGNED ☐ ASSISTED | TIME | EXPLAIN/REMARKS | DATE | CASE STATUS ☐ OPEN ☐ CLOSED | DATE | ☐ SUP | DATE | ☐ CLEARED | TIME |
|---|---|---|---|---|---|---|---|---|---|

| 46 PERSON SAYING INITIAL REPORT | 47 SUPERVISOR | 48 UCPD SENT (GUARD TIMES) ☐ NO ASSIGNED OR RECEIVED ☐ PLAIN OR CONFINED ☐ HOLDING OFFICER |
|---|---|---|
| | R.y.C. | MARKS FMT. ALISON CALLIER |

| 49 WATCH CMDR. | | |
|---|---|---|
| ☐ YES ☐ NON-CLEARABLE ☐ INITIATE | U/C0111 | RISK MGMT (CAMPUS) |

| OPERATOR 1 VEHICLE 1 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATE | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|
| OPERATOR 2 VEHICLE 2 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATE | OTHER IDENTIFYING MARKS |

- Follow dotted lines to draw outline of roadway at place of accident.
- Number each vehicle and show direction of travel by arrow.

→ 1 2 ←

Use solid line to show path before accident. → 2

Dotted line after accident. ---→ 2

Show pedestrian by: ◯
Show utility poles by: ⊕
Show motorcycle by: Θ⊖

**IDENTIFY STREETS BY NAME OR NUMBER**

**DRAW ARROW INDICATING NORTH**

| | (Circle) | | | |
|---|---|---|---|---|
| Direction of Travel | N | S | E | W |
| Vehicle 1 | 1 | 2 | 3 | 4 |
| Vehicle 2 | 1 | 2 | 3 | 4 |

51. NARRATIVE: In Summary

In Refuehce to PAI # U2020 08 OCT 08 0238 HRS. O3C - GALAEZA units 101 responded to a 10-1 call to assist unit 109 Off. Farres, Off Galaeza reported while trying to hand cuff the offender he injured his Right shulder. Refer to P.I. # 42624

U/C0112

| 1. TYPE OF INCIDENT | 2. CLASSIFICATION CODE | 3. CLASSIFICATION |
|---|---|---|
| ☒ SERVICE ☐ OFFENSE ☐ ATTEMPTED OFFENSE | 61 | Injured Person |

**SCENE**

| 4. ADDRESS OF OCCURRENCE | 5. DATE OCC (DAY-MO-YR) | 6. TIME OF OCCURRENCE |
|---|---|---|
| 1435 E 53rd St | 18 OCT 08 | 0236 |

| 7. APT. OR ROOM NUMBER | 8. TYPE OF PROPERTY | 9. ☐ OF PROPERTY | 10. DATE REPORTED | 11. TIME REPORTED |
|---|---|---|---|---|
| ☒ OTHER HMD D-n-A | ☐ APT ☐ HOME ☐ C PROPERTY | ☒ NON RESIDENCE ☐ ON STREET ☐ OUTSIDE AREA OF AUTHORITY ☐ IN ALLEY | 18 OCT 08 | 1209 |

GIVE NAME OF BLDG OR TYPE OF LOCATION WHERE INCIDENT OCCURRED: STREET   BUILDING CODE: D-n-A

REPORTED VIA ☒ ON VIEW ☐ OTHER ☐ U.G. RADIO ☐ CPD RADIO

ALL INFORMATION DESCRIPTIONS AND STATEMENTS IN THIS REPORT ARE APPROXIMATIONS OR SUMMARIZATIONS UNLESS INDICATED OTHERWISE

**COMPL/VICTIM**

| 12. ☒ COMPLAINANT ☒ VICTIM | ADDRESS | APT. OR ROOM NO. | 14. HOME PHONE | 15. TIME AVAILABLE |
|---|---|---|---|---|
| Moore Clarence | 5555 S Ellis Chgo IL | | 702-8181 | Any |

| 16. ☒ FAC ☐ STU ☐ STAFF | DEPT & POSITION Police | u ☐ ALUMNI ☐ PAL ☐ NON-UNIV | EMPLOYER U of Chgo | g ☐ RELATIVE OF ☐ FAC ☐ STU | SEX M | RACE 1 | AGE 55 | 17. BUSINESS PHONE 702-8181 | 18. TIME AVAILABLE Any |

COMPLETE INFO ON LINE • 20

| 19. ☐ ILLNESS ☒ INJURY | ☐ TREATED | ☐ RELEASED ☐ ADMITTED | IF ADMITTED | ROOM NO | PHYSICIAN | HOSPITAL |
|---|---|---|---|---|---|---|

**OF./SUSPECT/VICTIM/WITNESS**

| 20. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☒ WITNESS ☐ OTHER | SEX M | RACE A | AGE 41 | HT 5'9 | WT 150 | EYES Brn | HAIR BLK | BUILD MED | COMPLEXION Lt |
|---|---|---|---|---|---|---|---|---|---|
| Ozifes Lazy | ADDRESS 5555 S Ellis | | | PHONE | | | | | |

UOF C AFFILIATED ☐ YES ☐ FAC ☐ NO ☐ STU ☐ STAFF   DEPT.   ☐ CU/CPD ARREST

| 21. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION |
|---|---|---|---|---|---|---|---|---|---|

| 22. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION |
|---|---|---|---|---|---|---|---|---|---|

| 23. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION |
|---|---|---|---|---|---|---|---|---|---|

| 24. NAME OF ☐ OFFENDER ☐ SUSPECT ☐ VICTIM ☐ WITNESS ☐ OTHER | SEX | RACE | AGE | HT | WT | EYES | HAIR | BUILD | COMPLEXION |
|---|---|---|---|---|---|---|---|---|---|

25. HOW MANY OFFENDERS

**CIRCUMSTANCES**

26. VEHICLE OF ☐ OFFENDER ☐ SUSPECT

| 27. WEAPON | ☐ HAND GUN | ☐ RIFLE | ☐ OTHER FIREARM | ☐ OTHER WEAPON (SPECIFY TYPE) |
|---|---|---|---|---|
| ☒ NONE ☐ USED ☐ NOT DISPLAYED | ☐ SHOT GUN | ☐ KNIFE | ☐ OTHER | |

28. POSSIBLE POINT OF ENTRY

32. BURG ALARM ON PREMISE? ☐ YES ☐ NO ☒ UNA

36. DESCRIBE PROPERTY ☐ TAKEN ☐ DAMAGED ☐ LOST ☐ MISSING ☐ RECOVERED ☐ FOUND ☒ UNA

**PROPERTY**

37. VEHICLE OR TRAILER IDENTIFY BY #: N/A

38. OWNER OF PROPERTY

**ANNUAL**

| 39. REPORTING OFFICER'S NAME / PHONE | STAR |
|---|---|
| Hill, | 205 |

41. ASSIST OFFICER (PRINT) NAME AND SIGNATURE

| 43. APPROVING SUPERVISOR (PRINT) | STAR |
|---|---|
| Sgt Chisem | |

45. ☐ WATCH CDR ☐ ASSGN INV ☐ ASST INV

46. PERSON MAKING NOTIFICATION

U/C0113

| RATOR 1 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATE | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|
| CLE 1 | | | | | | | |

| PERATOR 2 | COLOR | YEAR | MAKE | BODY STYLE | LICENSE NO. | STATE | OTHER IDENTIFYING MARKS |
|---|---|---|---|---|---|---|---|
| VEHICLE 2 | | | | | | | |

Follow dotted line to draw
outlines of roadway at place
of accident.
Number each vehicle and
show direction of travel by
arrow.

Use solid line to show path
fore accident.

dotted line after accident

Show pedestrian by:
Show utility poles by:
Show motorcycle by:

IDENTIFY STREETS
BY NAME OR NUMBER

DRAW ARROW
INDICATING
NORTH

(Circle)
Direction of Travel   N   S   E   W
Vehicle 1   1   2   3   4
Vehicle 2   1   2   3   4

**51. NARRATIVE:** In Summary
- Above listed Location, Date and times Officer
Moore #1012 Unit 101 Responded to a 10-1 call to
Assist unit 109 Officer Torres. Officer Moore injured
His Left wrist while in Process of Handcuffing
And placing Officer in custody Reference PDJ
U2020

TORRES

EXHIBIT NO. 2

11·09·09  KDR

02/24/2009 10:04 FAX 773 702-1026    UofC Police    007

## THE UNIVERSITY OF CHICAGO
## POLICE DEPARTMENT
### RECORD OF ARREST

Name: O Boyle Charles O

| Last Name | First | Mi |
|---|---|---|
| O Boyle | Charles | O |

**Alias** N/A

**Address** 6733 S. Chappel

**Phone** 773 363-2575

| Male ☒ | Age 21 | Weight 150 | Height 5'09" | Marks, Scars, etc. Tatoo LFT Arm RT Arm |
|---|---|---|---|---|
| Female ☐ | | | | |

PO N 2020

| Race | Wht. ☐ Blk. ☒ Oth. ☐ | Compl. | Lt. ☐ Med. ☐ Drk. ☒ | Sl. ☐ Bld. Med. ☐ Hvy. ☒ | Eyes | Brn. ☒ Bl. ☐ Grey ☐ Green ☐ |

| Color Hair | Blk. ☒ Brn. ☐ Red ☐ | Blonde ☐ White ☐ Grey ☐ |

**Where Employed** ST. PATRICK'S CHURCH

**Date of Birth** 04/07/1987

**Social Security Number** 335 | 78 | 4561

**Place of Arrest** 1435 E 53rd ST
Initiated ☒ Assigned ☐

**Date & Time of Arrest** 18 OCT 08 02:38

**Charges and Type of Arrest** INTERFERENCE WITH PUBLIC OFFICER (RESISTING)

☐ Misd. Warrant
☐ Felony Warrant
☐ Felony
☒ Misdemeanor
☐ Traffic

| Arresting Officers 2 | Chgo. Police Dept. DARLING #19135 7.1 Dist. | U of C P.D. C MOORE 1012 L TORRES 1028 |

**Complainant's Name** C MOORE #1012    L TORRES #1028

**Address** 5555 S. Ellis

**Phone** 773 702-8181

| Court Br. 34-2 | Date & Time 9:00 am 04 Dec 08 | IR # |

**Docket #**

**Final Disposition**

TORRES
EXHIBIT NO. 3
11.09.09 KOR

U/C
0051

| Last Name | SiNClAiR | First | STevEN | MI | D | Campus Area | |
|---|---|---|---|---|---|---|---|

Address 7834 S Lansky

Phone

| Location of Contact | 1435 E 53ST | | | Date & Time of Contact 18 OcT 08 | | | |
|---|---|---|---|---|---|---|---|
| Race B | Sex M | Age 21 | Hght. 5'7 | Wght. 165 | Hair BlK | Eyes BRN | Compl. DRK | Scars N/U |

Clothing Worn BlK Hoody + BlK Jeans

D.O.B. N/A

Desc. of Vehicle Involved Silver Chrysler

Driver's Lic. No. 5524-7848-7048

Incident Report #

**THE UNIVERSITY OF CHICAGO**
**POLICE DEPARTMENT**
Field Contact Card

UCS

---

| Last Name | Roberson | First | Kenneth | MI | D | Campus Area | |
|---|---|---|---|---|---|---|---|

Address 7533 S KiNG DR

Phone

| Location of Contact | 1412 E 53ST | | | Date & Time of Contact 18 OcT 08 | | | |
|---|---|---|---|---|---|---|---|
| Race B | Sex M | Age | Hght. 5'10 | Wght. 165 | Hair BllK | Eyes BRN | Compl. DRK | Scars N/U |

Clothing Worn BlK Hoody + DRK Jeans

D.O.B. 12/15/86

Desc. of Vehicle Involved

Driver's Lic. No.

Incident Report #

**THE UNIVERSITY OF CHICAGO**
**POLICE DEPARTMENT**
Field Contact Card

UCS

U/C
0064

TORRES
EXHIBIT NO. 2
11-09-09 KOR

| Last Name | | First | | MI | Campus Area |
|---|---|---|---|---|---|
| GLOVER | | ASHLEY | | | |
| Address | | | | | Phone 773 |
| 13033 S. SEELY Blue ISLAND | | | | | 757-70.9 |
| Location of Contact | | | | Date & Time of Contact | |
| 1435 E 53ST | | | | 18 OCT OK | |
| Race | Sex | Age 21 | Hght. 507 | Wght. 112 | Hair BLK | Eyes BRN | Compl. MED | Scars N/U |

| Clothing Worn | | D. O. B. |
|---|---|---|
| BLK JACKET DRK PANTS | | |

| Desc. of Vehicle Involved | Driver's Lic. No. |
|---|---|
| SILVER CHRYSLER | N/A |

| | Incident Report # |
|---|---|
| | |

THE UNIVERSITY OF CHICAGO
**POLICE DEPARTMENT**
Field Contact Card

UCS

U/C
0065

NARRATIVE:

IN SUMMARY ON 12 DEC 08 AT APPROX. 0700AM R/O'S TORRES + MOORE APPEARED IN COURT BRANCH 46 ROOM 304 AT 09:00AM FOR DEFENDANT BOYLE, CHARLES FOR PDI # U2020 SUSPICIOUS PERSON/AUTO CPD RD # HP634061 INTERFERENCE WITH A POLICE OFFICER THE CASE WAS CONTINUED TO 20 JAN 09 BRANCH 46 RM 304 AT 13:30PM

IN SUMMARY ON 18 OCT 08 AT APPROX 2:38HRS WHILE ON PATROL R/O'S MOORE #1012 +TORRES #1028 NOTICED A SILVER CHRYSLER DRIVING EAST BOUND ON 53ST. THE VEHICLE CURBED AND R/O'S INVESTIGATED THE SITUATION AT WHICH TIME OFFENDER BOYLE BECAME VERY EVASIVE AND THEN COMBATIVE. R/O'S CALLED FOR ASSISTANCE AND WAS PLACED INTO CUSTODY AND PROCESSED AT THE 21ST DIST POLICE STATION.

TORRES
EXHIBIT NO. 5
11·09·09  KDR

U/C
0052

PAGE 1 OF 1

SUPERVISOR: _____

OFFICER: TORRES  1028

The University of Chicago Police Department
## ARREST CLEARING AND CLOSING / OFFENSE CLEAR UP / COURT INFO

| ORIGINAL INCIDENT DATE: | SUPPLEMENTAL DATE/TIME: | TYPE OF INCIDENT: | PDI # |
|---|---|---|---|
| 18 OCT 08 | 20 JAN 09 | Suspicious Auto | U3020 |

☒ **COURT REPORT: BRANCH:** 46 (555 W. Harrison) JUDGE: Donnelly

COMPLAINANT(S): Illegs # 1078   Meade # 1012

DEFENDANT: Charles Boyle   DOCKET # 08-27751   CHARGE: Resisting

DEFENDANT: _____ DOCKET # _____ CHARGE: _____

DEFENDANT: _____ DOCKET # _____ CHARGE: _____

DEFENDANT: _____ DOCKET # _____ CHARGE: _____

OFFICER'S IN COURT: Iorless # 1078

STATE'S ATTORNEY: _____ DEFENSE ATTORNEY(S): _____

PERSON(S) TRANSPORTED: N/A

---

☐ **OFFENSE CLEARANCE:** ☐ Administrative Clearance ☐ Cleared by Arrest ☐ Cleared Exceptional ☐ Cleared Unfounded

### COMPLETE THE REVERSE SIDE SUMMARIZING THE INVESTIGATION
### INDICATE ADMISSIONS, WEAPONS AND VEHICLES USED, M.O. AND PROPERTY RECOVERED

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____

SUSPECT: _____ SEX/RACE: _____ DOB: _____ SOC# _____

ADDRESS: _____

IN CUSTODY DATE/TIME: _____ LOCATION OF ARREST: _____

ARRESTING AND ASSISTING OFFICERS: _____

CHARGE(S): _____ COURT DATE AND BRANCH: _____

**U/C 0060**

NOTIFICATIONS: _____

TRANSMITTALS: _____

**NARRATIVE:**

IN SUMMARY ON 18 OCT 08 AT APPROX 7:30 AM
R/O's MONTE # 1612 + TORRES # 1028 NOTICED A SILVER
CHRYSLER DRIVING EAST BOUND ON 53 ST. TWO MALE SUBJECTS
EXITED VEHICLE AND BEGAN WALKING EAST BOUND ON 53 ST.
THE THIRD SUBJECT CHARLES BOYLE EXITED VEHICLE AND
OPENED HOOD OF VEHICLE. R/O's THEN ASKED BOYLE FOR
ID REFUSED AND THEN BECAME COMBATIVE + P/O TORRES
CALLED FOR ASSITANCE.

ON 20 JAN 09 R/O's RETURNED TO BRANCH 46
IN FRONT ON JUDGE DONNELLY WHO DISMISSED ALL
CHARGES AGAINST CHARLES BOYLE DUE TO CPD
COMPLAINTS WRITTEN WRONG.

U/C
0061

PAGE / OF /

SUPERVISOR: _____  850    OFFICER: TORRES    1028
NAME                    RANK              NAME              STAR#

**SPECIAL ORDER**

| | | 1 February 1990 | 1 February 1990 | 01-90 |

| SUBJECT | DIST. | AMENDS |
|---|---|---|
| Questioning and Frisk Without Arrest | AC, CU, SU, PU | None |

| RELATED DIRECTIVES | RESCINDS |
|---|---|
| None | None |

I.  **PURPOSE**

To provide guidelines that ensure judicial compliance, safeguarding citizen rights, and proper police conduct during temporary questioning and search without arrest.

II.  **POLICY**

It is the policy of this Department to regulate the circumstances and manner in which officers may temporarily question without arrest.

III.  **PROCEDURE**

A.  Definition

1.  "Stop and Frisk" refers to stopping and detaining persons on public premises or on the street for the purposes of briefly questioning and obtaining personal identification.

   a.  The "Stop" includes a temporary detention of a person for investigation. It occurs when an officer uses authority to compel a person to halt or remain in a certain place.

   b.  A "frisk", which is distinguished from a search, is the running of hands rapidly over another person; it is done after a person is "stopped" solely for the purpose of discovering weapons if an officer has reason to believe the person is armed and dangerous.

B.  Guidelines for a "Stop"

1.  Will be made only when the officer has a reasonable belief that a crime is being committed, is about to be committed or has been committed by the person(s) stopped.

2.  May be made with less than probable cause to arrest but the facts involving the stop must constitute "reasonable suspicion."

3.  The officer will identify himself and state the purpose for the "Stop."

4.  Persons will be detained for a reasonable period of time only.

5.  Detention and questioning will be conducted in the vicinity of where the person was stopped.

U/C0100

TORRES

EXHIBIT NO. 6

11-09-09 KDR

6.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHARLES BOYLE,                )
           Plaintiff,     )
                         )
v.                           )
                         )     No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE  )
OFFICER LARRY TORRES, et al.,  )
                         )
           Defendants.     )

### DEFENDANT TORRES'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

NOW COMES the Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER LARRY TORRES, Star #1028 ("Torres"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information and belief and are made without prejudice to the objections set forth herein. Defendant reserves the right to amend and/or supplement his responses at any time to introduce i̇

TORRES
**EXHIBIT NO.** 7
11-09-09 KDR

6459565v18

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1. Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:** Larry Torres. My attorney, Steven Puiszis, consulted with me in preparing these answers.

2. Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

6459565v1897854 4236

**ANSWER:** Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well as a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and then handcuffing him. Officer Moore injured his left wrist and Officer Galarza injured his shoulder in the process. Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin. Other offices from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

3.    Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

**ANSWER:**    Objection, defendant objects to this Interrogatory on the grounds that it seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify anyone believed "to have knowledge supporting the defendant" and also asks for a summary of "what knowledge" this defendant "believes each person may possess." That information is more proper the subject of a deposition and to require the provision of such a summary is overbroad, harassing and unduly burdensome. Subject to those objections and without waiving same, see those individuals listed in Interrogatory No. 2 and defendants who were identified in the University of Chicago defendants' Rule 26 Disclosures. The University of Chicago officers would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4.    Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

      a.    Why he/she was at that location;

      b.    Whether he/she had any physical contact with Plaintiff;

      c.    Whether he/she participated in the arrest of Plaintiff;

      d.    Whether he/she participated in the search of Plaintiff;

      e.    Whether he/she had any participation in the bringing of criminal charges against Plaintiff.

**ANSWER:**    Objection. Defendant objects to this Interrogatory as being vague and ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against the defendant include assertions relating to his arrest and to the purported use of force against him as well as a state law claim of malicious prosecution. Subparagraph (e) is vague and ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

criminal charges." Subject to those objections and without waiving same, see my answer to Interrogatory No. 2.

Officer Moore and me had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past us with its horn continuously blowing and then observed the vehicle abruptly swerve to the curb and bump it. They initially investigated what was happening. The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance. The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar, Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officers Moore and I would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and any Complaints were signed by both Officer Moore and me.

5.      If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

**ANSWER:**    I do not personally know of any such investigation. However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

5

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6. State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:** No I was not injured. I understand that Officer Gillespie was kicked in the head during the incident and his glasses were broken. I also understand that Officer Galarza injured his shoulder and Officer Moore injured his wrist, but I do not know what treatment they received.

7. Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:** Objection. This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc. Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it. Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact. I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we turn any such person over to the Chicago Police who will then transport that person to a local

6

police station and process that person, including taking booking photos, filling out arrest reports, filing criminal complaints and seeking approval by the State's Attorney working felony review of felony charges. While University of Chicago employees write out our own reports, we do not prepare criminal complaints and do not process an arrestee during the booking process.

8.    Please state how long and in what capacity you have been employed by the University of Chicago Police Department. Your response should include a brief description of your change in assignments and/or rank if any, and when those changes occurred. Your response should also include whether you were concurrently employed by the City of Chicago as a police officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:**    On the date of the incident involving Charles Boyle, I had been employed by the University of Chicago since January 2, 2007. I have worked as a patrol officer during that timeframe. At no time while I was employed by the University of Chicago Police Department was I concurrently employed by the City of Chicago as a police officer.

9.    Please describe your assignment with the University of Chicago Police Department on October 18, 2008. Your response should include the actual time you began and ended your duties.

**ANSWER:**    On October 18, 2008, I was working for the University of Chicago on the midnight shift. I was working assignment 109. Clarence Moore was riding with me to learn the University's practices and procedures.

10.    State the case number, caption, and jurisdiction of all civil cases in which you were named a defendant during the course of your employment with the University of Chicago Police Department and/or the City of Chicago Police Department.

**ANSWER:**    I have never worked for the Chicago Police Department and I have never been previously sued in my capacity as a University of Chicago Police officer.

11.    Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

7

**ANSWER:** Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in some capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other complaints that are substantially similar in nature. Subject to those objections and without waiving same, there have been no complaints that have been sustained against me with the University of Chicago.

12. Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

**ANSWER:** Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13. State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

**ANSWER:** I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14. State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:** Defendant objections to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving said objection, defendant states this is unknown to me at this time.

8

6459565v1897854 4236

15. State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

**ANSWER:** Yes. I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46.

16. State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:** I was subpoenaed to testify before Judge Thomas Donnelly on January 20, 2009 in Branch 46 and appeared at that hearing on behalf of the University of Chicago.

17. State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:** Objection. This Interrogatory calls for attorney work product. Defendant further objects to this Interrogatory as overbroad and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion. Defendant further objects that it is unduly burdensome and harassing. Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of Chicago Defendants' Response to Plaintiff's Production Request and these Answers to Interrogatories.

By: _____
Officer Larry Torres

SUBSCRIBED AND SWORN TO
before me this 20th day of July, 2009.

_____
Notary Public

OFFICIAL SEAL
ELLEN L JENNINGS-MORGAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/03/2012

9

6459565v1897854 4236

# EXHIBIT F

Page 2

```
1       APPEARANCES:

2           ED FOX & ASSOCIATES, by

3           JONATHAN R. KSIAZEK, ESQ.

4           300 WEST ADAMS STREET, SUITE 330

5           CHICAGO, ILLINOIS    60606

6           (312) 345-8877

7               Representing the Plaintiff,

8

9           HINSHAW & CULBERTSON, LLP, by

10          STEVE PUSZNIS, ESQ.

11          222 NORTH LASALLE STREET, SUITE 300

12          CHICAGO, ILLINOIS    60601

13          (312) 704-3000

14              Representing Defendant, University of

15              Chicago

16

17

18

19

20

21

22

23

24
```

Electronically signed by Fran Lucante (101-029-917-2804)                     830a02d5-5296-40b8-8ee7-58122a006645

Page 3

1   APPEARANCES CONTINUED:

2

3         ASSISTANT CORPORATION COUNSEL, by

4         HELEN GIBBONS, ESQ.

5         30 NORTH LASALLE STREET, SUITE 900

6         CHICAGO, ILLINOIS    60602

7         (312) 744-3989

8             Representing City of Chicago

9             Police Officers.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                      I N D E X

2    WITNESS                          EXAMINATION

3    Vincent Darling

4        By Mr. Ksiazek              5

5        By Mr. Pusznis             50

6

7                   E X H I B I T S

8    NUMBER                      MARKED FOR ID

9    Deposition Exhibit

10       No. 1                          39

11       No. 2                          41

12       No. 3                          43

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

```
 1                     (Witness sworn.)
 2                  VINCENT DARLING,
 3    called as a witness herein, having been first duly
 4    sworn, was examined and testified as follows:
 5                     EXAMINATION
 6    BY MR. KSIAZEK:
 7        Q.    Could you please state your full name for
 8    the court reporter, spelling your last name.
 9        A.    Vincent Darling, D-a-r-l-i-n-g.
10        Q.    Mr. Darling, have you ever had your
11    deposition taken before?
12        A.    No.
13        Q.    So this is your first time?
14        A.    Yes.
15        Q.    I'm going to explain some of the ground
16    rules to you about having your deposition taken.
17    Basically, I'm just going to ask you a series of
18    questions about an incident that occurred on
19    October 18th, 2008.  I just ask that you answer all
20    questions to the best of your ability and
21    truthfully.  Okay?
22        A.    Yes.
23        Q.    And if at any time you don't understand
24    one of my questions or you don't hear one of my
```

Page 14

```
 1      A.   Somewhat a little different, because I
 2  have a vest on top when I go out.
 3      Q.   What color is the vest that you wear?
 4      A.   Black.
 5      Q.   Is there anything on the vest besides the
 6  vest itself?
 7      A.   Yes.  My star would be on my vest.
 8      Q.   On October 18, 2008, were you wearing your
 9  uniform with your vest that night?
10      A.   I'm not sure of that, depending on what
11  type of weather it was.  I could have had a jacket
12  over it, but I don't recall what the temperature
13  was that day.
14      Q.   Did you have the occasion to arrive at
15  approximately 1435 East 53rd Street on October 18,
16  2008?
17      A.   Yes.
18      Q.   Do you recall how you arrived at that
19  location?  Do you recall if you got a dispatch to
20  direct you to that location?
21      A.   Yes.
22      Q.   Do you know when you got that dispatch?
23      A.   No, I don't know what time.
24      Q.   Do you know what you were doing
```

1    immediately prior to receiving that dispatch

2    directing you to go to 53rd Street?

3         MS. GIBBONS:  Objection, misstates previous

4    testimony.  Go ahead.

5         THE WITNESS:  No.  You just drive around the

6    beat.

7    BY MR. KSIAZEK:

8         Q.   So we're talking about the dispatch that

9    you received.  Do you recall what this dispatch

10   said?

11        A.   Yes.

12        Q.   What did the dispatch tell you?

13        A.   Assist a University of Chicago Police

14   Officer.

15        Q.   Was that the exact words, or is that kind

16   of paraphrasing?

17        A.   It could be paraphrasing, but that's the

18   call; right.

19        Q.   Did they give you the location of where to

20   assist?

21        A.   Yes.

22        Q.   That was 53rd Street?

23        A.   Yes.

24        Q.   Did they say anything else besides

1    assisting a University of Chicago Police Officer at

2    53rd Street?

3         A.   No, not that I can recall.

4         Q.   So what did you do after receiving this

5    dispatch?

6         A.   I was a passenger in the vehicle.  My

7    partner, Officer Martin, drove to the location.

8         Q.   Did you have any conversations with

9    Officer Martin after receiving this dispatch?

10        A.   No.

11        Q.   Do you know what path you took to go to

12   where the incident occurred or where it was on 53rd

13   Street that night?

14        A.   No.

15        Q.   Do you remember how long it took you to

16   get there?

17        A.   No.

18        Q.   But at some point you did arrive on 53rd

19   Street?

20        A.   Yes.

21        Q.   That's where there was a scene, correct?

22        A.   Yes.

23        Q.   And there was a bunch of other officers?

24        A.   Yes.

1    Q.    Now when you first arrived on that scene,

2    what was your understanding of what was actually

3    going on?

4    A.    Well, when I first arrived on the scene I

5    just -- like I said, there was a lot of chaos

6    there.  I had to sit back and observe what was

7    going on first, and then that's when I seen the

8    defendant in handcuffs.

9    Q.    Did you know anything about the -- not the

10   defendant, Mr. Boyle, right?

11   A.    Yes.  Mr. Boyle, yes.

12   Q.    Did you know anything about Mr. Boyle

13   prior to arriving at the scene that night?

14   A.    No.

15   Q.    Had you heard anything about Mr. Boyle

16   resisting arrest that night prior to arriving at

17   the scene?

18   A.    No.

19   Q.    So you said when you first arrived on the

20   scene you observed chaos.  Can you describe what

21   you saw?

22   A.    It was a lot of squad cars blocking the

23   street.

24   Q.    Anything else?

Page 18

1    A.    There were a few sirens on on the squad

2    cars.

3    Q.    How many squad cars do you remember

4    seeing?

5    A.    Approximately six, seven.

6    Q.    If you do remember, how many of these

7    squad cars were University of Chicago squad cars?

8    A.    I'm not sure.  I would say I think it was

9    three of us was Chicago police cars would be an

10   estimate for me.

11   Q.    So about three Chicago police cars, maybe

12   three to four University of Chicago police cars?

13   A.    Right.

14   Q.    What's the difference between the

15   University of Chicago police car and a Chicago

16   police car, if you can describe that?

17   MS. GIBBONS:  Objection, vague.  Go ahead.

18   THE WITNESS:  The Chicago police car is blue

19   and white, blue stripe.  The University cars are

20   white with a burgundy stripe, at that time.

21   BY MR. KSIAZEK:

22   Q.    How many officers, if you can remember,

23   did you see on the scene that night when you first

24   arrived?

Page 24

1      A.    I come to find out one of their names was

2   Officer Moore.  That's the only other name that I

3   really remember.

4      Q.    How did you find out that the gentleman's

5   name was Officer Moore?

6      A.    Because he was one of the officers that

7   came to the police station with us.

8      Q.    After you had this conversation, did you

9   place Mr. Boyle into your custody or take Mr. Boyle

10  into your custody?

11     MS. GIBBONS:  Objection, vague.

12     THE WITNESS:  Yes.  He got placed in the back

13  of our squad car, yes.

14  BY MR. KSIAZEK:

15     Q.    Was Mr. Boyle walked over to your squad

16  car, or did you actually physically have to move

17  him to your squad car?

18     A.    The University of Chicago Police Officer,

19  the one I described, placed him in the back of our

20  vehicle with the cuffs on him already.

21     Q.    That was the Latino officer you're

22  speaking of?

23     A.    Correct.

24     Q.    Did Mr. Boyle say anything to you when he

Page 28

1    Q.    In the car ride back to the 21st District,

2   did you tell Mr. Boyle why you were taking him into

3   custody?

4    A.    Yes.

5    Q.    What did you say to him?

6    A.    Well, I related to him that he was being

7   arrested for resisting arrest by a police officer.

8    Q.    What did he say when you told him that he

9   was under arrest for resisting a police officer?

10    A.    He said it was bullshit.

11    Q.    Did you say anything when he gave that

12   response to you?

13    A.    No.

14    Q.    Besides the conversations we've talked

15   about before, did you have any other conversations

16   with Mr. Boyle on the drive back to the 21st

17   District?

18    A.    No.

19    Q.    Do you remember if Officer Martin had any

20   conversations besides those we've already talked

21   about?

22    A.    No.

23    Q.    So you arrived at the 21st District?

24    A.    Yes.

Electronically signed by Fran Lucente (101-029-917-2804)

1    Q.   Once you arrived back at the 21st

2  District, what did you do at that point?

3    A.   I took Mr. Boyle out of the back of our

4  vehicle.  I walked him back to the processing room

5  in the 21st District.

6    Q.   When you told the Latino University

7  Officer that they could follow you guys to the 21st

8  District, do you know if they actually did follow

9  you back?

10   A.   Yes, they did.

11   Q.   Were they still at the scene when you left

12  the scene?

13   A.   They followed us back right away.  As soon

14  as we left, they left with us.

15   Q.   Do you know if it was the Latino officer

16  and Officer Moore that followed you back?

17   A.   Yes, both of them.

18   Q.   Did any other University of Chicago Police

19  Officers arrive at the 21st District that you're

20  aware of?

21   A.   No.

22   Q.   When you took Mr. Boyle from the back of

23  your vehicle to the processing, did he say anything

24  to you at that point?

Page 30

1    A.    No.

2    Q.    What are the steps that you take when you

3   process someone that you're going to arrest?

4    A.    We take them in back of our vehicle and

5   take them back into the processing room, get his

6   information, his name, birth date, his address

7   where he lives at.  Of course, you read him his

8   rights, and at the same time the other two officers

9   from the University, they're in the next room, so

10  we have to get their story of what happened.

11  Mr. Boyle explained what happened also.

12   Q.    Okay.  So is that the order that you

13  actually did all those steps on October 18, 2008?

14   A.    It might not be the exact order but close

15  to that.

16   Q.    Sure.  Okay.  So you read Mr. Boyle his

17  rights?

18   A.    Yes.

19   Q.    And then after reading Mr. Boyle his

20  rights, did you go and talk to the other two

21  University of Chicago Officers?

22   A.    Yes.

23   Q.    What did they say to you about what

24  happened that night when you went and talked to

1  them?

2      A.    Well, Officer Moore stated he made a stop

3  on Mr. Boyle because he had the hood of his vehicle

4  up on the street.  He related to me there are a lot

5  of car thefts in the area so he just wanted to make

6  sure everything was on the up-and-up.  He had

7  mentioned to me him and Mr. Boyle got into a verbal

8  altercation.  He told Mr. Boyle calm down.  He said

9  he didn't, and he said he started coming towards

10  him so he said he had to take him down.

11      Q.    Did Officer Moore say anything else after

12  that?

13      A.    No.

14      Q.    Did the Latino officer say anything about

15  what happened that night?

16      A.    Yes.  The Latino officer came to assist

17  Officer Moore, and then he had to assist in calming

18  Mr. Boyle down and placing him in custody.

19      Q.    Did they say -- either Officer Moore or

20  the Latino officer -- anything else to you in

21  regards to what happened that night?

22      A.    No.

23      Q.    Did you ask them anything about anything

24  more?

1    A.    Yes.   I asked them what happened.   I

2   explained earlier, when Officer Moore made the

3   stop, and that's how it got set off from there.

4      Q.    Did you say anything after they provided

5   you with this information about what happened that

6   night?

7      A.    Yes I said are you all ready to sign

8   complaints, and they were all like, yes.

9      Q.    Did you have an idea of what Mr. Boyle was

10   going to be charged with at this point?

11     A.    Yes.

12     Q.    What was Mr. Boyle going to be charged

13   with?

14     A.    Resisting arrest by a police officer.

15     Q.    Was there any reason based on these

16   statements that you received by Officer Moore and

17   the Latino officer to charge Mr. Boyle with battery

18   of an officer?

19     A.    Yes.

20     Q.    What were those reasons?

21     A.    When Officer Moore stated he ran --

22   Mr. Boyle ran towards him, you know, in an

23   aggressive manner, and fell on his arm swinging at

24   him.   That's why he took him down to the ground.   I

1   guess in the process he got hit a couple of times.

2       Q.   Did he tell you that he got hit?

3       A.   Yes.

4       Q.   Did he tell you where he got hit?

5       A.   No.

6       Q.   So why did you not charge Mr. Boyle with

7   battery?

8       MS. GIBBONS:   Objection, vague, misstates the

9   facts in evidence.   Go ahead.

10      THE WITNESS:   Well, they wanted just to sign

11  complaints on resisting arrest.   He wasn't

12  injured.

13  BY MR. KSIAZEK:

14      Q.   So Officer Moore indicated to you that he

15  was not injured?

16      A.   Yes.

17      Q.   They wanted to sign complaints for

18  resisting arrest, not battery?

19      A.   Yes.

20      Q.   Them, being the University of Chicago

21  Officers?

22      A.   Yes.

23      Q.   Was that the end of the conversation you

24  had with those University of Chicago Police

Page 45

1    A.   I wasn't at the scene there when anything

2   happening.  It was over once we had gotten there,

3   me and Officer Martin.

4    Q.   Right.

5    A.   Yes.

6    Q.   After you finished writing these three

7   reports, what, if anything, did you do at that

8   point?

9    A.   Well, after that, our normal procedure is

10  that we call the paddy wagon.  We don't have a

11  lockup at the 21st District, so they'll transport

12  them in a paddy wagon to 2nd District on 51st and

13  Wentworth.  That's where they'll take him to the

14  lockup and take his fingerprints and his photo.

15   Q.   So no photographs were taken of him at the

16  21st District?

17   A.   No.

18   Q.   To the best of your knowledge?

19   A.   Yes.  To the best of my knowledge, no.

20   Q.   You said that while you were writing these

21  reports you were talking to Mr. Boyle all

22  throughout?

23   A.   I was interjecting every now and then.  He

24  was doing most of the talking.  I just wanted him

Electronically signed by Fran Lucente (101-020-017-2004)

Page 58

1      Q.    What did Mr. Boyle say to you when you

2  asked him if he was having any pain?

3      A.    He said no, not at all.

4      Q.    Did you see any signs of injury about

5  Mr. Boyle?  Was he limping?  Was he bruised?  Was

6  he cut or anything?

7      A.    No, not that I can see.

8      Q.    Do you have any information from any

9  source that the University of Chicago Officers

10  repeatedly kicked Mr. Boyle that night?

11     A.    No.

12     Q.    Was Mr. Boyle given an I-Bond?  In other

13  words, he was released on his own recognizance to

14  your knowledge?

15     A.    Yes.  He did, yes.

16     MR. PUSZNIS:  I don't have any other

17  questions.  Thank you, Officer.

18     MR. PUSZNIS:  Good.

19     MS. GIBBONS:  I have no questions.  We'll

20  reserve.

21                    (FURTHER DEPONENT SAITH NOT.)

22                    (Whereupon, the deposition

23                    concluded at 11:30)

24

```
1   STATE OF ILLINOIS  )

2                      )   SS:

3   COUNTY OF C O O K  )
```

4      I, Frances S. Lucente, a notary public within

5   and for the County of Cook County and State of

6   Illinois, do hereby certify that heretofore,

7   to-wit, on the 1st day of December, 2009,

8   personally appeared before me, at 222 North LaSalle

9   Street, Chicago, Illinois, VINCENT DARLING, in a

10  cause now pending and undetermined in the Circuit

11  Court of Cook County, Illinois, wherein CHARLES

12  BOYLE is the Plaintiff, and UNIVERSITY OF CHICAGO

13  POLICE OFFICER LARRY TORRES, ET AL, are the

14  Defendants.

15     I further certify that the said witness was

16  first duly sworn to testify the truth, the whole

17  truth and nothing but the truth in the cause

18  aforesaid; that the testimony then given by said

19  witness was reported stenographically by me in the

20  presence of the said witness, and afterwards

21  reduced to typewriting by Computer-Aided

22  Transcription, and the foregoing is a true and

23  correct transcript of the testimony so given by

24  said witness as aforesaid.

Page 61

1       I further certify that the signature to the

2  foregoing deposition was reserved by counsel for

3  the respective parties.

4       I further certify that the taking of this

5  deposition was pursuant to Notice, and that there

6  were present at the deposition the attorneys

7  hereinbefore mentioned.

8       I further certify that I am not counsel for nor

9  in any way related to the parties to this suit, nor

10  am I in any way interested in the outcome thereof.

11       IN TESTIMONY WHEREOF: I have hereunto set my

12  hand and affixed my notarial seal this 18th day of

13  March, 2010.

14

15

16

17

18

19     _____

     NOTARY PUBLIC, COOK COUNTY, ILLINOIS

20

21

22

23

24

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COPY

CHARLES BOYLE,                          )
                                        )
          Plaintiff,                    )
                                        )
     vs.                                )   No. 09 C 1080
                                        )
UNIVERSITY OF CHICAGO POLICE            )
OFFICER LARRY TORRES,                   )
STAR #1028, UNIVERSITY OF               )
CHICAGO POLICE OFFICER                  )
CLARENCE E. MOORE, STAR #1012,          )
UNIVERSITY OF CHICAGO POLICE            )
OFFICER GALARZA, UNIVERSITY OF          )
CHICAGO POLICE OFFICER                  )
KWIATKOWSKI, UNIVERSITY OF              )
CHICAGO POLICE OFFICER                  )
GILLESPIE, UNIVERSITY OF                )
CHICAGO, CHICAGO POLICE OFFICER         )
V. DARLING, STAR #19135,                )
CHICAGO POLICE OFFICER C.E.             )
MARTIN, STAR #17246, AND THE            )
CITY OF CHICAGO,                        )
                                        )
          Defendants.                   )

          The deposition of OFFICER CARL MARTIN,
called by the Plaintiff for examination, taken pursuant
to notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Michelle M. Scalise, Certified Shorthand Reporter, at
300 West Adams Street, Suite 330, Chicago, Illinois,
commencing at 10:37 a.m. on the 28th day of October,
A.D., 2009.

**JENSEN REPORTING**
205 West Randolph Street, Suite 510
Chicago, Illinois 60606
Phone: (312) 236-6936
Fax: (312) 236-6968
www.jensenreporting.com



JENSEN REPORTING
Whenever you need it. Whatever it takes.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,                          )
                                        )
          Plaintiff,                    )
                                        )
     vs.                                )  No. 09 C 1080
                                        )
UNIVERSITY OF CHICAGO POLICE            )
OFFICER LARRY TORRES,                   )
STAR #1028, UNIVERSITY OF               )
CHICAGO POLICE OFFICER                  )
CLARENCE E. MOORE, STAR #1012,          )
UNIVERSITY OF CHICAGO POLICE            )
OFFICER GALARZA, UNIVERSITY OF          )
CHICAGO POLICE OFFICER                  )
KWIATKOWSKI, UNIVERSITY OF              )
CHICAGO POLICE OFFICER                  )
GILLESPIE, UNIVERSITY OF                )
CHICAGO, CHICAGO POLICE OFFICER         )
V. DARLING, STAR #19135,                )
CHICAGO POLICE OFFICER C.E.             )
MARTIN, STAR #17246, AND THE            )
CITY OF CHICAGO,                        )
                                        )
          Defendants.                   )

          The deposition of OFFICER CARL MARTIN,
called by the Plaintiff for examination, taken pursuant

to notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Michelle M. Scalise, Certified Shorthand Reporter, at

300 West Adams Street, Suite 330, Chicago, Illinois,

commencing at 10:37 a.m. on the 28th day of October,

A.D., 2009.

Jensen Reporting 312-236-6936

Page 2

```
 1   APPEARANCES:
 2      ED FOX & ASSOCIATES
         MR. JONATHAN R. KSIAZEK
 3       300 West Adams Street
         Suite 330
 4       Chicago, Illinois 60606
         Phone: (312) 345-8877
 5
           On behalf of the Plaintiff;
 6
 7      HINSHAW & CULBERTSON, LLP
         MS. CONNIE C. HEGGIE
 8       222 North LaSalle Street
         Suite 300
 9       Chicago, Illinois 60601
         Phone: (312) 704-3000
10
           On behalf of the Defendants University of
11       Chicago Police Officers Larry Torres,
         Clarence E. Moore, Galarza, Kwiatkowski,
12       Gillespie, University of Chicago;
13      CITY OF CHICAGO, DEPARTMENT OF LAW
         MS. HELEN GIBBONS
14       30 North LaSalle Street
         Room 900
15       Chicago, Illinois 60602
         Phone: (312) 744-3982
16       Email: helen.gibbons@cityofchicago.org
17
18              *  *  *  *  *  *
19
20
21
22
23
24
```

Page 3

```
 1            I N D E X
 2   WITNESS                    PAGE
 3   OFFICER CARL MARTIN
 4     Direct Examination by Mr. Ksiazek ....  4
 5     Cross-Examination by Ms. Heggie ......  47
 6
 7
 8           E X H I B I T S
 9   MARTIN DEPOSITION EXHIBIT       PAGE
10     No. 1 ...............................  31
11     No. 2 ...............................  34
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
          1              (Witness sworn.)
          2   WHEREUPON:
          3         OFFICER CARL MARTIN,
          4   called as a witness herein, having been first duly
          5   sworn, was examined and testified as follows:
          6              DIRECT EXAMINATION
          7   BY MR. KSIAZEK:
          8      Q.  Good morning.
          9         Will you please state your name, spelling your
10:37:29 10   last name for the record?
         11      A.  Carl Edward Martin, M A R T I N.
         12      Q.  And, Mr. Martin, have you ever had your
         13   deposition taken before?
         14      A.  Yes.
10:37:40 15      Q.  When was the last time you had your deposition
         16   taken?
         17      A.  In the military, so it's been a while.  More
         18   than ten years ago.
         19      Q.  Okay.  I'm just going to remind you of a few
10:37:53 20   basic things that are going to happen at the deposition
         21   today.  I'm going to ask you a series of questions and
         22   if you don't understand any of my questions, just let me
         23   know and I can rephrase or I can reask the question.  Is
         24   that fair?
```

Page 5

```
          1      A.  Yes.
          2      Q.  And you understand that you're obligated to
          3   tell the truth today and you're under oath?
          4      A.  Yes.
10:38:15  5      Q.  For purposes of the court reporter, just make
          6   sure that you don't talk over any of my questions and I
          7   will of course try to do the same for you just so we can
          8   get everything on the record.  Do you understand?
          9      A.  Yes.
10:38:30 10      Q.  And as you're answering yes now, just make
         11   sure in the future that you don't say uh-huh or uh-uh or
         12   shake your head.  We need verbal answers on the record.
         13   And so -- We just need yes and no.  Do you understand?
         14      A.  Okay.
10:38:50 15      Q.  Okay.  Mr. Martin, what is your current
         16   position?
         17      A.  Police officer, City of Chicago.
         18      Q.  And are you -- You're a patrol officer?
         19      A.  Yes.
10:39:11 20      Q.  How long have you been a patrol officer for?
         21      A.  11 years.
         22      Q.  What district are you based out of?
         23      A.  21st District.
         24      Q.  Have you always been based out of the
```

2  (Pages 2 to 5)

Electronically signed by Michelle Scalise (101-420-547-2376)                    e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Page 6

1  21st District?
2      A.  Yes.
3      Q.  How have you -- You mentioned earlier you were
4  in the military.  When were you in the military?
10:39:38  5      A.  19- -- Was it -- 1990 to 1999, I believe.
6      Q.  So is that prior to --
7      A.  Coming to the police department.
8      Q.  -- coming to the police department?
9      A.  Yes.
10:39:55 10      Q.  Okay.  What was the highest rank that you
11  achieved in the military?
12      A.  Petty Officer, second class.
13      Q.  What is your educational background?
14      A.  Criminal justice.
10:40:18 15      Q.  And where did you receive that certificate
16  from?
17      A.  College of Lake County.
18      Q.  Do you remember when you received that
19  certificate?
10:40:31 20      A.  19- -- Probably 2000.  Somewhere around 2000.
21      Q.  That was prior to joining the force or was
22  that --
23      A.  Yes.  Actually, I was still in the military,
24  so it had to be around '98 or '99.  I'm sorry.

Page 7

1      Q.  Okay.  The incident we're here to talk about
2  happened on October 18th, 2008.  Do you recall the
3  incident that we're here to talk about today?
4      A.  I recall being in it, yes.
10:41:18  5      Q.  Yes.
6          And prior to October 18th, 2008, had you ever
7  seen the plaintiff in this case, Charles Boyle?
8      A.  No.
9      Q.  Just some background about your position as a
10:41:45 10  patrol officer.
11          What are your duties?
12      MS. GIBBONS:  Objection.  Vague.
13  BY MR. KSIAZEK:
14      Q.  You can answer.
10:41:52 15      A.  To patrol my beat, assist other officers,
16  crime prevention.
17      Q.  And what is your beat currently?
18      A.  Beat 2132.
19      Q.  Was that the same beat that you were on on
10:42:17 20  October 18th, 2008?
21      A.  That's the beat that I work, yes.
22      Q.  Okay.  Do you work with a partner?
23      A.  Yes.
24      Q.  And were you working with a partner on

Page 8

1  October 18th, 2008?
2      A.  Yes.
3      Q.  Who was the partner that you were working
4  with?
10:42:36  5      A.  Vincent Darling.
6      Q.  How long have you worked with Officer Darling?
7      A.  Roughly, three or four years.
8      Q.  As of today's date?
9      A.  Yes, roughly three or four years.
10:42:53 10      Q.  And you were working with Mr. Darling -- You
11  were working with Mr. Darling on October 18th, 2008?
12      A.  Yes.
13      Q.  What are the current -- What are the hours
14  that you were working on October 18th, 2008?
10:43:19 15      A.  That would be midnight until 8:00 a.m.
16      Q.  Is that considered the first shift?
17      A.  Yes.
18      Q.  Do you recall what you were doing as you began
19  your first shift on October 18th, 2008?
10:43:46 20      A.  Regarding ...
21      Q.  Do you recall where you were located when you
22  first started your shift?
23      A.  On the beat.
24      Q.  And do you travel in a marked patrol car?

Page 9

1      A.  Yes.
2      Q.  And you were traveling in a marked patrol car
3  on October 18th, 2008?
4      A.  Correct.
10:44:12  5      Q.  Your patrol car has a radio in it, right?
6      A.  That's correct.
7      Q.  And on this radio you're able to pick up
8  transmissions from the Chicago Police Department, right?
9      A.  That's correct.
10:44:30 10      Q.  Now, are you able to pick up transmissions
11  from the University of Chicago Police Department?
12      A.  No.
13      Q.  Do you interact with the University of Chicago
14  Police Department often on your Beat 2132?
10:44:53 15      A.  Yes.
16      MS. GIBBONS:  Objection.  Vague as to interact.
17  BY MR. KSIAZEK:
18      Q.  How often would you say you talk to the
19  University of Chicago officers on a daily basis?
10:45:07 20      MS. HEGGIE:  Objection.  Vague.
21  BY THE WITNESS:
22      A.  Some days we do, some days we don't.
23      Q.  And when you -- On those days when you do
24  have -- when you have conversations with the University

3  (Pages 6 to 9)

Electronically signed by Michelle Scalise (101-420-547-2376)          e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Page 10

1  of Chicago Police Department, what would be a typical
2  situation where you would have such an occurrence?
3      MS. GIBBONS: Same objection. Calls for
4  speculation.
10:45:32  5      MS. HEGGIE: I join that objection.
6  BY THE WITNESS:
7      A. We would have a job assigned to us by the
8  dispatcher and sometimes the University of Chicago
9  police will show up and assist.
10:45:45  10     Q. Now, did you get -- have the occasion to have
11  a dispatch call directing you to 1435 East 53rd Street
12  on October 18th, 2008?
13     A. Yes.
14     Q. Do you remember when you received this
10:46:10  15  dispatch call?
16     A. No.
17     Q. Do you recall what the dispatch said?
18     A. Actually, there was a 10-1 at the University
19  of Chicago.
10:46:26  20     Q. And what does 10-1 represent?
21     A. Officer needs assistance.
22     Q. So the dispatch said 10-1 at 1435 East 53rd
23  Street?
24     MS. GIBBONS: Objection. Mischaracterizes his

Page 11

1  previous testimony.
2      Go ahead.
3  BY THE WITNESS:
4      A. Yes.
10:46:51  5      Q. Did the dispatch say anything else?
6      A. That's pretty much it. That there was a 10-1,
7  officer needs assistance and they gave out the address.
8      Q. Prior to arriving at 1435 East 53rd Street,
9  was this all of the information that you had about the
10:47:21  10  situation there?
11     A. Yes.
12     Q. Do you recall what time you arrived at
13  1435 East 53rd Street?
14     A. I'm not sure of the exact time, but it was
10:47:36  15  somewhere in the early morning hour.
16     Q. Do you recall if it was after 1:00 in the
17  morning?
18     A. I'm not sure. I'm sure it was in the early
19  morning hour.
10:47:53  20     Q. Was it before 4:00 a.m.?
21     A. It could possibly have been.
22     Q. And where were you located when you got this
23  dispatch call?
24     A. Somewhere on the beat. I'm not exactly sure.

Page 12

1      Q. Do you recall how long it took you to arrive
2  on the scene after receiving this dispatch call?
3      A. Maybe five minutes or less.
4      Q. So you were approximately five minutes away or
10:48:38  5  less from 1435 East 53rd Street when you received this
6  call?
7      A. Correct.
8      Q. Now, upon arriving at 1535 East 53rd Street,
9  what did you see when you first approached?
10:49:03  10     A. The supervisor was there, there were other
11  officers there, a CTD, and University of Chicago, and I
12  saw the defendant in handcuffs.
13     Q. The plaintiff you mean?
14     A. The plaintiff in handcuffs. I'm sorry.
10:49:23  15     Q. Okay. Let's go back just a second.
16         So you said you saw the supervisor?
17     A. That's correct.
18     Q. Do you know who the supervisor was?
19     A. Sergeant Witzack.
10:49:34  20     Q. How do you spell that?
21     A. I'm not sure.
22     MS. GIBBONS: I think it's W I T Z A C K.
23  BY THE WITNESS:
24     A. Something like that.

Page 13

1      Q. So where was the supervisor located?
2      A. He was on the scene.
3      Q. Specifically, do you recall if he was standing
4  in the street, on the sidewalk?
10:50:00  5      A. In the street.
6      Q. Was he standing in front of a car or behind a
7  car or ...
8      A. I'm not exactly sure but I know he was in the
9  street.
10:50:11  10     Q. Okay. Was -- Was anyone around Sergeant
11  Witzack?
12     A. There were other officers about, but I'm not
13  sure exactly who was standing around him.
14     Q. Okay. How close were Sergeant Witzack and
10:50:31  15  these other officers in relation to each other?
16     A. Relatively close. I mean, there were a lot of
17  officers out there and I'm not exactly sure who were all
18  out there, but Officer Jones was there.
19     Q. Okay. That was going to be my next question.
10:50:48  20         You said there were other officers there.
21  Besides Officer Jones --
22     A. University of Chicago officers.
23     Q. So Officer Jones and Sergeant Witzack were the
24  only two other Chicago Police Officers there?

4 (Pages 10 to 13)

Electronically signed by Michelle Scalise (101-420-547-2376)                    e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Page 14

1    A.  That I saw, yes.
2    Q.  That you saw.
3        And how many University of Chicago officers
4  did you see there?
10:51:14  5    A.  Not exactly sure, but five or six maybe.
6    Q.  Okay.  What -- I think you indicated that the
7  sergeant and other officers were standing around.  Do
8  you recall anything else they were doing at that point?
9    A.  No.
10:51:41  10   Q.  Were all of them standing in the street?
11   A.  Yes.
12   Q.  So what else was in the street besides the
13  officers that you described?
14   A.  The vehicles and the plaintiff.
10:52:06  15   Q.  Do you recall how many vehicles were located
16  in the street?
17   A.  No.
18   Q.  When you say "vehicles," do you mean the --
19   A.  University of Chicago police officers.
10:52:24  20   Q.  Okay.  Did you see a tan vehicle also present
21  on the scene?
22   A.  I don't recall.
23   Q.  So what happened after you arrived and you
24  pulled up on the scene?

Page 15

1    A.  I spoke with the sergeant and said that -- I
2  guess the plaintiff was being arrested for battery to
3  University of Chicago police officers and that my Beat
4  2132 had to take him in and process him because the beat
10:53:13  5  that it was on, which was 2131 Beat, that particular
6  officer was a 1099.
7    Q.  What does 1099 mean?
8    A.  That officer was working by himself.
9    Q.  And it's procedure to take an arrestee back to
10:53:33  10  the station in a car with two officers?
11   A.  Two officers, yes.
12   Q.  Okay.  You said you saw the plaintiff,
13  Mr. Boyle, in handcuffs?
14   A.  Yes.
10:53:53  15   Q.  Do you recall where he was located when you
16  saw him?
17   A.  He was standing outside of the University of
18  Chicago police car.
19   Q.  Do you remember anything specific about the
10:54:13  20  University of Chicago police car when you were standing
21  outside?
22   A.  No.
23   Q.  Did you have any further conversations with
24  the sergeant beyond what you have just described to me?

Page 16

1    A.  No.
2    Q.  And did you have any conversations with any of
3  the officers at the scene besides the sergeant?
4    A.  No.
10:54:50  5    Q.  So what happened after you had this
6  conversation with the sergeant?
7    A.  The plaintiff was in hand restraints, he was
8  walked over to our vehicle, placed in the vehicle,
9  transported to the 21st District for processing.
10:55:28  10   Q.  When you first noticed the plaintiff, how did
11  he appear to you?
12   A.  He was a little -- I don't know.  He wasn't
13  irate but he looked a little, I guess, disheveled,
14  sweaty, a little annoyed.
10:56:07  15   Q.  Did you notice any marks or bruises upon him?
16   A.  No.
17   Q.  Did you notice anything about his clothing?
18   A.  No.  I don't recall.
19   Q.  By the way, what were -- were you wearing your
10:56:44  20  uniform on that day --
21   A.  Yes.
22   Q.  -- on October 18th, 2008?
23   A.  Yes.
24   Q.  And as you -- Was it one of the University of

Page 17

1  Chicago officers that handed the plaintiff over to you?
2    A.  No.
3    MS. GIBBONS:  Objection.  Mischaracterizes his
4  previous testimony.
10:57:09  5    MS. HEGGIE:  Join the objection.
6  BY MR. KSIAZEK:
7    Q.  Who handed the plaintiff to --
8    A.  No one actually --
9    MS. GIBBONS:  Same objection.
10:57:16  10       Go ahead.
11  BY THE WITNESS:
12   A.  No one handed the plaintiff over to us.  He
13  was walked over to our vehicle.
14   Q.  When you say walked over to your vehicle, what
10:57:25  15  do you mean?
16   A.  He was walked over to the vehicle.
17   Q.  Was he escorted?
18   A.  Basically, yes.
19   Q.  Was -- Did one of the officers grab him or
10:57:34  20  have his hands in any way?
21   A.  He was in hand restraints and he was walked
22  over to the vehicle.
23   Q.  How many officers walked him over to the
24  vehicle?

                        5 (Pages 14 to 17)

Electronically signed by Michelle Scalise (101-420-547-2376)                    e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Page 18

1    A. There was the University of Chicago officer
2    and myself and Officer Darling stood by as he was walked
3    over.
4       Q. So one University of Chicago officer walked
10:58:00  5  him over?
6       A. Right. And we were, like, standing right next
7    to him.
8       Q. How far away was he, the plaintiff, before he
9    was walked over to your car?
10:58:13  10    A. I don't know. Roughly, 2 or 3 feet, I guess,
11   or more. I'm not sure.
12      Q. By the way, where did you park on 53rd Street
13   when you arrived on the scene?
14      A. We parked in a westbound direction on 53rd on
10:58:40  15  the south side of the street.
16      Q. Were you behind any other police vehicles or
17   cars?
18      A. The only vehicle I saw was probably 2131.
19      Q. Okay. And 21-- Car 2131 was --
10:59:11  20    A. A 1099 unit, yes.
21      Q. Right. But car 2131 was -- was this vehicle
22   parked in front of you when you parked or where was this
23   vehicle parked?
24      A. Right -- It was in front.

Page 19

1       Q. Did you have any conversations with Mr. Boyle
2    as he was being walked over to your vehicle?
3       A. No.
4       Q. And you -- He was placed inside your vehicle?
10:59:54  5    A. Yes.
6       Q. In the backseat?
7       A. Yes.
8       Q. Now, after he was placed in the backseat of
9    the car, what did you do?
11:00:07  10    A. Transported him to the station.
11      Q. And how long of a drive is it to the 21st
12   station from where you were at that point?
13      A. Maybe five or ten minutes.
14      Q. During these -- this five- to ten-minute drive
11:00:30  15  to the station, did you have any conversations with
16   Mr. Boyle?
17      A. No.
18      Q. Did Mr. Boyle say anything to you?
19      A. In the station.
11:00:39  20    Q. Did he say anything to you during the car
21   ride?
22      A. No.
23      Q. Did he say anything to your partner during the
24   car ride?

Page 20

1       A. No.
2       Q. Did you have any conversations with your
3    partner during the car ride?
4       A. No.
11:00:52  5    Q. So what was your understanding of why you were
6    taking Mr. Boyle back to the station at that point?
7       MS. GIBBONS: Objection. Vague,
8    Go ahead.
9    BY THE WITNESS:
11:01:13  10    A. My understanding is that he had battered a
11   University of Chicago police officer and that upon
12   signing a complaint he was taken into custody.
13      Q. And this was your belief after you placed him
14   in your vehicle?
11:01:30  15    MS. GIBBONS: Objection. Vague, Mischaracterizes
16   his previous testimony.
17      Go ahead.
18   BY THE WITNESS:
19      A. That was my belief before he was placed into
11:01:39  20  the vehicle.
21      Q. When did you come to that belief?
22      MS. GIBBONS: Same objection.
23   BY THE WITNESS:
24      A. When we arrived on the scene and the sergeant

Page 21

1    advised us of what had occurred.
2       Q. Do you recall -- You said you took him back to
3    the station, right?
4       A. Correct.
11:02:04  5    Q. Do you know what time you arrived back at the
6    station?
7       A. I'm not exactly sure, no.
8       Q. Okay. When you got at the station with
9    Mr. Boyle, what did you do at that point?
11:02:27  10    A. He was logged in.
11      Q. What do you mean by "logged in"?
12      A. You have to log prisoners in. He was taken
13   back to the interview room, and from there he was
14   processed for the arrest.
11:02:51  15    Q. And why was he taken to the interview room?
16      A. That's where arrestees are taken.
17      Q. Did anyone -- any of the other officers at the
18   scene come back to the station with you, either Chicago
19   police officers or University of Chicago police
11:03:11  20  officers?
21      A. University of Chicago.
22      Q. Do you recall the names of the officers who
23   came back to the station?
24      A. I believe there was Officer Moore -- Can I see

6 (Pages 18 to 21)

Electronically signed by Michelle Scalise (101-420-547-2376)                          e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Page 22

```
            1   that?
            2       Q.  When I -- I'll show it to you in a little bit.
            3       MS. GIBBONS:  Just from your memory.
            4   BY THE WITNESS:
11:03:32    5       A.  I believe there was Officer Moore, Officer
            6   Torres, and Officer Galarza.
            7       Q.  Okay.  When you said you processed the arrest,
            8   what do you mean by that?
            9       A.  Complaints were signed.  Upon complaints being
11:04:02   10   signed, we do the name check, background, and the arrest
           11   report.
           12       Q.  Okay.  Do you know if you filled out the
           13   arrest report or if your partner filled out the arrest
           14   report?
11:04:24   15       A.  I believe my partner made the arrest report.
           16       Q.  Did you fill out any paperwork for Mr. Boyle?
           17       A.  Complaints.
           18       Q.  The complaints?
           19       A.  Yes.
11:04:37   20       Q.  Did you fill out any further paperwork besides
           21   the complaints?
           22       A.  Not that I recall.
           23       Q.  You said earlier that the plaintiff had a
           24   conversation with you when you arrived at the station,
```

Page 23

```
            1   correct?
            2       A.  Inside the interview room, correct.
            3       Q.  Do you recall what time this conversation took
            4   place?
11:05:13    5       A.  I'm not sure, no.
            6       Q.  Okay.  What did he say to you in the interview
            7   room?
            8       A.  Something to the effect that -- that he had no
            9   problem with the way we handled things, that he was
11:05:29   10   being arrested, but that he felt that -- I guess, the
           11   university guys didn't handle him properly and that he
           12   was going to sue the University of Chicago; that my
           13   partner and I need not worry about anything because we
           14   hadn't done anything to him.
11:05:58   15       Q.  Was anyone else present for this conversation?
           16       A.  Officer Darling.
           17       Q.  Was anyone else present?
           18       A.  I don't recall.
           19       Q.  Did you say anything in response or did you or
11:06:28   20   your partner say anything in response to these
           21   statements?
           22       A.  No.
           23       Q.  Did you know what he was talking about when he
           24   said he felt that the University of Chicago guys didn't
```

Page 24

```
            1   handle it properly?
            2       MS. GIBBONS:  Objection.  Foundation.  Calls for
            3   speculation.
            4   BY THE WITNESS:
11:06:58    5       A.  No.
            6       MS. HEGGIE:  Join the objection.
            7   BY MR. KSIAZEK:
            8       Q.  What did you do after you had this
            9   conversation with Mr. Boyle?
11:07:09   10       A.  Continued on with the processing of the
           11   arrest.
           12       Q.  Now, at that point when you're inside the
           13   station, did you have any conversations with the
           14   University of Chicago officers that you indicated were
11:07:28   15   present, I believe, Moore, Galarza, and Torres?
           16       A.  No.
           17       Q.  At any point on that date, October 18th, 2008,
           18   did you have any conversations with any of the
           19   University of Chicago officers?
11:07:57   20       A.  I'm not understanding what you said.
           21       Q.  Sure.
           22           You said you didn't have any conversations
           23   with the University of Chicago officers at the scene,
           24   right?
```

Page 25

```
            1       A.  Correct.
            2       Q.  On the scene on 53rd Street?
            3       A.  Correct.
            4       Q.  And you said you didn't have any conversations
11:08:15    5   with the University of Chicago officers while you're at
            6   the station?
            7       A.  Correct.
            8       Q.  Now, at any point during that day after you
            9   were inside the station, did you have any conversations
11:08:33   10   with any other Chicago officers?
           11       A.  As in -- About the incident or ...
           12       Q.  I'm just asking generally.
           13       A.  There was a phone call made --
           14       Q.  Okay.
11:08:42   15       A.  -- to the station.
           16       Q.  And who made this phone call, if you remember?
           17       A.  There was a gentleman who said that he was the
           18   uncle.
           19       Q.  Do you recall his name?
11:08:52   20       A.  He -- I'm not sure of his name, but the desk
           21   called me to the front desk that there was a gentleman
           22   on the phone who identified himself as, I guess, a
           23   Deputy Chief of Police or something for -- I think it
           24   was Maywood Park or Oak Park police and he identified
```

7  (Pages  22  to  25)

Electronically signed by Michelle Scalise (101-420-547-2376)     e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

## Page 26

1  himself as the uncle of the plaintiff and he wanted to
2  know what had happened, and I explained to him that I
3  was only the arresting officer, that the
4  University -- this was a University of Chicago arrest
11:09:35  5  and that he would have to speak to the University of
6  Chicago police officers.
7  Q. Okay. At that point --
8  A. And it was -- I'm sorry.
9  Q. Sure. Go ahead.
11:09:51  10  A. And it was -- At that point, I went to the
11  interview one and I asked one of the officers if they
12  wanted to speak to the gentleman on the phone and they
13  said no. I went back to the phone, explained to him
14  what the situation was and he thanked me and that he
11:10:09  15  just wanted to know if his nephew was okay.
16  Q. When you say you explained the situation, can
17  you elaborate on that?
18  A. I explained to him that it was a -- that the
19  plaintiff was arrested for battery to a police officer,
11:10:32  20  University of Chicago, that this was indeed a University
21  of Chicago arrest, but that we had to process the
22  arrest.
23  Q. Now, is it your understanding that when the
24  University of Chicago Police Department decides to

## Page 27

1  arrest any person, are you, the Chicago Police
2  Department, charged with processing those arrests made
3  by the University of Chicago?
4  MS. GIBBONS: Objection. Vague. Calls for
11:11:10  5  speculation.
6  BY THE WITNESS:
7  A. Yes.
8  Q. So is it your understanding that the
9  University of Chicago does not have any -- the
11:11:17  10  University of Chicago Police Department does not arrest
11  individuals themselves?
12  MS. GIBBONS: Same objection.
13  MS. HEGGIE: I'll join in the objection.
14  BY THE WITNESS:
11:11:28  15  A. When there's probable cause for an arrest to
16  be made, the University of Chicago detains and the City
17  of Chicago actually processes the arrest.
18  Q. So it's your understanding that the University
19  of Chicago does not process any arrest?
11:11:50  20  A. As far as I know.
21  Q. Okay. Besides this conversation with what you
22  said was the Deputy Chief of Police of either Maywood or
23  Oak Park --
24  A. That's what he identified himself as.

## Page 28

1  Q. -- did you have any other conversations with
2  any officers from the University of Chicago officers on
3  that date either inside the station or outside the
4  station?
11:12:18  5  A. After the gentleman identified who he was, I
6  went back to the interview room and said there's a
7  gentleman on the phone who said he's the uncle of this
8  kid and would like to speak to one of you.
9  Q. Sure.
11:12:30  10  A. And at that time, they declined, I went back
11  to the phone and, as I stated, explain to him the
12  situation, he thanked me and stated that he wanted to
13  know that his nephew was okay, and that was it.
14  Q. In regards -- Do you know when the University
11:13:00  15  of Chicago officers, Officers Moore, Torres, and
16  Galarza, I believe, do you know when they arrived at the
17  station?
18  A. Right around the same time that we got there.
19  Q. So it was about the same time when you
11:13:17  20  arrived?
21  A. Roughly around the same time, yes.
22  Q. Do you know when they left the station?
23  A. No.
24  Q. Okay. What were the University of Chicago

## Page 29

1  officers doing once -- What did they do once they
2  arrived at the station?
3  MS. GIBBONS: Objection. Calls for speculation.
4  You can answer.
11:13:37  5  BY MR. KSIAZEK:
6  Q. If you know.
7  A. I guess they have their own individual reports
8  that they have to fill out.
9  Q. So -- If you know, you believe that -- If you
11:13:47  10  know, do you think that they were filling out their
11  reports?
12  MS. GIBBONS: Objection. Calls for speculation.
13  MS. HEGGIE: Objection. Foundation.
14  BY THE WITNESS:
11:13:56  15  A. I don't know.
16  Q. Okay. Where were the University of Chicago
17  officers, if you know, when you went into the interview
18  room and had that conversation with the plaintiff that
19  we spoke about?
11:14:21  20  MS. GIBBONS: Same objection.
21  BY THE WITNESS:
22  A. I don't know.
23  Q. At any -- Did you ever see the -- Let me back
24  up. At any point, did the University of Chicago

8 (Pages 26 to 29)

Jensen Reporting 312-236-6936

Electronically signed by Michelle Scalise (101-420-547-2376)                    e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

## Page 30

1   officers enter into the interview room while you were in
2   there?
3       A.  No.
4       Q.  At any point after you left the interview
11:14:54  5   room, did you see the University of Chicago officers
6   enter the interview room?
7       A.  No.
8       Q.  At any point, did you see the University of
9   Chicago officers have a conversation with the plaintiff?
11:15:11  10      A.  No.
11      Q.  Did you overhear any conversation that may or
12  may not have occurred between the University of Chicago
13  officers and the plaintiff?
14      A.  No.
11:15:22  15      Q.  Did you overhear any conversations that the
16  University of Chicago officers were having among
17  themselves?
18      A.  No.
19      Q.  Do you recall anything that the University of
11:15:52  20  Chicago officers said once they arrived at the station?
21      A.  No.
22      Q.  When you placed Mr. Boyle -- After you left
23  Mr. Boyle in the interview room, where did you go?
24      A.  To the front desk.

## Page 31

1       Q.  How far away is the front desk from the
2   interview room?
3       A.  Approximately, 2 feet maybe.
4       Q.  And was that the front desk that you filled
11:16:35  5   out the complaint, as you said?
6       A.  No.  I filled out the complaint in the
7   interview room.
8       Q.  Okay.  I'm going to --
9       MR. KSIAZEK:  Will you mark this?
11:16:41  10      (Martin Deposition Exhibit No. 1
11          marked as requested.)
12  BY MR. KSIAZEK:
13      Q.  I'm handing you what has been marked for
14  identification purposes as Exhibit 1.  This is a police
11:17:41  15  report; is that right?
16      (Witness viewing document.)
17  BY THE WITNESS:
18      A.  Correct.
19      Q.  And under Box 1 on the top under offense,
11:17:51  20  slash, incident, it states interference with public
21  officer.  Is that what it states?
22      A.  Yes.
23      MS. GIBBONS:  Jonathan, just to be clear for the
24  record, it's a general offense case report.  I know it's

## Page 32

1   kind of cut off, but I just want to put that on there.
2       MR. KSIAZEK:  Okay.  I wasn't sure about that.
3       Thank you.
4   BY MR. KSIAZEK:
11:18:11  5       Q.  Do you know who filled out this general
6   offense case report?
7       A.  My partner, Vincent Darling.
8       Q.  And this is your signature on the bottom of
9   the page in Box 96 where it says reporting Officer
11:18:40  10  C. Martin?
11      A.  Correct.
12      Q.  Did you review this document prior to the
13  deposition testimony today?
14      A.  Yes.
11:18:49  15      Q.  Okay.  And, if you would, could you read
16  silently to yourself the narrative that is provided in
17  the bottom middle of the page, and then I'll ask you if
18  that -- if that is correct.
19          (Witness viewing document.)
11:19:06  20  BY MR. KSIAZEK:
21      Q.  Is -- That information that is contained
22  there, is that correct information?
23      A.  Yes.
24      Q.  So when it states that by flailing his arms

## Page 33

1   and pulling away during a protective pat-down, do you
2   have any knowledge of the plaintiff flailing his arms
3   and pulling away during a protective pat-down?
4       A.  No.
11:20:04  5       MS. GIBBONS:  Objection.  Foundation.
6       Go ahead.
7   BY THE WITNESS:
8       A.  No.
9       Q.  Did you -- When it says offender read rights,
11:20:17  10  did you read the plaintiff his right?
11      A.  Yes, he was read his rights.
12      Q.  Was it by yourself?
13      A.  Officer Darling.
14      Q.  Officer Darling.
11:20:28  15      Okay.  And when it states 80's had no
16  knowledge of events, that 80 indicates arresting
17  officers, correct?
18      A.  Yes.
19      Q.  And that statement is true, right?
11:20:50  20      A.  That's correct.
21      Q.  Now, under 41, the offender's name, can you
22  read the height and weight for me?
23      A.  Charles Boyle; 5, 9, 197.
24

Electronically signed by Michelle Scalise (101-420-547-2376)                e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Page 34

```
 1            (Martin Deposition Exhibit No. 2
 2             marked as requested.)
 3      BY MR. KSIAZEK:
 4        Q. I've handed you what's been marked as
11:22:11  5  Exhibit 2. Do you recognize this document?
 6            (Witness viewing document.)
 7      BY THE WITNESS:
 8        A. Yes.
 9        Q. And this is --
11:22:16 10  MS. GIBBONS: Not to interrupt, but this is a
11      multi-page document.
12      MR. KSIAZEK: I'm sorry. Group exhibit.
13      MS. GIBBONS: It includes numerous different
14      reports that aren't -- this is basically the City of
11:22:28 15  Chicago's -- part of their 26-A disclosure. So I just
16      want to be clear, you're directing him to look at the
17      first part?
18      MR. KSIAZEK: Sure. Actually -- Yeah.
19      MS. GIBBONS: Which is a criminal history report
11:22:42 20  which is a two-page Bates-stamped 1 and 2.
21      BY MR. KSIAZEK:
22        Q. The first two pages of this document indicate
23      Mr. Boyle's criminal history report, correct?
24        A. Yes.
```

Page 35

```
 1        Q. And did you search Mr. Boyle's history
 2      report -- criminal history report?
 3      MS. GIBBONS: Objection. Vague.
 4        Go ahead.
11:23:21  5  BY THE WITNESS:
 6        A. Yes.
 7        Q. When did you search Mr. Boyle's criminal
 8      history?
 9        A. On the date of the incident.
11:23:26 10       Q. Do you recall if you searched his criminal
11      history at the station or --
12        A. Yes.
13        Q. -- was it at the scene?
14        Okay. Did you search your history before or
11:23:38 15  after filing -- or preparing the reports?
16        A. During.
17        Q. During?
18        A. Yes.
19        Q. Okay. If you flip to page 3 of this document,
11:24:06 20  what has been Bates-stamped 0003, this is a clear data
21      warehouse information sheet, is that correct, that's
22      what this document states?
23        A. Yes.
24        Q. Now, there's pictures of Mr. Boyle on this
```

Page 36

```
 1      clear data warehouse sheet, correct?
 2        A. Yes, that's correct.
 3        Q. Is this how -- Do these pictures fairly and
 4      accurately reflect how Mr. Boyle appeared on
 5      October 18th, 2008?
11:24:45  6  MS. GIBBONS: Objecting for the record that this is
 7      a very dark photograph of the picture of the clear data
 8      warehouse, so to the best of your knowledge.
 9      BY THE WITNESS:
11:24:57 10       A. I -- I'm not sure. I can't actually see this.
11        Q. Okay. Let's look at the top left photograph.
12      There are four photographs on this page that are
13      apparently printed out. Looking at the top left
14      photograph, and I know it's dark, does it appear in this
11:25:21 15  photograph that the plaintiff's T-shirt or polo shirt is
16      ripped to your -- from what you see?
17      MS. GIBBONS: Same objection.
18      BY THE WITNESS:
19        A. I really can't tell.
11:25:37 20       Q. Okay. And just on the bottom -- on the bottom
21      two photographs, those are photographs of Mr. Boyle's
22      shoulders and arms, correct?
23        A. I believe so, yes.
24        Q. Okay. Let's turn to, I believe this is
```

Page 37

```
 1      page 8, what has been marked as Bates-stamped 0008.
 2      This is the original case incident report; is that
 3      correct?
 4        A. Yes.
11:26:28  5  Q. Okay. And if we -- Under occurrence date, it
 6      states October 18th, 2008 and it says 237. Does
 7      that -- Is that approximately when this incident
 8      occurred?
 9        A. Where is that located?
11:27:06 10       Q. In the top portion under the incident box.
11        A. Occurrence date?
12        Q. Where it says occurrence date, right.
13        A. Yes.
14        Q. So that 237 would be about when this incident
11:27:18 15  occurred?
16        A. 237 probably is when, I guess, it was
17      dispatched to us. Same whereabouts that time.
18        Q. Okay. And it states the victims -- it says
19      Clarence Moore and Larry Torres, right?
11:27:36 20       A. Correct.
21        Q. If you turn to the next page, which is
22      Bates-stamped 0009, this has your name as a reporting
23      officer, right?
24        A. Yes.
```

10   (Pages 34 to 37)

Electronically signed by Michelle Scalise (101-420-547-2376)                    e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

## Page 38

1    Q.  Okay.  And on the next page, 0010, this is a
2    narrative.  I just ask that you read through this
3    narrative very quickly.  Once you're finished, just let
4    me know whether or not this is a correct statement of
5    events.
6         (Witness viewing document.)
7    BY THE WITNESS:
8    A.  Okay.  Yes.
9    Q.  Okay.  And did Officer Darling prepare this
10   arrest --
11   A.  Yes.
12   Q.  -- report?
13       Okay.  Okay.  It appears documents 11 --
14   documents Bates-stamped 0011, 0012 are sort of a similar
15   version of this arrest report.  Did you photograph --
16   I'm sorry -- fingerprint the plaintiff?
17   A.  No.
18   Q.  And you didn't take any photographs --
19   A.  No.
20   Q.  -- of the plaintiff?
21       That would be the lockup keeper's job?
22   A.  Yes.
23   Q.  What did you do after filling out the arrest
24   report and complaint?

## Page 39

1    MS. GIBBONS:  Objection to the extent that couples
2    the documents that you signed off on.
3    BY MR. KSIAZEK:
4    Q.  What did you do?
5    A.  I got this processed, searched, called for a
6    transport.
7    Q.  And do you recall what time a transport
8    arrived?
9    A.  No.
10   Q.  Going back to the scene itself, do you recall
11   any other people who were present on the scene besides
12   officers?  Do you recall seeing anyone?
13   A.  There was a young man and a young lady.
14   Q.  Anyone else besides this young man and young
15   lady?
16   A.  No, not that I recall.
17   Q.  Can you describe these two persons as you saw
18   them?
19   A.  No.
20   Q.  Do you know if they were white or
21   African-American?
22   A.  African-American.
23   Q.  Were they taller or shorter than you?
24   A.  I can't recall.  I'm sure the female was.

## Page 40

1    Q.  Have you ever been sued before?
2    A.  No.
3    Q.  Did you see the University of Chicago
4    defendants -- University of Chicago officers strike
5    Mr. Boyle at any point on 53rd Street on October 18th,
6    2008?
7    A.  No.
8    Q.  Did you see the University of Chicago officers
9    strike Mr. Boyle at any point inside the station on
10   October 18th, 2008?
11   A.  No.
12   Q.  Did you have any conversations besides those
13   we've already spoken about in regards to the University
14   of Chicago officers striking Mr. Boyle?
15   MS. GIBBONS:  Objection vague.
16       Go ahead.
17   BY THE WITNESS:
18   A.  No.
19   Q.  So you didn't have any conversations with any
20   other officers in regards to what happened at the scene
21   on October -- what happened on 53rd Street?
22   MS. GIBBONS:  Objection, asked and answered.
23   BY THE WITNESS:
24   A.  The only conversations that I had with any

## Page 41

1    officer was with my partner, Officer Darling.
2    Q.  What conversation did you have with Officer
3    Darling?
4    A.  As far as what allegedly had happened?
5    Q.  Okay.  When did this conversation take place?
6    A.  Probably during the processing.
7    Q.  And besides yourself and Mr. Darling, was
8    anyone else present?
9    A.  No.
10   Q.  And what -- What did you say?
11   A.  I asked him -- Basically, we were talking
12   about the complaints and what the complaints -- what the
13   complaint should state and the arrest report.
14   Q.  Okay.  How did he respond?
15   A.  Explained what happened.  That was explained
16   to him by the University of Chicago police what
17   happened.
18   Q.  Okay.  What did Officer Darling tell you that
19   the University of Chicago police officers explained to
20   him?
21   A.  Everything that's indicated on the general
22   offense case report.
23   Q.  When you say "everything," just --
24   A.  The flailing of the arms and he pulled away

11 (Pages 38 to 41)

Electronically signed by Michelle Scalise (101-420-547-2376)          e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Timestamps (left column): 11:28:25, 11:28:34, 11:28:55, 11:29:20, 11:29:54, 11:30:21, 11:31:08, 11:31:15

Timestamps (right column): 11:32:23, 11:32:39, 11:32:57, 11:33:04, 11:33:25, 11:33:39, 11:34:00, 11:34:19

Page 42

1  and they were trying to pat him down and -- basically
2  that's it. What's here in the case report.
3      Q. Did he say who he talked to specifically?
4      A. No.
11:34:53  5      Q. He just said he talked to University of
6  Chicago officers?
7      A. Yes.
8      Q. Did he say when he had these conversations?
9      A. No.
11:35:02  10      Q. Did he say anything else about the flailing of
11  the arms about -- what the University of Chicago officer
12  said to him about the flailing of the arms?
13      A. No.
14      Q. So basically everything he told you was -- I
11:35:31  15  just want to clarify -- everything he told you was what
16  is stated on the arrest report?
17      A. Yes. What the university explained to him
18  that happened.
19      Q. Do you know what you ended up charging
11:35:56  20  Mr. Boyle with?
21      A. I believe it was resisting a police officer.
22      Q. Why did you charge Mr. Boyle with resisting a
23  police officer?
24      A. Well, there was a sign of complaint, the

Page 43

1  complainant stating that he had battered a police
2  officer and that was the charge.
3      Q. When did -- Who was the complainant?
4      A. Officers Moore and Torres.
11:36:30  5      Q. When did they state that the -- they were
6  battered to you or when did they say that?
7      A. I don't recall. When they stated it to him,
8  to Officer Darling?
9      Q. To anyone?
11:36:43  10      A. I'm not sure.
11      Q. So you're saying that Officers Moore and
12  Torres told Officer Darling that they were battered?
13      MS. HEGGIE: Objection. Foundation.
14      MS. GIBBONS: Same objection.
11:36:56  15  BY THE WITNESS:
16      A. I'm saying that we arrived on the scene, the
17  situation was explained to us by the sergeant and at one
18  point, I guess, Officer Darling was told what happened
19  by Officer Torres or Officer Moore. I'm not exactly
11:37:18  20  sure who explained to him exactly what happened.
21      Q. Do you know when -- and I think I may have
22  asked this -- but do you know when Officers Moore or
23  Torres told Officer Darling what happened?
24      MS. HEGGIE: Objection, foundation.

Page 44

1      MS. GIBBONS: Same objection.
2      BY THE WITNESS:
3      A. No.
4      Q. Okay. Did -- But Officer Torres and Moore
11:37:47  5  never told you specifically that they were battered,
6  right?
7      A. No.
8      Q. And you filled out the complaint?
9      A. Yes.
11:37:54  10      Q. Why didn't you talk to Officers Moore or
11  Torres about this incident?
12      A. I guess I didn't want to talk to them. I
13  don't know.
14      Q. Why didn't you want to talk to them?
11:38:22  15      A. There were complaints signed, there was an
16  arrest made.
17      Q. So you didn't -- You didn't follow up with
18  Officer Moore and Torres about -- about what exactly
19  happened?
11:38:38  20      MS. GIBBONS: Objection. Vague, argumentative.
21      BY THE WITNESS:
22      A. No.
23      Q. And at any point after you filled out the
24  complaint, did you talk to Officers Moore and Torres

Page 45

1  about whether or not they were battered on October 18th,
2  2008?
3      MS. GIBBONS: Objection, asked and answered.
4      Go ahead.
11:39:05  5  BY THE WITNESS:
6      A. No.
7      Q. Have you seen the plaintiff since
8  October 18th, 2008?
9      A. No.
11:39:23  10      Q. Just one moment. I might have a few more
11  questions, sir, and then we should be all done.
12      Have you testified in court for any reason in
13  relation to this case; the charge -- the complaint that
14  you filed?
11:41:07  15      A. No.
16      Q. And had you had conversations with anyone
17  since the date of filing the complaint about this
18  incident?
19      MS. GIBBONS: Objection to the extent it calls for
11:41:34  20  information for attorney-client privilege.
21      BY MR. KSIAZEK:
22      Q. I'm sorry. Not including your attorney.
23      A. No.
24      Q. So -- So you haven't spoke to Officer Darling

12  (Pages 42 to 45)

Page 46

1      about the incident since October 18th, 2008?
2          MS. GIBBONS:  Same objection.
3      BY MR. KSIAZEK:
4          Q.  Okay.  Outside the presence of your attorney?
11:41:52   5      A.  No.
6          Q.  Have you spoken to any -- any of the
7      University of Chicago officers since the date of the
8      filing of the complaint?
9          A.  No.
11:42:11   10     Q.  Have you seen any -- Officer Torres or Officer
11     Moore or Officer Galarza since that date?
12         A.  That was my first time seeing Officer Moore.
13     I don't think he works third watch, so I haven't seen
14     him since, and I haven't seen Officer Torres either.
11:42:30   15     Q.  Have you seen Officer Galarza?
16         A.  Yes.
17         Q.  When did you see Officer Galarza?
18         A.  Somewhere on the street.
19         Q.  Do you recall when this took place?
11:42:43   20     A.  No.
21         Q.  It was just on your normal duty?
22         A.  Yes.
23         Q.  Okay.
24         MR. KSIAZEK:  I don't have any further questions.

Page 47

1              CROSS-EXAMINATION
2      BY MS. HEGGIE:
3          Q.  I just have a few for you, Officer Martin.
4      I'm one of the attorneys representing the University of
11:43:23   5      Chicago and the University of Chicago police officers.
6              Did you complete high school?
7          A.  Yes.
8          Q.  Where did you attend high school?
9          A.  Wendell Phillips High School.
11:43:31   10     Q.  Is that here in Chicago?
11         A.  Yes.
12         Q.  What is your date of birth?
13         MS. GIBBONS:  Objection.  You can ask him how old
14     he is.  We would just object to that as a security
11:43:41   15     issue.
16         MS. HEGGIE:  Okay.  I'll withdraw my question.
17     BY MS. HEGGIE:
18         Q.  When you arrived at the scene on October 18th,
19     did you see any of the University of Chicago police
11:43:51   20     officers using excessive force towards Mr. Boyle, the
21     plaintiff?
22         A.  No.
23         Q.  Did you see, when you arrived at the scene on
24     October 18th, any of the University of Chicago police

Page 48

1      officers being harmful in any way towards the plaintiff,
2      Mr. Boyle?
3          A.  No.
4          Q.  You testified that you witnessed Mr. Boyle
11:44:14   5      being walked 2 or 3 feet to your squad car by the
6      University of Chicago police officers on the 18th; is
7      that right?
8          A.  Yes.
9          Q.  When the University of Chicago police officers
11:44:27   10     were walking Mr. Boyle to your squad car, did you see
11     him using excessive force towards Mr. Boyle?
12         A.  No.
13         Q.  As they were walking Mr. Boyle to your squad
14     car, did you see them acting in any way harmful or
11:44:37   15     hurting Mr. Boyle?
16         A.  No.
17         Q.  Okay.  And do you know if the University of
18     Chicago Police Department has a lockup facility, if you
19     know?
11:44:49   20     A.  I'm not sure.
21         Q.  All right.  Anyone that the University of
22     Chicago Police Department detains would be brought to
23     the City of Chicago Police Department for processing an
24     arrest, correct?

Page 49

1          A.  Yes.
2          Q.  And the City of Chicago prepares police
3      reports and documents associated with the arrest?
4          A.  Correct.
11:45:10   5      Q.  And do you know if the University of Chicago
6      Police Department paperwork regarding anyone they detain
7      is presented to a court on an arrest the City of Chicago
8      makes?
9          A.  I'm not sure.
11:45:24   10     Q.  And prior to working with the City of Chicago
11     Police Department, did you work with any other police
12     departments?
13         A.  I was military police.
14         MS. HEGGIE:  I have no further questions.
11:45:38   15     Thank you.
16         MS. GIBBONS:  I have no questions.
17         MR. KSIAZEK:  We're all done then.
18         MS. GIBBONS:  We'll reserve.
19             (Witness excused.)
20
21
22
23
24

13  (Pages 46 to 49)

Electronically signed by Michelle Scalise (101-420-547-2376)          e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

Page 50

```
 1    STATE OF ILLINOIS   )
                          )  SS.
 2    COUNTY OF COOK     )
 3
           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 4              COUNTY DEPARTMENT, LAW DIVISION
 5
                          )
 6    CHARLES BOYLE,      )
           Plaintiff,     )
 7        vs.             )
      UNIVERSITY OF CHICAGO   ) No. 09 C 1080
 8    POLICE OFFICER LARRY    )
      TORRES, STAR #1028,     )
 9    UNIVERSITY OF CHICAGO   )
      POLICE OFFICER CLARENCE E.  )
10    MOORE, STAR #1012,      )
      UNIVERSITY OF CHICAGO   )
11    POLICE OFFICER GALARZA,  )
      UNIVERSITY OF CHICAGO   )
12    POLICE OFFICER KWIATKOWSKI,  )
      UNIVERSITY OF CHICAGO   )
13    POLICE OFFICER GILLESPIE,  )
      UNIVERSITY OF CHICAGO,  )
14    CHICAGO POLICE OFFICER V.  )
      DARLING, STAR #19135,  )
15    CHICAGO POLICE OFFICER C.E.  )
      MARTIN, STAR #17246, AND  )
16    THE CITY OF CHICAGO,   )
           Defendants.     )
17
           I, OFFICER CARL MARTIN, state that I have read
18    the foregoing transcript of the testimony given by me at
      my deposition on the 28th day of October, A.D., 2009,
19    and that said transcript constitutes a true and correct
      record of the testimony given by me at the said
20    deposition except as I have so indicated on the errata
      sheets provided herein.
21
                _____
22                OFFICER CARL MARTIN
      SUBSCRIBED AND SWORN to
23    before me this _____ day
      of _____, 2007.
24        _____
              NOTARY PUBLIC
```

Page 52

```
 1        In witness whereof, I have hereunto set my
 2    hand at Chicago, Illinois, this 15th day of March, A.D.,
 3    2010.
 4
 5
 6        Michelle M. Scalise
          MICHELLE M. SCALISE, CSR
 7        205 West Randolph Street
          5th Floor
 8        Chicago, Illinois 60606
          Phone: (312) 236-6936
 9
10    CSR No. 084-004616
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 51

```
 1    UNITED STATES OF AMERICA      )
      NORTHERN DISTRICT OF ILLINOIS )
 2    EASTERN DIVISION     )  SS.
      STATE OF ILLINOIS    )
 3    COUNTY OF COOK       )
 4        I, Michelle M. Scalise, Certified Shorthand
 5    Reporter, do hereby certify that OFFICER CARL MARTIN,
 6    was first duly sworn by me to testify to the whole truth
 7    and that the above deposition was reported
 8    stenographically by me and reduced to typewriting under
 9    my personal direction.
10        I further certify that the said deposition was
11    taken at the time and place specified and that the
12    taking of said deposition commenced on the 28th day of
13    October, A.D., 2009, at 10:37 a.m.
14        I further certify that I am not a relative or
15    employee or attorney or counsel of any of the parties,
16    nor a relative or employee of such attorney or counsel,
17    nor financially interested directly or indirectly in
18    this action.
19
20
21
22
23
24
```

14 (Pages 50 to 52)

Electronically signed by Michelle Scalise (101-420-547-2376)     e7a4e24a-a1b2-4fb5-9256-88f673fbdb81

| ERAL OFFENSE REPORT / AGO POLICE | 1. OFFENSE/INCIDENT–PRIMARY CLASSIFICATION **INTERFERENCE WITH PUBLIC OFFICER** | I. UCR OFF. CODE **3, 7, 0** | 2. SECONDARY CLASSIFICATION **RESIST** | | 3. R.D. NO. **HP – 634061** |
|---|---|---|---|---|---|

| 4. ADDRESS OF OCCURRENCE NO. **1,4,3,5** DIR. **E** STREET **53rd St** | APT. NO. | 5. FIRE RELATED ☐ YES ☒ NO | 6. DATE OF OCCURRENCE – TIME MO. **18** DAY. **OCT** YR. **08** **0237** | 7. BEAT NOT ASSIGN **Z132** | 28. BEAT OF OCCUR. **Z132** |
|---|---|---|---|---|---|

| 9. TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE) **STREET** | 10. LOCATION CODE **3 0 4** | 11. DATE R.O. ARRIVED – TIME **18 OCT 08 0243** | 12. ASSIGNED BY ☒ ICUS ☐ 2 ON VIEW ☐ 3 SUPERVISOR |
|---|---|---|---|

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 21. NAME (LAST–FIRST–M.I.) | IDENTITY VERIFIED | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. TIME AVAIL. | 27. OCCUPATION | 28. VEH | 29. VEH. REL. CODE |
|---|---|---|---|---|---|---|---|---|---|
| MOORE, CLARENCE (U of C. P.O) | | 5555 S. ELLIS | M 1, 55 | DNA | (773) 702-8181 | ANY | POLICE OFC | X | 24 |
| TORRES, LARRY (U of C. P.O) | | 5555 S. ELLIS | M 2, 40 | DNA | 702-8181 | ANY | POLICE OFC | X | 24 |

| PARENT/GUARDIAN, IF JUVENILE | | | | | | |
|---|---|---|---|---|---|---|

RACE CODES
1-BLACK   3-BLACK-HISPANIC   5-AMER. IND./ALASK. NAT.
2-WHITE   4-WHITE-HISPANIC   6-ASIAN/PACIFIC ISLANDER

OFFENDER/VICTIM RELATIONSHIP CODES
• USE CORRESPONDING CODE FOR ALL "STEP" RELATIONSHIPS • DO NOT LEAVE RELATIONSHIP CODE BLANK
01 - WIFE        09 - BROTHER        18 - BROTHER-IN-LAW        25 - CARETAKER
02 - HUSBAND     10 - SISTER         19 - SISTER-IN-LAW
03 - FATHER      11 - AUNT           19 - OTHER RELATIVE
04 - FORMER WIFE 12 - UNCLE          20 - GIRLFRIEND (INCLUDES "FORMER")
05 - MOTHER      13 - MOTHER-IN-LAW  21 - BOYFRIEND (INCLUDES "FORMER")
06 - FATHER      14 - FATHER-IN-LAW  22 - FRIEND/ACQUAINTANCE
07 - SON         15 - SON-IN-LAW     23 - OTHER - SPECIFY
08 - DAUGHTER    16 - DAUGHTER-IN-LAW 24 - STRANGER

| 31. ☐ 1 DISCOVERED  ☐ 2 WITNESSED  ☐ 3 REPORTED OFFENSE | 32. | 33. | 34. | 35. |
|---|---|---|---|---|
| ☐  ☐  ☐ | | | | |
| ☐  ☐  ☐ | | | | |

| 41. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42. HOME ADDRESS | 43. SEX–RACE–AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC. | 44. C.B./I.R. NO. | 45. OFFENDER REL. CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| BOYLE, CHARLES D. D. | 6733 S. CHAPPEL | M 1, 21 | 5'09" | 197 | BR | BLK | DARK | TATTOO CLOUD RT ARM "n PRAYING HANDS" | 17392877 | 24 |

| 51. OBJECT/WEAPON ☒ 1 USED ☐ 2 DISPLAYED ☐ 3 UNK | 52. FIREARM FEATURES | 53. POINT/ENTRY | 54. POINT/EXIT | 55. BURGLAR ALARM | 56. SAFE BURGLARY METHOD | 57. IF RESIDENCE, WHERE WERE OCCUPANTS |
|---|---|---|---|---|---|---|
| ☐ 01 HAND GUN  ☐ 08 EXPLOSIVE | ☐ 01 CHROME/NICKEL | ☐ 01 FRONT DOOR | ☐ 01 FRONT DOOR | ☒ DNA | ☐ 01 PUNCH  ☐ 06 PEEL | ☐ 01 WORK  ☐ 05 OTHER |
| ☐ 02 SHOTGUN  ☐ 09 LIQUID/GAS | ☐ 02 BLUE STEEL | ☐ 02 REAR DOOR | ☐ 02 REAR DOOR | ON PREMISE | ☐ 02 TORCH  ☐ 07 OPEN | ☐ 02 VISITING  ☐ 07 UNKNOWN |
| ☐ 03 RIFLE  ☐ 10 BOTTLE/GLASS | ☐ 03 SHORT BARREL | ☐ 03 WINDOW | ☐ 03 WINDOW | ☐ 1 YES  ☐ 2 NO | ☐ 03 EXPLOSIVE  ☐ 08 UNKNOWN | ☐ 03 VACATION  ☒ 08 DNA |
| ☐ 04 KNIFE  ☐ 11 RAZOR | ☐ 04 LONG BARREL | ☐ 04 ROOF | ☐ 04 ROOF | ALARM CIRCUMVENTED | ☐ 04 DRILL  ☒ DNA | ☐ 04 WEDDING |
| ☐ 05 VEHICLE  ☐ 12 PRY TOOL | ☐ 05 SAWED OFF | ☐ 05 FLOOR | ☐ 05 FLOOR | ☐ 1 YES  ☐ 2 NO | ☐ 05 REMOVED | ☐ 05 FUNERAL/WAKE |
| ☐ 06 BLUNT INSTRUMENT ☒ 13 HAND, FEET | ☐ 06 OTHER | ☐ 06 SIDE DOOR | ☐ 06 SIDE DOOR | | | |
| ☐ 07 THROWN OBJECT  ☐ 14 OTHER | ☐ 07 UNKNOWN | ☐ 07 OTHER | ☐ 07 OTHER | 58. UNUSUAL CHARACTERISTICS OF OFFENSE | | 59. GANG RELATED – AFFILIATION |
| ☒ 09 DNA | ☒ 09 DNA | ☐ 08 UNKNOWN  ☒ 09 DNA | ☐ 08 UNKNOWN  ☒ 09 DNA | **SEE NARRATIVE** | | ☐ VICTIM **DNA** ☐ OFFENDER **DENIED** |

| 71. DESCRIBE PROPERTY IN NARRATIVE | | T = TAKEN : R = RECOVERED | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 MONEY | 2 JEWELRY | 13 FURS | 4 CLOTHING | 7 OFFICE EQUIPMT. | 8 TV, RADIO, STEREO | (I) HOUSEHOLD GOODS | 0 CONSUM. GOODS | (I) FIREARMS | 8 Narc./Dang. Drugs | 5 OTHER | 6 NONE |
| ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S | ☐ T  S |
| ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |

| 72. VEHICLE/TRAILER YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | | | STATE LICENSE NO. | STATE | EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO. POLICE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ STOLEN ☐ THEFT FROM ☐ OFFENDER'S | | | | | | | | | | | |

74. NARRATIVE (Do not duplicate or repeat information – for explanation and additional information only)

**EVENT # 02513 IN SUMMARY: A/O'S RESPONDED TO AN ASSIST THE UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL U of C POLICE OFC MOORE #1012, AND U of C POLICE OFC TORRES #1028 HAD ABOVE OFFENDER IN CUSTODY IN THAT HE BECAME COMBATIVE ON AN INVESTIGATORY STREET STOP, BY FLAILING HIS ARMS AND PULLING AWAY DURING A PROTECTIVE PATDOWN, VICTIMS REQUESTED ASSISTANCE OFFENDER READ RIGHTS AND**

80. SOBRIETY OF VICTIM ☐ SOBER ☐ HBD
☐ SDBER

82. FLASH MESSAGE SENT ☐ YES ☐ NO

| 84. EXTRA COPIES REQUIRED ☒ NORMAL | ☒ CONT'D, OTHER SIDE | 92. OFFICER NOTIFYING FOLLOW-UP INVESTIG. UNIT **BY REPORT** | UNIT NOTIFIED | PERSON ☐ NOTIFIED | ☐ ARRIVED | DATE (DAY-MO-YR) – TIME |
|---|---|---|---|---|---|---|

| 93. FIRST OFFICER AT SCENE **UNIVERSITY OF CHICAGO** | ☐ R.O. | 94. OFFICER NOTIFYING ☐ 1ST D/S ☐ E.T. ☐ M.E. | | PERSON ☐ NOTIFIED | ☐ ARRIVED | – TIME |
|---|---|---|---|---|---|---|

| 95. REPORTING OFFICER'S NAME (PRINT) **V. DARLING** | STAR NO **19135** | OFFICER'S SIGNATURE | DATE INVEST. COMPLETED–TIME **18 OCT 08   0455** | 97. SUPERVISOR APPR. | STAR NO |
|---|---|---|---|---|---|
| 96. REPORTING OFFICER'S NAME (PRINT) **C. MARTIN** | STAR NO **17246** | OFFICER'S SIGNATURE | | APPROVAL SIGNATURE | – TIME |

11.380 (Rev. 8/96)

EXHIBIT
Martin #1
10/28/09

I.D. NO.

HP — 634061

0000013

TRANSPORTED TO 021 DIST FOR FURTHER PROCESSING.

BT# 2120, 2131 ON SCENE. AIO'S HAVE NO

KNOWLEDGE OF EVENTS

COURT INFO: 34-2

04 DEC 08

0900 HRS

| | | | |
|---|---|---|---|
| I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDI- CATE THAT IT IS ACCEPTABLE. | SUPERVISOR'S SIGNATURE | | DATE (DAY-MO-YR.) |

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

| I-UCR OFFENSE CODE —<br>☐ 1 CORRECT<br>☐ 2 REVISED | REV. CODE | I-UCR METHOD CODE | METHOD ASSIGNED<br>☐ 1 FIELD ☐ 2 ADMIN.<br>☐ 3 SUMMARY | UNIT NO. | OFFICER ASSIGNED<br>STAR NO. | DATE ASSIGNED | SUPV. STAR NO. | INVESTIGATIVE FILE<br>☐ 1 YES ☐ 2 NO | REASSIGNED<br>☐ 1 YES ☐ 2 NO |
|---|---|---|---|---|---|---|---|---|---|

| OFFICER REASSIGNED —<br>STAR NO. | DATE | STATUS ☐ 0 PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED<br>☐ 3 CLEARED CLOSED ☐ 4 CLEARED OPEN ☐ 5 EXC. CLRD. CLOSED<br>☐ 6 EXC. CLEARED OPEN ☐ 7 CLOSED—NON-CRIMINAL | | IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST)<br>☐ 1 ARREST ☐ 2 DIRECTED TO ☐ 3 COMPL. REFUSED ☐ 4 COMMUNITY ☐ 5 OTHER<br>& PROSECUTION FAMILY COURT TO PROSECUTE ADJUSTMENT EXCEPTIONAL | | | | ☐ 1 AC<br>☐ 1 JU |
|---|---|---|---|---|---|---|---|---|

| VICTIM IDENTIFIERS<br>☐ 1 CORRECT<br>☐ 2 REVISED | VICTIM NO. | REVISED NAME | REVISED ADDRESS | REVISED PHONE NO.<br>☐ HOME<br>☐ BUSINESS |
|---|---|---|---|---|

| VALUE OF PROPERTY TAKEN/RECOVERED | ☐ 1 DNA ☐ 2 VERIFIED ☐ 3 CORRECTED | | | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT. | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| 1 MONEY<br>☐ T $<br>☐ R | 2 JEWELRY<br>☐ T $<br>☐ R | 3 FURS<br>☐ T $<br>☐ R | 4 CLOTHING<br>☐ T $<br>☐ R | 7 OFFICE EQUIPMT.<br>☐ T $<br>☐ R | 8 TV, RADIO, STEREO<br>☐ T $<br>☐ R | 9 HOUSEHOLD GOODS<br>☐ T $<br>☐ R | 10 CONSUM. GOODS<br>☐ T $<br>☐ R | 11 FIREARMS<br>☐ T $<br>☐ R | 8 NARC/DANG. DRUGS<br>☐ T $<br>☐ R | 15 OTHER<br>☐ T $<br>☐ R | 8 NON-<br>☐ T $<br>☐ R |
|---|---|---|---|---|---|---|---|---|---|---|---|

| SERIAL NOS. OR IDENTIFICATION NOS. | ☐ 1 DNA ☐ 2 VERIFIED ☐ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED |
|---|---|---|

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

| PREPARED BY — SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) | APPROVED BY — SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) |
|---|---|---|---|---|---|

1



# CHICAGO POLICE DEPARTMENT
3510 South Michigan Avenue/Chicago, Illinois 60653
Identification Section

## CRIMINAL HISTORY REPORT



CPD-31903C (REV 7/04)

**BOYLE, CHARLES D**
IR #
**1958082**
SID #
FBI #
IDOC #

Current Arrest Information:

| | | CPD photo |
|---|---|---|
| MALE | | |
| BLACK | | |
| 5'09" | | |
| 197 lbs | | |
| EYES : BRO | | |
| HAIR : BLK | | |
| HAIR STYLE : SHORT | | |
| COMPLEXION : DRK | | |

| | |
|---|---|
| Date of Birth: | 07-MAY-1987 |
| Age: | 21 years |
| Place of Birth: | ILLINOIS |
| SSN #: | 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 |
| Drivers License #: | B40014487100 |
| Drivers Lic. State: | UNITED STATES (AIRCRAFT, US MILITARY, FEDERAL VEH) |

Scars, Marks &Tattoos:

**Tattoo Cloud on Upper Right Arm**

**Tattoo Praying Hands on Upper Left Arm**

Key Historical Identifiers:

| Alias or AKA used | Date Used | Dates of Birth Used | Social Security Numbers Used |
|---|---|---|---|
| BOYLE, CHARLES D | 18-OCT-2008 | 07-MAY-1987 | 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 |

Criminal Justice Summary: Total arrests: 1 (0 Felony, 1 Misdemeanor)   Total convictions: 0

═══════════════════════════ ARREST ═══════════════════════════

| | | |
|---|---|---|
| Arrest Name: **BOYLE, CHARLES D** | Arrest Date: **18-OCT-2008** | Holding Facility: CPD - **DISTRICT 002 MALE** |
| Date of Birth: **07-MAY-1987** | Arrest Address: **1435 E 53RD ST CHICAGO, IL 60615** | |
| DCN or CB: **017392877** | Residence: **6733 S CHAPPEL AVE CHICAGO, IL 60649** | |
| Officer: ~~DARLING~~ | Officer Badge#: 19135 | Arresting Agency: CPD |

| Count | Class | Type | Statute | Arrest Charge Description | Inchoate |
|---|---|---|---|---|---|
| [2] | A | M | 720 ILCS 5.0/31-1-A | Resist/Obstruct - Peace Officer/ Correctional Emp | OFFENSE AS CITED |

**COURT CHARGES/DISPOSITION**

| Statute | Charge | Class | Case# |
|---|---|---|---|
| 720-5/31-1-A | RESIST/OBSTRUCT - PEACE O | M | 08127795101 |

| | |
|---|---|
| Disposition: DISMISSED | Disposition Date: 20-JAN-2009 |
| Sentence: | Sentence Date: |
| Disposition: NOLLE PROSEQUI | Disposition Date: 20-JAN-2009 |
| Sentence: | Sentence Date: |
| Disposition: DISMISSED | Disposition Date: 20-JAN-2009 |
| Sentence: | Sentence Date: |
| Disposition: NOLLE PROSEQUI | Disposition Date: 20-JAN-2009 |
| Sentence: | Sentence Date: |

**EXHIBIT**
martin #2
10/28/09

Boyle, 09 C 1080
FCRL 0001

1

***End of Report***

This Chicago Police Department IR rap-sheet should not replace the use of the Illinois State Police statewide criminal history transcript, which may contain additional criminal history data and can be obtained by performing a CQR1 inquiry via your LEADS terminal.

20-MAR-2009 12:03                                                                 Requested by:  IL16CPDAAI

Boyle, 09 C 1080
FCRL 0002

1

# CLEAR Data Warehouse

**BOYLE, CHARLES**
**CB# 17392877**

Charge(s) = RESIST/OBSTRUCT - PEACE OFFICER/
CORRECTIONAL EMP

IR# = 1958082

M/BLK/21 - Height 509 / 197 lbs.

DOB= 07-MAY-1987

Arrest Date = 18-OCT-2008

Address of Arrest = 1435 E 53RD ST

Beat of Arrest =2132

LKA= 6733 S CHAPPEL AVE

City = CHICAGO, IL

Beat of Residence = 0331

REPORT DATE= 20-March-2009  10:50:37 AM
REQUESTED BY= IL16CPDAAI
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!





1

# CLEAR Data Warehouse

**BOYLE, CHARLES**
**CB# 17392877**

Charge(s) = RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP

IR# = 1958082

M/BLK/21 - Height 509 / 197 lbs.

DOB= 07-MAY-1987

Arrest Date = 18-OCT-2008

Address of Arrest = 1435 E 53RD ST

Beat of Arrest = 2132

LKA = 6733 S CHAPPEL AVE

City = CHICAGO, IL

Beat of Residence = 0331

REPORT DATE= 20-March-2009 10:51:03 AM
REQUESTED BY= IL16CPDAAI
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!



1

# CLEAR Data Warehouse



**BOYLE, CHARLES**
**CB# 17392877**

Charge(s) = RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP

IR# = 1958082

M/BLK/21 - Height 509 / 197 lbs.

DOB= 07-MAY-1987

Arrest Date = 18-OCT-2008

Address of Arrest = 1435 E 53RD ST

Beat of Arrest = 2132

LKA = 6733 S CHAPPEL AVE

City = CHICAGO, IL

Beat of Residence = 0331

REPORT DATE= 20-March-2009 10:51:25 AM
REQUESTED BY= IL16CPDAAI
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!



Boyle, 09 C 1080
FCRL 0005

# CLEAR Data Warehouse

**BOYLE, CHARLES**
**CB# 17392877**

Charge(s) = RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP

IR# = 1958082

M/BLK/21 - Height 509 / 197 lbs.

DOB= 07-MAY-1987

Arrest Date = 18-OCT-2008

Address of Arrest = 1435 E 53RD ST

Beat of Arrest = 2132

LKA = 6733 S CHAPPEL AVE

City = CHICAGO, IL

Beat of Residence = 0331

REPORT DATE= 20-March-2009  10:52:06 AM
REQUESTED BY= IL16CPDAAI
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!



1

## CLEAR Data Warehouse

**BOYLE, CHARLES**
**CB# 17392877**

Charge(s) = RESIST/OBSTRUCT - PEACE OFFICER/
CORRECTIONAL EMP

IR# = 1958082

M/BLK/21 - Height 509 / 197 lbs.

DOB = 07-MAY-1987

Arrest Date = 18-OCT-2008

Address of Arrest= 1435 E 53RD ST

Beat of Arrest = 2132

LKA = 6733 S CHAPPEL AVE

City = CHICAGO, IL

Beat of Residence = 0331

REQUESTED BY= IL16CPDAAI on 20-March-2009 @ 10:50:18 AM
FOR OFFICIAL POLICE USE ONLY! NOT FOR DISSEMINATION!



**CHICAGO POLICE DEPARTMENT**
# ORIGINAL CASE INCIDENT REPORT
3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11.388(6/03)-C)

RD #: **HP634061**
EVENT #: 0829202513
Case ID: 8552348 CASR229

This Document is not an official copy. It is a computerized version of data entered from an original case report. A copy of the original case report can be obtained from the Records Division

## ASSIGNED TO ADMINISTRATIVE PERSONNEL

**INCIDENT**

IUCR: 3710 - Interfere With Public Officer - Resist/Obstruct/Disarm Officer

Occurrence Location: 1435 E 53rd St
Chicago IL 60615
304 - Street
Occurrence Date: 18 October 2008 02:37

Beat: 2132

Unit Assigned: 2132
RO Arrival Date: 18 October 2008 02:43
# Offenders: 1

### VICTIM

**NON-OFFENDER**

Name: MOORE, Clarence
Res: 5555 S Ellis Ave
Chicago IL 60637

Beat: 2133
Beat: 5100

Demographics
Male
Black
Age: 55 Years

Other Communications and Availability
Business Phone: 773-702-8181

### VICTIM

Name: TORRES, Larry
Res: 5555 S Ellis Ave
Chicago IL 60637

Beat: 2133
Beat: 5100

Demographics
Male
White
Age: 40 Years

Other Communications and Availability
Business Phone: 773-702-8181

### Suspect # 1                    In Custody

**SUSPECTS**

Name: BOYLE, Charles D
Res: 6733 S Chappel Ave
Chicago IL 60649

Beat: 0331

Demographics
Male
Black
5'09,
197 lbs
Brown Eyes
Black Hair
Dark Complexion
Age: 21 years

Other Communications and Availability

## RELATIONSHIP

(Victim)
MOORE, Clarence      Is a   No Relationship of

( Offender )
BOYLE, Charles,D

RD #: HP634061

Print Generated By: KOOISTRA,MARK  (PC0D788)     Page 1 of 2         20-MAR-2009 12:04

CLEAR Technology

Boyle, 09 C 1080
FCRL 0008

**Chicago Police Department - Incident Report**

RD #: HP634061

| PERSONNEL | | Star No | Emp No | Name | User | Date | Unit | Beat |
|---|---|---|---|---|---|---|---|---|
| | Reporting Officer | 19135 | #33994 | DARLING, Vincent | (PC0R101) | 19 Oct 2008 09:03 | 021 | 2132 |
| | Reporting Officer | 17246 | #49591 | MARTIN, Carl, E | (PC0S916) | 19 Oct 2008 09:03 | 021 | 2132 |

powered by CLEAR Technology

Boyle, 09 C 1080
FCRL 0009

1

CLEAR Data Warehouse
Arrest Narrative For Arrest ID 15290500
Report Date= 3/20/2009

The narrative contained herein has been transcribed from the original arrest report and is therefore not official!

| NARRATIVE |
|---|
| IN SUMMARY : A/O'S RESPONDED TO ASSIST UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL SPOKE WITH U OF C POLICE OFFICER MOORE, CLARENCE #1012, AND U OF C OFFICER TORRES, LARRY #1028, WHO RELATED TO A/O'S THAT THE ABOVE LISTED OFFENDER BOYLE, CHARLES D., REFUSED TO PRODUCE ID UPON AN INVESTIGATORY STREET STOP, AND DURING A PROTECTIVE PATDOWN OFFENDER BECAME COMBATIVE BY FLAILING HIS ARMS AND PULLING AWAY. OFFENDER TAKEN INTO CUSTODY ON SIGNED COMPLAINTS, READ RIGHTS PER MIRANDA AND TRANSPORTED TO 021 DISTRICT FOR FURTHER PROCESSING. OFC TORRES ADVISED OF COURT INFO. |

Boyle, 09 C 1080
FCRL 0010

CHICAGO POLICE DEPARTMENT
**ARREST REPORT**
3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11. 4200(REV. 6/30)

**FINAL APPROVAL**

CB #: 17392877
IR #: 1958082
YD #:
RD #: HP634081
EVENT #: 0829202513

| | ARREST REPORTING | |
|---|---|---|

**OFFENDER**

Name: BOYLE, Charles D
Res: 6733 S Chappel Ave          Beat: 331
  Chicago, IL 60649
  773-363-2575
Empl: Church
  Maintenance
DOB: 07 May 1987
AGE: 21 years
POB: Illinois
SSN: 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
DLN: B40014487100 -US
ARMED WITH Unarmed

Male
Black
5' 09"
197 lbs
Brown Eyes
Black Hair
Short Hair Style
Dark Complexion

Marks:  Tattoo Cloud on Upper Right Arm
  Tattoo Praying Hands on Upper Left Arm

**INCIDENT**

Arrest Date: 18 October 2008 02:56     TRR Completed? No
  Location: 1435 E 53rd St          Beat: 2132
  Chicago, IL 60615
  304 - Street
Holding Facility: District 002 Male Lockup
Resisted Arrest?  Yes

Total No Arrested: 1     Co-Arrests     Assoc Cases
          DCFS Ward ?  No
Dependent Children? No

**CHARGES**

| | | |
|---|---|---|
| 1. | Offense As Cited | **720 ILCS 5.0/31-1-A** |
| | | RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP |
| | | Class  A - Type  M |
| 2. | Offense As Cited | **720 ILCS 5.0/31-1-A** |
| | | RESIST/OBSTRUCT - PEACE OFFICER/ CORRECTIONAL EMP |
| | | Class  A - Type  M |

**Victim**

**RECOVERED NARCOTICS**

NO NARCOTICS RECOVERED

IR #1958082

**WARRANT**

NO WARRANT IDENTIFIED

CB #17392877

Print Generated By: NITSCHE, Lawrence ( IL16CPDAAI )     Page 1 of 5     20 MAR 2009 12:10
powered by: CLEAR Technology

Boyle, 09 C 1080
FCRL 0011

Chicago Police Department - ARREST Report

CB #: [ 17392077 ]
BOYLE, Charles

**ARREST REPORTING**

**NON-OFFENDER(S)**

**ARRESTEE VEHICLE**

NO ARRESTEE VEHICLE INFORMATION ENTERED

**PROPERTIES**

Confiscated Properties :
All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR     BOYLE, Charles,     NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

**INCIDENT NARRATIVE**

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)
IN SUMMARY : A/O'S RESPONDED TO ASSIST UNIVERSITY OF CHICAGO POLICE, UPON ARRIVAL SPOKE WITH U OF C POLICE OFFICER MOORE, CLARENCE #1012, AND U OF C OFFICER TORRES, LARRY #1028, WHO RELATED TO A/O'S THAT THE ABOVE LISTED OFFENDER BOYLE, CHARLES D., REFUSED TO PRODUCE ID UPON AN INVESTIGATORY STREET STOP, AND DURING A PROTECTIVE PATDOWN OFFENDER BECAME COMBATIVE BY FLAILING HIS ARMS AND PULLING AWAY. OFFENDER TAKEN INTO CUSTODY ON SIGNED COMPLAINTS, READ RIGHTS PER MIRANDA AND TRANSPORTED TO 021 DISTRICT FOR FURTHER PROCESSING. OFC TORRES ADVISED OF COURT INFO.

**COURT INFO**

Desired Court Date:     04 December 2008
Branch: 34-2     155 W 51ST ST - Room
Court Sgt Handle?  Yes
Initial Court Date:  04 December 2008
Branch: 34-2     155 W 51ST ST - Room
Docket #:

**BOND INFO**

Bond Date: 16 October 2008 11:8
Type:     Recognizance
Receipt #:  I8770331
Amount:   $1,000.00

Print Generated By: NITSCHE, Lawrence ( IL16CPDAAI )          Page 2 of 5

powered by: CLEAR Technology

20 MAR 2009 12:10

Boyle, 09 C 1080
FCRL 0012

**Chicago Police Department - ARREST Report**

CB #: 17392877

BOYLE, Charles

**ARREST REPORTING**

**REPORTING PERSONNEL**

**ATTESTING OFFICER:**

I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

| | | | |
|---|---|---|---|
| Attesting Officer: | #19135 | DARLING, V (PC0R101) | 18 OCT 2008 04:39 |

**ARRESTING OFFICER(S):**

| | | | Beat |
|---|---|---|---|
| 1st Arresting Officer: | #19135 | DARLING, V (PC0R101) | 2132 |
| 2nd Arresting Officer: | #17246 | MARTIN, C E (PC0S916) | 2132 |

**APPROVING SUPERVISOR:**

| | | | |
|---|---|---|---|
| Approval of Probable Cause : | #339 | STOPPA, K A (PC0F280) | 18 OCT 2008 04:40 |

Boyle, 09 C 1080
FCRL 0013

**Chicago Police Department - ARREST Report**

CB #: 17392877

BOYLE, Charles

### ARREST PROCESSING REPORT

| LOCKUP KEEPER PROCESSING | | | | |
|---|---|---|---|---|
| Holding Facility: District 002 Male Lockup | | Time Last Fed: 18 October 2008 07:22 | | |
| Received in Lockup: 18 October 2008 07:21 | | Time Called: | | Phone#: |
| Prints Taken: 18 October 2008 07:58 | | Cell #: 2/3 | | |
| Palmprints Taken: Yes | | | | |
| Photograph Taken: 18 October 2008 07:57 | | Transport Details : 2PO 2132 18-OCT-2008 03:00 | | |
| Released from Lockup: 18 October 2008 11:15 | | | | |

| VISUAL CHECK OF ARRESTEE | | ARRESTEE QUESTIONNARIE | |
|---|---|---|---|
| Is there obvious pain or injury? | No | Presently taking medication? | No |
| Is there obvious signs of infection? | No | (If female)are you pregnant? | No |
| Under the influence of alcohol/drugs? | No | First time ever been arrested? | No |
| Signs of alcohol/drug withdrawal? | No | Attempted suicide/serious harm? | No |
| Appears to be despondent? | No | Serious medical or mental problems? | No |
| Appears to be irrational? | No | Are you receiving treatment? | No |
| Carrying medication? | No | | |

**RETURN TO HOLDING FACILITY COMMENTS:**

**QUESTIONNAIRE REMARKS:**

**LOCKUP KEEPER COMMENTS:**

**EMERGENCY CONTACT**

Name : SINCLAIR, Steven

Res: 1735 E 79th St, #2FL                     Beat:0414
Chicago, IL 60649
773-574-4135

**INTERVIEW LOG**

NO INTERVIEWS LOGGED

**VISITOR LOG**

NO VISITORS LOGGED

Boyle, 09 C 1080
FCRL 0014

Chicago Police Department - ARREST Report

CB #: 17392877

BOYLE, Charles

## ARREST PROCESSING REPORT

**MOVEMENT LOG**

MOVEMENT LOG INFORMATION NOT AVAILABLE

**WC COMMENTS**

Watch Commander Comments:

REL w/o CHARGING

DOES NOT APPLY TO THIS ARREST

**PROCESSING PERSONNEL**

ARRESTEE PROCESSING PERSONNEL:

Beat

| | | |
|---|---|---|
| Searched By: | #4299 | DRIVER, F T (PC0E416) |
| Lockup Keeper: | #9865 | LAMAR, W L (PC0L482) |
| Assisting Arresting Officer: | #1012 | MOORE, C |
| Assisting Arresting Officer: | #1028 | TORRES, L |
| Fingerprinted By: | #9865 | LAMAR, W L (PC0L482) |

APPROVAL PERSONNEL:

Beat

| | | | |
|---|---|---|---|
| Final Approval of Charges : | #55 | FLUDER, J A(PC02957) | 18 OCT 2008 11:04 |

Boyle, 09 C 1080
FCRL 0016



| CPD | NAME (LAST - FIRST - M.I.) BOYLE, CHARLES D | | | DATE OF BIRTH 19870507 | C.B. NO. 017392877 | DATE PRINTED 20081018 |
|---|---|---|---|---|---|---|
| Arrested BY (STAR NO.) 30468 | DET. FACILITY 002M | AGENCY ILCPD00Q0 | SEX M | RACE B | I.R. NO. 001958082 | |

LEFT WRITERS PALM

LEFT UPPER PALM

LEFT LOWER PALM

LEFT THUMB

Boyle, 09 C 1080
FCRL 0016



| CPD | NAME (LAST – FIRST – M.I.)<br>BOYLE, CHARLES D | | | DATE OF BIRTH<br>19870507 | C.B. NO.<br>017392877 | CONTROL NUMBER |
|---|---|---|---|---|---|---|
| Arrested BY (STAR NO.)<br>30468 | DET. FACILITY<br>002M | AGENCY<br>ILCPD0000 | SEX<br>M | RACE<br>B | I.R. NO.<br>001958082 | HST0104017392877 |

↑ RIGHT WRITERS PALM

RIGHT UPPER PALM

RIGHT LOWER PALM

RIGHT THUMB

Boyle, 09 C 1080
FCRL 0017



| CPD | LAST NAME BOYLE, | FIRST NAME CHARLES D | MIDDLE NAME | SEX M | RACE B | DOB 19870507 | CB # 017392877 |
|-----|-----|-----|-----|-----|-----|-----|-----|
| ARRESTING AGENCY (ORI) ILCPD0000 | | DET. FACILITY 002M | | | IP # 001958082 | | |

RIGHT WRITERS PALM

RIGHT UPPER PALM

LEFT WRITERS PALM

LEFT UPPER PALM

Boyle, 09 C 1080
FCRL 0018



| NAME (LAST-FIRST-M.I.) BOYLE, CHARLES D | | DATE OF BIRTH 19870507 | C.B. NO. 017392877 | | CONTROL NUMBER PRINTED FROM ARCHIVE |
| --- | --- | --- | --- | --- | --- |
| ADDRESS 6733 S CHAPPEL AVE | | SEX M | RACE B | I.R. NO. 001958082 | |
| REASON PRINTED (APPLICATION TYPE OR ARREST CHARGE) 720 ILCS 5.0/31-1-A | ARRESTED BY (STAR NO.) 19135 | | | DET. FACILITY 002M | HST0104017392877 |
| DATE/TIME PRINTED 20081018 075824 | PRINTED BY (PRINT NAME) | STAR/EMPLOYEE NO. 30468 | SOCIAL SECURITY NO. 335784561 | | AGENCY ILCPD0000 |

1. RIGHT THUMB  2. RIGHT INDEX  3. RIGHT MIDDLE  4. RIGHT RING  5. RIGHT LITTLE

6. LEFT THUMB  7. LEFT INDEX  8. LEFT MIDDLE  9. LEFT RING  10. LEFT LITTLE

LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY   LEFT THUMB   RIGHT THUMB   RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

THIS DATA MAY BE COMPUTERIZED IN LOCAL, STATE AND NATIONAL FILES

CPD-31.813 (REV. 8/98)   FINGERPRINT CARD/CHICAGO POLICE DEPARTMENT

Boyle, 09 C 1080
FCRL 0019

# EXHIBIT H

ORIGINAL

```
         IN THE UNITED STATES DISTRICT COURT FOR THE
              NORTHEASTERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION

CHARLES BOYLE,                    )
              Plaintiff,          )
         vs.                      ) No. 09 CH 1080
UNIVERSITY OF CHICAGO POLICE      )
OFFICER LARRY TORRES, et al.,)
         Defendants.              )

         The discovery deposition of
OSCAR GALARZA, taken in the above-entitled
cause, before Karen E. Dominick-Rigoni, a
Registered Professional Reporter of Cook County,
Illinois, on the 9th day of November, 2009, at
the hour of 2:29 p.m. at 222 North LaSalle
Street, Suite 300, Chicago, Illinois, pursuant
to notice.


Reported by: Karen E. Dominick-Rigoni, CSR, RPR
License No.:  084-004480
```

1

```
1          I N D E X
2   WITNESS              EXAMINATION
3   OSCAR GALARZA
4     By Mr. Ksiazek...................4, 56
5     By Ms. Gibbons..................52
6     By Mr. Puiszis..................53, 63
7
8
9
10         E X H I B I T S
11   NUMBER              MARKED FOR ID
12   Galarza Deposition Exhibit
13     No. 8...........................55
14     No. 9...........................58
15
16
17
18
19
20
21
22
23
24
```

3

```
1   APPEARANCES:
2        ED FOX & ASSOCIATES, By
         MR. JONATHAN R. KSIAZEK
3        300 West Adams Street, Suite 330
         Chicago, Illinois  60606
4        (312) 345-8877
5          Representing the Plaintiff;
6
         HINSHAW & CULBERTSON, LLP, By
7        MR. STEVEN M. PUISZIS
         222 North LaSalle Street, Suite 300
8        Chicago, Illinois  60601
         (312) 704-3000
9
            - AND -
10
         CITY OF CHICAGO - DEPARTMENT OF LAW
11       EMPLOYMENT AND POLICY LITIGATION
         DIVISION, By
12       MS. HELEN GIBBONS
         30 North LaSalle Street, Room 900
13       Chicago, Illinois  60602
         (312) 742-3541
14
           Representing the Defendants.
15
16
17
18
19
20
21
22
23
24
```

2

```
1            (Witness sworn.)
2          OSCAR GALARZA,
3   called as a witness herein, having been first
4   duly sworn, was examined and testified as follows:
5            EXAMINATION
6   BY MR. KSIAZEK:
7      Q.  Good morning -- or good afternoon
8   actually.  Could you please state your name,
9   spelling the last name for the record.
10     A.  First name Oscar, O-s-c-a-r, last name
11  Galarza, G-a-l-a-r-z-a.
12     Q.  Mr. Galarza, my name is Jonathan
13  Ksiazek.  I'm an attorney for the plaintiff in
14  this matter.  I'm just going to be asking you
15  some questions regarding what happened on
16  October 18, 2008.  Before I begin, have you ever
17  had a deposition taken before?
18     A.  I have.
19     Q.  Okay.  When was the last time you had a
20  deposition taken?
21     A.  A few years ago.
22     Q.  What was the deposition taken in
23  regards with?
24     A.  In the City of Chicago while I was
```

4

1    working for the City of Chicago.
2        Q.  Was that a lawsuit for the City of
3    Chicago?
4        A.  No, sir.
5        Q.  Do you know how many years ago it was?
6        A.  A few years ago.
7        Q.  Okay.  Well, I'm just going to remind
8    you a few of the ground rules since it has been
9    a few years since you have had your deposition
10   taken.  Like I said, I'm going to ask you a
11   series of questions, and I ask that you answer
12   the questions truthfully and to the best of your
13   ability; is that fair?
14       A.  Yes, sir.
15       Q.  Okay.  And when I'm asking these
16   questions, you're going to have to answer
17   verbally, so you're going to have to say yes or
18   no or whatever the answer is instead of saying
19   uh-uh or uh-huh, okay, just so the court
20   reporter can pick up whatever testimony you're
21   giving.
22       A.  Okay.
23       Q.  And I will do my best not to speak over
24   you and I just ask that you not speak over me

                                                    5

1    when I'm asking a question or, like I said, I'll
2    do my best not to step over you when -- or talk
3    over you when you're giving your answer, but
4    that's just for the benefit of the court
5    reporter so we can have a clean transcript,
6    okay?
7        A.  Okay.
8        Q.  And you understand that you're under
9    oath today?
10       A.  Yes, sir.
11       Q.  And is there anything preventing you
12   from testifying truthfully today?
13       A.  No.
14       Q.  Can you tell me about your educational
15   history?
16       A.  I have an associate's in criminal
17   justice.  I have a bachelor's in law enforcement
18   management, and I'm currently working on my
19   master's in public safety administration.
20       Q.  Let's start with your associate's
21   degree.  Where did you get that from?
22       A.  City of Chicago, Wright College.
23       Q.  And when did you obtain that degree?
24       A.  Somewhere in maybe 1999, 2000, 2001,

                                                    6

1    somewhere down there.
2        Q.  Okay.  Did you -- after obtaining your
3    associate's degree, did you immediately seek
4    your bachelor's degree?
5        A.  It probably took me a year or so, a
6    little longer maybe.  I don't remember.
7        Q.  What were you doing within that year
8    period after you obtained your associate's?
9        A.  Most likely I was working.
10       Q.  Where were you working?
11       A.  Oh, my God, I don't remember.
12       Q.  Okay.  And where did you obtain your
13   bachelor's degree from?
14       A.  Calumet College of St. Joseph in
15   Whiting, Indiana.
16       Q.  How long did you attend St. Joseph?
17       A.  How long does it take for a bachelor's,
18   maybe two years?  Two years, two years plus
19   maybe, yeah.
20       Q.  Do you know when you graduated from
21   St. Joseph's?
22       A.  If I'm not mistaken --
23       Q.  I'm sorry, Calumet college.
24       A.  -- could be two thousand -- I graduated

                                                    7

1    maybe in 2006, somewhere down there.  Maybe a
2    little bit before, maybe after.
3        Q.  Okay.  And where are you currently
4    seeking your master's at?
5        A.  Same school, Calumet College of
6    St. Joseph.
7        Q.  How long of a program is that?
8        A.  It's a two-year program.
9        Q.  How far are you into that?
10       A.  Halfway.  I started in January, so I
11   will be graduating December of 2010.
12       Q.  How long have you worked for the
13   University of Chicago as a police officer?
14       A.  Since 2007, June or July of 2007.
15       Q.  Before working for the University of
16   Chicago as a police officer, had you ever worked
17   for any other police departments?
18       A.  Yes.
19       Q.  Which other ones?
20       A.  City of Chicago Aviation Police.
21       Q.  Is that it?
22       A.  Yes.
23       Q.  When did you work as -- for the City of
24   Chicago as aviation police?

                                                    8

2 (Pages 5 to 8)

| | |
|---|---|
| 1    A. I'm sorry? | 1    BY MR. KSIAZEK: |
| 2    Q. When? What years did you work? | 2    Q. Have you ever served in the military? |
| 3    A. I work for -- from maybe 2006 to 2007. | 3    A. No, sir. |
| 4    Q. So about a year? | 4    Q. Okay. And are you currently a patrol |
| 5    A. A little more than a year if I'm not | 5  officer with the University of Chicago? |
| 6  mistaken. I know it was more than a year, less | 6    A. Yes, sir. |
| 7  than two years. | 7    Q. And was that your rank in October |
| 8    Q. Did you leave the aviation police with | 8  of 2008? |
| 9  the City of Chicago to work for the University | 9    A. 2008? |
| 10  of Chicago? | 10    Q. In October 2008. |
| 11    A. Yes, sir. | 11    A. Yes, sir. |
| 12    Q. And was the aviation police job with | 12    Q. What are your duties as a patrol |
| 13  the City of Chicago, was that your first job | 13  officer? |
| 14  after graduating from Calumet College? | 14    A. Protect the students and property of |
| 15    A. No, sir. | 15  the University of Chicago, serve and protect. |
| 16    Q. Where else did you work? | 16    Q. Do you have an assigned beat that you |
| 17    A. Chicago Fire Department, Internal | 17  work at the University of Chicago currently? |
| 18  Affairs Division, IAD. | 18    A. Currently I've been working 241, but |
| 19    Q. How long did you work there for? | 19  it's not something -- I mean, I've been working |
| 20    A. I worked there from -- it has to be | 20  for the past maybe two months, but nobody has a |
| 21  from maybe 2005 to the time I started working | 21  set beat. Any given time, you can work |
| 22  for aviation police, somewhere in there. | 22  something else. |
| 23    Q. When you worked for the City of Chicago | 23    Q. Do you recall what beat you were |
| 24  Aviation Police, did you ever have any | 24  working on October 18, 2008? |
|                        9 |                        11 |
| 1  discipline? | 1    A. Yes. |
| 2    A. No, sir. | 2    Q. What beat was that? |
| 3    Q. You ever get written up? | 3    A. 101. |
| 4    A. No, sir. | 4    Q. What are the boundaries of Beat 101? |
| 5    Q. Officer, how tall are you? | 5    A. Back then it was from Cottage Grove to |
| 6    A. I'm sorry? | 6  Shore Drive and from 39 to maybe 47 -- |
| 7    Q. How tall are you? | 7  47th Street. |
| 8    A. Five nine. | 8    Q. Okay. And were you working with a |
| 9    Q. And how much do you weigh? | 9  partner on October 18, 2008? |
| 10    A. Right now, about 215. | 10    A. No, sir. |
| 11    Q. How much did you weigh on -- | 11    Q. So you were driving a patrol car by |
| 12    MR. PUISZIS: No way. | 12  yourself? |
| 13  BY MR. KSIAZEK: | 13    A. Yes, sir. |
| 14    Q. How much did you weigh in October | 14    Q. Did your car have a computer in it -- |
| 15  of 2008, if you recall? | 15  inside of it in October of 2008? |
| 16    A. No, I don't recall. | 16    A. No, sir. |
| 17    Q. Is it about the same? | 17    Q. So how would you go about getting |
| 18    A. I don't recall. | 18  information about a potential suspect without a |
| 19    MS. GIBBONS: It's all the muscle. | 19  computer in your car? |
| 20    MR. PUISZIS: Where do you pack it away? | 20    A. Over the radio. |
| 21    MS. GIBBONS: It's pure muscle. | 21    Q. How did you have the occasion to come |
| 22    THE WITNESS: That's what my doctor told me a | 22  to 1435 East 53rd Street on the night of |
| 23  couple weeks ago I was about 200, 210, 215, | 23  October 18, 2008? |
| 24  something like that. I don't really remember. | 24    A. A call was placed over the air. |
|                      10 |                      12 |

3 (Pages 9 to 12)

1    Q.  Do you recall -- this is from dispatch?
2    A.  Yes, sir.
3    Q.  Do you recall what the dispatch call
4  said?
5    A.  For a 10-1.
6    Q.  Well, what's your understanding of what
7  a 10-1 means?
8    A.  10-1 is an officer who needs help right
9  away.
10    Q.  Did the dispatch indicate where the
11  10-1 was occurring?
12    A.  Yes.
13    Q.  Where was that?
14    A.  To the best of my knowledge, somewhere
15  on 53rd and Blackstone.
16    Q.  Okay.  Where were you located when you
17  got this dispatch call?
18    A.  I was in the area of 47th and
19  Lake Park.
20    Q.  How far away is that from 53rd and
21  Blackstone?
22    A.  Walking distance?  Driving distance?
23    Q.  Well, let's go with -- let's go with
24  driving distance.

13

1    A.  A few minutes.
2    Q.  Would you say more than five?
3    A.  A few minutes.  It all depends,
4  traffic.  You tell me.  Depends on the day, the
5  time, hours.
6    Q.  Do you remember how long it actually
7  took you to arrive at 53rd and Blackstone from
8  47th and Lake Park that night?
9    A.  Yeah, a few minutes.
10    Q.  Do you recall what route you took to
11  arrive at 53rd and Blackstone?
12    A.  Yes.  I drove north -- I drove
13  southbound Lake Park and then westbound on 53rd.
14    Q.  Do you remember what time you got this
15  dispatch call?
16    A.  Approximately 2:35, 2:30 something,
17  somewhere around there.
18    Q.  And what did you do once you got that
19  call?
20    A.  I put on the air that -- I put on the
21  air that I just arrived.
22    Q.  So you got the call and you headed
23  towards 53rd and Blackstone?
24    A.  Yes.

14

1    Q.  And then you told dispatch that you
2  arrived on the scene?
3    A.  Yes.
4    Q.  Now, what did you first see as you
5  arrived on the scene?
6    A.  I observed Officer Torres and
7  Officer Moore wrestling with a male subject.
8    Q.  Okay.  Let's go back.  Where did you
9  park your car?
10    A.  In the middle of the street with the
11  lights on.
12    Q.  And where was Officer Moore and
13  Torres's car located?
14    A.  Their car was parked on 53rd facing
15  eastbound.
16    Q.  Was it in the street?
17    A.  Yes.
18    Q.  Was it in the eastbound lane of
19  traffic?
20    A.  That I don't recall well.  I don't
21  recall that.  I know the car was parked on
22  eastbound 53rd.
23    Q.  Did you see another car parked on the
24  street?

15

1    A.  Yeah, there were several cars parked on
2  the street.
3    Q.  What other cars do you remember being
4  parked on the street?
5    A.  Several civilian cars.
6    Q.  Can you describe these cars?
7    A.  No, sir.
8    Q.  Did you see a silver Chrysler parked on
9  the street?
10    A.  I don't remember, sir.
11    Q.  Did you see a car parked either
12  immediately next to or right nearby
13  Officer Moore and Torres's car?
14    A.  Like I said, next to -- next was
15  several cars parked.  I don't recall which
16  model, what color or anything like that.
17    Q.  Okay.  Well, where were Officer Moore
18  and Torres and Mr. Boyle, who you said was
19  wrestling with them, where were they located?
20    A.  They were -- they were in the street.
21    Q.  Was it close to the curb, in the middle
22  of the street?  Where was it?
23    A.  In the middle of the street on the
24  eastbound lane.

16

1    Q.  Were they close to the median or was it
2  sort of right in the middle of the eastbound
3  lane?
4    MR. PUISZIS:  Objection, the question assumes
5  there's a median there.
6    Subject to the objection, you can answer the
7  question.
8  BY MR. KSIAZEK:
9    Q.  You can answer the question.
10    A.  He was in the middle of the lane.  I
11  mean, they were moving back and forth.
12    Q.  Okay.  So describe -- when you say
13  wrestling, describe what you saw.
14    A.  I observed Officer Moore and
15  Officer Torres trying to apprehend the subject
16  and the subject was pushing away from them and
17  they were wrestling.  They were just pushing
18  each other.
19    Q.  Where was Officer Moore located in
20  relation to the subject?
21    A.  That I don't recall, sir.
22    Q.  Do you recall where Officer Torres was
23  located in relation to the subject?
24    A.  No, sir.
                                                    17

1    Q.  But you do know that Officer Moore and
2  Torres were attempting to arrest Mr. Boyle?
3    A.  The subject, yes, sir.
4    Q.  How do you know that?
5    A.  Because when I show up at the scene --
6  would you repeat the question.
7    Q.  Sure.  How do you know that
8  Officer Moore and Officer Torres were trying to
9  arrest Mr. Boyle?
10    A.  Because both officers were stating to
11  the subject that he's under arrest.
12    Q.  Okay.  When you arrived at the scene,
13  what did you do?  What was the first thing that
14  you did?
15    A.  When I arrived at the scene, I observed
16  the two officers and the subject in the middle
17  of the street, so what I did was park my car in
18  the middle of both lanes facing westbound with
19  the lights so neither one of them will get hit
20  by a car.
21    Q.  And when did you hear Officer Moore and
22  Torres saying to Mr. Boyle that he was under
23  arrest?
24    A.  When I got out of the car and on my way
                                                    18

1  to help them out to place the subject in
2  apprehension.
3    Q.  Did you see any other University of
4  Chicago Police cars at the scene when you first
5  arrived?
6    MR. PUISZIS:  You mean other than Moore and
7  Torres?
8  BY MR. KSIAZEK:
9    Q.  I'm sorry, yes, other than Moore and
10  Torres?
11    A.  At that point, no.
12    Q.  So you were the second University of
13  Chicago patrol car to arrive at the scene?
14    A.  Yes.
15    Q.  And did you hear Mr. Boyle say anything
16  in response to Officer Moore and Torres's
17  statements that he was under arrest?
18    A.  Oh, yes.
19    Q.  What did he say?
20    A.  He was just -- he was using vulgar
21  language.  He was insulting everybody.
22    Q.  What was he saying?
23    A.  MF this, MF that, F this, F that, you
24  know, the usual.
                                                    19

1    Q.  Well, I wasn't there, so...
2    A.  Well, I'm telling you what he was
3  saying.  I mean, you know, trust me, if I were
4  to know that we were going to get into a
5  lawsuit, I would have brought my own camera.  I
6  would have recorded the whole thing for you.
7  Moreover, I mean, it's a shame that we don't
8  have a camera in the car, otherwise you will be
9  able to observe and hear everything on your own.
10    Q.  Sure.
11    Okay.  So you said he was saying
12  MF this, F that.  How many times did he say
13  that?
14    A.  I didn't have a chance to write this
15  down, so I don't recall that, sir.
16    Q.  So Officer Moore and Torres just said
17  to Mr. Boyle you're under arrest, right?
18    A.  Yes, sir.
19    Q.  In response, Mr. Boyle said MF?  What
20  did he say?
21    A.  Like I said, he was insulting, MF this,
22  MF that and couple other things.  Those are the
23  couple things I remember right now.
24    Q.  Okay.  How many -- did he say MF twice
                                                    20

1  or did he say it more than that?
2      A.  Multiple times.
3      MR. PUISZIS:  Maybe we should find out how
4  many times he said it in his rap songs.
5  BY MR. KSIAZEK:
6      Q.  So after you heard Mr. Boyle say
7  MF this, MF that, what did you do?
8      A.  Then at some point -- at some point,
9  Officer Torres, Officer Moore and the subject
10  went on the ground and one of his arms broke
11  loose from being handcuffed and that's when I
12  gained control -- trying to gain control of that
13  hand to make the -- to place the subject in
14  handcuffs.
15      Q.  Okay.  How long was Mr. Boyle swearing
16  at the Officers Moore and Torres?
17      A.  Excuse me?
18      Q.  How long -- how much time had passed
19  when Officer Moore and Torres -- how much time
20  passed -- let me rephrase.
21          How much time -- how long did Mr. Boyle
22  swear at Officer Moore and Torres?
23      A.  During the whole altercation.
24      Q.  Okay.  Did Officer Moore and Torres say

                                                    21

1  they pushing Mr. Boyle?
2      A.  What do you mean "pushing"?
3      Q.  Were they striking him?
4      A.  No.
5      Q.  Did they push him?
6      A.  No.
7      Q.  What did they do to him?
8      A.  Trying to place the subject in
9  handcuffs.
10      Q.  Well, how did they try and put him in
11  handcuffs?
12      A.  By placing the two hands on the back
13  and placing the handcuffs on him.
14      Q.  And they were doing this in the middle
15  of the street?
16      A.  Yes.
17      Q.  So when you first arrived, you saw
18  Officer Moore and Torres trying to put Mr. Boyle
19  in handcuffs?
20      A.  Yes, sir.
21      Q.  Okay.  As you saw them try and put him
22  in handcuffs, what was Mr. Boyle doing?
23      A.  Pushing away from them.
24      Q.  How was he pushing away from them?

                                                    23

1  anything in response to Mr. Boyle swearing at
2  them?
3      A.  Stop resisting.
4      Q.  Was Mr. Boyle resisting at that point?
5      A.  Oh, yes, sir.
6      Q.  How was he resisting?
7      A.  By pushing away, using every mean he
8  can -- he could to get away from the location by
9  kicking.
10      Q.  Well, was he standing up at this point?
11      MR. PUISZIS:  At what point?  Objection.
12  BY MR. KSIAZEK:
13      Q.  Okay.  After he was swearing -- when he
14  was swearing to Officer Moore and Torres, was he
15  standing up?
16      A.  I don't recall.
17      Q.  Were Officer Moore and Torres standing
18  up?
19      A.  Listen, it was a pushing situation.  It
20  was back and forth, back and forth.  I mean, if
21  you give -- we'll have to be -- it was from the
22  floor to up and the ground, up and the ground,
23  on the floor.  This is how bad it was.
24      Q.  So were Officer Moore and Torres, were

                                                    22

1      A.  For instance, if I grab your arm, you
2  will resist by pushing your arm away from me.
3  That is the way.
4      Q.  Is that what Mr. Boyle was doing?
5      A.  Yes.
6      Q.  Okay.  What else was he doing to resist
7  being placed in handcuffs?
8      A.  Using any other means, for instance,
9  kicking, pushing his other arm.
10      Q.  When did he kick?
11      A.  When he was on the floor, he started
12  kicking.  That's one of the times I recall him
13  kicking.
14      Q.  Okay.  How did he get on the floor?
15      A.  How did he get on the floor?
16      Q.  Yes.
17      A.  Good question.  I don't know.
18      Q.  Was he on the floor before they tried
19  to put him in handcuffs?
20      A.  Maybe when he was resisting, he fell on
21  the floor.
22      Q.  You were there.  You need to tell me.
23      A.  Yeah, like I said, he was pushing,
24  kicking.  We were asking him to stop resisting

                                                    24

6  (Pages 21 to 24)

1 and then everybody went on the floor. And then
2 I recall one of the officers not leaving the
3 scene, but, I guess, if I'm not mistaken,
4 Officer Torres got tired so he step aside for a
5 second and then I gained control of his -- one
6 of his arms. But at that point, he started
7 kicking with his legs.
8        Officer -- if I'm not mistaken,
9 Officer Gillespie got kicked in the face and his
10 glasses broke. Somehow he got his other hand
11 loose while I was trying to gain control of his
12 other arm. He overpowered me and that's the way
13 I hurt -- I injured my right shoulder.
14     Q. Okay. So you gave me a lot of stuff
15 there.
16     A. Oh, yeah.
17     Q. Let's go through it. So according to
18 your testimony, they were trying to arrest
19 Mr. Boyle, right?
20     A. Yes.
21     Q. And at some point, they went onto the
22 floor, and Officer Moore, Torres and Mr. Boyle
23 went on the floor?
24     A. And myself, yes.

25

1     Q. Okay. When did you get involved in the
2 skirmish between Officer Moore, Torres and
3 Mr. Boyle?
4     A. When I arrived at the scene.
5     Q. So you arrived at the scene and went
6 immediately to help Officer Moore and Torres?
7     A. Correct.
8     Q. What did you do to help Officer Moore
9 and Torres?
10     A. How?
11     Q. What actions did you take, yes.
12     A. Trying to place the subject in
13 handcuffs. Help assisting the two officers
14 place him, the subject, in handcuffs.
15     Q. All right. Where did you approach
16 Mr. Boyle at to try and get him into handcuffs?
17     A. That I don't remember. I mean, it
18 happens -- you don't have time for all this
19 stuff. You just -- you need to place the
20 subject in handcuffs and that's what it is. I
21 mean, I don't remember if I was coming from the
22 right or the left. That I don't remember. .
23     Q. Okay. Were you helping out putting him
24 in handcuffs, were you in front of Mr. Boyle?

26

1 Were you facing Mr. Boyle?
2     A. I don't remember that.
3     Q. You don't remember where you were?
4     A. No.
5     Q. And I think you stated already
6 previously you don't remember where
7 Officer Moore was?
8     A. Correct.
9     Q. And you don't remember where
10 Officer Torres was?
11     A. Correct.
12     Q. But you do know that at some point all
13 four of you went down to the ground, right?
14     A. Correct.
15     Q. And what happened when the four of you
16 went down onto the ground?
17     A. Then at that point, we were able to
18 gain control of his two arms and place the
19 subject in handcuffs.
20     Q. Do you recall how Mr. Boyle fell to the
21 ground, in what position he was?
22     A. No, sir.
23     Q. You don't know if he was facedown or
24 back?

27

1     A. No, I don't remember, sir.
2     Q. Okay. Were you on top of Mr. Boyle?
3     A. No.
4     Q. You were on the side?
5     A. Yes.
6     Q. Do you know where Officer Moore and
7 Officer Torres were once the four of you fell to
8 the ground?
9     A. Yeah, the four of us fell on the
10 ground. Nobody fall on top of anybody. I mean,
11 it was just all around him.
12     Q. Well, if there was three of you, how
13 did all four of you fall to the ground? If
14 there's three officers trying to wrestle, how
15 did all four of you fall to the ground?
16     A. I don't know.
17     Q. Were you in contact with Mr. Boyle?
18     A. I was in contact with Mr. Boyle, yes.
19     Q. What part of his body were you
20 contacting when he fell?
21     A. All the time was his arm.
22     Q. So you were holding onto his arm?
23     A. Yes.
24     Q. And you fell to the ground while you

28

7 (Pages 25 to 28)

```
 1   were holding onto his arm?
 2      A.  Yes.
 3      Q.  Do you know who actually was able to
 4   get Mr. Boyle into handcuffs?
 5      A.  No.
 6      Q.  Was it yourself?
 7      A.  I don't remember, sir.
 8      Q.  Did you -- was Mr. Boyle put in
 9   handcuffs while he was on the ground?
10      A.  Yes, sir.
11      Q.  And when -- when you went down to the
12   ground, do you remember Mr. Boyle saying
13   anything to you or to any of the officers?
14      A.  He's still running his mouth.  He was
15   still talking about -- saying something.  I
16   don't remember what he was saying.
17      Q.  Was it swear words?
18      A.  I don't recall.
19      Q.  And were Officer Moore -- was
20   Officer Moore saying anything while you were
21   down on the ground?
22      A.  I don't remember.
23      Q.  Was Officer Torres saying anything
24   while you were on the ground?
                                          29
```

```
 1      A.  I observed Michael -- what is his last
 2   name?
 3      Q.  Kwiatkowski?
 4      A.  Kwiatkowski, yes.  He was there.
 5      Q.  So Officers Gillespie and Kwiatkowski
 6   were present while the four of you were down on
 7   the ground?
 8      A.  Yes, at some point.
 9      Q.  How long were you down on the ground
10   for?
11      A.  I don't recall.
12      Q.  Where was Officer Gillespie when you
13   were on the ground?
14      A.  He was --
15      MR. PUISZIS:  Objection.  At what point?
16   BY MR. KSIAZEK:
17      Q.  Okay.  When did -- while you were on
18   the --
19      MR. PUISZIS:  He already said he doesn't know
20   when Gillespie arrived, so, I mean --
21      MR. KSIAZEK:  I'm asking where he was
22   standing.  Where was Officer Gillespie standing
23   when he was on the ground?
24      MR. PUISZIS:  If you know, go ahead.
                                          31
```

```
 1      A.  I don't remember.
 2      Q.  And did you say anything?
 3      A.  Yes, I did.
 4      Q.  What did you say?
 5      A.  Stop resisting.
 6      Q.  And why did you say that?
 7      A.  Because I have to communicate with the
 8   subject.
 9      Q.  Okay.  Did he say anything in response?
10      A.  I don't remember.
11      Q.  Now, you said that Officer Gillespie
12   had arrived at some point?
13      A.  Yes, sir.
14      Q.  Do you recall -- do you know when he
15   arrived?
16      A.  No.
17      Q.  Did you see him arrive?
18      A.  No.
19      Q.  Did you see any other officers
20   while you were on the ground besides
21   Officer Gillespie from the University of Chicago
22   or Chicago Police Officers?
23      A.  Yes.
24      Q.  Who did you see?
                                          30
```

```
 1      THE WITNESS:  Officer -- at some point, I
 2   observed Officer Gillespie holding the subject's
 3   legs.
 4   BY MR. KSIAZEK:
 5      Q.  And that's -- was that while the
 6   subject was on the ground?
 7      A.  At some point, yes.
 8      Q.  Did you see Officer Kwiatkowski do
 9   anything when he arrived at the scene?
10      A.  Yes.
11      Q.  What did he do?
12      A.  He helped -- he tried to help place the
13   subject in handcuffs.
14      Q.  This was before Mr. Boyle was in
15   handcuffs?
16      A.  Yes.
17      Q.  So Officer Gillespie and Kwiatkowski
18   arrived before Mr. Boyle was in handcuffs?
19      A.  Yes.
20      Q.  Okay.  So what happened after Mr. Boyle
21   was placed in handcuffs?
22      A.  Officer Gillespie started looking for
23   his glasses, which were in pieces, and he was
24   holding his face because he got kicked pretty
                                          32
```

8 (Pages 29 to 32)

1  bad during the time he was helping restrain the
2  subject.
3  Q.  Did you see Officer Gillespie get
4  kicked?
5  A.  Oh, yeah.
6  Q.  Can you describe what happened?
7  A.  He got struck.  I mean, the subject
8  struck him with his leg.  The glasses fall apart
9  and he -- I mean, you heard the (indicating)
10  actual the way he was struck with his feet.
11  Q.  Okay.  Was Mr. Boyle in handcuffs when
12  he kicked Officer Gillespie?
13  A.  No.
14  Q.  And was Officer Gillespie on the ground
15  or was he standing?
16  A.  He was on the ground.
17  Q.  How was he on the ground?  Was he on
18  his knees?  Was he laying down?
19  A.  Yes, he was on his knees trying to hold
20  his legs.
21  Q.  Which leg did Mr. Boyle --
22  A.  I don't know, sir.
23  Q.  Can you describe the glasses?
24  A.  No, sir.

33

1  A.  Yes.
2  Q.  Why were you out of breath?
3  A.  Why?
4  Q.  Yes.
5  A.  Because he was fighting.
6  Q.  How was he fighting?
7  MR. PUISZIS:  Objection.  You've asked and
8  answered this five times now.  You can answer it
9  a sixth time.  You can go ahead and answer it.
10  THE WITNESS:  If you could repeat the
11  question for me, please.
12  MR. PUISZIS:  He wanted to know how he was
13  fighting.
14  MR. KSIAZEK:  Sure.
15  MR. PUISZIS:  So, I mean, you can tell him
16  again how he kicked Gillespie in the face.  You
17  can talk about everything else that happened
18  that we've been talking about for the last
19  15 minutes.  So you can go ahead and answer the
20  question.
21  THE WITNESS:  Okay.  After he was pushing,
22  kicking, fighting, after he hurt my shoulder,
23  after I was able to pull his -- help him out,
24  handcuff him, yes.  Once he was restrained and

35

1  Q.  Do you know how many pieces it
2  shattered into?
3  A.  No.
4  Q.  But you heard it, right?
5  A.  Yeah.
6  Q.  So Mr. Boyle was placed into handcuffs
7  while he was still on the ground, right?
8  A.  Yes.
9  Q.  At some point, did someone pull him up
10  from the ground?
11  A.  Once he was handcuffed, we placed him
12  on his feet.
13  Q.  Who actually pulled him up from his
14  feet --
15  A.  I don't remember.
16  Q.  -- or from the ground?
17  A.  I don't remember.
18  Q.  Was it yourself?
19  A.  No, it wasn't me.
20  Q.  What were you doing once -- when
21  Mr. Boyle was being pulled up to his feet?
22  A.  Oh, I stepped on the side to catch my
23  breath.
24  Q.  Were you out of breath?

34

1  on his feet, I stepped to the side so I can
2  catch my breath.  I was tired.  How's that?
3  BY MR. KSIAZEK:
4  Q.  Sure.  You said you hurt your shoulder?
5  A.  I didn't hurt -- he hurt my shoulder.
6  Q.  Well, your shoulder was hurt?
7  A.  Yes, sir.
8  Q.  And specifically do you remember how
9  your shoulder was hurt?
10  A.  It was painful, pain.
11  Q.  Well, I mean, what action did Mr. Boyle
12  take that hurt your shoulder?
13  A.  When he pushed my right arm.
14  Q.  And this is while you were on the
15  ground?
16  A.  At some point.
17  Q.  Was it on the ground or were you
18  standing up?
19  A.  You know what -- he was fighting all of
20  us from the time he was on the ground to the
21  time he was in handcuffs -- all the way until he
22  was in handcuffs.
23  Q.  So you're not sure when you injured
24  your shoulder?

36

9 (Pages 33 to 36)

1    A.   Yeah, when he pulled my -- when he
2    pulled my arm.
3    Q.   Okay.  I'm just trying to clarify when
4    actually that happened.
5    A.   When?  During the fight.
6    Q.   Was it before -- was it before he was
7    in handcuffs?
8    A.   Of course.
9    Q.   And was it before he went down to the
10   ground?
11   A.   That I don't recall.  It was -- that
12   was in between.
13   Q.   Okay.  So what happened after Mr. Boyle
14   stood up and you stepped to the side to catch
15   your breath?
16   A.   A couple city units arrived on the
17   scene and they took the subject with them.  I
18   don't know anything else.
19   Q.   Did the University of Chicago officers
20   physically walk Mr. Boyle over to the Chicago
21   Police Department?
22   A.   Yes.
23   Q.   How far did they walk him over there?
24   A.   A couple feet.
                                              37

1    Q.   Did you hear Mr. Boyle say anything
2    after he got up and was being walked over to the
3    Chicago Police officers?
4    A.   I don't recall.
5    Q.   Did any of the Chicago -- I'm sorry,
6    University of Chicago Police officers say
7    anything after he was stood up and walked over
8    to the Chicago Police officers?
9    A.   I don't recall.
10   Q.   Did you say anything to the City of
11   Chicago Police officers?
12   A.   No, sir.
13   Q.   So once Mr. Boyle was walked over to
14   the Chicago Police officers, their vehicle, what
15   did you do?
16   A.   Then I cleared out the scene.
17   Q.   What did that entail?
18   A.   Meaning that I put over the air that I
19   will -- that I told dispatch to clear me from
20   the scene and put me back in my zone, which
21   means I'm going back to whatever area I was
22   patrolling.
23   Q.   Well, did you go see a doctor about
24   your shoulder?
                                              38

1    A.   Half an hour later, my arm -- my
2    shoulder started bothering me.  That's when I
3    called my lieutenant.
4    Q.   Okay.  Let's go back actually.  When
5    you were still at the scene but after Mr. Boyle
6    was in the Chicago Police officer car, did you
7    talk to any witnesses at the scene?
8    A.   No.
9    Q.   Did you see anyone else gathered at the
10   scene besides the officers, either University of
11   Chicago or Chicago Police officers and
12   Mr. Boyle, besides those persons, did you see
13   anyone else at the scene?
14   A.   I don't recall, sir.
15   Q.   Did you see a young woman at the scene?
16   A.   No, sir.  I don't recall anything.
17   Q.   So after you told dispatch to clear
18   from the scene, you continued on your beat after
19   that?
20   A.   Yes.
21   Q.   And then 30 minutes later you said --
22   you told your lieutenant your shoulder was
23   bothering you?
24   A.   Approximately 30 minutes.
                                              39

1    Q.   How did you communicate that to your
2    lieutenant?
3    A.   I called the lieutenant.
4    Q.   Did you call him over the radio?
5    A.   No.  My cell phone.
6    Q.   What did you tell him?
7    A.   That my shoulder hurts.
8    Q.   And what did he say?
9    A.   To go to the emergency room.
10   Q.   Did you go to the emergency room?
11   A.   Yes, sir.
12   Q.   Where -- what emergency room did you go
13   to?
14   A.   University of Chicago ER.
15   Q.   And what did the doctors tell you?
16   A.   They took some X-rays and told me to
17   put some ice packs for a few days, and if the
18   pain consisted, you have to contact a shoulder
19   doctor, orthopaedic.
20   Q.   Did you ever follow up with a shoulder
21   doctor, an orthopaedic?
22   A.   No.  But my shoulder still bothers me,
23   so I'm thinking about going.
24   Q.   Your shoulder still bothers you today?
                                              40

10  (Pages 37 to 40)

1   A. Yes.
2   Q. How does it bother you?
3   A. It hurts. When the weather is kind of
4 cold, it hurts a little bit.
5   Q. Okay. I'm going to show you what has
6 already been previously marked as Exhibit 1.
7 This is a copy of the dispatch tape. Have you
8 reviewed this document before your testimony
9 today?
10   A. I don't recall.
11   Q. You don't recall seeing this document?
12   A. Uh-uh.
13   Q. Okay. This is a transcript that's been
14 provided by your counsel about the -- of the
15 dispatch on October 18, 2008, okay. And at the
16 top it says start time, approximately 2:37
17 hours. Is that when you remember arriving at
18 35th Street on the 18th?
19   A. If this document says that, yes.
20   Q. Okay.
21   A. I was not looking at my clock -- on my
22 time clock, but that's fine.
23   Q. Okay. Now, if you look in the middle
24 of the page under -- where it says dispatch,

41

1 somebody get there? Next unit on the scene,
2 tell me what you got. Do you remember hearing
3 that over dispatch?
4   A. I don't recall.
5   Q. You don't recall hearing that?
6   A. Well, I don't recall this.
7   Q. Okay. Now, where it says unknown, it
8 says, we got one guy on the ground, we got two
9 officers. Did you say that to dispatch?
10   A. (Indicating.)
11   Q. You have to answer yes or no.
12   A. Don't know. Maybe I did. Maybe I
13 didn't. I don't recall.
14   Q. Okay. Well, dispatch was asking you
15 what you got over there, right? They were
16 talking to you when it says, 101, what you got
17 over there, right?
18   A. Yes.
19   Q. So does it make sense that this would
20 be you saying we got one guy on the ground, we
21 got two officers?
22   MR. PUISZIS: Objection. He's already said
23 he doesn't remember. Dispatch also says, next
24 unit on the scene, tell me what you got.

43

1 53rd and Blackstone, we've got a 10-1, 10-1,
2 53rd and Blackstone. Is that the dispatch call
3 that you heard which caused you to go to 53rd
4 and Blackstone Street?
5   A. Yes.
6   Q. And you said earlier you're Unit 101,
7 correct?
8   A. Yes, sir.
9   Q. So you stated in response, 101 en route
10 53rd and Blackstone, right?
11   A. Correct.
12   Q. Okay. If you look a little later down
13 the page where it says 101 again, it says 101,
14 23.
15   A. Yes.
16   Q. What does 23 indicate?
17   A. 23 means I have arrived at the location
18 previously given to me. On the scene, how's
19 that?
20   Q. Sure.
21   Okay. And then dispatch asked you,
22 101, what do you got over there? One, zero,
23 one, what do you have? 101, do you see 109?
24 Okay, units, we got the city coming. Can

42

1 BY MR. KSIAZEK:
2   Q. Well, you did testify you were the only
3 one -- the only additional unit on the scene
4 when you first got there, right?
5   A. Correct.
6   Q. Okay. If you can turn to page two of
7 this document. If you look at the top where it
8 says, 101, and you say to dispatch 101, right?
9   A. Uh-huh.
10   Q. You have to answer yes.
11   A. Yes.
12   Q. Okay. And then dispatch echoes back
13 101, correct?
14   A. Correct.
15   Q. And then 101 says, please run driver's
16 license for me, driver's license B, boy,
17 400-1448-7100. Did you say that to dispatch?
18   A. I don't recall by the paper. I don't
19 recall that.
20   Q. Okay. But at some point, did you
21 obtain Mr. Boyle's driver's license?
22   A. I don't recall. I mean, I don't
23 remember.
24   Q. You don't remember if you ever got

44

11 (Pages 41 to 44)

1    Mr. Boyle's driver's license?
2      A.  I don't remember.
3      Q.  I'm going to ask you to look at what
4    has been previously marked as Plaintiff's
5    Exhibit 2. If you would turn to the third page,
6    what is -- they have little numbers on the
7    bottom which is U, dash, C0111.
8      A.  Okay.
9      Q.  Do you see that?
10      Okay. This is a police report that you
11   filled out.
12     A.  Excuse me?
13     Q.  I said this is a police report -- I'm
14   sorry. Oh, I'm sorry, wrong. Disregard that.
15     Did you fill out any reports in
16   connection with this case?
17     A.  No, sir.
18     Q.  You didn't file out an injured person's
19   report?
20     A.  I don't fill one out because I was
21   injured. Another officer does it for me -- did
22   it for me.
23     Q.  Okay. So someone filled this out for
24   you?

45

1     A.  Yes, sir.
2    MR. PUISZIS: Well, wait, can he see what it
3   is before he answers a question.
4    MR. KSIAZEK: I'm sorry, he gave it back to
5   the --
6    MR. PUISZIS: Which page are you looking at?
7    MR. KSIAZEK: We're looking at -- still
8   looking at 0111. This is the injured person's
9   report.
10    MR. PUISZIS: Okay.
11   BY MR. KSIAZEK:
12     Q.  So someone filled this document out for
13   you?
14     A.  Yes.
15     Q.  And when -- where you see at the bottom
16   where it says Lisa -- I'm not sure if I can make
17   that out -- Raduke. Do you know whose that is?
18     A.  Yes.
19     Q.  Who filled this out for you?
20     A.  Officer Lisa Redmond.
21     Q.  Redmond, okay. So Officer Redmond
22   filled this out for you?
23     A.  Yes, sir.
24     Q.  Okay. Did you talk to her and provide

46

1    her with information here?
2     A.  Yes, sir.
3     Q.  Information in this report.
4     When did you talk to her?
5     A.  When I went to the hospital.
6     Q.  So was she -- was she with you at the
7   hospital?
8     A.  We have a police officer at the
9   hospital 24/7.
10     Q.  And that, on October 18, 2008, that
11   would be -- Lisa Redmond would be the police
12   officer at the hospital that night?
13     A.  Yes, sir.
14     Q.  So this isn't your handwriting?
15     A.  No, sir. You don't see my signature
16   anywhere here.
17     Q.  Right. Do you know what time you spoke
18   to Officer Redmond on October 18?
19     A.  Whatever time, it was documented in the
20   report.
21     Q.  Well, this report at the top indicates
22   2:38, right?
23     A.  Uh-huh.
24    MR. PUISZIS: Under time of occurrence.

47

1    MR. KSIAZEK: Under time of occurrence,
2   right, that's what I'm getting at.
3   BY MR. KSIAZEK:
4     Q.  Under time of occurrence it says 2:38,
5   right?
6     A.  Uh-huh.
7     Q.  You have to say yes.
8     A.  What time are we talking about?
9     Q.  We're looking at the very top under
10   time of occurrence next to date.
11     A.  2:38, yes, sir.
12     Q.  Okay. But it doesn't say when this
13   report was filled out, though, right, on this
14   document?
15     A.  Whatever it says there, you know. I
16   didn't write this report, so I can't answer
17   that, sir. I don't know.
18     Q.  Okay. If you turn to the next page
19   which is Bates stamped 0112, did you provide
20   Officer Redmond with the information which is
21   located in the paragraph under narrative?
22     A.  Yes, sir.
23     Q.  Okay. So this paragraph states, in
24   reference to -- is that PDI?

48

12 (Pages 45 to 48)

1    A.   Yes, sir.
2    Q.   Number U2020, 18th of October, '08,
3  2:38 hours.  Officer Galarza, Unit 101,
4  responded to a 10-1 call to assist with 109.
5  Officer Torres, Officer Galarza reported
6  while -- is that reported?
7    A.   Yes.
8    Q.   -- while trying to handcuff the
9  offender, he injured his right shoulder.  Is
10  that true and accurate?
11    MR. PUISZIS:  Did you read it accurately?
12  BY MR. KSIAZEK:
13    Q.   What did I not read?
14    A.   If you rewind the tape, you will hear.
15    Q.   What did I miss?
16    A.   A couple words in there.
17    Q.   Oh, I'm sorry, refer to PDI, U2020?
18    A.   No, sir, but that's fine.  For the most
19  part, it's accurate, yes.
20    Q.   Well --
21    A.   You want to read it again?
22    Q.   I'll read it again just so we can get
23  it true and accurate here.
24    A.   10-4.
                                              49

1  University of Chicago officers why Mr. Boyle was
2  being arrested that night?
3    A.   No, sir.
4    Q.   Why not?
5    A.   Because I read the report later on.
6    Q.   But you never asked why he was being
7  arrested while you were at the scene on the
8  18th?
9    MR. PUISZIS:  In response to a 10-1 officer
10  needs assistance?
11    MR. KSIAZEK:  I'm asking the question.
12    THE WITNESS:  No, sir.
13  BY MR. KSIAZEK:
14    Q.   When did you read the Chicago Police
15  report?
16    A.   Not the Chicago Police report, our
17  report.
18    Q.   Okay.  When did you read your report?
19    A.   Later on.
20    Q.   Do you know how much later?
21    A.   A few days later.
22    MR. KSIAZEK:  I don't have any more questions
23  at this time.
24
                                              51

1    Q.   Okay.  In summary, in reference to
2  PDI Number U2020, 18th of October 08,
3  2:38 hours, Officer Galarza, Unit 101, responded
4  to a 10-1 call to assist with --
5    A.   Unit.
6    Q.   Unit, okay.  I missed that word, sorry.
7    -- Unit 109.  Officer Torres,
8  Officer Galarza reported while trying to
9  handcuff the offender, he injured his right
10  shoulder.  Refer to PDI Number U2020.  That's
11  correct, right?
12    A.   Yes.
13    Q.   Okay.  Did you have any conversations
14  with Officer Moore or Officer Torres on
15  October 18 regarding this incident?
16    A.   No.
17    Q.   Have you ever had any conversations
18  with Officer Moore or Torres since October 18
19  regarding this incident?
20    A.   No.
21    Q.   Did you ever see any of the University
22  of Chicago officers strike Mr. Boyle?
23    A.   No, sir.
24    Q.   Did you ever discuss with any of
                                              50

1         EXAMINATION
2  BY MS. GIBBONS:
3    Q.   I just have a few.
4    A.   Yes, ma'am.
5    Q.   Not to go completely back, but I just
6  need to understand when exactly you first
7  noticed the City of Chicago Police officers?
8  What do you recall?
9    A.   After the subject was in handcuffs.
10    Q.   Okay.  So when you kind of stepped off
11  to the side?
12    A.   Once we handcuffed the subject and the
13  subject was on his feet, I stepped aside and
14  then I saw city units on the scene.
15    Q.   Now, when the city units were on the
16  scene, were they just arriving to the scene
17  or --
18    A.   Arriving at the scene.
19    Q.   Okay.  Do you recall how many units
20  arrived?
21    A.   Definitely more than one, ma'am.
22    Q.   Do you recall -- did you know any of
23  those officers?
24    A.   No.  No.  Nobody by name.  I don't
                                              52

13 (Pages 49 to 52)

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

1    remember.
2        Q.   Do you recall if there was a City of
3    Chicago sergeant that arrived on the scene?
4        A.   I remember seeing a white shirt from
5    the city.
6        Q.   And did you talk to any of those
7    officers?
8        A.   No, ma'am.
9        MS. GIBBONS: That's all I have.
10                EXAMINATION
11   BY MR. PUISZIS:
12       Q.   Did you ever see any of the University
13   of Chicago officers pull Mr. Boyle's pants and
14   underwear down on the street?
15       A.   No, sir.
16       Q.   When you get a 10-1 call, that means an
17   officer needs assistance I think you said?
18       A.   Yes, it does. Yes, sir.
19       Q.   Are you timing how long it takes you
20   normally when you respond to a 10-1 call how
21   quickly you get to the scene?
22       A.   Definitely not.
23       Q.   And when you arrive on the scene in
24   response to a 10-1 call, are you measuring

                                                    53

1        Q.   Typically when officers place someone
2    in handcuffs and they're resisting arrest, do
3    they try to put the subject on the ground?
4        A.   No, sir.
5        Q.   And did -- was Charles Boyle taken back
6    to the University of Chicago after this incident
7    or was he taken to Chicago Police Department?
8        A.   He was taken to the Chicago Police.
9        Q.   Why wasn't he taken back to the
10   University of Chicago?
11       A.   Because we don't process anyone. All
12   the processing is done at any of the police
13   stations in the city.
14       Q.   Do you have a lockup at the
15   University of Chicago?
16       A.   No, sir, we do not. We don't.
17       MR. PUISZIS: Thank you. I don't have
18   anything else.
19       MR. KSIAZEK: I'm just going to show you
20   these things real quick. This is Exhibit 8 I
21   believe.
22            (Whereupon, Galarza Deposition
23            Exhibit No. 8 was marked for
24            identification.)

                                                    55

1    things before you get out of your squad car?
2        A.   No.
3        Q.   Are you timing things before you get
4    out of your squad car?
5        A.   No, sir.
6        Q.   You see two officers wrestling with
7    someone, are you bothering to count off the
8    number of feet from your squad car to where the
9    two officers are wrestling?
10       A.   No, sir.
11       Q.   Are you taking out a tape measure and
12   measuring how far from another car the two
13   officers and the subject are wrestling?
14       A.   No, sir.
15       Q.   What's your purpose when you get out of
16   the squad car and go to where the two officers
17   and the subject are wrestling?
18       A.   To help the other officers, they're
19   under stress.
20       Q.   And are you making a mental note
21   because there's going to be a lawsuit about
22   who's holding whom where?
23       A.   No, sir. That's the least of my
24   concerns.

                                                    54

1             FURTHER EXAMINATION
2    BY MR. KSIAZEK:
3        Q.   Do you recognize this document?
4        A.   I recognize -- this specific? I have
5    seen these forms, but never seen this before.
6        Q.   You've never seen this actual document
7    itself?
8        A.   No, sir.
9        Q.   You didn't fill this document out?
10       A.   No, sir.
11       Q.   It says this form was completed by
12   Robert Callahan?
13       A.   Sergeant Callahan.
14       Q.   Okay. And on October 18, 2008 --
15       A.   Yes, sir.
16       Q.   -- on the bottom.
17            Did you yourself speak with
18   Sergeant Callahan?
19       A.   Yes, he's the sergeant from the
20   hospital.
21       Q.   Okay. What did you say to Sergeant
22   Callahan?
23       A.   What you see here is what I told him.
24       Q.   When did you have this conversation?

                                                    56

                              14  (Pages 53 to 56)

1      A.  When I arrived at the ER, the hospital.
2      Q.  So was Sergeant Callahan present with
3  the other officer?
4      A.  What officer?
5      MR. PUISZIS:  Redmond?
6  BY MR. KSIAZEK:
7      Q.  Redmond, yeah, I'm sorry.
8      So was Sergeant Callahan present with
9  Officer Redmond when you arrived at the
10  hospital?
11     A.  Yes, sir.
12     Q.  Were you there when he filled out this
13  form for you?
14     A.  I was in the hospital when he filled it
15  out.
16     Q.  I'm sorry, did you actually see him
17  fill out this form?
18     A.  No.
19     Q.  Okay.  Did he ask you about how the
20  accident occurred?
21     A.  Yes, sir.
22     Q.  And what did you tell him?
23     A.  Exactly what you see in the report.
24     Q.  So you told him that you were -- the

57

1  offender was resisting a lawful arrest?
2      A.  Yes, sir.
3      Q.  And you told him that you were
4  attempting to effect a lawful arrest?
5      A.  Yes, sir.
6      Q.  And you told him that handcuffs were
7  being used when you were attempting to effect
8  this lawful arrest?
9      A.  Yes, sir.
10     Q.  And it states that the offender
11  resisted violently.  Did you tell
12  Officer Callahan -- or Sergeant Callahan that?
13     A.  Yes, sir.
14     Q.  And you -- where it says list all
15  injuries, you complained of pain and soreness in
16  your back and right shoulder?
17     A.  Yes, sir.
18     MR. KSIAZEK:  This is Exhibit 9.
19         (Whereupon, Galarza Deposition
20         Exhibit No. 9 was marked for
21         identification.)
22  BY MR. KSIAZEK:
23     Q.  Okay.  What I've handed you that's
24  marked for identification as Exhibit 9 are your

58

1  answers to the plaintiff's interrogatories.
2  Have you seen this document before?
3      A.  Yes.
4      Q.  And on the last page, this is your
5  signature?
6      A.  Yes, sir.
7      Q.  Okay.  If you look on page three of
8  this document, it's the second paragraph down,
9  where it says, "Other officers from the
10  University of Chicago also responded and would
11  have seen the plaintiff either on the ground or
12  in handcuffs or being escorted to a City of
13  Chicago squad car for transportation.  Officer
14  Gerald Johnson and a Lieutenant White from the
15  University of Chicago Police Department were on
16  the scene at some point."  Do you recall seeing
17  Officer Johnson and Lieutenant White at the
18  scene?
19     A.  Yes.
20     Q.  Where did you -- or when did you see
21  them at the scene?
22     A.  Once he was handcuffed and city units
23  were at the scene.
24     Q.  So did Officer Johnson arrive after

59

1  Mr. Boyle was handcuffed?
2      A.  I don't know what time he arrived.
3      Q.  But the first time you saw them was
4  after he was in handcuffs?
5      A.  Yes.
6      Q.  So on page five is the first full
7  paragraph which begins, "Officers Moore and
8  Torres had just stepped out of a Dunkin'
9  Donuts".  If you look at the fourth sentence, it
10  says, "The University of Chicago officers Moore
11  and Torres initially attempted to handcuff the
12  plaintiff who refused to allow himself to be
13  handcuffed and the other officers including
14  Aguilar, Kwiatkowski and Gillespie assisted in
15  attempting to get the plaintiff onto the ground
16  and handcuffed."
17     MR. PUISZIS:  Aguilar is a typo.  It's my
18  mistake.
19     MR. KSIAZEK:  Okay.
20     MR. PUISZIS:  It should be Galarza.
21  BY MR. KSIAZEK:
22     Q.  So that's yourself, not Aguilar?
23     MR. PUISZIS:  There is no Officer Aguilar
24  with the city -- University of Chicago, right?

60

15 (Pages 57 to 60)

1    THE WITNESS: Right.
2  BY MR. KSIAZEK:
3    Q.  If you turn to the next page, page six,
4  question six asks -- it says, "State whether you
5  sustained any physical injury during your
6  interaction with the plaintiff on or about
7  October 18, 2008." And it asks you to describe
8  your injury.
9        So you say that you were given pain
10  medication in the second or third sentence
11  there. What kind of pain medication were you
12  given?
13    A.  Prescription.
14    Q.  Was it Tylenol or --
15    A.  I guess it was Vicodin or something
16  like that.
17    Q.  How long were you on Vicodin for?
18    A.  A couple days.
19    Q.  Are you still on Vicodin?
20    A.  Sorry, what did you ask me?
21    Q.  Are you still on Vicodin right now?
22    A.  I told you that I was on Vicodin for a
23  couple days after the accident.
24    Q.  Okay. And you state, "I used ice packs
                                                    61

1  with the University of Chicago." Have you had
2  any complaints made against you that -- just in
3  general?
4    MR. PUISZIS: You mean like this one?
5  BY MR. KSIAZEK:
6    Q.  Well, besides this one.
7    A.  No.
8    Q.  So this is the only complaint that
9  you've had against you?
10    A.  Yes. Been a good boy.
11    MR. KSIAZEK: Nothing further.
12        FURTHER EXAMINATION
13  BY MR. PUISZIS:
14    Q.  Is it lawful to resist an arrest of an
15  officer at any time to your knowledge?
16    A.  I'm sorry, what was that?
17    Q.  Is it lawful or is it permissible to
18  resist an officer's arrest at any time?
19    A.  No, sir.
20    MR. PUISZIS: Nothing further.
21    MS. GIBBONS: I have nothing further.
22    MR. PUISZIS: Let's reserve.
23        FURTHER DEPONENT SAITH NAUGHT
24    (Witness excused at 3:44 p.m.)
                                                    63

1  on my shoulder for sometime following the
2  incident." How long did you use ice packs on
3  your shoulder for?
4    A.  At least a week. A little more than a
5  week.
6    Q.  Do you know -- the next sentence says,
7  "I understand Officer Moore injured his wrist
8  and Officer Gillespie was also kicked in the
9  head and his glasses were broken in the
10  incident." I believe we talked about
11  Officer Gillespie being kicked in the head. Do
12  you know how Officer Moore injured his wrist?
13    A.  No idea, sir. Don't know.
14    Q.  Have you ever been sued before in your
15  capacity as an officer?
16    A.  No, sir.
17    Q.  If you look on page eight where it
18  says, identify all complaints, including but not
19  limited to, complaints of false arrests,
20  excessive use of force, unlawful search and/or
21  seizure, et cetera. In your answer on the last
22  sentence you said, "Subject to those objections
23  and without waiving same, there have been no
24  complaints that have been sustained against me
                                                    62

1
2  IN THE UNITED STATES DISTRICT COURT FOR THE
3     NORTHEASTERN DISTRICT OF ILLINOIS
4           EASTERN DIVISION
5
6  CHARLES BOYLE,          )
        Plaintiff,         )
7  vs.                     ) No. 09 CH 1080
  UNIVERSITY OF CHICAGO POLICE )
8  OFFICER LARRY TORRES, et al.,)
        Defendants.         )
9
10    This is to certify that I have read the
11  transcript of my deposition taken in the
12  above-entitled cause by KAREN E.
13  DOMINICK-RIGONI, Registered Professional
14  Reporter, on November 9, 2009, and that the
15  foregoing transcript accurately states the
16  questions asked and the answers given by me as
17  they now appear.
18  _____
19        OSCAR GALARZA
20  SUBSCRIBED AND SWORN TO
21  Before me this _____, day
22  of _____, 2010.
23  _____
24  Notary Public
                                                    64



1  STATE OF ILLINOIS    )
2                       ) SS:
3  COUNTY OF C O O K    )
4        I, KAREN E. DOMINICK-RIGONI, a
5  Registered Professional Reporter within and for
6  the County of Cook County and State of Illinois,
7  do hereby certify that heretofore, to-wit, on
8  the 9th day of November, 2009, personally
9  appeared before me, at 222 North LaSalle Street,
10 Suite 300, Chicago, Illinois, OSCAR GALARZA, in
11 a cause now pending and undetermined in the
12 Circuit Court of Cook County, Illinois, wherein
13 CHARLES BOYLE is the Plaintiff, and UNIVERSITY
14 OF CHICAGO POLICE OFFICER LARRY TORRES, ET AL.
15 are the Defendants.
16        I further certify that the said
17 witness was first duly sworn to testify the
18 truth, the whole truth and nothing but the truth
19 in the cause aforesaid; that the testimony then
20 given by said witness was reported
21 stenographically by me in the presence of the
22 said witness, and afterwards reduced to
23 typewriting by Computer-Aided Transcription, and
24 the foregoing is a true and correct transcript

65

1   McCORKLE COURT REPORTERS, INC.
       200 North LaSalle Street, Suite 300
2      Chicago, Illinois 60601-2956
           (312) 263-0052
3
    January 12, 2010
4
5      HINSHAW & CULBERTSON, LLP
    ATTN: MR. STEVEN M. PUISZIS
6      222 North LaSalle Street, Suite 300
       Chicago, Illinois  60601
7      IN RE: BOYLE vs. UNIVERSITY OF CHICAGO
    COURT NUMBER: 09 CH 1080
8      DATE TAKEN: 11/09/09
         DEPONENT: OSCAR GALARZA
9
    Dear Mr. Puiszis:
10
    Enclosed is the deposition transcript for the
11  aforementioned deponent in the above-entitled
    cause.  Also enclosed are additional signature
12  pages, if applicable, and errata sheets.
13  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
14  and signature.  All changes or corrections must
    be made on the errata sheets, not on the
15  transcript itself.  All errata sheets should be
    signed and all signature pages need to be signed
16  and notarized.
17  After the deponent has completed the above,
    please return all signature pages and errata
18  sheets to me at the above address, and I will
    handle distribution to the respective parties.
19
    If you have any questions, please call me at the
20  above phone number.
21  Sincerely,
22  Margaret Setina      Court Reporter:
    Signature Department  Karen E. Dominick-Rigoni
23                          CSR, RPR
24  cc:  All parties.

67

1  of the testimony so given by said witness as
2  aforesaid.
3        I further certify that the signature
4  to the foregoing deposition was not waived by
5  counsel for the respective parties.
6        I further certify that the taking of
7  this deposition was pursuant to notice, and that
8  there were present at the deposition the
9  attorneys hereinbefore mentioned.
10       I further certify that I am not
11 counsel for nor in any way related to the
12 parties to this suit, nor am I in any way
13 interested in the outcome thereof.
14       IN TESTIMONY WHEREOF:  I have
15 hereunto set my hand and affixed my signature
16 this 12th day of January, 2010.
17
18
19
20
21  *Karen E. Dominick-Rigoni*
22 KAREN E. DOMINICK-RIGONI, CSR, RPR
23 COOK COUNTY, ILLINOIS
24

66

17 (Pages 65 to 67)



THE UNIVERSITY OF
**CHICAGO**
HUMAN RESOURCES MANAGEMENT

Effective 10/2007
Page 1 of 1
Questions about this form? Contact UHRM Benefits,
E-mail: Benefits@uchicago.edu

## Supervisor's First Report – Workers' Compensation Claim of Injury/Illness

PLEASE PRINT

Department: _PoLICE_

Date Notified of Injury/Illness: _18 OCT 08_

Employee Name _GALARZA, OSCAR A_

Job Title: _POLICE OFFICER_ Union: _PBA_

Date Hired to Present Position: _____

Last Day Worked: _18 OCT 08_

Date of Injury/Illness/Accident: _18 OCT 08_

Time: _2:38_ (am)/pm M-F Accident: Y / (N)

Specific Location of Accident: (address, building name, area in building or grounds):

_1435 E. 53RD ST. (ON STREET)_

How did the accident/injury/illness occur: _OFFENDER WAS RESISTING A LAWFUL ARREST._

What was the employee doing specifically at the time: _ATTEMPTING TO EFFECT A LAWFUL ARREST._

Were the activities within the scope, responsibilities, duties and course of employment: (Y) / N

List any equipment or tools being used at the time: _HANDCUFFS,_

Identify contributing factors, if any at the time: _OFFENDER RESISTED VIOLENTLY,_

List all injuries, where on the employee's body or nature of illness: _COMPLAINT OF PAIN/SORENESS IN BACK AND RIGHT SHOULDER,_

List witnesses and co-workers present, include contact information:

_OFC L. TORRES (773) 418-9782_

_OFC G. MOORE (773) 426-7404_

U/C0108

First person notified of injury/illness/accident: _LT. S. WHITE_

UC Safety/Environmental Office notified: Y / (N) By: _____ Date: _____

Employee sent for medical attention: (Y) / N ER or UCOM Clinic: _E.R._

Form completed by: _ROBERT Y. CALLAHAN_

Title: _SERGEANT_

Signature: _Robert Y. Callahan_

Date: _18 OCT 08_

GALARZA
EXHIBIT NO. _8_
11-05-09 KOR

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,

     Plaintiff,

v.

UNIVERSITY OF CHICAGO POLICE
OFFICER LARRY TORRES, et al.,

     Defendants.

)
)
)
)
)
)
)
)
)

No. 09 C 1080

## DEFENDANT GALARZA'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

NOW COMES the Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER GALARZA ("Galarza"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information -- ¹ ¨ ¯ ¯ and are made without prejudice to the objections set forth herein. Defendant s₁ reserves the right to amend and/or supplement his responses at any time to introduce in₂

GALARZA
EXHIBIT NO. 9
11·09·09 KDR

6459575v1

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1. Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:** Oscar Galarza. My attorney, Steven Puiszis, consulted with me in preparing these answers.

2. Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

**ANSWER:** Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well as a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and then handcuffing him. I injured my shoulder in the process, Officer Moore injured his wrist and Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin. Other offices from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

3.     Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

ANSWER:     Objection, defendant objects to this Interrogatory on the grounds that it seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify anyone believed "to have knowledge supporting the defendant" and also asks for a summary of "what knowledge" this defendant "believes each person may possess." That information is more proper the subject of a deposition and to require the provision of such a summary is overbroad, harassing and unduly burdensome. Subject to those objections and without waiving same, see those individuals listed in Interrogatory No. 2 and defendants who were identified in the University of Chicago defendants' Rule 26 Disclosures. The University of Chicago officers would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4.     Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

    a.     Why he/she was at that location;

    b.     Whether he/she had any physical contact with Plaintiff;

    c.     Whether he/she participated in the arrest of Plaintiff;

    d.     Whether he/she participated in the search of Plaintiff;

    e.     Whether he/she had any participation in the bringing of criminal charges against Plaintiff.

ANSWER:     Objection. Defendant objects to this Interrogatory as being vague and ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against the defendant include assertions relating to his arrest and to the purported use of force against him as well as a state law claim of malicious prosecution. Subparagraph (e) is vague and ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

criminal charges." Subject to those objections and without waiving same, see my answer to Interrogatory No. 2.

Officers Moore and Torres had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past them with its horn continuously blowing and then observed the vehicle abruptly swerve to the curb and bump it. They initially investigated what was happening. The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance. The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar, Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officers Moore and Torres would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and any Complaints would have been signed by either Officer Moore or Officer Torres.

5. If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

**ANSWER:** I do not personally know of any such investigation. However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6. State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:** Yes, I injured my shoulder in this occurrence. I went to the University Hospital where x-rays were taken. I was given pain medication and was told to stay off of work for several days. I used ice packs on my shoulder for sometime following the incident. I understand that Officer Moore injured his wrist and Officer Gillespie was also kicked in the head and his glasses were broken in the incident. I do not know if they received any treatment.

7. Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:** Objection. This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc. Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it. Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact. I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we

6

6459575v1897854 4236

turn any such person over to the Chicago Police who will then transport that person to a local

police station and process that person, including taking booking photos, filling out arrest reports,

filing criminal complaints and seeking approval by the State's Attorney working felony review

of felony charges. While University of Chicago employees write out our own reports, we do not

prepare criminal complaints and do not process an arrestee during the booking process.

8.    Please state how long and in what capacity you have been employed by the
University of Chicago Police Department. Your response should include a brief description of
your change in assignments and/or rank if any, and when those changes occurred. Your response
should also include whether you were concurrently employed by the City of Chicago as a police
officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:**    On the date of the incident involving Charles Boyle, I had been employed

by the University of Chicago for approximately 15 months.

9.    Please describe your assignment with the University of Chicago Police
Department on October 18, 2008. Your response should include the actual time you began and
ended your duties.

**ANSWER:**    On October 18, 2008, I was working for the University of Chicago Police

Department as a patrol officer on the midnight shift. My assignment was 101.

10.    State the case number, caption, and jurisdiction of all civil cases in which you
were named a defendant during the course of your employment with the University of Chicago
Police Department and/or the City of Chicago Police Department.

**ANSWER:**    Defendant objects to this Interrogatory in that it is overbroad, unduly

burdensome, harassing, and not designed to lead to the discovery of relevant or admissible

information in that it seeks information about all civil cases in which I was named a defendant

irrespective of whether a lawsuit was filed against me in a capacity other than as police officer.

Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the

discovery of relevant information since it does not seek information about other lawsuits that are

substantially similar in nature. Subject to those objections and without waiving same, I have

7

never worked for the Chicago Police Department and I have never been previously sued in my capacity as a University of Chicago Police officer.

11.    Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

**ANSWER:**    Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in some capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other complaints that are substantially similar in nature. Subject to those objections and without waiving same, there have been no complaints that have been sustained against me with the University of Chicago.

12.    Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

**ANSWER:**    Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13.    State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

8

**ANSWER:** I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14. State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:** Defendant objects to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving said objection, this defendant states this is unknown to me at this time.

15. State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

**ANSWER:** No.

16. State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:** Defendant objects to this Interrogatory in that he was never subpoenaed to Court and, therefore, his duties as an Officer for the University of Chicago on January 20, 2009 and/or December 6, 2008 are irrelevant and immaterial. Defendant further objects to this Interrogatory as overbroad and harassing and seeks information not reasonably calculated to lead to the discovery of admissible evidence.

17. State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:** Objection. This Interrogatory calls for attorney work product. Defendant further objects to this Interrogatory as overbroad and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion. Defendant further objects that it is unduly burdensome and harassing. Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of

9

6459575v1897854 4236

Chicago Defendants' Response to Plaintiff's Production Request and these Answers to Interrogatories.

By: _____

Officer Oscar Galarza

SUBSCRIBED AND SWORN TO
before me this 20 day of
July, 2009.

_____
Notary Public

```
+--------------------------------------+
|            OFFICIAL SEAL             |
|          MAXWELL A FISHER            |
|  NOTARY PUBLIC - STATE OF ILLINOIS   |
|   MY COMMISSION EXPIRES:11/27/09     |
+--------------------------------------+
```

10

6459575v1897854 4236

# EXHIBIT I

STATE OF ILLINOIS )

                )   SS:    **ORIGINAL**

COUNTY OF C O O K )

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHARLES BOYLE,            )

     Plaintiff,          )

       Vs.             ) No. 09 C 1080

UNIVERSITY OF CHICAGO     )

POLICE OFFICER LARRY TORRES, )

ET AL,                 )

     Defendants.        )

      The discovery deposition of ARTHUR

GILLESPIE, taken in the above-entitled cause,

before Angela C. Loisi, a notary public of Cook

County, Illinois, on the 25th day of November,

2009, at the hour of 1:16 p.m. at 222 North

LaSalle, Suite 300, Chicago, Illinois, pursuant

to notice.

              (Proceedings ended at

                 2:24 p.m.)

Reported by: Angela C. Loisi, CSR, RPR

License No: 084-004571

1

```
 1     APPEARANCES:

 2          ED FOX & ASSOCIATES

 3          300 West Adams, Suite 330

 4          Chicago, Illinois 60606

 5          (312)345-8877

 6          BY: MR. JONATHAN KSIAZEK

 7               Representing the Plaintiff;

 8

 9          HINSHAW & CULBERTSON, LLP

10          222 North LaSalle Street, Suite 300

11          Chicago, Illinois 60601

12          (312)704-3000

13          BY: MR. STEVE PUISZIS

14               Representing the University of

15               Chicago;

16

17          ASSISTANT CORPORATION COUNSEL

18          30 North LaSalle Street, Suite 800

19          Chicago, Illinois 60602

20          (312)744-7150

21          BY: MS. HELEN GIBBONS

22               Representing the Chicago Police

23               Officers, Darling and Martin;

24
                                                        2
```

```
 1                    I N D E X

 2    WITNESS                        EXAMINATION

 3    ARTHUR GILLESPIE

 4        By Mr. Ksiazek                    4

 5        By Ms. Gibbons                   48

 6        By Mr. Puiszis                   50

 7        By Mr. Ksiazek (further)         53

 8        By Mr. Puiszis (further)         54

 9

10

11

12

13

14

15                  E X H I B I T S

16    NUMBER                       MARKED FOR ID

17              (No Exhibits Marked.)

18

19

20

21

22

23

24
                                                   3
```

```
 1                        (Whereupon, the witness was

 2                        duly sworn.)

 3              ARTHUR GILLESPIE,

 4     Having been first duly sworn, was examined and

 5     testified as follows:

 6                        EXAMINATION

 7     BY MR. KSIAZEK:

 8         Q.  Can you please state your name for the

 9     court, spelling the last for the record?

10         A.  Sure.  Arthur Gillespie spelled -- last

11     name, G-I-L-L-E-S-P-I-E.

12         Q.  Sure.

13              Officer Gillespie, have you ever had

14     your deposition taken before?

15         A.  No.

16         Q.  Okay.  I'm just going to explain a few

17     ground rules about the deposition.

18              My name is Jonathan Ksiazek, and I

19     represent the plaintiff in this matter.

20              Basically we have you here today because

21     we're going to ask you some questions about an

22     incident that happened on October 18, 2008.  So

23     I'm going to ask you some questions.

24              If at any point you don't understand any
```

4

1    of my questions, just go ahead and ask me to

2    rephrase or repeat the question, I will go ahead

3    and do that for you, okay?

4        A.  Yes.

5        Q.  But if you do answer my question, we

6    will all assume that you did understand the

7    question and what I'm asking you, okay?

8        A.  Okay.

9        Q.  Great.

10           And when you do answer the questions,

11   make sure to answer out loud.

12       A.  Uh-huh.

13       Q.  Like you're doing, yes or no.

14       A.  Yes, okay.

15       Q.  Instead of saying mm-hmm or nuh-huh.

16       A.  Okay.  Yes.

17       Q.  Okay.  And if you ever need to take a

18   break at any point, just make sure that you give

19   an answer to my question before asking for a

20   break.

21       A.  Yes, yes.

22       Q.  And one other thing:  In order for the

23   transcript to come out properly --

24       A.  Uh-huh.

5

```
 1        Q.  -- I will do my best to not talk over

 2    you, and I would just ask that you do the

 3    same --

 4        A.  Yes, sir.

 5        Q.  -- so we don't talk over each other,

 6    okay?

 7        A.  Yes, sir.

 8        Q.  And you realize that you are under oath

 9    today?

10        A.  Yes.

11        Q.  Okay.  And did you review any documents

12    in preparation for your deposition today?

13        A.  Just my interrogatories.

14        Q.  Is there anything preventing you from

15    testifying truthfully today?

16        A.  No.

17        Q.  Okay.  Just to ask you a few questions

18    about your educational background, where did you

19    go to school?

20        A.  How far back do you want me to go?

21        Q.  Did you go to college?

22        A.  Yes.

23        Q.  Okay.  Where did you go to college?

24        A.  Southern Illinois University.
```

6

1      Q.   And when did you graduate from

2  Southern --

3      A.   I didn't.

4      Q.   Okay.  When was the last time that you

5  attended college of Southern Illinois

6  University?

7      A.   That would have been 1989.

8      Q.   How many years did you attend Southern?

9      A.   I was there actually for four years.

10     Q.   Okay.  And what degree were you seeking?

11     A.   Communications.

12     Q.   Okay.  Did you go to any other colleges

13 besides Southern Illinois University?

14     A.   I've done some coursework at Daley

15 College as well.

16     Q.   When did you do that coursework?

17     A.   Let's see.  I'd say between 2006 and

18 2008.

19     Q.   And why were you taking those courses at

20 Daley College?

21     A.   Working towards finishing up a law

22 enforcement degree, two-year law enforcement

23 degree.

24     Q.   Do you have a law enforcement degree

7

1    today?

2         A.   No, not currently.

3         Q.   Are you still working towards law --

4         A.   Yes, I am, yes.

5         Q.   Okay.  Are you still attending Daley

6    College or --

7         A.   Actually, I have one more course to

8    finish with them before obtaining that degree.

9    So I am looking to try and match my schedule so

10   I can finish the course.

11        Q.   Sure.  How long have you -- as of

12   today's date, how long have you worked for the

13   University of Chicago Police Department?

14        A.   As of today's date, just going to be

15   short of -- I'm sorry, two years.  Two years in

16   February, so that's one year...

17        Q.   One year and nine months?

18        A.   Nine months yeah, right, yeah.

19        Q.   And in October of 2008 how many months

20   have you been working for University of Chicago

21   Police Department?

22        A.   At that time I believe just seven --

23   seven plus months.

24        Q.   Okay.

8

1     A.   Between seven and eight months.

2     Q.   Before working for the University of

3  Chicago Police Department, have you ever worked

4  for any other police departments?

5     A.   No.

6     Q.   What job did you hold prior to working

7  for the University of Chicago?

8     A.   Prior to the University of Chicago I

9  worked with the City of Chicago Department of

10  Aviation.

11     Q.   How long did you work there for?

12     A.   I worked there just about four years.

13     Q.   Okay.  And what made you want to work

14  for the University of Chicago Police Department?

15     A.   Excuse me.  I've also wanted to work for

16  a police department.  So I had an opportunity to

17  go to the police academy and seek certification

18  required to work for the university.

19     Q.   Okay.  When did you go to the police

20  academy?

21     A.   I was in the police academy in, let's

22  see, October of 2004.

23     Q.   And then just to clarify, you started in

24  February of 2007 with --

9

```
 1        A.   University, yes, sir.  February, 2007.

 2        Q.   Okay.  And what is your current rank

 3   with the University of Chicago Police

 4   Department?

 5        A.   Patrol officer.

 6        Q.   And you were a patrol officer in October

 7   of 2008 also?

 8        A.   Yes, I was.

 9        Q.   How tall are you, sir?

10        A.   I'm 5'9".

11        Q.   Okay.  And how much do you weigh

12   currently?

13        A.   Two twenty.

14        Q.   Did you weigh about 220 pounds in

15   October of 2008?

16        A.   About that, yes.

17        Q.   Okay.  And how old were you in October

18   of 2008?

19        A.   In October of 2008 I would have been 42.

20        Q.   Okay.  Do you remember what your

21   assignment was with the Chicago Police

22   Department in October of 2008?

23        A.   I'm sorry, with the Chicago Police

24   Department?
```

10

1    Q.   I'm sorry, the University of Chicago

2    Police Department.

3        A.   I believe I was Beat 103, 103.

4        Q.   Actually one more question:  Have you

5    ever served in the military?

6        A.   No, I have not.

7        Q.   Okay.  Beat 103, do you know what the

8    boundaries are for that beat?

9        A.   Yes, I believe the boundaries of the

10   beat -- for the beat at that time were 55th

11   Street to 47th Street and Kenbark Avenue east to

12   Lake Shore Drive.

13       Q.   Okay.  And what shift were you working

14   in -- I'm sorry --

15       A.   I'm sorry, go ahead, go ahead.

16       Q.   Okay.  What shift were you working in

17   October of 2008 with the University of Chicago

18   Police Department?

19       A.   I was working with the first watch.

20       Q.   What were the hours that you were

21   working?

22       A.   That would have been between 23:00 or

23   11:00 p.m. midnight to, let's say 23:00, 11:00

24   p.m. to 7:00 a.m., or sometimes it varied,

                                                    11

1    12:00 midnight to 8:00 a.m.

2        Q.   Okay.  Do you -- are you assigned to the

3    same beat, 103, currently?

4        A.   No, I'm not.

5        Q.   What beat are you currently assigned to?

6        A.   Actually, I don't have a permanent

7    assigned beat.  So I -- the beats rotate.  They

8    vary.  They rotate different assignments.

9        Q.   So right now you're on a rotation?

10       A.   Yes.

11       Q.   Are you still working the first watch

12   shift?

13       A.   No, actually I'm working -- we have had

14   some scheduling changes since that time.

15            I'm working mornings, which is actually

16   now considered to be the first watch, but the

17   time is going to be different.

18            And we're currently working 12-hour

19   shifts, so I work from 7:00 a.m. to 7:00 p.m.

20       Q.   Okay.  Were you driving a patrol car on

21   October 18, 2008?

22       A.   Yes, I was.

23       Q.   Okay.  Were you working with a partner

24   in October of 2008?

12

1        A.   No, sir, I wasn't.

2        Q.   Okay.  Was this a marked patrol car?

3        A.   Yes, it was.

4        Q.   And do you remember if on October 18,

5    2008, you were wearing a University of Chicago

6    uniform?

7        A.   Yes, sir, I was.

8        Q.   Can you describe the uniform for me?

9        A.   At that time it was a light blue shirt,

10   dark, dark navy blue pants with a police vest.

11   Police Velcroed on the back of the vest.  Police

12   star on the front of the vest.

13            Also a police hat with the university

14   police, and the university's emblem, that's it.

15       Q.   Okay.  Now, at some point on October 18,

16   2008, did you have the occasion to arrive at

17   1435 East 53rd Street?

18       A.   Yes, sir, I did.

19       Q.   Okay.  Do you know what -- about what

20   time you had -- you arrived at that location?

21       A.   Not exactly.  It would -- I believe it

22   was between maybe 1:00 a.m., just after

23   1:00 a.m., between 1:00 a.m. and 2:00 a.m.

24       Q.   Okay.  And do you remember receiving

                                                    13

1    dispatch telling you to go to that location?

2        A.  No, I don't.

3        Q.  Okay.  How did you come to arrive at

4    1435 East 53rd Street on that evening?

5        A.  Okay.  I overheard on the radio,

6    portable radio, what sounded to be an officer in

7    distress.  There is a code that's used, 10-1,

8    and I heard 10-1.

9        Q.  Okay.  Do you remember if it was the

10   dispatch that was saying 10-1, or do you

11   remember if it was the actual officer saying

12   10-1?

13       A.  I believe it was the officer that I

14   heard calling 10-1.

15       Q.  Okay.  And where were you when you heard

16   the officer calling 10-1 over the radio?

17       A.  I can't recall specifically where I was

18   at.

19       Q.  Can you recall what you were doing when

20   you got this radio?

21       A.  Just routine patrol, patrolling.

22   Specifically I was driving.

23       Q.  Okay.  Once you got this call over the

24   radio for a 10-1 -- well actually, what did you

14

1   understand a 10-1 to mean?

2       A.  I understood that to mean that an

3   officer needed assistance, immediate assistance.

4       Q.  So once you got this call, what did you

5   do?

6       A.  Excuse me.  I attempted to -- my

7   goodness, excuse me.

8       I attempted to respond to the location.

9   I believe I attempted to get clarification from

10  the dispatch as to where the officer's last

11  location was.

12      Q.  Do you remember what you said to

13  dispatch to try and get clarification?

14      A.  I don't recall, no.

15      Q.  Do you remember anything that dispatch

16  would have told you in response for when you

17  asked for clarification?

18      A.  I believe at some point I heard the

19  address, which understandably, is the 53rd

20  Street address.

21      Q.  Okay.  And once you received this 53rd

22  Street address, did you head over to that

23  location?

24      A.  I did.

15

1    Q.   Okay.  Do you know how long it took you

2    from where you were located when you first

3    received the 10-1 radio and when you arrived at

4    53rd Street?

5         Do you know how long it took you to get

6    there?

7    A.   Yeah.  I couldn't say specifically.  I

8    guess it was probably between -- maybe one

9    minute, minute and a half.

10   Q.   Okay.  Do you remember what route you

11   took to get there?

12   A.   No, I don't recall specifically what

13   route.

14   Q.   And when you did arrive at 53rd Street,

15   what, if anything, did you see?

16   A.   When I arrived -- excuse me, I observed

17   two officers, what I believe -- I believe it was

18   two officers in the struggle with who I now know

19   to be, I believe, Mr. Boyle.

20   Q.   Mr. Boyle.

21   A.   Mr. Boyle.

22   Q.   Okay.  You said you saw two officers?

23   A.   I believe it was two.  I'm not for

24   certain.

16

1       Q.   Do you know how many police cars you saw

2   on the scene, whether University of Chicago or

3   Chicago Police Department, when you first

4   arrived?

5       A.   No, I can't say for certain.  I believe

6   I saw Officer Torres and Officer Moore's

7   vehicle, I believe they were riding together.

8            But my attention was solely focused on

9   the confrontation.

10      Q.   Did you know when you first arrived at

11  the scene that it was Officer Torres and Officer

12  Moore's vehicle?

13      A.   Yes.

14      Q.   Okay.  How did you know that?

15      A.   They were -- I assume that because they

16  were -- they were on the scene -- on the scene

17  one -- other than those two on the scene, so I

18  assume that to be their vehicle.

19      Q.   Okay.  And you recognize them

20  immediately --

21      A.   Yes.

22      Q.   -- once you were --

23      A.   Mm-hmm.

24      MR. PUISZIS:   You have to make sure he

                                                    17

1    finishes his question --

2         THE WITNESS:  Okay.  I'm sorry.

3         MR. PUISZIS:  -- before you answer.

4         THE WITNESS:  Okay.  I'm sorry.

5    BY MR. KSIAZEK:

6         Q.  Did you see a silver Chrysler vehicle

7    located near where Officer Torres and Officer

8    Moore were?

9         A.  No, sir, I don't recall seeing that.

10        Q.  You said that Officer Torres and Officer

11   Moore were struggling with Officer Boyle?

12        A.  That's what appeared to be the case to

13   me, yes.

14        Q.  Can you describe how Officer Torres and

15   Moore were struggling with Mr. Boyle?

16        A.  There appeared to be thrashing, they

17   were attempting to handcuff, and I remember

18   hearing:  Stop resisting.

19             I observed Mr. Boyle fighting, his arms

20   moving about attempting to push the officers

21   away from him.

22        Q.  Okay.  When you first arrived on the

23   scene, where were Officer Moore and Officer

24   Torres located in relation to Mr. Boyle?

                                                    18

1     A.   I want to say they could have been on

2    either side of him, one on his right and one on

3    his left, I believe.

4         Q.   And what was Mr. Boyle doing, if

5    anything, when Officer Torres and Officer Moore

6    were on his left and right?

7         MR. PUISZIS:   Objection, asked and answered,

8    but you can go ahead and answer again.

9         THE WITNESS:   Again, I believe you will

10   see -- well, he was thrashing.  He was thrashing

11   about.

12            He was -- his arms were moving.  He was

13   pushing.  He was resisting being put -- having

14   his arms put behind him.

15   BY MR. KSIAZEK:

16        Q.   So when you saw Mr. Boyle resisting and

17   having his arms thrashing and put behind him,

18   what, if anything, did you do at that point?

19        A.   I rushed over to their location to

20   provide assistance.

21        Q.   Now, at this point when you first got

22   out of your car, what, if anything, did you know

23   besides the 10-1 that an officer needed

24   assistance?

19

1      A.   I didn't know -- I didn't know if -- I

2   didn't know if they were struggling for a

3   weapon.  I didn't know -- I didn't know

4   anything.

5      Q.   Okay.  They were attempting to handcuff

6   him you said?

7      A.  Yes.  I remember hearing:  Place your

8   arms behind you back, and stop resisting.  And

9   so...

10     Q.  Did -- when the officers -- actually,

11  who was saying put your arms behind your back,

12  was it Officer Torres or Officer Moore?

13     A.   I heard stop resisting from, I believe

14  it to be both of them at different points.

15     Q.  Do you know who actually said it first?

16     A.  No, I can't recall.

17     Q.  Did Officer Torres and Officer Moore

18  actually have their handcuffs out?

19     A.   I can't recall if I saw them at that

20  point.

21     Q.  But they were trying to put his hands

22  behind his back?

23     A.  Yes, they were.

24     Q.  Okay.  And at what point did you

                                                    20

1    actually get out of your car, was it when his

2    hand -- were his hands already behind his back

3    when you got out of his car -- when you got out

4    of your car?

5        A.  No, it was at the point that I saw them.

6    When I arrived on the scene I made visual

7    contact with them, saw that they were thrashing

8    about, exited my vehicle and went over.

9        Q.  And what did you do to help assist

10   Officer Torres and Officer Moore?

11       A.  I made physical contact with the three

12   of them.  I believe at that point we all three

13   fell to the ground.

14       Q.  Okay.  When you say physical contact,

15   what exactly do you mean?

16       A.  Well, my hands actually touched

17   Mr. Boyle in attempting to try to help Officer

18   Torres and Officer Moore to get his arms in a

19   position that we could put handcuffs on him.

20       Q.  Where on Mr. Boyle's body did your hands

21   touch him?

22       A.  I don't recall specifically where.

23       Q.  Let me ask you this:  Was Mr. Boyle

24   facing you as you approached him?

                                                21

1    A.  I don't recall.

2    Q.  And do you know if Officer Moore and

3  Officer Torres were facing you when you first

4  got out of your car?

5    A.  No, they were facing him more so than

6  me.

7    Q.  So were their backs to you?

8    A.  No, I can't recall that.  I could -- no,

9  no, I don't recall seeing the backs, no.

10    Q.  Okay.  How did -- you said the three

11  of -- you made the contact with the three of

12  them, and all four of you went down to the

13  ground?

14    A.  Yes, I believe my momentum from running,

15  running over caused us to fall to the ground.

16    Q.  And you had your hands out while you

17  were running?

18    A.  Yes, yes, I did.

19    Q.  Can you describe how -- and all four of

20  you fell to the ground, right?

21    A.  Yes.

22    Q.  Okay.  Can you describe how all four of

23  you fell to the ground?

24        I know you already testified that you

22

1    were running and all of you sort of fell.

2           Can you sort of just tell me how the

3    bodies fell onto the ground once you were all

4    going down?

5      A.  Yeah, I couldn't say for certain how we

6    all fell, what positions we were in at that

7    point.

8           I just -- yeah, I just can't recall

9    specifically where we were when we initially

10   made contact with the ground.

11     Q.  And you didn't have your handcuffs out

12   at this point or anything?

13     A.  Not at that point, no.

14     Q.  What position did you find yourself in

15   once you were actually on the ground?

16     A.  I was in a position where I was by

17   Mr. Boyle's legs, legs and feet.

18     Q.  And do you know how you ended up by

19   Mr. Boyle's legs and feet?

20     A.  No, I can't say for certain.  Just after

21   falling, that's just where -- when I kind of

22   regained my sense of bearing that's where I

23   found myself.

24     Q.  Now, when you fell, you've told me that

                                                    23

1    you saw a car that you thought was Officer

2    Torres and Officer Moore's, right?

3        A.  I believe I did, right, yes.

4        Q.  When you fell, do you know how far away

5    you were from Officer Torres and Officer Moore's

6    car?

7        A.  No, sir.  I can't say for certain, no.

8        Q.  Do you know if you were close to any

9    other cars besides Officer Torres and Officer

10   Moore's car?

11       A.  Again, no.  I can't say.  I was just

12   more focused with trying to maintain control of

13   the situation there.

14       Mr. Boyle was fighting about pretty

15   extensively.  So I was just trying to maintain

16   control and help out, bring some order to that

17   situation.

18       Q.  Where did you park your car in relation

19   to Officer Torres and Officer Moore's car?

20       A.  I believe I -- my part -- my vehicle

21   would have been parked on 53rd Street.  I can't

22   recall if I was just east or west of Blackstone,

23   but I was facing westbound.

24       Q.  Do you know how far away you parked from

                                                    24

1    Officer Moore and Officer Torres' car?

2        A.  No, I can't recall.

3        Q.  Did you park in an angle, or do you know

4    if you parked straight ahead?

5        A.  I believe I -- I believe I parked

6    straight ahead, possibly along the curb.

7        Q.  Okay.  So when -- yourself is on the

8    ground -- when you're on the ground, where, if

9    you can remember, were Officer Torres and

10   Officer Moore?

11       A.  They were, in relation to me, more so

12   towards Mr. Boyle's upper torso and his upper --

13   along his upper body.

14       Q.  And once the four of you fell to the

15   ground, what, if anything, happened?

16       A.  We continued to -- well, I continued to

17   hear the orders to stop resisting, give me your

18   hands.

19           They continued to struggle with him up

20   top.  I -- we were trying to communicate with

21   each other to try to work in unison.

22           I made the decision to try and keep his

23   legs still, keep them from moving about.

24       Q.  Okay.  Going back to when you first

                                                    25

1    arrived at the scene, did you hear Mr. Boyle say

2    anything to Officer Torres and Officer Moore?

3        A.  I can't recall, no, no, I didn't.

4        Q.  Okay.  And when you fell to the ground,

5    did you hear Mr. Boyle say anything once all the

6    four of you fell, fell down?

7        A.  No, I don't recall him saying anything.

8        Q.  Okay.  And when Officer Torres or

9    Officer Moore gave Mr. Boyle an order to stop

10   resisting, what, if anything -- and once you

11   were off the ground, what, if anything, did

12   Mr. Boyle do?

13       A.  Initially while we were on the ground he

14   still continued to resist.  They still struggled

15   to get him to comply with putting his arms

16   behind his back.

17       Q.  Was he just resisting with his arms or

18   were --

19       A.  No, he was resisting with his arms and

20   his legs.

21       Q.  And when you said you were trying to

22   communicate with each other, Officer Torres and

23   Officer Moore, what, if anything, were they

24   saying to you, or what were you saying to them?

                                                    26

1      A.   I heard the two of them maybe mention --

2    grabbed his arm, grab his arm.  I remember

3    saying I got his legs, I will hold his legs.

4      Q.   Anything else?

5      A.   No.

6      Q.   Okay.  Did any of the University of

7    Chicago officers who were there, and yourself,

8    Officer Torres, Officer Moore, have their

9    handcuffs out at that point?

10     A.   I don't recall.  I can't recall.  I

11   don't recall seeing anything specifically, the

12   handcuffs specifically.

13     Q.   And while you were holding his legs,

14   what, if anything, happened?

15     A.   Well, while I was holding his legs, at

16   some point he kicked away, which actually kicked

17   and made contact with the right side of my face.

18        My glasses were thrown from my face,

19   broke the glasses, the frames were mangled and

20   the lenses popped out of them.

21     Q.   Do you know which foot they kicked you

22   with, was it the right or the left?

23     A.   No, I couldn't say for certain.

24     Q.   But he did make contact with the right

                                              27

1    side of your face?

2        A.  Yes.

3        Q.  And did you see how far your glasses

4    actually flew off your face?

5        A.  No, sir, I couldn't say for certain.

6        Q.  Were you actually injured as a result of

7    this kick?

8        A.  Well, I was hurt.  I was -- just like

9    slight bruising.  But I didn't think I required

10   medical attention.

11       Q.  Was this the only time that Mr. Boyle

12   kicked you?

13       A.  Yes.

14       Q.  Okay.  And after your glasses had been

15   kicked off your face, what, if anything, did you

16   do?

17       A.  Well, from the force of a kick, I was

18   kind of thrown clear a little bit.  I re-engaged

19   at the legs and continued to try and hold him in

20   place while the officers up top attempted to

21   cuff him, handcuff him.

22       Q.  Now, at any point before your glasses

23   had been kicked off your face, did you see any

24   other University of Chicago officers on the

                                                    28

1    scene?

2        A.   I -- I can't say for certain who was

3    there other than Moore and Torres at that point.

4        Q.   Okay.   So just to clarify, you think it

5    was yourself, Moore and Torres when you were

6    kicked in the face?

7        A.   I believe at that point, yes.   Yes,

8    that's what I believed at that point.   I didn't

9    know if anyone else was there.

10            I didn't take my hands off of -- or my

11   eyes, I should say, off of the area, the area I

12   was trying to control there.

13            And once my glasses were off, I just

14   really tried to focus on keeping his legs in

15   place.

16       Q.   Okay.   Are you nearsighted or

17   farsighted?

18       A.   I have to see things, have to be fairly

19   close.

20       Q.   Sure.   So if your glasses got kicked off

21   your face, you can't see things far distances?

22       A.   Far away, yes, sorry.

23       Q.   Now, what point did you first see other

24   University of Chicago officers arrive?

                                                    29

1      A.   That would have been after Mr. Boyle was

2   handcuffed, and after I was able to disengage.

3      Q.   Did you see who actually did handcuff

4   Mr. Boyle?

5      A.   No, I never did.

6      Q.   But you didn't personally, right?

7      A.   No, sir, I didn't.

8      Q.   Do you know how many -- do you know if

9   it was one pair of handcuffs or two pairs of

10   handcuffs that were used on Mr. Boyle?

11      A.   I couldn't say for certain, no, sir.

12      Q.   Did you ever give Officer Torres or

13   Officer Moore your pair of handcuffs to help

14   them --

15      A.   No, sir, I didn't.

16      Q.   Okay.  So when -- after Mr. Boyle was

17   handcuffed, what, if anything, did you do?

18      A.   Again, I disengaged.  I was a bit

19   disoriented.  I immediately started to look for

20   my glasses.

21      Q.   Okay.  So Mr. Boyle was handcuffed.

22           Did they -- did Officer Moore and Torres

23   stand him up?

24      A.   I know at some point he was stood up.  I

                                                    30

1    didn't actually see when that happened.

2         Q.  Was he stood up after you disengaged?

3         A.  After I disengaged, yes.

4         Q.  And what do you actually mean by

5    disengaged?

6         A.  I took my hands off of him.  There was

7    no need for me to try and maintain control of

8    him.

9         Q.  So at that point was he not struggling

10   anymore?

11        A.  At that point he was not struggling

12   anymore, no.

13        Q.  And when he was not struggling anymore,

14   was that when he was in the handcuffs?

15        A.  I believe that because I remember

16   specifically hearing -- I believe hearing that

17   he was cuffed, and the struggle stopped.

18        Q.  Do you know who actually said that

19   Mr. Boyle was cuffed?

20        A.  No, I can't say for certain.

21        Q.  Okay.  Do you know if any other officers

22   besides yourself, Officer Torres and Officer

23   Moore helped to put Mr. Boyle into handcuffs?

24        A.  I don't know for certain who actually

31

1    cuffed him.  No, I couldn't say for certain.

2        Q.   When you went to disengage and sort of

3    let go of Mr. Boyle, did you take a few steps

4    away from Mr. Boyle?

5        A.   Yeah, just a couple, maybe.  I was still

6    actually on my knees, just kind of setback.

7        Q.   So this whole time when you were trying

8    to hold his legs together, were you on your

9    knees the whole time?

10       A.   Yes.

11       Q.   Okay.  So when you say you fell to the

12   ground, you actually fell to your knees?

13       A.   Yes.

14       Q.   Okay.  Did -- how long were you

15   disoriented for?

16       A.   Not long, just -- I mean, the initial

17   kick probably was more so -- I would say

18   probably -- you know, 30, 40 seconds.

19       Q.   And after you sort of got your bearings

20   back a little bit, what, if anything, did you do

21   at that point?

22       A.   Well, once I finally recovered my

23   glasses and saw the condition they were in, I

24   believe I made contact via my radio with my

                                            32

1    watch commander.

2           I let him know I was going to have to

3    try and retrieve a spare pair of glasses.

4    Q.   Okay.  Where -- when you took a few

5    steps away were you by a curb at that point,

6    were you in the street?

7    A.   I believe I was in the street.

8    Q.   And where did you find your glasses?

9    A.   Not far from me, maybe a foot, foot and

10   a half away from me.

11   Q.   Was that in the street or was it on the

12   sidewalk?

13   A.   It was in the street.

14   Q.   You said they were in pieces?

15   A.   The frames were mangled and the lenses

16   were detached from the frames.

17   Q.   Okay.  Can you, just to the best of what

18   you remember, can you describe how the frames

19   were mangled?

20   A.   They were twisted, twisted completely

21   out of shape.  Arms were -- one of the arms were

22   almost broken, just kind of hanging by the

23   screw, I believe, at the hinge.

24   Q.   Okay.  And the -- you said the glasses

33

1    were out?

2        A.  Yes, both of the lenses were detached

3    from the frames.

4        Q.  You said both?

5        A.  Yes.

6        Q.  Okay.  Do you know how -- so when you

7    went to pick it up, you had to pick up the frame

8    and then you picked up the two -- the lenses?

9        A.  Yes.

10       Q.  How far away from the actual frame were

11   the lenses located?

12       MR. PUISZIS:  Objection to relevance.

13           You can go ahead and answer the

14   question, if you remember.

15       THE WITNESS:  I couldn't say for certain.

16   Maybe a few inches, not much.

17   BY MR. KSIAZEK:

18       Q.  Sure.  Do you remember what you said to

19   dispatch about your glasses?

20       A.  I believe I just -- my glasses were

21   broken.

22       Q.  Do you know what, if anything, dispatch

23   said to you in response?

24       A.  Dispatch, nothing in response.

                                                34

1     Actually, I think I was talking to dispatch, so

2     I just communicated that to my lieutenant, my

3     watch commander.

4         Q.  And who was your watch commander at that

5     time?

6         A.  Lieutenant Stan White.

7         Q.  And did Lieutenant White say anything to

8     you?

9         A.  I believe he asked me if I had a spare,

10    or if I needed to go and get a spare, something

11    to that effect.

12        Q.  Okay.  After you had this conversation,

13    what, if anything, did you see that the other

14    officers were doing with Mr. Boyle?

15        A.  I don't recall.  I don't recall at that

16    point.  I...

17        Q.  Did -- was -- do you recall if any

18    Chicago Police Department officers were on the

19    scene at the point when you had this dispatch

20    conversation about your glasses?

21        A.  At that point I do recall -- I believe

22    seeing some CP officers, Chicago Police

23    Department officers.

24        Q.  Okay.  Do you know when these CPD

35

1    officers first arrived?

2        A.  No, I couldn't say when they first

3    arrived.

4        Q.  Was that the first time that you saw

5    them right as -- after you had this conversation

6    about your glasses?

7        A.  It was right -- it was after the

8    struggle.  I can't recall if it was before

9    dispatch or after -- after my communication with

10    dispatch.

11        Q.  Did you have any conversations -- or had

12    you had any conversations with dispatch prior to

13    talking to Lieutenant White about your glasses?

14        MR. PUISZIS:  You mean that night?

15    BY MR. KSIAZEK:

16        Q.  Yeah, I'm sorry.  On October 18, 2008.

17        MR. PUISZIS:  Well, I object because you --

18    I don't mean to be raising a speaking objection,

19    but we -- you asked previously about

20    conversations he had with dispatch around the

21    time of the 10-1.

22        So I mean, I'm not sure.  You got him

23    talking to dispatch then, and you've got him

24    talking to dispatch -- you know, about the

                                            36

1    glasses.  I'm not sure what else you're looking

2    for.

3  BY MR. KSIAZEK:

4        Q.   I am just asking if there is any other

5    conversations besides the 10-1, and when you

6    talked to dispatch about your glasses, did you

7    have any conversations with dispatch in between

8    those two conversations?

9        A.   No, I don't believe so.

10       Q.   Okay.  Okay.  Did you see Mr. Boyle be

11   put into a Chicago Police Department vehicle?

12       A.   No, sir, I didn't.

13       Q.   Okay.  What, if anything, did you see

14   after you had this conversation with Mr. Boyle?

15            I'm sorry if I asked that already,

16   but...

17       A.   I didn't see much.  Actually, one side

18   disengaged, one side retrieved my broken

19   glasses.  I then attempted to get back to my

20   vehicle.

21       Q.   How bad is your vision actually?

22       A.   Well, I don't believe it to be very bad.

23   I couldn't say for certain as far as specifics.

24       Q.   Okay.  Could you make out what was

                                                   37

1    actually happening at the scene?

2        A.  Yes.

3        Q.  Okay.  Did you eventually get back to

4    your vehicle?

5        A.  Yes.

6        Q.  And what did you do once you got back to

7    your vehicle?

8        A.  I made the determination to go the short

9    distance to our police station.

10       Q.  Okay.  Can you drive without your

11   glasses?

12       A.  I can.

13       Q.  Did you have any conversations about

14   whether or not you could drive back to the

15   station without your glasses with any of the

16   other officers at the scene?

17       A.  No, I didn't.  I don't recall, I don't

18   believe I did.

19       Q.  Okay.  Did you have any conversations

20   with any of the other officers at the scene,

21   whether it be University of Chicago officers, or

22   Chicago Police Department officers, before you

23   actually did leave the scene that night?

24       A.  Actually, yeah.  Before I left -- I

                                                    38

1    don't recall who specifically -- I mean, I think

2    a couple of guys asked about my glasses, kind

3    of riving me about them being broken, but I

4    think that was just about it.

5        Q.   Did they say anything -- do you know who

6    actually was riving you about the glasses?

7        A.   No, I couldn't say for certain.  No, I

8    just don't recall for certain.

9        Q.   Okay.  And did you have any

10   conversations with any of these officers about

11   actually what happened in that incident on the

12   18th?

13       A.   No, sir, no, not that -- no.

14       Q.   Do you know how far it is from 53rd

15   Street where you were on 18th that night to --

16   back to University of Chicago station?

17       A.   I could -- not for certain,

18   approximately maybe about four blocks, four or

19   five blocks, somewhere in that ballpark, four to

20   six.

21       Q.   But right before you left, do you know

22   how many officers -- how many University of

23   Chicago officers were on the scene?

24       A.   I couldn't say for certain, no.  The

                                              39

1    exact number, no.

2        Q.  But it's more than before, just yourself

3    and Torres and Moore?

4        A.  I believe it was -- yeah, it was more

5    than the four.  I think some other responding

6    units may have come by.

7        Q.  Do you know how many Chicago Police

8    Department officers, if any, were at the scene?

9        A.  No, I couldn't say for certain, no.

10       Q.  Okay.  And once you got back to the

11   station, what did you do at that point?

12       A.  I called home to have someone bring a

13   spare pair of glasses for me.

14       Q.  Okay.  Did you talk to anyone at the

15   station about what -- when you first got back

16   and made that call about your glasses, did you

17   talk to anyone about what happened on 53rd

18   Street that night?

19       A.  No, sir.

20       Q.  Did -- at any point later that morning

21   did you have any conversations with Officer

22   Moore or Officer Torres about what actually

23   happened that night?

24       A.  No, no.  I think we may have generally

                                                   40

1    just talked about the incident. The fact

2    that -- no, I'm sorry, we -- I don't recall. We

3    didn't say anything. We really didn't talk

4    about it.

5        Q. Okay. Did -- at any point later after

6    the 18th, did you have a conversation with

7    Officer Moore and Torres about it?

8        A. Just a general conversation in the --

9    when the court -- when they had to go -- the

10   court dates, and they had to go to court, but...

11       Q. Okay. And what, if anything, did they

12   say to you, or what did you say to them when

13   those court dates had come up?

14       A. They would just say specifically -- they

15   would just say in general that -- when they had

16   to go to court.

17           Never talked direct -- any detail about

18   the actual proceedings, just I am going to court

19   this day, or I am going to court for that

20   incident that happened, and that didn't happen

21   back on the 18th, nothing more than that.

22       Q. Okay. At any point did you learn who

23   actually was present from the University of

24   Chicago Police Department on October 18, 2008?

                                                      41

1      A.   I believe -- not until the actual

2    paperwork from the reports.  That's the only

3    time I really had an idea of who was all there.

4      Q.   Have you seen the police report that had

5    been prepared in this case?

6      A.   I don't think I looked at our police

7    report, our police report.  I don't believe I

8    saw a police report.  No, I didn't.

9      Q.   But what do you mean the paperwork from

10   the reports?

11     A.   Well, I was speaking more so about the

12   paperwork that I received from Mr. Puiszis'

13   office.

14     Q.   The interrogatories?

15     A.   Right, exactly.

16     Q.   When -- after you got the 10-1 call and

17   headed toward 53rd Street, did you have your

18   patrol lights on?

19     A.   Yes, I did.

20     Q.   And you -- did you have your sirens on?

21     A.   Yes.

22     Q.   Did you ever take any pictures of your

23   broken glasses?

24     A.   No, I haven't.

                                                42

```
 1        Q.  Do you still have your glasses that were
 2   broken?
 3        A.  No, I just replaced the model -- got the
 4   old -- got a different pair.
 5        Q.  When did you replace the glasses?
 6        A.  I want to say it would have been on my
 7   off day.  It may have been a day or two later.
 8   I am not sure when I was off after that,
 9   probably within two to three days after.
10        Q.  Okay.  Did you actually bring the
11   glasses into the eye place where you went?
12        A.  Yes, I did.
13        Q.  Okay.  And then did they throw the
14   glasses away, or what did they do with them?
15        A.  I'm not -- I can't say for certain what
16   they did with them.
17        Q.  But you actually gave --
18        A.  Yes.
19        Q.  Do you know what place it was?
20        A.  Pearle Vision, I believe.  Pearle
21   Vision.
22        Q.  Okay.  Do you know what town that was
23   in?
24        A.  I believe Oak Lawn, I believe.
```

43

1      Q.  Do you know if anyone took any pictures

2   of the glasses?

3      A.  No, I don't.  I don't believe anyone

4   did, no.

5      Q.  Do you know if any other University of

6   Chicago officers were hurt during that

7   altercation on the 18th?

8      A.  I believe Officer Gulersa (phonetic)

9   hurt his shoulder.  I believe Officer Moore may

10   have hurt his wrist, but I don't know how severe

11   either injury was, or the extent of treatment

12   that they needed.

13      Q.  Okay.  Did you actually see Officer

14   Moore hurt his wrist?

15      A.  I didn't, no.

16      Q.  Did you see Officer Gulersa hurt his

17   shoulder?

18      A.  No.

19      Q.  Did -- while you were at the scene on

20   the 18th, did Officer Moore ever tell you, I

21   hurt my wrist?

22      A.  He did not, no.

23      Q.  And did Officer Gulersa ever tell you he

24   hurt his shoulder?

44

1      A.   He didn't -- not -- no.

2      Q.   Did you ever have any conversations with

3    Mr. Boyle besides what we've talked about

4    previously during that whole incident on the

5    18th?

6      A.   No, sir.

7      Q.   And have you ever had any complaints

8    filed against you in your duties as a Chicago

9    police officer, besides what we're here for

10   today?

11     MR. PUISZIS:  Objection, irrelevant.

12         Go ahead and answer the question.

13     THE WITNESS:  Yeah, I believe there have

14   been two complaints that I know of, both have

15   been unsustained or unfounded.

16   BY MR. KSIAZEK:

17     Q.   Okay.  Do you know what the first

18   complaint was for?

19     MR. PUISZIS:  Objection, irrelevant.

20         You can go ahead and answer the

21   question.

22     THE WITNESS:  The first, I believe, was an

23   incident involving a disruptive person I was

24   working in the emergency room, University of

                                               45

1    Chicago Bernard Mitchell Hospital.

2    BY MR. KSIAZEK:

3        Q.   Do you know when this incident occurred?

4        A.   I can't recall specifically the date.

5        Q.   Do you know what year?

6        A.   I believe it was in 2007.

7        Q.   And what happened with this disruptive

8    person at Bernard Mitchell Hospital?

9        A.   I was attempting to escort her from the

10   emergency room and attempted to place her in

11   handcuffs, and I believe she complained about

12   her wrist hurting from being put in the

13   handcuffs.

14       Q.   And there was an investigation that was

15   undertaken?

16       A.   Yes, there was.

17       Q.   Okay.   And you said that this was

18   unfounded?

19       A.   Yes.

20       Q.   Do you know when the second complaint

21   was filed against you?

22       MR. PUISZIS:   Objection, irrelevant.

23            You can go ahead and answer it.

24       THE WITNESS:   Not the specific date, I

                                                    46

1    believe it was in 2008.  No, no, sir, 2009.

2  BY MR. KSIAZEK:

3        Q.   Okay.  Do you know when in 2009?

4        A.   I want to say maybe September.

5        Q.   Okay.  What happened in this complaint?

6        MR. PUISZIS:  Objection, irrelevant.

7             You can go ahead and answer.

8        THE WITNESS:  There was an incident with an

9   intoxicated student.  And during our interaction

10   he used the "N" word.

11            He used "N" words directed towards me,

12   and I believe because our -- of our interaction

13   he -- I filed a report against him, and then he,

14   in turn, complained against me.

15            But he was expelled, and I was, I

16   believe -- I was unfounded as well.

17  BY MR. KSIAZEK:

18        Q.   And so do you know what report did you

19   file against him?

20        A.   I just documented -- I just documented

21   the incident.

22        Q.   Okay.

23        A.   A general case report.

24        Q.   And this was a student you said?

47

1        A.   Yes, at the time.

2        Q.   Do you know when this complaint was

3     found to be sustained or unfounded?

4        A.   I couldn't say the specific date.

5        MR. KSIAZEK:   Okay.  I don't think I have

6     any other questions at this time.

7        MS. GIBBONS:   I have just have a few.

8                    EXAMINATION

9     BY MS. GIBBONS:

10       Q.   Officer Gillespie, just stepping back to

11    the incident itself, when do you first recall,

12    if at all, seeing the City of Chicago police

13    present on the scene?

14       A.   Again, it was after I felt the situation

15    was...

16       THE COURT REPORTER:   I'm sorry?

17       THE WITNESS:   It was back when I -- when I

18    believed the situation was under control, and

19    after Mr. Boyle had been handcuffed.

20    BY MS. GIBBONS:

21       Q.   So it was after the struggle?

22       A.   Yes, after the struggle.

23       Q.   Mr. Boyle was handcuffed.

24            Was he continuing to struggle at all at

                                                    48

1    that point?

2        A.  At that point, no.

3        Q.  Do you recall approximately how many

4    City of Chicago police officers were present on

5    the scene?

6        A.  I couldn't say for certain.  I saw at

7    least, I believe maybe three officers.

8        Q.  Do you recall seeing a Chicago police

9    officer in a white shirt or a sergeant on the

10   scene?

11       A.  I believe I did at one point.

12       Q.  Do you know who any of the City of

13   Chicago police officers were?

14       A.  That were on the scene?

15       Q.  Mm-hmm.

16       A.  I know them by face more so than the

17   name.

18       Q.  Okay.  And just to make sure I

19   understand, you don't recall seeing any City of

20   Chicago police officers while Mr. Boyle was

21   still struggling --

22       A.  No.

23       Q.  -- with -- the --

24       A.  No.

49

```
 1        Q.  -- University police?

 2        A.  I'm sorry.

 3        Q.  No, that's fine.  Don't worry.  And I

 4   keep talking in and out.  So that's fine.

 5            I have no further questions.

 6                        EXAMINATION

 7   BY MR. PUISZIS:

 8        Q.  How was the traffic during the early

 9   morning hours when this incident happened?

10        A.  Minimal, very light.

11        Q.  Had there been anything other than

12   minimal traffic, would you have driven your

13   squad car back to the University of Chicago

14   after this incident, given the fact that your

15   glasses were broken?

16        A.  No, sir, I wouldn't have.

17        Q.  Why not?

18        A.  I would have just probably preferred to

19   have someone take me just to avoid any problems.

20        Q.  If you would take off your glasses, how

21   far would I have to walk away, or how far could

22   you distinguish my face in terms of distance

23   from another person?

24        A.  A pretty good distance.  That's
```

50

```
 1     probably -- I estimate 20, maybe 15, 20 feet.
 2          Q.  Okay.  Now, do you recall seeing Golarza
 3     at the scene at some point during the incident?
 4          A.  I do after -- after -- after the
 5     struggle.
 6          Q.  Okay.  Do you know where he was while
 7     the struggle was going on?
 8          A.  I couldn't say for certain, no.
 9          Q.  Okay.  Do you know if he was
10     participating in the struggle?
11          A.  No, I can't, I couldn't say for certain.
12          Q.  Okay.  By the way, did you ever hit
13     Charles Boyle?
14          A.  No, I did not.
15          Q.  Did you ever punch him?
16          A.  No.
17          Q.  Did you ever kick him?
18          A.  No.
19          Q.  Did you ever take out a flashlight and
20     hit him in the stomach?
21          A.  No, I did not.
22          Q.  Did you ever hit him with a baton?
23          A.  No.
24          Q.  Did you ever see any other officers do
```

51

1      any of that?

2           A.   I did not see that, no.

3           Q.   By the way, you guys brought -- are

4      University of Chicago officers allowed to carry

5      the big cell flashlights?

6           A.   No, sir, we're not.

7           Q.   And you're not allowed to carry billy

8      clubs either, are you?

9           A.   No, sir.

10          Q.   Did you see other car -- was there

11     another car parked on the street somewhere near

12     the officer's squad car?

13               I'm talking about Moore and Torres.

14          A.   There was.

15          Q.   Do you recall what kind of vehicle that

16     was?

17          A.   I couldn't say for certain, no.

18          Q.   Okay.  Is it permissible or lawful to

19     resist any arrest?

20          A.   No, sir.

21          Q.   So as far as your concern when you

22     arrived at the scene, you saw Mr. Boyle

23     resisting arrest, did you believe you had

24     probable cause to place him under arrest?

                                                    52

```
 1        MR. KSIAZEK:  Objection.

 2   BY MR. PUISZIS:

 3        Q.   For resisted arrest, based on your years

 4   of experience and training as a Chicago police

 5   officer.

 6        MR. KSIAZEK:  I will object for a legal

 7   conclusion, but go ahead.

 8        THE WITNESS:  Yes, sir.

 9        MR. PUISZIS:  Nothing further.

10                  FURTHER EXAMINATION

11   BY MR. KSIAZEK:

12        Q.   You do usually carry -- what do you

13   carry on your belt when you're on patrol?

14        A.   I carry currently?

15        Q.   Well, in the October of 2008, excuse me.

16        A.   Okay.  Then firearm, flashlight,

17   handcuffs, that's it.

18        Q.   Did you see any of the officers during

19   the struggle on the ground, did you see any of

20   them take out their flashlights?

21        A.   I did not, no.

22        Q.   You were actually the reason why the

23   four of you all went to the ground, yourself,

24   Mr. Boyle, Officer Torres and Officer Moore,
```

53

```
 1    right?

 2          MS. GIBBONS:  Objection, vague.

 3          MR. PUISZIS:  Calls for a conclusion.

 4          You can go ahead and answer, if you

 5    know.

 6          THE WITNESS:  Possibly, I just can't say for

 7    certain.

 8    BY MR. KSIAZEK:

 9          Q.  Okay.  But you were running towards the

10    three of them?

11          A.  I was running towards them, yes.

12          MR. KSIAZEK:  I don't think I have anything

13    further.

14                    FURTHER EXAMINATION

15    BY MR. PUISZIS:

16          Q.  Describe the flashlight for us that you

17    carried in October of 2008?

18          A.  It's a plastic light, probably about

19    maybe 6 or 7 inches in length.  Small --

20          Q.  That wouldn't extend very far above your

21    fist, would it?

22          A.  Not very far at all.

23          Q.  Okay.  Nothing further.

24          I'm sorry, you said it was plastic?
                                                      54
```

1    A.  Yes.

2    MR. PUISZIS:  Okay.  Nothing further, we'll

3  reserve.

4    THE COURT REPORTER:  Would anyone like to

5  order?

6    MR. KSIAZEK:  I will let you know in a few

7  days.

8    * * * FURTHER DEPONENT SAITH NOT * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                    55

1    STATE OF ILLINOIS   )

2                    )  SS:

3    COUNTY OF COOK     )

4          I, ANGELA C. LOISI, CSR, RPR, a notary

5    public within and for the County of Cook County

6    and State of Illinois, do hereby certify that

7    heretofore, to-wit, on the 25th day of November

8    2009, personally appeared before me at 222 North

9    LaSalle, Suite 300, Chicago, Illinois, ARTHUR

10   GILLESPIE, in a cause now pending and

11   undetermined in the Circuit Court of Cook County,

12   Illinois, wherein CHARLES BOYLE is the Plaintiff,

13   and UNIVERSITY OF CHICAGO POLICE OFFICER LARRY

14   TORRES, ET AL is the Defendant.

15          I further certify that the said witness

16   was first duly sworn to testify the truth, the

17   whole truth, and nothing but the truth in the

18   cause aforesaid; that the testimony then given by

19   said witness was reported stenographically by me

20   in the presence of the said witness, and

21   afterwards reduced to typewriting by

22   Computer-Aided Transcription, and the foregoing

23   is a true and correct transcript of the testimony

24   so given by said witness as aforesaid.

57

1        I further certify that the signature to

2    the foregoing deposition was not waived by

3    counsel for the respective parties.

4        I further certify that the taking of

5    this deposition was pursuant to Notice, and that

6    there were present at the deposition the

7    attorneys hereinbefore mentioned.

8        I further certify that I am not counsel

9    for nor in any way related to the parties to this

10    suit, nor am I in any way interested in the

11    outcome thereof.

12        IN TESTIMONY WHEREOF:  I have hereunto

13    set my hand and affixed my notarial seal this 5th

14    day of January, 2010.

15

16    _____

17                Notary Public

18

19

20

21

22

23

24

58

# EXHIBIT J

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
CHARLES BOYLE,              )
              Plaintiff,    )
      -vs-                  )  No. 09 C 1080
UNIVERSITY OF CHICAGO       )
POLICE OFFICER LARRY        )
TORRES, et al.,             )
              Defendants.   )
```

The deposition of MICHAEL KWIATKOWSKI,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before ATHANASIA MOURGELAS, a notary
public within and for the County of Cook and
State of Illinois, at 222 North LaSalle Street,
Suite 300, Illinois, on the 10th day of
November, 2009, at the hour of 10:09 o'clock
a.m.

Reported by: Athanasia Mourgelas
License No. 084-004329

*Page 1*

---

```
 1  APPEARANCES:
 2    ED FOX & ASSOCIATES, by
 3    MR. JONATHAN R. KSIAZEK,
 4    300 West Adams Street, Suite 330,
 5    Chicago, Illinois 60606,
 6    (312) 345-8877,
 7       Representing the Plaintiff;
 8
 9    HINSHAW & CULBERTSON, by
10    MR. STEVE M. PUISZIS,
11    222 North LaSalle Street, Suite 300,
12    Chicago, Illinois 60601,
13    (312) 704-3000,
14       Representing the Defendant,
15       University of Chicago Police
16       Officers;
17
18    ASSISTANT CORPORATION COUNSEL, by
19    MS. HELEN C. GIBBONS,
20    30 North LaSalle Street, Room 900,
21    Chicago, Illinois 60602,
22    (312) 744-3982,
23       Representing the Defendant,
24       City of Chicago.
```

*Page 2*

---

I N D E X

```
 2  WITNESS                    EXAMINATION
 3  MICHAEL KWIATKOWSKI
 4    By Mr. Ksiazek                6
 5    By Ms. Gibbons               42
 6    By Mr. Puiszis              44
 7    BY MR. Ksiazek (further)      50
 8
 9
10
11
12           E X H I B I T S
13  NUMBER              MARKED FOR ID
14  PLAINTIFF'S Deposition Exhibit
15    No. 10                      33
16
17
18
19
20
21
22
23
24
```

*Page 3*

---

```
 1          (Whereupon, the deposition
 2       began at 10:09 o'clock a.m.)
 3          (Witness sworn.)
 4    MR. KSIAZEK: Can you please state your name
 5  spelling your last name for the record.
 6    THE WITNESS: Michael Kwiatkowski,
 7  K-W-I-A-T-K-O-W-S-K-I.
 8    MR. KSIAZEK: Officer Kwiatkowski, is that
 9  how you say it; right?
10    THE WITNESS: Yes, sir.
11    MR. KSIAZEK: Have you ever had your
12  deposition taken before?
13    THE WITNESS: No.
14    MR. KSIAZEK: So this is your first time
15  having your deposition taken of you?
16    THE WITNESS: Yes.
17    MR. KSIAZEK: I'm going to give you some
18  ground rules, basically explain what we're doing
19  here and what's going to happen. First of all,
20  I'm just going to ask you some questions, and
21  ask that you answer them truthfully and to the
22  best of your knowledge. Is that okay?
23    THE WITNESS: Yes.
24    MR. KSIAZEK: And when you're answering
```

*Page 4*

1 (Pages 1 to 4)

1 those questions, I just ask that you answer them
2 verbally, so out loud with a yes or no or
3 whatever answer you're going to give and there
4 might be times when you say uh-uh or uh-huh or
5 you shake your head, and then we'll just remind
6 you to answer out loud. Is that okay?
7      THE WITNESS: Yes.
8      MR. KSIAZEK: Okay. And when I'm asking my
9 questions, I'll do my best to not try and talk
10 over when you're giving your answers and I just
11 ask that you do the same for me just so that we
12 can have a clear record for the court reporter.
13 Okay?
14     THE WITNESS: Yes.
15     MR. KSIAZEK: And you understand that you
16 are under oath today?
17     THE WITNESS: Yes.
18     MR. KSIAZEK: And is there anything
19 preventing you from testifying truthfully today?
20     THE WITNESS: No.
21
22
23
24
                                                5

1      A.  Approximately six and a half years.
2      Q.  So you started in approximately 2002,
3 middle of 2002?
4      A.  2003.
5      Q.  Do you know when you started in 2003?
6      A.  June of 2003.
7      Q.  Have you worked for any other police
8 departments prior to working for the University
9 of Chicago Police Department?
10     A.  No.
11     Q.  So your first job was with the
12 University of Chicago?
13     A.  Yes.
14     Q.  What was your rank when you first
15 started in 2003 with the University of Chicago
16 Police Department?
17     A.  Patrolman.
18     Q.  And were you a patrolman on October
19 18th, 2008 with the University of Chicago?
20     A.  Yes.
21     Q.  When did you become a sergeant?
22     A.  August of 2009.
23     Q.  Have you ever served in the military?
24     A.  No.
                                                7

1           MICHAEL KWIATKOWSKI,
2 having been first duly sworn, was examined and
3 testified as follows:
4           EXAMINATION
5 BY MR. KSIAZEK:
6      Q.  Okay. What is your educational
7 background?
8      A.  I achieved a bachelor's in criminal
9 justice from Michigan State University.
10     Q.  When did you obtain that bachelor's
11 degree?
12     A.  1999.
13     Q.  Upon graduating from Michigan State
14 University, what jobs did you hold?
15     A.  I was a supervisor for RPS Airborne
16 Express and a manager for USF Distribution.
17     Q.  UFS Distribution you said, sir?
18     A.  USF.
19     Q.  And what is your current position?
20     A.  I'm a sergeant.
21     Q.  Where do you work?
22     A.  The University of Chicago Police.
23     Q.  How long have you worked for University
24 of Chicago Police Department?
                                                6

1      Q.  How tall are you, sir?
2      A.  Approximately 6', 1".
3      Q.  And how much do you weigh?
4      A.  Between 275 and 280.
5      Q.  How much did you weigh in October of
6 2008?
7      A.  Approximately the same.
8      Q.  How old are you?
9      A.  32.
10     Q.  Were you assigned to a beat on October
11 18th of 2008?
12     A.  Yes.
13     Q.  What beat was that?
14     A.  152.
15     Q.  What are the boundaries of Beat 152 in
16 October of 2008?
17     A.  There's not really a set boundary.
18     Q.  Okay. So what is your assignment with
19 Beat 152?
20     A.  Surveillance. At that time it was
21 surveillance.
22     Q.  How long was your assignment on Beat
23 152 surveillance?
24     A.  From -- can you explain the question,
                                                8

2 (Pages 5 to 8)

1  are you asking --
2    Q. Sure. How long did you serve on Beat
3  152? You said on October 2002 you were working
4  Beat 152?
5    A. Yeah.
6    Q. How long were you working on Beat 152?
7    A. The hours?
8    Q. The months, years?
9    MR. PUISZIS: How many days had you been
10 working?
11   THE WITNESS: I would say approximately six
12 months.
13 BY MR. KSIAZEK:
14   Q. You had been working six months prior
15 to October of 2008?
16   A. Correct.
17   Q. And how many months did you work after
18 October of 2008?
19   A. All the way until July of '09.
20   Q. Now, when you say your assignment was
21 surveillance, what do you mean by that?
22   A. Do you mean the capacity?
23   Q. What were you surveying? What were you
24 investigating?

9

1    A. Patrol and maintaining safety and
2  security of the campus and faculty and staff
3  students of the University.
4    Q. And did you have a focus more on this
5  robbery pattern that you spoke of earlier or was
6  it just more general patrol?
7    A. Our focus was the robbery but we were
8  also doing general patrol and maintaining campus
9  safety and security.
10   Q. Were you working with a partner?
11   A. No.
12   Q. So --
13   MR. PUISZIS: Let him finish his question
14 before you answer.
15 BY MR. KSIAZEK:
16   Q. And did you have your own squad car?
17   A. I had my own vehicle.
18   Q. Was it a marked car or was it an
19 unmarked car?
20   A. Unmarked.
21   Q. And what beat are you currently
22 assigned to?
23   A. The beat number is 170.
24   Q. What does Beat 170, what is that

11

1    A. Within the University area of authority
2  at that time I believe I was working a robbery
3  pattern, so I was in areas where we would have
4  incidents of robberies.
5    Q. Okay. Was there a specific part of the
6  campus that you were investigating more than
7  others?
8    A. At that time I believe it was between
9  53rd to basically 63rd Street.
10   Q. Do you know what the boundaries were --
11 you said 53rd and 63rd Street, were there
12 another cross section boundaries where you were
13 investigating streets?
14   A. Our campus -- our area of authority we
15 go from Cottage Grove back east until Stony
16 Island or the lake depending on the area you're
17 in, Stony Island or Lake Shore depending on the
18 area.
19   Q. So you were investigating 53rd Street
20 to 63rd Street from Cottage Grove to Stony
21 Island approximately?
22   A. I was working in those areas.
23   Q. Okay. And what were your day-to-day
24 duties be in October of 2008?

10

1  assignment?
2    A. Training.
3    Q. So where do you -- do you currently
4  train all the new officers?
5    A. We schedule training.
6    Q. And what is your role in the training?
7    A. And I provide training on various
8  subjects.
9    Q. What subjects do you provide training
10 on?
11   A. We do our annual firearms
12 qualification.
13   Q. Anything else?
14   A. Mobile data terminals and use.
15   Q. Anything else besides firearms
16 qualifications and mobile data terminals and
17 use?
18   A. Report writing.
19   Q. Anything else besides these three
20 training class that you spoke of?
21   A. Currently, no.
22   Q. Okay. So just to recap, you train
23 officers in firearms qualifications, mobile data
24 terminals and use and how to write a report; is

12

3 (Pages 9 to 12)

1  that correct?
2      A.  The report writing, correct.
3      Q.  And do you work out of the Chicago
4  Police Department -- University of Chicago
5  Police Department headquarters?
6      A.  No.
7      Q.  When you're not on patrol?
8      A.  Correct.
9      Q.  And what is your shift currently?
10     A.  Days.
11     Q.  Okay.  So what are your hours during
12  the days?
13     A.  06:30 to 14:30 hours.
14     Q.  In October of 2008 when you were
15  working Beat 152, what were your hours then?
16     A.  21:00 to 05:00.
17     Q.  Did you have the occasion to be at 1435
18  53rd Street on October 13th, 2008?
19     A.  What was the address?
20     Q.  1435 East 53rd Street?
21     A.  I don't believe I was at that address.
22     Q.  Were you on -- let's put it this way,
23  did you get a dispatch telling you that there
24  was a 10-1 on 53rd Street on October 18th, 2008?
                                              13

1      A.  Yes.
2      Q.  Do you recall what the dispatch said
3  exactly?
4      A.  No, I do not recall the exact details.
5      Q.  Where were you when you got this
6  dispatch?
7      A.  Approximately 60th and Drexel.
8      Q.  Do you know what time you got this
9  dispatch?  Do you know what time you got
10  dispatched?
11     A.  Approximately 02:30 to 02:40 hours.
12     Q.  And what did you do once you received
13  this dispatch?
14     A.  I started heading towards the location
15  of the dispatch.
16     Q.  How far did it take you to arrive at
17  53rd Street from 60th and Drexel?
18     A.  Could you repeat that question?
19     Q.  Sure.  How long did it take you to
20  arrive at 53rd Street from where you were at
21  60th and Drexel?
22     A.  Approximately one to two minutes.  I
23  don't recall exactly.
24     Q.  Do you know how far away, how many
                                              14

1  miles or blocks it is?
2      A.  Approximately eight to nine blocks.
3      Q.  And what were you doing when you got
4  this dispatch?
5      A.  Patrol.
6      Q.  So you got this dispatch and you headed
7  towards 53rd Street?
8      A.  Yes.
9      Q.  Do you remember what route you took to
10  get to 53rd Street?
11     A.  I believe I went north on Blackstone.
12     Q.  And then you turned onto 53rd from
13  Blackstone?
14     A.  I would have turned westbound onto
15  53rd.
16     Q.  Okay.  As you turned westbound onto
17  53rd Street, what did you see?
18     A.  Could you be more specific with the
19  question?
20     Q.  I'm just asking you as you're turning
21  onto 53rd Street, what, if anything, did you see
22  on 53rd Street?
23     A.  I observed several University officers
24  that have responded to a call trying to place a
                                              15

1  subject into custody.
2      Q.  Okay.  And at some point did you park
3  your vehicle?
4      A.  Yes.
5      Q.  And where did you park your vehicle?
6      A.  Approximately I was -- my vehicle was
7  -- it was west of 53rd Street -- it was west of
8  Blackstone on 53rd Street.
9      Q.  Do you know how far you traveled down
10  53rd Street before you parked your vehicle?
11     A.  I don't recall exactly.  It could have
12  been approximately a quarter of a block.  I
13  don't recall exactly.
14     Q.  Okay.  After you parked your vehicle,
15  what did you do?
16     A.  I exited my vehicle.
17     Q.  And as you exited your vehicle, what
18  did you see at that point?
19     A.  Several officers trying to place the
20  subject into custody.
21     Q.  Can you describe how the officers --
22  first of all, how many officers were there?
23     A.  I would say approximately five at that
24  point.
                                              16

4 (Pages 13 to 16)

1    Q.  Do you know if they were all University
2    of Chicago officers or were there some Chicago
3    Police Officers there?
4    A.  They were all University of Chicago.
5    Q.  Did you recognize any of the officers
6    that were attempting to put the subject into
7    custody?
8    A.  Yes.
9    Q.  Who did you recognize?
10   A.  Officer Galarza, Torres, Gillespie,
11   Officer Moore, and there -- that's all I could
12   recall.  There may have been a few more.  That's
13   all I can recall.
14   Q.  Okay.  So how were Officers Galarza,
15   Torres, Gillespie and Moore attempting to place
16   the subject into custody?
17   A.  They were attempting to place him into
18   handcuffs.
19   Q.  Where was Officer Galarza in relation
20   to the subject?
21   A.  When I arrived, I believe Officer
22   Galarza was by the subject's arms.
23   Q.  And did you later learn that the
24   subject at the scene that night was Charles

17

1    Boyle?
2    A.  Yes.
3    Q.  Where was Officer Torres in relation to
4    Mr. Boyle?
5    A.  I don't recall.
6    Q.  When you say Officer Galarza was by
7    Mr. Boyle's arms, was he on the left side or the
8    right side?
9    A.  When -- I don't recall exactly when I
10   arrived on the scene what side.  I believe he
11   was more -- yeah, I don't recall.
12   Q.  Where was Officer Gillespie to
13   Mr. Boyle?
14   A.  Officer Gillespie was by Mr. Boyle's
15   legs.
16   Q.  Was Mr. Boyle standing at this point?
17   A.  No.
18   Q.  Where was Mr. Boyle?
19   A.  Mr. Boyle was facedown on the ground.
20   Q.  Was he laying on the ground with his
21   belly on the ground or was his back on the
22   ground?
23   A.  His stomach was on the ground.
24   Q.  And did you notice anything that

18

1    Mr. Boyle was doing while he was on the ground?
2    A.  Yes.
3    Q.  What was he doing?
4    A.  He was kicking and struggling.  He was
5    kind of wiggling his arms trying to break his
6    arms free.
7    Q.  Okay.  Where was Officer Moore in
8    relation to Mr. Boyle when Mr. Boyle was on the
9    ground?
10   A.  I do not recall.
11   Q.  And you said that Mr. Boyle was kicking
12   and struggling, do you know which officer was
13   trying to actually put the handcuffs on
14   Mr. Boyle?
15   A.  I believe it was Officer Galarza, and I
16   went to assist.
17   Q.  When you said Mr. Boyle was kicking and
18   struggling, was he kicking violently?
19   MR. PUISZIS:  Objection to the
20   characterization.  I don't know what you mean by
21   violently.  When a person can look at a
22   situation and say it's violent, someone else
23   could say it was not so violent.  So subject to
24   the objection, you can answer the question.

19

1    BY MR. KSIAZEK:
2    Q.  Was he kicking violently?
3    A.  I personally would characterize it as
4    violently, yes.
5    Q.  And why is that?
6    A.  The amount of force being exerted.
7    Q.  Did you -- you actually saw Mr. Boyle's
8    legs go up in the air?
9    A.  I believe so.
10   Q.  Do you know how high his legs went up
11   in the air?
12   A.  No.
13   Q.  Was it -- were both legs going up in
14   the air?
15   A.  I don't recall.
16   Q.  You said you saw Mr. -- I'm sorry,
17   Officer Gillespie by Mr. Boyle's legs, did you
18   see Mr. Boyle actually kick Officer Gillespie?
19   A.  No.
20   Q.  Did you actually see Mr. Boyle kick in
21   Officer Gillespie's direction?
22   A.  Yes.
23   Q.  Do you know if Officer Gillespie was
24   wearing his glasses when you saw him that night?

20

5 (Pages 17 to 20)

1    A.  Yes.
2    Q.  And when you arrived on the scene and
3  as you say Mr. Boyle was kicking in Officer
4  Gillespie's direction, when you saw this, was
5  Officer Gillespie wearing his glasses at that
6  point?
7    A.  I don't recall. I do know that after
8  the completion of the call, we were looking for
9  Officer Gillespie's glasses.
10    Q.  Do you know if he ever found his
11  glasses?
12    A.  I believe he did. I believe they were
13  in several pieces.
14    Q.  Did you ever see the glasses yourself?
15    A.  No, I don't recall.
16    Q.  Do you know who found Officer
17  Gillespie's glasses?
18    A.  No.
19    Q.  Okay. While -- you said you moved over
20  to Mr. Boyle to attempt to place -- assist in
21  placing him in handcuffs; right?
22    A.  Yes.
23    Q.  So what happened as you went over to
24  assist placing Mr. Boyle in handcuffs?

21

1    A.  We stated to stop to -- to Mr. Boyle to
2  stop resisting arrest, and I helped maintain
3  control of Mr. Boyle's arms when the handcuffs
4  were placed on him.
5    Q.  So did you actually -- were you the
6  officer who actually put the handcuffs on
7  Mr. Boyle?
8    A.  No.
9    Q.  Do you know which officer actually
10  physically placed the handcuffs on Mr. Boyle?
11    A.  No, I do not recall. My focus was
12  maintaining control of his arms so nobody -- for
13  officer safety and nobody would get hit or
14  struck.
15    Q.  By the way, when you first arrived on
16  the scene and you exited your vehicle, did you
17  hear any conversation between -- did you hear
18  Mr. Boyle say anything?
19    A.  No.
20    Q.  And did you hear -- right after you
21  exited your vehicle, did you hear any of the
22  four University of Chicago officers say
23  anything?
24    A.  Yes. I heard Officer Galarza say stop

22

1  resisting.
2    Q.  How many times did you hear Officer
3  Galarza say that?
4    A.  I don't recall the exact amount of
5  times.
6    Q.  But it was more than once?
7    A.  Yes.
8    Q.  Did Mr. Boyle say anything in response?
9    A.  Not that I can recall.
10    Q.  When you first arrived on the scene and
11  exited your vehicle, did you see any witnesses
12  at the scene?
13    A.  I believe there were some people on the
14  street, but I don't know exactly who or how
15  many.
16    Q.  And do you know how many police cars
17  were on the scene when you arrived?
18    A.  I don't recall exactly. I know I was
19  the fourth or fifth assist unit to arrive. Like
20  I said, my primary focus was on officer safety,
21  so I wasn't really paying attention to how many
22  squad cars were --
23    Q.  Sure. Did you see a silver Chrysler on
24  the scene that night?

23

1    A.  Yes.
2    Q.  Where was that silver Chrysler located?
3    A.  That would -- it was on 53rd facing
4  westbound.
5    Q.  Where did -- where was Mr. Boyle laying
6  or -- or how far away from the silver Chrysler
7  was Mr. Boyle laying on the ground, if you can
8  recall?
9    A.  I don't recall.
10    Q.  Did you -- how far away was Mr. Boyle
11  laying from the closest University of Chicago
12  Police patrol car?
13    A.  I couldn't recall. I don't recall.
14    Q.  Do you know if it was a few feet or was
15  it more than that?
16    A.  I couldn't say. I couldn't give you an
17  exact distance or recall.
18    Q.  Did you hear anyone -- once you first
19  got out of your vehicle, did you hear any of the
20  witnesses that you said that were on the scene?
21    A.  No.
22    Q.  Did you hear -- you didn't hear
23  anything from them?
24    A.  No.

24

6 (Pages 21 to 24)

1    Q.  You didn't hear any conversations
2    between them?
3    A.  No.
4    Q.  Did you notice if anyone was located
5    inside of the silver Chrysler?
6    A.  No, I did not.
7    MR. PUISZIS:  You didn't notice or you
8    didn't know?
9    THE WITNESS:  I didn't know -- I don't
10   recall seeing anybody inside of it.
11   MR. PUISZIS:  Okay.
12   BY MR. KSIAZEK:
13   Q.  So after -- how long approximately did
14   it take from the point when you first arrived on
15   the scene and exited your vehicle to when
16   Mr. Boyle was in handcuffs?
17   A.  A few minutes.  Approximately a few
18   minutes.
19   Q.  Do you know -- well, did you see any of
20   the four officers that you named, Officer
21   Galarza, Moore, Torres and Gillespie, did you
22   see any of them strike Mr. Boyle?
23   A.  No.
24   Q.  Did you see Mr. Boyle strike any of

25

1    them?
2    A.  No.
3    Q.  You just saw them attempting to put him
4    into handcuffs, the four officers?
5    A.  Correct.
6    Q.  What happened after Mr. Boyle was
7    placed into handcuffs?
8    A.  I don't recall.  Could you be more
9    specific with your question?
10   Q.  Well, you said he was on the ground,
11   did someone pull him up from the ground,
12   Mr. Boyle?
13   A.  Yes, I believe he was -- I don't know
14   if he was put into a squad car.  I'm not sure
15   exactly what happened afterwards.
16   Q.  You were -- when Mr. Boyle was actually
17   placed into handcuffs, were you standing over
18   him?
19   A.  I believe I was on his -- more toward
20   his right side.
21   Q.  And do you know what, if any,
22   University of Chicago officers were located
23   around you on Mr. Boyle's right side?
24   A.  I don't recall.  I knew there were

26

1    several officers there.  I know as I stated
2    earlier Gillespie was there, Galarza was there
3    and Moore and Torres was there.  I don't recall
4    anybody's specific location.  I was focused
5    maintaining control of the subject's arms.
6    Q.  Okay.  Did you -- at some point,
7    though, Mr. Boyle stood up from the ground?
8    A.  Yes.
9    Q.  And that was by one of the officers who
10   was there, either Moore or Torres or Galarza or
11   Gillespie?
12   A.  Yeah, I don't recall exactly who
13   assisted him up from the ground.
14   Q.  Did Mr. Boyle say anything when he was
15   -- once he stood up from the ground?
16   A.  Not that I can recall.
17   Q.  Did you hear any of the officers say
18   anything when Mr. Boyle stood up from the
19   ground?
20   A.  Not that I can recall.
21   Q.  So what happened if you can recall once
22   Mr. Boyle was stood up?
23   A.  I was not on the scene for -- after he
24   was placed into custody, I wasn't on the scene

27

1    for much longer.  I know the Chicago Police
2    Department did arrive on the scene, and I
3    believe the -- he was -- I'm not sure exactly if
4    he was turned over to them or what happened
5    next.
6    Q.  When did you first see the Chicago
7    Police Officers at the scene?
8    A.  Shortly after the subject was in
9    custody.
10   Q.  Was that when Mr. Boyle was still on
11   the ground or was that when he stood up?
12   A.  I do not recall.  I don't recall
13   exactly.
14   Q.  But you do remember Mr. Boyle being
15   given over to the Chicago Police Department?
16   A.  I'm not sure exactly who transported
17   Mr. Boyle in.  I wasn't there for that part of
18   the call so I don't want to go further into that
19   because I don't --
20   Q.  What did you do once Mr. Boyle was
21   stood up and given over to either the Chicago
22   Police Department officers or some other
23   officers?
24   A.  I cleared the scene of the call and

28

7 (Pages 25 to 28)

1    went back on patrol.
2       Q.  Do you know when you actually cleared
3    the scene?
4       A.  No.
5       Q.  Was it before or was it after Mr. Boyle
6    was taken away from the scene?
7       A.  I believe it was before.
8       Q.  Did you have any conversations when
9    Mr. Boyle was taken into custody with Officer
10   Moore at that point?
11      A.  No, not that I can recall.
12      Q.  Did you have any conversations with
13   Officer Torres once Mr. Boyle was taken into
14   custody?
15      A.  Not that I can recall.
16      Q.  Did you have any conversations with
17   Officer Galarza?
18      A.  Not that I can recall.
19      Q.  And did you have any with Officer
20   Gillespie?
21      A.  No.  I -- I may have spoken to him
22   regarding his glasses because after the call we
23   were looking for his glasses but that was the
24   extent if there was any conversation.

29

1       A.  No, I don't recall.
2       Q.  Do you know if that was the same day or
3    you just don't recall?
4       A.  I believe it was after the incident.
5    Probably the days following.  I couldn't give
6    you specifics.
7       Q.  What did they say to you when you asked
8    them if they were okay?
9       A.  I don't recall the specifics of the
10   conversation.
11      Q.  Have you had any other involvement with
12   this case outside of what you've spoken about
13   today?
14      A.  There was one court appearance.
15      Q.  Do you recall when you appeared in
16   court?
17      A.  I believe it was in January of '09.
18      Q.  And why were you in court in January of
19   2009?
20      A.  I was subpoenaed for this case.
21      Q.  Did you end up testifying?
22      A.  No, I did not.
23      Q.  Did you ever -- on October 18th, 2008,
24   did you ever tell dispatch that you were on the

31

1       Q.  Do you recall what you said to Officer
2    Gillespie or what he said to you?
3       A.  No.
4       Q.  Now, during this altercation when you
5    saw Mr. Boyle on the ground and were attempting
6    to assist placing him into handcuffs, at any
7    point did you strike Mr. Boyle?
8       A.  No.
9       Q.  Did Mr. Boyle strike you?
10      A   No.
11      Q.  Did you have any conversations with any
12   Chicago Police Officers who were at the scene
13   that night?
14      A.  No.
15      Q.  Did you ever talk to any of the four
16   University of Chicago Police Officers that we
17   have spoken of, Torres, Moore, Gillespie or
18   Galarza about what happened that morning since
19   October 18th, 2008?
20      A.  Not specifically.  I may have asked
21   them if they were okay, but I don't recall any
22   specific.
23      Q.  Do you know when you asked them if they
24   were okay?

30

1    scene?
2       A.  Yes, I believe I did.  I may have let
3    dispatch know that I was, with the radio, on the
4    scene.
5       Q.  Did you ever tell dispatch everybody
6    take a slow down?
7       A.  I don't recall.
8       Q.  Do you recall what you did tell
9    dispatch that night?
10      A.  No.
11      Q.  When did you learn that the suspect on
12   the scene was Charles Boyle?
13      A.  I don't recall exactly.
14      Q.  Did you fill out any paperwork in
15   conjunction with this case?
16      A.  No.
17      Q.  You didn't fill out a police report?
18      A.  No, I did not.
19      Q.  And you didn't fill out an injury
20   report?
21      A.  No.
22      Q.  Did you fill out a court report for
23   your appearance on January 20th, 2009?
24      A.  I do not believe I filed a court

32

1    report.
2        MR. KSIAZEK: I will mark this as Exhibit
3    No. 10.
4            (Whereupon, PLAINTIFF'S
5            Deposition Exhibit No. 10 was
6            marked for identification.)
7    BY MR. KSIAZEK:
8        Q.  What I've handed you and what's been
9    marked as Plaintiff's Exhibit 10, these are your
10   Answers to Interrogatories that you prepared
11   with your counsel.
12           Do you recognize this document?
13       A.  Yes.
14       Q.  You've read through this document?
15       A.  Yes.
16       Q.  By the way, what documents did you read
17   through in preparation for your deposition
18   today?
19       A.  This is the only document, the
20   interrogatory.
21       Q.  Okay.  And if you look on the last
22   page, which has been marked at the bottom as
23   Page 10, that's your signature on the last page?
24       A.  Yes.
                                                33

1        A.  Yes.
2        Q.  If you look above in the first
3    paragraph, the second to last sentence in the
4    answer it says, Officer Moore injured his left
5    wrist and Officer Galarza injured his shoulder
6    in the process.
7            Do you know how Officer Moore injured
8    his left wrist?
9        A.  No, I do not.  I don't know the
10   specifics.
11       Q.  Do you know how Officer Galarza injured
12   his shoulder?
13       A.  No.
14       Q.  And in the next sentence it states,
15   Officer Gillespie was kicked in the head by the
16   plaintiff breaking his glasses.
17           And you stated previously you didn't
18   see Officer Gillespie get kicked in the head?
19       A.  He stated that he was -- that's why we
20   were looking for his glasses.
21       Q.  Sure.  But you never saw Officer
22   Gillespie get kicked in the head; right?
23       A.  No, I didn't actually see that.  No.
24       Q.  Did you have any conversations with
                                                35

1        Q.  If you look on Page 3, under answer --
2    there's an answer to question two, which is on
3    the previous page, which is Page 2, please
4    identify all persons including but not limited
5    to police officers who witnessed or have
6    knowledge of the incident alleged in the
7    plaintiff's complaint.  And if you turn back to
8    Page 3, in the second paragraph, which is in the
9    middle of the page --
10       A.  Uh-huh.
11       Q.  -- in the last sentence says Officer
12   Gerald Johnson and Lieutenant White were on the
13   scene at some point?
14       A.  Yes.
15       Q.  Did you ever see Officer Johnson or
16   Lieutenant White on the scene that night?
17       A.  Yes.
18       Q.  When did you see them on the scene?
19       A.  I don't recall the exact point.
20       Q.  Were they at the scene when you
21   arrived, when you first arrived?
22       A.  No.
23       Q.  And do you know if you saw them after
24   Mr. Boyle was placed into custody?
                                                34

1    Officer Moore or Officer Torres about them
2    hearing a horn on October 18th, 2008 in relation
3    to the Chrysler?
4        A.  No.  Not other than after the report,
5    after the incident.
6        Q.  Okay.  Did you read the police report
7    after the incident?
8        A.  Yeah, I believe I did review it for --
9    I saw a copy of it before we went to court.
10       Q.  Was that the only time that you read
11   the police report?
12       A.  That I can recall.
13       Q.  So was that the first time that you
14   learned about the suspicious vehicle on October
15   18th, 2008?
16       A.  I don't recall exactly what the
17   original dispatch was.
18       Q.  Well, you said the dispatch was a 10-1?
19       A.  No.  But what I'm saying if there was
20   radio traffic leading up to that point.  I don't
21   recall.  I was responding to the 10-1.
22       Q.  Well, when you arrived at the scene on
23   October 18th, 2008, did you -- what did you know
24   about what was taking place?
                                                36

9 (Pages 33 to 36)

1    A.   Other than the fact that the 10-1 went
2  out, that's what I was responding to.  That's
3  all I can recall at this point.  I was
4  responding to the 10-1.
5    Q.   Did you know anything about a
6  suspicious vehicle when you arrived on the
7  scene?
8    A.   I don't recall.
9    Q.   Did you know if there was a suspect
10  that was resisting arrest when you arrived on
11  the scene?
12    A.   No.  I was responding to the call, the
13  10-1.  So I was responding to the officer's
14  request for assistance and that --
15    Q.   So is your testimony that the dispatch
16  didn't say anything about a suspicious vehicle?
17    A.   I don't recall exactly what was said
18  over dispatch.
19    Q.   Okay.  If you look on Page 6, and this
20  answer asks -- I'm sorry, this question asks for
21  your understanding of the policies and customs
22  that govern writing of any log report when an
23  individual is arrested and when the custody is
24  transferred to the City of Chicago Police
                                                    37

1  sentence in answer to question 9.
2    What plain clothes were you wearing on
3  that night?
4    A.   I don't recall exactly what I was
5  wearing.
6    Q.   But you weren't wearing your uniform?
7    A.   Correct.
8    Q.   Did you have any identification on you
9  like a badge or a --
10    A.   Yes, I had -- I wore a badge holder.
11    Q.   And were you wearing that around your
12  neck?
13    A.   Yes.
14    Q.   Have you ever been disciplined during
15  your employment at the University of Chicago
16  Police Department?
17    A.   No.
18    Q.   Have you ever been written up while
19  working for the University of Chicago Police
20  Department?
21    MR. PUISZIS:  Objection.  What do you mean
22  by written up?
23  BY MR. KSIAZEK:
24    Q.   I mean, have you ever been -- I'm not
                                                    39

1  Department.
2    As a University of Chicago officer, you
3  can't arrest anyone; right?
4    A.   Correct.
5    Q.   Okay.  So basically what University of
6  Chicago officers do is you will detain a
7  suspect; right?
8    A.   Correct.
9    Q.   Then you will wait for the Chicago
10  Police Officers to arrive?
11    A.   Yes.
12    Q.   And the Chicago police officer will
13  actually arrest?
14    A.   Yes, they do the arrest report.
15    Q.   And the University of Chicago officers
16  they also write their own reports; right?
17    A.   Yes, they do an in-house report.
18    Q.   And they also patrol, the University of
19  Chicago officers also patrol certain areas?
20    A.   Yes, in our designated areas of patrol.
21    Q.   So if you look on Page 7 of this
22  document, under question 9, it states I was
23  working an investigation in plain clothes on
24  behalf of the University.  That's the second
                                                    38

1  sure if there's anything -- if there's a
2  difference between write up or discipline, but
3  have you ever been written up for any reason?
4    A.   I have not been disciplined.
5    Q.   Okay.  Have you ever been -- have you
6  ever had any investigations or any complaints
7  against you?
8    A.   I was subject of an investigation.
9    Q.   What was -- when did this investigation
10  take place?
11    MR. PUISZIS:  Let me object because it's
12  irrelevant, but you can go ahead and answer the
13  question.
14    THE WITNESS:  I believe it was in July of
15  2008.
16  BY MR. KSIAZEK:
17    Q.   And what happened to cause this
18  investigation to take place?
19    A.   The University officers responded to a
20  call along with Chicago Police, and in the
21  Chicago Police report it stated that OC spray
22  was used by a University of Chicago police
23  officer.
24    So the responding University of Chicago
                                                    40

10 (Pages 37 to 40)

1      Police Officers had an investigation opened on
2      them by the Department to verify that this was
3      not the case. We do not carry OC spray. It's
4      not issued to us, and we're not authorized to
5      use it. So it was unfounded.
6          Q.  Just what is OC spray?
7          A.  Oleoresin Capsicum. It's similar to a
8      pepper spray. We are not authorized to carry or
9      deploy it.
10         Q.  And you were working -- in July of
11     2008, you were working on this surveillance
12     unit?
13         A.  Yes.
14         Q.  That was Unit 152; right?
15         A.  Yes.
16         Q.  Have you ever been sued in your
17     capacity as University of Chicago police officer
18     before?
19         A.  No.
20         Q.  Outside of this lawsuit, obviously
21     outside of this lawsuit.
22             Did you have a computer in your vehicle
23     on October 18th, 2008?
24         A.  No.

                                                    41

1          Q.  So when you would get some information
2      -- or when you would request information about a
3      potential suspect, you would relay
4      information to dispatch; right?
5          A.  Yes.
6          Q.  And dispatch would tell you, for
7      instance, if you had a license plate number,
8      they would tell you who the owner of the car
9      was?
10         A.  Yes.
11         Q.  Is there anything else that you wish to
12     state or can think of in relation to this
13     incident on October 18th, 2008?
14         A.  No.
15         Q.  Are there any other conversations that
16     you had on October 18th, 2008 that we haven't
17     spoken about today with anyone?
18         A.  Not that I can recall.
19         MR. KSIAZEK:  I don't have any further
20     questions.
21         MS. GIBBONS:  I just have a few questions.
22                   EXAMINATION
23     BY MS. GIBBONS:
24         Q.  Hi, Officer, I'm Helen Gibbons. I'm

                                                    42

1      one of the attorneys representing the City of
2      Chicago Police Officers.
3              I just want to step back to the
4      incident to understand who you saw there and
5      when you noticed CP on the scene.
6              So you said that you noticed the
7      Chicago Police Officers after the subject was in
8      custody?
9          A.  Yes, after the cuffs had been placed on
10     him.
11         Q.  Okay. But you didn't recall if
12     Mr. Boyle was still on the ground or if he was
13     standing up?
14         A.  Correct.
15         Q.  Do you recall about how many Chicago
16     Police Officers were on the scene?
17         A.  I don't recall exactly. I know it was
18     -- there was at least one patrol unit, and I
19     believe a sergeant responded. I don't have the
20     specific beats or names.
21         Q.  Okay. That was going to be my next
22     question. You don't know any of the CP officers
23     or the sergeant?
24         A.  I don't recall.

                                                    43

1          Q.  Do you recall -- or do you know or have
2      you come to know any of their names?
3          A.  I believe it was -- yeah, I can't -- I
4      can't recall.
5          Q.  Now, after Mr. Boyle was in custody,
6      did he -- when the handcuffs were on him, did he
7      continue to struggle and fight against the
8      University of Chicago Police Officers?
9          A.  Yes. After the handcuffs were placed
10     on him, I believe he was still struggling.
11         Q.  Do you recall for about how long?
12         A.  No, I do not.
13         Q.  And do you recall if the Chicago Police
14     Officers were on the scene when Mr. Boyle was
15     still struggling?
16         A.  I don't recall.
17         Q.  And do you recall who walked Mr. Boyle
18     -- you know what, I'm sorry you already
19     testified to that.
20         MS. GIBBONS:  Those are all the questions I
21     have.
22                   EXAMINATION
23     BY MR. PUISZIS:
24         Q.  The investigation that you talked

                                                    44

11 (Pages 41 to 44)

1    about, that was -- was there a citizen who filed
2    a complaint against you?
3        A.  No, it was not a citizen complaint.  It
4    was internal generated by our former deputy
5    chief.
6        Q.  And that was to simply investigate
7    whether you or any other University of Chicago
8    officer who responded to this particular
9    incident had or used pepper spray?
10       A.  Yes.
11       Q.  And what was the result of that
12   investigation?
13       A.  It was unfounded.
14       Q.  So neither you nor any other University
15   of Chicago officer carried pepper spray or used
16   pepper spray in connection with that incident;
17   correct?
18       A.  Correct.
19       Q.  Now, you mentioned University of
20   Chicago is not permitted to use OC or pepper
21   spray?
22       A.  Right.
23       Q.  Does the University of Chicago allow
24   its officers to carry the big long cal

45

1    its station in October of 2008 have a lockup
2    facility?
3        A.  No.
4        Q.  Did it have any capacity to inventory
5    property or anything like that?
6        A.  No.
7        Q.  Are you allowed now or then to make
8    traffic offenses or arrests for traffic
9    offenses?
10       A.  No.
11       Q.  Now or then are you allowed to take
12   someone into custody back to the University of
13   Chicago station?
14       A.  No.
15       Q.  If you see someone commit a crime, what
16   are you permitted to do?
17       A.  To place them into custody and detain
18   them for -- notify Chicago Police Department and
19   turn them over to the City of Chicago Police.
20       Q.  And then who prepares the police
21   reports and go to court, and who fills out the
22   criminal complaints?
23       A.  The Chicago Police Department.
24       Q.  Does the University of Chicago officers

47

1    flashlights?
2        A.  No.
3        Q.  Did you see anyone from the University
4    of Chicago carrying any big cal flashlights that
5    night?
6        A.  No.
7        Q.  Are you permitted to carry any type of
8    flashlight?
9        A.  Yes, the --
10       Q.  Can you describe the type of flashlight
11   you're allowed to carry?
12       A.  Yes, the small -- they refer to it as
13   the stinger style flashlights, the poli -- the
14   plastic.
15       Q.  How big are they?
16       A.  They're approximately eight -- I
17   believe about eight inches in length.
18       Q.  So maybe the size of two fists?
19       A.  Yes, approximately.
20       Q.  Not the 16 or 20 inch flashlights that
21   you might see that you can purchase in a
22   commercial establishment?
23       A.  Correct.
24       Q.  Now, does the University of Chicago at

46

1    have any authority to do that?
2        A.  No.
3        Q.  Would it be fair to say that you have
4    not been provided full police powers as a
5    University of Chicago officer?
6        MR. KSIAZEK:  Objection, calls for a legal
7    conclusion.  You can answer.
8        MR. PUISZIS:  Go ahead.
9        THE WITNESS:  Correct.  Yes.
10   BY MR. PUISZIS:
11       Q.  The areas that you patrol, are they
12   also patrolled by the City of Chicago police?
13       A.  Yes.
14       Q.  Are there any areas that you patrol
15   that the City of Chicago does not patrol?
16       A.  No.
17       Q.  Have you been delegated an exclusive
18   public function to patrol any areas of the
19   University of Chicago campus or any part of the
20   City of Chicago that the Chicago Police are not
21   authorized to patrol?
22       A.  No.
23       Q.  Have you been delegated any exclusive
24   public authority to do anything that the City of

48

12 (Pages 45 to 48)

Chicago police officers are not permitted to do?
A. No.
Q. And there are certain things you cannot do; is that correct?
A. Correct.
Q. Do you recall if the vehicle -- the silver Chrysler that you were talking about earlier if it was facing eastbound or westbound or do you recall one way or the other?
A. I believe there were -- there were two silver Chryslers, the subject's vehicle and I believe that night I may have been driving a silver vehicle also. So the subject Boyle's vehicle was facing eastbound and my vehicle was facing westbound.
Q. Was Mr. Boyle allowing himself to be handcuffed?
A. No.
Q. Is it lawful to resist any arrest whatsoever?
A. No.
Q. And is it proper to put someone in handcuffs to protect an officer's safety?
A. Yes.

MR. PUISZIS: I don't have anything else.

FURTHER EXAMINATION

BY MR. KSIAZEK:
Q. Okay. Just where was your vehicle parked in relation to you said the subject's vehicle, the silver Chrysler?
A. I don't recall the exact orientation where they were. I know my vehicle was facing westbound.
Q. Do you know how far apart from the silver Chrysler your vehicle was parked?
A. No, I do not recall.
MR. KSIAZEK: Nothing further.
MR. PUISZIS: No further questions.
MS. GIBBONS: I have nothing further.
MR. KSIAZEK: We'll reserve.
(Whereupon, the deposition concluded at 11:16 o'clock a.m.)

(FURTHER DEPONENT SAITH NAUGHT.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE, )
Plaintiff, )
-vs- ) No. 09 C 1080
UNIVERSITY OF CHICAGO )
POLICE OFFICER LARRY )
TORRES, et al., )
Defendants. )

I, MICHAEL KWIATKOWSKI, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken on the 10th day of November, 2009; that I have read the foregoing transcript of my deposition, consisting of pages 6 through 50 inclusive, and affix my signature to same.

____________________________
MICHAEL KWIATKOWSKI

Subscribed and sworn to before me this ________ day of ______________, 2010.

__________________________
Notary Public

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, ATHANASIA MOURGELAS, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on the 10th day of November 2009, personally appeared before me, at 222 North LaSalle Street, Suite 300, Chicago, Illinois, MICHAEL KWIATKOWSKI, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein CHARLES BOYLE, is the Plaintiff, and UNIVERSITY OF CHICAGO POLICE OFFICER, et al., are the Defendants.

I further certify that the said MICHAEL KWIATKOWSKI was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as

1    aforesaid.

2        I further certify that the signature to

3    the foregoing deposition was reserved by counsel

4    for the respective parties.

5        I further certify that the taking of this

6    deposition was pursuant to notice and that there

7    were present at the deposition the attorneys

8    hereinbefore mentioned.

9        I further certify that I am not counsel

10   for nor in any way related to the parties to

11   this suit, nor am I in any way interested in the

12   outcome thereof.

13       IN TESTIMONY WHEREOF:  I have hereunto

14   set my hand and affixed my notarial seal this

15   6th  day of January, 2010.

16

17

18

19

20

21    NOTARY PUBLIC, COOK COUNTY, ILLINOIS

22    LIC. NO. 84-4329

23

24

                                                           53

---

1       McCorkle Court Reporters, Inc.
           200 N. LaSalle Street Suite 300

2         Chicago, Illinois 60601-1014

3

4   January 6th, 2010
   Mr. Steve M. Puiszis

5   Hinshaw & Culbertson
   222 North LaSalle Street

6

   IN RE: Boyle v. University of Chicago, et al.

7   COURT NUMBER: 09 C 1080
   DATE TAKEN:  November 10, 2009

8   DEPONENT: Michael Kwiatkowski

9   Dear Mr. Puiszis:

10   Enclosed is the deposition transcript for the
    aforementioned deponent in the above-entitled

11   cause. Also enclosed are additional signature
    pages, if applicable, and errata sheets.

12

    Per your agreement to secure signature, please

13   submit the transcript to the deponent for review
    and signature.  All changes or corrections must

14   be made on the errata sheets, not on the
    transcript itself.  All errata sheets should be

15   signed and all signature pages need to be signed
    and notarized.

16

    After the deponent has completed the above,

17   please return all signature pages and errata
    sheets to me at the above address, and I will

18   handle distribution to the respective parties.

19   If you have any questions, please call me at the
    phone number below.

20

21   Sincerely,
    Margaret Setina      Athanasia Mourgelas

22   Signature Department     Court Reporter
              (312) 263-0052

23   cc: Mr. Ksiazek, Ms. Gibbons.

24

                                                           54

14 (Pages 53 to 54)

**A**

above-entitled
54:10
achieved
6:8
Adams
2:4
additional
54:11
address
13:19,21  54:17
affix
51:16
affixed
53:14
aforementioned
54:10
aforesaid
51:13 52:18
53:1
agreement
54:12
ahead
40:12 48:8
air
20:8,11,14
Airborne
6:15
al
1:9 51:9 52:14
54:6
alleged
34:6
allow
45:23
allowed
46:11 47:7,11
allowing
49:16
altercation
30:4
amount
20:6 23:4
annual
12:11
answer
4:21 5:1,3,6
11:14 19:24
34:1,2 35:4
37:20 39:1
40:12 48:7
answering
4:24
answers
5:10 33:10
anybody
25:10
anybody's
27:4
apart
50:10
appearance
31:14 32:23
APPEARANCES
2:1
appeared
31:15 52:8
applicable
54:11
approximately
7:1,2 8:2,7
9:11 10:21
14:7,11,22
15:2 16:6,12
16:23 25:13
25:17 46:16
46:19
area
10:1,14,16,18
areas
10:3,22 38:19

38:20 48:11
48:14,18
arms
17:22 18:7
19:5,6 22:3
22:12 27:5
arrest
22:2 37:10
38:3,13,14
49:19
arrested
37:23
arrests
47:8
arrive
14:16,20 23:19
28:2 38:10
arrived
17:21 18:10
21:2 22:15
23:10,17
25:14 34:21
34:21 36:22
37:6,10
asked
30:20,23 31:7
asking
5:8 9:11 15:20
asks
37:20,20
assigned
8:10 11:22
assignment
8:18,22 9:20
12:1
assist
19:16 21:20,24
23:19 30:6
assistance
37:14
ASSISTANT
2:18
assisted
27:13
ASSOCIATES
2:2
Athanasia
1:15,23 52:4
54:21
attempt
21:20
attempting
17:6,15,17
26:3 30:5
attention
23:21
attorneys
43:1 53:7
August
7:22
authority
10:1,14 48:1
48:24
authorized
41:4,8 48:21
a.m
1:20 4:2 50:19

**B**

B
3:12
bachelor's
6:8,10
back
10:15 18:21
29:1 34:7
43:3 47:12
background
6:7
badge
39:9,10

basically
4:18 10:9 38:5
beat
8:10,13,15,19
8:22 9:2,4,6
11:21,23,24
13:15
beats
43:20
began
4:2
behalf
38:24
believe
10:2,8 13:21
15:11 17:21
18:10 19:15
20:9 21:12
21:12 23:13
26:13,19
28:3 29:7
31:4,17 32:2
32:24 36:8
40:14 43:19
44:3,10
46:17 49:10
49:12
belly
18:21
best
4:22 5:9
big
45:24 46:4,15
Blackstone
15:11,13 16:8
block
16:12
blocks
15:1,2
bottom
33:22
boundaries
8:15 10:10,12
boundary
8:17
Boyle
1:4 18:1,4,13
18:16,18,19
19:1,8,8,11
19:14,17
20:18,20
21:3,20,24
22:1,7,10,18
23:8 24:5,7
24:10 25:16
25:22,24
26:6,12,16
27:7,14,18
27:22 28:10
28:14,17,20
29:5,9,13
30:5,7,9
32:12 34:24
43:12 44:5
44:14,17
49:16 51:4
52:12 54:6
Boyle's
18:7,14 20:7
20:17 22:3
26:23 49:13
break
19:5
breaking
35:16

**C**

C
1:6 2:19 51:6
52:3 54:7
cal

45:24 46:4
call
15:24 21:8
28:18,24
29:22 37:12
40:20 54:19
called
1:12
calls
48:6
campus
10:6,14 11:2,8
48:19
capacity
9:22 41:17
47:4
Capsicum
41:7
car
11:16,18,19
24:12 26:14
42:8
carried
45:15
carry
41:3,8 45:24
46:7,11
carrying
46:4
cars
23:16,22
case
31:12,20 32:15
41:3
cause
40:17 52:10,18
54:11
cc
54:23
certain
38:19 49:3
certify
52:6,15 53:2,5
53:9
changes
54:13
characteriz...
19:20
characterize
20:3
Charles
1:4 17:24
32:12 51:4
52:12
Chicago
1:7 2:5,12,15
5:21,24 6:22
6:24 7:9,12
7:15,19 13:3
13:4 17:2,2
17:4 22:22
24:11 26:22
28:1,6,15,21
30:12,16
37:24 38:2,6
38:9,12,15
38:19 39:15
39:19 40:20
40:21,22,24
41:17 43:2,7
43:15 44:8
44:13 45:7
45:15,20,23
46:4,24
47:13,18,19
47:23,24
48:5,12,15
48:19,20,20
49:1 51:7
52:9,13 54:2
54:6

chief
45:5
Chrysler
23:23 24:2,6
25:5 36:3
49:7 50:6,11
Chryslers
49:11
Circuit
52:11
citizen
45:1,3
City
2:24 37:24
43:1 47:19
48:12,15,20
48:24
Civil
1:13
class
12:20
clear
5:12
cleared
28:24 29:2
closest
24:11
clothes
38:23 39:2
come
44:2
commercial
46:22
commit
47:15
complaint
34:7 45:2,3
complaints
40:6 47:22
completed
54:16
completion
21:8
computer
41:22
Computer-Aided
52:22
concluded
50:18
conclusion
48:7
conjunction
32:15
connection
45:16
consisting
51:15
continue
44:7
control
22:3,12 27:5
conversation
22:17 29:24
31:10
conversations
25:1 29:8,12
29:16 30:11
35:24 42:15
Cook
1:16 52:5,12
53:21
copy
36:9
CORPORATION
2:18
correct
9:16 13:1,2,8
26:5 38:4,8
39:7 43:14
45:17,18
46:23 48:9

49:4,5 52:23
corrections
54:13
Cottage
10:15,20
counsel
2:18 33:11
53:3,9
County
1:16 52:3,5,5
52:12 53:21
court
1:1 5:12 31:14
31:16,18
32:22,24
36:9 47:21
51:1 52:11
54:1,7,22
Courts
1:14
CP
43:5,22
crime
47:15
criminal
6:8 47:22
cross
10:12
cuffs
43:9
Culbertson
2:9 54:5
current
6:19
currently
11:21 12:3,21
13:9
custody
16:1,20 17:7
17:16 27:24
28:9 29:9,14
34:24 37:23
43:8 44:5
47:12,17
customs
37:21

**D**

D
3:1
data
12:14,16,23
DATE
54:7
day
1:18 31:2
51:13,21
52:7 53:15
days
9:9 13:10,12
31:5
day-to-day
10:23
Dear
54:9
Defendant
2:14,23
Defendants
1:10 51:10
52:14
degree
6:11
delegated
48:17,23
Department
6:24 7:9,16
13:4,5 28:2
28:15,22
38:1 39:16
39:20 41:2
47:18,23

54:22
departments
7:8
depending
10:16,17
deploy
41:9
deponent
50:21 51:12
54:8,10,13
54:16
deposition
1:11 3:14 4:1
4:12,15 33:5
33:17 50:17
51:13,15
53:3,6,7
54:10
depositions
1:14
deputy
45:4
describe
16:21 46:10
designated
38:20
details
14:4
detain
38:6 47:17
difference
40:2
direction
20:21 21:4
discipline
40:2
disciplined
39:14 40:4
dispatch
13:23 14:2,6,9
14:13,15
15:4,6 31:24
32:3,5,9
36:17,18
37:15,18
42:4,6
dispatched
14:10
distance
24:17
distribution
6:16,17 54:18
District
1:1,2,13 51:1
51:2
DIVISION
1:3 51:3
document
33:12,14,19
38:22
documents
33:16
doing
4:18 11:8 15:3
19:1,3
Drexel
14:7,17,21
driving
49:12
duly
6:2 51:11
52:16
duties
10:24

E

E
3:1,12
earlier
11:5 27:2 49:8
east

10:15 13:20
eastbound
49:8,14
EASTERN
1:3 51:3
ED
2:2
educational
6:6
eight
15:2 46:16,17
either
27:10 28:21
employment
39:15
enclosed
54:10,11
errata
54:11,14,14,17
establishment
46:22
et
1:9 51:9 52:14
54:6
everybody
32:5
exact
14:4 23:4
24:17 34:19
50:7
exactly
14:3,23 16:11
16:13 18:9
23:14,18
26:15 27:12
28:3,13,16
32:13 36:16
37:17 39:4
43:17
examination
1:12 3:2 6:4
42:22 44:22
50:2
examined
6:2
exclusive
48:17,23
exerted
20:6
Exhibit
3:14 33:2,5,9
exited
16:16,17 22:16
22:21 23:11
25:15
explain
4:18 8:14
Express
6:16
extent
29:24

F

facedown
18:19
facility
47:2
facing
24:3 49:8,14
49:15 50:8
fact
37:1
faculty
11:2
fair
48:3
far
14:16,24 16:9
24:6,10
50:10
feet

24:14
fifth
23:19
fight
44:7
filed
32:24 45:1
fill
32:14,17,19,22
fills
47:21
finish
11:13
firearms
12:11,15,23
first
4:14,19 6:2
7:11,14
16:22 22:15
23:10 24:18
25:14 28:6
34:21 35:2
36:13 51:11
52:16
fists
46:18
five
16:23
flashlight
46:8,10
flashlights
46:1,4,13,20
focus
11:4,7 22:11
23:20
focused
27:4
following
31:5
follows
6:3
force
20:6
foregoing
51:14 52:23
53:3
former
45:4
found
21:10,16
four
22:22 25:20
26:4 30:15
fourth
23:19
FOX
2:2
free
19:6
full
48:4
function
48:18
further
3:7 28:18
42:19 50:2
50:13,14,15
50:21 52:15
53:2,5,9

G

Galarza
17:10,14,19,22
18:6 19:15
22:24 23:3
25:21 27:2
27:10 29:17
30:18 35:5
35:11
general
11:6,8

generated
45:4
Gerald
34:12
Gibbons
2:19 3:5 42:21
42:23,24
44:20 50:15
54:23
Gillespie
17:10,15 18:12
18:14 20:17
20:18,23
21:5 25:21
27:2,11
29:20 30:2
30:17 35:15
35:18,22
Gillespie's
20:21 21:4,9
21:17
give
4:17 5:3 24:16
31:5
given
28:15,21 52:19
52:24
giving
5:10
glasses
20:24 21:5,9
21:11,14,17
29:22,23
35:16,20
go
10:15 20:8
28:18 40:12
47:21 48:8
going
4:17,19,20 5:3
20:13 43:21
govern
37:22
graduating
6:13
ground
4:18 18:19,20
18:21,22,23
19:1,9 24:7
26:10,11
27:7,13,15
27:19 28:11
30:5 43:12
Grove
10:15,20

H

H
3:12
half
7:1
hand
53:14
handcuffed
49:17
handcuffs
17:18 19:13
21:21,24
22:3,6,10
25:16 26:4,7
26:17 30:6
44:6,9 49:23
handed
33:8
handle
54:18
happen
4:19
happened
21:23 26:6,15
27:21 28:4

30:18 40:17
head
5:5 35:15,18
35:22
headed
15:6
heading
14:14
headquarters
13:5
hear
22:17,17,20,21
23:2 24:18
24:19,22,22
25:1 27:17
heard
22:24
hearing
36:2
Helen
2:19 42:24
helped
22:2
hereinbefore
53:8
heretofore
52:7
hereunto
53:13
Hi
42:24
high
20:10
Hinshaw
2:9 54:5
hit
22:13
hold
6:14
holder
39:10
horn
36:2
hour
1:19
hours
9:7 13:11,13
13:15 14:11

I

ID
3:13
identification
33:6 39:8
identify
34:4
Illinois
1:2,17,18 2:5
2:12,21 51:2
52:1,6,10,12
53:21 54:2
inch
46:20
inches
46:17
incident
31:4 34:6 36:5
36:7 42:13
43:4 45:9,16
incidents
10:4
including
34:4
inclusive
51:16
individual
37:23
information
42:1,2,4
injured
35:4,5,7,11

injury
32:19
inside
25:5,10
instance
42:7
interested
53:11
internal
45:4
Interrogato...
33:10
interrogatory
33:20
inventory
47:4
investigate
45:6
investigating
9:24 10:6,13
10:19
investigation
38:23 40:8,9
40:18 41:1
44:24 45:12
investigations
40:6
involvement
31:11
in-house
38:17
irrelevant
40:12
Island
10:16,17,21
issued
41:4

J

January
31:17,18 32:23
53:15 54:4
job
7:11
jobs
6:14
Johnson
34:12,15
JONATHAN
2:3
July
9:19 40:14
41:10
June
7:6
justice
6:9

K

K
52:3
kick
20:18,20
kicked
35:15,18,22
kicking
19:4,11,17,18
20:2 21:3
kind
19:5
knew
26:24
know
7:5 10:10 14:8
14:9,24 16:9
17:1 19:12
19:20 20:10
20:23 21:7
21:10,16
22:9 23:14

23:16,18
24:14 25:8,9
25:19 26:13
26:21 27:1
28:1 29:2
30:23 31:2
32:3 34:23
35:7,9,11
36:23 37:5,9
43:17,22
44:1,2,18
50:8,10
**knowledge**
4:22 34:6
**Ksiazek**
2:3 3:4,7 4:4
4:8,11,14,17
4:24 5:8,15
5:18 6:5
9:13 11:15
20:1 25:12
33:2,7 39:23
40:16 42:19
48:6 50:3,13
50:16 54:23
**Kwiatkowski**
1:11 3:3 4:6,8
6:1 51:11,18
52:10,16
54:8
**K-W-I-A-T-K...**
4:7

**L**

**lake**
10:16,17
**LARRY**
1:8 51:8
**LaSalle**
1:17 2:11,20
52:9 54:1,5
**lawful**
49:19
**lawsuit**
41:20,21
**laying**
18:20 24:5,7
24:11
**leading**
36:20
**learn**
17:23 32:11
**learned**
36:14
**left**
18:7 35:4,8
**legal**
48:6
**legs**
18:15 20:8,10
20:13,17
**length**
46:17
**let's**
13:22
**LIC**
53:22
**license**
1:24 42:7
**Lieutenant**
34:12,16
**limited**
34:4
**located**
24:2 25:4
26:22
**location**
14:14 27:4
**lockup**
47:1
**log**

37:22
**long**
6:23 8:22 9:2
9:6 14:19
25:13 44:11
45:24
**longer**
28:1
**look**
19:21 33:21
34:1 35:2
37:19 38:21
**looking**
21:8 29:23
35:20
**loud**
5:2,6

**M**

**M**
2:10 54:4
**maintain**
22:2
**maintaining**
11:1,8 22:12
27:5
**manager**
6:16
**Margaret**
54:21
**mark**
33:2
**marked**
3:13 11:18
33:6,9,22
**McCorkle**
54:1
**mean**
9:21,22 19:20
39:21,24
**mentioned**
46:19 53:8
**Michael**
1:11 3:3 4:6
6:1 51:11,18
52:10,15
54:8
**Michigan**
6:9,13
**middle**
7:3 34:9
**miles**
15:1
**military**
7:23
**minutes**
14:22 25:17,18
**mobile**
12:14,16,23
**months**
9:8,12,14,17
**Moore**
17:11,15 19:7
25:21 27:3
27:10 29:10
30:17 35:4,7
36:1
**morning**
30:18
**Mourgelas**
1:15,23 52:4
54:21
**moved**
21:19

**N**

**N**
3:1 54:1
**name**
4:4,5

**named**
25:20
**names**
43:20 44:2
**NAUGHT**
50:21
**neck**
39:12
**need**
54:15
**neither**
45:14
**never**
35:21
**new**
12:4
**night**
17:24 20:24
23:24 30:13
32:9 34:16
39:3 46:5
49:12
**nine**
15:2
**north**
1:17 2:11,20
15:11 52:9
54:5
**NORTHERN**
1:2 51:2
**notarial**
53:14
**notarized**
54:15
**notary**
1:15 51:24
52:4 53:21
**notice**
18:24 25:4,7
53:6
**noticed**
43:5,6
**notify**
47:18
**November**
1:19 51:14
52:7 54:7
**number**
3:13 11:23
42:7 54:7,19

**O**

**O**
52:3,3
**oath**
5:16 51:12
**object**
40:11
**objection**
19:19,24 39:21
48:6
**observed**
15:23
**obtain**
6:10
**obviously**
41:20
**OC**
40:21 41:3,6
45:20
**occasion**
13:17
**October**
7:18 8:5,10,16
9:3,15,18
10:24 13:14
13:18,24
30:19 31:23
36:2,14,23
41:23 42:13
42:16 47:1

**offenses**
47:8,9
**officer**
1:8 4:8 17:10
17:11,19,21
18:3,6,12,14
19:7,12,15
20:17,18,21
20:23 21:3,5
21:9,16 22:6
22:9,13,24
23:2,20
25:20 29:9
29:13,17,19
30:1 34:11
34:15 35:4,5
35:7,11,15
35:18,21
36:1,1 38:2
38:12 40:23
41:17 42:24
45:8,15 48:5
51:8 52:14
**officers**
2:16 12:4,23
15:23 16:19
16:21,22
17:2,3,5,14
22:22 25:20
26:4,22 27:1
27:9,17 28:7
28:22,23
30:12,16
34:5 38:6,10
38:15,19
40:19 41:1
43:2,7,16,22
44:8,14
45:24 47:24
49:1
**officer's**
37:13 49:23
**okay**
4:22 5:6,8,13
6:6 8:18
10:5,23
12:22 13:11
15:16 16:2
16:14 17:14
19:7 21:19
25:11 27:6
30:21,24
31:8 33:21
36:6 37:19
38:5 40:5
43:11,21
50:4
**old**
8:8
**Oleoresin**
41:7
**once**
14:12 23:6
24:18 27:15
27:21 28:20
29:13
**opened**
41:1
**orientation**
50:7
**original**
36:17
**outcome**
53:12
**outside**
31:12 41:20,21
**owner**
42:8
**o'clock**
1:19 4:2 50:18

**P**

**page**
33:22,23,23
34:1,3,3,8,9
37:19 38:21
**pages**
51:15 54:11,15
54:17
**paperwork**
32:14
**paragraph**
34:8 35:3
**park**
16:2,5
**parked**
16:10,14 50:5
50:11
**part**
10:5 28:17
48:19
**particular**
45:8
**parties**
53:4,10 54:18
**partner**
11:10
**patrol**
11:1,6,8 13:7
15:5 24:12
29:1 38:18
38:19,20
43:18 48:11
44:14,15,18
48:21
**patrolled**
48:12
**patrolman**
7:17,18
**pattern**
10:3 11:5
**paying**
23:21
**pending**
52:11
**people**
23:13
**pepper**
41:8 45:9,15
45:16,20
**permitted**
45:20 46:7
47:16 49:1
**person**
19:21
**personally**
20:3 52:8
**persons**
34:4
**pertaining**
1:14
**phone**
54:19
**physically**
22:10
**pieces**
21:13
**place**
15:24 16:19
17:15,17
21:20 36:24
40:10,18
47:17
**placed**
22:4,10 26:7
26:17 27:24
34:24 43:9
44:9
**placing**
21:21,24 30:6
**plain**
38:23 39:2

**plaintiff**
1:5 2:7 35:16
51:5 52:13
**plaintiff's**
3:14 33:4,9
34:7
**plastic**
46:14
**plate**
42:7
**please**
4:4 34:3 54:12
54:17,19
**point**
16:2,18,24
18:16 21:6
25:14 27:6
29:10 30:7
34:13,19
36:20 37:3
**poli**
46:13
**police**
1:8 2:15 6:22
6:24 7:7,9
7:16 13:4,5
17:3 23:16
24:12 28:1,7
28:15,22
30:12,16
32:17 34:5
36:6,11
37:24 38:10
38:12 39:16
39:19 40:20
40:21,22
41:1,17 43:2
43:7,16 44:8
44:13 47:18
47:19,20,23
48:4,12,20
49:1 51:8
52:13
**policies**
37:21
**position**
6:19
**potential**
42:3
**powers**
48:4
**preparation**
33:17
**prepared**
33:10
**prepares**
47:20
**presence**
52:20
**present**
53:7
**preventing**
5:19
**previous**
34:3
**previously**
35:17
**primary**
23:20
**prior**
7:8 9:14
**Probably**
31:5
**Procedure**
1:13
**process**
35:6
**proper**
49:22
**property**
47:5

protect
49:23
provide
12:7,9
provided
48:4
public
1:16 48:18,24
51:24 52:4
53:21
Puiszis
2:10 3:6 9:9
11:13 19:19
25:7,11
39:21 40:11
44:23 48:8
48:10 50:1
50:14 54:4,9
pull
26:11
purchase
46:21
pursuant
1:12 53:6
put
13:22 17:6
19:13 22:6
26:3,14
49:22

———————
Q
———————
qualification
12:12
qualifications
12:16,23
quarter
16:12
question
8:24 11:13
14:18 15:19
19:24 26:9
34:2 37:20
38:22 39:1
40:13 43:22
questions
4:20 5:1,9
42:20,21
44:20 50:14
54:19

———————
R
———————
R
2:3
radio
32:3 36:20
rank
7:14
read
33:14,16 36:6
36:10 51:14
really
8:17 23:21
reason
40:3
recall
14:2,4,23
16:11,13
17:12,13
18:5,9,11
19:10 20:15
21:7,15
22:11 23:4,9
23:18 24:8,9
24:13,13,17
25:10 26:8
26:24 27:3
27:12,16,20
27:21 28:12
28:12 29:11
29:15,18

30:1,21 31:1
31:3,9,15
32:7,8,13
34:19 36:12
36:16,21
37:3,8,17
39:4 42:18
43:11,15,17
43:24 44:1,4
44:11,13,16
44:17 49:6,9
50:7,12
recap
12:22
received
14:12
recognize
17:5,9 33:12
record
4:5 5:12
reduced
52:21
refer
46:12
regarding
29:22
related
53:10
relation
17:19 18:3
19:8 36:2
42:12 50:5
relay
42:3
remember
15:9 26:14
remind
5:5
repeat
14:18
report
12:18,24 13:2
32:17,20,22
33:1 36:4,6
36:11 37:22
38:14,17
40:21
reported
1:23 52:19
reporter
5:12 54:22
Reporters
54:1
reports
38:16 47:21
representing
2:7,14,23 43:1
request
37:14 42:2
reserve
50:16
reserved
53:3
resist
49:19
resisting
22:2 23:1
37:10
respective
53:4 54:18
responded
15:24 40:19
43:19 45:8
responding
36:21 37:2,4
37:12,13
40:24
response
23:8
result
45:11

return
54:17
review
36:8 54:13
right
4:9 18:8 21:21
22:20 26:20
26:23 35:22
38:3,7,16
41:14 42:4
45:22
robberies
10:4
robbery
10:2 11:5,7
role
12:6
Room
2:20
route
15:9
RPS
6:15
rules
1:12 4:18

———————
S
———————
S
3:12
safety
11:1,9 22:13
23:20 49:23
signature
33:23 51:16
SAITH
50:21
saw
20:7,16,24
21:4 26:3
30:5 34:23
35:21 36:9
43:4
saying
36:19
says
34:11 35:4
scene
17:24 18:10
21:2 22:16
23:10,12,17
23:24 24:20
25:15 27:23
27:24 28:2,7
28:24 29:3,6
30:12 32:1,4
32:12 34:13
34:16,16,20
36:22 37:7
37:11 43:5
43:16 44:14
schedule
12:5
seal
53:14
second
34:8 35:3
38:24
section
10:12
secure
54:12
security
11:2,9
see
15:17,21 16:18
20:18,20
21:14 23:11
23:23 25:19
25:22,24
28:6 34:15
34:18 35:18
35:23 46:3
46:21 47:15

seeing
25:10
sentence
34:11 35:3,14
39:1
sergeant
6:20 7:21
43:19,23
serve
9:2
served
7:23
sat
8:17 53:14
Setina
54:21
shake
5:5
sheets
54:11,14,14,17
shift
13:9
Shore
10:17
Shortly
28:8
shoulder
35:5,12
side
18:7,8,10
26:20,23
signature
33:23 51:16
53:2 54:11
54:12,13,15
54:17,22
signed
54:15,15
silver
23:23 24:2,6
25:5 49:7,11
49:13 50:6
50:11
similar
41:7
simply
45:6
Sincerely
54:21
sir
4:10 6:17 8:1
situation
19:22
six
7:1 9:11,14
size
46:18
slow
32:6
small
46:12
sorry
20:16 37:20
44:18
specific
10:5 15:18
26:9 27:4
30:22 43:20
specifically
30:20
specifics
31:6,9 35:10
spelling
4:5
spoke
11:5 12:20
spoken
29:21 30:17
31:12 42:17
spray
40:21 41:3,6,8

45:9,15,16
45:21
squad
11:16 23:22
26:14
SS
52:2
staff
11:2
standing
18:16 26:17
43:13
started
7:2,5,15 14:14
state
1:17 4:4 6:9
6:13 42:12
52:1,6
stated
22:1 27:1
35:17,19
40:21
states
1:11,13 35:14
38:22 51:1
station
47:1,13
stenographi...
52:20
step
43:3
Steve
2:10 54:4
stinger
46:13
stomach
18:23
Stony
10:15,17,20
stood
27:7,15,18,22
28:11,21
stop
22:1,2,24
street
1:17 2:4,11,20
10:8,11,19
10:20 13:18
13:20,24
14:17,20
15:7,10,17
15:21,22
16:7,8,10
23:14 52:9
54:1,5
streets
10:13
strike
25:22,24 30:7
30:9
struck
22:14
struggle
44:7
struggling
19:4,12,18
44:10,15
students
11:3
style
46:13
subject
16:1,20 17:6
17:16,20,24
19:23 28:8
40:8 43:7
49:13
subjects
12:8,9
subject's
17:22 27:5

49:11 50:5
submit
54:13
suppoenaed
31:20
Subscribed
51:20
sued
41:16
suit
53:11
Suite
1:18 2:4,11
52:9 54:1
supervisor
6:15
sure
9:2 14:19
23:23 26:14
28:3,16
35:21 40:1
surveillance
8:20,21,23
9:21 41:11
surveying
9:23
suspect
32:11 37:9
38:7 42:3
suspicious
36:14 37:6,16
sworn
4:3 6:2 51:12
51:20 52:16

———————
T
———————
T
3:12
take
14:16,19 25:14
32:6 40:10
40:18 47:11
taken
1:15 4:12,15
29:6,9,13
51:13 54:7
talk
5:9 30:15
talked
44:24
talking
49:7
tall
8:1
tell
31:24 32:5,8
42:6,8
telling
13:23
terminals
12:14,16,24
testified
6:3 44:19
testify
52:16
testifying
5:19 31:21
testimony
37:15 52:18,24
53:13
thereof
53:12
things
49:3
think
42:12
three
12:19
time
4:14 8:20 10:2
10:8 14:8,9

36:10,13
times
5:4 23:2,5
today
5:16,19 31:13
33:18 42:17
Torres
1:9 17:10,15
18:3 25:21
27:3,10
29:13 30:17
36:1 51:9
to-wit
52:7
traffic
36:20 47:8,8
train
12:4,22
training
12:2,5,6,7,9
12:20
transcript
51:15 52:23
54:10,13,14
Transcription
52:22
transferred
37:24
transported
28:16
traveled
16:9
true
52:23
truth
52:17,17,17
truthfully
4:21 5:19
try
5:9
trying
15:24 16:19
19:5,13
turn
34:7 47:19
turned
15:12,14,16
28:4
turning
15:20
two
14:22 34:2
46:18 49:10
type
46:7,10
typewriting
52:22

**U**

UFS
6:17
uh-huh
5:4 34:10
uh-uh
5:4
understand
5:15 43:4
understanding
37:21
undetermined
52:11
unfounded
41:5 45:13
uniform
39:6
unit
23:19 41:12,14
43:18
United
1:1,13 51:1
University

1:7 2:15 6:9
6:14,22,23
7:8,12,15,19
10:1 11:3
13:4 15:23
17:1,4 22:22
24:11 26:22
30:16 38:2,5
38:15,18,24
39:15,19
40:19,22,24
41:17 44:8
45:7,14,19
45:23 46:3
46:24 47:12
47:24 48:5
48:19 51:7
52:13 54:6
unmarked
11:19,20
use
12:14,17,24
41:5 45:20
USF
6:16,18

**V**

v
54:6
various
12:7
vehicle
11:17 16:3,5,6
16:10,14,16
16:17 22:16
22:21 23:11
24:19 25:15
36:14 37:6
37:16 41:22
49:6,11,13
49:14,14
50:4,6,8,11
verbally
5:2
verify
41:2
violent
19:22,23
violently
19:18,21 20:2
20:4
vs
1:6 51:6

**W**

wait
38:9
walked
44:17
want
28:18 43:3
wasn't
23:21 27:24
28:17
way
9:19 13:22
22:15 33:16
49:9 53:10
53:11
wearing
20:24 21:5
39:2,5,6,11
weigh
8:3,5
went
15:11 19:16
20:10 21:23
29:1 36:9
37:1
weren't

39:6
west
2:4 16:7,7
westbound
15:14,16 24:4
49:8,15 50:9
we'll
5:5 50:16
we're
4:18 41:4
whatsoever
49:20
WHEREOF
53:13
White
34:12,16
wiggling
19:5
wish
42:11
witness
3:2 4:3,6,10
4:13,16,23
5:7,14,17,20
9:11 25:9
40:14 48:9
52:19,21,24
witnessed
34:5
witnesses
23:11 24:20
wore
39:10
work
6:21 9:17 13:3
worked
6:23 7:7
working
7:8 9:3,6,10
9:14 10:2,22
11:10 13:15
38:23 39:19
41:10,11
wrist
35:5,8
write
12:24 38:16
40:2
writing
12:18 13:2
37:22
written
39:18,22 40:3

**X**

X
3:1,12

**Y**

yeah
9:5 18:11
27:12 36:8
44:3
years
7:1 9:8

**0**

02:30
14:11
02:40
14:11
05:00
13:16
06:30
13:13
084-004329
1:24
09
1:6 9:19 31:17
51:6 54:7

**1**

1
8:2
10
3:15 33:3,5,9
33:23 54:7
10th
1:18 51:13
52:7
10-1
13:24 36:18,21
37:1,4,13
10:09
1:19 4:2
1080
1:6 51:6 54:7
11:16
50:18
13th
13:18
14:30
13:13
1435
13:17,20
152
8:14,15,19,23
9:3,4,6
13:15 41:14
16
46:20
170
11:23,24
18th
7:19 8:11
13:24 30:19
31:23 36:2
38:15,23
41:23 42:13
42:16
1999
6:12

**2**

2
34:3
20
46:20
20th
32:23
200
54:1
2002
7:2,3 9:3
2003
7:4,5,6,15
2008
7:19 8:6,11,16
9:15,18
10:24 13:14
13:18,24
30:19 31:23
36:2,15,23
40:15 41:11
41:23 42:13
42:16 47:1
2009
1:19 7:22
31:19 32:23
51:14 52:8
54:7
2010
51:22 53:15
54:4
21:00
13:16
222
1:17 2:11 52:8
54:5
263-0052
54:22

275
8:4
280
8:4

**3**

3
34:1,8
30
2:20
300
1:18.2:4,11
52:9 54:1
312
2:6,13,22
54:22
32
8:9
33
3:15
330
2:4
345-8877
2:6

**4**

42
3:5
44
3:6

**5**

50
3:7 51:16
53rd
10:9,11,19
13:18,20,24
14:17,20
15:7,10,12
15:15,17,21
15:22 16:7,8
16:10 24:3

**6**

6
3:4 8:2 37:19
51:16
6th
53:15 54:4
60th
14:7,17,21
60601
2:12
60601-1014
54:2
60602
2:21
60606
2:5
63rd
10:9,11,20

**7**

7
38:21
704-3000
2:13
744-3982
2:22

**8**

84-4329
53:22

**9**

9
38:22 39:1
900

2:20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES BOYLE,                                )
                          Plaintiff,          )
                                              )
v.                                            )
                                              )        No. 09 C 1080
UNIVERSITY OF CHICAGO POLICE                  )
OFFICER LARRY TORRES, et al.,                 )
                                              )
                          Defendants.         )

**EXHIBIT**
Plaintiff's
10
1:10cqWJLIFIO

## DEFENDANT KWIATKOWSKI'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

Defendant, UNIVERSITY OF CHICAGO POLICE OFFICER KWIATKOWSKI ("Kwiatkowski"), by and through his attorneys, Hinshaw & Culbertson LLP, and for his answers to Plaintiff's Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Defendant's responses to plaintiff's interrogatories are made solely for the purpose of this litigation. Any response made and any information provided by the defendant through these answers are subject to objections as to the competency, relevancy, materiality, propriety, or admissibility of the information sought in plaintiff's interrogatories and defendant's responses thereto. Any information provided through any answer or response is further subject to any and all other objections that would require the exclusion of any information provided herein if that information is sought to be elicited at any further proceeding including the trial of plaintiff's claims, and/or if the information identified herein is asked of or disclosed by a witness testifying at any further proceeding. All of the aforementioned objections are hereby expressly reserved and may be interposed at a later date.

Any answers or responses herein are based on present knowledge, information and belief, and are made without prejudice to the objections set forth herein. Defendant specifically reserves the right to amend and/or supplement his responses at any time to introduce information

not identified herein if it should it become known at any time through further investigation, and defendant obtains additional or different information from that provided herein. Defendant expressly reserves the right to revise, correct, add to or clarify any answer, response and/or objections set forth below. Defendant further specifically reserves the right to rely upon such facts or documents and persons having knowledge of such facts or documents, as may be derived through future discovery or through his continuing investigation in this matter, or as may be adduced at trial.

Any answer or response set forth below is based on information presently available to defendant, and except for explicit facts expressly set forth herein, no incidental or implied admissions are intended thereby. The fact that defendant has answered, responded or objected to any paragraph of plaintiff's interrogatories or any part thereof, is not intended to be and should not be construed to be an admission by the defendant that he accepts or admits the existence of any facts set forth or assumed by said discovery requests, nor should it be construed as a waiver by the defendant of all or any part of objection to any request for production made by plaintiff. The fact that defendant has answered, responded to, or objected to any paragraph of plaintiff's interrogatories should not be taken as an admission that such answer, response or objection constitutes admissible evidence.

## ANSWERS TO INTERROGATORIES

1.    Please identify (including title) all persons who assisted in the responses to these interrogatories.

**ANSWER:**    Michael Kwiatkowski. My attorney, Steven Puiszis, consulted with me in preparing these answers.

2.    Please identify all persons, including but not limited to police officers, who witnessed or have knowledge of the incident alleged in the Plaintiff's Complaint.

2

ANSWER:     Objection, the defendant objects to Interrogatory No. 2 because it is vague and ambiguous it that it refers to "the incident alleged in plaintiff's Complaint." Plaintiff's claims include allegations concerning his arrest and the purported use of force against him as well as a state law claim of malicious prosecution. Therefore, the term "incident" as used in Interrogatory No. 2 is vague and ambiguous. Subject to that objection and without waiving same, Officer Clarence Moore and Larry Torres were the original two officers from the University of Chicago on the scene. After the University of Chicago dispatcher called for a 10-1, or officers in need of assistance, other University of Chicago officers responded to the scene including Oscar Galarza, Michael Kwiatkowski, and Arthur Gillespie. Galarza, Kwiatkowski and Gillespie assisted Torres and Moore at some point in getting the plaintiff to the ground and then handcuffing him. Officer Moore injured his left wrist and Officer Galarza injured his shoulder in the process. Officer Gillespie was kicked in the head by the plaintiff, breaking his glasses.

Other officers from the University of Chicago also responded and would have seen the plaintiff either on the ground or in handcuffs or being escorted to a City of Chicago squad car for transportation. Officer Gerald Johnson and a Lieutenant White from the University of Chicago Police Department were on the scene at some point.

Officers from the City of Chicago would have also responded to the scene in connection with a call for assistance and would have transported Charles Boyle to the local police station for processing and would have prepared his paperwork. They would have included Officers Darling and Martin. Other offices from the City of Chicago may also have responded as well, I don't know their names. I believe there were other individuals who were at the scene who may or may not have witnessed some or all of what transpired, including an Ashley Glover, Kenneth Roberson and Steven Sinclair. The defendant's investigation continues.

3

3.      Please identify all persons, including but not limited to police officers, who are believed by defendant to have knowledge supporting Defendant's denials of Plaintiff's allegations. Briefly summarize what knowledge Defendant believes each person may possess.

<u>ANSWER:</u>      Objection, defendant objects to this Interrogatory on the grounds that it

seeks attorney work-product and is vague and ambiguous in that it seeks parties to identify

anyone believed "to have knowledge supporting the defendant" and also asks for a summary of

"what knowledge" this defendant "believes each person may possess." That information is more

proper the subject of a deposition and to require the provision of such a summary is overbroad,

harassing and unduly burdensome. Subject to those objections and without waiving same, see

those individuals listed in Interrogatory No. 2 and defendants who were identified in the

University of Chicago defendants' Rule 26 Disclosures. The University of Chicago officers

would have knowledge of their activities at the scene of the occurrence and subsequent thereto.

4.      Identify all police officers who were present at or near 1435 East 53rd Street, Chicago, Illinois 60615 at the time of the incident alleged in the complaint, and for each such officer indicate the following:

   a.      Why he/she was at that location;

   b.      Whether he/she had any physical contact with Plaintiff;

   c.      Whether he/she participated in the arrest of Plaintiff;

   d.      Whether he/she participated in the search of Plaintiff;

   e.      Whether he/she had any participation in the bringing of criminal
           charges against Plaintiff.

<u>ANSWER:</u>      Objection.  Defendant objects to this Interrogatory as being vague and

ambiguous in that it refers to the incident alleged in the Complaint and plaintiff's claims against

the defendant include assertions relating to his arrest and to the purported use of force against

him as well as a state law claim of malicious prosecution. Subparagraph (e) is vague and

ambiguous in that you fail to define what you mean by "any participation in the brining of the

4

criminal charges." Subject to those objects and without waiving same, see my answer to Interrogatory No. 2.

Officers Moore and Torres had just stepped out of a Dunkin Donuts after getting coffee when they observed a vehicle drive past them with its horn continuously blowing and then observed the vehicle abruptly swerve to the curb and bump it. They initially investigated what was happening. The other officers from the University of Chicago responded to a dispatch indicating that Officers Moore and Torres needed assistance. The University of Chicago officers Moore and Torres initially attempted to handcuff the plaintiff who refused to allow himself to be handcuffed and the other officers including Aguilar, Kwiatkowski and Gillespie assisted in attempting to get the plaintiff onto the ground and handcuffed.

Officers Moore and Torres would have explained what happened at the scene of the incident to City of Chicago officers who would then prepare the arrest paperwork and any Complaints would have been signed by either Officer Moore or Officer Torres.

5. If there were any investigations, including, but not limited to, an internal affairs, or O.P.S., investigation, relating to the incident alleged in Plaintiffs' Complaint, please state who conducted and/or took part in it, and state and describe its findings.

**ANSWER:** I do not personally know of any such investigation. However, my attorneys are aware that the plaintiff, using an alias, Charles Boyle made a complaint apparently under the name Charles D'Angelo.

Sergeant Kevin Murray was principally involved in the investigation of that complaint. Sergeant Chisem of the University of Chicago would also have knowledge concerning plaintiff's complaint using the name of Charles D'Angelo, and Investigator Salvatore of the Independent Police Review may have knowledge of a conversation with the plaintiff in which he refused to tell him about the incident and said "he had another way he was going to deal with this" or words to that effect.

5

Ultimately, the complaints filed by Plaintiff under the name of Charles D'Angelo were "unfounded" because of his refusal to participate in the investigation. Sergeant Murray's efforts to speak with the plaintiff are outlined in letters and in transcripts of phone calls that he made, copies of which were produced by the defendants and Bates stamped numbers U-C0001-0039.

6.    State whether you sustained any physical injury during your interaction with plaintiff on or about October 18, 2008. If yes, describe your injury. Additionally, if you received any medical treatment of your injury state the date(s) of your treatment and identify the medical provider(s).

**ANSWER:**    No I was not injured. I understand that Officer Gillespie was kicked in the head during the incident and his glasses were broken. I also understand that Officer Galarza injured his shoulder and Officer Moore his wrist, but I do not know what treatment they received.

7.    Please state and describe your understanding of the policies and customs which govern the writing of any kind of log and/or report including, but not limited to, complaint report, arrest report, search report, property report, supplemental report, or otherwise, (1) when an individual is arrested for interfering with a public officer — resisting/obstructing/disarming an officer and (2) when the custody of an arrestee is transferred to the City of Chicago Police Department. Included in this response, must be when a log, report, or other document is to be written, on what type of form it is to be written, and what facts are to be put in such log, reports, or other document.

**ANSWER:**    Objection. This interrogatory is vague and ambiguous in that it asks for "policies or customs" governing the writing of reports, logs, etc. Over that objection and without waiving same, my understanding is that any report I write should be an accurate summary of an event as best as I can recall it. Because it is only a summary, it cannot include all of the facts and may not incorporate facts that others deem important when reviewing an incident well after the fact. I am not aware of anything specific as it relates to interfering with a police officer or resisting or obstructing a police officer other than may report should be an accurate summary. University of Chicago employees are permitted to detain individuals who commit crimes and we turn any such person over to the Chicago Police who will then transport that person to a local

6

police station and process that person, including taking booking photos, filling out arrest reports, filing criminal complaints and seeking approval by the State's Attorney working felony review of felony charges. While University of Chicago employees write out our own reports, we do not prepare criminal complaints and do not process an arrestee during the booking process.

8.    Please state how long and in what capacity you have been employed by the University of Chicago Police Department. Your response should include a brief description of your change in assignments and/or rank if any, and when those changes occurred. Your response should also include whether you were concurrently employed by the City of Chicago as a police officer at any time during your employment with the University of Chicago Police Department.

**ANSWER:**    On the date of the incident involving Charles Boyle, I had been employed by the University of Chicago for approximately five years and four months. During this timeframe there has been no change in rank and at no time while employed with the University of Chicago have I been employed concurrently with the City of Chicago as a police officer.

9.    Please describe your assignment with the University of Chicago Police Department on October 18, 2008. Your response should include the actual time you began and ended your duties.

**ANSWER:**    On October 18, 2008, I was working as an officer for the University of Chicago during its midnight shift. I was working an investigation in plain clothes on behalf of the University.

10.    State the case number, caption, and jurisdiction of all civil cases in which you were named a defendant during the course of your employment with the University of Chicago Police Department and/or the City of Chicago Police Department.

**ANSWER:**    Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in a capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are

7

substantially similar in nature. Subject to those objections and without waiving same, I have never worked for the Chicago Police Department and I have never been previously sued in my capacity as a University of Chicago Police officer.

11.    Identify all complaints (and the names of all complainants), including but not limited to, complaints of false arrests, excessive use of force, unlawful search and/or seizure, perjury, malicious prosecution, or general misconduct which have been lodged against you during the course of your career with the University of Chicago Police Department. Your response should list each number, such as complaint register number, that has been assigned to each complaint, indicate when each investigation was concluded, and state the nature of punishment, if any, received by the defendant as a result of the complaint.

**ANSWER:**    Defendant objects to this Interrogatory in that it is overbroad, unduly burdensome, harassing, and not designed to lead to the discovery of relevant or admissible information in that it seeks information about all civil cases in which I was named a defendant irrespective of whether a lawsuit was filed against me in a capacity other than as police officer. Additionally, the Interrogatory is overbroad, unduly burdensome, and not designed to lead to the discovery of relevant information since it does not seek information about other lawsuits that are substantially similar in nature. Subject to those objections and without waiving same, there have been no sustained complaints against me during my career as a University of Chicago police office.

12.    Identify all documents, notes, memoranda, or other writings, including internal investigations statements, police reports, and inter-agency memos which you wrote which relate or refer to the Plaintiff and/or the incident alleged in the Plaintiffs complaint.

**ANSWER:**    Any report, memo or other document which I prepared or wrote would contain my signature at some place on the document. My attorney has informed me that he has produced documents to your attention Bates stamped numbers U/C001-0079. Please see those documents for any that bear my signature.

13.    State whether you gave any statement, oral, written or tape recorded, signed or unsigned to an investigator (internal or otherwise) in connection with the incident alleged in the complaint. If yes, state the current location of each original statement.

8

**ANSWER:** I did not make any such statement, other than speaking to my attorney and my conversations with my attorney which are privileged from disclosure.

14. State the name and current or last known address of each and every individual you may call as a witness in the trial of this matter.

**ANSWER:** Defendant objects to Interrogatory No. 14 on the basis that it is premature and seeks work product. Subject to and without waiving same objection, this defendant states this is unknown to me at this time.

15. State whether you ever testified in any court proceeding relating to your interactions with plaintiff on October 18, 2008. If yes, state the date, courtroom, nature of court proceeding, and case number(s) associated with said testimony.

**ANSWER:** No.

16. State whether you performed any duties of any kind as a University of Chicago Police Officer on January 20, 2009 and/or December 6, 2008. If yes, state the hours you performed your duties, and the location(s) where these duties were performed.

**ANSWER:** Defendant objects to Interrogatory No. 16 in that he was never subpoenaed to Court and, therefore, his duties as an Officer for the University of Chicago on January 20, 2009 and/or December 6, 2008 are irrelevant and immaterial. Defendant also objects to this Interrogatory as overbroad and harassing and seeks information not reasonably calculated to lead to the discovery of admissible evidence.

17. State each and every fact that explains each affirmative defense set forth in your answer to the complaint. Identify all witnesses who support each affirmative defense, if any, and state the subject matter of each witness' knowledge.

**ANSWER:** Objection. This Interrogatory calls for attorney work product. Defendant further objects to this Interrogatory as overbroad, and unduly burdensome and because it seeks information outside of my personal knowledge and calls for a legal conclusion. Defendant further objects that it is unduly burdensome and harassing. Subject to those objections and without waiving same, see the information disclosed in the University of Chicago Defendant's Rule 26(a)(1) Disclosures as well as information disclosed in connection with the University of

9

Chicago Defendants' Response to Plaintiff's Production Request and these Answers to Interrogatories.

By: _____
Officer Michael Kwiatkowski

SUBSCRIBED AND SWORN TO
before me this 21st day of July, 2009.

_____
Notary Public

OFFICIAL SEAL
JODY A DONNE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/24/12

10

# EXHIBIT K



STATE OF ILLINOIS )
                    ) SS:
COUNTY OF COOK )

    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
    MUNICIPAL DEPARTMENT-FIRST MUNICIPAL DISTRICT

THE PEOPLE OF THE       )
STATE OF ILLINOIS,     )
                     )
      Plaintiff,    )
                     )
      vs             )  #08MC1277951
                     )  Branch 46
                     )
CHARLES BOYLE,         )
                     )
      Defendant.    )

         REPORT OF PROCEEDINGS of the Motions and
Hearing before the Honorable THOMAS DONNELLY, Judge of
said court, on the 20th day of January, 2009.

         APPEARANCES:

         HON. ANITA M. ALVAREZ,
         State's Attorney of Cook County, by:
         MR. WILLIAM COTTER,
         Assistant State's Attorney,
         appeared for the People;

         MR. ED FOX, Atty.,
         appeared for the Defendant.



Oona Campbell-Smith, C.S.R.
Official Court Reporter, #084-001439
69 W. Washington Street
Chicago, Illinois 60602.

1

```
1              THE CLERK:  Charles Boyle.
2              THE COURT:  This case is set for trial.  There
3    is also, at least it appears, several pending motions.
4    Are both sides ready to argue on the motions?
5              MR. FOX:  Excuse me, judge.  My understanding
6    was the Court indicated the motion would be today and
7    trial would be tomorrow morning.
8              THE COURT: That's indeed how we proceed.  We do
9    motions and instructions conference today.  And then
10   proceed with the testimony tomorrow.
11             MR. FOX:  Okay.
12             THE COURT:  As to the motion, both sides ready
13   to argue on the motion?
14             MR. FOX:  Yes.
15             MR. COTTER:  Yes.
16             THE COURT:  I have three motions before the
17   Court.  A motion to dismiss.  A motion to quash and a
18   pretrial motion for discovery.
19                As to the motion to quash and suppress
20   evidence, you will be proceeding by way of testimony
21   evidence with respect to that.  So we will reserve ruling
22   on that.
23                However, the motion to dismiss and pretrial
24   motions for discovery will be addressed by the Court at
```

2

1  this time.  It would appear Motion to Dismiss would
2  probably be the optimal one to start with.  Are you ready
3  to argue that motion?
4          MR. FOX:  I am, your Honor.
5          THE COURT:  State ready?
6          MR. COTTER:  Yes.
7          THE COURT:  Proceed, counsel.
8          MR. FOX:  For the record, Ed Fox, for the
9  defendant, who is present in court.
10          The motion to dismiss is based upon, there is
11  a filing of two counts of resisting arrest.  And I
12  researched case law on these motions.  All the elements
13  have to be met as required by the statute, as well as the
14  case law.
15          And among other things, for the motion to
16  dismiss, and to plead a resisting arrest or obstruction,
17  as they pled here, in two separate counts and the
18  complaints are identical in terms of the words, just
19  different officers are involved.
20          One thing the case law makes abundantly clear
21  is that resistance has to be some sort of physical action
22  of resistance.  And it can't just be refusal to do
23  something or flailing the arms, for that matter, which is
24  what they appear to allege.

3

1          And it is a little murky here, but they

2     appear to allege that he resisted an investigatory stop,

3     by failing to produce ID.  That's not enough to have

4     resisting arrest charge.  And, in fact, the state cites

5     the same case that we do.  The Stoudt case.  And cited

6     for the same proposition that we do, indicating some sort

7     of passive resistance or refusal to so something is not

8     enough.

9          THE COURT:  Let me interrupt a moment.  State,

10    did you file response to the motion to dismiss?

11         MR. COTTER:  I did.

12         THE COURT:  Did you serve the Court with

13    courtesy copies of that document.

14         MR. COTTER:  We did not hand to the Court

15    personally, but we would have left on the Court's desk,

16    in chambers.

17         THE COURT:  It does not appear to be in the

18    court file nor did the Court get a copy of it.  Do you

19    have an extra copy of that response?

20         MR. COTTER:  I have my own.

21         THE COURT:  All right.  Proceed.

22         MR. FOX:  As I was just saying, the Stoudt case

23    says refusal to do something, without more, is not enough

24    for resisting arrest charge.

1        And as far as the flailing of the arms,
2   whenever I see that flailing the arms, it is also a
3   little murky what that means.  If someone is just waving
4   their arms in the air or what exactly it means.  At any
5   rate, I don't understand.
6        It is not the Raby case, Illinois Supreme
7   Court case, requires some physical resistance.  They
8   don't allege physical resistance in here.
9        For that reason alone, there is not enough to
10  show obstruction or resisting arrest.  Just no physical
11  resistance is alleged.
12       And then as far as the other point that we
13  made in our motion, is that boilerplate language is not
14  enough.  And particularly to say that an officer, in
15  order to have resisting arrest charge, an officer has to
16  be engaged in his authorized authority to do whatever it
17  is he's doing.
18       That leads to whatever the resisting arrest
19  is.  And using the language engaged in execution of his
20  duty, which is the boilerplate language they use here,
21  case law says that is not enough. You have to a say a
22  little bit more.
23       THE COURT:  They do say a little bit more, in
24  that he was engaged in investigatory stop.  So there is a

5

1  little bit more than the execution of his duty.  Is that
2  not enough?

3         MR. FOX:  That's not either.  We don't know if
4  he's authorized to do anything.  An officer just can't
5  have an investigatory stop just because he feels like it.
6  There has to be some reasonable belief something is going
7  on of a criminal nature before you can do that.

8         They have not alleged, for example, we
9  believe there was a stolen vehicle, so we did a stop.
10  They didn't do anything like that.  We have very vague
11  language, engaged in execution of his duty, in that he
12  resisted an investigatory stop, which is not enough.

13         Barely more than boilerplate language does
14  not tell us at all that they were authorized to do
15  whatever they were doing.  In fact, here they implicitly
16  say he failed to produce ID.  You don't have authority to
17  request ID of anybody just because you want it.

18         You have to, by statute, believe you have to
19  have reasonable belief, at minimum, like a Terry stop,
20  that the person has been engaging or about to engage in
21  criminal activity.  They don't come close to alleging
22  anything like that.

23         So, on those two grounds we would submit the
24  Motion to Dismiss should be granted.

6

1    THE COURT:  All right.  Response.

2    MR. COTTER:  Judge, I believe that the

3    explanation of their authorized duty, being investigative

4    stop, more than satisfies limited requirement, or at

5    least in specifying what it was the officers were doing.

6    Clearly an investigatory stop and

7    investigation generally has been purview of police

8    officers, which complainants in this case are.  Which is

9    what they were doing on the date in question.

10   So, with respect to that argument, I think it

11   holds no water.  Further, I think that with respect --

12   THE COURT:  What is the law with respect to

13   failing to produce ID?  We went over this just recently

14   in another case.  And I thought there was specific case

15   law, with respect to this issue, where the Illinois

16   Appellate Court has addressed the issue of, and my

17   recollection is, and I can grab my folder.  That case law

18   is that even incorrectly identifying yourself is not

19   resisting or obstructing a peace officer.

20   So it would seem like if failing completely,

21   or incorrectly identifying yourself is not an offense,

22   that failing to produce ID would also not be an offense.

23   But I would like to be refreshed in what the law is.  I

24   know there is very particular case law that was cited by

7

1    the Appellate Court, with respect to that issue.

2            So, what is the law, Mr. Cotter, with respect

3    to identification?

4            MR. COTTER:  I am not certain about that.  But,

5    I don't know what the case law is on that.  But I think

6    that certainly --

7            THE COURT:  If that's, if the Court is right

8    and that's a problem, does then the mere flailing of the

9    arms save the complaint, if defendant became combative by

10   flailing his arms?  So the Court can strike one language

11   and leave the rest it would still be actions.

12           MR. COTTER:  Certainly that's the state's

13   position that language be in there.  That flailing of the

14   arms is conduct that arises to the level of obstructing a

15   peace officer engaged in his official duty.

16           And based on the presence of that, Motion to

17   Dismiss is inappropriate and should not be granted at

18   this time.

19           THE COURT:  All right.  Reply.

20           MR. FOX:  Judge, again, I have not heard that

21   there was anything to indicate they were authorized to do

22   an investigatory stop. Nothing pled.  I have not heard it

23   and there is state statute on point that says you have --

24           THE COURT:  Did you cite that statute?

8

1          MR. FOX:  I didn't.  But I can do that.  I have

2     a Supreme Court case with me.

3          THE COURT:  I am going to take a moment,

4     counsel, to get my file.  In the rush to get out here, I

5     didn't bring my case law file.  If you will bear with me

6     one second.  I just want to make sure there was a case

7     with respect to identification.

8          Counsel, you did not uncover it in your

9     research at all, with respect to producing

10    identification?

11         MR. FOX:  No, all I know there is a state

12    statute.

13         THE COURT:  What is the Supreme Court case you

14    are citing?

15         MR. FOX:  Kollender vs Lawson.

16         THE COURT:  Did you cite that in your --

17         MR. FOX:  I am not sure.  I don't believe it is

18    cited, but I have it with me, if the Court wishes to look

19    at it.

20         THE COURT:  Do you have a copy for the state?

21         MR. FOX:  No, I don't.

22         THE COURT:  Show it to the state first then.

23    And this is a U. S. Supreme Court case?

24         MR. FOX:  Correct.  And I believe the statute

9

1   is modeled after that case.

2           THE COURT:  Are you referring to any particular

3   passage.

4           MR. FOX:  I can show your Honor.

5           THE COURT:  Now, the case I was referring to,

6   this is cited in Synott, a number of cases have dealt

7   with refusing to obey various commands of police

8   officers.  It has been held refusing to identify one's

9   self, or falsely identifying one's self, in connection

10  with criminal matters does not constitute resistance or

11  obstruction.

12          And that's Synott, which is S-y-n-o-t-t.  At

13  349 Il Ap 3rd, 223.  And the provision I was citing is

14  found page 239.  Excuse me, found 225 and 226.  The Court

15  is citing for that proposition, People vs Ramirez.  151

16  Il Ap 3rd, 731.  People vs Washington, 76 Il Ap 3rd, 173.

17          So it seems there is case law on point

18  directly as to refusal to identify yourself already.

19          MR. FOX:  So I don't have to go to the next

20  step, because what you are saying, that's not a crime.

21  At least the crime of resisting that they charge here.

22          So then it leaves the next point.  It leaves

23  is whether flailing the arms.

24          THE COURT:  Flailing.

10

1    MR. FOX:  I don't know what flailing is.  I am

2  waving my arms now, that could be deemed flailing.  By

3  doing this, I would not be deemed to be resisting arrest.

4  That's a pretty murky thing. We are entitled to have

5  allegations of the complaint be clear enough so we

6  understand what it is we are, what we are defending

7  against.

8    And what they are describing there is not

9  resisting arrest.  They can say flailing their arms until

10  they are blue in the face.  I don't know what that means,

11  resisting arrest, in and of itself.  I have seen this,

12  and I am sure the Court has seen this language before.

13  It always remains murky to me what that is going on.

14    That, putting aside the fact they have, they

15  still have not said what authorized act.  How they were

16  engaged in authorized act, by even doing an investigatory

17  stop.

18    So, I will just rest there, saying I don't

19  see an act of physical resistance consistent with the

20  statute.

21    THE COURT:  Neither one of you cited Synott,

22  apparently.

23    MR. FOX:  Right, we didn't.

24    THE COURT:  Synott sets out for me the standard

11

1  for a complaint, in that you found a commission
2  sufficient, when defendant knowingly obstructs arresting
3  officer's investigation of possible crime, DUI, by
4  repeatedly refusing to comply with the officer's order
5  that the defendant exit his vehicle.

6        It seems we are half way there, when we say
7  investigatory stop.  Obviously the complaint is much
8  fuller in Synott than we have here, in that it said what
9  the person was not doing and not getting out of the car.
10 And also indicated the possible crime, driving under the
11 influence of alcohol, for which getting out the car would
12 be.  And also that's an authorized act.

13       Under Maryland vs Wilson, we know the officer
14 is authorized, as a matter of law, to order someone out
15 of the car, pursuant to a traffic stop.  So we can make a
16 judgment as to that.

17       MR. FOX:  Right.

18       THE COURT:  But we are sort of half way there
19 with this complaint.  We've got an affirmative action,
20 flailing the arms.  I just want to hear your argument.  I
21 see affirmative action, and I see some act of the
22 officer, namely an investigatory stop.

23       So, my inclination on a pleading attack is to
24 say there is enough.  You can, obviously, file a motion

12

1   for Bill of Particulars to get more specific.  But in
2   terms of giving the defendant an idea of what they are
3   facing, I am not sure that, what degree of particularity
4   I can demand of a complaint.

5           MR. FOX:  We know, judge, in the Leave case, I
6   can read a brief passage, section 31, which is resisting
7   charge of criminal code, under which defendant was
8   charged in this case, with resisting or obstructing a
9   peace officer has one of its element requirements peace
10  officer be engaged in course of any authorized act.

11          Prosecution for violation of the text where
12  charge is resisting, one of the issues whether defendant
13  resisted an authorized act of the peace officer and
14  citation.  Since performance of peace officer of
15  authorized act within his official authority is an
16  element of the crime, failure to set forth this element
17  is subject to dismissal, under the previous section.  And
18  they cited to that.  And they go on.

19          So, again, I am going to go on in a moment,
20  but just says they are involved in investigatory stop.
21  Doesn't tell what their official authority is.

22          Unlike the case you just read, they stopped
23  the guy.  They believed he was driving drunk and do an
24  investigation.  They don't have any of that here.  They

13

1    don't say why they are doing an investigatory stop.  And
2    that's a problem, because they cannot just go up to
3    people on the street, which is really what they did here,
4    and do an investigatory stop just because they want to.
5              That is the difference between the case your
6    Honor just read and what is alleged.
7              THE COURT:  You are saying it is closer to
8    Hilgenberg, where Hilgenberg says people in homes,
9    officers, refused to let people into their house,
10   obviously without a warrant, the officers have no right
11   to go into the house.
12             So you have to state more in a case where
13   the level of particularity demands of a complaint where
14   the act itself is something that's not well established
15   or not evidence from the allegations of the act, like
16   ordering somebody out the car in a DUI, where there is
17   case law authorizing. There is a different case I can
18   cite for the stop.  They have to have some Terry basis.
19             MR. FOX:  Right.
20             THE COURT:  They have to have reasonable
21   articulable sufficient evidence something criminal,
22   suspicious, something criminal is afoot, in order to, and
23   that has to be stated in the complaint you are saying.
24   So it is more like the Hilgenberg, that case you did

14

1   cite, I believe, the house case.

2         MR. FOX:  Right.

3         THE COURT:  Which is People vs Hilgenberg.  In

4   that case they say where the officer alleges resisting

5   and refused to open the door, that that demands a higher

6   level of particularity. Here there is confrontation on

7   the street.  And again, you are saying there has to be

8   some Terry basis.

9         MR. FOX:  Right.  Whether it is in a house or

10  on the street, by a car, it should not make any

11  difference.  You have to have authority to do an act.

12  And just saying you have done an investigatory stop, you

13  are putting the cart before the horse.

14         Officers are authorized to do investigatory

15  stops, if they have the proper legal grounds to do so.

16  Which they have not alleged.

17         THE COURT:  All right.  After hearing

18  arguments, clearly the failure to produce ID, at least

19  from the case law as I understand, is not a permissible

20  ground.

21         So, we respect to that, I think that the

22  complaint must be dismissed, pursuant to the defendant's

23  motion.

24         Also, I think that counsel is right with

15

1    respect to level of particularity.  And the Court has

2    found, having since March sat in this courtroom, that the

3    state's cases would actually be advantaged by stating

4    with greater particularity the exact nature of the

5    resisting or obstructing that is going on in the

6    particular instances.

7            So the Court is going to grant the Motion to

8    Dismiss.  State, are you seeking leave to amend the

9    complaint or file amended complaint?

10           MR. COTTER:  Yes, judge.

11           THE COURT:  All right.

12           And do you want a moment to consider?

13           MR. COTTER:  If we can have about five moments.

14           MR. FOX:  I would just submit, judge, they are

15   not allowed to make a substantive amendment.

16           THE COURT:  I am going to allow the state some

17   time to make an amendment to the complaint.  And then we

18   will proceed with respect to the discovery motion and

19   then to the Motion to Quash.  But I want to give them a

20   little time to make sure they do it right.  The Court

21   will take a five minute recess.

22                   (Whereupon the Court took a brief

23                   recess.)

24


16

1          THE COURT:  All right.  We took a brief recess
2    to allow the state to frame an amended complaint.  State,
3    do you have a complaint?

4          MR. COTTER:  Yes, judge.  I have returned the
5    court complaint to the Court, the copy.  Tender copy of
6    proposed amendment to counsel.  Our witnesses are
7    present, ready to be sworn, if necessary.

8          THE COURT:  Defense.

9          MR. FOX:  Well, in the first instance, again I
10   would be submitting this is a substantive, certainly not
11   a correcting of a clerical error or date or anything like
12   that.  They are not allowed, my understanding by statute,
13   they are not allowed to undertake a substantive amendment
14   like this, especially on the eve of trial.  And that's
15   what the statute says.  They are changing the language.

16         THE COURT:  What portion of the statute are you
17   relying on?

18         MR. FOX:  Your Honor, I don't know offhand.
19         THE COURT:  You want a copy of the statute
20   book?

21         MR. FOX:  Yes.  It never fails, I can't find
22   it.  I can't find what I am looking for now.  Let me
23   state this, judge.  In connection with what they have
24   said here, unlike the case that you cited, where they

17

1   stopped a guy for suspect DUI, they are not even, they
2   are saying suspicious car.  And again that's about as
3   vague as you can get.  I don't know what it means to be a
4   suspicious car.  I don't know what suspicious car means.

5           Doesn't mean they are investigating
6   aggravated crime.  Doesn't mean we have reasonable
7   suspicion there is a crime committed or they are around a
8   crime.  Just says suspicious car.  Cars could be
9   suspicious for a thousand reasons.  And I have no idea
10  what they are talking about.

11          Even from the wording of the police report, I
12  have no, literally no idea what they are talking about.
13  So I think, again, judge, we are back at the start.  We
14  don't know that they are authorized to do anything by
15  saying a suspicious car.

16          And again, they have said by becoming.  I
17  don't understand this entire paragraph, judge.  They are
18  saying that the officer engaged in, was engaged in
19  execution of his duty, in that he, the defendant,
20  resisting an investigatory stop of a suspicious car by
21  becoming combative.  I don't know what that means.

22          The officer stopped there and then he becomes
23  combative.  He starts fighting with him.  I don't
24  understand what is going on, from reviewing this

18

1    complaint.  What authorized act was the officer taking?

2    Did he believe the car to be engaged in, aligned with

3    some sort of criminal activity?  Did he see my client do

4    anything that looked like criminal activity?  Did he have

5    reasonable suspicion to believe there was criminal

6    activity going on?  Then all of a sudden he's becoming

7    combative.

8              Now, they have taken out that he failed to

9    produce ID.  So, now he has become combative in the act.

10   So I don't know what kind of, what is he resisting.  What

11   kind of investigation is he resisting, I guess.  What

12   authorized act is he resisting?  I still don't know by

13   reading this.

14             THE COURT:  So that's the basis of your

15   objection to this amendment?

16             MR. FOX:  Yes.

17             THE COURT:  Not only timeliness, but --

18             MR. FOX:  Correct.

19             THE COURT:  Still whether it states a claim,

20   pursuant to the statute.  As to the right of the state to

21   amend, I think there are some problems about amendments.

22             However, the statute that sets out the right

23   of the defendant to seek a Motion to Dismiss, 725 ILCS

24   5114-1, provides in e, that dismissal of a new charge,

19

1   dismissal of the charge, upon grounds set forth in
2   subsection a4 through a11, which includes a8, the failure
3   to state a claim.  All this section shall not prevent
4   return of new indictment or filing of new charges.

5           And upon dismissal of the Court, may order
6   that the defendant be held in custody, etcetera.  So I
7   don't think that it precludes it.

8           Ordinarily the Court frowns upon motions to
9   amend brought on the day of trial, because the counsel is
10  not informed of what the nature of the charges are.  But
11  in this case, based on the fact that the amendment was
12  caused by Motion to Dismiss, I am hard to hold that
13  against the state.

14          Mr. Cotter, what is your response to the
15  defendant's objection, being that it does still fail to
16  state a claim?  The fact if I had known previously that
17  defendant was in a car, which I didn't know from the
18  previous complaint, that may have changed the nature of
19  the law's requirement as to producing identification.  Of
20  course we know if somebody is a driver.  Is this the
21  driver in the car or passenger?

22          MR. COTTER:  Passenger in the car.  Forgive the
23  state's ignorance in how much specificity needs to be in
24  a complaint, which I believe is a document designed to

20

1   put defense on notice what the charges are, and not state
2   in exact detail what we believe will be shown when and if
3   the case proceeds to trial.

4           THE COURT:  Mostly because of the Aguilar case,
5   I am sort of working my way through this myself, Mr.
6   Cotter, because we had a thorough examination of what is
7   necessary in these particular kinds of complaints that
8   obstructing and resisting is different than partly in
9   that Supreme Court have told us we can't just use the
10  statutory language as we can in a battery complaint.

11          In a battery complaint you can just say
12  bodily harm, or we can say insulting or provoking nature
13  and that's enough.  But the Supreme Court has told us in
14  resisting and obstructing, because of the generic nature
15  of the language and the statute, that it is not enough to
16  inform the defendant of the charges that are brought
17  against him.  That there is a higher level of
18  specificity.

19          So I am trying to work this out with your
20  guidance.  I understand it may be a little taxing,
21  because it is something we are not used to in these
22  courts, because ordinarily we can cite boilerplate
23  statutory language, but that's not enough in these
24  particular complaints.

21

1    So I just want your response, and appreciate
2    your patience with respect to is this enough specificity
3    for the Court.  And as you raise in our arguments in
4    Aguilar, the question is, can we determine, based on the
5    language that the, as a matter of law, the police officer
6    was engaged in an authorized act.

7    I think that is what Synott really tells me,
8    is that when I pick up the complaint, as I just read in
9    Synott, and say the guy didn't get out the car when he
10   was ordered to do so in a possible DUI investigation.

11   I know from reading that complaint, that's an
12   authorized act.  So I can tell, as a matter of law,
13   reading that complaint, that the officer was authorized
14   to do that.  The question is, can I do the same thing in
15   this case, when I see resisted investigatory stop of
16   suspicious car by becoming combative and flailing his
17   arms.

18   It is not clear what the officer was doing
19   and what the defendant was doing.  Was he flailing his
20   arms inside the car?  Did the officer order him out the
21   car and he flailed his arms.

22   We know that passengers can be ordered out of
23   the car in an automobile stop.  The Supreme Court has
24   told us that.  So if they flail the arms in attempt to

22

1   get them out the car, I can tell that would be an
2   authorized act, as a matter of law.  But it is difficult
3   to understand investigatory stop of suspicious car by
4   becoming combative and combative meaning.  We know that
5   verbal, any words do not constitute resisting.  So
6   combative in this context seems to me just verbal
7   combative. That's what it seems to be implying.

8           I don't know if that's what the state
9   intends.  But we know, from the case law, that's not
10  amount to resisting or obstructing.  The Supreme Court or
11  U. S. District Court was clear about that in Landry vs
12  Daley, in that you can't have, just talking is not
13  enough.  And mouthing off to the officer does not
14  constitute resisting.  And Synott goes over that as well.

15          So being combative, unless it encompasses
16  some additional act, the flailing of the arms, while the
17  officer was investigating, and you are saying that's
18  enough, that we have enough to state an offense.

19          Could you give me argument on that, Mr.
20  Cotter.

21          MR. COTTER:  I believe physical combativeness,
22  in specifically with flailing of the arms, that are the
23  actions that defendant committed, that we allege, gives
24  rise to this offense.  We believe that our witnesses

23

1    would testify that they believe they were investigating a

2    possible stolen car, which is here specified in the

3    complaint, or not specified as suspicious car, and that

4    was the reason for initial contact with defendant who

5    became --

6            THE COURT:  Physically combative meaning

7    flailing of the arms?

8            MR. COTTER:  Including, but not limited to

9    flailing his arms.

10           THE COURT:  And they were attempting to get him

11   out the car, or was it in the car.

12           MR. COTTER:  He was already outside the car.

13           MR. FOX:  According to the report he was.

14           THE COURT:  Just let me.

15           MR. FOX:  I am sorry.

16           THE COURT:  I will give you time to reply.  So

17   he's out of the car and they are trying to question him?

18           MR. COTTER:  Correct.

19           THE COURT:  And he makes physical contact with

20   the officer or.

21           MR. COTTER:  I believe that's what the officer

22   would testify to, yes.

23           THE COURT:  So they are investigating a

24   possible stolen car.  They order him out the vehicle, and


24

1    he makes physical contact with them, while they are

2    trying to ask him questions.

3              MR. COTTER:  Correct.

4              THE COURT:  I think that sounds like a better

5    complaint to me.  They are investigating possible stolen

6    vehicle.  Then we know what we are dealing with.  We know

7    exactly what is happening here, in that they are

8    questioning and he starts to make physical contact with

9    them, resisting their investigative questioning.

10             If the state amends their complaint, as I

11   have suggested.  I hate to be the third state's attorney

12   in the courtroom, but I guess.

13             MR. FOX:  Let me say this, judge.  I would be

14   interested in hearing the officer.  I have the police

15   reports.  I would be interested in hearing them be sworn

16   in to stating something like what you just said, because

17   that's not in the police report.  They are not going to

18   say they ordered him out the vehicle.  He's already out

19   the vehicle.  They are not going to say anything about

20   suspicious stolen car.  At least the police report

21   doesn't say anything.

22             If they are going to amend like that, and

23   they are going to be sworn to say these things, I will

24   live with that and we will try the case.

25

```
 1          THE COURT:  And you have some impeachment now.
 2          MR. FOX:  A lot of it.
 3          THE COURT:  At least that sounds like I can
 4   figure out what is going on here.
 5          MR. FOX:  If they want to be sworn on the
 6   record and say something like that, it sounds like they
 7   are getting to the point they are saying they are
 8   authorized because they are investigating a stolen
 9   vehicle and he starts fighting with them upon getting out
10   the car.
11              If that's what they are going to swear to,
12   sounds like they have alleged the elements of the, they
13   need to allege.  I would like to see them swear to that,
14   that's all.
15          THE COURT:  Mr. Cotter, you want to amend the
16   complaint?
17          MR. COTTER:  Just so I am clear.
18          THE COURT:  Investigating possible stolen motor
19   vehicle.  And after getting out the car became physically
20   combative and flailing, is sort of the language.  I mean,
21   the state has to amend their own complaint.  But at least
22   that gives me some idea what they are talking about.
23          MR. COTTER:  We are not filing new complaints
24   unless --  We are actually not amending anything.
```

26

1      THE COURT:  That's correct.  They are new
2  complaints.  You want another few moments or you want to
3  do it at the bench?

4      MR. COTTER:  I am doing it as we speak.
5      THE COURT:  Obviously, I don't want to invade
6  province of the executive branch.  It is your decision as
7  to content of the complaint.  I am trying to be of as
8  much help as I can.

9          All right, any objection?  You have had a
10  chance to review.  Any objection, Mr. Fox, to the second
11  proposed amendment?

12      MR. FOX:  The way it is written, I am still
13  objecting to it.  I think it, it says doing investigative
14  stop of possible stolen car.  It is very conclusory to
15  me.

16      THE COURT:  Over your objection, I am going to
17  allow the new complaint to be filed.  If you will have
18  your complaining witness approach and show a copy of the
19  new complaint, and be resworn to these complaints. That's
20  over defendant's objection.  After your complaining
21  witnesses have reviewed, if they'll tender back to the
22  Court.

23          Both complaining witnesses have had a chance
24  to review the complaint.  Officer Larry Torres?

27

```
 1                  THE COMPLAINANT:  Yes.
 2                              (The officer is sworn to the new
 3                              complaint.)
 4                  THE COURT:  Officer sworn to the new complaint.
 5       Clarence Moore?
 6                  THE COMPLAINANT:  Yes.
 7                              (The officer is sworn to the new
 8                              complaint.)
 9                  THE COURT:  All right.  A new complaint will be
10       allowed to be filed.  And you may be seated.  With
11       respect to discovery motion.
12                  MR. FOX:  Judge, before you move on, I think
13       there was another change in that, after we talked the
14       words combative were taken out, scratched out, in at
15       least one.
16                  MR. COTTER:  In both.
17                  MR. FOX:  Now, we are back to flailing his
18       arms. They crossed out combative.
19                  THE COURT:  Made physical contact upon one of
20       them and flailing arms on Torres.  And then with respect
21       to flailing arms, without any physical contact on Moore.
22       All right.  I note your objection.  I am going to
23       overrule it.  I think the nexus is here.  The only
24       question is a fact question now.  Whether flailing of
```

1    arms was sufficient to resist an investigatory stop.  I
2    think that's a fact question, rather than maybe of law.
3    For those reasons, objection will be overruled.
4           MR. FOX:  For the record, I want to be clear.
5    I am objecting to the amendments or the new filing at
6    all.  I want to be clear.
7           THE COURT:  Respect to the discovery motion.
8           MR. FOX:  Judge, what I did, I subpoenaed some
9    records for tomorrow.  I don't think the state has access
10   to certain records.  I subpoenaed records for tomorrow
11   morning.  I can show the Court the subpoena.
12          THE COURT:  With respect to discovery motion,
13   do you wish to argue that motion?
14          MR. FOX:  No.
15          THE COURT:  Are you withdrawing it?
16          MR. FOX:  Withdrawing it.
17          THE COURT:  Then with respect to the last
18   motion, which is the Motion to Quash arrest and Suppress
19   evidence.  Both sides ready to proceed?
20          MR. COTTER:  Yes.
21          MR. FOX:  Yes.
22          THE COURT:  All right.  Mr. Fox, are you ready
23   to call your first witness.
24          MR. FOX:  Yes.

```
 1              MR. COTTER:  Motion to exclude.
 2              THE COURT:  That will be granted.  Any opening
 3    statements from either side?
 4              MR. FOX:  No.
 5              MR. COTTER:  State waives.
 6              THE COURT:  Call your first witness.
 7              MR. FOX:  We will call Officer Moore.  Judge, I
 8    will call Officer Torres first.  Officer Moore went to
 9    the washroom.
10              OFFICER TORRES
11    called as a witness herein having been first duly sworn
12    was examined and testified as follows, to wit:
13              DIRECT EXAMINATION
14              BY:  MR. FOX:
15    Q.  Officer did you write police reports in connection
16    with this stop?
17    A.  Yes, I did.
18    Q.  And do you recall what time of day the stop was?
19    A.  Approximately 2:30 in the morning, I am not
20    exactly sure the exact time.
21    Q.  Officer, you work for the University of Chicago?
22    A.  Yes.
23    Q.  You are a police officer for them?
24    A.  Yes.
```

30

1    Q.   And where was it that you, that you first saw the

2    vehicle?

3    A.   Well, actually we first heard the vehicle.  We

4    heard a horn sound.

5    Q.   So you were alerted to the vehicle by a horn?

6    A.   Originally, yes.

7    Q.   You did not stop the vehicle, did you?

8    A.   I was not driving, no.

9    Q.   Your partner did not curb the vehicle did he?

10   A.   No, the vehicle curbed itself.

11   Q.   The car was stopped by the time you saw it, is

12   that right?

13   A.   No, they were still proceeding, they curbed.

14   Q.   They curbed before you turned your lights on to

15   request it been curbed, isn't that true?

16   A.   Yes, we were standing outside the vehicle.

17   Q.   Outside your vehicle?

18   A.   Yes, and the other vehicle was coming eastbound.

19   Q.   You were in a marked vehicle?

20   A.   Yes.

21   Q.   In a marked vehicle on what street?

22   A.   53rd street.

23        THE COURT:  Just the clarify.  The question was

24   before you alerted with your lights, it sounded like you

31

1  never used your lights.  You were outside your vehicle

2  when the car came?

3      A.   We heard the car, the sound.

4           THE COURT:  You didn't use your --

5      A.   We were getting in the car at the time when the

6  car was passing us.  We were out the vehicle entering

7  into the vehicle.

8           THE COURT:  Proceed.

9           MR. FOX:  Q.  Then when you heard the horn

10  sound, where was the vehicle, in relation to you?

11      A.   About half a block west of us.

12      Q.   And 53rd street is an east-west street?

13      A.   Yes.

14      Q.   And it was traveling westbound or eastbound?

15      A.   Car was traveling eastbound.

16      Q.   In your direction?

17      A.   Correct.

18      Q.   And then how long after you first heard the horn

19  did, how long after that did the vehicle then curb

20  itself?

21      A.   Minutes.

22      Q.   And how far were you from the vehicle where it

23  curbed?

24      A.   75 to 100 feet.

32

```
 1    Q.   Was it east of you or west of you?

 2    A.   It was east of us.

 3    Q.   So it was 75 to 100 feet just pass you, and the

 4  vehicle curbed itself?

 5    A.   Yes.

 6    Q.   And you were in a marked vehicle?

 7    A.   Correct.

 8    Q.   And you heard a horn honk?

 9    A.   Correct.

10    Q.   And you didn't, again you were outside your

11  vehicle, so your vehicle, you did not do anything to try

12  and curb the vehicle, did you?

13    A.   Not at that time, no, I was standing outside my

14  vehicle.

15    Q.   Neither did your partner?

16    A.   No.

17    Q.   That's correct?

18    A.   Yes.

19    Q.   Now, what kind of vehicle was it?

20    A.   It was a Chrysler, silver Chrysler.

21    Q.   What year, roughly?

22    A.   I believe 06.

23    Q.   Did you, after you heard the horn honk, did you

24  walk in the direction of the vehicle?
```

33

1    A.   After we heard the honk horn.

2    Q.   After you heard the horn honk and vehicle parked,

3    did you walk in the direction to the vehicle?

4    A.   We heard the horn coming.  The car was proceeding

5    eastbound.  We looked, seen the car coming.  We entered

6    our vehicle, at the time it then passed us.  It curbed

7    itself.  We got in our car, activated lights and stopped

8    the vehicle.

9    Q.   When you activated your lights, the vehicle was

10   already stopped?

11   A.   Correct.

12   Q.   When you stopped your vehicle, did you run the

13   plates?

14   A.   Usually the driver does.  I didn't do it.

15   Q.   You get any information?

16   A.   At that time.

17   Q.   You didn't get any information before you exited

18   your vehicle again that was a stolen vehicle, did you?

19   A.   I didn't.

20   Q.   Neither did your partner, to your knowledge?

21   A.   I don't know what my partner did, at the time.

22   Q.   Your partner didn't run the plates and then

23   indicate to you we think we have a stolen vehicle, did

24   you?

34

```
 1    A.   Did he run the plates, no.

 2    Q.   And you were able to see the vehicle, correct?

 3    A.   Yes.

 4    Q.   And it didn't match any vehicle you knew to be

 5    stolen, did it?

 6    A.   No.

 7    Q.   So, at the time you got out the vehicle, there was

 8    somebody with the hood up, looking under the hood, is

 9    that right?

10    A.   He exited the vehicle from the rear.  He stepped

11    maybe three steps pass the vehicle like, he was going to

12    keep walking.  Then he turned around and proceeds to open

13    the hood, while we were there.

14    Q.   While you were there?

15    A.   Yes.

16    Q.   He opened the hood?

17    A.   Yes.

18    Q.   Didn't make any attempt to run?

19    A.   He walked pass the car first, then he turned

20    around, walked back to the car and proceeded to open the

21    hood.

22    Q.   You said you wrote the police report?

23    A.   Yes.

24    Q.   You didn't say anything in your police report
```

35

1   about investigating a stolen vehicle, did you?

2     A.  Suspicious vehicle.

3     Q.  You didn't say anything in your report about

4   investigating a stolen vehicle, did you?

5     A.  No.

6     Q.  What was suspicious about the vehicle?

7     A.  The horn was sounding.

8     Q.  The horn was sounding and you noticed somebody

9   looking under the hood of the car?

10    A.  The horn was sounding when I heard it, then he

11  proceeds pass me.

12    Q.  Correct?

13    A.  And the vehicle curbed right away.  And then two

14  other people exited the vehicle and proceed to walk

15  eastbound.  And the other offender then exited from the

16  driver's side rear and walked pass the car.  And then

17  seen us, because we stopped in front of him.  He walked

18  back, he took about three steps pass his vehicle, walked

19  back, opened the hood.

20    Q.  You don't say anything like that in your police

21  report, do you?

22    A.  Not in those details, no.

23    Q.  You don't say anything about anybody walking pass

24  the vehicle and then back to it, do you?

36

1    A.   No.

2    Q.   And, in fact, all you say is that, and tell me if

3  this isn't accurate, all you say is Charles Boyle exited

4  the vehicle and opened the hood of the vehicle?

5    A.   Correct.

6    Q.   You don't say anything about walking pass the car,

7  do you?

8    A.   No.

9    Q.   Now you seem to think that's important?

10        MR. COTTER:  Objection, judge.

11        THE COURT:  Overruled.

12        MR. FOX:  Q.  Now, you said two other people

13  had previously gotten out the vehicle or just got out the

14  vehicle and walked somewhere else?

15   A.   Correct.

16   Q.   But you didn't say to them, stop, police, or

17  anything, did you?

18   A.   That's because the car was ahead of us.

19   Q.   Right?

20   A.   At the time we got there they were gone.

21   Q.   The other two guys had gone?

22   A.   Correct.

23   Q.   So you got to the vehicle and Charles Boyle is

24  under the hood of the vehicle?

37

1    A.  He began to open the hood.  He was not underneath.

2    Q.  When you got out your vehicle you walked towards

3  the vehicle?

4    A.  Correct.

5    Q.  And how far away from it were you?

6    A.  How far was I from the vehicle.

7    Q.  Right, when you got out?

8    A.  I was standing right next to it, once I exited the

9  vehicle.

10    Q.  So your vehicle was parked right behind?

11    A.  In front of his.

12    Q.  Right in front of, immediately in front of?

13    A.  Correct.

14    Q.  So we know now, and I just want to sum up.  The

15  horn was honking, a guy got out the vehicle, looked under

16  the hood, is that fair?

17    A.  Yes.

18    Q.  You didn't have any report of stolen vehicles that

19  matched that car?

20    A.  No.

21    Q.  You didn't, as far as you know, you didn't run the

22  license plate, did you?

23    A.  I didn't, no.

24    Q.  Did you ever run the license plate that evening?

1    A.    Yes, we did.

2    Q.    When was that?

3    A.    After all the commotion.

4    Q.    Now, did you, during the course of you walking

5    over to them, you asked who owns the vehicle, is that

6    right?

7    A.    Yes.

8    Q.    And it was still a person in the vehicle when you

9    went over there?

10   A.    Yes.

11   Q.    And a woman in the vehicle responds to you, didn't

12   she, it was her vehicle?

13   A.    No.

14   Q.    When you walked over to the vehicle, you asked,

15   who you later found was Charles Boyle, was still at the

16   vehicle when you were next to the vehicle?

17   A.    Correct.

18   Q.    He didn't attempt to run?

19   A.    No.

20   Q.    Did you notice any tools on him?

21   A.    No.

22   Q.    Had you looked inside the vehicle, up to that

23   point in time?

24   A.    No.

1    Q.   Had your partner looked inside the vehicle?

2    A.   No.

3    Q.   And how far were you when -- You finally stopped

4   to talk to Mr. Boyle, is that correct?

5    A.   Yes.

6    Q.   How far from him were you?

7    A.   A foot, right next to him.

8    Q.   You don't say anything in your report about him

9   smelling like alcohol or anything, do you?

10    A.   No.

11    Q.   You asked him, I take it, whose vehicle it was?

12    A.   Yes.

13    Q.   You saw there was a female also in the car?

14    A.   Yes.

15    Q.   She had not attempted to get out the car?

16    A.   No.

17        THE COURT:   Any further questions?

18        MR. FOX:   Momentarily.

19    Q.   When you asked him whose vehicle it was, he asked

20   you why?

21    A.   Yes.

22    Q.   You asked for his ID, at that time?

23    A.   Yes.

24        MR. FOX:   Nothing further.

40

```
 1                 THE COURT:  All right.  Mr. Cotter, cross.
 2                 CROSS EXAMINATION
 3                 BY:  MR. COTTER:
 4      Q.   Officer Torres, on the morning in question you
 5   were working in your capacity as University of Chicago
 6   police officer, correct?
 7      A.   Yes.
 8      Q.   Uniform?
 9      A.   Yes.
10      Q.   Working with a partner, Officer Clarence Moore?
11      A.   Yes.
12      Q.   He too was in uniform?
13      A.   Yes.
14      Q.   Marked squad car?
15      A.   Yes.
16      Q.   18 October 2008, that was a Saturday, correct?
17      A.   Yes, I believe so.
18      Q.   And this happened about 2:30, 2:40 in the morning?
19      A.   Yes.
20      Q.   And you and your partner were at approximately
21   1435 E. 53rd street?
22      A.   Yes.
23      Q.   Chicago, correct?
24      A.   Yes.
```

41

1    Q.   Cook County?

2    A.   Yes.

3    Q.   And you said you initially were made aware of a

4    silver four-door Chrysler Sebring, heading eastbound on

5    53rd street, by its horn, correct?

6    A.   Correct.

7    Q.   And what was distinctive -- Let me ask you this.

8         What were traffic conditions like on that block of

9    53rd street, on that date, at that approximate time?

10   A.   There was no other traffic.

11   Q.   Besides this silver four door Chrysler?

12   A.   Correct.

13   Q.   And you are in a marked squad car?

14   A.   Correct.

15   Q.   What is distinctive about the horn that initially

16   alerted you to the presence of that Chrysler?

17   A.   It was not repeated, just constant, maybe it was

18   an alarm going off or something.   Just constant noise

19   sounding.

20   Q.   Was the horn sound emanating from that car

21   uninterrupted?

22   A.   Uninterrupted.

23   Q.   And again, there were no other cars present?

24   A.   No.

42

1    Q.   That Chrysler could possibly be signaling with its

2    horn?

3    A.   No.

4    Q.   Now, at some point that car passed where you or

5    your partner were situated on 53rd street?

6    A.   Yes.

7    Q.   You said the car curbed itself?

8    A.   Correct.

9    Q.   Obviously, someone was driving that car?

10   A.   Correct.

11   Q.   The car did not actually curb itself?

12   A.   Somebody else, yes.

13   Q.   Did it appear to you the individual driving that

14   automobile was attempting to park it?

15   A.   No, there is no other cars there.  It kind of hit

16   the curb, bounced off the curb.

17   Q.   Did you see the break light illuminate on that

18   car, before it made contact with the curb?

19   A.   I don't recall.

20   Q.   You made a motion.  Did that car, the Chrysler,

21   came in contact with the curb?

22   A.   Correct.

23   Q.   Had it come to a near, a complete stop or near

24   complete stop?

43

1    A.   After it hit the curb.

2    Q.   And at any point, between when that car, the

3  Chrysler, passed you and did you lose sight of it before

4  it struck the curb?

5    A.   No.

6    Q.   Now, you said two individuals exited the car?

7    A.   Correct.

8    Q.   From what, specifically, from what part of the car

9  did those persons exit?

10    A.   From the, both from the front driver's side and

11  passenger side.

12    Q.   So the driver of the car exited the car?

13    A.   And the passenger front.

14    Q.   And were they running or walking away from the

15  car?

16    A.   Walking.

17    Q.   What direction were they walking?

18    A.   Eastbound.

19    Q.   And, at this time, were you and your partner still

20  getting into your car and heading that way?

21    A.   We were, correct.

22    Q.   And by the time you arrived to where the car had

23  suddenly hit the curb, were those two individuals that

24  left gone from the scene entirely?

44

1      A.   Yes.

2      Q.   There were two other individuals on the scene when

3   you arrived?

4      A.   Correct.

5      Q.   One was female?

6      A.   Correct.

7      Q.   Do you see the other person there in court this

8   afternoon?

9      A.   Yes.

10     Q.   What is he wearing now?

11     A.   Black jacket with gray shirt.

12          MR. COTTER:  Ask the record indicate in-court

13   identification of the defendant, Charles Boyle.

14          THE COURT:  It shall.

15          MR. COTTER:  Q.  Now, when you and your partner

16   came upon this stopped Chrysler, was the female subject

17   still in the car?

18     A.   Yes, she was.

19     Q.   Was the defendant still in the car?

20     A.   No, he was not.

21     Q.   And you said that he had exited the car prior to

22   your arrival?

23     A.   Correct.

24     Q.   And he walked beyond the car?

45

1    A.  A few steps.

2    Q.  At some point he turned back around, toward the

3  car?

4    A.  Correct, yes.

5    Q.  And that was when you and your partner arrived?

6    A.  Correct.

7    Q.  What did you personally believe was going on with

8  the car that caused you and your partner to go over

9  there?

10        MR. FOX:  Objection, relevance to his personal

11  belief.

12        THE COURT:  Overruled.  You may answer.

13    A.  Possibly stolen vehicle.

14        MR. COTTER:  If I can have a moment please,

15  judge.

16    Q.  Let me ask you this.  About how much time passed

17  between when that Chrysler made contact with the curb and

18  those two unidentified males exited the car and walked

19  away?

20    A.  How much time was there between that.

21    Q.  Yes?

22    A.  It was quick.  A matter of maybe a minute.  They

23  were gone quick.

24    Q.  So about, let's say was it more or less than a

1  minute, between when the car passed you going eastbound

2  on 53rd street and when you and your partner relocated to

3  the scene?

4  A.  A little bit more than a minute.

5  Q.  By the time you arrived, the two unidentified

6  males exited the car and left the scene completely?

7  A.  Correct.

8  THE COURT:  A little bit more than a minute

9  between the time it hits the curb and the two came out

10  or.  I am a little bit confused.

11  A.  They are saying two different times.  Now, from

12  the time -- Ask me the question again.

13  THE COURT:  It hit the curb, they exited almost

14  immediately?

15  A.  Exactly.

16  THE COURT:  Then a little more than a minute is

17  reference to what?

18  A.  When we pulled up.

19  THE COURT:  When you pulled up on them.  All

20  right.

21  MR. COTTER:  Q. Officer Torres, at any point

22  did you have occasion to speak to the female in the car?

23  A.  No.

24  Q.  At some point you asked the defendant who owned

47

1   the car?

2       A.   Yes.

3       Q.   And he did not respond to your question?

4       A.   No.  Well, actually he said, why.  I asked him

5   whose car is it and he said, why.

6               MR. COTTER:  No further questions.

7               THE COURT: Redirect examination, based on that?

8               MR. FOX:  Yes.

9                    REDIRECT EXAMINATION

10                   BY:  MR. FOX:

11      Q.   You didn't ask for license and registration, but

12  asked for ID, is that right?

13      A.   Yes, he was not driving.

14      Q.   The driver you said you observed get out the car?

15      A.   Yes.

16      Q.   You believed this was possibly a stolen vehicle?

17      A.   Yes.

18      Q.   The driver got out the car and walked eastbound on

19  53rd street?

20      A.   Yes.

21      Q.   Didn't run but walked eastbound, correct?

22      A.   Yes.

23      Q.   You made no attempt to go over to where the driver

24  was walking though, did you?

48

1    A.   He was gone out of our sight.

2    Q.   You saw him get out the car walking eastbound,

3    right?

4    A.   For a matter of seconds.

5    Q.   You made no attempt to go find him, did you?

6    A.   By the time I exited my vehicle he was out my

7    sight.

8    Q.   When you first got in your vehicle you just seen

9    him walk eastbound down the street, right?

10   A.   Correct.

11   Q.   Now, you also said that the car, when it curbed

12   itself, it hit the curb hard and bounced off it?

13   A.   Correct.

14   Q.   Show me, in your police report, where you indicate

15   the car hit the curb hard and bounced off of it?

16   A.   I don't have that in there.

17   Q.   You don't have that, I am sorry?

18   A.   I don't have it.

19   Q.   Okay.  That caused you to be suspicious, it hit

20   the curb hard?

21   A.   The noise was the main thing, the horn.

22   Q.   The horn honking?

23   A.   Yes.

24   Q.   There was a guy looking under the hood of the car,

49

1   Mr. Boyle, when you arrived?

2    A.  He proceeded to open the hood.  When we got there

3  he wasn't looking under.

4    Q.  He proceeds to open the hood and you were right

5  there, is that right?

6    A.  Correct.

7    Q.  And you didn't ask him for registration for the

8  vehicle, did you?

9    A.  No.

10    Q.  Because the driver had gone down the street and

11  you weren't interested in him, at that time, is that

12  right?

13    A.  Correct.

14       MR. FOX:  Nothing further.

15       THE COURT:  Recross, based on that.

16       MR. COTTER:  I have one question.

17         RECROSS EXAMINATION

18         BY: MR. COTTER:

19    Q.  What, specifically, about the way the horn was

20  sounding made you believe that the car might be stolen?

21    A.  It was just a constant sound, like I have heard

22  when you snap underneath ignition and everything,

23  sometimes it sets off a horn sound where it doesn't shut

24  off.

1    MR. COTTER:  No further questions.

2    THE COURT: Redirect examination, based on that.

3         REDIRECT EXAMINATION

4         BY:  MR. FOX:

5    Q.  Officer, did you say anywhere in your police

6    report you believe it might be a stolen vehicle because

7    of the way the horn sounded?

8    A.  I stated it was a suspicious vehicle.  The horn

9    was sounding on the car.

10   Q.  Did you say anything about the fact you believe it

11   was a stolen vehicle in your police report, at any time?

12   A.  No.

13   Q.  In fact, you could have called for backup when you

14   saw the driver walk down the street, but you didn't do

15   that, did you?

16   A.  It happened so quick, no.

17        MR. FOX:  Nothing further.

18        THE COURT:  Recross, based on that.

19        MR. COTTER:  No.

20        THE COURT:  You are excused, officer.  Do not

21   talk about the case with anyone until the trial is over.

22             (Witness excused.)

23        Mr. Fox, call your next witness.

24        MR. FOX:  I will call Officer Moore.

51

```
 1              OFFICER MOORE
 2   called as a witness herein having been first duly sworn
 3   was examined and testified as follows, to wit:
 4              DIRECT EXAMINATION
 5              BY:  MR. FOX:
 6   Q.  Officer Moore, you work for the University of
 7   Chicago?
 8              THE COURT:  I am sorry.  Before you start,
 9   state your full name, for the record.
10   A.  Clarence E. Moore.
11              MR. FOX:  Q. You work for the University of
12   Chicago police department?
13   A.  Yes, part time.
14   Q.  In October you worked for them part time?
15   A.  Yes.
16   Q.  You are a sworn officer?
17   A.  Yes.
18   Q.  Work for any other police?
19   A.  Chicago Police Department.
20   Q.  On October 18, 2008, you were on duty for
21   University of Chicago?
22   A.  Yes.
23   Q.  And did you have a uniform on that day?
24   A.  Yes.
```

52

1    Q.   Marked vehicle that day?

2    A.   Yes.

3    Q.   Clearly identify itself as marked police vehicle?

4    A.   Yes, sir.

5    Q.   You were around roughly two, 2:30 in the morning,

6    you were parked on 53rd street?

7    A.   Yes.

8    Q.   What were you doing there?

9    A.   We had just come out of Dunkin' Donuts, getting

10   coffee.

11   Q.   And, at that time, you noticed a vehicle that had

12   a horn on?

13   A.   Excuse me.

14   Q.   You noticed a horn honking on a vehicle?

15   A.   At that time, I heard an, I did not hear it

16   honking.  I heard a continuance uninterrupted horn.

17   Q.   What did that mean to you?

18   A.   At that point, I didn't see the vehicle, I just

19   heard it coming.

20   Q.   When you heard the horn honking, uninterrupted

21   fashion, it was continuously honking, correct?

22   A.   No, it was not, it was uninterrupted, a steady

23   horn sounding, no honking.

24   Q.   When you heard that sound you looked in the

1    direction where it was coming from?

2    A.   Yes.

3    Q.   And you saw what?

4    A.   I saw the vehicle coming.  The vehicle passed.

5    The horn still constantly uninterrupted going off. I

6    observed the vehicle slowly passing through.  Then I

7    observed the vehicle pass us and drifted to the curb, hit

8    the curb and an abrupt stop.  The horn still constantly

9    going.

10   Q.   When it passed you it was not speeding, was it?

11   A.   No.

12   Q.   Did you observe it engage in any vehicle code

13   violations?

14   A.   No.

15   Q.   Traffic was light?

16   A.   Yes.

17   Q.   How far pass you, you were -- The car was going

18   eastbound on 53rd?

19   A.   Yes.

20   Q.   How far pass you did the vehicle pull over to the

21   curb?

22   A.   It did not pull over, it drifted over to the curb

23   as if the steering was locked.

24   Q.   So, when the car drifted over, did you make a

54

1    report about this at all, a police report?

2    A.   Yes.

3    Q.   Did you write a police report yourself?

4    A.   Yes.

5    Q.   Let me show you what we will mark as exhibit a. On

6    the top it is written, the letters DNA, is that your

7    handwriting?

8    A.   No.  You asked did I write the report.

9             THE COURT:   Just, you have answered the

10   question. No question pending.  Ask another question.

11            MR. FOX:  If I can approach with another.

12            THE COURT:  Yes.

13            MR. FOX:  I will identify as exhibit b. Putting

14   in front of you another report.

15   Q.   Is that your report, officer?

16   A.   No, this is Chicago police report.  You are asking

17   did I write this report.

18   Q.   Correct?

19   A.   Did if fill this out.

20   Q.   The narrative?

21   A.   No.

22   Q.   Is there any narrative you put together in that

23   document?

24            MR. COTTER:  Objection, at this point.  I have

55

1  not been shown this document.

2       THE COURT: Counsel, before you confront the

3  witness, if you will please show opposing counsel what

4  you are showing him. Is this exhibit c or b?

5       MR. FOX: One page I marked as b, correct. We

6  can identify the whole package as group b.

7       THE COURT: If you will show to the state.

8       MR. FOX: Judge, the problem I have now, these

9  are all the police reports I have got. So I don't have

10  the police report this officer wrote.

11       THE COURT: Do you have any further questions

12  of this officer?

13       MR. FOX: I do.

14    Q. Did you write a report on University of Chicago

15  report form?

16    A. University of Chicago report was filled out.

17  Officer Torres wrote the report.

18    Q. I am sorry?

19    A. Officer Torres wrote the report.

20    Q. Did you review his report?

21    A. Yes.

22    Q. Was that the first report I put in front of you?

23       THE COURT: That's exhibit a.

24       MR. FOX: Q. Is that this report?

56

1    A.  Yes.

2    Q.  Now, is there anything in that report to indicate

3    anything of the sort that the car drifted over, as if the

4    steering was locked?

5         MR. COTTER:  Objection, one ground, foundation.

6    Two, hearsay.  This officer did not author this report.

7         THE COURT:  Overruled.  He has adopted.  I will

8    allow impeachment.

9         MR. FOX:  Q. Does it indicate anywhere in that

10   report the car drifted over, as if the steering was

11   locked?

12   A.  The vehicle then curbed quickly.

13   Q.  Other than saying vehicle curbed quickly, is there

14   anything to indicate, saying it drifted over quickly, as

15   if the steering was locked?

16   A.  No.

17   Q.  Now, officer, after the vehicle curbed, you saw

18   two people get out the vehicle?

19   A.  I got in the car.  We got behind the car, put on

20   our mars lights.  After the vehicle curbed, we had our

21   mars lights on.  Two males got out the vehicle.

22   Q.  So, if I understand correctly, the vehicle curbed

23   before you put your mars light on?

24   A.  No.

57

1    Q.   You put your mars lights on, then the vehicle
2    curbed?

3    A.   We got in our car, the car passed us, with the
4    horn going off, drifting over.  We get in our car, get
5    behind the vehicle.  Okay, it drifted to the curb.  We
6    put our mars lights on.  I put the mars lights on, I was
7    driving.

8    Q.   After the vehicle curbed?

9    A.   Simultaneously, if I recall correctly,
10   simultaneously, as it went into the curb.

11   Q.   It appeared the vehicle was going towards the curb
12   before you put the mars lights on, is that a fair
13   statement?

14   A.   In my opinion, the car was drifting as if the
15   steering wheel was locked.

16   Q.   All right.  The steering was not, in fact, locked,
17   was it, you found out?

18   A.   I didn't get a chance to check that out.

19   Q.   Now, after, when you put the mars lights on, at
20   the time you put the mars lights on, the vehicle was not
21   completely stopped, is that your testimony?

22   A.   The vehicle was stopped.  The mars lights on.  The
23   vehicle stopped.  Two males get out the car and walk
24   away, eastbound.

58

1 Q. Okay.  When you parked your vehicle, you parked it

2 east of Mr. Boyle's vehicle, correct?

3 A. No, we were behind the vehicle.

4 Q. You parked behind the vehicle?

5 A. Yes.

6 Q. Now, after you parked your car, you said --

7 A. I didn't.  Okay, go ahead.

8 Q. Did you park your car?

9 A. My car is stopped in the street, as the vehicle

10 stopped, it is not parked.

11 Q. You stopped your vehicle, and at that point two

12 guys got out the car in front of you, the car that

13 drifted toward the curb?

14 A. Yes.

15 Q. You see two guys get out the car?

16 A. Yes.

17 Q. They start walking eastbound?

18 A. Yes.

19 Q. They don't run?

20 A. No.

21 Q. You don't do anything to try to stop them, do you?

22 A. Didn't get a chance to.

23 Q. You didn't call out to them?

24 A. They completely walked away.

59

1    Q.   How far behind the vehicle did you stop the

2  vehicle you were interested in, did you stop your

3  vehicle?

4    A.   Probably two car lengths.  Three car lengths,

5  maybe, two car lengths.

6    Q.   Less than 20 feet?

7    A.   No.

8    Q.   Two car lengths, you said?

9    A.   Car length is at least 20 feet, on average.

10    Q.   So you were within 30 or 40 feet you are saying,

11  within 40 feet?

12    A.   Of what.

13    Q.   Of the vehicle you are interested in?

14    A.   Yes.

15    Q.   You see two guys get out that vehicle, correct?

16    A.   Yes.

17    Q.   You make no attempt to yell out to them, stop,

18  police, do you?

19    A.   No.

20    Q.   One was the driver?

21    A.   One exited from the driver's side, yes.

22    Q.   And your partner didn't call out to that person

23  either, the person that exited the vehicle?

24    A.   No.

1 Q. You got out your vehicle and walked towards the
2 vehicle that had drifted toward the curb?

3 A. Yes.

4 Q. And another person got out the vehicle, who you
5 later learned was Mr. Boyle?

6 A. Yes.

7 Q. Now, at that time, up to that time, had you run
8 the plates of the vehicle?

9 A. No.

10 Q. Had that car matched any description of any stolen
11 vehicle you were aware of?

12 A. Matched, no.

13 Q. And when you got, when it was also a female in the
14 vehicle, when you saw it, when you got to the car?

15 A. Yes.

16 Q. Did you see any tools of any sort in the vehicle,
17 as you walked towards it?

18 A. I didn't, I did not investigate the inside of the
19 vehicle first.

20 Q. When you saw Mr. Boyle got out the vehicle, he
21 opened the hood?

22 A. No.

23 Q. Mr. Boyle walked out the vehicle and did what?

24 A. He walked, he exited the vehicle.  He walked, he

61

1   didn't look back, he walked straight in front of the

2   vehicle, approximately two or three steps, then he

3   stopped.  By that time he came back to the vehicle and

4   raised the hood, and the horn is steady going off.

5   Q.  So you are saying he walked two to three steps

6   pass the vehicle?

7   A.  Yes.

8   Q.  A run, trot or just walking?

9   A.  Just walking.

10   Q.  Did he engage in any sort of, make any moves that

11   you thought were suspicious, personally?

12   A.  Yes, walking pass, exiting the vehicle and walking

13   pass the vehicle was suspicious to me, with the horn

14   steady going off.

15   Q.  He returned around and opened the hood?

16   A.  Yes.

17   Q.  And then you walked towards him?

18   A.  Yes.

19   Q.  Did he make any suspicious moves, at that point?

20   A.  No.

21   Q.  He was not the driver, is that correct, Mr. Boyle,

22   who you saw open the hood?

23   A.  No.

24   Q.  Did you talk to him first, or your partner?

1　　A.　I don't recall who talked to him first.

2　　Q.　After he opened the hood, somebody asked him for

3　his ID?

4　　A.　We asked whose car it was.  That was the question

5　that came out, whose car.

6　　Q.　The person from inside the car responded to you?

7　　A.　No, she did not get out the car.

8　　Q.　Did she open her window and tell you it was her

9　car?

10　　A.　No.

11　　Q.　Had anybody told you there was a stolen car

12　consistent with that vehicle, that evening?

13　　A.　No.

14　　　　　MR. FOX:  Thank you, nothing further.

15　　　　　THE COURT:  Cross.

16　　　　　　　CROSS EXAMINATION

17　　　　　　　BY:  MR. COTTER:

18　　Q.　Officer Moore, this occurred about 1435 E. 53rd

19　street?

20　　A.　Yes.

21　　Q.　And that's in Chicago, correct?

22　　A.　Yes.

23　　Q.　And that street is open to the public?

24　　A.　Yes.

63

1    Q.   It is not private, in any way?

2    A.   Yes.

3    Q.   It is not restricted from access to the public, in

4    any way?

5    A.   That's correct.

6    Q.   There is no gate preventing entry where that's

7    located?

8    A.   That's correct.

9    Q.   Now, when you encountered the defendant, where in

10   relation to the -- Let me back up a minute.

11       You said that the silver Chrysler made contact

12   with the curb.  Did that happen before you and your

13   partner, before you activated your emergency lights?

14   A.   It is about the same time, because we were behind

15   the car and it hit the curb, yes.

16   Q.   It was about that same time that you activated

17   your emergency equipment?

18   A.   Yes.

19   Q.   So would it been fair to say the car stopped of

20   its own accord, not as a result of you activating your

21   emergency equipment?

22   A.   Yes.

23   Q.   Now, at some point did you have interaction with

24   someone who you later learned was Charles Boyle?

1    A.    Yes.

2    Q.    Do you see Charles Boyle here this afternoon?

3    A.    Yes, sitting in the back of the courtroom, with

4    black jacket, black tie and gray shirt.

5          MR. COTTER:  Ask the record indicate in-court

6    identification of defendant.

7          THE COURT:  It shall.

8          MR. COTTER:  Q.  Where, in relation to the now

9    stopped silver Chrysler, did you have interaction with

10   the defendant?

11   A.    In the front of the vehicle.

12   Q.    In the front, in the front of the vehicle?

13   A.    Yes.

14   Q.    Now, and you are aware there was a female still in

15   the car, at that point, right?

16   A.    Yes.

17   Q.    Was she seated in the back passenger side of the

18   car?

19   A.    She was in the back seat, yes, she is in the back

20   seat.

21   Q.    And this happened on the 18th of October, correct?

22   A.    If I recall correctly, the 18th, or I would need

23   to see the report.

24         MR. COTTER:  No further questions.


65

1          THE COURT:  Redirect, based on that?

2          MR. FOX:  No.

3          THE COURT:  All right, you are excused. Do not

4    talk about the case with anyone until the trial is over.

5                         (Witness excused.)

6               Mr. Fox, call your next witness.

7          MR. FOX:  I will call Ashley Glover.

8          ASHLEY GLOVER

9    called as a witness herein having been first duly sworn

10   was examined and testified as follows, to wit:

11          DIRECT EXAMINATION

12          BY:  MR. FOX:

13   Q.  Ma'am, state your name?

14   A.  Ashley Glover.

15   Q.  Ms. Glover, do you know Charles Boyle?

16   A.  Yes.

17   Q.  How do you know him?

18   A.  I know him through my boyfriend, who is Steven

19   Sinclair.

20   Q.  Were you with him the night of October 18th?

21   A.  Yes.

22   Q.  Whose vehicle were you in that evening?

23   A.  It, that was my vehicle.

24   Q.  And how was the function of the vehicle that

1  evening?

2  A.  It was okay, besides I was having a shortage in my

3  horn.  So that was the only problem with the vehicle, at

4  that time.

5  MR. COTTER:  Objection, judge.

6  THE COURT:  Shortage in my horn.  That was the

7  only problem with the vehicle, at that time.

8  MR. COTTER:  Q.  As a result of this short, try

9  and speak up, what was your horn doing, if anything?

10  A.  It was honking constantly.  It was a constant

11  honk.

12  Q.  Now, were you out that evening?

13  A.  Yes.

14  Q.  Who were you with?

15  A.  I was with Charles, Steven and Kenneth.

16  Q.  Who is driving the vehicle?

17  A.  Driving back, Steven was driving.

18  Q.  And where was, where were you sitting?

19  A.  I was in the passenger seat, in the front.

20  Q.  And where was Charles sitting?

21  A.  He was in the back seat, I think in the back

22  driver, behind the driver, in the back.

23  Q.  At some point in the early morning hours, was your

24  vehicle on 53rd street?

67

1    A.    Yes.

2    Q.    Do you remember which direction it was driving in?

3    A.    I am really bad with direction, we were driving

4    down 53rd street.  I think going east, I am not sure

5    though.

6    Q.    While driving down 53rd street, was your horn

7    giving you any problem?

8    A.    It went off.

9    Q.    After it went off, what did the person driving

10   your vehicle do?

11   A.    Parked.

12   Q.    Did he, describe how he parked?

13   A.    He pulled just like you would in an ordinary

14   parking spot.

15         THE COURT:  The driver was Steven?

16   A.    Yes.

17         THE COURT:  If you will use the name of the

18   people that would help me keep track.

19         MR. FOX:  Q. Describe Steven's vehicle, as it

20   is parking?

21   A.    We just pulled into the park and he straightened

22   the car and then he got out the vehicle.

23   Q.    To your knowledge, was there any problem with the

24   steering that evening?

68

1    A.  No.

2    Q.  Did you ever have any problem with the steering of

3  that vehicle?

4    A.  No.

5    Q.  Do you recall if you bounced off the curb at all?

6    A.  No.

7    Q.  Did it not happen?  Did the car bounce off the

8  curb?

9    A.  No.

10    Q.  As your car was on 53rd street, did you see police

11  officers?

12    A.  I didn't see the police until they pulled on the

13  side of the vehicle.  I didn't see them as we were

14  passing them.

15    Q.  After your vehicle stopped, what did the folks in

16  your car do?

17    A.  Two of them got out to go to the bank across the

18  street.  And Charles got out the car and was going to

19  check under my hood.

20    Q.  Okay.  Was that in connection with the horn?

21    A.  Yes.

22    Q.  So, is that, in fact, what happened?

23    A.  Yes, he got out the car and lifted the hood up,

24  was looking under the hood.

1   Q.  Were you able to look out your window, at that

2  time?

3   A.  Yes.

4   Q.  Describe, as precisely as you can, how Charles got

5  out the car, where he walked and what he did?

6   A.  He got out the car, walked around to the front.  I

7  pulled the thing so the hood could pop up, and he lifted

8  up the hood.  Was bent underneath the hood of the car.

9  He was holding the hood up, bent over.

10   Q.  He was holding up with one hand, you are

11  motioning?

12   A.  Yes.

13   Q.  At some point in time, did you see police

14  officers?

15   A.  Yes, they pulled up on the side of the car.

16   Q.  By the way, did Charles walk like a few steps pass

17  your vehicle at all, before he pulled open the hood?

18   A.  No, he just walked around to the front of the car

19  and lifted the hood up.

20   Q.  And by that time the other two guys in the car,

21  Steven, and you said Kenneth?

22   A.  Yes.

23   Q.  They left to go to the bank?

24   A.  Yes.

70

1    Q.   Was this to an ATM?

2    A.   Yes.

3    Q.   And what point, when did you see police officers?

4    Let me ask this way.

5         Where were the other folks you were with, when you

6    saw the police?

7    A.   They had already exited the car.  I am not sure if

8    they made it inside the ATM or bank branch whatever yet,

9    but I know they already exited the car.  And so did

10   Charles.

11   Q.   Where was Charles when you saw the police

12   officers?

13   A.   He was in front of my car.

14   Q.   Was the hood up, at that time?

15   A.   Yes.

16   Q.   He was looking into your car?

17   A.   Yes.

18   Q.   Did you see police officers approach?

19   A.   Yes, I did.

20   Q.   Who did they approach?

21   A.   They approached Charles.

22   Q.   Could you hear any conversation?

23   A.   I heard some of it, yes.

24   Q.   What was the first conversation that you heard?

71

1    A.   They asked Charles who he was.

2            MR. COTTER:   Objection, hearsay.

3            THE COURT:   Overruled.   It is a question.   That

4    cannot be hearsay.

5    A.   They asked Charles whose vehicle it was.

6            MR. FOX:   Q.   What was the next thing that was

7    said, that you heard?

8    A.   Charles said, he pointed at me and said, it is her

9    vehicle.

10   Q.   And then did you say anything, at that time?

11   A.   No, they asked again, whose vehicle it was, and

12   looked inside the car.   And then I rolled down the window

13   and said, it is my vehicle.

14   Q.   And you had registration for that vehicle?

15   A.   Yes.

16   Q.   Did anybody ask you for your registration?

17   A.   No.

18   Q.   Did anybody ask you if it was your vehicle?

19   A.   The cop had asked.   I am not really sure if it was

20   directed towards me or not, but I answered, yes, it is my

21   vehicle, in here.

22   Q.   Did he ask you for your ID?

23   A.   No.

24   Q.   And then after the second time, when you said you

72

1  kind of waved your hand at the officer from inside the
2  vehicle?

3      A.  Yes.

4      Q.  After that, what is the next thing that happened?

5      A.  The officer asked Charles for his ID.

6      Q.  What did Charles say?

7      A.  He asked, he was, he said, sir, why do you need my
8  ID?  And so then the officer said again, I need to see.
9  He used the words, I don't want to say, it was a curse
10  word.

11     Q.  You can say what is the first letter of the word?

12     A.  F.

13     Q.  Okay?

14     A.  He said, I need to see some ID.  And Charles was
15  like, I am not trying to be rude.  I just told you it was
16  her vehicle.  Why do you need my ID.

17     Q.  And then did you say anything, at that point?

18     A.  No.

19     Q.  What did, what was the next thing that occurred?

20     A.  The next thing I remember is the officer he was
21  standing behind Charles.  And so he kind of lifted, it
22  was some words exchanged.  It was kind of hard to hear,
23  because my window was only cracked. There was some words
24  exchanged. I don't know what was said.  Next thing I

1    know, the officer grabbed Charles by the back of his

2    shirt.

3        Q.   And did what?

4        A.   He tried to push him, throw him against the car.

5             MR. FOX:   Thank you.   Nothing further.

6             THE COURT:   Cross.

7                  CROSS EXAMINATION

8                  BY:   MR. COTTER:

9        Q.   Ms. glover, your boyfriend, Steven, was the driver

10   of the car on that night in question, correct?

11       A.   Correct.

12       Q.   And Charles Boyle is a friend of your boyfriend?

13       A.   Yes.

14       Q.   And this is about 2:30, 2:40 in the morning?

15       A.   Yes.

16       Q.   You said you were driving back from somewhere,

17   where were you driving back from?

18       A.   I believe the name of the place, Olay Lounge, I

19   think that's how you say it.

20       Q.   That is a bar or restaurant or something?

21       A.   I think it is a bar.

22       Q.   And it was your car that Steven was driving,

23   right?

24       A.   Yes.

74

1    Q.   Was he driving because you had some drinks that
2  night?

3    A.   I had a drink.  I just didn't.  I usually, when we
4  are in the car together, I let him drive, because I don't
5  like to drive that much.

6    Q.   Now, there was this problem with your horn, due to
7  some sort of electrical shortage?

8    A.   That's what I was guessing.

9    Q.   That's what you guys were trying to figure out?

10   A.   Exactly.

11   Q.   And the horn noise, it did not stop when the car
12 stopped, correct?

13   A.   It stopped.  Once we parked it had went off.  It
14 went off like the horn stop making the noise, once we
15 parked.

16   Q.   Now, was, as far as you can tell, and what you
17 could see, actually you said you were sitting in the
18 front passenger seat of the car?

19   A.   Yes.

20   Q.   And Steven was driving.  Did you see Steven do
21 anything in order to fix the horn, or did anything else?

22   A.   He got out.  Steve and Kenneth got out the car to
23 go to the ATM. Charles said he'll look at it, while they
24 go in there.  That's why he got out to go look under the

75

1    hood.  He said he'll look at it while they go in there.

2        Q.   So Charles got out.  When Charles got out the car

3    to look at the horn, was the horn still going off, making

4    noise?

5        A.   No, not that I believe, no.

6        Q.   So as a result of the car coming to a stop, that

7    somehow caused the horn to stop?

8        A.   I am guessing the horn, it was random, like it

9    goes on and off. I don't really know what made it stop.

10   It just, it was going on and off.

11       Q.   So, the Olay Lounge, where you were, is that on

12   the north side or south side of the city?

13       A.   North side.

14       Q.   And you guys had driven from there to the 1400

15   hundred block of 53rd street?

16       A.   Yes.

17       Q.   Was the horn making noise the whole time?

18       A.   No.

19       Q.   How long before the car came to a stop, had the

20   horn started making noise?

21       A.   When we turned down on 53rd it started.  It was

22   going, it went off only about 15, 20, 15 to 30 seconds.

23       Q.   The horn had been going off that long?

24       A.   Yes, it only did that once we turned down 53rd,

76

1    right before we were parking.

2        Q.   Is there any reason you know of that Kenneth and

3    Steven went to go get money?

4        A.   I know that they were going to put money in. I

5    think Kenneth had cash on him he didn't want to hold.

6        Q.   I am sorry?

7             THE COURT:  He had cash on him.

8        A.   I don't think he wanted to hold it.  So he was

9    going to put money in.  And Steven, I think, was checking

10   his balance and putting money in just in case he over

11   drafted, I think.

12            MR. COTTER:  Q.   This was about quarter to

13   three in the morning?

14       A.   Yes.

15       Q.   And when Charles got out to see what is going on

16   with the car, he went to the hood of the car?

17       A.   Yes.

18       Q.   And this is a 2006 Chrysler?

19       A.   Sebring, yes.

20       Q.   And had you, prior to this day, ever had occasion

21   to look under the hood of the car?

22       A.   Have I.

23       Q.   Yes?

24       A.   Yes.

77

1    Q.  And does the car have one of those tools to hold

2  itself open when you open the car?

3    A.  I don't know what it is called.

4    Q.  A bar that props it open?

5    A.  Yes.

6    Q.  I don't know what it is called either.  So when

7  Charles had this encounter with these police officers,

8  the hood was up, correct?

9    A.  Yes.

10    Q.  And you said that your window was open only a

11  small amount?

12    A.  Yes.

13    Q.  Is that because the temperature was cool out on

14  that night?

15    A.  Yes.

16    Q.  Were you guys listening to music in the car on the

17  way home?

18    A.  On the way home, yes.

19    Q.  Do you remember what you guys were listening to?

20    A.  No.

21    Q.  And was the music going up to that point, when the

22  car stopped on 53rd street?

23    A.  Was the radio on while we were driving.

24    Q.  Yes?

78

1    A.   Yes, the radio was on while we were driving.
2    Q.   And about --
3              MR. COTTER:  No further questions.
4              THE COURT:  Redirect, based on that.
5              MR. FOX:  No.
6              THE COURT:  You may step down.  Do not talk
7    about the case with anyone until the trial is over.
8                       (Witness excused.)
9              Call your next witness.
10             MR. FOX:  Defense rest.
11             THE COURT:  State.
12             MR. COTTER:  If I can have a moment, judge.
13   Well, judge, really the state doesn't have any additional
14   evidence, at this time.  We would, however, ask your
15   Honor take judicial notice that the 18th of October of
16   2008, the date in question, is, in fact, a Saturday
17   morning.  I can show you.
18             THE COURT:  Any objection.
19             MR. FOX:  I don't care.
20             THE COURT:  State rest?
21             MR. COTTER:  Yes.
22             THE COURT:  All right, argument.  Do you want
23   the parties in for argument?  It doesn't matter to the
24   Court.

1      MR. COTTER:  No, it doesn't matter.

2      THE COURT:  All right.  Mr. Fox, you may

3 proceed.

4      MR. FOX:  You prefer we stand when we address

5 the Court?

6      THE COURT:  I don't care.  Whatever is more

7 comfortable for you.

8      MR. FOX:  Thank you.  You know, judge, what

9 we've got is, up to the point in time that we are

10 interested in largely not that much in dispute, except

11 whether the car hit the curb hard or not, I suppose.

12 Other than that, it is not much dispute.

13      But what we've got is the officer informed

14 of what they know, at the time, is that there is a car

15 with a horn honking, based on their testimony, honking in

16 an uninterrupted fashion.

17      The car proceeds to slow down.  They stop

18 very close to their vehicle, not as if they are trying to

19 conceal themselves or the car.  It was a marked vehicle.

20 They don't have information from anywhere it was a stolen

21 vehicle, other than a horn honking.

22      I hate to bring this out, but if this was a

23 middle aged family, with kids, with a horn honking and

24 father looking under the hood of the car, we wouldn't be

80

1 here today, at all.

2          And so I would just venture to say, judge,
3 we've a car with a horn honking.  It is late at night,
4 early morning hour.  There is nothing else going on
5 whatsoever.  There is no probable cause or reasonable
6 suspicion to believe whatsoever, we've a stolen vehicle
7 here.  The man is looking under the hood, consistent with
8 a horn honking and a problem with the horn.  That's all
9 we have.

10          The fact the horn is honking, other than
11 that, seems to have very little significance to anything.
12 And with that, I don't know what else to say about it.

13          THE COURT:  State.

14          MR. COTTER:  Judge, initially this isn't a car
15 that is curbed on a public way, on a city street.  These
16 officers do, obviously, have a right to be where they are
17 when these events occur, which is what you heard from the
18 officers.

19          THE COURT:  What is the grounds for the stop?
20 Are you saying this is reasonable suspicion?

21          MR. COTTER:  Yes, judge.  I believe that the
22 officers' testimony supports the contention that they had
23 a reasonable, articulable suspicion that either a car was
24 stolen or perhaps that someone was driving under the

81

1    influence.

2           But, at any rate, a number of factors support

3    that.  That this happened at 2:40 in the morning.  That

4    the car is making this uninterrupted horn sound.  That it

5    comes to an abrupt stop, making contact with the curb,

6    where there are no other cars present.  And nothing to

7    suggest that this sort of evasive, or I don't, I should

8    not characterize as evasive, that there was anything from

9    impeding this car from parking in a deliberate --

10          THE COURT:  You are saying that the horn

11   honking is the equivalent to the, the guys casing the

12   joint in Terry vs Ohio.  That's the reasonable suspicion,

13   somebody walking back and forth of a premises where there

14   had repeated burglaries and police are able to stop them

15   and question them because they have reasonable suspicion

16   something criminal was afoot, not words of Terry.

17          So in that case there was location.  Two,

18   there was somebody walking back and forth and looking,

19   late at night, into this premises.

20          So you are saying the equivalent to that is

21   the honking horn and the abrupt stop and the guy walking?

22          MR. COTTER:  The sounding horn, the abrupt

23   stop, the immediate exit from the car of these two

24   individuals, who don't come back.


82

1            And again, taking into account the fact this

2     occurs early morning hours.  And I think counsel kind of

3     implied this might be racial.  But a bunch of young

4     people out and, yes, sir, young people more than not, are

5     going to be involved in, you know, in drinking.  And

6     there would be driving under the influence type of

7     situation involved.

8            And I know that following this discussion

9     about the complaint, and what they said they thought was

10    going on, but I believe that what you have heard

11    establishes that these officers did have a reasonable

12    articulable suspicion to investigate.  I pointed out too,

13    the car was actually stopped.  They didn't curb the

14    vehicle.  So the stop is just them getting out the car to

15    see what is going on, those officers.

16            That's when they encounter the defendant.  I

17    believe, under totality of circumstances, that what these

18    officers observed, and what they testified to in court

19    this afternoon establishes --

20            THE COURT:  What is the standard, as opposed to

21    automobile stop, what is the standard for stop of

22    pedestrians, or when you stop pedestrians on the street?

23    What is the fourth amendment standard that's applicable

24    here?

1     MR. COTTER:  I pointed out it happened on the
2  public street.  Obviously, being out in public, on the
3  public way, one has decidedly less expectation of privacy
4  then they do in one's abode.

5     THE COURT:  What is the legal standard?  It is
6  not probable cause.  It is not reasonable suspicion.
7  What is it?  Is it reasonable suspicion, the same as.

8     MR. COTTER:  My understanding.

9     THE COURT:  Is it identical to Terry.  You know
10  under New York vs Belton, there is a lessor degree of
11  expectation of privacy in a car, and that allows the
12  officers to stop on reasonable suspicion.  Is that the
13  same as Terry stop for pedestrians on the street?

14     MR. COTTER:  That's my understanding.  I mean,
15  Terry was not pedestrian on the street, in that this is
16  analogous, somewhat analogous situation.

17     THE COURT:  You are maintaining there is a
18  possible other suspicion than the one they articulate.
19  They chose to articulate on the street here, while not in
20  the report, a stolen vehicle.  You are adding another
21  possible suspicion here, and that's driving under the
22  influence.

23          They didn't give any testimony to support any
24  suspicion of driving under the influence of alcohol, did

84

1   they?

2           MR. COTTER:  No.

3           THE COURT:  So the only possible articulable

4   suspicion you can hang your hat on, in the particular

5   case, would be stolen motor vehicle.

6           MR. COTTER:  That's what the officer said.

7           THE COURT: That's what I need to evaluate

8   whether that suspicion was reasonable, given everything

9   they knew under the totality of the circumstances.

10          MR. COTTER:  That a specific crime was

11  occurring or had occurred or was about to.

12          THE COURT:  Reasonable articulation of stolen

13  motor vehicle.

14          MR. COTTER:  Not that any crime has occurred.

15          THE COURT:  It has to be a particular crime.  I

16  am asking for guidance.  I am looking to see whether

17  their suspicion of stolen motor vehicle, which was their

18  reason for the stop, under the circumstances, whether

19  that was reasonable, given all the facts and

20  circumstances. That's what I need to determine.

21          MR. COTTER:  I, frankly, don't know.  I believe

22  it, the Terry writes states of reason.  They thought

23  these guys were casing the place.  Then they find

24  narcotics on Terry, or something, a weapon.  Obviously,

1    the officer in Terry --

2                I think your Honor is right.  It is for

3    articulable suspicion they were committing offense act.

4    In this case the car was stolen.

5                Officer Torres said the way the horn was

6    sounding, he believed it was suspicion with tampering

7    with a vehicle, in an effort to steal.

8                I believe your Honor is correct, articulable

9    suspicion the car was stolen.  And for the grounds I

10   stated, and the officers' testimony too, for those

11   reasons, I believe that was reasonable suspicion.  And

12   you should deny the defendant's motion.

13              THE COURT:  All right.  Defense.

14              MR. FOX:  Your Honor, everything that happened

15   in this case, that my client did in this case, along with

16   his friends, was totally inconsistent with criminal

17   activity.  Aside from the fact the horn was honking.

18              They located the sound.  Stopped the vehicle

19   right across from where the marked police car was.  Two

20   get out the vehicle, walk, don't run.  There is no

21   indication of fleeing, just walk, don't run, towards the

22   bank.

23              Neither of the officers are suspicious of

24   these guys, at the time, because neither calls out to the

86

1    driver to stop, wait a minute, buddy.  They are not

2    suspicious themselves of a stolen vehicle. That's

3    inconsistent of horn honking.  Can do no better than

4    attract attention.

5         My client and their friends are not making

6    attempt to get away, as if in a stolen vehicle.  So they

7    are attracting attention to themselves to park

8    practically right next to a police car.  And there is a

9    horn honking.  At the end of the day, that's what we are

10   left with.

11        If I was driving down the street, with my

12   family, and the same thing happened, we would not be

13   here.  It just boggles my mind, in that sense.

14        THE COURT:  All right.  I have heard the

15   evidence and arguments of counsel.

16        The motion to suppress will be granted.  For

17   many reasons.  One, I do not believe this meets the

18   standard under Terry.  I was waiting to see whether the

19   state would argue this was community safekeeping stop.

20   They did not chose to argue that.  I am not sure whether

21   it was needed, under that standard.

22        But certainly I don't think under the argued

23   standard, articulable suspicion that the car was stolen.

24   I don't think the officer had, judging from totality of

87

1    the circumstances, reason to believe that something
2    criminal was afoot here.

3             The officers also, both the officers had, I
4    think, problems with credibility.  The facts regarding
5    the way the vehicle stopped, and the conduct of the
6    defendant, were not included in the report.  And that
7    impeachment by omission, specifically, with the testimony
8    of Ms. Glover, who I found to be highly credible.

9             Those two things together.  I don't believe
10   the officer's testimony, with respect to the way the stop
11   actually occurred.  I think these are facts, that these
12   are such important facts, that if they occurred they
13   would have included in the report.

14            Also, just even if I go with them and concede
15   all these things, the officer didn't say, didn't offer
16   any basis for his opinion that a solid horn is indicative
17   of a stolen car.  He has just voiced that opinion,
18   without supporting that with any experience that he has
19   had in prior five or six times, perhaps he knows this is
20   connected to a stolen vehicle.  There was nothing to
21   support that.

22            So that testimony that this sound is
23   articulable suspicion of stolen motor vehicle or horn
24   malfunctioning was not persuasive.

88

1        In Illinois, particularly, we have the right,

2   not only to be free from unreasonable search and seizure.

3   Article one, Section six, of Illinois Constitution

4   provides we have the right to privacy.  The right to be

5   left alone.  And state intervening and stopping us in our

6   daily life has to be reason to do so. Reason that stands

7   up in court.

8        The Court does not find, in this instance,

9   the two officers had sufficient reason to stop Mr. Boyle.

10  And for all those reasons, the Motion to Suppress will be

11  granted.

12       And based on that, with respect to the

13  underlying criminal charge?

14       MR. COTTER:  Motion State nolle pros.

15       THE COURT:  All charges are dismissed against

16  you, Mr. Boyle.  You are free to go.  The case is

17  dismissed. The defendant is discharged.

18                    (Which was all the evidence heard

19                     in the above-entitled cause.)

20

21

22

23

24


89

```
 1    IN THE CIRCUIT OF COOK COUNTY, ILLINOIS
 2              FIRST DISTRICT
 3
 4    I, OONA CAMPBELL-SMITH, an Official Court Reporter of
 5    the Circuit Court of Cook County, County Department
 6    Municipal Division, do hereby certify that I reported in
 7    shorthand the proceedings had on the hearing in the
 8    above-entitled cause; that I thereafter caused to be
 9    transcribed into typewriting the above Report of
10    Proceedings, which I hereby certify is a true and correct
11    transcript of the proceedings had upon the hearing of the
12    defendant before the Honorable THOMAS DONNELLY, Judge of
13    said Court.
14
15
16
17
18
19              Official Court Reporter.
20
21
22
23    Dated this 4th day of
24    March, 2009.
```

90