**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHARLES BOYLE,** )<br><br>)<br>**Plaintiff,** )<br><br>)<br>**v.** )<br><br>)<br>**UNIVERSITY OF CHICAGO POLICE** )<br>**OFFICER LARRY TORRES, et al.,** )<br><br>)<br>**Defendants.** )<br>) | No. 09 C 1080 |

## MEMORANDUM OPINION AND ORDER

Charles Boyle ("Boyle") sued several officers of the University of Chicago Police Department ("UCPD"): Larry Torres ("Torres"), Clarence E. Moore ("Moore"), Oscar Galarza ("Galarza"), Michael Kwiatkowski ("Kwiatkowski"), and Arthur Gillespie ("Gillespie") (together, "the UCPD Officers"). The suit is also brought against the City of Chicago and two officers of the Chicago Police Department ("CPD"): Vincent Darling ("Darling") and Carl Martin ("Martin") (together, "the CPD Officers"). Boyle's complaint asserts causes of action under 42 U.S.C. § 1983 and Illinois law. The UCPD Officers and the City/CPD Officers have each moved for summary judgment. For the reasons discussed below, the CPD Officers' motion is granted, and the UCPD Officers' motion is granted in part and denied in part.

**I.**

During the early morning hours of October 18, 2008, Boyle was riding in a car with his friends, Kenneth Roberson ("Roberson"), Steven Sinclair ("Sinclair"), and Ashley Glover ("Glover"). The car, which belonged to Glover, was driven by Sinclair. They were headed to an ATM machine in the Hyde Park neighborhood after spending the evening at a bar.

When the car was one or two blocks from the ATM, its horn spontaneously began to sound. This was the result of a malfunction in Glover's car and had occurred on previous occasions. While the horn was blaring, the car happened to pass Officers Moore and Torres. Sinclair parked the car a short distance away. He and Roberson then exited the car and walked about half a block to the ATM. Boyle got out of the car and began looking under the hood to see if he could fix the horn (which by now had stopped blowing). Glover remained in the front passenger seat of her car. Less than one minute later, Moore and Torres drove up and parked in front of Glover's car. The parties offer different accounts of what happened next.[1]

---

[1]    In his Local Rule 56.1(b)(3)(C) Response to the defendants' Rule 56.1(a)(1)(3) Statements, Boyle argues that the vast majority of the defendants' statements should be stricken. In each case, he cites *Nair v. Principi*, No. 03 C 6806, 2005 WL 1850358 (N.D. Ill. Aug 10, 2005), for the proposition that "[w]here the Court agrees that statements of facts are misleading or mischaracterize the evidence, it is appropriate

The UCPD Officers claim that they approached Boyle and asked him who owned the car. They note that Boyle, who was an All Conference football player in high school, stands nearly six feet tall and weighed about 235 pounds on the date of the incident. Boyle gestured in the direction of Glover in the front seat and stated that the car belonged to her. Glover waved her hand out of the passenger window and said that the car was hers.

The UCPD Officers then asked Boyle for his identification. Boyle asked the officers why they wanted to see his identification. When they asked him again, Boyle responded by asking why. Moore then placed his hand on Boyle's arm with the intention of guiding him over to the squad car. They claim that

_____

for the Court to disregard facts not supported by the cited evidence." *Id.* at *2. Essentially, Boyle asserts this objection wherever the defendants' factual allegations differ from his own. This has prompted the UCPD Officers to move that Boyle's response be stricken in its entirety. *See* Doc. 72. Meanwhile, the CPD Officers argue that many of Boyle's Rule 56.1 statements of additional fact should be denied on the ground that many of Boyle's statements are immaterial, or because they are redundant and fail "to set forth an additional fact requiring denial of City Defendants' summary judgment motion."

None of the actual or alleged violations of Local Rule 56.1 has hindered my ability to meaningfully review the parties' motions for summary judgment. Indeed, if the alleged violations have caused an inconvenience, it is by spawning ancillary arguments over the motions and requests to strike. Accordingly, I deny all of the parties' requests to strike.

Boyle pushed Moore's arm away. Torres then allegedly grabbed Boyle's arm and told him to relax, and Boyle pulled his arm away from Torres. Moore then allegedly grabbed Boyle's other arm. At some point during this sequence of events, Moore and Torres claim that Boyle flailed his arm in order to remove the officers' hands from his shoulder. Before long, the three were entangled in a wrestling match.

The UCPD Officers claim that Boyle knocked the wind out of Torres by putting him in a "bear hug," lifting him up, and pushing him into their police car. Torres called the dispatcher for assistance. A short time later, UCPD Officers Gillespie, Galarza, and Kwiatkowski arrived and assisted in the arrest. Boyle continued to struggle, kicking Gillespie in the side of the head and breaking his glasses. Moore is alleged to have injured his wrist; Galarza was seen in the University of Chicago emergency room, where his shoulder was x-rayed and he was prescribed pain medication. Boyle was eventually handcuffed and handed over to CPD Officers Darling and Martin, who, along with a number of other Chicago Police Officers, had arrived at the scene after hearing the dispatcher's call for assistance.

According to Boyle's version of events, Moore and Torres approached him while he had his back turned to them and was looking under the hood of Glover's car. One of the officers told him to "put [his] f[uck]ing hands up." Boyle complied and

turned around to face the officers.  Moore then asked Boyle who owned the car.  Boyle pointed to Glover, who was sitting in the car, and said that the car was hers.  Glover waved her hand outside of the passenger window to indicate that she owned the car.  Boyle claims that he turned back around and began tending to the car's engine, and that one of the officers then told him, "Show me some damn ID."  Boyle claims that he responded by asking "Why?" and that he turned back around to face the officer.  According to Boyle, the officer said, "Show me some fucking ID."  Boyle says that he told the officer that he did not have a problem with authority and that he was simply asking why he was being asked to show his identification.

At this point, Moore allegedly said, "I see we're going to have to deal with you."  He allegedly grabbed Boyle, turned him around, and slammed him onto the squad car parked in front of Glover's car.  Boyle claims that Moore grabbed him by the collar and again ordered him to produce his identification.  Once more, Boyle responded by asking why, to which Moore replied, "Because I said so."  Moore then slammed Boyle into the car.  At the same time, Torres punched Boyle in the back, hit him in the stomach with a flashlight, and began to pull Boyle's pants down.  Moore allegedly commented, "We're going to get your ass."  As Moore and Torres continued to kick and beat him, Boyle claims that he fell to the ground.  As the beating continued, Boyle says that

he asked the officers to stop, saying "I'm not doing anything, please stop hitting me," and "I'm not resisting. Please stop kicking me."

After two or three minutes, additional squad cars arrived on the scene. UCPD Officers Galarza, Gillespie, and Kwiatkowski exited their vehicles and, Boyle alleges, immediately began assisting Moore and Torres in beating him. A number of CPD officers, including Darling and Martin, also arrived. According to Boyle, instead of coming to his aid, Darling and Martin stood by and watched the beating continue. Boyle claims that the UCPD Officers kicked and punched him more than twenty times, for a period lasting between five and ten minutes.

Roberson returned from the ATM to see Boyle lying on the ground, handcuffed, with his pants partially pulled down. When he asked the officers what they were doing, one of them responded by asking him if he "wanted to be next." Roberson claims that he also heard one of the officers say to Boyle, "You're lucky this wasn't ten years ago because I would have killed you, you made me break my glasses."

Eventually, Boyle was lifted off the ground and slammed into a squad car. He was then walked over to Darling and Martin and placed in the back of their vehicle. Darling and Martin transported Boyle to the 21st District Police Station for processing, and he was charged with resisting arrest under 720

ILCS 5/31-1(a). In January 2009, the charge was dismissed by entry of a *nolle prosequi*.

**II.**

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Boyle's complaint has six counts: Count I alleges a § 1983 claim for unreasonable seizure against the UCPD Officers; Count II alleges a § 1983 claim for unreasonable seizure against Darling and Martin; Count III alleges a § 1983 excessive force claim against the UCPD Officers; Count IV alleges a § 1983 claim against Darling and Martin for failing to protect him; Count V asserts a claim for malicious prosecution under Illinois law against all of the defendants; Count VI alleges a claim for battery under Illinois law against the UCPD Officers.

**A. Count I: Unreasonable Seizure (UCPD Officers)**

Count I alleges that the UCPD Officers violated Boyle's Fourth Amendment right to be free from unreasonable searches and seizures. "To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the defendant deprived the plaintiff of a

right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996).

**1. Deprivation of a Constitutional Right**

"In order to make out a claim under Section 1983 for an unreasonable seizure in violation of the Fourth Amendment, a plaintiff must allege . . . that the defendants' conduct constituted a seizure, and that the seizure was unreasonable." *Bielanski v. County of Kane*, 550 F.3d 632, 637 (7th Cir. 2008). Boyle argues that the UCPD Officers violated his Fourth Amendment rights at several points during the October 18 encounter.

Boyle first claims that Moore and Torres violated the Fourth Amendment when they initially approached him and demanded to see his identification. This argument is without merit. As Boyle himself acknowledges, this initial inquiry amounted to no more than a *Terry* stop, which only requires a showing that the officers had reasonable suspicion to believe that a crime was about to be or had been committed. *See, e.g.*, *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010). "A reasonable suspicion requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (quotation marks omitted). "Determining whether an officer had

a reasonable suspicion is assessed considering the totality of the circumstances and common-sensical judgments and inferences about human behavior." *Id.* (quotation marks omitted).

Boyle claims that the UCPD Officers lacked reasonable suspicion because they stopped him only on account of the fact that he was looking under the hood of Glover's vehicle. This is not an accurate characterization of the circumstances. In particular, Boyle ignores the lateness of the hour, the frequency of car theft in the area, and especially the blaring car horn. As Moore testified, the sustained blowing of a car horn often indicates that a vehicle's alarm system has been short-circuited as a result of a hot-wiring attempt. University Defs.' L.R. 56.1 Stmt. ¶ 32. Under these circumstances, Officers Moore and Torres had reasonable suspicion and committed no Fourth Amendment violation in their initial *Terry* stop of Boyle.

Boyle is on firmer ground, however, in claiming that Moore and Torres violated his Fourth Amendment rights during his subsequent arrest. "It is axiomatic that a warrantless arrest must be supported by probable cause." *United States v. Sholola*, 124 F.3d 803, 814 (7th Cir. 1997) (quotation marks, brackets, and ellipsis omitted). "Probable cause is a state of facts that would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person

arrested committed the offense charged." *Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 863 (7th Cir. 2010) (citations and quotation marks omitted). "[I]t requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Id.*

Moore and Torres contend that they had probable cause to arrest Boyle for at least two offenses. First, they claim that Boyle committed a battery by shunting their hands away when they attempted to guide him over to their vehicle, and by "flailing" his arm when the officers put their hands on his shoulder. The evidence on this point is disputed: Boyle denies having pushed the officers' hands away or having flailed his arm. Moore and Torres also claim that that they had probable cause to arrest Boyle for resisting arrest. But here, too, disputed issues of fact preclude summary judgment. Illinois law provides that "[a] person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a). According to Moore and Torres, Boyle resisted arrest by refusing to move when they attempted to guide him over to their squad car. On Boyle's account, however, the officers made no attempt to guide him over to the squad car and he did not refuse to move. Rather, he

testified that the officers grabbed him by his shirt collar and began pushing him onto their squad car when he continued to ask the officers why they wanted to see his identification. *See, e.g.*, Pl.'s Resp. 56.1 Stmt. ¶ 37, 43; Glover Dep. at 71-88.

Moore and Torres also claim that Boyle resisted arrest when he refused their requests for his identification. However, courts have consistently held that under Illinois law, "resistance" requires some physical act, or a refusal to perform a physical act, and that mere silence or verbal responses are not enough. *See, e.g., People v. McCoy*, 881 N.E.2d 621, 630 (Ill. App. Ct. 2008) ("The statute does not prohibit a person from verbally resisting or arguing with a police officer about the validity of an arrest or other police action. Verbal resistance or argument alone, even the use of abusive language, is not a violation of the statute."). As the Seventh Circuit has pointed out, "the Illinois Appellate Court has reaffirmed that a 'physical act' is an essential element of obstruction under § 5/31-1, and has further clarified that . . . 'mere silence' in the face of requests for identifying information, or even supplying false information, is not enough to constitute obstruction." *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001); *see also People v. Hilgenberg*, 585 N.E.2d 180, 183 (Ill. App. Ct. 1991) ("Mere refusal to answer a police officer, in the absence of a physical act, may be deemed tantamount to

argument which is not a violation of the statute."); *People v. Synnott*, 811 N.E.2d 236, 23 (Ill. App. Ct. 2004) ("It has been held that refusing to identify oneself or falsely identifying oneself in connection with a criminal matter does not constitute resistance or obstruction.") (citing *People v. Ramirez*, 502 N.E.2d 1237, 1239-40 (Ill. App. Ct. 1986)).[2] Boyle's response of "why" to Moore and Torres's request for ID was not a physical act of resistance.

Indeed, even if mere refusal to provide ID were a potential basis for arrest, Moore and Torres still would not be entitled to summary judgment, for disputed issues of fact exist as to whether Boyle indeed "refused" to produce ID. Boyle maintains that he did not refuse but instead merely asked the reason for the officers' request. Responding in this fashion might well be tantamount to resistance if carried on long enough; but Moore and Torres offer no view on the question of when Boyle's questioning could properly be deemed resistance. Moreover, even

---

[2] I note the Seventh Circuit's statement in *Cady v. Sheahan*, 467 F.3d 1057 (7th Cir. 2006), that "Illinois has . . . a statute [725 ILCS 5/107-14] permitting officers to demand identification during a temporary stop," and that "[u]nder *Hiibel* [*v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177 (2004),] and in conjunction with 720 ILCS 5/31-1 (2006), an individual could be arrested for obstructing a peace officer for failing to identify himself during a temporary stop." *Id.* at 1063 n.8. Even if this were not dicta, it still would not affect my conclusion because, as discussed below, the record does not permit a clear determination that Boyle indeed "refused" to provide his identification.

if there were a bright-line rule for making this determination, summary judgment could not be granted on this record, because it presents no clear indication as to how much of an opportunity Boyle was afforded to produce his ID. Although the parties agree that Boyle was asked for his ID more than once, Boyle's account suggests that he had little time to comply before the situation escalated into a physical altercation. Viewing the record in the light most favorable to Boyle, it is not possible to say as a matter of law that his questions constituted a refusal to produce his identification.

Moore and Torres argue that even if they lacked probable cause to arrest Boyle, they are entitled to qualified or "good faith" immunity for their conduct. In the context of a § 1983 unlawful arrest claim, determining whether an officer is protected by qualified immunity requires asking whether "the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). "Courts have referred to the second inquiry as asking whether the officer had 'arguable' probable cause." *Id.* For the reasons outlined above, when the evidence is viewed in the light most favorable to Boyle, a jury could reasonably conclude that it was objectively unreasonable for Moore and Torres to believe that they had probable cause to

arrest Boyle. *See, e.g.*, *Morfin v. City of East Chicago*, 349 F.3d 989, 1000 n.13 (7th Cir. 2003) (Because the facts within officer's knowledge at the time of the arrest are a matter of dispute between the parties, summary judgment on the basis of "arguable probable cause" was inappropriate). In short, a triable issue of fact remains as to whether Moore and Torres violated Boyle's Fourth Amendment rights.

With respect to UCPD Officers Galarza, Gillespie, and Kwiatkowski, matters are different. Insofar as these officers were involved in Boyle's arrest, their actions were supported by probable cause. It is undisputed that Galarza, Gillespie, and Kwiatkowski came to the scene after hearing a call that an officer was in need of assistance. By the time they arrived, Boyle was engaged in a scuffle with Moore and Torres. It was not necessary for the officers to make an independent inquiry to establish probable cause. Rather, based on the circumstances they observed when they arrived, Galarza, Gillespie, and Kwiatkowski were entitled to believe that Moore and Torres had probable cause to arrest Boyle. *See, e.g.*, *Adeszko v. Degnan*, No. 05-C-4589, 2006 WL 3469541, at *4 (N.D. Ill. Nov. 29, 2006)("[M]erely assisting another officer in effectuating an arrest in progress does not require that the assisting officer acquire probable cause independent of the initiating officer."); *O'Leary v. Luongo*, 692 F. Supp. 893, 902 (N.D. Ill. 1988)

("Probable cause for [Officer] Luongo arose when [Officer] Leide, a reliable informant as a matter of law in the absence of any evidence otherwise, radioed him for assistance."); *Perkins v. Daley*, No. 87 C 9756, 1989 WL 4213, at *2 (N.D. Ill. Jan. 19, 1989) ("A late-arriving officer may assist in an arrest already in progress when there is no basis for questioning the legality of that arrest.").

Since Boyle has failed to establish a triable issue of material fact as to whether Galarza, Gillespie, and Kwiatkowski had probable cause, Boyle's unreasonable seizure claim against them fails.[3] Hence, these officers are granted summary judgment on Count I.

## 2.  Color of Law

The UCPD Officers next contend that Boyle's § 1983 claim fails because they are not employed by the government, and their alleged actions therefore could not have been performed under the color of law.  I disagree.

As the UCPD Officers themselves acknowledge, the mere fact that they are employed by a private institution does not settle

---

[3] As explained more fully below, this conclusion does not foreclose Boyle's excessive force claim against Galarza, Gillespie, and Kwiatkowski in Count III.

the question of whether they are state actors for purposes of §
1983. "Although it is usually used only against government
officers because of its requirement that the defendant act
'under color of state law,' § 1983 may also be brought to bear
on private individuals who exercise government power." *Payton*,
184 F.3d at 628. More specifically, the Seventh Circuit has
explained that "a private party will be deemed to have acted
under 'color of state law' when the state either (1) effectively
directs or controls the actions of the private party such that
the state can be held responsible for the private party's
decision; or (2) delegates a public function to a private
entity." *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894,
896 (7th Cir. 2004) (quotation marks omitted).

Boyle relies on the second of these theories. He contends
that the State of Illinois has delegated to the UCPD the same
powers as those possessed by ordinary municipal police officers.
Boyle's position is supported by 110 ILCS 1020/1, which
provides:

> Members of the campus police department shall have the
> powers of municipal peace officers and county
> sheriffs, including the power to make arrests . . .
> for violations of state statutes or municipal or
> county ordinances, including the ability to regulate
> and control traffic on the public way contiguous to
> the college or university property, for the protection
> of students, employees, visitors and their property,
> and the property branches, and interests of the

> college or university, in the county where the college
> or university is located.[4]

Because section 1020/1 confers full police powers on peace
officers employed by private universities, Boyle contends that
the UCPD Officers should be regarded as state actors.

Boyle's position finds further support in this Circuit's
case law. In *Scott v. Northwestern University School of Law*,
No. 98 C 6614, 1999 WL 134059 (N.D. Ill. March 8, 1999), for
example, the court held that two officers of the Northwestern
University Police Department ("NUPD") acted under color of law
when they arrested the plaintiff on suspicion of theft. Citing
section 1020/1, the court concluded that even though the NUPD
was a private entity, it was a state actor for purposes of
Scott's § 1983 claim, because NUPD officers performed
essentially the same functions as the municipal police. "By
accepting [section 1020/1's] authorization," the court held,
"Northwestern and its police must also accept the grave
responsibility to protect an individual's constitutional rights,

---

[4] The version of the statute in effect at the time of the events
in question stated that university police "powers may be
exercised only on college or university property." 110 ILCS
1020/1. Because the incident at issue here did not take place
on the University of Chicago campus, it might be argued that
Boyle's reliance on the statute is misplaced. However, the UCPD
Officers have expressly waived this argument, stating that they
"do not base their color-of-law argument on whether their
actions occurred on or off campus property, and have never
suggested that the issue turns on where the incident occurred."
UCPD Defs.' Supp. Mem. at 5.

the same responsibility that § 1983 enforces against municipal and other police forces." *Id.* at *6.

Similarly, in *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, the plaintiff brought a § 1983 suit against two hospital security guards who had allegedly accosted him. The guards were designated as "special police officers" under section 4-340 of the Chicago Municipal Code, which gave them essentially the same authority as that possessed by the CPD officers. 184 F.3d at 630. The court held that "for purposes of determining whether [the guards] could be state actors . . . , no legal difference exists between a privately employed special officer with full police powers and a regular Chicago police officer." *Id.* Likewise, in *United States v. Hoffman*, 498 F.2d 879 (7th Cir. 1974), the Seventh Circuit held that police officers employed by Penn Central Railroad had acted under the color of law because an Illinois statute gave them "like police powers as those conferred upon the police of cities." *Id.* at 881 (quotation marks omitted).

The UCPD Officers argue that these cases are distinguishable because, despite the broad grant of authority under section 1020/1, UCPD officers do not actually exercise full police powers. Notably, the UCPD's own website contradicts this statement, announcing: "Our more than 100 state-certified officers have full police powers. We respond to emergency calls,

patrol neighborhoods, listen to residents' concerns, conduct food and toy collections for neighbors in need, and more. Our reputation for quick response is a powerful force in the community." *See* http://safety-security.uchicago.edu/police/. As a factual matter, they claim, UCPD officers do not make arrests, but instead merely detain suspects and call the CPD for assistance. UCPD Officers' 56.1 Stmt. ¶ 72. Further, it is undisputed that UCPD officers do not make traffic stops or issue traffic tickets; they do not fill out criminal complaint forms or decide what charges are brought against an arrestee; the UCPD has no "lockup" area, and its officers are not permitted to take individuals into custody at the University of Chicago's security facility. *Id.* Moreover, while they carry guns, they do not carry pepper spray, "billyclubs," or "big Kel brand flashlights." Finally, the UCPD Officers point out that the territory they patrol is also patrolled by the CPD. *Id.*

The UCPD Officers' argument is bottomed on the assumption that private police or security forces do not exercise full police powers, and thus are not state actors, if they do not perform every function performed by municipal police officers. It is difficult to see how this assumption can be correct. For instance, it seems highly doubtful that the officers in *Hoffman* or *Payton* had the ability to issue traffic tickets and perform all other duties enumerated by the UCPD Officers; nevertheless,

they were deemed to have full police powers and to have acted under color of law. The same holds true here: the fact that UCPD officers do not perform the particular functions or carry the specific equipment singled out above does not mean that they are not state actors.

The UCPD Officers also argue that they cannot be deemed state actors because they do not perform any function that traditionally has been the "exclusive prerogative" of the state. They maintain with particular vehemence that they do not have the power to effect arrests. This claim is problematic in several respects. For one thing, it flies in the face of the evidence. If the seizure to which the UCPD Officers subjected Boyle was not an "arrest," it is difficult to imagine what it should have been called. The UCPD Officers rely heavily on the fact that, in his response to their Local Rule 56.1 Statement, Boyle did not specifically dispute that they lacked the power to perform arrests. In his supplemental briefing on the color-of-law issue, however, Boyle does contest the issue. In any event, issues of nomenclature aside, there can be no question that in dealing with Boyle, the UCPD Officers acted in a way that only police officers are authorized to act. Although the UCPD Officers insist that they do not have the power to arrest, they also maintain that the power to arrest is not an exclusive state function. But if performing arrests truly is not an exclusive

state function, it is unclear why it should be necessary for the UCPD Officers to show that they do not perform arrests. The UCPD Officers place much emphasis on Judge Posner's statement in *Spencer v. Lee*, 864 F.2d 1376 (7th Cir. 1989), that "[a]rrest has never been an exclusively governmental function," and that "[i]n ancient Greece and Rome, and in England until the nineteenth century, most arrests and prosecutions were by private individuals." *Id.* at 1380. Notably, however, after making the latter remark, Judge Posner goes on to observe that "[e]very function performed by government has an analogue that was performed privately when government was rudimentary, or before there was government." *Id.* As this remark indicates, it is doubtful that any function has ever been exclusively performed by the state. Thus, if taken literally and pressed to its logical conclusion, the requirement that a private entity perform an exclusive state function would make the public function test a dead letter.

In any event, there can be no question that the UCPD's role is one that has traditionally been the exclusive prerogative of the state: they carry guns, they wear police uniforms, and they patrol their territory in squad cars; they have the ongoing authority to detain citizens and place them in handcuffs; they have the authority to demand that individuals furnish them with

ID. When the ensemble of the officers' powers and functions is kept in view, there can be no doubt that they are state actors.

The cases cited by the UCPD Officers in support of their position are easily distinguished. In *Wade v. Byles*, 83 F.3d 902 (7th Cir. 1996), for example, the plaintiff was shot by a security guard who worked for a private company hired by the Chicago Housing Authority ("CHA") to police the lobby areas of CHA buildings. The security guards were responsible for controlling access to the buildings by monitoring people coming and going. If a visitor refused to show identification, the guards could call the police and wait for them to remove the person, or they could arrest the individual for criminal trespass pending the arrival of the police. The guards carried handguns and were authorized to use deadly force in self-defense. The Seventh Circuit held that the guard had not acted under color of law, explaining that although all of the powers exercised by the guards "had been traditionally exercised by the sovereign via the police, none has been *exclusively* reserved to the police." *Id.* at 906.

The UCPD Officers' authority far exceeds that of the security guards in *Wade*. First and most obviously, the territory patrolled by UCPD officers is not as restricted as that of the guards in *Wade*. Moreover, the guards in *Wade* were authorized to arrest individuals only for criminal trespass pending the

arrival of the police. Thus, if a crime occurred in an apartment or stairwell, the security guards presumably would have had to call the police. *Payton*, 184 F.3d at 623. Similarly, if the guards witnessed a crime other than criminal trespass, their only recourse was apparently to dial 911. *Id.* Here, by contrast, the UCPD is authorized to detain individuals for criminal activity of all kinds.

The UCPD Officers' reliance on *Johnson v. LaRabida Children's Hospital* is also misplaced. *Johnson* involved an altercation between a former hospital employee and one of the hospital's security guards. The Seventh Circuit affirmed the dismissal of the plaintiff's § 1983 claim, holding that the guard could not be deemed a state actor. Although the guard was a "special police officer" under Chicago Municipal Code § 4-340-100, and thus possessed all the powers of ordinary municipal police officers, the court noted that for purposes of his employment with the hospital, the guard was not expected or authorized to carry out the functions of a police officer; he was "merely responsible for routine security duties only such as patrolling the interior and exterior of the hospital, observing potential safety hazards, manning an information desk, monitoring the alarm system, and providing escorts for patients and staff." 372 F.3d at 897. The guard was not authorized to carry a firearm; and if a visitor became belligerent, the guard

could either ask the person to leave or call 911 for help. *Id.*
The guard's role bears little resemblance to that of the UCPD
Officers.

For these reasons, I conclude that the UCPD Officers acted
under color of law.  In light of this conclusion, and in view of
my earlier determination that a triable issue of fact exists as
to whether the UCPD Officers deprived Boyle of his
constitutional rights, I deny Moore and Torres's motion for
summary judgment on Count I's unreasonable seizure claim.

**B.    Count II: Unreasonable Seizure (City/CPD Officers)**

In Count II, Boyle asserts a claim for unreasonable seizure
under § 1983 against CPD officers Darling and Martin.  His main
contention is that the CPD Officers lacked probable cause
because when they arrived on the scene, they had no reason to
believe that he was resisting the UCPD Officers.  Boyle claims
that prior to responding to the incident, the CPD Officers were
never told by the dispatcher that a suspect was resisting
arrest; instead, he maintains that they were informed only that
an officer had requested assistance.  In addition, Boyle
contends that the CPD Officers themselves never witnessed him
resisting arrest.  By the time they arrived, he argues, he was
on the ground and had already been hand-cuffed.

As already discussed with respect to Galarza, Gillespie,
and Kwiatkowski, the fact that the CPD Officers did not

personally witness Boyle resist arrest does not establish that they lacked probable cause. As the Seventh Circuit has explained, "[i]n making a decision to arrest someone for criminal conduct that he did not witness, a police officer may rely on information provided to him by the victim or by an eyewitness to the crime that the officer reasonably believes is telling the truth." *Holmes v. Village of Hoffman Estate[s]*, 511 F.3d 673, 680 (7th Cir. 2007) (citations and quotation marks omitted). "So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest." *Id.* Based on what they saw and what they were told, Martin and Darling had probable cause to believe that Boyle had resisted arrest.

Martin and Darling also had probable cause to arrest Boyle for battery. Boyle himself insists that Moore told Darling that Boyle had hit him. *See* Pl.'s Resp. to CPD Mem. at 6. It is true that Boyle was ultimately never charged with battery. But that does not show that the CPD Officers lacked probable cause to arrest him on that charge. *See, e.g.*, *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001).

Boyle claims to find a number of inconsistencies in Moore's testimony. These, he maintains, show that Moore's statements could not have provided Martin and Darling with probable cause

25

for his arrest. This line of argument is unavailing because the purported inconsistencies in Moore's testimony turn out to be illusory. For example, Boyle claims that Moore first told Darling that he decided to check on Boyle because Boyle had the hood of his car up on the street. He claims that Moore later said that he had gotten into a verbal altercation with Boyle and that he had taken Boyle down to the ground because Boyle had approached him. Pl.'s Resp. to City Defs.' Mem. at 9. According to Boyle, these statements conflict with Moore's later testimony that "he told the CPD Officers about the vehicle, the horn constantly sounding, two people getting out of the car, Boyle refusing to provide information, Boyle pushing off of the University Officers and about cuffing Boyle." *Id.* Even granting that this is a fair characterization of Moore's testimony (which the CPD Officers dispute), these statements are simply different, not contradictory.

Similarly, Boyle argues that Moore never told Darling that he suspected the car Boyle was working on had been stolen. Pl.'s Resp. CPD Defs.' Mem. at 9. "In fact," Boyle claims, "Moore didn't even include the fact that he thought the car was stolen on his own police report." *Id.* at 9. Nevertheless, Boyle points out, "on the last version of the criminal complaint against Boyle (with Martin's signature on it), Boyle is alleged

to have resisted an investigative stop into a possible stolen car." *Id.*

As an initial matter, this misrepresents the record: regardless of whether Moore told Darling *in haec verba* that he was investigating a possible stolen car, Darling testified unequivocally that Moore told him that part of the reason he approached Boyle was because the area in question had a high rate of car theft. *See, e.g.*, City of Chicago, Ex. G, Darling Dep. at 31:4-6. Further, even if Moore never told Darling that he suspected the car might be stolen, this would not present any conflict in his testimony: it would show only that while Moore mentioned his suspicion to Martin, he did not mention it to Darling. Once again, the statements are simply different, not inconsistent.

Finally, even assuming that Martin and Darling lacked probable cause to arrest Boyle, they would be protected by qualified immunity. Unlike in the case of the UCPD Officers, there is no doubt that CPD Officers can invoke the doctrine of qualified immunity. *E.g.*, *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 459 (7th Cir. 2010) ("The doctrine of qualified immunity shields from liability public officials who perform discretionary duties, and it thus protects police officers who act in ways they reasonably believe to be lawful.") (citation and quotation marks omitted).

To invoke the doctrine successfully, they must show that they were not objectively unreasonable in believing that probable cause existed. *Wollin*, 192 F.3d at 621. On this record, it is clear that they were not unreasonable. *See, e.g.*, *Duran v. Sirgedas*, 240 Fed. App'x. 104, 116 (7th Cir. 2007) ("[A] reasonable officer witnessing the scene and seeing other officers move to arrest [the defendant] could believe that those officers were acting on probable cause, and assist in effectuating the arrest. Although the other officers may not have expressly told [the assisting officer] that probable cause existed, their conduct implied as much."); *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002); *Carr v. Village of Richmond*, No. 96 C 50203, 1999 WL 626773, at *6 (N.D. Ill. July 9, 1999) *Bettis v. Pearson*, No. 1:04-cv-112, 2007 WL 2426404, at *6 (E.D. Tenn. Aug. 21, 2007).

For these reasons, the CPD Officers are entitled to summary judgment on Count II.

## C. Excessive Force

Count III of Boyle's complaint alleges a claim for excessive force under § 1983 against the UCPD Officers. The UCPD Officers devote little effort to seeking summary judgment with respect to Count III. Indeed, they acknowledge that Boyle has marshaled sufficient evidence to raise a triable issue of fact as to whether they used excessive force in arresting him.

*See* UCPD Defs.' Reply at 13 n.2. In passing, they argue that, as with Boyle's unreasonable seizure claim, his excessive force claim fails because they did not act under color of law. As already explained, however, the UCPD Officers' color-of-law argument does not hold water.

Nor is Boyle's excessive force claim affected by my conclusion above that his unreasonable seizure claim fails as to Officers Galarza, Gillespie, and Kwiatkowski. As the Seventh Circuit has explained, "[t]he doctrine of Fourth Amendment reasonableness has distinct, component parts. A seizure without probable cause is conceptually different from a seizure that employs excessive force; both are unreasonable, but for different reasons." *Carlson v. Bukovic*, 621 F.3d 610, 622 n. 19 (7th Cir. 2010); *see also Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) ("If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or

neither."). Thus, even if Galarza, Gillespie, and Kwiatkowski had probable cause to arrest Boyle, the question remains whether they used a reasonable degree of force in doing so. Because a question of fact remains with respect to the latter issue, the UCPD Officers' motion for summary judgment is denied as to Count III.

### D. Failure to Protect

In Count IV, Boyle asserts a § 1983 claim against Officers Martin and Darling for failing to intervene to prevent the violation of his rights. As a general matter, an officer has a "duty under § 1983 to intervene to prevent a false arrest or the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it." *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008).

Count IV fails, however, because Boyle has failed to produce sufficient evidence from which a jury could infer that Martin and Darling had a realistic opportunity to prevent the alleged violation of Boyle's rights. Martin and Darling have testified unequivocally that they never saw the UCPD Officers use force against Boyle. The evidence to which Boyle cites shows only that CPD officers may have been present during the time he was allegedly beaten. In light of the fact that at least four CPD officers arrived on the scene during the

30

incident, this is not sufficient. Boyle must come forward with evidence specifically showing that Martin and Darling were among the CPD officers present at that time. This he has failed to do.

Boyle cites Darling's testimony that when he and Martin first arrived on the scene "there was a lot of chaos there," and that he "had to sit back and observe what was going on first." Darling Dep. at 17:1-18:5. Boyle takes this to mean that Darling was present while his struggle with the UCPD Officers was taking place. However, Darling's subsequent testimony makes clear that the "chaos" he witnessed was not the altercation between Boyle and the UCPD, but rather the fact "[i]t was a lot of squad cars blocking the street," that and that "[t]here were a few sirens on the squad cars." Pl.'s Ex. F at 18.

In several places, Boyle argues that after lifting him up, "Officer Moore slammed Boyle against the trunk of a squad car," and that "Darling and Martin, who were still standing next to their squad car, then saw Torres, Moore, and Galarza walk Boyle over to their City patrol car and place Boyle into the back seat." Pl.'s L.R. 56.1 Stmt. ¶ 24. From this, Boyle concludes that "Darling and Martin had to be present when the University officers kicked Boyle was on the ground as they were out of their cars before Boyle was stood up and walked over to their vehicle." *Id.* However, Boyle's citations to the record only

support his claim that he was slammed against the trunk of the car and that he was walked over to Darling and Martin's vehicle. He cites no evidence indicating that Martin and Darling had been standing next to their vehicle long enough to see these events or to intervene to stop them.

In short, even taking the facts and inferences in the light most favorable to Boyle, no reasonable jury could conclude on this record that Martin and Darling had the ability to prevent the alleged violations of Boyle's rights. *See, e.g.*, *Smith v. Hunt*, No. 08 C 6982, 2010 WL 3842374, at *9 (N.D. Ill. Sept. 27, 2010) (rejecting failure-to-intervene claim against sergeant where plaintiff offered no specific argument or evidence to show sergeant was present at the time the excessive force was used). Accordingly, the CPD Officers' motion for summary judgment is granted as to Count IV.

### E.  Malicious Prosecution

In Count V, Boyle asserts a claim for malicious prosecution under Illinois law.   To establish malicious prosecution, a plaintiff "must show (1) the commencement or continuation of an original criminal or civil proceeding by the defendants; (2) termination of the proceeding in his favor; (3) the absence of probable cause; (4) the presence of malice on the defendants' part; and (5) damages." *Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 863 (7th Cir. 2010).

Given that the CPD Officers had probable cause to arrest
Boyle, they are entitled to summary judgment with respect to
Count V. *See, e.g.*, *Porter v. City of Chicago*, 912 N.E.2d 1262,
1271 (Ill. App. Ct. 2009) (probable cause is an absolute defense
to malicious prosecution).  Moreover, Boyle presents no argument
or evidence to support his malicious prosecution claim against
UCPD Officers Gillespie, Galarza, and Kwiatkowski.  Hence, they,
too, are entitled to summary judgment as to Count V.

As for Moore and Torres, they do not dispute that Boyle has
satisfied the element of damages; there also is no dispute that
the proceedings terminated in Boyle's favor; moreover, as
explained above, a triable issue of fact exists as to whether
Moore and Torres had probable cause to detain and initiate
charges against Boyle.  Thus, the survival of Boyle's malicious
prosecution claim depends on whether he can establish its two
remaining elements: that Moore and Torres "commenced" the
prosecution and that they did so with malice.

"In Illinois, criminal proceedings are commenced by the
filing of a complaint, an indictment, or an information." *Logan
v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir. 2001).
"Illinois law requires that, in order to commence or continue a
criminal proceeding, the defendant must have initiated the
criminal proceeding or his participation in it must have been of

so active and positive a character as to amount to advice and cooperation." *Id.* (quotation marks omitted).

Boyle's argument on these issues is perilously terse, and the case he cites in support of his position, *Joiner v. Benton Community Bank*, 411 N.E.2d 229 (Ill. 1980), is inapposite. In *Joiner*, the appellate court upheld the trial court's grant of summary judgment to the defendant on the plaintiff's malicious prosecution claim. The basis for the court's holding was the fact that the plaintiff had entered into a settlement agreement in exchange for having the charges against him dropped. The court held that the malicious prosecution claim failed because the proceedings had not terminated in a manner indicative of the plaintiff's innocence. Other than the fact that it involved a claim for malicious prosecution, *Joiner* has nothing in common with this case and provides no support for Boyle's position.

Nevertheless, the record contains sufficient evidence to support Boyle's malicious prosecution claim against Moore and Torres. On this record, a jury could reasonably conclude that Moore and Torres responded with unjustified aggression to Boyle's failure to produce identification, and that, in order to justify their actions, they were less than truthful in describing the incident to Officers Martin and Darling. In making knowingly false statements to the CPD Officers, Moore and Torres would have satisfied the "commencement" requirement for a

malicious prosecution claim. *See, e.g.*, *Logan*, 246 F.3d at 922; *Allen v. Berger,* 784 N.E.2d 367, 370 (Ill. App. Ct. 2002) ("[W]hen a person makes a knowingly false report to a prosecuting officer, the resulting prosecution is attributable to that person"). Similarly, if Moore and Torres are viewed as having knowingly made false statements about their encounter with Boyle, they can be deemed to have acted with malice. *See, e.g.*, *Williams v. Southern Illinois Riverboat/Casino Cruises, Inc.*, No. 06-cv-664-JPG, 2008 WL 1776461, at *12 (S.D. Ill. Apr. 16, 2008).

For these reasons, while I grant summary judgment on Count V as to Martin, Darling, Gillespie, Galarza, and Kwiatkowski, I deny the motion as to Moore and Torres.

**F. Battery**

Lastly, in Count VI, Boyle asserts a claim for battery against the UCPD Officers. Their argument for summary judgment is based on 720 ILCS 5/7-5, which provides that "[a] peace officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of

any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest."[5]

The UCPD Officers are correct in pointing out that section 7-5 allows the use of force by those who perform arrests. However, section 7-5 does not authorize the unbridled use of force. Rather, the statute limits the use of force to that which the officer "reasonably believes to be necessary" to effect the arrest. *See, e.g.*, *Brucato v. Dahl*, No. 02 C 9401, 2006 WL 644470, at *5 (N.D. Ill. Mar. 2, 2006) ("When a reasonable jury could find that the force used was unreasonable, however, a claim for battery will survive summary judgment."); *Bedenfield v. Shultz*, No. 01 C 7013, 2002 WL 1827631, at *10 (N.D. Ill. Aug. 7, 2002); *see also Cross v. City of Chicago*, 4 F.3d 996 (7th Cir. 1993) (summary judgment was warranted on plaintiff's battery claim because the means used by officer were reasonable under the circumstances).

Boyle claims that Moore and Torres threw him against a car and later began kicking and beating him simply because, when they asked him to produce his identification, he asked them why they wanted to it. A reasonable jury could conclude on the

---

[5] While section 5/7-5 belongs to Illinois' criminal code, courts have frequently noted that the statute "has been applied in cases where police officers are faced with civil liability for battery in effecting arrests." *Stewart v. Harrah's Illinois Corp.*, No. 98 C 5550, 2000 WL 988193, at *18 (N.D. Ill. July 18, 2000).

basis of this record that Officers Moore and Torres used an unreasonable and unjustified degree of force in arresting Boyle. Similarly, Boyle has adduced evidence suggesting that officers Galarza, Kwiatkowski, and Gillespie used an unreasonable degree of force against Boyle by immediately joining in the kicking and beating when they arrived on the scene. As a result, with respect to Boyle's battery claim, the UCPD Officers' motion for summary judgment is denied.

## IV.  Conclusion

For the reasons discussed above, the City/CPD Officers' motion for summary judgment is granted and the UCPD Officers' motion is granted in part and denied in part

**ENTER ORDER:**

_____
        **Elaine E. Bucklo**
   United States District Judge

Dated:  December 21, 2010